## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ROBERT F. KENNEDY
HUMAN RIGHTS,
1300 19th Street NW, Suite 750
Washington, DC 20036,

NATIONAL ASSOCIATION OF
CRIMINAL DEFENSE LAWYERS,
1660 L Street NW
Washington DC 20036,

IMMIGRANT DEFENDERS
LAW CENTER,
634 S. Spring Street
Los Angeles, CA 90014,

IMMIGRATION EQUALITY,
594 Dean Street
Brooklyn, NY 11238,

CALIFORNIA COLLABORATIVE
FOR IMMIGRANT JUSTICE,
1999 Harrison Street, Suite 1800
Oakland, CA 94612,

*Plaintiffs,*

v.                                        Case No.

DEPARTMENT OF STATE,
2201 C Street NW
Washington, DC 20520, and

MARCO RUBIO, in his official
capacity as Secretary of State,
2201 C Street NW
Washington, DC 20520,

*Defendants.*

## COMPLAINT

1

1.     Earlier this year, the U.S. Department of State took unprecedented action to facilitate the extrajudicial disappearance of people residing in the United States, in an effort to place them beyond the reach of U.S. law, without due process and without recourse.  That action shocks the conscience.  It also violates the law.

2.     In February 2025, the State Department entered into an agreement or series of agreements with El Salvador pursuant to which the United States government has disappeared individuals living in the United States into confinement in El Salvador ("the Agreement").

3.     Under the Agreement, El Salvador has committed to accept individuals rendered from the United States and to hold them, incommunicado and potentially indefinitely, in facilities that are internationally infamous for human rights abuses. In exchange, the United States has agreed to pay fees to El Salvador.

4.     Pursuant to the Agreement, the United States has already rendered hundreds of people to facilities in El Salvador.  The United States has taken the position that once it has done so, it no longer exercises any control over the treatment of the rendered individuals or when they are ultimately released—if indeed they ever are.

5.     Executive branch leaders have stated that the government plans to continue availing itself of the Agreement, sending more people, including potentially U.S. citizens, to indefinite detention in what is an effective black site.

6.      The Administrative Procedure Act requires agency actions—like the Agreement entered into by the State Department—to be both reasonable and

reasonably explained.  The Agreement is neither.  It is arbitrary.  It is capricious. It is contrary to law.  And it was entered into without any legal basis.

7.      This case presents an extraordinary set of facts, but an ordinary application of blackletter APA law.  Because the Agreement fails to meet even minimum standards for agency action, it must be set aside as unlawful.

## PARTIES

8.      **Plaintiff Robert F. Kennedy Human Rights** (RFK Human Rights) is a nonprofit organization created in 1968 to carry on Senator Robert F. Kennedy's unfinished work in pursuit of a more just and peaceful world. RFK Human Rights advocates for human rights, engages in public education, and pursues strategic litigation to hold governments accountable at home and around the world, including by pursuing immigrants' rights and anti-detention advocacy and litigation.

9.      **Plaintiff National Association of Criminal Defense Lawyers** (NACDL) is a nonprofit voluntary professional bar association that works on behalf of criminal defense attorneys to ensure justice and due process for those accused of crime or misconduct. It has a nationwide membership of many thousands of direct members, and up to 40,000 with affiliates. NACDL is committed to enhancing the capacity of the criminal defense bar to safeguard fundamental constitutional rights.

10.     **Plaintiff Immigrant Defenders Law Center** (ImmDef) is a nonprofit organization based in California.  ImmDef's mission and vision is that no immigrant should have to face deportation proceedings alone and that every person facing removal deserves to have zealous, competent counsel at their side.  ImmDef provides

deportation defense, legal representation, legal education, and social services to detained and non-detained children and adults, including unaccompanied children.

11.    **Plaintiff Immigration Equality** is a national nonprofit organization whose mission is to promote equality and justice for LGBTQ and HIV-positive immigrants and families through direct legal services, policy advocacy, and impact litigation. In order to effectuate its mission, Immigration Equality runs a pro bono asylum program, provides technical assistance to attorneys, maintains an informational website as well as a phone hotline for those in detention, and fields questions from LGBTQ and HIV-positive individuals across the country and beyond.

12.    **Plaintiff California Collaborative for Immigrant Justice** (CCIJ) is a California-based nonprofit organization that utilizes coordination, advocacy, and legal services to fight for immigrants in carceral settings. CCIJ seeks to empower immigrants in and at risk of detention through technical assistance, education, and participatory defense strategies, while also advancing advocacy, policy and litigation initiatives consistent with the goals of freedom for immigrants in detention.

13.    **Defendant Department of State** is a federal agency headquartered in Washington, D.C.

14.    **Defendant Marco Rubio** is Secretary of State. He is sued in his official capacity.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under federal law, principally the Administrative Procedure Act, 5 U.S.C. § 551, *et seq.*

16.    Venue is proper in this District under 28 U.S.C. § 1391(e) because at least one of the Defendants is headquartered in Washington, D.C., and a substantial part of the events giving rise to Plaintiffs' claims occurred here.

## FACTUAL BACKGROUND

*Prison Conditions in El Salvador*

17.    Salvadoran prisons are notorious for inhumane conditions that severely threaten the health, safety, and even lives of those held there.

18.    As Defendant the Department of State itself has documented, El Salvador suffers from "[s]ignificant human rights issues," including "torture or cruel, inhuman, or degrading treatment or punishment by security forces; harsh and life-threatening prison conditions; arbitrary arrest or detention; serious problems with the independence of the judiciary;" and "trafficking in persons, including forced labor." Bureau of Democracy, Human Rights, and Labor, U.S. Dep't of State, *El Salvador 2023 Human Rights Report* 1, https://perma.cc/MG4W-P4EE.

19.    The "arbitrary or unlawful killings[] largely stem[] from deaths of detainees while in prison, either from medical neglect or physical abuse." *Id.* at 2. The State Department has acknowledged that there are "credible reports" of torture and other cruel, inhumane, or degrading treatment or punishment. *Id.* at 4. These

include examples of "systemic abuse in the prison system, including beatings by guards and the use of electric shocks," such as "activat[ing] electric stun guns against the prison's wet floors to deliver electric shocks to all the prisoners in a cell." *Id.* at 5.

20.    By the State Department's own account, prison conditions are "harsh and life threatening due to gross overcrowding; inadequate sanitary conditions; insufficient food and water shortages; a lack of medical services in prison facilities; and physical attacks"—problems that have all been "exacerbated" in recent years. *Id.* at 7.  There have been reports of "a lack of food and potable water and being limited to two tortillas, one spoonful of beans, and one glass of water per day," as well as "limited water for sanitation," "severe heat and lack of ventilation in the cells," and "prolonged confinement, without the opportunity for movement or the use of sanitary facilities." *Id.* at 7–8.

21.    Reports cited by the State Department also decry the "lack of access to medical care or medicine in prison." *Id.* at 8.  For example, one incarcerated person, who was diabetic, received insulin only two or three times while incarcerated—and died. *Id.*  Reports have also found that "communicable diseases such as tuberculosis and scabies were widespread in the prisons." *Id.*

22.    The State Department has noted "regular reports that security and law enforcement officials arrested persons and did not inform their families of their whereabouts." *Id.* at 3.  One organization has reported over one thousand cases in which detained people's families "did not receive confirmation that their relatives

were in the prison system, information regarding their whereabouts, or confirmation that they were alive." *Id.*

23.    Federal courts in the United States have noted "extensive evidence about the [Salvadoran] government's willingness to use torture on suspected gang members" and others, including via extrajudicial killings. *See Rodriguez-Arias v. Whitaker*, 915 F.3d 968, 974–75 (4th Cir. 2019); *see also Rogel Lopez v. Garland*, 861 F. App'x 130, 134 (9th Cir. 2021) (remanding for Board of Immigration Appeals to grant relief under the Convention Against Torture where petitioner had previously been "kidnapped and tortured by two [Salvadoran] police officers who drove a patrol car and wore police badges"); *Ramos v. Lynch*, 636 F. App'x 710, 711 (9th Cir. 2016) (remanding for BIA to consider claim for relief under Convention Against Torture where petitioner had been "attacked by [Salvadoran] police").

24.    That evidence has included documentation of severe abuses in Salvadoran prisons, such as one petitioner's prison file showing "that prison guards severely injured his jaw, probably breaking it, and then left him without treatment for some period of time, such that his jaw did not heal and he lost a 'major' amount of weight due to not being able to eat." *Najarro-Portal v. Lynch*, 630 F. App'x 719, 722–23 (9th Cir. 2015) (remanding for BIA to grant relief under the Convention Against Torture).  Uncontradicted testimony in that case also showed that prisoners who complain about prison conditions "are mistreated, forcefully transferred to different prisons, put in solitary confinement, and accused of being gang leaders to justify their treatment." *Id.* at 722.

25.    Human rights organizations have made similar observations of El Salvador's prison system.  They have documented, for example:

- A practice of police beating people newly arrived in the prisons with batons for an hour;

- A prisoner being sent to a "dark basement cell with 320 detainees, where prison guards and other detainees beat him every day";

- Cells so overcrowded that people held in them "had to sleep on the floor or standing, a description often repeated by people who have been imprisoned in El Salvador";

- Guards forcing people held in the prison to kneel on the ground—naked—for hours;

- Guards forcing people held in prisons to sit in ice baths dozens of times in rapid succession, sometimes holding them underwater;

- The use of "punishment cells" that are kept "constantly dark," without regular access to drinking water, and—again—so overcrowded that "detainees had to sleep standing"; and

- At least one instance of someone who died in custody being buried in a mass grave, without his family's knowledge.

*See* Human Rights Watch, *Human Rights Watch Declaration on Prison Conditions in El Salvador for the J.G.G. v. Trump Case* (Mar. 20, 2025), https://perma.cc/VEC8-R4VF (Dkt. 44-3).

26.    The Inter-American Commission on Human Rights has likewise reported overcrowding in prisons reaching as high as 600% of capacity.    Inter-American Commission on Human Rights, *Report: State of Emergency and Human Rights in El Salvador* ¶ 237 (2024), https://www.oas.org/en/iachr/reports/pdfs/2024/Report_StateEmergencyHumanRights_ElSalvador%20(1).pdf. The Commission reported dire conditions as a result: for example, one prisoner was in a cell with 140 people and only 18 cots; another with 210 people and 50 cots (in a space designed for 150); another in a cell with 130 people and 60 cots.  *Id.* ¶ 252. Another was in a cell with 200 people, where it was "not possible to walk," and so "dead bodies started coming out of the center" of the cell: "[t]hey were drowning because they were suffocating."  *Id.*

27.    As to hygiene, the Commission reported testimony that toilets in Salvadoran prisons were "overflowing" with waste, and that access to water was highly variable—sometimes available only from a dirty bucket, sometimes available only from 4:00 to 5:00 a.m., sometimes not available at all.  *Id.*  ¶ 255.  The Commission reported nutrition standards so poor that one of their witnesses weighed only 90 pounds (down from 170) when he left the prison.  *Id.* ¶ 257.

28.    Testimony procured by the Commission reflected further brutality: one witness described being beaten with a stick while handcuffed for hours; another the use of pepper spray and withholding of food as collective punishment; another beatings until the victims lost consciousness; another being forced to walk on their

knees on sun-heated gravel, and being given electric shocks, by laughing guards who were "happy" when the prisoners fell down. *Id.* ¶ 300.

29. The Commission has also "found that 100% of the population deprived of liberty [in El Salvador] remained in isolation from the outside world." *Id.* ¶ 238.

30. Journalists have reported similar conditions, including, for example, a man who lost thirty pounds in one month while incarcerated in El Salvador; "starving inmates"; "prisoners suffer[ing] from 'a kind of diarrhea I didn't know was possible'"; going four days or more between meals; being "crammed three to a bunk"; and, on arrival, prisoners "stripped to their underwear and forced to walk between rows of guards who hit them with clubs." Annie Correal, *Lost in the 'Death Realm' of El Salvador's Prisons*, N.Y. Times (May 1, 2025), https://perma.cc/9D3S-K95L [hereinafter, "Correal, *Lost*"].

31. Within El Salvador's prison system, the largest facility is located in Tecoluca: the Centro de Confinamiento del Terrorismo, known as CECOT, which opened in 2023.

32. CECOT was originally said to have the capacity to hold 20,000 people, although the Salvadoran government now reports its capacity as 40,000. *See* Human Rights Watch, *supra* ¶ 25. But "[c]ells lack enough bunks for everyone." *What to Know About CECOT, El Salvador's Mega-prison for Gang Members*, Associated Press (Mar. 17, 2025), https://perma.cc/LDQ3-C3CR.

33. It is a place "where visitation, recreation, and education are not allowed." *Id.* The people held there "are never allowed outdoors." *Id.*

34.    Instead, they spend twenty-three and a half hours each day in communal cells that hold up to one hundred men each and have no furniture other than metal bunks, without mattresses, pillows, or sheets.  *See* David Culver et al., *In Notorious Salvadoran Prison, US Deportees Live in Identical Cells to Convicted Gangsters*, CNN (Apr. 8, 2025), https://perma.cc/9L95-3VPM; Annie Correal, *Inside the 'Tropical Gulag' in El Salvador Where U.S. Detainees Are Being Held*, N.Y. Times (Apr. 18, 2025), https://perma.cc/W84P-LU4P [hereinafter, "Correal, *Inside*"].

35.    Their heads are shaved.  Culver, *supra* ¶ 34.  "They are allowed no personal possessions."  *Id.*  There is no privacy, but only an open toilet.  *Id.*  The lights are always on.  *Id.*  They are forbidden even from using utensils to eat their "paltry meals."  Correal, *Inside*, *supra* ¶ 34.

36.    Civil society organizations in El Salvador have calculated, based on satellite images of CECOT, that each person held there would have an average of 0.60 meters of space, well below international guidelines of four square meters per person.  Inter-American Commission on Human Rights, *supra* ¶ 26, at ¶ 250.

37.    Human rights organizations have observed that CECOT routinely mistreats the people who are held there: "[t]his includes cases of torture, ill-treatment, incommunicado detention, severe violations of due process and inhumane conditions, such as lack of access to adequate healthcare and food."  Human Rights Watch, *supra* ¶ 25.

38.    People in CECOT are held incommunicado:  they are not allowed visits by their attorneys, clergy, or family members.  *See* Ariana Figueroa, *Experts: $6*

*Million Payment to Salvadoran Prison Likely Violates US Human Rights Law*,
Baltimore Sun (Apr. 18, 2025), https://perma.cc/76WJ-ZSMQ; Edgar Beltrán, *CECOT
and the Church in El Salvador*, The Pillar (Feb. 12, 2025), https://perma.cc/AZH2-
5DHB.  They do not have access to books.  Correal, *Inside*, *supra* ¶ 34.  And they are
not allowed to communicate with the outside world.  *Id.*

39.     According to human rights organizations, since March 2022, "over 350
people have died in El Salvador's prisons."  Human Rights Watch, *supra* ¶ 25.
Although that reflects the number of prison deaths that have been documented,
human rights organizations believe "the true number is likely much higher."  Correal,
*Lost*, *supra* ¶ 30.

40.     On information and belief, no one who has been imprisoned at CECOT
has ever been freed, *see* Figueroa, *supra* ¶ 38; Human Rights Watch, *supra* ¶ 25:
El Salvador officials have reportedly stated that "the only way out is in a coffin,"
Cecilia Vega, *U.S. Sent 238 Migrants to Salvadoran Mega-Prison; Documents
Indicate Most Have No Apparent Criminal Records*, CBS News (Apr. 6, 2025 7:00
PM), https://perma.cc/48ZE-B663.  On information and belief, no one who has been
imprisoned at CECOT has ever even left the facility, other than Kilmar Abrego
Garcia.  Mr. Abrego Garcia, whom the U.S. government  rendered to El Salvador by
mistake, was permitted a brief meeting with U.S. Senator Chris Van Hollen, and was
transferred to a different Salvadoran facility, after a U.S. District Court ordered the
United States to facilitate his return.  *See* Tara Lynch, *Kilmar Abrego Garcia*

*Transferred to El Salvador Facility with Own Bed and Furniture, Update Reveals*, CBS News (Apr. 21, 2025 6:57 AM), https://perma.cc/5XK2-7GD9.

*The State Department's Agreement with El Salvador*

41.    On February 3, 2025, following discussions with Salvadoran President Nayib Bukele, Secretary of State Rubio announced that President Bukele "has agreed to the most unprecedented and extraordinary migratory agreement anywhere in the world."  Press Release, Marco Rubio, *Secretary of State Marco Rubio and Salvadoran Foreign Minister Alexandra Hill Tinoco at the Signing of a Memorandum of Understanding Concerning Strategic Civil Nuclear Cooperation*, U.S. Dep't of State (Feb. 3, 2025), https://perma.cc/EAL4-XLM5; *see also* Press Release, Tammy Bruce, *Secretary Rubio's Meeting with Salvadoran President Nayib Bukele*, U.S. Dep't of State (Feb. 3, 2025), https://perma.cc/GU5N-T8EN (confirming that "[m]ultiple agreements were struck to fight the waves of illegal mass migration currently destabilizing the entire region").

42.    Defendants, other components of the U.S. government, and the government of El Salvador have publicly disclosed the existence of and described the Agreement, including specific details contained therein.

43.    Despite Secretary Rubio's description of the Agreement as a "migratory agreement," the details that both governments have disclosed reveal that the Agreement addresses a domestic issue: the treatment and detention of individuals who are located within the United States and who, absent their lawful removal or repatriation, would otherwise remain within the United States. *See, e.g.*, Marco

Rubio, @SecRubio, X (Mar. 16, 2025, 7:59 AM), https://perma.cc/7VNN-W7SJ (asserting that, by outsourcing detention to El Salvador, the Agreement will "save our taxpayer dollars").

44.    Secretary Rubio explained: President Bukele "has agreed to accept for deportation any illegal alien in the United States who is a criminal from any nationality, be they MS-13 or Tren de Aragua, and house them in his jails." Rubio, *supra* ¶ 41.

45.    The Secretary continued: "And he's also offered to do the same for dangerous criminals currently in custody and serving their sentences in the United States, even if they're U.S. citizens or legal residents. We are just profoundly grateful." *Id.*

46.    President Bukele trumpeted the agreement on social media that evening, explaining that the United States's end of the bargain would involve paying a fee that "would be relatively low for the U.S. but significant for us," allowing the United States "to outsource part of its prison system":



Nayib Bukele (@nayibbukele), X (Feb. 3, 2025 9:44 PM), https://perma.cc/8LJB-8EJE.

47.     According to reporting, under the terms of the Agreement, the United States "will pay El Salvador $6 million to imprison for one year about 300 alleged members of the Venezuelan Tren de Aragua gang."  Matthew Lee & Regina Garcia Cano, *US Prepares to Deport About 300 Alleged Gang Members to El Salvador*, Associated Press (Mar. 15, 2025), https://perma.cc/9HLB-6WVA.  Further reporting revealed that the United States would pay around $20,000 per person rendered to

El Salvador as a "one-time maintenance fee." Jennifer Hansler & Priscilla Alvarez, *Trump Admin Proposed Sending up to 500 Alleged Venezuelan Gang Members During Negotiations to Use El Salvador's Mega-prison*, CNN (Apr. 28, 2025), https://perma.cc/NMJ4-WACD.

48.    In addition, the United States agreed to return to El Salvador certain MS-13 leaders who were facing criminal prosecution in the United States. Press Release, Marco Rubio, *On the President's Action to Protect Americans from Dangerous Foreign Gang Members*, U.S. Dep't of State (Mar. 16, 2025), https://perma.cc/R8KF-T5T3; Evan Perez & Priscilla Alvarez, *'Historical Loss': Alleged Gang Leader Evades US Justice with Deportation to El Salvador*, CNN (Mar. 24, 2025), https://perma.cc/6RYG-ZH6F. According to an e-mail that was reported, "Upon all nine [MS-13 leaders] being returned, (El Salvador) will provide (US government) a 50% discount for Year 2, if necessary, of the original TdAs." Hansler & Alvarez, *supra* ¶ 47.

49.    For its part, "El Salvador confirms it will house these individuals [the alleged members of Tren de Aragua] for one (1) year, pending the United States' decision on their long term disposition." Lee & Cano, *supra* ¶ 47.

50.    A "State Department document also suggests that it may set aside $15 million to send El Salvador to house additional members of the gang." *Id.*

51.    The administration has publicly announced its interest in rendering U.S. citizens to El Salvador under the Agreement as well. For example, when asked about President Bukele's offer to take U.S. citizens from the federal prison

population, President Trump responded: "I love that. . . . I'd be honored to give them. I don't know what the law says on that, but I can't imagine the law would say anything different."    @Acyn, X (Apr. 6, 2025 7:56 PM), https://x.com/acyn/status/1909032577291505794.    President Trump has also suggested sending some sentenced to jail domestically for vandalism to Salvadoran prisons:



I look forward to watching the sick terrorist thugs get 20 year jail sentences for what they are doing to Elon Musk and Tesla. Perhaps they could serve them in the prisons of El Salvador, which have become so recently famous for such lovely conditions!

**7.57k** ReTruths  **34.3k** Likes                    Mar 21, 2025, 7:43 AM

Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 21, 2025 7:43 AM), https://perma.cc/F4WN-DB4Y.

52.    On information and belief, U.S. residents who are disappeared into CECOT experience the same treatment as Salvadoran prisoners there.  Culver, *supra* ¶ 34.  According to CECOT's own prison director, they receive no special privileges. *Id.*  And according to reporting, when El Salvador asked the State Department what "requirements" it requested for the people it was rendering, Secretary Rubio's chief of staff responded that the "baseline requirements do not differ from El Salvador's for the treatment of prisoners."  Hansler & Alvarez, *supra* ¶ 47.

*The Federal Government Renders People to El Salvador Under the Agreement*

53.    On March 15, the federal government flew more than 200 people—including but not limited to Venezuelans purportedly subject to a presidential proclamation invoking the Alien Enemies Act—to El Salvador to be held in CECOT.[1] *See, e.g.*, Marco Rubio, @SecRubio, X (Mar. 16, 2025, 7:59 AM), https://perma.cc/7VNN-W7SJ (revealing that the government had sent 23 alleged members of MS-13 plus "over 250 alien enemy members of Tren de Aragua which El Salvador has agreed to hold in their very good jails at a fair price that will also save our taxpayer dollars"); Marco Rubio (@SecRubio), X (Mar. 16, 2025 8:39 AM), https://x.com/SecRubio/status/1901252043517432213 (sharing post and video revealing details of the flights). Prior to their forced rendition, some or all of these people were either living in immigration detention or at liberty within the United States.  Videos showed that upon their arrival at CECOT, they were shackled and "forced to lower their heads and bodies" as they were marched through the facility by masked men, who shaved their heads.  *See* Vega, *supra* ¶ 40.

54.    Although the administration has stated that these people were all terrorists or gang members, it has set forth no credible evidence supporting that assertion.  Many of the people rendered to El Salvador had not been convicted of any crime, and reporting has demonstrated that many of these designations—based largely on the asserted meaning of certain common tattoos—are likely flawed.

---

[1] On information and belief, the Agreement does not specifically require that El Salvador hold people rendered pursuant to the Agreement in CECOT, as opposed to other Salvadoran prisons.  *See* Lynch, *supra* ¶ 40.

*See* Julie Turkewitz et al., *'Alien Enemies' or Innocent Men? Inside Trump's Rushed Effort to Deport 238 Migrants*, N.Y. Times (Apr. 16, 2025), https://perma.cc/YCJ7-ZC9Q; David J. Bier, *50+ Venezuelans Imprisoned in El Salvador Came to US Legally, Never Violated Immigration Law*, Cato Inst. (May 19, 2025), https://perma.cc/8RMX-6M4B.

55.    Nevertheless, Department of Homeland Security Secretary Kristi Noem has stated that the people the United States has rendered to El Salvador under the Agreement "should stay there for the rest of their lives."  Brittany Gibson, *Migrant Detainees Should Be in El Salvador Prison "for the Rest of Their Lives," Noem Says*, Axios (Apr. 9, 2025), https://perma.cc/GZN9-QHUD.  Secretary Noem has stated: "We have no plans to bring them back, this is a long-term solution."  Vera Bergengruen & Michelle Hackman, *El Salvador's Bukele Plans to Double the Size of Giant Prison Holding U.S. Deportees*, Wall St. J. (Apr. 16, 2025), https://perma.cc/Y44Y-UK3A.

56.    Despite that position, the government has made—and indeed admitted to—mistakes in whom it renders under the Agreement, such that people in the United States well outside the government's stated targets are at risk.[2]  Though implausible, the administration has taken the position in court that it has no recourse to recall those people to the United States.  *See Abrego Garcia v. Noem*, No. 25-cv-951, Dkt. 77 ¶ 7 (D. Md. Apr. 15, 2025).  Even after the administration admitted that it made a

---

[2] The United States has recently removed U.S. citizens and has recently detained U.S. citizens based on an incorrect belief that their proof of citizenship was invalid. *See, e.g.*, José Olivares, *US Citizen Detained by Immigration Officials Who Dismissed His Real ID as Fake*, The Guardian (May 24, 2025 12:22 PM), https://perma.cc/8BGE-3F6J.

mistake as to Kilmar Abrego Garcia, who was rendered to El Salvador, and after the Supreme Court unanimously upheld an order requiring the government to facilitate his return, *Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025), the Attorney General has stated that it is "up to El Salvador if they want to return [Mr. Abrego Garcia;] that's not up to us," *Abrego Garcia v. Noem*, No. 25-cv-951, Dkt. 77-1, at 10 (time stamp 16:45) (D. Md. Apr. 15, 2025).

57.     President Bukele, for his part, has stated of Mr. Abrego Garcia that he does not "have the power to return him to the United States."  Seung Min Kim (@seungminkim), X (Apr. 14, 2025 12:02 PM), https://perma.cc/6NUS-L5GT.

58.     Senator Chris Van Hollen reported that when he asked the Vice President of El Salvador why that government continued to hold Mr. Abrego Garcia even though he has not been charged with any crime, "[h]is answer was that the Trump administration is paying the government of El Salvador to keep him at CECOT."  Anna Bower (@annabower.bsky.social), BlueSky (Apr. 16, 2025 2:20 PM), https://perma.cc/Z5TB-87RK.

59.     On March 22, the State Department "formal[ly] notice[d]" a $4.76 million grant to El Salvador, stating that its purpose was "to be used by Salvadoran law enforcement and corrections agencies for its law enforcement needs, which include costs of detaining the 238 TdA members recently deported to El Salvador." Hansler & Alvarez, *supra* ¶ 47.  This amount is consistent with the $20,000 per person rate under the Agreement, and, on information and belief, constitutes payment under the terms of the Agreement.

60.     The administration shows every sign of continuing to avail itself of the
Agreement.   On March 31, Secretary Rubio announced a "military transfer[]" of
seventeen people to El Salvador.   Marco Rubio, *More Foreign Gang Terrorists
Deported Out of America*, U.S. Dep't of State (Mar. 31, 2025), https://perma.cc/UD3W-
MT8T.  On April 13, Secretary Rubio announced that the United States had rendered
another ten people to El Salvador.  Marco Rubio (@SecRubio), X (Apr. 13, 2025 10:45
AM), https://perma.cc/K3KT-XAXV.  And on April 18, at least twenty-eight migrants
were loaded onto buses heading to an airport, some told they were being sent to
El Salvador—until emergency legal filings that resulted in a decision from the
Supreme Court induced authorities to turn the buses around.  Vaughn Hillyard et
al., *As Legal Fight Raged, ICE Buses Filled With Venezuelans Heading Toward
Airport Turned Around, Video Shows*, NBC News (Apr. 20, 2025),
https://perma.cc/YJ8L-AD8X; *see also A.A.R.P. v. Trump*, 145 S. Ct. 1034 (2025).

61.     Secretary Noem, as well as several current and former members of the
U.S. House of Representatives, have been allowed to tour CECOT.  *See, e.g.*, Dep't of
Homeland Security (@DHSgov), X (Mar. 28, 2025 11:28 AM), https://perma.cc/4R9Y-
D6BU; Rep. Riley M. Moore (@RepRileyMoore), X (Apr. 15, 2025 7:38 PM),
https://perma.cc/6H2H-MRVC?type=image.

62.     Secretary Noem noted that President Bukele "has plans to double the
size" of CECOT; President Bukele apparently believes it is "[u]p to the U.S. to send
enough [people] to fill it."  Bergengruen & Hackman, *supra* ¶ 55.  These plans are not

based on false hopes: President Trump has told President Bukele, "[Y]ou gotta build about five more places." *Id.*

*The Agreement Has Injured Plaintiffs*

63.    Plaintiffs include four nonprofits that represent immigrants in immigration proceedings and otherwise work to support immigrants, improve conditions of confinement, and provide additional direct services to immigrant communities. As alleged more fully below, the Agreement has injured these organizations by directly impairing their ability to carry out their core missions— including by making it more difficult for them to provide legal and other direct services to people who because of the Agreement may be or in some cases already have been rendered to El Salvador.

64.    Plaintiffs also include a nonprofit association of criminal defense attorneys, many of whom represent immigrants in criminal proceedings. As alleged more fully below, the Agreement has injured this organization's members by—among other things—frustrating and complicating their ability to provide legal counsel and vigorous representation to clients who may be or have already been rendered to El Salvador.

65.    Plaintiffs will be further harmed by additional renditions pursuant to the Agreement.

*Robert F. Kennedy Human Rights*

66.    Plaintiff RFK Human Rights works to advance human rights within the United States and abroad. That work includes visiting immigration detention

22

facilities to give presentations that inform detained people about their legal rights and protections against abusive government treatment; exposing and combatting human and civil rights abuses that occur in immigration detention, including through litigation and human rights reporting; and publishing informational materials to teach attorneys, advocates, and detained people how to effectively vindicate the human rights of people in detention.

67.    Carrying out each of these vital parts of its mission requires that RFK Human Rights be able to communicate with its clients and others held in immigration detention and assess the conditions of their confinement.    RFK Human Rights frequently represents people held in detention who are seeking to challenge unjust and inhumane conditions, including sexual abuse, prolonged solitary confinement, brutality from guards, and denial of essential medical care.    RFK Human Rights typically communicates with its clients through phone and video calls and in-person visits and does so on a regular basis, generally weekly by phone and monthly by in-person visit.

68.    RFK Human Rights currently has ten clients held in CECOT—all Venezuelan migrants rendered there by the United States, pursuant to the Agreement.    But RFK Human Rights attorneys have not been permitted to communicate directly with those clients—on information and belief, because the Agreement does not permit (or require El Salvador to facilitate) such communication. In late April, attorneys from RFK Human Rights traveled to El Salvador to meet with

these clients in person, but were denied entry to CECOT and denied access to their clients.

69.    RFK Human Rights's work on behalf of its clients in CECOT and their families has been impeded by its inability to communicate with those held within the facility.

70.    The Agreement harms RFK Human Rights's ability to carry out its core mission to monitor and combat human rights abuses through education of detained people, reporting on conditions of confinement, strategic litigation over conditions of confinement, and otherwise addressing the mistreatment, abuse, and torture of those held in immigration detention and other facilities.  By authorizing the rendition and disappearance of individuals within the United States, whom RFK Human Rights otherwise would have had some ability to reach and track through normal channels (such as phone calls and in-person visits), to a black site in El Salvador where they are held incommunicado, the Agreement directly impairs RFK Human Rights's ability to communicate with and defend those who are disappeared under the Agreement.  It also thwarts its ability to more broadly monitor and call attention to the conditions in which those individuals are held.

71.    Staff capacity and organizational financial resources are both strained by time-consuming and expensive travel to El Salvador from RFK Human Rights's offices in New York and Washington, D.C., that would not need to occur but for the Agreement facilitating the forcible disappearance of RFK Human Rights clients. These strains mean that RFK Human Rights is unable to devote staff time and

financial resources to other work it would have completed, including U.S. federal litigation seeking redress for violations of human rights by police and prison officials and informational campaigns and advocacy to promote human rights causes related to suppression of civic space around the world.

72.    The Agreement further harms RFK Human Rights because the Agreement's terms—under which individuals held in immigration detention in the United States need fear their sudden disappearance to El Salvador—materially impede RFK Human Rights's ability to provide current and relevant training materials to detained people on how to vindicate their human rights while in detention.  For example, if people held at CECOT were instead detained in U.S. immigration detention centers, RFK Human Rights attorneys could and in many cases would have visited them in person to provide legal rights presentations explaining how to file a pro se habeas corpus petition with the federal courts, a complaint about conditions of confinement with a Department of Homeland Security oversight body, or a request for release from detention through administrative advocacy with Immigration and Customs Enforcement or the Executive Office for Immigration Review.

73.    The Agreement further harms RFK Human Rights by requiring it to devote attorney time and organizational resources to representing clients who have been rendered to (or are at risk of being rendered to) facilities in El Salvador, diminishing the overall number of clients that RFK Human Rights is able to assist and projects that RFK Human Rights is able to undertake.

*National Association of Criminal Defense Lawyers*

74.    Plaintiff NACDL's mission is to identify and reform flaws and inequities in the criminal legal system and redress systemic racism, and ensure that its members and others in the criminal defense bar are fully equipped to serve all accused persons at the highest level.   The Agreement has directly undermined NACDL members' ability to serve their clients to the best of their ability and consistent with the guarantees of the Fifth and Sixth Amendments.

75.    NACDL members, who are criminal defense lawyers, frequently represent in criminal cases people who are simultaneously litigating immigration proceedings.   Sometimes, these clients are detained or removed from the United States by U.S. immigration services while their criminal cases remain pending, or are on appeal.   Nevertheless, the lawyers representing them in their criminal cases have an ethical obligation to continue to zealously advocate for their interests. Accordingly, NACDL members whose clients have been detained or removed must still communicate regularly with their clients to assist with factual development, keep the clients informed of case milestones, and permit the clients to make strategic litigation decisions.  The Agreement interferes with this attorney-client relationship, as it provides for the rendition to facilities in El Salvador where clients are held incommunicado.   An inability to adequately communicate with one's client—and perhaps even being forced to defend them at trial in absentia—materially harms these lawyers' ability to carry out their constitutionally required role of providing representation in criminal proceedings.

76.    At least one NACDL member has both current and former clients who were rendered under the Agreement and who remain incommunicado in CECOT.  For example, the member began representing one person in state criminal proceedings in January 2025.  That same month, the client was able to post bond and was transferred into ICE custody.  In March, the client was flown to CECOT as part of the administration's first wave of renditions.  Although the NACDL member has no way to communicate with their client in CECOT, and was only able to learn of his whereabouts from press reporting and the client's family members, they have continued to represent him in his criminal proceedings, which remain ongoing.  The inability to access the client has materially interfered with the member's ability to carry out their work and has required the member to devote significant additional time and resources to the matter, such as by conducting additional legal research and engaging in motions practice that would not be required had the client remained relatively more accessible in ICE detention.

77.    NACDL members representing immigrants who are at risk of rendition under the Agreement have also been forced to take, as required by their ethical responsibilities to their clients, additional steps to prepare for that eventuality.  This practice, which is often non-compensable, deprives these members of the limited (and often, too scarce) time they have to prepare their defense in the first place.  Similarly, members must advise clients who are not U.S. citizens about the potential immigration consequences of their litigation strategy, even if those clients are not presently in immigration proceedings.  The Agreement has materially changed the

stakes that may, for example, attach to a guilty plea (because, depending on the circumstances, the collateral consequences could include rendition), requiring NACDL members to spend valuable time recalibrating their advice. Because NACDL members (especially public defenders) are often working under crushing caseloads, the extra time required for each client can quickly multiply into a significant burden, and even a few extra minutes required to properly advise a client can meaningfully impinge on the lawyer's ability to provide appropriate counsel. The Agreement, however, can require that a lawyer spend far more than a few extra minutes to provide competent counsel.

78.    For example, one NACDL member represents multiple clients who are at significant risk of rendition under the Agreement. Concerns regarding the possibility of rendition led the NACDL member to consult multiple different experts and review human rights reports in order to advise their clients not only of the strength of fear-based immigration claims, but also the actual risk to clients' safety and life should any decision point in their litigation lead to clients' rendition. This additional work has caused delay in the resolution of such cases. The member has also expended resources securing independent immigration counsel for clients at risk of rendition, requiring time-intensive coordination.

79.    In addition to these individual representations, the NACDL member has been forced to expend significant time creating materials to assist the rest of their law office in identifying and advising clients at risk of rendition under the Agreement. The member has created intake guidance for the other attorneys in their office to help

them identify clients who are at greater risk of rendition and internal resources to educate their fellow attorneys on the issue—who then refer to the member for additional guidance and support.  In the past two months, the member estimates that they spent around 20% of their time on these additional demands as a result of the Agreement.  These additional pressures take away time and resources from other clients, and hinder the member from providing the certainty of advice that the member is used to.

*Immigrant Defenders Law Center*

80.    Plaintiff ImmDef's mission is to ensure that no immigrant goes unrepresented in immigration court.  To accomplish that work, ImmDef provides full-scale deportation defense, legal representation, legal education, and connections to social services to thousands of detained and non-detained adults and children each year.  These projects include legal consultations and full-scope deportation defense for unaccompanied children; representation of immigrants seeking post-conviction relief from criminal convictions that are impacting their immigration status; serving as court-appointed counsel for people unable to represent themselves in immigration court because of serious mental disorders; providing training and resources to partner organizations to increase capacity to represent clients; and providing non-legal holistic support through a client wellness initiative that connects clients to mental health services and other support while their cases are pending.  The Agreement materially harms ImmDef's ability to carry out these critical projects.

81.    ImmDef represents eight clients that have been rendered from the United States and are currently held in CECOT pursuant to the Agreement— including one that ImmDef represented before his rendition.  ImmDef has ongoing responsibilities to these clients.  But, like RFK Human Rights, ImmDef attorneys have not been permitted to communicate directly with those clients since their rendition—on information and belief, because the Agreement does not permit (or require El Salvador to facilitate) such communication.

82.    ImmDef's representation of its clients now in CECOT (including ImmDef's ability to develop its clients' legal claims for their immigration proceedings) has been directly impeded by its inability to communicate with those held within the facility and their clients' lack of access to the legal process they are due more generally.  For example, one of ImmDef's clients had a court date for his asylum hearing in the United States on March 17, 2025—but was not brought to the hearing, because he had been rendered to CECOT two days earlier.  Last month, the immigration judge granted the government's motion to dismiss that client's case based on his absence from the United States, over ImmDef's objections in court and in writing.  ImmDef continues to represent this client and others held at CECOT, including for purposes of determining whether to appeal and throughout the appeal, if taken, but this representation is frustrated by ImmDef's inability to communicate with its clients.

83.    ImmDef has been compelled to devote additional staff time to representing their clients in CECOT as compared to what would have been required

had those clients remained in the United States. Representing these clients now requires several additional hours per week, for multiple attorneys across case teams, compared to ImmDef's typical practice. That change is directly traceable to the Agreement and has necessarily reduced the number of clients ImmDef can help overall, given that ImmDef has finite staff and resource capacity.

84. The unpredictability created by the Agreement has also materially impeded ImmDef's ability to represent and counsel its clients who are at risk of rendition by making it more difficult for ImmDef to provide concrete advice. For example, ImmDef attorneys are spending additional time advising them about the range of potential outcomes in their situation, including being rendered to El Salvador, and are screening for and documenting any tattoos.

85. Because, on information and belief, the Agreement purports to authorize the rendition of children over the age of fourteen, this uncertainty—and the additional resources it requires ImmDef to expend—apply likewise to ImmDef's clients who are children, particularly those from Venezuela who reasonably fear rendition, and whose cases are often more complex and resource-intensive.

86. Moreover, ImmDef's relationship with its clients—and the provision of services to these clients—is not limited to legal representation, nor does it end simply because the client is released from detention. ImmDef's mission-critical work also includes a client wellness initiative, through which ImmDef staff work with clients to create individualized post-release plans, including referrals for medical care and setting up travel arrangements for detained clients upon their release. This initiative

is an integral part of ImmDef's mission because in many cases it helps to ensure that ImmDef's clients are able to meet their obligations to prepare their cases with ImmDef and attend their court hearings. ImmDef also stays in contact with some clients who have been deported, for example, when there may be a basis to reopen their case later or if they are removed pending appeal. Rendition to El Salvador pursuant to the Agreement thwarts ImmDef's ability to deliver these services.

87. ImmDef also provides technical assistance on removal defense to legal service providers throughout California, including one-on-one meetings, office hours, and quarterly meetings to help build capacity to provide representation in furtherance of ImmDef's mission to ensure universal representation for immigrants. ImmDef also provides community education materials, which it has had to spend staff hours to update to include both video and written information regarding the heightened risk factors for being rendered to El Salvador. ImmDef is compelled to continually use additional staff time to modify these materials to meet this ongoing need for information and to maintain its reputation as a trusted source on these topics.

*Immigration Equality*

88. Plaintiff Immigration Equality is a national organization whose mission is to promote equality and justice for LGBTQ and HIV-positive immigrants and families through direct legal services, policy advocacy, and impact litigation. For 30 years, it has worked to secure safe haven, freedom, and equality for the LGBTQ and

HIV-positive communities through direct legal services, policy advocacy, impact litigation, and other programs.

89.    In order to serve as many individuals as possible, Immigration Equality has developed self-help materials and limited representation programming through which it provides assistance to otherwise unrepresented applicants.  For example, Immigration Equality assists asylum applicants in filing asylum applications, provides LGBTQ asylum seekers with general "Know Your Rights" materials, and guides pro se asylum seekers on how to file certain documents, such as work authorization applications.  Immigration Equality works not only through its own staff, but also through its pro bono program, a network of volunteer attorneys from law firms across the country.  Even where a pro bono volunteer is taking on this work, Immigration Equality remains involved, providing training, resources, in-depth mentorship, and review of the pro bono attorney's work.   Immigration Equality also maintains a library of materials for pro bono attorneys on the state of the law and the asylum process, which Immigration Equality updates to reflect significant changes in policy or the law.

90.    Pursuant to its mission, Immigration Equality runs a detention program that provides legal representation, as well as other services to support and protect LGBTQ and HIV-positive immigrants in detention facilities.  Through this program, Immigration Equality staff provide advice and materials to pro se asylum seekers; prepare clients for and assist others with credible fear interviews; represent detained individuals in parole applications, on bond motions, and in custody redetermination

requests; and monitor and advocate for improvements to conditions of confinement, such as by filing conditions complaints with the DHS Office for Civil Rights and Civil Liberties and similar bodies and by publicly reporting on unlawful and dangerous conditions.

91.    Immigration Equality operates a toll-free hotline for exclusive use by detained people.  Through the hotline, detained immigrants can speak with a paralegal or attorney regarding their immigration case to determine whether they qualify for representation by Immigration Equality and to receive other assistance, such as self-help guides or referrals to other organizations or attorneys.  Through the detention hotline, its main phone line, and an online portal, Immigration Equality answers thousands of phone calls and online inquiries annually regarding LGBTQ and HIV-related immigration issues.  Immigration Equality staff and volunteers answer these inquiries.  To do so effectively they must receive training from Immigration Equality on the law and asylum process, on commonly recurring issues confronting the populations Immigration Equality serves, and on collecting relevant information from potential clients.  In addition to conducting this training, Immigration Equality has developed a library of template responses that provide individuals with basic information on LGBTQ immigration and, in particular, on asylum, withholding of removal, and Convention Against Torture claims.

92.    In addition, Immigration Equality's in-house legal team and its network of pro bono attorneys assist and represent LGBTQ and HIV-positive immigrants with matters before the U.S. Citizenship and Immigration Services, Executive Office for

Immigration Review, U.S. Immigration and Customs Enforcement, the BIA, and federal courts. Immigration Equality's legal services focus primarily on asylum, withholding of removal, and CAT claims, and related applications and benefits, such as work authorization and adjustment of status. Immigration Equality has helped thousands of asylum seekers win asylum, withholding of removal, relief under the CAT, and other benefits and forms of relief.

93. The Agreement directly impairs Immigration Equality's ability to operate all of its core programs. Immigration Equality cannot continue to provide legal and other direct services to LGBTQ and HIV-positive immigrants, and otherwise work to improve their conditions of detention and for safe conditions, if those individuals are disappeared to facilities in El Salvador where they cannot be contacted and where conditions are notoriously brutal. Immigration Equality is not able to serve people who have been rendered through its detention hotline, which it uses to identify emerging threats to the populations it serves, uncover dangerous conditions of confinement, or provide assistance and advice to LGBTQ and HIV-positive individuals. And it cannot provide assistance to pro se individuals taken to CECOT or other facilities in El Salvador.

94. The risk that individuals Immigration Equality serves will be rendered under the Agreement is all too real. Immigration Equality provides services to hundreds of people each year who are held in immigration detention across the country. It recently did an intake evaluation with an asylum seeker at the Bluebonnet facility who had received paperwork accusing him of being part of Tren

de Aragua.  It also currently and regularly assists other Venezuelan asylum seekers who could be identified for rendition to El Salvador.

95.    The constant threat of rendition created by the Agreement itself impedes Immigration Equality's core work.  LGBTQ and HIV-positive individuals can face severe risk of persecution and harm in El Salvador, as the State Department itself has recognized.  *See, e.g.*, Bureau of Democracy, Human Rights, and Labor, U.S. Dep't of State, *El Salvador 2021 Human Rights Report* 33 ("Police and gangs continue to commit acts of violence against LGBTQI+ individuals. These actions were tolerated by the government, and perpetrators were rarely prosecuted."), https://perma.cc/D6KA-9RTQ.  If the Agreement remains in place, Immigration Equality will have to expend resources it would otherwise put to other core parts of its mission to updating and creating new guidance, trainings, and materials for detained individuals, volunteers, and pro bono attorneys in order to advise on the risks posed by this new threat to LGBTQ and HIV-positive individuals and avenues for trying to avoid rendition under the Agreement. Immigration Equality is already devoting staff time and resources to following the quickly changing developments on this issue and beginning to research and prepare for the necessary changes to its programs.

### California Collaborative for Immigrant Justice

96.    Plaintiff CCIJ's mission is to strengthen and guide grassroots efforts to support detained and incarcerated immigrants and push for their liberation.  CCIJ furthers this mission through direct legal services, other legal support, advocacy

initiatives, data collection and reporting, and public health advocacy for immigrants, particularly those who are detained.

97.    CCIJ provides legal services to immigrants through direct representation and through clinics supporting immigrants with their pro se claims. CCIJ offers regular legal clinics at ICE detention centers in California.  CCIJ also provides legal consultations related to immigration matters to noncitizens incarcerated in federal prisons around the country.  It is one of only a few organizations that does so.  As part of its clinic and consultation work, CCIJ staff provide individual consultations and group "Know Your Rights" information, distribute self-help materials, offer limited assistance with form-filling and other preparation of court filings, screen for competency concerns and advocate for appointed counsel in such cases, and provide direct representation in certain cases.

98.    Many individuals in immigration detention and federal prisons participate repeatedly in CCIJ's clinics as they pursue their own pro se representation. Via its regular clinics, CCIJ is able to provide ongoing support through a pro se person's immigration court case and appeals, and in collateral matters like post-conviction relief or habeas petitions.  CCIJ typically continues to communicate with clients (and sometimes clinic participants) even after they are released from detention or prison in the United States or deported to another country, in order to provide ongoing legal services and/or support CCIJ's public education initiatives.

99. When clients or clinic participants are transferred from the detention facility or prison at which CCIJ has previously contacted them, and CCIJ is unable to locate them or get in contact with them, CCIJ's ability to continue providing legal services and engaging in related advocacy initiatives is materially impaired. The Agreement, by providing for the rendition of detained or incarcerated immigrants beyond communication with CCIJ, impairs its ability to provide services. Rendition not only prevents CCIJ from serving clients at its regular clinics (which are the most efficient way to serve an overwhelming number of unrepresented people), but prevents CCIJ from serving them at all. At least two people whom CCIJ has served through its clinics have been relocated to Texas and, on information and belief, would be rendered to El Salvador under the Agreement but for other court orders enjoining that action.

100. As a result of the Agreement, CCIJ has had to implement new procedures to identify clients and clinic participants who may face rendition under the Agreement and to change how it provides advice and operates its clinics. To begin, CCIJ must now screen every individual for risk factors for possible rendition to El Salvador or other third countries. Where risk factors are identified, individuals receive additional advice from a CCIJ attorney, beyond the self-help materials that CCIJ typically offers.

101. CCIJ largely staffs its immigration detention clinics with rotating volunteers from other organizations and law firms, and volunteers now must receive additional training (from CCIJ staff) to screen for risk factors of rendition in order to

flag such cases for a CCIJ attorney. At-risk individuals also receive specialized material—which CCIJ and a partner organization developed in response to the Agreement and translated into multiple languages—to advise individuals of their rights and to enable access to counsel by requesting that CCIJ and the partner organization be contacted before they are transferred for possible rendition. Because of the Agreement, CCIJ staff now must devote additional time and resources to providing these materials and advice to individuals at risk of rendition.

102.    CCIJ also provides at-risk individuals with contact information and instructions to call CCIJ if they believe they are being transferred for possible rendition. CCIJ has received a number of communications from immigrants detained at the Bluebonnet facility who reasonably fear rendition under the Agreement; these communications have required CCIJ to devote additional staff time and resources to creating records to track these people and monitor for possible attempts at rendition so that CCIJ can take appropriate steps to intervene.

103.    CCIJ also supports and engages in advocacy alongside former clients and other individuals after they are released from ICE detention and federal prisons. CCIJ has had to reach out to many such individuals—many of whom were previously granted protection from removal under the Convention Against Torture or as applicants for U-Visas—to advise on the new risk that they could be re-detained and rendered to El Salvador or another third country, in order to protect these individuals and ensure they can serve as partners in work that is central to CCIJ's mission. For the same reasons, CCIJ has also devoted time to arranging for attorney

accompaniment for such individuals when attending check-ins with ICE, due to the new risks and uncertainties caused by the Agreement.

104.    Overall, the Agreement has required CCIJ to devote substantial time to training volunteers, creating materials, providing more complex consultations, and assisting formerly detained or incarcerated individuals.  These additional demands on staff capacity have caused an overall reduction in the quantity and quality of the services CCIJ regularly provides to people in ICE detention and federal prisons. Because clinic consultations now take longer than they previously did in order to ensure that volunteers and CCIJ attorneys are screening for and advising on risks created by the Agreement, CCIJ is not able to serve as many people in those clinic sessions.

105.    CCIJ also advocates for the health and safety of the people who are being held inside ICE detention facilities.  For example, CCIJ conducts outreach with local agencies and public health departments to encourage and facilitate inspections and ensure appropriate oversight of conditions, and files complaints with the Department of Homeland Security on behalf of detained immigrants regarding their health and safety while in detention.  CCIJ has also served as class counsel in litigation on behalf of hundreds of people incarcerated in federal prisons, securing a consent decree requiring the provision of medical care, limitations on the use of solitary confinement, appropriate housing designations, and ongoing confidential communication between CCIJ and incarcerated class members.  *See California Coalition for Women Prisoners v. Federal Bureau of Prisons*, No. 23-cv-4155, Dkt. 473-1 (N.D. Cal. Feb. 27, 2025).

This work, central to CCIJ's mission, depends on CCIJ's ability to know, in real time, what is happening to people who are detained and incarcerated, and whether their medical and other needs are being met—an impossible task were those individuals to be disappeared into facilities in El Salvador.

106.    To further its mission, CCIJ collects and analyzes data relating to both immigration enforcement and detention center conditions.  This data helps CCIJ inform the public and government officials of what is actually happening to those taken into immigration detention.  For example, in recent years, CCIJ commissioned and contributed to a report exposing the inhumane labor conditions that had previously led detained workers to initiate a labor strike.  It also published a report about the denial of proper nutrition in immigration detention.  Reports of this sort rely on access to accurate information collected over time.

## LEGAL BACKGROUND

*The APA Sets Minimum Standards for Final Agency Action*

107.    The Administrative Procedure Act authorizes judicial review of final agency action.  5 U.S.C. § 704.

108.    Under the APA, federal agencies such as the State Department cannot take final actions that are contrary to law or constitutional right, arbitrary and capricious, or in excess of statutory authority.  *See id.* § 706(2)(A)–(C).

*The Agreement Is Final Agency Action*

109.    Final agency actions are those (1) that "mark the consummation of the agency's decisionmaking process" and (2) "by which rights or obligations have been

determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks omitted).

110.    The Agreement is final agency action subject to the Court's review.

111.    The Agreement marks the consummation of the State Department's decisionmaking process because it has been completed with El Salvador as a counterparty. Secretary Rubio has confirmed that he and President Bukele had "finalize[d]" the "verbal agreement [they] had reached" in February. Marco Rubio, *Secretary of State Marco Rubio Remarks to the Press*, U.S. Dep't of State (Mar. 28, 2025), https://perma.cc/BU2X-JFJH.

112.    The Agreement is also an action by which rights or obligations have been determined or from which legal consequences will flow because the Agreement provides the terms for and facilitates the disappearance of individuals in the United States to El Salvador.

*The Court May Enjoin Defendants' Ultra Vires Actions*

113.    "[T]he case law in this circuit is clear that judicial review is available when an agency acts *ultra vires*." *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1173 (D.C. Cir. 2003). "[C]ourts will 'ordinarily presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command.'" *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (quoting *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 681 (1986)).

## CLAIMS FOR RELIEF

### Count One
### Administrative Procedure Act–706(2)(A), (B)
### Contrary to Law and Constitutional Right
### (Against All Defendants)

114.    Plaintiffs reallege all paragraphs above as if fully set forth here.

115.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law" or "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(A), (B).

116.    The APA's reference to "law" in the phrase "not in accordance with law," "means, of course, *any* law, and not merely those laws that the agency itself is charged with administering."  *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) (emphasis in original).

117.    Article I, Section 9, Clause 2 of the U.S. Constitution (the Suspension Clause) provides that the writ of habeas corpus shall not be suspended, unless when in cases of rebellion or invasion the public safety may require it.  The Agreement is contrary to the Suspension Clause because, although habeas has not been—and cannot legally be—suspended under the present circumstances, the Agreement attempts to render the people subject to it beyond the jurisdiction of U.S. courts and thus effectively to deprive them of access to habeas relief.

118.    Article I, Section 9, Clause 7 of the U.S. Constitution (the Appropriations Clause) provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  The Agreement is contrary to the Appropriations Clause because it provides for payment to El Salvador of money

from the Treasury in order to finance the rendition of people from the United States without an appropriation for that purpose made by law.

119.   The First Amendment of the U.S. Constitution and the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb *et seq.*, protect the free exercise of religion.  RFRA provides that the government "may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person is in furtherance of a compelling governmental interest; and is the least restrictive means of furthering that compelling governmental interest."  *Id.* § 2000bb–1(b).  The Agreement is contrary to the Free Exercise Clause of the First Amendment and to RFRA, including because it provides for the rendition of individuals in the United States into conditions of potentially indefinite detention in which they lack access to clergy and other necessary components of their free exercise of religion.

120.   The Fifth Amendment of the U.S. Constitution provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." The Agreement is contrary to the Fifth Amendment because it provides for the rendition of individuals in the United States into conditions of potentially indefinite detention without due process of law.

121.   The Sixth Amendment of the U.S. Constitution provides for the rights to a speedy and public trial, by an impartial jury in the district where the crime was allegedly committed, to be informed of the nature and cause of the accusation, to be confronted by witnesses, to be able to obtain witnesses in one's favor, and to have the assistance of counsel.  The Agreement is contrary to the Sixth Amendment because

it provides for the rendition of individuals in the United States into conditions of potentially indefinite detention without constitutionally required process and without access to counsel.

122.    The Eighth Amendment of the U.S. Constitution prohibits the infliction of cruel and unusual punishment.  The Agreement is contrary to the Eighth Amendment, including because it provides for the rendition and potentially indefinite incarceration of individuals in the United States in conditions known for human rights abuses, torture, and death; and it provides for lengthy and potentially indefinite incarceration, untethered to any particular crime, or even any civil violation.

123.    The Convention Against Torture, to which the United States is a party, provides that no party "shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture."   Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 3.1, Dec. 10, 1984, 1465 U.N.T.S. 85.  Congress implemented the CAT via the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), which announced "the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture."  8 U.S.C. § 1231 note.  The FARRA further directed agencies to issue implementing regulations.  *See, e.g.*, 8 C.F.R. §§ 208.16– 208.18.  The Agreement is contrary to the United States's obligations under the CAT

and to the FARRA and its implementing regulations, including because it provides for the rendition and potential indefinite incarceration of individuals in the United States in conditions known to include torture.

124.    The Case-Zablocki Act, 1 U.S.C. § 112b, requires that the State Department report to the House Foreign Affairs Committee and Senate Foreign Relations Committee on all international agreements that were "signed, concluded, or otherwise finalized the prior month" and those that "entered into force" or "became operative" during the prior month.  The Agreement is contrary to the Case-Zablocki Act because the State Department has not submitted any required report about the Agreement to the relevant committees.  *See* Letter from Gregory Meeks, Ranking Member, House Foreign Affairs Committee, and Joaquin Castro, Ranking Member, Subcommittee on Western Hemisphere, to Marco Rubio, Secretary of State (Apr. 17, 2025), https://perma.cc/6MGE-JEKZ.  The Case-Zablocki Act further requires that the Secretary of State make publicly available the text of international agreements on the State Department website.  1 U.S.C. § 112b(b).  Secretary Rubio has yet not made the full text of the Agreement so available or otherwise released it to the public. *See* U.S. Dep't of State, *2025 Treaties and Agreements*, https://perma.cc/GAQ8-EJ23 (last visited June 4, 2025).  To the same extent that the Agreement is contrary to the Case-Zablocki Act, it is likewise contrary to the State Department's regulations implementing the Act.  *See* 22 C.F.R. pt. 181.

125.    The Immigration and Nationality Act, 8 U.S.C. chpt. 12, provides a comprehensive framework for the removal of non-citizens from the U.S., including

dictating the procedures that must be followed in effectuating a removal, *e.g.*, *id.* §§ 1229a, 1228, and the countries to which a non-citizen can be removed, *id.* § 1231(b). The Agreement is contrary to the INA, including because it provides for the rendition of non-citizens out of the country without observance of required procedures and to a destination country not authorized by the INA.

126.    The Americans with Disabilities Act, 42 U.S.C. § 12132, provides that "no qualified individual with a disability shall, by reason of such disability, . . . be subjected to discrimination by" "a public entity."  The Rehabilitation Act, 29 U.S.C. § 794(a), provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, . . . be subjected to discrimination . . . under any program or activity conducted by any Executive agency." The Agreement is contrary to the ADA and Rehabilitation Act because it provides for the rendition of individuals in the United States into facilities that do not comply with the requirements of these statutes.

127.    The Non-Detention Act provides that "[n]o citizen shall be imprisoned or otherwise detained by the United States except pursuant to an Act of Congress." 18 U.S.C. § 4001(a).  The Agreement is contrary to the Non-Detention Act because it fails to include sufficient safeguards against the rendition and indefinite detention of U.S. citizens without authorization by any act of Congress.

128.    The Detainee Treatment Act provides that "[n]o individual in the custody or under the physical control of the United States Government, regardless of nationality or physical location, shall be subject to cruel, inhuman, or degrading

treatment or punishment."  42 U.S.C. §§ 2000dd(a), 2000dd-0(1).  The Agreement is contrary to the Detainee Treatment Act because it provides for the rendition of individuals in the custody or under the physical control of the U.S. government to facilities in which they will be subject to cruel, inhuman, or degrading treatment or punishment.

129.  The First Step Act requires that the Bureau of Prisons "place [a] prisoner in a facility as close as possible to the prisoner's primary residence, and to the extent practicable, in a facility within 500 driving miles of that residence."  18 U.S.C. § 3621(b).  To the extent the Agreement outsources the detention of people who have been convicted and committed to the custody of the Bureau of Prisons, the Agreement is contrary to the First Step Act because it necessarily requires that people rendered pursuant to the Agreement be placed in a location wholly inaccessible from the person's primary residence.

130.  The Bureau of Prisons has promulgated regulations governing the housing of prisoners and those awaiting trial.  These regulations provide, among other things, that "pretrial inmates will be separated, to the extent practicable, from convicted inmates," 28 C.F.R. § 551.100, that both prisoners and those awaiting trial shall "have access to . . . religious programs," *id.* § 551.110; *see also id.* § 548.10, and that both shall also have "access to legal materials" and "to telephone the inmate's attorney as often as resources of the institution allow," *id.* § 551.117; *see also id.* § 543.13.  To the extent the Agreement outsources the detention of people detained pre-trial or post-conviction in the United States, the Agreement is contrary to these

and other provisions of the Bureau of Prisons's regulations because it provides for the rendition of individuals in the United States into facilities that do not comply with the requirements of these provisions.

131.  The Department of Homeland Security has promulgated regulations governing the prevention of sexual abuse and assault in immigration detention. 6 C.F.R. subpts. A, B.  These regulations require, among other things, that immigration detention and DHS holding facilities "shall hold juveniles apart from adult detainees," *id.* §§ 115.14, 115.114, shall provide specific avenues for detained people to report sexual abuse, *id.* §§ § 115.52, 115.151, and provide training to employees about identifying and addressing sexual assault, *id.* §§ § 115.31, 115.131. They also require the government, "[w]hen contracting for the confinement of detainees in immigration detention facilities operated by non-DHS private or public agencies or other entities, including other government agencies," to include in such contracts "the entity's obligation to adopt and comply with these standards." *Id.* §§ 115.12, 115.112.  To the extent the Agreement outsources immigration detention, the Agreement is contrary to these and other provisions of DHS's regulations because it provides for the rendition of individuals in the United States into facilities that do not comply with the requirements of these provisions.

132.  The Federal Acquisition Regulation (FAR), 48 C.F.R. chpt. 1, sets out uniform policies and procedures by which executive agencies contract for goods and services.  The State Department has, by regulation, adopted the FAR with respect "to all DOS acquisitions of personal property and services . . . both within and outside

the United States," subject to limited exceptions. *Id.* § 601.302. The FAR requires, among other things, the public disclosure of information concerning certain contract actions. *See, e.g.*, 48 C.F.R. § 5.406. The Agreement is contrary to the FAR and the State Department's regulations concerning acquisitions because it contracts for services without complying with the policies and procedures set out in those rules.

133.    The Agreement is not in accordance with law because it is contrary to these myriad provisions.

**Count Two**
**Violation of the Administrative Procedure Act—706(2)(A)**
**Arbitrary and Capricious**
**(Against All Defendants)**

134.    Plaintiffs reallege all paragraphs above as if fully set forth here.

135.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

136.    The Agreement is arbitrary and capricious in multiple respects. Several examples follow.

137.    First, the Agreement's many conflicts with the laws addressed above renders it arbitrary and capricious.

138.    Second, the State Department has failed to proffer a reasonable explanation for the Agreement, including addressing the conflicts with numerous laws addressed above.

139.    Third, the Agreement fails to adequately address, and is irreconcilably at odds with, the State Department's own findings that CECOT and other prison facilities in El Salvador are replete with human rights abuses.

140.    Fourth, the government's position is that the Agreement does not include a provision ensuring the United States' ability to recall individuals who are rendered to the United States, including in situations where the individual was rendered arbitrarily, without basis, or by mistake, or where a court has ordered the United States to facilitate their return—an unexplained and irrational omission.

141.    Fifth, on information and belief, the Agreement does not include provisions guaranteeing an appropriate standard of care for those rendered to CECOT or elsewhere in El Salvador.

142.    Sixth, the Agreement reflects no consideration of reasonable alternative approaches.  The government has not explained—nor could it—why it could not have simply followed the law regarding detention, incarceration, and removal within the United States.

143.    Seventh, the State Department failed to account for the substantial reliance interests of Plaintiffs and those like them in being able to communicate with people who are detained or incarcerated under U.S. authority, much less the interests of the individuals who have themselves been disappeared and their loved ones, employers, and communities.

144.    For these and other failings, the Agreement is arbitrary and capricious.

**Count Three**
**Administrative Procedure Act–706(2)(C)**
**In Excess of Statutory Authority**
**(Against All Defendants)**

145.    Plaintiffs reallege all paragraphs above as if fully set forth here.

146.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

147.    "An agency . . . literally has no power to act—including under its regulations—unless and until Congress authorizes it to do so by statute."  *FEC v. Cruz*, 596 U.S. 289, 301 (2022) (internal quotation marks and citation omitted).

148.    No statutory provision authorizes the State Department to enter into an agreement to outsource the detention of individuals in the United States by rendering them into a foreign black site, potentially indefinitely.

149.    The Agreement therefore is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.

**Count Four**
**Ultra Vires Action**
**(Against All Defendants)**

150.     Plaintiffs reallege all paragraphs above as if fully set forth here.

151.    There is no statute, constitutional provision, or other source of law that authorizes Defendants' actions to enter into the Agreement.  And the Agreement is contrary to law and constitutional right, as set forth above.

152.    Plaintiffs have a non-statutory right of action to declare unlawful, set aside, and enjoin Defendants' ultra vires actions.

**PRAYER FOR RELIEF**

Plaintiffs request that the Court enter the following relief:

a. Declare unlawful and set aside the Agreement as not in accordance with law and contrary to constitutional right under 5 U.S.C. § 706(2)(A), (B), arbitrary, capricious, or an abuse of discretion under 5 U.S.C. § 706(2)(A), in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C. § 706(2)(C), and ultra vires;

b. Enjoin Defendants, their officers, employees, and agents from taking any further action pursuant to the Agreement, including but not limited to rendering any person to El Salvador for detention, and/or taking any steps to implement, give effect to, or reinstate the Agreement under a different name;

c. Award Plaintiffs their costs, reasonable attorney's fees, and other disbursements as appropriate;

d. Grant such other relief as the Court deems necessary, just, and proper.


Dated: June 5, 2025                 Respectfully submitted,

                                    /s/ *Jessica Anne Morton*

                                    Jessica Anne Morton (DC Bar No. 1032316)
                                    Kevin E. Friedl (DC Bar No. 90033814)
                                    Robin F. Thurston (DC Bar No. 1531399)
                                    Democracy Forward Foundation
                                    P.O. Box 34553
                                    Washington, DC 20043
                                    (202) 448-9090
                                    jmorton@democracyforward.org
                                    kfriedl@democracyforward.org
                                    rthurston@democracyforward.org

                                    *Counsel for All Plaintiffs*

Anthony Enriquez (DDC Bar No. NY0626)
Sarah T. Gillman (DDC Bar No. NY0316)
Robert F. Kennedy Human Rights
88 Pine Street, Suite 801
New York, NY 10005
(917) 284-6355
enriquez@rfkhumanrights.org
gillman@rfkhumanrights.org

Sarah E. Decker (DDC Bar No. NY0566)
Medha Raman (DC Bar No. 90027539)
Robert F. Kennedy Human Rights
1300 19th Street NW, Suite 750
Washington, DC 20036
(202) 559-4432
decker@rfkhumanrights.org
raman@rfkhumanrights.org

*Counsel for Plaintiff RFK Human Rights*