**Redacted for Public Filing**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ROBERT F. KENNEDY
HUMAN RIGHTS, *et al.*,

   *Plaintiffs,*

v.

DEPARTMENT OF STATE, *et al.*,

   *Defendants.*

Case No. 25-cv-1774-JEB

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

  The Department of State entered into an Agreement with El Salvador that already has facilitated the extrajudicial rendition of hundreds of people to confinement in conditions the government knew and knows to be dangerous and inhumane. This agency action is contrary to law and constitutional right; it is arbitrary and capricious; and it is without legal basis. The Agreement thus violates the Administrative Procedure Act, and it is also ultra vires. The Court should enter summary judgment for Plaintiffs and set aside the Agreement.

## BACKGROUND

### A. Prison Conditions in El Salvador

  The State Department has previously documented "[s]ignificant human rights issues" in El Salvador, particularly its prisons, including "torture or cruel, inhuman, or degrading treatment or punishment by security forces" and "harsh and life-threatening prison conditions." Ex. 1, at 1; *see also* Exs. 2–6 (prior State Department reports raising similar concerns). The State Department's 2023 human rights report,

Redacted for Public Filing

its most recently published version, noted reports of "arbitrary or unlawful killings[]" by the government, "largely stemming from deaths of detainees while in prison, either from medical neglect or physical abuse." Ex. 1, at 2. It also acknowledged "credible reports" of torture and other cruel, inhumane, or degrading treatment or punishment. *Id.* at 4. These include examples of "systemic abuse in the prison system, including beatings by guards and the use of electric shocks." *Id.* at 5.

By the State Department's own account, prison conditions are "harsh and life threatening due to gross overcrowding; inadequate sanitary conditions; insufficient food and water shortages; a lack of medical services in prison facilities; and physical attacks"—problems that have all been "exacerbated" in recent years. *Id.* at 7. There have been reports of "a lack of food and potable water and being limited to two tortillas, one spoonful of beans, and one glass of water per day," as well as "limited water for sanitation," "severe heat and lack of ventilation in the cells," and "prolonged confinement, without the opportunity for movement or the use of sanitary facilities." *Id.* at 7–8.

Reports cited by the State Department also describe a "lack of access to medical care or medicine in prison." *Id.* at 8. For example, one incarcerated person, who was diabetic, received insulin only two or three times while incarcerated—and died suddenly in his sleep. *Id.* Reports also found that "communicable diseases such as tuberculosis and scabies were widespread in the prisons." *Id.*

Such observations about El Salvador's prison system are widespread. *See* Ex. 7 ¶ 2. Human Rights Watch, for example, has documented cells so overcrowded that

Redacted for Public Filing

people held in them "had to sleep on the floor or standing"; incessant beatings; and guards forcing people held in prison to kneel on the ground, naked, for hours, among other horrors. *See id.* ¶¶ 7–10, 16.

The Inter-American Commission on Human Rights has, as of 2024, reported overcrowding so dire that people were suffocating; toilets "overflowing" with waste; water sometimes available only from a dirty bucket, only for one hour at 4:00 a.m., or not available at all; nutrition standards so poor that one witness had lost 80 pounds— nearly half his body weight—when he left prison; beatings that lasted for hours, sometimes until the victims passed out; the use of pepper spray and withholding of food as collective punishment; prisoners being forced to walk on their knees in sun-heated gravel; and prisoners being given electric shocks by laughing guards. Ex. 8 ¶¶ 237, 252, 255, 257, 300. The Commission likewise reported that "100% of the population deprived of liberty [in El Salvador] remained in isolation from the outside world." *Id.* ¶ 238.

U.S. federal courts have come to similar conclusions. For example, in *Najarro-Portal v. Lynch*, the Ninth Circuit remanded for the Board of Immigration Appeals to grant relief under the Convention of Torture after evidence documented severe abuses in Salvadoran prisons, including prison guards severely injuring—likely breaking—a prisoner's jaw and leaving him without treatment such that he was not able to eat. 630 F. App'x 719, 722–23 (9th Cir. 2015). Uncontradicted testimony in that case also showed that prisoners who complain about prison conditions "are mistreated, forcefully transferred to different prisons, put in solitary confinement,

Redacted for Public Filing

and accused of being gang leaders to justify their treatment." *Id.* at 722. Indeed, this Court has noted that "[i]n Salvadoran prisons, deportees are reportedly highly likely to face immediate and intentional life-threatening harm at the hands of state actors"; that Salvadoran prisons have "poor living conditions"; and that they carry "the risk of torture, beatings, and even death." *J.G.G. v. Trump*, 772 F. Supp. 3d 18, 41–42 (D.D.C. 2025).

El Salvador's largest prison, the Centro de Confinamiento del Terrorismo or CECOT, is no exception. *See* Ex. 7 ¶ 19. As public reporting from March 2025 made clear, it was known as a place "where visitation, recreation and education are not allowed." Ex. 51, at 1. The people held there "are never allowed outdoors." *Id.* at 3. As Human Rights Watch has documented, people held in CECOT experienced "repeated beatings," "cells without mattresses or privacy for toilets, constant illumination," "use of the same unsanitary water for drinking and bathing," "limited or denied" medical care, "physical abuse," "being held in dark isolation cells for extended periods," and denial of "any direct contact with family members or lawyers." Ex. 7 ¶ 18. Until the past few months, Human Rights Watch was not aware of any detainee who had been permitted to leave. *Id.* ¶ 17.

## B.    The State Department's Agreement with El Salvador

Against this backdrop, on February 3, 2025, Secretary Rubio announced that Salvadoran President Nayib Bukele "has agreed to the most unprecedented and extraordinary migratory agreement anywhere in the world." Ex. 9, at 4.

Secretary Rubio explained: President Bukele "has agreed to accept for deportation any illegal alien in the United States who is a criminal from any

Redacted for Public Filing

nationality, be they MS-13 or Tren de Aragua, and house them in his jails." *Id.* "And he's also offered to do the same for dangerous criminals currently in custody and serving their sentences in the United States, even if they're U.S. citizens or legal residents. We are just profoundly grateful." *Id.* President Bukele corroborated this account, posting on social media that El Salvador had "offered the United States of America the opportunity to outsource part of its prison system" for a fee that "would be relatively low for the U.S. but significant for us." Ex. 10. President Bukele accompanied this text with pictures of CECOT, including prisoners packed tightly on the floor, overseen by masked and helmeted guards dressed all in black. *Id.*

According to Secretary Rubio, he "finalize[d] in a verbal agreement" during calls with President Bukele the details of the deal under which El Salvador agreed to accept and detain in its jails people rendered from the United States in exchange for payment and other consideration from the State Department ("the Agreement"). Ex. 11, at 15.



.[1] On March 13, the U.S. Embassy in San Salvador sent a note to El Salvador's Ministry of Foreign Affairs, stating that it "has the honor to request that El Salvador accept, by March

---

[1] The diplomatic notes document particular renditions under the Agreement but do not themselves constitute the whole of the Agreement. The March 13 note from the State Department provides 24-hours notice of incoming renditions (and does not even specify the "in-kind and financial support" upon which the parties had apparently agreed), Ex. 14; the March 14 note confirms that El Salvador will accept a somewhat smaller number of people, Ex. 15; and the March 31 note, which came long after the Agreement was finalized, merely documents after the fact that the United States had sent and El Salvador had accepted another rendition flight, Ex. 16.

Redacted for Public Filing

14, 2025," an alleged "gang leader requested by President Bukele," an alleged "gang leader convicted of murder in El Salvador," and "up to 500 Venezuelan Tren de Aragua (TdA) members." Ex. 14, at 1. "This note," it explained, "serves as 24-hour notice of the arrival of the [two alleged gang leaders] and up to 500 Venezuelan TdA members." *Id.* at 2.

The note stated that the "United States understands that El Salvador will take these actions in accordance with its authorities under Salvadoran domestic law, and in a manner that is consistent with El Salvador's international legal obligations regarding human rights and treatment of prisoners, including the Convention Against Torture. Further, with regard to the TdA members, the United States understands El Salvador intends to accommodate them for a duration of one year unless or until a determination concerning their long-term disposition is made." *Id.* at 1.

In consideration for this "accommodat[ion]," the Embassy expressed the United States' "inten[tion], consistent with U.S. domestic legal requirements to provide in-kind and financial support to the Government of El Salvador." *Id.* at 2.

The next day, El Salvador responded, "reaffirm[ing] its commitment to assist the United States in combating terrorism and promoting peace and freedom across our nations, while upholding human rights." Ex. 15. Specifically, El Salvador "[a]gree[d] to the transfer" of the two alleged gang leaders, and "express[ed its] readiness to accommodate approximately 300 members of the foreign terrorist organization 'Tren de Aragua,' currently detained by the United States." *Id.*



El Salvador stated: "we assure you that the reception of these individuals will be conducted in accordance with Salvadoran law and international obligations, including adherence to the Convention Against Torture." Ex. 15.

The following day—March 15—the federal government flew more than 200 people to El Salvador. Secretary Rubio tweeted: "we have sent over 250 alien enemy members of Tren de Aragua which El Salvador has agreed to hold in their very good jails at a fair price that will also save our taxpayer dollars." Ex. 17. This number included Venezuelans who deny being TdA members, who had never been charged with or convicted of a crime, and who were in active immigration proceedings (such as pending asylum applications). *See, e.g.*, Ex. 18 ¶ 19; Ex. 19 ¶¶ 4, 6–7.

In the days following the rendition, U.S. government officials noted—with approbation—the conditions at CECOT. On social media, Secretary Rubio shared a post from President Bukele boasting that "the first 238 members of the Venezuelan criminal organization, Tren de Aragua, arrived in our country," where they "were immediately transferred to CECOT, the Terrorism Confinement Center, for a period of one year (renewable)." President Bukele noted that the "United States will pay a

**Redacted for Public Filing**

very low fee for them, but a high one for us." He included in the post a video of the planes arriving in El Salvador, showing men dragged off the planes, hunched over, by crowds of uniformed guards, while helicopters swirled overhead. The video showed the men being bussed to CECOT, then dragged into the facility by masked guards, still hunched over, their hands shackled to their feet, their heads shoved down, while other guards aimed guns their way. They were forced to their knees and their heads were shaved. The men were then ushered into cages lined with bare metal bunks, each prodded along by a nightstick. Secretary Rubio, sharing this post, wrote: "Thank you for your assistance and friendship, President Bukele." Ex. 20; *see also* Ex. 21 (describing the "lovely conditions").



**Redacted for Public Filing**

Secretary Rubio's chief of staff responded that the "baseline requirements do not differ from El Salvador's for the treatment of prisoners." *See* Ex. 24, at 3.

[3] ████████████████████████ when El Salvador asked the State Department what "requirements" it requested for the people it was rendering, Secretary Rubio's chief of staff responded that the "baseline requirements do not differ from El Salvador's for the treatment of prisoners." *See* Ex. 24, at 3.

███████████ **Redacted for Public Filing**

████████████████████████████████

████████

████████████████, on March 31, the U.S. Embassy sent another diplomatic note, this time "acknowledg[ing] one flight which arrived in El Salvador March 30, 2025, carrying 16 passengers"—nine of whom were Salvadoran and allegedly members of MS-13, and seven of whom were allegedly "identified as Venezuelan members of the Foreign Terrorist Organization Tren de Aragua (TdA)." Ex. 16, at 8; *see also* Ex. 25, at 1 (announcing a "military transfer[]" of seventeen people to El Salvador, leaving one person unaccounted for in the diplomatic note).

The March 31 note came only after the United States had already rendered these people to El Salvador, and after the conditions experienced by people from the first planes had been well publicized. Rather than taking any concrete steps to assure better treatment for those the government had just sent, the note merely repeats the same language that had already proved meaningless for those held in CECOT: the "United States highlights the importance of the Government of El Salvador's previous assurance that El Salvador's reception and treatment of TdA and MS-13 individuals will be in accordance with Salvadoran law and international obligations, including adherence to the Convention Against Torture." Ex. 16, at 8.

On April 13, Secretary Rubio announced that yet another group—this time, ten people—had been rendered to El Salvador, stating that "[t]he alliance between [President Trump and President Bukele] has become an example for security and

Redacted for Public Filing

prosperity in our hemisphere." Ex. 26. Defendants have provided no diplomatic note corresponding to this rendition.

## C.    Some People Are Released From CECOT

On July 18, President Bukele announced that El Salvador had "handed over all the Venezuelan nationals detained in our country, accused of being part of the criminal organization Tren de Aragua," in exchange for Venezuela's release of political prisoners and several Americans. Ex. 27. The Venezuelans released from CECOT have described the conditions they experienced in terms fully consistent with what the State Department and the international community more broadly knew to be true of Salvadoran prisons even before the Agreement. *See generally* Exs. 18–19, 28–30. They were beaten relentlessly. Ex. 18 ¶¶ 17, 18, 19, 24, 27, 29, 30, 31, 32, 35, 36, 37; Ex. 19 ¶¶ 18, 20, 24, 29, 32, 35. They "never saw daylight." Ex. 19 ¶ 26; *see also* Ex. 18 ¶ 28. Their cells lacked beds, sheets, and mattresses—but did feature "very bright and hot white lights 24 hours a day, 7 days a week." Ex. 19 ¶¶ 19, 25; *see also* Ex. 18 ¶ 23. They suffered "intense" thirst and "hell[ish]" heat. Ex. 18 ¶ 20. They were not allowed to have books. Ex. 19 ¶ 26. They were not allowed to practice their religion, other than briefly reading the Bible, which they were not allowed to keep. *Id.*; Ex. 18 ¶ 39. They were not allowed to speak with or write to friends or family or lawyers. Ex. 19 ¶ 26; Ex. 18 ¶ 38. And lawyers were not permitted to speak with their clients while they were in CECOT. *See* Ex. 31 ¶¶ 5–7; Ex. 32 ¶ 5.

Although some people rendered pursuant to the Agreement have now been released, some have not. And the Agreement remains in place, along with the potential for additional renditions, not only of the rest of the original 500 people

Redacted for Public Filing

referred to in the State Department's March 13 note but of other people as well. *See* Ex. 33, at 1 (noting that "upwards of $15 million in International Narcotics Control and Law Enforcement (INCLE) funds have been set aside to send to El Salvador to house additional detainees"). For example, when asked about President Bukele's offer to take U.S. citizens from the federal prison population, President Trump responded: "I love that . . . I'd be honored to give them. I don't know what the law says on that, but I can't imagine the law would say anything different." Ex. 34, at 0:07–0:25. On April 18, at least twenty-eight people were loaded on buses heading to an airport, some told they were being sent to El Salvador, until emergency legal filings induced authorities to turn the buses around. *See A.A.R.P. v. Trump*, 145 S. Ct. 1364, 1367 (2025); Ex. 35. And President Trump has told President Bukele: "[Y]ou gotta build about five more places." Ex. 36, at 2.

## LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it is capable of affecting the substantive outcome of the litigation," and "[a] dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *CREW v. SEC*, 916 F. Supp. 2d 141, 144 (D.D.C. 2013) (citations omitted). "In a case involving review of a final agency action under the APA, however," the court's role is "to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Id.* (quotation marks and

Redacted for Public Filing

citations omitted). "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Id.* at 145.

## ARGUMENT

### I.   Plaintiffs Have Standing.

Standing requires Plaintiffs to establish (1) "injury in fact" that is (2) "fairly traceable to the challenged action of the defendant," and (3) could be "redressed by a favorable decision." *Humane Soc'y of the U.S. v. Dep't of Agric.*, 41 F.4th 564, 567 (D.C. Cir. 2022). Although only one Plaintiff need have standing, *see Massachusetts v. EPA*, 549 U.S. 497, 518 (2007), each does.

*Injury-in-Fact: Organizational Plaintiffs.* Plaintiffs RFK Human Rights, ImmDef, Immigration Equality, and CCIJ assert organizational standing. "[O]rganizations may have standing 'to sue on their own behalf for injuries they have sustained.'" *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393 (2024) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982)). Courts in this circuit have understood this test to be met where "(1) the agency action or omission . . . injure[s] the organization's interest, and (2) the organization . . . used its resources to counteract that harm." *Campaign Legal Ctr. v. FEC*, 466 F. Supp. 3d 141, 153 (D.D.C. 2020) (citing *PETA v. USDA*, 797 F.3d 1087, 1094 (D.C. Cir. 2015)); *see also League of United Latin Am. Citizens v. Exec. Off. of the President*, No. 25-946, 2025 WL 1187730, at *23 (D.D.C. Apr. 24, 2025) (observing that "[p]rior circuit precedent is

Redacted for Public Filing

consistent with the organizational-standing principles articulated in *Alliance for Hippocratic Medicine*").[4]

This requires a showing that the defendant "directly affected and interfered with [the plaintiff's] core business activities." *All. for Hippocratic Med.*, 602 U.S. at 394–95 (quotation marks and citations omitted); *see also League of United Latin Am. Citizens*, 2025 WL 1187730, at *23 (noting that while "mere 'issue-advocacy' activities are not sufficient to support organizational standing," "organizations can have standing to challenge practices that directly interfere with their core activities, such as direct services programs"). While the harm must "inhibit the organization's daily operations in a concrete way, such as by undermining the organization's ability to perform its fundamental programmatic services," *Whitman-Walker Clinic v. HHS*, 485 F. Supp. 3d 1, 19 (D.D.C. 2020) (quotation marks, citations, and alterations omitted), precedent "is quite generous in defining harm to an organizational plaintiff's 'activities.'" *Scenic Am. v. Dep't of Transp.*, 983 F. Supp. 2d 170, 177 (D.D.C. 2013).

Moreover, if "the organization will expend resources to counteract the effects of the defendant's challenged conduct, that diversion can suffice for Article III purposes." *Id.* (quotation marks and alterations omitted). Even if that choice is "made willfully or voluntarily," it is not necessarily a "self-inflicted injury," *id.* (quotation

---

[4] At least one court in this District has noted that "[i]t is unclear whether" the second "use-of-resources" prong "is still required after *Alliance of Hippocratic Medicine*," but considered the requirement, "if it still exists," "out of an abundance of caution." *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, No. 25-306, 2025 WL 1825431, at *22 n.7 (D.D.C. July 2, 2025), *appeal pending*, No. 25-5243 (D.C. Cir.). Plaintiffs meet the test in either formulation.

Redacted for Public Filing

marks and alterations omitted), because "[r]esources do not grow on trees—when an organization has to 'divert' them from an area where it planned to spend time and money to one where it did not, that leaves fewer resources for its other organizational needs." *Campaign Legal Ctr.*, 466 F. Supp. 3d at 154 (quotation marks omitted).

As "in the bulk of cases satisfying organizational standing, the plaintiff organization[s here] engage[] in direct services to individuals that [a]re made more difficult by the challenged action." *Ctr. for Responsible Sci. v. Gottlieb*, 346 F. Supp. 3d 29, 42 (D.D.C. 2018) (collecting cases). They provide direct services to those in immigration detention, such as by, among other things, representing them in legal proceedings, offering advice and resources for pro se litigants, and operating phone hotlines through which those in detention can obtain information and report unsafe conditions. They also provide resources and services to non-detained people who are nonetheless at risk of rendition under the Agreement. These programs are and have long been central to Plaintiffs' missions. The Agreement directly impedes those missions by materially impairing the quality and in some cases quantity of services Plaintiffs are able to offer. *See Whitman-Walker Clinic*, 485 F. Supp. 3d at 21 (finding organizational injury where a clinic's "ability to provide adequate care and time to its patients" would be limited by the challenged action, and the clinic would have "to provide costlier and more involved treatment" (quotation marks and alteration omitted)).

RFK Human Rights and ImmDef each provide legal representation to people being held in confinement. At the time this case was filed, both had legal clients held

Redacted for Public Filing

in CECOT pursuant to the Agreement with whom they could not communicate, thereby dramatically undercutting their ability to provide legal counsel and defend their clients' interests. Ex. 31 ¶¶ 5, 7; Ex. 32 ¶¶ 5–9; Ex. 18 ¶ 38; Ex. 19 ¶ 26. While those clients were recently removed from CECOT, RFK Human Rights continues to represent other clients who remain in CECOT and another Salvadoran prison, Centro Industrial de Santa Ana, and with whom it is allowed no contact. Similarly, at least two people to whom CCIJ has provided legal services through its clinics have been relocated to Texas and, CCIJ believes, would be rendered to El Salvador—and thus beyond communication—but for court orders enjoining their removal. Ex. 37 ¶ 6. As long as the Agreement remains in force, these risks continue—as does the work these organizations must do now to account for that risk, *see infra*.

RFK Human Rights, Immigration Equality, and CCIJ also count among their core missions monitoring, reporting on, and working to improve conditions of confinement; ImmDef, too, monitors conditions and submit complaints accordingly. But those important missions are made impossible when, as under the Agreement, those they serve are held extraterritorially in an effective blacksite where Plaintiffs cannot contact them, otherwise obtain information about their situation, or pursue avenues that would be available to try to improve their conditions (such as filing complaints with a Department of Homeland Security oversight body) if they had remained in confinement in the United States. Ex. 31 ¶ 8; Ex. 38 ¶¶ 8, 14; Ex. 37 ¶¶ 12–14. *Cf. PETA*, 797 F.3d at 1095 (affirming organizational standing where agency "perceptibly impaired" the plaintiff's ability "to both bring [animal welfare]

violations to the attention of the agency charged with preventing avian cruelty and continue to educate the public" (quotation marks omitted)). Immigration Equality, for example, cannot use its immigration hotline to identify emerging threats and uncover dangerous conditions of confinement, as it has for years—let alone provide legal advice—to clients who are rendered beyond access to the hotline in CECOT. Ex. 38 ¶¶ 9–10, 14. And CCIJ, similarly, is unable to carry out its years-long work of collecting data on detention conditions, which it would otherwise use to educate the public and government officials and to inform conditions complaints that it files with DHS on behalf of detained immigrants. Ex. 37 ¶¶ 2, 12, 14.

The constant threat of rendition created by the Agreement itself interferes with Plaintiffs' ability to carry out their core missions. For example, the unpredictability created by the Agreement has materially impeded ImmDef's ability to carry out its work counseling clients, requiring ImmDef to spend additional time advising clients about the potential for rendition, screening for and documenting any tattoos, and making it more difficult to provide concrete advice. Ex. 32 ¶¶ 10, 14. Given the particular risks that the Agreement poses to the LGBTQ and HIV-positive populations it serves, Immigration Equality, too, has had to devote staff time and resources to tracking legal and factual developments relating to CECOT and preparing changes to the guidance and training materials the group creates for use by detained individuals and pro bono attorneys. Ex. 38 ¶ 16. The uncertainty created by the Agreement has "impair[ed its] ability to help LBGTQ and HIV-positive people facing deportation" through legal services because it is "impossible for [Immigration

Redacted for Public Filing

Equality] to fully assess the risks" and to "develop all available avenues" for relief. *Id.* ¶ 18. And as a result of the Agreement, CCIJ has had to implement new and more complex procedures to identify clients and clinic participants who may face rendition, now screening every individual for risk factors, and, where they are identified, providing additional, more time-intensive advice. Ex. 37 ¶¶ 6–8; *cf. Refugee & Immigrant Ctr.*, 2025 WL 1825431, at *23 ("The organization cannot carry out much of its core work if noncitizens cannot access asylum or other statutory protections." (quotation marks and alteration omitted)).

These injuries are materially indistinguishable from, say, the frustration of an organization's counseling and referral services, or an increase in the number of people who need an organization's counseling services, or reducing the effectiveness of an organization's outreach efforts—all of which have been found to demonstrate organizational standing. *See Scenic America* at 177 (citing *Havens Realty Corp.*, 455 U.S. at 369; *Fair Emp. Council of Greater Wash., Inc. v BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994); and *Equal Rights Ctr. v. Post Props.*, 633 F.3d 1136, 1140–42 (D.C. Cir. 2011)). And these injuries likewise "directly frustrate Plaintiffs' missions to offer [immigration services] to all." *Whitman-Walker Clinic*, 485 F. Supp. 3d at 22 (quotation marks omitted); *see also* Ex. 31 ¶¶ 2–3; Ex. 32 ¶¶ 2–3; Ex. 37 ¶¶ 2–3, 12, 14; Ex. 38 ¶¶ 3–12 (describing missions).

Each organization has also been forced to divert resources, leaving fewer for other organizational needs. RFK Human Rights has explained that the Agreement required it to "devote attorney time and organizational resources to representing

Redacted for Public Filing

clients who have been rendered to (or are at risk of being rendered to) facilities in El Salvador, diminishing the overall number of clients that RFK Human Rights is able to assist and projects that RFK Human Rights is able to undertake." Ex. 31 ¶ 11. RFK Human Rights's "[s]taff capacity and organizational financial resources are both strained by time-consuming and expensive travel to El Salvador" that the group undertook in order to attempt to make contact with their clients and survey the conditions in which they were being held. *Id.* ¶ 9. Such expenses "would not need to occur but for the Agreement," meaning the organization "is unable to devote staff time and financial resources to other work." *Id.* The additional demands on staff capacity that CCIJ has experienced have necessarily reduced not only the quality of services it can provide but the quantity of people it can serve. Ex. 37 ¶ 11. ImmDef has been forced to reduce the number of clients it can serve, and to divert resources to modify the educational materials it uses to assist other legal service providers. Ex. 32 ¶ 17. Immigration Equality has already had to divert time and resources to following these quickly changing developments, and beginning research for necessary consequent changes to its program; it anticipates that as the Agreement remains in place, it will continue to expend resources it would otherwise put to its core mission to update its training materials. Ex. 38 ¶ 16; *cf. Refugee & Immigrant Ctr.*, 2025 WL 1825431, at *23 (finding standing where immigration organization had to divert resources to respond to agency action by training staff). And the horrific experiences recounted by RFK Human Rights clients and others who have been released from CECOT, *see, e.g.*, Exs. 18–19, have only underscored the need for Plaintiffs to

Redacted for Public Filing

continue to take steps to protect their clients and others they serve. *See* Ex. 31 ¶ 7; Ex. 32 ¶ 12; Ex. 38 ¶ 19.

*Injury-in-Fact: Associational Plaintiff.* NACDL, as an association suing on behalf of its members, must show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Metro. Wash. Chapter, Associated Builders & Contractors, Inc. v. District of Columbia*, 62 F.4th 567, 572 (D.C. Cir. 2023) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

NACDL's members have been injured in their ability to provide effective legal services consistent with their constitutional obligations as criminal defense counsel. Ex. 39 ¶¶ 7–9, 11.[5] "Precedent makes plain that both the inhibition of [lawyers'] daily operations and the corresponding expenditure of additional time and resources are injuries in fact" to establish associational standing." *Drs. for Am. v. OPM*, No. 25-322, 2025 WL 1836009, at *10 (D.D.C. July 3, 2025) (quotation marks and citations omitted). Both are true here. For example, one NACDL member has found that the task of advising clients at risk of rendition "has become extremely difficult." Ex. 40 ¶ 9. Routine matters that would ordinarily take only a few hours have ballooned to

---

[5] Although the NACDL member in Exhibit 40 is anonymous, "anonymity is no barrier to standing on this record." *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 41 F.4th 586, 594 (D.C. Cir. 2022); *see also NAACP v. Trump*, 298 F. Supp. 3d 209, 225 & n.10 (D.D.C. 2018) (explaining, in summary judgment context, that the government could not "seriously dispute" that anonymous affidavits from association members were sufficient).

Redacted for Public Filing

forty. *Id.* ¶ 10. And as a result, the quality of advice they are able to offer has "meaningfully diminish[ed]." *Id.* This member has also been forced to expend resources creating additional intake guidance and resources for their colleagues representing clients at risk of rendition, taking about 15–20% of their time—which would otherwise be spent representing clients. *Id.* ¶ 7.

Another NACDL member had a professional obligation to continue defending her client from an ongoing criminal prosecution—even after that client was rendered to El Salvador, and his lawyer was unable to contact him. Ex. 41 ¶¶ 7–10. The inability to access her client while he was in CECOT "materially interfered with [her] ability and [her] colleagues' ability to carry out [their] work consistent with [their] obligations to provide constitutionally adequate counsel," and required "significant additional time and resources." *Id.* ¶ 13.

Protecting these members' interests is germane to NACDL's mission to "ensure that its members and others in the criminal defense bar are fully equipped to serve all accused persons at the highest level." Ex. 39 ¶ 5. And nothing about the claims here requires individual members' participation. *See United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996) (explaining that individual participation is not usually necessary "when an association seeks prospective or injunctive relief for its members," as opposed to an "action for damages to [its] members").

*Causation*. The harms outlined above are directly traceable to the Agreement, which provides the basis for and facilitates the rendition of people in the United

Redacted for Public Filing

States to El Salvador. *Cf. Whitman-Walker Clinic*, 485 F. Supp. 3d at 29 ("The D.C. Circuit has repeatedly held that 'injurious private conduct is fairly traceable to the administrative action contested in the suit if that action authorized the conduct or established its legality.'" (quoting *Tel. & Data Sys., Inc. v. FCC*, 19 F.3d 42, 47 (D.C. Cir. 1994))).

To the extent the State Department counters that the true cause of Plaintiffs' injuries is not the Agreement itself, but actions third parties have taken pursuant to the Agreement, that line of reasoning is unavailing, twice over. First, the Agreement itself facilitates the renditions, and the uncertainties and other issues related to the renditions, that injure Plaintiffs. Second, even though third parties cause the inhumane conditions in CECOT and actually transport people there, "the D.C. Circuit has routinely found causation established in cases where the relevant third-party conduct is voluntary but reasonably predictable." *Whitman-Walker Clinic*, 485 F. Supp. 3d at 24 (quotation marks and alterations omitted); *see also All. for Hippocratic Med.*, 602 U.S. at 383. Here, third-party conduct is not only predictable, but has actually happened: the Agreement was the linchpin that facilitated the renditions, even if other agencies played a part in executing them.

*Redressability*. Redressability follows more clearly still. *See Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 n.1 (D.C. Cir. 2017) ("[I]f a government action causes an injury, enjoining the action usually will redress that injury."). If the Agreement were set aside, as Plaintiffs request, then there would be no mechanism by which Plaintiffs' clients (including, for example, those currently in U.S. detention) could be

Redacted for Public Filing

rendered to El Salvador; they would not lose access to their clients, as well as information and reports about conditions immigrants are experiencing; and their direct services would not suffer from a need to prepare for the rendition of those they serve. Setting aside the Agreement is therefore—at minimum—likely to resolve Plaintiffs' ongoing injuries. *See Hecate Energy LLC v. FERC*, 126 F.4th 660, 665 (D.C. Cir. 2025) ("The key word is 'likely.'" (quotation marks and alteration omitted)).

## II.    The Agreement Violates the APA.

### A.    The Agreement is final agency action subject to judicial review under the APA.

A "final agency action"—like the Agreement here—is reviewable under the APA. 5 U.S.C. § 704. For agency action to be "final" it must (1) "mark the consummation of the agency's decisionmaking process" and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotation marks omitted).

The Agreement marks the "consummation" of the State Department's decisionmaking process. It is not "merely tentative or interlocutory," *id.* at 178, nor even simply complete, but has been actually implemented. Pursuant to the Agreement, the State Department has ███████████████████, and El Salvador has accepted the rendition of hundreds of people into its prisons. *See supra* 5–10.

The Agreement is likewise one "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178 (quotation marks omitted). Without it, the United States would have no mechanism to facilitate extrajudicial rendition—including of many non-Salvadorans—into

Redacted for Public Filing

Salvadoran prisons "for a duration of one year unless or until a determination concerning their long-term disposition is made." Ex. 14, at 1.

Nor could Defendants hope to evade APA review by (apparently) declining to memorialize all aspects of the Agreement in writing. *Cf.* Ex. 11, at 15 (party admission that details of the arrangement were "finalize[d] in a verbal agreement" between Secretary Rubio and President Bukele). An agency decision that meets the definition of final agency action is subject to review regardless of the particular form in which that decision is memorialized. *See Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 931 (D.C. Cir. 2008) (emphasizing that proper focus of APA review was agency's decision "to adopt a policy of disclosing confidential information without notice"—not a later document that merely "illuminates the nature of the policy"); *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015) ("Agency action . . . need not be in writing to be final and judicially reviewable"). "Denying review of agency action that is essentially conceded but ostensibly unwritten would fly in the face of the Supreme Court's instruction that finality be interpreted pragmatically." *R.I.L-R*, 80 F. Supp. 3d at 184 (quotation marks and brackets omitted).

## B.    The Agreement is contrary to law and constitutional right.

Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law" or "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A), (B). The APA's reference to "law" in the phrase "not in accordance with law," "means, of course, *any* law, and not merely those

Redacted for Public Filing

laws that the agency itself is charged with administering." *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) (emphasis in original).

An agency acts contrary to law or constitutional right when, among other things, its actions: (1) are themselves expressly prohibited by the Constitution or other law, *see, e.g.*, *E. Band of Cherokee Indians v. Dep't of the Interior*, 534 F. Supp. 3d 86, 97 (D.D.C. 2021) ("Agency action is obviously 'not in accordance with law' if it violates some extant federal statute or regulation."); (2) enable conduct that is prohibited by the Constitution or other law, *see, e.g.*, *Humane Soc'y of the U.S. v. Glickman*, 217 F.3d 882, 884 (D.C. Cir. 2000) (agency memo stating "that federal agencies no longer needed to obtain a permit before taking or killing migratory birds" was contrary to law because killing the birds without a permit was prohibited by statute); or (3) deny someone a right guaranteed them by the Constitution or other law, *see, e.g.*, *Navajo Nation v. Azar*, 302 F. Supp. 3d 429, 435–36, 439–440 (D.D.C. 2018) (agency acted contrary to statute by denying plaintiff appeal rights provided under that law). The Agreement is contrary to numerous provisions of law. Any one of those violations would justify holding the Agreement unlawful and setting it aside.

1.    **The Agreement deprives people of foundational constitutional and statutory protections before they are rendered.**

By providing for the sudden rendition of people in the United States without process, to be held in another country incommunicado and without access to counsel, the Agreement deprives people of fundamental protections offered by the Fifth Amendment's Due Process Clause, the Suspension Clause, the Sixth Amendment, the

**Redacted for Public Filing**

Immigration and Nationality Act, and the Non-Detention Act. The Agreement is therefore contrary to these constitutional provisions and statutes.

The Agreement's implementation, the government's own admissions about the Agreement, and ███████████████████████████ uniformly establish that the Agreement lacks protections sufficient to ensure that "[n]o person" "shall be . . . deprived of life, liberty, or property, without due process of law," U.S. Const. amend. V, and that it enables government action directly at odds with that guarantee. "An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950)). That protection applies "in the context of removal proceedings." *A.A.R.P. v. Trump*, 145 S. Ct. 1364, 1367 (2025); *see also Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025) (holding that detainees subject to the President's Alien Enemies Act proclamation "are entitled to notice and opportunity to be heard").

Yet the Agreement has allowed the government to take people from the United States, put them on planes, and send them to be held in prison facilities in El Salvador with little to no notice and no opportunity for a hearing. *See, e.g.*, *J.G.G. v. Trump*, No. 1:25-cv-766, 2025 WL 1577811, at *3–4 (D.D.C. June 4, 2025), *vacated & remanded*, No. 25-5217, 2025 WL 2317650 (D.C. Cir. Aug. 8, 2025). Defendants' March 13 diplomatic note shows that even El Salvador received only 24 hours' initial notice that the first renditions were coming. Ex. 14, at 2. The Court thus has already

Redacted for Public Filing

determined in a related case that a class of people rendered under the Agreement were likely to succeed in showing that the government violated their right to due process. *J.G.G.*, 2025 WL 1577811, at *7. The Agreement's lack of safeguards to avoid such results renders it contrary to the Due Process Clause.

The Agreement is also contrary to both the Suspension Clause and the Sixth Amendment. The Suspension Clause provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. art. I, § 9, cl. 2. The Sixth Amendment guarantees important rights "[i]n all criminal prosecutions," including the right to a public trial, to be informed of the accusation, to confront witnesses, and to the assistance of counsel. U.S. Const. amend. VI.

The Agreement runs roughshod over these critical protections regarding the government's power to imprison people. It allows the government to abruptly disappear people to CECOT or other facilities in El Salvador where, in the government's view, at least, those people have no access to habeas corpus. *See* Ex. 42, at 5–12, *J.G.G.*; *see also J.G.G.*, 2025 WL 1577811, at *13 (concluding on then-existing record that the Court likely lacked jurisdiction to hear habeas petition of those held in CECOT). That is "suspend[ing]" the privilege of habeas corpus for those people by any understanding of the term. So too, the Agreement results in the government sending people it accuses of grave crimes to be incarcerated in CECOT or other prison facilities without *any* of the protections the Sixth Amendment

Redacted for Public Filing

guarantees, including the right to trial and access to counsel, which continue to be denied once held in CECOT. *See supra* 11.

The Agreement also conflicts with the comprehensive framework set out in the Immigration and Nationality Act dictating the procedures that must be followed in removing someone from the United States, *e.g.*, 8 U.S.C. §§ 1229a, 1228, and the countries to which a non-citizen can be removed, *id.* § 1231(b). The INA, for example, provides for removal proceedings to take place before an immigration judge and sets forth the details of how such proceedings should be conducted. *Id.* § 1229a. Yet the Agreement allows for removal without any observance of these procedures or the protections they afford to those being removed.[6] Similarly, the INA limits the countries to which a person may be removed, *id.* § 1231(b), but the Agreement makes no allowance for those limitations, resulting already in the rendition of hundreds of Venezuelans to El Salvador despite their lack of connection to that country. *See, e.g.*, Ex. 43 (describing case of one Venezuelan asylum seeker whom the government disappeared into CECOT almost without a trace).

Because the Agreement fails to include sufficient safeguards against the rendition and indefinite detention of U.S. citizens, it also violates the Non-Detention

---

[6] While the government has invoked the Alien Enemies Act as an alternative basis for rendering some people under the Agreement, it has also rendered people under the Agreement who fall outside the scope of the President's proclamation under the AEA, and has threatened to do the same to still more. In any event, to the extent that the government has relied on the Alien Enemies Act, the Agreement is contrary to that law, too—including its guarantees of a "full examination and hearing" in federal court, 50 U.S.C. § 23, and, for those not chargeable with crimes against public safety, "reasonable time" to "settle affairs and depart" that is "consistent with the public safety, and according to the dictates of humanity and national hospitality," *id.* § 22.

Redacted for Public Filing

Act's prohibition on the United States "imprison[ing] or otherwise detain[ing]" one of its citizens "except pursuant to an Act of Congress." 18 U.S.C. § 4001(a).

### 2. The Agreement unlawfully condemns people to torture and abuse in confinement.

By providing for the rendition of people directly into conditions of torture, abuse, and severe mistreatment, the Agreement is also contrary to the Eighth Amendment, the Detainee Treatment Act, and the Convention Against Torture and its implementing statute and rules.

As detailed above, *see supra* 1–4, it was widely known—and acknowledged by the State Department itself—at the time Defendants entered into the Agreement that inhumane treatment, including violent physical abuse and torture, was rampant in Salvadoran prisons. The experience of those rendered under the Agreement confirms that reality. *See, e.g.*, Exs. 18–19. Prison conditions there not only plainly qualify as cruel, inhumane, and degrading but easily meet the government's own understanding of "torture." *See* 8 C.F.R. § 208.18.

Yet the central purpose of the Agreement is to provide for people to be held in such conditions. The Agreement thus is contrary to the Eighth Amendment's prohibition on the infliction of "cruel and unusual punishment," U.S. Const. amend. VIII; *see also DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989) ("[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set

Redacted for Public Filing

by the Eighth Amendment."). And because that is so, it is also contrary to the Detainee Treatment Act's prohibition on subjecting anyone "in the custody or under the physical control of the United States Government, regardless of nationality or physical location," to "cruel, inhuman, or degrading treatment or punishment," 42 U.S.C. §§ 2000dd(a), 2000dd-0(1); *see also id.* § 2000dd(d) (incorporating conduct prohibited by the Fifth, Eighth, and Fourteenth Amendments); § 2000dd-0(2) (same); Ex. 44, at 5 (per *J.G.G.* file-stamp) (reflecting statement by El Salvador explaining that the United States "facilitated the use of the Salvadoran prison infrastructure for the custody of persons detained within the scope of the justice system and law enforcement" of the United States).

So too, the Agreement violates the prohibition in CAT and its implementing laws against expelling "a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." U.N. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 3, Dec. 10, 1984; Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, tit. XXII, § 2242, 112 Stat. 2681 (1998) (codified at 8 U.S.C. § 1231 notes); 8 C.F.R. §§ 208.16–.18. While "torture" as used in CAT refers to "an extreme form of cruel and inhuman treatment" even more severe than some types of mistreatment and neglect prohibited by the Eighth Amendment and Detainee Treatment Act, *see* 8 C.F.R. § 208.18(a)(2), there were at the time of the Agreement "substantial grounds" to suspect that people rendered under the Agreement faced the danger of being tortured as a result.

**Redacted for Public Filing**

The fact that those diplomatic notes Defendants have chosen to provide include references to CAT, *see* Ex. 14, at 1, Ex. 15, Ex. 16, at 8, does not demonstrate that the Agreement is consistent with the government's obligations under that treaty or its implementing laws. (The references to CAT are also plainly not controlling of whether the Agreement was contrary to the Eighth Amendment or Detainee Treatment Act, both of which provide protections beyond preventing actual torture.) The notes do not reflect the whole of the Agreement and appear to have come only after the State Department and El Salvador had already agreed that the United States would pay El Salvador to accept people from the United States and hold them in its prisons. *See supra* 5 & n.1. The March 13 note expressed the State Department's "understand[ing]" that El Salvador will "accept" the rendered people "in a manner that is consistent with [its] international legal obligations . . . including [CAT]," Ex. 14, at 1, and El Salvador's March 14 response stated that "the reception of these individuals will be conducted in accordance with," among other obligations, CAT, Ex. 15. But neither addresses those individuals' treatment once in confinement or included any mechanism for monitoring their treatment and ensuring they were not tortured—despite the obvious need for assurances given the State Department's awareness of the conditions they were sending people to face in Salvadoran prisons. The March 31 note comes even longer after the Agreement was finalized (and after sustained reporting on the horrific conditions in CECOT) and even after the rendition of people it documents; it is more akin to a receipt than an agreement. Ex. 16.

Redacted for Public Filing

Collectively, these notes created after the Agreement was finalized shed little light on—and certainly are not determinative of—the Agreement's consistency with CAT and its implementing laws. *Cf. Motor Vehicle Mrfs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) (rejecting reliance on "*post hoc* rationalizations for agency action"). While the Court's review of agency action "is deferential," the Court is "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

### 3. The Agreement denies people other basic legal rights and protections to which they would otherwise be entitled.

Because people rendered under the Agreement are denied basic rights and protections, such as the right to practice religion, the Agreement is also contrary to the First Amendment, Religious Freedom Restoration Act, the First Step Act, and regulations of the Bureau of Prisons and Department of Homeland Security.

As the State Department's own prior findings suggest ███████████████, prison facilities in El Salvador do not provide detainees with the right to practice religion that they would have enjoyed had they remained in the United States. *See* Ex. 1, at 20 (incorporating other State Department findings); Ex. 4, at 6; Ex. 5, at 6; Ex. 18 ¶ 39; Ex. 19 ¶ 26. The Agreement therefore is contrary to the First Amendment's Free Exercise Clause and to the Religious Freedom Restoration Act, which requires that government actions that "substantially burden a person's exercise of religion" must satisfy strict scrutiny, 42 U.S.C. § 2000bb-1. (The Agreement flunks strict scrutiny, including because the government could not show

Redacted for Public Filing

that rendering people to a foreign blacksite is the "least restrictive means" of furthering any relevant government interest, *see id*. § 2000bb-1(b)(2).)

The Agreement also runs afoul of the First Step Act, which requires that the Bureau of Prisons "place [a] prisoner in a facility as close as practicable to the prisoner's primary residence, and to the extent practicable, in a facility within 500 driving miles of that residence." 18 U.S.C. § 3621(b). To the extent the Agreement outsources the detention of people who have been convicted and committed to the custody of the Bureau of Prisons, it necessarily requires that those rendered be placed in a location wholly inaccessible from their primary residence.

Similarly, the direct and obvious effect of the Agreement as applied to those rendered from the custody of the Bureau of Prisons or Department of Homeland Security into CECOT is to unlawfully deprive those people of the rights and protections they would otherwise have continued to receive under Bureau of Prisons and DHS regulations. For those in the custody of the Bureau of Prisons, these rights include, among other things, having access to religious programs, 28 C.F.R. §§ 551.110, 548.10, as well as legal materials and the ability to call an attorney, *id*. §§ 551.117; 543.13. For those held by DHS, it means important protections against sexual abuse and assault, *see* 6 C.F.R. subpts. A, B—protections clearly lacking in CECOT, *see* Ex. 18 ¶ 33; Ex. 19 ¶ 36.

█████████████████████████████                    **Redacted for Public Filing**

### 4. The Agreement contracts to spend government money without valid appropriation by Congress or observance of regulatory requirements.

The Agreement is contrary to the Appropriations Clause because it provides for payment of government funds to reimburse the cost of detaining those rendered without an appropriation made by law. It is contrary to the Federal Acquisition Regulation because it utterly fails to comply with the procedures for government contracting set out in the FAR.

The Appropriations Clause states that, "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. "Textually, the command is unmistakable—no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 425 (2024) (quotation marks omitted). Yet no act of Congress appropriates money to fund the rendition of those in the United States to be held in CECOT or other facilities in El Salvador. ██████████████████

████████████████████████████████████████ ███

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

The most recent appropriations act ███████████████████████

████████████████ is no help to Defendants either: It nowhere authorizes the use of that money for extrajudicial renditions to inhumane prisons. *See* Further Consolidated Appropriations Act, 2024, Pub. L. No. 118–47, tit. IV, 138 Stat. 460, 747

Redacted for Public Filing

(Mar. 23, 2024); *see also* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119–4, tit. I, 139 Stat. 9, 10, 12 (Mar. 15, 2025) (re-appropriating funds under Public Law 118–47 "under the authority and conditions provided in applicable appropriations Acts for fiscal year 2024"). To the contrary, Congress directed that the money "shall be made available for assistance *to eliminate* inhumane conditions in foreign prisons and other detention facilities." Further Consolidated Appropriations Act, 2024 § 7035(a)(5), 138 Stat. 795. Instead of eliminating such conditions, the Agreement directly finances them. And it likewise flouts requirements in that act that no funds "may be obligated or expended" for El Salvador absent required notifications to the Committees on Appropriations. *Compare id.* § 7015(f), 138 Stat. 768, *with* Ex. 45, at 2 (citing lack of notification). The Agreement cannot be squared with the Appropriations Clause.

Similarly, the Agreement is counter to the FAR, 48 C.F.R. chpt. 1, which sets out uniform policies and procedures by which executive agencies contract for goods and services. By outsourcing the detention of those held in confinement in the United States, Defendants have contracted for services from El Salvador yet have failed to comply with the FAR or its implementing regulations. *See id.* § 601.302 (adopting the FAR for "all DOS acquisitions of personal property and services . . . both within and outside the United States," subject to limited exceptions). The FAR requires, among other things, disclosure of certain justifications. *See, e.g.*, *id.* § 5.406. In entering the Agreement, Defendants complied with none of these requirements.

██████████████████████    **Redacted for Public Filing**

### C.    The Agreement is arbitrary and capricious.

"The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *accord Multicultural Media, Telecom & Internet Council v. FCC*, 873 F.3d 932, 936–37 (D.C. Cir. 2017) ("The court must ensure that the agency's action— and the agency's explanation for that action—falls within a zone of reasonableness."); 5 U.S.C. § 706(2)(A). While a court "may not substitute its judgment for that of the agency," "it must ensure, among other things, that the agency has offered a satisfactory explanation for its action" and did not "simply ignore an important aspect of the problem." *Ohio v. EPA*, 603 U.S. 279, 292–93 (2024) (quotation marks omitted).

The Agreement is arbitrary and capricious in numerous respects. First, in entering into the Agreement, Defendants ignored the requirements of the various constitutional provisions, statutes, and other laws that, as just described, *see* supra Sec. II.B, govern the conditions in which individuals may be detained and the circumstances in which they may be removed. Because the requirements of the Fifth Amendment, INA, and other laws relevant to detention and removal are clearly "an important aspect of the problem" that was before the agency, Defendants were required to consider and address them. *State Farm*, 463 U.S. at 43. They did not. ████████████████████████ that, prior to entering the Agreement, Defendants considered the requirements of any of these laws or sought to conform the Agreement to them. To the contrary, and as already explained, the Agreement actually conflicts with those laws. ████████████████████████████████████

███████████████████████    **Redacted for Public Filing**

████████████████████████████████████████

████████████████████████████████████████

████████████████████████    It is therefore not only unsupported by a

reasonable explanation but substantively unreasonable. *See Prometheus Radio*, 592

U.S. at 423; *Multicultural Media*, 873 F.3d at 936.

Second, the Agreement failed to account for the barbaric conditions in

Salvadoran prison facilities, conditions the State Department itself has long warned

about. *See supra* 1–2; *see also 2021 Global Magnitsky Human Rights Accountability

Act Annual Report*, 88 Fed. Reg. 18,624, 18,628 (Mar. 29, 2023) (Treasury, in

consultation with the Secretary of State, sanctioning Chief of the Salvadoran Penal

System and Vice Minister of Justice and Public Security for, among other things,

allowing known gang members to enter prison facilities). Evidence of those conditions

was clearly "an important aspect" that Defendants were required to consider and

address before entering into an agreement to send people in the United States to be

held in those conditions. *State Farm*, 463 U.S. at 43. But again, nothing ████████

establishes, that before entering the Agreement, Secretary Rubio or anyone else in a

position of responsibility at the State Department seriously considered, let alone

substantively addressed, the beatings, torture, hunger, thirst, terror, pain, sickness,

and other cruelties that would—and, in fact, did—directly result from their actions.

This Court and others routinely set aside agency actions as arbitrary and capricious

for far lesser oversights. *E.g.*, *Ohio v. EPA*, 603 U.S. at 293–94 (holding that EPA

likely acted arbitrarily and capriciously where it did not consider how the number of

█████████████████████  **Redacted for Public Filing**

states participating in an emissions-limitation plan would "affect what measures maximize cost-effective downwind air-quality improvements").

Third, and relatedly, the Agreement fails ████████████████ sufficient to ensure an appropriate standard of care for those rendered to El Salvador—notwithstanding the copious evidence concerning the conditions there that was before the agency when it acted. ████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████ ██ ██

Yet ████████████████████████████████

██████████ , they took no effective steps to prevent the abuse of those sent there from the United States. ████████████████████████████

████████████████████████████████████

████████████████████████████ *see, e.g.*, Ex. 19 ¶ 4—a problem that was not only foreseeable, but actually materialized. Given Defendants' awareness of the conditions in Salvadoran prisons, ████████████████████████ ,

Redacted for Public Filing

and the dire and foreseeable consequences of failing to ensure an adequate standard of care, this aspect of the Agreement is plainly arbitrary and capricious.

Fourth, the Agreement similarly fails—if one accepts the government's own position—to provide for any mechanism of securing someone's return after rendition. For example, addressing the case of Kilmar Abrego Garcia, whom the United States rendered to El Salvador by mistake, the Attorney General represented that it is "up to El Salvador if they want to return him, that's not up to us." *See* Ex. 46 (time stamp 16:45); Ex. 47 ¶ 7 (disavowing the authority to extract Mr. Abrego Garcia from CECOT, who was ultimately returned to the U.S. to face criminal charges).

The likelihood that U.S. immigration authorities might erroneously render someone to El Salvador, or that there would otherwise be need to seek their return, was apparent at the time Defendants entered into the Agreement. Erroneous removals occur: The government's own data indicates that from fiscal year 2015 to March 2020, "ICE arrested 674, detained 121, and removed 70 potential U.S. citizens." Ex. 48, at 3. And that was before the current administration instituted arrest quotas and other steps that have only increased the chance of error. *See* Ex. 49, at 1; Ex. 50, at 1–2 (tripling January quotas). Defendants' failure to take even minimal steps to prepare for the entirely foreseeable situation of needing to seek an individual's return is arbitrary and irrational.

Fifth, the Agreement reflects no consideration of reasonable alternative approaches. An agency is required "to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives." *Spirit*

Redacted for Public Filing

*Airlines, Inc. v. Dep't of Transp.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021). "This principle goes to the heart of reasoned decisionmaking; it is not limited to rulemaking." *Id.* "The failure of an agency to consider obvious alternatives has led uniformly to reversal." *Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 746 n.36 (D.C. Cir. 1986). Here, obvious alternatives to the approach Defendants took include: providing for a minimum standard for care for those who are rendered; providing that they be given access to counsel, the reasonable ability to practice their religion, and some opportunity for communication with their families; and including a mechanism to secure the return of people from El Salvador. An even more straightforward alternative would have been for the government to simply comply with all relevant laws and stick to its normal processes for detaining and removing people. Defendants have not given—and could not give—"a reasoned explanation for [their] rejection of such alternatives." *Spirit Airlines*, 997 F.3d at 1255. Their actions are arbitrary and capricious as a result.

Sixth, Defendants failed to account for the substantial reliance interests of Plaintiffs and those like them in being able to communicate with those who are detained or incarcerated under U.S. authority. Plaintiffs and their members rely on that ability to carry out their missions by, for example: talking with clients to discuss legal strategy and gather information in order to ensure effective representation; providing "know your rights" materials and other assistance to those pursuing pro se claims; and monitoring conditions of confinement and threats to the well-being of the communities they serve. *See supra* Sec. I. Those in detention or who have been

incarcerated have an even greater reliance on being able to communicate not only with their counsel like Plaintiffs but with family and others.

"When an agency changes course, as [Defendants] did here, it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020). That required Defendants, before replacing the existing system of detention and removal with an entirely new regime of rendition to a foreign black site, "to assess whether there were reliance interests [engendered by the prior regime], determine whether they were significant, and weigh any such interests against competing policy concerns." *Id.* at 33. As Defendants did none of those things, the Agreement should be vacated. *See, e.g.*, *Int'l Org. of Masters, Mates & Pilots, ILA, AFL-CIO v. NLRB*, 61 F.4th 169, 180 (D.C. Cir. 2023) (explaining that "we are left with no choice but to vacate the Board's arbitrary and capricious decision for want of reasoned decision making" because the Board "adopted its new rule with no regard for the parties' reliance interests").

These multiple fundamental shortcomings, whether considered individually or in combination, make the Agreement arbitrary and capricious.

### D.    The Agreement exceeds statutory authority.

"An agency . . . literally has no power to act . . . unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022) (quotation marks omitted). No statute authorized the State Department to outsource the detention of individuals within the United States, much less their abuse, by entering

Redacted for Public Filing

into the Agreement with El Salvador. The Court therefore should hold unlawful and set aside the Agreement as "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

The State Department's general role and responsibilities in negotiating agreements with other countries does not authorize it to enter into agreements on any terms it chooses. Agencies are not imbued with "some default authority" to take whatever action they believe falls within their general purview. *See Michigan v. EPA*, 268 F.3d 1075, 1084 (D.C. Cir. 2001). That is particularly true here, where numerous specific statutory provisions define the conditions in which the government may hold individuals in confinement and the circumstances in which it may remove non-citizens. *See supra* Sec. II.B. The State Department cannot circumvent those specific provisions via resort to its general mission and responsibilities. *See, e.g.*, *Michigan v. EPA*, 268 F.3d at 1084 ("EPA cannot rely on its general authority to make rules necessary to carry out its functions when a specific statutory directive defines the relevant functions of EPA in a particular area." (quoting *Am. Petroleum Inst. v. EPA*, 52 F.3d 1113, 1119 (D.C. Cir. 1995))); *cf. Gomez v. Trump*, 485 F. Supp. 3d 145, 190–94 (D.D.C. 2020) (holding that the State Department likely exceeded its statutory authority where its actions were inconsistent with specific provisions of INA governing visa eligibility).

Defendants' lack of authority is made even clearer by the unprecedented and shocking nature of the power they assert. The Supreme Court has emphasized repeatedly that it "expect[s] Congress to speak clearly when authorizing an agency to

Redacted for Public Filing

exercise powers of vast economic and political significance." *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022) (quoting *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021)); *see also Nat'l Council of Nonprofits v. OMB*, 775 F. Supp. 3d 100, 126 (D.D.C. 2025) (noting that "the 'sheer scope of [an agency]'s claimed authority' can trigger heightened judicial scrutiny" (quoting *Ala. Ass'n of Realtors*, 594 U.S. at 764)), *appeal pending*, No. 25-5148 (D.C. Cir.). There is no such congressional directive here.

Defendants can hardly gainsay that the power to contract for people in the United States to be flown to and held in an overseas facility where they face torture is one of "vast . . . political significance," *Nat'l Fed'n of Indep. Bus.*, 595 U.S. at 117—certainly as significant as the decision to cancel a large amount of student loan debt, *see Biden v. Nebraska*, 600 U.S. 477, 506 (2023). "Indeed, the Government's [position] would give the [State Department] a breathtaking amount of authority." *See Ala. Ass'n of Realtors*, 594 U.S. at 764. It would seem to confer on that agency sweeping powers over those living in the United States, so long as the agency exercised those powers via agreements with foreign actors. No provision of the State Department's organic statute, or any other statute, grants the agency that authority.

## III. The Agreement Is Ultra Vires.

In the alternative, the Court should hold the Agreement ultra vires and invalid because it conflicts with the Constitution and several statutory prohibitions.

Plaintiffs are entitled to judicial review of their claims that the Agreement violates the Constitution. "The ability to sue to enjoin unconstitutional actions by

Redacted for Public Filing

state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015); *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) ("[I]t is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution." (quoting *Bell v. Hood*, 327 U.S. 678, 684 (1946)). As explained above, *supra* Sec. II.B, the Agreement infringes on the protections provided by the Due Process Clause, Suspension Clause, Sixth Amendment, Eighth Amendment, First Amendment, and Appropriations Clause. The Court therefore should hold unlawful and enjoin any action based on the unconstitutional Agreement.

Plaintiffs would also be entitled to review of their statutory ultra vires claims, if the Court were to conclude that Plaintiffs' APA claims were unavailable. As the Supreme Court recently emphasized, courts may review alleged statutory violations by an agency if (1) the agency "has taken action entirely in excess of its delegated powers and contrary to a specific prohibition in a statute" and (2) no "statutory review scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial review" or if such a scheme "forecloses all other forms of judicial review." *NRC v. Texas*, 145 S. Ct. 1762, 1775–76 (2025) (quotation marks and emphasis omitted). As detailed above, Defendants have acted entirely in excess of their delegated powers, in shocking and unprecedented ways, and in doing so have acted contrary to specific statutory prohibitions, *e.g.*, 8 U.S.C. § 1231 note; 42 U.S.C. §§ 2000dd(a), 2000dd-0(1).

## IV.    The Agreement Must Be Set Aside.

The APA "provid[es] clear instruction for what courts must do if they find that agency action" violates the APA—"namely, 'hold unlawful and set aside' the defective action." *Whitman-Walker Clinic*, 485 F. Supp. 3d at 62 (quoting 5 U.S.C. § 706(2)). The D.C. Circuit has therefore held—for decades—that "[t]he ordinary practice is to vacate unlawful agency action." *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019); *see also Rose v. Becerra*, No. 19-2848 , 2024 WL 3202342, at *29 (D.D.C. June 27, 2024) (declining "to judicially re-write what the agency did so that it somehow does not apply to a narrow group of people or so that it persists piecemeal"). Given the "seriousness of the [Agreement's] deficiencies," there is no reason to deviate from the ordinary course here. *Stewart v. Azar*, 366 F. Supp. 3d 125, 155 (D.D.C. 2019). To the extent that vacatur "disrupts" plans to render additional people to El Salvador, consigning them to inhumane treatment in violation of myriad U.S. laws, that is the appropriate result. And to the extent anyone remains rendered to El Salvador under the Agreement, they should be returned, as the legal basis (such as it was) for their rendition has been invalidated. Were the Court to award relief only as to Plaintiffs' ultra vires claim, it should declare the Agreement unlawful and enjoin Defendants and those described in Rule 65(d)(2) from taking any steps to implement, give effect to, or reinstate the Agreement under a different name.

## CONCLUSION

The Court should declare the Agreement unlawful and set it aside.

Redacted for Public Filing

Dated: August 22, 2025                    Respectfully submitted,

/s/ *Jessica Anne Morton*

Jessica Anne Morton (DC Bar No. 1032316)
Kevin E. Friedl (DC Bar No. 90033814)
Robin F. Thurston (DC Bar No. 1531399)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
jmorton@democracyforward.org
kfriedl@democracyforward.org
rthurston@democracyforward.org

*Counsel for All Plaintiffs*


Anthony Enriquez (DDC Bar No. NY0626)
Sarah T. Gillman (DDC Bar No. NY0316)
Robert F. Kennedy Human Rights
88 Pine Street, Suite 801
New York, NY 10005
(917) 284-6355
enriquez@rfkhumanrights.org
gillman@rfkhumanrights.org

Sarah E. Decker (DDC Bar No. NY0566)
Medha Raman (DC Bar No. 90027539)
Robert F. Kennedy Human Rights
1300 19th Street NW, Suite 750
Washington, DC 20036
(202) 559-4432
decker@rfkhumanrights.org
raman@rfkhumanrights.org

*Counsel for Plaintiff RFK Human Rights*