[redacted] **Redacted for Public Filing**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ROBERT F. KENNEDY HUMAN RIGHTS, *et al.*,

*Plaintiffs*,

v.

DEPARTMENT OF STATE, *et al.*,

*Defendants*.

Case No. 25-cv-1774-JEB

**DECLARATION OF JESSICA ANNE MORTON**

I, Jessica Anne Morton, declare as follows:

1. I am an attorney at Democracy Forward Foundation, counsel for Plaintiffs in the above-captioned action. I submit this declaration in support of Plaintiffs' motion for summary judgment.

2. Attached as Exhibit 1 is a true and correct copy of the Department of State's Bureau of Democracy, Human Rights, and Labor's report entitled *El Salvador 2023 Human Rights Report*, which Democracy Forward obtained from the State Department's website on May 28, 2025, and which is publicly available at https://perma.cc/MG4W-P4EE.

3. Attached as Exhibit 2 is a true and correct copy of the Department of State's Bureau of Democracy, Human Rights, and Labor's report entitled *El Salvador 2022 Human Rights Report*, which Democracy Forward obtained from the State Department's website on August 18, 2025, and which is publicly available at https://perma.cc/PJ3C-VKUE?type=image.

4. Attached as Exhibit 3 is a true and correct copy of the Department of State's Bureau of Democracy, Human Rights, and Labor's report entitled *El Salvador 2021 Human Rights Report*, which Democracy Forward obtained from the State Department's website on May 28, 2025, and which is publicly available at https://perma.cc/D6KA-9RTQ.

5. Attached as Exhibit 4 is a true and correct copy of the Department of State's Bureau of Democracy, Human Rights, and Labor's report entitled *El Salvador 2020 Human Rights Report*, which Democracy Forward obtained from the State Department's website on August 18, 2025, and which is publicly available at https://perma.cc/97MN-N7GK?type=image.

6. Attached as Exhibit 5 is a true and correct copy of the Department of State's Bureau of Democracy, Human Rights, and Labor's report entitled *El Salvador 2019 Human Rights Report*, which Democracy Forward obtained from the State Department's website on August 18, 2025, and which is publicly available at https://perma.cc/HV3V-72HQ?type=image.

7. Attached as Exhibit 6 is a true and correct copy of the Department of State's Bureau of Democracy, Human Rights, and Labor's report entitled *El Salvador 2018 Human Rights Report*, which Democracy Forward obtained from the State Department's website on August 2, 2025, and which is publicly available at https://perma.cc/5RML-KY5T?type=image.

8. Attached as Exhibit 7 is a true and correct copy of a declaration of Juanita Goebertus, dated August 19, 2025.

9. Attached as Exhibit 8 is a true and correct copy of the Inter-American Commission on Human Rights's report entitled *Report: State of Emergency and Human Rights in El Salvador* and dated June 28, 2024, which Democracy Forward obtained from the Inter-American Commission's website, and which is publicly available at https://perma.cc/HHF2-RA94.

10. Attached as Exhibit 9 is a true and correct copy of a press release issued by the State Department entitled *Secretary of State Marco Rubio and Salvadoran Foreign Minister Alexandra Hill Tinoco at the Signing of a Memorandum of Understanding Concerning Strategic Civil Nuclear Cooperation* and dated February 3, 2025, which Democracy Forward obtained from the State Department's website, and which is publicly available at https://perma.cc/EAL4-XLM5.

11. Attached as Exhibit 10 is a true and correct copy of an X post from Nayib Bukele's X account (@nayibbukele) dated Feb. 3, 2025 at 9:44 PM, which Democracy Forward obtained from the X website, and which is publicly available at https://perma.cc/8LJB-8EJE.

12. Attached as Exhibit 11 is a true and correct copy of a document entitled *Secretary of State Marco Rubio Remarks to the Press* and dated March 28, 2025, which Democracy Forward obtained from the State Department's website, and which is publicly available at https://perma.cc/BU2X-JFJH.

13. Attached as Exhibit 12 is a true and correct copy of [redacted] and produced by Defendants, Bates-stamped RFK Human Rights_0010–14. For the redacted version of this filing, we attach a

redacted, non-designated version of this document produced by Defendants on August 5, 2025 (which does not bear either a signature or Bates numbers).

14. Attached as Exhibit 13 is a true and correct copy of [redacted] and produced by Defendants, Bates-stamped RFK Human Rights_0015–20.

15. Attached as Exhibit 14 is a true and correct copy of a diplomatic note from the Embassy of the United States of America to the Ministry of Foreign Affairs of the Republic of El Salvador dated March 13, 2025 and produced by Defendants, Bates-stamped RFK Human Rights_0001–2.

16. Attached as Exhibit 15 is a true and correct copy of a diplomatic note from the Ministry of Foreign Affairs of the Republic of El Salvador to the Embassy of the United States of America dated March 14, 2025 and produced by Defendants, Bates-stamped RFK Human Rights_0003.

17. Attached as Exhibit 16 is a true and correct copy of a diplomatic note from the Embassy of the United States of America to the Ministry of Foreign Affairs of the Republic of El Salvador dated March 31, 2025 and produced by Defendants, Bates-stamped RFK Human Rights_0008–9.

18. Attached as Exhibit 17 is a true and correct copy of an X post from Secretary Rubio's account (@SecRubio) dated March 16, 2025 at 7:59 AM, which Democracy Forward obtained from the X website, and which is publicly available at https://perma.cc/7VNN-W7SJ.

19. Attached as Exhibit 18 is a true and correct copy of a declaration of an RFK Human Rights client who was rendered to CECOT, dated August 14, 2025, accompanied by a true and correct copy of a translation of that declaration from Spanish into English, and a declaration from the translator, all of which have the name of the declarant redacted.

20. Attached as Exhibit 19 is a true and correct copy of a declaration of an RFK Human Rights client who was rendered to CECOT, dated August 15, 2025, accompanied by a true and correct copy of a translation of that declaration from Spanish into English, and a declaration from the translator, all of which have the name of the declarant redacted.

21. Attached as Exhibit 20 is a true and correct copy of an X post from Secretary Rubio's account (@SecRubio) dated March 16, 2025 at 8:39 AM, which Democracy Forward obtained from the X website. Although the attached pdf cannot show the video in this post, the post (with video capability) is publicly available at https://x.com/SecRubio/status/1901252043517432213 or (in a preserved form, without video) at https://perma.cc/WH9B-K7AE.

22. Attached as Exhibit 21 is a true and correct copy of a Truth Social post from President Trump's account (@realDonaldTrump) dated March 21, 2025 at 7:43 AM, which Democracy Forward obtained from the Truth Social website and which is publicly available at https://perma.cc/F4WN-DB4Y.

23. Attached as Exhibit 22 is a true and correct copy of [redacted]

[redacted] **Redacted for Public Filing**

[redacted] and produced by Defendants, Bates-stamped RFK Human Rights_0004–7.

24. Attached as Exhibit 23 is a true and correct copy of a document entitled *U.S. Department of State Terms and Conditions for Foreign Public Entities*, which Democracy Forward obtained from the State Department's website on August 19, 2025, and which is publicly available at https://perma.cc/BA98-GBK4.

25. Attached as Exhibit 24 is a true and correct copy of Jennifer Hansler and Priscilla Alvarez's CNN article entitled *Trump Admin Proposed Sending up to 500 Alleged Venezuelan Gang Members During Negotiations to Use El Salvador's Mega-prison* dated April 28, 2025, which Democracy Forward obtained from the CNN website and which is publicly available at https://perma.cc/NMJ4-WACD.

26. Attached as Exhibit 25 is a true and correct copy of a document entitled *More Foreign Gang Terrorists Deported Out of America* and dated March 31, 2025, which Democracy Forward obtained from the State Department's website, and which is publicly available at https://perma.cc/UD3W-MT8T.

27. Attached as Exhibit 26 is a true and correct copy of an X post from Secretary Rubio's account (@SecRubio) dated April 13, 2025 at 10:45 AM, which Democracy Forward obtained from the X website, and which is publicly available at https://perma.cc/K3KT-XAXV.

28. Attached as Exhibit 27 is a true and correct copy of an X post from Nayib Bukele's X account (@nayibbukele) dated July 18, 2025 at 3:49 PM, which Democracy

Forward obtained from the X website. Although the attached pdf cannot show the video in this post, the post (with video capability) is publicly available at https://x.com/nayibbukele/status/1946296384035918284?t=ISZ3RlEfksb_vhKoxu_pNg or (in a preserved form, without video) at https://perma.cc/3ZB7-ENDU.

29. Attached as Exhibit 28 is a true and correct copy of Samantha Schmidt et al.'s Washington Post article entitled *'Welcome to hell': Inside the megaprison where the U.S. deported migrants*, dated July 31, 2025, which Democracy Forward obtained from the Washington Post website and which is publicly available at https://perma.cc/639M-LRV5.

30. Attached as Exhibit 29 is a true and correct copy of Perla Trevizo et al.'s ProPublica article entitled *Now That They're Free*, dated July 30, 2025, which Democracy Forward obtained from the ProPublica website and which is publicly available at https://perma.cc/VA5D-DEB6.

31. Attached as Exhibit 30 is a true and correct copy of Alan Feuer's New York Times article entitled *Abrego Garcia Was Beaten and Tortured in El Salvador Prison, Lawyers Say*, dated July 2, 2025, which Democracy Forward obtained from the New York Times website and which is publicly available at https://perma.cc/85JN-FWAA.

32. Attached as Exhibit 31 is a true and correct copy of a declaration of Anthony Enriquez, dated August 21, 2025.

33. Attached as Exhibit 32 is a true and correct copy of a declaration of Melissa Shepard, dated August 18, 2025.

34. Attached as Exhibit 33 is a true and correct copy of a letter from Senator Jeanne Shaheen to Secretary Marco Rubio dated Apr. 14, 2025, which Democracy Forward obtained from the U.S. Senate website, and which is publicly available at https://perma.cc/X84J-V7UE.

35. Attached as Exhibit 34 is a true and correct copy of an X post from @Acyn's account dated April 6, 2025 at 7:56 PM, which Democracy Forward obtained from the X website. Although the attached pdf cannot show the video in this post, the post (with video capability) is publicly available at https://x.com/acyn/status/1909032577291505794 or (in a preserved form, without video) at https://perma.cc/FMB6-7WYV.

36. Attached as Exhibit 35 is a true and correct copy of Vaughn Hillyard et al.'s NBC News article entitled *As Legal Fight Raged, ICE Buses Filled With Venezuelans Heading Toward Airport Turned Around, Video Shows*, dated April 20, 2025, which Democracy Forward obtained from the NBC News website and which is publicly available at https://perma.cc/YJ8L-AD8X.

37. Attached as Exhibit 36 is a true and correct copy of Vera Bergengruen and Michelle Hackman's Wall Street Journal article entitled *El Salvador's Bukele Plans to Double the Size of Giant Prison Holding U.S. Deportees*, dated April 16, 2025, which Democracy Forward obtained from the Wall Street Journal website and which is publicly available at https://perma.cc/Y44Y-UK3A.

38. Attached as Exhibit 37 is a true and correct copy of a declaration of Kathleen Kavanagh, dated August 19, 2025.

39. Attached as Exhibit 38 is a true and correct copy of a declaration of Bridget Crawford, dated August 15, 2025.

40. Attached as Exhibit 39 is a true and correct copy of a declaration of Lisa Monet Wayne, dated August 19, 2025.

41. Attached as Exhibit 40 is a true and correct copy of a declaration of a NACDL member, with personal identifying information redacted, dated August 14, 2025.

42. Attached as Exhibit 41 is a true and correct copy of a declaration of Amrutha N. Jindal, dated August 18, 2025.

43. Attached as Exhibit 42 is a true and correct copy of an opposition to a motion for preliminary injunction that was filed at docket number 108 in *J.G.G. v. Trump*, No. 25-cv-766 (D.D.C.) on May 1, 2025.

44. Attached as Exhibit 43 is a true and correct copy of Shayla Colon's New York Times article entitled *ICE Deported Him. His Father Heard Nothing for Months. Then, a Call*, dated August 9, 2025, which Democracy Forward obtained from the New York Times website and which is publicly available at https://perma.cc/7SEQ-JHTJ.

45. Attached as Exhibit 44 is a true and correct copy of a document entitled *Report on Enforced or Involuntary Disappearances* that was filed at docket number 160-1 in *J.G.G. v. Trump*, No. 25-cv-766 (D.D.C.) on July 7, 2025.

46. Attached as Exhibit 45 is a true and correct copy of a letter from Representative Gregory W. Meeks and Representative Joaquin Castro to Secretary

Marco Rubio dated April 17, 2025, which Democracy Forward obtained from the U.S. House of Representatives website, and which is publicly available at https://perma.cc/6MGE-JEKZ.

47. Attached as Exhibit 46 is a true and correct copy of a document that was filed at docket number 77-1 in *Abrego Garcia v. Noem*, No. 25-cv-951 (D. Md.) on April 15, 2025.

48. Attached as Exhibit 47 is a true and correct copy of a declaration of Joseph N. Mazzara that was filed at docket number 77 in *Abrego Garcia v. Noem*, No. 25-cv-951 (D. Md.) on April 15, 2025.

49. Attached as Exhibit 48 is a true and correct copy of Government Accountability Office report GAO-21-487, entitled *Immigration Enforcement: Actions Needed to Better Track Cases Involving U.S. Citizenship Investigations* dated July 20, 2021, which Democracy Forward obtained from the GAO website and which is publicly available at https://perma.cc/2WLC-NAQS.

50. Attached as Exhibit 49 is a true and correct copy of Nick Miroff and Maria Sacchetti's Washington Post article entitled *Trump officials issue quotas to ICE officers to ramp up arrests*, dated January 26, 2025, which Democracy Forward obtained from the Washington Post website and which is publicly available at https://perma.cc/U6DX-NLTU.

51. Attached as Exhibit 50 is a true and correct copy of José Olivares's The Guardian article entitled *Trump administration sets quota to arrest 3,000 people a day in anti-immigration agenda*, dated May 29, 2025, which Democracy Forward

obtained from the Guardian website and which is publicly available at https://perma.cc/Q7EY-6E94.

52. Attached as Exhibit 51 is a true and correct copy of the Associated Press's article entitled *What to Know About CECOT, El Salvador's Mega-prison for Gang Members*, dated March 17, 2025, which Democracy Forward obtained from the Associated Press website and which is publicly available at https://perma.cc/LDQ3-C3CR.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 21, 2025.

Jessica Anne Morton

Jessica Anne Morton

Case No. 25-cv-1774-JEB

# Exhibit 1

# El Salvador 2023 Human Rights Report

## Executive Summary

Under the state of exception, reports of gang violence decreased significantly, allowing citizens to exercise their right to life, liberty, and security of person, and to engage in daily activities and commerce without the constant threat of violence and extortion. Arbitrary arrests and mass pretrial hearings, however, undermined due process and exacerbated historically difficult conditions in overcrowded prisons.

Significant human rights issues included credible reports of: unlawful or arbitrary killings; enforced disappearance; torture or cruel, inhuman, or degrading treatment or punishment by security forces; harsh and life-threatening prison conditions; arbitrary arrest or detention; serious problems with the independence of the judiciary; arbitrary or unlawful interference with privacy; extensive gender-based violence, including domestic and sexual violence, and femicide; substantial barriers to sexual and reproductive health services access; trafficking in persons, including forced labor; and crimes involving violence targeting lesbian, gay, bisexual, transgender, queer, or intersex persons.

The government took credible steps to identify and punish officials who may have committed human rights abuses.

# Section 1. Respect for the Integrity of the Person

## a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were reports that the government or its agents committed arbitrary or unlawful killings, largely stemming from deaths of detainees while in prison, either from medical neglect or physical abuse. The human rights nongovernmental organization (NGO) Socorro Jurídico Humanitario recorded the deaths of 79 detainees as of August 16 and determined that 33 of the deaths were violent. The human rights organization Cristosal confirmed 71 deaths of detainees and determined that 13 of the deaths showed signs of violence, including beatings by a club or baton. In March the newspaper *El Pais* interviewed several released detainees, one of whom stated prison guards beat his cellmate to death. Socorro Jurídico Humanitario reported that 21 detainees died from a lack of medical attention. Cristosal reported two of the detainees who died had anemia and 11 died of complications from illnesses such as diabetes to chronic kidney disease.

On June 13, the attorney general announced his office had investigated 143 deaths in prison during the state of exception and that his office, in conjunction with the Institute for Legal Medicine, had determined the 143 deaths resulted from pre-existing conditions or illness.

The government reported that widespread killings by criminal gangs decreased significantly in comparison with previous years. The Attorney General's Office reported intentional homicides of a criminal nature (excluding ones resulting from a family or social dispute) decreased from 366 during the first half of 2022 to 32 during the first half of 2023. The government and observers widely attributed the decrease to the government's policies under the state of exception, declared in March 2022 and extended monthly. As of December, it continued in effect. Despite the reduction, the Observatory for Human Rights at the University of Central America, a human rights think tank, argued the government homicide figures could have been undercounted, as they did not take into consideration the number of human remains located or disappearances reported.

## b. Disappearance

There were regular reports that security and law enforcement officials arrested persons and did not inform their families of their whereabouts. Socorro Jurídico Humanitario reported that as of August, it was tracking 1,376 cases in which the families of those detained under the state of exception did not receive confirmation that their relatives were in the prison system, information regarding their whereabouts, or confirmation that they were alive. Socorro Jurídico Humanitario also reported that in three cases, detainees' bodies were interred before their families were notified of their

deaths. The Human Rights Ombudsperson's Office (PDDH) received 17 complaints regarding the lack of information on detainees under the state of exception.

Media and human rights groups reported cases of disappearances and missing persons continued to occur, although it was often impossible to distinguish between a "disappearance" and a "missing person," due to limited law enforcement resources to investigate. In June the Foundation of Studies for the Application of Law calculated there were 2,397 unresolved cases of missing persons first reported between January 2019 and June 2022. The National Civil Police (PNC) reported that of the missing persons reported from January to August, 143 cases remained unsolved as of August 11.

On March 27, the minister of justice and public security announced that investigations into disappearances would remain suspended, as authorities continued to prioritize capturing gang members.

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, and Other Related Abuses

The law prohibited such practices, but there were credible reports that government officials employed them.

Human rights organizations and media outlets reported complaints of abuse

and mistreatment of detainees by prison guards. On July 14, a coalition of human rights organizations at an Interamerican Human Rights Commission public audience stated they collectively interviewed more than 100 released detainees, many of whom reported systemic abuse in the prison system, including beatings by guards and the use of electric shocks. The coalition alleged the treatment of prisoners constituted torture.

On March 25, the newspaper *El País* reported a man released from Izalco prison said guards beat one of his cellmates to death with batons and the butts of their rifles. He also said guards activated electric stun guns against the prison's wet floors to deliver electric shocks to all the prisoners in a cell.

Cristosal spoke with the family of a prisoner who died of stomach cancer on February 10, after being released from Zacatecoluca prison on January 28. Cristosal reported his body showed signs of torture, including significant bruising on his back and stomach, as well as signs of malnutrition and gastrointestinal hemorrhaging.

There were sporadic complaints of mistreatment by police and members of the armed forces. As of July 26, the PNC registered 48 complaints of threats committed by police officers. As of July 31, 129 victims registered complaints with the PDDH regarding the violation of physical integrity, mistreatment, or physical abuse by the PNC, and seven registered complaints of the same abuses committed by members of the armed forces. Five victims registered complaints with the PDDH concerning torture or

cruel and inhuman punishment at the hands of PNC officers, and one victim registered a complaint of the same treatment committed by members of the armed forces.

The judiciary continued prosecuting several cases from the civil war against members of the armed forces. The judge in the 1981 El Mozote massacre case continued to hear witness testimony. The government, however, continued to deny expert witnesses access to military archives to determine criminal responsibility for the massacre, in defiance of a 2020 judicial order. On February 7, a judge opened trial proceedings against three former soldiers who allegedly belonged to a death squad that kidnapped, tortured, and killed civilians in San Miguel during the civil war. This was the first time a case involving death squad members had come to trial.

Impunity was a problem in the General Directorate of Penal Centers, particularly for prison guards. Human rights organizations noted the Attorney General's Office had not opened any complaints into the allegations of torture, abuse, or mistreatment by prison guards.

Some concerns remained regarding impunity in the PNC and armed forces. The state of exception empowered security forces to make arrests without meeting traditional evidentiary standards, and media and civil society reported some security officials might have used that authority to extract bribes, sexual favors, or other concessions from citizens. Some members of the security forces were convicted, however, and were facing criminal

proceedings for misconduct, such as sexual assault.

## Prison and Detention Center Conditions

Prison conditions before the state of exception were harsh and life threatening due to gross overcrowding; inadequate sanitary conditions; insufficient food and water shortages; a lack of medical services in prison facilities; and physical attacks. The addition of 72,000 detainees under the state of exception exacerbated the problem. Human rights organizations reported that as of August 22, more than 70 detainees died in prisons from violence, insufficient medical care, and chronic health conditions.

**Abusive Physical Conditions:** Prisons were severely overcrowded, as the number of detainees increased and only a limited number were released. As of July, the government reported that 71,776 persons were detained under the state of exception. In 2021, the prison system had a capacity of 30,000 and was already overcrowded. The government inaugurated a new prison with a reported capacity for 40,000 on January 31, but as of September, only 12,000 detainees had been moved into it. A prisoner released from the Izalco prison reported that 100 prisoners were held in a cell built for 50.

Detainees released from the Izalco and La Esperanza prisons reported a lack of food and potable water and being limited to two tortillas, one spoonful of beans, and one glass of water per day. They also reported limited water for

sanitation. Human rights organizations noted released prisoners reported severe heat and lack of ventilation in the cells and prolonged confinement, without the opportunity for movement or the use of sanitary facilities.

Released prisoners and their families reported a lack of access to medical care or medicine in prison. One released prisoner reported to *El País* that his diabetic cellmate received insulin only two or three times during his period of incarceration and died suddenly in his sleep. Although families of prisoners were often instructed to bring medicine to the prison for the prisoner, the medicine often did not reach the prisoner. Human rights organizations reported communicable diseases such as tuberculosis and scabies were widespread in the prisons.

Human rights groups and news outlets reported unsanitary conditions and limited food and medical care in women's prisons. There were reports of life-threatening lack of medical care or sanitation for detained pregnant women and young children held with their mothers. On July 24, the newspaper *El Faro* published an interview with a released prisoner who gave birth while in prison. She reported being held in a unit with 150 other pregnant women in the Izalco prison farm, with two doctors assigned to them. She reported receiving only sporadic prenatal care and extremely limited access to medicine. Cristosal published a statement from a released prisoner who reported many pregnant women miscarried due to a lack of medical care.

Young babies often stayed with their mothers in prison and received limited medical care, despite widespread scabies and other communicable diseases. The newspaper *El Diario de Hoy* reported that on May 17, a girl, age one, died of pneumonia after being held in Apanteos prison with her mother for six months. Socorro Jurídico Humanitario reported a baby, age six months, born while his mother was held in Izalco, died of kidney failure, liver failure, and pneumonia on June 26, six days after he was transferred from the prison to the care of other members of his family.

**Administration:** The PDDH had the authority to investigate allegations of abusive conditions in prison; however, the human rights ombudsperson reported the PDDH did not receive access to visit prisons during the year. PDDH representatives conducted 32 visits to jails in the Ahuachapan Department, where they found the detainees' basic needs were provided for but detainees were transferred to prisons within five days of their arrest, without the ability to contact their families.

**Independent Monitoring:** The International Committee of the Red Cross had access to prison facilities.

## d. Arbitrary Arrest or Detention

The constitution prohibited arbitrary arrests, and the law provided for the right of any person to challenge the lawfulness of their arrest or detention in court. The state of exception, itself a legal mechanism, suspended the right

to legal defense, as well as the requirement that persons be informed of the reason of their arrest at the time of their detention, and increased the number of days an individual could be held in detention before being formally charged. The government did not always observe the requirements of the law and constitution.

## Arrest Procedures and Treatment of Detainees

The constitution required a written warrant for arrest, except in cases where an individual was caught in the act of committing a crime. The language of the state of exception decree did not detail changes to enforcement procedures.

Security forces arrested suspected gang members or collaborators "in the act" of being a gang member or collaborator without a warrant and entered homes without warrants, ostensibly with verbal permission of the residents. The state of exception decree suspended the right to legal counsel, and law enforcement agents did not wait for suspects to obtain counsel before questioning them.

A July 2022 change in the law provided that hearings for gang membership charges could proceed without the detainees' physical presence, although with defense counsel participating in person. Many detainees' hearings were conducted virtually and en masse, often with one defense lawyer in the courtroom representing hundreds of persons appearing by video, unable

to consult with their defense lawyers in real time or hear the proceedings because of technical problems, complicated by the number of participants.

In July the Legislative Assembly approved legislation for the prosecution of detainees under the state of exception cases, eliminating the previous provision that a criminal process could not exceed 24 months. As of November, no case from the state of exception had gone to trial.

The court system was slow to respond to habeas corpus petitions filed by those challenging their detention under the state of exception. In July Socorro Jurídico Humanitario submitted 1,285 requests for habeas corpus and received 28 responses, of which 25 were declared inadmissible.

**Arbitrary Arrest:** As of July 31, the PDDH reported 738 complaints of arbitrary detention, compared with 283 from January to July 2022. Civil society entities also received complaints from the public regarding arbitrary arrests during the state of exception, although fewer than in 2022. Cristosal reported that as of August 9, it received 348 complaints of arbitrary arrest, compared with 3,110 such complaints in 2022. Several human rights organizations asserted that many detainees who remained in pretrial detention were arrested arbitrarily in 2022, without evidence of gang affiliation and only for having tattoos or living in a gang-controlled area. Leaked arrest files of 690 persons detained in March-April 2022 showed 50 were charged with being a gang member based on a suspicious or nervous appearance, and 50 for having a tattoo, with no indication if the tattoo was

gang-related.

The government established an anonymous tip line to provide information about gang members. Media reported cases in which detainees, or their families, believed they had been arrested on the basis of anonymous complaints. On March 30, in an interview with the BBC, the vice president declared police did not carry out arrests based on tattoos or being named in an anonymous call. He stated the government maintained a database of profiled gang members and carried out arrests based on that database. The vice president acknowledged it was possible persons with no gang ties were arrested but noted that courts released more than 3,000 detainees after determining they had no such ties. On August 22, the minister of justice and public security reported that of the more than 71,000 persons arrested under the state of exception, approximately 7,000 had been released.

On July 28, the PNC reported four police officers were arrested on charges of detaining civilians and extorting their relatives for money in exchange for their release.

**Pretrial Detention:** Lengthy pretrial detention was a significant problem. COVID-19 pandemic closures had already severely delayed trial and hearing dates, and the sharp increase in cases during the state of exception further exacerbated the situation. For example, in the majority of hearings, judges ordered defendants to remain in detention even when the Attorney General's Office failed to provide sufficient evidence demonstrating

defendants were affiliated with a gang.

In March the Foundation for the Study of the Application of Law noted prosecutors often requested extensions to the six-month evidence-gathering period due to their large caseload resulting from the state of exception. This further prolonged pretrial detention.

## e. Denial of Fair Public Trial

The law provided for an independent judiciary. The government held approximately 72,000 detainees to try under the state of exception but presented no plan to accomplish this. The government indicated it likely would resort to mass trials, calling into question the availability of a fair public trial for these detainees.

### Trial Procedures

The law provided for the right to a fair and public trial, but the state of exception suspended the right to be informed promptly of charges and the right to defense. Other rights were not always respected. The law allowed for trials for gang membership charges to proceed without the defendants' physical presence, although with defense counsel participating in person. On July 26, the Legislative Assembly approved amendments to the law that would allow collective trials with up to 900 defendants for those who were already detained under the state of exception and were charged as gang

members. No case of persons detained under the state of exception had gone to trial as of November.

After implementation of the state of exception, the demand for public defenders exceeded the capacity of the Public Defender's Office. One public defender noted in 2022 that his caseload had grown from 45-50 new cases a month to 95 new cases a day. In March the Foundation for the Study of the Application of Law reported that defense lawyers continued to be overwhelmed by cases.

### Political Prisoners and Detainees

The government arrested or continued to detain sitting and former politicians from opposition parties and the governing party. Media questioned the legitimacy of the detentions, but the government declared the charges against them were legitimate. The detainees were generally subjected to the same harsh prison conditions as convicted prisoners.

As of August 24, Ernesto Muyshondt, former mayor of San Salvador and a prominent opposition politician, had been detained for more than two years and two months, even though the criminal code prior to the state of exception did not allow for defendants to be held for more than two years in pretrial detention without a sentence. Arrested in 2021, he was acquitted of misappropriation of tax withholdings and breach of duty on August 9. The remaining charges against him were for appropriation of five million dollars

in labor contributions and also electoral fraud and illicit associations for allegedly negotiating with gangs in exchange for votes in the 2015 legislative elections.

Muyshondt developed serious health problems during his detainment and in 2022 said that while detained he was beaten and tied up. In January he was hospitalized after a four-week hunger strike. Prison officials did not comply with seven subsequent orders issued by a judge for Muyshondt to be taken to a hospital. During a preliminary hearing on April 23, Muyshondt said prison officials planned to kill him and that the Director of Penitentiaries, Osiris Luna, had denied him access to a hospital for 63 days.

Two former Farabundo Marti National Liberation Front (FMLN) party officials, charged in 2021 with money laundering and illicit enrichment, remained in detention. Three other former FMLN officials also charged in the same case were under house arrest. Defenders of the three claimed they were detained for political reasons, while the government asserted the charges against them were legitimate. Investigations continued as of October.

On January 11, six former FMLN guerrillas were arrested in Santa Marta, Cabañas, for the 1989 kidnapping, torture, and killing of Maria Inés Alvarenga during the civil war. Many in the Santa Marta community recalled the accused parading Alvarenga's body around town as a warning and few denied the allegations, but they said the government was pursuing the

charges for possibly political reasons. Five of those arrested were members of an FMLN-linked community organization that advocated against mining. Defenders of those arrested claimed authorities chose to prosecute the case to silence their environmental activism. The repeal of the civil war amnesty law in 2016 allowed for the prosecution of cases from the civil war. The government declared the charges against the former guerrillas were legitimate and based on testimony from multiple witnesses.

## f. Transnational Repression

Not applicable.

## g. Property Seizure and Restitution

Not applicable.

## h. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence

The constitution prohibited such actions. Reforms to the criminal code introduced in 2022 allowed the Attorney General's Office to carry out a wide range of undercover digital monitoring activities without a warrant, with no restrictions on scope or duration. There were allegations the government tracked journalists, members of NGOs, and political opponents and collected information from private messages on their cell phones. There were reports

security forces entered homes without warrants.

As of August, the Association of Journalists of El Salvador (APES) reported two cases of government officials monitoring of journalists, two cases of surveilling journalists, and one case of illegally accessing the telephone of a journalist.

The PNC reported that as of July 26, they received nine complaints that police officers entered homes without a warrant.

# Section 2. Respect for Civil Liberties

## a. Freedom of Expression, Including for Members of the Press and Other Media

The constitution provided for freedom of expression, including for members of the press and other media, and the government generally respected this right. Journalists, media and civil society organizations, and opposition figures criticized the government's online harassment of critics and rhetoric towards journalists. There were sporadic reports of monitoring and threats against journalists.

**Freedom of Expression:** In November the government repealed a 2022 amendment to the criminal code that prohibited creating, reproducing, or transmitting any visual content (texts, images, graffiti, or other forms of

visual expression) that related to gangs, and stipulated a penalty of 10 to 15 years in prison. Media organizations and NGOs stated this had served as a threat to journalists and had created a chilling effect on the independent media for the duration of time it was active. The government stated the legislation was designed to prevent persons from relaying gang messages to the public. No one was arrested under this law while it was in effect.

**Violence and Harassment:** As of August, the APES Center for Monitoring Attacks on Journalists reported 14 acts of intimidation against journalists committed by government officials, six cases in which government officials threatened journalists, and two instances in which government officials issued threats of legal action against journalists.

APES and other media outlets reported one journalist was detained arbitrarily. The journalist, Victor Barahona, host of a local television show, was arrested in June 2022 on charges of gang associations and released on parole on May 19. Barahona said his arrest was either because he interviewed a guest on his show who criticized local government leaders for corruption or because of his involvement in a community organization in a gang-controlled neighborhood. In July he gave an interview regarding prison conditions to national media. After the interview, he was summoned to a hearing to review his conditions of release, during which he was warned to keep the process confidential, according to his lawyer.

APES reported that from January to August, five journalists left the country.

Two left pre-emptively after publishing investigative pieces, and three cited threats as their reason for leaving. One other journalist moved internally after publishing an investigative piece, and another moved internally after he reported he was followed to his residence by police and military officials.

APES raised concerns that in 10 separate instances, government officials arbitrarily stopped journalists and prevented them from carrying out their work, restricting their access into certain areas and demanding that they delete photographic or video footage. In one such instance, on March 31, five soldiers prevented two journalists from *El Diario de Hoy* from entering a section of a neighborhood and said they needed a permit to enter.

**Censorship or Content Restrictions for Members of the Press and Other Media, Including Online Media:** In April *El Faro*, an investigative online newspaper, moved its administrative headquarters and legal registration to Costa Rica, citing primarily the multiple audits it faced from the Ministry of Finance and fabricated criminal accusations, as well as surveillance, threats, harassment of advertisers, and defamation by public officials. Its journalists remained in the country and continued to report.

There were reports that other news outlets also experienced harassment of advertisers and chose to self-censor or reduce operations.

**Nongovernmental Impact:** Unlike in previous years, there were no reports that journalists who reported on gangs and narcotics trafficking were

subject to threats from criminal groups.

### Internet Freedom

The government did not restrict or disrupt access to the internet or censor online content.

There were reports that government-backed bots and troll accounts were used to manipulate social media discourse. On July 14, the investigative digital magazine *Revista Factum* tracked the activity of a network of progovernment accounts they determined to be trolls. The site's reporters determined the most prolific account tweeted up to 700 times per day and had 61,000 followers. *Revista Factum* reported that in one case, the network generated more than 2,000 negative tweets against a target in 24 hours.

## b. Freedoms of Peaceful Assembly and Association

The constitution provided for the freedoms of peaceful assembly and association, and the government generally respected these rights.

## c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at https://www.state.gov/religiousfreedomreport/.

## d. Freedom of Movement and the Right to Leave the

## Country

The constitution provided for freedom of internal movement, foreign travel, emigration, and repatriation. As part of Phase V of the administration's "territorial control plan," security forces occasionally restricted movement around and into certain, mostly low-income, neighborhoods with a history of gang activity.

In contrast with previous years, gangs did not restrict movement between neighborhoods and areas. In February *El Faro* visited 14 previously gang-controlled communities. The residents interviewed reported gangs no longer restricted movement between communities or the circulation of outside service providers in their neighborhoods. The residents reported having access for the first time to services such as ride-hailing apps and food delivery. Communities were able to use communal spaces, including soccer fields and cemeteries, without restriction; previously only gang members were allowed access.

## e. Protection of Refugees

The government cooperated with the Office of the UN High Commissioner for Refugees and other humanitarian organizations in providing protection and assistance to refugees or asylum seekers, as well as other persons of concern.

**Access to Asylum:** The law provided for the granting of asylum or refugee status, and the government had a system for providing protection to refugees, but the law had major regulatory and operational gaps. The legal framework required persons with international protection needs to file their claim within five days of entering the country and asylum seekers to renew their status every 30 days.

## f. Status and Treatment of Internally Displaced Persons (IDPs)

The Internal Displacement Monitoring Center estimated there were 52,000 new IDPs due to violence in 2022 (most recent data available), noting the causes included threats, extortion, and killings perpetrated by criminal gangs. The center also reported an additional 4,600 IDPs in 2022, affected mostly by Tropical Storm Julia.

# Section 3. Freedom to Participate in the Political Process

The constitution provided citizens the ability to choose their government in free and fair periodic elections held by secret ballot and based on universal and equal suffrage.

## Elections and Political Participation

**Abuses or Irregularities in Recent Elections:** National elections were widely reported to be fair and free of abuses and irregularities.

**Political Parties and Political Participation:** On March 15, the Legislative Assembly repealed a section of the electoral code that prohibited changes to election laws within one year of elections. In June the Legislative Assembly approved laws to reduce the number of deputies in the assembly from 84 to 60 and the number of municipalities from 262 to 44. The law also changed the formula for calculating party seat distribution in the assembly. Some opposition politicians and political analysts argued these reductions were designed to consolidate the power of the president's party, Nuevas Ideas (New Ideas). The NGO Acción Ciudadana (Citizen Action) stated several small minority parties risked losing representation in the Legislative Assembly altogether under the new formula. President Nayib Bukele and Nuevas Ideas legislators asserted the change would return the number of deputies to the same number that existed in 1991 prior to the signing of the peace accords, which added deputies to increase FMLN representation, and that reducing the number of municipalities was necessary to streamline government administration and to save money. The reforms were passed quickly, but in line with democratic requirements per the constitution.

**Participation of Women and Members of Marginalized or Vulnerable Groups:** Some transgender persons reported difficulties registering to vote and voting because their gender identities did not match the gender stated on their identification cards.

## Section 4. Corruption in Government

The law provided criminal penalties for corruption by officials, and the government implemented the law, prosecuting officials from both the opposition and the governing party.

**Corruption:** President Bukele touted his government's enforcement actions against corrupt officials, declaring a "war on corruption" on June 1. The Attorney General's Office filed civil and criminal charges against, and courts convicted, high-ranking officials from past administrations. Charges were also filed against sitting officials in municipal governments as well as several lower-level sitting Nuevas Ideas officials and one Nuevas Ideas Legislative Assembly member. Courts convicted former high-ranking officials from several past administrations on charges of corruption. Allegations of corruption among sitting officials persisted, however. Opposition critics argued the government selectively prosecuted corruption charges to persecute political opponents.

As of July 26, the Attorney General's Office opened investigations into 285 cases involving corruption, including embezzlement, extortion, illicit

negotiations, illicit enrichment, and bribery. As of August 10, the Government Ethics Tribunal reported it opened 178 administrative proceedings against 290 public officials. The tribunal imposed sanctions in 25 cases and referred eight cases to the Attorney General's Office.

On May 29, a court sentenced former President Mauricio Funes to 14 years in prison for arranging a gang truce during his administration. Funes, who resided in Nicaragua, called the trial unjust and politically motivated. On August 10, court proceedings began against Funes' former wife and nine other former high-level members of his administration for money laundering, embezzlement, and tax evasion.

As part of President Bukele's "war on corruption," the Attorney General's Office seized the assets of former President Alfredo Cristiani on June 1, alleging he stole public funds while in office and used those funds to enrich himself and family members. Cristiani did not reside in the country. Corruption-related charges were brought against a former Supreme Electoral Tribunal president and a former president of the Legislative Assembly. A former minister of defense, a former minister of justice, a former Legislative Assembly deputy, a former state intelligence agency director, and a former vice minister of commerce and industry were convicted of corruption-related charges.

Municipal officials were also the subject of corruption charges and investigations. On August 11, the mayors of two municipalities, Conchagua

and Tacuba, along with various other municipal officials and council members, were arrested on unrelated corruption charges. The mayor of Conchagua and two associates charged with him remained under arrest as of August 22, while the remaining officials were released pending their initial hearing.

Although most officials investigated for or charged with corruption were from the ARENA party, FMLN, or minor opposition parties, several sitting members of the Nuevas Ideas party also faced corruption investigations. On January 11, the Attorney General's Office charged the mayor of Soyapango, Nercy Patricia Montano De Martínez, and four other officials in the mayor's office with misappropriation and embezzlement of public funds. Montano, a member of the Nuevas Ideas party, had been the subject of municipal unrest and protests due to her mismanagement of funds. In February a waste disposal company filed a complaint with the Attorney General's Office against the Nuevas Ideas mayor of Mejicanos, Saúl Antonio Meléndez, accusing the mayor of embezzlement and breach of duty for nonpayment of services rendered totaling more than $896,000, plus interest. On August 9, the attorney general accused Nuevas Ideas deputy Erick Garcia of fraud relating to election campaign expenses and requested the Legislative Assembly strip Garcia of his immunity. The Legislative Assembly voted to do so on August 17, and Garcia was arrested the same day. Garcia's alternate deputy, Nidia Aracely Turcios Anaya, was also arrested.

For additional information about corruption in the country, please see the Department of State's *Investment Climate Statement* for the country, and the Department of State's *International Narcotics Control Strategy Report*, which includes information on financial crimes.

## Section 5. Governmental Posture Towards International and Nongovernmental Monitoring and Investigation of Alleged Abuses of Human Rights

A variety of domestic and international human rights groups generally operated without government restriction to monitor or investigate human rights conditions or cases and publish their findings. Several domestic human rights groups, including Cristosal, accused the government of opening excessive audits into their operations as an intimidation tactic and using the revocation of tax-exempt status as a tool to punish organizations critical of the government.

Human rights groups observed that the government increasingly declined to make public data for monitoring and analysis purposes. *Gato Encerrado*, an investigative newspaper, noted the government continued to expand the types of information it classified as confidential and not subject to public disclosure requirements.

**Government Human Rights Bodies:** The principal human rights

investigative and monitoring body was the autonomous PDDH, whose ombudsperson was chosen by the Legislative Assembly for a three-year term. The PDDH had a constitutional duty to investigate human rights abuses and defend human rights conventions in the country. Some NGOs believed the PDDH was not fully independent or effective.

On May 25, President Bukele created a Presidential Commission for Human Rights and Freedom of Speech and appointed Andrés Guzmán Caballero as the commissioner. The responsibilities and duties of the commission were unclear.

# Section 6. Discrimination and Societal Abuses

## Women

**Rape and Domestic Violence:** The law criminalized rape of women or men, domestic or intimate partner rape, and other forms of domestic and sexual violence, including so-called corrective rape of lesbian, gay, bisexual, transgender, queer, or intersex (LGBTQI+) persons. The law could apply to spousal rape, at the judge's discretion. The law required the Attorney General's Office to prosecute rape cases whether or not the survivor pressed charges and did not permit the survivor to withdraw the charge. The penalty for rape was generally imprisonment for six to 10 years. Laws against rape were not effectively enforced.

Violence against women, including domestic violence, remained a widespread and serious problem. The law prohibited domestic violence and generally provided for sentences ranging from one to three years in prison, although some forms of domestic violence carried higher penalties. The law also permitted restraining orders against offenders. The law against domestic violence was poorly enforced. The domestic NGO Feminist Network Against Violence Against Women analyzed cases of violence reported in the first half of 2021 and found the conviction rate was 6 percent. They attributed the low conviction rate to fear of aggressors, normalization of violence, a lack of understanding regarding survivors' rights, impunity, and an overall patriarchal system.

ORMUSA, a domestic women's rights organization, registered 26 femicides between January and May 31, 42 percent of which were committed by the partner of the victim and 54 percent of which were committed in the home of the victim. On February 21, the Legislative Assembly unanimously voted to remove the statute of limitations for prosecuting femicide.

**Other Forms of Gender-based Violence or Harassment:** The law prohibited sexual harassment and established sentences of five to eight years' imprisonment for the crime. Courts also could impose fines in cases in which the perpetrator held a position of trust or authority over the victim. By law, employers were required to create and implement programs to prevent sexual harassment. The government, however, did not consistently

enforce the law effectively. The Union of Seamstresses and Tailors asserted the Ministry of Labor lacked the will to investigate one such sexual harassment case it filed during the year.

As of August 26, the PNC registered 21 complaints of sexual harassment committed by police officers. On February 7, a police officer filed a complaint against the chief inspector of her division for sexual harassment.

**Discrimination:** The constitution granted women and men the same legal status. The law was generally respected, but with exceptions. Women faced discrimination in employment and occupation. Although the law provided for equal pay between men and women, women did not receive equal pay. In 2021, the United Nations reported that women made 18 percent less than men in the same jobs. The law established sentences of one to three years in prison for public officials who denied a person's civil rights based on gender, and six months to two years for employers convicted of discriminating against women in the workplace, but labor organizations noted that employees generally did not report such discrimination due to fear of employer reprisals.

**Reproductive Rights:** There were no reports of coerced abortion or involuntary sterilization on the part of government authorities.

The law banned abortion under all circumstances. Civil society advocates expressed concern the ban led to the wrongful incarceration of women who

suffered severe pregnancy complications, including miscarriages. As of July 26, the Attorney General's Office reported six women were under investigation for abortions and two for alleged feticide, which the legal system termed "homicide of a 'recently born' child," a charge often invoked for suspicions related to the cause of miscarriage. Charges were brought in one case of feticide.

Numerous factors served as barriers to access sexual and reproductive health services. In 2021, UN experts noted that there was "a systemic practice of discrimination against women who suffer obstetric emergencies or pregnancy losses." In 2022, the women's rights organization Las Dignas presented the results of a study on contraception access carried out in two rural districts. It found that 20 percent of the population studied had an active sex life but did not use contraceptives for reasons including dangerous or difficult conditions that prevented travel to health centers, not having required parental authorization for minors to obtain contraceptives, and a lack of availability of contraceptives in health centers.

The government provided access to sexual and reproductive health services for survivors of sexual violence, and emergency contraception and postexposure prophylaxis were available as part of clinical management of rape.

## Systemic Racial or Ethnic Violence and Discrimination

There were several laws to protect members of racial or ethnic minorities or groups from violence and discrimination. The government did not enforce the laws effectively, and the administration took no action to implement a 2018 policy designed to focus on the inclusion of ethnic groups in all social and economic aspects. Some civil society organizations and individuals reported instances of racial discrimination against Afro-descendent persons and Indigenous groups.

## Indigenous Peoples

The constitution recognized Indigenous peoples and stated the government was required to adopt policies to maintain and develop the ethnic and cultural identity, world view, values, and spirituality of Indigenous peoples. The law provided for the preservation of Indigenous languages and archeological sites. The municipalities of Cacaopera and Yucuaiquin, in the eastern part of the country, had special laws to recognize Indigenous cultural heritage.

Although the law provided for Indigenous groups to participate in decision making on issues that affected their rights, it did not include the right to be consulted regarding development and other projects envisioned on Indigenous land, nor did it provide Indigenous groups the right to share in revenue from exploitation of natural resources on historically Indigenous

lands. The government did not demarcate any lands as belonging to Indigenous communities. Because few Indigenous persons possessed title to land, opportunities for bank loans and other forms of credit were limited.

As of October, there was no progress in the case against the Attorney General's Office brought by victims' family members for failing to investigate the death of three Indigenous persons during "The Massacre of 1932."

## Children

**Child Abuse:** The law prohibited child abuse. Penalties for child abuse included losing custody of the child and three to 26 years' imprisonment, depending on the nature of the abuse. The government enforced the law effectively.

**Child, Early, and Forced Marriage:** The legal minimum age for marriage was 18. The law banned child marriage to prevent child abusers from avoiding imprisonment by marrying their underage victims, and the law likewise banned exceptions to child marriage in cases where the child was pregnant. The government enforced the law effectively.

**Sexual Exploitation of Children:** The law prohibited the sale, grooming, or use of children for commercial sexual exploitation, including sex trafficking. The law stipulated imprisonment of 16 to 20 years.

The minimum age for consensual sex was 18. The law classified statutory

rape as sexual relations with anyone younger than age 18 and included sentences of four to 13 years' imprisonment.

The law prohibited paying anyone younger than 18 for sexual services. The law prohibited participating in, facilitating, or purchasing materials containing child pornography and provided for prison sentences of up to 16 years. Despite these provisions, sexual exploitation of children remained a problem. The government did not enforce the law effectively.

## Antisemitism

The Jewish community totaled approximately 150 persons. There were no reports of antisemitic incidents.

## Trafficking in Persons

See the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## Acts of Violence, Criminalization, and Other Abuses Based on Sexual Orientation, Gender Identity or Expression, or Sex Characteristics

**Criminalization:** The law did not criminalize consensual same-sex conduct between adults, cross-dressing, or other sexual or gender characteristic-related behaviors.

**Violence and Harassment:** COMCAVIS TRANS, a domestic NGO that promoted LGBTQI+ rights, found 43 percent of transgender women, 42 percent of cisgender men, and 14 percent of cisgender women had encountered problems with law enforcement officials.

Violence against LGBTQI+ persons was a problem. The Attorney General's Office reported that as of July 26, 13 LGBTQI+ persons were victims of sexual assault or harassment, and one was the victim of bodily harm.

The law allowed for stricter sentences for crimes committed on the basis of sex, gender identity, and gender expression, among other categories. The PDDH recorded and investigated complaints of violence and harassment against LGBTQI+ individuals. As of July 31, the PDDH received 20 complaints, involving 23 victims, ranging from five victims of acts of cruel and degrading punishment to five victims of insults.

**Discrimination:** The law prohibited discrimination by state and nonstate actors based on sexual orientation, gender identity or expression, or sex characteristics. Discrimination against LGBTQI+ persons was widespread and hindered access to education and employment. Surveys conducted in 2021 by COMCAVIS TRANS found that 39 percent of LGBTQI+ individuals surveyed were unemployed, compared with 5 percent of the general population. Transgender persons regularly faced discrimination in health care, banking, and voting.

**Availability of Legal Gender Recognition:** The Legislative Assembly did not take steps to create a procedure allowing transgender persons to change their identity documents to reflect their gender, despite a 2022 Supreme Court ruling to do so by February.

**Involuntary or Coercive Medical or Psychological Practices:** There were no reports of the practice of so-called conversion therapy targeting LGBTQI+ individuals in an attempt to change their sexual orientation, gender identity, or expression. There were no reports that medically unnecessary and irreversible "normalization" surgeries were performed on children or on nonconsenting adult intersex persons.

**Restrictions of Freedom of Expression, Association, or Peaceful Assembly:** There were no restrictions on freedom of expression or association regarding LGBTQI+ matters.

## Persons with Disabilities

The law prohibited discrimination against persons with physical, sensory, intellectual, and mental disabilities, but the government did not enforce the law. Persons with disabilities did not have access to education, health services, public buildings, or transportation on an equal basis with others. Persons with disabilities faced discrimination in employment and occupation. No formal system existed for filing a discrimination complaint based on disability.

The National Council for Comprehensive Attention to Persons with Disability (CONAIPD), composed of representatives from multiple government entities, was the agency responsible for protecting the rights of persons with a disability, but it lacked enforcement power. According to a CONAIPD representative, the government did not effectively enforce legal requirements for access to buildings or information and communications for persons with disabilities. Few access ramps or provisions for the mobility of persons with disabilities existed.

Disability advocates said children with disabilities faced access problems in school, including a lack of ramps and other accommodations. The government provided little support for schools to include accommodations, and there were few teachers trained to teach students with disabilities.

Persons with disabilities also faced discrimination in the public health-care system. Disabilities rights groups reported that women with disabilities were often instructed by their doctors to use birth control to avoid having children, believing the women would bear children with disabilities.

Persons with disabilities faced discrimination in employment and occupation. CONAIPD stated there was no mechanism to verify compliance with the law requiring businesses and nongovernment agencies to hire one person with disabilities for every 25 hires. CONAIPD reported employers frequently fired persons who acquired disabilities and would not consider persons with disabilities for work for which they were qualified. The

Network of Survivors and Persons with Disabilities Foundation noted the Special Law on Inclusion of Persons with Disabilities was never implemented or enforced. The Association of Blind Women added that companies preferred to pay fines instead of employing workers with disabilities.

### Other Societal Violence or Discrimination

The law prohibited discrimination based on HIV or AIDS status. As of August 11, the PDDH received three complaints of discrimination against persons with HIV or AIDS.

## Section 7. Worker Rights

### a. Freedom of Association and the Right to Collective Bargaining

The law provided for the right of most workers to form and join independent unions, in certain workplaces to bargain collectively, and after a lengthy regulated process, the right to strike. The government did not enforce these rights. Unions experienced lengthy delays in processing their credentials with the Ministry of Labor, some waiting nine months or longer. Without credentials, unions could not engage in collective bargaining or participate in tripartite entities that governed worker-related issues such as setting a minimum wage, health care, and housing. According to media reports and union representatives, the minister of labor rewarded unions

loyal to him and his party with expedited credentials and punished unions critical of the government by delaying their certifications.

The law prohibited antiunion discrimination, and workers were protected from firing or demotion for union organizing activity. If fired during this time, they could bring cases to court for reinstatement. Members of the military, judges, and high-level public officers could not form or join unions. Workers in private security firms could not form or join unions. The labor code did not cover public-sector workers and municipal workers, whose wages and terms of employment were regulated by law. Only citizens could serve on unions' executive committees. The labor code also barred individuals from holding membership in more than one trade union. Unions had to meet certain requirements to register, including having a minimum of 35 members. If the Ministry of Labor denied registration, the law prohibited any attempt to organize for up to six months following the denial.

Collective bargaining was strictly regulated. Unions representing fewer than 51 percent of the workers in an enterprise did not have the right to bargain, even on behalf of their own members. Provisions of the law allowed either party to a collective bargaining agreement, under some conditions, to seek to change its provisions after one year in force. Employees of most public institutions did not have the right to bargain collectively.

The law contained cumbersome and complex procedures for conducting a legal strike. The law did not recognize the right to strike for public and

municipal employees or for workers in essential services. The law did not specify which services met this definition, and courts therefore applied this provision on a case-by-case basis. The law required that 30 percent of all workers in an enterprise support a strike for it to be legal and that 51 percent support the strike before all workers were bound by the decision to strike. Unions could strike only to obtain or modify a collective bargaining agreement or to protect the common professional interests of the workers. Unions were required to engage in negotiation, mediation, and arbitration processes before striking, although many unions often skipped or expedited these steps. Workers at times engaged in strikes that did not meet legal requirements. The law provided no way for workers to appeal a government decision declaring a strike illegal.

The government did not effectively enforce the laws on freedom of association and the right to collective bargaining, and penalties were less than those for other laws involving denials of civil rights, such as discrimination. Penalties were rarely applied against violators. Judicial procedures were subject to lengthy delays and appeals. According to union representatives, the government inconsistently enforced labor rights for a wide range of workers, and enforcement was dependent upon the political affiliations of their labor unions.

Unions reported that their members sometimes faced violence or threats of violence and that viable legal recourse against such violence was

unavailable. Public-sector union members reported public officials threatened to dismiss employees who made labor complaints.

On January 10, three members of the union of municipal workers in Soyapango were arrested on charges of public disorder and resisting arrest during a demonstration in which they demanded payment of salary owed. The charges against them were provisionally dismissed in June.

There were concerns the lowered standard of evidence required for an arrest under the state of exception allowed employers and municipal officials to retaliate against union members by alleging they were gang members. The human rights NGO Socorro Jurídico Humanitario reported 21 union members were arrested during the state of exception, 40 percent on charges of gang associations and 60 percent on charges of public disorder or resisting arrest. The NGO stated the individuals were arrested for their labor-related activities, but their cases were handled following the same procedures as other state-of-exception cases, as if the arrestees were members of illicit groups. The NGO further reported that as of August 16, 10 union members remained in pretrial detention.

Although many unions were aligned with political parties, they functioned independently from the government and political parties.

## b. Prohibition of Forced or Compulsory Labor

See the Department of State's annual *Trafficking in Persons Report* at

https://www.state.gov/trafficking-in-persons-report/.

## c. Prohibition of Child Labor and Minimum Age for Employment

See the Department of Labor's *Findings on the Worst Forms of Child Labor* at https://www.dol.gov/agencies/ilab/resources/reports/child-labor/findings/.

## d. Discrimination (see section 6)

## e. Acceptable Conditions of Work

**Wage and Hour Laws:** The law provided for a minimum wage for all sectors, to be set by the government. The minimum wage varied by sector; all were above poverty income levels. The law set a maximum normal workweek of 44 hours – limited to no more than six days per week and to no more than eight hours per day – but allowed overtime, which was to be paid at double the usual hourly wage. The law mandated that full-time employees receive pay for an eight-hour day of rest in addition to the 44-hour normal workweek. The law prohibited compulsory overtime for all workers other than domestic employees, such as maids and gardeners, who were obligated to work on holidays if their employer made this request. In such cases, they were entitled to double pay.

**Occupational Safety and Health:** The Ministry of Labor set and enforced

occupational safety and health (OSH) standards, and the standards were appropriate for the main industries. The law established a tripartite committee to review the standards. The law required employers to take steps to meet OSH requirements in the workplace, including providing proper equipment and training and a violence-free environment. The law promoted occupational safety awareness, training, and worker participation in OSH matters.

Workers could legally remove themselves from situations that endangered health or safety without jeopardy to their employment.

**Wage, Hour, and OSH Enforcement:** The government did not adequately enforce wage, hour, or OSH laws. Penalties were less than those for similar crimes, such as fraud, and were rarely applied against violators. Some companies reportedly found it more cost-effective to pay fines than comply with the law. The Ministry of Labor was responsible for enforcing wage, hour, and OSH laws.

The government trained inspectors on legal standards. The number of inspectors was insufficient to enforce compliance. Inspectors did not have the authority to initiate unannounced inspections or sanctions. Inspections were scheduled according to a calendar set by the Inspections Directorate or to verify a complaint, and labor inspectors notified companies prior to their arrival. Allegations of corruption among labor inspectors continued.

The Ministry of Labor received complaints regarding failure to pay overtime, minimum wage violations, unpaid salaries, and the illegal withholding of benefits, including social security and pension funds. Reports of overtime and wage violations occurred in several sectors. According to the ministry, employers in the agricultural sector routinely violated the laws requiring annual bonuses, vacation days, and rest days. Women in domestic service faced exploitation, mistreatment, verbal abuse, threats, sexual harassment, and generally poor work conditions. Workers in the textile industry reportedly experienced violations of wage, hour, and safety laws.

The informal sector represented almost 75 percent of the economy. The government did no enforce labor laws in this sector.

Case No. 25-cv-1774-JEB

# Exhibit 2

# EL SALVADOR 2022 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

El Salvador is a constitutional multiparty republic with a democratically elected government. In 2019 voters elected Nayib Bukele as president for a five-year term. The election was generally free and fair, according to international observers. Municipal and legislative elections took place in February 2021 and also were considered largely free and fair by observers.

The National Civilian Police, overseen by the Ministry of Justice and Public Security, is responsible for maintaining public security. The Ministry of Defense is responsible for maintaining national security. Although the constitution separates public security and military functions, it allows the president to use the armed forces "in exceptional circumstances" to maintain internal peace and public security "when all other measures have been exhausted." The military is responsible for securing international borders and conducting joint patrols with the civilian police. Civilian authorities maintained effective control over security forces. There were reports that members of the security forces committed abuses.

On March 27, the Legislative Assembly declared a state of exception in response to the dramatic rise in homicides committed by gangs over the weekend of March 25-27. Under the state of exception, which must be renewed monthly, security forces were empowered to arrest anyone suspected of belonging to a gang or providing support to gangs. In addition, the state of exception suspended the rights to be informed immediately of the reason for detention, to legal defense during initial investigations, to privacy in conversations and correspondence, and to freedom of association. Numerous reports of arbitrary arrests, invasion of homes, unfair judicial procedures, and deaths of detainees followed the declaration. More than 52,000 persons were arrested in the first six months of the state of exception, leading to allegations of overcrowding and inhuman treatment in the prisons.

Significant human rights issues included credible reports of: unlawful or arbitrary killings, forced disappearances; torture and cruel, inhuman, or degrading treatment or punishment by security forces; harsh and life-threatening prison conditions;

arbitrary arrest and detention; serious problems with the independence of the judiciary; arbitrary or unlawful interference with privacy; serious restrictions on free expression and media, including censorship and threats to enforce criminal laws to limit expression; serious government corruption; lack of investigation and accountability for gender-based violence; significant barriers to accessing sexual and reproductive health services; and crimes involving violence against lesbian, gay, bisexual, transgender, queer, and intersex individuals.

Impunity persisted in the security forces, other executive branch offices, and justice system. In some cases, authorities investigated and prosecuted persons accused of committing crimes and human rights abuses.

Criminal groups, including local and transnational gangs and narcotics traffickers, were significant perpetrators of violent crimes. They committed killings, acts of extortion, kidnapping, human trafficking, intimidation, and other threats and violence. They directed these acts against police, judicial authorities, the business community, journalists, women, and members of vulnerable populations. Authorities investigated and prosecuted such actions.

# Section 1. Respect for the Integrity of the Person

## a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were reports that the government or its agents committed arbitrary or unlawful killings, largely stemming from deaths of detainees while in prison during the state of exception. The Attorney General's Office investigates whether security force killings were justifiable and pursues prosecutions. The National Civilian Police (PNC) reported that as of August, no police officers had been accused of homicide.

On August 15, the Human Rights Ombudsman's Office (PDDH) stated it had opened 28 investigations of prisoner deaths during the state of exception. Human Rights Ombudsman Apolonio Tobar said the investigations were based on complaints from persons who attributed the deaths of their relatives to the state of exception. The investigations aimed to examine the culpabilities of the Attorney

General's Office and if prisoners were victims of neglect or murder while in government custody (see section 1.d.). On August 26, the daily newspaper *La Prensa Gráfica* reported that 73 detainees died in prison following the start of the state of exception. Government officials stated they were investigating all deaths in prison to determine if they were committed by government authorities but that, to date, they had not identified any such cases.

## b. Disappearance

Under the state of exception, there were regular reports that security and law enforcement officials arrested persons and did not inform their families of their whereabouts. On May 31, Cristosal, a human rights group, reported that of the 808 complaints the organization documented during the first two months of the state of exception, 65 percent involved cases in which the whereabouts of the arrestees were unknown.

Media and human rights groups reported that nongovernment-related disappearances, which they and the families of those disappeared attributed to gang violence, continued to occur on a regular basis. The government reported varying numbers of disappearances and sporadically declined to provide media with numbers and additional data on disappearances, often claiming the statistics were classified. The PNC reported 255 disappearances from January to August. In May, however, the PNC declared to *La Prensa Gráfica* there were 577 reports of missing persons between January and the end of May. In October the Institute of Legal Medicine (IML), the forensics department under the Supreme Court, reported that only 129 persons had been reported missing from January to September. On May 19, the international division of the Swiss Broadcasting Society reported the leading forensic expert in the Prosecutor's Office had acknowledged on several occasions that if a person spent more than eight days missing, there was a high probability the person had been killed and buried in a clandestine grave.

On May 16, officials from the Attorney General's Office and PNC told family members of the disappeared they had suspended investigations into disappearances because they were prioritizing activities supporting the state of exception.

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, and Other Related Abuses

The law prohibits such practices, but there were credible reports that government officials employed them at times. Media and civil society allegations of abuse and mistreatment by police and prison guards significantly increased after the introduction of the state of exception in March.

The PNC reported that by August 1, it had registered 24 complaints of police officer misconduct. In contrast, from January to July, the Office of the Inspector General of Public Security reported it had received 50 complaints of physical abuse, two complaints of sexual abuses, and four complaints of sexual harassment by police officers. The PDDH reported it had received nine complaints of cruel, inhuman, or degrading treatment; 58 cases of maltreatment; and 15 complaints of disproportionate use of force by PNC officers from January to July. In the same period, the PDDH received one complaint of torture; three complaints of cruel, inhuman or degrading treatment; six complaints of maltreatment; and one complaint of disproportionate use of force by the armed forces.

On August 22, the PDDH reported it had received more than 400 complaints of possible abuses during the state of exception. Ombudsman Tobar provided results of the PDDH investigations of complaints received in the first month of the state of exception in the San Salvador and Cuscatlán Districts. Tobar said the PDDH did not find human rights abuses in 95 percent of the 173 complaints from San Salvador and did not find culpability by officials in any of the 73 cases in Cuscatlán. The PDDH did not visit prisons to verify prison conditions or prisoner treatment until 107 days after the start of the state of exception, and in November the PDDH announced prison officials had once again denied them access.

Human rights organizations also received complaints of abuse and mistreatment by police and prison guards. On August 10, the University Observatory of Human Rights (OUDH) reported it had received reports of 28 cases of maltreatment, 12 cases of disproportionate use of force, seven cases of cruel treatment, and six cases of intimidation. All the reported cases occurred during the state of exception. OUDH coordinator general Danilo Flores alleged the complaints attested to the existence of torture. The OUDH highlighted the case of a boy, age 14, who was

detained in police holding cells where security officers allegedly submerged his face in water and squeezed his fingers with pincers to force him to admit that he belonged to a gang. He also claimed he was placed in a cell with gang members who beat him. He was vomiting blood when he was eventually released. After his release, he reported being harassed by police officers in his home. He eventually left the country to avoid further police harassment.

On April 4, *La Prensa Gráfica* reported a man died after his arrest on March 30 in El Refugio, Ahuachapan. The IML stated that the cause of death was severe blunt chest trauma and that he had other injuries to his eyes, knees, and shoulders. Witnesses to the arrest said they saw PNC officers beat him during the arrest, demanding that he confess to being a gang member. The PNC declared he received his injuries from other inmates after he was transferred to Izalco Prison.

On May 2, Human Rights Watch and Cristosal reported they had obtained first-hand information on 34 cases of abuse by police. The organizations interviewed victims, their family members, lawyers, and civil society organizations and analyzed medical reports, photographs, and documents to corroborate the information from the interviews. Witnesses alleged they saw security forces beating persons while making arrests and threating family members of the detained persons with arrest if they did not "stop asking questions." In one documented case, a man, age 21, was arrested on April 3 and held incommunicado. On April 19, a hospital informed his family that he had died of "hypertension" and "sudden death." No autopsy was performed, however, and photographs of his body showed injuries.

The judiciary continued prosecuting several cases from the civil war against members of the armed forces. The judge in the 1981 El Mozote massacre case heard witness testimony, and the judge in the case of the killings of four Dutch journalists ordered the arrest of several high-ranking defendants. The government, however, continued to deny expert witnesses access to military archives to determine criminal responsibility for the El Mozote massacre, in defiance of a 2020 judicial order.

Impunity was a problem in the PNC and armed forces. Factors contributing to impunity included politicization and corruption. The government provided annual

training to military units to diminish gross abuses of human rights, such as the training provided to the Marine Infantry Battalion by the navy's legal unit on the need to respect human rights.

**Prison and Detention Center Conditions**

Prison conditions worsened during the state of exception. The number of prisoners more than doubled within several months of the beginning of the state of exception, leading to allegations of gross overcrowding, inadequate sanitary conditions, food shortages, a lack of medical services in prison facilities, and physical attacks.

**Abusive Physical Conditions:** According to the OUDH, prisons were at 119 percent of capacity prior to the state of exception but became more crowded as the number of detainees doubled. By May, more than 71,000 detainees were being held in a penitentiary system designed for 30,000. Released prisoners confirmed overcrowding was severe, with 80 prisoners held in cells built for 12 and insufficient room to lie down. On March 28, Director of Penitentiaries Osiris Luna stated prisoners would have only two meals per day, after President Bukele ordered food rationing due to the arrival of additional inmates. A released prisoner reported he received four ounces of rice and one tortilla per day. From the start of the state of exception, the government frequently advertised on social media the overcrowded conditions and lack of adequate food in the prisons as appropriate treatment for gang members.

Men and women were kept separately (see section 6, Children, for detention and imprisonment of children). While the worst conditions were reported in the men's prisons, the domestic social organization Passionist Social Service reported that unsanitary conditions existed in detention centers for women and children.

In April Human Rights Ombudsman Tobar stated his office had investigated complaints of arbitrary detention during the state of exception and concluded detainees had not suffered treatment beyond what was allowed by law. In June the ombudsman visited a PNC detention facility, along with the director of penitentiaries and the minister of justice and public security. After the visit, the PDDH released a report and a series of videos of the visit, but media outlets and

human rights organizations noted the ombudsman made no mention of the more than 50 deaths of prisoners during the state of exception, most of them occurring in Mariona Prison. Following the release of the videos, critics alleged that Tobar was no longer an independent defender of human rights. In October Tobar's term ended and the Legislative Assembly elected Raquel Caballero de Guevara as the new ombudsperson. In November her office reported she had been denied access to prisons to verify conditions.

In November the Attorney General's Office announced it was investigating 90 prison deaths, consistent with the growing count of deaths in prison kept by newspapers and human rights organizations. On August 26, *La Prensa Gráfica* reported that 73 detainees had died in prison since the beginning of the state of exception. The newspaper cited an IML report that 35 of the detainees died from causes such as strangulation, blunt force trauma, or other causes that could indicate torture or mistreatment while in detention. The IML determined an additional 22 detainees died due to inadequate medical care while in prison. Many families of prisoners reported that prison authorities refused to accept medicine that they brought, with some of those prisoners later dying. Another 12 inmates died from "undetermined causes," and the newspaper confirmed reports of four more inmate deaths after the IML report was published. Several of the few detainees who were released reported that guards regularly beat detainees.

Gangs remained prevalent in prisons, and the PDDH reported that prisoners were divided into groups composed of gang members, gang collaborators, and those with no gang connections.

**Administration:** The PDDH has the authority to investigate allegations of abusive conditions in prison. The PDDH stated it had opened investigations into allegations of abuse or abusive conditions but not completed the investigations by year's end. Although by law the PDDH should have free and immediate access to prisons, all prison visits were suspended in March 2020. Ombudsman Tobar, with other government officials, visited prisons twice during the year.

**Independent Monitoring:** The government suspended visits to prisons in March 2020 due to the COVID-19 pandemic. The suspension continued as of October, long after the government lifted all other pandemic-related restrictions. The

suspension of visits to prisons included most institutional inspections, visits by international organizations, nongovernmental organizations (NGOs), churches, and others.

## d. Arbitrary Arrest or Detention

The constitution prohibits arbitrary arrests, and the law provides for the right of a person to challenge the lawfulness of his or her arrest or detention in court. With the introduction of the state of exception in March, the government did not always observe these requirements.

**Arrest Procedures and Treatment of Detainees**

The constitution requires a written warrant for arrest except in cases where an individual is caught in the act of committing a crime. Prior to the state of exception, authorities generally apprehended persons with warrants issued by a judge and based on evidence, although this was frequently ignored when allegations of gang membership arose. Police generally informed detainees promptly of charges against them. The state of exception decree suspended the right to legal defense, as well as the requirement that persons be informed the reason of their arrest at the time of their detention, and it increased the number of days an individual could be held in detention before being formally charged.

The language of the state of exception decree did not detail changes to enforcement procedures, but in practice, security forces were no longer required to have warrants prior to making arrests or entering homes to make arrests. Because the decree also suspended the right to legal counsel, law enforcement agents did not wait for suspects to obtain counsel before questioning them. Although the law permits release on bail for detainees who are unlikely to flee or whose release would not impede the investigation of the case, most detainees under the state of exception were not released on bail.

The state of exception increased the number of days that a suspect could be held in detention before being formally charged in court from three days to 15. This extension, in addition to the sharp increase in the number of detainees, overwhelmed the court system. To process the increase, judges held mass pretrial detention hearings for up to 300 detainees at the same time. Public defenders

responsible for representing the detainees reported being overwhelmed as their case load increased from 50 cases per month to 95 cases per day. One public defender told the digital newspaper *El Faro* that it was nearly impossible to mount an effective defense and that he had been unable to secure an alternative to pretrial detention in any of his cases.

The state of exception allowed detainees to be held for the first 15 days without any notification to family members, and local news outlets reported that even after 15 days, some families received no information. Family members of those detained frequently waited for days in large temporary encampments outside of prisons in hopes of receiving information regarding the location and condition of the detainee.

**Arbitrary Arrest:** As of July 27, the PDDH reported 283 complaints of arbitrary or illegal detention, compared with 25 from January to August 2021. Of the total, 247 involved detentions by police officers and 36 by soldiers.

Civil society entities also received complaints from the public regarding arbitrary arrests during the state of exception. As of August, the OUDH received reports of 1,673 cases of arbitrary arrests, and Cristosal reported that as of November 28, it received 3,139 complaints that persons were deprived of their rights during the state of exception, of which 97 percent involved arbitrary arrests. The specific grounds for complaints most frequently noted were that detainees were not given the reasons for their arrests, not presented with a warrant for arrest, and not given information regarding where or when they would have an initial judicial hearing. Government officials, however, claimed that arrests under the state of exception were not arbitrary. They stated the government had a database of more than 76,000 known gang members and arrests largely had been based on that database or other credible intelligence that a suspect was a gang member.

In the first months of the state of exception, police and military raided low-income and rural neighborhoods and carried out mass arrests. Local news sources and human rights groups alleged security forces frequently arrested persons for gang membership based solely on anonymous denunciations through a government hotline, for having tattoos, or for having any prior contact with the criminal justice system. *El Faro* gained access to court records for 690 individuals arrested under

the state of exception for gang membership and found that 60 were arrested on ambiguous criteria such as having a "suspicious appearance" or being nervous.

The Salvadoran Police Workers Movement, a police union, received more than 20 complaints from police officers of being pressured to give false testimony to incriminate detainees and to reach a daily quota of arrests. The union also documented 50 cases in which agents refused to make arrests because they considered them arbitrary. On June 10, the founder of the union was arrested and held for four days on charges of "apologizing for crime," which other members of the union denounced as reprisal by the police leadership for his public complaints (see section 7.d.). All charges against him were eventually dropped.

**Pretrial Detention:** Lengthy pretrial detention was a significant problem, exacerbated by the state of exception. COVID-19 pandemic closures had already severely delayed trial and hearing dates, and the sharp increase in cases during the state of exception further delayed cases. In November the Attorney General's Office reported that of the more than 57,000 persons arrested under the state of exception, approximately 2,000 had been released. *La Prensa Gráfica* reported that as of October 26, the Attorney General's Office had officially presented charges against 50,197 of those arrested.

The court system was slow to respond to habeas corpus petitions filed by those challenging their detention under the state of exception. The NGO Legal and Anti-Corruption Advisory Office reported that 1,825 habeas corpus petitions had been filed before the Supreme Court of Justice from the beginning of the state of exception until August 28. Of these, only eight had been granted a hearing.

## e. Denial of Fair Public Trial

Although the constitution provides for an independent judiciary, the government did not respect judicial independence and sought to increase control of the judiciary.

Legislation passed in August 2021 forced all judges older than age 60 or with 30 years of experience to retire, giving the Bukele-appointed Supreme Court the right to name their replacements. Previously, in May 2021, the Legislative Assembly had dismissed all five magistrates of the Constitutional Chamber of the Supreme

Court of Justice and replaced them with judges loyal to the Bukele administration. The move was widely criticized by human rights groups and legal experts as unconstitutional. Many legal experts saw these acts as steps to further cement the executive branch's control over the nominally independent judiciary.

As of August 31, the PDDH received 112 complaints of a lack of a fair public trial, compared with 65 such complaints from January to August 2021.

**Trial Procedures**

The law provides for the right to a fair and public trial, but the state of exception suspended portions of these rights. For example, the right to be informed promptly of charges was suspended, and other rights were not always respected.

The law allows for trials for gang membership charges to proceed without the defendants' physical presence, although with defense counsel participating in person. Virtual trials often involved group hearings before a judge, with defense lawyers in the courtroom but defendants appearing by video, unable to consult with their defense lawyers in real time. This practice continued with state of exception arrests, with many defendants tried virtually en masse, unable to hear the proceedings because of technical problems, complicated by the number of participants.

According to the OUDH, the demand for public defenders exceeded the capacity of the Public Defender's Office. Since many judicial hearings during the state of exception occurred en masse with hundreds of defendants at the same time, defendant could not properly exercise the right to defense. As a result, even if the Attorney General's Office failed to provide sufficient evidence demonstrating that defendants were affiliated with a gang, judges ordered defendants to remain in detention for six months.

In a June 3 statement on the state of exception, the Inter-American Commission on Human Rights reminded the government of its "international obligation to ensure judicial guarantees, due process, and access to a remedy for respect for rights and freedoms whose suspension is not authorized by international human rights law." The commission condemned the practice of holding judicial hearings for up to 500 persons simultaneously, without allowing defendants to plead their individual

cases. Likewise, the commission reported that the Office of the General Defender of the Republic did not have the capacity to handle all the cases in its remit.

Legal experts identified overall problems with the legal system outside of the state of exception, pointing to an overreliance on witness testimony, as opposed to the use of forensic or other scientific evidence.

**Political Prisoners and Detainees**

There were reports of political detainees. Media questioned the legitimacy of the detentions. The detainees were generally subjected to the same harsh prison conditions as convicted prisoners. Only one political detainee received visits from his family.

As of November, Ernesto Muyshondt, former mayor of San Salvador and prominent opposition politician, remained in detention following his June 2021 arrest, awaiting the conclusion of investigations and trial; no trial date was set. In January he filed a complaint to the courts stating that his rights had been violated by two prison guards. On June 6, the Eighth Investigating Court of San Salvador rejected a request for house arrest, which he had made due to health problems. Muyshondt told media he had been near death three times while in detention and recovered only when prison officials took him to a hospital outside the prison. He also said that while imprisoned, he was beaten, tied up, and photographed half naked and while sleeping. Muyshondt was arrested for misappropriation of tax withholdings to the detriment of the Public Treasury while mayor and also for electoral fraud and illicit associations for allegedly negotiating with gangs in exchange for votes in the 2015 legislative elections.

Three former Farabundo Marti National Liberation Front party officials, charged in July 2021 with money laundering and illicit enrichment, remained in detention. Defenders of the three claimed they were detained for political reasons, while the government asserted the charges against them were legitimate. Investigations of the case continued.

**Civil Judicial Procedures and Remedies**

The law allows litigants to submit civil lawsuits seeking damages for, as well as

cessation of, human rights abuses. Domestic court orders generally were enforced, except in cases involving political prisoners. Most attorneys pursued criminal prosecution and later requested civil compensation. Courts were insufficiently independent, however, to provide effective civil remedies for human rights abuses.

## f. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence

The constitution prohibits such actions, but there were allegations the government tracked journalists, members of NGOs, and political opponents and collected information from private messages on their cell phones. On February 1, the Legislative Assembly passed legislation expanding the government's ability to do so. Under the state of exception, reports of security forces entering homes without warrants increased.

On January 12, *El Faro* published the results of an analysis by the international NGO Citizen Lab and Access Now. The analysis, certified by Amnesty International, detailed conclusive evidence that from September to December 2021, the iPhones of 35 journalists and civil society actors were infiltrated by the Pegasus spyware created by NSO Group, an Israeli firm. Targets included journalists working at media outlets *El Faro*, *Gato Encerrado*, *La Prensa Gráfica*, *Revista Digital*, *Disruptiva*, *Diario El Mundo*, *El Diario de Hoy*, and staff at several NGOs, including Fundación DTJ and Cristosal. The report also said the targets remained under constant digital surveillance from at least June 29, 2020, to November 23, 2021. Two-thirds of *El Faro*'s staff were surveilled with the spyware, which occurred during the period they worked on major events in national politics in 2020 and 2021. The analysis also discovered conclusive evidence of extractions of information from cell phones of 11 *El Faro* employees. Experts said Pegasus allows for the extraction of anything stored in a mobile phone, including photographs, conversations, audio files, and contacts. The report did not rule out the theft of information from other brands of cell phones.

On March 16, the Inter-American Commission on Human Rights held a hearing on the Pegasus spyware hacks in the country, calling them a "vertiginous deterioration of press freedom." Aside from the Citizen Lab and Access Now investigation, multiple representatives from other media outlets and NGOs reported receiving

warnings from Apple that their phones may have been penetrated by Pegasus, indicating that the spying likely went beyond the *El Faro* journalists. NSO Group confirmed that it licenses the Pegasus software only to national governments.

On February 1, the Legislative Assembly approved five changes to the criminal code regarding computer crimes. These authorize the Attorney General's Office to carry out "undercover digital operations that are necessary" without a court order; establishes "digital undercover agents" to surveil "digital documents, electronic messages, images, videos, data, and any type of information that is received or transmitted through information and communication technologies or through any electronic device"; and conduct wiretaps in either criminal or civil investigations with no mention of restrictions on scope or duration of the surveillance and no oversight. The Inter American Press Association condemned the changes, saying they had "serious implications for freedom of the press," as they were "official reprisal measures against journalism."

The state of exception did not formally suspend the legal requirement for police to obtain a warrant before entering a home. As of June 3, however, The Foundation of Studies for the Application of Law reported that of the 170 persons who registered complaints regarding the state of exception with them, 35 percent claimed law enforcement agents entered their homes without a warrant.

# Section 2. Respect for Civil Liberties

## a. Freedom of Expression, Including for Members of the Press and Other Media

The constitution provides for freedom of expression, including for members of the press and other media, although the government passed a law in April that increases legal liability for journalists reporting on gangs. The law permits the executive branch to use the emergency broadcasting service to take control of all broadcast and cable networks temporarily to televise political programming.

**Freedom of Expression:** On April 5, the Legislative Assembly amended the criminal code to allow a 10- to 15-year prison sentence for anyone convicted of creating, reproducing, or transmitting any visual content (texts, images, graffiti, or

other forms of visual expression) that relates to gangs (see section 1.f.). The government claimed the legislation was designed to prevent persons from relaying gang messages to the public and noted that no journalists had been arrested under the law; nonetheless, media and NGOs noted it effectively prohibits reporting on gang-related issues.

On August 28, Luis Alexander Rivas Samayoa, also known by his Twitter handle "The Commissioner," was arrested after he questioned on Twitter the president's brother's use of the president's security detail. Karim Bukele was sightseeing on a beach with the detail in attendance when Rivas Samayoa posted a photograph of the security detail and his criticism. Agents from the Division of Protection of Important Persons approached Rivas Samayoa after he posted the tweet, confiscated his and his family's cell phones, and took them to a police station to await the inspection of their phones, where Rivas Samayoa was arrested. His colleague, Mario Gómez, said Rivas Samayoa was guilty only of questioning the use of government resources to protect a relative of the president, and he added that he was working with Rivas Samayoa and international media to monitor scams through the government's Chivo Wallet bitcoin app. After being released on September 5, Rivas Samayoa was immediately rearrested on different charges, which police did not specify. As of November, Rivas Samayoa remained in jail pending trial.

**Violence and Harassment:** As of August, the PDDH reported that two journalists had filed cases reporting violence or harassment. On May 3, APES released a report detailing the harassment and restrictions that journalists faced. From January to April, the APES Center for Monitoring Attacks on Journalists recorded 39 cases of journalists reporting harassment, threats, and digital attacks. The center also said journalists faced forced displacement due to persecution, defamation, and lack of security guarantees by government institutions.

On April 19, Ernesto Castro, the president of the Legislative Assembly, denounced Juan Martínez, an anthropologist and journalist who covered gang violence, during a televised session of the Legislative Assembly. Castro stated that Martínez "confessed that he spent a year living with them (gang members) and he felt safe. And now that they are putting terrorists in jail, he feels insecure in this country."

On March 29, a photojournalist from the newspaper *El Diario de Hoy* was detained after photographing an air force installation in Colonia Santa Lucía, Ilopango. Soldiers made him kneel on the ground, restrained him, and forced him to delete photographs from his camera. According to the photojournalist, the soldiers restrained him despite the fact that he identified himself and presented his press credentials.

On August 15, *El País*, a Spanish newspaper, published an article in which a Salvadoran journalist, Bryan Avelar, said he sought asylum in Mexico after persons close to President Bukele accused him of having a brother in a gang. Avelar said that he did not have a brother and believed the Bukele loyalists spread rumors about him to portray him as a gang-affiliated criminal instead of a journalist. He left the country because he feared that officials were preparing a warrant for his arrest.

**Censorship or Content Restrictions for Members of the Press and Other Media, including Online Media:** Criminal code amendments passed on April 5 specifically forbid radio, television, and print and digital media outlets from reproducing or transmitting messages or statements originating or presumably originating from criminal groups. The legislation imposes prison sentences of up to 15 years. Marcela Pineda, a legislator for the governing Nuevas Ideas political party, declared that journalists interviewing gang members would be committing a crime and that journalists would be considered to be acting as spokespersons for the gangs by broadcasting their message and allowing them to "generate terrorism in the population." Local and international press freedom organizations criticized the law and said it amounted to media censorship. The Association of Journalists of El Salvador (APES) condemned the law as "a new tool to criminalize journalism." The Committee to Protect Journalists said the amended law "sets a truly dangerous precedent."

On October 18, APES reported that 10 journalists had fled the country. The director of the organization cited the amended law as a driving factor behind their departure.

**Nongovernmental Impact:** APES noted journalists who reported on gangs and narcotics trafficking were subject to kidnappings, threats, and intimidation from

criminal groups. Observers reported that gangs also charged print media companies to distribute in communities where they operated, costing media outlets as much as 20 percent of their revenues.

### Internet Freedom

The government did not restrict or disrupt access to the internet or censor online content. There were credible reports that the government monitored private online communications without appropriate legal authority. In an attempt to legalize this activity (see section 1.f.), the government amended the law to give it increased authority to monitor the internet and online platforms.

## b. Freedoms of Peaceful Assembly and Association

The constitution provides for the freedoms of peaceful assembly and association, but these freedoms were temporarily suspended under the state of exception. The March 27 declaration of a state of exception suspended the rights to peaceful assembly and association, except in the case of meetings or associations for religious, cultural, economic, or sporting purposes.

On August 16, the government restored the freedom of association.

### Freedom of Peaceful Assembly

On April 28, Minister of Labor Rolando Castro stated that anyone participating in the Labor Day protest march on May 1 would be imprisoned for violating the prohibition against assembly during the state of exception. Castro added that participants of the march would be labeled criminals and gang defenders and arrested. In response to his comments, many labor unions did not participate in the march, fearing arrest of their members. Others chose to march despite the warnings, and most were allowed to peacefully assemble despite Castro's warnings.

## c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at https://www.state.gov/religiousfreedomreport/.

## d. Freedom of Movement and the Right to Leave the Country

The constitution provides for freedom of internal movement, foreign travel, emigration, and repatriation. In many areas, the government could not assure freedom of movement due to criminal gang activity. Under the state of exception, security forces restricted movement around and into certain, mostly low-income, neighborhoods with a history of gang activity.

**In-country Movement:** Prior to the implementation of the state of exception, major gangs controlled access to their specific territories. Gang members did not allow persons living in another gang's area to enter their territory, even when travelling via public transportation. Gangs forced persons to present government-issued identification cards (which contain a person's address) to determine their residence. If gang members discovered that a person lived in a rival gang's territory, that person risked being killed, beaten, or denied entry to the territory. Bus companies paid bribes to operate within gang territories, often paying numerous fees for the different areas in which they operated. As gang activity decreased under the state of exception, freedom of movement increased.

Although the text of the decree of the state of exception did not mention restrictions on movement, President Bukele warned a day before its approval that the measure included focused and temporary closures in some areas. Starting on March 28, security forces regulated entry to and exit from low-income communities with a high level of gang activity. Police checked residents' identification documents and allowed passage only to persons whose documents showed they resided in the communities.

## e. Protection of Refugees

The government cooperated with the Office of the UN High Commissioner for Refugees and other humanitarian organizations in providing protection and some assistance to refugees, returning refugees, or asylum seekers, as well as other persons of concern, although this was often difficult in gang-controlled neighborhoods.

**Access to Asylum:** The law provides for granting asylum or refugee status, and

the government has established a system for providing protection to refugees, but it has major regulatory and operational gaps. The Commission for the Refugee Status is responsible for refugee status determinations but does not have its own budget. The legal framework requires persons with international protection needs to file their claim within five days of entering the country. The criteria for case decisions are unclear, and the appeals process is also decided by the commission.

### f. Status and Treatment of Internally Displaced Persons

The Internal Displacement Monitoring Center estimated there were 175,000 new internally displaced persons due to violence in 2021 (most recent data available), noting the causes included threats, extortion, and killings perpetrated by criminal gangs. The center reported 550 internally displaced persons due to floods in 2021.

## Section 3. Freedom to Participate in the Political Process

The constitution provides citizens the ability to choose their government in free and fair periodic elections held by secret ballot and based on universal and equal suffrage.

### Elections and Political Participation

**Recent Elections:** The most recent legislative and municipal elections occurred in February 2021. Nuevas Ideas, the party affiliated with President Bukele, won 56 of 84 seats in the Legislative Assembly and 152 of 262 mayorships. The elections were generally considered free and fair; the election reports published by the Organization of American States and the EU electoral mission noted the elections generally met international standards.

**Participation of Women and Members of Minority Groups:** No laws limit participation of women or members of minority groups in the political process, and they did participate. Some transgender persons, however, reported difficulties registering to vote and voting because their gender identities did not match the gender stated on their identification cards (see section 6, Acts of Violence, Criminalization, and Other Abuse Based on Sexual Orientation, Gender Identity or Expression, or Sex Characteristics).

# Section 4. Corruption and Lack of Transparency in Government

The law provides criminal penalties for corruption by officials. Although the Supreme Court investigated corruption in the executive and judicial branches and referred some cases to the Attorney General's Office for possible criminal indictment, allegations of corruption and impunity persisted. In addition, most cases prosecuted by the Attorney General's Office were against former officials of previous governments, despite reports of corruption among sitting officials.

As of July 22, the Government Ethics Tribunal reported it had opened 148 administrative proceedings against 214 public officials. The tribunal imposed sanctions in 37 cases and referred 22 cases to the Attorney General's Office.

**Corruption:** On May 17, *El Faro* published an interview with a spokesperson for the Mara Salvatrucha-13 (MS-13) gang, who said the Bukele administration had negotiated a secret truce with the gang at the beginning of Bukele's term in office in exchange for political support. *El Faro* also obtained recordings of conversations between the gangs and Director for Social Cohesion Carlos Marroquin about the alleged deal, in which he also mentioned the involvement of President Bukele and Director of Penitentiaries Osiris Luna Meza. According to the spokesperson, the gangs agreed to dramatically reduce the number of homicides in the country in exchange for several demands, including government protection for certain gang leaders against extradition to the United States, better treatment for gang members in prison, and payments from the government. The MS-13 spokesperson told the reporter that the truce ended in March when the government arrested leaders of the gang after luring them to a meeting.

On May 23, the Government Ethics Tribunal fined the mayor of Apopa, Jennifer Esmeralda Juárez García, a member of the Nuevas Ideas party, $1,095 for hiring her cousin to work in the mayor's office. In June the tribunal fined the mayor of Antiguo Cuscatlán, Milagro Navas, $3,000 for authorizing institutional fuel vouchers for $5,330 to private vehicles owned by the mayor and her daughter in 2017.

On June 20, *El Faro* reported that two weeks before his appointment as attorney

general, Rodolfo Delgado signed a consulting services agreement with the government on behalf of his family business, owned by his mother. The business provided consulting services on preventing money laundering to the Transmission Company of El Salvador, a government company under the Hydroelectric Executive Commission of the Lempa River. Delgado became attorney general on May 1, 2021, and the contract remained in force until December 22, 2021. Between April and December 2021, the government company paid more than $45,000 to Delgado's mother.

On August 16, the First Sentencing Court sentenced Miguel Menendez "Mecafé," former president of the government-operated convention center and close friend of former President Funes, to eight years in prison for money laundering. The Attorney General's Office proved that "Mecafé" received an airplane from Guatemalan businessman Jaime Ramón Aparicio Mejía, owner of Serdelco S.A., a construction company, in exchange for influencing the Funes administration to award an eight-million-dollar contract in 2013 to the company for the San Isidro Bridge construction project.

## Section 5. Governmental Posture Towards International and Nongovernmental Investigation of Alleged Abuses of Human Rights

A variety of domestic and international human rights groups generally operated without government restriction, investigating and publishing their findings on human rights cases. Government officials were somewhat cooperative but rarely responsive to their views.

President Bukele and his supporters made disparaging remarks regarding national and international human rights groups on social media. For example, on June 11, after the PNC successfully discovered an MS-13 arsenal and dismantled a gang encampment, President Bukele tweeted that international organizations and NGOs sponsored the evolution of gangs into guerilla groups and that international organizations and NGOs gave gangs "legal, media, political, and financial coverage."

**Government Human Rights Bodies:** The principal human rights investigative

and monitoring body is the autonomous PDDH, whose ombudsperson is nominated by the Legislative Assembly for a three-year term. The PDDH has a constitutional duty to investigate human rights abuses and defend human rights conventions in the country. Apolonio Tobar served as human rights ombudsperson from October 2019 until October 2022, when Raquel Caballero de Guevara was appointed to replace him. NGOs believed the PDDH was not fully independent or effective.

## Section 6. Discrimination and Societal Abuses

### Women

**Rape and Domestic Violence:** The law criminalizes rape of men or women, and the law may apply to spousal rape, at the judge's discretion. The law requires the Attorney General's Office to prosecute rape cases whether or not the victim presses charges, and does not permit the survivor to withdraw the charge. The penalty for rape is generally imprisonment for six to 10 years. Laws against rape were not effectively enforced.

As of June 30, the PDDH received 15 complaints of femicide. On August 19, *La Prensa Gráfica* reported that femicide convictions decreased to 54 between June 1, 2021, and May 31, 2022, compared with 164 convictions between June 1, 2020, and May 31, 2021.

In June Hugo Ernesto Osorio Chávez, a former PNC officer, was sentenced to 70 years in prison for murdering two women who came to his house looking for a relative in May 2021. The officer was also accused of numerous other femicides and other homicides after police found the bodies of approximately 40 persons, mostly women and girls, in his back yard in May 2021.

The law prohibits domestic violence and generally provides for sentences ranging from one to three years in prison, although some forms of domestic violence carry higher penalties. The law also permits restraining orders against offenders. The law against domestic violence was poorly enforced, and violence against women, including domestic violence, remained a widespread and serious problem.

In September the domestic NGO Feminist Network Against Violence Against Women reported that courts convicted suspects in only 712 cases of the 11,867

complaints of gender-based violence filed with police in the first half of 2021. The Feminist Network believed the high level of gender-based violence and low conviction rates was due to fear of aggressors, normalization of violence, a lack of understanding regarding victims' rights, impunity for aggressors, and an overall patriarchal system.

On August 1, an armed forces colonel was arrested for statutory rape of two girls. The colonel allegedly brought the girls to his quarters at the Armed Forces Logistical Support Command on August 1, gave them intoxicating beverages, and had sexual relations with them.

On March 14, the Second Criminal Chamber of San Salvador sentenced Magistrate Eduardo Jaime Escalante Díaz to 10 years in prison for sexually assaulting a girl, age 10, in Ilopango. The case was initially dismissed in 2019, but public pressure on social media led to the reopening of the case.

**Sexual Harassment:** The law prohibits sexual harassment and establishes sentences of five to eight years' imprisonment for the crime. Courts also may impose fines in cases in which the perpetrator held a position of trust or authority over the victim. By law employers must create and implement programs to prevent sexual harassment. The government, however, did not enforce the law effectively.

On July 23, city council members from Guadalupe, San Vicente, introduced a petition to temporarily suspend the mayor, José Ernesto Renderos Pineda, for sexual harassment. The mayor, however, concluded the session before the council could vote on the petition. The alleged victim explained she started working at mayor's office in May 2021 and the harassment began a month later.

**Reproductive Rights:** There were no reports of coerced abortion or involuntary sterilization on the part of government authorities.

The law bans abortion under all circumstances. Civil society advocates expressed concern that the ban led to the wrongful incarceration of women who suffered severe pregnancy complications, including miscarriages. On May 9, a judge sentenced a woman to 30 years in prison for aggravated homicide after she suffered a miscarriage. According to the Citizen Group for the Decriminalization

of Abortion, the woman had an obstetric emergency but did not receive adequate medical care to prevent miscarriage. The woman was held in pretrial detention for two years before her conviction for abortion. This was the first conviction in the country after the Inter-American Court of Human Rights ruled against the country in March 2021 for the death of another woman who died while serving a 30-year sentence for abortion. On June 29, a woman, age 21, was sentenced to 50 years in prison for aggravated homicide after she suffered an obstetric emergency.

Access to sexual and reproductive health services was hampered by restrictive abortion laws, lack of access to contraceptives, and a lack of reproductive education. In December 2021, UN experts noted that there was "a systemic practice of discrimination against women who suffer obstetric emergencies or pregnancy losses." On July 21, the organization Las Dignas presented the results of a study on contraception access carried out in two rural districts. It found that 20 percent of the population studied had an active sex life but did not use contraceptives, for reasons including dangerous or difficult conditions that prevented travel to health centers, not having required parental authorization for minors to obtain contraceptives, and lack of availability of contraceptives in health centers.

**Discrimination:** The constitution grants women and men the same legal status in family, religious, personal status, and nationality law. There were no reports of discrimination in marriage, divorce, child custody, education, and judicial processes. The law also provides equal rights for men and women in the areas of property rights, inheritance, employment, access to credit, business ownership, and housing. Women, however, faced discrimination in employment and occupation. The law establishes sentences of one to three years in prison for public officials who deny a person's civil rights based on gender and six months to two years for employers convicted of discriminating against women in the workplace, but employees generally did not report such discriminations due to fear of employer reprisals.

## Systemic Racial or Ethnic Violence and Discrimination

There are several laws to protect members of racial or ethnic minorities or groups from violence and discrimination. The government did not enforce the laws

effectively, and the administration took no action to implement a 2018 policy designed to focus on the inclusion of ethnic groups in all social and economic aspects. Systemic racial discrimination existed towards Afro-descendent persons and Indigenous groups. The government did not recognize Indigenous persons or the Afro-descendent community in the most recent population census (2007).

## Indigenous Peoples

The constitution recognizes Indigenous peoples and states the government will adopt policies to maintain and develop the ethnic and cultural identity, world view, values, and spirituality of Indigenous peoples. The law provides for the preservation of languages and archeological sites. The municipalities of Cacaopera and Yucuaiquin, in the eastern part of the country, have special laws to recognize their Indigenous cultural heritage.

Although the law provides for Indigenous groups to participate in decision making on issues that affect their rights, it does not include the right to be consulted regarding development and other projects envisioned on Indigenous land, nor does it provide Indigenous groups the right to share in revenue from exploitation of natural resources on historically Indigenous lands. The government did not demarcate any lands as belonging to Indigenous communities. Because few Indigenous persons possessed title to land, opportunities for bank loans and other forms of credit were limited.

On March 10, members of the Salvadoran Indigenous Coordinating Council said relations between the Indigenous communities and the government had deteriorated since 2019. They noted that although the Ministry of Culture was responsible for executing a national plan of action for Indigenous communities, it had not implemented any programs focused on Indigenous communities. Indigenous communities were omitted from the Ministry of Education program that delivered computers to school children. Most Indigenous communities did not have access to the internet, and some did not have access to electricity. Council representatives also said gangs extorted a share of the crops from some Indigenous communities or forced them from their land.

On August 16, the Constitutional Chamber allowed a claim to proceed against the

Attorney General's Office for failing to investigate the death of three Indigenous persons during "The Massacre of 1932." The court stated that the Attorney General's Office failed to take the "necessary steps to determine the circumstances" related to the case in the years since the incident occurred, and that the Attorney General's Office never initiated an investigation "despite the historical significance for the country, since it involved the disappearance and death of thousands of victims belonging to the different Indigenous peoples in the country." Conversely, the court dismissed the same plaintiff's claim against the armed forces in the same incident.

## Children

**Birth Registration:** Children derive citizenship by birth within the country or from citizen parents. The law requires parents to register a child within 15 days of birth or pay a small fine. Birth registration was provided on a nondiscriminatory basis. Failure to register may result in denial of school enrollment.

**Child Abuse:** Child abuse remained a serious and widespread problem. The law gives children the right to petition the government without parental consent. Penalties for child abuse include losing custody of the child and three to 26 years' imprisonment, depending on the nature of the abuse.

**Child, Early, and Forced Marriage:** The legal minimum age for marriage is 18. The law bans child marriage to prevent child abusers from avoiding imprisonment by marrying their underage victims, and the law likewise bans exceptions to child marriage in cases where the child is pregnant.

**Sexual Exploitation of Children:** Child sex trafficking is prohibited by law. Prison sentences stipulate imprisonment of 16 to 20 years.

The minimum age for consensual sex is 18. The law classifies statutory rape as sexual relations with anyone younger than age 18 and includes sentences of four to 13 years' imprisonment.

The law prohibits paying anyone younger than age 18 for sexual services. The law prohibits participating in, facilitating, or purchasing materials containing child pornography and provides for prison sentences of up to 16 years. Despite these

provisions, sexual exploitation of children remained a problem. The government did not enforce the law effectively.

**Institutionalized Children:** In March legislators approved reforms to the juvenile criminal code to establish prison sentences for minors convicted of serious crimes committed while belonging to gangs. Such crimes include homicide, extortion, kidnapping, rape, sexual assault, and aggravated robbery. The previous code did not apply prison sentences to juveniles ages 12 to 18 for committing serious crimes. Under the reforms, minors 16 or older could be sentenced up to 20 years in prison, and minors 12 to 15 could face up to 10 years in prison.

On July 27, the Salvadoran Institute of Child Development reported the number of minors ages 12 to 17 in detention increased from 247 in 2021 to 1,373, largely due to enforcement actions under the state of exception.

## Antisemitism

The Jewish community totaled approximately 150 persons. There were no reports of antisemitic acts.

## Trafficking in Persons

See the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## Acts of Violence, Criminalization, and Other Abuses Based on Sexual Orientation, Gender Identity or Expression, or Sex Characteristics

**Criminalization:** Laws do not criminalize consensual same-sex conduct between adults or cross-dressing.

**Violence against LGBTQI+ Persons:** Violence against lesbian, gay, bisexual, transgender, queer, and intersex (LGBTQI+) persons was widespread. The law allows for higher sentences for crimes committed on the basis of sex, gender identity, and gender expression, among other categories.

On May 17, the Solidarity Association to Promote Human Development reported that the situation of transgender women and men worsened during the state of exception, due to security force and gang violence. Comcavis Trans reported in August that it had received 20 complaints from transgender individuals regarding their treatment by security forces during the state of exception, including allegations of illegal detention, abuse of power, and physical aggression.

**Discrimination:** Discrimination against LGBTQI+ persons was widespread. On February 4, Comcavis Trans and the Organization for Salvadoran Women for Peace presented the results of a study of discrimination and violence against the LGBTQI+ community that reported 65 percent of individuals interviewed claimed to have been victims of discrimination by municipal security agents. A Human Rights Watch report published in February found that transgender persons regularly faced discrimination in health care, employment, banking, and voting.

On April 26, the PNC arrested Kendra and Dayana, two transgender women from Metapán, Santa Ana, as part of law enforcement actions under the state of exception. On the day of the arrest, police posted a photograph of them on Facebook and Twitter in which both were identified by their male names, not the names they used, and shown with exposed torsos. The post received numerous antitransgender comments. Transgender men arrested during the state of exception also reported police forced them to expose their torsos.

**Availability of Legal Gender Recognition:** On February 23, the Supreme Court ruled that discrimination based on gender identity is unconstitutional and gave the Legislative Assembly one year to create a procedure allowing transgender persons to change their identity documents to reflect their gender. As of November, the Legislative Assembly had not taken any steps to create such a procedure.

**Involuntary or Coercive Medical or Psychological Practices Specifically Targeting LGBTQI+ Individuals:** There were no reports of the practice of so-called conversion therapy targeting LGBTQI+ individuals.

**Restrictions of Freedom of Expression, Association, or Peaceful Assembly:** There were no restrictions on freedom of expression or association.

On June 25, LGBTQI+ activists noted the Bukele administration had failed to

provide police to protect marchers during the Pride parade in the past two years, although the parade drew more 20,000 participants in a society that was at times violent towards the LGBTQI+ community. The PNC regularly provided protection for other marches, as part of its mandate to guarantee public order.

## Persons with Disabilities

The law prohibits discrimination against persons with physical, sensory, intellectual, and mental disabilities, but the government did not enforce these laws. Persons with disabilities did not have access to education, health services, public buildings, or transportation on an equal basis with others. Persons with disabilities faced discrimination in employment and occupation. No formal system existed for filing a discrimination complaint based on disability.

The National Council for Comprehensive Attention to Persons with Disability (CONAIPD), composed of representatives from multiple government entities, is the agency responsible for protecting the rights of persons with a disability, but it lacked enforcement power. According to a CONAIPD representative, the government did not effectively enforce legal requirements for access to buildings, information, and communications for persons with disabilities. Few access ramps or provisions for the mobility of persons with disabilities existed.

Disability advocates said that children with disabilities faced access problems in school, including a lack of ramps and other accommodations. The government provided little support for schools to include accommodations, and there were few teachers trained to teach students with disabilities.

On March 25, the Without Limits Association reported on discrimination faced by children with disabilities in the public education system. Many schools in the country did not admit disabled children due to lack of adequate facilities to accommodate disabilities. The law obliges public-sector institutions to allocate a part of their budget to provide for inclusion of persons with disabilities. According to Without Limits, the Ministry of Education did not comply with the law.

Persons with disabilities also faced discrimination in the public health-care system. Women with disabilities were often instructed by their doctors to use birth control to avoid having children, believing that the women would bear children with

disabilities.

CONAIPD said there was no mechanism to verify compliance with the law requiring businesses and nongovernment agencies to hire one person with disabilities for every 25 hires. CONAIPD reported employers frequently fired persons who acquired disabilities and would not consider persons with disabilities for work for which they qualified.

### Other Societal Violence or Discrimination

Although the law prohibits discrimination based on HIV or AIDS status, Entre Amigos, an NGO that worked on issues concerning LGBTQI+ persons, reported HIV-related discrimination was widespread. As of June 30, the PDDH had not received any complaint for cases of discrimination against persons with HIV or AIDS.

## Section 7. Worker Rights

### a. Freedom of Association and the Right to Collective Bargaining

The law provides for the right of most workers to form and join independent unions, to strike, and to bargain collectively, but the government did not enforce these rights. Unions experienced lengthy delays in processing their credentials with the Ministry of Labor, some waiting nine months or longer. Without credentials, unions may not engage in collective bargaining or participate in tripartite entities that govern worker-related issues such as setting a minimum wage, health care, and housing. According to media reports and union representatives, the minister of labor rewarded unions loyal to him and his party with expedited credentials and punished unions critical of the government by delaying their certifications.

The law prohibits antiunion discrimination, although it does not require reinstatement of workers fired for union activity. Military personnel, national police, judges, and high-level public officers may not form or join unions. Workers in private security firms may not form or join unions. The labor code does not cover public-sector workers and municipal workers, whose wages and terms of employment are regulated by the 1961 civil service law. Only citizens

may serve on unions' executive committees. The labor code also bars individuals from holding membership in more than one trade union. Unions must meet certain requirements to register, including having a minimum membership of 35 individuals. If the Ministry of Labor denies registration, the law prohibits any attempt to organize for up to six months following the denial.

Collective bargaining is strictly regulated. Unions representing fewer than 51 percent of the workers in an enterprise do not have the right to bargain, even on behalf of their own members. Provisions of the law allow either party to a collective bargaining agreement, under some conditions, to seek to change its provisions after one year in force. Employees of most public institutions do not have the right to bargain collectively, and for those that do, collective bargaining agreements are subject to the approval of the employing ministry before they go into force.

The law contains cumbersome and complex procedures for conducting a legal strike. The law does not recognize the right to strike for public and municipal employees or for workers in essential services. The law does not specify which services meet this definition, and courts therefore applied this provision on a case-by-case basis. The law requires that 30 percent of all workers in an enterprise must support a strike for it to be legal and that 51 percent must support the strike before all workers are bound by the decision to strike. Unions may strike only to obtain or modify a collective bargaining agreement or to protect the common professional interests of the workers. Unions must engage in negotiation, mediation, and arbitration processes before striking, although many unions often skipped or expedited these steps. Workers at times engaged in strikes that did not meet legal requirements. The law provides no way for workers to appeal a government decision declaring a strike illegal.

The law specifies 30 reasons for which an employer may terminate a worker's contract without triggering any additional responsibilities, including consistent negligence, leaking private company information, or committing immoral acts while on duty. An employer may legally suspend workers, including due to an economic downturn or market conditions. If an employer illegally dismisses a worker, the law requires the employer to pay the equivalent of 30 days of basic salary for each year of service, in lieu of requiring employers to reinstate them.

The government did not effectively enforce the laws on freedom of association and the right to collective bargaining, and penalties were not commensurate with those for other laws involving denials of civil rights, such as discrimination. Penalties were rarely applied against violators. Judicial procedures were subject to lengthy delays and appeals. According to union representatives, the government inconsistently enforced labor rights for a wide range of workers, and enforcement was dependent upon the political affiliations of their labor unions. Unions reported that their members frequently faced violence or threats of violence and that viable legal recourse against such violence was unavailable. Gang activity made it difficult for workers, who continued to be harassed and exposed to violence, to exercise their union activities freely.

Although many unions were aligned with political parties, they functioned independently from the government and political parties.

On April 28, Minister of Labor Castro stated that he would consider any Labor Day demonstrators to be defending gang members. In the event, the demonstrations were largely peaceful and without arrests (see section 2.b., Freedom of Assembly).

## b. Prohibition of Forced or Compulsory Labor

The law prohibits all forms of forced or compulsory labor. The government generally did not effectively enforce such laws. The Ministry of Labor did not report on forced labor. Children and adults were exposed to forced begging, domestic work, agricultural labor, construction, textile industry, and street work. Adults from neighboring countries were forced to work in construction, domestic work, and other informal sector jobs, sometimes under threat of physical violence. Gangs subjected children to forced labor in illicit activities, including selling or transporting drugs and committing homicides.

Also see the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## c. Prohibition of Child Labor and Minimum Age for Employment

See the Department of Labor's *Findings on the Worst Forms of Child Labor* at

https://www.dol.gov/agencies/ilab/resources/reports/child-labor/findings/.

## d. Discrimination with Respect to Employment and Occupation

The constitution, labor laws, and state regulations prohibit discrimination based on age, race, color, sex, religion, political opinion, national origin (except in cases determined to protect local workers), social origin, gender, disability, language, or HIV-positive status. The government did not effectively enforce the laws and regulations, and penalties were not commensurate to laws related to civil rights, such as election interference. Penalties were sometimes applied against violators. Although the Supreme Court of Justice ruled that gender identity was a protected class, the government did not enforce this.

Discrimination in employment and occupation occurred based on age, gender, disability, and sexual orientation or gender identity (see section 6). According to the Ministry of Labor, migrant workers have the same rights as citizens, but the ministry did not effectively protect their rights.

The law prohibits establishing an upper age limit for job applications, using age as a cause to dismiss an employee, or forcing an employee to retire due to age. The law was not enforced.

Although the law provides for equal pay between men and women, women did not receive equal pay. In July 2021, the United Nations reported that women made 18 percent less than men in the same jobs.

Persons with disabilities faced discrimination in employment and occupation (see section 6). On March 7, the Network of Survivors and Persons with Disabilities Foundation said that women with disabilities faced discrimination when seeking employment in public institutions, including through the Ministry of Labor's Job Placement Program. The foundation highlighted that the Special Law on Inclusion of Persons with Disabilities was never implemented or enforced. The Association of Blind Women added that companies preferred to pay fines instead of employing workers with disabilities.

Although the law prohibits forcing an employee to retire due to age, on May 11, the Legislative Assembly approved the Special Law for the Retirement and

Granting of Economic Compensation, which provides financial compensation to employees age 60 or older in the National Civilian Police and the National Academy of Public Security who were forced to retire in March by order of the minister of security. The minister signed the order on March 30, and the employees were forced to retire the next day, without compensation. The order affected approximately 3,000 workers across various law enforcement bodies.

## e. Acceptable Conditions of Work

**Wage and Hour Laws:** The government sets the minimum wage, which varies by sector; all were above poverty income levels. The Ministry of Labor is responsible for enforcement of wage and hour laws. The law sets a maximum normal workweek of 44 hours – limited to no more than six days per week and to no more than eight hours per day – but allows overtime, which is to be paid at double the usual hourly wage. The law mandates that full-time employees receive pay for an eight-hour day of rest in addition to the 44-hour normal workweek. The law provides that employers pay double time for work on designated annual holidays, a Christmas bonus based on the time of service of the employee, and 15 days of paid annual leave. The law prohibits compulsory overtime for all workers other than domestic employees, such as maids and gardeners, who are obligated to work on holidays if their employer makes this request. In such cases, they are entitled to double pay.

**Occupational Safety and Health:** The Ministry of Labor is responsible for setting and enforcing occupational safety and health (OSH) standards, and the law establishes a tripartite committee to review these standards. The law requires employers to take steps to meet OSH requirements in the workplace, including providing proper equipment and training and a violence-free environment. The law promotes occupational safety awareness, training, and worker participation in OSH matters. The laws were appropriate for the main industries.

In some cases, the country's high crime rate undermined acceptable conditions of work as well as workers' psychological and physical health. Some workers, such as bus drivers, bill collectors, messengers, and teachers in high-risk areas, reported being subject to extortion by and death threats from gang members. The reports decreased following the advent of the state of exception.

Workers may legally remove themselves from situations that endanger health or safety without jeopardy to their employment. One police officer reported being arrested due to complaints he made regarding the conditions of work under the state of exception. On June 10, Jorge Alberto Vásquez Panameño, one of the founders of the Movement of Police Workers, was summoned to a meeting where the PNC Internal Affairs Commission and PNC Director Mauricio Chicas were waiting to carry out his arrest. He was told his arrest was because he shared images on WhatsApp of the exhaustion experienced by police officers during the state of exception. Police union representatives claimed he was detained in retaliation for denouncing the abuses suffered by PNC police officers such as suspension of time off, lack of payment, insufficient supplies to carry out work, and forced retirement of officers 60 years of age or above. He was released four days later, and all charges were dropped.

**Wage, Hour, and OSH Enforcement:** The government did not adequately enforce wage, hour, or OSH laws and regulations. Penalties were not commensurate with those for similar crimes, such as fraud, and were not consistently applied against violators. Some companies reportedly found it more cost effective to pay fines than comply with the law.

The government trained inspectors on legal standards. The number of inspectors was insufficient to deter violations. Inspectors did not have the authority to initiate unannounced inspections or sanctions. Inspections were scheduled according to a calendar set by the Inspections Directorate or to verify a complaint, and labor inspectors notified companies prior to their arrival. Allegations of corruption among labor inspectors continued.

The Ministry of Labor received complaints regarding failure to pay overtime, minimum wage violations, unpaid salaries, and the illegal withholding of benefits (including social security and pension funds). Reports of overtime and wage violations occurred in several sectors. According to the ministry, employers in the agricultural sector routinely violated the laws requiring annual bonuses, vacation days, and rest days. Women in domestic service faced exploitation, mistreatment, verbal abuse, threats, sexual harassment, and generally poor work conditions. Workers in the textile industry reportedly experienced violations of wage, hour, and safety laws. According to the Women Transforming Association, certain

apparel companies violated women's rights through occupational-health violations and unpaid overtime.

**Informal Sector:** The informal sector represented almost 75 percent of the economy. Workers in the informal sector, including children, were not protected by labor laws, and their workplaces were not inspected by the Ministry of Labor.

Case No. 25-cv-1774-JEB

# Exhibit 3

# EL SALVADOR 2021 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

El Salvador is a constitutional multiparty republic with a democratically elected government. In 2019 voters elected Nayib Bukele as president for a five-year term. The election was generally free and fair, according to international observers. Municipal and legislative elections took place on February 28 and were largely free and fair.

The National Civilian Police, overseen by the Ministry of Justice and Public Security, is responsible for maintaining public security. The Ministry of Defense is responsible for maintaining national security. Although the constitution separates public security and military functions, it allows the president to use the armed forces "in exceptional circumstances" to maintain internal peace and public security "when all other measures have been exhausted." The military is responsible for securing international borders and conducting joint patrols with the civilian police. Civilian authorities at times did not maintain effective control over security forces. There were credible reports that members of the security forces committed some abuses.

Significant human rights issues included credible reports of: unlawful killings of suspected gang members and others by security forces; forced disappearances by military personnel; torture and cruel, inhuman, or degrading treatment or punishment by security forces; harsh and life-threatening prison conditions; arbitrary arrest and detention; serious problems with the independence of the judiciary; serious restrictions on free expression and media, including violence or threats of violence against journalists and censorship; substantial interference with the freedom of peaceful assembly and freedom of association; serious acts of government corruption; lack of consistent investigation and accountability for gender-based violence; significant barriers to accessing reproductive health; and crimes involving violence by security forces against lesbian, gay, bisexual, transgender, queer, and intersex individuals.

Impunity persisted in the security forces, executive branch, and justice system. In

some cases authorities investigated and prosecuted persons accused of committing crimes and human rights abuses. Impunity for official corruption remained endemic.

Organized criminal elements, including local and transnational gangs and narcotics traffickers, were significant perpetrators of violent crimes. They committed killings and acts of extortion, kidnapping, human trafficking, intimidation, and other threats and violence. They directed these acts against police, judicial authorities, the business community, journalists, women, and members of vulnerable populations.

# Section 1. Respect for the Integrity of the Person

## a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were no reports that the government or its agents committed politically motivated killings. There were reports, however, of security force involvement in extrajudicial killings of suspected gang members. As of October 25, the Office of the Human Rights Ombudsman (PDDH) was investigating seven cases of extrajudicial killings, six attributed to the members of the National Civilian Police (PNC) and one to the armed forces.

On January 31, PNC officers arrested three men on charges of double homicide after they killed two supporters of opposition party Farabundo Marti National Liberation Front (FMLN) following a soccer match. The three perpetrators worked for the Ministry of Health. President Bukele tweeted that the attack was a plot hatched by his political rivals to damage his Nuevas Ideas party's chances in the February 28 legislative and municipal elections, but there was no evidence of a plot.

On July 19, PNC officers in Guacotecti, Cabanas Department, killed two brothers suspected of being members of transnational gang MS-13. According to relatives, PNC officers arrived at the house to arrest the two brothers who had outstanding warrants, and the brothers fled with rifles when they saw the police officers. The victims' father said his two sons previously received threats from police, claiming

the PNC officers planned the shooting and told him, "We are going to kill your children."

The First Justice of the Peace of Santa Tecla, La Libertad Department, ordered the provisional arrest of four soldiers for the aggravated homicide of a 30-year-old engineer on August 12. The soldiers from the Apolo Task Force claimed the victim attacked them with a firearm from his vehicle and that the soldiers returned fire. The Scientific Technical Police found no firearms or bullet casings in the vehicle, and the victim's hands did not have traces of gunpowder.

On February 7, the First Trial Court of Santa Tecla convicted three PNC officers of aggravated homicide and sentenced each of them to 25 years in prison for the 2017 extrajudicial killings of three persons in San Jose Villanueva, La Libertad Department. The PNC officers claimed they received information that the three persons in the vehicle were armed gang members, but the prosecutor showed that the PNC officers intercepted the vehicle and shot the victims without confrontation.

## b. Disappearance

Media reports alleged that security and law enforcement officials were involved in unlawful disappearances. According to reports, the PNC recorded 989 disappearances between January 1 and June 29, an increase from the same period in 2020 when the PNC tracked 728 cases. The PNC reported that 545 of those reported missing were later found alive and 51 found dead. Minister of Justice and Public Security Gustavo Villatoro explained that many disappeared persons were victims of homicide, as criminals hid the bodies of their victims to avoid charges of homicide.

On April 7, the Foundation for Studies for the Application of Law released a study stating that the illegal practice of disappearing a person was no longer exclusive to gangs and that police, soldiers, and extermination groups viewed unlawful disappearances as a low-cost, effective way of resolving conflicts. According to a Human Rights Observatory of the Central American University (OUDH) report published in September, extermination groups operated with police, military, and civilian members, simulating legal actions such as searches, raids, and police

operations in addition to illegal actions such as arbitrary detentions and killings. The report also noted that between 2015 and 2020, the Attorney General's Office identified approximately 15 extermination groups in the country.

On May 31, Minister of Justice and Public Security Gustavo Villatoro criticized families who posted photographs of their missing relatives on social media accounts and asked them instead to file a formal complaint with the PNC or the Attorney General's Office. Villatoro accused the families of psychologically damaging their missing children who eventually are found and stated most persons leave their families because they want to leave their life partner or because they did not get enough attention at home.

On June 1, the daily newspaper *El Diario de Hoy* reported that the Attorney General's Office stopped the regular practice of publishing the photographs and information of missing persons following the arrival of the new attorney general, Rodolfo Delgado, on May 1. The Attorney General's Office recorded more missing persons (5,381) than homicides (2,940) during the first two years of the Bukele administration, with most of the victims disappeared in areas with a high presence of gangs.

The Attorney General's Office reported 66 minors as missing in the first 10 months of the year, 15 boys and 51 girls. All cases were under investigation.

On December 1, the daily newspaper *La Prensa Grafica* reported the findings from a study by the OUDH showing that between June 2019 and June 2021, only four cases of missing persons ended in a conviction. This number represented well less than 1 percent of the total cases of missing persons initiated by the Prosecutor's Office.

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The law prohibits such practices, but there were reports of violations. As of August 31, the PDDH had received 13 complaints of torture or cruel or inhuman treatment by the PNC and one by the armed forces, compared with 15 and two complaints, respectively, as of August 2020. The PDDH also received 62

complaints of mistreatment and disproportionate use of force by the PNC and seven by the armed forces, compared with 55 and four complaints, respectively, as of August 2020.

As of September the PNC registered a total of 95 accusations against police officers involved in crimes and offenses. Of the 95 accusations, 38 concerned homicides committed by police officers. The PNC received 296 complaints of general misconduct in the same period, including but not limited to torture and cruel, inhuman, or degrading acts of punishment. Three of the 296 complaints were referred to the Attorney General's Office for prosecution, while the 293 unresolved cases remained under investigation by the PNC.

On March 12, the Attorney General's Office issued arrest warrants for four PNC officers for the torture of a minor and a woman in 2017 in Sensuntepeque, Cabanas Department. According to a video widely circulated on social media, PNC officers Cristian Neftali Franco Vasquez, Elvis Alirio Montenegro Beltran, Omar Alexander Pineda Chevez, and Mario Enrique Perez Chavez beat the minor to force him to reveal the hiding location of drugs and weapons. One of the officers fired a warning shot when a woman who witnessed the beating began to complain.

On April 30, *El Diario de Hoy* reported that an armed forces officer was arrested for shooting Rene Alfredo Lainez Andasol in the face in Victoria, Cabanas Department. The Attorney General's Office accused the soldier of attempted homicide.

On June 23, the Sentencing Court of Cojutepeque, Cuscatlan Department, sentenced PNC officer Juan Carlos Portillo Velasquez to 12 years in prison for the aggravated rape of an adolescent in 2018. According to the Attorney General's Office, Portillo Velasquez abused his position by ordering a 17-year-old girl to enter her home and remove her clothes under the guise of checking for gang-related tattoos. His partner caught him in the act of rape and informed his supervisors.

According to the Conduct in UN Field Missions online portal, there were no new allegations against El Salvadoran peacekeepers brought in the year. The most recent allegation was submitted in March 2020 concerning sexual exploitation and

abuse by Salvadoran peacekeepers deployed to the UN Mission in South Sudan, allegedly involving an exploitative relationship with an adult. As of October the United Nations had found the allegation of sexual exploitation or abuse to be unsubstantiated but found evidence of fraternization and repatriated the perpetrator.

Impunity was a problem in the PNC and armed forces. Factors contributing to impunity included politicization and general corruption. The Attorney General's Office investigates whether security force killings were justifiable and pursues prosecutions, and the PDDH investigates complaints of such killings. The government provided annual training to military units to dissuade any potential for gross abuses of human rights, such as the training provided to the Marine Infantry Battalion by the navy's Legal Unit on the need to respect human rights. The government repeatedly defied a June 2020 judicial order to allow expert witnesses access to inspect military archives to determine criminal responsibility for the 1981 El Mozote massacre.

Previous government efforts to counter impunity were also eliminated. In June President Bukele ended the cooperative agreement with the Organization of American States to back the International Organization Against Impunity in El Salvador. Civil society organizations condemned this action and characterized it as a step backwards in the fight against impunity and corruption in the country. The government pursued actions against members of other parties governing in past administrations and judges who had served a long time in a so-called effort to "clean house" of influence of officials appointed under previous administrations. Civil society organizations criticized many of these actions as politically motivated.

Impunity in the executive branch also remained a problem. From January through September, the Attorney General's Office reported that it processed 150 cases of embezzlement, illicit negotiations, illicit enrichment, and bribery perpetrated by government employees. Of these cases, only seven resulted in convictions.

### Prison and Detention Center Conditions

Prison and detention center conditions remained harsh and life threatening due to

gross overcrowding, unhygienic conditions, and gang activity.

**Physical Conditions:** Overcrowding was a serious threat to prisoners' health and welfare. The prison system had a capacity for 30,864 inmates, but as of April 19, held more than 36,500 inmates. Director of Penal Centers Osiris Luna reported that the General Directorate of Penal Centers (DGCP) reduced the overcrowding of prisons from 50 percent to 12 percent and stated one of the objectives of the government's Territorial Control Plan was to reduce the number of prisons from 23 to 10. Police holding facilities were equally crowded. In May the director of the National Civilian Police stated that there were approximately 5,000 persons in police holding cells, including prosecuted and convicted individuals who could not be transferred to the overcrowded prisons. Convicted inmates and pretrial detainees were sometimes held in the same prison cells.

Gangs remained prevalent in prisons. As of April the DGCP reported approximately 51 percent (18,652 prisoners) of the prison population were active or former gang members.

According to the PDDH, many prisons had inadequate sanitation, potable water, ventilation, temperature control, medical care, and lighting. Inmates experienced gastrointestinal illnesses and skin problems due to poor water quality.

According to the DGCP, 94 inmates died between January 2020 and February 2021. PDDH deputy attorney Beatriz Campos said most of the deaths were due to chronic diseases, including kidney failure, respiratory diseases, and HIV. Campos said the DGCP received nine to 15 complaints daily, with 90 percent related to inquiries about health.

**Administration:** The PDDH has authority to investigate credible allegations of inhuman conditions. The government suspended visits to prisons in March 2020, which continued as of November. According to February 14 media reports, relatives of inmates had not communicated with inmates in a year. Despite an article of the PDDH law that allows the PDDH to have free and immediate access to prisons to inspect and guarantee the human rights of the inmates, the DGCP denied entry to PDDH staff in March. On August 12, the DGCP again denied the PDDH access to prisons despite the Second Peace Court authorizing the PDDH

entry to visit three former government officials in prison after receiving complaints from the officials' relatives on their state of health.

On June 17, *La Prensa Grafica* reported that relatives of an inmate who died inside Mariona Prison in San Salvador Department on June 7 learned of the death through Facebook. Prison Directorate personnel failed to inform the family of the deceased in a timely manner.

**Independent Monitoring:** The prison system was closed to visits during the year, allowing only employees to enter. Professional and family visits, inspections of institutions, and visits by international organizations, nongovernmental organizations (NGOs), churches, and others were suspended, although there were reports of sporadic entries granted based on personal connections with prison officials to members of the clergy and nonprofits.

## d. Arbitrary Arrest or Detention

The law provides for the right of any person to challenge the lawfulness of his or her arrest or detention in court. The Constitutional Chamber of the Supreme Court is responsible for addressing these types of cases.

### Arrest Procedures and Treatment of Detainees

The constitution requires a written warrant of arrest except in cases where an individual is caught in the act of committing a crime. Authorities generally apprehended persons with warrants based on evidence and issued by a judge, although this was frequently ignored when allegations of gang membership arose. Police generally informed detainees promptly of charges against them.

The law permits release on bail for detainees who are unlikely to flee or whose release would not impede the investigation of the case. The bail system functioned adequately in most cases. The courts generally enforced a ruling that interrogation without the presence of counsel is coercive, and that evidence obtained in such a manner is inadmissible. As a result PNC authorities typically delayed questioning until a public defender or an attorney arrived. The constitution permits the PNC to hold suspects for 72 hours before presenting them to court. The law allows up to six months for investigation of serious crimes before requiring either a trial or

dismissal of the case; this period may be extended by an appeals court. Many cases continued beyond the legally prescribed period.

**Arbitrary Arrest:** As of August 31, the PDDH reported 25 complaints of arbitrary detention or illegal detention, compared with 22 from January to August 2020.

According to media reports, on April 22, the Attorney General's Office accused PNC officers Miguel Angel Hernandez, Luis Edgardo Chavez, Cesar Ernesto Menjivar, Milton Cesar Hernandez, Oscar Antonio Mancia, and Jose Leodan Menjivar of at least a dozen illegal acts, including arbitrarily detaining citizens.

On July 21, the Original Blue organization, a local NGO that seeks social transformation and supports vulnerable populations, reported that young persons in areas identified as having high presence of gangs were victims of arbitrary or illegal detentions by the PNC. The report included testimony from 12 individuals who said they were detained illegally.

On September 1, a vocal critic of President Bukele's proposal to adopt Bitcoin as legal tender of El Salvador was arrested without a warrant and without explanation of the reason of his arrest. He was released the same day with no charges filed.

**Pretrial Detention:** Lengthy pretrial detention was a significant problem. Some persons remained in pretrial detention longer than the maximum legal sentences for their alleged crimes. In such circumstances detainees were permitted to request a Supreme Court review of their continued detention.

## e. Denial of Fair Public Trial

Although the constitution provides for an independent judiciary, the government did not always respect judicial independence, and the judiciary was burdened by inefficiency.

While the government generally respected court orders, some agencies ignored or minimally complied with orders.

As of August 31, the PDDH received 65 complaints of lack of a fair public trial, compared with 12 such complaints as of August 2020.

On May 1, during the first plenary session of the newly elected Legislative Assembly, legislators of the majority Nuevas Ideas, a political party founded by President Bukele, and their allies voted to dismiss all five magistrates of the Constitutional Chamber of the Supreme Court of Justice and the attorney general without granting any of them due process. Critics contended the dismissals lacked legal cause and amounted to an unconstitutional power grab. The president defended the votes, claiming the Legislative Assembly had the authority to do this according to the constitution. On June 30, the Legislative Assembly installed new judges loyal to the president to replace the five dismissed magistrates.

On August 31, the Legislative Assembly used an emergency waiver process to pass two judicial career laws, instead of following the constitutionally prescribed process that judicial reforms must originate from the Supreme Court. The laws mandate the retirement of judges and prosecutors aged 60 or older and also those who have completed 30 years of service or more. In addition the attorney general and Supreme Court were given authority, at their discretion, to transfer prosecutors and judges between districts. While the Legislative Assembly justified the actions as an effort to rid the courts of corruption, legal analysts argued the laws were unconstitutional and were enacted to allow the ruling political party to appoint loyal replacement judges. More than 200 judges were forced by the new laws to retire, including Judge Jorge Guzman Urquilla, the magistrate overseeing the prosecution of 13 surviving former military officers for the alleged El Mozote massacre of more than 800 civilians in 1981. Although the Supreme Court offered him a one-time exception to remain in his position, Judge Guzman resigned in protest before the law went into effect.

**Trial Procedures**

The law provides for the right to a fair and public trial, and an independent judiciary generally enforced this right, although some trial court judges were subject to political, economic, or other corrupting influences. By law juries hear only a narrow group of cases, such as environmental complaints. In those cases, after the jury determines innocence or guilt, a panel of judges decides the sentence.

Defendants have the right to be present in court (except in virtual trials; see below), question witnesses, and present witnesses and evidence. The constitution further

provides for the presumption of innocence, the right to be informed promptly and in detail of charges, the right to a trial without undue delay (seldom observed), protection from self-incrimination, the right to communicate with an attorney of choice, the right to adequate time and facilities to prepare a defense, freedom from coercion, the right to appeal, and government-provided legal counsel for the indigent.

In criminal cases a judge may allow a private plaintiff to participate in trial proceedings (calling and cross-examining witnesses, providing evidence, etc.), assisting the prosecuting attorney in the trial procedure. Defendants have the right to free assistance of an interpreter. Authorities did not always respect these legal rights and protections. Although a jury's verdict is final, a judge's verdict is subject to appeal. Trials are public unless a judge seals a case.

The law allows for virtual trials for gang membership charges to proceed without the defendants present, although with defense counsel participating. The law requires judicial and prison authorities to provide a video copy of the virtual trial to the defendants within 72 hours so they may exercise their right to defense.

Virtual trials often involved group hearings before a judge, with defense lawyers physically present in the courtroom but defendants appearing by video, unable to consult with their defense lawyers in real time. This practice continued throughout the year due to precautionary measures taken by the courts to curb the spread of COVID-19. The number of virtual trials increased but continued to involve delays due to lack of equipment, technical problems, and lack of coordination between courts and penitentiaries.

Legal experts identified overall issues with the legal system, pointing to an overreliance on witness testimony, as opposed to the use of forensics or other scientific evidence. For example the justice system lacked DNA analysis and other forensic capabilities.

### Political Prisoners and Detainees

There were no clear reports of political prisoners or detainees, but media reported several detentions of opposition party members and questioned the legitimacy of the detentions.

On June 4, Attorney General Rodolfo Delgado ordered the arrest of former mayor of San Salvador and prominent opposition politician Ernesto Muyshondt for the charge of misappropriation of tax withholdings to the detriment of the Public Treasury while mayor. The arrest occurred minutes after the Second Investigative Court of San Salvador ordered house arrest for Muyshondt for the crimes of electoral fraud and illicit associations for allegedly negotiating with gangs in exchange for votes in the 2015 legislative elections. As he was escorted from the court, Muyshondt declared himself as "the first political prisoner of the Bukele dictatorship." Despite a court order from the Third Criminal Chamber again granting house arrest for Muyshondt, the General Directorate of Penal Centers never released him, claiming it did not have an available ankle-monitoring bracelet. On October 1, newly appointed judges in the Third Criminal Chamber overturned the house arrest order, and Muyshondt remained in prison.

In July, five former FMLN party officials were detained but were not immediately informed of the reason for their detention. Several hours later they learned about the charges against them during a press conference. The officials remained in prison while awaiting the investigation of their crimes and were denied visitation despite a court order granting visitation by family and attorneys.

**Civil Judicial Procedures and Remedies**

The law provides for access to the courts, enabling litigants to submit civil lawsuits seeking damages for, as well as cessation of, human rights violations. Domestic court orders generally were enforced. Most attorneys pursued criminal prosecution and later requested civil compensation.

## f. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence

The constitution prohibits such actions, and there were no reports the state intelligence service tracked journalists or collected information regarding their private lives.

In many neighborhoods gangs and other armed groups targeted certain persons and interfered with privacy, family, and home life. Efforts by authorities to remedy

these situations were generally ineffective.

# Section 2. Respect for Civil Liberties

## a. Freedom of Expression, Including for Members of the Press and Other Media

The constitution provides for freedom of expression, including for members of the press and other media, although the government at times did not respect this right. The law permits the executive branch to use the emergency broadcasting service to take control of all broadcast and cable networks temporarily to televise political programming.

**Freedom of Expression for Members of the Press and Other Media, Including Online Media:** Journalists from several digital and print media outlets publicly accused President Bukele, his administration, and his supporters of a pattern of harassment designed to constrain media. In public statements and in testimony to the Legislative Assembly, journalists claimed the president and his cabinet officials bullied them on Twitter, threatened them with physical harm, launched unwarranted financial investigations into their taxes and funding sources, denied them access to press conferences, and surveilled them. Senior officials, such as legal advisor Javier Argueta, called for actions against journalists who criticized the government. The increased villainization of the role of media inspired supporters of the president to threaten journalists as well. The president denied threatening journalists and dismissed accusations he was stifling freedom of the press.

On September 29, the jury of the Maria Moors Cabot award from Columbia University, the Governing Council of the Gabriel Garcia Marquez Foundation, Reporters without Borders, and the Inter American Press Association issued statements in which they demanded that President Bukele cease attacks against critical media in the country.

In November the president of the Association of Salvadoran Journalists (APES) stated at a journalism forum that journalists were seen by the government as enemies of the state. He also confirmed that an increasing number of journalists

were under attack by the government.

**Violence and Harassment:** On June 6, Minister of Justice and Public Security Gustavo Villatoro confirmed during a radio interview that the government was investigating and monitoring many journalists for what he alleged was their irresponsible coverage of crime.

On July 7, a PNC officer slapped a journalist in the face, claiming the journalist had entered a crime scene. A video showed PNC officer Raul Martinez Velasquez hit Jorge Beltran, a journalist for *El Diario de Hoy*, while Beltran was reporting on the recovery of the body of a missing student kidnapped and killed by gang members in Apopa, San Salvador Department. In response the PNC issued memorandums on July 20 and July 22 instructing police officers to act with professionalism and to adhere to the law and respect for human rights when interacting with citizens.

As of August 30, APES had registered 173 violations of the exercise of journalism, an increase of 73 percent, compared with 2020. Among these were physical aggression, digital harassment, blocking access to public information, intimidation, and sexual harassment. APES noted 84 violations against the exercise of journalism during the February 28 municipal and legislative elections, most of which the PNC perpetrated. As of August 31, the PDDH had received four complaints of violence against journalists by government officials, compared with 10 as of August 2020.

On April 14, the digital newspaper *El Faro* published the preliminary results of the audit the Ministry of Finance had performed on the newspaper over a one-year period. According to the ministry's audit, *El Faro* evaded approximately $34,000 in taxes in 2017. The newspaper disputed the finding, saying it was an attempt by the government to again harass and threaten the organization, and it vowed to fight the finding in court if needed.

**Censorship or Content Restrictions:** On May 5, the Legislative Assembly reformed the printing law to eliminate tax exemptions on the importation of raw materials, machinery, and equipment for printing materials. The Inter American Press Association described the reform as a "serious attack against democracy"

that would impact the local newspaper industry. Romeo Auerbach, a legislative assembly member from the Grand Alliance for National Unity (GANA) party, justified the reform by arguing that the print media had evaded paying taxes for decades.

On June 14, the First Justice of the Peace of Santa Ana, Santa Ana Department, ordered the local investigative magazine *Factum* to take down its June 12 article about killings in Chalchuapa, Santa Ana Department, because the article included details of the crimes that were declared confidential. The Attorney General's Office supported the court's decision by citing the Special Comprehensive Law for a Life Free of Violence for Women, which prevents the disclosure of the victim's identifying information. *Factum* sourced its article from a witness statement that detailed the names, dates, and modus operandi of 13 killings that occurred in Chalchuapa in 2020 and 2021, directly contradicting the government's claim that the homicides occurred more than a decade ago.

On June 21, Minister Villatoro accused independent media of causing anxiety and deceiving persons and asked citizens to inform themselves through state-owned media instead.

On July 6, the General Directorate of Migration and Foreigners (DGME) denied a work permit to Mexican journalist Daniel Lizarraga of *El Faro* because he allegedly could not prove that he was a journalist. The DGME notified Lizarraga that he had five days to leave the country. On July 9, the DGME also denied the work permit of Roman Gressier, another *El Faro* journalist. According to the DGME, Gressier failed to comply with the provision to remain in the country while his permit was in process.

On July 15, Minister Villatoro stated the PNC would further limit access to crime scenes to prevent the publication of violent images. Villatoro justified the restriction to protect the mental health of children.

**Nongovernmental Impact:** APES noted journalists who reported on gangs and narcotics trafficking were subject to kidnappings, threats, and intimidation. Observers reported that gangs also charged print media companies to distribute in their communities, costing media outlets as much as 20 percent of their revenues.

### Internet Freedom

The government did not restrict or disrupt access to the internet or censor online content, and there were no credible reports that the government monitored private online communications without appropriate legal authority.

### Academic Freedom and Cultural Events

There were no government restrictions on academic freedom or cultural events.

## b. Freedoms of Peaceful Assembly and Association

The constitution provides for the freedoms of peaceful assembly and association, but there were times the government limited these freedoms (see section 7.a.).

### Freedom of Peaceful Assembly

On September 5, *La Prensa Grafica* reported that PNC officers using professional equipment took photographs of persons protesting the Constitutional Chamber of the Supreme Court of Justice's ruling allowing for the re-election of the president.

On September 15, thousands of protesters marched against the Supreme Court ruling allowing the re-election of the president, the dismissal of justices older than age 60, bitcoin adoption as legal tender in the country, and other recent actions by the government. Some of the marchers included Legislative Assembly staff and judges. On September 17, 75 employees of the Legislative Assembly were arbitrarily dismissed. The union representing Legislative Assembly staff members said the employees who attended the September 15 protests were among those fired. The dismissed staff members had worked in the communications, radio, and television units as well as the Access to Public Information Office. The Legislative Assembly used police to escort the dismissed employees out of their workplace.

On September 26, some judges claimed that they were transferred to preside in remote courts in retaliation for their participation in the September 15 protest.

**Freedom of Association**

The constitution provides for the freedoms of peaceful assembly and association, and the government generally respected these rights, although many nongovernmental organizations that were critical of the government or whose activities did not align with government policies faced threats or restrictions during the year (see section 5).

## c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at https://www.state.gov/religiousfreedomreport/.

# d. Freedom of Movement and the Right to Leave the Country

The constitution provides for freedom of internal movement, foreign travel, emigration, and repatriation. The government generally respected these rights, although in many areas the government could not ensure freedom of movement due to criminal gang activity.

**In-country Movement:** The major gangs controlled access to their specific territories. Gang members did not allow persons living in another gang's area to enter their territory, even when travelling via public transportation. Gangs forced persons to present government-issued identification cards (containing their addresses) to determine their residence. If gang members discovered that a person lived in a rival gang's territory, that person risked being killed, beaten, or denied entry to the territory. Bus companies paid extortion fees to operate within gang territories, often paying numerous fees for the different areas in which they operated. The extortion costs were passed on to customers.

On April 12, gang members in Santa Tecla, La Libertad Department, beat a 77-year-old priest who tried to circumvent heavy traffic and accidentally entered a neighborhood with gang presence. When the priest slowed down to ask for directions, gang members surrounded his vehicle and demanded to know why he was in their neighborhood. The gang members then beat the priest and took

photographs of his identity documents.

On August 25, gang members killed a 25-year-old man in Ciudad Delgado, San Salvador Department. The victim was helping change a tire on his friend's vehicle when MS-13 gang members approached them to demand their identity documents, where they lived, and what they were doing in the neighborhood. When the gang members realized the victim and his friend resided in a different neighborhood, the gang members shot the victim, while the friend managed to escape.

## e. Status and Treatment of Internally Displaced Persons

The Internal Displacement Monitoring Center (IDMC) estimated there were 114,000 new instances of internal forced displacement due to violence during 2020 and reported the causes included threats, extortion, and assassinations perpetrated by criminal gangs. The IDMC also reported 17,000 additional internally displaced persons (IDPs) due to hurricanes Eta and Iota in 2020.

More than 30 families that lived in Panchimalco, San Salvador Department, abandoned their homes on May 25 after receiving threats from gang members. The families, some of whom had lived in Panchimalco for more than 40 years, feared their lives would be in danger after the gang threatened to hold the village responsible for the disappearance of a gang member.

Comprehensive, up-to-date data on internal displacement was not available, but the NGO Cristosal counted 200 persons displaced between January and June. As of August 31, the PDDH reported 53 cases of forced internal displacement. Beatriz Campos, a PDDH attorney, said 90 percent of forced internal displacement cases were caused by gangs in their community and the other 10 percent due to PNC harassment of youth in high-risk communities.

Although the government passed new IDP legislation in January 2020, authorities had yet to take substantial action to fund or implement the law. The government failed to allocate sufficient funding to the Unit of Attention to Victims of Internal Forced Displacement, the entity tasked with the implementation of the law. According to the Due Process of Law Foundation, implementation of the law was further hindered by the lack of clear implementing regulations and available records of IDPs in the country.

### f. Protection of Refugees

The government cooperated with the Office of the UN High Commissioner for Refugees and other humanitarian organizations in providing protection and some assistance to refugees, asylum seekers, and other persons of concern, although this was often difficult in gang-controlled neighborhoods.

**Access to Asylum:** The law provides for the granting of asylum or refugee status, and the government has established a system for providing protection to refugees, but it has major regulatory and operational gaps. The Commission for the Refugee Status is responsible for refugee status determinations but does not have its own budget.

The legal framework requires persons with international protection needs to file their claim within five days of entering the country; the criteria for case decisions is unclear; and the appeals process is decided by the same government entity that issues the initial decision.

## Section 3. Freedom to Participate in the Political Process

The constitution provides citizens the ability to choose their government in free and fair periodic elections held by secret ballot and based on universal and equal suffrage.

### Elections and Political Participation

**Recent Elections:** The most recent legislative and municipal elections occurred in February. Nuevas Ideas, the party affiliated with President Bukele, won 56 of 84 seats in the Legislative Assembly and 152 of 262 mayorships. The election reports published by the Organization of American States (OAS) and the EU electoral mission noted the election generally met international standards.

Observers noted that political and economic conditions prior to the elections may have been instrumental in swaying public support towards the Nuevas Ideas party, thus creating an unfair advantage for Nuevas Ideas candidates. Beginning in June 2020, the government withheld funding to the municipalities through the Social Development Fund, citing lack of funds due to the pandemic. Municipalities were

not able to pay their employees and their bills and provided only limited services to residents. The lack of funding may have created the impression among voters that the sitting municipal leaders, who all belonged to oppositional political parties, were ineffective. Nuevas Ideas candidates then campaigned to bring about improvements to the political and economic situation within municipalities.

Before the February elections, the government failed to provide campaign finances to all political candidates as required by law, severely limiting the ability of the opposition parties to advertise their candidates. Candidates from the Nuevas Ideas party were not limited by the lack of government campaign financing because they had received campaign funds through private sources. As a result the election advertisements were predominantly from Nuevas Ideas candidates.

**Political Parties and Political Participation:** While the law prohibits public officials from campaigning in elections, the provision was not consistently enforced.

On May 5, the Constitutional Chamber of the Supreme Court of Justice ordered the Legislative Assembly to make the necessary regulatory adjustments to provide suffrage to Salvadorans living abroad and allow all citizens to register and run as candidates for the legislative and municipal elections in 2024.

On September 3, the Constitutional Chamber approved a ruling to allow for the immediate re-election of the president despite the express prohibition on re-election by the constitution. The Constitutional Chamber determined that historical interpretations of the constitutional limits on re-election were erroneous and that sitting presidents may run for re-election if they resign the office six months prior to the end of the presidential term. Critics decried the ruling as an attack on democracy and pointed out that the Constitutional Chamber issuing the ruling was composed of five magistrates appointed by the Legislative Assembly on May 1 in a maneuver that was itself controversial.

**Participation of Women and Members of Minority Groups:** No laws limit participation of women or members of minority groups in the political process, and they did participate. The law requires all registered political parties to have at least 30 percent of their candidates for the Legislative Assembly be women. On May 1,

*El Diario de Hoy* reported a low rate of women's participation in politics, stating that women held 24 of the 84 seats in the Legislative Assembly, two seats fewer than in the previous Legislative Assembly. Women held 30 of the 262 mayoralty offices.

According to the Supreme Electoral Tribunal, 328,215 persons with disabilities registered to vote in the February 28 elections. The tribunal launched a campaign to encourage the political participation of persons with disabilities and added accommodations such as braille ballots.

The February 28 election was the first time in the country's history to include a transgender candidate and an openly gay candidate. Alejandra Menjivar, a transgender woman, ran as a candidate for the Central American Parliament from the FMLN party. Erick Ivan Ortiz, an openly gay man, ran as a candidate for the Legislative Assembly from the Nuestro Tiempo party. Neither candidate won their respective election.

## Section 4. Corruption and Lack of Transparency in Government

The law provides criminal penalties for conviction of corruption by officials. Although the Supreme Court investigated corruption in the executive and judicial branches and referred some cases to the Attorney General's Office for possible criminal indictment, corruption and impunity remained endemic.

Multiple officials in the executive branch were accused of engaging in corrupt acts. In many instances the government either ignored the actions or took steps to actively prevent prosecution of those officials unless the officials were political opponents or were members of previous administrations.

**Corruption:** On August 23, *El Faro* followed up on its September 2020 story accusing the Bukele administration of negotiating with senior gang leaders since 2019 to obtain electoral support and a reduction in homicides prior to this year's legislative and municipal elections. Citing photographs and audio recordings, *El Faro* reported that former attorney general Raul Melara's investigation found evidence that the Bukele administration negotiated with the MS-13 and 18th Street

gangs and that the DGCP removed hard drives and hundreds of logbooks documenting the negotiations four days after the publication of the initial article.

On September 19, *El Faro* reported that the Attorney General's Office under former attorney general Melara found evidence that Bureau of Prisons Director Osiris Luna embezzled $1.6 million worth of food between September and November 2020 from the Public Health Emergency Program, a government food program assisting families during the pandemic. There was also evidence that Luna then resold these goods to a merchant who was known to sell contraband.

According to media reports, President Bukele dismissed Minister of Justice and Public Security Eduardo Rogelio Rivas Polanco in March due to Rivas Polanco diverting public funds to a private account to finance his presidential candidacy in the 2024 elections.

On May 6, the Legislative Assembly approved the Law for the Use of Products for Medical Treatments in Exceptional Public Health Situations Caused by the COVID-19 Pandemic. The law includes provisions to shield vaccine manufacturers from liability and allows the government to bypass procurement and transparency regulations. According to the NGO Democracy, Transparency, and Justice Foundation, the new law seeks to retroactively protect government officials from misuse of public money for pandemic spending that occurred before the approval of the law.

On June 4, President Bukele announced the termination of the cooperation agreement with the OAS, bringing an end to the International Commission Against Impunity in El Salvador (CICIES). The president claimed the termination was in response to the OAS announcing the hiring of former San Salvador mayor Ernesto Muyshondt as an advisor to the OAS. The president explained that Muyshondt faced criminal proceedings for negotiating with gangs for electoral support and therefore the government could not continue to work with an organization that hired a criminal as an advisor. Analysts and media reported that CICIES was investigating Bukele administration officials and speculated that the president used the Muyshondt issue as a pretense to terminate the CICIES agreement to stymie the investigations into his administration. In July, OAS representatives stated they offered Muyshondt an honorary contract but did not formally hire him and that the

contract was never signed. Head of CICIES Ronalth Ochaeta said CICIES sent 12 cases of possible corruption from five government institutions to the Attorney General's Office on April 7. As of September 13, the Attorney General's Office had not revealed the details of those investigations.

Officials from the Attorney General's Office raided the headquarters of opposition party, the Nationalist Republican Alliance (ARENA) on July 2 and seized assets to recover funds embezzled from a donation by Taiwan made between 2003 and 2004. Attorney General Rodolfo Delgado stated that former president Antonio Saca financed his electoral campaign with $10 million donated by Taiwan for reconstruction projects following two earthquakes in 2001.

On July 22, the PNC arrested five former government officials on charges of illicit enrichment for having received illegal side payments that exceeded their salaries authorized by law. All five served in the administration of former president Mauricio Funes, who remained under political asylum protection in Nicaragua to evade charges of illicit enrichment. Attorney General Delgado also issued arrest warrants for four more government officials, including former president Salvador Sanchez Ceren, who left the country in December 2020 and became a citizen of Nicaragua on July 30. Funes, Ceren, the five arrested officials, and the other former officials with arrest warrants all belonged to opposition party FMLN.

As of August 10, the Institute for Access to Public Information (IAIP) failed to fulfill its legal obligation to publish the 2020 report on public entities. The report, approved in November 2020, evaluated the transparency performance of 98 government institutions and 60 municipalities and was expected to cover information related to purchases, contracts, or tenders made during the COVID-19 pandemic. After President Bukele appointed three commissioners to the IAIP, the institute decided in December 2020 to postpone publication of the report. As of August 20, the Ethics Tribunal reported that it had opened 170 administrative proceedings against 240 public officials. The Ethics Tribunal imposed sanctions on 19 cases and referred 18 cases to the Attorney General's Office.

On September 8, the Legislative Assembly approved reforms to the criminal procedure code to remove the statute of limitations and apply the law retroactively to crimes of corruption.

## Section 5. Governmental Posture Towards International and Nongovernmental Investigation of Alleged Abuses of Human Rights

A variety of domestic and international human rights groups critical of the Bukele administration and Nuevas Ideas party were subjects of government investigations and surveillance. Government officials were not cooperative and responsive to their views.

On June 2, President Bukele gave a speech announcing the beginning of "the battle of the people against the ideological apparatus," referring to civil society organizations and media as an "internal enemy" that controls the people's way of thinking.

On July 30, the president summoned representatives from civil society organizations for a four-hour closed-door meeting at the Presidential House. The civil society organizations reported that the president agreed to reduce confrontational speeches attacking the press and civil society and made a commitment to not persecute journalists or others critical of the government. Observers noted the president has not kept his promise.

On November 12, the Ministry of Finance presented to the Attorney General's Office evidence of alleged money laundering and tax evasion by a nongovernmental organization dedicated to economic and social development. The ministry claimed their audit showed the organization moved $50 million to a tax haven on a Caribbean island. Although the press announcement did not include the name of the organization, representatives of the Salvadoran Foundation for Economic and Social Development later confirmed they were the subject of the audit. They said that they were innocent of the accusations and claimed the organization and other NGOs who were critical of the actions of the government had been persecuted.

In November several members of NGOs, civil society organizations and journalists received an alert on their cellphones from Apple saying they may have been the target of state-sponsored espionage. Among the recipients of the alert were members of the Institute of Human Rights of the Central American University,

Cristosal, and the Democracy, Transparency and Justice Foundation as well as journalists from *El Faro*, *La Prensa Grafica*, *El Diario de Hoy*, *Disruptiva Magazine*, *Gato Encerrado* magazine, *Diario El Mundo*, and independent journalists.

**Government Human Rights Bodies:** The principal human rights investigative and monitoring body is the autonomous PDDH, whose ombudsman is nominated by the Legislative Assembly for a three-year term. The PDDH regularly issued advisory opinions, reports, and press releases on prominent human rights cases. The PDDH ombudsman, Jose Apolonio Tobar, requested access to monitor conditions in the prisons but had not been allowed to enter the prisons since the beginning of the pandemic in March 2020. In addition the budget approved by the Legislative Assembly for the PDDH in the coming year was again significantly cut.

# Section 6. Discrimination and Societal Abuses

## Women

**Rape and Domestic Violence:** The law criminalizes rape of men or women, and the law's definition of rape may apply to spousal rape, at the judge's discretion. The law requires the Attorney General's Office to prosecute rape cases whether or not the victim presses charges, and the law does not permit the victim to withdraw the criminal charge. The penalty for conviction of rape is generally imprisonment for six to 10 years. Laws against rape were not effectively enforced.

The law prohibits domestic violence and generally provides for sentences for conviction ranging from one to three years in prison, although some forms of domestic violence carry higher penalties. The law also permits restraining orders against offenders. Laws against domestic violence remained poorly enforced, and violence against women, including domestic violence, remained a widespread and serious problem.

According to a newly published survey, the first of its kind carried out by the General Directorate of Statistics and Census (DIGESTYC), six of 10 women older than age 15 suffered some type of sexual violence in their life. The data was

collected in 2019 but not disclosed until March due to difficulties caused by the COVID-19 pandemic.) Sixty-three percent of women ages 15 to 19 and 72 percent of women ages 30 to 34 reported having suffered sexual violence.

Between January and April, the Attorney General's Office received 441 complaints of domestic violence, which encompasses domestic violence toward any member of the family, including children. Observers noted this number likely did not capture most domestic violence cases, particularly those perpetrated against women. On November 3, several women's organizations discussed in a forum the 2019 National Data System on Violence against Women of the Ministry of Justice and DIGESTYC, which showed that 68 percent of women older than 15 years suffered sexual violence, but only 5.3 percent sought help. The organizations attributed this low reporting number to women's distrust of state institutions.

On January 15, the Specialized Sentencing Court for a Life Free of Violence for Women sentenced David Eliseo Diaz Ramirez to 35 years in prison for femicide. Diaz Ramirez and several gang members killed a woman in Tutunichapa, San Salvador Department, in 2019 because she refused to have sex with them.

On May 8, the PNC found more than a dozen bodies, most of them girls and women, buried in the house of former police officer Hugo Ernesto Chavez Osorio, who was arrested on May 6 for the murders of two women. According to the PNC investigation, Chavez Osorio raped his victims and then killed them before burying their bodies in his house.

The Organization of Salvadoran Women for Peace (ORMUSA) reported that the Ministry of Health registered 6,938 pregnant girls or adolescents in the first six months of the year, including 156 girls ages 10 and 11 who were raped and became pregnant. During the first half of the year, the number of pregnancies among girls between the ages of 10-14 increased 9 percent as compared to the same period in 2020. ORMUSA attributed this to several causes, including a lack of government policy for preventing pregnancies in girls and adolescents, a lack of comprehensive sexual and reproductive health education, and an increase in sexual violence. According to the Feminist Collective, families did not report the rapes to the PNC and the Attorney General's Office because the rapist was commonly a relative of the victim and the families considered it an embarrassment.

**Sexual Harassment:** The law prohibits sexual harassment and establishes sentences if convicted of five to eight years' imprisonment. Courts also may impose additional fines in cases in which the perpetrator held a position of trust or authority over the victim. The law mandates that employers take measures against sexual harassment and create and implement preventive programs. The government, however, did not enforce sexual harassment laws effectively.

On March 11, the Second Sentencing Court sentenced Jose Misael Maldonado Palacios, a corporal of the Third Infantry Brigade of the San Miguel Armed Forces, to six years in prison for improper sexual conduct against two employees. The Specialized Attention Unit for Crimes related to Children, Adolescents, and Women stated that in March 2020, Maldonado Palacios offered to pay two women in exchange for sexual acts inside the barracks.

On March 19, the Attorney General's Office announced the arrest of Salvador Alcides Villegas, general manager of the Council of Mayors of Usulutan. Villegas was formally accused of sexual harassment of three women, including touching and improper sexual expressions. The victims told the authorities that Villegas touched their legs, breasts, and buttocks.

**Reproductive Rights:** There were no reports of coerced abortion or involuntary sterilization on the part of government authorities.

The law bans abortion. Civil society advocates expressed concern that the ban led to the wrongful incarceration of women who suffered severe pregnancy complications, including miscarriages.

In March the Inter-American Court of Human Rights concluded that the government violated the right to personal freedom, life, health, and justice of Manuela, a woman sentenced to 30 years in prison in 2008 for the aggravated homicide of her unborn child. Manuela died from cancer in 2010 after not receiving timely and appropriate treatment in prison.

On June 2, the Citizen Group for the Decriminalization of Abortion in El Salvador reported that at least 17 women were in prison on charges of having an abortion after suffering out-of-hospital obstetric emergencies. One of the women, Sara Rogel, received early parole, and the Second Court of Penitentiary Surveillance in

Cojutepeque, Cuscatlan Department, released her from prison on June 7. Rogel suffered an obstetric emergency in 2012 when she slipped while washing clothes and was sentenced to 30 years in prison for aggravated homicide for allegedly having an abortion. The court commuted Rogel's sentence to 10 years in January, and Rogel received early parole after the Attorney General's Office declined to appeal the decision.

The government-run Institute for Women's Development implements the National Care System which aims to improve the care, protection, and access to justice for victims of sexual and other types of violence. The specialized comprehensive care includes medical care, counseling, family planning, medical examinations, and treatment of sexually transmitted infections in victims of sexual violence and services were generally available throughout the country.

ORMUSA reported that the closure of Ciudad Mujer health centers throughout the country since June 2019, shortly after President Bukele became president, had created a barrier to women and lesbian, gay, bisexual, transgender, queer, and intersex (LGBTQI+) persons receiving timely health services. Following the closure of the centers, women and LGBTQI+ persons were subjected to long delays to see doctors, and the doctors were not specialized in the field of reproductive health and health issues specific to the LGBTQI+ community, as were the doctors in the Ciudad Mujer health centers.

**Discrimination:** The constitution grants women and men the same legal status in family, religious, personal status, and nationality laws. There were no reports of discrimination in marriage, divorce, child custody, education, and judicial processes. The law also provides equal rights for men and women in the areas of property rights, inheritance, employment, access to credit, business ownership, and housing. The law establishes sentences of one to three years in prison for public officials convicted of denying a person's civil rights based on gender and six months to two years for employers convicted of discriminating against women in the workplace, but employees generally did not report such violations due to fear of employer reprisals.

## Systemic Racial or Ethnic Violence and Discrimination

Systemic racial discrimination existed towards those in the Afro-descendent community and indigenous groups. There are several laws to protect members of racial or ethnic minorities or groups from violence and discrimination. The law provides for individual and collective rights of indigenous peoples to practice ethnic minority traditions, participate in decision-making on issues that affect their rights, and for protection against discrimination. In 2018 the government implemented the *Public Policy for Indigenous Communities in El Salvador*, which focused on the inclusion of ethnic groups in all social and economic aspects. The government did not enforce the laws effectively, and the administration took no further action to implement the 2018 policy. The government did not recognize indigenous persons of the Afro-descendent community in the last population census in 2007.

## Indigenous Peoples

The constitution recognizes indigenous peoples and states that the government will adopt policies to maintain and develop the ethnic and cultural identity, world view, values, and spirituality of indigenous peoples. The law provides for the preservation of languages and archeological sites. The municipalities of Cacaopera and Yucuaiquin, in the eastern part of the country, have special laws to recognize their indigenous cultural heritage.

The law does not include the right to be consulted regarding development and other projects envisioned on indigenous land, nor does it provide indigenous peoples the right to share in revenue from exploitation of natural resources on historically indigenous lands. The government did not demarcate any lands as belonging to indigenous communities. Because few indigenous persons possessed title to land, opportunities for bank loans and other forms of credit remained limited.

According to the most recent census, from 2007, there were 60 indigenous groups, making up 0.4 percent of citizens, mainly from the Nahua-Pipl, Lencas, Cacaopera (Kakwira), and Maya Chorti groups. According to the Institute of the Faculty of Sciences and Humanities of the University of El Salvador, political parties did not

consider proposals in favor of indigenous peoples as part of their electoral platforms.

On January 10, Nahuat language teacher Hector Martinez reported that the indigenous Nahuat language was only spoken in four municipalities: Santo Domingo de Guzman, Cuisnahuat, Nahuizalco, and Tacbua. The 2007 census showed there were only 197 Nahuat speakers, but Martinez said the number was drastically fewer because the Nahuat speakers were all elderly and living in extreme poverty. According to the culture law, Spanish is the official language of the country, but "the state is obliged to promote and conserve the rescue, teaching, and respect of ancestral languages throughout the territory."

On October 17, members of indigenous groups marched against the current administration, demanding visibility of their complaints a stop to the destruction of their sacred places and ceremonial sites such as Tacushcalco and Nexapan archeological sites and the Sensunapan River.

Members of indigenous groups said they do not feel represented by the government or any public official. They said that the government has not responded to their various requests, which included the return of indigenous lands taken by the government, respect for ancestral form of governance, and more access to health care, education, social welfare, and employment.

Indigenous communities reported they faced racial discrimination and economic disadvantage. On November 11, the EU, International Organization for Migration, and the Office of the UN High Commissioner for Refugees reported that 27 percent of the indigenous population planned to migrate out of the country. According to the report, the main cause of migration intention was a lack of employment options.

## Children

**Birth Registration:** Children derive citizenship by birth within the country and from their parents. The law requires parents to register a child within 15 days of birth or pay a small fine. Failure to register may result in denial of school enrollment.

**Child Abuse:** Child abuse remained a serious and widespread problem. The law gives children the right to petition the government without parental consent. Penalties for conviction of breaking the law include losing custody of the child and three to 26 years' imprisonment, depending on the nature of the abuse.

**Child, Early, and Forced Marriage:** The legal minimum age for marriage is 18. The law bans child marriage to prevent child abusers from avoiding imprisonment by marrying their underage victims, and the law likewise bans exceptions to child marriage in cases where the minor is pregnant.

**Sexual Exploitation of Children:** Child sex trafficking is prohibited by law. Prison sentences for convicted traffickers stipulate imprisonment from 16 to 20 years.

The minimum age for consensual sex is 18. The law classifies statutory rape as sexual relations with anyone younger than age 18 and includes penalties for conviction of four to 13 years' imprisonment.

The law prohibits paying anyone younger than age 18 for sexual services. The law prohibits participating in, facilitating, or purchasing materials containing child pornography and provides for prison sentences of up to 16 years for conviction of violations. Despite these provisions, sexual exploitation of children remained a problem.

**International Child Abductions:** The country is a party to the 1980 Hague Convention on the Civil Aspects of International Child Abduction. See the Department of State's *Annual Report on International Parental Child Abduction* at https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/for-providers/legal-reports-and-data/reported-cases.html.

## Anti-Semitism

The Jewish community totaled approximately 150 persons. There were no reports of anti-Semitic acts.

## Trafficking in Persons

See the Department of State's *Trafficking in Persons Report* at

https://www.state.gov/trafficking-in-persons-report/.

## Persons with Disabilities

Persons with disabilities do not have access to education, health services, public buildings, or transportation on an equal basis with others.

The percentage of children with disabilities enrolled in the public school system is very low. The Ministry of Education's last reported statistics in 2018 indicated only 1,158 students with disabilities were enrolled in high schools across the country, representing fewer than 0.01 percent of all secondary students. Disability advocates said that this low percentage was due to the lack of ramps and other accommodations for students with disabilities. The government provided very little support for schools to include accommodations, and there were few teachers trained to teach students with disabilities.

The law prohibits discrimination against persons with physical, sensory, intellectual, and mental disabilities, but the government did not enforce these laws. The National Council for Comprehensive Attention to Persons with Disability (CONAIPD), composed of representatives from multiple government entities, is the governmental agency responsible for protecting disability rights, but it lacked enforcement power. According to a CONAIPD representative, the government did not effectively enforce legal requirements for access to buildings, information, and communications for persons with disabilities. Few access ramps or provisions for the mobility of persons with disabilities existed.

CONAIPD stated there was no mechanism to verify compliance with the law requiring businesses and nongovernment agencies to hire one person with disabilities for every 25 hires. CONAIPD reported employers frequently fired persons who acquired disabilities and would not consider persons with disabilities for work for which they qualified. In addition some academic institutions did not accept children with disabilities.

No formal system existed for filing with the government a discrimination complaint involving a disability.

On May 24, Elba Chacon, coordinator of the human rights program at the Network

of Survivors and Persons with Disabilities Foundation, asked the government to update the statistics on persons with disabilities. CONAIPD last carried out the National Survey of Persons with Disabilities in 2015. Chacon said the government did not have updated statistics on access to government services and resources for persons with disabilities.

Organizations of persons with disabilities protested outside the Ministry of Finance on August 30 to demand the government comply with the Special Law on the Inclusion of Persons with Disabilities that was implemented in January. The law includes plans to create a new CONAIPD with greater autonomy to hear complaints and impose sanctions for noncompliance with the law; however, the ministry did not allocate a budget to carry out the law.

## HIV and AIDS Social Stigma

Although the law prohibits discrimination based on HIV/AIDS status, Entre Amigos, an NGO that works on issues concerning LGBTQI+ persons, reported HIV-related discrimination was widespread. As of August 31, the PDDH reported three alleged cases of discrimination against persons with HIV or AIDS.

## Acts of Violence, Criminalization, and Other Abuses Based on Sexual Orientation and Gender Identity

Police and gangs continue to commit acts of violence against LGBTQI+ individuals. These actions were tolerated by the government, and perpetrators were rarely prosecuted.

On February 20, the Attorney General's Office announced three MS-13 gang members were convicted of homicide for the 2017 murders of two transgender women in San Luis Talpa, La Paz Department, and each was sentenced to more than 60 years in prison. The Prosecutor's Office handled the case as a quarrel between gangs and not as a crime related to gender identity of the victims, and as a result the Prosecutor's Office did not categorize the homicides as hate crimes.

On April 25, Zashy del Cid, a transgender woman, died in San Miguel after she was shot in the back while walking down the street. As of June 5, police had made no arrests. A report by Association Communicating and Training Trans Women in

El Salvador (COMCAVIS Trans) found that gangs were responsible for nearly two-thirds of the violence against the LGBTQI+ community.

LGBTQI+ activists reported to the Attorney General's Office that they received death threats on social media. Police generally failed to act on these reports. NGOs reported that public officials, including police, engaged in violence and discrimination against LGBTQI+ persons. Persons from the LGBTQI+ community stated the PNC and officials from the Attorney General's Office harassed transgender and gay individuals who reported cases of violence against LGBTQI+ persons, including by conducting unnecessary and invasive strip searches.

In 2020 the Bukele administration eliminated five presidential secretariats created under the previous administration, including the Secretariat of Inclusion. The responsibilities of the secretariat moved to the Gender and Diversity Office in the Ministry of Cultural Affairs, which has no authority to influence policy and insufficient support to implement programs. It did not provide any significant public services.

The law prohibits discrimination based on sexual orientation or gender identity, which applies to discrimination in housing, employment, nationality, and access to government services. Gender identity and sexual orientation are included in the law covering hate crimes, along with race and political affiliation. Despite the existence of these laws, the government has not taken enforcement actions against violators.

As of August 31, the PDDH reported seven alleged cases of discrimination against LGBTQI+ persons. The PDDH confirmed on February 14 that they opened an investigation into the possible discrimination against an army officer who complained of being discharged due to his sexual orientation. On January 31, the Lieutenant Cristian Adalberto Castro Grijalva was discharged from the army for "public or private conduct that is notoriously immoral or contrary to good customs or public order." Castro Grijalva said his sexual orientation was not a secret and that it never affected his performance.

Supreme Electoral Tribunal guidelines state individuals may not be denied the

right to vote because the photograph on their identification card does not match their physical appearance. Nonetheless, media documented cases of transgender persons who faced harassment while voting in the municipal elections during the year because their name and photograph on their national identification document did not match their expression of gender identity.

COMCAVIS Trans reported that the LGBTQI+ community faced discrimination when obtaining health care. Lesbian women said their gynecologists only focused on HIV or other sexually transmitted diseases when they learned that their patients were lesbian instead of spending time treating routine gynecological issues. According to COMCAVIS Trans, transgender persons also faced discrimination from medical staff when they insisted on calling patients by their legal name instead of their chosen names.

# Section 7. Worker Rights

## a. Freedom of Association and the Right to Collective Bargaining

The law provides for the right of most workers to form and join independent unions, to strike, and to bargain collectively. The law also prohibits antiunion discrimination, although it does not require reinstatement of workers fired for union activity. Military personnel, national police, judges, and high-level public officers may not form or join unions. The labor code does not cover public-sector workers and municipal workers, whose wages and terms of employment are regulated by the 1961 civil service law. Only citizens may serve on unions' executive committees. The labor code also bars individuals from holding membership in more than one trade union.

Unions must meet complex requirements to register, including having a minimum membership of 35 individuals. If the Ministry of Labor denies registration, the law prohibits any attempt to organize for up to six months following the denial. Collective bargaining is obligatory only if the union represents a majority of workers.

Unions experienced lengthy delays by the Ministry of Labor in processing their credentials, some facing up to eight months when it previously took a maximum of

two months. Without credentials, unions cannot participate in collective bargaining. According to media reports, the Ministry of Labor rewarded like-minded unions with expedited credentials and punished unions critical of the government with delays in their certification. Minister of Labor Rolando Castro stated the delays were due to incorrect or incomplete information in their paperwork.

The law contains cumbersome and complex procedures for conducting a legal strike. The law does not recognize the right to strike for public and municipal employees or for workers in essential services. The law does not specify which services meet this definition, and courts therefore applied this provision on a case-by-case basis. The law requires that 30 percent of all workers in an enterprise must support a strike for it to be legal and that 51 percent must support the strike before all workers are bound by the decision to strike. Unions may strike only to obtain or modify a collective bargaining agreement or to protect the common professional interests of the workers. Unions must engage in negotiation, mediation, and arbitration processes before striking, although many unions often skipped or expedited these steps. The law prohibits workers from appealing a government decision declaring a strike illegal.

In lieu of requiring employers to reinstate illegally dismissed workers, the law requires employers to pay those workers the equivalent of 30 days of their basic salary for each year of service. The law specifies 30 reasons for which an employer may terminate a worker’s contract without triggering any additional responsibilities, including consistent negligence, leaking private company information, or committing immoral acts while on duty. An employer may legally suspend workers, including due to an economic downturn or market conditions.

The government did not effectively enforce the laws on freedom of association and the right to collective bargaining, and penalties were not commensurate with those for other laws involving denials of civil rights, such as discrimination. Judicial procedures were subject to lengthy delays and appeals. According to union representatives, the government inconsistently enforced labor rights for a wide range of workers, and enforcement was dependent upon the political affiliations of their labor unions. Unions reported that their members frequently faced violence or threats of violence and that viable legal recourse against such violence was

unavailable. Gang activity made it difficult for workers, who continued to be harassed and exposed to violence, to exercise their union activities freely.

Most unions functioned independently from the government and political parties, although many generally were aligned with political parties of Nuevas Ideas, GANA, ARENA, and the FMLN. Workers at times engaged in strikes regardless of whether the strikes met legal requirements.

## b. Prohibition of Forced or Compulsory Labor

The law prohibits all forms of forced or compulsory labor. The government generally did not effectively enforce such laws. Penalties were not commensurate with those for other analogous serious crimes, such as kidnapping. The Ministry of Labor did not report on forced labor; however, it increased investigations. Children and adults were exposed to forced begging, domestic work, agricultural labor, construction, textile industry, and street work. Adults from neighboring countries were forced to work in construction, domestic work, and other informal sector jobs, sometimes under threat of physical violence. Gangs subjected children to forced labor in illicit activities, including selling or transporting drugs and committing homicides (see section 7.c.).

Also see the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## c. Prohibition of Child Labor and Minimum Age for Employment

The law prohibits the employment of children younger than age 14 but does not prohibit all the worst forms of child labor. The law allows children between ages 14 and 18 to engage in light work if it does not damage the child's health or development or interfere with compulsory education. The law prohibits children younger than 16 from working more than six hours per day and 34 hours per week; those younger than 18 are prohibited from working at night or in hazardous occupations. The Ministry of Labor maintained a list of types of hazardous work, which included repairing heavy machinery, mining, handling weapons, fishing and harvesting mollusks, and working at heights above five feet while doing construction, erecting antennas, or working on billboards. Children ages 16 and

older may engage in light work on coffee and sugar plantations and in the fishing industry if it does not harm their health or interfere with their education.

The Ministry of Labor is responsible for enforcing child labor laws but did not effectively enforce the law. Penalties were not commensurate with those for other analogous serious crimes, such as kidnapping. Labor inspectors focused almost exclusively on the formal sector. According to the ministry, from January through August 2020, officials conducted 220 child labor inspections in the formal sector and found no minors working. By comparison, in 2017, according to the ministry, there were 140,700 children and adolescents working, of whom 91,257 were employed in "dangerous work" in the informal sector. No information on any investigations or prosecutions by the government was available. The ministry did not effectively enforce child labor laws in the informal sector, which represented almost 75 percent of the economy.

There were reports of children younger than age 16 engaging in the worst forms of child labor, including in coffee cultivation, fishing, shellfish collection, and fireworks production. Children were subjected to other worst forms of child labor, including commercial sexual exploitation (see section 6, Children) and recruitment into illegal gangs to perform illicit activities in the arms and narcotics trades, including committing homicide. Children were engaged in child labor, including domestic work, construction, work in textiles, the production of cereal grains and baked goods, cattle raising, and sales. Orphans and children from poor families frequently worked as street vendors and general laborers in small businesses despite the presence of law enforcement officials.

Also see the Department of Labor's *Findings on the Worst Forms of Child Labor* at https://www.dol.gov/agencies/ilab/resources/reports/child-labor/findings.

## d. Discrimination with Respect to Employment and Occupation

The constitution, labor laws, and state regulations prohibit discrimination based on age, race, color, sex, religion, political opinion, national origin (except in cases determined to protect local workers), social origin, gender, disability, language, or HIV-positive status. The government did not effectively enforce those laws and regulations, and penalties were not commensurate to laws related to civil rights,

such as election interference. Sexual orientation and gender identity are not protected in the constitution or labor law, although the PDDH and the Ministry of Labor actively sought to protect workers against discrimination on those grounds.

Discrimination in employment and occupation occurred with respect to age, gender, disability, and sexual orientation or gender identity (see sections 6 and 7.e.). According to the Ministry of Labor, migrant workers have the same rights as citizens, but the ministry did not effectively protect their rights.

On January 27, the Legislative Assembly approved the Special Law for the Protection of the Elderly, which prohibits establishing an age limit for job applications, using age as a cause to dismiss an employee, or forcing an employee to retire due to age.

On August 31, the Legislative Assembly approved reforms to the Law of the Judicial Career, establishing that all judges older than 60 years or with more than 30 years of service must be removed from their position. The law affected 156 judges across the country but excluded the Supreme Court of Justice, which may grant exceptions to the judges of their choosing (see section 1.e.).

Although the law provides for equal pay between men and women, women did not receive equal pay. In July the United Nations reported that women made 18 percent less than men in the same jobs. The report also stated that 53 percent of the population in the country were women and that one-third of households were supported only by the income of women.

On April 19, a Mr. Wings restaurant in Soyapango, San Salvador Department, fired an employee for being pregnant. On April 20, the Ministry of Labor confirmed that the employee had been reinstated after an intervention by a team of inspectors from the ministry. The ministry also warned the restaurant against seeking any retaliation against the employee.

## e. Acceptable Conditions of Work

The government sets the minimum wage, which varies by sector. All the wage rates were above poverty income levels.

**Wage and Hour Laws:** The Ministry of Labor is responsible for enforcement of wage and hour laws. The law sets a maximum normal workweek of 44 hours – limited to no more than six days and to no more than eight hours per day – but allows overtime, which is to be paid at double the usual hourly wage. The law mandates that full-time employees receive pay for an eight-hour day of rest in addition to the 44-hour normal workweek. The law provides that employers must pay double time for work on designated annual holidays, a Christmas bonus based on the time of service of the employee, and 15 days of paid annual leave. The law prohibits compulsory overtime for all workers other than domestic employees, such as maids and gardeners, who are obligated to work on holidays if their employer makes this request. In such cases they are entitled to double pay. The government did not adequately enforce these laws, and penalties were not commensurate with those for similar crimes, such as fraud.

**Occupational Safety and Health:** The Ministry of Labor is responsible for setting and enforcing occupational safety and health (OSH) standards, and the law establishes a tripartite committee to review these. The law requires employers to take steps to meet OSH requirements in the workplace, including providing proper equipment and training and a violence-free environment. Employers who violate labor laws may be penalized, but penalties were not commensurate with those for other similar crimes; some companies reportedly found it more cost effective to pay the fines than to comply with the law. The law promotes occupational safety awareness, training, and worker participation in OSH matters. While the laws were appropriate for the main industries and the government trained its inspectors on these standards, it did not effectively enforce them.

The number of inspectors was insufficient to deter violations. Inspectors did not have the authority to initiate unannounced inspections or sanctions. Inspections were scheduled under a calendar set by the Inspections Directorate or to verify a complaint, and labor inspectors did not notify the company prior to their arrival. Allegations of corruption among labor inspectors continued. The Labor Ministry received complaints regarding failure to pay overtime, minimum wage violations, unpaid salaries, and cases of employers illegally withholding benefits (including social security and pension funds) from workers.

Reports of overtime and wage violations existed in several sectors. According to

the Labor Ministry, employers in the agricultural sector routinely violated the laws requiring annual bonuses, vacation days, or rest days. Women in domestic service faced exploitation, mistreatment, verbal abuse, threats, sexual harassment, and generally poor work conditions. Workers in the textile industry reportedly experienced violations of wage, hour, and safety laws. According to the Women Transforming Association, certain apparel companies violated women's rights through occupational-health violations and unpaid overtime. The government was ineffective in pursuing such violations.

In some cases the country's high crime rate undermined acceptable conditions of work as well as workers' psychological and physical health. Some workers, such as bus drivers, bill collectors, messengers, and teachers in high-risk areas, reported being subject to extortion and death threats by gang members. The PNC received 1,131 complaints of extortion from January to August. In 2020 extortion victims totaled 1,345 for the entire year, in which five months were mandatory national lockdown due to the COVID-19 pandemic. As of August the average of extortion complaints was five per day, while in all of 2020 the total was four per day.

On January 11, *Diario El Mundo* reported that coffee farmers complained that gangs operating near the farms did not allow cutters from outside the neighborhood to enter the farms to work unless they paid an extortion fee.

After the killing of a bus employee on July 2, there was a seven-day work stoppage of public buses on Route 151 in San Jose Villanueva, La Libertad Department, forcing approximately 5,000 persons who used the 24 buses on the route to walk or find more costly detours. Although the PNC did not present a motive for the killing, residents claimed that gang members shot and killed the man for not paying the extortion fee.

Workers may legally remove themselves from situations that endanger health or safety without jeopardy to their employment, but authorities did not effectively enforce this law.

**Informal Sector:** The informal sector represented almost 75 percent of the economy. Workers in the informal sector were not protected by labor laws and were not inspected by the Ministry of Labor. The Ministry of Labor did not

effectively enforce child labor laws in the informal sector.

Case No. 25-cv-1774-JEB

# Exhibit 4

# EL SALVADOR 2020 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

El Salvador is a constitutional multiparty republic with a democratically elected government. In February 2019 voters elected Nayib Bukele as president for a five-year term. The election was generally free and fair, according to international observers. Free and fair municipal and legislative elections took place in 2018.

The National Civilian Police, overseen by the Ministry of Justice and Public Security, is responsible for maintaining public security. The Ministry of Defense is responsible for maintaining national security. Although the constitution separates public security and military functions, it allows the president to use the armed forces "in exceptional circumstances" to maintain internal peace and public security "when all other measures have been exhausted." The military is responsible for securing international borders and conducting joint patrols with the civilian police. In November 2019 President Bukele signed a decree authorizing military involvement in police duties. The decree, in effect until December 31, authorizes the military under National Civilian Police control to identify areas with the highest incidence of crime to target peacekeeping operations; conduct joint patrols with police to prevent, deter, and apprehend members of organized crime and common crime networks; carry out searches of individuals, vehicles, and property; help persons in cases of accidents or emergencies; make arrests and hand over detainees to police; prevent illegal trafficking of goods and persons at unauthorized national borders; strengthen perimeter security at prisons and other detention centers and schools; and provide land, sea, and air support to police. Civilian authorities at times did not maintain effective control over security forces. Members of the security forces committed some abuses. On February 9, the executive branch used security forces to attempt to interfere with the independence of the legislature.

Significant human rights issues included: allegations of unlawful killings of suspected gang members and others by security forces; forced disappearances by military personnel; torture and cases of cruel, inhuman, or degrading treatment or punishment by security forces; harsh and life-threatening prison conditions; arbitrary arrest and detention; serious problems with the independence of the judiciary; serious restrictions on free expression and the press; serious acts of government corruption; lack of consistent investigation and accountability for violence against women; and crimes involving violence by security forces against lesbian, gay, bisexual, transgender, and intersex individuals.

Impunity persisted despite government steps to dismiss and prosecute abusers in the security forces, executive branch, and justice system. In some cases authorities investigated and prosecuted persons accused of committing crimes and human rights abuses.

Organized criminal elements, including local and transnational gangs and narcotics traffickers, were significant perpetrators of violent crimes. They committed killings and acts of extortion, kidnapping, human trafficking, intimidation, and other threats and violence. They directed these acts against police, judicial authorities, the business community, journalists, women, and members of vulnerable populations.

## Section 1. Respect for the Integrity of the Person, Including Freedom from:

### a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were no reports that the government or its agents committed politically motivated killings. There were reports, however, of security force involvement in extrajudicial killings of suspected gang members. The Attorney General's Office (FGR) investigates whether security force killings were justifiable and pursues prosecutions. According to the FGR, as of August 24, there were seven extrajudicial killings under investigation in which nine National Civilian Police (PNC) officers were implicated, including cases that originated in past years. As of August 27, the Office of the Human Rights Ombudsman (PDDH) announced it was investigating six complaints of such killings, some by law enforcement, including those in which PNC officers were alleged to have directly participated and one attributed to prison guards.

On April 26, President Bukele responded, via Twitter, to an increase in gang-related homicides, stating, "the use of lethal force is authorized for self-defense or for the defense of the lives of Salvadorans." This tweet did not grant police any additional powers, although international civil society and multilateral organizations criticized the president for heightening the risk that police would commit extrajudicial killings of gang members. On July 9, the news agency EFE reported that the official figures from Minister of Security Rogelio Rivas indicated that from January to late May, there were 90 confrontations between security forces and alleged gang members, leaving 44 persons dead, 29 injured, and 70 detained.

On May 13, media outlets reported the case of a woman killed by PNC officers while she was shopping in San Julian Municipality, Sonsonate Department. According to police reports, the woman was a gang member who attacked three police officers with a firearm, and in response, the officers returned fire and killed the woman. The newspaper *El Diario de Hoy* reported police sources did not find it credible that the woman attacked police, and the woman's family denied she was involved with gangs. The police officers faced an initial hearing before the justice of the peace of San Julian. Per the request of the FGR, the judge decided the officers would continue to face the judicial process but without being detained in prison.

On August 13, the FGR arrested three PNC officers who were allegedly linked to an extermination group accused of murdering three persons in July 2019.

On August 16, the Specialized Court of Instruction C of San Salvador, at the request of the FGR, announced a sentencing hearing for four PNC officers accused of forced disappearances and aggravated homicide. Three of the officers worked in rural Usulutan and the fourth in Zacatecoluca, La Paz Department. According to media reports, the officers were charged with a triple homicide that occurred on July 7, as well as prior homicides from 2017 and 2019.

On June 20, media reported that Víctor David Castillo Campos, an officer of the elite Police Reaction Group (GRP) and alleged accomplice in the killing of fellow GRP member Carla Ayala after a GRP gathering in 2017, received house arrest after serving two years in prison without a final verdict. Castillo Campos was arrested in 2018 and was one of 13 defendants (eight police officers and five civilians) implicated as accomplices in Ayala's killing. Juan Jose Castillo Arevalo was also accused of killing Ayala and since 2017 remained a fugitive. The PNC disbanded the GRP in 2018.

In July the Institute for Human Rights at the University of Central America (IDHUCA), Servicio Social Pasionista, Cristosal, Due Process of Law Foundation, and other organizations presented a report on extrajudicial killings that was a follow-up to the UN special rapporteur's 2018 recommendations. On July 9, EFE stated the report concluded extrajudicial killings persisted in the country despite a change of the presidency in June 2019. According to the report, from June to December 2019, there were 156 clashes between the security forces and alleged gang members that left 107 civilians dead and 43 injured.

**b. Disappearance**

Reports alleged that security and law enforcement officials were involved in unlawful disappearances. Law enforcement agencies had not released data on disappearances since 2017, citing a discrepancy between data collected by the PNC and the FGR. Media reported in March that the discrepancy continued.

According to media reports, the FGR recorded 542 disappearances between January and March, with an average of six missing persons cases per day. This marked a decrease from the same period in 2019 when the FGR tracked 829 cases, equivalent to nine disappearances daily. The PNC reported that 65 percent of those reported missing were later found alive and that there was a likelihood that many of the remaining 35 percent had emigrated. The FGR reported 724 cases of "deprivation of liberty" through July 13, compared with 2,234 cases from January through October 2019; however, this offense included both disappearances and missing persons.

On August 10, media reported that the PNC registered 728 missing persons cases in the first half of the year, compared with 1,295 reported during the same time period in 2019. Of the cases reported in the first six months, 56 percent were still missing as of September, 40 percent were found alive, and 4 percent were found deceased. The local nongovernmental organization (NGO) Servicio Social Pasionista reported that as of June there were 434 disappearances, compared with 652 in 2019.

**c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment**

The law prohibits such practices, but there were reports of violations. As of August 27, the PDDH had received 15 complaints of torture or cruel or inhuman treatment by the PNC and two by the armed forces, compared with 33 and nine complaints, respectively, as of August 2019. The PDDH also received 55 complaints of mistreatment and disproportionate use of force by the PNC, four by the armed forces and one by the PNC and armed forces together.

Reports of abuse and police misconduct came mostly from residents of metropolitan San Salvador and mainly from men and young persons. As of June, according to the PNC, 104 officers had been involved in crimes and offenses, resulting in 92 charges. Furthermore, as of September 14, the PNC received 90 complaints of general misconduct by police, including but not limited to torture or

cruel or inhuman treatment; five of the 90 complaints were officially submitted to the FGR.

On May 6, in Zacatecoluca, La Paz Department, media reported on the case of a man who died while in provisional detention under police custody. Allegedly, the PNC told the family of the man, arrested on homicide and gang membership charges connected to the 2019 killing of a soldier, that he had died of COVID-19 and that he should be buried immediately and without opening the casket. Media reported that the family did not believe the cause of death and inspected the body at the grave, finding the man still handcuffed, with a bloodied face and broken teeth. The family believed he died after being tortured and took photographs of the body. The PNC maintained the man died of massive bleeding. The PDDH called for an investigation into the case. On May 12, the FGR exhumed the body for an autopsy but, as of September 16, had not made any arrests.

According to the *Conduct in UN Field Missions* online portal, there was one allegation submitted in March of sexual exploitation and abuse by Salvadoran peacekeepers deployed to the UN Mission in South Sudan, allegedly involving an exploitative relationship with an adult. As of September the United Nations was investigating the allegation.

Impunity was a problem in the PNC and armed forces. Media reported cases of the PNC abusing their authority during the nationwide stay-at-home order. The government repeatedly defied judicial order to allow expert witnesses access to inspect military archives to determine criminal responsibility for the 1981 El Mozote massacre. Factors contributing to impunity included politicization and general corruption. The FGR is responsible for investigating abuses. The government provided annual training to military units to dissuade any potential for gross abuses of human rights, such as the training provided to the Marine Infantry Battalion by the navy's Legal Unit on the need to respect human rights.

**Prison and Detention Center Conditions**

Prison and detention center conditions remained harsh and life threatening due to gross overcrowding, unhygienic conditions, and gang activities.

<u>Physical Conditions</u>: Overcrowding, at one-third above capacity as of August, was a serious threat to prisoners' health and welfare. The prisons system had a capacity for 27,037 inmates, but, as of August 17, there were more than 36,000 inmates.

For example, the PDDH reported that in one prison, 1,486 inmates were held in facilities designed for 280.

Convicted inmates and pretrial detainees were sometimes held in the same prison cells.

Gangs remained prevalent in prisons. After a sudden increase in gang violence in late April, President Bukele ordered a lockdown and imposed strict measures in the seven prisons where most imprisoned gang leaders and members were held. Prison authorities implemented the order, placing gang leaders in solitary confinement, mixing rival gang members together, conducting cell searches for contraband, and boarding up cells to prevent prisoners communicating among cells using visual signals. As of September approximately 55 percent (18,746 prisoners) of the prison population were active or former gang members.

According to the PDDH, many prisons had inadequate sanitation, potable water, ventilation, temperature control, medical care, and lighting. Inmates experienced gastrointestinal illnesses and skin problems due to poor water quality.

In August the PNC reported 51 percent overcrowding in police holding cells, with more than 4,000 detainees in cells designed for 1,500-1,800 individuals. This was up from 2,300-2,400 detainees held in similar facilities in 2019.

On March 11, President Bukele announced a quarantine plan that required anyone entering the country be placed in a government-run quarantine center for 30 days. Government officials began implementation immediately after President Bukele's announcement and forced many who were already in transit to enter the quarantine centers. According to media reports, the government was not sufficiently prepared and faced high levels of overcrowding; one facility in particular held 700 persons in an area meant to house 400. Quarantined individuals posted photographs and videos on social media denouncing poor sanitary conditions, including dirty restrooms and a lack of personal hygiene supplies, as well as a lack of food, water, and medical attention.

Administration: The PDDH has authority to investigate credible allegations of inhuman conditions. During the state of emergency, authorities did not allow prisoners and detainees to receive any visitors or to gather for religious observances.

Independent Monitoring: As of August, according to the PDDH, COVID-19 made it temporarily impossible to inspect detention centers or interview inmates due to the serious health risk. At times the prison system was entirely closed to visits, allowing only employees to enter. Professional and family visits, inspections of institutions, and visits by international organizations, NGOs, churches, and others were completely suspended.

Improvements: New construction and a redistribution of prisoners reduced overcrowding from 141 percent in September 2019 to 139 percent as of August.

**d. Arbitrary Arrest or Detention**

Although the constitution prohibits arbitrary arrest and detention, there were numerous complaints that the PNC and military forces carried out arbitrary arrests. NGOs reported that the PNC arbitrarily arrested and detained individuals on suspicion of gang affiliation.

The law provides for the right of any person to challenge the lawfulness of his or her arrest or detention in court. The government generally observed this provision.

On March 21, President Bukele issued a mandatory nationwide stay-at-home order for 30 days. Following this announcement, the PNC and armed forces began enforcement and placed those violating the order in containment centers for 30 days of quarantine. Some of those detained for violating the stay-at-home order were taken to police stations and held for more than 24 hours.

Apolonio Tobar, the ombudsman for human rights, reported that individuals in detention were not receiving their COVID-19 test results until weeks after being tested. According to media, this delay contributed to extended time in detention as individuals were forced to stay in the quarantine facilities longer than the mandated 30 days without a specific explanation from health officials regarding the reason for their continued quarantine or the date of their release.

**Arrest Procedures and Treatment of Detainees**

The constitution requires a written warrant of arrest except in cases where an individual is caught in the act of committing a crime. Authorities generally apprehended persons with warrants based on evidence and issued by a judge, although this was frequently ignored when allegations of gang membership arose. Police generally informed detainees promptly of charges against them.

The law permits release on bail for detainees who are unlikely to flee or whose release would not impede the investigation of the case. The bail system functioned adequately in most cases. The courts generally enforced a ruling that interrogation without the presence of counsel is coercive and that evidence obtained in such a manner is inadmissible. As a result PNC authorities typically delayed questioning until a public defender or an attorney arrived. The constitution permits the PNC to hold suspects for 72 hours before presenting them to court. The law allows up to six months for investigation of serious crimes before requiring either a trial or dismissal of the case; this period may be extended by an appeals court. Many cases continued beyond the legally prescribed period.

Arbitrary Arrest: As of August 27, the PDDH reported 22 complaints of arbitrary detention or illegal detention, compared with 66 from January to August 2019. Most of the complaints were related to alleged violations of the COVID-19 quarantine.

In March the NGO Cristosal presented a habeas corpus petition to the Constitutional Chamber of the Supreme Court on behalf of three women in Jiquilisco, Usulutan Department, who were arrested and taken into police custody after they went shopping for food and medication. On April 8, the court ordered the government to release the women, since shopping for food and medication was a permitted exception to the stay-at-home order and thus the arrests were illegal. On the same day, the Constitutional Chamber issued a resolution ordering the executive branch to stop illegal and arbitrary arrests and detentions. The Constitutional Chamber stated that any arrest or decision to take someone to a quarantine facility needed the legal framework of a legislative decree, not a presidential decree. The court stated that the decision to move someone into quarantine should be made by health officials only in cases where there are risks of being exposed to or spreading COVID-19.

In a follow-up order on April 15, the Constitutional Chamber ordered the executive branch to set up a registry of persons who had been detained and those who had been released, and mandated that the PDDH monitor the situation and send progress reports to the court every five days. President Bukele announced via Twitter that his administration did not recognize the court's resolutions or the oversight role of the PDDH.

The Constitutional Chamber ruled in April that any military, police, or other security officials who committed abuses in applying COVID-19 containment

policies, including strict enforcement of a stay-at-home order resulting in arbitrary arrests or detention, would be held personally responsible for their actions. The court warned that no one would be allowed to claim "due obedience" for complying with orders and that neither the military nor police were authorized to carry out discretionary or arbitrary arrests.

The Constitutional Chamber received 330 habeas corpus petitions in the two months after the government instituted the nationwide stay-at-home order. Prior to COVID-19, the Constitutional Chamber averaged approximately 400 petitions a year. Most of the complaints involved alleged violations of citizens' freedom of movement, brought by individuals who were detained in containment centers for disobeying the stay-at-home order. On or about May 11, security forces stopped sending individuals to containment centers for circulating publicly and instead began sending them home. According to the IDHUCA Human Rights Observatory report, 16,756 persons were detained and released from the containment centers from March 21 to August 24.

Pretrial Detention: Lengthy pretrial detention was a significant problem. As of August three-quarters of the general prison population had been convicted and one-quarter had yet to be tried. Some persons remained in pretrial detention longer than the maximum legal sentences for their alleged crimes. In such circumstances detainees were permitted to request a Supreme Court review of their continued detention.

## e. Denial of Fair Public Trial

Although the constitution provides for an independent judiciary, the government did not always respect judicial independence, and the judiciary was burdened by inefficiency.

On February 9, President Bukele used the PNC and armed soldiers to pressure and intimidate the Legislative Assembly to approve funding for his security plan. The Constitutional Chamber of the Supreme Court of Justice stated his action put "at risk the republican, democratic and representative form of government, the pluralist political system and in a particular way the separation of powers." Observers noted that although at the time President Bukele believed his actions were justified based on the advice of his legal counsel, his subsequent acquiescence to the ruling of the Supreme Court prohibiting further such actions demonstrated the independence of the judicial branch.

While the government generally respected court orders, some agencies ignored or minimally complied with orders.

As of August the PDDH received 12 complaints of lack of a fair public trial.

On August 28, the judge in the prosecution of 13 surviving former military officers for the alleged El Mozote massacre of more than 800 civilians in 1981 ordered inspections of 12 military archives and the national historical archives between September 21 and November 13. After the Ministry of Defense refused to permit the El Mozote judge to access archives on September 21, President Bukele defended the ministry's actions in a national address on September 24, claiming the judge has no jurisdiction over the armed forces and no right to access the archives. On October 12, the Supreme Court Constitutional Chamber rejected a Ministry of Defense petition seeking to block the military archive inspections. As of October 19, the ministry continued to refuse the El Mozote judge access to inspect the military archives, notwithstanding the Supreme Court ruling.

**Trial Procedures**

The law provides for the right to a fair and public trial, and an independent judiciary generally enforced this right, although some trial court judges were subject to political, economic, or other corrupting influences. By law juries hear only a narrow group of cases, such as environmental complaints. In those cases after the jury determines innocence or guilt, a panel of judges decides the sentence.

Defendants have the right to be present in court (except in virtual trials; see below), question witnesses, and present witnesses and evidence. The constitution further provides for the presumption of innocence, the right to be informed promptly and in detail of charges, the right to a trial without undue delay (seldom observed), protection from self-incrimination, the right to communicate with an attorney of choice, the right to adequate time and facilities to prepare a defense, freedom from coercion, the right to appeal, and government-provided legal counsel for the indigent.

In criminal cases a judge may allow a private plaintiff to participate in trial proceedings (calling and cross-examining witnesses, providing evidence, etc.), assisting the prosecuting attorney in the trial procedure. Defendants have the right to free assistance of an interpreter. Authorities did not always respect these legal rights and protections. Although a jury's verdict is final, a judge's verdict is subject to appeal. Trials are public unless a judge seals a case.

While implemented in 2015 to expedite fair trials, virtual trials still involved delays. The law allows for virtual trials for gang membership charges to proceed without the defendants present, although with defense counsel participating. The law requires judicial and prison authorities to provide a video copy of the virtual trial to the defendants within 72 hours so they may exercise their right to defense.

Virtual trials often involved group hearings before a judge, with defendants unable to consult with their defense lawyers in real time. The law allows defense lawyers to attend a hearing without the defendant's presence. Human rights groups questioned the constitutionality of the reform.

Legal experts pointed to an overreliance on witness testimony, as opposed to the use of forensics or other scientific evidence. The justice system lacked DNA analysis and other forensic capabilities.

**Political Prisoners and Detainees**

There were no reports of political prisoners or detainees.

**Civil Judicial Procedures and Remedies**

The law provides for access to the courts, enabling litigants to submit civil lawsuits seeking damages for, as well as cessation of, human rights violations. Domestic court orders generally were enforced. Most attorneys pursued criminal prosecution and later requested civil compensation.

**f. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence**

The constitution prohibits such actions, and there were no reports the state intelligence service tracked journalists or collected information regarding their private lives.

In many neighborhoods, armed groups and gangs targeted certain persons and interfered with privacy, family, and home life. Efforts by authorities to remedy these situations were generally ineffective.

**Section 2. Respect for Civil Liberties, Including:**

**a. Freedom of Expression, Including for the Press**

The constitution provides for freedom of expression, including for the press, although the government at times did not respect this right. The law permits the executive branch to use the emergency broadcasting service to take control of all broadcast and cable networks temporarily to televise political programming.

Freedom of Press and Media, Including Online Media: Journalists from several digital and print media outlets publicly accused President Bukele, his administration, and his supporters of a pattern of harassment designed to constrain media. In public statements and in testimony to the Legislative Assembly, journalists claimed President Bukele and his cabinet officials bullied them on Twitter, threatened them with physical harm, launched unwarranted financial investigations into their taxes and funding sources, denied them access to press conferences, and surveilled them. President Bukele strongly denied threatening journalists and dismissed accusations he was stifling freedom of the press. President Bukele called public attention to the outlets' funding sources, which he claimed carry a heavy political bias and had been mobilized by the opposition ahead of legislative elections scheduled to be held in February 2021.

Violence and Harassment: On April 15, the Inter American Press Association reported several journalists complaining that progovernment trolls harassed, discredited, and threatened journalists on Twitter.

As of April the Salvadoran Journalist Association (APES) had registered 54 violations of the exercise of journalism. Among these were restrictions to asking questions during press conferences related to the government handling of the pandemic, destruction of journalistic material, harassment against independent journalists and discrediting of media outlets by government officials. As of August 27, the PDDH had received 10 complaints of violence against journalists by government officials.

On September 14, the digital newspaper *El Faro* filed suit against the government, accusing the Finance Ministry of using aggressive auditing practices to punish the firm for its critical reporting. *El Faro* representatives claimed auditors were asking for more information than the law allows, including nonfinancial records, for use other than auditing purposes that could lead to a form of censorship.

Censorship or Content Restrictions: Government advertising accounted for a significant portion of media income. According to media reports, the Bukele

administration punitively cancelled all government advertising in the newspaper *El Diario de Hoy* after it reported on the banning of some journalists from the president's press conferences. According to APES, media practiced self-censorship, especially in reporting on gangs and narcotics trafficking.

On October 5, the government began broadcasting a state-owned newscast on Channel 10. On October 19, the government launched the state-owned newspaper *Diario El Salvador*. Serafin Valencia of APES criticized the state-owned media outlets as "government propaganda disguised as journalism."

Nongovernmental Impact: APES noted journalists who reported on gangs and narcotics trafficking were subject to kidnappings, threats, and intimidation. Observers reported that gangs also charged print media companies to distribute in their communities, costing media outlets as much as 20 percent of their revenues.

**Internet Freedom**

The government did not restrict or disrupt access to the internet or censor online content, and there were no credible reports that the government monitored private online communications without appropriate legal authority.

**Academic Freedom and Cultural Events**

There were no government restrictions on academic freedom or cultural events.

**b. Freedoms of Peaceful Assembly and Association**

The constitution provides for the freedoms of peaceful assembly and association, and the government generally respected these rights, except with respect to labor unions (see section 7.a.).

**c. Freedom of Religion**

See the Department of State's *International Religious Freedom Report* at https://www.state.gov/religiousfreedomreport/.

**d. Freedom of Movement**

The constitution provides for freedom of internal movement, foreign travel, emigration, and repatriation. The government generally respected these rights,

although in many areas the government could not ensure freedom of movement due to criminal gang activity.

In-country Movement: The major gangs controlled access to their specific territories. Gang members did not allow persons living in another gang's area to enter their territory, even when travelling via public transportation. Gangs forced persons to present government-issued identification cards (containing their addresses) to determine their residence. If gang members discovered that a person lived in a rival gang's territory, that person risked being killed, beaten, or denied entry to the territory. Bus companies paid extortion fees to operate within gang territories, often paying numerous fees for the different areas in which they operated. The extortion costs were passed on to customers.

As of July the FGR had filed 463 cases charging an illegal limitation on the freedom of movement, a decrease from the 1,515 cases brought from January through October 2019. The FGR reported 81 convictions for such charges through July 13, compared with 50 through the same period in 2019.

**e. Status and Treatment of Internally Displaced Persons**

The Internal Displacement Monitoring Center (IDMC) estimated there were 454,000 additional internally displaced persons (IDPs) due to violence in 2019 and reported the causes of internal displacement included threats, extortion, and assassinations perpetrated by criminal gangs. The IDMC also reported 1,900 additional IDPs due to natural disasters in 2019.

On January 10, the NGO ARPAS, an association of community radio networks, reported that the Legislative Assembly approved the Special Law for the Comprehensive Care and Protection of Internally Displaced Persons. The law calls for the creation of a national system whose main function is to implement and evaluate the national policy towards IDPs.

**f. Protection of Refugees**

The government cooperated with the Office of the UN High Commissioner for Refugees and other humanitarian organizations in providing protection and some assistance to IDPs, refugees, returning refugees, asylum seekers, stateless persons, and other persons of concern, although this was often difficult in gang-controlled neighborhoods.

Access to Asylum: The law provides for the granting of asylum or refugee status, and the government has established a system for providing protection to refugees.

**Section 3. Freedom to Participate in the Political Process**

The constitution provides citizens the ability to choose their government in free and fair periodic elections held by secret ballot and based on universal and equal suffrage.

**Elections and Political Participation**

Recent Elections: The most recent presidential election occurred in February 2019. Nayib Bukele, of the center-right Grand Alliance for National Unity party, was elected to a five-year term. The election reports published by the Organization of American States and the EU electoral mission noted the election generally met international standards.

Political Parties and Political Participation: While the law prohibits public officials from campaigning in elections, the provision lacked consistent enforcement.

Participation of Women and Members of Minority Groups: No laws limit participation of women or members of minority groups in the political process, and they did participate. The law requires all registered political parties to have at least 30 percent of their candidates for the Legislative Assembly be women. On October 13, the newspaper *El Diario de Hoy* reported a low rate of women's participation in politics, stating that women held 26 of the 84 seats in the Legislative Assembly and 29 of the 262 mayor offices.

**Section 4. Corruption and Lack of Transparency in Government**

The law provides criminal penalties for conviction of corruption by officials. Although the Supreme Court investigated corruption in the executive and judicial branches and referred some cases to the FGR for possible criminal indictment, corruption and impunity remained endemic. Courts issued inconsistent rulings and failed, in particular, to address secret discretionary accounts within the government.

Corruption in the judicial system contributed to the high level of impunity, undermining the rule of law and the public's respect for the judiciary. As of June 30, the Supreme Court had received complaints against 46 judges due to

irregularities (41 of which remained under review) and had punished one judge. Accusations against judges included collusion with criminal elements and sexual harassment.

Corruption: On September 3, *El Faro* accused the Bukele administration of negotiating with senior gang leaders since 2019 to obtain electoral support and a reduction in homicides prior to the February 2021 legislative and municipal elections. On September 4, the attorney general announced an investigation into *El Faro*'s allegations. On June 23, the FGR arrested former defense minister David Victoriano Munguia Payes and issued an arrest warrant for former president Mauricio Funes, for their alleged roles in similar negotiations associated with the 2012-14 truce with the MS-13 and 18th Street gangs.

In June, July, and August, local press reported on irregular government purchases of food, personal protective equipment, and other supplies to combat the COVID-19 pandemic that allegedly involved inflated prices, agreements with companies linked to government officials, and purchases from companies with no past experience selling the purchased products or similar products. These transactions included the purchase of $1.1 million of protective masks for allegedly inflated prices from companies associated with the newly appointed finance minister, Jose Alejandro Zelaya, and the head of the Salvadoran Environmental Fund, Jorge Alejandro ("Koky") Aguilar Zarco; the purchase of $12 million in medical supplies from Javi Performance Parts, a Spanish automobile parts company that last filed required financial reports in 2012, and $3.5 million in medical supplies from Lasca Design LLC, a Florida-based ceramics company, neither of which have any apparent experience manufacturing or selling medical supplies.

President Bukele fired Aguilar Zarco shortly after his reported transactions became public, and as of October 19, Aguilar Zarco was the only administration official to lose his job because of pandemic-related corruption allegations. On June 26, the attorney general confirmed he had opened criminal investigations of several senior Bukele administration officials based on newspaper reports of corruption. As of October 19, the attorney general had not publicly filed charges against any of those officials.

As of June 30, the Supreme Court's Probity Section had opened 47 illicit enrichment investigations against public officers and forwarded two cases to the FGR for potential prosecution.

On August 14, two former defense ministers, David Victoriano Munguia Payes and Jose Atilio Benitez Parada, and the former president of the National Republican Alliance (ARENA), Gustavo Lopez Davidson, were arrested on various embezzlement-related charges associated with a two-million-dollar weapons transaction in 2012. The FGR also filed charges against and issued arrest warrants for several other defendants, including former president Mauricio Funes.

As of August the Ethics Tribunal reported that it had opened 355 administrative proceedings against public officials between September 2019 and August 31. One complaint against a Supreme Court magistrate ended with the judge removed from the bench. As of September 3, the FGR had filed claims against three judges for committing crimes involving corruption or for violating public administration laws.

Financial Disclosure: The illicit enrichment law requires appointed and elected officials to declare their assets to the Probity Section of the Supreme Court. The law establishes modest fines for noncompliance. The declarations were not available to the public unless requested by petition. The Supreme Court established three criteria for selecting investigable cases: age of the case (that is, proximity to the statute of limitations), relevance of the official's position, and seriousness and notoriety of the alleged illicit enrichment.

On July 6, local investigative magazine *Factum* reported that the Supreme Court Probity Section had identified $1.4 million in unjustified funds in the accounts of Walter Araujo, an outspoken Bukele supporter, legislative candidate for the political party Nuevas Ideas and former Supreme Electoral Court magistrate. As of September 14, the Supreme Court judges had not yet voted on whether to send Araujo to trial for illicit enrichment.

The law requires public officers to present asset certification reports no later than 60 days after taking a position. In September the Supreme Court Probity Section reported that 112 public officers had failed to present their assets certifications in the 10 previous years and two public officers from the current administration had failed to present their assets certification in the last year.

**Section 5. Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Abuses of Human Rights**

A variety of domestic and international human rights groups generally operated without government restriction, investigating and publishing their findings on

human rights cases. Government officials were somewhat cooperative and responsive to their views.

In March several international and national nongovernmental human rights organizations, such as Amnesty International, Human Rights Watch, Tutela Legal, and Cristosal, among others, questioned the government's methods to contain the spread of COVID-19 and warned that these methods violated the rule of law and opened the door to arbitrary detentions and abuses of power by police. President Bukele criticized these groups through his Twitter account.

Government Human Rights Bodies: The principal human rights investigative and monitoring body is the autonomous PDDH, whose ombudsman is nominated by the Legislative Assembly for a three-year term. The PDDH regularly issued advisory opinions, reports, and press releases on prominent human rights cases. There was a tense relationship between the PDDH and the Bukele administration. The PDDH ombudsman, Jose Apolonio Tobar, said his institution received constant attacks, particularly from President Bukele, who stigmatized him as a defender of criminals. President Bukele publicly discredited the work of the PDDH ombudsman on several occasions. When the Legislative Assembly nominated Tobar as the PDDH ombudsman in October 2019, Tobar was facing three criminal cases for "fraud, bribery, and arbitrary acts" from his time as a civil court judge, and international organizations, NGOs, several legislators, the San Salvador mayor, and President Bukele criticized the nomination.

## Section 6. Discrimination, Societal Abuses, and Trafficking in Persons

### Women

Rape and Domestic Violence: The law criminalizes rape of men or women, and the law's definition of rape may apply to spousal rape, at the judge's discretion. The law requires the FGR to prosecute rape cases whether or not the victim presses charges, and the law does not permit the victim to withdraw the criminal charge. The penalty for conviction of rape is generally imprisonment for six to 10 years. Laws against rape were not effectively enforced.

The law prohibits domestic violence and generally provides for sentences for conviction ranging from one to three years in prison, although some forms of domestic violence carry higher penalties. The law also permits restraining orders against offenders. Laws against domestic violence remained poorly enforced, and violence against women, including domestic violence, remained a widespread and

serious problem. In 2018 the Salvadoran Organization of Women for Peace (ORMUSA) reported that in 2016 and 2017, only 5 percent of the 6,326 reported crimes against women went to trial.

On January 31, the Specialized Court of Instruction for a Life Free of Violence and Discrimination against Women found the boyfriend of a journalist from the newspaper *La Prensa Grafica* guilty of femicide for her death and imposed the maximum prison sentence of 50 years. The National Coordinator of Femicides from the FGR stated the ruling sent a message that "in this country it will not be allowed to continue killing women because of their condition of being a woman."

On April 3, ORMUSA reported a 70 percent increase in domestic violence cases during the nationwide stay-at-home order. According to the *IDHUCA Human Rights Observatory Report*, the FGR registered 158 cases of domestic violence between March 21 and May 13.

<u>Sexual Harassment</u>: The law prohibits sexual harassment and establishes sentences if convicted of five to eight years' imprisonment. Courts also may impose additional fines in cases in which the perpetrator held a position of trust or authority over the victim. The law mandates that employers take measures against sexual harassment and create and implement preventive programs. The government, however, did not enforce sexual harassment laws effectively.

According to the *2019 Survey of Households and Multiple Purposes* of the General Directorate of Statistics and Censuses, at least 889 women left their workplace due to sexual harassment from supervisors and coworkers, compared with approximately 1,340 cases in 2018.

<u>Coercion in Population Control</u>: There were no reports of coerced abortion or involuntary sterilization on the part of government authorities.

<u>Discrimination</u>: The constitution grants women and men the same legal rights, but women did not receive equal pay or employment opportunities. The law establishes sentences of one to three years in prison for public officials convicted of denying a person's civil rights based on gender and six months to two years for employers convicted of discriminating against women in the workplace, but employees generally did not report such violations due to fear of employer reprisals.

In July a female legislator filed a complaint with the FGR against the president of the Legislative Assembly, Mario Ponce, and ARENA legislator Mauricio Vargas for gender discrimination in the workplace and psychological and public harassment. The 11th Peace Court declared the lawsuit inadmissible because both Ponce and Vargas had legislative immunity.

**Children**

Birth Registration: Children derive citizenship by birth within the country and from their parents. The law requires parents to register a child within 15 days of birth or pay a small fine. Failure to register may result in denial of school enrollment.

Child Abuse: Child abuse remained a serious and widespread problem. The law gives children the right to petition the government without parental consent. Penalties for conviction of breaking the law include losing custody of the child and three to 26 years' imprisonment, depending on the nature of the abuse.

On February 29, the FGR arrested a teacher in Santiago de Maria, Usulutan Department, for sexual aggression against a 10-year-old girl.

On June 2, the Criminal Chamber of the Supreme Court overturned the November 2019 lower court decision that had eliminated criminal charges against Judge Eduardo Jaime Escalante Diaz for sexually touching a 10-year-old girl. The court ordered the trial court to proceed with a criminal trial for sexual assault.

Child, Early, and Forced Marriage: The legal minimum age for marriage is 18. The law bans child marriage to prevent child abusers from avoiding imprisonment by marrying their underage victims. The law allows for marriage of a minor in cases of pregnancy.

Sexual Exploitation of Children: Child sex trafficking is prohibited by law. Prison sentences for convicted traffickers stipulate imprisonment from 16 to 20 years.

The minimum age for consensual sex is 18. The law classifies statutory rape as sexual relations with anyone younger than age 18 and includes penalties for conviction of four to 13 years' imprisonment.

The law prohibits paying anyone younger than age 18 for sexual services. The law prohibits participating in, facilitating, or purchasing materials containing child

pornography and provides for prison sentences of up to 16 years for conviction of violations. Despite these provisions, sexual exploitation of children remained a problem.

International Child Abductions: The country is a party to the 1980 Hague Convention on the Civil Aspects of International Child Abduction. See the Department of State's *Annual Report on International Parental Child Abduction* at https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/for-providers/legal-reports-and-data/reported-cases.html.

**Anti-Semitism**

The Jewish community totaled approximately 150 persons. There were no reports of anti-Semitic acts.

**Trafficking in Persons**

See the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

**Persons with Disabilities**

The law prohibits discrimination against persons with physical, sensory, intellectual, and mental disabilities. The National Council for Comprehensive Attention to Persons with Disability (CONAIPD), composed of representatives from multiple government entities, is the governmental agency responsible for protecting disability rights, but it lacks enforcement power. According to a CONAIPD representative, the government did not effectively enforce legal requirements for access to buildings, information, and communications for persons with disabilities. Few access ramps or provisions for the mobility of persons with disabilities existed.

CONAIPD stated there was no mechanism to verify compliance with the law requiring businesses and nongovernment agencies to hire one person with disabilities for every 25 hires. CONAIPD reported employers frequently fired persons who acquired disabilities and would not consider persons with disabilities for work for which they qualified. Further, some academic institutions would not accept children with disabilities.

No formal system existed for filing a discrimination complaint involving a disability with the government.

On March 6, the newspaper *El Diario de Hoy* reported that the FGR charged two PNC officers with the crime of torture based on a video showing the two officers beating a person with disabilities. Although the video was filmed in 2017, it was widely circulated on social media on March 4, and President Bukele and the PNC director immediately denounced the violent act through Twitter.

**Indigenous People**

Indigenous communities reported they faced racial discrimination and economic disadvantage. According to community leaders, gangs pushed out of urban centers by police mounted incursions into and appropriated indigenous land. Indigenous persons also reported gang members threatened indigenous children for crossing gang territorial lines artificially drawn across ancestral indigenous land, forcing some children to drop out of school or leave home.

According to the 2007 census (the most recent), there were 60 indigenous groups, making up 0.4 percent of citizens, mainly from the Nahua-Pipl, Lencas, Cacaopera (Kakwira), and Maya Chorti groups. The constitution recognizes the rights of indigenous peoples to maintain their cultural and ethnic identity. The law, however, does not include the right to be consulted regarding development and other projects envisioned on indigenous land, nor does it provide indigenous peoples the right to share in revenue from exploitation of natural resources on historically indigenous lands. The government did not demarcate any lands as belonging to indigenous communities. Because few indigenous persons possessed title to land, opportunities for bank loans and other forms of credit remained limited.

The law provides for the preservation of languages and archeological sites. The municipalities of Cacaopera and Yucuaiquin, in the eastern part of the country, have special laws to recognize their indigenous cultural heritage.

**Acts of Violence, Criminalization, and Other Societal Abuses Based on Sexual Orientation and Gender Identity**

On July 28, the First Sentencing Court of San Salvador found three PNC officers guilty of the aggravated homicide in January 2019 of Camila Diaz Cordova, a transgender woman, and sentenced each officer to 20 years in prison. These were

reportedly the first convictions for the homicide of a transgender person. While the Prosecutor's Office initially accused the officers of committing a "hate crime," the Fifth Peace Court decided on March 11 that there was insufficient evidence to establish a hate crime had occurred.

Lesbian, gay, bisexual, transgender, and intersex (LGBTI) activists reported to the FGR that they received death threats on social media. Police generally failed to act on these reports. NGOs reported that public officials, including police, engaged in violence and discrimination against LGBTI persons. Persons from the LGBTI community stated the PNC and the FGR harassed transgender and gay individuals who reported cases of violence against LGBTI persons, including by conducting unnecessary and invasive strip searches.

The Bukele administration eliminated five presidential secretariats created under the previous administration, including the Secretariat of Inclusion. The Secretariat of Inclusion focused on issues affecting the LGBTI community and supported LGBTI persons through a telephone line. The Ministry of Cultural Affairs assumed some of the functions of the Secretariat of Inclusion, but the telephone line for support to LGBTI persons was deactivated and replaced by information on pregnancy and childcare support.

The law prohibits discrimination based on sexual orientation or gender identity, which applies to discrimination in housing, employment, nationality, and access to government services. Gender identity and sexual orientation are included in the law covering hate crimes, along with race and political affiliation.

Supreme Electoral Tribunal guidelines from 2017 state individuals may not be denied the right to vote because the photograph on their identification card does not match their physical appearance. Nonetheless, media documented cases of transgender persons who faced harassment while voting in the presidential elections because their name and photograph on their national identification document did not match their expression of gender identity.

**HIV and AIDS Social Stigma**

Although the law prohibits discrimination on the basis of HIV/AIDS status, Entre Amigos, an LGBTI NGO, reported HIV-related discrimination was widespread. As of August 31, the PDDH reported one alleged case of discrimination against persons with HIV or AIDS that purportedly took place at a public health workers union in La Union Department.

## Section 7. Worker Rights

### a. Freedom of Association and the Right to Collective Bargaining

The law provides for the right of most workers to form and join independent unions, to strike, and to bargain collectively, but violations were reported to the Ministry of Labor. The law also prohibits antiunion discrimination although it does not require reinstatement of workers fired for union activity. Military personnel, national police, judges, and high-level public officers may not form or join unions. The labor code does not cover public-sector workers and municipal workers, whose wages and terms of employment are regulated by the 1961 civil service law. Only citizens may serve on unions' executive committees. The labor code also bars individuals from holding membership in more than one trade union.

Unions must meet complex requirements to register, including having a minimum membership of 35 individuals. If the Ministry of Labor denies registration, the law prohibits any attempt to organize for up to six months following the denial. Collective bargaining is obligatory only if the union represents the majority of workers.

The law contains cumbersome and complex procedures for conducting a legal strike. The law does not recognize the right to strike for public and municipal employees or for workers in essential services. The law does not specify which services meet this definition, and courts therefore apply this provision on a case-by-case basis. The law requires that 30 percent of all workers in an enterprise must support a strike for it to be legal and that 51 percent must support the strike before all workers are bound by the decision to strike. Unions may strike only to obtain or modify a collective bargaining agreement or to protect the common professional interests of the workers. Unions must engage in negotiation, mediation, and arbitration processes before striking, although many unions often skipped or expedited these steps. The law prohibits workers from appealing a government decision declaring a strike illegal.

In lieu of requiring employers to reinstate illegally dismissed workers, the law requires employers to pay those workers the equivalent of 30 days of their basic salary for each year of service. The law specifies 30 reasons for which an employer may terminate a worker's contract without triggering any additional responsibilities, including consistent negligence, leaking private company

information, or committing immoral acts while on duty. An employer may legally suspend workers, including due to an economic downturn or market conditions.

The government did not effectively enforce the laws on freedom of association and the right to collective bargaining, and penalties were not commensurate with those for other laws involving denials of civil rights, such as discrimination. Judicial procedures were subject to lengthy delays and appeals. According to union representatives, the government inconsistently enforced labor rights for a wide range of workers. Unions reported that their members frequently faced violence or threats of violence and that viable legal recourse against such violence was unavailable. Gang activity made it difficult for workers, who continued to be harassed and exposed to violence, to exercise their union activities freely.

Unions functioned independently from the government and political parties, although many generally were aligned with the traditional political parties of ARENA and the Farabundo Marti National Liberation Front. The elected leadership of the Social Security Institute Workers Union alleged that a group of dissident members aligned with the government seized control of the union in 2019 and gained government recognition by a manner contrary to the union's by-laws. Workers at times engaged in strikes regardless of whether the strikes met legal requirements.

**b. Prohibition of Forced or Compulsory Labor**

The law prohibits all forms of forced or compulsory labor. The government generally did not effectively enforce such laws. Penalties were not commensurate with those for other analogous serious crimes, such as kidnapping. The Ministry of Labor did not report on forced labor. Children and adults were exposed to forced begging, domestic work, agricultural labor, construction, and street work. Adults from neighboring countries were forced to work in construction, domestic work, and other informal sector jobs, sometimes under threat of physical violence. Gangs subjected children to forced labor in illicit activities, including selling or transporting drugs and committing homicides (see section 7.c.).

Also see the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

**c. Prohibition of Child Labor and Minimum Age for Employment**

The law prohibits the employment of children younger than age 14 but does not prohibit all of the worst forms of child labor. The law allows children between ages 14 and 18 to engage in light work if it does not damage the child's health or development or interfere with compulsory education. The law prohibits children younger than 16 from working more than six hours per day and 34 hours per week; those younger than 18 are prohibited from working at night or in hazardous occupations. The Ministry of Labor maintained a list of types of hazardous work, which included repairing heavy machinery, mining, handling weapons, fishing and harvesting mollusks, and working at heights above five feet while doing construction, erecting antennas, or working on billboards. Children age 16 and older may engage in light work on coffee and sugar plantations and in the fishing industry if it does not harm their health or interfere with their education.

The Ministry of Labor is responsible for enforcing child labor laws but did not effectively enforce the law. Penalties were not commensurate with those for other analogous serious crimes, such as kidnapping. Labor inspectors focused almost exclusively on the formal sector. According to the ministry, from January through August, officials conducted 220 child labor inspections in the formal sector and found no minors working. By comparison, in 2017, according to the ministry, there were 140,700 children and adolescents working, of whom 91,257 were employed in "dangerous work" in the informal sector. No information on any investigations or prosecutions by the government was available. The ministry did not effectively enforce child labor laws in the informal sector, which represented almost 75 percent of the economy.

There were reports of children younger than age 16 engaging in the worst forms of child labor, including in coffee cultivation, fishing, shellfish collection, and fireworks production. Children were subjected to other worst forms of child labor, including commercial sexual exploitation (see section 6, Children) and recruitment into illegal gangs to perform illicit activities in the arms and narcotics trades, including committing homicide. Children were engaged in child labor, including domestic work, the production of cereal grains and baked goods, cattle raising, and sales. Orphans and children from poor families frequently worked as street vendors and general laborers in small businesses despite the presence of law enforcement officials.

Also see the Department of Labor's *Findings on the Worst Forms of Child Labor* at https://www.dol.gov/agencies/ilab/resources/reports/child-labor/findings.

**d. Discrimination with Respect to Employment and Occupation**

The constitution, labor laws, and state regulations prohibit discrimination on the basis of race, color, sex, religion, political opinion, national origin (except in cases determined to protect local workers), social origin, gender, disability, language, or HIV-positive status. The government did not effectively enforce those laws and regulations, and penalties were not commensurate to laws related to civil rights, such as election interference. Sexual orientation and gender identity are not protected in the constitution or labor law, although the PDDH and the Ministry of Labor actively sought to protect workers against discrimination on those grounds.

Discrimination in employment and occupation occurred with respect to gender, disability, and sexual orientation or gender identity (see sections 6 and 7.e.). According to the Ministry of Labor, migrant workers have the same rights as citizens, but the ministry did not effectively protect their rights.

As of May the Ministry of Labor had not received complaints of disability discrimination but had received six complaints of gender-based discrimination. The law, reformed in 2018, prohibits the dismissal of women returning from maternity leave for up to six months.

**e. Acceptable Conditions of Work**

The government sets the minimum wage, which varies by sector. All of the wage rates were above poverty income levels. The government enforced the minimum wage law more effectively in the formal sector than in the informal sector.

The law sets a maximum normal workweek of 44 hours--limited to no more than six days and to no more than eight hours per day--but allows overtime, which is to be paid at a rate of double the usual hourly wage. The law mandates that full-time employees receive pay for an eight-hour day of rest in addition to the 44-hour normal workweek. The law provides that employers must pay double time for work on designated annual holidays, a Christmas bonus based on the time of service of the employee, and 15 days of paid annual leave. The law prohibits compulsory overtime for all workers other than domestic employees, such as maids and gardeners, who are obligated to work on holidays if their employer makes this request. In such cases they are entitled to double pay. The government did not adequately enforce these laws, and penalties were not commensurate with those for similar crimes, such as fraud.

The Ministry of Labor is responsible for setting and enforcing occupational safety and health (OSH) standards, and the law establishes a tripartite committee to review these. The law requires employers to take steps to meet OSH requirements in the workplace, including providing proper equipment and training and a violence-free environment. Employers who violate labor laws may be penalized, but penalties were not commensurate with those for other similar crimes; some companies reportedly found it more cost-effective to pay the fines than to comply with the law. The law promotes occupational safety awareness, training, and worker participation in OSH matters. While the laws were appropriate for the main industries and the government trained its inspectors on these standards, it did not effectively enforce them.

The number of inspectors was insufficient to deter violations. Inspectors did not have the authority to initiate unannounced inspections or sanctions. Inspections were scheduled under a calendar set by the Inspections Directorate or to verify a complaint, and labor inspectors did not notify the company prior to their arrival. During the COVID-19 pandemic, labor inspectors made several unannounced inspections to verify employers were providing workers with personal protective equipment such as hand sanitizers and masks. As of September labor inspectors completed 17,512 inspections, compared with 33,636 inspections conducted in all of 2019. Allegations of corruption among labor inspectors continued. The Labor Ministry received complaints regarding failure to pay overtime, minimum wage violations, unpaid salaries, and cases of employers illegally withholding benefits (including social security and pension funds) from workers.

Reports of overtime and wage violations existed in several sectors. According to the Labor Ministry, employers in the agricultural sector routinely violated the laws requiring annual bonuses, vacation days, or rest days. Women in domestic service faced exploitation, mistreatment, verbal abuse, threats, sexual harassment, and generally poor work conditions. Workers in the construction industry and domestic service reportedly experienced violations of wage, hour, and safety laws. According to ORMUSA, civil society organizations, and media, certain apparel companies violated women's rights through occupational health violations and unpaid overtime. There were reports of OSH violations in other sectors, including reports that a very large percentage of buildings did not meet safety standards set by law. The government proved ineffective in pursuing such violations.

In some cases the country's high crime rate undermined acceptable conditions of work as well as workers' psychological and physical health. Some workers, such as bus drivers, bill collectors, messengers, and teachers in high-risk areas, reported

being subject to extortion and death threats by gang members. On May 25, the newspaper *La Prensa Grafica* reported extortion by gang members continued during the nationwide stay-at-home order. The FGR received 661 complaints of extortion from January 1 to May 14, compared with 899 complaints during the same period in 2019, and explained the decrease in complaints occurred because some victims chose to pay the extortion rather than file a complaint. On October 21, the newspaper *Diario El Mundo* reported gang members killed public transport employees to pressure transportation companies into paying extortion.

Through May 31, the Ministry of Labor reported 2,866 workplace accidents. These included 1,352 accidents in the services sector, 864 in the industrial sector, 310 in the commercial sector, 266 in the public sector, and 74 in the agricultural sector. The ministry did not report any deaths from workplace accidents.

Workers may legally remove themselves from situations that endanger health or safety without jeopardy to their employment, but authorities did not effectively enforce this law. On March 14, the Legislative Assembly unanimously approved Legislative Decree 593, which stated that workers could not be fired for being quarantined for COVID-19 or because they could not report to work due to immigration or health restrictions. President Bukele also mandated persons older than 60 and pregnant women to work from home.

Case No. 25-cv-1774-JEB

# Exhibit 5

# EL SALVADOR 2019 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

El Salvador is a constitutional multiparty republic. On February 3, voters elected Nayib Bukele as president for a five-year term. The election was generally free and fair, according to international observers. Free and fair municipal and legislative elections took place in 2018.

The National Civilian Police (PNC), overseen by the Ministry of Justice and Public Security, is responsible for maintaining public security, and the Ministry of Defense is responsible for maintaining national security. Although the constitution separates public security and military functions, it allows the president to use the armed forces "in exceptional circumstances" to maintain internal peace and public security "when all other measures have been exhausted." The military is responsible for securing international borders and conducting joint patrols with the PNC. In 2016 then president Sanchez Ceren renewed the decree authorizing military involvement in police duties, a presidential order in place since 1996. Civilian authorities failed at times to maintain effective control over security forces.

Significant human rights issues included: allegations of unlawful killings of suspected gang members and others by security forces; forced disappearances by military personnel; torture by security forces; arbitrary arrest and detention by the PNC; harsh and life-threatening prison conditions; serious problems with the independence of the judiciary; widespread government corruption; violence against women and girls that was inconsistently addressed by authorities; security force violence against lesbian, gay, bisexual, transgender, and intersex (LGBTI) individuals; and children engaged in the worst forms of child labor.

Impunity persisted despite government steps to dismiss and prosecute abusers in the security forces, executive branch, and justice system.

Organized criminal elements, including local and transnational gangs and narcotics traffickers, were significant perpetrators of violent crimes and committed acts of murder, extortion, kidnapping, human trafficking, intimidation, and other threats and violence directed against police, judicial authorities, the business community, journalists, women, and members of vulnerable populations. In some cases authorities investigated and prosecuted persons accused of committing crimes and human rights abuses.

## Section 1. Respect for the Integrity of the Person, Including Freedom from:

### a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were no reports that the government or its agents committed politically motivated killings. There were reports, however, of security force involvement in extrajudicial killings of suspected gang members. As of August 22, the Office of the Human Rights Ombudsman (PDDH) announced it was investigating 39 complaints of such killings, some by law enforcement, including four in which PNC officers were alleged to have directly participated and one attributed to an alleged extermination group.

On August 27, the PDDH presented a report on purported extrajudicial killings attributed to law enforcement agencies during the period 2014-18. The PDDH analyzed 48 incidents involving the alleged extrajudicial killing of 116 persons. Most victims were male and nearly half were between 18 and 24 years old. Almost all victims were killed by firearms. Separately, the PDDH reported that law enforcement officers were victims of gang-orchestrated attacks.

On September 7, a PNC officer in Soyapango, San Salvador Department, was arrested for shooting and killing a motorist who failed to stop his car when directed by the officer. At the initial hearing, the Eighth Peace Court of San Salvador released the officer from custody pending trial but required him to post $6,000 bail and wear an electronic tracking bracelet.

On September 30, the Attorney General's Office announced the arrest of 22 members of an alleged extermination group operating in San Miguel and Usulatan Departments that was responsible for more than 50 killings of gang members, their associates, and civilians, as well as numerous other crimes in 2016 and 2017. According to the attorney general, the extermination group consisted of 45 members, including 14 active-duty PNC officers (only 11 of whom were arrested) and four former PNC officers.

On October 16, nine police officers faced retrial before the First Court of Judgment of Santa Tecla for the 2016 murder of three alleged gang members and another person in Villas de Zaragoza, La Libertad Department. The case was pending as of November.

In November 2018 the trial court acquitted five police officers of aggravated homicide charges in the 2015 killing of a man at a farm in San Blas, San Jose Villanueva. This was the second trial of the five officers, whose initial acquittal was reversed on appeal. The Attorney General's Office appealed the November 2018 acquittal, and as of September 16, the appeal was pending. As of July 2, authorities reported alleged gang members had killed 24 police officers and 12 soldiers.

On June 7, the director of the Institute for Human Rights at the University of Central America (IDHUCA) questioned the nomination of Mauricio Arriaza Chicas to be police director due to his past leadership in the Subdirectorate of Operational Areas, which included the Police Reaction Group (GRP) and the El Salvador Reaction Specialized Forces. The GRP was disbanded in February 2018 following the disappearance of female GRP member Carla Ayala after a GRP party in 2017. GRP officer Juan Josue Castillo Arevalo was accused of killing Ayala. Castillo Arevalo remained at large, and his former supervisor, Julio Cesar Flores Castro, was charged with breach of duty in June 2018 for failing to arrest Castillo Arevalo. On September 10, Flores Castro was acquitted of that charge and released from custody, based in part on his pending promotion in the PNC. The Attorney General's Office continued prosecution of 14 other defendants, including 12 police officers and two civilians.

**b. Disappearance**

There were reports alleging that security and law enforcement officials were involved in unlawful disappearances. Law enforcement agencies had not released data on disappearances since 2017, citing a discrepancy between data collected by the PNC and the Attorney General's Office. On July 17, the attorney general launched a specialized unit to track disappearance complaints, and the Attorney General's Office and the PNC created a joint working group to focus on disappearance cases and to ensure data consistency regarding such cases.

On August 27, a think tank, The Salvadoran Foundation for Social and Economic Development, presented a legal and institutional situation report covering the first half of the year, which noted that despite the decrease in homicide rates during that period, those figures may have actually underreported homicides, since reported disappearances during the first half of the year might include additional homicides. Local nongovernmental organization (NGO) PASIONISTAS reported that, as of June, there were 652 disappearances, compared with 2,457 in 2018. The Attorney General's Office reported 2,234 cases of "deprivation of liberty" through October

22, compared with 2,359 cases through October 22, 2018; however, this offense includes both disappearances and missing persons.

In July *La Prensa Grafica* newspaper reported it had received reports of 259 disappeared persons, of whom 173 were later found living, 11 were found dead, and 72 cases remained under investigation.

On April 23, the judge in the prosecution of the 1981 El Mozote massacre, in which almost 1,000 civilians were killed, issued an order adding three new charges, including a forced disappearance charge, against the 16 remaining defendants. The defendants appealed that order, which was affirmed by the intermediate appellate court. This was pending a further appeal (see section 1.e. for more information).

In November 2018, after a lengthy trial process, the Sonsonate Court of Judgment convicted six members of the armed forces for the crimes of deprivation of freedom, making false accusations of gang membership, and forced disappearance of three young men in 2014 in Armenia, La Libertad Department.

**c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment**

The law prohibits such practices, but there were reports of violations. As of August 22, the PDDH had received 33 complaints of torture or cruel or inhuman treatment by the PNC, nine by the armed forces, and seven by other public officials.

Reports of abuse and police misconduct came mostly from residents of metropolitan San Salvador and mainly from men and young persons. As of June the Office of the Police Inspector General reported it had received 775 complaints of general misconduct by police (including but not limited to torture or cruel or inhuman treatment) and taken disciplinary action against 120 police officers accused of misconduct.

On February 6, PNC officers allegedly tortured a juvenile male. According to the Attorney General's Office, PNC members detained the individual in a police station in Coruna, Soyapango, San Salvador Department, for six days and accused him of receiving stolen property, although the PNC officers had no proof against the suspect. According to the victim, the police officers tortured him and stole $80 from him. As of October 29, three officers were in pretrial detention.

On March 8, six police officers from the Tactic Operative Section allegedly tortured and attempted to kill a young man by setting him on fire after accusing him of being a gang member in a rural neighborhood of Apopa, San Salvador Department. When the victim filed a complaint against the police officers with the Attorney General's Office in Apopa, the prosecutor allegedly implied the young man's gang affiliation had provoked the police response. In April, despite this initial hostility to the victim and possible gang affiliation, the Attorney General's Office arrested and charged the police officers with attempted homicide and placed four of them in pretrial detention. In June the victim reported ongoing harassment against him and his family by other police officers. On September 20, a judge determined that four of the officers would stand trial solely on a torture charge.

On July 12, the Sentence Tribunal of Cojutepeque, Cuscatlan Department, convicted five police officers and four members of the armed forces of deprivation of freedom, sexual abuse, and threatening and torturing a young woman. The court sentenced them to three years in prison and fined each $1,000. The victim had reported the case to the Attorney General's Office in January 2018.

**Prison and Detention Center Conditions**

Prison and detention center conditions remained harsh and life threatening due to gross overcrowding, unhygienic conditions, and gang activities.

<u>Physical Conditions</u>: Overcrowding, at 141 percent of capacity as of September, was a serious threat to prisoners' health and welfare. For example, as of August 22, the PDDH reported that in one prison, 1,654 inmates were held in facilities designed for 600.

Convicted inmates and pretrial detainees were sometimes held in the same prison cells.

Gangs remained prevalent in prisons. As of September 14, approximately 55 percent (18,293 prisoners) of the prison population were active or former gang members. As of August 29, extraordinary measures designed to interrupt gang communications and coordination between imprisoned leaders and gang members outside the prisons were in effect in eight prisons. The measures reduced the smuggling of weapons, drugs, and other contraband such as cell phones and SIM cards into prisons; however, contraband remained a problem, at times with complicity from prison officials.

On June 20, the minister of justice and the director of prisons imposed a state of emergency in 19 prisons at President Bukele's request and as part of his security program, the *Plan for Territorial Control*. Under the state of emergency, prisoners were not able to receive any type of visit, were confined to their cells 24 hours a day, were not permitted to visit recreational or medical facilities except in extraordinary circumstances, did not receive mail or have access to radios or televisions, and did not engage in work activities. In addition, beginning on June 21, the minister and the director used their legal authority to completely disable cell phone signals inside and around prisons. The Court of Penitentiary Surveillance and Penalty Execution subsequently ratified the state of emergency. On September 2, President Bukele instructed the minister and the director to lift the state of emergency in prisons. Inmates' right to receive visitors was gradually restored in prisons that did not hold inmates affiliated with gangs.

In many facilities, provisions for sanitation, potable water, ventilation, temperature control, medical care, and lighting were inadequate, according to the PDDH. As of September 14, the director of prisons reported no cases of inmate malnutrition, down from 2,440 reported cases between August 2017 and May 2018.

According to the Direction of Penitentiaries, 21 inmates died in 2018, nine by homicide. As of August the Salvadoran Institute for Child Development reported no minors had been killed by gang members while in detention, compared with three in 2018.

In August the PNC reported 30 percent overcrowding in police holding cells, with 2,300-2,400 detainees in cells designed for 1,500-1,800 individuals. This was down from 5,500-6,000 detainees held in similar facilities in 2018.

<u>Administration</u>: The PDDH has authority to investigate credible allegations of inhumane conditions. The Constitutional Chamber of the Supreme Court has authority over the protection of constitutional rights. During the state of emergency, authorities did not allow prisoners and detainees to receive any visitors or to gather for religious observances.

<u>Independent Monitoring</u>: As of August 22, according to the PDDH, due to the state of emergency enacted on June 20, the government prevented independent human rights groups from visiting all prisons (not just the 19 covered by the state of emergency). Prior to the imposition of the state of emergency, and again after September 2, the government permitted visits by independent human rights

observers, NGOs, and media to low- and medium-security prisons. Inspections of high-security prisons were limited to government officials, the PDDH, and the International Committee of the Red Cross. Church groups, IDHUCA, LGBTI activists, and other groups visited prisons during the first six months of the year.

Improvements: Construction of new prisons and a redistribution of prisoners reduced overcrowding from 215 percent to 141 percent as of September.

On September 12, legislators reallocated $9.3 million from the year's budget to improve prison conditions, including $4.1 million for a salary increase for prison personnel and $5.2 million for improved food for inmates.

## d. Arbitrary Arrest or Detention

Although the constitution prohibits arbitrary arrest and detention, there were numerous complaints that the PNC and military forces carried out arbitrary arrests. NGOs reported that the PNC arbitrarily arrested and detained individuals on suspicion of gang affiliation. According to these NGOs, the accused were ostracized by their communities upon their return.

The law provides for the right of any person to challenge the lawfulness of his or her arrest or detention in court. The government generally observed this provision.

### Arrest Procedures and Treatment of Detainees

The constitution requires a written warrant of arrest except in cases where an individual is caught in the act of committing a crime. Authorities generally apprehended persons with warrants based on evidence and issued by a judge, although this was frequently ignored when allegations of gang membership arose. Police generally informed detainees promptly of charges against them.

The law permits release on bail for detainees who are unlikely to flee or whose release would not impede the investigation of the case. The bail system functioned adequately in most cases. The courts generally enforced a ruling that interrogation without the presence of counsel is coercive and that evidence obtained in such a manner is inadmissible. As a result, PNC authorities typically delayed questioning until a public defender or an attorney arrived. The constitution permits the PNC to hold suspects for 72 hours before presenting them to court. The law allows up to six months for investigation of serious crimes before requiring either a trial or

dismissal of the case; this period may be extended by an appeals court. Many cases continued beyond the legally prescribed period.

Arbitrary Arrest: As of August 22, the PDDH reported 66 complaints of arbitrary detention or illegal detention, compared with 31 from January to October 2018. According to the PNC and a report by *El Faro*, 72 percent of those arrested in the first 15 days of the Bukele administration--969 of the 1,350 individuals arrested during or immediately after an alleged crime--were released within 72 hours and were not formally charged with a criminal offense.

Pretrial Detention: Lengthy pretrial detention was a significant problem. As of August approximately 33 percent of the general prison population was in pretrial detention. Some persons remained in pretrial detention longer than the maximum legal sentences for their alleged crimes. In such circumstances detainees were permitted to request a Supreme Court review of their continued detention.

**e. Denial of Fair Public Trial**

Although the constitution provides for an independent judiciary, the government did not always respect judicial independence, and the judiciary was burdened by inefficiency and corruption. For example, when employees of several executive branch agencies targeted for closure in June filed a complaint with the Supreme Judicial Court, President Bukele warned the Supreme Court justices not to interfere with the case.

While the government generally respected court orders, some agencies ignored or minimally complied with orders.

In February, in a renewed effort to shield the perpetrators of war crimes and human rights abuses committed during the country's 1980-92 civil war, a group of influential legislators proposed a draft national reconciliation law. Despite Constitutional Court rulings in 2016 and 2018 that expressly prohibited a broad and unconditional amnesty, the proposed bill would have granted amnesty to several high-level officials who enjoyed immunity from prosecution due to their positions in the recent administration of President Salvador Sanchez Ceren. Victims' rights groups, other civil society actors, and the international community successfully campaigned against the proposed bill, and President-elect Bukele stated his strong opposition to an amnesty bill and expressed his support for additional consultation with victims. On May 29, the Inter-American Court of Human Rights ordered the government to immediately suspend consideration of

the proposed law. The proposed bill eventually lost support among legislators and failed to reach a floor vote.

Despite a June 2018 Constitutional Court order directing it to release military records related to the El Mozote killings and serious civil war crimes, the Ministry of Defense had not produced the requested documentation as of November 12. On November 1, President Bukele stated that he was committed to the truth and that he would release the records. Previously, the Ministry of Defense claimed the El Mozote archive records were destroyed in an accidental warehouse fire. Civil society and victims' groups continued to press for release of these archives.

As of August 22, the PDDH received 74 complaints of lack of a fair, public trial.

Corruption in the judicial system contributed to the high level of impunity, undermining the rule of law and the public's respect for the judiciary. As of August 31, the Supreme Court had heard 110 cases against judges due to irregularities (57 of which remained under review), sanctioned four judges, and brought formal charges against six judges. Accusations against judges included collusion with criminal elements and sexual harassment.

On April 23, the judge in the El Mozote prosecution issued an order adding three new charges against the 16 remaining defendants: Torture, forced disappearance, and forced displacement. He also imposed several provisional measures on the defendants, including a prohibition on leaving the country or contacting victims, and a requirement that the defendants physically appear in court biweekly. The defendants appealed these rulings, which were affirmed by an intermediate appellate court. On February 14, the Legislative Assembly approved a transitory law establishing mechanisms designed to allow family members to be added to the El Mozote victims' registry.

A number of women charged under the 1998 penal code, which makes it illegal to perform, self-induce, or consent to an abortion under any circumstances, asserted they had suffered miscarriages, stillbirths, and other medical emergencies during childbirth. Legal experts pointed to serious flaws in forensics collection and medical interpretation in many of these cases.

On August 16, Evelyn Hernandez was released from prison after serving two years on charges that she attempted to kill her baby in 2016. The court opined that the evidence presented by the prosecution was insufficient to support the charges, relying heavily on an autopsy of the baby that showed it had died because of

swallowing meconium. The prosecutor had requested a 40-year prison sentence. On September 6, the Attorney General's Office filed an appeal of the order acquitting her.

Between January 1 and September 13, the justice system released nine women accused or convicted of infanticide of their unborn or newborn children. Sixteen other women remained in custody for infanticide.

**Trial Procedures**

The law provides for the right to a fair and public trial, and an independent judiciary generally enforced this right, although some trial court judges were subject to political, economic, or other corrupting influences. By law juries hear only a narrow group of cases, such as environmental complaints. After the jury determines innocence or guilt, a panel of judges decides the sentence.

Defendants have the right to be present in court (except in virtual trials; see below), question witnesses, and present witnesses and evidence. The constitution further provides for the presumption of innocence, the right to be informed promptly and in detail of charges, the right to a trial without undue delay (seldom observed), protection from self-incrimination, the right to communicate with an attorney of choice, the right to adequate time and facilities to prepare a defense, freedom from coercion, the right to appeal, and government-provided legal counsel for the indigent.

In criminal cases a judge may allow a private plaintiff to participate in trial proceedings (calling and cross-examining witnesses, providing evidence, etc.), assisting the prosecuting attorney in the trial procedure. Defendants have the right to free assistance of an interpreter. Authorities did not always respect these legal rights and protections. Although a jury's verdict is final, a judge's verdict is subject to appeal. Trials are public unless a judge seals a case.

While implemented in 2015 to expedite fair trials, virtual trials still involved delays of up to eight months, according to a July 2018 *La Prensa Grafica* report. On May 6, the Legislative Assembly passed a reform that allows for, when necessary and appropriate, virtual trials for gang membership charges to proceed without the defendants present, although with defense counsel participating. The reform also states that the judicial and prison authorities must provide a video copy of the virtual trial to the defendants within 72 hours so that they may exercise their right to defense.

Virtual trials often involved group hearings before a judge, with defendants unable to consult with their defense lawyers in real time. The penitentiary code reforms passed in August 2018 allow defense lawyers to attend a hearing without the defendant's presence. Human rights groups questioned the constitutionality of the reform.

According to 2018 press reports, plea deals occurred in approximately 20 percent of cases, with the accused turning state's witness in order to prosecute others. Legal experts pointed to an overreliance on witness testimony in nearly all cases, as opposed to the use of forensics or other scientific evidence. The justice system lacked DNA analysis and other forensic capabilities; in July the Howard Buffett foundation announced a $25 million PNC Forensic Research Center project to improve the country's forensic abilities.

**Political Prisoners and Detainees**

There were no reports of political prisoners or detainees.

**Civil Judicial Procedures and Remedies**

The law provides for access to the courts, enabling litigants to bring civil lawsuits seeking damages for, as well as cessation of, human rights violations. Domestic court orders generally were enforced. Most attorneys pursued criminal prosecution and later requested civil compensation.

**f. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence**

The constitution prohibits such actions. In contrast with 2018, there were no reports the state intelligence service tracked journalists or collected information about their private lives.

In many neighborhoods, armed groups and gangs targeted certain persons and interfered with privacy, family, and home life. Efforts by authorities to remedy these situations were generally ineffective.

**Section 2. Respect for Civil Liberties, Including:**

**a. Freedom of Expression, Including for the Press**

The constitution provides for freedom of expression, including for the press, although the government at times did not respect this right. The law permits the executive branch to use the emergency broadcasting service to take over all broadcast and cable networks temporarily to televise political programming.

Press and Media, Including Online Media: Allegations continued that the government retaliated against members of the press for criticizing certain policies. On September 6, President Bukele's press and communications staff banned journalists of digital newspapers *El Faro* and *Factum Magazine* from a press conference in which President Bukele announced the launch of the Salvadoran Commission Against Corruption and Impunity (CICIES). The Bukele administration stated that journalists from both outlets had acted improperly in past press conferences, including shouting questions at speakers and behaving disrespectfully toward staff. On September 11, *Factum Magazine* journalist Rodrigo Baires was denied entry to a press conference at the same location. The refusals to admit journalists to presidential press conferences drew widespread criticism and concern regarding freedom of expression and freedom of the press, including by the United Nations, Organization of American States (OAS), and Committee to Protect Journalism. Following the criticism, a *Factum Magazine* reporter was allowed to attend and ask questions at a September 12 presidential press conference.

Violence and Harassment: On July 3, the Salvadoran Journalist Association (APES) reported on the rise of cyber intimidation and attacks against journalists. APES specifically criticized President Bukele for seeking to intimidate journalists Mariana Belloso and Roxana Sandoval. After they criticized the Bukele administration, accounts on social media associated with Bukele supporters targeted Belloso and Sandoval with insults, intimidation, threats, and attempts to discredit their work.

As of August 22, the PDDH had received six complaints of violence against journalists by government officials. APES reported 77 cases of aggressions against journalists during the year, an increase of 18 percent over the 65 cases reported in 2018.

Censorship or Content Restrictions: Government advertising accounted for a significant portion of press advertising income. According to media reports, the Bukele administration cancelled all government advertising in the newspaper *El*

*Diario de Hoy* after it reported on the banning of journalists from *El Faro* and *Factum Magazine* from President Bukele's press conferences. According to APES, media practiced self-censorship, especially in reporting on gangs and narcotics trafficking.

Nongovernmental Impact: APES noted journalists who reported on gangs and narcotics trafficking were subject to kidnappings, threats, and intimidation. Observers reported that gangs also charged print media companies to distribute in their communities, costing media outlets as much as 20 percent of their revenues.

**Internet Freedom**

The government did not restrict or disrupt access to the internet or censor online content, and there were no credible reports that the government monitored private online communications without appropriate legal authority.

**Academic Freedom and Cultural Events**

There were no government restrictions on academic freedom or cultural events.

**b. Freedoms of Peaceful Assembly and Association**

The constitution provides for the freedoms of peaceful assembly and association, and the government generally respected these rights, except with respect to labor unions (see section 7.a.).

**c. Freedom of Religion**

See the Department of State's *International Religious Freedom Report* at https://www.state.gov/religiousfreedomreport/.

**d. Freedom of Movement**

The constitution provides for freedom of internal movement, foreign travel, emigration, and repatriation. The government generally respected these rights, although in many areas the government could not guarantee freedom of movement due to criminal gang activity.

In-country Movement: The major gangs (MS-13 and two factions of 18th Street) controlled their own territory. Gang members did not allow persons living in

another gang's area to enter their territory, even when travelling via public transportation. Gangs forced persons to present government-issued identification cards (containing their addresses) to determine their residence. If gang members discovered that a person lived in a rival gang's territory, that person risked being killed, beaten, or not allowed to enter the territory. Bus companies paid extortion fees to operate within gang territories, often paying numerous fees for the different areas in which they operated. The extortion costs were passed on to customers.

As of October 22, the Attorney General's Office had filed 1,515 new cases charging an illegal limitation on the freedom of movement, an increase from the 920 new cases brought in the same period 2018. The Attorney General's Office reported 50 convictions for such charges through October 22, compared with 13 through October 22, 2018.

**e. Internally Displaced Persons**

As of August the PDDH reported 148 complaints of forced displacement, 28 of which arose from the same incident. Nearly all of the complaints were from gang-controlled territories, with 84 cases from San Salvador, although in three cases, the complaint alleged the PNC caused the displacement. As of October 2018, the government acknowledged that 1.1 percent of the general population (approximately 68,060 persons) was internally displaced. The Office of the UN High Commissioner for Refugees estimated there were 71,500 internally displaced persons (IDPs) and reported the causes of internal displacement included abuse, extortion, discrimination, and threats.

As of October 24, the Legislative Assembly had failed to pass court-ordered legislation addressing internal displacement by no later than January 2019. In July 2018 the Constitutional Chamber of the Supreme Court ruled that the government violated the constitution by not recognizing forced displacement or providing sufficient aid to IDPs. The court also called on the government to retake control of gang territories, develop protection protocols for victims, and uphold international standards for protecting victims.

**f. Protection of Refugees**

Access to Asylum: The law provides for granting asylum or refugee status, including an established system for providing protection to refugees. Between January 1 and August 15, the Ministry of Foreign Affairs received 10 asylum petitions, compared with 31 refugee/asylum claims in 2018.

**g. Stateless Persons**

Not applicable.

**Section 3. Freedom to Participate in the Political Process**

The constitution provides citizens the ability to choose their government in free and fair periodic elections held by secret ballot and based on universal and equal suffrage.

**Elections and Political Participation**

Recent Elections: The most recent presidential election occurred on February 3. Nayib Bukele, of the center-right Grand Alliance for National Unity (GANA) party, was elected to a five-year term. The election reports published by the OAS and the EU electoral mission noted the election generally met international standards.

While the law prohibits public officials from campaigning in elections, the provision lacked consistent enforcement.

Participation of Women and Minorities: No laws limit participation of women or members of minorities in the political process, and they did participate.

**Section 4. Corruption and Lack of Transparency in Government**

The law provides criminal penalties for corruption by officials. Although the Supreme Court investigated corruption in the executive and judicial branches and referred some cases to the Attorney General's Office for possible criminal indictment, impunity remained endemic, with courts issuing inconsistent rulings and failing, in particular, to address secret discretionary accounts within the government.

On September 6, President Bukele launched CICIES to combat corruption and impunity. Foreign Minister Alexandra Hill and OAS Strategic Counsel Luis Porto signed a Letter of Intent to create the commission. The letter stated that the parties would sign a formal agreement within three months. The letter focused on strengthening the judiciary and Attorney General's Office and creating a special anticorruption unit under the PNC. The letter promised that CICIES and the OAS

would coordinate with local judicial institutions in creating guidelines for selecting cases. In Bukele's announcement, he noted that CICIES would be financed with assistance from the OAS and other international organizations. As of October 29, there was an anticipated cost of $15 million and OAS was asking for funding, but no other details had been confirmed. In November the OAS reported that CICIES had established a headquarters in the country.

Corruption: In January the Supreme Court issued an order limiting its Probity Section investigations of public officials to those who had left public office within the last 10 years. On May 6, *Factum Magazine* published an article underlining that, due to this decision, 79 cases were due to expire on May 31. According to *Factum*, in four of these, the Probity Section had already completed the investigation, and it required only a decision from the Supreme Court. The four investigations involved former Farabundo Marti National Liberation Front (FMLN) legislator Sigfrido Reyes; GANA legislator Guillermo Gallegos (regarding actions taken in 2006-09); former vice president Oscar Ortiz, when he served as FMLN legislator in 1994 and 1997; and also of Ortiz when he served as Santa Tecla mayor in 2006 and 2009. As of June 30, the Supreme Court's Probity Section had opened six illicit enrichment cases against public officers.

On June 20, the Attorney General's Office filed a corruption complaint against Rafael Hernan Contreras, former chief of the Court of Accounts, one of the six agencies that oversees corruption investigations and cases. According to the attorney general, Contreras issued a false document that certified former president Antonio Saca, serving 10 years in prison for misappropriating more than $300 million, had managed funds effectively during his presidency. Saca still faced charges for bribing a judicial official for access to information. Six other officials from the Saca administration also received prison sentences in September 2018 for misappropriating public funds while in government.

In December 2018 a judge sentenced former attorney general Luis Martinez (2012-15) to five years in prison and ordered him to pay $125,000 in restitution on corruption-related charges of purposely and unlawfully disclosing recordings obtained in a wiretap investigation. In 2016 Martinez was fined $8,000 by the Government Ethics Tribunal for inappropriately accepting gifts from businessman Enrique Rais. Martinez faced a number of pending corruption charges, including allegations he took bribes from former president Mauricio Funes, who received citizenship from Nicaragua in July after fleeing corruption charges in El Salvador.

The Attorney General's Office reportedly investigated past misuse of a presidential discretionary fund, established in 1989 and used by six presidents, to fund the national intelligence service. The fund, totaling one billion dollars since the accounts' inception, had never been audited by the Court of Accounts. Former presidents Saca and Funes allegedly misappropriated more than $650 million from this fund during their terms in office.

As of September 16, the Ethics Tribunal reported that between September 2018 and August 21, it had opened 438 administrative proceedings against 426 public officials. During that same period, the tribunal imposed fines against 41 sitting and former public officials. As of September 3, the Attorney General's Office had filed claims against three judges for committing crimes involving corruption or for violating public administration laws.

Financial Disclosure: The illicit enrichment law requires appointed and elected officials to declare their assets to the Probity Section of the Supreme Court. The law establishes fines for noncompliance that range from $11 to $571. The declarations were not available to the public unless requested by petition. The Supreme Court established three criteria for selecting investigable cases: the age of the case (that is, proximity to the statute of limitations); relevance of the official's position; and seriousness and notoriety of the alleged illicit enrichment.

The law requires public officers to present asset certification reports no later than 60 days after taking a new position. In August the Supreme Court Probity Section reported that 8,974 public officers had failed to present their assets certifications in the 10 previous years. This included 16 legislators who took office in May 2018 and who had failed to present their assets reports by June 30, 2019.

## Section 5. Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Abuses of Human Rights

A variety of domestic and international human rights groups generally operated without government restriction, investigating and publishing their findings on human rights cases. Although government officials generally were cooperative and responsive to these groups, officials expressed reluctance to discuss certain issues, such as extrajudicial killings and IDPs, with the PDDH.

Government Human Rights Bodies: The principal human rights investigative and monitoring body is the autonomous PDDH, whose ombudsman is nominated by the Legislative Assembly for a three-year term. The PDDH regularly issued

advisory opinions, reports, and press releases on prominent human rights cases. The PDDH generally enjoyed government cooperation and was considered generally effective except on problems relating to criminal groups and gangs.

The PDDH maintained a constructive dialogue with the Office of the President. The government publicly acknowledged receipt of reports, although in some cases it did not act on recommendations, which are nonbinding. The PDDH faced threats, including two robberies at its headquarters targeting computers containing personally identifiable information.

On October 16, the Legislative Assembly nominated a new PDDH ombudsman who was facing three criminal cases for "fraud, bribery, and arbitrary acts," as well as a Court of Accounts case from his time as a civil court judge. International organizations, NGOs, several legislators, the San Salvador mayor, and President Bukele criticized the nomination.

## Section 6. Discrimination, Societal Abuses, and Trafficking in Persons

### Women

Rape and Domestic Violence: The law criminalizes rape of men or women, and the criminal code's definition of rape may apply to spousal rape, at the judge's discretion. The law requires the Attorney General's Office to prosecute rape cases whether or not the victim presses charges, and the law does not permit the victim to withdraw the criminal charge. The penalty for rape is generally imprisonment for six to 10 years. Laws against rape were not effectively enforced.

The law prohibits domestic violence and generally provides for sentences ranging from one to three years in prison, although some forms of domestic violence carry higher penalties. The law also permits restraining orders against offenders. Laws against domestic violence remained poorly enforced, and violence against women, including domestic violence, remained a widespread and serious problem. In July 2018 the Salvadoran Organization of Women for Peace (ORMUSA) reported that in 2016 and 2017, only 5 percent of the 6,326 reported crimes against women went to trial.

On April 24, a woman died in Guazapa after being beaten by her husband days earlier. The Attorney General's Office charged her husband with femicide. According to the woman's children, her husband had been previously deported

from the United States after being implicated in a similar case of violence against women.

Sexual Harassment: The law prohibits sexual harassment and establishes sentences of five to eight years' imprisonment. Courts may impose fines in addition in cases in which the perpetrator held a position of trust or authority over the victim. The law mandates that employers take measures against sexual harassment and create and implement preventive programs. The government, however, did not enforce sexual harassment laws effectively.

On April 4, following an abbreviated trial, the Third Sentence Tribunal of San Salvador sentenced a PNC chief inspector to three years in prison following his conviction for sexual assault, sexual harassment, and threats of violence against three female subordinates.

Coercion in Population Control: There were no reports of coerced abortion or involuntary sterilization.

Discrimination: The constitution grants women and men the same legal rights, but women did not receive equal pay or employment opportunities. The law establishes sentences of one to three years in prison for public officials who deny a person's civil rights based on gender and six months to two years for employers who discriminate against women in the workplace, but employees generally did not report such violations due to fear of employer reprisals.

On March 6, the Permanent Working Group for Labor, Justice, and Labor Unions reported that more than 100 women had been arbitrarily fired from different municipal governments, including in San Salvador, Santa Ana, Ciudad Delgado, and Ilopango. On August 28, ORMUSA reported that of 1,090 women who participated in its survey, 18 percent claimed to have been victims of discrimination in their workplace, of whom 8 percent specifically identified their gender as the basis for the discrimination.

**Children**

Birth Registration: Children derive citizenship by birth within the country and from their parents. The law requires parents to register a child within 15 days of birth or pay a $2.85 fine. Failure to register can result in denial of school enrollment.

Child Abuse: Child abuse remained a serious and widespread problem. The law gives children the right to petition the government without parental consent. Penalties for breaking the law include losing custody of the child and three to 26 years' imprisonment, depending on the nature of the abuse. As of August the PNC had received 2,081 child abuse complaints.

On February 19, Judge Jaime Escalante was charged with the crime of sexual aggression against a 10-year-old female child. On March 4, the Legislative Assembly voted to remove his immunity from criminal prosecution. On October 31, the Criminal Chamber determined that Escalante's actions did not constitute a felony but rather a misdemeanor, because the encounter happened quickly and in a crowded place. The attorney general appealed the decision and asked the Criminal Chamber to overturn the ruling, admit all evidence, and send Escalante to trial.

According to a 2016 National Health Survey, more than half of households punished their children physically and psychologically.

Early and Forced Marriage: The legal minimum age for marriage is 18. The law bans child marriage to prevent child abusers from using legal technicalities to avoid imprisonment by marrying their underage victims. The law allows for marriage of a minor in cases of pregnancy.

Sexual Exploitation of Children: Child sex trafficking is prohibited by law. Prison sentences for convicted traffickers stipulate imprisonment from six to 10 years.

The minimum age for consensual sex is 18. The law classifies statutory rape as sexual relations with anyone younger than 18 and includes penalties of four to 13 years' imprisonment for violations.

The law prohibits paying anyone younger than 18 for sexual services. The law prohibits participating in, facilitating, or purchasing materials containing child pornography and provides for prison sentences of up to 16 years for violations. Despite these provisions, sexual exploitation of children remained a problem.

International Child Abductions: The country is a party to the 1980 Hague Convention on the Civil Aspects of International Child Abduction. See the Department of State's *Annual Report on International Parental Child Abduction* at https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/for-providers/legal-reports-and-data/reported-cases.html.

## Anti-Semitism

The Jewish community totaled approximately 150 persons. There were no reports of anti-Semitic acts.

## Trafficking in Persons

See the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## Persons with Disabilities

The law prohibits discrimination against persons with physical, sensory, intellectual, and mental disabilities. The National Council for Comprehensive Attention to Persons with Disability (CONAIPD), composed of representatives from multiple government entities, is the governmental agency responsible for protecting disability rights, but it lacks enforcement power. According to CONAIPD, the government did not effectively enforce legal requirements for access to buildings, information, and communications for persons with disabilities. Few access ramps or provisions for the mobility of persons with disabilities existed.

According to CONAIPD, there is no mechanism to verify compliance with the law requiring businesses and nongovernment agencies to hire one person with disabilities for every 25 hires. CONAIPD reported employers frequently fired persons who acquired disabilities and would not consider persons with disabilities for work for which they qualified. Further, some academic institutions would not accept children with disabilities.

No formal system existed for filing a discrimination complaint involving a disability with the government.

## Indigenous People

Indigenous communities reported they faced racial discrimination and economic disadvantage. According to community leaders, gangs pushed out of urban centers by police mounted incursions into and appropriated indigenous land. They also reported gang members threatened their children for crossing gang territorial lines artificially drawn across ancestral indigenous land, forcing some children to drop out of school or leave home.

According to the 2007 census (the most recent), there were 60 indigenous groups, making up 0.4 percent of citizens, mainly from the Nahua-Pipl, Lencas, Cacaopera (Kakwira), and Maya Chorti groups. A 2014 constitutional amendment recognizes the rights of indigenous peoples to maintain their cultural and ethnic identity. The law, however, does not include the right to be consulted regarding development and other projects envisioned on indigenous land, nor does it provide indigenous peoples rights to share in revenue from exploitation of natural resources on historically indigenous lands. The government did not demarcate any lands as belonging to indigenous communities. Because few indigenous individuals possessed title to land, opportunities for bank loans and other forms of credit remained limited.

The law provides for the preservation of languages and archeological sites. During the year the municipalities of Cacaopera and Yucuaiquin, in the eastern part of the country, approved special laws to recognize their indigenous cultural heritage.

**Acts of Violence, Discrimination, and Other Societal Abuses Based on Sexual Orientation and Gender Identity**

The law prohibits discrimination based on sexual orientation or gender identity, which also applies to discrimination in housing, employment, nationality, and access to government services. Gender identity and sexual orientation are included in the criminal code provisions covering hate crimes, along with race and political affiliation. NGOs reported that public officials, including police, engaged in violence and discrimination against sexual minorities. Persons from the LGBTI community stated that the PNC and the Attorney General's Office harassed transgender and gay individuals when they reported cases of violence against LGBTI persons, including by conducting unnecessary and invasive strip searches.

On January 31, a transsexual woman, Camila Diaz Cordova, identified in her national identification card as Nelson Arquimides Diaz Cordova, was allegedly killed by three police officers with the National Civil Police's 911 System in San Salvador. In July, at an initial hearing in the Fifth Peace Court, the Prosecutor's Office accused the officers of committing a "hate crime."

As of August 22, the PDDH reported four accusations by the LGBTI community of homicides, one complaint of torture, four complaints of violations to human integrity, one complaint each of physical abuse and harassment. The PDDH was unable to determine whether the incidents were bias motivated. Activists also

reported receiving death threats on social media. Police generally failed to act on these reports. The PDDH reported it was processing a case against security personnel at a prison in Sensuntepeque, Cabanas Department, for deprivation of liberty and inhuman treatment of transsexual prisoners based on their sexual orientation and gender identity.

Media reported killings of LGBTI community members in October and November. On October 27, Anahy Rivas, a 27-year-old transwoman, was killed after being assaulted and dragged behind a car. Jade Diaz, a transwoman who disappeared on November 6, was assaulted prior to her killing. Her body was found submerged in a river. On November 16, Manuel Pineda, known as Victoria, was beaten to death and her body left naked in the street in Francisco Menendez, Ahuachapan Department. Uncensored photographs of the body were circulated on social media.

In 2017 the Supreme Electoral Tribunal announced guidelines stating individuals cannot be denied the right to vote because the photograph on their identification card does not match their physical appearance. Nonetheless, media documented cases of transgender persons who faced harassment while voting in the presidential elections because their name and photograph on their national identification did not match their expression of gender identity.

### HIV and AIDS Social Stigma

Although the law prohibits discrimination on the basis of HIV/AIDS status, Entre Amigos, an LGBTI NGO, reported HIV-related discrimination was widespread. As of August 31, the PDDH reported one alleged case of discrimination against persons with HIV or AIDS that purportedly took place at a public health union in La Union Department.

## Section 7. Worker Rights

### a. Freedom of Association and the Right to Collective Bargaining

The law provides for the right of most workers to form and join independent unions, to strike, and to bargain collectively. The law also prohibits antiunion discrimination, although it does not require reinstatement of workers fired for union activity. Military personnel, national police, judges, and high-level public officers may not form or join unions. Workers who are representatives of the employer or in "positions of trust" also may not serve on a union's board of directors. The law does not define the term "positions of trust." The labor code

does not cover public-sector workers and municipal workers, whose wages and terms of employment are regulated by the 1961 civil service law. Only citizens may serve on unions' executive committees. The labor code also bars individuals from holding membership in more than one trade union.

Unions must meet complex requirements to register, including having a minimum membership of 35 individuals. If the Ministry of Labor denies registration, the law prohibits any attempt to organize for up to six months following the denial. Collective bargaining is obligatory only if the union represents the majority of workers.

The law contains cumbersome and complex procedures for conducting a legal strike. The law does not recognize the right to strike for public and municipal employees or for workers in essential services. The law does not specify which services meet this definition, and courts therefore apply this provision on a case-by-case basis. The law requires that 30 percent of all workers in an enterprise must support a strike for it to be legal and that 51 percent must support the strike before all workers are bound by the decision to strike. Unions may strike only to obtain or modify a collective bargaining agreement or to protect the common professional interests of the workers. They must also engage in negotiation, mediation, and arbitration processes before striking, although many unions often skipped or expedited these steps. The law prohibits workers from appealing a government decision declaring a strike illegal.

In lieu of requiring employers to reinstate illegally dismissed workers, the law requires employers to pay the workers the equivalent of 30 days of their basic salary for each year of service. The law specifies 30 reasons for which an employer can terminate a worker's contract without triggering any additional responsibilities, including consistent negligence, leaking private company information, or committing immoral acts while on duty. An employer may also legally suspend workers, including for reasons of economic downturn or market conditions. According to the Ministry of Labor, through September 30, 7,495 persons had filed complaints of dismissal without justification. In addition, the Ministry of Labor reported that from January 1 through June, it received 15 complaints of failure to pay wages owed, one complaint of an employer's improper retention of social security contributions, and eight complaints of a failure to pay overtime.

The government did not effectively enforce the laws on freedom of association and the right to collective bargaining. Penalties remained insufficient to deter

violations. Judicial procedures were subject to lengthy delays and appeals. According to union representatives, the government inconsistently enforced labor rights for public workers, maquiladora/textile workers, food manufacturing workers, subcontracted workers in the construction industry, security guards, informal-sector workers, and migrant workers. Between January 1 and June 3, the ministry received 36 claims of violations for labor discrimination.

As of August 15, the inspector general of the Ministry of Labor had reported 124 alleged violations of the right of freedom of association, including 72 such violations against members of labor unions and 39 resulting complaints of discrimination.

Unions functioned independently from the government and political parties, although many generally were aligned with the traditional political parties of ARENA and the FMLN. Workers at times engaged in strikes regardless of whether the strikes met legal requirements. On June 10, the International Labor Organization Conference Committee on the Application of Standards discussed, for the fifth consecutive year, the nonfunctioning of the country's tripartite Higher Labor Council. In September the Ministry of Labor reactivated the council.

**b. Prohibition of Forced or Compulsory Labor**

The law prohibits all forms of forced or compulsory labor. The government generally did not effectively enforce such laws. Penalties were not sufficient to deter violations. The lack of sufficient resources for inspectors reduced their ability to enforce the law fully. The Ministry of Labor did not report on incidents of forced labor. Gangs subjected children to forced labor in illicit activities, including selling or transporting drugs (see section 7.c.).

Also see the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

**c. Prohibition of Child Labor and Minimum Age for Employment**

The law prohibits the employment of children younger than 14 but does not prohibit all of the worst forms of child labor. The law allows children between the ages of 14 and 18 to engage in light work if it does not damage the child's health or development or interfere with compulsory education. The law prohibits children younger than 16 from working more than six hours per day and 34 hours per week; those younger than 18 are prohibited from working at night or in

occupations considered hazardous. The Ministry of Labor maintained a list of types of work considered hazardous, which included repairing heavy machinery, mining, handling weapons, fishing and harvesting mollusks, and working at heights above five feet while doing construction, erecting antennas, or working on billboards. Children age 16 and older may engage in light work on coffee and sugar plantations and in the fishing industry so long as it does not harm their health or interfere with their education.

Child labor remained a serious and widespread problem. According to the Ministry of Labor, the percentage of children and adolescents between the ages of five and 17 who were working decreased from 8.4 percent in 2017 to 6.8 percent in 2018.

The Ministry of Labor is responsible for enforcing child labor laws but did not effectively enforce the law. Penalties for violations of child labor laws were insufficient to act as a deterrent in the informal sector. Labor inspectors focused almost exclusively on the formal sector. According to the ministry, from January through August, officials conducted 669 child labor inspections in the formal sector that discovered 10 minors working, all of whom were authorized to work. By comparison, as of September 2017, according to the ministry, there were 140,700 children and adolescents working, of whom 91,257 were employed in "dangerous work" in the informal sector. No information on any investigations or prosecutions by the government was available. The ministry did not effectively enforce child labor laws in the informal sector, which represented almost 75 percent of the economy.

There were reports of children younger than 16 engaging in the worst forms of child labor, including in coffee cultivation, fishing, shellfish collection, and fireworks production. Children were subjected to other worst forms of child labor, including commercial sexual exploitation (see section 6, Children) and recruitment into illegal gangs to perform illicit activities in the arms and narcotics trades, including committing homicide. Children were engaged in child labor, including domestic work, the production of cereal grains and baked goods, cattle raising, and sales. Orphans and children from poor families frequently worked as street vendors and general laborers in small businesses despite the presence of law enforcement officials.

Also see the Department of Labor's *Findings on the Worst Forms of Child Labor* at https://www.dol.gov/agencies/ilab/resources/reports/child-labor/findings.

### d. Discrimination with Respect to Employment and Occupation

The constitution, labor laws, and state regulations prohibit discrimination on the basis of race, color, sex, religion, political opinion, national origin (except in cases determined to protect local workers), social origin, gender, disability, language, or HIV-positive status. The government did not effectively enforce those laws and regulations. Penalties were insufficient to deter violations. Sexual orientation and gender identity are not included in the constitution or labor law, although the PDDH and the Ministry of Labor actively sought to protect workers against discrimination on those grounds.

Discrimination in employment and occupation occurred with respect to gender, disability, and sexual orientation or gender identity (see sections 6 and 7.e.). According to the Ministry of Labor, migrant workers have the same rights as citizens, but the ministry did not enforce them.

As of June the Ministry of Labor had received one complaint of disability discrimination and six complaints of gender-based discrimination. In August the Legislative Assembly approved an "equal job, equal pay" reform to the labor code that provides for equal pay for women and persons with disabilities who perform the same duties as others. The law, reformed in 2018, prohibits the dismissal of women returning from maternity leave for up to six months.

On February 14, the Legislative Assembly reformed the labor code in order to grant employment stability to persons suffering from chronic diseases that require frequent medical checks and rehabilitation. The reform applies to women who are pregnant and ensures job security during pregnancy. The guarantee of job stability starts from the issuance of the corresponding medical diagnosis and is extended for three months after the respective medical treatment has ended, except for the causes established in Article 50 of the labor code, which include serious immoral acts, breaches of confidentiality and recurring negligence.

### e. Acceptable Conditions of Work

There is no national minimum wage; the minimum wage is determined by sector. In 2018 a minimum wage increase went into effect that included increases of nearly 40 percent for apparel assembly workers and more than 100 percent for workers in coffee and sugar harvesting. All of these wage rates were above poverty income levels. The government proved more effective in enforcing the minimum wage law in the formal sector than in the informal sector. As of June the

Ministry of Labor had registered three complaints of noncompliance with the minimum wage.

The law sets a maximum normal workweek of 44 hours, limited to no more than six days and to no more than eight hours per day, but allows overtime, which is to be paid at a rate of double the usual hourly wage. The law mandates that full-time employees receive pay for an eight-hour day of rest in addition to the 44-hour normal workweek. The law provides that employers must pay double time for work on designated annual holidays, a Christmas bonus based on the time of service of the employee, and 15 days of paid annual leave. The law prohibits compulsory overtime. The law states that domestic employees, such as maids and gardeners, are obligated to work on holidays if their employer makes this request, but they are entitled to double pay in these instances. The government did not adequately enforce these laws.

The Ministry of Labor is responsible for setting and enforcing workplace safety standards, and the law establishes a tripartite committee to review the standards. The law requires employers to take steps to meet health and safety requirements in the workplace, including providing proper equipment and training and a violence-free environment. Employers who violate most labor laws could be penalized, but penalties were not sufficient to deter violations; some companies reportedly found it more cost effective to pay the fines than to comply with the law. The law promotes occupational safety awareness, training, and worker participation in occupational health and safety matters. While the laws were appropriate for the main industries, the government did not effectively enforce them.

Unions reported the ministry failed to enforce the law for subcontracted workers hired for public reconstruction contracts. The government provided its inspectors updated training in both occupational safety and labor standards. As of June the ministry conducted 13,315 inspections, in addition to 3,857 inspections to follow up with prior investigations, and had levied $777,000 in fines against businesses.

The number of inspectors was insufficient to deter violations and allegations of corruption among labor inspectors continued. The Labor Ministry received complaints regarding failure to pay overtime, minimum wage violations, unpaid salaries, and cases of employers illegally withholding benefits (including social security and pension funds) from workers.

Reports of overtime and wage violations existed in several sectors. According to the Labor Ministry, employers in the agricultural sector did not generally grant

annual bonuses, vacation days, or days of rest. Women in domestic service and the industrial manufacturing for export industry, particularly in the export-processing zones, faced exploitation, mistreatment, verbal abuse, threats, sexual harassment, and generally poor work conditions. Workers in the construction industry and domestic service reportedly experienced violations of wage, hour, and safety laws. According to ORMUSA, apparel companies violated women's rights through occupational health violations and unpaid overtime. There were reports of occupational safety and health violations in other sectors, including reports that a very large percentage of buildings did not meet safety standards set by the General Law on Risk Protection. The government proved ineffective in pursuing such violations.

In some cases the country's high crime rate undermined acceptable conditions of work as well as workers' psychological and physical health. Some workers, such as bus drivers, bill collectors, messengers, and teachers in high-risk areas, reported being subject to extortion and death threats by gang members.

Through September 30, the Ministry of Labor reported 6,771 workplace accidents. These included 3,069 accidents in the services sector, 2,090 in the industrial sector, 785 in the commercial sector, 605 in the public sector, and 222 in the agricultural sector. The ministry did not report any deaths from workplace accidents.

Workers may legally remove themselves from situations that endanger health or safety without jeopardy to their employment, but authorities lacked the ability to protect employees in this situation effectively.

Case No. 25-cv-1774-JEB

# Exhibit 6

# EL SALVADOR 2018 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

El Salvador is a constitutional multiparty republic. Municipal and legislative elections held in March were generally free and fair, according to international observers, although slow tabulation contributed to reporting delays. Free and fair presidential elections took place in 2014.

Civilian authorities failed at times to maintain effective control over security forces.

Human rights issues included allegations of unlawful killings of suspected gang members and others by security forces; forced disappearances by military personnel; torture by security forces; harsh and life-threatening prison conditions; arbitrary arrest and detention; lack of government respect for judicial independence; widespread government corruption; violence against women and girls that was infrequently addressed by the authorities, as well as security force violence against lesbian, gay, bisexual, transgender, and intersex individuals; and children engaged in the worst forms of child labor.

Impunity persisted despite government steps to dismiss and prosecute some in the security forces, executive branch, and justice system who committed abuses.

Organized criminal elements, including local and transnational gangs and narcotics traffickers, were significant perpetrators of violent crimes and committed acts of murder, extortion, kidnapping, human trafficking, intimidation, and other threats and violence directed against police, judicial authorities, the business community, journalists, women, and members of vulnerable populations.

## Section 1. Respect for the Integrity of the Person, Including Freedom from:

### a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were no reports that the government or its agents committed politically motivated killings. There were reports, however, of security force involvement in extrajudicial killings of suspected gang members. As of July 31, the Office of the Human Rights Ombudsman (PDDH) announced it was investigating 22 complaints

against police officers, prison guards, and personnel of the Attorney General's Office for such killings.

The case continued against nine police officers charged in September 2017 with aggravated homicide and concealment stemming from the killing of five persons. Three of the accused were members of the now decommissioned Police Reaction Group (GRP), and police claimed at the time of the events that the deaths were justified homicides.

On March 2, the Attorney General's Office appealed the September 2017 acquittal of five police officers for aggravated homicide charges in the 2015 killing of a man at a farm in San Blas, San Jose Villanueva. The judge had ruled that the prosecutors failed to prove which of the five officers was specifically responsible for firing the fatal shot and likewise failed to prove conspiracy. On May 4, the Fourth Appellate Court of Appeals confirmed it would retry the case.

On February 23, police authorities in coordination with INTERPOL arrested Jaime Ernesto Bonilla Martinez, who lived in Texas, for participating in at least eight homicides as part of an alleged extermination group operating in San Miguel. The group, composed of civilians, some of whom were alleged rival gang members, and retired and active members of the military and police, was purportedly responsible for murder-for-hire and targeted killings of alleged gang members in San Miguel. Funding for the extermination group reportedly came from Salvadoran citizens living abroad.

As of October 25, alleged gang members had killed 21 police officers. On August 21, the Organized Crime Court convicted 61 MS-13 members of homicide, extortion, illicit trafficking, and conspiracy to kill police officers, among other crimes.

**b. Disappearance**

There were reports alleging that members of security and law enforcement were involved in unlawful disappearances. Since March 2017 law enforcement agencies had not released data on disappearances, citing a discrepancy between data collected by police and the Attorney General's Office.

On March 7, the Constitutional Chamber of the Supreme Court ruled that the armed forces were responsible for investigating the disappearance of two 17-year-old boys in Ilopango in 2014. According to the court, seven soldiers detained and

searched them, tied their hands with their shoelaces, and took them to Colonia Santa Maria, which was controlled by a rival gang. The two youths missed school that afternoon and were not seen thereafter. The case was ongoing.

In May 2017 a Sonsonate court convicted five soldiers of forced disappearance committed in 2014 and sentenced them to eight years' imprisonment. Their defense attorneys filed an appeal, and the case remained ongoing. In January the Constitutional Chamber found the military in contempt of their August 2017 order that the Ministry of Defense investigate and report on civilian deaths caused by the military.

On September 1 and in December 2017, the Constitutional Chamber issued two sentences in forced disappearance cases from 1982. The Constitutional Chamber determined that investigations should be carried out on the whereabouts of the victims and underlined the state's responsibility in ensuring an unobstructed investigation. The chamber noted that the Ministry of Defense and the chief of the joint chiefs of staff of the armed forces were uncooperative in the investigation.

As of October the attorney general had opened investigations into 12 instances of forced disappearance during the 1980-92 civil war.

### c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The law prohibits such practices, but there were reports of violations. As of July 31, the PDDH received 18 complaints of torture or cruel or inhuman treatment by the National Civil Police (PNC), the armed forces, and other public officials.

On May 29, a court recommended that colonels Hector Solano Caceres and David Iglesias Montalvo, along with Lieutenant Colonel Ascencio Sermeno face charges for homicide, bribery, and conspiracy for ordering the torture of two men in 2016 in Apaneca. In 2017 six soldiers were convicted in the same case.

### Prison and Detention Center Conditions

Prison and detention center conditions remained harsh and life threatening due to gross overcrowding, unhygienic conditions, and gang activities.

Physical Conditions: Overcrowding remained a serious threat to prisoners' health and welfare. As of June 30, the PDDH reported that think tank Salvadoran

Foundation for Economic and Social Development reported 38,849 inmates were being held in facilities designed for 18,051 inmates.

Convicted inmates and pretrial detainees were sometimes held in the same prison cells.

In June the Salvadoran Institute for Child Development (ISNA) reported 945 juveniles in detention, with 274 of those awaiting trial. Of those, 356 were held on homicide charges, 465 for extortion, 313 for drug-related crimes, and 143 for gang membership. As of July ISNA reported that three minors were killed by gang members while in detention, compared with nine in 2017. ISNA also reported that as of June, seven minors were victims of trafficking in persons, compared with 18 in 2017.

Gangs remained prevalent in prisons. As of September 2017, detention centers held 17,614 current or former gang members, or 46 percent of the prison population. So-called extraordinary measures were designed to interrupt gang communications and coordination between imprisoned leaders and gang members outside the prisons. Smuggling of weapons, drugs, and other contraband such as cell phones and cell phone SIM cards was reduced but remained a problem in the prisons, at times with complicity from prison officials.

Law enforcmement officials credited the extraordinary measures with a 45 percent reduction in homicides. The PDDH and human rights groups faulted the measures for lacking judicial oversight. On August 16, the Legislative Assembly formalized some elements of the extraordinary measures as part of a reformed penitentiary code, which now allows supervised family visits.

In many facilities provisions for sanitation, potable water, ventilation, temperature control, medical care, and lighting were inadequate, according to the PDDH. From August 2017 to May, the General Prison Directorate reported 2,440 cases of inmate malnutrition and the PDDH reported more than 500 cases of severe malnutrition in Izalco and Ciudad Barrios prisons. The PDDH noted that in 2017 a total of 64 inmates died, some of them due to unspecified causes.

In October the PNC reported overcrowding in police holding cells, with 5,500 detainees in cells designed for 1,500 persons. Those in pretrial detention were held alongside sick inmates.

Administration: The PDDH has authority to investigate credible allegations of inhuman conditions. The Constitutional Chamber of the Supreme Court has authority over the protection of constitutional rights. The extraordinary measures granted broad authorities to wardens to order disciplinary actions, to include isolation and withholding family or religious visitations, without judicial oversight. Extraordinary measures ended in August when the Legislative Assembly reformed the penitentiary code.

Independent Monitoring: The government permitted visits by independent human rights observers, nongovernmental organizations (NGOs), and media to low- and medium-security prisons. Inspections of high-security prisons were limited to government officials, the PDDH, and the International Committee of the Red Cross (ICRC). Early in the year, the government reinstated the ICRC's access to all prisons. Church groups; the Institute for Human Rights at the University of Central America; lesbian, gay, bisexual, transgender, and intersex activists; the UN special rapporteur for extrajudicial, summary, or arbitrary executions; and other groups visited prisons during the year. The PDDH reported that from May 2017 to April, it conducted 1,644 unannounced prison inspections.

Improvements: Due to the construction of new prisons completed during the year and redistribution of prisoners, overcrowding declined from 334 percent to 215 percent as of August.

### d. Arbitrary Arrest or Detention

Although the constitution prohibits arbitrary arrest and detention, there were numerous complaints that the PNC and military forces arbitrarily arrested and detained persons. As of July 31, the PDDH received 31 complaints of arbitrary detention, a decrease from 86 complaints received in the same period in 2017. NGOs reported that the PNC arbitrarily arrested and detained groups of persons on suspicion of gang affiliation. According to these NGOs, the accused were ostracized by their communities upon their return.

The law provides for the right of any person to challenge the lawfulness of his or her arrest or detention in court, and the government generally observed this provision.

### Role of the Police and Security Apparatus

The PNC, overseen by the Ministry of Justice and Public Security, is responsible for maintaining public security, and the Ministry of Defense is responsible for maintaining national security. Although the constitution separates public security and military functions, it allows the president to use the armed forces "in exceptional circumstances" to maintain internal peace and public security "when all other measures have been exhausted." The military is responsible for securing international borders and conducting joint patrols with the PNC. In 2016 President Sanchez Ceren renewed the decree authorizing military involvement in police duties, a presidential order in place since 1996.

The military's "Zeus Command" comprised 3,100 soldiers in 10 task forces to support police in providing security. These soldiers were to operate only in support of the PNC and were not authorized to arrest or detain. Three hundred and twenty soldiers in the Volcano Task Force, launched in September 2017 as a temporary expansion of the military's presence in San Salvador, continued to support the city's police and installed checkpoints throughout the city and conducted random searches of public buses.

There were reports of impunity for security force involvement in crime and human rights abuses during the year. The PDDH is authorized to investigate (but not prosecute) human rights abuses and refers all cases involving human rights abuses to the Attorney General's Office. Reports of abuse and police misconduct were most often from residents of the metropolitan area of San Salvador and mostly from men and young persons.

The Police Inspector General reported it received 831 complaints against police and dismissed 155 police officers due to misconduct and took disciplinary action against 555 police officers as of October 23.

On August 2, Deputy Police Director of Specialized Operative Areas Mauricio Arriaza stated that 10 police officers of the Specialized Police Tactical Unit (UTEP) were dismissed due to human rights abuses. UTEP was created on February 14 to replace the Specialized Reaction Force of El Salvador, the Special Operation Group, and the GRP. The GRP was disbanded in February following the disappearance of female GRP member Carla Ayala. As of November 5, the Ministry of Defense had not responded to requests to report the number of soldiers removed from its ranks due to alleged ties to gangs.

As of October 26, authorities reported alleged gang members had killed 22 police officers, three soldiers, and three prison guards.

**Arrest Procedures and Treatment of Detainees**

The constitution requires a written warrant of arrest except in cases where an individual is caught in the act of committing a crime. Authorities apprehended persons with warrants based on evidence and issued by a judge. Police generally informed detainees promptly of charges against them.

The law permits release on bail for detainees who are unlikely to flee or whose release would not impede the investigation of the case. The bail system functioned adequately in most cases. The courts generally enforced a ruling that interrogation without the presence of counsel is coercive and that evidence obtained in such a manner is inadmissible. As a result, PNC authorities typically delayed questioning until a public defender or an attorney arrived. The constitution permits the PNC to hold suspects for 72 hours before presenting them to court. The law allows up to six months for investigation of serious crimes before requiring either a trial or dismissal of the case which may be extended by an appeals court. Many cases continued beyond the legally prescribed period.

Arbitrary Arrest: As of October 23, the PDDH reported 31 complaints of arbitrary detention or illegal detention, compared with 86 from January to August 2017.

Pretrial Detention: Lengthy pretrial detention was a significant problem. As of October, 30 percent of the general prison population was in pretrial detention. Some persons remained in pretrial detention longer than the maximum legal sentences for their alleged crimes. In such circumstances detainees may request a Supreme Court review of their continued detention.

**e. Denial of Fair Public Trial**

Although the constitution provides for an independent judiciary, the government did not always respect judicial independence, and the judiciary was burdened by inefficiency and corruption.

While the government generally respected court orders, some agencies ignored or minimally complied with orders, or sought to influence ongoing investigations. When ordered by the Constitutional Court on June 19 to release military records related to the El Mozote killings and serious civil war crimes, the Ministry of Defense responded it had already done so while denying investigators access to archival facilities at military bases, citing national security concerns. As of July

31, the Legislative Assembly had not complied with a 2015 ruling that it issue regulations to clarify certain sections of the political parties law regarding campaign contributions.

In a February 26 press conference, Minister of Defense David Munguia Payes criticized the attorney general's charges against three military officers after they were acquitted of obstruction of justice in a torture case. On February 27, UN Special Rapporteur on Extrajudicial, Summary, or Arbitrary Executions Agnes Callamard released a statement calling on Payes to respect the independence of the judiciary and reiterating her support for the attorney general. Media experts called Munguia's stagecraft menacing and reminiscent of civil war-era propaganda employed by the military junta.

While implemented to expedite fair trials, virtual trials still involved delays of up to eight months, according to a July 22 newspaper report. Virtual trials often involved group hearings before a judge, with defendants unable to consult with their defense lawyers in real time. The penitentiary code reforms passed in August allow defense lawyers to attend a hearing without the defendant's presence. Human rights groups questioned the constitutionality of the reform.

As of July 31, the PDDH received 31 complaints of lack of a fair, public trial.

Corruption in the judicial system contributed to a high level of impunity, undermining the rule of law and the public's respect for the judiciary. As of August 31, the Supreme Court heard 57 cases against judges due to irregularities, 52 of which remained under review; removed two judges; suspended nine others; and brought formal charges against eight judges. Accusations against judges included collusion with criminal elements and sexual harassment.

In 2016, in response to a petition by victims, a judge issued an order to reopen the investigation into the 1981 El Mozote massacre, in which an estimated 800 persons were killed. The PDDH concluded that the Attorney General's Office lacked initiative in investigating civil war crimes, The PDDH also cited the Attorney General Office's lack of cooperation from the Ministry of Defense and the Office of the President (CAPRES). On August 16, a group of Argentine forensics specialists testified they recovered 282 pieces of evidence determined to be human remains, including 143 skulls, 136 of them belonging to children younger than 12 years old. They also recovered 245 bullet casings corresponding to the type used in automatic weapons used by the armed forces.

Women who were accused of intentionally terminating their pregnancies were charged with aggravated homicide, but a number asserted they had suffered miscarriages, stillbirths and other medical emergencies during childbirth. Legal experts pointed to serious flaws in the forensics collection and interpretation.

In December 2017 Teodora del Carmen Vasquez' conviction on aggravated homicide charges was upheld by the same appeals judges who had earlier sentenced her to 30 years. The Supreme Court commuted her sentence on February 15, opining that the evidence and motive presented by the prosecution in the case was insufficient to support the charges.

During the first nine months of the year, the justice system released five women accused of aggravated homicide of their unborn or newborn children due to lack of evidence. Twenty-five other women remained in custody for infanticide.

**Trial Procedures**

The law provides for the right to a fair and public trial, and an independent judiciary generally enforced this right, although some trial court judges were subject to political and economic influence. By law juries hear only a narrow group of cases, such as environmental complaints. After the jury determines innocence or guilt, a panel of judges decides the sentence.

Defendants have the right to be present in court, question witnesses, and present witnesses and evidence. The constitution further provides for the presumption of innocence, the right to be informed promptly and in detail of charges, the right to a trial without undue delay, protection from self-incrimination, the right to communicate with an attorney of choice, the right to adequate time and facilities to prepare a defense, freedom from coercion, the right to appeal, and government-provided legal counsel for the indigent.

According to press reports, plea deals occurred in approximately 20 percent of cases, with the accused turning state's witness in order to prosecute others. Legal experts pointed to an overreliance on witness testimony in nearly all cases, as opposed to the use of forensics or other scientific evidence. The justice system lacked DNA analysis and other forensics capability. In criminal cases a judge may allow a private plaintiff to participate in trial proceedings (calling and cross-examining witnesses, providing evidence, etc.), assisting the prosecuting attorney in the trial procedure. Defendants have the right to free assistance of an interpreter. Authorities did not always respect these legal rights and protections.

Although a jury's verdict is final, a judge's verdict is subject to appeal. Trials are public unless a judge seals a case.

**Political Prisoners and Detainees**

There were no reports of political prisoners or detainees.

**Civil Judicial Procedures and Remedies**

The law provides for access to the courts, enabling litigants to bring civil lawsuits seeking damages for, as well as cessation of, human rights violations. Domestic court orders generally were enforced. Most attorneys pursued criminal prosecution and later requested civil compensation.

On May 25, the Constitutional Chamber declared unconstitutional Article 49 of the Civil Service Law, ruling that it violated the double jeopardy prohibition because previously established facts were taken as an essential element for a more serious administrative sanction.

**f. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence**

The constitution prohibits such actions; however, a January news report claimed the state intelligence service tracked several journalists and collected compromising information about their private lives. The newspaper submitted photographic and whistleblower evidence to support its claim.

In many neighborhoods armed groups and gangs targeted certain persons; and interfered with privacy, family, and home life. Efforts by authorities to remedy these situations were generally ineffective.

**Section 2. Respect for Civil Liberties, Including:**

**a. Freedom of Expression, Including for the Press**

The constitution provides for freedom of expression, including for the press, and the government generally respected this right. The law permits the executive branch to use the emergency broadcasting service to take over all broadcast and cable networks temporarily to televise political programming.

Press and Media Freedom: There continued to be allegations that the government retaliated against members of the press for criticizing its policies. There were reports the Ministry of Labor conducted arbitrary labor inspections and financial audits of news organizations.

Both the Nationalist Republican Alliance (ARENA) and Farabundo Marti Liberation Front (FMLN) parties steered funding, including public funds, to journalists in exchange for positive coverage. The online news outlet *El Faro* reported during the year that former president Antonio Saca funneled $665,000 (currency is the U.S. dollar) to media contacts in exchange for positive coverage from 2004 until 2009, while former president Mauricio Funes continued the practice of using a secret fund to corrupt journalists from 2009 through 2014.

Violence and Harassment: On May 22, the Salvadoran Journalist Association (APES) reported that former youth secretary Carlos Aleman threatened *El Faro* journalist Gabriel Labrador after he published a report that accused Aleman of benefiting from illegal salary increases during the Saca administration. APES also reported that journalist Milagro Vallecillos received a call asking him where he would like a body disposed after he criticized the police investigation into the killing of journalist Karla Turcios.

In relation to reporting on the March 4 municipal and legislative assembly elections, APES recorded 15 complaints against civil servants, mayors, unions, and gang members. The incidents included three verbal threats, two physical assaults, one property damage claim, and three suspicious incidents. On March 19, online news outlet *Diario 1* journalist Miguel Lemus was physically attacked by members of the San Salvador city employees' union.

Minister of Defense Munguia reportedly visited media offices unannounced and accompanied by armed soldiers.

Censorship or Content Restrictions: Government advertising accounted for a significant portion of press advertising income. According to APES, media practiced self-censorship, especially in reporting on gangs and narcotics trafficking.

Nongovernmental Impact: APES noted journalists reporting on gangs and narcotics trafficking were subject to kidnappings, threats, and intimidation. Observers reported that gangs also charged print media companies to distribute in their communities, costing media outlets as much as 20 percent of their revenues.

### Internet Freedom

The government did not restrict or disrupt access to the internet or censor online content, and there were no credible reports that the government monitored private online communications without appropriate legal authority.

The International Telecommunication Union reported 31 percent of the population used the internet in 2017.

### Academic Freedom and Cultural Events

There were no government restrictions on academic freedom or cultural events.

## b. Freedoms of Peaceful Assembly and Association

The constitution provides for the freedoms of peaceful assembly and association, and the government generally respected these rights.

## c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at www.state.gov/religiousfreedomreport/.

## d. Freedom of Movement

The constitution provides for freedom of internal movement, foreign travel, emigration, and repatriation. The government generally respected these rights, although in many areas the government could not guarantee freedom of movement due to criminal gang activity. As of July 31, the PDDH received two complaints of restrictions from freedom of movement, one against the PNC and the other against a court in Jiquilisco. Both cases involved subjects being detained without charge. The government cooperated with the Office of the UN High Commissioner for Refugees (UNHCR) and other humanitarian organizations in providing protection and some assistance to internally displaced persons, refugees, returning refugees, asylum seekers, stateless persons, and other persons of concern, although this was often difficult in gang-controlled neighborhoods.

In-country Movement: The major gangs controlled their own territory. Gang members did not allow persons living in another gang's controlled area to enter

their territory, even when travelling via public transportation. Gangs forced persons to present government-issued identification cards (containing their addresses) to determine their residence. If gang members discovered that a person lived in a rival gang's territory, that person risked being killed, beaten, or not allowed to enter the territory. Bus companies paid extortion fees to operate within gang territories, often paying numerous fees for the different areas in which they operated. The extortion costs were passed on to customers.

**Internally Displaced Persons (IDPs)**

On July 13, the Constitutional Chamber of the Supreme Court ruled that the government violated the constitution by not recognizing forced displacement or providing sufficient aid to IDPs. The ruling followed several lawsuits brought by victims, including members of the PNC. The court ordered the Legislative Assembly to pass legislation addressing internal displacement and officially recognize internal displacement. The court also called on the government to retake control of gang territories, develop protection protocols for victims, and uphold international standards for protecting victims.

As of July the PDDH reported 69 complaints of forced displacement from January to May. Nearly all of the complaints were from gang-controlled territories, with 51 cases from San Salvador. As of October the government acknowledged that 1.1 percent of the general population was internally displaced. UNHCR estimated there were 280,000 IDPs. UNHCR reported the causes of internal displacement included abuse, extortion, discrimination, and threats.

**Protection of Refugees**

Access to Asylum: The law provides for the granting of asylum or refugee status, including an established system for providing protection to refugees. As of July 31, four petitions had been submitted, with three resulting in denial and one still under consideration.

**Section 3. Freedom to Participate in the Political Process**

The constitution provides citizens the ability to choose their government in free and fair periodic elections held by secret ballot and based on universal and equal suffrage.

**Elections and Political Participation**

Recent Elections: The most recent municipal and legislative elections occurred on March 4, with the final election results released by the Supreme Electoral Tribunal on March 20 and April 4, respectively. The election reports published by the Organization of American States and the EU electoral mission noted that the elections generally met international standards.

While the law prohibits public officials from campaigning in elections, this provision lacked consistent enforcement.

Participation of Women and Minorities: No laws limit participation of women or members of minorities in the political process, and they did participate.

**Section 4. Corruption and Lack of Transparency in Government**

The law provides criminal penalties for corruption by officials. While the Supreme Court investigated corruption in the executive and judicial branches, referring cases to the Attorney General's Office for possible criminal indictment, impunity remained endemic, with courts issuing inconsistent rulings and failing to address secret discretionary accounts within the government, for example in CAPRES.

Corruption: On September 12, a judge sentenced former president Antonio Saca to 10 years in prison. He originally faced up to 30 years in prison before seeking a plea deal. As part of his plea agreement, Saca detailed how he used a network of public officials and advisers to launder money into his ARENA political party, banks, media outlets, publicity companies, fronts, and other activities. Saca testified that weak institutions such as the Court of Accounts were ineffectual in conducting audits, with transparency mechanisms failing to detect fraud. While Saca's defense offered to return $15 million, the court found him fully liable and ordered him to repay $260 million and surrender his bank accounts and six companies managing 86 radio stations to the asset forfeiture program.

The attorney general investigated corruption pertaining to a discretionary fund within CAPRES in existence for more than 25 years and used by six presidents since 1989. It was originally created to provide resources for the national intelligence budget and CAPRES. The funds, totaling more than one billion dollars since its inception, had never been audited by the Court of Accounts. Both former presidents Saca and Funes were accused of embezzling more than $650 million from public funds. President Sanchez Ceren's discretionary account was

reportedly $147 million, while former presidents Saca and Funes controlled $301 million and $351, million respectively.

On June 19, the Attorney General's Office initiated an asset forfeiture claim against 24 properties owned by Funes, cabinet members, public officers, and his relatives. Properties included sugarcane plantations, beach houses, and homes.

As of July 31, the Ethics Tribunal reported it had received 190 complaints against 273 public officials. The tribunal sanctioned 20 public officials and forwarded six cases to the attorney general. The attorney general issued 28 arrest warrants on June 6, targeting individuals linked to more than $300 million allegedly embezzled by former president Funes from 2009 through 2014. Despite Constitutional Chamber restrictions on transferring funds without legislative approval, Funes allegedly had misdirected funding for personal gain since 2010. In July the attorney general accused Funes of using $215,000 in public funds to acquire 91 military-grade weapons through the Ministry of Defense for his personal use.

Financial Disclosure: The illicit enrichment law requires appointed and elected officials to declare their assets to the Probity Section of the Supreme Court. The law establishes fines for noncompliance that range from $11 to $571. The declarations were not available to the public unless requested by petition. In 2016 the Supreme Court established three criteria for selecting investigable cases: the age of the case (i.e., proximity to the statute of limitations), relevance of the position, and seriousness and notoriety of the alleged illicit enrichment.

**Section 5. Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Abuses of Human Rights**

A variety of domestic and international human rights groups generally operated without government restriction, investigating and publishing their findings on human rights cases. Although government officials generally were cooperative and responsive to these groups, officials expressed reluctance to discuss certain issues, such as extrajudicial killings and IDPs, with the PDDH.

Government Human Rights Bodies: The principal human rights investigative and monitoring body was the autonomous PDDH, whose head is nominated by the Legislative Assembly for a three-year term. The PDDH regularly issued advisory opinions, reports, and press releases on prominent human rights cases. The PDDH generally enjoyed government cooperation and was considered generally effective except on problems relating to criminal groups and gangs.

The PDDH maintained a constructive dialogue with CAPRES. The government publicly acknowledged receipt of reports, although in some cases it did not take action on recommendations, which are nonbinding. The PDDH faced threats, such as two robberies at its headquarters specifically targeting computers containing personally identifiable information.

## Section 6. Discrimination, Societal Abuses, and Trafficking in Persons

### Women

Rape and Domestic Violence: The law criminalizes rape of men or women, and the criminal code's definition of rape may apply to spousal rape, at the judge's discretion. The law requires the Attorney General's Office to prosecute rape cases whether or not the victim presses charges, and the law does not permit the victim to withdraw the criminal charge. The penalty for rape is generally imprisonment for six to 10 years. Laws against rape were not effectively enforced.

The law prohibits domestic violence and generally provides for sentences ranging from one to three years in prison, although some forms of domestic violence carry higher penalties. The law also permits restraining orders against offenders. Laws against domestic violence remained poorly enforced, and violence against women, including domestic violence, remained a widespread and serious problem. On July 31, the Salvadoran Organization of Women for Peace (ORMUSA) reported that in 2016 and 2017, only 5 percent of the 6,326 reported crimes against women went to trial. On July 4, police arrested a police commissioner for violating the terms of a restraining order protecting his spouse.

According to the World Health Organization, the rate of cases involving violence against women was 5,999 per 100,000 inhabitants and that 574 women were killed in 2015, 524 in 2016, and 469 in 2017.

Sexual Harassment: The law prohibits sexual harassment and provides imprisonment for five to eight years. Courts may impose fines in addition where the perpetrator maintains a position of trust or authority over the victim. The law mandates that employers take measures against sexual harassment and create and implement preventive programs. The government, however, did not enforce sexual harassment laws effectively.

On September 24, media reported the sole female member of an elite police unit was reassigned to a high threat precinct in retaliation for taking gender-discrimination claims to internal affairs inspectors. She said her uniforms were discarded, her sleeping quarters moved, and a colleague threatened to kill her.

Coercion in Population Control: There were no reports of coerced abortion or involuntary sterilization. (For more information on maternal mortality and availability of contraception, see Appendix C.)

Discrimination: The constitution grants women and men the same legal rights, but women did not enjoy equal pay or employment opportunities. The law establishes sentences of one to three years in prison for public officials who deny a person's civil rights based on gender and six months to two years for employers who discriminate against women in the workplace, but employees generally did not report such violations due to fear of employer reprisals.

On September 16, a labor union reported that a justice of the peace in Las Vueltas Chalatenango refused to promote a female clerk because she preferred a man have the position.

**Children**

Birth Registration: Children derive citizenship by birth within the country and from their parents. The law requires parents to register a child within 15 days of birth or pay a $2.85 fine. Failure to register resulted in denial of school enrollment.

Education: Education is free, universal, compulsory through the ninth grade, and nominally free through high school. Rural areas, however, frequently did not provide required education to all eligible students due to a lack of resources and because rural parents often withdrew their children from school by the sixth grade, requiring them to work.

Child Abuse: Child abuse remained a serious and widespread problem. The law gives children the right to petition the government without parental consent. Penalties for breaking the law include the child being taken into protective custody and three to 26 years' imprisonment, depending on the nature of the abuse.

On November 15, police arrested a woman in Juayua, Sonsonate, after she beat an 11-year-old child with a stick for losing a cell phone accessory. According to a

2016 National Health Survey, more than half of households punished their children physically and psychologically.

Early and Forced Marriage: The legal minimum age for marriage is 18. The law bans child marriage to prevent child abusers from using legal technicalities to avoid imprisonment by marrying their victims.

Sexual Exploitation of Children: Child sex trafficking is prohibited by law. Prison sentences for convicted traffickers stipulate imprisonment from six to 10 years. The minimum age for consensual sex is 18. The law classifies statutory rape as sexual relations with anyone younger than age 18 and includes penalties of four to 13 years' imprisonment for violations.

The law prohibits paying anyone younger than age 18 for sexual services. The law prohibits participating in, facilitating, or purchasing materials containing child pornography and provides for prison sentences of up to 16 years for violations. Despite these provisions, sexual exploitation of children remained a problem.

International Child Abductions: The country is a party to the 1980 Hague Convention on the Civil Aspects of International Child Abduction. See the Department of State's *Annual Report on International Parental Child Abduction* at https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/for-providers/legal-reports-and-data.html.

**Anti-Semitism**

The Jewish community totaled approximately 150 persons. There were no reports of anti-Semitic acts.

**Trafficking in Persons**

See the Department of State's *Trafficking in Persons Report* at www.state.gov/j/tip/rls/tiprpt/.

**Persons with Disabilities**

The law prohibits discrimination against persons with physical, sensory, intellectual, and mental disabilities. The National Council for Comprehensive Attention to Persons with Disability (CONAIPD), composed of representatives from multiple government entities, is the governmental agency responsible for

protecting disability rights, but lacks enforcement power. According to CONAIPD, the government did not effectively enforce legal requirements for access to buildings, information, and communications for persons with disabilities. Few access ramps or provisions for the mobility of persons with disabilities existed.

According to CONAIPD, there is no mechanism to verify compliance with the law requiring businesses and nongovernment agencies to hire one person with disabilities for every 25 hires. CONAIPD reported employers frequently fired persons who acquired disabilities and would not consider persons with disabilities for work for which they qualified. Further, some academic institutions would not accept children with disabilities.

No formal system existed for filing a discrimination complaint involving a disability with the government.

**Indigenous People**

Indigenous communities reported they faced racial discrimination and economic disadvantage. According to community leaders, gangs pushed out of urban centers by police mounted incursions and appropriated indigenous land. They also reported gang members threatened their children for crossing gang territorial lines artificially drawn across ancestral indigenous land, forcing some children to drop out of school or leave home.

According to the 2007 census, the most recent for which this data was available, there were 60 indigenous groups, and 0.4 percent of citizens identified as indigenous, mainly from the Nahua-Pipl, Lencas, Cacaopera (Kakwira) and Maya Chorti groups. A 2014 constitutional amendment recognizes the rights of indigenous people to maintain their cultural and ethnic identitiy, but no laws provide indigenous people rights to share in revenue from exploitation of natural resources on historically indigenous lands. The government did not demarcate any lands as belonging to indigenous communities. Because few possessed title to land, opportunities for bank loans and other forms of credit remained limited.

While the law provides for the preservation of languages and archeological sites, it does not include the right to be consulted regarding development and other projects envisioned on their land.

**Acts of Violence, Discrimination, and Other Societal Abuses Based on Sexual Orientation and Gender Identity**

The law prohibits discrimination based on sexual orientation or gender identity, which also applies to discrimination in housing, employment, nationality, and access to government services. Gender identity and sexual orientation are included in the criminal code provisions covering hate crimes, along with race and political affiliation. NGOs reported that public officials, including police, engaged in violence and discrimination against sexual minorities. Persons from the lesbian, gay, bisexual, transgender, and intersex (LGBTI) community stated that the PNC, and the Attorney General's Office harassed transgender and gay individuals when they reported cases of violence against LGBTI persons, including by conducting strip searches.

As of July 31, the PDDH reported eight accusations made by the LGBTI community of five homicides, one unauthorized search, and one harassment complaint. The PDDH was unable to determine whether the incidents were bias-motivated. Activists also reported receiving death threats via social media; police generally failed to take action on these reports.

On April 16, the Ministry of Security and Justice led a formal signing ceremony for the Institutional Policy for the Protection of the LGBTI Community. A product of two years of roundtable dialogues, the policy instructs the security and migration sectors of government to consult with the Office of Secretariat for Social Inclusion to ensure LGBTI persons are treated in accordance with international standards in their interactions with the state. In November 2017 the Supreme Electoral Tribunal announced guidelines stating individuals cannot be denied the right to vote because the photograph on their identification card does not match their physical appearance.

**HIV and AIDS Social Stigma**

Although the law prohibits discrimination on the basis of HIV/AIDS status, Entre Amigos, an LGBTI NGO, reported discrimination due to HIV was widespread. As of July 31, the PDDH reported four cases of discrimination against persons with HIV or AIDS. This included use of pejorative language against an inmate by a prosecutor, denial of university access, lack of medical confidentiality in the prison system of an HIV-positive diagnosis and discriminatory treatment from other inmates, and discrimination by public-health caregivers to a child and her mother.

## Section 7. Worker Rights

### a. Freedom of Association and the Right to Collective Bargaining

The law provides the right of most workers to form and join independent unions, to strike, and to bargain collectively. The law also prohibits antiunion discrimination, although it does not require reinstatement of workers fired for union activity. Military personnel, national police, judges, and high-level public officers may not form or join unions. Workers who are representatives of the employer or in "positions of trust" also may not serve on the union's board of directors. The law does not define the term "positions of trust." The labor code does not cover public-sector workers and municipal workers, whose wages and terms of employment are regulated by the 1961 civil service law.

Unions must meet complex requirements to register, including having a minimum membership of 35. If the Ministry of Labor denies registration, the law prohibits any attempt to organize for up to six months following the denial. Collective bargaining is obligatory only if the union represents the majority of workers. Labor unions accused the ministry of trying to block the registration of unions not aligned with the government's party. Consequently, unions were unable to vote for membership in tripartite bodies, consisting of members of government, labor, and business.

The law contains cumbersome and complex procedures for conducting a legal strike. The law does not recognize the right to strike for public and municipal employees or for workers in essential services. The law does not specify which services meet this definition, and courts therefore apply this provision on a case-by-case basis. The law requires that 30 percent of all workers in an enterprise must support a strike for it to be legal and that 51 percent must support the strike before all workers are bound by the decision to strike. Unions may strike only to obtain or modify a collective bargaining agreement or to protect the common professional interests of the workers. They must also engage in negotiation, mediation, and arbitration processes before striking, although many groups often skipped or went through these steps quickly. The law prohibits workers from appealing a government decision declaring a strike illegal.

In lieu of requiring employers to reinstate illegally dismissed workers, the law requires employers to pay the workers the equivalent of 30 days of their basic salary for each year of service. The law specifies 30 reasons for which an employer can terminate a worker's contract without triggering any additional

responsibilities, including consistent negligence, leaking private company information, or committing immoral acts while on duty. An employer may also legally suspend workers, including for reasons of economic downturn or market conditions. As of July the Ministry of Labor had received 1,778 complaints of violations of the labor code, including 565 instances of failure to pay the minimum wage.

The government did not effectively enforce the laws on freedom of association and the right to collective bargaining. Resources to conduct inspections remained inadequate, and remedies remained ineffective. Penalties for employers who fire workers with the goal or effect of ensuring the union no longer met the minimum number of members ranged from 10 to 50 times the monthly minimum salary. These were paid to the government's general fund, not to the fired employee. The penalty for employers who interfere with the right to strike was between $3,000 and $15,000. Such penalties remained insufficient to deter violations. The Ministry of Labor acknowledged it lacked sufficient resources, such as vehicles, fuel, and computers, to enforce the law fully. Judicial procedures were subject to lengthy delays and appeals. According to union representatives, the government inconsistently enforced labor rights for public workers, maquila/textile workers, food manufacturing workers, subcontracted workers in the construction industry, security guards, informal-sector workers, and migrant workers. As of July the ministry had received 15 claims of violations for labor discrimination.

On November 10, a court ordered a mayor in Conchagua to cease age discrimination of a group female employees. The employees filed a complaint with the Ministry of Labor that they were subjected to harassment by the mayor and his subordinates because of their age and his desire to replace them.

Unions functioned independently from the government and political parties, although many generally were aligned with the ARENA, FMLN, or other political parties. According to union leaders, the administration blacklisted public-sector employees who they believed were close with the opposition. Workers at times engaged in strikes regardless of whether the strikes met legal requirements. The International Labor Organization (ILO) Conference Committee on the Application of Standards discussed the country for the fourth year in a row over the nonfunctioning of the tripartite Higher Labor Council.

**b. Prohibition of Forced or Compulsory Labor**

The law prohibits all forms of forced or compulsory labor. The government generally did not effectively enforce such laws. The labor code's default fine of $57 per violation applied. This penalty was generally not sufficient to deter violations. The lack of sufficient resources for inspectors reduced their ability to enforce the law fully. The Ministry of Labor did not report on incidents of forced labor. Gangs subjected children to forced labor in illicit activities, including selling or transporting drugs (see section 7.c.).

Also see the Department of State's *Trafficking in Persons Report* at www.state.gov/j/tip/rls/tiprpt/.

**c. Prohibition of Child Labor and Minimum Age for Employment**

The law prohibits the employment of children younger than age 14. The law allows children between the ages of 14 and 18 to engage in light work if the work does not damage the child's health or development or interfere with compulsory education. The law prohibits children younger than age 16 from working more than six hours per day and 34 hours per week; those younger than age 18 are prohibited from working at night or in occupations considered hazardous. The Ministry of Labor maintained a list of the types of work considered hazardous and prohibited for children, to include repairing heavy machinery, mining, handling weapons, fishing and harvesting mollusks, and working at heights above five feet while doing construction, erecting antennas, or working on billboards. Children age 16 and older may engage in light work on coffee and sugar plantations and in the fishing industry so long as it does not harm their health or interfere with their education.

The Ministry of Labor maintains responsibility for enforcing child labor laws but did so with limited effectiveness. Child labor remained a serious and widespread problem. The law specifies a default fine of no more than $60 for each violation of most labor laws, including child labor laws; such penalties were insufficient to act as a deterrent. Labor inspectors focused almost exclusively on the formal sector. According to the ministry, from January 2017 through May, officials conducted 1,440 child labor inspections that discovered 18 minors, five of whom were unauthorized to work. By comparison, as of September 2017, according to the ministry, there were 140,700 children and adolescents working, of whom 91,257 were employed in "dangerous work" in the informal sector. No information on any investigations or prosecutions by the government was available. The ministry did not effectively enforce child labor laws in the informal sector.

There were reports of children younger than age 16 engaging in the worst forms of child labor, including in coffee cultivation, fishing, shellfish collection, and fireworks production. Children were subjected to other worst forms of child labor, including commercial sexual exploitation (see section 6, Children) and recruitment into illegal gangs to perform illicit activities related to the arms and drug trades, including committing homicide. Children were engaged in child labor, including domestic work, the production of cereal grains and baked goods, cattle raising, and vending. Orphans and children from poor families frequently worked as street vendors and general laborers in small businesses despite the presence of law enforcement officials.

Also see the Department of Labor's *Findings on the Worst Forms of Child Labor* at www.dol.gov/ilab/reports/child-labor/findings/.

**d. Discrimination with Respect to Employment and Occupation**

The constitution, labor laws, and state regulations prohibit discrimination regarding race, color, sex, religion, political opinion, national extraction (except in cases determined to protect local workers), social origin, gender, disability, language, or HIV-positive status. The government did not effectively enforce those laws and regulations. Sexual orientation and gender identity are not included in the constitution or labor law, although the PDDH and the Ministry of Labor actively sought to protect workers against discrimination on those grounds.

Discrimination in employment and occupation occurred with respect to gender, disability, and sexual orientation or gender identity (see sections 6 and 7.e.). According to the Ministry of Labor, migrant workers have the same rights as citizens, but the ministry did not enforce them.

On January 30, the Legislative Assembly reformed the labor code, prohibiting discriminatory practices and violence against women in the workplace. Further, on June 26, the Legislative Assembly reformed the labor code, civil service law, and the Vacations and Permits Law for Public Employees, prohibiting the dismissal of women returning from maternity leave for up to six months.

**e. Acceptable Conditions of Work**

There is no national minimum wage; the minimum wage is determined by sector. In January a major minimum wage increase went into effect that included increases of nearly 40 percent for apparel assembly workers and more than 100 percent for

workers in coffee and sugar harvesting. After the increase the minimum daily wage was $10 for retail, service, and industrial employees; $9.84 for apparel assembly workers; and $3.94 for agricultural workers. The government reported the poverty income level was $179.67 per month in urban areas and $126.97 per month in rural areas.

The law sets a maximum normal workweek of 44 hours, limited to no more than six days and to no more than eight hours per day, but allows overtime, which is to be paid at a rate of double the usual hourly wage. The law mandates that full-time employees receive pay for an eight-hour day of rest in addition to the 44-hour normal workweek. The law provides that employers must pay double-time for work on designated annual holidays, a Christmas bonus based on the time of service of the employee, and 15 days of paid annual leave. The law prohibits compulsory overtime. The law states that domestic employees, such as maids and gardeners, are obligated to work on holidays if their employer makes this request, but they are entitled to double pay in these instances. The government did not adequately enforce these laws.

The Ministry of Labor is responsible for setting workplace safety standards, and the law establishes a tripartite committee to review the standards. The law requires employers to take steps to meet health and safety requirements in the workplace, including providing proper equipment and training and a violence-free environment. Employers who violate most labor laws could receive a default fine of no more than $57 for each violation. While the laws were appropriate for the main industries, a lack of compliance inspectors led to poor enforcement. These penalties were also insufficient to deter violations, and some companies reportedly found it more cost effective to pay the fines than to comply with the law. The law promotes occupational safety awareness, training, and worker participation in occupational health and safety matters.

The Ministry of Labor is responsible for enforcing the law. The government proved more effective in enforcing the minimum wage law in the formal sector than in the informal sector. Unions reported the ministry failed to enforce the law for subcontracted workers hired for public reconstruction contracts. The government provided its inspectors updated training in both occupational safety and labor standards. As of June the ministry conducted 13,315 inspections, in addition to 3,857 inspections to follow up with prior investigations, and had levied $777,000 in fines against businesses.

Allegations of corruption among labor inspectors continued. The Labor Ministry received complaints regarding failure to pay overtime, minimum wage violations, unpaid salaries, and cases of employers illegally withholding benefits (including social security and pension funds) from workers.

Reports of overtime and wage violations existed in several sectors. According to the Labor Ministry, employers in the agriculture sector did not generally grant annual bonuses, vacation days, or days of rest. Women in domestic service and the industrial manufacturing for export industry, particularly in the export-processing zones, faced exploitation, mistreatment, verbal abuse, threats, sexual harassment, and generally poor work conditions. Workers in the construction industry and domestic service reportedly fell subject to violations of wage, hour, and safety laws. According to ORMUSA, apparel companies violated women's rights through occupational health violations and unpaid overtime. There were reports of occupational safety and health violations in other sectors, including reports that a very large percentage of buildings were out of compliance with safety standards set by the General Law on Risk Protection. The government proved ineffective in pursuing such violations.

In some cases the country's high crime rate negatively affected acceptable conditions of work as well as workers' psychological and physical health. Some workers, such as bus drivers, bill collectors, messengers, and teachers in high-risk areas, reported being subject to extortion and death threats.

As of July the Ministry of Labor reported 5,199 workplace accidents. These included 2,609 accidents in the services sector, 1,859 in the industrial sector, 620 in the commercial sector, and 111 in the agricultural sector. The ministry did not report any deaths from workplace-related accidents.

Workers may legally remove themselves from situations that endanger health or safety without jeopardy to their employment, but authorities lacked the ability to protect employees in this situation effectively.

Case No. 25-cv-1774-JEB

# Exhibit 7

DECLARATION OF JUANITA GOEBERTUS,

DIRECTOR, AMERICAS DIVISION, HUMAN RIGHTS WATCH

I, Juanita Goebertus, declare as follows:

1. I am the Director of the Americas Division of Human Rights Watch and have worked with the organization since 2022. I hold BAs in Law and Political Science from the Universidad de los Andes (Colombia) and an LLM from Harvard Law School. I oversee Human Rights Watch's work on El Salvador and have traveled to the country several times, most recently in 2024. I provide this declaration based on my personal knowledge and experience.

2. As of March 2025, the detention conditions at the Center for Terrorism Confinement, Centro de Confinamiento del Terrorismo (CECOT), in Tecoluca, El Salvador, were publicly known, including through videos released by the Salvadoran government. The prison was first announced for a capacity of 20,000 detainees. The Salvadoran government later doubled its reported capacity, to 40,000. As Human Rights Watch explained to the UN Human Rights Committee in July 2024, the population size raises concerns that prison authorities will not be able to provide individualized treatment to detainees, thereby contravening the UN Standard Minimum Rules for the Treatment of Prisoners.

3. People held in CECOT, as well as in other prisons in El Salvador, are denied communication with their relatives and lawyers, and only appear before courts in online hearings, often in groups of several hundred detainees at the same time. The Salvadoran government has described people held in CECOT as "terrorists," and previously said that they "will never leave." The government of El Salvador denies human rights groups access to its prisons and has only allowed journalists and social media influencers to visit CECOT under highly controlled circumstances. In videos produced during these visits, Salvadoran authorities are seen saying that prisoners only "leave the cell for 30 minutes a day" and that some are held in solitary confinement cells, which are completely dark.

4. Prison conditions in El Salvador should be understood within the context of the country's state of emergency - currently in excess of three years - which has suspended constitutional due process rights. Since the state of emergency was instituted in March 2022, security forces report detaining 88,000 people (the equivalent of 1.4% of the country's population). Although the government has denied Human Rights Watch information on the number of detainees it holds and its prison capacity, Human Rights Watch estimates based on official data that there are around 110,000 people held in prisons with an official capacity for 70,000. Since the state of emergency was instituted, over 430 people have died in El Salvador's prisons according to a Salvadoran human rights group. In December 2022, Human Rights Watch and Cristosal, a Salvadoran rights group, published a joint report, "We

Can Arrest Anyone We Want" (herein after "We Can Arrest Anyone"), documenting widespread abuses in the country's prisons.[1]

5. In July 2024, Human Rights Watch published a report on abuses committed against children during the state of emergency, titled "Your Child Does Not Exist Here." Over 3,300 children have been detained, many without any ties to gang activity or criminal organizations. Human Rights Watch documented 66 cases of children subjected to torture, ill-treatment and appalling conditions, including at times extreme overcrowding, unhygienic conditions, and inadequate access to food and medical care while in custody. In February, the Legislative Assembly approved a law ordering the transfer of children detained for organized crime offenses to the country's adult prison system, exposing them to a heightened risk of abuse and violating international legal standards on juvenile justice.

6. For "We Can Arrest Anyone," and in "Your Child Does Not Exist Here," Human Rights Watch interviewed more than 30 people released from El Salvador's prisons, including children, and dozens of people who have relatives in jail.[2] These interviews were conducted in person in several states in El Salvador or by telephone and corroborated by additional research and media reports.

7. One of the people we spoke with was an 18-year-old construction worker who said that police beat prison newcomers with batons for an hour. He said that when he denied being a gang member, they sent him to a dark basement cell with 320 detainees, where prison guards and other detainees beat him every day. On one occasion, one guard beat him so severely that he broke a rib.

8. The construction worker said the cell he was imprisoned in was so crowded that detainees had to sleep on the floor or standing, a description often repeated by people who have been imprisoned in El Salvador.

9. Another detainee we interviewed was held for two days in a police lock-up with capacity for 25 people, but he said that when he arrived, there were over 75 prisoners. He slept on the floor next to "the bathroom," a hole in the ground that smelled "terrible." He and other prisoners were sent in a group to Izalco prison on the third day, where on their arrival they were ordered to take off their clothes. They were forced to kneel on the ground naked looking downwards for four hours in front of the prison's gate . Guards took the group to a room with five barrels full of water with ice, he said. Fifteen guards forced him and others to go into the barrels for around two hours in total, as they questioned them. The detainee was forced into a barrel "around 30 times," and was kept there for about a minute each time. Guards forced his head under water so he could not breathe. "I felt I was drowning," he said.

---

[1] Human Rights Watch, "We Can Arrest Anyone We Want": Widespread Human Rights Violations Under El Salvador' s "State of Emergency", WWW.HRW.ORG, Dec. 7, 2022, https://www.hrw.org/report/2022/12/07/we-can-arrest-anyone-we-want/widespread-human-rights-violations-under-el#3683 (last visited Mar. 19, 2025).

[2] Human Rights Watch, " Your Child Does Not Exist Here": Human Rights Abuses Against Children Under El Salvador's "State of Emergency", WWW.HRW.ORG, Jul. 16, 2024, https://www.hrw.org/report/2024/07/16/your-child-does-not-exist-here/human-rights-abuses-against-children-under-el (last visited Mar. 19, 2025).

Guards repeatedly insulted them, calling them "dogs" and "scum" and saying they would "pay for what [they] had done."

10. A third detainee held in prison in June 2022 described being sent to what he described as a "punishment cell." He said officers moved him and others there to "make room for other detainees." The new cell was constantly dark, detainees had to sleep standing due to overcrowding, and there was no regular access to drinking water.

11. For "We Can Arrest Anyone," Human Rights Watch and Cristosal gathered evidence of over 240 cases of people detained in prisons in El Salvador with underlying health conditions, including diabetes, recent history of stroke, and meningitis. Former detainees often describe filthy and disease-ridden prisons. Doctors who visited detention sites told us that tuberculosis, fungal infections, scabies, severe malnutrition, and chronic digestive issues were common.

12. Out of the estimated 430 detainees who have died in El Salvador's prisons, we documented 11 of these cases in detail in "We Can Arrest Anyone", based on interviews with victims' relatives, medical records, analysis by forensic experts, and other evidence.

13. In one case, a person who died in custody was buried in a mass grave, without the family's knowledge. This practice could amount to an enforced disappearance if authorities intentionally concealed the fate or whereabouts of the detainee.

14. In at least two other cases, officials appear to have failed to provide detainees the daily medication they required to manage underlying health conditions such as diabetes.

15. In at least four of the eleven cases, photographs of the bodies show bruises. Members of the Independent Forensic Expert Group (IFEG) of the International Rehabilitation Council for Torture Victims (IRCT), who reviewed the photos and other evidence in two of the cases, told Human Rights Watch and Cristosal that the deaths were "suspicious" given that the bodies "present multiple lesions that show trauma that could have been caused by torture or ill-treatment that might have contributed to their deaths while in custody."

16. In a separate Human Rights Watch report from February 2020, titled "Deported to Danger," Human Rights Watch investigated and reported on the conditions in Salvadoran prisons experienced by Salvadoran nationals deported by the United States.[3] In interviews with deportees and their relatives or friends, we collected accounts of three male deportees from the United States who said they were beaten by police or soldiers during arrest, followed by beatings during their time in custody, which lasted between three days to over a year. During their time in prison, two of these individuals reported being kicked in the face and testicles. A third man described being kicked by guards in his neck and abdomen,

---

[3] Human Rights Watch, Deported to Danger: United States Deportation Policies Expose Salvadorans to Death and Abuse, WWW.HRW.ORG, Feb. 5, 2020, https://www.hrw.org/report/2020/02/05/deported-danger/united-states-deportation-policies-expose-salvadorans-death-and (last visited Mar. 19, 2025).

after which he sustained injuries requiring an operation for a ruptured pancreas and spleen, month-long hospitalization, and 60 days of post-release treatment.

17. On July 18, the government of El Salvador transferred 252 Venezuelan prisoners to Venezuela pursuant to an agreement between the Salvadoran and Venezuelan governments. Until that time, Human Rights Watch was not aware of any detainees who had been released from that prison, aside from Kilmar Abrego García, a Salvadoran living in the United States who was sent to El Salvador on March 15 and flown back to the United States on June 2 following a U.S. court order to facilitate his return after finding he was wrongfully removed.

18. Human Rights Watch has conducted interviews with 40 people released from CECOT and documented torture, ill-treatment, and degrading conditions of detention, including repeated beatings by prison guards and security forces, prolonged confinement in cells without mattresses or privacy for toilets, constant illumination, and use of the same unsanitary water for drinking and bathing. Medical care was limited or denied. They reported being held in dark isolation cells for extended periods, and the use of restraints combined with physical abuse. Hunger strikes and other protests were met with excessive force, including rubber bullets. Interviewees also described routine verbal abuse, and psychological threats such as that families believed them dead. During their four months in detention, detainees were denied any direct contact with family members or lawyers.

19. Mistreatment of detainees at CECOT is in large part similar to what Human Rights Watch has documented in other prisons in El Salvador, including Izalco, La Esperanza (Mariona) and Santa Ana prisons. This includes cases of torture, ill-treatment, incommunicado detention, severe violations of due process and inhumane conditions, such as lack of access to adequate healthcare and food.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 19 day of August, 2025 in Mexico City, Mexico.

Juanita Goebertus

Juanita Goebertus

Case No. 25-cv-1774-JEB

# Exhibit 8

65 YEARS IACHR
Inter-American Commission on Human Rights

OAS
More rights for more people

# El Salvador

## STATE OF EMERGENCY AND HUMAN RIGHTS



65 YEARS IACHR
Inter-American Commission on Human Rights

OAS
More rights for more people

OEA/Ser.L/V/II
Doc. 97/24
June 28, 2024
Original: spanish

Inter-American Commission On Human Rights

# Report **State of Emergency and Human Rights in El Salvador**

2024

www.iachr.org

## INTER-AMERICAN COMMISSION ON HUMAN RIGHTS

**Members**
Roberta Clarke
Carlos Bernal Pulido
José Luis Caballero Ochoa
Edgar Stuardo Ralón Orellana
Arif Bulkan
Andrea Pochak
Gloria Monique de Mees

**Executive Secretary**
Tania Reneaum Panszi

**Chief of Staff**
Patricia Colchero Aragonés

**Assistant Executive Secretary for Monitoring, Promotion, and Technical Cooperation**
María Claudia Pulido Escobar

**Assistant Executive Secretary for the Petitions and Cases System**
Jorge Meza Flores

**Special Rapporteur on Economic, Social, Cultural, and Environmental Rights**
Javier Palummo Lantes

**Special Rapporteur for Freedom of Expression**
Pedro Vaca Villarreal

---

**OAS Cataloging-in-Publication Data**

Inter-American Commission on Human Rights. El Salvador: State of Emergency and Human Rights: Approved by the Inter-American Commission on Human Rights on June 28, 2024. p. ; cm. (OAS. Official Records; OEA/Ser.L)

ISBN 978-0-8270-7948-9

1. Human rights--El Salvador. 2. Civil rights--El Salvador. 3. Public safety--El Salvador. 4. Criminal justice, Administration of--El Salvador. I. Title. II. Series. OEA/Ser.L/V/II.doc.97/24

---

Commissioner Carlos Bernal Pulido issued a reasoned partially dissenting vote on the report, which Commissioner Edgar Stuardo Ralón Orellana joined. Commissioner José Luis Caballero Ochoa and Commissioner Andrea Pochak issued a reasoned concurring vote. Per Article 19.2 of the IACHR Rules of Procedure, these opinions are included at the end of this document.

# Index

**EXECUTIVE SUMMARY ........................................................................................7**

**INTRODUCTION.................................................................................................13**

A. The actions of gangs and their effects on human rights ............................20

**THE INSTALLATION OF A STATE OF EXCEPTION (STATE OF EMERGENCY) AS A CITIZEN SECURITY POLICY IN EL SALVADOR....................................27**

A. General considerations: the suspension of guarantees in the framework of states of emergency ........................................................................27

B. The state of emergency decreed in El Salvador in relation to citizen security..........................................................................................38

**CITIZEN SECURITY AND ACCESS TO JUSTICE ...........................................64**

A. Citizen security policy adopted in the fight against gangs ..........................64

B. Reforms in criminal legislation, criminal procedure, and juvenile justice in connection with the state of emergency: conventionality and risks to human rights of the application of those reforms. ................................................82

C. Complaints on human rights violations related to the criminal policy implemented during the state of emergency .............................................99

**THE SITUATION OF PERSONS DEPRIVED OF LIBERTY ...............................172**

A. Background.........................................................................................172

B. The worsening of detention conditions ....................................................174

C. Deaths, allegations of torture and mistreatment of persons deprived of their liberty ................................................................................................211

D. Impacts on family members of detainees................................................226

**FREEDOM OF EXPRESSION, JOURNALISM, AND THE DEFENSE OF HUMAN RIGHTS ...............................................................................................237**

A. Legislative reforms during the state of emergency and their impact on freedom of expression ..............................................................................242

B. Right to information and the state of emergency in El Salvador ............... 252

C. Situation of journalists and other impacts of the state of emergency in El Salvador on the right to freedom of expression ....................................... 264

D. Obstacles for the work of Human Rights Ombudspersons ....................... 274

**CONCLUSIONS AND RECOMMENDATIONS .................................................. 279**

**EXPLANATIONS OF VOTES ............................................................ 290**

# EXECUTIVE SUMMARY

## EXECUTIVE SUMMARY

1. This report analyzes the emergency regime decreed in March 2022 in El Salvador and its effects on human rights. This regime, which remains in force as of the date of approval of this document, was decreed following a wave of violence that culminated in at least 92 deaths between March 24 and 27, 2022.

2. In this regard, the Commission recognizes that maras and gangs are a serious problem that has affected the country for decades due to the far-reaching control and influence they have in various territories and the high levels of violence they engage in. Consequently, this report examines the impact of organized crime on human rights and how it affects particular groups in a differentiated manner.

3. The Commission analyzes in detail Legislative Decree No. 333 of March 27, 2022, which declared the emergency regime throughout the national territory, as well as its successive extensions, based on Inter-American human rights standards governing the mechanism of suspension of rights and guarantees. The IACHR takes note of the information available on the current and unprecedented rates of improvement in citizen security in the country reported by the State, which would demonstrate that there is no emergency situation that justifies maintaining in force the suspension of rights and guarantees in accordance with the requirements of the American Convention.

4. In accordance with inter-American standards, states of emergency are an exceptional measure that must be necessary, reasonable, and proportional to the context of the emergency, noting that indispensable judicial guarantees cannot be suspended under any circumstances. For this reason, the IACHR calls on the Salvadoran State to reestablish the suspended rights and to adopt measures for the prevention, control, and response to criminality within the framework of a citizen security policy evaluated from a perspective that respects and guarantees human rights.

5. In this report, the IACHR addresses a series of additional measures in the area of citizen security adopted by the Salvadoran State in the fight against criminal groups described inside El Salvador as "terrorist organizations". The State refers to a combination of intersectoral efforts in the prevention of violence, mitigation of risks and damages to vulnerable groups, and the rehabilitation of the social and community fabric. However, the IACHR reiterates the challenges previously identified in terms of social participation and accountability in citizen security policy. The Commission emphasizes the State's obligation to investigate crimes that consist of human rights violations, effectively seeking the truth about what happened, and to prosecute and punish those responsible, underscoring the importance of the administration of justice to ensure the rights of victims. It also recommends the development of adequate institutions to provide due attention to crime victims as a mainstay of its actions in the area of citizen security.

6. Since the installation of the emergency regime, a series of legislative amendments have been approved in the areas of criminal law, criminal procedure, and juvenile justice, which include several aspects of concern related to human rights. Thus, the IACHR notes that the reforms above all pursue a strongly punitive approach to address challenges to citizen security and in this report it addresses the risks of applying those regulations. In addition, it highlights the aspects contrary to the inter-American legal framework and the standards developed by the Inter-American Human Rights System, particularly the mandatory application of pre-trial detention to certain crimes, the confidentiality of the identity of justice operators in the framework of their actions in criminal proceedings, and the extension of the rules governing adult sentences to persons under 18 years of age.

7. According to available information, 73,000 people were detained from March 27, 2022 to the beginning of November 2023, the vast majority of whom were remanded in custody. In this regard, the IACHR interviewed individuals and heard allegations of human rights violations perpetrated by the security forces, including: systematic and widespread, illegal and arbitrary detentions, illegal searches of homes, abuses in the use of force y violations of the rights of children and adolescents. In addition, it received information on specific challenges in access to justice posed by detentions and their implications for the guaranteeing of the rights of Salvadoran individuals to judicial guarantees and judicial protection, which include, inter alia: delay in judicial oversight of detentions, the ineffectiveness of the habeas corpus recourse, the lack of evidence to support the charges brought, abuses in the imposition of pre-trial detention, the holding of judicial mass hearings, restrictions on the exercise of the right to defense and judicial guarantees, and disrespect for due process of law. Some of the reports received refer to worrisome aspects of a lack of respect for the specific rights and guarantees of children in conflict with the law.

8. Of particular concern, with regard to persons deprived of liberty, is the worsening of this population's already precarious situation, observed by the IACHR during its visit to the country in 2019, as a result of the deplorable conditions of detention, the high levels of overcrowding in certain centers, and the excessive application of pretrial detention. In the context of the emergency regime, the IACHR notes that the prison population tripled in a few months and, in view of the construction of the Terrorism Confinement Center, calls on the State to prioritize the review of pre-trial detentions already decreed and to pursue a criminal policy that uses deprivation of liberty as a measure of last resort. In addition to addressing the inhumane conditions, ill-treatment, and torture denounced by civil society organizations and a number of people interviewed, the information received points to the possible death of 189 to 200 persons deprived of liberty – the figures differ according to the source – and concerns about shortcomings in the investigations of these cases, as well as about the procedures for

notification of relatives and handling of the bodies. The Commission also received information on different effects on the families of persons detained during the emergency regime.

9. With regard to freedom of expression and journalism, the Commission and its Office of the Special Rapporteur for Freedom of Expression emphasize the essential role they play during states of emergency in preserving the values and functions of the democratic system. Thus, they address legislative reforms approved during that period that curtailed freedom of expression. These include restrictions to the right of access to information due to various obstacles, including an alleged increase in the number of refusals by State institutions to provide public information and failures to comply with international norms and standards on the matter; as well as the absence of available, periodic, and disaggregated information; and the denial of access to requests for information on the measures adopted in the context of an emergency. Likewise, there are challenges for journalistic coverage and the defense of human rights, judging by reports of a hostile environment for carrying out this work in the country, including recurrent stigmatizing discourse from state authorities.

10. In its conclusions, the Commission points out that there is a false dilemma between adopting effective actions to confront organized crime and observing the State's legal and international human rights obligations. The State must address the causes and consequences of crime from a comprehensive and intersectoral perspective, adopting prevention, control and response measures within the limits and procedures that guarantee respect for human rights, including gender and intersectional approaches and with greater citizen participation. It also urges the State to reestablish the rights and guarantees suspended by the legislative decrees promulgated under the emergency regime, reaffirming that this exceptional/emergency mechanism cannot become part of its permanent citizen security policy. Given the allegations of systematic and widespread illegal and arbitrary detentions by the security forces, as well as other violations of rights in the administration of justice and places of deprivation of

liberty, the IACHR considers it necessary to identify the circumstances that generated this pattern of alleged violations and the possible institutional and individual responsibilities. This includes also identifying the victims and the damages suffered in order to provide them with comprehensive reparation and adopt guarantees for non-repetition.

11. Finally, the Commission issues twenty-two recommendations to the State of El Salvador and places itself at the disposal of the State to provide technical assistance in accordance with its mandate.

# INTRODUCTION

## INTRODUCTION

12. The Inter-American Commission on Human Rights (IACHR) issues the present report on the state of emergency *(regime of exception)* and its effects on human rights in El Salvador, pursuant to the mandate conferred by Article 41 of the American Convention on Human Rights (ACHR). This norm establishes as its main function to promote the observance and defense of human rights, stimulating awareness of them among the peoples of the Americas, preparing studies and reports, and formulating recommendations, when it deems appropriate, to the member states. To that end, the IACHR followed the procedure established in Article 60 of its Rules of Procedure.

13. In 2021, the IACHR published a report on the human rights situation in El Salvador, subsequent to the on-site visit carried out in December 2019, following 32 years in which the IACHR was unable to conduct observations of this kind in the country.[1] On that occasion, the Commission addressed events up to the end of 2020, including efforts and progress made after the internal armed conflict that resulted in the construction and strengthening of Salvadoran democratic institutions. It also examined the challenges identified with regard to protecting and guaranteeing human rights based on certain thematic axes and taking into account the situation of groups at particular risk. In its report, in line with previous and subsequent reports detailed below, the Commission noted that the widespread control exercised by the maras and gangs over the territories and their violent actions produced multiple impacts on the exercise of human rights in the country, which were accompanied by ongoing violence after the end of the armed conflict due to other manifestations and actors.[2] The IACHR expresses its solidarity with the victims of maras and gangs, while recognizing the enormous impact of their actions, particularly the high number of human lives lost; and that this scenario requires the adoption of a

[1] IACHR. Situation of Human Rights in El Salvador, OEA/Ser.L/V/II. Doc. 278, October 14, 2021.

[2] IACHR. Situation of Human Rights in El Salvador, OEA/Ser.L/V/II. Doc. 278, October 14, 2021, paras. 28-31.

policy that addresses the causes and consequences of this organized crime. In 2015, the rate of intentional homicides per inhabitant reached alarming levels, positioning El Salvador with the highest figure in the world.[3] In the following years, the IACHR observed a significant improvement in crime rates, with the lowest homicide figures in the country being recorded as of 2019.[4]

14. In this context of a steady reduction of homicides in the country, between March 24 and 27, 2022, El Salvador registered a sudden spike in homicides in the different departments, resulting in the death of at least 92 people according to official data.[5] As a result of that situation, the Legislative and Executive Branches declared a state of emergency ("regime of exception") derived from the serious disturbances to public order by criminal groups that threaten the life, peace, and security of the Salvadoran population, in which a group of constitutional rights and guarantees were suspended in the national territory.[6] In the months that followed, three of the six initially suspended constitutional articles remained suspended; in particular, the right to be informed of rights and reasons for detention, not to be forced to testify, to have technical assistance; the 72-hour time limit for administrative detention; and the inviolability of correspondence and telecommunications and the consequences of violation of those

[3] IACHR. Situation of Human Rights in El Salvador, OEA/Ser.L/V/II. Doc. 278, October 14, 2021, par. 29.

[4] IACHR, 2019 Annual Report, Chapter IVA, 2020, par. 263; IACHR, 2020 Annual Report , Chapter IVA, 2021, par. 347; IACHR, 2021 Annual Report , Chapter IVA, 2022, par. 525; IACHR, 2022 Annual Report , Chapter IVA, 2023, par. 365.

[5] State of El Salvador, Report of the State of El Salvador to the Inter-American Commission on Human Rights on State of Emergency Decree No. 333, Diplomatic Note MPOEA-OEA-063/2022, April 26, 2022; State of El Salvador, Un Nuevo El Salvador (A New El Salvador), Diplomatic Note MPOEA-OEA-117/2023, July 14, 2023, pp. 5, 6, 9-11.

[6] Legislative Assembly, Legislative Decree N°. 333 of March 27, 2022 - Let a "State of Emergency" be decreed throughout the national territory.

rights.[7] In addition, various measures were adopted in the fight against maras and gangs, including the arrest of more than 70,000 people suspected of having committed crimes related to collaboration with or membership in these criminal groups[8].

15. The Commission received repeated allegations that the measures adopted in this framework had resulted in systematic and widespread human rights violations;[9] and, on several occasions, it called on the State to ensure that its efforts to prevent, control, and respond to criminality, including the investigation, prosecution, and punishment of criminal activities, were in accordance with its international human rights obligations.[10] In particular, it warned of reports of illegal and arbitrary detentions and restrictions on access to justice during the emergency regime, as well as possible violations of the rights of persons deprived of their liberty and the impact that the set of initiatives generated on the rights of children and adolescents.

[7] Legislative Assembly, Legislative Decree (DL) No. 358, April 24, 2022; DL No. 396, May 25, 2022; DL No. 42721, June 2022; DL No. 454, July 19, 2022; DL No. 476, August 16, 2022; DL No. 503, September 14, 2022; DL No. 530, October 14, 2022; DL No. 569, November 15, 2022; DL No. 611, December 14, 2022; DL No. 644, January 12, 2023; DL No. 661, February 15, 2023; DL No. 687, March 15, 2023; DL No. 719, April 16, 2023; DL No. 738, May 14, 2023; DL No. 765, June 16, 2023; DL No. 797, July 12, 2023; DL No. 815, August 10, 2023; DL No. 843, September 13, 2023; DL No. 865, October 11, 2023; DL No. 888, November 7, 2023.

[8] Diario Las Américas, El Salvador deroga ley de sanciones por difundir mensajes de pandillas (El Salvador repeals law on penalties for disseminating gang messages), November 2, 2023; NTN24, "En El Salvador hay más de 73.000 detenidos que no se sabe si son inocentes": defensora en Derechos Humanos ("In El Salvador there are more than 73,000 detainees whose guilt or innocence is unknown": Human Rights Defender.), November 6, 2023.

[9] In primary and secondary sources, which will be identified throughout the Report, which will be developed in paragraphs 146 to 161, 177, and 178.

[10] IACHR, Press Release 82/22 - IACHR Urges El Salvador to Ensure that Law Enforcement and Any Exceptional Measures Comply with Human Rights, April 20, 2022; IACHR, Press Release 126/22 - IACHR Urges El Salvador to Comply with Its International Obligations and Ensure Prisons and Law Enforcement Policies That Respect Human Rights, June 3, 2022; IACHR, Press Release 254/22 - Seven Months into the Exceptional Framework: IACHR Reminds El Salvador That It Must Comply with its Obligations Concerning Human Rights, November 11, 2022; IACHR, Press Release 58/23 - IACHR Calls on El Salvador to Reestablish Rights and Guarantees Suspended a Year Ago Under the State of Emergency, April 6, 2023.

16. In view of the information received and the persistence of allegations of human rights violations in the context of the prolongation of the emergency regime, which is still in force, the Commission decided to draft this special country report, which includes testimonies received from victims of human rights violations.[11] The purpose of this document is to analyze the effects of the emergency regime decreed in March 2022 on human rights in El Salvador, as well as the compatibility of the suspension of the exercise of rights and guarantees with inter-American norms and standards on the matter.

17. To prepare this report, the Commission compiled, analyzed, and systematized information regarding the human rights situation in El Salvador from the events immediately preceding the installation of the emergency regime on March 27, 2022 until November 10, 2023. As part of this work, the IACHR used primary and secondary sources.[12] Among the primary sources, it used the information received through the different mechanisms available to the IACHR, such as: public hearings; meetings with civil society organizations defending human rights, alleged victims of human rights violations and with the State; interviews conducted remotely and individually with individuals regarding alleged human rights violations within the scope of this report; and information available in the follow-up on compliance with IACHR recommendations. Official State documents, including those issued by the Constitutional Chamber of the Supreme Court of Justice, were also used as primary sources. Likewise, under the powers conferred by Article 41 of the American Convention, the IACHR requested information from the State on May 10, 2023. On June 16, 2023, the State was granted an extension to respond,

[11] In March 2023, the IACHR took virtual testimonies from 29 people in order to obtain direct and in-depth information on the effects on human rights of the measures adopted during the state of emergency. In so doing, it heard from the following: persons detained and subsequently released during the state of emergency; relatives of persons deprived of their liberty, including those who died in State custody; and legal representatives of the detained persons and their relatives. The Commission conducted interviews using a questionnaire containing both previously prepared and open questions on the arrests made, judicial oversight of the arrests and access to justice, the conditions of detention, and the personal impacts triggered by the events reported.

[12] IACHR, Rules of Procedure of the Inter-American Commission on Human Rights, March 22, 2013, Article 59.5.

incorporating additional consultations. This request for information was answered on July 14, 2023; additionally, the State sent this information to the IACHR on October 6 and 8, 2023[13].

18. Regarding the secondary sources, the IACHR took into account studies and other documents prepared by civil society organizations and individuals;[14] journalistic notes; decisions and recommendations of specialized international organizations, among others.

19. The IACHR acknowledges and is particularly grateful for the information provided by the State, as well as by civil society organizations and human rights defenders. Particularly noteworthy is the effort made by victims of human rights violations, their families,

[13] State of El Salvador, Un Nuevo El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, on file with the IACHR; State of El Salvador, Diplomatic Note MPOEA-LE-011/2023, October 6, 2023, on file with the IACHR; State of El Salvador, Diplomatic Note MPOEA-LE-015/2023, October 6, 2023, on file IACHR; State of El Salvador, Diplomatic Note MPOEA-LE-018/2023, October 6, 2023, received on October 8, 2023, on file IACHR.

[14] The following reports and documents prepared by human rights organizations were, inter alia, taken into account: Azul Originario, Centro de Estudios de la Diversidad Sexual y Genérica, Cristosal, Fundación de Estudios para la Aplicación del Derecho, Instituto de Derechos Humanos de la Universidad Centroamericana José Simeón Cañas (IDHUCA), Red Salvadoreña de Defensoras de Derechos Humanos, Servicio Social Pasionista (SSPAS), Informe anual sobre violaciones a derechos humanos durante el estado de excepción en El Salvador (Annual report on human rights violations during the state of emergency in El Salvador), March 2023; IDHUCA, Cristosal, Due Process Foundation (DPLF), Red Salvadoreña de Defensoras de Derechos Humanos, SSPAS, Muertes en cárceles durante el Régimen de Excepción en El Salvador: presuntas ejecuciones extrajudiciales, Informe de organizaciones de sociedad civil ante el Relator Especial sobre Ejecuciones Extrajudiciales April 10, 2023; Human Rights Watch, Cristosal, "We can detain whoever we want" Widespread human rights violations during the "regime of exception" in El Salvador, December 2022; Cristosal, One year under the emergency regime: a permanent measure of repression and human rights violations. Situation Report for March 27, 2022 to March 27, 2023,May 12, 2023; Amnesty International, El Salvador: President Bukele plunges country into human rights crisis after three years in office, June 2, 2022; Amnesty International, El Salvador: One year into the state of emergency, authorities systematically commit human rights violations, April 3, 2023. Amnesty International, El Salvador: Open Letter to President Nayib Bukele April 1, 2022; DPLF, Undue Process. Human Rights Violations During the Emergency Regime in El Salvador. Provisional Detention July 2023; DPLF, Undue Process. Human Rights Violations During the Emergency Regime in El Salvador. Substantive penal reforms, July, 2023; DPLF, Undue Process. Human Rights Violations During the Emergency Regime in El Salvador. Faceless judges and other violations of the guarantee of a competent, independent, and impartial judge, 2023; Observatorio Universitario de Derechos Humanos de la Universidad Centroamericana José Simeón Cañas (University Observatory of Human Rights of the Central American University José Simeón Cañas), Annual Report 2022: The State of Human Rights in El Salvador, April 2023; WOLA, Corruption Under the State of Emergency in El Salvador: A Democracy Without Oxygen, September 27, 2022.

and witnesses to present their testimonies and complaints.[15]

20. In its observations on the draft of this report, the State raised a series of questions regarding the Commission's mandate to formulate this study and the methodology used, particularly with respect to the sources selected and the credibility of the information from civil society organizations. It also alleged the lack of inclusion of, and comparison with, information from the State, among other aspects. In this regard, as previously indicated, the IACHR requested abundant information from the State of El Salvador for the preparation of this report, which, once received, was duly analyzed and most of it was included. Likewise, the IACHR has made a series of requests to visit the State in order to observe in situ the human rights situation denounced, but to date it has not been possible to do so.[16]

21. This report is divided into 4 chapters. In the introduction, the IACHR addresses relevant background information regarding the actions of gangs and their effects on human rights. The first chapter deals with the inter-American standards for the suspension of guarantees and

[15] The Commission clarifies that the term "complaint" does not refer to a case and petition being processed before the System, but rather refers to information presented by individuals or organizations alleging human rights violations. It also notes that this report is not intended to determine individual or state responsibilities with respect to specific cases of possible human rights violations. Individuals or groups who consider that they have suffered human rights violations have at their disposal the contentious proceedings mechanism (*mecanismo contencioso*) of the inter-American system, subject to compliance with specific requirements. By lodging petitions with the Inter-American Commission, those who have suffered human rights violations can obtain help The Commission investigates the situation and may formulate recommendations to the responsible State so that the enjoyment of rights is restored to the extent possible, so that similar events do not occur in the future, and so that the events that occurred are investigated and redressed. In addition, individuals have at their disposal the mechanism of precautionary and provisional measures, as provided for in Articles 25 of the IACHR Rules of Procedure and 63.2 of the ACHR, respectively. More information is available on the official website of the IACHR: https://www.oas.org/en/IACHR/jsForm/?File=/en/iachr/mandate/petitions.asp

[16] CIDH, 925-23/ CIDH/SE/MPCT-VT, Ref.: Working visit to El Salvador, November 21, 2023; IACHR, Press Release 254/22 - Seven Months into the Exceptional Framework: IACHR Reminds El Salvador That It Must Comply with its Obligations Concerning Human Rights, November 11, 2022; IACHR, 649-22/IACHR/SE/MPCT-MISC, Ref: IACHR Working Visit Request to the State of El Salvador, November 9, 2022; IACHR, Hearing 'Detenciones arbitrarias y situación de las personas privadas de libertad en el Estado de Excepción en El Salvador (Arbitrary detentions and situation of persons deprived of liberty in the State of Exception in El Salvador)', 185th regular session, October 25, 2022; IACHR, Press Release 58/23 - IACHR Calls on El Salvador to Reestablish Rights and Guarantees Suspended a Year Ago Under the State of Emergency, April 6, 2023; IACHR, Annual Report 2022, Chapter IV.A Human Rights Development in the Region, 2023, par. 366.

analyzes the conventionality and the risks to human rights of the declaration of the emergency regime in El Salvador and its successive extensions. The second chapter addresses the measures adopted in the fight against gangs during the emergency regime, including the legislative reforms in criminal matters carried out during that period and the human rights violations denounced in the implementation of criminal policy in that context. The third chapter refers to the situation of persons deprived of liberty and the impact on their families; and the fourth chapter deals with events and measures adopted in the context of the emergency regime that affect the exercise of freedom of expression, journalism, and the defense of human rights. Finally, the Commission presents its conclusions and recommendations to the State.

22. On January 8, 2024, the IACHR transmitted a copy of the preliminary draft of this report to the Salvadoran State and requested that it submit its observations in accordance with its Rules of Procedure. The IACHR encouraged the State to submit updated information for review and inclusion in the report. The State requested two extensions to submit the information, which were granted.[17] On April 8, 2024, the IACHR received the information from the State,[18] which, where pertinent, was incorporated into the text. On June 28, 2024, the Commission approved the final version of this report.[19]

---

[17] State of El Salvador, Diplomatic Note MPOEA-OEA-004/2024, January 9, 2024; State of El Salvador, Diplomatic Note MPOEA-OEA-028/2024, March 1, 2024; IACHR, 21-24/IACHR/SE/MPCT-CT, REF: Draft Report: State of Emergency and Human Rights in El Salvador. Request for extension, January 19, 2024; IACHR, 273-24 IACHR/SE/MPCT-Inf.P, REF: Draft Report: State of Emergency and Human Rights in El Salvador. Additional extension request and technical visit, March 5, 2024.

[18] State of El Salvador, Observations of the State of El Salvador on the IACHR Report "State of Emergency and Human Rights in El Salvador," Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024.

[19] The final version of the report was approved by the majority of the IACHR membership. Commissioner Carlos Bernal Pulido issued an explanation of his vote partially dissenting from the report: a position that was also shared by Commissioner Edgar Stuardo Ralón Orellana. Commissioner José Luis Caballero Ochoa and Commissioner Andrea Pochak issued a concurring opinion.

## A. The actions of gangs and their effects on human rights

23. The IACHR recognizes gang activity as a serious problem in El Salvador. The citizen security situation in the country is complex, since, according to data released by the State in November 2022, the main maras and gangs - Mara Salvatrucha, Barrio 18 Sureños, and Barrio 18 Revolucionarios - have 77,000, 21,000, and 20,000 members each, distributed in the 14 departments of the country[20]. As the Commission has pointed out, for decades these criminal groups have exercised great control and influence in various territories of the country, as well as in the daily lives of the people, who are commonly affected by threats, extortion, or generalized violence in the context of rivalries and confrontations between those groups.[21] In this context, El Salvador had the highest homicide rate in the world (106.3 homicides per 100,000 inhabitants in 2015).[22]

24. The State of El Salvador indicated to the Commission that crime is a multifactorial phenomenon that has progressively strengthened in the country since the mid-1990s, going from isolated criminal groups to organized crime groups that control portions of territory and exercise powers and attributions of the State.[23] It emphasized that maras and gangs are violent, heavily armed criminal groups that finance their activities through extortion and profit from the decent work of simple people and small and large businessmen, acting as true agents of terror and especially impacting the most

[20] UN, Committee against Torture, Seventy-fifth session, Summary record of the 1966th meeting, CAT/C/SR.1966, 24 November 2022 November 2022, for. 16.

[21] IACHR, Situation of Human Rights in El Salvador, OEA/Ser.L/V/II. Doc. 278, October 25, 2021, para. 30.

[22] State of El Salvador, Un Nuevo El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, on file with IACHR, p. 8-9; World Bank, United Nations Office on Drugs and Crime International Homicide Statistics database; Intentional Homicides (per 100,000 population) - El Salvador; 2015; United Nations, Regional Conference on Population and Development, Number of victims of intentional homicides per 100,000 population, disaggregated by sex and age (SDG Indicator 16.1.1). El Salvador, 2015.

[23] State of El Salvador, Report of the State of El Salvador to the Inter-American Commission on Human Rights on Emergency Regime Decree No. 333, Diplomatic Note MPOEA-OAS-063/2022, April 26, 2022, on file with the IACHR, pp. 1-2.

vulnerable sectors.[24] As part of their actions, they carry out systematic attacks on the life, security, and personal integrity of the population. They also attack civilian, military, police, and prison authorities; they attack property by committing crimes of extortion against individuals or legal entities; they violate the right of every citizen to reside anywhere in the territory by forcing people to abandon their homes through threats. The State also indicated that they violate the right to education by forcing students to drop out of school. In addition, they threaten free transit, by establishing limitations on the movement of people in specific areas, and place them at risk of attacks on their lives or integrity; they paralyze public passenger transportation, even at the national level, and frequently threaten the lives of public transportation service personnel; and they impede the free exercise of economic and labor activities of broad segments of the population, among other actions.[25] In its observations on the draft of this report, the State pointed out that the Constitutional Chamber of the Supreme Court of Justice characterized these groups as terrorist organizations.[26]

25. The State detailed that, for more than two decades, children and adolescents lived in an environment of violence and deprivation in which it was unfeasible to guarantee their human rights and that exposure to situations of violence limited their options for comprehensive development and favored their involvement in criminal groups or gangs.[27] In this regard, it referred to data from 2015 and

[24] State of El Salvador, Report of the State of El Salvador to the Inter-American Commission on Human Rights on Emergency Regime Decree No. 333, Diplomatic Note MPOEA-OAS-063/2022, April 26, 2022, pp. 1-2.

[25] State of El Salvador, Report of the State of El Salvador to the Inter-American Commission on Human Rights on Emergency Regime Decree No. 333, Diplomatic Note MPOEA-OAS-063/2022, April 26, 2022, pp. 1-2.

[26] State of El Salvador, Observaciones del Estado de El Salvador al Informe de la CIDH "Estado de Excepción y derechos humanos en El Salvador"(Observations of the State of El Salvador on the IACHR report entitled “State of Emergency and Human Rights in El Salvador”), Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, p. 60; Supreme Court of Justice, Constitutional Chamber, 22-20007/42-2007/89-2007/96-2007, August 24, 2015.

[27] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 28-29.

2016 according to which young people under the age of 24 were a significant percentage of both perpetrators and victims of homicides in El Salvador.[28] It also reported that, in 2019, school dropouts caused by gang threats and violence hovered around 4.6%, affecting more than 40,000 students nationwide.[29]

26. On several occasions, the Commission and other international organizations have recognized that the actions of these criminal groups have a series of impacts on human rights and are responsible for high levels of violence, including acts such as sexual violence, sexual slavery, human trafficking, and generating the forced internal displacement of entire families and migratory flows to other countries in the region.[30] The IACHR has also maintained that in areas under the control of these groups a parallel power emerges that installs its own system of rules in order to exert control over the territory and the people who live there. This informal system of rules governs important aspects of people's lives and limits the exercise of their rights, in addition to infringing their right to personal security and putting their well-being at risk if those rules are broken.[31] Likewise, the IACHR has emphasized that gangs exercise various forms of social violence in the territories and that their criminal activities have a negative impact on the daily lives of these people, with effects in the institutional, economic, and social spheres.[32] In addition to territorial dominance, these groups are characterized by the use of violence to legitimize

[28] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 28-29.

[29] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 28-29.

[30] IACHR, Situation of Human Rights in El Salvador, OEA/Ser.L/V/II. Doc. 278, October 25, 2021, para. 30; IACHR, The Impact of Organized Crime on Women, Girls, and Adolescents in the Countries of Northern Central America, February 17, 2023, paras. 62, 67; IACHR, Violence, Children and Organized Crime, OEA/Ser.L/V/II. Doc. 40/15 11 November 2015, para. 162;

[31] IACHR, Organized Crime and the Rights of Children, Adolescents and Youth: Challenges and State Actions, February 16, 2023, par. 52.

[32] IACHR, The Impact of Organized Crime on Women, Girls and Adolescents in the Countries of Northern Central America, OEA/Ser.L/V/II. Doc. 9/23, February 17, 1998, 2023, § 62 and 87.

patriarchal power, establish hierarchical relationships, and impose control over the members of the organization.[33]

27. While violence as a mechanism of gang control affects both women and men, the Commission has observed that gender-based violence is a critical and fundamental element of the strategy of terror, control, and domination of territories, commercial transactions, information, and, ultimately, of the population.[34] In this regard, it has identified situations of extreme violence, cruelty, and brutality against women, whose lives and bodies are perceived as territories for exercising power and control.[35] It has also highlighted how the violence exercised by organized crime-related actors adds to the other specific forms of violence already faced by women in different facets of their lives related to structural and historical factors of gender discrimination.[36] Even women and adolescent girls linked to gangs or those who live with gang members as family members are subject to disturbing acts of gender-based violence, such as sexual violence as a form of punishment and murders carried out with particular misogynistic cruelty, among other forms of violations with this bias.[37]

28. In addition to the above, over the last few years, the IACHR has paid close attention to the impact on the rights of children, adolescents, and young people and their interaction with organized crime in northern Central America, delving into the various forms of violence and

---

[33] IACHR, The Impact of Organized Crime on Women, Girls and Adolescents in the Countries of Northern Central America, February 17, 2023, par. 87.

[34] IACHR, Violence and Discrimination against Women and Girls, OEA/Ser.L/V/II. Doc. 233 of 14 November 14, 2019, § 87,194.

[35] IACHR, Violence and Discrimination against Women and Girls, OEA/Ser.L/V/II. Doc. 233 of 14 November 14, 2019, § 230.

[36] IACHR, The Impact of Organized Crime on Women, Girls, and Adolescents in the Countries of Northern Central America, OEA/Ser.L/V/II. Doc. 9/23, February 17, 1998, 2023, § 31.

[37] IACHR, Situation of Human Rights in El Salvador, OEA/Ser.L/V/II. Doc. 278, October 25, 2021, para. 183, 184 IACHR Violence and Discrimination against Women and Girls, OEA/Ser.L/V/II. Doc. 233 of 14 November 14, 2019, § 81 and 194.

violations they face in contexts of violence and insecurity.[38] Thus, the Commission has highlighted how the presence of criminal organizations in the territory generates a lack of effective guarantees for several of their rights, reinforces the circle of exclusion and violence, and exposes them to being recruited, used, abused, and exploited.[39] Also, that incorporation into criminal groups subjects them to different levels of violence within the groups, in confrontation between rival groups or with security forces and in juvenile justice bodies.[40] Likewise, the IACHR has indicated how the cycle of recruitment by maras and gangs, through coercion or persuasion, particularly affects children living in poverty or with a disintegrated family nucleus.[41]

29. In addition, the Commission has addressed the relationship between the actions of these criminal groups and forced internal displacement in El Salvador.[42] In this regard, the IACHR valued the ruling of the Constitutional Chamber of the Supreme Court of Justice, which recognized that forced displacement has its origins in the context of violence and insecurity in El Salvador in gang-controlled areas, as well as in the systematic human rights violations caused by organized crime.[43] The Court emphasized that displacement in these circumstances is a multiple and continuous violation, affecting the

[38] IACHR, North Central America. Organized Crime and the Rights of Children, Adolescents and Youth: Challenges and State Actions, OEA/Ser.L/V/II. Doc. 51/23, February 16, 2023; IACHR, Violence, Children and Organized Crime, OEA/Ser.L/V/II. Doc. 40/15, November 11, 2015; IACHR, Juvenile Justice and Human Rights in the Americas, OEA/Ser.L/V/II. Doc. 78, 44, 13, 2011.

[39] IACHR, North Central America. Organized Crime and the Rights of Children, Adolescents and Youth: Challenges and State Actions, OEA/Ser.L/V/II. Doc. 51/23, February 17, 1998, 2023, § 397.11; 187.

[40] IACHR, North Central America. Organized Crime and the Rights of Children, Adolescents and Youth: Challenges and State Actions, OEA/Ser.L/V/II. Doc. 51/23, February 17, 1998, 2023, § 159, 160, 163, 398.17, 398.20.

[41] IACHR, North Central America. Organized Crime and the Rights of Children, Adolescents and Youth: Challenges and State Actions, OEA/Ser.L/V/II. Doc. 51/23, February 17, 1998, 2023, § 397.15.

[42] IACHR, Situation of Human Rights in El Salvador, OEA/Ser.L/V/II. Doc. 278, October 25, 2021, para. 245.

[43] Supreme Court of Justice, Constitutional Chamber, Amparo 411-2017, July 13, 2018; IACHR, Situation of Human Rights in El Salvador, OEA/Ser.L/V/II. Doc. 278, October 25, 2021, para. 249.

exercise of a series of rights to the extent that families have to move to escape threats, direct violence by these actors, and the recruitment of their members.[44] In the process, they often suffer new rights violations when they relocate to another area also controlled by other criminal groups.[45]

30. In this context, the Commission has formulated multiple recommendations from a regional and sub-regional perspective and directed to El Salvador that refer to different fronts, such as the production of knowledge on the actions and impact of organized crime on the human rights situation; the strengthening of actions for the comprehensive protection of different groups in vulnerable situations; the adoption of multidimensional measures to prevent and reduce crime and to neutralize the recruitment of new members to criminal groups; the strengthening of social reinsertion programs for people disassociated from organized crime; the investigation, prosecution, and punishment of acts of violence and discrimination related to organized criminal activities and reparation for victims; among other measures.[46]

---

[44] IACHR, Situation of Human Rights in El Salvador, OEA/Ser.L/V/II. Doc. 278, October 25, 2021, para. 241-248, 256-268.

[45] IACHR, Situation of Human Rights in El Salvador, OEA/Ser.L/V/II. Doc. 278, October 25, 2021, para. 263.

[46] IACHR, Situation of Human Rights in El Salvador, OEA/Ser.L/V/II. Doc. Report on Citizen Security and Human Rights, OEA/Ser.L/V/II. Doc. 57, December 31, 2009; IACHR, North Central America. Organized Crime and the Rights of Children, Adolescents and Youth: Challenges and State Actions, OEA/Ser.L/V/II. Doc. 51/23, February 16, 2023; IACHR, The Impact of Organized Crime on Women, Girls and Adolescents in the Countries of Northern Central America, OEA/Ser.L/V/II. Doc. 9/ 23, February 17, 2023; inter alia.

# CHAPTER 1:
# THE INSTALLATION OF A STATE OF EXCEPTION (STATE OF EMERGENCY) AS A CITIZEN SECURITY POLICY IN EL SALVADOR

# THE INSTALLATION OF A STATE OF EXCEPTION (STATE OF EMERGENCY) AS A CITIZEN SECURITY POLICY IN EL SALVADOR

## A. General considerations: the suspension of guarantees in the framework of states of emergency

31. Before analyzing the state of emergency established in El Salvador, the Commission considers it necessary to specify its recent actions in this matter in relation to the countries of the region, as well as the international norms derived from the American Convention and the inter-American standards developed in this matter based on the interpretation made by the Inter-American Commission and Court of Human Rights within their own spheres of competence.

32. The suspension of guarantees is an exceptional prerogative provided by the American Convention on Human Rights by means of which States may apply certain restrictive measures to rights and freedoms that, under normal conditions, are prohibited or subject to more rigorous requirements.[47] The Inter-American Court of Human Rights has indicated that this mechanism does not imply the suspension of the rights protected by the ACHR, but rather consists of the suspension or impediment of their full and effective exercise under certain circumstances.[48] According to Article 27.2 of the American Convention, no matter how serious the emergency, a certain category of rights may never be suspended. Likewise, in order to suspend the exercise of a right recognized by the American Convention, States must comply with the strict conditions established in its Article 27:

1); and In time of war, public danger, or other emergency that threatens the independence or security of a State Party, it may take measures derogating from its obligations under the present

[47] I/A Court H.R., Advisory Opinion OC-8/87on Habeas Corpus in Emergency Situations (Articles 27.2, 25.1, and 7.6 of the American Convention on Human Rights), January 30, 1987, par. 24.

[48] I/A Court H.R., Advisory Opinion OC-8/87on Habeas Corpus in Emergency Situations (Articles 27.2, 25.1, and 7.6 of the American Convention on Human Rights), January 30, 1987, par. 18.

Convention to the extent and for the period of time strictly required by the exigencies of the situation, provided that such measures are not inconsistent with its other obligations under international law and do not involve discrimination on the ground of race, color, sex, language, religion, or social origin.

2. The foregoing provision does not authorize any suspension of the following articles: Article 3 (Right to Juridical Personality), Article 4 (Right to Life), Article 5 (Right to Humane Treatment), Article 6 (Freedom from Slavery), Article 9 (Freedom from Ex Post Facto Laws), Article 12 (Freedom of Conscience and Religion), Article 17 (Rights of the Family), Article 18 (Right to a Name), Article 19 (Rights of the Child), Article 20 (Right to Nationality), and Article 23 (Right to Participate in Government), or of the judicial guarantees essential for the protection of such rights.

3. Any State Party availing itself of the right of suspension shall immediately inform the other States Parties, through the Secretary General of the Organization of American States, of the provisions the application of which it has suspended, the reasons that gave rise to the suspension, and the date set for the termination of such suspension.

33. Regardless of the distinctions that domestic law may make on the denomination or dimension of states of emergency, states of exception, states of siege, or other similar legal concepts, the IACHR and the Inter-American Court have focused their approach on the way in which States have used the suspension of guarantees in connection with such declarations of exceptional circumstances. In its monitoring work, the IACHR has expressed its concern about the context, purpose, and scope of the measures adopted, recalling the

requirements and limits for their use.[49] Recently, it specifically followed up on the establishment of states of emergency as a containment measure for the COVID-19 pandemic.[50] The IACHR highlighted the disproportionate effects that restrictions or limitations to rights can have on certain vulnerable groups, pointing out the need to adopt positive measures that generate an additional protection framework in this context.[51] It also reaffirmed the fundamental role of the independence and performance of all branches of government and oversight institutions in these circumstances, calling on States to strengthen democratic institutions under a human rights approach in order to comply with international obligations and the Inter-American Democratic Charter.[52]

34. During the suspension of guarantees, some of the legal limits on the actions of the public authorities may be different from those in force under normal conditions; likewise, those in power must act within the law and governed by the effective exercise of representative democracy, and the temporary suspension of the rule of law is not

---

[49] E.g.  IACHR, Situation of Human Rights in Honduras, OEA⁄Ser.L⁄V⁄II. Doc. 146, 13 August 13, 2014, § 34; IACHR, , Situation of Human Rights in Guatemala: Diversity,; and Exclusion OEA⁄Ser.L⁄V⁄II. Doc. 43⁄15, December 31, 2011, para, 2015, § 160, 170, 172; IACHR, Report on the Situation of Human Rights in Jamaica, OEA⁄Ser.L⁄V⁄ II.144 Doc.12, August 10, 2012, par. 34; IACHR, press release 60⁄09 - IACHR presents its preliminary observations on its visit to Honduras. Tegucigalpa, August 21, 2009; IACHR, Honduras: Human Rights and the Coup d'Ètat. Doc. 55 from December 30 30, 2009, § 7, 91; IACHR, Follow-Up Report. Access to Justice and Social Inclusion: The Road towards Strengthening Democracy in Bolivia, OEA⁄Ser⁄L⁄V⁄II.135. 40, August 13, 2014, para. 49; IACHR, 2021 Annual Report, OEA⁄Ser.L⁄V⁄II DOC. Doc. 64 rev. 1 In May 26 26, 2022, §  245; IACHR, 2021 Annual Report, Chapter IV. B Guatemala, May 26, 2022, par.  13; IACHR, 2021 Annual Report, Chapter IV. B Venezuela, May 26, 2022, par.  2; IACHR, Annual Report 2020, Chapter V Guatemala, 2021, par. 85; IACHR, 2020 Annual Report, Chapter IV.B Venezuela, 2021. paras. 2 and 22.

[50] IACHR, Report on the pandemic and Human Rights, OEA/Ser.L/V/II. Doc. 396, September 9, 2022; IACHR, 2019 Annual Report, Chapter IVA, 2020.

[51] IACHR, 130/ 20- IACHR Calls for guarantees for Democracy and the Rule of Law during the COVID-19 Pandemic, June 9, 2020..

[52] IACHR, 130/ 20- IACHR Calls for guarantees for Democracy and the Rule of Law during the COVID-19 Pandemic, June 9, 2020..

admissible.[53] The Commission considers that respect for, and the guaranteeing of, all rights must be the rule and the basis of State action, while curtailment of the exercise of some rights is only authorized under very special circumstances.

35. The Commission and the Court have highlighted the **proclamation of** a state of emergency as an essential condition for the suspension of guarantees.[54] This implies a series of publication and publicity-related acts, which are indispensable in determining responsibilities for the adoption and execution of exceptional measures, so that citizens can know exactly the extent of the limitations to their rights imposed by the State.[55] The idea is to prevent States from arbitrarily suspending rights in cases where material situations do not justify the adoption of such a measure.[56] Thus, in addition to public knowledge of internal turmoil, States have the obligation to comply with the substantial and formal requirements of domestic laws to establish states of emergency.[57]

36. On the other hand, Article 27.3 of the ACHR provides that States must immediately inform the other States Parties to the Convention of the provisions whose application they have suspended, the reasons for the suspension, and the date on which the suspension was terminated. The **notification** procedure, which must be carried out

[53] I/A Court H.R., Advisory Opinion OC-8/87 on Habeas Corpus in Emergency Situations (Articles 27.2, 25.1, and 7.6 of the American Convention on Human Rights), January 30, 1987, paras. 20 and 24.

[54] I/A Court H.R. Case of Baena Ricardo et al. Panama, Merits, Reparations and Costs, Judgment of February 2, 2001. Series C No. 72, par. 94; IACHR, Baena Ricardo et al. Case: Panama, Case of Baena Ricardo et al. v. Panama. Panama, Observations of the Commission to the Written Statement of the State of Panama of June 29, 1998, pp. 9-11, 1998, pp. 9-11.

[55] IACHR, Baena Ricardo et al. Case: Panama, Case of Baena Ricardo et al. v. Panama. Panama, Observations of the Commission to the Written Statement of the State of Panama of June 29, 1998, pp. 9-11, 1998, pp. 9-11.

[56] IACHR, Baena Ricardo et al. Case: Panama, Case of Baena Ricardo et al. v. Panama. Panama, Observations of the Commission to the Written Statement of the State of Panama of June 29, 1998, pp. 9-11, 1998, pp. 9-11.

[57] IACHR, Baena Ricardo et al. Case: Panama, Case of Baena Ricardo et al. v. Panama. Panama, Observations of the Commission to the Written Statement of the State of Panama of June 29, 1998, p. 12, 1998, p. 12.

immediately through the Secretary General of the Organization of American States, constitutes a safeguard to prevent abuse of the exceptional powers of suspension of guarantees and allows other States to assess that the scope of such suspension is in accordance with the provisions of the Convention.[58] Likewise, the State is not exempted from justifying to the international community the existence of the emergency situation and the appropriate nature of the measures taken in this regard.[59]

37. Regarding the **circumstances** that prompt the suspension of guarantees, Article 27.1 expressly establishes the situations that may justify the adoption of these measures: "In time of war, public danger, or other emergency that threatens the independence or security of a State party." The Inter-American Court has pointed out that, in accordance with Article 29.a of the ACHR, such prerogative must be exercised and interpreted as **exceptional** and in restrictive terms.[60] For its part, the Commission has indicated that the circumstances invoked to justify exceptional measures must be very serious and constitute an imminent threat to the organized life of the nation.[61]

38. Accordingly, the IACHR has questioned the suspension of guarantees based on vague or ambiguous expressions such as "acts of violence in different regions of the country", as well as the lack of justification or evidence that the situation could not have been addressed through the

---

[58] I/A Court H.R. Case of Zambrano-Vélez et al. v. Ecuador. Merits, Reparations and Costs, Judgment of July 2, 2004. Series C No. 166, par. 70; I/A Court H.R., Case of Espinoza Gonzáles v. Peru, Preliminary Objections, Merits, Reparations, and Costs. Judgment of 20 November 2014, para. 117.

[59] I/A Court H.R. Case of Zambrano-Vélez et al. v. Ecuador. Merits, Reparations and Costs, Judgment of July 2, 2004. Series C No. 166, par. 70.

[60] I/A Court H.R., Case of Espinoza Gonzáles v. Peru, Preliminary Objections, Merits, Reparations, and Costs. Judgment of 20 November 2014, para. 117.

[61] IACHR, Third Report on the Situation of Human Rights in Colombia, Chapter II. Protection of Human Rights in the Colombian Legal and Political System, OEA/Ser.L/V/II.102 Doc. 9 rev. 1, February 24, 2020, par. 57.

ordinary mechanisms of the State.[62] On another occasion, it indicated that derogating essential guarantees of the population as a way of channeling social unrest and combating crime does not meet the parameters required by the American Convention.[63] For its part, the Inter-American Court has pointed out that the suspension of guarantees must operate as a strictly exceptional measure to confront real emergency situations and does not constitute a means to combat common crime.[64]

39. Even in the exceptional circumstances that authorize the use of this prerogative, the scope of the measures adopted and their adequacy to address the context of the emergency are fundamental elements in defining their compatibility with the precepts of the American Convention. States must ensure that the suspension adopted is strictly limited in extent and time to the requirements of the situation.[65] This means that what is permissible in some circumstances may not be permissible in others.[66] Along these lines, the act that suspends the guarantees must define the **material scope** of the suspension - i.e. the rights suspended -, the **duration,** and the **geographic scope** of its application.[67] Likewise, the **legality of** the measures adopted to address each of the special situations referred to in Article 27.1 will depend on the nature, intensity, depth, and particular context of the emergency, as well as on the

[62] IACHR, Third Report on the Situation of Human Rights in Colombia, Chapter II. Protection of Human Rights in the Colombian Legal and Political System, OEA/Ser.L/V/II.102 Doc. 9 rev. 1, February 24, 2020, par. 65, 67, 71.

[63] IACHR, Annual Report 1998, Chapter V, Ecuador, OEA/Ser.L/V/II.102, April 16, 1999, par. 44.

I/A Court H.R. Case of Zambrano-Vélez et al. v. Ecuador. Merits, Reparations and Costs, Judgment of July 2, 2004. Series C No. 166, par. 52.

[65] Article 27.1 of the CADH.

[66] I/A Court H.R., Advisory Opinion OC-8/87 on Habeas Corpus in Emergency Situations (Articles 27.2, 25.1, and 7.6 of the American Convention on Human Rights), January 30, 1987, par. 22.

I/A Court H.R. Case of Zambrano-Vélez et al. v. Ecuador. Merits, Reparations and Costs, Judgment of July 2, 2004. Series C No. 166, par. IACHR, Criminalization of the Work of Human Rights Defenders, OEA/Ser.L/V/II.144/15, December 31, 2015, para. 34.

**necessity**, **proportionality**, and **reasonableness** of the measures adopted with respect to it.[68]

40. Regarding the temporality of the measures, the IACHR has pointed out that using the state of siege in a systematic manner is tantamount to maintaining a regime of indefinite duration, and that this affects the institutional functioning of the rule of law.[69] It has also criticized the regulation authorizing the maintenance of a state of emergency for up to 270 days and stressed that it can only last as long as the exceptional circumstances giving rise to the emergency persist.[70] On that occasion, the Commission noted the difficulty of conceiving of many situations in which an extraordinary circumstance requiring the declaration of a state of emergency would persist for nine months.[71] It also indicated that the simple regulatory forecast of such a long period of time ends up promoting the use of this measure for that entire period of time.[72] With regard to the judgment on the proportionality of the suspension of certain rights, the IACHR has indicated that it is necessary to evaluate whether it is a measure strictly demanded by the situation.[73] This State decision

---

[68] I/A Court H.R., Advisory Opinion OC-8/87 on Habeas Corpus in Emergency Situations (Articles 27.2, 25.1, and 7.6 of the American Convention on Human Rights), January 30, 1987, par. 22; I/A Court H.R., Case of Espinoza Gonzáles v. Peru, Preliminary Objections, Merits, Reparations, and Costs. Judgment of 20 November 2014, para. 117.

[69] IACHR, Report on the Situation of Human Rights in the Republic of Colombia, Chapter I - Political and Regulatory System, E. The Emergency Regime in the Current Legal System, OEA/Ser.L/V/II.53 doc. June 2, 2000, paras. 2.

[70] IACHR, Third Report on the Situation of Human Rights in Colombia, Chapter II. Protection of Human Rights in the Colombian Legal and Political System, OEA/Ser.L/V/II.102 Doc. 9 rev. 1, February 24, 2020, par. 57–63.

[71] IACHR, Third Report on the Situation of Human Rights in Colombia, Chapter II. Protection of Human Rights in the Colombian Legal and Political System, OEA/Ser.L/V/II.102 Doc. 9 rev. 1, February 24, 2020, par. 57–63.

[72] IACHR, Third Report on the Situation of Human Rights in Colombia, Chapter II. Protection of Human Rights in the Colombian Legal and Political System, OEA/Ser.L/V/II.102 Doc. 9 rev. 1, February 24, 2020, par. 62.

[73] IACHR, Case of Baena Ricardo et al. v. Panama, Observations of the Commission to the Written Statement of the State of Panama of June 29, 1998, p. 2, 1998, p. 12, 1998, p. 12.

cannot be arbitrary; on the contrary, it must be based on the requirements imposed by the particular situation that motivates it, it must be reasonable and proportional to that situation, and there must be no alternative less restrictive of rights that would allow it to overcome the emergency.[74] As for the principle of necessity, it requires the existence of an immediate as well as causal relationship between the measure and the danger it is intended to overcome.[75]

41. At the same time, the bodies of the Inter-American Human Rights System (IARHS) have reiterated the **limits** of State power to suspend rights and freedoms: these provisions must not violate other international obligations of the State, nor entail any discrimination based on race, color, sex, language, religion, or social origin.[76] Likewise, according to Article 27.2 of the ACHR, there are certain **rights whose suspension is prohibited** under any circumstances: articles 3 (Right to Recognition of Juridical Personality); 4 (Right to Life); 5 (Right to Personal Integrity); 6 (Prohibition of Slavery and Servitude); 9 (Principle of Legality and Retroactivity); 12 (Freedom of Conscience and Religion); 17 (Protection of the Family); 18 (Right to a Name); 19 (Rights of the Child); 20 (Right to Nationality); and 23 (Political Rights). Also prohibited is the suspension of the judicial guarantees indispensable for the protection of such rights.

42. In this regard, the Inter-American Court has determined that those judicial procedures that are ordinarily ideal for guaranteeing the full exercise of rights and freedoms that cannot be suspended should be

[74] IACHR, Case of Baena Ricardo et al. v. Panama, Observations of the Commission to the Written Statement of the State of Panama of June 29, 1998, p. 2, 1998, p. 12, 1998, p. 12.

[75] IACHR, Case of Baena Ricardo et al. v. Panama, Observations of the Commission on the Written Statement of the State of Panama of June 29, 1998, p.5, 1998, p.5

[76] I/A Court H.R., Advisory Opinion OC-8/87 on Habeas Corpus in Emergency Situations (Articles 27.2, 25.1, and 7.6 of the American Convention on Human Rights), January 30, 1987, par. 19; IACHR, Third Report on the Situation of Human Rights in Colombia, Chapter II. Protection of Human Rights in the Colombian Legal and Political System, OEA/Ser.L/V/II.102 Doc. 9 rev. 1, February 24, 2020, par. 57.

considered as **indispensable judicial guarantees.**[77] These guarantees will differ according to the rights they seek to protect.[78] All judicial guarantees needed to ensure the effectiveness of the rights and freedoms that have not been suspended in the emergency[79] and those inherent to the preservation of the rule of law[80]must likewise be preserved.

43. Although the Court has not drawn up an exhaustive list of indispensable judicial guarantees, it has expressly recognized in its Advisory Opinions 8 and 9 and reaffirmed in its judgments that the legal procedures enshrined in Articles 25.1 and 7.6 of the American Convention on Human Rights are part of this group of rights that cannot be suspended under any circumstances.[81] Likewise, it has understood that Article 29.c of the ACHR cannot be suspended with respect to the judicial procedures inherent to the representative democratic form of government provided for in the domestic law of the States Parties as best suited to guarantee the full exercise of the rights protected by Article 27.2.[82] In addition, within the framework of

---

[77] I/A Court H.R., Advisory Opinion OC-8/87 on Habeas Corpus in Emergency Situations (Articles 27.2, 25.1, and 7.6 of the American Convention on Human Rights), January 30, 1987, par. 29; I/A Court H.R., Advisory Opinion OC-9/87 on Judicial Guarantees in States of Emergency (Articles 27.2, 25, and 8 of the American Convention on Human Rights), October 6, 1987, par. 41.

[78] I/A Court H.R., Advisory Opinion OC-8/87 on Habeas Corpus in Emergency Situations (Articles 27.2, 25.1, and 7.6 of the American Convention on Human Rights), January 30, 1987, par. 30.

[79] I/A Court H.R., Advisory Opinion OC-8/87 on Habeas Corpus in Emergency Situations (Articles 27.2, 25.1, and 7.6 of the American Convention on Human Rights), January 30, 1987, par. 39.

[80] I/A Court H.R., Advisory Opinion OC-9/87 on Judicial Guarantees in States of Emergency (Articles 27.2, 25, and 8 of the American Convention on Human Rights), October 06, 1987, paras. 38, 41.2.

[81] I/A Court H.R., Advisory Opinion OC-8/87 on Habeas Corpus in Emergency Situations (Articles 27.2, 25.1, and 7.6 of the American Convention on Human Rights), January 30, 1987, par. 44; I/A Court H.R., Advisory Opinion OC-9/87 on Judicial Guarantees in States of Emergency (Articles 27.2, 25, and 8 of the American Convention on Human Rights), October 6, 1987, paras. 41.1, 41.2; I/A Court H.R., Case of Neira Alegría et al v. Peru, Merits. Judgment of 19 January 1995, Series C No. 20., paras, 82- 83; I/A Court H.R., Durand and Ugarte Case Judgment of August 16, 2000. Series A No. 68, para. 106- 107; I/A Court H.R. Case of Zambrano-Vélez et al. v. Ecuador. Merits, Reparations and Costs, Judgment of July 2, 2004. Series C No. 166, par. 54; I/A Court H.R., Case of Osorio Rivera and Family v. Peru, Preliminary Objections, Merits, Reparations, and Costs. Judgment of November 26, 2010, Series C No. 274, par. 120.

[82] I/A Court H.R., Advisory Opinion OC-9/87 on Judicial Guarantees in States of Emergency (Articles 27.2, 25, and 8 of the American Convention on Human Rights), October 6, 1987, par. 41.3.

its contentious function, the Court has ruled on other non-derogable, non-suspendable rights - in particular, the prohibition of arbitrary deprivation of liberty[83] and torture and cruel, inhuman, or degrading treatment or punishment.[84]

44. Article 25.1 refers to a general provision that includes the procedural institution of amparo, understood as a simple and brief judicial procedure that aims to protect all the rights recognized by constitutions, laws, and the Convention, including those protected by Article 27.2 of the ACHR.[85] While Article 25.1 refers to a genre of judicial proceedings, Article 7.6 deals with one of its specific aspects - the writ of habeas corpus.[86] As indicated by the Inter-American Court, habeas corpus in its classic sense directly protects personal or physical liberty against arbitrary detentions, utilizing a judicial mandate addressed to the corresponding authorities to bring the detainee before a judge so that he can examine the legality of the deprivation and, if necessary, order his or her release.[87] In this sense, it also serves as a means to oversee respect for the life and integrity of the person, to prevent his disappearance or failure to declare his whereabouts (place of detention), as well as to protect him from torture or other cruel, inhuman, or degrading treatment or punishment.[88]

[83] I/A Court H.R. Case of Osorio Rivera and relatives v. Peru, Preliminary Objections, Merits, Reparations, and Costs. Judgment of November 26, 2010, Series C No. 274, par. 120; I/A Court H.R. Case of Rodríguez Vera et al. (The Disappeared from the Palace of Justice) v. Colombia. Preliminary Objections, Merits, Reparations, and Costs. Judgment of November 30, 2016, Series C No. 287, par. 402; I/A Court H.R. Case of Yarce et al. v. Colombia. Preliminary Objection, Merits, Reparations , and Costs, Judgment of November 30, 2016, Series C No. 325, par. 141.

[84] I/A Court H.R. Case of Lori Berenson Mejía v. Peru, Merits, Reparations and Costs, Judgment of November 30, 2016, Series C No. 119, par. 100; I/A Court H.R. Case of Rodríguez Vera et al. (The Disappeared from the Palace of Justice) v. Colombia. Preliminary Objections, Merits, Reparations, and Costs. Judgment of November 30, 2016, Series C No. 287, par. 418.

[85] I/A Court H.R., Advisory Opinion OC-8/87 on Habeas Corpus in Emergency Situations (Articles 27.2, 25.1, and 7.6 of the American Convention on Human Rights), January 30, 1987, par. 32.

[86] I/A Court H.R., Advisory Opinion OC-8/87 on Habeas Corpus in Emergency Situations (Articles 27.2, 25.1, and 7.6 of the American Convention on Human Rights), January 30, 1987, par. 34.

[87] I/A Court H.R., Advisory Opinion OC-8/87 on Habeas Corpus in Emergency Situations (Articles 27.2, 25.1, and 7.6 of the American Convention on Human Rights), January 30, 1987, par. 33.

[88] I/A Court H.R., Advisory Opinion OC-8/87 on Habeas Corpus in Emergency Situations (Articles 27.2, 25.1, and 7.6 of the American Convention on Human Rights), January 30, 1987, par. 35.

45. In addition, the indispensable judicial guarantees must be exercised within the framework and according to the principles of **due process of law**, as set forth in Article 8 of the Convention.[89] This article covers the conditions that must be met to ensure the adequate defense of those persons whose rights or obligations are under judicial consideration.[90] In order to be able to speak of true and proper judicial guarantees in accordance with the Convention, these requirements must be observed by the procedural bodies concerned.[91]

46. In sum, the organs of the Inter-American Human Rights System have emphasized that the suspension of guarantees can only be legitimately adopted when the conditions, general principles, and limits on the circumstances, the procedure, and the specific measures affecting the suspended rights or freedoms are respected. In this regard, the Commission and the Court have reaffirmed the importance of the existence of **suitable means for overseeing** emergency provisions issued by the State, so that they are reasonably adapted to the needs of the situation and do not exceed the strict limits imposed by the Convention or derived from it.[92] In this regard, the IACHR has considered it an important advance and guarantee that the country's constitution establishes that declarations of a state of emergency are subject to judicial review.[93]

---

[89] I/A Court H.R., Advisory Opinion OC-9/87 on Judicial Guarantees in States of Emergency (Articles 27.2, 25, and 8 of the American Convention on Human Rights), October 6, 1987, par. 41.3; I/A Court H.R. Case of Neira Alegría et al v Peru, Merits. Judgment of 19 January 1995, Series C No. 20, par. 83; I/A Court H.R. Case of Zambrano-Vélez et al. v. Ecuador. Merits, Reparations and Costs, Judgment of July 2, 2004. Series C No. 166, par. 54.

[90] I/A Court H.R., Advisory Opinion OC-9/87 on Judicial Guarantees in States of Emergency (Articles 27.2, 25, and 8 of the American Convention on Human Rights), October 6, 1987, par. 28.

[91] I/A Court H.R., Advisory Opinion OC-9/87 on Judicial Guarantees in States of Emergency (Articles 27.2, 25, and 8 of the American Convention on Human Rights), October 6, 1987, paras. 27 and 30.

[92] I/A Court H.R., Case of Espinoza Gonzáles v. Peru, Preliminary Objections, Merits, Reparations, and Costs. Judgment of 20 November 2014, para. 120; I/A Court H.R. Case of J. v. Peru, Preliminary Objection, Merits, Reparations , and Costs, Judgment of November 27, 2008. Series C No. 275, par. 139.

[93] IACHR, Third Report on the Situation of Human Rights in Colombia, Chapter II: Protection of Human Rights in the Colombian Legal and Political System, OEA/Ser.L/V/II.102 Doc. 9 rev. 1, February 24, 2020, par. 59 and 69.

47. Finally, the Commission recalls that when certain rights are legitimately suspended, this does not mean that they are completely unenforceable.[94] In this context, the intervention of an independent and impartial judicial body capable of determining the legality of the actions carried out within the state of emergency[95] takes on special relevance, given that any action by the public authorities that exceeds the limits precisely indicated in the provisions that decree the suspension of guarantees[96] constitutes an abuse.

## B. The state of emergency decreed in El Salvador in relation to citizen security

48. In March 2022, the Executive and Legislative Branches of El Salvador declared a state of emergency *(régimen de excepción*) that has been in effect continuously until now: the closing date of this report. On at least four occasions, the IACHR alerted the State to the requirements stipulated in the American Convention for suspending the guarantees protected therein, as well as the limits established by international human rights law in exceptional circumstances.[97] Likewise, the Commission also warned the State about the impact on the exercise of human rights in the country derived from a series of facts and measures adopted in this context, related to citizen security, access to justice, and persons deprived of liberty.

---

[94] I/A Court H.R, Case of J. v. Peru, Preliminary Objection, Merits, Reparations and Costs, November 27, 2013. par. 141.

[95] I/A Court H.R., Advisory Opinion OC-8/87 on Habeas Corpus in Emergency Situations (Articles 27.2, 25.1, and 7.6 of the American Convention on Human Rights), January 30, 1987, par. 30.

[96] I/A Court H.R., Advisory Opinion OC-8/87 on Habeas Corpus in Emergency Situations (Articles 27.2, 25.1, and 7.6 of the American Convention on Human Rights), January 30, 1987, par. 38.

[97] IACHR, Communiqué 82/22 - IACHR Urges El Salvador to implement citizen security actions in accordance with human rights, including under the Emergency Regime, April 20, 2022; IACHR, Communiqué 126/22 - IACHR Urges El Salvador to comply with its international obligations and guarantee penitentiary and citizen security policies with respect for human rights, June 3, 2022; IACHR, Communiqué 254/22 - Seven Months of the Emergency Regime: IACHR reminds El Salvador to comply with its human rights obligations, November 11, 2022; IACHR, Communiqué 58/23 - IACHR calls on El Salvador to reestablish the rights and guarantees suspended one year ago by the emergency regime, April 6, 2023.

49. As indicated above, States do not enjoy unlimited discretion to establish these exceptional measures, and the inter-American bodies must exercise subsidiary and complementary oversight within their spheres of competence.[98] Thus, in this section, the Commission will first examine the rules and procedures adopted by the State to suspend guarantees. The purpose of this is to highlight certain aspects regarding their compatibility with international obligations derived from the treaties to which El Salvador is a party and inter-American human rights standards, as well as the risks of applying these rules and procedures.

### Analysis of Legislative Decree No. 333 of 2022 and its extensions: conventionality and the human rights risks posed by the Decree's application

50. On March 27, 2022, on the initiative of the President of the Republic through the Council of Ministers, the Legislative Assembly of El Salvador approved Legislative Decree (DL) No. 333 - Exceptional Regime (State of Emergency). The decree was published in the Official Gazette on the same date and in its 5 articles: (i) indicates that its purpose is "to facilitate the legal tools and mechanisms to the institutions of Public Security, National Civil Police, and Armed Forces of El Salvador, to reestablish order and citizen security and territorial control"; (ii) declares "an exceptional regime" throughout the national territory, "derived from the serious disturbances to public order by criminal groups that threaten the life, peace, and security of the Salvadoran population"; iii) establishes that the Ministries of Justice and Public Security, of National Defense, and the Director of the National Civil Police shall coordinate actions to comply with the provisions of the decree, as well as coordinate pertinent measures to recover the security of the territory; iv) suspends the constitutional

[98] I/A Court H.R. Case of Zambrano-Vélez et al. v. Ecuador. Merits, Reparations and Costs, Judgment of July 2, 2004. Series C No. 166, par. 47.

rights and guarantees regulated in Articles 7 (right of assembly and freedom of association; prohibition of the existence of armed groups)[99], 12 sub-paragraph 2 (right to be informed of the rights and reasons for the detention, not to be forced to testify, to have technical assistance)[100], 13 sub-paragraph 2 (limit of 72 hours for administrative detention)[101], and 24 (inviolability of correspondence and telecommunications and consequences of their violation)[102], in relation to article 131.27 [103], and article 29[104] all of the Constitution of the Republic; and v) indicates that its provisions are effective for 30 days from the date of publication in the Official Gazette.

---

[99] Article 7.- The inhabitants of El Salvador have the right to associate freely and to meet peacefully, without arms, for any lawful purpose. No one shall be obligated to belong to an association. A person shall not be limited or impeded from the exercise of any licit activity because he does not belong to an association. The existence of armed groups of a political, religious or guild character is prohibited.

[100] Article 12.-[.] The detained person shall be immediately and clearly informed of his rights and of the reasons for his detention, and shall not be compelled to make a statement. The detained is guaranteed the assistance of a defense lawyer (defensor) during the proceedings of the auxiliary organs of the administration of justice and in judicial proceedings, in the terms established by the law.

[101] Article 13.-[.] Administrative detention shall not exceed seventy-two hours, within which the detained must be consigned to the order of a competent judge, with the diligences that he may have practiced.

[102] Article 24 - Correspondence of every kind is inviolable; if intercepted, it shall not be given credence nor accepted as evidence in any legal action, except in the cases of insolvency proceedings and bankruptcy. Interference of telecommunications is prohibited. Exceptionally, the temporary intervention of any kind of telecommunications may be judicially authorized, in a written and reasoned form, maintaining in any case the secrecy of private issues that are unrelated to the process Information drawn from an illegal intervention will have no value. The attested contravention of what is established in this Article, by any official, will be just cause for the instant dismissal from his office and will lead to compensation for damages caused. A special law shall determine the crimes in which investigation of this authorization may be granted. It will also indicate the controls, periodic reports to the Legislative Assembly, and administrative, civil and criminal responsibilities and sanctions that the officials that illegally apply this exceptional measure will incur. The enactment and amendment of this law demands the favorable vote of at least two thirds of the total number of elected deputies.

[103] Article 131 - It corresponds to the Legislative Assembly: […] 27º- To suspend and re-establish the constitutional guarantees in agreement with Article 29 of this Constitution, in a public and registered vote with at least two-thirds of the elected Deputies;

[104] Article 29 - In cases of war, invasion of territory, rebellion, sedition, catastrophe, epidemic, or other general disaster, or serious disturbances of the public order, the guarantees established in Articles 5; 6, first paragraph; 7, first paragraph; and 24 of this Constitution shall be suspended, except for meetings or associations with religious, cultural, economic or sport purposes. This suspension may affect all or part of the territory of the Republic and may be accomplished by a decree of the Legislative Organ or the Executive Organ, as the case may be. The guarantees contained in Articles 12, second paragraph, and 13, second paragraph, of this Constitution shall be suspended whenever the Legislative Organ so accords, with the favorable vote of three quarters of the elected Deputies; the administrative detention not exceeding fifteen days.

51. In consecutive months, and until November 10, 2023, the Assembly approved 21 decrees establishing continuous extensions to Legislative Decree No. 333[105]; all of them also presented by initiative of the Council of Ministers and valid for 30 days. Several extension decrees provide for the extension of the effects of Legislative Decree No. 333 under the same conditions, keeping most of the rights and guarantees contemplated in the aforementioned constitutional articles suspended. However, as of Legislative Decree No. 396 of May 25, 2022, the suspension of the second and third paragraphs of Article 7 of the Constitution - which, respectively, prohibit limiting the exercise of lawful activities for not belonging to an association and prohibit the existence of armed groups - was lifted, maintaining only the suspension of the first paragraph related to freedom of association and assembly. As of Legislative Decree No. 476 of August 17, 2022, the first paragraph of Article 7° was also no longer suspended. Consequently, the constitutional rights and guarantees provided for in articles 12, second paragraph, 13, second paragraph, and 24 were suspended for at least the last 19 months.

52. As noted above, in accordance with the duty of **proclamation** and **notification**, the State must observe certain aspects regarding the publication of the acts adopted to suspend guarantees as well as the publicity of these measures. The Commission has not received information that the State has failed to comply with the formal requirements of domestic law for declaring a state of emergency and suspending guarantees. It did, however, learn of criticisms regarding the material aspects of the measure, which will be addressed below.

[105] Legislative Assembly, Decrees: No. 358, April 24, 2022; Decree No. 396, May 25, 2022; Decree No. 42721, June 2022; Decree No. 454, July 19, 2022; Decree No. 476, August 16, 2022; Decree No. 503, September 14, 2022; Decree No. 530, October 14, 2022; Decree No. 569, November 15, 2022; Decree No. 611, December 14, 2022; Decree No. 644, January 12, 2023; Decree No. 661, February 15, 2023; Decree No. 661, February 15, 2023. 661, February 15, 2023; Decree No. 687, March 15, 2023; Decree No. 719, April 16, 2023; Decree No. 738, May 14, 2023; Decree No. 765, June 16, 2023; Decree No. 797, July 12, 2023; Decree No. 815, August 10, 2023; Decree No. 843, September 13, 2023; Decree No. 865, October 11, 2023; Decree No. 888, November 7, 2023.

53. Regarding publicity on the scope and reasons for the suspension of guarantees, the IACHR notes that Decree Law No. 333 limits its duration to 30 days, as well as the constitutional rights and guarantees that would be suspended, establishing the entire national territory as the scope of application of the measure. In the extension decrees, the geographic scope is not explicit, but the terms of the initial decree are reiterated. The Commission notes that the explanatory memorandum of DL No. 333 indicates the context that would require the suspension of guarantees and the constitutional grounds of "serious disturbances to public order" but does not detail why the suspension of those rights in particular would be a necessary, reasonable, and proportional measure to address the emergency situation. In the extension decrees, the information on the reasons for continuing to adopt the suspension of guarantees varies and, later in this report the Commission will express its concerns about the exceptional nature of this type of measure.

54. The Commission notes that the Permanent Mission of El Salvador to the OAS immediately notified the General Secretariat of the Organization of the suspension of guarantees adopted on March 27, 2022, attaching the respective legislative decree.[106] The extensions of the suspension of guarantees adopted respectively on April 24 and May 25 were only communicated by means of a note sent on June 13, 2022.[107] In the following months all the extension decrees were notified late, with intervals of 1 day to 20 days between the date of

[106] El Salvador, Note Verbale No. MPOEA- OEA-034/2022,March 27, 2022.

[107] El Salvador, Note No. MPOEA- OEA-096/2022, June 13, 2022.

their adoption and international notification[108]; except for Decree No. 888 issued on November 7, 2023, which was not notified until the closing of this report. In this regard, the IACHR takes note of the notifications made and recalls that Article 27.3 of the ACHR requires immediate notification of the provisions whose application has been suspended, the reasons for the suspension, and the date on which the suspension was terminated.

55. Regarding the **emergency situation** that prompted the suspension of guarantees, the IACHR recalls that Article 27.1 of the ACHR only authorizes this measure "In time of war, public danger, or other emergency that threatens the independence or security of a State Party", while the national Constitution admits the suspension of certain guarantees "in cases of war, invasion of territory, rebellion, sedition, catastrophe, epidemic or other general calamity, or serious disturbances of public order"[109] In this regard, it considers it relevant to analyze the information provided on what was allegedly the exceptional context and why it would fall within the contemplated hypotheses.

56. The explanatory grounds identified in DL No. 333 point to "an increase in violent acts throughout the national territory by criminal structures, which endangers the life and physical integrity of the population" and the generation in the country of "a serious emergency [...] in recent hours, due to the increase in homicides that is affecting the population, where the fundamental right to life of the

[108] El Salvador, Note No. MPOEA- OAS-100/2022, June 24, 2022; El Salvador, Note No. MPOEA-OAS-116/2022, July 22, 2022; El Salvador, Note No. MPOEA- OAS-136/2022, August 22, 2022; El Salvador, Note No. MPOEA- OAS-184/2022, October 19, 2022; El Salvador, Note No. MPOEA-OAS-202/2022, November 18, 2022; El Salvador, Note No. MPOEA- OAS-220/2022, December 20, 2022; El Salvador, Note No. MPOEA- OAS-005/2023, January 19, 2023; El Salvador, Note No. MPOEA- OAS-032/2023, March 1, 2023; El Salvador, Note No. MPOEA - OAS-054/2023. March 31, 2023; El Salvador, Note No. MPOEA - OAS-063/2023, April 28, 2023; El Salvador, Note No. MPOEA - OAS-078/2023, May 24, 2023; El Salvador, Note No. MPOEA - OAS-109/2023, June 30, 2023; El Salvador, Note No. MPOEA - OAS-109/2023june 30, 2023; El Salvador, Note No. MPOEA - OAS-126/2023, July 28, 2023; El Salvador, Note No. MPOEA - OAS-146/2023, August 29, 2023; El Salvador, Note No. MPOEA - OAS-172/2023, October 3, 2023; El Salvador, Note No. MPOEA - OAS - 190/2023, October 31, 2023.

[109] Article 29, first paragraph.

entire population is being put at risk" In response to a request for information sent by the IACHR,[110] the State also indicated that criminal groups had responded in an extremely violent manner to State actions that sought to address the phenomenon of violence in a comprehensive manner. State officials stressed that these groups had implemented a "strategy of terror," embarking, between March 24 and 27, 2022, on a wave of indiscriminate homicidal violence, which resulted in the death of at least 92 people; and that on March 26 alone 62 people were killed in 12 of the 14 departments of the country. According to the State, this situation had triggered a serious disturbance to public order, a generalized panic in the population and constituted a national emergency that threatened the independence and security of the State, since those planned actions were aimed at destabilizing the authorities.[111]

57. At the same time, the IACHR received comments questioning the existence of an emergency situation in terms of the exceptional authorization granted by the ACHR and the Constitution of El Salvador. Thus, a civil society organization criticized the fact that Legislative Decree No. 333 did not indicate why the sudden increase in homicides constituted a serious disturbance of public order that altered the normal course of national life.[112] It also pointed out that the country has experienced sudden increases in homicides in the past[113]; and that one view held by the Constitutional Chamber of the Supreme Court of Justice considers that the increase in homicides does not

---

[110] IACHR, request for information from the State El Salvador, 156-22/IACHR/SE/MPCT-Art.41, Ref.: State of Emergency Decree No. 333 - El Salvador, April 4, 2022.

[111] State of El Salvador, Report of the State of El Salvador to the Inter-American Commission on Human Rights on State of Emergency Decree No. 333, Diplomatic Note MPOEA-OEA-063/2022, April 26, 2022; State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OEA-117/2023, July 14, 2023, pp. 5, 6, 9-11.

[112] Cristosal, Legal Analysis of the Emergency Situation (Régimen de Excepción) decreed on March 27, 2022march 29, 2022.

[113] Cristosal, A 'régimen de excepción' that violates the constitution and enables human rights violations is not an effective measure against criminal violence, 2022.

constitute grounds to suspend fundamental rights.[114] According to this jurisprudential precedent, a period of increased crime would be an emergency situation, but it is not regulated in the Constitution as a case warranting suspension of constitutional guarantees.[115]

58. In its observations to the draft of the present report, the State declared that this would be a biased statement that ignores the context surrounding the pronouncement of the Constitutional Chamber regarding the difference between a state of exception and a state of emergency. It indicated that the Constitutional Chamber observed that merely describing a law as an "emergency" is not enough to allege the existence of a "regime of exception" envisaged in Article 29 of the Constitution. For that reason, a distinction is made between the two.[116]

59. With respect to the extensions of DL No. 333, the Commission notes that, in general, the regulations declare the continuity of a state of emergency justifying its continuation in a generic manner based on a risk due to the existence and actions of criminal organizations or pointing out the purpose and results of the measures implemented. In the first renewal of the state of emergency, the measures adopted are alleged to have shown convincing results; however, it is stated that the exceptional security circumstances will persist.[117] The following decrees[118] point out the reduction in the number of homicides and the capture of tens of thousands of people in the country, also stating that the state of emergency in the country persists. Specifically, they argue

---

[114] Cristosal, Legal Analysis of the Emergency Situation (Régimen de Excepción) decreed on March 27, 2022march 29, 2022.

[115] Court of Justice, Constitutional Chamber, Judgment- 15-96 and Ac. Legislative Decree No. 668, February 14, 1996, p . 60.

[116] State of El Salvador, Observaciones del Estado de El Salvador al Informe de la CIDH "Estado de Excepción y derechos humanos en El Salvador"(Observations of the State of El Salvador on the IACHR report entitled "State of Emergency and Human Rights in El Salvador"), Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, p. 49.

[117] Legislative Assembly, Decree No. 358, April 24, 2022.

[118] Legislative Assembly, Decree No. 396, May 25, 2022; Legislative Assembly, Decree No. 427, June 21, 2022; Legislative Assembly, Decree No. 454, July 19, 2022.

that: i) violent acts such as homicides cannot be separated or isolated from the conditions that lead to them; ii) most of the criminals were still at large; and iii) that these criminal organizations would continue to disintegrate and their composition would be affected, which would keep Salvadoran citizens and members of the public security and national defense institutions at risk.

60. Five months after the entry into force of the state of emergency, subsequent decrees[119] continued to stress the highly significant reduction in crime in the country compared to previous years, highlighting what allegedly constituted the lowest homicide rate in El Salvador's historical records. At the same time, they referred to the decrease in the circumstances under which the suspension of rights and guarantees was decreed, but maintained that the threat of criminal activity by these groups persisted. The decree published on December 14, 2022[120] indicates that in addition to the numerous captures of criminals, the main leaders of gang groups were also arrested. Even so, it is reaffirmed that the circumstances that led to the suspension of guarantees are still in place because the attacks and aggressions carried out during the state of emergency persisted. In addition, it is alleged that the criminal organizations and their members have changed their methods of criminal activity and are engaging in the illegal simulation of identity, activities, and trades in order to prevent their location and capture. In this context, the state of emergency would allow the eradication of this criminal phenomenon to continue along with the execution of phase 5 of the Territorial Control Plan, known as "Extraction".

[119] Legislative Assembly, Decrees: No. 476, August 16, 2022; Decree No. 503, September 14, 2022; Decree No. 530, October 14, 2022; Decree No. 569, November 15, 2022.

[120] Legislative Assembly, Decree No. 611 - Prolong throughout the national territory, for a period of 30 days, the effects of Legislative Decree No. 333, dated March 27, 2022, December 14, 2022.

61. The decrees adopted between January and November 2023[121] reiterate that the suspension of guarantees must be maintained because the circumstances under which the suspension of rights and guarantees was decreed persist. These decrees add other grounds for the continuity of the emergency regime, such as: i) that the intervention of the security forces (*fuerza pública*)should lead to the definitive eradication of this type of criminality; ii) the war against gangs faces a structural problem that must be addressed through systematic actions, requiring exceptional conditions to dismantle criminal groups; and, iii) the need to provide conditions for public security authorities to implement inter-agency strategies to revert the deterioration caused by gangs and ensure the sustainability of the progress achieved.

62. Additionally, the State of El Salvador explained to the IACHR that it has not adopted indefinitely the extensions to the emergency regime issued to date, given that they arise from a precise analysis of the temporal context with respect to the reasons for which the measure was originally adopted and which let it to conclude that it was necessary to restrict certain rights specifically identified in the legislative decrees that support those measures. This was to contain the actions of criminal groups that caused serious disturbances to public order and for years filled the population with fear, imposing restrictions on freedom of movement, the exercise of economic activities subject to the payment of extortion, deciding the life or death of many people, and marking in the most atrocious way the lives of women and girls, subjected to sexual slavery or care of the children of the same gang members.[122]

63. The State gave the following reasons for extending the decrees: the seriousness of the organized crime phenomenon; the excessive

[121] Legislative Assembly, Decrees: No. 644, January 12, 2023; Decree No. 661, February 15, 2023; Decree No. 687, March 15, 2023; Decree No. 719, April 16, 2023; Decree No. 738, May 14, 2023; Decree No. 765, June 16, 2023; Decree No. 797, July 12, 2023; Decree No. 815, August 10, 2023; Decree No. 843, September 13, 2023; Decree No. 865, October 11, 2023; Decree No. 888, November 7, 2023.

[122] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 9-11.

complexity resulting from the entrenchment of criminal structures developed for decades within society and their lack of timely treatment; the persistence of conditions of insecurity; the fact that a majority of terrorists are still at large; the risk of mutation due to the process of disintegration of criminal organizations; armed attacks on members of public security institutions; the use of police intelligence for concealment mechanisms of terrorist leaders; the dismantling of the subjugation of some local governments to terrorist groups; the need to maintain the police reaction to terrorist attacks; and the wide variety of criminal mechanisms to prevent location and capture.[123]

64. In its observations on the draft of this report, the State also indicated that the criminal groups comprise more than 120,000 members,[124] 71,000 of whom are detained, so that more or less 36% are still at large and, therefore, there is a latent risk of rearmament, reorganization, and/or retaliation against members of the population who denounced them or those who charged "fees" (extortion).[125] It also stated that the country is facing a scourge that has sought to override the exercise of the powers conferred on state institutions, in order to create a parallel state governed by criminal groups. According to the State, this is the reason why these groups, in a totally illegal and illegitimate manner, have distributed what they considered to be their territorial domains. It also indicated that in these territories the gang leaders imposed their authority and decided how people living in the communities should behave through all forms of coercion and the use

[123] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 9-11.

[124] The IACHR notes that there is a discrepancy between the figures presented by the State in its Report of April 8, 2024 and those contained in Annex 1 of this document. The first document indicates that the criminal groups comprise 120,000 people, while the second refers to 170,000 people.

[125] State of El Salvador, Observaciones del Estado de El Salvador al Informe de la CIDH "Estado de Excepción y derechos humanos en El Salvador"(Observations of the State of El Salvador on the IACHR report entitled “State of Emergency and Human Rights in El Salvador”), Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, p. 49.

of extreme violence.[126] The State asserted that the extension of the emergency regime is justified by the clear evidence that the disintegration of these groups has not led to an immediate or instantaneous reduction in their capacity to cause harm.[127]

65. For their part, civil society organizations affirmed that there are no valid reasons to prolong the state of emergency. They indicated that the period originally described as exceptional had become a permanent state policy; and that a state of emergency cannot be used for ordinary tasks such as crime control, since there are specialized instruments for ordinary use, except in extreme situations that render them ineffective.[128] Likewise, civil society organizations stressed that the circumstance triggering the emergency regime was the increase in homicides that occurred in March 2022 and that this did not persist due to the reduction in homicides, with official figures registering days in which there were no homicides in the country.[129] It was also indicated that the legislative body has not complied with the obligation established in constitutional jurisprudence to document and prove the existence of objective circumstances that justify the appropriate nature, necessity, and proportionality of the measures adopted.[130]

---

[126] State of El Salvador, Observaciones del Estado de El Salvador al Informe de la CIDH "Estado de Excepción y derechos humanos en El Salvador"(Observations of the State of El Salvador on the IACHR report entitled “State of Emergency and Human Rights in El Salvador”), Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, p. 46.

[127] State of El Salvador, Observaciones del Estado de El Salvador al Informe de la CIDH "Estado de Excepción y derechos humanos en El Salvador"(Observations of the State of El Salvador on the IACHR report entitled “State of Emergency and Human Rights in El Salvador”), Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, p. 46.

[128] Amnesty International, El Salvador: Open letter to President Nayib Bukele, April 1, 2022; Azul Originario et al, Annual report on human rights violations during the state of emergency in El Salvador, March, 2023, pp. 14-16.

[129] Cristosal, Resumen Análisis prórroga de régimen de excepción realizada el 17 de agosto de 2022, August, 2022; AMATE, Red Salvadoreña de Defensoras de Derechos Humanos, Idhuca, FESPAD, SSPAS, Cristosal, Organizaciones documentan más de 4,500 denuncias de abusos bajo el régimen de excepción, February 8, 2022.

[130] Cristosal, Summary Analysis of the extension of the state of emergency (exception regime) carried out on August 17, 2022August 2022.

66. The IACHR acknowledges the delicate situation that occurred between March 24 and 27, 2022, and has rejected the acts of violence that resulted in the deaths of 92 people. On that occasion, in view of the context described above, it was necessary for the State to adopt certain actions in order to protect the life and integrity of its population within the framework of its obligation to prevent new violations of the human rights protected by the ACHR. The IACHR will address later in this report whether or not the measures adopted were necessary, reasonable, and proportional to deal with this situation.

67. With respect to the decrees extending the state of emergency subsequent to the initial one, the IACHR emphasizes that it is not sufficient to state that the emergency exists; rather, the State must identify the situation and justify why it falls within one of the specific circumstances enumerated in the American Convention[131]. In this regard, based on information provided by the State, it appears that the regulations extending the suspension of guarantees have not complied with this requirement, given that they do not present specific data or facts illustrating "serious disturbances of public order" when each decree was adopted. On the contrary, they recognize a substantial reduction in violent acts in the country. The Commission also takes into account all the information provided by the State, and described in detail in the following chapter, on how the current citizen security situation in El Salvador is an unprecedented improvement, reflected in multiple facets of life in the country. In this sense, the sum of actions undertaken by the State on different fronts has resulted in a decrease in crime in the country. However, based on current information, the initial objective reasons for the emergency set forth in D.L. No. 333 and its extensions or in the information provided by the

[131] IACHR, Case of Baena Ricardo et al. v. Panama, Reply in the Case of Baena Ricardo et al. v. Panama, Observations of the Commission on the Written Statement of the State of Panama of June 29, 1998, 1998, pp. 9-13.

State[132] no longer persist or justify maintaining the suspension of rights and guarantees protected by the ACHR.[133]

68. In addition to the above, the American Convention establishes that the suspension of guarantees must be strictly limited in time to the requirements of the emergency situation. The Committee notes that the legislature limited the **duration** of the measures to 30-day periods, with each legislative decree taking effect immediately upon expiration of the previous one.[134] As of the second extension of the emergency regime, the regulations went on to cite a ruling of the Constitutional Chamber issued in 2020 on the possibility of extending the emergency regime. According to the Legislative Assembly's interpretation of said judgment, it is not inferred that the extension of the exception regime must be limited to one time only and in no way should it be understood that successive extensions are prohibited. These are considered admissible as long as the circumstances that led to the suspension of rights continue to exist.[135]

---

[132] State of El Salvador, Report of the State of El Salvador to the Inter-American Commission on Human Rights on State of Emergency Decree No. 333, Nota Diplomática MPOEA-OEA-063/2022, 26 de abril de 2022; CIDH, Audiencia 'Derechos humanos y estados de excepción en El Salvador', 187° período de sesiones, 14 de julio de 2023; Estado de El Salvador, Un Nuevo El Salvador, Nota Diplomática MPOEA-OEA-117/2023, 14 de julio de 2023; Asamblea Legislativa, Decretos: No. 358, 24 de abril de 2022; Decreto No. 396, 25 de mayo de 2022; Decreto No. 42721 de junio de 2022; Decreto No. 454, 19 de julio de 2022; Decreto No. 476, 16 de agosto de 2022; Decreto No. 503, 14 de septiembre de 2022; Decreto No. 530, 14 de octubre de 2022; Decreto No. 569, 15 de noviembre de 2022; Decreto No. 611, 14 diciembre de 2022; Decreto No. 644, 12 de enero de 2023; Decreto No. 661, 15 de febrero de 2023; Decreto No. 687, 15 de marzo de 2023; Decreto No. 719, 16 de abril de 2023; Decreto No. 738, 14 de mayo de 2023; Decreto No. 765, 16 de junio de 2023; Decreto No. 797, 12 de julio de 2023; Decreto No. 815, 10 de agosto de 2023; Decreto No. 843, 13 de septiembre de 2023; Decreto No. 865, 11 de octubre de 2023; Decreto No. 888, 7 de noviembre de 2023.

[133] In its observations on the draft of this report, the State declared that this reflected a simplistic vision by the Commission of a complex, structural reality, and one lacking analysis, insight, and a long-term view. See: State of El Salvador, Observations by the State of El Salvador on the IACHR Report entitled "State of Emergency and Human Rights in El Salvador", Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, p. 50.

[134] Except for Legislative Decree No. 427, which came into force days before the end of the period covered by DL No. 396.

[135] Supreme Court of Justice, Constitutional Chamber, Judgment 21-2020AC Unconstitutionality , June 8, 2020. pp. 55–56.

69. In addition, the IACHR notes that, in the aforementioned judgment, the Chamber analyzed the duration of measures related to the containment of the COVID-19 pandemic, and took the view that there was a specific constitutional gap regarding situations involving "epidemics, catastrophes, or general calamities that often last more than 60 days."[136] In this judgment, it indicated that a state of emergency (regime of exception) is a concept that in Latin American history has led to excesses, abuses, and perpetuation of a state of abnormality that should be characterized by its short duration.[137]

70. The Commission emphasizes that any decision aimed at maintaining a regime that is supposed to be extraordinary must unequivocally prove that the exceptional situations that gave rise to it persist, which is not evident from the information provided. In this regard, it reiterates its warning that the suspension of rights and guarantees, especially when applied indefinitely, constitutes an inadequate mechanism to combat crime. A state of emergency cannot, in practice, replace a State's security policy.

71. Regarding the **scope of** the measures adopted and their **legality** to address the emergency situation indicated, the Commission recalls that they must be necessary, reasonable, and proportional to the nature, intensity, depth, and particular context of the emergency. Furthermore, the provisions must not violate other international obligations of the State, involve any discrimination based on race,

[136] Supreme Court of Justice, Constitutional Chamber, Judgment 21-2020AC Unconstitutionality , June 8, 2020. pp. 54.

[137] The Salvadoran Court highlighted the historical context of civil war that El Salvador was facing at the time of drafting its Constitution, noting that "all the discussions of the constituent deputies in relation to the regime of exception were focused on avoiding the perpetuation of the states of siege that were common at that time". See: Supreme Court of Justice, Constitutional Chamber, Judgment 21-2020AC Unconstitutionality June 8, 2020. pp. 37, 53.

color, sex, language, religion, or social origin, or affect **rights that may not be derogated**[138].

72. In the first decree, constitutional rights and guarantees regulated in articles 7, 12, second paragraph, 13, second paragraph, and 24 of the Constitution were suspended, which are directly related to aspects of the right of assembly, freedom of association, the right to personal freedom, judicial guarantees, judicial protection, and the protection of honor and dignity, contemplated in the ACHR. In addition, other elements were included, such as: the prohibition of the existence of armed groups of a political, religious, or trade union nature; the length of time of administrative detention; the procedure for interference and intervention in correspondence, as well as the consequences of their illegal use. As mentioned above, Legislative Decree No. 333 only indicates that the measures are adopted for the containment of serious disturbances to public order, but not the reasons or how the suspension of these rights is essential and proportional in that context. The State submitted to the IACHR complementary information in this regard that addresses, in summary, three components: the magnitude of gang activity; the limitations of the ordinary mechanisms available; and the purpose and value of the extraordinary measures adopted.[139]

73. Regarding the actions of the gangs, it indicated that violence in El Salvador has been pointed out by international organizations as a constant concern and that they have urged the State to improve the situation in the country, with conclusions on the territorial control of the gangs and their responsibility for massive human rights violations in

[138] I/A Court H.R. Habeas corpus in Emergency Situations (Arts. 27.2, 25.1, and 7.6 of the American Convention on Human Rights). Advisory Opinion OC-8/87 of January 30, 1987. Series A No. 8, par. 22; I/A Court H.R. Case of Espinoza Gonzáles v. Peru. Preliminary Objections, Merits, Reparations, and Costs. Judgment of November 20, 2014. Series C No. 289, par. 117.

[139] State of El Salvador, Report of the State of El Salvador to the Inter-American Commission on Human Rights on State of Emergency Decree No. 333, Diplomatic Note MPOEA-OEA-063/2022, April 26, 2022; State of El Salvador, Un Nuevo El Salvador, Diplomatic Note MPOEA-OEA-117/2023, July 14, 2023.

the country. It pointed to the maras or gangs as criminal and terrorist groups, which deliberately provoked an increase in homicides, generating social alarm, public danger, and risk to the security of the State and the Salvadoran population. It alleged that such criminality was not conventional, but constituted an abnormality within the trend that had been occurring. The State indicated that these serious disturbances of public order that needed to be contained were abnormal or extraordinary due to the abruptness of the context that arose, as well as the origin of the disturbances.[140]

74. In its observations on the draft of this report, the State indicated that the characterization of these groups as "terrorist" was due, first, to the fact that, from its perspective, the gangs had an organized structure, which amounted to what it called "a parallel State", with a clear hierarchy, control of territory throughout the country, with rules and codes of conduct to regulate their own actions and those of the population in the territories where they are present. Second, the State reported that these gangs had recruitment processes, illicit financing methods, and previous negotiations with governments. Third, it stated that these groups exercised power through violence and prevailed in certain sectors over the police forces. Fourth, they collected illegal taxes called "fees" and instilled fear in the population by systematically committing homicides, injuries, and threats, redistribution of the cable signal, appropriation of real estate, rape, theft, and robbery, receiving and other related activities such as money laundering, bribery, intimidation, drug trafficking, extortion, arms trafficking, and disappearances. Finally, it stated that they engaged in attacks with explosive devices, burning of public transport vehicles, and homicides, in order to create alarm and undermine state institutions.[141]

---

[140] State of El Salvador, Report of the State of El Salvador to the Inter-American Commission on Human Rights on State of Emergency Decree No. 333, Diplomatic Note MPOEA-OAS-063/2022, April 26, 2022, p. 1-8; State of El Salvador, Un Nuevo El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023.

[141] State of El Salvador, Observaciones del Estado de El Salvador al Informe de la CIDH "Estado de Excepción y derechos humanos en El Salvador"(Observations of the State of El Salvador on the IACHR report entitled "State of Emergency and Human Rights in El Salvador"), Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, p. 60.

75. Regarding the ordinary mechanisms available, the State pointed out that the country has legislation on crime, as well as a judicial system and auxiliary bodies for the administration of justice that work together to develop plans, operations, and government policies to combat crime; however, the legal and institutional framework, as well as the tools to combat crime, have not been sufficient to contain the increase in the number of violent homicides. The State maintained that the ordinary laws would have been an impediment to curtailing the attacks of these criminal groups on the population.[142]

76. The Salvadoran State also indicated that it was necessary to suspend constitutional guarantees in order to address the aforementioned situation through the urgent application of extraordinary measures. The State affirmed that, with the issuance of Decree No. 333, only the rights necessary to contain both the alarming situation of public danger and the risk to the security of the State and the Salvadoran population were restricted; and that these rights were linked to the daily actions of these terrorist groups. In addition, it highlighted the rights that were intended to be protected, such as life, liberty, security, and physical integrity, and the property of the population in general. Thus, in its opinion, the state of emergency (exception regime) approved was proportional and effective to deal with the situation of public danger and security faced by the Salvadoran State[143].

77. The State affirmed that the right of assembly and association of the population was not restricted in general, but only in cases necessary to counteract the illegal and illegitimate actions of gang members or criminal groups. Likewise, it indicated that no events or meetings of any kind had been suspended throughout the national territory. Thus,

---

[142] State of El Salvador, Report of the State of El Salvador to the Inter-American Commission on Human Rights on State of Emergency Decree No. 333, Diplomatic Note MPOEA-OAS-063/2022, April 26, 2022, p. 1-8; State of El Salvador, Un Nuevo El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023.

[143] State of El Salvador, Report of the State of El Salvador to the Inter-American Commission on Human Rights on State of Emergency Decree No. 333, Diplomatic Note MPOEA-OEA-063/2022, April 26, 2022, pp. 1-8; State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OEA-117/2023, July 14, 2023.

church meetings, sports, social, and cultural events were being held normally, contributing to a climate of peace, trust, and security for the benefit of the population. Finally, the State indicated that the purpose of the measures was to prevent members of criminal groups from meeting to conspire and agree on the commission of criminal acts; in other words, the idea was to dismantle the formation of those structures in order to prevent criminal actions. The State claimed that the measures would only apply to members of criminal bodies, whose meetings and associations were held for the planning and execution of criminal acts.[144]

78. For its part, the civil society organization Cristosal pointed out that the Legislative Assembly failed to analyze the proportionality that would justify the use of the state of emergency (exception regime), since it was approved after waiving procedures and without further analysis.[145] The Organization emphasized that the decree is not duly justified since neither the proportionality of the state of emergency as a whole, nor that of each specific right, was determined, a constitutional requirement derived from Article 29 of the Constitution as expressed by the Constitutional Chamber, in its Unconstitutionality Ruling 21-2020 (Cumulative). It pointed out that part of the content of article 12, second paragraph - on not obtaining declarations without the consent of the persons involved - was protected in other constitutional provisions that were not suspended; and that this article refers to judicial guarantees that cannot be suspended in accordance with article 27 of the ACHR.

79. The Commission considers that, although the sudden increase in homicides produced a context that required immediate and urgent

[144] State of El Salvador, Report of the State of El Salvador to the Inter-American Commission on Human Rights on State of Emergency Decree No. 333, Diplomatic Note MPOEA-OAS-063/2022, April 26, 2022, p. 1-8; State of El Salvador, Un Nuevo El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023.

[145] Cristosal, Legal Analysis of the Exception Regime decreed on March 27, 2022 March 29, 2022; Cristosal, A regime of exception that violates the constitution and makes human rights violations possible does not represent an effective measure against criminal violence, 2022.

actions by the State to prevent new fatalities, the suspension of some of the constitutional provisions affected would not be necessary or reasonable measures to address the reported situation. In this regard, it highlights the suspension of the second paragraph of Article 7 of the Constitution, according to which "a person may not be limited or prevented from exercising any lawful activity because he or she does not belong to an association" and the third paragraph of the same article, which "prohibits the existence of armed groups of a political, religious, or trade union nature." The information provided by the State does not allow the IACHR to identify how the regulations present in these constitutional provisions hindered the adoption of State efforts in the aforementioned context. It also notes that, from a literal reading of Article 29 of the Salvadoran Magna Carta, both paragraphs could not be suspended in the framework of a state of emergency (regime of exception).

80. Regarding the proportionality of the measures adopted, the State asserted that the right of assembly and association of the population in general was not suspended, but only in cases necessary to counteract the actions of criminal groups. However, DL No. 333 does not establish conditions, requirements, or limitations when suspending the different constitutional provisions, thus unrestrictedly affecting the entire population in the rights and guarantees it enumerates. Along these lines, it is of concern that this regulation suspends, broadly and throughout the country, the protection established in Article 24 of the Constitution against arbitrary or abusive interferences in private communications, suspending both the requirement of judicial oversight of the interventions carried out by public agents and of the legal consequences of the use of material obtained under these circumstances.

81. Article 13, second paragraph of the Constitution establishes that administrative detention shall not exceed seventy-two (72) hours, within which time the detainee must be placed under the orders of the competent judge, together with any proceedings that may have been

carried out; this is expressly related to Article 7.5 of the ACHR.[146] In the case of suspension of this rule, Article 29, second paragraph of the Constitution establishes a maximum period of 15 days for administrative detentions. Likewise, the maximum period for the presentation of a person before a judicial authority in such circumstances is not expressly specified, so the Commission understands -in the absence of any disclaimer by the State- that a detained person could be detained for up to 15 days without being presented before a judicial authority.

82. In this regard, the Inter-American Court has determined that, even under a suspension of guarantees, it is not proportional for a person detained without a warrant to remain deprived of liberty for 15 days without any form of judicial control.[147] The Court has stressed that the suspension of Article 7.5 of the ACHR cannot be considered absolute, whereby immediate judicial review of the detention is especially important in cases of arrests made without a warrant.[148] The IACHR reiterates the Court's jurisprudence establishing that "the suspension of certain aspects of the right to personal liberty cannot signify that the State's actions can derogate the jurisdictional controls over the way in which detentions are carried out."[149]

83. In addition to the above, the IACHR considers it serious that constitutional provisions related to indispensable judicial guarantees have been suspended, given that the American Convention does not

[146] Article 7.5 - Any person detained shall be brought promptly before a judge or other officer authorized by law to exercise judicial power and shall be entitled to trial within a reasonable time or to be released without prejudice to the continuation of the proceedings. His or her release may be subject to guarantees to assure her or his appearance for trial.

[147] I/A Court H.R. Case of Espinoza Gonzáles v. Peru. Preliminary Objections, Merits, Reparations, and Costs. Judgment of November 20, 2014. Series C No. 289, par. 132; Case of J. v. Peru. Preliminary Objection, Merits, Reparations, and Costs. Judgment of November 27, 2013. Series C No. 275, par. 144.

[148] I/A Court H.R, Case of J. v. Peru, Preliminary Objection, Merits, Reparations and Costs, November 27, 2013. par. 143.

[149] I/A Court H.R, Case of J. v. Peru, Preliminary Objection, Merits, Reparations and Costs, November 27, 2013. par. 144; I/A Court H.R. Case of Castillo Petruzzi et al. v. Peru. Merits, Reparations, and Costs. Judgment of May 30, 1999. Series C No. 52, par. 110.

establish this under any hypothesis. The second paragraph of Article 12 of the Constitution provides for the right of a detained person to be informed immediately and comprehensibly of his rights and the reasons for his detention; not to be forced to testify against himself; as well as the guarantee of the assistance of counsel in the proceedings of the auxiliary bodies of the administration of justice and in criminal judicial proceedings; provisions that are directly related to Articles 7.4, 8.2.g, and 8.2.d of the ACHR.[150] In this regard, the Inter-American Court has pointed out that Article 8 of the ACHR recognizes due process of law, that is, "the procedural requirements that should be observed in order to be able to speak of effective and appropriate judicial guarantees under the Convention."[151] As the Court points out, these principles cannot be suspended even in emergency situations, since they are necessary conditions for the procedural instruments regulated by the Convention to be considered as judicial guarantees.[152]

84. The IACHR considers that Article 7(4) of the American Convention is also part of the core of indispensable judicial guarantees, given that it is an essential tool to prevent arbitrary deprivation of liberty. According to the Inter-American Court, arbitrary deprivation of liberty is prohibited as a non-derogable right which cannot be suspended, even in cases where detention is carried out for reasons of public safety.[153] As, the

---

[150] Article 7.4 - Anyone who is detained shall be informed of the reasons for his detention and shall be promptly notified of the charge or charges against him. Article 8.2 - Every person accused of a criminal offense has the right to be presumed innocent so long as his guilt has not been proven according to law. During the proceedings, every person is entitled, with full equality, to the following minimum guarantees: [...] d. the right of the accused to defend himself personally or to be assisted by legal counsel of his own choosing, and to communicate freely and privately with his counsel;[…] g. the right not to be compelled to be a witness against himself or to plead guilty; and

[151] I/A Court H.R., Advisory Opinion OC-9/87 on Judicial Guarantees in States of Emergency (Articles 27.2, 25, and 8 of the American Convention on Human Rights), October 06, 1987, paras. 27, 28.

[152] I/A Court H.R., Advisory Opinion OC-9/87 on Judicial Guarantees in States of Emergency (Articles 27.2, 25, and 8 of the American Convention on Human Rights), October 6, 1987, par. 30.

[153] I/A Court H.R. Case of Rodríguez Vera et al. (The Disappeared from the Palace of Justice) v. Colombia. Preliminary Objections, Merits, Reparations, and Costs. Judgment of November 14, 2014. Series C No. 287, par. 402.

regards the right established in Article 7.4 of American Convention, the Court has maintained that it refers to two guarantees for the person detained: i) oral or written information on the reasons for detention, and ii) notification, which must be in writing, of the charges.[154] This information at the time of the detention constitutes a mechanism to avoid illegal or arbitrary detentions from the very moment of deprivation of liberty and, in turn, guarantees the individual's right to defense.[155] The lack of information on the facts and the legal basis for the arrest affects the exercise of the defense and makes judicial control illusory.[156] In this sense, this article protects an essential procedure to ensure the proper judicial protection of rights and freedoms that cannot be suspended.

85. With regard to the extension decrees, the IACHR has already indicated that in the months that followed no extraordinary events or ongoing reasons for continuing the initial suspension of guarantees were identified. As noted above, the State has maintained that the level of violence has subsided. From the information provided by the State, there are no elements that merit maintaining the state of emergency. The lack of this requirement demanded by Article 27(1) of the American Convention vitiates the legality of any suspension of guarantees adopted by a State. In addition, the IACHR reiterates that the Convention establishes restrictions for the use of these extraordinary measures not only in terms of the gravity of the situation but also in terms of their permanence over time.

86. The Commission recalls that, in the event of a suspension of guarantees in accordance with inter-American parameters, the

[154] I/A Court H.R, Case of J. v. Peru, Preliminary Objection, Merits, Reparations and Costs, November 27, 2013. par. 149; I/A Court H.R., Case of Espinoza Gonzáles v. Peru, Preliminary Objections, Merits, Reparations, and Costs. Judgment of November 20, 2014, par. 124.

[155] I/A Court H.R, Case of J. v. Peru, Preliminary Objection, Merits, Reparations and Costs, November 27, 2013. par. 149; I/A Court H.R., Case of Espinoza Gonzáles v. Peru, Preliminary Objections, Merits, Reparations, and Costs. Judgment of November 20, 2014, par. 124.

[156] I/A Court H.R, Case of J. v. Peru, Preliminary Objection, Merits, Reparations and Costs, November 27, 2013. par. 149; I/A Court H.R., Case of Espinoza Gonzáles v. Peru, Preliminary Objections, Merits, Reparations, and Costs. Judgment of November 20, 2014, par. 124.

application of the measures in specific cases is subject to jurisdictional control to determine whether they were established in accordance with the laws and international obligations of the State, as well as whether they were used in an abusive manner in the specific cases[157]. In this context, the IACHR emphasizes that the Inter-American Court has held that all authorities and public bodies, including judges and other bodies involved in the administration of justice, at all levels, are, within the framework of their respective competencies, obliged to verify compliance with the Convention in the issuance and application of the norms.[158] Thus, they must assess their validity and compatibility with the American Convention taking into account the treaty itself and, as appropriate, the precedents or jurisprudential guidelines of the Inter-American Court.[159]

87. The State, for its part, referred to the Supreme Court of Justice (CSJ) as the institution with the function of guaranteeing the abstract and concrete control of the constitutionality of acts, omissions, norms and other possible objects of constitutional control, in accordance with the power conferred upon it by Articles 174 and 183 of the Constitution of the Republic.[160] It also added that it is incumbent upon the courts, within their power to administer justice, in cases in which they have to pronounce judgment, to declare the inapplicability of any law, treaty, or provision of other bodies, contrary to the constitutional precepts.[161] In its observations on the draft of this report, the State indicated that no

[157] I/A Court H.R. Habeas corpus in Emergency Situations (Articles 27.2, 25.1, and 7.6 of the American Convention on Human Rights). Advisory Opinion OC-8/87 of January 30, 1987. Series A No. 8, paras. 30 and 38.

I/A Court H.R., Case of Gelman v. Uruguay. Monitoring of Compliance with Judgment. Order of the Inter-American Court of Human Rights of March 20, 2013, par. 69.

[159] I/A Court H.R., Case of Gelman v. Uruguay. Monitoring of Compliance with Judgment. Order of the Inter-American Court of Human Rights of March 20, 2013, par. 69.

[160] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, p. 8.

[161] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, p. 8.

claims of unconstitutionality have been admitted against Decree No. 333 of 2022, nor against the successive extensions of that decree.[162]

88. Finally, the Commission warns once again that the suspension of guarantees is a prerogative that cannot be legitimately adopted without respecting the conditions set forth in the ACHR, inasmuch as certain categories of rights can never be suspended.[163] The IACHR takes into account the risks and effects that the criminal actions of maras and gangs have on the human rights of the population of El Salvador, with respect to which there is a State obligation to provide care from a comprehensive perspective in order to rebuild the social fabric. Efforts to overcome the causes or consequences of crime must be carried out in full respect of the law and the international obligations assumed by the State for all persons under its jurisdiction. In view of the above, the Commission reiterates its call to the State of El Salvador to reestablish the full validity of the rights and guarantees suspended during recent months within the framework of the emergency regime and to adopt measures for the prevention, control, and response to crime within the framework of a citizen security policy evaluated from the perspective of respect and guarantees for human rights.[164] It also calls for criminal activities to be investigated, prosecuted, and punished with due diligence. In this sense, all initiatives related to the prevention or deterrence of crime, the dismantling of organized crime, or criminal charges (*atribución criminal)* must take place within the framework provided by the American Convention for the effective protection and guarantee of human rights in the country.[165]

---

[162] State of El Salvador, Observations of the State of El Salvador to the IACHR Report "State of Emergency and Human Rights in El Salvador," Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, pp. 49-50.

[163] I/A Court H.R., Advisory Opinion OC-8/87 on Habeas Corpus in Emergency Situations (Articles 27.2, 25.1, and 7.6 of the American Convention on Human Rights), January 30, 1987, paras. 21 and 39.

[164] IACHR, Report on Citizen Security and Human Rights, OEA/Ser.L/V/II. Doc. 57, December 31, 2009, par. 35.

[165] IACHR, Report on Citizen Security and Human Rights, OEA/Ser.L/V/II. Doc. 57, December 31, 2009, par. 162.

# CAPÍTULO 2:
# CITIZEN SECURITY AND ACCESS TO JUSTICE

# CITIZEN SECURITY AND ACCESS TO JUSTICE

## A. Citizen security policy adopted in the fight against gangs

89. The IACHR has been monitoring the State's actions in the area of citizen security, particularly the efforts deployed since the change of government in June 2019, including notably the implementation of the Territorial Control Plan (PCT).[166] At that time, the State reported on three of the seven stages of the PCT: 1) "Preparedness": primary prevention and visible presence of the National Police and the Armed Forces, which aims to profile and identify criminal structures in 17 municipalities for frontal combat, through direct intervention; control and strictness in detention centers to improve prison conditions; and deterrence of criminal behavior in the most vulnerable areas to transform the obtaining of resources and livelihoods. 2) "Opportunities": The reconstruction of the social fabric through the prosecution and prevention of crime, aimed at galvanizing social and economic opportunities in vulnerable areas; recovering, cleaning up, and remodeling spaces to improve living conditions, thereby facilitating coexistence and generating a sense of belonging; and providing support through a variety of opportunities and options, transforming localities for insertion into productive life. 3) "Modernization": modernization of the security forces in terms of tools, infrastructure, and resources.[167] Subsequently, the State reported the implementation of Phase 4 "Incursion": which would allow security forces to reach the places where gang groups operate, doubling the 20,000 military personnel already in place and incorporating new police for operations in different parts of the country.[168] Through

166 IACHR, Situation of Human Rights in El Salvador, OEA/Ser.L/V/II. Doc. 278, October 14, 2021, paras. 28–72.

167 IACHR, Situation of Human Rights in El Salvador, OEA/Ser.L/V/II. Doc. 278, October 14, 2021, par. 33.

168 State of El Salvador, Report of the State of El Salvador to the Inter-American Commission on Human Rights on the status of compliance with the recommendations contained in the report "Situation of Human Rights in El Salvador" approved after an on-site visit carried out in 2019, Diplomatic Note MPOEA-OAS-122/2022, July 28, 2022, pp. 5; Ministry of Justice and Public Security, Presidente Nayib Bukele anuncia IV Fase del Plan Control Territorial "Incursión" [President Nayib Bukele anounces Phase IV-- "Incursion" -- of the Territorial Control Plan], July 19, 2021.

information in the public domain, the IACHR learned that Phase 5 "Extraction": was being carried out - with the aim of extracting criminals from the communities[169]; along with Phase 6 "Integration": which, based on the National Directorate of Integration, "will focus on addressing medium and long-term needs where the Salvadoran State, private enterprise, universities, communities, and all sectors of society will be able to join together to address problems such as poverty."[170] The IACHR is not aware of what Phase 7 of the PCT would consist of.

90. In its 2021 country report, the IACHR recognized the drastic reduction in homicides nationwide.[171] For the year 2020 a homicide rate of 21 per 100,000 inhabitants was recorded,[172] reflecting a succession of decreases from the high point recorded in 2015 of 106.3 homicides per 100,000 inhabitants.[173] The Commission expressed its appreciation of positive aspects of the PCT, such as the effort to restore governance in the territories and the measures taken to protect and reconstruct the social fabric.[174]

91. The Commission also expressed concern about the lack of transparency and social participation in the Territorial Control Plan,

---

[169] IACHR, 2022 Annual Report, Chapter V: Follow-up of recommendations made by the IACHR in its country or thematic reports: El Salvador, April 1, 2023, paras. 13, 15; Ministry of Security and Justice of El Salvador, President Nayib Bukele announces Phase 5 of the Territorial Control Plan: Extraction, November 24, 2022.

[170] Ministry of Security and Justice of El Salvador, President Nayib Bukele announces Phase VI of Territorial Control Plan, September 15, 2023.

[171] IACHR, Situation of Human Rights in El Salvador, OEA/Ser.L/V/II. Doc. 278, October 14, 2021, par. 32.

[172] World Bank, United Nations Office on Drugs and Crime International Homicide Statistics Database; Intentional Homicides (per 100,000 inhabitants) - El Salvador; 2020; United Nations, Regional Conference on Population and Development; 2020; UN, Regional Conference on Population and Development, Number of victims of intentional homicides per 100,000 population, disaggregated by sex and age (SDG Indicator 16.1.1). El Salvador, 2020.

[173] State of El Salvador, Un Nuevo El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, on file with IACHR, pp. 8-9; World Bank, United Nations Office on Drugs and Crime International Homicide Statistics database; Intentional Homicides (per 100,000 population) - El Salvador; 2015; United Nations, Regional Conference on Population and Development, Number of victims of intentional homicides per 100,000 population, disaggregated by sex and age (SDG Indicator 16.1.1). El Salvador, 2015.

[174] IACHR, Situation of Human Rights in El Salvador, OEA/Ser.L/V/II. Doc. 278, October 14, 2021, par. 34.

indicating that this made it difficult to identify the measures adopted and to analyze their correlation with the results obtained in terms of citizen security.[175] In this context, the Commission received information about a possible informal agreement between state officials and gangs to reduce violence, which was rejected by the State.[176] In this regard, in its observations on the Draft Report, the State affirmed that there is not, nor has there been any agreement of any kind between the State and the gangs to reduce violence in the current administration.[177]

92. In addition, in its 2021 Report, the IACHR also addressed the punitive response applied by the State, drawing attention to the exponential increase in the application of anti-terrorist laws to alleged gang members and the criminalization of these offenses.[178] It also criticized the involvement of the Armed Forces of El Salvador in citizen security activities[179] and referred to allegations related to abuses in the use of force by the police and armed forces that reportedly resulted in injuries or deaths.[180] It also addressed measures in response to the disappearances that have occurred in the country.[181] The Commission drew up three recommendations regarding these problems, in particular: publicize the Territorial Control Plan and incorporate bodies engaged in civil society participation and dissemination of citizen

---

175 IACHR, Situation of Human Rights in El Salvador, OEA/Ser.L/V/II. Doc. 278, October 14, 2021, paras. 35–36.

176 IACHR, Situation of Human Rights in El Salvador, OEA/Ser.L/V/II. Doc. 278, October 14, 2021, paras. 35–37.

177 State of El Salvador, Observaciones del Estado de El Salvador al Informe de la CIDH "Estado de Excepción y derechos humanos en El Salvador"(Observations of the State of El Salvador on the IACHR report entitled “State of Emergency and Human Rights in El Salvador”), Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, p. 55.

178 IACHR, Situation of Human Rights in El Salvador, OEA/Ser.L/V/II. Doc. 278, October 14, 2021, paras. 39–43.

179 IACHR, Situation of Human Rights in El Salvador, OEA/Ser.L/V/II. Doc. 278, October 14, 2021, par. 48.

180 IACHR, Situation of Human Rights in El Salvador, OEA/Ser.L/V/II. Doc. 278, October 14, 2021, paras. 55–64.

181 IACHR, Situation of Human Rights in El Salvador, OEA/Ser.L/V/II. Doc. 278, October 14, 2021, paras. 65–72.

security policies; urgently carry out diligent and impartial investigations in all cases where civilians are injured or killed by police or military forces, in order to establish the facts and determine the corresponding criminal responsibilities; and strengthen the capacities of the police in order to advance in the implementation of the plan for the gradual replacement of the armed forces in public security tasks, in accordance with Inter-American human rights standards[182]; and it concluded that compliance with these recommendations was still pending at the end of 2022.[183]

93. Despite the notable decrease in the number of violent deaths in the country, between March 24 and 27, 2022, at least 92 homicides were registered in different departments of the country, by organized crime groups, as indicated by the State. This situation was rejected by the IACHR.[184] In this regard, the Commission emphasizes the State's obligation to investigate these events seriously, impartially, and effectively, seeking the truth about what happened and to prosecute and punish all those intellectually and materially responsible for these crimes.[185] It also stresses that the State must ensure due attention and reparation to the victims of the crimes, including the relatives of the deceased victims, in accordance with international standards on the matter.[186]

---

182 IACHR, Situation of Human Rights in El Salvador, OEA/Ser.L/V/II. Doc. 278, October 14, 2021, paras. 342.1, 342.2, 342.3.

183 IACHR, 2022 Annual Report, Chapter V: Follow-up of recommendations made by the IACHR in its country or thematic reports: El Salvador, April 1, 2023, paras. 13–30.

184 CNN, 62 murders registered this Saturday in El Salvador, the most violent day during the government of Nayib Bukele, March 27, 2022; ElSalvador.com, Violence killed 87 people in three days in El Salvador, March 28, 2022; State of El Salvador, Report of the State of El Salvador to the Interamerican Commission of Human Rights on state of emergency Decree No. 333, Diplomatic Note MPOEA-OAS-063⁄2022, April 26, 2022, on file with the IACHR.

185 I/A Court H.R. Velásquez Rodríguez Case v. Honduras. Merits. Judgment of July 29, 1988. Series C No. 4 paras. 177 and 178.

186 IACHR, Report on Citizen Security and Human Rights, OEA/Ser.L/V/II. Doc. 57, December 31, 2009, par. 66.

94. Quite apart from this episode, the Commission considers it necessary to specify that human rights violations can be established even when the responsible agents are not individually identified[187] and that the State must perform due diligence to prevent the violation or address it as required by the American Convention even if an unlawful act violating human rights is not initially directly attributable to a State.[188]

95. The Court has indicated that in the event of any violation of rights, States have the obligation to investigate and punish it, also seeking the reestablishment, if possible, of the violated right and, where appropriate, the reparation of the damages caused by the violation of human rights.[189] Along these lines, the IACHR highlights the relevance of the justice administration bodies, which must carry out their investigation and judicial proceedings guaranteeing the victims of human rights violations or their relatives ample opportunities to participate and be heard, both in the clarification of the facts and the punishment of those responsible, as well as in the search for due reparation.[190] In addition, the IACHR has called on the States to have an adequate institutional framework to provide due attention to the victims of crimes or violent acts as a pillar of their actions in the area of citizen security, including aspects such as material, medical, psychological, and social assistance, among others.[191]

96. On this point, the State indicated that it continues to work to respond to the needs of the victims in order to protect, assist, and repair the

[187] I/A Court H.R. Velásquez Rodríguez Case v. Honduras. Merits. Judgment of July 29, 1988. Series C No. 4, par. 173.

[188] I/A Court H.R. Velásquez Rodríguez Case v. Honduras. Merits. Judgment of July 29, 1988. Series C No. 4, par. 172.

[189] I/A Court H.R., Velásquez Rodríguez Case v. Honduras. Judgment of July 29, 1988, Series C No. 4, par. 166.

[190] Case of Pueblo Bello Massacre v. Colombia. Judgment of January 31, 2006, Series C No. 140, par. 144; I/A Court HR, Case of Gelman v. Uruguay. Judgment of February 24, 2011, Merits and Reparations, par. 187.

[191] IACHR, Report on Citizen Security and Human Rights, OEA/Ser.L/V/II. Doc. 57, December 31, 2009, par. 66; UN, General Assembly, Declaration of Basic Principles of Justice for Victims of Crime and Abuse of Power, A/RES/40/34, 29 November 1985.

damage caused. To this end, the Directorate of Attention to Victims of the Ministry of Justice and Public Security provides attention to the victim population of different acts of violence, but with special emphasis on those who are at risk and in a situation of forced internal displacement.[192] It indicated that this Directorate has 11 Local Victim Assistance Offices deployed throughout the country, where cases are received, victims are interviewed and offered legal, psychological, and psychosocial assistance.[193] In this sense, the aim is to provide a comprehensive response to the victims, in relation to the needs identified during the interview, through referral to other institutions or public or private entities and, as a last step, the action protocol is activated based on the particular case involved.[194] In its observations on the draft of this report, the State indicated that it has requested technical cooperation from the IACHR to address this situation, since it recognizes the need for a policy to assist victims, who for years suffered the scourge of gang violence. It does so despite the fact that the State is already taking major steps to ensure the recomposition of the social and community fabric in the hardest-hit areas and care of the victims of the generalized violence.[195]

97. The Commission values these efforts and expresses its willingness to cooperate technically in strengthening measures to assist crime victims. It also notes that for the year 2022, only about half of the budget foreseen in the Ministry of Justice and Security for the Integral Attention to Victims item ($272,100.00 out of $484,100.00) was executed.[196]

---

[192] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, p. 55.

[193] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, p. 55.

[194] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, p. 55.

[195] State of El Salvador, Observaciones del Estado de El Salvador al Informe de la CIDH "Estado de Excepción y derechos humanos en El Salvador"(Observations of the State of El Salvador on the IACHR report entitled “State of Emergency and Human Rights in El Salvador”), Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, p. 127.

[196] Ministry of Finance, Liquidation of the last approved budget: Statements 1 to 18, General State Budget: Primary Units and Central Government Institutions, Demonstrative Statement of Budget Execution of Expenditures by Primary and Budgetary Units, January 1 to December 31, 2022, March 13, 2023, p. 219, March 13, 2023, p. 219.

98. Following the establishment of the state of emergency and the implementation of new measures in criminal and prison policies, the IACHR requested information on the main measures implemented to prevent and control criminality linked to maras and gangs, as well as their structural factors.[197] It also requested information on the means of data collection and type of statistical information available to the State for the formulation and measurement of the results of public policies in this area; and whether these policies incorporated a human rights approach and citizen participation, particularly of the communities most affected by violence.[198]

99. The State indicated to the Commission that the public security strategies have been implemented in a technical manner and with a minimum impact on rights, using the necessary tools that allow State institutions to defend the rights of citizens in the face of crime, without affecting the social and economic life of the country.[199] In particular, it referred to the state of emergency declaration itself and its extensions as one of the complementary measures adopted in the area of citizen security.[200] It also noted that, as of May 16, 2023, 68,700 criminals had been arrested, 1,201of whom were heads of the various terrorist organizations.[201] The State also pointed to the implementation of security fences in some communities to remove gang members, some of whom are involved in small-scale drug dealing.[202] The State claimed that it had taken resolute steps to address the phenomenon of crime,

[197] IACHR, Request for information from the State of El Salvador, Note No. 247-23/CIDH/SE/MPCT-Art.41, REF: Request for information on the state of emergency (emergency regime) and its effects on human rights, May 10, 2023.

[198] IACHR, Request for information from the State of El Salvador, Note No. 247-23/CIDH/SE/MPCT-Art.41, REF: Request for information on the state of emergency (emergency regime) and its effects on human rights, May 10, 2023.

[199] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, p. 11.

[200] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 8-12.

[201] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, p. 11.

[202] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 42-44.

establishing policies to guarantee the functions of prevention, combating crime, rehabilitation, and reintegration, which had been achieved through regulatory reforms in criminal, criminal procedure, and penitentiary matters.[203] In this regard, it detailed the legal reforms undertaken in the area of criminal justice[204], which will be discussed in more detail in the following section of this report.

100. It also pointed out that violence prevention actions have included an increase in preventive patrols; intelligence-led patrols; intervention operations in communities with the highest incidence of maras or gangs nationwide; permanent police presence in places with the greatest influx of people such as tourist sites, financial or banking systems, markets and bus terminals; searches for persons and motor vehicles, among others.[205] All of this was aimed at reducing common criminal offenses and organized crime, and had resulted in a reduction in the number of homicides, extortion, forced internal displacement by mara or gang members, among others.[206]

101. In its comments on the draft of this report, the State further noted that the "Integration" phase of the Territorial Control Plan, which was launched in September 2022, aims to address the social roots of crime and gangs through community integration and social inclusion. Thus, the National Directorate for Integration will oversee community development initiatives and crime prevention programs. This phase also involves collaboration with civil society organizations and international agencies to develop projects that strengthen community resilience. The State emphasized that modernization of the security forces, creation of opportunities for young people, and social integration are crucial components

[203] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, p. 19.

[204] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 19-20.

[205] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, p. 19.

[206] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, p. 19.

indicative of a proactive and preventive approach to be backed by an annual investment of $30 million.[207]

102. Regarding the information used to formulate and measure public policies, the State reported that the Ministry of Justice and Public Security has implemented different mechanisms for this purpose, such as: i) the Operational Roundtable for Determining Homicide Figures - which aims to collect and validate data related to homicides in the country and provide a reliable national figure of homicides and cases of lethal violence, facilitating decision making and the formulation of evidence-based public policies. It involves the Attorney General's Office, the Institute of Forensic Medicine, the National Civil Police and the Ministry itself; ii) the Data Collection System on High Incidence Crimes - which is aimed at collecting information on the most frequently committed crimes in the country, with the objective of establishing policies and making decisions focused on the most affected territories, allowing for effective inter-agency articulation, given that it is aligned with the Territorial Control Plan and the National Justice and Public Security Policy; iii) the Data System on Violence against Women - focuses on the collection of specific information on gender-based violence, disaggregating the data collected by sex, thereby making it possible to carry out interventions with a gender approach and addressing violence against women more effectively; and iv) the Evidence on Trafficking in Persons - database that provides valuable information for the design and implementation of public policies aimed at combating all forms of trafficking in persons.[208]

103. In addition, the State affirmed that the human rights approach and citizen participation were essential elements in the formulation of public policy and strategies by the Ministry of Justice and Public

[207] State of El Salvador, Observaciones del Estado de El Salvador al Informe de la CIDH "Estado de Excepción y derechos humanos en El Salvador"(Observations of the State of El Salvador on the IACHR report entitled “State of Emergency and Human Rights in El Salvador”), Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, p. 55.

[208] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, p. 21.

Security.[209] It expressed a commitment to human rights and gender equity, reflected by the participation of different institutions in the Operational RoundTable for the Determination of Homicide Figures and the emphasis on sex-disaggregated data in the system of violence against women.[210] Furthermore, in its observations on the draft of this report, the State indicated that, in order to guarantee the rational and proportional use of force during the Emergency Regime, the Secretariat of Professional Responsibility of the National Civil Police created the General Supervision Plan in application of Legislative Decree No. 333, which contains the Emergency Regime. In addition, that Secretariat, through the Human Rights Unit, prepared the Decalogue on the use of force in a state of emergency, which includes the guidelines contained in international obligations, with a special focus on police actions in a state of emergency. The State pointed out that the dissemination of this document was verified at the national level, at the behest of the General Directorate of the National Civil Police, to ensure that police personnel practice self-control during their operations.[211]

104. It also indicated that data collection in communities most affected by violence confirmed a focus on inclusion and citizen participation in decision-making and policy implementation.[212] The State provided extensive information on the efforts undertaken on behalf of vulnerable groups, such as youth, young children, children and adolescents, women, among others, and indicated that it had promoted the adoption of a framework of standards and protection mechanisms for their comprehensive and full development.[213] It also stated that it had

[209] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, p. 21.

[210] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, p. 21.

[211] State of El Salvador, Observaciones del Estado de El Salvador al Informe de la CIDH "Estado de Excepción y derechos humanos en El Salvador"(Observations of the State of El Salvador on the IACHR report entitled “State of Emergency and Human Rights in El Salvador”), Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, p. 45.

[212] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, p. 21.

[213] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 22-29.

prioritized the development of plans for crime prevention and the reconstruction of the social fabric.[214]

105. With regard to actions focused on children, adolescents, and youth, the State reported on the legislative reforms prior to the emergency regime that criminalized the recruitment of children and adolescents, as well as on the implementation of different strategies led by institutions that make up the National System for the Comprehensive Protection of Early Childhood, Children, and Adolescents.[215] It also highlighted actions for the reconstruction of the social and community fabric as part of the implementation of the Territorial Control Plan. In this regard, the State emphasized that between 2021 and 2023, 11 Urban Centers of Wellbeing and Opportunities (CUBO) were inaugurated in areas that were previously controlled by gangs in various parts of the country.[216] The State explained that these facilities allow young people in the communities to develop diverse skills, access training opportunities, and take part in activities for healthy recreation and integration, with more than 308,745 people benefiting.[217] The Commission had the opportunity to visit one of the CUBOs during its visit to the country in 2019, welcomes this initiative to rebuild the social fabric and encourages its replication in other communities.[218] The State indicated that the above is in addition to other strategies for the construction and more dynamic use of public spaces aimed at strengthening community identity and belonging - through culture and sports, for example - as elements of

214 State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 22-29.

215 State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 22-29.

216 State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 22-29.

217 State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 22-29.

218 IACHR. Situation of Human Rights in El Salvador, OEA/Ser.L/V/II. Doc. 278, October 14, 2021, par. 38.

rehabilitation and reconstruction of the social fabric and contributing to the prevention of violence.[219] [220]

106. In addition, the State reported that, as a counterpart to the "war against gangs" and in response to communities that were once inaccessible territories, a comprehensive education reform was launched in September 2022.[221] The purpose of this project was to dignify learning opportunities and facilities in a comprehensive manner and contribute to the formation of new generations through first level educational training based on six pillars: infrastructure, early childhood, teacher training, renewed curriculum, technology, health, and nutrition.[222] In this regard, the State provided details on the institutional transformation carried out with a focus on children and adolescents, which includes the approval of the "Growing Up Together Law for the Comprehensive Protection of Early Childhood, Childhood, and Adolescence" and the creation of the National Council for Early Childhood, Childhood, and Adolescence.[223] It also described the following actions: the 226 Local Rights Committees; the 16 Protection Boards on the rights of children and adolescents; the Network of Entities for the Care of Children and Adolescents, as well as the interagency coordination processes at the territorial level for the

[219] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 22-29.

[220] In its observations on the draft of this report, the State indicated that it has implemented and continues to conduct more than 16 workshops in the 4 Social Integration Centers, with the aim of repairing social and family relationships. It indicated that the workshops allow for reintegration into the community, reduce recidivism, lower the procedural burden, and avoid stigmatization, and have led to educational gains and resocialization. See: State of El Salvador, Observations by the State of El Salvador on the IACHR Report entitled "State of Emergency and Human Rights in El Salvador", Diplomatic Note MPOEA-OEA-054⁄2024, April 8, 2024, pp. 57-58.

[221] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 30-39.

[222] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 30-39.

[223] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 30-39.

comprehensive care of cases of children and adolescents and their families in vulnerable situations identified by Social Welfare.[224]

107. In addition, the State referred to a number of community projects being executed with a focus on children and adolescents, including notably the following: "Linking the families of returned migrant children and adolescents to livelihoods"; "Follow-up of returned migrant children and adolescents and strengthening the sustainable reintegration of their families" - which has benefited hundreds of children and adolescents; "Attention to children and adolescents deprived of liberty" - which has addressed a total of 365 cases.[225] It also pointed to the Protection Programs, which involve interventions, actions, services, or projects with common objectives aimed at early childhood, children, and adolescents whose rights have been threatened or violated; as well as the Shelter Centers for children and adolescents. In addition, the State mentioned programs and facilities that are available to children and adolescents whose rights are threatened or violated and who are deprived of their family environment.[226] In addition, it pointed out the existence of institutions and measures related to juvenile justice, which will be addressed in the next chapter of this report.

108. With regard to efforts to address gang violence against women, the Salvadoran Institute for the Development of Women (ISDEMU), as the institution responsible for women's rights, has been able to consolidate a strategy that allows it to monitor, promote, and ensure compliance with the regulatory framework and public policies on prevention, care, and justice for women who face gender-based violence.[227] The State

---

[224] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 30-39.

[225] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 30-39.

[226] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 30-39.

[227] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 39-41.

reported that ISDEMU implements a management and interagency articulation mechanism at the national level for the comprehensive and specialized care of women facing gender-based violence.[228] Thus, it includes a range of guidance, protection, care, and multidisciplinary counseling services from various devices such as: telephone lines, platforms, specialized care centers, departmental care centers, mobile units, and the Women's Protection System.[229]

109. The State also reported on the implementation of the Territorial Activation Plan in the communities of La Tutunichapa, La Campanera, and El Congo, and its planning for the Las Margaritas neighborhood. These territories are reportedly benefiting from a set of actions involving: social protection, reconstruction of the social fabric, social infrastructure, labor and productive inclusion; with the objective of generating opportunities for economic, social, and cultural development to contribute to the progressive reduction of the conditions of social and economic vulnerability of families of the communities excluded and stigmatized by violence.[230] The State informed that this strategy is part of the second phase of the Territorial Control Plan, called "Opportunities", which seeks to generate conditions for the inhabitants of areas previously besieged by gangs to escape cycles of violence and contribute to the economic and social development of their communities.[231] It also pointed out the multisectoral effort in which more than 15 State institutions work together to bring essential health, education, housing, and sports services to these communities.[232]

---

228 State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 39-41.

229 State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 39-41.

230 State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 37-39.

231 State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 42-44.

232 State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 42-44.

110. In addition to the above, the State of El Salvador reported having carried out infrastructure works in the framework of the Territorial Activation Plan, such as interventions to improve lighting and access to roads previously blocked by gang members; at the same time, having adopted the initiative to get rid of gang territorial symbols while promoting urban art.[233] Another noteworthy measure was the recovery and handing over to formal owners of 5,600 of an estimated 7,000 homes that had been taken or dispossessed by members of criminal organizations and their associates.[234] The State also indicated that it is developing the Judicial Facilitators Program in multiple departments, which relies on volunteer community leaders at the service of the administration of justice to guarantee efficient access to justice, strengthening conflict prevention and resolution mechanisms for peaceful coexistence, and promoting a culture of peace among the inhabitants of their communities.[235] In this regard, it detailed the services provided and activities carried out through this program, which has 611 volunteers.[236]

111. As a result of the aforementioned measures, the State asserted that they have had unprecedented results: the disarticulation of organized crime structures; the reestablishment of public security conditions at the national level; the favorable reversal of crime and impunity rates; the recovery of control of territories historically besieged by criminal groups and effective exercise of authority; the recovery of public spaces; greater security in communities; the reestablishment of property rights; the considerable increase in homicide-free municipalities, and the reduction of the homicide rate to historic lows - reaching 7.8 homicides per 100,000 inhabitants in 2022; as well as a

---

[233] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 42-44.

[234] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 42-44.

[235] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 42-44.

[236] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 42-44.

significant reduction in the crime of extortion.[237] The State indicated that, between June 2019 and July 2023, El Salvador reached the 400-day mark without homicides, reportedly as a result of the implementation of the different phases of the Territorial Control Plan and the application of state of emergency rules.[238] As a result of this level of security, it indicated that it had been able to extend the hours of operation of public passenger transportation[239]; and that health personnel had been able to enter any area where their services are required.[240] In its comments on the draft of this report, the State indicated that, in 2023, only 154 homicides were recorded: a rate of 2.4 homicides per 100,000 inhabitants. It also indicated that the number of municipalities without homicides increased and that whole days without homicides were recorded, reflecting a significant improvement in public safety.[241]

112. In this context, the health sector also reportedly recorded a reduction in medical care due to violence, which made it possible to direct $60 million dollars to other care such as medicines, vaccinations, and care for chronic degenerative diseases.[242] Finally, the State highlighted the security strategy as an economic and tourism enhancer, facilitating an environment where the Salvadoran population can develop its activities and boost its finances without worrying about the risk to their

[237] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 73, 8.

[238] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, p. 7.

[239] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 42-44.

[240] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 42-44.

[241] State of El Salvador, Observaciones del Estado de El Salvador al Informe de la CIDH "Estado de Excepción y derechos humanos en El Salvador"(Observations of the State of El Salvador on the IACHR report entitled “State of Emergency and Human Rights in El Salvador”), Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, p. 28.

[242] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 42-44.

lives or to their sources of work or investment.[243] In this regard, the State emphasized that the security climate resulting from the implementation of the state of emergency and the PCT had attracted important investments in the energy, construction, and technology sectors.[244] It also noted the improvement in the flow of foreign investment and economic cooperation, as well as economic growth of 2.6%, which was reflected in an increase in employment and income, in exports of goods and services, in increased investment, and in households' maintenance of their levels of consumption.[245] The State also stressed that the security strategy had generated greater foreign demand in the tourism sector, reflecting a 78.1% growth in international visitors in the last decade and positioning the country as a tourist destination on a global scale, which has meant an improvement in the quality of life of the population that lives in tourist areas and/or derives its income from tourism.[246]

113. The Commission appreciates the information provided by the State regarding the different areas in which it has been acting to prevent, control, and respond to gang crime in the country. Although the Commission does not address the scope and impact of these measures at this time, it welcomes the fact that a joint effort has been made to prevent violence and mitigate risks and harm to vulnerable groups. In particular, it welcomes those aimed at recomposing the social and community fabric, through multisectoral measures to address the impacts that these territories have suffered over the years. The IACHR considers that actions of this nature play a fundamental

[243] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 12-15.

[244] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 12-15.

[245] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 12-15.

[246] In this regard, the State pointed out the recovery of 96% of post-pandemic tourism by the end of 2022, with a tourist income to El Salvador of 2.5 million visitors and record numbers visiting mountain areas, beaches, and other cultural attractions. Also noteworthy was the choice of the country for various sports tournaments. See: State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 15-18.

role in reducing crime in the territories and encourages strengthening them at the national level. It also stresses the importance of their being carried out and supervised by the citizenry, as mentioned below.

114. The Commission has indicated that public policies on citizen security should aim to prevent and control violent or criminal behavior that affects the exercise of rights, so that the members of a society can go about their daily lives with the lowest level of threat to their personal integrity, their civic rights, and the enjoyment of their property.[247] In this sense, it has pointed out that, from a preventive point of view, they should include three dimensions: primary prevention, based on measures aimed at the entire population in the areas of public health, education, employment, and training for the respect of human rights and the construction of democratic citizenship; secondary prevention, through measures aimed at persons or groups in situations of greater vulnerability to violence and crime, in order to reduce risk factors and generate social opportunities; and tertiary prevention, with actions aimed at persons already involved in criminal conduct, who are serving a criminal sentence, or who have recently completed their sentence.[248] Within this perspective, the Commission appreciates the important steps taken in relation to the primary and secondary prevention dimensions. At the same time, it calls on the State to include the tertiary prevention dimension as a pillar of its crime and violence prevention policy.

115. The IACHR observes that, although the State affirms that citizen participation is an essential element in the formulation of public policy, it does not identify the concrete mechanisms through which citizens can participate in the design, implementation, and evaluation of citizen security policy at the national and local levels. On the

[247] IACHR, Report on Citizen Security and Human Rights, OEA/Ser.L/V/II. Doc. 57, December 31, 2009, paras. 18 and 23.

[248] IACHR, Report on Citizen Security and Human Rights, OEA/Ser.L/V/II. Doc. 57, December 31, 2009, par. 155.

contrary, according to the monitoring carried out before[249] and during the preparation of this report, during the state of emergency, the difficulties in accessing information related to citizen security in the country, such as statistical data and official records on violence and crime, as well as the measures adopted by the State in its prevention, control, and repression of crime, worsened. In this regard, the Commission reiterates its recommendation and encourages the incorporation of civil society participation bodies and dissemination of citizen security policies.

116. While appreciating the efforts referred to regarding violence prevention, risk mitigation, and rehabilitation of the social and community fabric, which it hopes will continue and be consolidated, the Commission has received worrying information on the implementation of operational measures in the field during the current state of emergency, as well as measures for the investigation and criminal prosecution of persons linked to criminal activity, which it addresses below.

## B. Reforms in criminal legislation, criminal procedure, and juvenile justice in connection with the state of emergency: conventionality and risks to human rights of the application of those reforms.

117. While the state of emergency (emergency regime) was in effect, the IACHR became aware of a series of legislative modifications in the areas of criminal law, criminal procedure, and juvenile justice that

[249] IACHR, 2022 Annual Report, Chapter V: Follow-up of recommendations made by the IACHR in its country or thematic reports: El Salvador, April 1, 2023, paras. 15 and 16.

include several aspects of concern related to human rights.[250] The State indicated that it carried out: ten legal reforms in special legislation for the effective prosecution of organized crime and the reinforced protection of victims; nine reforms in criminal legislation to adapt the ranges of penalties for organized crime offenses and the criminalization of the use of expressions and gang insignia for public tranquility and, control and security in communities; and two reforms in criminal procedure legislation with the aim of preventing recidivism of those who are subject to criminal proceedings in organized crime offenses and avoiding the paralysis of criminal proceedings due to the absence of the accused.[251]

118. According to the State, the regulatory modifications shared the same objective as the emergency regime (state of emergency) decree, in that they sought to provide the institutions that exercise the coercive power of the State with the necessary legal mechanisms to effectively stop, counteract, and/or penalize the unlawful conduct linked to the wave of violence perpetrated by the terrorist groups. The State claimed that it was necessary to carry out permanent reforms that would contribute to the fight against terrorist groups, not only in these moments of emergency, but also in the course of time, since over the years these groups have carried out attacks or systematic, planned,

---

[250] Legislative Assembly, Legislative Decree (DL) N°.: 337 of March 30, 2022 - The Penal Code is reformed; DL No. 338 of March 30, 2022 - Law Regulating Drug Related Activities; DL No.- 339 of March 30, 2022 - The Code of Criminal Procedure is reformulated; DL N°. 341 of March 30, 2022 - Amend the Special Law against Acts of Terrorism; DL No. 342 of March 30, 2022 - Reform the Juvenile Penal Law; DL No. 343 of March 30, 2022 - Reform the Special Law against the Crime of Extortion; DL No. 344 of March 30, 2022 - Law on Rewarding and Eliminating Impunity for Acts of Terrorism; DL N°. 349 of April 05, 2022 - The Penal Code is reformed; DL No. 350 of April 5, 2022 - Reform the Law for the Prohibition of Maras, Gangs, Groupings, and Organizations of a Criminal Nature; Legislative Assembly, DL No. 507 of September 21, 2022 - Reform the Code of Criminal Procedure; DL No. 547 of October 26, 2022 - Reform the Law against Organized Crime; DL N°. 548 of October 26, 2022 - Reform the Telecommunications Law; Legislative Assembly, DL No. 803 of July 26, 2023 - Special Transitory Provisions to Order the Prosecution of defendants detained under the Exception Regime (state of emergency), decreed as of March twenty-seventh, two thousand and twenty-two.

[251] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, p. 20.

and organized actions against broad sectors of the population.[252] In its observations on the draft of this report, the State indicated that the reforms are aimed at attacking criminal organizations, and that they are part of a set of regulatory instruments that have been modified to combat an abnormally grave level of crime and that are accompanied by actions aimed at protecting victims and reintegrating individuals within the territories.[253]

119. In this regard, on April 20, 2022, the IACHR urged the Salvadoran State to check whether the legislative reforms adopted abided by the ACHR*(conventionality)*. In a public hearing held in June 2022, civil society organizations argued to the IACHR that the regulations were contrary to international human rights standards, and criticized their repressive nature.[254] In particular, they highlighted their concern about: i) the increase in the lengths of pretrial detention; ii) the creation of "faceless judges"; and, iii) the lowering of the minimum age of criminal responsibility for children and adolescents in conflict with the law; among other aspects. In this regard, the Commission will now analyze its concerns regarding the set of legislative reforms made to criminal policy, highlighting certain modifications that arguably deviate from Inter-American human rights standards.

120. First, regarding changes in the **length and use of pretrial detention or internment (*plazo y el uso de la detención o internamiento provisional*),** the reform to the Code of Criminal Procedure of March 30, 2022 established that, for certain crimes, the previously existing maximum term of pretrial detention will no longer be applicable, and its duration will now be subject to the duration of the proceedings until

[252] State of El Salvador, Report of the State of El Salvador to the Inter-American Commission on Human Rights on State of Emergency Decree No. 333, Diplomatic Note MPOEA-OAS-063⁄2022, April 26, 2022, pp. 7-8.

[253] State of El Salvador, Observaciones del Estado de El Salvador al Informe de la CIDH "Estado de Excepción y derechos humanos en El Salvador"(Observations of the State of El Salvador on the IACHR report entitled "State of Emergency and Human Rights in El Salvador"), Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, p. 66.

[254] IACHR, Hearing 'Situation of Human Rights and the Rule of Law in El Salvador', 184th period of sessions, June 23, 2022.

a final sentence is reached.[255] Likewise, the reform established that, in proceedings against certain crimes, the use of substitute or alternative measures to pretrial detention will not be allowed, which in practice, according to the organizations, would mean the indefinite application of pretrial detention.[256]

121. Both the IACHR and the Court have stressed on different occasions that, as an exceptional and procedural measure, the use of pretrial detention can only be based on its legitimate purposes, namely: to ensure that the accused will not impede the development of the proceedings or evade justice.[257] In this sense, the general rule should be the freedom of the accused person while his criminal responsibility is being resolved, since he enjoys a legal state of innocence that requires that he receive treatment from the State in accordance with his status as an unconvicted person.

122. In addition, the Commission has stressed that pretrial detention should be maintained for a reasonable period of time, and must not be sustained for a period longer than the State can appropriately justify as necessary; otherwise, deprivation of liberty becomes arbitrary. In the same vein, the Commission has established that a reasonable

---

[255] Article 1° of Legislative Decree N°. 339 of March 30, 2022 - The Code of Criminal Procedure is reformed.

[256] Article 5° of Legislative Decree N°. 339 of March 30, 2022; IACHR, Hearing 'Situation of Human Rights and Rule of Law in El Salvador', 184th session, June 23, 2022; Cristosal, Análisis De Las Recientes Reformas Penales: (Analysis of Criminal Reforms) "A return to the inquisitorial model and the lack of protection of rights of the Salvadoran population." September 2022, p.19; Human Rights Observatory of the José Simeón Cañas Centralamerican University, Annual Report 2022: The State of Human Rights in El Salvador, April 2023, pp. 135-136; DPLF, Undue Process. Human Rights Violations During the Emergency Regime in El Salvador. Pretrial Detention, July 2023.

[257] IACHR, Report on Measures Aimed at Reducing the Use of Pretrial Detention in the Americas, OEA/Ser.L/V/II.163, Doc. 105, July 3, 2017, par. 231. B. 2; I/A Court H.R., Case of Mendoza et al. v. Costa Rica, Preliminary Objections, Merits, Reparations, and Costs. Judgment of April 25, 2018. Series C No. 354, par. 367.

period cannot be established in abstract terms because it responds to criteria whose impact should be determined in each individual case.[258]

123. In addition, the Court and the IACHR have emphasized that the application of pretrial detention must be justified in each specific case.[259] In that regard, the IACHR has indicated that legislation contemplating the application of this precautionary measure based on the type of crime contradicts the principles of necessity and proportionality enshrined in the American Convention.[260] Accordingly, the IACHR urges the repeal of any provision requiring its mandatory application and preventing other options based on the type of offense.[261] It also calls upon the State of El Salvador to ensure that detention or pretrial detention is subject to periodic review, so that it is not prolonged when the reasons for its adoption no longer exist.[262]

---

[258] To this end, elements such as the complexity of the case and the level of diligence of the judicial authorities in conducting the investigations may be considered. Thus, it is incumbent upon the State to present elements to justify extending the duration of the measure. Consequently, once the period considered reasonable has expired, the person subject to pretrial detention must be released -without prejudice to the continuation of the proceeding- since the State has lost the opportunity to continue ensuring the end of the proceeding by depriving the accused of his liberty. In these cases, the State must adopt other less harmful measures that ensure the accused's appearance at trial, other than deprivation of liberty. In that connection, see: IACHR, Report on the Use of Pretrial Detention in the Americas, OEA/Ser.L/V/II., Doc. 46/13, December 30, 2013, paras. 159, 168, 169, 173, 361.

[259] I/A Court H.R., Case of Usón Ramírez v. Venezuela. Preliminary Objection, Merits, Reparations, and Costs. Judgment of November 20, 2009. Series C No. 207, par. 144.

[260] IACHR, Report on Measures Aimed at Reducing the Use of Pretrial Detention in the Americas, OEA/Ser.L/V/II.163, Doc. 105, July 3, 2017, par. 231.B.3; IACHR, Report on the Use of Pretrial Detention in the Americas, December 30, 2013, par. 137.

[261] In this regard, in its observations on the Draft Report, the State indicated that it is unacceptable to suggest the repeal of provisions that the State has not implemented. State of El Salvador, Observations of the State of El Salvador to the IACHR Report "State of Emergency and Human Rights in El Salvador," Diplomatic Note MPOEA-OAS-054/2024, April 8, 2024, Annex 1, Methodological Systematization Matrix, line 24, column E.

[262] I/A Court H.R. Case of Mendoza et al. v. Costa Rica. Preliminary Objections, Merits, Reparations, and Costs. Judgment of April 25, 2018. Series C No. 354, par. 362. In this regard, in its observations on the Draft Report, the State indicated that the implementation of the emergency regime does not imply, under any circumstances, omitting periodic review of arrests or pretrial detention, as evidenced by the release of more than 7,000 people, which, it says, demonstrates the State's commitment to due process and justice. State of El Salvador, Observations of the State of El Salvador to the IACHR Report "State of Emergency and Human Rights in El Salvador," Diplomatic Note MPOEA-OAS-054/2024, April 8, 2024, Annex 1, Methodological Systematization Matrix, line 24, column E.

124. On the other hand, the Commission learned that, as measures for the protection of justice operators exercising criminal jurisdiction, the reform of the Code of Criminal Procedure established that administrative or judicial acts shall not contain the names or general data of judges, magistrates, or secretaries, or any other data that may serve for their identification, and that a number or any other code may be used for such purposes; and that, in the practice of face-to-face or virtual hearings, the necessary forms or means shall be used to make their visual identification impossible.[263] Civil society organizations indicated that these measures create the figure of **faceless judges**, which has been rejected by the Commission and the Court in its jurisprudence.[264]

125. In its observations on the draft of this report, the State indicated that "the regulations in force in El Salvador address the need to confront terrorist groups comprising as many as 170,000 individuals that have inflicted pain on the country. .[265] [266] This rule, far from being arbitrary, is implemented in exceptional circumstances and, in fact, there is no documentation of any case in which its application has led to the violation of procedural guarantees." The State also claimed that this reform responded to the need to guarantee the security of judicial authorities, given the gangs' practice of attacking officials of the justice administration system in El Salvador.[267]

263 Article 2° of Legislative Decree N°. 339, March 30, 2022.

264 IACHR, Hearing 'Situation of Human Rights and the Rule of Law in El Salvador', 184th session, June 23, 2022; University Observatory of Human Rights of the Central American University José Simeón Cañas, Annual Report 2022: The State of Human Rights in El Salvador, April 2023, pp. 134-135.

265 The IACHR notes that there is a discrepancy between the figures presented by the State in its Report of April 8, 2024 and those contained in Annex 1 of this document. The first document indicates that the criminal groups comprise 120,000 people, while the second refers to 170,000 people.

266 State of El Salvador, Observations of the State of El Salvador to the IACHR Report "State of Emergency and Human Rights in El Salvador," Diplomatic Note MPOEA-OAS-054/2024, April 8, 2024, Annex 1, Methodological Systematization Matrix, line 25, column E.

267 State of El Salvador, Observaciones del Estado de El Salvador al Informe de la CIDH "Estado de Excepción y derechos humanos en El Salvador"(Observations of the State of El Salvador on the IACHR report entitled "State of Emergency and Human Rights in El Salvador"), Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, p. 60.

126. The IACHR recalls that the ISHR bodies have reiterated that trials before "faceless" or identity-restricted judges violate Article 8(1) of the American Convention, since they prevent the accused from knowing the identity of the judges and, therefore, from assessing their suitability and competence, as well as from determining whether grounds for recusal are present, all of which would hinder the exercise of their defense before an independent and impartial court.[268] The Court has also indicated that this extends to other non-judicial persons involved in the criminal process.[269] In this regard, the IACHR calls on the State to repeal the regulatory or other provisions that allow for the confidentiality of the identity of justice operators in the context of their actions in criminal proceedings.

127. With regard to **juvenile justice**, the Commission is concerned about a significant worsening of the measures applicable to children and adolescents in conflict with the law. In this regard, the previous legislation did not provide for the application of imprisonment to a child or adolescent who had committed an act classified as a crime, and "internment" was the most severe deprivation of liberty measure applicable. With the reform of the juvenile criminal law, three relevant modifications were established, namely: i) the "prison sentence" must necessarily be the measure applicable to a series of infractions previously subject to internment; ii) other infractions were added that will be punishable with this prison sanction; and iii) the maximum applicable sentence was increased - previously 15 years of internment and now 20 years of imprisonment.[270] In this regard, it was established

---

[268] I/A Court H.R, Case of J. v. Peru, Preliminary Objection, Merits, Reparations and Costs, November 27, 2013. par. 184; Cantoral Benavides Case v. Peru. Merits, supra, paras. 127 and 128; Case of Lori Berenson Mejía v. Peru. Merits, Reparations and Costs, supra, par. 147; IACHR, Second Report on the Situation of Human Rights in Peru, OEA/Ser.L/V/II.84 doc. 39 rev. October 14, 1993, Conclusions and Recommendations, Recommendations, par. 6.

[269] I/A Court H.R. Case of Pollo Rivera et al. v. Peru. Merits, Reparations, and Costs. Judgment of October 21, 2016. Series C No. 319, par. 170.

[270] Articles 1° and 2° of Legislative Decree N°. 342 of March 30, 2022; DPLF, Undue Process. Human Rights Violations During the Emergency Regime in El Salvador. The Substantive Criminal Reforms, July 2023, p.15.

that a child in conflict with the law who has reached 12 years of age may be punished with a prison sentence of up to 10 years, and that an adolescent who has reached 16 years of age may be punished with a prison sentence of up to 20 years.[271] In addition, in the current legislation, the 90-day limit for provisional measures for children and adolescents was abolished for certain crimes, which means that children and adolescents may be subject to provisional detention during the proceeding and until the final sentence; and neither detention or prison measures may be modified, substituted, or revoked in certain circumstances.[272]

128. In addition to the above, a legislative amendment of October 2022 established that the Courts against Organized Crime will be competent to hear crimes committed by children and adolescents under the modality of organized crime.[273] According to this reform, cases involving adults and minors as defendants must be heard by two judges, one with jurisdiction for adults and the other for minors, who, in such cases, will hear the cases jointly from the beginning of the proceedings until their completion. Likewise, the norm indicates that the legal guarantees established in legislation and international law must be respected at all times for children and adolescents in the determination of measures, sentences, and penitentiary establishments where the sentences are to be served.[274]

129. In this regard, civil society organizations expressed their opposition to the reduction of the minimum age for criminal responsibility of children

[271] Articles 1° and 2° of Legislative Decree N°. 342, March 30, 2022.

[272] Article 3° of Legislative Decree N°. 342, March 30, 2022.

[273] Article 3° of Legislative Decree N°. 547 of October 26, 2022; Cristosal, Análisis de las recientes reformas penales un regreso al modelo inquisitivo y la desprotección de derechos de la población salvadoreña, (Analysis of recent criminal reforms, return to the inquisitorial model, and failure to respect the rights of the Salvadorian population.) September 2022, pp.12-14.

[274] Article 3° of Legislative Decree N°. 547, October 26, 2022.

and adolescents in conflict with the law,[275] as well as the competence granted to the Courts against Organized Crime to hear crimes committed by this population, because it contravenes the special legal regime for this age group. In this regard, they emphasized that constitutional norms require the structure of a proceeding organized specifically for children and adolescents, with greater guarantees than those used for trying adults.[276]

130. For its part, the State indicated to the IACHR that "police and judicial statistics from criminal investigations show that many minors have assumed an active role in criminal organizations and terrorist structures, participating in confrontations against rival groups and attacking the authorities in charge of public security, as well as carrying out other criminal activities that are part of their 'modus operandi'."[277] For this reason, imprisonment was incorporated as a legal consequence for the commission of crimes related to organized crime. The State also indicated that the reforms to the Juvenile Criminal Law at no time repealed the special regime applicable to minors, and that only those involved in crimes related to organized crime will be treated under a special jurisdiction. It also pointed out that the reforms are in accordance with the Convention on the Rights of the Child, noting that the regulatory reform states that the protection of the rights and procedural guarantees of minors, as provided for in

[275] According to the information received, under the previous legislation, detention measures were only applicable to adolescents over 16 years of age. See: IACHR, Hearing 'Situation of Human Rights and the Rule of Law in El Salvador', 184th session, June 23, 2022; DPLF, Undue Process. Human Rights Violations During the Emergency Regime in El Salvador. Substantive Penal Reforms, July 2023

[276] Cristosal, Analysis of Recent Criminal Reforms: "A return to the inquisitorial model and the lack of protection of the rights of the Salvadoran population",, September 2022, pp.12-14.

[277] State of El Salvador, Report of the State of El Salvador to the Inter-American Commission on Human Rights on the occasion of the Hearing "Detenciones Arbitrarias y Situación de las personas privadas de libertad en el Estado de Excepción en El Salvador," (Arbitrary detentions and the situation of persons deprived of liberty during the state of emergency in El Salvador) Diplomatic Note MPOEA-OAS-186/2022, October 25, 2022, on file with the IACHR.

international legislation and treaties, must be fully ensured.[278] In its observations on the draft of this report, the State indicated that imprisonment for minors is not prohibited in the Convention or in Salvadoran domestic law, and that the limitations and exceptional application that should be applied to it have been complied with in the aforementioned reforms. This is due to the fact that, exceptionally, the imprisonment measures referred to are aimed at punishing those who commit these crimes in the form of organized crime. The State asserts that it is no generalization of prison sentences for minors; on the contrary, imprisonment is only applied in specific cases.[279]

131. Based on the foregoing, the IACHR recalls that one of the principles that governs the juvenile criminal system is the principle of specialization, according to which the adjudication of criminal law offenses committed by children and adolescents is the exclusive competence of the jurisdictional bodies specializing in juvenile criminal matters.[280] Likewise, regarding the minimum age at which children can be held accountable under the juvenile justice system, the Commission recommended that it be raised to an age closer to 18 years of age and, once raised, to ensure, in accordance with the principle of non-regression, that it is not lowered.[281] On the last point, the IACHR recalls that the principle of non-regression in this area implies that States must refrain from adopting legislative or administrative measures that entail a limitation or regression in the

[278] State of El Salvador, Report of the State of El Salvador to the Inter-American Commission on Human Rights on the occasion of the Hearing "Detenciones Arbitrarias y Situación de las personas privadas de libertad en el Estado de Excepción en El Salvador," (Arbitrary detentions and the situation of persons deprived of liberty during the state of emergency in El Salvador) Diplomatic Note MPOEA-OAS-186/2022, October 25, 2022, on file with the IACHR.

[279] State of El Salvador, Observaciones del Estado de El Salvador al Informe de la CIDH "Estado de Excepción y derechos humanos en El Salvador"(Observations of the State of El Salvador on the IACHR report entitled "State of Emergency and Human Rights in El Salvador"), Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, p. 58.

[280] I/A Court H.R., Juridical Condition and Human Rights of the Child. Advisory Opinion OC-17/02 of August 28, 2002. Series A No. 17, paras. 78 and 79.

[281] In that regard, see the IACHR, Juvenile Justice and Human Rights in the Americas OEA/Ser.L/V/II, Doc. 78, Adopted on July 13, 2011, par. 614, Specific recommendations, paras 12). a and 13. e), g).

enjoyment of the rights of children and adolescents subject to the juvenile justice system.[282] Accordingly, States must prevent the entry into force of regulations that seek to suspend certain guarantees in proceedings against children and adolescents accused of breaking criminal laws, or that seek to lower the minimum age for breaking criminal laws or for being subject to ordinary justice, among other regressive measures.[283]

132. In addition, the Commission reiterates that juvenile justice systems must be respectful of the specific legal principles applicable to children and adolescents, as well as the procedural guarantees and judicial protection applicable in all criminal proceedings, including the principle of the presumption of innocence. In the same vein, the use of pretrial detention in this population should be limited to cases in which it strictly serves a legitimate procedural purpose and is duly grounded in the specific case. In addition, the legislation should indicate the maximum terms for the duration of pretrial detention of children and adolescents, which should be reasonably short, as well as establish a mechanism for periodic review of this measure.[284] Finally, the Commission reiterates that the States must guarantee that custodial sentences for children and adolescents be applied only as an exceptional measure of last resort; as well as establish mechanisms for the periodic review of custodial measures that allow this population to regain their freedom in cases where the situation does not warrant their continued imprisonment.[285] In view of the foregoing, the IACHR calls upon the State of El Salvador to adopt all legislative, administrative, and other measures aimed at bringing its juvenile

[282] IACHR, Juvenile Justice and Human Rights in the Americas, OEA⁄Ser.L⁄V⁄II, Doc. 78, Adopted on July 13, 2011, par. 614, Specific recommendations, paras 12). a and 13. e), g);

[283] In that regard, see the IACHR, Juvenile Justice and Human Rights in the Americas, OEA⁄Ser.L⁄V⁄II, Doc. 78, Adopted on July 13, 2011, par. 614, July 13, 2011, Specific recommendations, par. 13 g)

[284] On this, see: IACHR, Juvenile Justice and Human Rights in the Americas, OEA/Ser.L/V/II, Doc. 78, Adopted on July 13, 2011, par. 614, July 13, 2011, Specific recommendations, paras 13, 14. i), and 17. i). j), k), m).

[285] IACHR, Juvenile Justice and Human Rights in the Americas, OEA/Ser.L/V/II, Doc. 78, Adopted on July 13, 2011, par. 614, Specific recommendations, paras 18. a) and g).

criminal law into line with international obligations and the inter-American standards indicated.

133. The Commission has heard other concerns raised by civil society regarding setbacks in the **accusatory model and procedural guarantees** established in the legislation. In particular, they point out the following: (i) the modification in the Telecommunications Law would authorize the Prosecutor's Office to access personal data without the need for authorization or judicial control; (ii) the elimination of the explicit mention, in the Law against Organized Crime, on the control of legality of the evidentiary elements and the prohibition of obtaining illicit evidence; iii) the elimination of the effects that the absence of the person deprived of liberty previously had on the statute of limitations and the continuity of the criminal process, now allowing, inter alia, trials to be held and the process to be concluded with the accused person absent; iv) the granting of documentary evidence status to the mere denunciation and the acceptance of the police record of the interview as testimonial evidence.[286] In addition, the powers of the Public Prosecutor's Office were broadened to group together individuals who are allegedly members of the same criminal organization, without considering criteria such as the nature or typical characteristics of each individual's crime.[287] Regarding this last reform, the Due Process Foundation points out that a prosecutor's request would be sufficient for the case to be removed from one judge to another, based on alleged membership of a certain criminal organization,

[286] IACHR, Hearing 'Situation of Human Rights and the Rule of Law in El Salvador', 184th session, June 23, 2022; Cristosal, Análisis De Las Recientes Reformas Penales: (Analysis of the Recent Criminal Reforms) "A return to the inquisitorial model and the lack of protection of the rights of the Salvadoran population", September 2022, pp. 24-25, 5-6, 9-10, 12-14; Legislative Decree No. 547, October 26, 2022.

[287] Legislative Assembly, Decree No. 803 - Special transitory previsions to regulate the trial of accused detained under the state of emergency, decreed as of March 27, 2022, August 25, 2023; El Faro, Juicios colectivos en El Salvador traspasan una barrera innegociable para los derechos humanos, (Mass trials in El Salvador contravene limits that are non-negotiable when it comes to human rights.) August 11, 2023; Washington Office of Latin America, Juicios Colectivos en el Salvador: un ataque alarmante a los derechos humanos, (Mass trials in El Salvador: an alarming assault on human rights) August 10, 2023.

and could retroactively affect ongoing proceedings.[288] The Commission will refer to the backlog of cases later in the report when addressing the changes made to the structure of the criminal courts during the state of emergency. The IACHR also calls on the State to ensure that legislative changes, especially those of a criminal and criminal procedure nature, are aimed at progressively expanding the protection of human rights, which includes not rolling back the fundamental principles and guarantees of the accusatory criminal model.

134. In its observations on the draft of this report, the State referred to a ruling of the Constitutional Chamber, according to which the absence of the accused at trial would not violate the guarantee of defense contained in Article 11 of the Constitution, if his or her defense attorney is present .[289] It also indicated that notwithstanding the amendment to the Telecommunications Law, the Attorney General's Office has maintained the request for prior judicial authorization for the verification of personal data.[290]

135. The IACHR notes that there were also significant changes in the **criminalization of** different conducts and in the applicable **penalties**. Civil society organizations argued that some of the reformed norms

288 DPLF, Undue Process. Human Rights Violations During the Emergency Regime in El Salvador. Faceless judges and other violations of the guarantee of a competent, independent and impartial judge, 2023

289 Supreme Court of Justice, Constitutional Chamber, Habeas corpus Judgment 493-2016, January 27, 2017, Recital VI. 1; State of El Salvador, Observaciones del Estado de El Salvador al Informe de la CIDH "Estado de Excepción y derechos humanos en El Salvador" (Observations of the State of El Salvador to the IACHR Report "State of Emergency and Human Rights in El Salvador,"), Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, p. 57.

290 State of El Salvador, Observations by the State of El Salvador on the IACHR Report entitled "State of Emergency and Human Rights in El Salvador", Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, p. 59.

are vague and subjective or increase penalties disproportionately.[291] In this regard, they stated that the Constitutional Chamber has indicated that penalties cannot be of such a long duration as to render illusory any prospect of reintegration of the person into his or her social environment.[292] In addition, they indicated that the modification of the object of Article 1 of the Law against Organized Crime would be a step backwards insofar as it alters the investigation of crimes related to organized crime to the investigation of criminal organizations and their members, implying a return to the offender-based criminal law.[293]

136. In its observations on the draft of the present report, the State referred to the amendment of Article 345 of the Criminal Code, which targets persons who, knowing the negative consequences of collaborating with criminal groups, carry out actions that foster the actions of such terrorist groups.[294] In this regard, it indicated that all those persons who promote, help, facilitate, or support the formation or permanence of persons in terrorist groups, carry out such actions. It affirmed that the criminal definition is neither ambiguous nor contradictory, since its scope is properly restricted, so that the assertion that the criminal

[291] Art. 2 of Legislative Decree No.: 337 of March 30, 2022 - Amend the Penal Code; Art. 1 of Legislative Decree No. 338 of March 30, 2022 - Amend the Law Regulating Drug-Related Activities. As examples, they mentioned: the modification to the Penal Code that establishes penalties of 20 to 30 years in prison for persons who "receive direct or indirect benefit from relations of any nature with such organizations" - gangs or any other criminal organization; also the substantial increase in the penalties related to the Law Regulating Drug Activities - which previously established a prison sentence of 15 years as the highest penalty applicable to the crimes regulated therein and then, with the reform, established that the penalties will be from 20 to 30 years when committed by terrorist members, maras, gangs, or any other criminal group. On this, see: IACHR, Hearing 'Situation of Human Rights and the Rule of Law in El Salvador', 184th session, June 23, 2022; DPLF, Undue Process. Human Rights Violations During the Emergency Regime in El Salvador. The substantive penal reforms, July 2023.

[292] Court of Justice, Constitutional Chamber, Unconstitutionality Judgment 5- 2001, December 23, 2010.

[293] Cristosal, Analysis of Recent Criminal Reforms: "A return to the inquisitorial model and the lack of protection of the rights of the Salvadoran population", September 2022, pp. 11-12.

[294] State of El Salvador, Observaciones del Estado de El Salvador al Informe de la CIDH "Estado de Excepción y derechos humanos en El Salvador"(Observations of the State of El Salvador on the IACHR report entitled “State of Emergency and Human Rights in El Salvador”), Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, pp. 58-59.

definition causes insecurity or arbitrariness is unfounded.[295] The Commission has previously warned that countries in northern Central America have adopted "mano dura policies" that include linking criminal gangs to terrorism, such as the regulations of the Special Law Against Acts of Terrorism (LECAT). Regarding this law, the IACHR notes that there have been a number of questions about its constitutionality.[296] In 2015, the Supreme Court of Justice ratified several reforms to the Special Law against Acts of Terrorism, which declared some of the gangs and maras as terrorist groups.[297] The Constitutional Chamber of the Supreme Court also ratified that the LECAT contains a criminological justification for the punishment of just active membership in a terrorist organization.[298] In this regard, on different occasions, including in its report on the human rights situation in El Salvador, the Inter-American Commission has expressed its concerns about the application of anti-terrorism laws in this context.[299]

137. The IACHR has held that the principle of legality in matters of anti-terrorist laws is one of the fundamental guarantees of due process and a fair trial, which must be observed with particular attention by

[295] The State affirmed that, in essence, the amendment requires an intention to deliberately promote, aid, or support ongoing membership of those groups, whereby the means used to that end may be any activity that favors the emergence of new criminal groups or encourages their members to stay in those groups, because that entails strengthening such criminal groups through actions that promote, aid, or support the forming or permanence of such groups. Also, the criminal offense is not limited to the above-mentioned willful intention. Objectively, it also requires a profit motive, which is why the legislator made commission of the criminal offense dependent not only on executing the willful act of aid or promotion, but also on there being a causal link with a clearly defined outcome, consisting of a direct or indirect benefit, always in connection with support for organized crime: a condition that precludes simple collaboration. State of El Salvador, Observations by the State of El Salvador on the IACHR Report entitled "State of Emergency and Human Rights in El Salvador", Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, pp. 58-59.

[296] Supreme Court of Justice, Constitutional Chamber, 22-20007/42-2007/89-2007/96-2007, August 24, 2015.

[297] Supreme Court of Justice, Constitutional Chamber, 22-20007/42-2007/89-2007/96-2007, August 24, 2015.

[298] Supreme Court of Justice, Constitutional Chamber, 244-2015, September 2, 2015; State of El Salvador, Observations of the State of El Salvador to the Report of the IACHR "State of Emergency and Human Rights in El Salvador," Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, p. 33.

[299] IACHR, Situation of Human Rights in El Salvador, OEA/Ser.L/V/II. Doc. 278, October 14, 2021, paras. 39–42.

States in the course of anti-terrorist strategies. It indicated that the principle of criminal legality is "(of) particular pertinence in the context of terrorism (...). Ambiguities in laws proscribing terrorism (...) undermine the propriety of criminal processes that enforce those laws." [300] With respect to the classification of terrorist crimes, the IACHR has also warned that the principle of legality is violated when national legislation uses criminal definitions that are vague, abstract, or imprecise, as opposed to modern criminal systems modern criminal systems which resort to rigid terms that do not allow for greater interpretation; especially in cases in which the criminal definitions of terrorism can be confused with each other or with other criminal definitions that allow for broad interpretation, hindering the necessary legal certainty that the State must guarantee in this area.[301]

138. In this regard, in its report, the IACHR indicated that the Salvadoran State must take administrative, legislative, and judicial measures to ensure that the legislation satisfies the principle of legality both in its content and in its application.[302] It also urged effective compliance with all due process guarantees and, in particular, guaranteeing the presumption of innocence, as well as the precept that no one should be convicted of a crime except on the basis of individual criminal responsibility in the application of the law in question.[303]

139. On the other hand, the IACHR and its Rapporteurship on Freedom of Expression (RELE) have also expressed their views on the inclusion of **criminal offenses that restrict freedom of expression** , which will be addressed in Chapter 4 of this report.

---

[300] IACHR, Situation of Human Rights in El Salvador, OEA/Ser.L/V/II. Doc. 278, October 14, 2021, paras. 39- 42, IACHR, Report on Terrorism and Human Rights, OEA/Ser.L/V/II.116 , Doc. 5 rev. 1 corr. October 22, 2022.

[301] IACHR, Situation of Human Rights in El Salvador, OEA/Ser.L/V/II. Doc. 278, October 14, 2021, paras. 39- 42, IACHR, Report on Terrorism and Human Rights, OEA/Ser.L/V/II.116 , Doc. 5 rev. 1 corr. October 22, 2022.

[302] IACHR, Situation of Human Rights in El Salvador, OEA/Ser.L/V/II. Doc. 278, October 14, 2021, paras. 39–42.

[303] IACHR, Situation of Human Rights in El Salvador, OEA/Ser.L/V/II. Doc. 278, October 14, 2021, paras. 39–42.

140. The Commission notes that the set of legislative modifications made to criminal policy prioritizes a higher level of incarceration and a strongly punitive model as a solution to citizen security challenges. The IACHR notes that the punishable conducts and the applicable penalties have been increased, without the legal consequences necessarily being proportionate to the harm inflicted on legally protected assets, and that this is compounded by the possibility of greater application of pretrial detention and restrictions of the guarantees available to the persons charged. In this regard, the Commission has questioned the adoption of reforms of this nature in the region, noting that they are generally implemented without scientific reflection and a serious and inclusive debate on their relevance, feasibility, and consequences.[304] In addition, it has indicated that they reverse the progress achieved in strengthening the due process system and rationalizing the use of pretrial detention, and it has highlighted the severe impact of this approach generates on prison systems.[305] [306]

141. In its country report on Human Rights in El Salvador, the Commission urged the State to adopt measures aimed at making rational use of imprisonment, such as the use of the pretrial detention regime in accordance with the relevant standards, and the promotion, regulation, and application of alternative measures to the deprivation of liberty.[307]

---

304 IACHR, Report on the use of pretrial detention in the Americas OEA/Ser.L/V/II. Doc. 46/13, December 30, 2013, paras. 79 and 80.

305 IACHR, Report on the use of pretrial detention in the Americas OEA/Ser.L/V/II. Doc. 46/13, December 30, 2013, paras. 79 and 80.

306 In its observations on the Draft Report, the State indicated that amendments should not be analyzed in isolation, without taking into consideration the whole set of normative instruments that have been modified, in order to reach the conclusion that they are "punitive" or imply a step backward, which the Draft Report does; because this ignores both the objective of combating a level of crime that is far more serious than common crime and the other policies implemented by the State to deal with the problem comprehensively. See: State of El Salvador, Observations of the State of El Salvador to the IACHR Report "State of Emergency and Human Rights in El Salvador," Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, pp. 64-65.

307 IACHR, Situation of Human Rights in El Salvador, OEA/Ser.L/V/II Doc.278/21, October 14, 2021, par. 137.

Along these lines, the Commission reiterates its recommendation that the State establish a criminal policy aimed at using deprivation of liberty as a measure of last resort, by prioritizing the application of alternative measures,[308] which should be respectful of the gender perspective and the intersectional and intercultural approaches.[309] In conclusion, the IACHR emphasizes that strategies focused exclusively on the control and repression of violence and crime are insufficient to adequately address the structural and underlying causes that motivate violence and that usually disproportionately affect individuals and groups of people who are in a situation of vulnerability in the exercise of their rights, such as children, adolescents, and youth.[310] In this regard, the Commission calls on the State of El Salvador to focus more on policies for the prevention and reduction of violence aimed at responding to its causes with effective measures, from a comprehensive perspective that prioritizes the human rights approach and takes into consideration the social reintegration of convicted persons, as well as adequate care and reparation for victims.[311]

## C. Complaints on human rights violations related to the criminal policy implemented during the state of emergency

142. Since the installation of the emergency regime, the IACHR has received extensive complaints about human rights violations related to the measures adopted by the State in this context.[312] A number of civil

308 IACHR, Situation of Human Rights in El Salvador, OEA/Ser.L/V/II Doc.278/21, October 14, 2021, par. 342. Recommendation 12.

309 IACHR, Report on Women Deprived of Liberty in the Americas, OEA/Ser.L/V/II., Doc. 91/23, March 8, 2023, par. 316.

310 IACHR, Violence, Children, and Organized Crime, OEA/Ser.L/V/II.Doc. 40/15, November 11, 2015, paras. 114 and 118.

311 IACHR, Violence, Children, and Organized Crime, OEA/Ser.L/V/II.Doc. 40/15, November 11, 2015, par. 118.

312 IACHR, Hearing on 'Situation of Human Rights and the Rule of Law in El Salvador', 184th period of sessions, June 23, 2022; IACHR, Hearing on 'Arbitrary Detentions and Situation of Persons Deprived of Liberty during the State of Emergency in El Salvador', 185th period of sessions, October 25, 2022; IACHR, Hearing on ‘Human Rights and States of Emergency in El Salvador’, 187th period of sessions, July 14, 2023.

society organizations filed complaints and followed up on cases of possible violations, documenting at least 4,723 cases involving 5,082 people during the first year of the regime, mostly in urban areas, especially in the department of San Salvador.[313] Likewise, organizations pointed out that the military sieges carried out in different areas of the country imposed de facto restrictions on circulation, entry into, and exit from the territories under military control that were not contemplated by the emergency decrees and other national regulations.[314]

143. Regarding the facts reported, in the "Informe anual sobre violaciones a derechos humanos durante el estado de excepción en El Salvador" (Annual report on human rights violations during the state of emergency in El Salvador), it is recorded that 4,825 facts (95%) referred to arbitrary detentions; 1,233 to lack of due process; 1.046 to breaking and entering; 925 to threats; 402 to cruel, inhuman, and degrading treatment; 213 to ill-treatment; 211 to excessive use of force; 193 to forced disappearances; 147 to injuries; 111 to deaths of persons deprived of liberty; 22 to torture; 13 to sexual harassment; 6 to homicides; and 3 to rapes.[315] They also received reports of other types of conduct, including harassment, intimidation, robbery, and theft.[316] Additionally, they documented other consequences derived from this

---

[313] Azul Originario, Centro de Estudios de la Diversidad Sexual y Genérica, Cristosal, Fundación de Estudios para la Aplicación del Derecho, Instituto de Derechos Humanos de la UCA, Red Salvadoreña de Defensoras de Derechos Humanos, Servicio Social Pasionista (hereinafter Azul Originario et al.), Informe anual sobre violaciones a derechos humanos durante el estado de excepción en El Salvador (Annual Report on Human Rights Violations During the State of Emergency in El Salvador), March 2023, pp. 37-39.

[314] Azul Originario et al, Informe anual sobre violaciones a derechos humanos durante el estado de excepción en El Salvador, March 2023, pp. 38-39.

[315] Azul Originario et al., Informe anual sobre violaciones a derechos humanos durante el estado de excepción en El Salvador, March 2023, p. 43.

[316] Azul Originario et al., Informe anual sobre violaciones a derechos humanos durante el estado de excepción en El Salvador, March 2023, p. 43.

context.[317] Likewise, the organizations also stressed that the people and their families affected by the measures implemented have endured various kinds of hardship.[318]

144. Regarding the profile of the victims referred to in this group of complaints, this report indicates that 4,743 were adults, 87 children and adolescents, and 252 were not described as pertaining to any particular age group; 4,246 persons were cisgender men, 743 cisgender women, 35 were trans men, 29 were trans women, 5 were non-binary/queer persons, and information on gender identity was not available for 25 persons.[319] In addition, in the group of 3,275 complaints of violations received exclusively by the Cristosal organization, it was recorded that 58 of the persons detained are persons with disabilities; and that 506 cases correspond to violations of the rights of family members of detainees.[320]

145. In March 2023, the IACHR took virtual testimonies from 29 people in order to obtain direct and in-depth information on the effects of the measures adopted during the emergency regime on human rights.[321] In this process, testimonies were taken from the following: persons detained and subsequently released during the regime; relatives of persons deprived of their liberty, including those who died in State custody; and legal representatives of the detained persons and their relatives. The Commission received information mainly on the arrests

---

317 Azul Originario et al, Informe anual sobre violaciones a derechos humanos durante el estado de excepción en El Salvador, March 2023, pp. 46-47; Cristosal, Personas en situación de desplazamiento forzado interno por el régimen de excepción (Persons suffering forced internal displacement as a result of the state of emergency.), June 2022.

318 Azul Originario et al., Informe anual sobre violaciones a derechos humanos durante el estado de excepción en El Salvador, March 2023, p. 48.

319 Azul Originario et al., Informe anual sobre violaciones a derechos humanos durante el estado de excepción en El Salvador, March 2023, pp. 40, 41.

320 Cristosal, One year under the emergency regime: a permanent measure of repression and human rights violations. Situation Report for March 27 to 2022 March 27, 2023,May 12, 2023, pp. 21-22.

321 The Commission had the collaboration of civil society organizations in the process of identifying and counseling persons affected in this context based on the data contained in their complaints

made, the judicial oversight of the arrests and access to justice, the conditions of detention, and the personal impacts generated by the events reported. The IACHR was struck by the fear expressed by those providing information that there would be retaliation in criminal proceedings against them or their family members, which reportedly dissuaded other people from giving their testimonies.

**Illegal and arbitrary detentions**

146. The State indicated to the IACHR that, as of June 27, 2023, there were 65,940 persons detained during the 15 months of the emergency regime and placed at the order of the Attorney General's Office, of whom 63,114 were adults and 2,826 were minors.[322] By the beginning of November 2023, this figure had risen to 73,000 people according to public information[323], of whom at least 60,452 people were reportedly deprived of liberty in the first year of the regime alone.[324] By way of comparison, the University Observatory of Human Rights of the José Simeón Cañas University (OUDH) recorded, based on data from the National Civil Police, that in 2019, a total of 41,112 people were detained in the country including cases of persons in the act of committing crimes (flagrante delicto), or cases involving execution of orders issued by the Prosecutor's Office or a court; while in 2020, 30,956 detentions were counted; and 26,777 up to October 31, 2021.[325] These data show that the annual

[322] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, p. 52.

[323] Diario Las Américas, El Salvador repeals law on penalties for disseminating gang messages, November 2, 2023; NTN24, "En El Salvador hay más de 73.000 detenidos que no se sabe si son inocentes": defensora en Derechos Humanos ("In El Salvador there are more than 73,000 detainees whose guilt or innocence is unknown": Human Rights Defender.), November 6, 2023.

[324] Ministry of Security [@SeguridadSV]. (December 19, 2022). Estamos haciendo justicia en nombre de miles de salvadoreños. (We are doing justice on behalf of thousands of Salvadorans.) #Seguimos 24/7 en esta #GuerraContraPandillas. (#WeContinue 24/7 in this #WarAgainstGangs.) [Tweet].

[325] OUDH, Report: An X-Ray on the Right to Personal Liberty in El Salvador, 2021, pp. 46-48; OUDH, Annual Report 2021: The State of Human Rights in El Salvador2021, p. 59; OUDH, Annual Report 2020: The State of Human Rights in El Salvador2020, p. 75; OUDH, Annual Report 2019: State of Human Rights in El Salvador, 2019, pp. 56-57.

number of arrests made had been declining in the years prior to the state of emergency, but doubled during the first year of its implementation. The Commission also notes that the highest number of monthly detentions occurred in the first weeks of the state of emergency, as shown in the graph below:




Source: Prepared by the authors based on data from the Ministry of Justice and Public Security.[326]

[326] Graph prepared from data obtained from Ministry of Security [@SeguridadSV] Tweets: (2022, March 29), (2022, April 27), (2022, May 25), (2022, June 29), (2022, July 29), (2022, August 29), (2022, September 26), (2022, October 28), (2022, November 28), (2022, December 19), (2023, January 30), (2023, February 22), (2023, March 27), (2023, April 12), (2023, May 12). The number of persons detained during the state of emergency ceased to be disseminated on the Ministry's social networks as of May 2023.

147. From the information received from civil society organizations, as well as from the State, the IACHR observes worrisome situations that reportedly occurred during operations conducted by the security forces: allegations that were reiterated in the testimonies collected. In particular, they refer to a pattern of alleged illegalities and arbitrariness in detentions carried out in this context, including the absence of flagrante delicto circumstances or of an administrative or judicial order prompting the deprivation of liberty; and the use of discriminatory criteria to justify detentions based on the personal or socioeconomic characteristics of the person, or for having a criminal record. Witnesses also drew the IACHR's attention to an alleged failure to inform the detainee of the reason for his or her detention. The Commission also learned of other allegations of violations of rights in the context of the arrests carried out, including episodes of abuse in the use of force in these proceedings.

148. It is of concern that, in this context, the alleged illegal and arbitrary detention of a large number of people may have been justified, ordered, and tolerated as part of the security policy pursued in the context of the emergency decreed by the State. A number of sources indicate that there is pressure or incentives from political or institutional authorities within the Security Forces to detain a certain number of people per day. In this scenario, the police workers' movement pointed out the existence of a quota of 1,000 arrests per day.[327] In this regard, the Commission notes that there was a high number of arrests in the first months of the state of emergency, with a total of 20,000 people arrested in the first month alone.[328] There were

[327] La Prensa Grafica, Policemen denounce irregularities in arrest requests, April 12, 2022; Human Rights Watch, Cristosal, "We can detain whoever we want" Widespread human rights violations during the "regime of exception" in El Salvador, December 2022, pp. 63, 64; La Prensa Gráfica, Police Established "Detainee Quotas" in El Salvador, According to Movement Leader, July 27, 2023; La Prensa Gráfica, Walter died after being beaten by police when they captured him: "They ended up killing him. Our problem is that it could happen to any of us.", April 4, 2022'; La Prensa Gráfica, Captures under the State of Emergency total 22,754, May 3, 2022.

[328] Ministry of Security [@SeguridadSV]. (April 22, 2022). Historical results. Our elements of the @PNCSV and @FUERZARMADASV will continue to work in an articulated manner in this #GuerraContraPandillas (WarAgainstGangs) to get out of [Tweet].

also reports of alleged retaliation against security agents who failed to comply with orders from their superiors because they considered them illegal or arbitrary.[329] Likewise, the organizations also recorded that, in some cases, the reason given by the security agents for the detention was allegedly "following orders from superiors" or "orders from the president."[330] In the same sense, different people heard by the IACHR reported having been present during conversations of security agents about the existence of quotas or incentives related to detentions. By way of example, some testimonies indicated:

He was on his way to work [...] They passed a police post where they stopped the vehicle and told him he was being detained. His daughter went to the delegation. They told him "we already know this fellow and we know that he is clean and that he is not involved in anything". His daughter asked: "so why are you taking him away?" and they replied that it was routine. She was told not to worry, he would be out in 15 days. [...] "I believe that their only objective was to make a number of arrests."[331]

I was transferred to the cells in Usulután. The agents had been saying that for each person they detained in the state of emergency they were given an extra salary. With my capture, they completed the number of captures they had to make.[332]

When they were taking me to the police station, the policemen were saying: "with this one we meet the quota and we're off on leave."[333]

---

[329] La Prensa Grafica, Three police officers accused of breach of duty arrested, May 3, 2022; El Faro, The Regime's hidden files: hundreds of arrests for "nervousness" and "police record", August 7, 2022.

[330] Human Rights Watch, Cristosal, "We Can Arrest Anyone We Want" Widespread Human Rights Violations During the "State of Emergency" in El Salvador, December 2022, p. 66.

[331] Testimony No. 28 of March 23, 2023. Family member of a detained person.

[332] Testimony No. 16 of March 17, 2023. Person released under alternative measures (female).

[333] Testimony No. 23 of March 22, 2023. Person Released under substitute measures (female).

149. For their part, civil society organizations indicated that they have documented massive unlawful arrests and documented evidence of at least 1,100 cases, almost all without search or arrest warrants.[334] The IACHR was also informed that numerous arrests were reportedly based on anonymous complaints and social media, or based on the person having a "suspicious" or "nervous" appearance, with no relation to previous investigations into the crimes.[335] In this regard, Cristosal pointed out that, among the cases received, 209 people were reportedly arrested as a result of anonymous calls. A press investigation indicated a lack of transparency regarding the methodology and information used by the police to build the database of suspected gang members and collaborators, whose records have been used to support multiple arrests during the regime.[336] Thus, testimonies received by the IACHR point out:

> In the evening, at about 7 o'clock, two national police officers suddenly came up to my room. I asked how I could help them. They approached me and asked for my name and my I.D. (DUI). They asked me to accompany them to the delegation because a person was saying that I was doing things. According to them, they would only ask me a few questions at the delegation. [At the police station] They told me they had received an anonymous call saying that I was collaborating with the gangs. I told him that I could not be arrested based on that evidence.[337]

[334] Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report for March 27, 2022 to March 27, 2023, May 12, 2023, pp. 22, 23; Human Rights Watch, Cristosal, "We Can Arrest Whomever We Want" Widespread Human Rights Violations During the "Emergency Regime" in El Salvador, December 2022, pp. 63, 65.

[335] Cristosal, One year under the emergency regime: a permanent measure of repression and human rights violations. Situation Report March 27, 2022 to March 27, 2023, May 12, 2023, pp. 22-24; El Faro, The Regime's hidden files: hundreds of arrests for "nervousness" and "mugshot" (*ficha policial*), August 7, 2022.

[336] El Faro, The Regime's hidden files: hundreds of arrests for "nervousness" and "police record", August 7, 2022.

[337] Testimony No. 6 of March 15, 2023. Person released under alternative measures.

At the police station they asked me if I had been arrested before. I told them that I did have a police record. They asked me if I had tattoos. I told them yes, I have artistic tattoos. In the arrest report they said that there was an anonymous call against me. They never mentioned why I was being detained.[338]

He was taken as a result of an anonymous phone call. There are people who are lending themselves to filing anonymous complaints in return for money.[339]

150. The organizations also indicated that there was a pattern of arresting and charging persons with criminal records of the crime of belonging to illicit groups, even if they had served their entire prison sentence or were subject to alternative measures, or even had been acquitted with their cases dismissed in the framework of criminal proceedings.[340] It was also recorded that several people arrested during the regime were re-arrested after regaining their freedom, and charged with other crimes such as those related to terrorist organizations.[341] As of mid-October 2022, more than 43,000 people had been arrested for the crime "pertaining to illicit groups" and more than 7,000 for alleged membership in a "terrorist organization."[342] In this context, a lawyer reported that:

I have had cases in which [...] they grant the substitute measures, but when they let the person out of the prison gate, the police re-arrest the

[338] Testimony No. 11 of March 16, 2023. Person released under alternative measures.

[339] Testimony No. 18 of March 20, 2023. Family member of a person who died in detention.

[340] Cristosal, One year under the emergency regime: a permanent measure of repression and human rights violations. Situation Report for March 27 2022 to March 27, 2023,May 12, 2023, p. 23.

[341] Cristosal, One year under the emergency regime: a permanent measure of repression and human rights violations. Situation Report for March 27 2022 to March 27, 2023,May 12, 2023, p. 24.

[342] Human Rights Watch, Cristosal, "We Can Arrest Anyone We Want" Widespread Human Rights Violations During the "State of Emergency" in El Salvador, December 2022, p. 92.

person and they no longer present him/her to the same Prosecutor's Office, but to another Prosecutor's Office.[343]

151. The testimonies gathered by the IACHR, data from civil society organizations, and information in the public domain indicated that repeated arrests have been carried out solely on the basis of the physical appearance and socioeconomic situation of the individuals, thus stigmatizing tattooed persons and residents of low-income communities.[344] The testimonies also reveal acts of discrimination and criminalization of adolescents and women who have been identified as companions of suspected gang members.[345] In this regard, some of the testimonies collected indicate the following:

I was at home resting, I was with my daughter and my wife. […] They asked me for my identity documents. "You know there is an exception regime and you have tattoos," they told me. I replied that they were artistic tattoos and that they were not allusive to any gang. I told them that I was a student and worked [...], but they took me into custody.[346]

A few days earlier my partner (*compañero de vida*) had been arrested. On my way home on my motorcycle, I was given the stop sign. They asked for my license, my motorcycle card, and my I.D. They told me "We have been waiting for you all day." One asked me if I was

343 Testimony No. 3 of March 14, 2023. Defense attorney.

344 Human Rights Watch, Cristosal, "We Can Arrest Whomever We Want" Widespread Human Rights Violations During the "Emergency Regime" in El Salvador, December 2022, pp. 65, 68; Cristosal, One year under the emergency regime: a permanent measure of repression and human rights violations. Situation Report March 27, 2022 to March 27, 2023, May 12, 2023, p. 23; ElSalvador.com, Militares tratan diferente a los tatuados dependiendo de donde viven (Military treat tattooed persons different depending on where they live), August 21, 2022.

345 Cristosal, Violaciones a los derechos humanos Durante el régimen de excepción en El Salvador. (Human Rights Violations During the Emergency Regime in El Salvador) Situation Report for the period from March 27 to April 26, 2022, May 2022, p. 23; Cristosal, Violaciones a los derechos humanos Durante el régimen de excepción en El Salvador. (Human rights violations during the state of emergency in El Salvador) Situation Report for the period April 27 to May 25, 2022, June 14, 2022, pp. 27-28.

346 Testimony No. 17 of March 20, 2023. Person released under alternative measures.

the life partner of my partner, who had been arrested. They asked me to accompany them. Those were the reasons for my arrest. The policeman called other police officers advising that they already had the person they were looking for.[347]

She was in informal employment. Around 12:00 p.m. Three national police officers arrived and detained her with the lie that she was only going to answer a few questions and that was why they were taking her to the police station. [...] At the delegation, they told me "leave her there because she is not going to leave. She is here because of a link to a boy who is in detention. I don't know if you know that your daughter had a relationship with a gang member. You better leave her, if your daughter didn't know how to make the most of her time, you better leave her." Since one lives in poor areas or areas catalogued as dangerous or with persistent gangs, everyone or the police officers presumed that they all belong to crime or gangs.[348]

152. In addition to the above, the organizations pointed out the existence of cases in which people with psychosocial disabilities or mental health conditions were detained and, in several episodes, this was linked to aspects associated with their personal condition.[349] They also indicated that, in these cases, it has not been possible to determine whether detention procedures have respected the special obligations of States to ensure the rights of persons with disabilities.[350]

---

[347] Testimony No. 16 of March 17, 2023. Person released under alternative measures (female).

[348] Testimony No. 26 of March 23, 2023. Family member of detainee (female detainee).

[349] Human Rights Watch, Cristosal, "We Can Arrest Anyone We Want" Widespread Human Rights Violations During the "Emergency Regime" in El Salvador, December 2022, p. 68; Cristosal, Human Rights Violations During the Emergency Regime in El Salvador. Situation Report for the period March 27 to April 26, 2022, May 2022; p.26.

[350] Human Rights Watch, Cristosal, "We Can Arrest Anyone We Want" Widespread Human Rights Violations During the "State of Emergency" in El Salvador, December 2022, p. 68.

153. In response to a request for information from the IACHR[351], the State referred to the regulatory framework that allows it to exercise its punitive power and to deprive of liberty in the area of law enforcement and the administration of criminal justice, which provides for the protection of the rights of persons deprived of liberty, such as the right to a fair trial, the presumption of innocence, and the right not to be subjected to cruel or inhuman treatment.[352] It also indicated that states of emergency allow for the temporary suspension of certain rights and freedoms.[353] It reported that the arrests had been made in flagrante delicto and, for the most part, for the crime of pertaining to "Illegal Groups", due to membership in criminal organizations generally identified as "Mara Salvatrucha" and "Pandilla 18", whose existence has been declared illegal by articles 1 of the Law for the Prohibition of Maras and Gangs and 345 of the Penal Code. Also, that the defendants arrested were under investigation for the commission of a criminal act and, therefore, had an open proceeding against them, either in judicial instances or in the administrative phase of the Office of the Attorney General of the Republic.[354]

154. In its observations on the draft of this report, the State indicated that the National Civil Police (PNC) has tools created for the identification and profiling of gang members, such as the PNC Protocol for the Preparation and Updating of Criminal Profiles. The objective of the protocol is to develop guidelines for the preparation and updating of profiles of persons linked to a terrorist criminal group, organized crime, or common crime through the verification of databases and the gathering of field information from different sources. For such purposes, the State indicated that the following criteria are taken into account: i) having the individualization and identification of the person;

[351] IACHR, Request for information from the State of El Salvador, Note No. 247-23/CIDH/SE/MPCT-Art.41, REF: Request for information on the state of emergency (emergency regime) and its effects on human rights, May 10, 2023.

[352] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, p. 52.

[353] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, p. 52.

[354] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, p. 52.

ii) the existence of field documentation, territorial information, intelligence, or investigations linking the person with criminal groups, participation in some criminal act, which must be documented, notes, reports, and/or minutes (of denunciation, investigation, interview, among others); iii) use of forms of communication alluding to gangs, that the person was observed on any computer platform or social networks and that there is a digital or physical backup of this observation; iv) that the person has tattoos allusive to gangs; v) having a criminal record; iv) having a record of crimes committed in other countries.[355] The State also mentioned that it has a Gang Identification Manual for El Salvador, which aims to facilitate the understanding, interpretation, and analysis of the various ways in which gangs communicate with each other, in order to demonstrate the identity and membership of those criminal groups.

155. The State confirmed that the arrests carried out in this context have been made in flagrante delicto, mostly for the crime of "Unlawful Groups", due to the fact that the persons arrested belonged to criminal groups or gangs. It clarified that the individuals have been previously profiled as members or collaborators of a mara or gang. It indicated that the offenses for which a person is arrested are explicitly stated in the police reports drawn up at the time of arrest.[356]

156. In this regard, the IACHR recalls that the prohibition of arbitrary deprivation of liberty is a non-derogable right that cannot be suspended, including for reasons of public security,[357] and urges the State to observe the rights and guarantees provided in Article 7 of

[355] State of El Salvador, Observations by the State of El Salvador on the IACHR Report entitled "State of Emergency and Human Rights in El Salvador", Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, pp. 67-79.

[356] State of El Salvador, Observaciones del Estado de El Salvador al Informe de la CIDH "Estado de Excepción y derechos humanos en El Salvador"(Observations of the State of El Salvador on the IACHR report entitled "State of Emergency and Human Rights in El Salvador"), Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, pp. 50-51.

[357] I/A Court H.R., Case of Rodríguez Vera and others (The disappeared from the Palace of Justice) v. Colombia. Preliminary Objections, Merits, Reparations, and Costs. Judgment of November 14, 2014. Series C No. 287, par. 402.

the American Convention when applying measures depriving personal liberty.

157. No person may be deprived of his or her physical liberty except for the reasons and under the conditions previously established in the Political Constitutions of the States or in the laws enacted pursuant thereto; otherwise, the deprivation of liberty would be illegal and contrary to Article 7(2) of the American Convention.[358] This right was not suspended by the legislative decrees of the state of emergency and must be ensured in its entirety, and the State must refrain from making arrests for reasons other than those provided for in the applicable legislation. The Commission stresses that the limitations to which the public authorities are subjected must be precisely indicated in the provisions that decree the state of emergency, and consequently, any action that exceeds or goes beyond what is provided for in the law is illegal.[359]

158. Likewise, the Court has addressed a number of situations in which a deprivation of liberty can be considered arbitrary, such as those carried out for discriminatory reasons[360] or the prolongation of detention without the person being brought before a competent authority.[361] Regarding Article 7.3 of the Convention, it has indicated that arbitrariness is distinguished from the concept of "contrary to law" and should be interpreted more broadly to include elements of

358 I/A Court H.R., Case of Espinoza Gonzáles v. Peru, Preliminary Objections, Merits, Reparations, and Costs. Judgment of November 20, 2014, par. 109; I/A Court HR, Case of J. v. Peru, Preliminary Objection, Merits, Reparations, and Costs, November 27, 2013. par. 126; I/A Court H.R. Case of García and Family v. Guatemala. Merits, Reparations, and Costs, Judgment of November 29, 2012, par. 100.

359 I/A Court H.R. Case of Pollo Rivera et al. v. Peru. Merits, Reparations, and Costs. Judgment of October 21, 2016. Series C No. 319, par. 100; I/A Court H.R., Case of Espinoza Gonzáles v. Peru, Preliminary Objections, Merits, Reparations, and Costs. Judgment of November 20, 2014, par. 120.

360 I/A Court H.R. Case of Fernández Prieto and Tumbeiro v. Argentina. Merits and Reparations. Judgment of September 1, 2020. Series C No. 411, par. 82.

361 I/A Court H.R. Case of Espinoza Gonzáles v. Peru, Preliminary Objections, Merits, Reparations, and Costs. Judgment of November 20, 2014, par. 134.

impropriety, injustice, and unpredictability.[362] Both the Commission and the Court have held that no one may be arrested or imprisoned for reasons or by methods that, though classified as legal, may be considered incompatible with the observance of the fundamental human rights of the individual because they are, among other things, unreasonable, unforeseeable, or disproportionate.[363]

159. The Inter-American Court has indicated that programmed and collective detentions, which are not based on the individualization of punishable conduct and lack judicial oversight, are contrary to the presumption of innocence, and therefore the State may not carry them out under any circumstances.[364] In addition, States must also substantiate and prove the existence of sufficient evidence to reasonably assume the criminal conduct of the detained person and that the detention is strictly necessary.[365] This means that arrests cannot be made on the basis of mere suspicion or personal perception of the accused's membership in a particular illegal group or gang, especially when this is based on mere appearance.[366] As the Inter-American Court has indicated, States must evaluate on a case-by-case basis the objective reasons that effectively indicate that a person is linked to the commission of a crime, since the use of profiles implies a presumption of guilt against any person who fits them, which would result in detentions for discriminatory reasons which would, therefore, be arbitrary.[367]

---

[362] I/A Court H.R , Case of J v. Peru, Preliminary Objection, Merits, Reparations, and Costs, November 27, 2013. par. 127.

[363] I/A Court H.R , Case of J v. Peru, Preliminary Objection, Merits, Reparations, and Costs, November 27, 2013. par. 127.

[364] I/A Court H.R., Case of Servellón García et al. v. Honduras, Judgment of September 21, 2006, par. 96.

[365] I/A Court HR, Case of Pacheco Teruel et al. v. Honduras, Merits, Reparations, and Costs, Judgment of April 27, 2012 par. 106.

[366] I/A Court HR, Case of Pacheco Teruel et al. v. Honduras, Merits, Reparations, and Costs, Judgment of April 27, 2012 paras. 101 and 106.

[367] I/A Court H.R., Case of Fernández Prieto and Tumbeiro v. Argentina, Merits and Reparations, Judgment of September 1, 2020, par. 82.

160. Another aspect pointed out about the actions of the security forces is related to the failure to comply with their duty to inform about the reasons for the detention and the rights of the detained person. By way of example, testimonies collected by the IACHR contain phrases like:

> No, we were not informed of the reasons for detention. They only asked my brother about his criminal record or if we had been detained before.[368]

> People were not aware of their rights. In some cases, they were given the floor to speak and expressed their lack of knowledge about the reasons for detention.[369]

> When I entered Mariona I was asked if I knew why I was being detained. And I told him that I did not know and they informed me that it was because I was a collaborator of illicit groups. But I did not understand what that entailed. Until I got out, when I realized what crimes I was being charged with.[370]

161. The Commission notes that Decree No. 333 and its extensions have continued to suspend the constitutional article that requires immediate and understandable information to be given to the detained person about his rights and the reasons for his detention[371]. In light of the above, the IACHR reiterates its consideration that this suspension does not abide by the ACHR because the right to access this information is a guarantee provided for in Article 7.4 of the ACHR,

---

[368] Testimony No. 1 of March 13, 2023. Person released under alternative measures.

[369] Testimony No. 2 of March 13, 2023. Defense attorney.

[370] Testimony No. 20 of March 21, 2023. Person Released under substitute measures.

[371] In its observations on the Draft Report, the State claimed that, in all the detentions carried out, the corresponding minutes were drawn up for each case, which establish the crime for which individuals were detained and in what context. See: State of El Salvador, Observations by the State of El Salvador on the IACHR Report entitled "State of Emergency and Human Rights in El Salvador", Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, p. 69.

which is part of the core of indispensable judicial guarantees that cannot be suspended under any circumstances. According to Inter-American jurisprudence, the officer carrying out the detention must inform, in simple language and free of technicalities, the essential facts and legal grounds on which the detention is based, as a mechanism to avoid illegal or arbitrary detentions and to guarantee the individual's right of defense.[372] Therefore, the IACHR urges the security forces to provide this information from the very moment of deprivation of liberty, immediately informing the detained person of the reasons for his or her deprivation of liberty, as well as his or her rights.

**Illegal breaking and entering**

162. With regard to house raids, according to the information presented, repeated arrests that occurred during the period of the emergency regime were carried out with illegal entry into homes, since they were allegedly carried out without a warrant, by security agents practicing deception or intimidation.[373] [374] By way of example, some of the testimonies collected by the IACHR state:

> They did not bring a warrant from a judge, nor did they show me the anonymous call. They entered without permission, I did not

[372] I/A Court H.R, Case of Espinoza Gonzáles v. Peru, Preliminary Objections, Merits, Reparations, and Costs. Judgment of November 20, 2014, par. 124.

[373] Cristosal, One year under the emergency regime: a permanent measure of repression and human rights violations. Status Report March 27, 2022 to March 27, 2023, May 12, 2023, p. 24; Azul Origip. 24; Azul Originario et al., Annual Report on Human Rights Violations During the State of Emergency in El Salvador, March 2023, p. 445; ElSalvador.com, Policías y soldados registran viviendas en Soyapango, December 5, 2022.

[374] In its observations on the Draft Report, the State indicated that the arrest records describe how arrests were carried out, so that the claims of unauthorized entry into homes are unfounded. The State reiterated that without concrete information on the alleged cases in which this occurred, it is impossible to make assertions of such gravity, and that Salvadoran regulations and the procedures of security personnel set rules that are in accordance with the Constitution and the ACHR. See: State of El Salvador, Observations by the State of El Salvador on the IACHR Report entitled “State of Emergency and Human Rights in El Salvador”, Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, p. 69.

refuse because I knew that doing so would harm me. I felt intimidated, afraid.[375]"

About 8 to 12 policemen arrived. There was a loud knock on the door. I was told "open the door." My son was wearing his underpants and I was in my underwear. They took my son and husband out, leaving my other children inside. They were looking for weapons in my house. "We're going to take you," they told my son. "Why are they going to take him away?" I asked. They answered me that it was because of the decree of the state of emergency; that they were orders from the government. "But being poor and being young is not a crime," I told them. They had no arrest warrant or anything else. They just grabbed my son, handcuffed him, and put him in the patrol car. [...] They searched my house. We were not present, we were told to stay outside while my house was raided.[376]

After my son's arrest, as part of the "house by house" operation. On one occasion approximately eight national police officers came to my house and searched my home. I was alone with my granddaughter. Also, the other five little houses around here. We live in a rural area, there have never been gangs. They pointed their guns at me and inspected the house.[377]

163. In this regard, the IACHR recalls that the entry of police and military personnel without legal authorization or the consent of the inhabitants constitutes an arbitrary and abusive interference in their family home. The Inter-American Court has held that the protection of an individual's home from arbitrary or abusive interference implies recognition that there is a personal sphere that must be exempt from and immune to abusive and arbitrary invasion or attack by third

[375] Testimony No. 6 of March 15, 2023. Person released under alternative measures.

[376] Testimony No. 14 of March 17, 2023. Family member of detainees (adult male and female detainees).

[377] Testimony No. 28 of March 23, 2023. Family member of a detained person.

parties or the public authorities.[378] Under Article 11.2 of the ACHR, as a general rule, a search or house search requires due authorization or a warrant and exceptions thereto, such as flagrante delicto, are valid only in the circumstances established by law, and must be interpreted strictly.[379]

**Abuse in the use of force**

164. The Commission was also alerted to acts of violence by the police and armed forces, including disturbing reports of abuses in the use of force against children and adolescents and allegations of sexual harassment and violence.[380] Some of them contain the following statements:

> In my son's case they were going to kill him. According to what he tells me, they grabbed him by the hair and that rural policeman told him "you are a scum of society." [...] my son who is a minor. The policemen beat him with an iron chair, they never took him to forensics. They were taken to some police station cells (bartolinas) in another municipality.[381]

> There is no difference in the detention of minors. In a case I am handling, five soldiers arrived at a bus stop, beat the person they were going to arrest and my client, who is a minor, was also beaten and taken away, even though they were told that she was a minor.[382]

---

[378] I/A Court H.R, Case of Fernández Ortega et al. v. Mexico, Preliminary Objection, Merits, Reparations, and Costs, Judgment of August 30, 2010, par. 156.

[379] I/A Court H.R. Case of Pollo Rivera et al. v. Peru. Merits, Reparations, and Costs. Judgment of October 21, 2016. Series C No. 319, par. 116.

[380] ElSalvador.com, Armed Forces tried to hide rape of girl committed by military, according to MTP, September 27, 2023; ElSalvador.com, Colonel arrested for allegedly raping two minors, August 5, 2023; Infobae, Soldiers' sexual abuse of minors in El Salvador, the other monster hidden under the exception regime, October 8, 2023; ElSalvador.com, Women in Puerto El Triunfo accuse military chief of extorting them with sexual propositions, October 10, 2023; Gato Encerrado, They demand that the military cease sexual and physical violence against girls in the emergency regime, October 18, 2023.

[381] Testimony No. 9 of March 16, 2023. Family member of detainees (adolescent and adult detainees).

[382] Testimony No. 5 of March 14, 2023. Defense attorney.

They grabbed my sister, they groped her all over, her legs, her breasts. She was also arrested.[383]

Human Rights Watch and Cristosal documented cases in which security agents beat detainees or threatened to arrest their family members, with pregnant women losing their babies following these episodes.[384] Additionally, based on information from the National Civil Police and the Armed Forces, as of December 2022, there were at least 84 civilian deaths resulting from confrontations with security forces.[385]

165. In this regard, in its observations on the draft of this report, the State indicated that the Office of the Attorney General of the Republic rigorously monitors citizen complaints related to the abuse of force by officials of authority and investigates them diligently.[386] It pointed out that, in the context of more than 70,000 arrests of people linked to criminal groups, the figures consistently indicate a very low level of lethal force and a significant decrease in fatalities in the execution of police operations, which would demonstrate the

---

[383] Testimony No. 14 of March 17, 2023. Family member of detainee (adult male and female detainees).

[384] La Prensa Grafica, State of emergency I Family denounces capture of pregnant teenager who lost her baby in prison, October 7, 2022; La Prensa Gráfica, Homicides drop and family members seek information on detainees in El Salvador, March 29, 2022; La Prensa Gráfica, Mothers denounce threats from police during arrests, April 28, 2022; La Prensa Gráfica, Walter died after being beaten by police when they captured him: "They ended up killing him. Our problem is that it could happen to any of us.", April 4, 2022; ElSalvador.com, Minors arrested after participating in a play in Bajo Lempa released, November 7, 2022; Cristosal, Human Rights Violations During the Emergency Regime in El Salvador. Situation Report for the period March 27 to April 26, 2022, May 2022, p. 47; Human Rights Watch, Cristosal, "We Can Arrest Anyone We Want" Widespread Human Rights Violations During the "Emergency Regime" in El Salvador, December of 2022, p. 66

[385] Human Rights Watch, Cristosal, "We Can Arrest Anyone We Want" Widespread Human Rights Violations During the "Emergency Regime" in El Salvador, December of 2022, p. 63; La Prensa Gráfica, Clashes with the National Civil Police during the state of emergency leave 80 dead, November 28, 2022.

[386] State of El Salvador, Observaciones del Estado de El Salvador al Informe de la CIDH "Estado de Excepción y derechos humanos en El Salvador"(Observations of the State of El Salvador on the IACHR report entitled "State of Emergency and Human Rights in El Salvador"), Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, pp. 77-78.

effectiveness of the intervention mechanisms and protocols adopted by the National Civil Police.

**Violations of the rights of girls, boys, and adolescents.**

166. The IACHR also expresses its concern regarding the specific effects on children and adolescents in this context since, on the one hand, they face being detained by security forces and, on the other, the deprivation of liberty of their family members. Specifically, the IACHR expresses its concern over the detention of thousands of children and adolescents during the state of emergency According to figures provided by the State, a total of 2,826 children and adolescents detained during the state of emergency were deprived of liberty as of June 27, 2023.[387] According to press reports, this would include the detention of 10 to 13 year olds.[388] In this scenario, the IACHR is concerned about both the high number of children and adolescents detained would be the result of the use of discriminatory practices by security forces, based on their physical appearance or place of residence, as occurs in the case of adults.[389] There have even been reports of arrests with excessive use of force against children.[390]

167. In this regard, the Commission reiterates its concern about the human rights situation of thousands of children and adolescents who are or have been members of criminal organizations. In this regard, it recalls that the American Convention and the American Declaration provide

---

387 State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, p. 52.

388 La Prensa Grafica, LPG Forum: "We don't want the criminals free, we want the innocent free.", February 14, 2023.

389 On this, see: University Observatory of Human Rights of the Central American University José Simeón Cañas, Annual Report 2022: The State of Human Rights in El Salvador, April 2023, p. 164.

390 Cristosal, Violaciones a los derechos humanos Durante el régimen de excepción en El Salvador. (Human Rights Violations During the State of Emergency in El Salvador) Situation Report for the period from March 27 to April 26, 2022, May 2022, p. 22; Cristosal, Violaciones a los derechos humanos Durante el régimen de excepción en El Salvador. (Human rights violations during the state of emergency in El Salvador) Situation Report for the period April 27 to May 25, 2022, June 14, 2022, p.26.

that children have the right to special measures for their protection. Accordingly, these special protections include the prohibition of the recruitment of children and adolescents for illicit activities such as those carried out by organized crime, maras, and gangs. This prohibition implies that States must adopt immediate, effective, and urgent actions to eradicate such recruitment. Consequently, children and adolescents who are recruited by organized crime, maras, or gangs should be treated primarily as victims. In view of this, the IACHR reiterates that the systems for the protection and reintegration of children and adolescents recruited by criminal groups need to be redesigned in accordance with the principles of best interests and comprehensive protection. To this end, it is necessary that States review their "iron fist" policies that seek to lower the age of criminal responsibility and increase the length of sentences of deprivation of liberty for persons under 18 years of age in accordance with the Inter-American principles governing children.[391]

168. In addition to the above, the Commission recalls that, when detaining a child or adolescent, the police are obliged to guarantee the rights of children to be immediately brought before a competent judge, to have their parents or guardians notified as soon as possible, to make contact with their family, and to meet with their defense counsel as soon as possible. Additionally, pursuant to the duty of special protection contained in Article 19 of the American Convention and Article VII of the American Declaration, States must establish an even lower limit for judicial control of the detention of children. This, taking into account the fact that these are people in the developmental stage, the fact that the harmful effects of detention on children and adolescents are greater than those on adults, and the special situation of vulnerability of this population.[392]

---

[391] On this, see: IACHR, Organized Crime and the Rights of Children, Adolescents, and Youth: Challenges and State Actions in Northern Central America, OEA/Ser.L/V/II., Doc. 51/23, February 16, 2023, paras. 156 and 168.

[392] In this regard, IACHR, Juvenile Justice and Human Rights in the Americas, OEA/Ser.L/V/II., Doc. 78, adopted on July 13, 2011, paras. 252 and 255.

169. In its comments on the draft of this report, the State noted that the National Council for Early Childhood, Children, and Adolescents (CONAPINA) has validated the effectiveness of the protection procedures for adolescents implemented by the National Civil Police.[393] It informed that CONAPINA has been instructed to ensure differentiated treatment of minors, in separate shelters from adults and under the administration of this Council. It also reported that CONAPINA's official records do not show any protection process involving children under 12 years of age or adolescents of this age.[394]

### The control mechanisms of the security forces

170. Regarding the mechanisms to control the actions of the National Civil Police and the Armed Forces, the State informed that the country has the necessary tools to enforce rights. Likewise, to claim, in appropriate cases and as provided by law, compensation for damages caused by the actions of public sector agents.[395] The State indicated that the functions of the Office of the Deputy Attorney General (Procuraduría Adjunta) for the Defense of the Rights of Migrants and Citizen Security of the Office of the Attorney General for the Defense of Human Rights (PDDH) include the supervision of the actions of both institutions to provide specialized attention to the protection of the right to life, integrity, security, and personal liberty.[396] However, it did not indicate whether there are any complaints or denunciations filed before this body concerning possible human rights violations during the state of emergency. It informed that the National Verification Plan deployed by the institution contemplates guardianship and verification actions

[393] State of El Salvador, Observations of the State of El Salvador to the IACHR Report "State of Emergency and Human Rights in El Salvador," Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, Annex 1, Methodological Systematization Matrix, line 103, column G.

[394] State of El Salvador, Observations of the State of El Salvador to the IACHR Report "State of Emergency and Human Rights in El Salvador," Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, Annex 1, Methodological Systematization Matrix, line 103, column G.

[395] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OEA-117/2023, July 14, 2023, pp. 55-56.

[396] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OEA-117/2023, July 14, 2023, p. 55.

related to the state of emergency, as well as comprehensive care for the families of the victims of homicides and femicides.[397]

171. In its observations on the draft of this report, the State presented the actions of the PDDH within the framework of this Plan, indicating that more than 21,000 steps were taken, including interviews with authorities, telephone calls, guidance, consultation of files, official letters, and immediate actions.[398] It informed that the institution is notified by the Police of the arrests made and that it has carried out verifications in hearings; bartolinas (police detention centers); adult detention centers; in Social Integration Centers for Adolescents; and targeted closures. It also reported that it has a Prison Verification Department, which is responsible for responding to requests from families regarding possible violations of the rights of persons deprived of liberty; and that it coordinates with prison supervision judges regarding the conditions of persons deprived of liberty, police headquarters in each department; and with the PNC's Secretariat of Professional Responsibility. It also indicated that psychological care has been provided to alleged victims and/or family members whose situation is related to the state of emergency, with the help of coordination by the Victim Assistance Department. Regarding the verifications carried out, the State reported that from March 27, 2022 to November 12, 2023, 698 were carried out in detention centers, 175 in hearings; and 223 in other contexts; totaling 1,096 verifications.[399] The State indicated that the PDDH had also promoted rapprochement with public security authorities, the Public Prosecutor's Office, and police headquarters; also that it supports the training of police personnel and

[397] State of El Salvador, Report of the State of El Salvador to the Inter-American Commission on Human Rights on State of Emergency Decree No. 333, Diplomatic Note MPOEA-OEA-063/2022, April 26, 2022.

[398] State of El Salvador, Observaciones del Estado de El Salvador al Informe de la CIDH "Estado de Excepción y derechos humanos en El Salvador"(Observations of the State of El Salvador on the IACHR report entitled “State of Emergency and Human Rights in El Salvador”), Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, pp. 71-77.

[399] State of El Salvador, Observaciones del Estado de El Salvador al Informe de la CIDH "Estado de Excepción y derechos humanos en El Salvador"(Observations of the State of El Salvador on the IACHR report entitled “State of Emergency and Human Rights in El Salvador”), Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, pp. 71-77.

promotes the strengthening of interagency coordination and articulation mechanisms to guarantee human rights.[400]

172. In turn, the University Observatory of Human Rights of the Central American University José Simeón Cañas indicated that 847 people reported to the PDDH some type of violation committed by PNC personnel in 2022 and 176 by Armed Forces personnel.[401] With regard to the actions of the PDDH, it was indicated that the statistical data published show that technical and operational actions have been taken within the framework of its constitutional mandate.[402] However, civil society organizations questioned the lack of qualitative information on the situations attended to and observed by the PDDH during the state of emergency, and said that they were unaware of definitive resolutions having been reached on the cases related to this period.[403] They point out the absence of public updates on the implementation of the National Verification Plan and its qualitative findings, calling for greater transparency and periodicity in the dissemination of this information, as well as the coordination and formulation of concrete recommendations to the relevant state agencies.[404] In the same vein, the Commission stresses the importance of strengthening the PDDH as a channel for reporting human rights violations, as well as the importance of citizen confidence in this mechanism.

---

400 State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OEA-117/2023, July 14, 2023, p. 64.

401 University Observatory of Human Rights of the Central American University José Simeón Cañas, Annual Report 2022: The State of Human Rights in El Salvador, April 2023, p. 95.

402 Cristosal, One year under the emergency regime: a permanent measure of repression and human rights violations. Situation Report for March 27 to 2022 March 27, 2023,May 12, 2023, pp. 65-66.

403 Human Rights Watch, Cristosal, "We Can Arrest Anyone We Want" Widespread Human Rights Violations During the "Emergency Regime" in El Salvador, December 2022, p. 97; Cristosal, One year under the emergency regime: a permanent measure of repression and human rights violations. Situation Report for March 27, 2022 to March 27, 2023, May 12, 2023, pp. 65-66; Azul Originario et al, Annual report on human rights violations during the state of emergency in El Salvador, March of 2023, p. 57;

404 Cristosal, One year under the emergency regime: a permanent measure of repression and human rights violations. Situation Report March 27, 2022 to March 27, 2023, May 12, 2023, pp. 65-66, Human Rights Watch, Cristosal, "We Can Arrest Anyone We Want" Widespread Human Rights Violations During the "Emergency Regime" in El Salvador, December 2022, p. 12

173. In its observations on the draft of this report, the State informed that the Office of Citizen Attention for Internal Control of the National Civil Police has been set up to deal with complaints of alleged human rights violations committed by operational and administrative personnel, as an action to prevent human rights violations and care for victims of such alleged violations. It indicated that the creation of this unit responds to the need to make available to the population channels for reporting possible excesses in the use of force in the framework of police procedures.[405]

174. It also reported that the powers of the General Inspectorate of Public Security of the Ministry of Justice and Public Security for overseeing the Police include receiving and processing complaints or reports related to possible disciplinary offenses committed by police officers.[406] In the performance of its oversight and supervision functions, the Inspectorate pursued 66 disciplinary investigation proceedings between March 27, 2022 and November 10, 2023, of which: 4 were related to due process; 11 to personal freedom; 29 to personal integrity; 9 to personal safety; 5 to life; 3 to access to justice; 2 to privacy; 1 to dignity and 2 to legal security. It also indicated that, based on a resolution issued by the PDDH referring to complaints corresponding to 349 persons for events between June and September 2022, it ordered the initiation of investigations in 21 cases within the framework of its mandate. In addition, it pointed out that the Inspectorate has carried out 53 inspections in police units and delegations. The State also highlighted the existence of an Inter-institutional Working Group of the PDDH together with the National Civil Police, to strengthen police actions, conflict resolution, attention to victims, and treatment of detainees.

---

[405] State of El Salvador, Observaciones del Estado de El Salvador al Informe de la CIDH "Estado de Excepción y derechos humanos en El Salvador"(Observations of the State of El Salvador on the IACHR report entitled “State of Emergency and Human Rights in El Salvador”), Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, p. 45.

[406] State of El Salvador, Observaciones del Estado de El Salvador al Informe de la CIDH "Estado de Excepción y derechos humanos en El Salvador"(Observations of the State of El Salvador on the IACHR report entitled “State of Emergency and Human Rights in El Salvador”), Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, pp. 71-77.

175. For its part, the Human Rights Observatory of the UCA reported that in 2022, 552 complaints of human rights violations were reported to the PNC units that carry out internal surveillance tasks, including 158 cases on the alleged violation of freedom; 123 on personal safety and public safety; 68 on physical integrity; 48 on access to justice; 42 on ill-treatment or cruelty; and the remaining 113 cases on the right to life, privacy, life free of violence, dignity, legal security, among others.[407] The OUDH indicated that it had no information on the outcome of this group of complaints, and did not know if the cases were referred to the Attorney General's Office or if those responsible were eventually punished.[408] With respect to disciplinary offenses, it noted that 69 members of the public security forces were investigated for committing serious and very serious offenses during 2022, including violations of the right to personal integrity, providing false information on the whereabouts of persons, among others.[409] Throughout 2023, 111 proceedings were initiated for serious and very serious offenses committed by personnel, related to violations of the rights of other persons and 396 disciplinary proceedings were initiated against lower-level police, administrative, and technical personnel, only 33 of which involved offenses related to violations of the rights of persons outside the police institution.[410] The OUDH also reported difficulties in obtaining information on investigations that could constitute serious crimes due to the institution's reservations.[411] In 2022, no cases

---

[407] University Observatory of Human Rights of the Central American University José Simeón Cañas, Annual Report 2022: The State of Human Rights in El Salvador, April of 2023, pp. 78-91.

[408] University Observatory of Human Rights of the Central American University José Simeón Cañas, Annual Report 2022: The State of Human Rights in El Salvador, April 2023, p. 89.

[409] University Observatory of Human Rights of the Central American University José Simeón Cañas, Annual Report 2022: The State of Human Rights in El Salvador, April 2023, p. 80.

[410] University Observatory of Human Rights of the Central American University José Simeón Cañas, Annual Report 2022: The State of Human Rights in El Salvador, April 2023, pp. 81-81, 84-85.

[411] University Observatory of Human Rights of the Central American University José Simeón Cañas, Annual Report 2022: The State of Human Rights in El Salvador, April of 2023, pp. 85-86.

involving members of the armed forces were investigated, punished, or forwarded to the Public Prosecutor's Office.[412]

176. In this regard, the Commission reiterates the importance of establishing independent internal and external mechanisms and procedures to ensure the accountability of both the authorities responsible for citizen security policy and the functioning of the institutions that make up the citizen security system.[413] This should include disciplinary mechanisms and procedures for violations committed by law enforcement officials.[414]

177. From March 2022 to date, the Commission notes with concern the information received regarding the existence of a pattern of widespread and systematic illegal and arbitrary detentions carried out as part of a security plan under the state of emergency.[415] Of the more than 70,000 detentions carried out, the IACHR highlights reports of repeated deprivation of liberty in cases not involving flagrante delicto and without an administrative or judicial order, and the use of discriminatory criteria to justify detentions based on the personal or socioeconomic characteristics of the person, or for having a criminal record (see paragraphs 146ff). As indicated earlier in this chapter, based on information published by the State, two days after the establishment of the state of emergency, 1,400 persons were detained; in all, 20,000 persons were detained in the first month of the state of emergency; at least 35,000 persons were detained by the end of the second month; at least 42,000 persons were detained by the end of the third month; and at least 48,000

[412] University Observatory of Human Rights of the Central American University José Simeón Cañas, Annual Report 2022: The State of Human Rights in El Salvador, April 2023, p. 95.

[413] IACHR, Report on Citizen Security and Human Rights, OEA/Ser.L/V/II. Doc. 57, December 31, 2009, paras. 232.8.d, 232.4.

[414] IACHR, Report on Citizen Security and Human Rights, OEA/Ser.L/V/II. Doc. 57, December 31, 2009, paras. 232.9.i.

[415] I/A Court H.R. Case of Herzog et al. v. Brazil. Preliminary Objections, Merits, Reparations, and Costs. Judgment of March 15, 2018. Series C No. 353, paras. 222-229, 229-239; I/A Court H.R., Case of Members and Militants of the Unión Patriótica v. Colombia. Preliminary Objections, Merits, Reparations, and Costs. Judgment of July 27, 2022. Series C No. 455, par. 114.

persons were detained by the end of the fourth month. Likewise, in the following months, the IACHR observed that an average of around 2,000 detentions per month was maintained until May 2023, when this information was no longer published.[416] In this regard, it is of great concern that most of these arrests were made alleging flagrante delicto for the crime of "Unlawful Groups", and at the same time based on prior profiling by the security agencies - as indicated by the State - which could constitute a practice of illegal and/or arbitrary detention. Also of concern are the elements used to establish people's current links to criminal organizations - among which are the possession of tattoos, communications alluding to maras and gangs, as well as having a criminal record.[417] The IACHR recommends that the State make efforts to investigate the alleged illegal and arbitrary detentions, establishing, where applicable, individual responsibilities at different levels and identifying the circumstances leading to this situation. Determining the factors that caused or favored the repetition of a large number of abuses on a national scale is fundamental so that actions and/or institutional reforms can be adopted to prevent their repetition.[418]

178. Particularly with regard to the reports of violence involving injury to life and limb, the Commission emphasizes that law enforcement agencies may only use force as a last resort, and that the use of firearms and lethal force is even more exceptional.[419] In any hypothesis of deaths linked to the actions of state forces, the State is obliged to verify the legitimacy of the use of lethal force, investigating the facts ex officio,

---

416 Ministry of Security [@SeguridadSV] Tweets: (2022, March 29), (2022, April 27), (2022, May 25), (2022, June 29), (2022, July 29), (2022, August 29), (2022, September 26), (2022, October 28), (2022, November 28), (2022, December 19), (2023, January 30), (2023, February 22), (2023, March 27), (2023, April 12), (2023, May 12).

417 State of El Salvador, Observaciones del Estado de El Salvador al Informe de la CIDH "Estado de Excepción y derechos humanos en El Salvador"(Observations of the State of El Salvador on the IACHR report entitled “State of Emergency and Human Rights in El Salvador”), Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, pp. 50, 51, 67-79.

418 IACHR, Report ‘Situation of Human Rights in El Salvador’, OEA/Ser.L/V/II. Doc. 278, October 14, 2021, paras. 38, 44, 45, 342.1.

419 I/A Court H.R. Case of Zambrano-Vélez et al. v. Ecuador. Merits, Reparations, and Costs. Judgment of July 4, 2007. Series C No. 166, paras. 83-84.

without delay and in a serious, independent, impartial, and effective manner.[420] Likewise, the Inter-American Court has emphasized that sexual violence perpetrated by members of the security forces is particularly serious, causing devastating physical, emotional, and psychological consequences against women.[421] In this regard, the IACHR has recommended the creation of internal and external monitoring and accountability systems to enforce the duty to investigate, with a gender and ethno-racial perspective, all cases in which law enforcement officers use lethal force and/or sexual violence, and the strengthening of the institutional capacity of independent oversight bodies.[422]

179. In this regard, the State indicated that the Office of the Attorney General (FGR) of the Republic maintains strict vigilance in the context of citizen complaints related to the abuse of force by state agents, so that with respect to security operations carried out in the context of the state of emergency, that Office, as guarantor of legality and the right of access to justice of the population, has initiated 19 investigations for alleged abuse of force, of which 18 are in the investigation phase and one is being provisionally archived.[423] In turn, the OUDH reported that the internal mechanisms of the National Civilian Police had referred 119 cases of crimes to the FGR in 2022, of which they were able to verify that at least 26 referred to violations of the right to personal integrity and the life of persons outside the institution.[424] The Observatory indicated that the information on criminal proceedings

[420] I/A Court H.R. Case of Zambrano-Vélez et al. v. Ecuador. Merits, Reparations, and Costs. Judgment of July 4, 2007. Series C No. 166, par. 88.

[421] I/A Court H.R, Case of the Miguel Castro-Castro Prison v. Peru. Judgment of November 25, 2006. Merits, Reparations, and Costs, par. 311.

[422] IACHR, Report No. 141/11, Merits, Cases 11.566 and 11.694, Cosme Rosa Genoveva, Evandro De Oliveira et al. (Favela Nova Brasilia), Brazil, October 31, 2011, Recommendations, par. 5.

[423] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, p.64.

[424] University Observatory of Human Rights of the Central American University José Simeón Cañas, Annual Report 2022: The State of Human Rights in El Salvador, April of 2023, pp. 86-88.

initiated and concluded was reported as non-existent and subsequently as kept secret ("reservada") by the FGR.[425]

180. The IACHR calls on the State to ensure transparency in relation to this data, enabling citizen oversight of State actions in this area. It also appreciates the opening of these investigations and calls on the Attorney General's Office to continue following up on these and other possible cases in the framework of the considerations and recommendations addressed to the State of El Salvador in the 2021 Country Report regarding the investigation of abuses by security forces.[426] Notwithstanding the above, it is a priority to attend to the people who were victimized by the illegal and arbitrary measures. The IACHR will refer to aspects related to the restitution of liberty and other rights affected by the ongoing judicial proceedings when addressing the functioning of the justice system. Finally, with regard to the information received on the actions of the police authorities in the registration and custody of detainees, the Commission indicates that it will analyze this in the chapter on the situation of persons deprived of liberty.

**Initial considerations on the functioning of the justice system**

181. The IACHR emphasizes that, in the democratic system, the prosecutor's office and the judiciary have important functions, among them, to monitor the activity of the security forces, and must adopt the corresponding actions within the framework of their competencies to investigate, prosecute, and punish the human rights violations committed. Likewise, in administering justice, they must ensure respect for and guarantee the human rights and due process of the accused. Since the implementation of the state of emergency, the Commission has been informed of specific challenges in the functioning of the justice system in light of the

425 University Observatory of Human Rights of the Central American University José Simeón Cañas, Annual Report 2022: The State of Human Rights in El Salvador, April of 2023, pp. 86-88.

426 IACHR, Situation of Human Rights in El Salvador, OEA/Ser.L/V/II. Doc. 278, October 14, 2021, paras. 61-64, 342.2.

detentions carried out and their implications for guaranteeing the rights of Salvadoran individuals.[427]

182. In this regard, the State of El Salvador indicated that efforts were made to strengthen the Specialized Criminal Jurisdiction, calling on 22 judges or magistrates to lend support and creating another 236 temporary positions to support the courts.[428] It indicated that the Courts against Organized Crime were also created with the purpose of boosting efforts to strengthen judicial investigation and criminal prosecution of criminal organizations.[429] These courts are multi-person courts and are composed of four regular judges, one of whom is a juvenile court judge, who is known as a "the judge responsible for safeguarding the rights of minors", since he or she is exclusively responsible for the judgment when a trial also involves adults.[430] It also reported the creation of the Courts of Guarantees, whose function is established by the Constitution of the Republic and the Special Law for the Intervention of Telecommunications.[431] It indicated that out of 11 courts, 6 have jurisdiction for the Central Zone, 3 for the Western Zone, and 2 for the Eastern Zone[432]; 2 other Courts of Guarantees have nationwide jurisdiction and 2 Chambers against Organized Crime have nationwide jurisdiction.[433] As indicated, the courts created

[427] IACHR, Hearing 'Situation of Human Rights and Rule of Law in El Salvador', 184th session, June 23, 2022; IACHR, Hearing 'Arbitrary detentions and situation of persons deprived of liberty in the state of emergency in El Salvador', 185th session, October 25, 2022; Human Rights Watch, Cristosal, "We Can Arrest Anyone We Want" Widespread Human Rights Violations During the "Emergency Regime" in El Salvador, December of 2022, p. 91.

[428] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, p. 53.

[429] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 53-54.

[430] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 53-54.

[431] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 53-54.

[432] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 53-54.

[433] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 53-54.

began operating on June 1, 2023, reflecting a synchronized and consistent effort by all State bodies to fight criminal organizations, aimed at providing access to justice for all Salvadorans, guaranteeing legal security and ensuring effective completion of criminal proceedings.[434] In addition, USD $1,872,095.73 was reportedly invested in goods to equip the judicial offices.[435]

183. In its observations on the draft of this report, the State referred to the "special transitory provisions for ordering the prosecution of defendants detained under the state of emergency" approved by Legislative Decree No. 803 of 2022.[436] It reported that they are intended to regulate the procedure to be carried out for the submission of accused persons to a single criminal proceeding, due to their belonging to the same terrorist organization or illicit group and who were captured while the state of emergency was in force. For this reason, the Office of the Attorney General of the Republic was empowered to carry out a transitional procedure designed to assign defendants in proceedings under investigation in different courts to specific groups based on the following criteria: organization/group (*estructura*), name, operation, territory, or others that may be applicable at the discretion of the prosecutor and in accordance with the evidence available.[437] The Prosecutor's Office has two years to prosecute the cases, after which the judiciary shall issue a final dismissal of the cases in which the procedure is not complied with or the Prosecutor's Office does not rule on the determination of the illegal group to which a defendant belongs.

---

[434] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 53-54.

[435] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 53-54.

[436] State of El Salvador, Observaciones del Estado de El Salvador al Informe de la CIDH "Estado de Excepción y derechos humanos en El Salvador"(Observations of the State of El Salvador on the IACHR report entitled “State of Emergency and Human Rights in El Salvador”), Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, pp. 83-84.

[437] The expert, documentary, and testimonial evidence referred to by the State as that used by the Police and the Prosecutor's Office to prove membership in the illegal group is indicated in paragraph 200 of this report.

184. The IACHR takes note of the restructuring of the courts that created single jurisdictions for the crime of terrorism through special transitory provisions to regulate the proceedings of defendants detained under the state of emergency in El Salvador and the additional human and logistical resources allocated. However, the Commission observes that the establishment of a special jurisdiction to carry out functions normally performed by the ordinary jurisdiction is an extraordinary measure that, although feasible or apparently more efficient, cannot violate the procedural guarantees of the accused persons guaranteed in the American Convention.

185. Indeed, the accumulation of causes of the same nature in some cases can be positive, and has even been recommended. In this sense, in cases foreseen and authorized by procedural law, in situations where the dispersion and magnitude of the cases rather hinder access to justice, the IACHR has recommended the creation of a single jurisdiction.[438] In this regard, the IACHR has warned that highly complex procedural cases require the State to analyze the deployment of specific measures to comply with its international obligations regarding access to justice, in particular the prosecution and punishment of those responsible for human rights violations and, at the same time, to provide procedural guarantees for the accused.[439]

186. Thus, the State must evaluate, in the particular situation, how the dispersion of processes generates obstacles for justice operators to fully understand the evidence, contexts, and processes related to mega-criminal cases. However, this cannot rest solely on the decision of a single procedural party, but -in addition to the normative authorization- must be subject to litigation, observing the procedural guarantees of the persons charged and whether the restriction to their right to a natural judge is valid according to human rights norms and inter-American standards. An automatic

[438] IACHR, Third Report of the Special Follow-up Mechanism on the Ayotzinapa Case, OEA/Ser.L/V/II.Doc.270/22, November 8, 2022, paras. 183-185.

[439] IACHR, Third Report of the Special Follow-up Mechanism on the Ayotzinapa Case, OEA/Ser.L/V/II.Doc.270/22, November 8, 2022, paras. 183-185.

determination for the transfer of ongoing criminal cases, without a jurisdictional assessment or subject to appeal, may lead to proceedings being conducted before improper jurisdictions, resulting in setbacks and delays when these procedural flaws are corrected and the proceeding returns to the initial jurisdiction. [440]

187. The IACHR also reiterates the concerns previously expressed regarding the concealment of the identity of the judges in these jurisdictions, as well as the other procedural aspects that imply setbacks for the judicial guarantees of persons accused of crimes and in the area of juvenile justice. In addition, the Commission received troubling information on, inter alia, the delay in judicial control of detentions, the ineffectiveness of the habeas corpus recourse, lack of evidence to support the charges, abuses in the imposition of pretrial detention, the holding of mass judicial hearings, limitations on the exercise of the right to defense and judicial guarantees, and disrespect for due legal process.

**Judicial protection with respect to arrests made**

188. The State indicated that once a person is detained, whether in flagrante delicto or by administrative order, he or she is immediately referred to the Attorney General's Office, and in the case of arrests made by court order, the detained persons are immediately referred to the judge who issued the order.[441]

189. However, with the state of emergency in force, the maximum period for administrative detention was extended from 72 hours to 15 days, and it is not clear whether this is the maximum period for presenting the person deprived of liberty to a judicial authority. In its observations on the draft of this report, the State indicated that a significant number of persons linked to organized crime had been

[440] CIDH, Tercer Informe del Mecanismo Especial de Seguimiento al Asunto Ayotzinapa, OEA/Ser.L/V/II.Doc.270/22, 8 de noviembre de 2022, paras. 185 and 187.

[441] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, p. 51.

captured, posing a major challenge for the institutions responsible for prosecuting them; hence, the constitutional fifteen-day period guarantees that these persons are submitted within a specific time to the judicial system, for the determination of their criminal responsibility for the crimes with which they are charged. It indicates that this deadline is intended to assure those who are captured that they will not be held indefinitely without being tried. It also obliges the Attorney General's Office to comply with its constitutional duty to prosecute within that maximum period of detention.[442]

190. In this regard, the IACHR reiterates its previous considerations regarding this time period not being compatible with the obligations established in the American Convention even in a state of emergency. According to the Inter-American Court, the **immediate judicial review of a detention** is the ideal means of control to avoid the arbitrariness or illegality of detentions, and the judge must guarantee the rights of the detainee, authorize the adoption of precautionary or coercive measures, when strictly necessary, and ensure, in general, treatment consistent with the presumption of innocence that protects the accused until his or her responsibility is established.[443] In this regard, the UN Committee against Torture recommended that the State of El Salvador "abolish the provisions according to which detained persons may be held in administrative detention for periods of up to 15 days and make the necessary amendments to introduce instead a maximum period of 48 hours."[444]

191. Regarding the number of persons detained and released, the State reported that of the 65,940 persons detained as of June 27, 2023, 5,308 were released by court order at the request of the prosecuting

---

[442] State of El Salvador, Observaciones del Estado de El Salvador al Informe de la CIDH "Estado de Excepción y derechos humanos en El Salvador"(Observations of the State of El Salvador on the IACHR report entitled “State of Emergency and Human Rights in El Salvador”), Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, p. 51.

[443] I/A Court H.R. Case of the Gómez Paquiyauri Brothers v. Peru. Merits, Reparations, and Costs. Judgment of July 8, 2004. Series C No. 110, par. 95.

[444] United Nations, Committee Against Torture, Concluding observations on the third periodic report of El Salvador, CAT/C/SLV/CO/3, December 19, 2022, par. 11.c.

authority and 988 by administrative authority, for a total of 6,296 persons released.[445] Despite the above, the IACHR received information of repeated cases in which persons continued to be detained after having received an alternative measure to provisional detention.[446] The testimonies collected by the IACHR refer to this issue and also denounce the **lack of effectiveness of the habeas corpus recourse**:

When I was released, I spent 20 more days in the prison.[447]

I received a letter of release on February 24 and was notified on February 28. Although the letter said "release immediately", I was not released until March 16. I don't know why they keep you like this. My family went every day from 2:00 p.m. to midnight to wait for me to leave. They kept waiting for me.[448]

The mere filing of habeas corpus was not a problem. Yes, they have received them, but those processes are a dead letter. They may be resolved by the Constitutional Chamber or second instance chambers, but in no case do I know that they have been decreed. Habeas corpus is an ineffective procedure.[449]

I went to file a habeas corpus and the only response I received was a document asking me if I knew where my son was, what crime they were accusing him of (de qué delito me lo acusaban), the file number,

---

[445] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, p. 52.

[446] Cristosal, One year under the emergency regime: a permanent measure of repression and human rights violations. Situation Report from March 27, 2022 to March 27, 2023, May 12, 2023, p. 25; El Faro, Juzgado ordena liberar a panadero capturado durante el Régimen, pero Centros Penales desobedece (Judge orders the release of baker arrested during the state of emergency, but Centros Penales disobeys), August 25, 2023.

[447] Testimony No. 17 of March 20, 2023. Person released under alternative measures.

[448] Testimony No. 29 of March 24, 2023. Person released under alternative measures.

[449] Testimony No. 2 of March 13, 2023. Defense attorney.

but they did not give me any further response. I called a number I was given and they don't answer.[450]

192. According to information gathered by the Legal and Anti-Corruption Department of the National Foundation for Development, between March 2022 and January 2023, the Supreme Court of Justice received 4,012 Habeas Corpus requests in different judicial offices, most of them related to persons captured during the state of emergency, and at that time 3,512 appeals were still pending, that is, 78%.[451] Likewise, according to data from the Constitutional Chamber published in the press, between March 27, 2022 and June 30, 2023, the Supreme Court of Justice (CSJ) received 5,198 Habeas Corpus petitions in different judicial offices, most of them related to persons arrested during the state of emergency, and up to that moment it had resolved 1,419 appeals, that is, 28%.[452] For its part, the OUDH noted that, in 2022, there was a 630% increase in the number of habeas corpus filed before the CSJ compared to the same period of the previous year and that of the 3,396 appeals filed in 2022, 948 were resolved, and 27 were admitted.[453] The organizations also indicated that in some cases, the Constitutional Chamber made precautions requiring the petitioners to provide the location of the detained person or their state of health, data that the Habeas Corpus petitioners were unable to present, since it was precisely the refusal of the prison authorities to provide this information that had motivated the filing of the appeal.[454]

[450] Testimony No. 14 of March 17, 2023. Relative of two detainees (adult male and female detainees).

[451] La Prensa Grafica, Supreme Court of Justice has not resolved 3,512 petitions of Habeas Corpus, March 1, 2023.

[452] La Prensa Grafica, ¿Qué está pasando con los habeas corpus en el régimen de excepción en El Salvador? (What is happening with habeas corpus under the state of emergency in El Salvador?), November 13, 2023; Cristosal, Analysis: The State of the Control System in El Salvador, November 2023, p. 14; La Prensa Gráfica, Supreme Court of Justice without resolving 3,512 Habeas Corpus petitions, March 1, 2023.

[453] The University Observatory of Human Rights of the Central American University José Simeón Cañas , Annual report 2022: The State of Human Rights in El Salvador, April 2023, pp. 137-138.

[454] Cristosal, One year under the emergency regime: a permanent measure of repression and human rights violations. Situation Report for March 27 2022 to March 27, 2023, May 12, 2023, p. 64.

193. On this issue, the State indicated that the state of emergency has led to a greater activation of the constitutional jurisdiction, which is why the Constitutional Chamber has adopted measures to ensure the timely processing of cases.[455] These measures include the timely scheduling of Chamber sessions; an increase in staff performing legal coordination, legal collaboration, and notification functions; the identification of lawsuits with issues in common for similar treatment; and urgent cases that merit priority handling.[456] It also noted an increase in the settlement of constitutional Habeas Corpus proceedings.[457] In its comments on the draft of this report, the State reported, based on data from the Supreme Court of Justice of February 2024, that the number of proceedings initiated in 2022 and 2023, as well as those completed, is equivalent to five times the number received in previous years. In particular, it reported that in 2022, 3,396 habeas corpus petitions were filed, of which 948 were settled. In 2023, 3,071 were initiated and 2,716 were settled.[458] It also indicated that constitutional jurisprudence establishes that the workload must be considered as an objective factor when evaluating the time taken by the courts to issue rulings on certain matters. The State pointed out that this consideration must take into account the particularities of each case, since the volume of proceedings handled by a court may have an impact on the time it takes to settle cases under its jurisdiction, despite the efforts made by the authorities to avoid this.[459]

---

[455] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, p. 7.

[456] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, p. 7.

[457] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, p. 7.

[458] State of El Salvador, Observations of the State of El Salvador to the IACHR Report "State of Emergency and Human Rights in El Salvador," Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, Annex 1, Methodological Systematization Matrix, line 44, column E.

[459] State of El Salvador, Observations of the State of El Salvador to the IACHR Report "State of Emergency and Human Rights in El Salvador," Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, Annex 1, Methodological Systematization Matrix, line 45, column E.

194. The Commission recalls that habeas corpus fulfills the purpose of judicially verifying the legality of the deprivation of liberty as it is a means to control respect for the life and integrity of the person, prevent his disappearance or refusal to declare his place of detention, as well as to protect him against torture or other cruel, inhuman, or degrading treatment or punishment.[460] Both the detained person and his family members or other persons close to him must have access to this or other prompt and effective judicial procedures or remedies as a means to determine his whereabouts or state of health, or to identify the authority that ordered or carried out the deprivation of liberty.[461] This remedy must not only formally exist in law, or be formally admissible; it must also meet the objective of obtaining without delay a decision on the legality of the arrest or detention.[462] According to official information received by the Commission, the percentage of habeas corpus cases settled in 2022 was 28% and 88% in 2023. While the Commission appreciates the State's efforts to increase its capacity to process and respond to habeas corpus appeals in 2023, it notes that 84% of the appeals received in those 2 years are still pending resolution. In this regard, the IACHR considers the excessive length of time it takes to respond to these appeals to be serious, especially when a state of emergency is in force. Especially in such circumstances, the Court has stressed the relevance of judicial guarantees, both to protect non-derogable or non-suspended rights and to verify the legality of the measures applied in the specific case.[463]

195. The Commission notes that El Salvador's domestic jurisdiction has also consistently pronounced on the need for Habeas Corpus to be

[460] I/A Court H.R. Advisory Opinion OC-8/87. Habeas corpus in Emergency Situations (Articles 27.2, 25.1, and 7.6 of the American Convention on Human Rights). Resolution of January 30, 1987, par. 35.

[461] I/A Court H.R. Case of Torres Millacura et al v. Argentina. Merits, Reparations, and Costs. Judgment of August 26, 2011. Series C No. 229, par. 114.

[462] I/A Court H.R, Case of J. v. Peru, Preliminary Objection, Merits, Reparations, and Costs, November 27, 2013. par. 170.

[463] I/A Court H.R., Advisory Opinion OC-9/87 on Judicial Guarantees in States of Emergency (Articles 27(2), 25 and 8 of the American Convention on Human Rights) of October 6, 1987, p. 25.

resolved within a reasonable period of time. In this sense, following the provisions of the ACHR, Salvadoran courts have indicated that the right to jurisdiction guarantees compliance with the constitutional obligation to satisfy within a reasonable period of time the claims of the parties or to issue and execute the judgment without delay.[464] The IACHR agrees with Salvadoran jurisprudence that indicates that the saturation of hearings[465] or the workload[466] is not in itself sufficient to justify the legal time limits. In the present situation, the delay in the response to the Habeas Corpus actions responds to the detention policy, which should have foreseen that its execution would trigger an unprecedented procedural saturation. Taking into consideration that the legal actions undertaken deal with the right to liberty, it is necessary to take the appropriate measures to achieve procedural discharge, guaranteeing that it be completed within a reasonable period of time.

196. In view of the above, the Commission urges the State to take additional actions to strengthen the judiciary so that it can fulfill its mandate, considering the situation that has arisen as a result of the tens of thousands of arrests made in recent months. It also urges the State to ensure that habeas corpus petitions are analyzed within a reasonable period of time and are an effective remedy to review the legality of detentions and respect for the rights of detainees, and if granted, to grant immediate release to the detainee.

**The right to the presumption of innocence, due process of law, and judicial guarantees**

197. In its observations on the draft of this report, the State reported that at least 54,000 homicides were "established" during the preliminary

[464] Supreme Court of Justice, Constitutional Chamber, HC-49-2010 of January 19, 2018, p. 4; Court of Justice, Constitutional Chamber, HC-49-2010 of October 15, 2010, p. 3;

[465] Supreme Court of Justice, Constitutional Chamber, HC-49-2010 of January 19, 2018, p. 8; Court of Justice, Constitutional Chamber, HC-49-2010 of October 15, 2010, p. 5.

[466] Supreme Court of Justice, Constitutional Chamber, HC-126-2013 of July 3, 2013, p. 7; Court of Justice, Constitutional Chamber, HC-236-2011 of August 15, 2012, p. 12.

stage of criminal proceedings, with judicial oversight of the factors needed to determine the corresponding responsibilities based on criminal legislation. It asserted that the prosecution of all persons captured is carried out within the legally established deadlines, in order to guarantee both a response by the judiciary and the rights of the accused in the respective proceedings. It also claimed that the Salvadoran State has used the tools provided by the state of emergency in a responsible manner and with the sole purpose of criminally prosecuting those individuals proven to have been members of gangs who have engaged in criminal activities within those gangs.[467]

198. However, civil society organizations criticized other aspects related to the right to the presumption of innocence, due process of law, and judicial guarantees. They denounced a series of **practices on the part of the prosecutor's office** that can be summarized mainly as: tolerance of illegal and arbitrary procedures in the police and military actions that led to the arrest; criminal charges, especially for the crime of pertaining to unlawful groups, or the processing of provisional arrests without minimal evidence or even evidence against the accused person; and failure to individualize a specific crime committed by the accused person (*ausencia de individualización de las conductas típicas de la persona imputada*.)[468] Many of the charges were based on "police intelligence" assumptions, through: reports of people allegedly caught in "flagrante delicto"; police reports of "crime incidence" in the areas of residence or capture of the person; police intelligence database reports on the mara or gang structure operating in the area of residence or capture of the person; police "expertise" regarding people's tattoos and their interpretation; and reports of

---

[467] State of El Salvador, Observaciones del Estado de El Salvador al Informe de la CIDH "Estado de Excepción y derechos humanos en El Salvador"(Observations of the State of El Salvador on the IACHR report entitled "State of Emergency and Human Rights in El Salvador"), Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, pp. 67-69.

[468] Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Progress Report March 27, 2022 to March 27, 2023, May 12, 2023, p. 61; Cristosal, Human Rights Violations During the State of Emergency in El Salvador. Situation Report for the period March 27 to April 26, 2022, May 2022, p.16-17.

having a police and/or criminal record.[469] The testimonies taken also referred to some of these aspects:

The first hearing was 6 days after my arrest. We were moved to a room in Mariona. There is a screen there. They only mentioned the names of the people who were accused in order to know if they were present. There were about 150 of us. The prosecution requested six more months of investigation. All the people stayed the six months; no one was released at that hearing. They asked if anyone had anything to mention, but because of the same fear, no one gave an opinion, because it could had been held against us (*porque la tenemos en contra*).[470]

All of the demands are motivated by the facts relating to the increase in homicides in March 2022. They all have the same format, then they make a diagnosis of crime in the area, an analysis of the area, and the gang structure of the area. Then after the documentation they made reference to the capture of the person, a police intelligence report as a collaborator or member (even if it was drawn up after the arrest), plus the identification of any gang's tattoos.[471]

The evidence being offered by the Attorney General (FGR) is the arrest record, the medical check-up, the appointment of a public defender, and the reading of rights.[472]

---

[469] Cristosal, Violaciones a los derechos humanos Durante el régimen de excepción en El Salvador. (Human Rights Violations During the State of Emergency in El Salvador) Situation Report for the period April 27 to May 25, 2022, June 14, 2022, p.37; Cristosal, Human Rights Violations. During the state of emergency *(régimen de excepción)* in El Salvador. Situation Report for the period June to September 2022, October 19, 2022 p. 31.

[470] Testimony No. 23 of March 22, 2023. Person Released under substitute measures.

[471] Testimony No. 2 of March 13, 2023. Defense attorney.

[472] Testimony No. 3 of March 14, 2023. Defense attorney.

199. In its observations on the draft of this report, the State indicated that in order to prove membership in the illegal group, the Police and the Prosecutors' Office, in the investigation proceedings, must provide testimonial, documentary, and expert evidence regarding the individual and the group to which he or she belongs, including: a criminal profile of the person indicated, in the PNC database, in which it is stated that he/she belongs to the gang; history of arrest and link to a gang; that the accused has tattoos on his/her body identifying him/her as a gang member; demonstration of participation in the commission of crimes; testimonies of targeted witnesses (*testigos blancos*) or selected witnesses who establish membership in the gang; testimonies of victims linking him/her to the gang; seizures of telephones with information alluding to gangs; seizures of weapons, drugs, or other illicit objects while acting as a gang member; gang tattoo and graffiti interpretation analysis reports; social network information indicating gang membership; surveys of graffiti in areas frequented by gangs; body inspection albums showing tattoos alluding to gangs; other relevant indications.[473]

200. In addition, the IACHR was informed that **the specialized investigating judges** reportedly endorsed these practices to the extent that: they would automatically decree provisional detentions without proof, evidence or indications; they would not individualize the criminal conduct attributed to the detained person; and they would omit to deal with reports of deplorable and subhuman conditions of detention and cruel, inhuman, and degrading treatment. In repeated virtual hearings and in large groups, the microphone would be muted and the accused persons would not be able to exercise their material defense or narrate the abuses suffered; or the hearing would continue without the presence of the accused person when the Internet

[473] State of El Salvador, Observaciones del Estado de El Salvador al Informe de la CIDH "Estado de Excepción y derechos humanos en El Salvador"(Observations of the State of El Salvador on the IACHR report entitled "State of Emergency and Human Rights in El Salvador"), Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, pp. 83-84.

connection is interrupted.[474] Obstacles were also reported in obtaining basic information about the place of detention, the assigned court, the day of the hearing, as well as the lack of access to the court file[475]:

The courts are not raising formal obstacles, but they are obstructing material and technical defense by not giving me information. Decreeing the confidentiality of the file. [...] The only cases in which the Criminal Code provides for confidentiality are those that affect public morals, secrecy for national security, to protect the right to privacy of the victims or to protect public order. However, all cases are now reserved on "public order" grounds without justification or good reason.[476]

The biggest difficulty is that the whole process is shrouded in secrecy.[477]

We were told that the sheer amount of documents that existed made it impossible to access the file. As a general rule, there was no access to the file. In some cases, the injunction or summons was provided, but in a digital copy. At best, we had access to the prosecutor's injunction at the hearing. Access to documentation

---

[474] Cristosal, One year under the state of emergency : a permanent measure of repression and human rights violations. Progress Report for March 27, 2022 to March 27, 2023, May 12, 2023, pp. 23, 61-62, 91; Cristosal, Human Rights Violations During the State of Emergency in El Salvador. Situation report for the period March 27 to April 26, 2022, May 2022, p.18, Cristosal, Human Rights Violations During the State of Emergency in El Salvador. Situation Report for the period April 27 to May 25, 2022, June 14, 2022, pp. 40-41; Cristosal, Human Right Violations. During the state of emergency *(régimen de excepción)* in El Salvador. Situation Report for the period June to September 2022, October 19, 2022 p. 27.

[475] Cristosal, Violaciones a los derechos humanos Durante el régimen de excepción en El Salvador. (Human Rights Violations During the State of Emergency in El Salvador) Situation Report for the period from March 27 to April 26, 2022, May 2022, p.11; Cristosal, Human Rights Violations During the State of Emergency in El Salvador. Situation Report for the period April 27 to May 25, 2022, June 14, 2022, pp. 33-34; Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. dear Situation Report for March 27 2022 to March 27, 2023, May 12, 2023, p. 62.

[476] Testimony No. 5 of March 14, 2023. Defense attorney.

[477] Testimony No. 4 of March 14, 2023. Defense attorney.

was quite limited. Until after the initial hearing, the court did not allow access to the file.[478]

201. Regarding the initial **hearings**, in which the legality of the arrest must be assessed, the criminal charges must be decided, and a decision taken regarding whether the person charged must be placed in pre-trial detention, the Commission was informed that they have been held on some occasions in groups of up to 500 detainees.[479] From April 10 to December 31, 2022, there were at least 110 mass hearings involving 19,235 people, with pre-trial detention ordered in 99% of these hearings.[480] In some hearings, the authorities would allow public defenders about four minutes to present the case for 400 to 500 people[481]; and less than 2% of defendants would be able to speak on their own behalf in hearings of that magnitude.[482] It was also reportedly common to dismiss on no good reason defense pleas and requests for alternatives to imprisonment. [483] In this regard, the organizations pointed out that "mass hearings" reduce the opportunity to exercise an adequate material and technical defense and do not individualize criminal responsibilities, thereby curtailing the presumption of innocence.[484]

[478] Testimony No. 2 of March 13, 2023. Defense attorney.

[479] Human Rights Watch, Cristosal, "We Can Arrest Anyone We Want" Widespread Human Rights Violations During the "State of Emergency " in El Salvador, December 2022, p. 94; Cristosal, Cristosal, December 2022, p. 94; Cristosal, Human Rights Violations. During the state of emergency *(régimen de excepción)* in El Salvador. Situation Report for the period June to September 2022, October 19, 2022 p. 27.

[480] The University Observatory of Human Rights of the Central American University José Simeón Cañas , Annual report 2022: The State of Human Rights in El Salvador, April 2023, pp. 136-137.

[481] Human Rights Watch, Cristosal, "We Can Arrest Anyone We Want" Widespread Human Rights Violations During the "State of Emergency" in El Salvador, December 2022, p. 94.

[482] Cristosal, Violaciones a los derechos humanos Durante el régimen de excepción en El Salvador. (Human Rights Violations During the State of Emergency in El Salvador) Situation Report for the period April 27 to May 25, 2022. June 14, 2022, pp. 33-34.

[483] Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report for March 27 2022 to March 27, 2023,May 12, 2023, p. 62.

[484] Human Rights Watch, Cristosal, "We Can Arrest Anyone We Want" Widespread Human Rights Violations During the "State of Emergency" in El Salvador, December 2022, p. 94.

202. Likewise, for certain crimes -such as those related to "illicit groups" or "terrorism"-, Salvadoran legislation establishes that virtual hearings must be held virtually as a rule[485], which was highlighted as particularly detrimental in hearings with dozens and hundreds of accused persons.[486] These obstructions to the exercise of technical and material defense in the massive virtual hearings were also mentioned in the testimonies taken by the IACHR from the perspective of both the accused and the lawyers who have acted in different cases:

> There were many of us in the audience. The hearings are virtual. I didn't get to speak. Since there are [people] from different penal centers, I didn't get to give my testimony, but it wasn't going to do any good anyway, nobody got out. [...] In addition, there were about 400 of us for one public defender.[487]

> I have been present at hearings of up to 611 detainees, only private attorneys and a public defender were present. None of the defendants were physically present.[488]

> In the hearings that I have attended, they limit the time for the defense to participate. There are judges who indicate a maximum of 5 minutes. It is impossible to exercise a defense with that amount of time, added to the fact that we do not have access to the file in an optimal manner.[489]

> The hearings are done virtually, they just called me that I had a hearing and went to take me to where the computer is. There were

[485] Human Rights Watch, Cristosal, "We Can Arrest Anyone We Want" Widespread Human Rights Violations During the "State of Emergency" in El Salvador, December 2022, p. 95.

[486] Human Rights Watch, Cristosal, "We Can Arrest Anyone We Want" Widespread Human Rights Violations During the "State of Emergency" in El Salvador, December 2022, p. 95.

[487] Testimony No. 1 of March 13, 2023. Person released under alternative measures.

[488] Testimony No. 2 of March 13, 2023. Defense attorney.

[489] Testimony No. 7 of March 15, 2023. Defense attorney.

about 36 people there, it wasn't just me. I had the floor, but I couldn't say anything. I just said I wanted clothes, I couldn't say anything else.[490]

On the tenth day after I was transferred to the prison I had my hearing. It was about three o'clock in the afternoon. We were pulled out early and I was waiting. On site were a screen, camera and microphone and the person in charge of the hearing. The public defender pointed out the names of the people she was defending and we had to say "present." She told us that if we were given an opportunity to speak we should not use it or say anything. I had never been detained before and I wanted to ask the judge why I had been detained.[491]

203. With respect to virtual hearings, the State indicated that the Supreme Court of Justice has made efforts to integrate new communication technologies for the holding and development of oral hearings, which are also carried out through videoconferencing.[492] It pointed to the use of Delegates of Penitentiary Affairs, who from the prisons and penitentiaries, provide legal-administrative support to the activity of the judge, in accordance with the provisions of the Interagency Protocol for conducting hearings and proceedings through videoconferencing, in aspects such as verifying the identity of the accused, checking that the audiovisual system allowed for correct understanding of the act being executed, facilitating communication with the main hearing room and the defense attorneys, among others, thereby effectively protecting the accused and detainee.[493]

204. The Commission also received information on other patterns of limitations in the exercise of **judicial guarantees** and the **technical**

---

[490] Testimony No. 20 of March 21, 2023. Person Released under substitute measures.

[491] Testimony No. 6 of March 15, 2023. Person released under alternative measures.

[492] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 52-53.

[493] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 52-53.

**and material defense** of the accused persons, such as the restriction of contact between the accused persons and their legal representatives in the preparation of their defense due to the prohibition of entry into the penal centers.[494] Thousands of detainees were reportedly held incommunicado for weeks or months, barred from making phone calls and only having access to their legal representative for a few minutes shortly before their hearings.[495] Thus, the testimonies recorded:

> To begin with, the police never allowed the lawyer to meet with the detained person, either during the administrative stage, the judicial stage, or afterwards. None of the lawyers who have represented persons under the state of emergency have been able to meet with them. Brief communications, at best. The only mechanism for communication could be during the hearing for the imposition of precautionary measures.[496]

> They don't let lawyers in, they deprive us of any lawyer visits. I was accused of belonging to illicit groups. I had no legal assistance until the court hearing.[497]

> They only told me it was about illicit groups. No, I had no contact with my public defender. I was introduced to him at the police station, but I never spoke to him.[498]

---

[494] Cristosal, Violaciones a los derechos humanos Durante el régimen de excepción en El Salvador. (Human Rights Violations During the State of Emergency in El Salvador) Situation Report for the period from March 27 to April 26, 2022, May 2022, p.11; Cristosal, Human Rights Violations During the State of Emergency in El Salvador. Situation Report for the period April 27 to May 25, 2022, June 14, 2022, pp. 33-34; Cristosal, Human Right Violations. During the state of emergency *(régimen de excepción)* in El Salvador. Situation Report for the period June to September 2022, October 19, 2022, p.27; Cristosal, One year under the state of emergency : a permanent measure of repression and human rights violations. Situation Report for March 27 2022 to March 27, 2023, May 12, 2023, p. 62.

[495] Human Rights Watch, Cristosal, "We Can Arrest Anyone We Want" Widespread Human Rights Violations Under El Salvador's "State of Emergency", December 2022, pp. 93-94

[496] Testimony No. 2 of March 13, 2023. Defense attorney.

[497] Testimony No. 1 of March 13, 2023. Person released under alternative measures

[498] Testimony No. 23 of March 22, 2023. Person Released under substitute measures.

205. Based on the aforementioned practices, the Commission is concerned that persons accused of crimes during the state of emergency in El Salvador are facing serious harm to the **right to presumption of innocence** and violations of the exercise of **judicial guarantees**. The IACHR notes that in a short period of time there was a high number of open criminal cases, mainly for crimes related to membership of and collaboration with organized crime groups. The IACHR is concerned about reports of the practice of automatically charging persons detained in the context of the state of emergency, without adequately identifying the punishable acts committed and with little evidence to back the accusations made. In addition, judicial proceedings under the characteristics described above - especially mass hearings - do not allow for individualized knowledge of the cases and guilt of each individual, nor do they allow for the exercise of essential rights in criminal proceedings. The Commission warns that these and other violations of due process of law are particularly serious in light of the above-mentioned situation of massive illegal and arbitrary detentions since March 2022.

206. Article 8 of the American Convention recognizes due process, which encompasses the conditions that must be met to ensure the adequate defense of those whose rights or obligations are under judicial consideration.[499] Likewise, this article presents a set of minimum guarantees that must be ensured in the course of a criminal proceeding in observance of the principle of presumption of innocence of the accused.[500] In accordance with this principle, it is up to the prosecuting party to prove that the criminal offense is attributable to the person charged.[501] In this sense, the State has the duty to inform the interested party of the cause of the accusation and the reasons for the charge, i.e., the actions or omissions with which he or she is

---

499 I/A Court H.R. Judicial Guarantees in States of Emergency (Articles 27.2, 25, and 8 of the American Convention on Human Rights). Advisory Opinion OC-9/87 of October 6, 1987. Series A No. 9, par. 28.

500 I/A Court H.R. Case of Ricardo Canese v. Paraguay. Merits, Reparations, and Costs. Judgment of August 31, 2004. Series C No. 111, par. 153.

501 I/A Court H.R. Case of Zegarra Marín v. Peru. Preliminary Objections, Merits, Reparations, and Costs. Judgment of February 15, 2017. Series C No. 331, par. 123-125.

charged, the evidentiary basis for the accusation, and the legal characterization given to these facts.[502] The American Court has also stressed that all this information must be provided in an explicit, clear, complete, and sufficiently detailed manner to enable the accused to fully exercise his right to defense and prove to the judge his version of the facts.[503] The IACHR emphasizes that everyone has the right to be heard by a competent, independent, and impartial judge in the substantiation of any formal accusation against him or her.[504]

207. The American Convention establishes the specific guarantees of this right, the purpose of which is both to provide the accused with the necessary tools to prove his innocence, and to enable him to play an active part in a rigorous control of the process to guarantee the validity and credibility of the evidence allegedly showing his guilt.[505] Likewise, the Court has indicated that the core element in the right to material defense is the possibility for the accused to actively participate in the hearings and proceedings and to make a free statement on the facts attributed to him; while technical defense ensures that the accused is advised on his duties and rights and exercises critical and legal control in the production of evidence.[506] The Commission urges judges to ensure the effective exercise of the right of defense in trial of the accused in both its material and technical aspects, ensuring parity in the exercise of the adversarial process and, specifically, in the possibility of requesting the production of evidence and ensuring that such evidence is effectively gathered. This includes guaranteeing adequate means and time to prepare and exercise the defense; duly

[502] I/A Court H.R. Case of Barreto Leiva v. Venezuela. Merits, Reparations, and Costs. Judgment of November 17, 2009. Series C No. 206, par. 28.

[503] I/A Court H.R. Case of Barreto Leiva v. Venezuela. Merits, Reparations, and Costs. Judgment of November 17, 2009. Series C No. 206, par. 28.

[504] Article 8 of the American Convention on Human Rights.

[505] I/A Court H.R. Case of Rodríguez Revolorio *et al*. v. Guatemala. Preliminary Objection, Merits, Reparations, and Costs. Judgment of October 14, 2019. Series C No. 387, par. 117.

[506] I/A Court H.R. Case of Manuela *et al.* v. El Salvador, Preliminary Objections, Merits, Reparations, and Costs. Judgment of November 2, 2021. Series C No. 441, par. 120.

notifying of the charges filed; ensuring access to information related to the case file; among others.

208. The IACHR also notes that, due to the existence of the state of emergency , the second paragraph of Article 12 of the Constitution of El Salvador, which refers to the right of the detained person to be informed of his rights and the reasons for his detention; not to be forced to incriminate himself when testifying; and to be guaranteed the assistance of his defense before the organs of administration of justice, is still suspended in the country.[507] The Commission reaffirms its view that these aspects form the core of the indispensable judicial guarantees, which are not subject to suspension under any circumstances. It is precisely through this set of judicial procedures and legal conditions that the State guarantees the appropriate means to control the acts dictated in an emergency context, ensuring that the measures adopted do not exceed the limits imposed by the ACHR or detract from full observance of the rights protected by Article 27.2 of the ACHR.[508]

209. Particularly regarding the right not to be compelled to testify against oneself, the Inter-American Court has indicated that any statement obtained through any form of coercion capable of breaking the spontaneous expression of the person's will must be annulled.[509] In this regard, the court has emphasized that statements obtained through coercion are usually not truthful and should be excluded from the judicial process as a way of discouraging procedural acts derived from torture or cruel treatment.[510] In this context, the IACHR notes that Article 24 of the Constitution remains suspended, which affects the requirement of judicial control over the interventions carried out by

[507] Asamblea Legislativa, Decreto Legislativo No. 888, 7 de noviembre de 2023.

[508] I/A Court H.R., Advisory Opinion OC-9/87 on Judicial Guarantees in States of Emergency (Articles 27.2, 25, and 8 of the American Convention on Human Rights), October 6, 1987, paras. 20 and 21.

[509] I/A Court H.R. Case of Cabrera García and Montiel Flores v. Mexico. Preliminary Objection, Merits, Reparations, and Costs. Judgment of November 26, 2010. Series C No. 220, par. 166.

[510] I/A Court H.R. Case of Cabrera García and Montiel Flores v. Mexico. Preliminary Objection, Merits, Reparations, and Costs. Judgment of November 26, 2010. Series C No. 220, par. 166.

public agents, as well as the legal consequences of the use of material obtained under these circumstances.[511]

210. The Commission recalls that all authorities of a State Party to the Convention have an obligation to check compliance between acts or omissions and domestic norms and the American Convention (conventionality control), so that the interpretation and application of domestic law is consistent with the State's international human rights obligations.[512] As far as the justice system is concerned, justice operators must carry out this conventionality control within the framework of their respective competencies and the corresponding procedural regulations, taking into account not only the treaty, but also the interpretation that the Inter-American Court has made of it.[513] This supervisory task ensures respect for the rights that were not suspended by the state of emergency and control of the conventionality of the suspensions adopted. In view of the foregoing, the Commission calls upon the justice operators to exercise, within the framework of their respective competencies and with independence and impartiality, a control of conventionality both in the issuance and application of norms, in terms of their validity and compatibility with the Convention, and in the determination, trial, and resolution of particular situations and concrete cases, taking into account the treaty itself and, as appropriate, the precedents or jurisprudential guidelines of the Inter-American Court.[514]

211. With regard to **free criminal assistance**, the State indicated that the Office of the Attorney General of the Republic (PGR), as the institution responsible for providing free criminal assistance to persons who cannot obtain a private attorney and its Public Criminal Defense Unit

---

[511] See also Inter-American Convention to Prevent and Punish Torture (Article 10).

[512] I/A Court H.R. Case of Colindres Schonenberg v. El Salvador. Merits, Reparations, and Costs, Judgment of February 4, 2019. Series C No. 373, par. 129.

[513] I/A Court H.R. Case of Colindres Schonenberg v. El Salvador. Merits, Reparations, and Costs, Judgment of February 4, 2019. Series C No. 373, par. 129.

[514] I/A Court H.R., Case of Gelman v. Uruguay. Monitoring of Compliance with Judgment. Order of the Inter-American Court of Human Rights of March 20, 2013, par. 69.

(Ombudsman's Office), is a major player in the technical defense of adults and adolescents who are accused of committing a punishable act, from the initial investigation phase to the phase of prison supervision and enforcement of the sentence or execution of measures for minors, as appropriate.[515] It reported that the Ombudsman's Office has experienced a considerable increase in the number of cases since the first decree of the state of emergency, and has continuously and uninterruptedly provided its services, which have been comprehensive and focused on a human rights and gender perspective.[516] Between March 27, 2022 and May 16, 2023, the Ombudsman's Office has attended to approximately 58,880 criminally prosecuted persons, having increased the number of public defenders who provide their services on a permanent basis in the different local units; in addition, the institution's facilities have been adapted so that persons deprived of liberty are presented in a dignified manner and are allowed reasonable communication during the first interview with the assigned public defender.[517] The State mentioned the hiring of personnel in the Auxiliary Prosecutor's Offices at the national level, in the positions of Ombudsman, receptionist, psychologist, and social worker.[518] Although it did not specify the increase in contracted personnel, in its comments on the draft of this report, it indicated the number of people in these positions at the national level: 33 public defenders, 7 psychologists, 2 social workers, and 15 receptionists.[519] In addition, In a hearing held in November 2023 by the IACHR, the

[515] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 54-55.

[516] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 54-55.

[517] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 54-55.

[518] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, p. 8.

[519] State of El Salvador, Observaciones del Estado de El Salvador al Informe de la CIDH "Estado de Excepción y derechos humanos en El Salvador"(Observations of the State of El Salvador on the IACHR report entitled “State of Emergency and Human Rights in El Salvador”), Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, pp. 83-84.

State indicated that the PGR would conduct the criminal defense of almost 80% of the persons detained during the state of emergency.[520]

212. In turn, civil society organizations asserted that the PGR had collapsed, indicating that, between January and the end of March 2022, defenders handled 9,000 cases, which rose to more than 55,000 between March and July alone.[521] Due to the high increase in arrests, the PGR had reportedly advised the public not to seek initial legal attention until 13 days after capture by security forces.[522] The Commission also heard criticisms about the institution's procedures for receiving and preserving documentation relevant to the cases, as well as about communication with the families.[523] In repeated cases, basic information about the process, such as the basis of the accusations and the stage of a particular case, or an explanation of the documents that family members should submit, was not provided.[524] In addition, situations of neglect, negligence, mistreatment, gender violence, and stigmatization of family members were reported.[525]

---

520 IACHR, Hearing 'Forced Disappearances during the State of Emergency', 188th session, November 9, 2023.

521 Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report for March 27 2022 to March 27, 2023, May 12, 2023, p. 62.

522 Cristosal, Violaciones a los derechos humanos Durante el régimen de excepción en El Salvador. (Human Rights Violations During the State of Emergency in El Salvador) Situation Report for the period March 27 to April 26, 2022, May 2022; p.15.

523 Cristosal, Violaciones a los derechos humanos Durante el régimen de excepción en El Salvador. (Human Rights Violations During the Emergency Regime in El Salvador) Situation Report for the period April 27 to May 25, 2022, June 14, 2022, pp. p.35 -37.

524 Cristosal, Violaciones a los derechos humanos Durante el régimen de excepción en El Salvador. (Human Rights Violations During the Emergency Regime in El Salvador) Situation Report for the period April 27 to May 25, 2022, June 14, 2022, pp.35-37; Cristosal, Human Rights Violations. During the state of emergency *(régimen de excepción)* in El Salvador. Situation Report for the period June to September 2022, October 19, 2022, p.27; Cristosal, Violaciones a los derechos humanos durante el régimen de excepción en El Salvador. Situation Report for the period March 27 to April 26, 2022, May 2022, p.15; Human Rights Watch, Cristosal, "We Can Arrest Whoever We Want" Widespread Human Rights Violations During the "State of Emergency" in El Salvador, December 2022, pp. 93-94.

525 Cristosal, Violaciones a los derechos humanos Durante el régimen de excepción en El Salvador. (Human Rights Violations During the Emergency Regime in El Salvador) Situation Report for the period April 27 to May 25, 2022, June 14, 2022, pp.35-37; Cristosal, Human Rights Violations During the Emergency Regime in El Salvador. Situation Report for the period March 27 to April 26, 2022, May 2022; pp. 11, 62.

213. In its comments on the draft of this report, the State indicated that any complaint or denunciation filed by users or their relatives is directed through the appropriate channels, with the aim of establishing disciplinary responsibilities in the event that the public official has committed any fault. In this regard, it indicated that so far, the PGR's Legal Affairs Department, which is in charge of managing such disciplinary proceedings before the Civil Service Commission, has not registered any case related to the accusations raised.[526]

214. The Commission reiterates its views that, despite the increased human resources allocated to the PGR, the measures adopted in the area of citizen security under the emergency regime have substantially increased the demand for the services constitutionally assigned to that institution, and significant challenges have been observed with regard to complying with those additional requirements.[527] This makes it all the more important to determine the resources needed to meet the real demands of the institution in the current situation.[528] The Commission and the Court have underscored the importance of free public legal defense services for persons without resources as an essential part of their right to effective judicial protection and have indicated that this service must be provided with sufficient guarantees for its efficient performance, on an equal footing with the guarantees provided for prosecution.[529] It is also essential that the free services provided are geared towards facilitating access to justice for groups

[526] State of El Salvador, Observations of the State of El Salvador to the IACHR Report "State of Emergency and Human Rights in El Salvador," Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, Annex 1, Methodological Systematization Matrix, line 48, column E.

[527] IACHR, 2022 Annual Report, Chapter V: Follow-up of recommendations made by the IACHR in its country or thematic reports: El Salvador, April 1, 2023, paras. 90-91.

[528] IACHR, 2022 Annual Report, Chapter V: Follow-up of recommendations made by the IACHR in its country or thematic reports: El Salvador, April 1, 2023, paras. 90-91.

[529] I/A Court H.R, Exceptions to the Exhaustion of Domestic Remedies (Articles 46(1), 46(2)(a) and 46(2)(b), American Convention on Human Rights). Advisory Opinion OC-11/90 of August 10, 1990. Series A No. 11, par. 126; I/A Court H.R. Case of Ruano Torres et al. v. El Salvador. Merits, Reparations, and Costs, Judgment of October 5, 2015. Series C No. 303, par. 155; IACHR, Access to Justice as a Guarantee of Economic, Social, and Cultural Rights. A Review of the Standards Adopted by the Inter-American System of Human Rights, OEA/Ser.L/V/II.129 , Doc. 4, September 7, 2007. paras. 51– 55; I/A Court H.R. Case of Ruano Torres et al. v. El Salvador. Merits, Reparations, and Costs, Judgment of October 5, 2015. Series C No. 303, par. 157.

that are particularly affected by poverty, ensuring wide dissemination of information on rights and remedies within the justice system.[530]

215. In sum, based on the information received, the IACHR observed severe restrictions to rights and guarantees with respect to the actions of the Attorney General's Office and the Judiciary in their work to oversee the deprivations of liberty carried out during the state of emergency and in the criminal prosecution of persons allegedly linked to or collaborating with gangs. The Commission urges the State to adopt additional efforts to ensure the effectiveness of the habeas corpus remedy, especially in the face of the suspension of rights and guarantees due to the state of emergency. It also urges the implementation of the necessary measures for a complete, exhaustive, and impartial review of the criminal cases initiated in this context, in order to avoid or correct injustices, examining each case on a case-by-case basis based on strictly legal criteria.[531] To this end, it recommends the examination of the lines of inquiry and the procedures carried out, determining which acts should be corrected or annulled due to violations of due legal process, curtailment of defense, and failure to observe presumption of innocence of the persons prosecuted.

### Pretrial detention

216. Regarding pretrial detention, the State did not provide figures on how many people were subjected to this type of measure. It indicated that the Office of the Attorney General of the Republic compiles evidence of the commission of the crime and the participation of the accused, which it presents to the judicial authority for the corresponding decision, together with the request for the hearing for the imposition

[530] IACHR, Access to Justice as a Guarantee of Economic, Social, and Cultural Rights. A Review of the Standards Adopted by the Inter-American System of Human Rights, OEA/Ser.L/V/II.129 , Doc. 4, September 7, 2007. par. 88.

[531] Interdisciplinary Group of Independent Experts (GIEI)- Bolivia, Final Report on the acts of violence and human rights violations that occurred between September 1 and December 31, 2019, July 23, 2021, pp. 287, 465.

of measures.[532] It informed that in this hearing there is participation of the defense, the prosecution, and the defendant, either in person or by videoconference, which would guarantee the rules of due process.[533] Under the state of emergency, the Department of Probation and Assisted Liberty of the Supreme Court of Justice also provides support to the Judges of Penitentiary Surveillance and Execution of Sentences, managing information on assisted persons who are deprived of liberty due to the regime and who for that reason cease to comply with their conditions or rules of conduct, as well as alternative sentences to imprisonment. This is to ensure that the Judges have sufficient elements to support their decisions, in application of the criteria of justification for non-compliance that the same law recognizes, in such a way that the assisted person is guaranteed, among others, the right to due process, access to justice and legal certainty.[534]

217. According to public information, of the 65,795 people detained up until March 2023, about 90% were remanded in custody.[535] Of particular concern is the information that justice operators are automatically requesting and applying the measure for certain crimes, including "illicit groupings" and membership in a "terrorist organization", even in the absence of evidence[536]:

There were about 500 people in the audience that day. I saw the list, he was number three hundred and something and he was

[532] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, p. 52.

[533] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, p. 52.

[534] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, p. 52.

[535] France24, El Salvador under a state of emergency: the net outcome after one year of Bukele's controversial measure, March 29, 2023; Contrapunto, 313 days without homicides. There are 4,012 Habeas Corpus, March 1, 2023.

[536] Human Rights Watch, Cristosal, "We Can Arrest Whomever We Want" Widespread Human Rights Violations During the "Emergency Regime" in El Salvador, December 2022, p. 92; Cristosal, One year under the emergency regime: a permanent measure of repression and human rights violations. Situation Report for March 27, 2022 to March 27, 2023May 12, 2023, pp. , 27 62, 64, 65.

charged with belonging to illegal groups. All persons were remanded in custody.[537]

In the hearings, they do not evaluate evidence, all the lawyers had the people's papers (*arraigos*) with them. Only one of every 52 people was given alternative measures. Although judges receive evidence, they do not evaluate it. For example, when the substitution of precautionary measures is not achieved, a special hearing for the review of measures is requested, the evidence or opinions are received, but not evaluated. It even happened that, in order to prove the employment of a person, the judicial authority asked me absurdly to have the employer come and declare that the person I represent works in that place.[538]

218. The IACHR reiterates its considerations on the incompatibility with inter-American human rights standards of any regulation that establishes pretrial detention as mandatory based on the type of crime.[539] Bearing in mind the precautionary and exceptional nature of this measure, the Commission urges the State to ensure its rational use, favoring the use of less burdensome alternative measures.[540] It is incumbent upon the prosecution to show that the application of alternative measures is not feasible.[541] Likewise, its application should only occur when the applicable legal parameters are met in each individual case, which should be in accordance with international human rights law, and given necessity, proportionality, and legitimate purpose.[542] The corresponding resolution ordering pretrial detention

[537] Testimony No. 24 of March 23, 2023. Family member of a detained person.

[538] Testimony No. 3 of March 14, 2023. Defense attorney.

[539] IACHR, Report on Measures Aimed at Reducing the Use of Pretrial Detention in the Americas, OEA/Ser.L/V/II.163, Doc. 105, July 3, 2017, par. 231.B.4.

[540] IACHR, Report on Measures Aimed at Reducing the Use of Pretrial Detention in the Americas, OEA/Ser.L/V/II.163, Doc. 105, July 3, 2017, par. 231.E.2.

[541] IACHR, Report on Measures Aimed at Reducing the Use of Pretrial Detention in the Americas, OEA/Ser.L/V/II.163, Doc. 105, July 3, 2017, par. 231.E.2.

[542] IACHR, Report on Measures Aimed at Reducing the Use of Pretrial Detention in the Americas, OEA/Ser.L/V/II.163, Doc. 105, July 3, 2017, paras. 230, 231.B.1-4.

must name the individual whose pretrial detention is being ordered, spell out the facts attributed to him or her, specify the crimes that those facts constitute, explain the circumstances that necessitate pretrial detention, and set the time period that the individual is to be held in pretrial detention and the date on which it will expire.[543]

219. The Inter-American Court has indicated that in order for a precautionary measure restricting liberty not to be arbitrary and not affect the right to the presumption of innocence, it is necessary that: a) there are material assumptions related to the existence of an unlawful act and the link of the person being prosecuted to that act; b) these measures comply with the four elements of the "proportionality test", that is, with the purpose of the measure, which must be legitimate (compatible with the American Convention), suitable to comply with the purpose pursued, necessary, and strictly proportional; and c) the decision that imposes them is sufficiently well substantiated to evaluate whether it complies with the conditions indicated.[544]

220. The Inter-American Court has reiterated the obligation to duly substantiate and give reasons for decisions that may affect human rights, indicating, through rational argumentation, the reasons on which they are based, taking into account the allegations and the evidence provided in the case file.[545] In addition, the Commission recalls that it is the responsibility of the prosecution and judicial authorities to ensure periodic reviews of the situation of persons subject to pretrial detention and the validity of the circumstances that led to its application.[546] Likewise, the IACHR has recommended to the States that these should be decided in an oral hearing, with the

[543] IACHR, Report on Measures Aimed at Reducing the Use of Pretrial Detention in the Americas, OEA/Ser.L/V/II.163, Doc. 105, July 3, 2017, paras. 230, 231.B.6.

[544] I/A Court H.R., Case of García- Rodriguez et al v. Mexico. Preliminary Objections, Merits, Reparations, and Costs. Judgment of January 25, 2023, paras 156-158.

[545] I/A Court H.R. Case of Escher et al. v. Brazil. Preliminary Objections, Merits, Reparations, and Costs. Judgment of July 6, 2009. Series C No. 200, par. 139.

[546] IACHR, Report on Measures Aimed at Reducing the Use of Pretrial Detention in the Americas, OEA/Ser.L/V/II.163, Doc. 105, July 3, 2017, par. 165.

participation of all parties, in order to guarantee the principles of contradiction, immediacy, publicity, and celerity; and to ensure the right of defense, the accused persons should be present and heard by the judicial authority.[547]

221. It is important to note that the Inter-American Court has related automatic pretrial detention to the right to equality and non-discrimination, stating that States must refrain from actions that in any way are aimed, directly or indirectly, at creating situations of de jure or de facto discrimination. Likewise, in the event that the discriminatory treatment refers to unequal protection of domestic law or its application, the fact must be analyzed in light of Article 24 of the American Convention in relation to the categories protected by Article 1(1) of the Convention. In this regard, according to inter-American jurisprudence, a difference in treatment is discriminatory when it does not have an objective and reasonable justification, that is, when it does not pursue a legitimate aim and there is no reasonable relation of proportionality between the means used and the aim pursued.[548]

222. Regarding the processing and duration of open cases, the Commission learned that, as of the legislative reform of the Law against Organized Crime, specialized judges would be empowered to extend the term of the investigation for up to two years, postponing the preliminary hearing on the case[549]; and applying it retroactively to

[547] Along the same lines, see: IACHR, Report on the Use of Pretrial Detention in the Americas, OEA/Ser.L/V/II. Doc. 46/13, December 30, 2013, paras. 179 and 326. Recommendation C "Legal framework and application of pretrial detention"; Report on Measures Aimed at Reducing the Use of Pretrial Detention in the Americas, OEA/Ser.L/V/II.163. Doc. 105, July 3, 2017, par. 182.

[548] I/A Court H.R., Case of García- Rodriguez et al v. Mexico. Preliminary Objections, Merits, Reparations, and Costs. Judgment of January 25, 2023, par. 172.

[549] Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report March 27, 2022 to March 27, 2023, May 12, 2023, p. 62, 91; La Prensa Gráfica, Captured by the regime will spend another year in prison, January 31, 2023.

ongoing proceedings.[550] The legislative decree justifies in its explanatory memorandum that "in view of the significant increase in the number of criminal proceedings processed in these courts, it is temporarily necessary to extend the procedural deadlines, taking into account existing capacities".[551] For their part, testimonies from lawyers indicate that:

I have never, in my 35 years of practice, seen the time limit for preliminary investigation (*plazo de instrucción*) last a year. In almost all of the proceedings there have been extensions beyond the permitted time limits.[552]

The preliminary investigation stage has not been carried out. A decree was approved modifying the time limits for the investigation stage, which can be extended for one year. None were scheduled. Most of the persons detained under the state of emergency have not had a preliminary hearing.[553]

They are decreeing provisional measures of preventive detention for 6 months, but an extension of the pre-trial investigation can be requested for up to a further 6 months. However, after the reform it can be extended up to 1 year without any request from the prosecutor's office. Thus, the judges are decreeing the extension for up to one more year. This means that people can go two years without a preliminary hearing.[554]

---

550 Human Rights Watch, Cristosal, "We Can Arrest Whomever We Want" Widespread Human Rights Violations During the "Emergency Regime" in El Salvador, December 2022, p. 95; Cristosal, One year under the emergency regime: a permanent measure of repression and human rights violations. Situation Report for Sunday, March 27, 2022 to March 27, 2023May 12, 2023, pp. 62, 91.

551 Legislative Assembly, Decree Law No. 547 of October 26, 2022 - Amend the Law against Organized Crime.

552 Testimony No. 4 of March 14, 2023. Defense attorney.

553 Testimony No. 2 of March 13, 2023. Defense attorney.

554 Testimony No. 5 of March 14, 2023. Defense attorney.

223. The IACHR is alarmed that the measure adopted with respect to the increased burden on the justice system favors the prolongation of criminal proceedings and has a disproportionate impact on the rights of the accused. This is especially relevant considering that, as a rule, pretrial detention has been prioritized as a precautionary measure in the proceedings, and that complaints have been filed about the deficiencies in the investigations and evidentiary elements that support the charges brought and the detentions ordered. Likewise, the Commission notes that, due to the legislative reforms carried out in March 2022,[555] the length of pretrial detention was extended and can be maintained until a final sentence is issued in the process, something particularly serious considering the existing overcrowding in places of deprivation of liberty. The IACHR recalls the judicial obligation to process with greater diligence and promptness criminal proceedings in which the accused is deprived of liberty.[556]

**Juvenile justice**

224. The Commission has received very little information on the treatment of children and adolescents in conflict with the law during the state of emergency. According to information provided by the State, at least 2,826 were detained, but it was not indicated how many are facing charges, have been subjected to pretrial detention, or have been treated with various precautionary measures.[557] Human Rights Watch reported, based on leaked documents from the Ministry of Justice and Public Security, that 1,082 children would have been sent to pretrial detention under the state of emergency between March and August 2022; 21 of them were reportedly between 12 and 13 years old.[558] The total number of boys arrested would be 917 and

[555] Article 1° of Legislative Decree N°. 339 of March 30, 2022 - The Code of Criminal Procedure is reformed.

[556] I/A Court H.R. Case of Wong Ho Wing v. Peru. Preliminary Objection, Merits, Reparations, and Costs. Judgment of June 30, 2015. Series C No. 297, par. 268.

[557] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, p. 51.

[558] La Prensa Grafica, Leaking of official documents confirms abuses during the regime, January 28, 2023.

there would be 164 girls detained.[559] Salvadoran civil society organizations underscore the disproportionate impact that the legislative reforms and other measures adopted within the framework of the citizen security policy have had on children and adolescents. They stress that they have been arrested and prosecuted for broadly defined offenses that violate basic due process guarantees and undermine the prospects of justice for victims of gang violence. For its part, in its observations on the draft of this report, the State indicated that the information on the detention of children between 12 and 13 years of age does not match the records of the National Council for Early Childhood, Childhood and Adolescence (Consejo Nacional de la Primera Infancia, Niñez y Adolescencia).[560]

225. In this regard, some of the reports received by the IACHR mention facts of concern regarding the lack of respect for the specific rights and guarantees of children in conflict with the law:

> In the juvenile case, I asked the judge in writing to allow me to meet with the young man to assist him, the judge told me that there was no opportunity to do so. That it was the state of emergency and that I could not meet with the detainees.[561] [...] They are rescheduling the hearings to extend the ninety days in which the minors could be detained. For example, in one case I have, it has been extended 3 times, it should be subject to a measure other than detention. This minor has spent a year in detention, even though the maximum is 90 days.[562]

> They are calling minors for medical check-ups, but the protocols for

[559] La Prensa Grafica, Leaking of official documents confirms abuses during the regime, January 28, 2023.

[560] State of El Salvador, Observations of the State of El Salvador regarding the IACHR Report "State of Emergency and Human Rights in El Salvador," Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, pp. 87 and 93.

[561] Testimony No. 3 of March 14, 2023. Defense attorney.

[562] Testimony No. 3 of March 14, 2023. Defense attorney.

medical assessment of children and adolescents are not being complied with. [...] Parents are not notified. They wanted to enter to know the state of their daughter's health, especially because she is pregnant, but they were not allowed to enter the police station facilities. [...] The social workers and psychologists go to make the reports with family members, but they do not give them information about the legal situation or the state of health of their daughter.[563]

226. For its part, with respect to juvenile justice, the State reported that it has: (i) the Social Integration Programs - aimed at adolescents who have been in conflict with the law and who have been subjected to the Juvenile Criminal Justice System; (ii) the Social Integration Centers - physical spaces intended for the fulfillment of internment measures for adolescents, ordered exceptionally by a Juvenile Judge; (iii) the Care Program in the Administrative Measure of Guardianship - aimed at adolescents with an administrative measure depriving them of liberty in guardianship, with the general objective of promoting their dignified treatment at the stage of their entry into juvenile criminal justice processes; iv) the Program for the Care of Adolescents in Detention - with the objective of providing education in responsibility and social insertion of adolescent offenders as a public service to strengthen the Salvadoran family and the construction of a democratic society; and v) the Attention Program for Adolescents in Assisted Liberty Measures - with the objective of creating, fostering, and developing technical, vocational, and psychosocial skills that allow adolescents to create a life project without being separated from their social, community, and

[563] Testimony No. 5 of March 14, 2023. Defense attorney.

family contexts or the surroundings that enable them to achieve a full and satisfactory life.[564] [565]

227. In its observations on the draft of this report, the State indicated that although in the context of the state of emergency, adolescents allegedly linked to gang criminal activity have been detained, they are subject to due process in the juvenile courts.[566] It pointed out that, from the moment of their detention, they are guaranteed a space and treatment differentiated from that of adults, in accordance with national legislation on the protection of children's rights, which establishes that any measure of deprivation of liberty or internment must be of an exceptional nature and that under no circumstances should they remain with adults. For that reason, at the time of their detention they are transferred to Safeguard Centers (*Centros de Resguardo*) located nationwide and administered by CONAPINA. The National Council for Early Childhood, Childhood and Adolescence is responsible for verifying compliance with legal deadlines and ensuring that adolescents with alleged criminal responsibility have access to legal mechanisms for their due defense, providing transportation to attend their hearings and facilities for ombudspersons to take part in their defense; it has also facilitated access to the Social Integration Centers for the multidisciplinary teams of the Courts for the Monitoring of

564 State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 36-37.

565 In its comments on the draft of this report, the State indicated that the "Care Program of the Administrative Guardianship Measure" provides for the following: 1) Food and nutrition care; 2) Health care; and 3) Legal assistance; and that "Internment Care" has the following components: 1) Help with accessing formal education; 2) Help with accessing non-formal education; 3) Food and nutrition; 4) Health care: 5) Psychosocial care; 6) Legal assistance; and, 7) Life skills development care. In addition, the State reported that, during 2022, a total of 77,697 services were provided, 41.5% in integral health; a total of 1,036,530 food rations were served and distributed in the CIS; and a total of 22 adolescents and young people attended university; in addition to 326 who attended certified technical courses. In 2023, more than 35,000 services were provided to adolescents in conflict with the law, of which 19,227 corresponded to individual psychosocial care. See: State of El Salvador, Observations by the State of El Salvador on the IACHR Report entitled "State of Emergency and Human Rights in El Salvador", Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, p. 60.

566 State of El Salvador, Observaciones del Estado de El Salvador al Informe de la CIDH "Estado de Excepción y derechos humanos en El Salvador"(Observations of the State of El Salvador on the IACHR report entitled "State of Emergency and Human Rights in El Salvador"), Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, pp. 87-90.

Measures for Minors, in order to periodically review, and if possible substitute, internment measures. In this regard, it indicated that in no Social Insertion Center are there adolescents who have spent more than one year under internment measures without having their legal status defined.

228. The Commission recalls that juvenile criminal justice systems must guarantee children and adolescents all the rights and legal principles recognized for all persons accused of committing crimes and, in addition, those derived from the special protection that corresponds to them due to their age and stage of development.[567] Along these lines, the penal guarantees contained in Articles 8 and 25 of the American Convention must be respected and juvenile justice must take into account as one of its main objectives the reintegration of children and adolescents in conflict with the law. The Commission also underscores the right of children and adolescents to be heard and to participate in the juvenile justice process, directly or through their mother and/or father or other persons responsible for their care. At the same time, it draws attention to both the principle of the reasonableness of the time limit for these processes, and the need for the deprivation of liberty of children and adolescents to be kept as a last resort.[568]

**Final considerations on access to justice**

229. The Inter-American Commission warns that, with the implementation of the state of emergency, the tightening of citizen security legislation and policies, and the massive detentions carried out by the security forces, the justice system plays a more important part for the protection of human rights. On different occasions throughout 2022 and 2023, the IACHR urged the State of El Salvador to ensure that the judicial guarantees indispensable for the protection of the rights and freedoms enshrined in the Convention remain in force in all

[567] IACHR, Juvenile Justice and Human Rights in the Americas, OEA/Ser.L/V/II, Doc. 78, Adopted on July 13, 2011, paras. 13, 145, 148.

[568] IACHR, Juvenile Justice and Human Rights in the Americas, OEA/Ser.L/V/II, Doc. 78, adopted on July 13, 2011.

circumstances; and called attention to the special importance of judicial supervision of the measures adopted in this context.[569] However, the information received refers to a series of failures in the administration of justice that imply restrictions to due process of law, judicial guarantees, and judicial protection of persons detained and charged with crimes during the state of emergency.[570] The Commission is very concerned to note that a few months after the occurrence of serious events that diminished the independence of justice operators, numerous allegations arose regarding massive violations of rights and guarantees related to access to justice.

230. In fact, and by way of background, in 2021, the IACHR condemned the expedited dismissals of the plenary of regular and alternate magistrates of the Constitutional Chamber of the Supreme Court of Justice by the Legislative Assembly because the Commission considered that guarantees of due process had been ignored, and that there had been no specific causes for dismissals, as required by the Constitution. It considered that the lack of these elements constituted a serious attack on the principle of separation and independence of powers and the democratic rule of law and contravened inter-American standards for the removal of justice operators. The Legislative Branch argued that the magistrates had issued pronouncements declaring that decrees of the Executive Branch

569 IACHR, Communiqué No. 82 - IACHR Urges El Salvador to implement citizen security actions in accordance with human rights, including under the State of Emergency, April 20, 2022; IACHR, Communiqué No. 126 - IACHR Urges El Salvador to comply with its international obligations and guarantee penitentiary and citizen security policies with respect for human rights, June 3, 2022; IACHR, Communiqué No. 254 - Seven Months of the State of Emergency: IACHR reminds El Salvador to comply with its human rights obligations, November 11, 2022; IACHR, Communiqué No. 58 - IACHR calls on El Salvador to reestablish the rights and guarantees suspended one year ago by the state of emergency, April 6, 2023.

570 This situation is particularly alarming considering that, in 2021, the Commission had issued warnings to the Salvadoran State about the risks and impacts posed by a number of episodes for democratic institutions in the country, especially the justice system. See: IACHR, Communiqué No. 110 -IACHR condemns the dismissal of magistrates of the Constitutional Chamber of the Supreme Court of Justice, without respect for due process and urges El Salvador to preserve the rule of law, May 3, 2021; IACHR, Communiqué No. 234 - IACHR and UN Expert Reject Legislative Reforms that Remove Judges and Prosecutors in El Salvador and Call for Respect for Guarantees for Judicial Independence, September 7, 2021; IACHR, Hearing 'General Situation of Human Rights in El Salvador - de oficio', 180th Period of Sessions, June 30, 2021; IACHR, Public Hearing "Situation of Judicial Independence in El Salvador", held in the framework of the 183rd Period of Sessions, March 16, 2022.

during the pandemic were unconstitutional, thereby hindering the work of the Executive Branch.[571] In the same plenary session, the Assembly approved the election of 4 new members and a new president of the Constitutional Chamber; it also dismissed the Attorney General of the Republic and elected a new person to the position amid questions about his independence and impartiality.[572]

231. In addition to the above, on August 31, 2021, the Legislative Assembly of El Salvador approved reforms to the Judicial Career Law and the Organic Law of the Attorney General's Office.[573] Both regulations modified aspects related to the transfer of justice operators, as well as the termination of their careers. The IACHR and the United Nations Special Rapporteur on the Independence of Judges and Lawyers rejected such legislative reforms and called on El Salvador to respect the guarantees for judicial and prosecutorial independence, pointing out inter-American and international standards regarding the irremovability of justice operators and their proper appointment.

232. In the hearing "Situation of Judicial Independence in El Salvador," held on March 16, 2022, the State argued that the legislative reforms had been relevant to make the work of the justice system more efficient and that they sought to guarantee access to justice and dignify judicial work. It also stated that it had ensured a clear legal framework in relation to the start, transfer, promotions, and termination of such careers, requiring a duly substantiated resolution to carry out transfers. The State indicated that, out of a universe of 702 judges, it identified that the measures determined by the legal reform were applicable to 220 judicial officials; also, based on an agreement of the Supreme

[571] Legislative Assembly Decree No. 2. The following lawyers are removed from their posts as regular magistrates of the Constitutional Chamber: José Oscar Armando Pineda Navas, Aldo Enrique Cáder Camilot; Calos Sergio Avilés Velásquez; Carlos Ernesto Sánchez Escobar, and Marina de Jesús Marenco de Torrento. Diario Oficial (Official Gazette) No 81. San Salvador, May 1, 2021, p. 3.

[572] BBC News, El Salvador: new Bukele-friendly Legislative Assembly removes Constitutional Court judges and attorney general from office May 2, 2021.

[573] Legislative Assembly, Decree No. 144 - Reform the Judicial Career Law, August 31, 2021; Legislative Assembly, Decree No. 145 - Reform the Organic Law of the Office of the Attorney General of the Republic, August 31, 2021.

Court of Justice, a bonus was offered to those who voluntarily resigned from their posts before the law came into force. As a result, 96 judges resigned; 121 requested to continue acting under the availability regime and 5 were dismissed by the application of the law.[574] Civil society organizations criticized the legislative amendments, pointing out that the availability regime would not ensure guaranteed stability in office, as provided for in the Constitution; that the resignations of judges in this context should be considered as the result of external pressure, and that at least 98 new judges were appointed without allegedly having complied with the procedures required by law.[575] They also expressed the fear of justice operators of being removed or transferred as a consequence of their judicial decisions and the non-observance of the constitutional and legal procedures for appointments and promotions of members of the Judiciary. They also reported attacks and acts of criminalization of operators, including acts of harassment by the National Civil Police and the Armed Forces against judges, as well as allegedly unjustified summonses to the Attorney General's Office.

233. The Commission emphasizes that the history of measures that weaken the rule of law, with impacts on the separation of powers and on judicial and prosecutorial independence, is particularly important given the installation of a state of emergency that suspends rights and guarantees protected by the American Convention on Human Rights for a prolonged period of time. In addition, the adopted policy of confronting gangs by means of mass detentions of persons allegedly involved in criminal activities increases the importance of the role of

[574] IACHR, Hearing on the Situation of Judicial Independence in El Salvador, 183rd Period of Sessions, March 16, 2022; Meeting with civil society organizations held on June 9, 2022, on file with the IACHR.

[575] IACHR, Hearing on the Situation of Judicial Independence in El Salvador, 183rd Period of Sessions, March 16, 2022; Agrupación Ciudadana por la Despenalización del Aborto, Asociación Azul Originario, Centro de Derechos Reproductivos, CRISTOSAL, Fair Trials International, Fundación para el Debido Proceso, Instituto de Derechos Humanos de la UCA, Mujeres Libres, Organización Mundial Contra la Tortura, Servicio Social Pasionista, Report of Civil Society Human Rights Organizations against Torture of the United Nations, El Salvador, 2022El Mundo newspaper, Corte Suprema ya nombró a 100 jueces sustitutos por reformas a la carrera judicial (Supreme Court already appointed 100 substitute judges following judicial career reforms).November 15, 2021; DW, El Salvador: more than 200 dismissed judges must leave office in two days, September 23, 2021.

supervision of legality, constitutionality, and adherence to conventions that prosecutors and judges must exercise to ensure due process and the rights and guarantees of individuals. In particular, in the face of allegations of systematic and generalized illegality and arbitrariness in the deprivation of liberty. The Inter-American Court has emphasized that in criminal proceedings that may culminate in major sanctions such as the deprivation of personal liberty, careful scrutiny must be exercised in determining the criminal responsibility of the accused, along with respect for the formalities that guarantee the possibility of defense and the due process of law.[576] Based on the multiple complaints mentioned above, it is imperative that the State ensure full reparation for the affected persons, including the annulment of proceedings that violated the Convention.

234. The Commission reiterates the precautionary and non-punitive nature of pretrial detention, which should be applied in accordance with international standards on the matter. In observing a context of excessive application of this type of measure, the IACHR urges the State to periodically review whether requirements for maintaining the pretrial detention are met and to correct any excesses. The Commission also requests that special heed be paid to vulnerabilities that may increase of acts of violence and discrimination in pretrial detention contexts, such as race, ethnicity, age, sexual orientation, gender identity and expression, and disability, as well as intersectionality of the aforementioned factors.[577] In this regard, it urges the reduction of pretrial detention for people at special risk by prioritizing the use of alternative measures.[578]

235. Finally, the IACHR urges ensuring that criminal proceedings are normally well publicized, given that publicity constitutes both an

---

[576] Case of Rodríguez Revolorio *et al*. v. Guatemala. Preliminary Objection, Merits, Reparations, and Costs. Judgment of October 14, 2019. Series C No. 387, par. 119.

[577] IACHR, Report on Measures Aimed at Reducing the Use of Pretrial Detention in the Americas, OEA/Ser.L/V/II.163, Doc. 105, July 3, 2017, par. 229.

[578] IACHR, Report on Measures Aimed at Reducing the Use of Pretrial Detention in the Americas, OEA/Ser.L/V/II.163, Doc. 105, July 3, 2017, par. 229.

essential element of the judicial guarantees of the accused person and information of public interest.[579] Throughout its history, the Commission has pointed out that investigating human rights violations and imposing the appropriate sanctions on those responsible is a legal duty of the States,[580] which is a condition for the protection of the rights affected,[581] but also part of the rights of the victims or their families.[582] In this sense, in order to meet this obligation, it is imperative that the State ensures the individual criminal accountability of those persons who are actually responsible for the crimes committed in the country, rigorously investigating the criminal structures and individual responsibilities for the acts committed, especially those that have resulted in violations of rights.

---

[579] I/A Court H.R. Case of Palamara Iribarne v. Chile. Merits, Reparations, and Costs. Judgment of November 22, 2005. Series C No. 135, paras. 166-168.

[580] I/A Court H.R. Velásquez Rodríguez Case v. Honduras. Merits. Judgment of July 29, 1988. Series C No. 4 par. 174.

[581] I/A Court H.R. Case of the Massacres of El Mozote and nearby places v. El Salvador, Merits, Reparations, and Costs, Judgment of October 25, 2012. Series C No. 252, par. 244.

[582] I/A Court H.R. Case of the Massacres of El Mozote and nearby places v. El Salvador, Merits, Reparations, and Costs. Judgment of October 25, 2012. Series C No. 252, par. 242.

# CHAPTER 3:
# THE SITUATION OF PERSONS DEPRIVED OF LIBERTY

# THE SITUATION OF PERSONS DEPRIVED OF LIBERTY

## A. Background

236. The situation of persons deprived of liberty in El Salvador has been an issue of special concern to the Inter-American Commission in recent years. In its Country Report published in 2021, the IACHR made an extensive diagnosis and highlighted the precarious situation of this population as a result of deplorable detention conditions, high levels of overcrowding in certain centers, excessive application of pretrial detention, and permanent detentions in police detention centers.[583]

237. Based on information provided by the State, it was recorded that, as of December 28, 2020, the prison system had a prison population of 36,691 persons, of whom 92.28% were men and 7.72% were women, without taking into account persons detained in police facilities - the "bartolinas".[584] The IACHR highlighted the alarming overcrowding in the prison system, with average rates of 136% until December 2020, even reaching extreme levels of 600% in some prisons.[585] It further noted that a contributing factor to the high level of overcrowding in the country was related to the overuse and excessive length of pretrial detention, as well as the lack of alternatives to imprisonment.[586]

238. In its 2021 Country Report, the IACHR highlighted the negative impact of the "extraordinary security measures" or "emergency" measures implemented to combat crime inside prisons, which were extended several times and include the prohibition of visits, suspension of

---

[583] IACHR, Report 'Situation of Human Rights in El Salvador', OEA/Ser.L/V/II. Doc. 278, October 14, 2021, par. 338.

[584] IACHR, Report 'Situation of Human Rights in El Salvador', OEA/Ser.L/V/II. Doc. 278, October 14, 2021, par. 131.

[585] IACHR, Report 'Situation of Human Rights in El Salvador', OEA/Ser.L/V/II. Doc. 278, October 14, 2021, par. 133.

[586] IACHR, Report 'Situation of Human Rights in El Salvador', OEA/Ser.L/V/II. Doc. 278, October 14, 2021, par. 134.

hearings, and the confinement or isolation of detainees.[587] In this context, it found that 100% of the population deprived of liberty remained in isolation from the outside world, noting that restrictions were also imposed on persons in pretrial and administrative detention.[588] In addition, the State was alerted that the regime of prolonged isolation and solitary confinement inside maximum security prisons did not comply with inter-American standards on the matter.[589]

239. In relation to detention conditions, the IACHR found unsanitary conditions, lack of hygiene, inadequate medical care, and scarce and inadequate access to water.[590] These conditions had resulted in various types of diseases, leading the IACHR to call for minimal measures to improve them.[591] It expressed that persons deprived of liberty in the bartolinas also faced high levels of overcrowding and various challenges such as lack of access to food, personal hygiene products, and warm clothing.[592] The IACHR highlighted the serious violence to which trans women deprived of liberty in male prisons are subjected and have suffered, and requested the adoption of measures to protect their life and personal integrity.[593]

240. In light of the above-mentioned problems, the IACHR prepared a series of recommendations that addressed aspects such as the establishment of a criminal policy that uses deprivation of liberty as a

---

587 IACHR, Report 'Situation of Human Rights in El Salvador', OEA/Ser.L/V/II. Doc. 278, October 14, 2021, paras. 159-160.

588 IACHR, Report 'Situation of Human Rights in El Salvador', OEA/Ser.L/V/II. Doc. 278, October 14, 2021, par. 161.

589 IACHR, Report 'Situation of Human Rights in El Salvador', OEA/Ser.L/V/II. Doc. 278, October 14, 2021, par. 163,

590 IACHR, Report 'Situation of Human Rights in El Salvador', OEA/Ser.L/V/II. Doc. 278, October 14, 2021, par. 138.

591 IACHR, Report 'Situation of Human Rights in El Salvador', OEA/Ser.L/V/II. Doc. 278, October 14, 2021, paras. 140-142.

592 IACHR, Report 'Situation of Human Rights in El Salvador', OEA/Ser.L/V/II. Doc. 278, October 14, 2021, paras. 145-146.

593 IACHR, Report 'Situation of Human Rights in El Salvador', OEA/Ser.L/V/II. Doc. 278, October 14, 2021, paras. 150 and 152.

last resort; an end to the use of police facilities as places of long-term detention; the provision of resources in prisons; the guarantee of regular visits to prisons; the ratification of the Optional Protocol to the Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment; the creation of the National Mechanism for the Prevention of Torture; and the guarantee of differentiated attention to women deprived of their liberty.[594]

241. In its first report on the implementation of these recommendations, referring to the year 2022, the Commission determined that the aforementioned recommendations were pending compliance and indicated that the measures adopted in the context of the regime had posed new challenges at a particularly delicate juncture.[595] In this chapter, based on what has been analyzed, the IACHR will also address other issues related to deaths and allegations of torture of persons in state custody. In addition, the IACHR will analyze the impact that the measures adopted under the state of emergency have had on the families of the detained persons.

## B. The worsening of detention conditions

242. According to the data sent by the State, as of June 27, 2023, 63,114 adults had been detained since the beginning of the emergency regime. Of them 6,296 people were released, including adults, children, and adolescents.[596] The IACHR does not have information on the total number of persons deprived of liberty at the national level disaggregated by police detention centers, penitentiaries, and detention centers for children and adolescents or by population groups. It also highlights that as of December 28, 2020, the

---

594 IACHR, Report 'Situation of Human Rights in El Salvador', OEA/Ser.L/V/II. Doc. 278, October 14, 2021, paras. 342.12-342.16, 342.20.

595 IACHR, 2022 Annual Report, Chapter V: Follow-up of recommendations made by the IACHR in its country or thematic reports: El Salvador, April 1, 2023, paras. 57-85.

596 State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 51, 52.

Penitentiary System had 36,691 people in custody, as recorded in the last Country Report.

243. Throughout the state of emergency, the Commission received troubling information on the situation of persons in police stations; overcrowding in the prison system; inhumane conditions of detention; restrictions on medical care and access to medicines; lack of access to data on the whereabouts and situation of detainees; the application of isolation and incommunicado detention measures; and the differentiated impacts that deprivation of liberty has had on groups in vulnerable situations, among other issues that will be addressed below.[597]

244. Regarding the situation in the **bartolinas** (police stations), the University Observatory of Human Rights of the UCA estimated that, compared to the previous year, the population detained in the bartolinas increased by 488%, worsening overcrowding and overcrowding.[598] Similarly, the people interviewed by the IACHR reported deplorable conditions of detention in the bartolinas and that family members had to ensure access to minimum resources such as water, food, and clothing:

> In the bartolina they made us stay in boxer underwear. The cells were freezing and dirty. It was my first time in a bartolina; it was horrible. As they were saturated, they made daily transfers. There was no water, no food, no dinner. There is only the ground; that's where we slept. It is a feeling of despair, sadness; of not knowing why this is happening; of not understanding why we were taken without any justification. [...]I asked for a phone call. I went to the

[597] IACHR, Hearing on 'Situation of Human Rights and the Rule of Exception in El Salvador', 187th period of sessions, July 14, 2023; IACHR, Hearing 'Arbitrary detentions and situation of persons deprived of liberty in the state of emergency in El Salvador', 185th period of sessions, October 25, 2022; IACHR, Hearing 'Situation of Human Rights and Rule of Law in El Salvador', 184th period of sessions, June 23, 2022.

[598] The University Observatory of Human Rights of the Central American University José Simeón Cañas , Annual report 2022: The State of Human Rights in El Salvador, April 2023, p. 63.

phone and contacted my relatives. I asked them for a package because I had not eaten or drunk anything.[599]

I was taken to the Naval police barracks, commonly known as "el penalito". I only spent one day there. It is a very small cell, perhaps about three by three. There was a really disgusting toilet, you sleep on the floor, the cement is cold. One arrives and is left in his underwear.[600]

In the Zacamil bartolinas, in la mexicanos, we were in a cell for about 50 people, but there were 85 of us.[601]

In the bartolinas of Zacatecoluca I entered in the afternoon, maybe I was there for a day. My food was provided by my family, clothing too. In the cells, we slept on the floor.[602]

I spent one day in the Zacatecoluca delegation and then I was transferred to the Mariona prison. In the bartolinas there are no beds, one sleeps on the floor. I ate from the packages brought to me by my relatives.[603]

245. For its part, the State of El Salvador reported that the National Civil Police, through the Subdirectorate of Specialized Operational Areas, redesigned the procedure and steps necessary for the transfer of persons detained in police custody to a detention center in the shortest possible time.[604] Likewise, in order to guarantee the minimum conditions in police detention centers, it indicated that it has coordinated with the Ministry of Health to provide health care to

---

599 Testimony No. 6 of March 15, 2023. Person released under alternative measures.

600 Testimony No. 11 of March 16, 2023. Person released under alternative measures.

601 Testimony No. 17 of March 20, 2023. Person released under alternative measures.

602 Testimony No. 20 of March 21, 2023. Person Released under substitute measures.

603 Testimony No. 23 of March 22, 2023. Person Released under substitute measures.

604 State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 58-60.

persons deprived of liberty in bartolinas, including medical consultations, examinations, and medicines in cases of diagnosis of chronic illness.[605]

246. In this regard, the Commission recommended that the State of El Salvador cease the use of police facilities as places to house people for long periods of time. It also warned the State that the extension of the administrative detention period to 15 days was not compatible with this recommendation.[606] In light of this, the IACHR once again urges the State of El Salvador to implement urgent and effective actions to put an end, immediately to the use of police facilities as places of permanent housing for persons deprived of liberty.

247. With respect to **penitentiary centers**, the State indicated that there are currently 23 in the country, distributed in: admission centers, preventive centers, centers for serving sentences, and special centers.[607] The State affirmed that these have facilities that allow the creation of conditions for the satisfaction of the needs of persons deprived of liberty; particularly, within a state of emergency, such as access to basic services, food, drinking water, health, recreation, hygiene, programs, and workshops, among others.[608] It indicated that opportunities for improvement have been identified in the prison infrastructure related to the expansion of sectors in all prisons, ensuring cross ventilation and natural light, laundry areas, toilets,

[605] Among the permanent measures being developed, the State referred to: the immediate transfer to a health care center of persons deprived of liberty who present alterations or serious health problems in order to receive initial medical attention; the periodic sanitization of police detention centers and their perimeter to prevent the proliferation of diseases; access to food, clothing, and personal hygiene packages, permanent prescription drugs and, in the case of women, the facilitation of intimate personal hygiene during menstrual periods; the facilitation of spaces for breastfeeding. In that connection, see: State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 58-60.

[606] IACHR, 2022 Annual Report, Chapter V: Follow-up of recommendations made by the IACHR in its country or thematic reports: El Salvador, April 1, 2023, paras. 65-67.

[607] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 56, 57.

[608] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 56, 57.

courtrooms, elimination of humidity in common areas, among others.[609] It also highlighted the refurbishment of the former Apanteos Penitentiary Center, currently used to house women prisoners, in order to provide them with better conditions of detention, infrastructure, hygiene, cleanliness, space, health, and security; as well as the Ilopango Admission, Diagnosis, and Classification Center, which has provided, for the first time, an entry center for prisoners entering the system, during their initial observation and diagnosis.[610]

248. In addition, the State of El Salvador pointed out the construction of the Terrorism Confinement Center (CECOT), located in Tecoluca, for gang leaders and gang members in senior positions.[611] It indicated that, with an installed capacity for 40,000 inmates, it will allow for the reduction of prison occupancy in other prisons nationwide and the redistribution of the entire prison population based on technical-criminological criteria, in accordance with the legal system.[612] The State asserted that the CECOT offers decent work and accommodation conditions for police officers and prison guards, since it has a dining area, dormitories with individualized showers, a fully equipped gymnasium, and a recreation area, among other facilities; it also provides the conditions needed for the rehabilitation of inmates, since it has a factory with 64 workshops, including painting, desks, and textiles.[613] The State also stressed that CECOT is a clear example of the transformation of the Salvadoran Penitentiary System, which has gone from being considered an

609 State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 56, 57.

610 State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 56, 57.

611 State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 66- 69.

612 State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 66- 69.

613 State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 66- 69.

institution where criminal groups used to operate, to one where order, control, and discipline have been restored.[614]

249. According to information from Cristosal, the largest number of people detained under the emergency regime are concentrated in the prisons of Izalco, "La Esperanza", Apanteos, Ilopango, Santa Ana, Quezaltepeque, CECOT, and some in Ciudad Barrios, San Miguel, and Gotera.[615] Civil society organizations estimated that overcrowding reached 300%, taking into account that 39,538 people were reportedly deprived of liberty by March 1, 2022 and 65,291 were reportedly detained by March 2023 - which would total 104,829 people deprived of liberty with an installed capacity of the Salvadoran penitentiary system for 30,864 places.[616] Thus, for example, in the La Esperanza Penal Center, known as Mariona, the prison population reportedly increased from 7,600 to 33,000 inmates; and in the Izalco Penal Center there was reportedly an increase from 8,500 to 23,300 detainees; and both the Preventive and Sentence Enforcement Center for Women in Ilopango - which was converted into the Ilopango Admission, Diagnosis and Classification Center - and the San Miguel Preventive Detention Center reportedly exceeded six times their housing capacity.[617]

---

[614] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 66- 69.

[615] Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report for March 27 to 2022 March 27, 2023,May 12, 2023, pp. 39-40.

[616] Cristosal, Instituto de Derechos Humanos de la Universidad Centroamericana José Simeón Cañas (IDHUCA), Due Process Foundation (DPLF), Red Salvadoreña de Defensoras de Derechos Humanos, Servicio Social Pasionista (SPASS), Prison Deaths During the State of Emergency in El Salvador: Alleged Extrajudicial Executions, Report of Civil Society Organizations to the Special Rapporteur on Extrajudicial Executions, April 10, 2023 (hereinafter Cristosal et al, Prison Deaths During the State of Emergency in El Salvador: Alleged Extrajudicial Executions, April 10, 2023, pp. 12-13.

[617] The University Observatory of Human Rights of the Central American University José Simeón Cañas , Annual report 2022: The State of Human Rights in El Salvador, April 2023, p. 66.

250. Considering the 40,000 quotas created by CECOT, the organizations estimate that prison overcrowding is still as high as 133%.[618] The organizations criticized the confidentiality of information that would make it possible to confirm the real installed capacity of this center, among other data relevant to citizen control of prison policies.[619] They also pointed out that based on satellite images of the infrastructure and calculations of its dimensions, it was found that, on average, there is a space of 0.60 meters for each person deprived of liberty, which would be contrary to international guidelines of ensuring at least 4 square meters per person.[620] They also warned that a single space with 40,000 detainees poses risks in terms of management and individualized treatment of detainees in accordance with international standards.[621]

251. In its comments on the draft of this report, the State indicated that it has taken into account the recommendations of international standards on prison architecture. In its view, prison and security personnel are trained to be able to guarantee conditions and dignified treatment for the protection of persons deprived of their liberty inside the CECOT. In this regard, it reported that constant training has been provided to personnel in human rights and gender issues, with the support of the Prison School, the Prison Human Rights Unit, and the Gender Unit of the General Directorate of Prisons. It also indicated that the transfer of persons deprived of liberty to the CECOT is being carried out progressively, taking into account the security measures

[618] Cristosal et al., Prison Deaths during the Emergency Regime in El Salvador: Alleged Extrajudicial Executions, April 10, 2023, pp. 12-13.

[619] Azul Originario et al, Annual report on human rights violations during the state of emergency in El Salvador, March 2023, pp. 51-52; Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report for March 27, 2022 to March 27, 2023, May 12, 2023 pp 45-46.

[620] Azul Originario et al, Annual report on human rights violations during the state of emergency in El Salvador, March 2023, p. 51-53

[621] Azul Originario et al, Annual Report on Human Rights Violations During the State of Emergency in El Salvador, March 2023, pp. 51-53; Human Rights Watch, Cristosal, "We can detain whoever we want" Widespread human rights violations during the "state of emergency" in El Salvador, December 2022, pp. 75-77; University Observatory of Human Rights of the Central American University José Simeón Cañas, Annual Report 2022: The State of Human Rights in El Salvador, April 2023, p. 67.

that the procedure warrants in view of the characteristics of the population being housed in that center.[622]

252. The Commission notes that it does not have the official information necessary to evaluate the real situation of prison overcrowding.[623] It also highlights information from the organizations according to which only 2,000 inmates have been transferred to the new facility, which means that the system is still severely overcrowded.[624] In this context, the IACHR received information on the lack of space for detainees to move around the prisons[625]:

I wanted to be in the cell because I was exhausted, tired, sad, I wanted to rest, I had never felt so bad. There were 140 of us in one cell, there were only 12 cots, but they had put 6 more cots in. There was no room for us.[626]

They put us in a cell. At the beginning, there were 35 people. At 6:00 p.m. we were already 200 people. It was not possible to walk. The next day, dead bodies started coming out of the center. They were drowning because they were suffocating. [...] Then I was moved to

[622] State of El Salvador, Observaciones del Estado de El Salvador al Informe de la CIDH "Estado de Excepción y derechos humanos en El Salvador", Nota Diplomática MPOEA-OEA-054/2024, April 8, 2024, p. 96.

[623] In the current context, the Commission considers it relevant to highlight the case discussed in the Constitutional Chamber of the CSJ, which declared the existence of an unconstitutional state of affairs and ordered the cessation of the overcrowded conditions of the detainees in the police stations of Quezaltepeque, Soyapango, and San Vicente, as well as the other precincts where this problem is observed. It ordered the authorities involved to carry out the strategic plans for this purpose and follow-up on the results. See: Court of Justice, Constitutional Chamber, Habeas Corpus, 119-2014AC, May 27, 2016, p. 42.

[624] Cristosal et al., Prison Deaths during the Emergency Regime in El Salvador: Alleged Extrajudicial Executions, April 10, 2023, pp. 12-13; University Observatory of Human Rights of the Central American University José Simeón Cañas, Annual Report 2022: The State of Human Rights in El Salvador, April 2023, p. 66.

[625] Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report March 27, 2022 to March 27, 2023, May 12, 2023, pp. 39-40; Human Rights Watch, Cristosal, "We Can Arrest Anyone We Want" Widespread Human Rights Violations During the "Emergency Regime" in El Salvador, December 2022, pp. 77-78.

[626] Testimony No. 6 of March 15, 2023 . Person released under alternative measures.

sector three, which had 250 people, and was capable of holding about 50 people.[627]

The cells are overcrowded. Maybe 150 people can fit and there were 210 people. There were people sleeping on the floor. There were about 50 cots, sometimes we slept two or three people per cot.[628]

There were cots for 60 people, but we had 130 people crammed in. In Mariona, they were for 90 people but there were 140 of us. Some people slept in the "caves", that is, under the beds, where they would put two people. Three people slept on the cots and the aisles were also occupied by people sleeping there. To go to the bathroom, we could hardly walk at night.[629]

253. The IACHR takes note of the information regarding the creation of the CECOT. In this regard, it stresses that the construction of new prisons can help prevent or reduce overcrowding. At the same time, it considers that these measures may be insufficient when they are accompanied by criminal policies that prioritize the massive deprivation of personal liberty, especially in the case of prolonged pre-trial detention[630]. Likewise, the Commission recalls that mega prison complexes may generate various problems, such as the generation of conditions contrary to the principle of individualization of the execution of the sentence, the increased vulnerability of persons belonging to groups at special risk, and the difficulty for guards to effectively exercise internal control of the facilities.[631]

---

627 Testimony No. 10 of March 16, 2023. Person released under alternative measures.

628 Testimony No. 23 of March 22, 2023. Person released under alternative measures.

629 Testimony No. 29 of March 24, 2023. Person released under alternative measures.

630 Similarly, see: IACHR, Situation of Human Rights in Honduras. OEA/Ser.L/V/II. Doc. 146, August 27, 2019, par. 343.

631 IACHR, Report on the Situation of Persons Who Are Deprived of Liberty in Ecuador, OEA/Ser.L/V/II, adopted on February 21, 2022, par. 116.

254. Based on the above, and considering the high number of persons deprived of liberty, which has almost tripled in the last two years, the Commission reiterates its recommendation aimed at implementing a criminal policy that uses deprivation of liberty as a measure of last resort,[632] prioritizing the use of alternative measures respectful of gender and intercultural and intersectional approaches. Likewise, taking into consideration the risks inherent to mega-prison complexes, the IACHR urges the State to prioritize the review of pretrial detention decreed on the basis of the inter-American standards mentioned above.

255. The Commission also received alarming information about deplorable **detention conditions** in prisons. Particularly notable, in this regard, is complete confinement in cells without air circulation or with humidity and filtration problems, without being able to go out in the sun or carry out other types of activities.[633] Also noteworthy are restrictions on access to toilets and water for personal hygiene, consumption, and cleaning, with reports of only one glass or small bottle of water during the day or a shared container for more than 140 people in the cell.[634] The testimonies taken by the Commission also referred to critical conditions of sanitation and access to water:

> The toilets were overflowing with poop because there was no water to flush it down. People were sick with the flu. I had to sleep on the floor in a space of 40 centimeters. There was no water, only water from a bucket, but it was dirty. We slept in boxer shorts. I lasted nine days like this. My mom brought a package and I was able to change.[635]

---

[632] IACHR, 2022 Annual Report, Chapter V: Follow-up of recommendations made by the IACHR in its country or thematic reports: El Salvador, April 1, 2023, paras. 62-63.

[633] Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report for March 27 to 2022 March 27, 2023,May 12, 2023, pp. 39-40.

[634] Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report for March 27 to 2022 March 27, 2023,May 12, 2023, pp. 39-40.

[635] Testimony No. 6 of March 15, 2023 . Person released under alternative measures.

> The first day we had no water. There was water flowing from 4 to 5 a.m. to bathe the 125 of us, we did not wash anything. We'd better grab some water to drink. [...] There were packages containing hygiene material. I had to share with those who had nothing.[636]

> There was no running water. When we were allowed to fill up, we only had small bottles for the whole day. We bathed with a bottle. It was dirty water. Most people were in pain from the water; they were vomiting and had diarrhea. [...] The toilets were just clogged, the bathroom was full, you had to go outside. They never gave us water. Sometimes they would pass us buckets to use as lavatories. We ate next to where they did their necessities.[637]

> Drinking water is the same water we use for bathing. They do not give us a separate barrel. There was running water every day. One could go to the bathroom at any time, but with the shower, the cell attendants played roles (*hacían roles*).[638]

256. Likewise, the IACHR received information on restrictions on the sending and receipt of food packages and basic hygiene and clothing supplies from family members to their relatives deprived of liberty during the emergency regime[639]:

---

[636] Testimony No. 1 of March 13, 2023. Person released under alternative measures.

[637] Testimony No. 10 of March 16, 2023. Person released under alternative measures.

[638] Testimony No. 23 of March 22, 2023. Person released under alternative measures.

[639] In some prisons, family members were prohibited from sending packages to detainees and had to buy "institutional packages", which could cost US$170 per month for male prisoners and US$185 per month for female prisoners. Among other situations, despite not being prohibited, it was indicated that the monthly package sent by the family could take 15 days to be delivered, while the institutional package would be delivered on the same day. In addition, people who were released reportedly indicated that they did not receive all the supplies brought by their relatives. In that connection, see: University Observatory of Human Rights of the Central American University José Simeón Cañas, Annual Report 2022: The State of Human Rights in El Salvador, April 2023, p. 66; Infobae, Nayib Bukele's government now charges prisoners for food, clothing and hygiene products in prisons, February 18, 2023; La Prensa Gráfica, Prisons suspends sale of packages for detainees, February 23, 2023; La Prensa Gráfica, Uncertainty of families over sale of packages for inmates in prisons, January 14, 2023; ElSalvador.com, Families are wary of the new "fund" to deposit money for inmates, September 12, 2023.

> I was dropped off two packages with medicine and everything and they never delivered them. A guard told me I didn't need it. The trusted ones keep the packages. [...] I was never able to have visitors. I was not told whether someone had left me a package.[640]

> We have given them medicines and packages, but they say they don't get them in full. Now you pay for a food package in the prison that costs about 35 dollars.[641]

> Family members bring us packages, but they take things away from them. Even though I was sent medication, I never received the medication.[642]

257. The organizations reported that detainees frequently receive only one meal a day and that the food conditions in the prisons have caused a large number of inmates to suffer from high levels of malnutrition.[643] [644] In some prisons, cells have been set up for people with this condition, who reportedly received slightly better food, as well as food packages from their relatives.[645] In the testimonies taken by the Commission, the people indicated that the food was scarce and of poor quality, apart from the effects on their health:

---

[640] Testimony No. 20 of March 21, 2023. Person released under alternative measures.

[641] Testimony No. 27 of March 23, 2023. Family member of a detained person.

[642] Testimony No. 11 of March 16, 2023. Person released under alternative measures.

[643] Azul Originario et al, Annual report on human rights violations during the state of emergency in El Salvador, March 2023, pp. 53-54; Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report for March 27 to 2022 March 27, 2023,May 12, 2023, pp. 39-40.

[644] In its observations on the draft of the present report, the State reported that the Penitentiary Administration guarantees three mealtimes, with diets appropriate to the needs of recovery and conservation of the health of persons deprived of liberty, in the different Penitentiary Centers, regardless of the penitentiary regime under which the person is being held. See: State of El Salvador, Observations by the State of El Salvador on the IACHR Report entitled "State of Emergency and Human Rights in El Salvador", Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, p. 87-90.

[645] Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report for March 27 to 2022 March 27, 2023,May 12, 2023, pp. 39-40.

When I came in we were given a lunch break. Then they gave us two times. They gave us beans and a tortilla. Then they gave us rice and cream. I was malnourished. When I arrived at the prison I weighed 170 pounds; when I left I weighed 90 pounds.[646]

The first day and for a week, 4 people ate from a small plate, practically one bite each. After the 15 days, one for two arrived, but I only had one serving (*un tiempo*). Then a small plate for each person. People had to eat and drink to survive, not because it was in good condition.[647]

Sometimes breakfast and lunch or lunch and dinner would be together at the same time. And you had to eat it all. They are not fit to eat, not even one's dog at home would eat it, bad taste, poorly cooked.[648]

We shared a plate of food for 4 people, very little food, only twice a day.[649]

The first few days we were given very stale food, leftovers. Many colleagues became sick and had stomach aches. One pot for two people.[650]

258. Civil society organizations highlighted to the IACHR the various impacts on the health and physical, mental, and emotional integrity that these detention conditions have had on the detainees.[651] They denounced the proliferation of contagious skin and respiratory

646 Testimony No. 10 of March 16, 2023. Person released under alternative measures.

647 Testimony No. 11 of March 16, 2023. Person released under alternative measures.

648 Testimony No. 16 of March 17, 2023. Person released under alternative measures (female).

649 Testimony No. 17 of March 20, 2023. Person released under alternative measures.

650 Testimony No. 29 of March 24, 2023. Person released under alternative measures.

651 IACHR, Hearing "Arbitrary detentions and the situation of persons deprived of liberty under the State of Emergency in El Salvador", 185th period, October 25, 2022

diseases due to unsanitary cells and the shared use of objects.[652] They criticized the lack of access to information on the health conditions of persons deprived of liberty, the demands imposed on family members to provide medication, and the differentiated impacts that persons with disabilities suffer in this context.[653] According to them, some prisons operate clinics staffed mostly by inmates who are health professionals or students, and the services of the national system were reportedly unable to meet the demand.[654] Likewise, the lack of medical care and medication for serious or chronic illnesses has allegedly caused serious consequences or cost the lives of people in state custody.[655] At the same time, it was recognized that since June 2022, the Quezaltepeque Preventive and Sentence Enforcement Center, now called "Quezaltepeque Special Health Center", was assigned to the confinement of people with terminal and chronic diseases, including a significant number of people with HIV-AIDS, who reportedly have access to retroviral medication.[656] The people interviewed by the IACHR confirmed having faced various challenges related to medical care:

> I remember that some comrades died in Mariona, in sector 6. One shouted emergency and it was a boy who was convulsing. The custodian, when he arrived, would hit them with the toe of his boot

[652] Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report for March 27 to 2022 March 27, 2023,May 12, 2023, pp. 43-44.

[653] Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report for March 27 to 2022 March 27, 2023,May 12, 2023, pp. 43-44.

[654] Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report for March 27 to 2022 March 27, 2023,May 12, 2023, pp. 43-44.

[655] Human Rights Watch, Cristosal, "We Can Arrest Whomever We Want" Widespread Human Rights Violations During the "Emergency Regime" in El Salvador, December 2022, p. 78; Cristosal, One year under the emergency regime: a permanent measure of repression and human rights violations. Situation Report for March 27, 2022 to March 27, 2023, May 12, 2023, pp. 43-44; Azul Originario et al, Annual report on human rights violations during the state of emergency in El Salvador, March 2023, pp. 53-54.

[656] Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report for March 27, 2022 to March 27, 2023,May 12, 2023, p. 45

on the ribs and if you were still breathing they would leave you in the cell.[657]

You could only receive medical care for very serious emergencies. There was scabies, there were chronic diseases and they were not attended to. There is no medical attention inside the prison. The same people who are convicted of other crimes are the ones who serve you, they are called "white cross". There was only one doctor, but the prison authorities would not let us go to him.[658]

No, there was no access to medical care. There were people from the white cross, but they were the same inmates who are under trust. You have to be almost dying to get medical attention. Sometimes they were given some pills.[659]

When we arrived in sector 5 (in Mariona) we started to have fever, headache, we started to get fungus, we had itchy skin. We couldn't sleep because of these diseases. I lasted 17 nights without sleep. There were some guys who were called "white cross", who were the same inmates, and they filled out some protocols, but they only took you out if you were about to die. [...] After a while they began to take people to the doctor's office for scabies or fungus. We were given the opportunity for a consultation every three months.[660]

259. In this regard, the State indicated that attention to the right to health of persons deprived of liberty is a priority and, for this reason, the General Directorate of Penitentiary Centers (DGCP) had adopted measures to effectively ensure first, second, and third level health care, on an equal, free, and universal basis.[661] In addition, it indicated

[657] Testimony No. 29 of March 22, 2023. Person Released under substitute measures.

[658] Testimony No. 10 of March 16, 2023. Person released under alternative measures.

[659] Testimony No. 23 of March 22, 2023. Person released under alternative measures.

[660] Testimony No. 29 of March 24, 2023. Person released under alternative measures.

[661] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 58-60.

the approval of the "Protocol of action for prison staff in the different penitentiary centers in view of the impact of the application of the emergency regime in El Salvador", whose objective is to establish the main guidelines for action by prison staff to guarantee the protection of persons deprived of liberty and their rights; the hiring of medical staff of different specialties and nursing staff; the tripling of the number of clinical resources and the expansion of inter-agency coordination with the Ministry of Health.[662]

260. The State also mentioned the following as measures that had been adopted: a) the provision of immediate health care as soon as the person deprived of liberty enters the Penitentiary System, at the Center for Admission, Diagnosis and Classification of Persons Deprived of Liberty, where personnel from the clinical area ascertain their health condition in order to provide the appropriate treatment in a timely manner; b) identification of the prison population with chronic degenerative pathologies, psychiatric conditions, symptoms of tuberculosis, or malnutrition; c) timely identification of persons deprived of liberty who require surgery, for scheduling the same at the Quezaltepeque Prison Hospital; d) provision of food and special diets, if necessary, in the different prisons; e) medical controls for the attention of diseases and acquisition of medicines for their respective treatment, including sexual and reproductive health care and early detection of emergencies and potential health complications; f) taking laboratory tests, x-rays, height and weight, hydration, hygiene measures, cleaning campaigns, nutrition to increase the caloric intake of patients; g) the adaptation of a special cell in each penitentiary center to house the population deprived of liberty with tuberculosis and others with malnutrition, as a preventive and sanitary measure for a better approach; h) vaccination campaigns to comply with the basic immunization schedule, including 98% immunization against COVID19; and i) fumigation campaigns against vectors.[663]

[662] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 58-60.

[663] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 58-60.

261. Likewise, in its comments on the draft of this report, the State reiterated the efforts made in the area of health in the penitentiary system. It reported on the creation of prison clinics in each penitentiary, staffed with qualified health personnel; the supply of medicines; the signing of agreements with the Ministry of Health through Local Health Units, hospitals, and complementary health services (laboratory, physiotherapy, etc.).[664] It highlighted the creation and implementation of the Special Health Care Centers in the Penitentiary System, which house prisoners diagnosed with chronic or terminal diseases, such as diabetes, kidney failure, HIV, cancer, or tuberculosis, to provide them with adequate and specialized medical care and treatment: 1) Usulután Special Health Center; 2) La Occidental Comprehensive Health Care Center for Persons Deprived of Liberty; 3) Sensuntepeque Special Health Center; 4) Quezaltepeque Prison Health Center; 5) Izalco Special Health Care Center; and, 6) Zacatecoluca Special Health Care Center.[665] In addition, regarding the Quezaltepeque Special Health Care Center, known as "the Hospital" of the Penitentiary System, the State indicated that it has an operating room, as well as a recovery area for patients.[666] According to the State, in order to improve the health conditions of inmates, other measures have been implemented such as hydration plans, hygiene measures, and drinking water supply, as well as improvements in the storage and distribution of water and the implementation of nutritional plans.[667]

---

[664] State of El Salvador, Observaciones del Estado de El Salvador al Informe de la CIDH "Estado de Excepción y derechos humanos en El Salvador", Nota Diplomática MPOEA-OEA-054/2024, April 8, 2024, pp. 95-103.

[665] State of El Salvador, Observaciones del Estado de El Salvador al Informe de la CIDH "Estado de Excepción y derechos humanos en El Salvador", Nota Diplomática MPOEA-OEA-054/2024, April 8, 2024, pp. 95-103.

[666] State of El Salvador, Observaciones del Estado de El Salvador al Informe de la CIDH "Estado de Excepción y derechos humanos en El Salvador", Nota Diplomática MPOEA-OEA-054/2024, April 8, 2024, pp. 95-103.

[667] State of El Salvador, Observations of the State of El Salvador to the IACHR Report "State of Emergency and Human Rights in El Salvador," Diplomatic Note MPOEA-OAS-054/2024, April 8, 2024, pp. 95-103.

262. Regarding improvements in prison infrastructure and hygienic conditions in detention centers, the State indicated: (a) periodic review of the drinking water system; (b) the construction of shower and toilet areas with their respective "barred" windows for proper air circulation; (c) the elimination of humidity in shared spaces within the penitentiary centers; (d) the conformation of basins and supply of barrels, to maximize the collection of drinking water; e) the creation of spaces to separate persons deprived of liberty with delicate illnesses or health problems; f) the improvement of the infrastructure of the penitentiary centers to guarantee the circulation of air in the cells and the entry of natural light; g) the creation of new spaces within the same structure to distribute the persons deprived of liberty in an adequate manner.[668]

263. The Commission recognizes and appreciates the measures adopted by the State, especially those implemented to improve hygiene conditions, identify persons with a variety of medical care or medication needs, and treat them according to their specific conditions. However, the IACHR cautions that persons deprived of their liberty continue to face inhumane conditions of detention. Despite these measures, both the information received from civil society organizations and the testimonies gathered point to the increasingly precarious conditions in various detention centers as well as the serious risks to the rights to health, personal integrity, and life of inmates.[669] The IACHR deplores the failure to grant consent to an on-site observation on this matter. In this regard, the Commission reiterates that, in response to the measures adopted during the state of emergency, it issued several calls for the Salvadoran State to take concrete actions to guarantee the life, health, and integrity of all

[668] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 58-60.

[669] IACHR, Hearing on 'Situation of Human Rights and the Rule of Law in El Salvador', 185th session, October 25, 2022; IACHR, Hearing on 'Human Rights and States of Emergency in El Salvador', 187th session, July 14, 2023.

persons under its custody.[670] The IACHR also emphasizes that the State, by failing to ensure its obligation to provide minimum conditions of detention to persons deprived of liberty, generates a heavy burden for family members, especially women, as will be discussed in the last section of this chapter.

264. The Commission reiterates the obligation of States to provide timely and adequate health services to persons in their custody. In particular, the Inter-American Court has indicated that this duty implies guaranteeing the physical and mental health of persons deprived of liberty, particularly through the provision of a regular medical check-up and, when required, adequate, timely, and specialized medical treatment.[671] Along these lines, the IACHR emphasizes that the General Regulations of the Penitentiary Law establish the care and treatment of the physical and mental health of detainees in Special Centers and, in their absence, through the collaboration of different State entities.[672] Additionally, the IACHR reiterates its call in the 2021 Country Report in which it urged the State of El Salvador to adopt measures to provide prisons with sufficient human and financial resources in order to ensure minimum detention conditions for the incarcerated population, guaranteeing detention conditions compatible with human dignity and respect for fundamental rights.[673] This requires

[670] IACHR, Press Release No. 126 - IACHR Urges El Salvador to Comply with Its International Obligations and Ensure Prisons and Law Enforcement Policies That Respect Human Rights, June 3, 2022; IACHR, Press Release No. 254 - Seven Months into the Exceptional Framework: IACHR Reminds El Salvador That It Must Comply with its Obligations Concerning Human Rights, November 11, 2022; IACHR Calls on El Salvador to Reestablish Rights and Guarantees Suspended a Year Ago Under the State of Emergency April 6, 2023.

[671] I/A Court H.R. Case of Chinchilla Sandoval et al. v. Guatemala. Preliminary Objection, Merits, Reparations, and Costs. Judgment of February 29, 2016. Series C No. 312, paras. 171-72.

[672] Executive Decree No. 95 - General Regulations of the Penitentiary Law, November 14, 2000, Articles 202, 203.

[673] IACHR, 2022 Annual Report, Chapter V: Follow-up of recommendations made by the IACHR in its country or thematic reports: El Salvador, April 1, 2023, par. 72.

a prior diagnosis of priorities, followed by sufficient budget allocation to ensure the minimum conditions of detention.[674]

265. In recent years, the IACHR has also monitored other issues related to the **treatment of detainees** in El Salvador, condemning the "extraordinary security measures" or "emergency" measures implemented and the obstacles observed in guaranteeing due process, such as access to defense, limited participation in proceedings remotely through videoconferencing, the constant suspension of court hearings, prolonged and indefinite isolation under inhumane conditions, health problems, and the suspension of the visitation regime.[675] The IACHR will address information related to the disciplinary regime applied to persons deprived of liberty in the following section of this report. It also considers it relevant to highlight the seriousness of the persistence of the incommunicado detention of detainees, especially when added to complaints about failures in the registration of detainees and access to information about them.

266. On the other hand, civil society organizations reported to the Commission, in hearings[676] and by submitting information[677], that one of the main problems related to the mass arrests carried out in recent months was the forced disappearance of persons, in some

[674] IACHR, 2022 Annual Report, Chapter V: Follow-up of recommendations made by the IACHR in its country or thematic reports: El Salvador, April 1, 2023, par. 72.

[675] IACHR, Report 'Situation of Human Rights in El Salvador', OEA/Ser.L/V/II. Doc. 278, October 14, 2021, par. 160.

[676] IACHR, Hearing 'Forced Disappearances during the State of Emergency', 188th session, November 9, 2023; IACHR, Hearing 'Arbitrary Detentions and Situation of Persons Deprived of Liberty in the State of Emergency in El Salvador', 185th session, October 25, 2022; IACHR, Hearing 'Situation of Human Rights and the Rule of Law in El Salvador', 184th session, June 23, 2022.

[677] Azul Originario et al, Annual report on human rights violations during the state of emergency in El Salvador, March 2023, pp. 52-53; Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report March 27, 2022 to March 27, 2023, May 12, 2023, p. 26, May 12, 2023, p. 26; Human Rights Watch, Cristosal, "We Can Arrest Anyone We Want" Widespread Human Rights Violations During the "Emergency Regime" in El Salvador, December 2022, pp.70-72; University Observatory of Human Rights of the Central American University José Simeón Cañas, Annual Report 2022: The human rights situation in El Salvador, April 2023, pp. 48-50; Amnesty International, El Salvador: One year into the state of emergency, authorities systematically commit human rights violations, April 3, 2023.

cases for short periods of time, due to the lack of timely documentation and availability of information for the families of the detained persons so that they would know the place of detention of their loved ones. They indicated the absence of a centralized and efficient system of information on detained persons, and that institutions that should keep updated records, such as the General Directorate of Penal Centers and the Department of Information on Detained Persons of the Supreme Court of Justice, did not have updated information or did not provide it.[678] According to the press, the Prison Information System (SIPE) - which centralized information on the prison population - was deactivated for access from judicial headquarters as of December 2021.[679] Likewise, the Commission was informed of cases in which the whereabouts of the detained person remained unknown for days or weeks after being transferred from one penitentiary to another because the information was not provided to their families in a timely manner[680]:

In that case, I requested an expert opinion on his health condition. However, the doctor was informed that he was not in the prison. The court asked me to find out which penal center he was in. I told them they should know. And they said to me: "It is that penitentiary centers are transferring people without giving notice".[681]

---

678 Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Status Report March 27, 2022 to March 27, 2023, May 12, 2023, p. 26; Azul Originario et al Annual Report on Human Rights Violations during the State of Emergency in El Salvador, March 2023, p. 52-53; Human Rights Watch, March 2023, pp. 52-53; Human Rights Watch, Cristosal, "We can detain whoever we want" Widespread human rights violations during the "regime of exception" in El Salvador, December 2022, pp.70-72.

679 El Faro, Judges have lost access to the Prison Information System, March 30, 2022.

680 University Observatory of Human Rights of the Central American University José Simeón Cañas, Annual Report 2022: The State of Human Rights in El Salvador, April 2023, pp. 166-167; ASDEHU, Alerta Raquel, Cristosal, IDHUCA, FESPAD, DPLF, ORMUSA, SSPAS, Ref: El Salvador - Thematic Hearing "Forced Disappearances and Other Forms of Disappearance", August 11, 2023 (on file with IACHR).

681 Testimony No. 5 of March 14, 2023. Defense attorney.

On the day of the transfers, family members sleep outside to ask for information. My relatives tell me that after four or five days they were able to obtain information from the prosecutor's office.[682]

They selected us by name and had us sit for a while they verified everyone's data and transferred us to Izalco. The reason for the transfer was never reported. No, one's family is the one who asks. On their part, it is rare that they provide information. Just the insults one always receives.[683]

I knew that she had been transferred during the early morning hours to the Women's Prison because I went to the police station to buy a package for my daughter, and they told me that she had already been taken away. I went to the women's prison in July to take the packages to the women's prison and they told me that I did not appear in the system. Here she is in the center, but you can't leave food for her because she has no location at the moment. We don't know where they are going to place it, and I was prevented from buying a package for her. As a mother, I worried too much.[684]

267. This context reportedly led the families of the captured persons to move between different institutions and to gather for days or weeks around the prisons in order to confirm the whereabouts of their detained relatives, their health condition and to provide them with the food and clothing supplies required by the authorities.[685] The problem was registered as critical in the first months of the state of

[682] Testimony No. 12 of March 17, 2023. Person released under alternative measures (female).

[683] Testimony No. 23 of March 22, 2023. Person released under alternative measures.

[684] Testimony No. 26 of March 23, 2023. Family member of detainee (female detainee).

[685] Azul Originario et al, Annual Report on Human Rights Violations During the State of Emergency in El Salvador, March 2023, pp. 52-53;Human Rights Watch, Cristosal, "We can detain whoever we want" Widespread human rights violations during the "regime of exception" in El Salvador, December 2022, pp.70-72.

emergency,[686] given that on May 21, 2022 the authorities established "information centers" outside some prisons.[687] Likewise, these difficulties continued to be recorded in the following months.[688]

268. For its part, in a hearing held in November 2023, the State denied that there were forced disappearances in this context, indicating that in 2023 the Attorney General's Office had received no complaints about this type of crime.[689] It also reported on the mechanisms that the State offers to citizens who wish to receive information on the criminal proceedings of their relatives detained under the state of emergency.[690] In October 2022, the State indicated to the IACHR that family members and professionals practicing defense could request and receive the information registered in the SIPE on persons deprived of liberty through the Human Rights Prison Unit or the Penitentiary Centers.[691] In this regard, it indicated that the System established the requirements and procedure for providing information on the location, transfer, and needs of detainees, while in order to provide health information it would be necessary for the person

[686] Azul Originario et al, Annual Report on Human Rights Violations During the State of Emergency in El Salvador, March 2023, pp. 52-53;Human Rights Watch, Cristosal, "We can detain whoever we want" Widespread human rights violations during the "regime of exception" in El Salvador, December 2022, pp.70-72.

[687] Human Rights Watch, Cristosal, "We Can Arrest Anyone We Want" Widespread Human Rights Violations During the "Emergency Regime" in El Salvador, December 2022, pp.70-72

[688] La Prensa Grafica, More than a year of searching for detainees in the regime, April 13, 2023.

[689] IACHR, Hearing on 'Forced Disappearances during the State of Emergency', 188th session, November 9, 2023; State of El Salvador, Observations of the State of El Salvador on the Report of the IACHR "State of Emergency and Human Rights in El Salvador", Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, Annex 1, Methodological Systematization Matrix, line 56, column E.

[690] IACHR, Hearing on 'Forced Disappearances during the State of Emergency', 188th session, November 9, 2023; State of El Salvador, Observations of the State of El Salvador on the Report of the IACHR "State of Emergency and Human Rights in El Salvador", Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, Annex 1, Methodological Systematization Matrix, line 56, column E.

[691] State of El Salvador, Report of the State of El Salvador to the Inter-American Commission on Human Rights on the occasion of the Hearing "Arbitrary detentions and the situation of persons deprived of liberty during the state of emergency in El Salvador," Diplomatic Note MPOEA-OAS-186/2022, October 25, 2022, p. 5.

deprived of liberty to provide written consent.[692] It also indicated that the PDDH had recommended to the General Director of Penitentiary Centers that he strengthen the activation mechanism of the Care Center for Relatives of Persons Detained under the Emergency Regime, so that they could know the location, legal, and health condition of persons deprived of liberty, as well as generate safe conditions for access to personal supplies and medicines strictly necessary for persons deprived of liberty with health conditions.[693] Pursuant to that recommendation, the State indicated that the respective mechanism was strengthened by placing human resources outside the prisons that are receiving inmates under the regime, with appropriate technological equipment, to provide the necessary information - which can also be requested in writing at the administrative offices of the DGCP.[694] The State also indicated that inter-agency cooperation with the PDDH aimed to provide this same service in the facilities of that institution.[695] [696]

[692] State of El Salvador, Report of the State of El Salvador to the Inter-American Commission on Human Rights on the occasion of the Hearing "Arbitrary detentions and the situation of persons deprived of liberty during the state of emergency in El Salvador," Diplomatic Note MPOEA-OAS-186/2022, October 25, 2022, p. 5.

[693] State of El Salvador, Report of the State of El Salvador to the Inter-American Commission on Human Rights on the occasion of the Hearing "Arbitrary detentions and the situation of persons deprived of liberty during the state of emergency in El Salvador," Diplomatic Note MPOEA-OAS-186/2022, October 25, 2022, pp. 5-6.

[694] State of El Salvador, Report of the State of El Salvador to the Inter-American Commission on Human Rights on the occasion of the Hearing "Arbitrary detentions and the situation of persons deprived of liberty during the state of emergency in El Salvador," Diplomatic Note MPOEA-OAS-186/2022, October 25, 2022, pp. 5-6.

[695] State of El Salvador, Report of the State of El Salvador to the Inter-American Commission on Human Rights on the occasion of the Hearing "Arbitrary detentions and the situation of persons deprived of liberty during the state of emergency in El Salvador," Diplomatic Note MPOEA-OAS-186/2022, October 25, 2022, pp. 5-6.

[696] En sus observaciones al proyecto del presente informe, el Estado reiteró su rechazo a la existencia de un patrón de negación de detenciones y afirmó que cualquier caso eventual de demora en la puesta a disposición de la información no puede constituir una negativa del Estado a brindar información y mucho menos una desaparición forzada. Señaló que toda detención por la Policía Nacional Civil se realiza respetando los parámetros legales, las personas son puestas a disposición de autoridad judicial y cuentan con un defensor asignado. See: State of El Salvador, Observations by the State of El Salvador on the IACHR Report entitled "State of Emergency and Human Rights in El Salvador", Diplomatic Note MPOEA-OEA-054⁄2024, April 8, 2024, p. 100

269. In addition to deficiencies in the registration of detainees and failures to provide minimum data to family members and legal representatives, the Commission was informed about the prolonged incommunicado detention of persons deprived of their liberty. According to the press, they did not receive visits during the pandemic, at least from April 2020 to December 2021; and, in the context of the emergency regime, visits were also suspended.[697] There is no communication mechanism between the detainees and their families,[698] which was corroborated in some of the testimonies taken by the IACHR:

> In the seven months I was there I never met my children or the lawyer. I was uncertain about what was going on.[699]

> I never heard from my family. Until the day I was free. I knew they were okay if they were going to drop me off a package.[700]

> They had him kneeling there, they were abusing him as if he had been a criminal. I can't tell you exactly, you never hear from them again, nor do they give you any information about anything, it's like a kidnapping.[701]

270. In its observations on the Draft Report, the State pointed out that since a state of emergency is in force, "it is not possible" to comply with the ordinary conditions that existed prior to its implementation. It likewise indicated that there is no restriction on family members and defense attorneys receiving information regarding persons deprived of liberty

---

697 Azul Originario et al, Informe anual sobre violaciones a derechos humanos durante el estado de excepción en El Salvador, March 2023, pp. 52-53; La Prensa Gráfica, 22 meses sin permitir visitas a privados de libertad, December 28, 2021; IACHR, Hearing "Arbitrary detentions and the situation of persons deprived of liberty during the state of emergency in El Salvador"185th regular session, October 25, 2022.

698 La Prensa Gráfica, Three years without visits in Salvadoran penitentiaries, March 17, 2023.

699 Testimony No. 12 of March 17, 2023. Person released under alternative measures (female).

700 Testimony No. 16 of March 17, 2023. Person released under alternative measures (female).

701 Testimony No. 22 of March 21, 2023. Family member of deceased person.

or on persons deprived of liberty receiving their hygiene kits and medicines provided by their families.[702]

271. The Commission has alerted the Salvadoran State on the importance of ensuring direct contact and the maintenance of links between detainees and their families, recommending that visits be guaranteed in all penal establishments on a regular basis and that the prohibition contained in Article 79-A of Decree 93 - Reforms to the Penitentiary Law be reviewed.[703] In this regard, it recalls that solitary confinement should be an exceptional measure and that it can generate a situation of extreme psychological and moral suffering for the detainee.[704] Isolation from the outside world produces in any person moral suffering and psychic disturbances, places him or her in a situation of particular vulnerability[705] and both prolonged isolation and coercive solitary confinement are, by themselves, cruel and inhuman treatments,[706] and that in some situations, added to other conditions and contexts, could amount to torture. In addition to the above, lack of contact with the outside world may impair the exercise of other rights and guarantees and place the person in a situation of particular vulnerability, increasing the risk of other violations in prisons.[707]

---

[702] State of El Salvador, Observaciones del Estado de El Salvador al Informe de la CIDH "Estado de Excepción y derechos humanos en El Salvador", Nota Diplomática MPOEA-OEA-054/2024, April 8, 2024, p. 100.

[703] IACHR, 2022 Annual Report, Chapter V: Follow-up of recommendations made by the IACHR in its country or thematic reports: El Salvador, April 1, 2023, par. 76; IACHR, report has Situation of Human Rights in El Salvador, OEA/Ser.L/V/II. Doc. 278, October 14, 2021, par. 342.15

[704] I/A Court H.R, Case of Espinoza Gonzáles v. Peru Preliminary Objections, Merits, Reparations, and Costs. Judgment of November 20, 2014. 186; I/A Court H.R., Suárez Rosero Case v. Ecuador, Merits, Judgment of November 12, 1997, par. 51.

[705] I/A Court H.R., Suárez Rosero Case v. Ecuador Interpretation of the Judgment on Reparations. Judgment of May 29, 1999, Series C No, 51, par. 90

[706] I/A Court H.R. Case of Velásquez Rodríguez v. Honduras Merits. Judgment of July 29, 1998. Series C No. 4 par. 156.

[707] I/A Court H.R. Case of Suárez Rosero v. Ecuador. Merits. Judgment of November 12, 1997. Series C No. 35, par. 83, 90; I/A Court H.R., Loayza Tamayo Case v. Peru. Merits. Judgment of September 17, 1997. Series C No. 33, par. 52.

272. Accordingly, the bodies of the ISHR and the United Nations have referred to different measures essential to the prevention of arbitrary detentions, torture, and forced disappearances, among other possible violations of rights related to the deprivation of liberty. Places of deprivation of liberty must keep up-to-date records for each detained person and this information must be accessible to the person deprived of liberty, his or her representative, family members, and the competent authorities.[708]

273. Likewise, the agencies of the universal system have recommended the establishment of a uniform protocol and an effective control system for all centers where persons are deprived of their liberty, with appropriate sanctions for those who fail to register or deliberately refuse to provide such information to any person with a legitimate

[708] In this regard, the following applies: The record shall contain at least the following data: (a) information on the person's identity, which shall include, as a minimum, the following: the person's name, age, sex, nationality, ethnicity, address, and names of parents, family members, legal representatives or defense counsel if applicable, and any other relevant information pertaining to the person deprived of liberty; (b) information concerning the personal integrity and state of health of the person deprived of liberty; (c) reasons or grounds for the person's incarceration; (d) the authority that ordered or authorized the person's detention; (e) the authority who took the individual to the facility; (f) the authority legally responsible for supervising the detention; (g) date and time of admission and release; (h) dates and times of any transfers and the destinations; (i) the identity of the authority who ordered and is responsible for the transfer; (j) an inventory of the detainee's personal effects, and (k) the signature of the person incarcerated and, in the event of refusal or inability to sign, an explanation about the reasons thereof. This information must be accessible to the person deprived of liberty, his or her representative, family members and the competent authorities. In that connection, see: IACHR, Principles and Best Practices on the Protection of Persons Deprived of Liberty in the Americas (Approved by the Commission during its 131st regular period of sessions, held from March 3-14, 2008, Principles IX (2); I/A Court H.R. Matter of Urso Branco Prison, Brazil Provisional Measures. Order of the Inter-American Court of Human Rights of June 18, 2002, preambular paragraph 7; I/A Court H.R., I/A Court H.R., Matter of Children and Adolescents Deprived of Liberty in the "Complexo do Tatuapé" da FEBEM Brazil. Provisional Measures. Order of the Inter-American Court of Human Rights of November 30, 2005. Preambular paragraph 6; I/A Court H.R., Case of Landaeta Mejías Brothers et al v. Venezuela. Preliminary Objections, Merits, Reparations, and Costs. Judgment of August 27, 2014. Series C No. 281, par. 167-168; Article XI of the Inter-American Convention on Forced Disappearance of Persons, adopted in Belém do Pará, Brazil, June 9, 1994, at the twenty-fourth regular session of the General Assembly.

interest.[709] They have also recommended that a family member of the detainee should be informed of the fact and place of detention within 18 hours, or within 24 hours to ensure legal counsel.[710]

274. The Commission also asked the State to report on the special measures adopted to address the specific needs of women and people of African descent, indigenous people, LGBTI people, the elderly, people with disabilities, and children and adolescents in detention units.[711] In addition, with respect to measures adopted to address the specific needs of women and persons of African descent, indigenous people, LGBTI, the elderly, persons with disabilities, and children and adolescents in detention units , the State of El Salvador indicated that the work of the prison system is aimed at providing all persons deprived of liberty, without distinction, with favorable conditions for their development, taking into account **differentiated approaches with respect to certain groups of persons in vulnerable conditions.**[712] As examples of their gradual implementation, the State pointed to: the Women's Prison Centers and the adequate and specialized facilities for children with their mothers deprived of liberty; the Prison Center for foreigners, with the constant access of consulates and embassies; and the Prison Center for LGBTI population, chronically or terminally ill people.[713]

709 United Nations, Committee on Enforced Disappearances, Concluding observations on the report submitted by Argentina under Article 29, paragraph 1, of the Convention, CED/C/ARG/CO/ 1, 12 December 2013, par. 29, a, b; United Nations, Committee on Enforced Disappearances, Concluding observations on the report submitted by Burkina Faso under Article 29, paragraph 1, of the Convention, CED/C/BFA/CO/1, 24 May 2016, par. 34; United Nations, Working Group on Arbitrary Detention: Preliminary Observations of its visit to Mexico (September 18-29, 2023), p. 2; Articles 17.3, 18.1 of the International Convention for the Protection of All Persons from Enforced Disappearance, United Nations Doc. A/RES/61/177 of 20 December 2006.

710 United Nations, Commission on Human Rights, Report submitted by the Special Rapporteur on the question of torture pursuant to Commission resolution 2002/38, E/CN.4/2003/68, 17 December 2002, par. 26.g.

711 IACHR, Request for information from the State of El Salvador, 156-22/CIDH/SE/MPCT-Art.41, Ref.: Exceptional Regime Decree No. 333 - El Salvador, April 4, 2022.

712 State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 61-62.

713 State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 56, 57.

275. The State reported that there are protocols that establish the measures to be taken, according to the vulnerability of the detainee.[714] It indicated that the separation of children and adolescents in conflict with the law from adults deprived of their liberty is ensured, since they are not sent to police stations, in accordance with international standards that protect the rights of children, but are sent to special shelters, suitable for the care of this segment of the population, under the administration of other State institutions.[715] In addition, it asserted that persons identified as LGBTI population in police custody are kept in separate locations in order to guarantee their rights.[716] In turn, foreigners also receive legal advice, access to consular assistance is guaranteed, as is compliance with the Inter-American Convention on Serving Criminal Sentences Abroad.[717]

276. With regard to medical care, the State claimed that the Directorate General of Prisons ensures that it is received according to the prison population's general and specific needs; thus, the elderly population receives geriatric care; women, gynecological care; and the LGBTI population receives the health services required according to their particular needs.[718] In addition, in the case of foreigners, the LGBTI population, or any other vulnerable group, they are included in treatment programs based on their needs and in mental health programs, psychological care is provided when requested; and when there is no family support, personal hygiene items are provided. For persons with disabilities, facilities have been adapted to provide them with access to the prison clinic and to make it easier for them to get

[714] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 61-62.

[715] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 61-62.

[716] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 61-62.

[717] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 61-62.

[718] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 61-62.

around; they are provided with physiotherapy and with medical care from specialists in hospitals pertaining to the national network, and they are treated in prison in accordance with their physical condition. Therapeutic activities are also tailored to meet their needs and condition. In addition, they are provided with medical supplies to help them move around and to improve their overall condition.[719]

277. Regarding the specific needs of women deprived of liberty within the prison system, the State pointed to the following measures: medical and multidisciplinary evaluations with the objective of identifying the needs of each woman deprived of liberty and coordinating specialized medical consultations outside the prison, if necessary; awareness-raising activities on the importance of breastfeeding, with the objective of strengthening the bond between mother and child in the context of confinement; and the adaptation of spaces within prisons to meet the needs of women.[720] In its comments on the draft of this report, the State noted that since the Prison Act allows children up to the age of 5 to accompany their mothers deprived of their liberty, a specialized detention center was secured for this purpose.[721]

278. In addition, the IACHR was told about concerns regarding the situation of groups at particular risk of deprivation of liberty and the differentiated impacts of imprisonment. Regarding the transfers made

[719] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 61-62.

[720] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 61-62.

[721] At the same time, the State stressed that the General Directorate of Penitentiary Centers had implemented a program of care for children, which includes education, health, nutrition, psychosocial care, and a focus on rights, aimed at guaranteeing care in accordance with the law and promoting the all-round development of children from 0 to 5 years of age who are living with their mothers in the penitentiary system. It also reported on the implementation of the "Soy Persona" (I am a Person) program, designed to foster emotional ties between mother and child, by developing awareness processes and updating the protocols for the care of children, to make sure that they pursue early childhood care objectives. State of El Salvador, Observations by the State of El Salvador on the IACHR Report entitled “State of Emergency and Human Rights in El Salvador”, Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, p. 101.

from July 2022 from the "Centro Preventivo y de Cumplimiento de Penas para Mujeres de Ilopango" to other prisons, it was noted that they were carried out in a surprising and improvised manner and that some women reportedly lost their clothes and other objects. Some of the women were relocated to a specific area of the Izalco Men's Detention Center; some to the Apanteos center, which did not have adequate shelter facilities.[722] The precarious conditions were also reported in the testimonies taken by the Commission:

The cell was adapted for 160 women, and there were more than 360 women. [...]Early on, there was an opportunity to do some sports or read a book. As the prison collapsed due to overcrowding, the women were locked up day and night.[723]

There were 200 people in each cell and about 20 or fewer cots. Four or five of us had to fit into each cot: a tiny space. It is quite hot. The person in charge of each cell did the cleaning.[724]

The food always arrived in a pot and three times a day. Sometimes the food was dirty and hard, they said they put a lot of iodine in it. There were times when it smelt bad. [...]We had menstrual hygiene products only when a family left a package. [...] To bathe we had to bathe in no more than seven "*hucaladitas*". We only bathed every three days. [...] [Even if we were menstruating], we still had to wait for the water to come on to wash. Some colleagues had infections.[725]

I was transferred to the Apanteos prison in Santa Ana. According to the comments heard there, they said that human rights delegations had called their attention to the fact that there were many women sleeping on the floor and getting wet at night. When we arrived,

---

[722] Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report for March 27 to 2022 March 27, 2023,May 12, 2023, pp. 48-51.

[723] Testimony No. 16 of March 17, 2023. Person released under alternative measures (female).

[724] Testimony No. 8 of March 16, 2023. Person released under alternative measures (female).

[725] Testimony No. 8 of March 16, 2023. Person released under alternative measures (female).

they threw away everything we were carrying, leaving us with just one change of clothes. [...] Lack of water was what we suffered most. When the guard was in a good mood, she let us fill all the buckets, but when she was angry, only three. There we washed every three days, if there was water we bathed every day. If there was no water, we only drank 8 ounces of water, 4 in the morning and 4 in the evening.[726]

The only specialty it has is general medicine; there is no sexual and reproductive health care.[727]

279. In this regard, in its observations on the draft of this report, the State indicated that, in order to improve the conditions of confinement of women deprived of their liberty, the women who were being held at the Ilopango Preventive and Punishment Center for Women were transferred to the Apanteos Preventive and Punishment Center for Women, as part of the improvements to the infrastructure of the prison system. Several improvements were made to the latter prison to meet the needs of the women, including: an increase in installed capacity; construction of toilets and showers; improvement of natural and artificial lighting; and increased ventilation.[728]

280. The IACHR was also told about pregnant women with serious illnesses and chronic conditions reportedly not receiving the health care they require, and about a large number of women with mental illnesses, as well as skin, and respiratory diseases.[729] It also received reports of abortions that were allegedly caused by negligence or

---

[726] Testimony No. 16 of March 17, 2023. Person released under alternative measures (female).

[727] Testimony No. 12 of March 17, 2023. Person released under alternative measures (female).

[728] State of El Salvador, Observaciones del Estado de El Salvador al Informe de la CIDH "Estado de Excepción y derechos humanos en El Salvador"(Observations of the State of El Salvador on the IACHR report entitled "State of Emergency and Human Rights in El Salvador"), Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, p. 101.

[729] Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report for March 27 to 2022 March 27, 2023,May 12, 2023, pp. 48-51.

abuse of authority.[730] Additionally, it was pointed out as a risk factor the fact that the redistribution of women inmates in Ilopango to different prisons has exposed them to prison staff, including male guards, without the proper training to care for women.[731]

281. The Commission also learned about some acts of discrimination and mistreatment of lesbian and transgender women, who were reportedly more frequently subjected to physical punishment and confinement in punishment cells.[732] Likewise, the IACHR does not have information on the separation of trans women in prisons for men[733] and highlights the lack of information on the situation of persons with disabilities deprived of liberty in the context of the state of emergency.

282. The IACHR recalls that persons belonging to at-risk groups who face discrimination while at liberty are more susceptible to indirect discrimination due to the disproportionate risks and differentiated impacts they face during incarceration, which results in much more severe effects of imprisonment.[734] In view of this, the authorities are duty-bound to adopt measures based on a differentiated approach that takes into account the condition of vulnerability of persons in detention and the specific violations of their rights caused by incarceration. In addition, these measures should consider the frequent intersectionality of risk factors that may accentuate their risk situation.[735]

[730] Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report for March 27 to 2022 March 27, 2023,May 12, 2023, pp. 48-51.

[731] Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report for March 27 to 2022 March 27, 2023,May 12, 2023, pp. 48-51.

[732] Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report for March 27, 2022 to March 27, 2023,May 12, 2023, pp. 48- 51, 53.

[733] Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report for March 27 2022 to March 27, 2023, May 12, 2023, p. 53.

[734] Thus, IACHR, Report on Measures Aimed at Reducing the Use of Pretrial Detention in the Americas, par. 215; and IACHR, Request for an Advisory Opinion to the Inter-American Court of Human Rights, paras. 16 and 17

[735] Similarly, see: IACHR, Report on women deprived of freedom in the Americas, OEA/Ser.L/V/II., Doc. 91/23, March 8, 2023, par. 120.

283. Consequently, as part of their obligations, States must ensure that in places of deprivation of liberty for women or women's sections in mixed facilities, the supervision and custody of women must be exercised exclusively by female staff.[736] In addition, women deprived of their liberty have the right to access specialized medical care in accordance with their physical and biological characteristics, and that adequately responds to their reproductive health needs. This right includes receiving gender-sensitive health care on a regular and timely basis, at least in the specialties of gynecology, mastology, and sexual and reproductive health. In addition, it implies the duty of States to adopt measures to ensure that health professionals specialized in female and women's pathologies are available in prisons for medical consultations on a sufficiently regular basis. In cases where health services cannot be provided in the institutions, States must implement actions to ensure the prompt and regular transfer of incarcerated women to health centers where they can receive the appropriate care for their pathology.[737]

284. Regarding the accommodation of trans women, the IACHR has indicated that States must allocate exclusive spaces for the accommodation of trans women, and put an end to practices that result in their accommodation together with men or other LGBT persons without differentiation.[738]

285. Regarding **children and adolescents in internment centers**, the available public information is limited to August 30, 2022, when there were 2,312 adolescents in internment centers under the responsibility of the Salvadoran Institute for the Integral Development of Children and Adolescents, of whom 1.947 were males and 365 females; the majority were between 16 and 18 years of age (66.70%), followed by

[736]IACHR, Principles and Best Practices on the Protection of Persons Deprived of Liberty in the Americas, adopted by CIDH on March 13, 2008, Principles XIX and XX.

[737] IACHR, Report on Women deprived of liberty in the Americas, OEA/Ser.L/V/II., Doc. 91/23, March 8, 2023, par. 147.

[738] IACHR, Report on Women Deprived of Liberty in the Americas, OEA/Ser.L/V/II., Doc. 91/23, March 8, 2023, par. 295.

ages between 14 and 16 years (26.73%), between 12 and 14 years (3.63%), and 18 years of age (2.94%).[739] Likewise, the IACHR learned of possible situations of mistreatment inside the social insertion centers for adolescents, neglect in health services, and lack of personal hygiene supplies and provision of medicines, as well as the proliferation of skin and respiratory diseases, and malnutrition.[740]

286. With regard to the health care provided to adolescents in insertion centers (*Centros de Inserción*), in its observations on the draft of this report, the State indicated that as soon as they are placed under the care of CONAPINA, they are guaranteed a medical checkup in the Health Units and that the continuity of the treatment prescribed is ensured. This is due to the fact that there are properly equipped clinics and health personnel for the care and follow-up required by adolescents in the Social Integration Centers. It also pointed out that the medical check-ups have not revealed any physical abuse or injuries due to excessive use of force: a finding that is supported by the file of each adolescent in the Insertion and Protection Centers. The State also indicated that in these centers, the young people receive balanced food and nutrition thanks to a diet that is designed and approved by CONAPINA personnel, and that care is also taken to ensure healthy food preparation and distribution. In addition, the State reported that, at the beginning of the implementation of the state of emergency, CONAPINA ensured that children were "presumed to be underage" and that birth certificates were requested and, if no birth

[739] University Observatory of Human Rights of the Central American University José Simeón Cañas, Annual Report 2022: The State of Human Rights in El Salvador, April 2023, pp. 72-75

[740] Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report for March 27, 2022 to March 27, 2023, May 12, 2023, pp. 51-53.

certificate was found, it also ensured that the corresponding legal procedures were followed to identify their age.[741]

287. With regard to pregnant adolescents in Social Insertion Centers, the State reported that there is a separate space for their health care and that of their children, recreational rooms, comprehensive development centers, and other specialized care. It stressed that the same facilities are provided for children who are with their mothers deprived of their liberty at the Izalco Farm. On the other hand, the State pointed out that, despite the increase in the number of adolescents in detention, care services have not been overwhelmed and, in addition, the capacities and skills of the personnel providing direct care to adolescents (including administrative, security, and technical personnel, directors, multidisciplinary teams) have been strengthened.[742]

288. In this regard, the Commission recalls that the deprivation of liberty of children and adolescents due to their infringing criminal law does not authorize States to restrict their other human rights. Moreover, since the States are in a position of guarantors with respect to this population deprived of liberty, they must adopt positive measures to ensure that they can effectively enjoy all their rights. Deprivation of liberty must be carried out in such a way as to ensure the humane treatment and observance of children and the human rights of the detained juvenile. According to the Court, States' special position of

[741] It also mentioned that CONAPINA has invested in infrastructure and equipment improvements with a fund of approximately US$2 million to ensure decent conditions for adolescents, including the construction of schools, desks, and other implements for their educational and mental development. The State also reported that all surveillance, protection, and care personnel have been trained with an investment of US$90,000 and specialized personnel (167 professionals) have been hired to provide comprehensive care in psychology, nursing, and social work, at a cost of approximately US$141,000 per month for the social insertion centers. State of El Salvador, Observations of the State of El Salvador to the IACHR Report "State of Emergency and Human Rights in El Salvador," Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, pp. 101 and 102.

[742] State of El Salvador, Observations of the State of El Salvador to the IACHR Report "State of Emergency and Human Rights in El Salvador," Diplomatic Note MPOEA-OAS-054/2024, April 8, 2024, pp. 101 and 102.

guarantor vis-à-vis incarcerated persons is particularly reinforced in these cases, due to the special protection that the State must provide to persons under 18 years of age.[743]

289. Finally, the IACHR highlights the lack of information regarding the situation of deprivation of liberty of the **elderly**. El Salvador is a party to the Inter-American Convention on the Protection of the Human Rights of Older Persons, which determined in Article 5 that older persons deprived of their liberty constitute a group in a situation of vulnerability and victims of multiple discrimination. Likewise, Article 13 of said instrument establishes the obligation of the States to guarantee access to special programs and comprehensive care, which include rehabilitation mechanisms for their reintegration into society. Thus, it is essential to ensure their medical care, their physical accessibility in prison facilities, the preservation of family ties, and their social reintegration, as indicated by the Inter-American Court.[744] Therefore, given the disproportionate effect and impact that the precarious conditions of detention described in this report may have on the human rights of the elderly deprived of their liberty, it is necessary for the State to identify this population under its custody and provide specific guarantees for their confinement under dignified conditions. The IACHR reiterates that the aforementioned Convention establishes that, as appropriate, the States Parties shall promote alternative measures to deprivation of liberty, in accordance with their domestic legal systems.

---

[743] See: I/A Court H.R., Matter of Children and Adolescents Deprived of Liberty in the “Complexo do Tatuapé” of Fundação CASA. Provisional Measures. Order of the Inter-American Court of Human Rights of July 3, 2007, preambular paragraph 8; Matter of Children and Adolescents Deprived of Liberty in the "Complexo do Tatuapé" of FEBEM. Provisional Measures. Order of the Inter-American Court of Human Rights of July 4, 2006, preambular paragraph 10; Case of the “Juvenile Reeducation Institute” v. Paraguay. Preliminary Objections, Merits, Reparations, and Costs. Judgment of September 2, 2004. Series C No. 112, par. 160. I/A Court H.R. Case of the “Juvenile Reeducation Institute” v. Paraguay. Preliminary Objections, Merits, Reparations, and Costs. Judgment of September 2, 2004. Series C No. 112, par. 160.

[744] IACHR, Request for an Advisory Opinion to the I/A Court H.R., Differentiated Approaches to Persons Deprived of Liberty, November 25, 2019, UNODC. Handbook on Prisoners with Special Needs, 2009, p. 127. Prison Voice Washington, Correcting Food Policy in Washington Prisons: How the DOC Makes Healthy Food Choices Impossible for Incarcerated People & What Can be Done? 2016, p. 2.

## C. Deaths, allegations of torture and mistreatment of persons deprived of their liberty

290. Since the start of the state of emergency, the Commission has learned of disturbing information regarding deaths, allegations of torture, and ill-treatment of persons deprived of liberty, abuses in the use of disciplinary measures and the use of force against persons deprived of liberty, as well as deficiencies or omissions in the mechanisms for denouncing and investigating these events. The following section addresses some of these reports.

291. According to information in the public domain, from March 27, 2022, to June 2023, there were investigative inquiries into at least 142 **deaths of persons deprived of liberty** in that period.[745] By the end of October 2023, the number of deaths in custody had allegedly risen, with figures varying from 189 to 200 people.[746] A number of civil society organizations criticized the restrictions on access to this type of information and, based on consolidated data from various sources, indicated that there were higher numbers of deaths.[747] As of July 2023, the number of deceased persons reportedly amounted to

[745] AP News, Prosecutor's office registers (*archiva*) 142 deaths in El Salvador prisons attributed to natural causes, June 13, 2023; DW, El Salvador Registers (*archiva*) "142 Cases" of Deaths in its Prisons, 14 June 2023.

[746] DW, NGO: "Victims" of the State of Emergency in El Salvador Rise, October 19, 2023; La Prensa Gráfica, The number of people killed in prisons under the state of emergency in El Salvador rises to 200: "When the moms opened the boxes, there were their children completely beaten up.", October 31, 2023.

[747] Azul Originario et al, Annual Report on Human Rights Violations During the State of Emergency in El Salvador, March 2023, pp. 54-59; Cristosal, Instituto de Derechos Humanos de la Universidad Centroamericana José Simeón Cañas (IDHUCA), Due Process Foundation (DPLF), Red Salvadoreña de Defensoras de Derechos Humanos, Servicio Social Pasionista (SPASS), Prison Deaths During the State of Emergency in El Salvador: Alleged Extrajudicial Executions, Report of Civil Society Organizations to the Special Rapporteur on Extrajudicial Executions, April 10, 2023 (hereafter, Cristosal et al., Prison Deaths during the Emergency Regime in El Salvador: Alleged Extrajudicial Executions, Report of Civil Society Organizations to the Special Rapporteur on Extrajudicial Executions, April 10, 2023), pp. 6-9.

at least 174.[748] The majority were men, but a potential underreporting of women who died in detention was also noted.[749]

292. The organizations indicated that, in repeated cases, the relatives of the deceased were not immediately informed of the death by state agents, and heard about it through third parties, such as representatives of funeral service companies.[750] State agents also recorded their burial without notification to family members, in some cases, in mass graves and as unidentified persons.[751] In addition, they denounced the existence of clandestine graves inside the prisons.[752]

293. On the possible causes of the deaths, Cristosal conducted a study based on field, documentary, and interview research and grouped the then 139 deaths in state custody into four categories: 29 violent deaths, 7 probable violent deaths, 25 natural or pathological deaths, and 39 deaths in which a crime is suspected. Cristosal also indicated that it did not have sufficient data on 39 persons.[753] Likewise,

[748] Swissinfo.ch, The "victims" of the state of emergency in El Salvador total some 5,490, according to allegations, July 20, 2023; La Prensa Gráfica, The 175 people deprived of liberty who have died during the regime in El Salvador, August 8, 2023.

[749] Azul Originario et al, Annual report on human rights violations during the state of emergency in El Salvador, March 2023, pp. 54-59; Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report for March 27, 2022 to March 27, 2023, May 12, 2023, pp. 27-32, 48-51.

[750] Azul Originario et al, Annual report on human rights violations during the state of emergency in El Salvador, March 2023, pp. 52-53; Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report March 27, 2022 to March 27, 2023, May 12, 2023, pp. 35-36; Cristosal et al, Deaths in Prisons during the State of Emergency in El Salvador: Alleged Extrajudicial Executions, April 10, 2023, pp. 9-11.

[751] Azul Originario et al, Annual report on human rights violations during the state of emergency in El Salvador, March 2023, pp. 52-53; Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report March 27, 2022 to March 27, 2023, May 12, 2023, pp. 27-32, 35-36; Human Rights Watch, Cristosal, "We Can Arrest Anyone We Want" Widespread Human Rights Violations During the "State of Emergency" in El Salvador, December 2022, 85-91; Amnesty International, El Salvador: One year into the state of emergency, authorities systematically commit human rights violations, April 3, 2023.

[752] Cristosal et al., Prison Deaths During the Emergency Regime in El Salvador: Alleged Extrajudicial Executions, April 10, 2023), pp. 6-9.

[753] Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report for March 27 to 2022 March 27, 2023,May 12, 2023, pp. 27-32.

according to international experts consulted by Human Rights Watch and Cristosal, the death certificates reviewed did not meet legal and medical standards because they failed to record all the underlying causes and other significant conditions that contributed to the death in question.[754] The organizations highlighted the lack of consistency between the cause of death reported and the condition of the corpse, indicating that, in dozens of the cases studied, the document merely reported that death was the result of some kind of "edema", when there were evident signs of the corpse having been subjected to violence.[755] In this regard, Cristosal indicated that it had verified photographs from the Institute of Forensic Medicine that indicated possible blows and mechanical asphyxiation by strangulation, among other injuries, and disclosed some of these records.[756] In a hearing held at the 187th Period of Sessions of the IACHR, the organizations denounced that some of the deaths may have been extrajudicial executions.[757]

294. Likewise, in at least 20 cases, the deceased was not provided with the appropriate medication or medical care even when they were related to pre-existing conditions or others that arose or were aggravated by the incarceration.[758] The Commission learned of cases in which the families were informed that an autopsy would be performed, but were

---

[754] Human Rights Watch, Cristosal, "We Can Arrest Anyone We Want" Widespread Human Rights Violations During the "Emergency Regime" in El Salvador, December 2022, pp. 85-91.

[755] Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report for March 27, 2022 to March 27, 2023, May 12, 2023, pp. 27-34; Azul Originario et al, Annual report on human rights violations during the state of emergency in El Salvador, March 2023, pp. 54-59; La Prensa Gráfica, Medicina Legal reconoce 73 reos fallecidos en régimen de excepción (Forensic medicine acknowledges 73 accused dying during the state of emergency), August 26, 2022.

[756] Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report for March 27, 2022 to March 27, 2023, May 12, 2023, pp. 27-34; 92.

[757] IACHR, Hearing 'Human Rights and States of Emergency in El Salvador', 187th period of sessions, July 14, 2023.

[758] Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report for March 27 to 2022 March 27, 2023,May 12, 2023, pp. 27-32.

not told when it happened or what finding was reached.[759] According to the organization, as a rule, the forensic medical examination would not be performed for deaths that would be related to certain diseases, such as heart attack, pneumonia, kidney failure, among others, which would make it difficult to identify conditions that could have been acquired or aggravated as a result of torture or cruel, inhuman, and degrading treatment.[760] The people heard by the IACHR also referred to the lack of notification and access to information about the death of their relatives, as well as the difficulties encountered with forensic and investigative institutions:

> It was very insensitive, because, even on the same day in the morning, a family member went to the Mariona prison to deliver a package to him and they did not inform him about the death; they received the package. [...] We have been asking for the judicial file and the forensic file and they do not give it to us because they say it is incomplete. We have not been given the medical report indicating the cause of death. Only the medical report, which states the name, where they went to pick up the body and what he died of. It only states the cause without further explanation. There is no more detailed file. [...] According to forensic medicine we are told that it was due to mechanical asphyxia by strangulation.[761]

> When they no longer gave me information about him in the prison, I said I was going to fight until I found him. I went to many state institutions and although I was afraid that he was dead, I went to forensics to ask. There I was told that he had died (three months earlier) and that he had been transferred to mass graves. [...] Forensic medicine told me that he died of pulmonary edema. We did not know that he had this condition before he was arrested. When I examined his body, I saw many blows and he had not been beaten before. I was

[759] Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report for March 27 to 2022 March 27, 2023,May 12, 2023, pp. 27-32.

[760] Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report for March 32 to 2022 March 27, 2023,May 12, 2023, pp. 32-35.

[761] Testimony No. 18 of March 20, 2023. Family member of a person who died in detention.

very upset, [...] he was my right-hand man. The situation I experienced is not easy.[762]

It is only a cause of death sheet, but that cause is not further substantiated. I had to ask the doctor how it had happened. I was left in doubt. He told me that he had already had the symptoms for 5 months. That inside the prison he developed [the disease]. [...]They did not want to give me the clinical file at the hospital. [...]They don't tell us anything, if they are sick or if they have been taken out of the prison. A regrettable situation. A woman came out of the prison crying because she had been told that her daughter had been dead for two months and she had been taking her packages.[763]

There I could not see a perforation [...] until the funeral home when they were preparing her for me. That makes me think that something happened to her inside the penal center. The forensic medicine document talks about blood pressure, but it did not say anything about this problem that she had [...] I am quite doubtful because forensic medicine does not give you the autopsy. I was told that it would be ready in 15 to 20 days. They asked me to call them. I wanted to claim the autopsy, but they told me that they could not give it to me; only to the Prosecutor's Office handling the case. I started to do the rounds and went to the prosecutor's office. I was told that the case wasn't there. I had to pay for several cabs. I was told that the prosecutor in the case was not there. I explained what I was going for. They told me they would not give me the autopsy.[764]

295. In its observations on the draft of this report, the State indicated that the registration of deaths and the entry of a death certificate is an administrative procedure carried out by the registries of the municipal mayors' offices, and that the registration practice followed in El

[762] Testimony No. 19 of March 20, 2023. Family member of a person who died in detention.

[763] Testimony No. 21 of March 21, 2023. Family member of deceased person in detention (Deceased woman).

[764] Testimony No. 22 of March 21, 2023. Family member of a person who died in detention.

Salvador is to refer to the immediate cause of death.[765] For this purpose, when a corpse is delivered to the Institute of Forensic Medicine, the latter issues a one-time, original copy of a form, in which the forensic doctor gives a preliminary description of the cause of death. In cases where there is no evident cause of death, further (histopathological, toxicological, radiological) studies are conducted in order to determine the direct cause of death, in accordance with the corresponding medico-legal protocols. As a collaborating entity of the Administration of Justice, the Institute of Forensic Medicine issues forensic expert opinions at the request of the competent authority. The State indicated that according to the law, the forensic doctor's purpose is to determine the direct cause of death, the possible time of death, and related matters so that in its expert opinions the Institute only determines the cause of death, with the Attorney General's Office of the Republic being responsible for the criminal classification of the facts, based on the investigations.

296. Civil society organizations indicated that information on investigations is also reserved by the Attorney General's Office for a period of two years.[766] In June 2023, the Commission took cognizance of the statement of the Attorney General of the Republic, related to the archiving of the investigation of the 142 cases related to the death of persons deprived of liberty detained during the state of emergency. According to the authority, after scientifically establishing the causes of those deaths, it was determined that they were related to diseases preexisting at the time of arrest or to diseases for which timely assistance was provided and death occurred.[767] In a hearing held by the IACHR in July 2023, the head of the Attorney General's Office

[765] State of El Salvador, Observaciones del Estado de El Salvador al Informe de la CIDH "Estado de Excepción y derechos humanos en El Salvador"(Observations of the State of El Salvador on the IACHR report entitled “State of Emergency and Human Rights in El Salvador”), Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, pp. 104-105.

[766] Human Rights Watch, Cristosal, "We Can Arrest Anyone We Want" Widespread Human Rights Violations During the "State of Emergency" in El Salvador, December 2022, pp. 85-91, 95-97.

[767] ElSalvador.com, Prosecutor confirms 142 deaths of inmates under the exception regime and defends that "there is no crime to prosecute", June 13, 2023; AP News, Prosecutor files 142 deaths in El Salvador's prisons that he attributes to natural causes, June 13, 2023.

reiterated that, in relation to this type of death, the institution relies on scientific methods, endorsed by the Institute of Forensic Medicine[768]

297. As the Inter-American Commission and Court have reiterated, the State is the guarantor of the rights of persons deprived of liberty, insofar as it exercises total control over the person subject to its custody.[769] The treatment of detainees should be subject to the strictest scrutiny and take into account any special conditions of vulnerability that they present.[770] In this regard, the organs of the Inter-American system have indicated that there is a presumption of State responsibility for the deaths, injuries, or deterioration in the health of a person deprived of liberty, which can only be rebutted by a satisfactory and convincing explanation of what happened and by means of valid evidence.[771]

298. The Commission recalls that when it comes to the investigation of the death of a person who was in the custody of State agents, the corresponding authorities have the duty to initiate ex officio and without delay, a serious, independent, impartial, and effective investigation, that is, with due diligence and substantiated by all available legal means and aimed at determining the truth about what

[768] IACHR, Hearing 'Human Rights and States of Emergency in El Salvador', 187th period of sessions, July 14, 2023.

[769] IACHR, Report on the Human Rights of Persons Deprived of Liberty in the Americas, OEA/Ser.L/V/II., Doc. 64, December 31, 2011, paras. 46-57; I/A Court H.R, Case of Bulacio v. Argentina, Merits, Reparations, and Costs, Judgment of September 18, 2003, Series C No. 100, par. 126.

[770] I/A Court H.R., Case of Bulacio v. Argentina, Merits, Reparations, and Costs, Judgment of September 18, 2003, Series C No. 100, par. 126; I/A Court H.R. Case of Isaza Uribe et al. v. Colombia. Merits, Reparations, and Costs. Judgment of November 20, 2018. Series C No. 363, par. 87; I/A Court HR, Case of J. v. Peru, Preliminary objection, merits, reparations, and costs, Judgment of November 27, 2013, Series C No. 275, par. 343.

[771] I/A Court H.R., Case of Bulacio v. Argentina, Merits, Reparations, and Costs, Judgment of September 18, 2003, Series C No. 100, par. 126; I/A Court H.R. Case of Isaza Uribe et al. v. Colombia. Merits, Reparations, and Costs. Judgment of November 20, 2018. Series C No. 363, par. 87; I/A Court HR, Case of J. v. Peru, preliminary objection, merits, reparations, and costs, judgment of November 27, 2013, Series C No. 275, par. 343; I/A Court H.R., Case of Juan Humberto Sánchez v. Honduras, Preliminary Objection, Merits, Reparations, and Costs, Judgment of June 7, 2003, par. 111.

happened.[772] This includes taking into account certain specific relevant criteria, such as: considering the degree of involvement of state agents; providing a certain degree of public scrutiny to the investigation; preserving the scene of the facts and evidence; conducting an autopsy by trained professionals including any evidence indicating alleged acts of torture by state agents; among other measures.[773] The IACHR also calls on the State to take into account international guidelines in the investigation of possible extra-legal, arbitrary, and summary executions, including the Minnesota Protocol on the Investigation of Potentially Unlawful Death. Even in cases of non-violent deaths, the Commission warns that the failure to establish criminal responsibility should not necessarily prevent ongoing investigation of other types of responsibility for other acts or conduct that may have contributed to the death, depending on the circumstances of each case.[774]

299. Likewise, the Commission urges the State to ensure the dignified treatment of the mortal remains of deceased persons; the notification of family members regarding the death; the proper registration and identification of human remains; as well as to respect the will of the families regarding the final disposition of the bodies, all of the above with particular attention to the United Nations Standard Minimum Rules for the Treatment of Prisoners "The Nelson Mandela Rules".[775]

300. Both the persons heard by the Commission and civil society organizations denounced **acts of torture and ill-treatment** of detainees, abuses in the disciplinary sanctions applied, and omissions in the face of acts of intra-prison violence. They indicated that physical

---

[772] I/A Court H.R. Case of Chinchilla Sandoval et al. v. Guatemala. Preliminary Objection, Merits, Reparations, and Costs. Judgment of February 29, 2016. Series C No. 312, par. 257.

[773] I/A Court H.R. Case of Landaeta Mejías Brothers et al v. Venezuela. Preliminary Objections, Merits, Reparations, and Costs. Judgment of August 27, 2014. Series C No. 281, par. 254.

[774] I/A Court H.R. Case of Chinchilla Sandoval et al. v. Guatemala. Preliminary Objection, Merits, Reparations, and Costs. Judgment of February 29, 2016. Series C No. 312, paras. 259 and 280.

[775] IACHR, Practical Guide No. 1: What are the standards to ensure respect for mourning, funeral rites, and tributes to persons deceased during the COVID-19 pandemic, October 15, 2020, pp. 7-9.

punishment and beatings are said to be generalized in prisons that hold detainees during the state of emergency and reported accounts of violence that include beatings, simulated drowning, electric shocks, abuse in the use of pepper spray, among others[776]:

> They handcuffed me in the yard on the bars and from all the cells you could see what they were doing to me. They hit you with the stick wherever they can. They leave you handcuffed for three hours. Some people don't make it to the cell and they give you another beating.[777]

> We were lying in the sun on the asphalt with a lot of pebbles that bothered our knees. We spent more than two hours lying down. The prison guards wanted to find out which gangs we were from and beat us, but since we don't belong to gangs, they couldn't get us to say anything. Then we went forward on our knees to have our hair shaved. We were asked to move to the steps and then to the cells. We were beaten as we passed, and when we entered the cell, we were beaten as well. [...] I could not get up from my cot for three days because of the beating they gave me. [...] Well, the use of force was always imposed, there was no punishment cell because they are being used by people for sexual diversity. Whoever committed an infraction, if the cell did not say who committed it, we were pepper sprayed and left without food for a while. If someone said who it was, they would take that person out to do squats and then beat him between three or four custodians until they knocked him unconscious.[778]

> They kept us on the gravel for about half an hour, the stones were wedged in our knees, I started to bleed and tremble. You couldn't move because if we moved, the custodians would beat us.[779]

---

[776] Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report March 27, 2022 to March 27, 2023, May 12, 2023, pp. 37-43; Human Rights Watch, Cristosal, "We Can Arrest Anyone We Want" Widespread Human Rights Violations Under El Salvador's "State of Emergency", December 2022, pp. 77-78.

[777] Testimony No. 29 of March 24, 2023. Person released under alternative measures.

[778] Testimony No. 17 of March 20, 2023. Person released under alternative measures.

[779] Testimony No. 6 of March 15, 2023. Person released under alternative measures.

> The next day they took me to the Izalco prison. They put us on our knees and gave us a big beating and made us walk on our knees in the gravel. They insulted us, telling us that we were "shitty gang members" and that "it was our fault that Salvadorans were the way they were". [...] they sent us to the Mariona Prison. There they made us do the same, walk on our knees. The sun was very strong, we burned our knees because it was so hot. […] They counted us in the morning and in the afternoon. They would pull us out with their hands around our necks. They gave us electric shocks. They used to beat us up and kick us, for them it was like a sport, they would laugh, they were happy that we fell down.[780]

301. The testimonies taken by the Commission also referred to acts of sexual violence both in the bartolinas and in the prisons:

> When we were in the bartolinas, we asked policemen for sheets because it was very cold. The policemen told us that they were going to put a few "bugs" in to warm us up and rape us.[781]

> A colleague who was in the bartolinas was raped by the police.[782]

> In the penitentiary center it was men who did the inspection [on female detainees]. I did not know of any sexual violence, but they searched her private parts and male custodians did this search.[783]

> I also saw abortions due to lack of medical assistance. In the cell we were in, her appendix burst, they took her to the hospital, but when they did the surgery they didn't realize she was 4 months pregnant. They took her out again due to complications, realized she was

[780] Testimony No. 10 of March 16, 2023. Person released under alternative measures.

[781] Testimony No. 8 of March 16, 2023. Person released under alternative measures (female).

[782] Testimony No. 10 of March 16, 2023. Person released under alternative measures.

[783] Testimony No. 12 of March 17, 2023. Person released under alternative measures (female).

pregnant and had to perform a curettage. I don't know how she got pregnant, as she had been detained longer.[784]

"I had the misfortune to see how they raped a boy there, but nobody did anything because if you said anything you were next".[785]

302. In its observations on the draft of this report, the State reported that the Deputy Directors of Security of each prison have precise instructions to exercise the requisite oversight and monitoring, as well as to adopt the corresponding preventive security measures to safeguard the physical integrity of persons deprived of liberty. In the event of violence in prisons, the State emphasized that there is a Contingency Plan, which prioritizes immediate and timely notification of the corresponding legal authorities to ensure proper investigation.[786] It also indicated that there is no record in the Attorney General's Office of any complaints of violence in prisons such as those described, and that if they exist, the pertinent investigations will be carried out and it will be the justice system that will reach a decision in each case.[787]

303. Additionally, civil society organizations denounced the **hardening of internal disciplinary conditions** in prisons, through intensive searches, as well as other extra-legal measures such as the removal of inmates' personal possessions, food rationing as collective punishment, and confinement in cells, often for 24 hours a day.[788]

[784] Testimony No. 16 of March 17, 2023. Person released under alternative measures (female).

[785] Testimony No. 1 of March 13, 2023. Person released under alternative measures.

[786] State of El Salvador, Observaciones del Estado de El Salvador al Informe de la CIDH "Estado de Excepción y derechos humanos en El Salvador", Nota Diplomática MPOEA-OEA-054/2024, April 8, 2024, p. 105

[787] State of El Salvador, Observations of the State of El Salvador to the IACHR Report "State of Emergency and Human Rights in El Salvador," Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, Annex 1, Methodological Systematization Matrix, lines 66 and 67, column E.

[788] Azul Originario et al, Annual report on human rights violations during the state of emergency in El Salvador, March 2023, pp. 52-53 University Observatory of Human Rights of the Central American University José Simeón Cañas, Annual Report 2022: The State of Human Rights in El Salvador, April 2023, pp. 64-65.

They reported cases of detainees sent to punishment cells who returned in a state of malnutrition or died.[789] In addition, there are allegations that prison officials tolerate acts of violence committed by the detainees themselves.[790]

In Mariona we were locked up 24/7. Then in Izalco prison, at the most, we were taken out twice a week, one hour per cell.[791]

We didn't do anything, we didn't even have a book. We had no access to anything. Not even a pencil. They would not let us out of the cell. They only took us out in the sun for an hour twice a week [...] There was one time when they didn't give us food and water as punishment.[792]

In some areas, they would take us out in the sun for an hour. But most do not. [...]All sectors had to go through punishment cells, it was a rotation. All of us who came from the hospital were transferred to the punishment cell. We were given very little food as punishment. [...] What they did when they saw something they didn't like. They took them out in the middle of the court, they put handcuffs on us, and hung us by our hands, we spent 5 hours, there were people who bled to death. Even for just talking. He wanted all the people to be quiet. [...] When he was in there, the guards forced him to do what they said. And if you didn't, they beat us, they gave us electric shocks, in front of everyone so that the others could see.[793]

Depending on the severity, if one objected, one went to the "calabozo" which is a punishment cell. Or if the guard or the cell manager didn't

[789] Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report for March 40 to 2022 March 27, 2023,May 12, 2023, pp. 40-43.

[790] Amnesty International, El Salvador: President Bukele plunges country into human rights crisis after three years in office, June 2, 2022.

[791] Testimony No. 23 of March 22, 2023. Person released under alternative measures.

[792] Testimony No. 8 of March 16, 2023. Person released under alternative measures (female).

[793] Testimony No. 10 of March 16, 2023. Person released under alternative measures.

like you, they would also send you for punishment. There you had no rights. [...] She was left hanging for 24 hours in handcuffs without food. I also saw cases where they were beaten during the transfer. There was one woman who did not want to come and was beaten with a stick. I also saw how when they put women to exercise in the sun, they got sunstroke.[794]

304. In a hearing held in July 2023, the State indicated that the Office of the Attorney General of the Republic had received no complaints of torture or degrading human treatment.[795] On the other hand, the organizations indicated that the PDDH was reportedly not accessing places of deprivation of liberty to exercise its constitutional mandate, and demanded that they be able to carry out periodic visits to the different places, publishing information on their findings and recommendations.[796] In its observations on the Draft Report, the State indicated that within the framework of the National Verification Plan in the Context of the state of emergency, implemented by the Office of the Human Rights Ombudsman, visits have been made to prisons by the aforementioned institution to verify respect for the human rights of persons deprived of liberty and to monitor the activities of the General Directorate of Penitentiary Centers. It also noted that the PDDH, through various pronouncements, official letters, and verification reports in the context of the state of emergency, has issued relevant and timely recommendations to the various State authorities, to ensure that all procedures carried out in general, but particularly in the context of the state of emergency, are conducted with complete

[794] Testimony No. 12 of March 17, 2023. Person released under alternative measures (female).

[795] IACHR, Hearing 'Human Rights and States of Emergency in El Salvador', 187th period of sessions, July 14, 2023.

[796] Cristosal, One year under the emergency regime: a permanent measure of repression and human rights violations. Situation Report March 27, 2022 to March 27, 2023, May 12, 2023, pp. 65-66; OUDH, Report: 100 Days of State of Emergency in El Salvador, 2022, August 2022, pp. 135-138; Human Rights Watch, Cristosal, "We Can Arrest Anyone We Want" Widespread Human Rights Violations Under El Salvador's "State of Emergency" December 2022, p. 10.

respect for the principle of legality, innocence, due process, and the human rights of all persons.[797]

305. The IACHR also heard reports of a lack of internal channels or inadequate procedures to identify possible cases of rights violations inside places of deprivation of liberty:

> A doctor saw that someone was in agony and asked her what was wrong. You could not speak with confidentiality. The guard approached her and pointed his baton at her, threatening that if she said anything she would be beaten again. [...] On another occasion, a person got sciatic gout due to the blows given to him by the guards, some doctors asked about the blows and that they could make a memorandum indicating the situation, but the guards were there and one could not speak freely.[798]

> There was no [possibility to file petitions or complaints]. We said we wanted to talk to the director or the custodians, but they ignored us.[799]

306. The Commission reiterates its condemnation of all forms of torture, cruel, inhuman, or degrading treatment, and recalls its absolute prohibition in any situation.[800] In addition, it recalls that rape committed by state agents is a particularly serious and reprehensible act, taking into account the vulnerability of the victim and the abuse of power by the agent, constituting in all cases a violation of the human rights

---

[797] State of El Salvador, Observations of the State of El Salvador on the IACHR Report "State of Emergency and Human Rights in El Salvador," Diplomatic Note MPOEA-OEA-054⁄2024, April 8, 2024, pp. 105 and 106.

[798] Testimony No. 29 of March 24, 2023. Person released under alternative measures.

[799] Testimony No. 8 of March 16, 2023. Person released under alternative measures (female).

[800] IACHR, Report on the Human Rights of Persons Deprived of Liberty in the Americas, par. 350.

protected in Articles 5 and 11 of the American Convention.[801] Such illegal conduct presupposes severe and long-lasting physical and mental suffering, due to its non-consensual and invasive nature, affecting the victim, her family, and community. In turn, the Commission and the American Court have held that sexual violence against women has devastating physical, emotional, and psychological consequences.[802] The Commission recalls that it is an inalienable responsibility of the State to prevent all forms of torture and ill-treatment, to condemn their practice and to punish, at all times, all material and intellectual perpetrators.[803] Likewise, disciplinary restrictions or sanctions may not go so far as to amount to torture or ill-treatment.[804] The Commission notes that the State has not ratified the Optional Protocol to the Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment and that the

---

801 I/A Court H.R., Case of the Miguel Castro-Castro Prison v. Peru. Judgment of November 25, 2006. Merits, Reparations, and Costs, par. 311; IACHR, Application to the Inter-American Court of Human Rights. Case 12.579 12,579, Valentina Rosendo Cantú et al., Mexico, August 2, 2009, paras. 60, 90; CIDH, Application to the Inter-American Court of Human Rights. Case 12.580. Inés Fernández Ortega, Mexico, May 7, 2009, paras. 88-117; IACHR, Report 53/01, Case 11.565, Merits, Ana, Beatriz and González Pérez, Mexico, April 4, 2001, par. 45; IACHR, Report No. 5/96, Case 10.970, Merits, Raquel Martin Mejía, Peru, March 1, 1996, section 3. analysis.

802 IACHR. Report No 53/01. Case 11.565, Ana, Beatriz, and Celia González Pérez. México. April 4, 2001. Par. 45; I/A Court H.R., Miguel Castro Castro Prison Case. Merits, Reparations, and Costs. Judgment of November 25, 2006. Series C No. 160, par. 313, citing the Cfr. United Nations, Commission on Human Rights during the 54th period of sessions. Report submitted by Ms. Radhika Coomaraswamy, Special Rapporteur on violence against women, including its causes and consequences, in accordance with Commission resolution 1997/44. Doc. E/CN.4/1998/54, January 26, 1998, par. 14.

803 IACHR, Report on the Human Rights of Persons Deprived of Liberty in the Americas, par. 350. Under the United Nations Standard Minimum Rules for the Treatment of Prisoners, States have obligations to: (a) documentation and reporting of any signs of torture or other ill-treatment, during the examination of the inmate upon admission to prison or when providing medical care; (b) prompt and impartial processing and investigation of allegations of torture, by a national authority independent of the prison administration; and (c) recording in the prisoner file management system of petitions and complaints, including allegations of torture or other treatment or ill-treatment, unless they are of a confidential nature. In addition, they add that inspections facilitate monitoring that can ensure the transparency necessary to prevent acts of torture in places of detention. In that connection, see: United Nations, United Nations Standard Minimum Rules for the Treatment of Prisoners (Mandela Rules), E/CN.15/2015/L.6/Rev.1, 21 May 2015, Rule 34, 57.3, 8(d).

804 In this regard, the following practices are prohibited: a) indefinite solitary confinement; b) prolonged isolation; c) confinement in a dark or permanently illuminated cell; d) corporal punishment or reduction of food or drinking water; and e) collective punishments. See: United Nations, Standard Minimum Rules for the Treatment of Prisoners (Mandela Rules), E/CN.15/2015/L.6/Rev.1, 21 May 2015, Rule 43 1.

creation of the National Mechanism for the Prevention of Torture is pending, for which reason it urges that the Office of the Human Rights Ombudsman establish a program of periodic visits to places of deprivation of liberty, with the necessary privacy and confidentiality for interviews, and that the results be made public in reports.

## D. Impacts on family members of detainees

307. The Commission has learned how the detentions carried out during the state of emergency have affected the families of persons deprived of liberty in different ways. Both the people who gave testimony to the IACHR and civil society organizations and the press have stressed that women have been particularly impacted by this context, warning that it has exacerbated the gender disparities already existing in the country.[805] Women are often the ones who undertake the initial and ongoing efforts to locate their detained family members, help them to access justice, and provide them with basic supplies during deprivation of liberty.[806] In this regard, Cristosal indicates that 80.6% of the complaints received by the organization were filed by women.[807] These tasks are in addition to the roles of caregiver and/or financial support to the household, generating an overload and deterioration of women's living conditions.[808]

---

805 Azul Originario et al., Annual Report on Human Rights Violations during the State of Emergency in El Salvador, March 2023, p. 41.

806 Amnesty International, El Salvador: One year into the state of emergency, authorities systematically commit human rights violations, April 3, 2023; Cristosal, One year under emergency rule: a permanent measure of repression and human rights violations. Situation Report from March 27, 2022 to March 27, 2023, May 12, 2023, p. 47; El País, Madres a la fuerza: el impacto silencioso del régimen de excepción en El Salvador de Bukele (Mothers under duress: the sudden impact of the state of emergency in Bukele's El Salvador.), June 10, 2023; La Prensa Gráfica, Régimen de excepción ha sido doble impacto para las mujeres (The state of emergency has impacted women twice as hard as men.), April 20, 2023.

807 Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report for March 27 2022 to March 27, 2023, May 12, 2023, p. 47.

808 Amnesty International, El Salvador: One year into the state of emergency, authorities systematically commit human rights violations, April 3, 2023; Cristosal, One year under emergency rule: a permanent measure of repression and human rights violations. Situation Report for March 27 2022 to March 27, 2023, May 12, 2023, p. 47.

> Well, my sister-in-law, my mother, and I have been left to take care of their children. In the case of his youngest son, his health collapsed. He cries, every time he sees something of his brother, he cries. And financially, he needs him.[809]

> I had to stop going to work because I was looking for my partner. I just went on my own, with my ticket. I lost my job because of it. I had to leave my daughter with my sister-in-law.[810]

308. With regard to economic impacts, they point out that the detention of a member of the family and the extra tasks that arise as a result cause, on the one hand, a decrease in income and, on the other hand, additional expenses in the family budget.[811] They indicate that they have to go to different bodies to obtain information about their relatives and secure the necessary documentation for legal proceedings, which results in a loss of time and resources for their subsistence and affects their employment.[812] [813]

> It is very difficult because you have to save and save all month long to buy the most necessary things, buy the hygiene kit [...] It is very difficult, you spend a lot of money on the bus, and find a place to sleep

[809] Testimony No. 18 of March 20, 2023. Family member of a person who died in detention.

[810] Testimony No. 27 of March 23, 2023. Family member of a person detained in custody.

[811] Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report for March 27 2022 to March 27, 2023, May 12, 2023, p. 47.

[812] Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report for March 27, 2022 to March 27, 2023, May 12, 2023, p. 47; Cristosal, Human Rights Violations During the State of Emergency in El Salvador Situation Report for the period April 27 to May 25, 2022, June 14, 2022, pp. 35 -37.

[813] In its observations on the draft of this report, the State indicated that gangs and their criminal activity provided the means of subsistence for many families, so that, undoubtedly, the dismantling of these criminal groups has had an impact on the family economy of people linked to such criminal groups; however, this has translated into economic benefits for the rest of the population. See: State of El Salvador, Observations of the State of El Salvador to the IACHR Report "State of Emergency and Human Rights in El Salvador," Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, Annex 1, Methodological Systematization Matrix, line 71, column E.

because it is not a one-day trip. It's far away, you spend a lot of money. This prison is almost on the border with Guatemala.[814]

The reality that I live day by day is very difficult, [...] I used to eat three times a day and now I eat twice a day, to save money to give my son a package. My children do not study now.[815]

We have had to go into debt to get the packages to him. The trip alone is three hours there and three hours back. There is a lot of expense and it takes a lot of time. My health has deteriorated. [...] They have cornered us in such a way that I don't know how we are going to get out of this.[816]

309. The Commission also received information that families have suffered stigmatization, threats, and violence in the way they are treated by law enforcement and prison officials for being relatives of persons suspected of having committed a crime.[817]

Most family members are desperate and afraid. They are desperate because they have no protection and limited resources. They are afraid because, in several cases, the police warn them that they will be the next.[818]

I was later notified that she had been readmitted to the hospital. We tried to see her. The guards threatened to arrest me for asking for

[814] Testimony No. 13 of March 17, 2023. Family member of detainee (female detainee).

[815] Testimony No. 14 of March 17, 2023. Family member of detainees (adult male and female detainees).

[816] Testimony No. 28 of March 23, 2023. Family member of a detained person.

[817] La Prensa Grafica, State of Emergency has had a double impact for women, April 20, 2023; El País, Mothers under duress: the sudden impact of the state of emergency in Bukele's El Salvador, June 10, 2023; La Prensa Gráfica, PNC does not sanction police violence and drives away family members, April 27, 2022; Cristosal, Human Rights Violations During the Emergency Regime in El Salvador. Situation Report for the period April 27 to May 25, 2022, June 14, 2022, pp. 35 -37.

[818] Testimony No. 7 of March 15, 2023. Defense attorney.

information about my sister. I was told "you know I can proceed against you".[819]

Now one is afraid not only of crime and gangs, but also of the authorities.[820]

They also recalled that hundreds of family members were sleeping outside different prisons for weeks, facing adverse weather conditions to get news of their relatives.[821] In this context, the Commission learned that force was reportedly used to evict hundreds of family members who were waiting for the possible release of their relatives around the Mariona Prison.[822]

When he was taken to Mariona, we did not know to which penitentiary he had been transferred. They did not give us information. I even had to sleep outside with everything and my baby, who was one year old at the time. I was rained on and mistreated. They did not want us there. They were yelling at us to leave, they were lousy. We had to move to different penitentiary centers to ask for him. After a month we were able to find out that he was in Mariona (sector and cell). We do not know if he is well, sick, or alive.[823]

---

[819] Testimony No. 21 of March 21, 2023. Family member of deceased person in detention (Deceased woman).

[820] Testimony No. 26 of March 23, 2023. Family member of detainee in detention (Female detainee).

[821] El Faro, Women seeking among the Regime, May 4, 2022; Cristosal, Human Rights Violations During the State of Emergency in El Salvador. Situation Report for the period from April 27 to May 25, 2022, June 14, 2022, pp. 28-29; La Prensa Gráfica, PNC does not sanction police violence and drives away family members, April 27, 2022.

[822] La Prensa Grafica, Relatives continue in Mariona despite evictions, May 25, 2022.

[823] Testimony No. 27 of March 23, 2023. Family member of a detained person.

310. The Commission also learned that all of the above has produced diverse impacts on the physical, emotional, and mental health of family members, as well as on their life plans[824]:

> It gives me insomnia, I can't sleep. When they take a dead body out of Mariona, to think that my son could be killed. My children panic at the mere sight of a policeman. I have a little girl who trembles when she looks at policemen. Not knowing anything about one's children, and feeling powerless to do anything. When I go to Mariona, so close to my son and not being able to see him. I will never get rid of this drama I have; I am terrified.[825]

> It's a collective hysteria because we are watching the news about the transfers, about the deaths. It makes me anxious to go to the prison and see the people being transferred. When I go to ask for information I get a stomachache. We are re-victimized in the institutions.[826]

> It is a very difficult situation. From the moment they took her into custody, knowing she was innocent, we thought she was going to get out. We had hoped that she would appear at the 15-day hearing, then at six months. With all this going on it has been a change. Emotionally, we are all very bad. We do not accept what happened. We never prepared for her death. My family is destroyed, knowing that because of an anonymous phone call she is now dead. My mom has fallen ill.[827]

> The impact it has had on us is irreversible. I have suffered even since they took him away. After he died, it got worse. [...] I would like my

---

[824] Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report March 27, 2022 to March 27, 2023, May 12, 2023, p. 47; La Prensa Gráfica, Presos del régimen y sus familiares presentan enfermedades físicas y mentales (Prisoners and their family members are suffering from physical and mental illness), March 27, 2023.

[825] Testimony No. 14 of March 17, 2023. Family member of detainee (adult male and female detainees).

[826] Testimony No. 24 of March 23, 2023. Family member of a detained person.

[827] Testimony No. 21 of March 21, 2023. Family member of person who died in detention (Female).

son's name to be cleared because, in reality, my son was innocent. He was not a criminal.[828]

311. On the other hand, children and adolescents, the elderly, and people with disabilities have also suffered specific impacts from the detention of the person in charge of providing for the family or looking after them. According to civil society information published in the press, close to 100,000 children have suffered the detention of their mother or father, and sometimes both, which could put them at risk.[829] In repeated cases, adolescents had to support the family income or care and protection tasks of other family members.[830] In this regard, the organizations indicated that they have observed a higher incidence of child labor, school dropouts, and forced displacement among the families of persons deprived of liberty during the state of emergency.[831] Likewise, many children and adolescents have witnessed the use of physical and verbal violence in the detention of their relatives and acquaintances or have been approached for police searches in the communities where they live.[832] All of the above reportedly also affected their health and personal integrity, among other rights.[833] In addition, it was pointed out that the current criminal and penitentiary policy deprives children

---

828 Testimony No. 22 of March 21, 2023. Family member of a person who died in detention.

829 El Salvador.com, Childhood left homeless by captures during the regime exceeds 100,000 cases, September 30, 2023.

830 Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report for March 27, 2022 to March 27, 2023, May 12, 2023, pp. 51-53.

831 Amnesty International, El Salvador: One year into the emergency regime, authorities systematically commit human rights violations, April 3, 2023; Azul Originario et al, Annual report on human rights violations during the state of emergency in El Salvador, March 2023, p. 48; University Observatory of Human Rights of the Central American University José Simeón Cañas, Annual Report 2022: The State of Human Rights in El Salvador, April of 2023, pp. 165-166.

832 Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report March 27, 2022 to March 27, 2023, May 12, 2023, pp. 51-53; La Prensa Gráfica, Régimen de excepción está vulnerando a la niñez (State of emergency is harming children), March 30, 2022.

833 Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report for March 27, 2022 to March 27, 2023, May 12, 2023, pp. 51-53.

and adolescents from maintaining family relationships with their mothers, fathers, and caregivers.[834]

312. In its observations on the draft of the present report, the State indicated that, through the lead institution for children, it adopted measures to ensure a comprehensive approach to the situation of children with a family member deprived of liberty. Thus, CONAPINA has been working with a number of civil society organizations in the creation of the project entitled "Bolstering Human Resources for Protection Boards attending to cases of children and adolescents deprived of liberty in the context of the state of emergency." The State also reported that since March 2022, in coordination with the Ministry of Justice and the General Directorate of Penitentiary Centers, a voluntary census had been conducted of the entire adult prison population with regard to the children under their responsibility. This created a computer platform that allowed the Protection Boards to have information on children and adolescents deprived of liberty to ensure their care, protection, and monitoring of their situation and to guarantee their rights.[835]

313. The State reported that, in the first stage of implementation of the state of emergency, the needs of this population group were identified.[836] In addition, the State reported that judges, when

[834] Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report for March 27, 2022 to March 27, 2023, May 12, 2023, pp. 51-53.

[835] State of El Salvador, Observations of the State of El Salvador to the IACHR Report "State of Emergency and Human Rights in El Salvador," Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, pp. 108-110.

[836] It added that face-to-face interviews had been conducted in all prisons to determine whether the inmates had children, and thus address possible needs based on the circumstances in each case. This process included the creation of an offline data collection instrument, which allowed all needs for attention to be addressed. CONAPINA professionals carried out the procedures for obtaining information about children, facilitating their care through the Protection Boards, responsible for verifying and addressing the cases according to the needs identified. According to the State, "far fewer than 100,000 children and adolescents were identified." State of El Salvador, Observations by the State of El Salvador on the IACHR Report entitled “State of Emergency and Human Rights in El Salvador”, Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, p. 107

conducting hearings of adults, forward to CONAPINA the information regarding children and adolescents under their care and protection, in order for CONAPINA to take appropriate protection measures. It also stressed that economic support has been provided to caregivers to strengthen the care of children and adolescents with relatives deprived of liberty, by facilitating educational scholarships, seed capital, life-style options, and food support. The State emphasized that the results of the census were used to classify needs and deliver benefits and enrollment in programs or projects. All these actions were carried out in territories recovered from crime and gang control, allowing communities that for many years had been unable to access government benefits and cooperation services, due to the actions of the gangs, to now enjoy opportunities to enhance their development.[837] Finally, the State indicated that it had not registered an increase in street children and adolescents and that the still latent cause of the decrease in schooling was due to the COVID-19 pandemic.[838]

314. In this regard, the Commission has pointed out that the deprivation of liberty also causes differentiated impacts and disproportionate consequences for the persons under the care of detainees. Thus, considering that women are more frequently in charge of single-parent households and are the sole caregivers of their children, when women are incarcerated, the care of their children is generally left to the closest family member, sometimes requiring the intervention of social services to support their well-being. Accordingly, the rupture of

[837] The State also pointed out that CONAPINA has also developed several projects with components that strengthen families' self-sustainability mechanisms. It reported that since 2022, 1,203 families had benefited from 5 projects financed by international cooperation organizations, partner governments, and government agencies. All together, the projects entailed an investment of: $930,000.00. State of El Salvador, Observations of the State of El Salvador on the IACHR Report "State of Emergency and Human Rights in El Salvador," Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, pp. 108-110.

[838] State of El Salvador, Observations by the State of El Salvador on the IACHR Report entitled "State of Emergency and Human Rights in El Salvador", Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, p. 110.

protective ties caused by female incarceration means that persons under their care are exposed to poverty, marginalization, and neglect, which can have long-term consequences, such as involvement in criminal organizations or even institutionalization.[839]

While I was in prison I was sad for my daughter. I was afraid she would become ill or sick. When I was released I was told that my daughter was not eating, that she had become very ill and that she got sick. She is already starting to talk, but at first she didn't speak to me.[840]

Soldiers arrived and knocked on the door. [...]My dogs were beaten by them and they died. The children were frightened, they did not move at all. When she was taken away, they came to scream for their mother. The older kids cry, they don't want to eat, they don't want to study. The oldest girl was quite affected. She starts crying and screaming, she tells me "I want my mommy, I need my mommy".[841]

My son is not allowed to leave the house, he is studying online. I am afraid for my daughter to go out to school; I walk her to school and pick her up. My son only goes out with me.[842]

315. All these data and accounts show the Commission that the measures adopted under the state of emergency have produced a series of effects on human rights that go beyond the persons detained and extend to their families and communities. The IACHR observes different types of impacts, which include the concrete obstacle to the exercise of rights and guarantees of family members, or indirectly impacts due to the feeling of defenselessness and fear of being victims of illegalities and arbitrariness on the part of public agents from

---

839 IACHR, Report on Women Deprived of Liberty in the Americas, OEA/Ser.L/V/II., Doc. 91/23, March 8, 2023, par. 86.

840 Testimony No. 8 of March 16, 2023. Person released under alternative measures (female).

841 Testimony No. 13 of March 17, 2023. Family member of detainee (female detainee).

842 Testimony No. 9 of March 16, 2023. Family member of detainees (adolescent and adult detainees).

different institutions. In addition, the abusive use of pretrial detention, coupled with the current conditions of detention in prisons, has contributed to the increased poverty of economically vulnerable families, deepening gender inequalities and impacting groups that are already at special risk and vulnerability, generating consequences that may have a lasting effect on their lives.

316. The IACHR is particularly concerned about the magnitude of the measures undertaken during the state of emergency, which reveal the choice of a criminal policy model focused on highly repressive measures, with the suspension of rights and guarantees, and, in addition, allegedly systematic and widespread human rights violations. For this reason, the IACHR urges the State to develop criminal and penitentiary policies from a human rights and intersectional approach, which also consider the impacts that the prioritization of incarceration as a citizen security measure generates on family and community nuclei. In the same vein, the Commission reiterates the importance of strengthening intersectoral policies to prevent crime and restore the social fabric, based on data and built with transparency and social participation.

317. The Commission also calls on the State to ensure that the actions of the institutions, at all levels, are geared towards guaranteeing rights and stresses the importance of constantly reevaluating practices that are reported as victimizing by users. Along these lines, the IACHR takes note of the "Principles and Best Practices on the Protection of the Rights of Women Relatives of Persons Deprived of Liberty (Bogotá Principles)" as a regional initiative of civil society organizations and groups of women relatives of persons deprived of liberty and their contributions to best practices based on their experiences of the challenges encountered due to public policies.[843] Finally, the Commission calls on the State of El Salvador to take into account the voices of family members and the impacts they have endured, when formulating and implementing measures of reparation for the rights violations denounced in this report.

[843] IACHR, Hearing 'Differential Impact on the Lives of Women Relatives of Persons Deprived of Liberty in the Americas', 187th Period of Sessions, July 12, 2023.

# CHAPTER 4: FREEDOM OF EXPRESSION, JOURNALISM, AND THE DEFENSE OF HUMAN RIGHTS

## FREEDOM OF EXPRESSION, JOURNALISM, AND THE DEFENSE OF HUMAN RIGHTS

318. Freedom of expression, in all its forms and manifestations, is a fundamental and inalienable right, and an indispensable requirement for the very existence of a democratic society. Respect for and protection of freedom of expression acquires a primordial function, since this right also enables other human rights and safeguards democratic values.[844]

319. In states of emergency, freedom of expression acquires an essential function as it contributes to preserving the values and functioning of the democratic system, which is why States are called upon to respect and guarantee this right.[845] So important is the link between freedom of expression and democracy that the very purpose of Article 13 of the American is to strengthen the functioning of pluralistic and deliberative democratic systems by protecting and promoting the free flow of information, ideas, and expressions of all kinds.[846] Therefore, under exceptional institutional circumstances, the right to freedom of expression constitutes a necessary condition for the operation of mechanisms enabling citizens to exercise oversight of public administration.[847] Therefore, information, opinions, news,

844 IACHR, Background and Interpretation of the Declaration of Principles.

845 IACHR, Office of the Special Rapporteur for Freedom of Expression, A Hemispheric Agenda for the Defense of Freedom of Expression, OEA/Ser.L/V/II IACHR/SRFE/INF. 4/09, February 25, 2009, par. 18: 18.

846 IACHR Office of the Special Rapporteur for Freedom of Expression, Inter-American Legal Framework Regarding the Right to Freedom of Expression, OEA Ser.L/V/II IACHR/SRFE/INF. 2/09, December 30, 2009, par. 8.

847 IACHR Office of the Special Rapporteur for Freedom of Expression, Inter-American Legal Framework Regarding the Right to Freedom of Expression, OEA Ser.L/V/II CIDH/RELE/INF. 2/09, December 30, 2009, par. 8.

and ideas need to circulate as widely as possible, guaranteeing the maximum level of exercise of freedom of expression.[848]

320. Likewise, the Office of the Special Rapporteur has emphasized that broad, robust, and participatory public debate on matters that concern all citizens is an essential element during states of emergency, as it contributes to the formation of an informed public opinion that is aware of its rights.[849] Similarly, the right to freedom of expression and information promote accountability and transparency in the public administration of the authorities, as well as the reporting of situations of corruption, abuse, or concentration of power.[850] These rights become especially important in emergency situations, as they allow people to hear and express their opinions and differences in a peaceful manner.[851] Finally, these rights constitute an essential condition for citizens to gauge the scope of their rights, as well as the mechanisms and guarantees that exist to make them effective.[852]

---

848 I/A Court H/R. Advisory Opinion OC-5/85,Compulsory Membership in an Association Prescribed by Law for the Practice of Journalism (Articles 13 and 29 American Convention on Human Rights), November 13, 1985, Series A No. 5 par. 64; IACHR, Office of the Special Rapporteur for Freedom of Expression, Inter-American Legal Framework Regarding the Right to Freedom of Expression, OEA Ser.L/V/II IACHR/SRFE/INF. IACHR/SRFE/INF. 2/09, December 30, 2009, par. 81.

849 IACHR, Office of the Special Rapporteur for Freedom of Expression (SRFE), Annual Report 2022: OEA/Ser.L/V/II. Doc. 50 v. 2, March 6, 2022, par. 607.

850 I/A Court H.R, Case of Claude-Reyes et al. v. Chile, Merits, Reparations, and Costs, Judgment of September 19, 2006, Series C No. 151, paras. 85-87.

851 I/A Court H/R. Advisory Opinion OC-5/85, Compulsory Membership in an Association Prescribed by Law for the Practice of Journalism (Articles 13 and 29 American Convention on Human Rights), November 13, 1985, Series A No. 5 paras. 57 and 70; IACHR, Background and Interpretation of the Declaration of Principles.

852 IACHR, Office of the Special Rapporteur for Freedom of Expression, The right to access information in the Inter-American Legal Framework, OEA/Ser.L/V/II. IACHR/SRFE/INF. 9/12, March 7, 2011, Prologue.

321. The right to freedom of expression is not absolute and admits exceptional limitations.[853] Inter-American jurisprudence has established that, to be admissible, restrictions on freedom of expression must meet three basic conditions: (i) The limitation must have been precisely and clearly defined through a formal and material law,(ii) the limitation is aimed at achieving compelling objectives authorized by the American Convention, and (iii) the limitation is necessary in a democratic society for the achievement of the compelling purposes sought; strictly proportional to the purpose pursued; and suitable for achieving the compelling limitations it seeks to achieve. It is up to the authority imposing the limitations to demonstrate that these conditions have been met.[854] These restrictions are exceptional in nature and should not limit, beyond what is strictly necessary, the full exercise of freedom of expression and become a direct or indirect mechanism of prior censorship.[855] In contexts of suspension of rights and guarantees, compliance with these requirements is especially important and double-checking their observance helps to prevent the actions of the public authorities from being illegal, or exceeding the limits established by international human rights law.[856]

322. Likewise, in exceptional regimes, in addition to the criteria described above, there is the requirement of temporariness or temporariness, according to which measures restricting fundamental freedoms must

853 I/A Court H.R., Case of Herrera Ulloa v. Costa Rica, Preliminary Objections, Merits, Reparations, and Costs, Judgment of July 2, 2004, Series C No. 107, par. 120.

854 IACHR Office of the Special Rapporteur for Freedom of Expression, Inter-American Legal Framework on the Right to Freedom of Expression, OEA Ser.L/V/II IACHR/SRFE/INF. 2/09, December 30, 2009, paras. 67 and 68.

855 I/A Court H.R., Case of Palamara Iribarne v. Chile, Merits, Reparations, and Costs, Judgment of November 22, 2005, Series C No. 135, par. 79; I/A Court H.R., Case of Kimel v. Argentina, Merits, Reparations, and Costs, Judgment of May 2, 2008, Series C No. 177, par. 54.

856 I/A Court H.R., Advisory Opinion OC-8/87, Habeas Corpus in Emergency Situations (Articles 27.2, 25.1, and 7.6 American Convention on Human Rights), January 30, 1987, Series A No. 8, par. 38; IACHR, Pandemic and Human Rights, OEA/Ser.L/V/II Doc. 396, September 9, 2022, paras. 35 and 38.

be limited in time.[857] The IACHR and SRFE emphasize that the temporary nature of a state of emergency implies that the State must periodically verify, based on available information, the persistence of the causes that gave rise to the declaration of the state of emergency. In this regard, it is essential for the State to have accurate and timely information to evaluate, on a regular basis, whether or not the causes for the state of emergency persist.

323. Therefore, the IACHR and its Office of the Special Rapporteur emphasize that, in these contexts of exceptional circumstances, the work of the press plays a crucial role in keeping society informed about the different issues of public life, particularly those that are related to and allow for a better social and institutional understanding of the circumstances that led to the exceptional circumstances. This is essential to foster strong, informed, and vigorous debate. In states of emergency, journalists may not be victims of, among other things, arbitrary detentions, prosecutions, accusations, threats, or violence as a result of their work as journalists. Despite the above, SRFE has recorded that States often resort to criminal law to punish the publication or dissemination of ideas and information related to the state of emergency. In this regard, SRFE has pointed out that the use of criminal law as a form of reprisal and intimidation against journalists and communicators investigating matters of great public interest constitutes an indirect means of censorship and could curtail freedom of expression.[858]

324. In particular, in its observations on the draft of this report, the State of El Salvador indicated to the IACHR and its Special Rapporteurship that during the state of emergency there is no documented case in which journalists or media workers have suffered arbitrary detentions, prosecution, accusations, threats, or violence as a result

[857] I/A Court H.R., Advisory Opinion OC-8/87, Habeas Corpus in Emergency Situations (Articles 27.2, 25.1, and 7.6 American Convention on Human Rights), of January 30, 1987, Series A No. 8 paras 38 and 39.

[858] IACHR, Background and Interpretation of the Declaration of Principles.

of their work.[859] It also asserted that criminal law has not been used to punish the publication or dissemination of ideas and information related to the state of emergency.[860] Nevertheless, the Special Rapporteurship has learned of alleged intimidation and threats of prosecution against journalists and media workers investigating criminal matters as a result of the legislative amendments adopted on April 5, 2022 in connection with the state of emergency.[861] In the opinion of the Commission and its Special Rapporteurship, these regulations had an inhibiting effect on public discourse, especially in the case of journalists, writers, and the media, as will be detailed later in this chapter.[862]

325. Likewise, the IACHR has held that in periods of emergency, States must refrain from restricting the work of journalists, as it constitutes a fundamental tool for informing the public, ensuring compliance with the rule of law, and promoting transparency and accountability of the authorities.[863] Likewise, States are called upon to guarantee that journalists can freely carry out their work, providing maximum guarantees so that they can work in safety and without fear of reprisals.[864]

---

[859] State of El Salvador, Observations of the State of El Salvador to the IACHR Report "State of Emergency and Human Rights in El Salvador," Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, pp. 13-14.

[860] State of El Salvador, Observations of the State of El Salvador to the IACHR Report "State of Emergency and Human Rights in El Salvador," Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, pp. 13-14.

[861] This aspect is addressed in the sections on “Legislative amendments during the state of emergency and their impact on freedom of expression” and "Situation of journalists and other impacts of the state of emergency in El Salvador on the right to freedom of expression."

[862] This aspect is addressed in the sections on “Legislative amendments during the state of emergency and their impact on freedom of expression” and "Situation of journalists and other impacts of the state of emergency in El Salvador on the right to freedom of expression."

[863] IACHR, Office of the Special Rapporteur for Freedom of Expression, Press Release No. 58/20, COVID-19: Governments must promote and protect access to and free flow of information during pandemic – International experts., March 19, 2020; IACHR, Pandemic and Human Rights, OEA/Ser.L/V/II. Doc. 396, September 9, 2022, paras 125, 127, and 130.

[864] United Nations, OAS, Joint declaration on violence against journalists and media workers in the context of protests, September 13, 2013

326. In times of emergency, freedom of expression is a fundamental pillar, as it contributes to maintaining transparency and holding public authorities accountable.[865] Guarantees of freedom of expression legitimize democracy and reassure society and the international community insofar as they prove that public action can be scrutinized and debated by citizens.[866] Likewise, the work of the press becomes an essential tool for overseeing the rule of law, which contributes to providing society with information on matters of public interest.[867]

## A. Legislative reforms during the state of emergency and their impact on freedom of expression

327. As indicated in the preceding paragraphs, Decree No. 333 of March 27, 2022 suspended, for 30 days, a number of rights and guarantees of the Constitution of the Republic related to freedom of association, the right of assembly, protection against arbitrary or abusive interference in private life, among others.[868] Requests for extension of the state of emergency no longer included rights related to freedom of association.[869]

---

865 IACHR, Specialized supervisory bodies for the right to access public information, OEA/Ser.L/V/II. IACHR/SRFE/INF. 14/ 16, 2016, Office of the Special Rapporteur for Freedom of Expression, par. 3; IACHR, Special Rapporteurship for Freedom of Expression, The Inter-American Legal Framework regarding the Right to Access to Information OEA/Ser.L/V/II. IACHR/SRFE/INF. 9/12, March 7, 2011, par. 90; United Nations, OSCE, and OAS, Joint Declaration on International Mechanisms for the Promotion of Freedom of Expression, December 6, 2004.

866 IACHR, Special Rapporteurship for Freedom of Expression, The Inter-American Legal Framework regarding the Right to Access to Information, OEA/Ser.L/V/II. IACHR/SRFE/INF. 9/12, March 7, 2011, par. 172; IACHR, Office of the Special Rapporteur for Freedom of Expression, Inter-American Legal Framework on the Right to Freedom of expression, OEA Ser.L/V/II IACHR/SRFE/INF. 2/09, December 30, 2009, par. 33.

867 IACHR Office of the Special Rapporteur for Freedom of Expression, Inter-American Legal Framework Regarding the Right to Freedom of Expression, OEA Ser.L/V/II CIDH/RELE/INF. 2/09, December 30, 2009, paras. 165 et seq.

868 Republic of El Salvador, Legislative Assembly, Decree No. 333⁄22.

869 Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations, May 12, 2023.

328. In this context, on April 4, 2022, the Minister of Justice and Public Security submitted to the Legislative Assembly two draft Legislative Decrees aimed at expanding the catalog of crimes contained in both the Penal Code and the Law for the Prohibition of Maras, Gangs, Groups, Associations, and Organizations of a Criminal Nature.[870] On April 5, 2022, the Legislative Assembly decreed the amendment of the aforementioned laws, incorporating the following provisions respectively:

**Criminal Code, Article 345-C:** Whoever elaborates, participates in their elaboration, facilitates, or manufactures, texts, paintings, designs, drawings, graffiti, or any form of visual expression on real property of public or private use, that explicitly or implicitly transmit messages, signs, denominations, propaganda, or any type of written manifestation that makes allusion to the different groupings, or terrorist criminal associations of maras or gangs, and especially with the purpose of alluding to territorial control of said groups or transmitting threats, shall be sanctioned with a prison sentence of ten to fifteen years. The same sanction shall apply to those who, through the use of communication and information technologies, radio, television, written, or digital media, reproduce and transmit messages or communications originated or allegedly originated by such criminal groups, which could generate distress and spread panic among the general population.[871]

**Article 1, paragraph 3 of the Law for the Prohibition of Gangs:** Likewise, texts, paintings, designs, drawings, graffiti, or any form of visual expression, whether on public or private property, that explicitly or implicitly transmit messages related to the different groups or criminal associations referred to in this article, and especially those

[870] Bill proposed by the President of the Republic, Reforming the Penal Code, incorporating Art. 345-C, April 4, 2022; Bill proposed by the President, Reforming the Law for the Prohibition of Maras, Gangs, Groups, Associations, and Organizations of a Criminal Nature, April 4, 2022.

[871] Legislative Assembly, Reform to the Penal Code, Decree 349, published in the Official Gazette on April 5, 2022.

whose purpose is to allude to the territorial control of said groups or to transmit threats to the population in general, are declared illegal. Likewise, it is forbidden for the radio, television, written, or digital media to reproduce and transmit to the general population messages or statements originating or allegedly originating from said criminal groups, which could generate distress and panic in the population.[872]

329. The Minister of Justice and Security stated that the purpose of the amendment to the Law for the Prohibition of Gangs was to "repress and dissuade individuals from illegitimately using the right to freedom of expression" in a way that could "directly affect public order."[873]

330. As of November 1, 2023, the Legislative Assembly of El Salvador repealed the two norms that criminalized the dissemination of messages related to gangs or criminal groups by the media.[874] According to official information, the repeal of these provisions was justified by the effectiveness of the Government's security strategies, such as the implementation of the Territorial Control Plan and the state of emergency, implemented since March 2022 to combat gang violence.[875] The Nuevas Ideas party argued that the legislation responded to a reality of extreme violence that put the life and integrity of the citizens at risk, but, having fulfilled the objective for which the norms were decreed, "it becomes necessary to alter the referred paragraphs again, this time in order to guarantee the full exercise of the fundamental rights of all Salvadoran citizens."[876]

---

872 Legislative Assembly, Amending the Law for the Prohibition of Maras, Gangs, Groups, Associations, and Organizations of a Criminal Nature, Decree 350, published in the Official Gazette on April 5, 2022

873 IACHR, Office of the Special Rapporteur for Freedom of Expression (SRFE), Annual Report 2022:, OEA/Ser.L/V/II. Doc. 50 v. 2, March 6, 2022, paras 596.

874 X account of the Legislative Assembly (@AsambleaLegislativaSV), November 1 and November 1.

875 Legislative Assembly of El Salvador, Deputies decriminalize dissemination of messages generated by gangs, November 2.

876 AP News, El Salvador: Congress repeals controversial reform on gang messages in the media, November 2, 2023; La Prensa Gráfica, Assembly approves decriminalization of gang-generated messages through media, November 2, 2023.

331. The IACHR and its Office of the Special Rapporteur join the message of the Office of the United Nations High Commissioner for Human Rights (OHCHR), and recognize the importance of the decision adopted by the Legislative Assembly to repeal the second paragraph of Article 345-C of the Penal Code, as well as Article 1, paragraph three of the Law for the Prohibition of Maras and Gangs.[877] These rules would have had a chilling effect on public discourse, and particularly on journalists, writers, and the media.[878] As noted by the OHCHR, this decision should be complemented by other measures that contribute to strengthening civic space and provide the necessary conditions for the work of human rights defenders and journalists in a safe and enabling environment.[879]

332. On April 13, 2022, the Office of the Special Rapporteur for Freedom of Expression warned through a press release about the risks of criminalization of freedom of expression following the approval of these legislative amendments to the Penal Code and the Law for the Prohibition of Gangs.[880] In this regard, the Office of the Special Rapporteur considered that the broadness and vagueness of the terms used to describe the prohibited conducts conflict with international standards that require that any limit to freedom of expression be expressly, specifically, and clearly set forth in the law. The aforementioned ambiguity of the wording makes it difficult to distinguish between expressions that are punishable and those that are not. Thus, for example, the criminalization of any type of visual expression that "implicitly"

---

[877] Office of the United Nations High Commissioner for Human Rights (OHCHR), Press Release - El Salvador, 3 November 2023.

[878] This aspect is addressed in the following paragraphs, as well as in the section on "Situation of journalists and other impacts of the state of emergency in El Salvador on the right to freedom of expression."

[879] Office of the United Nations High Commissioner for Human Rights (OHCHR), Press Release - El Salvador, 3 November 2023.

[880] IACHR, Office of the Special Rapporteur for Freedom of Expression, Press Release No. 80/22, The Office of the Special Rapporteur warns of the risk of criminalization of legitimate exercises of freedom of expression in El Salvador as a result of legislative reforms, April 13, 2022.

alludes to criminal groups may conflict with what the Inter-American Court has pointed out regarding "the use of strict and unambiguous terms that clearly delimit punishable conduct."[881]

333. On that occasion, the State of El Salvador informed SRFE that, in its opinion, the reforms adopted were clear and specific and none of them led to a vague interpretation, but rather "sent a strong message to groups operating outside the law about the limits of their actions."[882] In addition, it indicated that it was up to the judiciary to hear each particular case and make the legal and factual assessments to verify whether the requirements of the criminal offense were met. According to the State, "it is precisely the margin of appreciation that allows the judge to evaluate human conduct in the context of compliance or non-compliance with the rules of social coexistence."[883]

334. The State of El Salvador also indicated that the punishable conducts "are very different from the informative work of the media," as is shown by the fact that, to date, seven days after the reforms came into force, "the media have continued to publish on a variety of platforms and social networks on the subject of gangs in El Salvador and there has been no prosecution whatsoever." Neither judicial nor administrative

---

881 IACHR, Office of the Special Rapporteur for Freedom of Expression, Press Release No. 80/22, The Office of the Special Rapporteur warns of the risk of criminalization of legitimate exercises of freedom of expression in El Salvador as a result of legislative reforms, April 13, 2022.

882 Mission of El Salvador to the OAS, Position of the State of El Salvador regarding the draft communiqué of the Office of the Special Rapporteur for Freedom of Expression of the IACHR on the risk of criminalization of legitimate exercises of freedom of expression in El Salvador as a result of legislative reforms. MPOEA-OEA-055/2022. April 12, 2022.

883 Mission of El Salvador to the OAS, Position of the State of El Salvador regarding the draft communiqué of the Office of the Special Rapporteur for Freedom of Expression of the IACHR on the risk of criminalization of legitimate exercises of freedom of expression in El Salvador as a result of legislative reforms. MPOEA-OEA-055/2022. April 12, 2022.

proceedings have been initiated against the media as an institution, or against individual members.[884]

335. The Commission and its Rapporteurship also note that, on the day those amendments were approved, the President stated through social networks that "[w]hen the Germans wanted to eradicate Nazism, they prohibited by law all Nazi symbology, as well as messages, apologies, and everything aimed at promoting Nazism. No one said anything, it was understandable. Now we will do that with the gangs."[885]

336. In July 2023, the State argued that it had been necessary to expand the list of crimes in order to prohibit and punish visual expressions used by gangs for territorial control as well as to prevent the use of any means to reproduce their messages. It also pointed out that there had already been examples of communiqués attributed to gangs in social networks that had reportedly alarmed the population and reiterated that no complaints had been registered in relation to this crime.[886]

337. In public hearings held during the 185th and 187th Sessions of the IACHR, held in October 2022 and July 2023, the Commission received

---

[884] Mission of El Salvador to the OAS, Position of the State of El Salvador regarding the draft communiqué of the Office of the Special Rapporteur for Freedom of Expression of the IACHR on the risk of criminalization of legitimate exercises of freedom of expression in El Salvador as a result of legislative reforms. MPOEA-OEA-055/2022.

[885] Nayib Bukele's X account (@nayibbukele), April 5, 2022; France 24, President Bukele steps up pressure in his "war" against gangs in El Salvador, April 7, 2022; Gato Encerrado, It is false that the media defends gangs in El Salvador, May 18, 2022. In response to those statements, in its Press Release No. 380/22, the Office of the Special Rapporteur maintained that neither in the norm itself nor in the preamble are there references leading one to conclude that the speeches that the Government seeks to combat have similarities with those speeches that are not protected by international law, such as propaganda for war, hate speech, or incitement to genocide. IACHR, Office of the Special Rapporteur for Freedom of Expression, Press Release R80/22, The Office of the Special Rapporteur warns of the risk of criminalization of legitimate exercises of freedom of expression in El Salvador as a result of legislative reforms, April 13, 2022.

[886] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 70-72.

information on the regressive impacts on freedom of expression that these norms had reportedly caused.[887] The petitioning organizations pointed out that the penal reforms implemented in connection with the state of emergency were having a self-censoring effect. Thus, they emphasized that citizens are afraid of denouncing and exposing ideas about criminal groups or gangs that could be framed within the expressions penalized in the reforms to the Penal Code and the Law for the Prohibition of Maras and Gangs. They also denounced the existence of official harassment and discrediting of human rights defenders and journalists for the social auditing work they carry out, which exacerbate the climate of intolerance against them and increase the risk of harm to their lives and integrity.[888] The State of El Salvador did not attend the hearing of the 185th Session; while at the hearing of the 187th Session it did not refer to the information presented by the petitioning organizations on this issue.

338. In addition, the Commission heard that the Association of Journalists of El Salvador (APES) and the organization Cristosal had filed a complaint of unconstitutionality of the penal amendments before the Constitutional Chamber of the Supreme Court of Justice in April 2022.[889] The organizations pointed out that the amendments impose absolute limits on freedom of expression and access to information, as they expressly prohibit reporting on key developments regarding, for instance, public safety and criminality committed by gangs.[890] In addition, they alleged that the legislative decrees would be unconstitutional because they make use of indeterminate legal

[887] IACHR, Arbitrary detentions and the situation of persons deprived of the liberty under the State of Emergency in El Salvador, 185th period of sessions, October 25, 2022.

[888] IACHR, Arbitrary detentions and the situation of persons deprived of the liberty under the State of Emergency in El Salvador", 185th period of sessions, October 25, 2022.

[889] La Prensa Grafica, APES and Cristosal file unconstitutionality lawsuit against reforms to Penal Code and Gang Prohibition Law, April 19, 2022; Revista Gato Encerrado X account (@GatoEncerradoSV), April 19, 2022.

[890] IACHR, Office of the Special Rapporteur for Freedom of Expression, Annual Report 2022 OEA/Ser.L/V/II. 50 v. 2, March 6, 2022, paras 606.

concepts, for example, when they prohibit messages that could "generate anxiety or panic in the population." Despite the time elapsed, as of the closing date of this report, the unconstitutionality suit had not been admitted by the Constitutional Chamber of the Supreme Court of Justice of El Salvador.[891] For its part, in its observations on the draft of this report, the State of El Salvador reiterated that said norms had been repealed by the Legislative Assembly on November 1, 2023.[892]

---

[891] Information provided by journalists and civil society organizations in 2023, Archive of the Office of the Special Rapporteur for Freedom of Expression. With respect to the judicial body and the functions of the Constitutional Court, the Special Rapporteurship considers it important to take into account that on May 1, 2021, the Legislative Assembly of El Salvador dismissed the 5 permanent judges of the Constitutional Chamber of the Supreme Court of Justice and the 4 alternate judges. On that occasion, the IACHR condemned the decision, as it failed to comply with constitutional norms regulating the procedure and inter-American standards for the removal of justice operators. It also urged El Salvador to respect the democratic rule of law and announced that, in response to these serious events, it had decided to install a Coordination and Timely and Integrated Response Room (SACROI) for El Salvador to monitor and respond to the human rights situation in the country. See, IACHR The IACHR condemns the removal of the judges of the Constitutional Chamber of the Supreme Court of Justice without respect for due process and urges El Salvador to preserve the rule of law., May 3, 2021

[892] State of El Salvador, Observations of the State of El Salvador on the IACHR Report "State of Emergency and Human Rights in El Salvador," Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, pp. 34-35, 115; State of El Salvador, Observaciones del Estado de El Salvador al Informe de la CIDH "Estado de Excepción y derechos humanos en El Salvador", Nota Diplomática MPOEA-OEA-054/2024, April 8, 2024, Annex 1, Matriz de Sistematización Metodológica, line 82, column E.

339. For the IACHR and its SRFE, the amendments described above, as they were drafted, could imply the criminalization of protected speech of special importance in a state of emergency. In this regard, the Inter-American System has held that, in the case of speech protected by its public interest, the punitive response of the State through criminal law is not in line with the Convention.[893] According to the Inter-American Court, "the use of criminal law against those who disseminate information of this nature would directly or indirectly constitute intimidation which, in the end, would limit freedom of expression and would impede public scrutiny of unlawful conduct, such as acts of corruption, abuse of authority, etc. Ultimately, this would weaken public controls over the State's powers, causing grave damage to democratic pluralism."[894]

340. The Court has specified that "Journalistic conduct can produce liability in another legal sphere, such as in civil law, or require correction or public apologies, for example, in cases of possible abuses or excesses of bad faith."[895] However, in the case of speech protected by the American Convention because of its public interest, criminal liability is excluded.[896]

341. In this sense, the Commission and its SRFE observe that the mere threat of being criminally charged for critical expressions on issues related to maras and gang-related activities could provoke self-

[893] I/A Court H.R., Álvarez Ramos v. Venezuela, Preliminary Objection, Merits, Reparations and Costs, Judgment of August 30, 2019, Series C No. 380 2019. Par. 121.

[894] I/A Court H.R., Álvarez Ramos v. Venezuela, Preliminary Objection, Merits, Reparations and Costs, Judgment of August 30, 2019, Series C No. 380 2019. Par. 122. I/A Court H.R. Baraona Bray v, Chile, par. 109

[895] I/A Court H.R., Urrutia et al. v. Ecuador, Merits, Reparations, and Costs, Judgment of November 24, 2021, Series C No.446, par. 119.

[896] I/A Court H.R., Palacio Urrutia et al. v. Ecuador, Merits, Reparations, and Costs, Judgment of November 24, 2021, Series C No.446, par. 119.

censorship.[897] As previously stated, the use of criminal tools to punish specially protected speech can be considered as an indirect method of restricting expression due to its intimidating, silencing, and inhibiting effects on the free flow of ideas, opinions, and information of all kinds.[898]

342. In summary, views on issues related to the criminal situation in El Salvador and the actions of illegal groups constitute specially protected speech due to their public interest and, therefore, must be widely respected and guaranteed by the State. The free flow of information and ideas on these matters allows society to be informed about issues that concern and impact it as citizens.

343. Finally, in its comments to the draft of this report, the State indicated that the maras and gangs have used the media and social networks to sow fear and expand their territorial control.[899] Nevertheless, the Commission and its Rapporteurship consider it appropriate to emphasize that the information and opinions disseminated by the press and other actors such as academics, human rights defenders, artists, or activists on issues related to gangs should not be qualified by the State *per se* as an endorsement of discourse that encourages or promotes violence and discrimination. There are risks for democracy if a paradigm is installed in which the understanding of complex phenomena such as organized crime is based exclusively on official information and seen from an official angle. On the other hand, it is enormously useful for democracy that the State provide and guarantee the conditions for a broad public debate, where the

---

[897] IACHR, Office of the Special Rapporteur for Freedom of Expression, Press Release R80/22, The Office of the Special Rapporteur warns of the risk of criminalization of legitimate exercises of freedom of expression in El Salvador as a result of legislative reforms, April 13, 2022.

[898] IACHR Office of the Special Rapporteur for Freedom of Expression, Inter-American Legal Framework on the Right to Freedom of Expression, OEA Ser.L/V/II IACHR/SRFE/INF. 2/09, December 30, 2009, par. 114.

[899] State of El Salvador, Observations of the State of El Salvador to the IACHR Report "State of Emergency and Human Rights in El Salvador," Diplomatic Note MPOEA-OAS-054/2024, April 8, 2024, Annex 1, Methodological Systematization Matrix, line 81, column E.

phenomenon of organized crime is socially understood based on a range of contributions to public debate, which include but are not limited to the governmental approach.

344. Based on the foregoing, although the IACHR and its SRFE recognize the repeal of the second paragraph of Article 345-C of the Penal Code, as well as the repeal of the third paragraph of Article 1 of the Law for the Prohibition of Maras and Gangs, they consider it imperative that the following actions be taken: First, the State should bring its criminal legislation, particularly those provisions that remain in force in the aforementioned articles, into line with international standards on freedom of expression. This implies using precise and unambiguous terms that clearly define punishable conduct, in an express, precise, exhaustive, and prior manner, differentiating them from those that are not punishable or that can be sanctioned with non-penal measures.[900] In particular, the Legislative Assembly should ensure that future laws or regulations that may affect freedom of expression within the framework of the state of emergency comply with international standards on the matter. Finally, steps should be taken to ensure that State spokespersons do not label speeches that diverge from official opinions as an endorsement of criminality and gangs.

## B. Right to information and the state of emergency in El Salvador

345. Access to information is a central component of the right to freedom of expression. In states of emergency, it is an important tool for ensuring the functioning of the state, promoting accountability and transparency in state management, and preventing corruption.[901] The IACHR has stated that access to information and active

[900] IACHR Office of the Special Rapporteur for Freedom of Expression, Inter-American Legal Framework Regarding the Right to Freedom of Expression, OEA Ser.L/V/II CIDH/RELE/INF. 2/09, December 30, 2009, par. 72.

[901] IACHR, Office of the Special Rapporteur for Freedom of Expression, The Inter-American Legal Framework regarding the Right to Access to Information , 2010, OEA/Ser.L/V/II. IACHR/SRFE/INF. 1/09. Par. 5.

transparency are central to guaranteeing the active participation of citizens in complex scenarios.[902]

346. During the state of emergency in El Salvador, the Commission and its Rapporteurship received information on alleged restrictions to the right of access to information, related to the absence of available, periodic, and disaggregated information; the denial of access to requests for information on the measures adopted; the absence of transparency in the decisions issued by the Institute of Access to Public Information (IAIP), as well as obstacles to journalistic coverage.[903] It should be noted that concerns about the status of the right of access to public information precede the state of emergency installed in March 2022. International organizations have drawn attention to the progressive and steady deterioration of transparency and accountability mechanisms since the inauguration of the current government in June 2019.[904] This is having a drastic impact on transparency and oversight of public spending, which has increased the risk of corruption and abuse of power in the country.[905]

347. According to information presented by civil society, there has been a drastic increase in the number of reservations of public information by State institutions, without compliance with international norms and

---

902 IACHR, Pandemic and Human Rights, OEA/Ser.L/V/II. Doc. 396, September 9, 2022, paras. 76 and 80.

903 Information submitted by the Passionist Social Service (SSPAS), Access to Public Information 2022. Archive of the Office of the Special Rapporteur for Freedom of Expression, undated; Elsalvador.com, Institute for Access to Information is "dead", say experts in transparency, May 23, 2022; Acción Ciudadana, There is a challenging context for transparency and the fight against corruption in El Salvador, December 5, 2022; Acción Ciudadana, The IAIP in favor of citizens?2022 Update, August 2022; La Prensa Grafica, 2022 was a year of challenges for transparency and fight against corruption, December 6, 2022.

904 Human Rights Watch, "We can arrest anyone we want", December 7, 2022.

905 Human Rights Watch, "We can arrest anyone we want", December 7, 2022; WOLA, Corruption Under the State of Emergency in El Salvador: A Democracy Without Oxygen, September 27, 2022.

standards on the matter.[906] Thus, for example, journalists report that the National Civil Police have declared the number of homicides and victims of the crime of disappearance to be confidential information.[907] The institution allegedly based its refusal to provide this information on the grounds that it would jeopardize national defense and public safety, and could cause harm to the prevention, investigation, or prosecution of illegal acts.[908] The same media outlet reported that, in response to a request for information made to the Attorney General's Office, the institution responded in May 2022 that it could not provide statistical data on reports of homicides, disappearances, rapes, sexual assaults, and violence against women, corresponding to the period of March and April.[909]

348. In its observations on the draft of this report, the State indicated that the response from the Access to Information Unit of the Attorney General's Office did not consist of communicating that the information itself "was nonexistent"; rather, it indicated that the Statistics Department did not have statistical reports generated that contained the information requested, since the databases of the automated system were being updated.[910] Likewise, it pointed out that the document consisting of the statistical report according to the

[906] Information provided by journalists and civil society organizations in 2023, Archive of the Office of the Special Rapporteur for Freedom of Expression.

[907] Gato Encerrado, Police withhold information on homicides and missing people, June 21, 2022.

[908] Gato Encerrado, Police withhold information on homicides and missing people, June 21, 2022.

[909] Gato Encerrado, Prosecutor's Office denies data on crimes of violence, June 14, 2022.

[910] State of El Salvador, Observaciones del Estado de El Salvador al Informe de la CIDH "Estado de Excepción y derechos humanos en El Salvador"(Observations of the State of El Salvador on the IACHR report entitled “State of Emergency and Human Rights in El Salvador”), Diplomatic Note MPOEA-OEA-054⁄2024, April 8, 2024, p. 117; State of El Salvador, Observaciones del Estado de El Salvador al Informe de la CIDH "Estado de Excepción y derechos humanos en El Salvador", Nota Diplomática MPOEA-OEA-054⁄2024, April 8, 2024, Annex 1, Matriz de Sistematización Metodológica, line 83, column E.

requested specifications had not been generated, pursuant to the provisions of Article 73 of the Law on Access to Public Information.[911]

349. Civil society organizations reported that, in response to several requests for information on citizen security issues made in 2022 and 2023, the General Directorate of Prisons responded that it could not provide it because it was confidential*(under reserve*).[912] In this way, information on the total number of persons held in prisons, LGTBI persons deprived of their liberty, persons who have died in prisons, serious offenses or crimes committed by guards, budget data, among others, was denied.[913]

350. Likewise, the Ministry of Justice and Public Security reportedly reserved information related to the Territorial Control Plan, advertising services, all procurement and contracting processes for goods and services, and arms loans between the police and the Armed Forces.[914] In this context, the IACHR and its Special Rapporteurship are particularly concerned about the lack of access to information on the construction of the Terrorism Confinement Center (CECOT). As far as the IACHR and its SRFE were able to ascertain, the information on the bidding and allocation processes for the works, as well as the construction and operating costs, was declared confidential by the Government.[915] This center was allegedly built on the basis of direct

[911] State of El Salvador, Observaciones del Estado de El Salvador al Informe de la CIDH "Estado de Excepción y derechos humanos en El Salvador", Nota Diplomática MPOEA-OEA-054/2024, April 8, 2024, p. 117; State of El Salvador, Observaciones del Estado de El Salvador al Informe de la CIDH "Estado de Excepción y derechos humanos en El Salvador", Nota Diplomática MPOEA-OEA-054/2024, April 8, 2024, Annex 1, Matriz de Sistematización Metodológica, line 83, column E.

[912] Information sent by the Passionist Social Service (SSPAS) on access to public information 2022, Archive of the Office of the Special Rapporteur for Freedom of Expression, August 15, 2023.

[913] Information sent by the Passionist Social Service (SSPAS) on access to public information 2022, Archive of the Office of the Special Rapporteur for Freedom of Expression, August 15, 2023.

[914] The Graphic Press, Hidden for seven years: Increased confidentiality of information related to Public Safety, October 5, 2022.

[915] BBC News, The secrecy surrounding Cecot, the mega-jail symbol of Bukele's war against gangs, July 4, 2023.

contracting under the new Public Procurement Law, which came into force in March 2023.[916] In this regard, in its observations on the draft of this report, the State maintained that the limitations on disclosure of public information by State institutions had complied strictly with legal requirements and international standards, as stipulated in the Law on Access to Public Information.[917]

351. The new Public Procurement Law replaced the Public Administration Procurement and Contracting Law and, according to public reports, would constitute a legislative setback in terms of access to information and transparency, as it limits accountability on the use of public funds by the Executive.[918] Thus, for example, the new law establishes that "strategic projects of public utility to be carried out by the institutions" are excluded from the application of this law -and, therefore, from the application of the principle of transparency. In the opinion of the Commission and its Special Rapporteur, this concept is ambiguous and vague since it does not clearly delimit which specific projects fall under this category. This could lead to the arbitrary and disproportionate use of this ground in order to excessively limit the transparency of relevant information on projects undertaken by the Government in the framework of its criminal policy in the state of emergency.

352. As mentioned above, the Office of the Special Rapporteur and the IACHR also learned about of alleged obstacles faced by the families of the detained persons, as a result of the lack of information on

[916] El Diario de Hoy, Government hides the cost and the construction contracts for the megajail at Tecolouca, February 7, 2023.

[917] State of El Salvador, Observations of the State of El Salvador to the IACHR Report "State of Emergency and Human Rights in El Salvador," Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, Annex 1, Methodological Systematization Matrix, line 83, column E.

[918] Wola, Corruption Under the State of Emergency in El Salvador: A Democracy without Oxygen, September 27, 2022; El Faro, Nueva ley de compras habilita gasto discrecional de más de $1,500 millones en megaobras (New purchasing law provides for discretionary spending of more than $1,500 on megaprojects), January 26, 2023.

substantial issues directly related to the state of emergency.[919] Among the limitations reported are: the absence of a centralized and efficient system of information on persons in custody[920] and the underreporting of the number and causes of deaths of persons in state custody.[921]

353. For its part, the State of El Salvador indicated that there has been adequate and timely dissemination of the process of creating the law of the different state emergency decrees and their respective extensions, which have been explained in a simple manner and in accessible audiovisual formats. In addition, it indicated that the general population has been kept informed in a timely and continuous manner of the progress in the fight against crime through the open signal for radio and television, as well as digital platforms. In the State's opinion, there has also been adequate and timely communication on progress in security and territorial recovery in those areas that were previously considered at risk and highly dangerous. In addition, the public media have reported in a timely manner on the arrests of alleged criminals; on the different public hearings held in accordance with the regulations of the criminal law in force in the country; as well as on the release of persons whose participation in a punishable act has not been proven and whose innocence has been proven.[922]

354. The State maintained that the Office of the Attorney General of the Republic has continuously and expeditiously provided information regarding statistical data and persons subject to criminal proceedings.

---

[919] Azul Originario Asociación, Amate, Cristosal, Fundación de Estudios para la Aplicación del Derecho, Idhuca, Red Salvadoreña de Defensoras de Derechos Humanos, Servicio Social Pasionista, Annual report on human rights violations during the state of emergency in El Salvador, March 2023.

[920] Azul Originario Asociación, Amate, Cristosal, Fundación de Estudios para la Aplicación del Derecho, Idhuca, Red Salvadoreña de Defensoras de Derechos Humanos, Servicio Social Pasionista, Annual report on human rights violations during the state of emergency in El Salvador, March 2023.

[921] Azul Originario Asociación, Amate, Cristosal, Fundación de Estudios para la Aplicación del Derecho, Idhuca, Red Salvadoreña de Defensoras de Derechos Humanos, Servicio Social Pasionista, Annual report on human rights violations during the state of emergency in El Salvador, March 2023.

[922] State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 70-72.

It also informed that the Information Office of Detained Persons of the Supreme Court of Justice receives the report of each one of the captures made, which is available to public and private institutions, as well as to the general public. Finally, it indicated that the Judicial Branch has tried to generate facilities for users requesting information related to the state of emergency, ensuring respect for the rights of persons detained by any authority.[923] On the other hand, it reported that it has made efforts to attend to relatives of detainees who request information on the place of detention. In addition to the measures discussed in the previous chapter of this Report, the State indicated that the Procurators' Office (*Procuraduría General de la República*) also has a virtual customer service system, which provides guidance and information on institutional services and persons detained in the context of the state of emergency. Through this system it is, according to the State, possible to establish appointments with the public defenders assigned to provide information and assistance to the families of detainees. Likewise, the Procurator's Office reportedly continues to provide in person orientation and information services.[924]

355. The IACHR and its Office of the Special Rapporteur recall that Article 13 of the American Convention protects the right of citizens to "seek" and "receive" information, and implies the positive obligation of the State to provide the information in its possession.[925] Principle 4 of the IACHR's Declaration of Principles of Freedom of Expression provides: "Access to information held by the State is a fundamental right of every individual. States have the obligation to guarantee the full exercise of

---

923 State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 70-72.

924 State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 70-72.

925 I/A Court H.R, Case of Claude-Reyes et al. Judgment of September 19, 2006, Series C No. 151, par. 58 a) and b); I/A Court H.R., Case of Claude Reyes et al, Merits, Reparations, and Costs, Judgment of September 19, 2006, Series C No. 151. Paras. 76 and 78; I/A Court H.R, Case of López Álvarez v. Honduras, Merits, Reparations, and Costs. Judgment of February 1, 2006, Series C No. 141, Par. 77; I/A Court H.R., Case of Herrera Ulloa v. Costa Rica, Preliminary Objections, Merits, Reparations and Costs, Judgment of July 2, 2004, Series C No. 107. Par. 108.

this right. This principle allows only exceptional limitations that must be previously established by law in case of a real and imminent danger that threatens national security in democratic societies."[926]

356. The right of access to information is a fundamental requirement to guarantee transparency in government management and on the part of state authorities, and a crucial tool for citizen control of the functioning of the State and accountability.[927] Likewise, the inter-American system has emphasized that the right to information is an instrument for the realization of other human rights, such as access to justice, personal identity, the right to health and education, allowing people to know exactly what their rights are, and the mechanisms that exist to protect them.[928] Therefore, the State must refrain from establishing general or arbitrary limitations to this right, based on reasons of security or public order.[929] Any type of restriction to this right, even in contexts of exception, must meet the criteria of legality, legitimate purpose, necessity, and proportionality.[930]

357. The right of access to public information imposes an obligation on the State to proactively disclose information about its functions, activities, and management of public resources on a routine basis, even in the absence of a request for access to public information, ensuring that the information is accessible, understandable, and up-to-date.[931] In

---

926 IACHR, Declaration of Principles on Freedom of Expression, Adopted by the IACHR at its 108th regular session held in October 2-20, 2000, Principle No. 4.

927 IACHR, Office of the Special Rapporteur for Freedom of Expression, Right to information and national security, OEA/Ser.L/V/II IACHR/SRFE/INF.24/20, July, 2020. Par. 123.

928 IACHR, Office of the Special Rapporteur for Freedom of Expression, The Inter-American Legal Framework regarding the Right to Access to Information OEA/Ser.L/V/II. IACHR/SRFE/INF. 1/09. Par. 5.

929 IACHR, Pandemic and Human Rights in the Americas, resolution 1/2020, April 10, 2020.

930 IACHR, Pandemic and Human Rights, OEA/Ser.L/V/II. Doc. 396, September 9, 2022, paras. 35, 62, 337 (3).

931 IACHR, Office of the Special Rapporteur for Freedom of Expression, Right to Information and National Security, OEA/Ser.L/V/II IACHR/SRFE/INF..24/20. July 2020. Par. 150.

states of emergency, this implies that States provide truthful, reliable, and disaggregated information on all aspects of public interest related to the emergency regime.[932]

358. In addition to its obligation to disclose, the State has the obligation to produce or gather the information it needs to fulfill its duties.[933] According to the IACHR, the production of duly disaggregated information is a means of guaranteeing the effectiveness of a public policy. In this regard, the Commission and the Rapporteurship emphasize that the information produced by the State in states of emergency is a crucial element for seriously evaluating the strategies implemented, challenges, difficulties, and progress, and to make decisions based on evidence.

359. The Commission and its Office of the Special Rapporteur have highlighted that there is a close link between the availability of public information and the monitoring of government response and performance during specific contexts, such as a state of emergency.[934] Public information allows citizens to know the reasons for the declaration of an emergency, the measures adopted by the government to address the situation, and to monitor the response and results of government measures. In this sense, it is a right that is fundamental for citizens to move through a situation of institutional alteration, such as a state of emergency, in an informed manner, and allows for due oversight by different bodies on the legality and conventionality of the measures adopted. This means that, during the

[932] IACHR, Pandemic and Human Rights, OEA/Ser.L/V/II. Doc. 396, September 9, 2022, paras. 80 and 86.

[933] IACHR, Office of the Special Rapporteur for Freedom of Expression, The Inter-American Legal Framework regarding the Right to Access to Information , 2010, OEA/Ser.L/V/II. IACHR/SRFE/INF. 1/09. Par. 35.

[934] CIDH, Press Release No. 119/20. IACHR and its Special Rapporteurships OSFRE and OSRESCER Express Serious Concern Over Violations of the Right to Information in Nicaragua and the Impact of These on Access to Health During the COVID-19 Pandemic, May 27, 2020.

period of exception, the Public Authority has a heightened duty to guarantee the right of access to information.[935]

360. With respect to the confidentiality of information held by the State, the Office of the Special Rapporteur for Freedom of Expression has expressed that the use of generic and automatic classifications should be avoided, and any confidentiality should be justified through the application of the harm test[936] and public interest.[937] At the same time, the authorities must refrain from using legal and de facto restrictions that hinder real and effective public access to archives containing information indispensable for the protection of human rights and the clarification of the truth.[938] According to the information reported, requests for information related to the state of emergency have often been denied based on general confidentiality criteria, and not as a result of harm test findings, contrary to what is established in inter-American standards.[939]

---

935 IACHR, Pandemic and Human Rights., OEA/Ser.L/V/II. Doc. 396, September 9, 2022, par. 81; IACHR, Press release No. 119/20. IACHR and its Special Rapporteurships OSFRE and OSRESCER Express Serious Concern Over Violations of the Right to Information in Nicaragua and the Impact of These on Access to Health During the COVID-19 Pandemic, May 27, 2020.

936 In accordance with the contents of the Inter-American Model Law 2.0 on Access to Public Information, the harm test requires an analysis to determine whether the disclosure of the requested information could generate a real, demonstrable, and identifiable harm, that is, that the disclosure of the information presents a real risk to the public interest, that determines that the harm to the public interest would be greater if the requested information were disclosed, and that the information would seriously affect the parties involved in the facts described.

937 IACHR, Office of the Special Rapporteur for Freedom of Expression, Right to Information and National Security, OEA/Ser.L/V/II IACHR/SRFE/INF.24/20, July 2020, par. 191

938 I/A Court H.R. Case of Myrna Mack Chang v. Guatemala Merits, Reparations, and Costs. Judgment of November 25, 2003. Series C No. 101, par. 181.

939 Such is the case, for example, of the information related to the construction of the CECOT, the withholding of information on the number of homicides and victims of the crime of disappearance issued by the National Civil Police, and the denial of information on reports of homicides, disappearances, rapes, sexual assaults, and violence against women by the Attorney General's Office.

361. In view of the above, the Commission and its RELE emphasize the importance of the Institute of Access to Public Information,[940] as well as the units of access to public information in the different state institutions, acting with total formal and material independence from the public authorities, thereby effectively ensuring that information on matters of public interest is accessible in accordance with the law. The IAIP must avoid the concealment of information, and ensure that Salvadoran society has access to information on fundamental data in the midst of a state of emergency.[941] The Commission highlights the need for effective control by the IAIP, as the highest administrative authority in this matter, to ensure that the confidentiality of information does not become an instrument of opacity, especially in critical contexts such as a state of emergency. It is essential to guarantee the suitability of the staff of the institute, the traceability of the processes of information requests, the compatibility of the decisions that reserve access to information in accordance with inter-American standards, and the respect of all obligated subjects for the decisions of the guarantor body.

362. Finally, although the State claims to have informed the population in a timely and continuous manner about the progress made in the fight against crime, the Office of the Special Rapporteur has learned that some State media and privately owned media administered by the State are disseminating biased content favorable to the government,

[940] Pursuant to Article 58 of the Access to Public Information Law, the IAIP is in charge of ensuring the correct interpretation and application of the Access to Public Information Law, in addition to guaranteeing the due exercise of the right to public information and resolving disputes regarding the classification and declassification of reserved information.

[941] EDH, Régimen de excepción: acceso a la información, otro derecho suspendido "de facto" (State of emergency: access to information, another right that has been suspended.) - Noticias de El Salvador, July 2-3, 2022.

for alleged political purposes and government propaganda.[942] In this regard, the Special Rapporteurship notes with concern that the State could be using its institutional channels with the objective of positioning the official account as the only legitimate and truthful one in the public debate on the alleged progress made during the state of emergency, and not necessarily to guarantee the right of access to public information, in accordance with international standards.[943]

363. In this regard, in its observations on the draft of this report, the State argued that the Commission and its Special Rapporteurship had adopted a subjective approach. According to the State, the institutional channels comply strictly with state (and not other) purposes, and that they play a crucial role in guaranteeing and facilitating access to public information for all citizens, in line with the fundamental principles of transparency in governance.[944]

364. In view of the above information, the Commission and its Rapporteurship are concerned about the existence of serious allegations of restrictions on access to public information in the context of El Salvador's state of emergency. In particular, complaints about violations of the human rights of persons deprived of their liberty, or abuses in the use of public force, among other issues that make it

---

942 IACHR, Annual Report 2022, Annual Report of the Office of the Special Rapporteur for Freedom of Expression, OEA/Ser.L/V/ II/ Doc. 50, March 6, 2023, paras. 961, 579-586; Cristosal, One Year under the Emergency Regime: A Permanent Measure of Repression and Human Rights Violations, May 12, 2023; Asociación de Periodistas de El Salvador (APES), Régimen de excepción y afectación a la libertad de prensa y libertad de expresión en El Salvador, June 2023; Reporters Without Borders (RSF), El Salvador: media landscape, 2024.

943 IACHR, Annual Report 2022, Annual Report of the Office of the Special Rapporteur for Freedom of Expression, OEA/Ser.L/V/ II/ Doc. 50, March 6, 2023, paras. 961, 579-586; Cristosal, One year under emergency rule: a permanent measure of repression and human rights violations, May 12, 2023; Reuters, Trolls, propaganda and fear stoke Bukele's media machine in El Salvador, November 29, 2022; Focos, New Ideas-infested newspaper received $7.4 million in public money, July 28, 2023; Razón Pública, Bukele: the president who disguises authoritarianism as democracy, March 12, 2023; Voice of America, Creadores de contenido tienen su espacio en el Congreso de El Salvador: ¿información o propaganda?, May 3, 2023.

944 State of El Salvador, Observations of the State of El Salvador to the IACHR Report "State of Emergency and Human Rights in El Salvador," Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, pp. 118-119

possible to monitor and evaluate the security context and the state of emergency. In this regard, the IACHR considers it essential that the authorities and obligated subjects give priority to requests for access to information related to situations in the context of an emergency, including the allocation of public funds, public procurement, and the impact of emergency measures on the exercise of fundamental rights and freedoms.[945]

## C. Situation of journalists and other impacts of the state of emergency in El Salvador on the right to freedom of expression

365. Journalism acquires a central role in states of emergency, insofar as journalists supervise and report on the actions of the authorities and public institutions. This oversight function is particularly relevant to prevent impunity for abuses of power and human rights violations.[946] As this Office has previously noted, it is by virtue of their role as public watchdogs that social communicators often become targets of violence and intimidation with a view to silencing them.[947]

366. In El Salvador, journalists continue to report a hostile climate for carrying out their work.[948] According to the information received, since the declaration of the state of emergency conditions for the practice of journalism have worsened with respect to the period preceding the state of emergency - which civil society organizations had already described as regressive in terms of guarantees for journalism - and

---

945 IACHR, Press Release No. 223/20, IACHR Calls on Countries to Combat Corruption and Guarantee Human Rights Through Public-Sector Transparency and Accountability During the COVID-19 Pandemic, September 16, 2020.

946 IACHR, Office of the Special Rapporteur for Freedom of Expression, Annual Report of the Office of the Special Rapporteur for Freedom of Expression 2002, Chapter II: Evaluation of the State of Freedom of Expression in the Hemisphere.

947 IACHR, Office of the Special Rapporteur for Freedom of Expression, Annual Report of the Office of the Special Rapporteur for Freedom of Expression 2002, Chapter II: Evaluation of the State of Freedom of Expression in the Hemisphere.

948 Gato Encerrado, Press Freedom Under Attack in El Salvador, May 3, 2023; El Diario de Hoy, APES condemns increased persecution against journalists, July 24, 2022.

particularly as a result of the approval and entry into force of criminal amendments aimed at repressing expressions linked to gangs, which have had a marked inhibiting effect on freedom of information on these issues.[949] According to information from civil society, due to this context, at least 10 journalists and one communicator (3 women and 8 men) have left the country as a preventive measure.[950]

367. The Association of Journalists of El Salvador and the Inter American Press Association (IAPA) affirmed that since the declaration of the state of emergency, threats, and hostilities against the independent press have intensified, a situation that has generated self-censorship of news sources not only towards local media but also vis-à-vis international media.[951] Likewise, the organization Article 19 highlighted the systematic discrediting of the press and a repressive policy that seeks to undermine the press.[952] At the same time, organizations of journalists and communicators have pointed out that there has been a serious regression in the regulatory frameworks of freedom of expression, freedom of the press, and access to public information, and that they should have sought legal advice in order to avoid

---

949 IACHR, Office of the Special Rapporteur for Freedom of Expression, Press Release No. 80/22, The Office of the Special Rapporteur warns of the risk of criminalization of legitimate exercises of freedom of expression in El Salvador as a result of legislative reforms, April 13, 2022.

950 Association of Journalists of El Salvador (APES), Régimen de excepción y afectación a la libertad de prensa y libertad de expresión en El Salvador (State of emergency and impact on press freedom and freedom of expression in El Salvador), June 2023; IACHR, Hearing No. 6: IACHR, Hearing "Arbitrary detentions and the situation of persons deprived of liberty under the State of Emergency in El Salvador", 185th period of sessions, October 25, 2022.

951 SIP, Conclusions78th General Assembly. October 27 - 30, 2022; Swissinfo, IAPA points out "restrictions and threats" to the press in El Salvador, April 25, 2023; Association of Journalists of El Salvador (APES), Régimen de excepción y afectación a la libertad de prensa y libertad de expresión en El Salvador (State of emergency and impact on press freedom and freedom of expression in El Salvador), June 2023; La Prensa Gráfica, Libertad de expresión en El Salvador ha retrocedido en régimen de excepción (Freedom of expression in El Salvador has deteriorated in the state of emergency), July 5, 2023.

**952** Article 19, Quarterly Analysis on the State of Freedom of Expression in Central America and the Caribbean. July-September 2023, pp. 5 and 6.

committing the criminal offenses created by the legislative amendments of April 2022.[953]

368. In this context, SRFE has followed up on the situation of community journalist Víctor Barahona, who was arrested on June 7, 2022 at his home in the municipality of Apopa, and subsequently charged for allegedly committing the crime of unlawful association.[954] According to information received by SRFE, the journalist was deprived of his liberty for 11 months, during which time he was allegedly the victim of mistreatment and cruel, inhuman and degrading treatment.[955] According to the journalist's public statements, prior to his arrest, he had interviewed Rodolfo Pereira, a leader of Soyapango vendors, who denounced corruption in the Soyapango mayor's office, live on a television program. Following that interview, Pereira was also reportedly captured under the state of emergency.[956] The journalist publicly stated that his capture could be linked to his journalistic work or community work.[957]

369. Following his public statements, the journalist was summoned to appear at a special hearing on July 27, 2023, at the request of the Attorney General's Office, allegedly because "the circumstances for which he was granted alternative measures to provisional detention had changed."[958] In addition, the Public Prosecutor's Office allegedly

---

[953] Information contributed by journalists and civil society organizations in 2023. Archive of the Office of the Special Rapporteur of Freedom of Expression.

[954] Elsalvador.com, Víctor Barahona, the first community journalist to be captured in regime, July 10, 2023.

[955] DW, APES denounces torture of journalist in El Salvador prison, July 11, 2023.

[956] El Faro, Victor Barahona: "The Jackals came to the cell and gave horrible beatings.", August 15, 2023; Elsalvador.com, "Being a journalist in this country is a crime", says Víctor Barahona, released from the regime, July 10, 2023.

[957] El Faro, Victor Barahona: "The Jackals would come to the cell and give horrible beatings.", August 15, 2023.

[958] DW, APES: El Salvador Prosecutor's Office Requests Re-Arrest of Reporter, July 27, 2023.

justified the need to prevent the journalist from "evading justice".[959] According to SRFE, during the hearing, the journalist and his lawyer were ordered to maintain total confidentiality.

370. The State of El Salvador has informed the IACHR and its Office of the Special Rapporteur that the legal proceedings against Víctor Barahona are not related to his journalistic profession, but to his alleged participation in crimes linked to maras and gangs.[960] In its observations on the draft of this report, the State reiterated that there is evidence of the alleged link between journalist Víctor Barahona and the "18 Revolutionaries" gang.[961] This was brought to the attention of the Commission and its Special Rapporteurship.[962]

371. The Rapporteurship has also learned of alleged intimidation and threats of prosecution against journalists investigating crimes related to the legislative amendments approved on April 5, 2022 in the framework of the state of emergency. For example, a member of the Nuevas Ideas party warned on social networks that he would file a formal complaint with the Attorney General's Office against journalists Óscar Martínez and Gabriela Cáceres for allegedly "having replicated messages related to gangs in order to terrorize the population."[963]

---

959 Voice of America, El Salvador: Prosecutor's Office seeks to imprison journalist Víctor Barahona again, June 27, 2023; Gato Encerrado, Court imposes silence on journalist who denounced torture in prisons under the State of Emergency, June 27, 2023.

960 Information provided by the State of El Salvador, September 2023. Archives of the Office of the Special Rapporteur for Freedom of Expression.

961 State of El Salvador, Observations of the State of El Salvador to the IACHR Report "State of Emergency and Human Rights in El Salvador," Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, Annex 1, Methodological Systematization Matrix, line 88-90, column H.

962 State of El Salvador, Observations of the State of El Salvador to the IACHR Report "State of Emergency and Human Rights in El Salvador," Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, Annex 1, Methodological Systematization Matrix, line 88-90, column H.

963 Swissinfo, Association of Salvadoran journalists denounces attempt of "criminalization", April 10, 2022; El Mundo, Member of Nuevas Ideas threatens to denounce El Faro journalists before the Attorney General's Office, 10 April 2022; El Faro, Juez documentó que Crook fue liberado pese a tener procesos penales abiertos (Judge documented the fact that Crook was released despite facing criminal proceedings), April 5, 2022.

372. Likewise, SRFE learned that a pro-government congresswoman, while exemplifying conducts that would fit into the new criminal offenses, warned that if a book on gangs and criminal groups, "instead of investigating the social phenomenon (...) were a book that disseminates messages (on any platform) of gang members", it would be penalized. In the same way, it mentioned the example that, if a book "talked about crimes or the ways in which they were committed", "it would be committing another crime because it would be an accomplice for not denouncing."[964]

373. In June 2023, during a television interview, the director of the National Civil Police reportedly warned that journalists "are going to have to answer for those actions in which they defended crime," referring to the coverage of the negotiations between the Government of El Salvador and the gangs in 2012.[965] Salvadoran journalists denounced that the official's message denotes persecution against them, with the clear intention of violating the right to freedom of expression as well as criminalizing the practice of journalism.[966]

374. In August 2023, the president disclosed in his X account that journalists Bryan Avelar, Héctor Silva Ávalos, and Sergio Arauz had allegedly received classified documents from former security advisor Alejandro Muyshont.[967] APES denounced that such a pronouncement constitutes a tacit threat to press freedom, and warned that such a pronouncement could lead to officials and employees being charged with talking to journalists.[968]

---

[964] El Mundo, Pineda says it's a crime if journalist's book on gangs talks about crimes, April 19, 2022; X account of Marcela Pineda (@MarcelaPinedaSV), , April 18, 2022.

[965] El País, El Salvador police director threatens to jail journalists who covered government-gang truce, June 6, 2023; Elsalvador.com, PNC director assures that politicians and journalists will be prosecuted for 2012 truce, June 6, 2023.

[966] La Prensa Grafica, Journalists warned of criminal prosecution over truce, June 7, 2023.

[967] Nayib Bukele's X account (@nayibbukele), August 9, 2023.

[968] X account of the Association of Journalists of El Salvador (@apeselsalvador), August 10, 2023.

375. On the other hand, the IACHR and its Special Rapporteurship also received reports on obstruction of journalistic coverage within the framework of the state of emergency. In May 2023, a photojournalist from *El Diario de Hoy* was reportedly detained by agents of the National Civil Police. According to information received, police officers detained the professional for photographing the facade of the Rosales Hospital in San Salvador. The hospital is a work in progress and the photojournalist wanted to document the progress of the work. The agents allegedly asked him to identify himself as a journalist and threatened him with arrest under the state of emergency for the crime of "resistance."[969]

376. Also, on June 5, 2023, an employee of the General Directorate of Penal Centers reportedly prevented Yessica Hompanera, a photojournalist for *El Diario de Hoy*, from taking photographs of the remodeling of the Jorge "Mágico" González National Stadium. The journalist was reportedly asked by prison employees to delete her photographic material, as she could not take pictures of the prisoners working at the site without a permit issued for that purpose.[970] According to information in the public domain, DGCP employees reportedly took photographs of the journalist and the vehicle in which she was traveling.[971]

377. In the context of the state of emergency, there have also been reports of stigmatizing statements by public officials against journalists, independent media, activists, human rights defenders, among other actors. Such is the case, for example, of a pro-government deputy who allegedly referred to journalists from El País as "bar journalists" after the publication of an article in which they reported on the declaration of the state of emergency. Another pro-government deputy, quoting a tweet from a journalist about the state of emergency, warned "the

---

969 Elsalvador.com, Police detain El Diario de Hoy photojournalist outside Rosales Hospital., May 24, 2023.

970 X account of the Association of Journalists of El Salvador (@apeselsalvador), June 05, 2023.

971 X account of the Association of Journalists of El Salvador (@apeselsalvador), June 5, 2023.

journalists of El Faro" that "they will go to jail if they collaborate with the gangs."[972] For his part, The Minister of Justice and Public Security described La Prensa Gráfica and El Diario de Hoy as "hypocrites", accusing them of "protecting the interests of criminal structures" and "being on the side of terrorists and their opposition allies to misrepresent information."[973] A similar incident was reported by the Vice Minister of Justice and Director General of Penitentiaries, who referred to *El Faro* journalists as "terrorists", "gang spokespersons," and "mercenaries."[974] Likewise, the president of the Legislative Assembly reportedly commented on his social networks that the gang members were "journalistic sources" for many journalists.[975]

378. The IACHR and its Office of the Special Rapporteur have continued to monitor reports of surveillance of the communications of journalists and human rights defenders, following the findings of the University of Toronto's Citizen Lab and the Access Now initiative in early 2022. The technical expertise carried out by the experts determined that at least 35 people from Salvadoran media and civil society organizations had their phones tapped with the Pegasus *software*, created by the Israeli company NSO Group. Among this group of people, 22 were members of the investigative journalism portal *El Faro.*[976] For its part, the State indicated that "the origin of such interventions is unknown, and it is conducting the corresponding investigations to determine the

---

972 IACHR, Office of the Special Rapporteur for Freedom of Expression, Annual Report 2022, OEA/Ser.L/V/II. Doc. 50 v. 2, March 6, 2022, par. 574.

973 IACHR, Office of the Special Rapporteur for Freedom of Expression (SRFE), Annual Report 2022: OEA/Ser.L/V/II. Doc. 50 v. 2, March 6, 2022, par. 574.

974 IACHR, Office of the Special Rapporteur for Freedom of Expression (SRFE), Annual Report 2022: OEA/Ser.L/V/II. Doc. 50 v. 2, March 6, 2022, par. 574.

975 Ernesto Castro's X account (@ECastroES), May 16, 2023.

976 IACHR, Press Release No. 022/22, IACHR, Its Special Rapporteurship for Freedom of Expression and OHCHR Are Concerned About Evidence of the Use of Pegasus Malware to Spy on Journalists and Civil Society Organizations in El Salvador, January 31, 2022.

responsibility and authorship of such acts, which would have also violated devices and communications of state officials."[977]

379. Although the events described above predate the current state of emergency, they constitute an extremely worrying precedent of patterns of intimidation against journalists and human rights defenders that the State must investigate fully, effectively, and impartially. In this sense, the Rapporteurship considers that the lack of clarification of what happened favors the repetition of the facts and has a self-censoring effect on the victims.

380. In late 2022, SRFE also learned about the alleged use of spying *software* against Supreme Court Justice Paula Patricia Velázquez, who reportedly received a message on her cell phone on December 15, 2022, stating "Apple believes that state-sponsored attackers are trying to breach your iPhone associated with your Apple ID."[978] In this regard, in its comments on the draft of this report, the State noted that Apple sent this generic communication to users who may have been infected with spyware. In addition, it indicated that Apple has filed a lawsuit against the company responsible for the creation of this software, in which it does not refer to any State and in particular to El Salvador.[979]

381. Journalists' associations and press freedom organizations have reportedly requested the Attorney General's Office to initiate an investigation into the reported espionage. However, according to reports, the investigations have not made much progress and only two

[977] IACHR, Press Release No. 022/22, IACHR, Its Special Rapporteurship for Freedom of Expression and OHCHR Are Concerned About Evidence of the Use of Pegasus Malware to Spy on Journalists and Civil Society Organizations in El Salvador, January 31, 2022.

[978] El Faro, Apple warns Supreme Court justice of possible spying with Pegasus, February 9, 2023

[979] State of El Salvador, Observations of the State of El Salvador to the IACHR Report "State of Emergency and Human Rights in El Salvador," Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, pp. 120-121; State of El Salvador, Observaciones del Estado de El Salvador al Informe de la CIDH "Estado de Excepción y derechos humanos en El Salvador", Nota Diplomática MPOEA-OEA-054/2024, April 8, 2024, Annex 1, Matriz de Sistematización Metodológica, line 92-94, column E.

summonses have been issued.[980] Likewise, SRFE learned that the organization Cristosal would file a writ of amparo before the Supreme Court of Justice due to the lack of investigation on the use of state funds for the alleged espionage against journalists.[981] On this issue, the State of El Salvador reported that to date no complaint has been registered in relation to the alleged existence of illegal interception of communications through surveillance technologies, during the period of validity of the state of emergency.[982]

382. According to information from civil society, the adverse context for freedom of the press has caused the forced departure of journalists from the country for fear of reprisals. As indicated above, according to the Association of Journalists of El Salvador, at least 10 journalists and one communicator (3 women and 8 men) have reportedly left the country for security reasons.[983]

383. In view of the foregoing considerations, the Commission and its Office of the Special Rapporteur reiterate that journalism is the primary and principal manifestation of freedom of expression of thought and that the State has the obligation to respect and guarantee its work.[984] These obligations become even more relevant during states of emergency, since the press requires the highest level of guarantees to carry out its work.

980 Information furnished by Journalists and civil society organizations, March 2023. Archive of the Office of the Special Rapporteur for Freedom of Expression.

981 DW, El Salvador: amparo to be filed for spying on journalists, April 29, 2023.

982 State of El Salvador, A New El Salvador, Diplomatic Note MPOEA-OAS-117/2023, July 14, 2023, pp. 70-72.

983 Association of Journalists of El Salvador (APES), Régimen de excepción y afectación a la libertad de prensa y libertad de expresión en El Salvador (State of emergency and impact on press freedom and freedom of expression in El Salvador), June 2023; IACHR, Hearing No. 6:Arbitrary detentions and the situation of persons deprived of liberty under the State of Emergency in El Salvador", 185th period of sessions, October 25, 2022.

984 I/A Court H/R. Advisory Opinion OC-5/85, Compulsory Membership in an Association Prescribed by Law for the Practice of Journalism (Articles 13 and 29 American Convention on Human Rights), November 13, 1985, Series A No. 5 paras. 70 and 71.

384. The State has the duty to ensure that journalists and media workers reporting during the state of emergency are not arrested, threatened, assaulted, or limited in any manner as a result of practicing their profession. Their work materials and tools must not be destroyed or confiscated by the authorities.[985] It is essential that the authorities emphatically condemn attacks against journalists and act with due diligence and speed in clarifying the facts and punishing those responsible.[986]

385. In addition, they recall that disproportionate restrictions on access to the scene of events, arrests, and charges brought against reporters in the performance of their professional duties violate the right to freedom of expression. It is up to the authorities to restore the impaired guarantees and ensure full respect for the right to freedom of expression.[987] In this regard, it is important that States adequately instruct security forces on the role of the press, in order to prevent obstruction and undue interference in its work under states of emergency.[988]

386. The Commission and the Rapporteurship recall that, in order to do their work effectively, journalists must be perceived as independent observers and not as potential criminals or accomplices to crimes for disseminating information or opinions related to gangs. The mere fact of being threatened with prison sentences for reporting on these matters has a deterrent effect.

---

[985] United Nations, OAS, Joint declaration on violence against journalists and media workers in the context of protests, September 13, 2013.

[986] IACHR, Office of the Special Rapporteur for Freedom of Expression, Silenced zones: Highly dangerous areas for the exercise of freedom of expression, OEA/Ser.L/V/II IACHR/SRFE/INF.16/17, March 15, 2017, par. 158.

[987] United Nations, OAS, Joint declaration on violence against journalists and media workers in the context of protests, September 13, 2013.

[988] United Nations, OAS, Joint declaration on violence against journalists and media workers in the context of protests, September 13, 2013.

## D. Obstacles for the work of Human Rights Ombudspersons

387. The work of human rights defenders is fundamental for the universal implementation of human rights, the existence of full and lasting democracies, and the consolidation of the rule of law, since they exercise the necessary social oversight of public officials and democratic institutions.[989]

388. Despite the importance of its work, the Commission has observed that the defense of human rights in El Salvador takes place in a hostile context, characterized by the discrediting of its activities. The Commission warns that, within the framework of the state of emergency, there have been various obstacles that impede the free exercise of the right to defend human rights in El Salvador. [990]

389. According to the Roundtable for the Right to Defend Rights, during 2022, 182 aggressions against human rights defenders and journalists were identified; while media monitoring recorded 82 acts of aggression.[991] It indicates that 47.80% of these assaults were committed against cisgender women, 27.47% involved cisgender men, and 20.87% were reported as collective cases.[992] Among the main aggressions directed against human rights defenders are intimidation, harassment and threats, cyber-harassment or cyberbullying, stigmatizing and discrediting speeches, criminalization, and digital

[989] IACHR, Toward a Comprehensive Policy for the Protection of Human Rights Defenders, OEA/Ser.L/V/II. Doc. 207, December 29, 2017, par. 30.

[990] IACHR, Situation of Human Rights in El Salvador, OEA/Ser.L/V/II. Doc. 278, October 14, 2021, paras. 283 and 284.

[991] Iniciativa Mesoamericana de Mujeres Defensoras de Derechos Humanos. "Mesa por el Derecho a Defender Derechos presenta Informe de agresiones contra personas defensoras y periodistas: análisis de casos 2022 en El Salvador ("Roundtable on the Right to Defend Rights presents a Report on attacks against human rights defenders and journalists: analysis of 2022 cases in El Salvador.") September 7, 2002, p. 15.

[992] Iniciativa Mesoamericana de Mujeres Defensoras de Derechos Humanos. "Roundtable on the Right to Defend Rights presents a Report on attacks against human rights defenders and journalists: analysis of 2022 cases in El Salvador." September 7, 2002, p. 16.

attacks.[993] The Commission was informed that more than half of the recorded attacks were allegedly committed by public officials: police officers (40%) and Members of the Legislative Assembly (15%).[994] [995]

390. The Commission is concerned about the multiple reports of aggressions against women human rights defenders, who, according to civil society, have filed the highest number of complaints, with harassment and bullying being the most recurrent, followed by cyberbullying and arbitrary detentions.[996] The Commission reminds the State of the differentiated risks and disproportionate gender-based effects faced by women defenders.[997] They suffer additional obstacles linked to gender discrimination and are victims of stigmatization, are exposed to sexist or misogynistic comments, or their complaints are not taken seriously.[998] Therefore, all measures aimed at mitigating the risks they face must be adopted with a gender perspective and an intersectional approach, so that they can provide comprehensive protection by considering, understanding, and by attaching especial importance to the complexities of the differentiated forms of violence faced by women defenders because of their profession and gender.[999]

---

993 Iniciativa Mesoamericana de Mujeres Defensoras de Derechos Humanos. "Roundtable on the Right to Defend Rights presents a Report on attacks against human rights defenders and journalists: analysis of 2021-2022 cases in El Salvador." September 7, 2002, p. 42.

994 IACHR, Public Hearing "Status of Judicial Independence in El Salvador", held within the framework of the 183rd Period of Sessions, July 14, 2023.

995 In its observations on the draft of this report, the State indicated that it is not certain that the facts included in these reports can be classified as attacks against journalists and human rights defenders. It was also adamant that there were no restrictions in El Salvador on the exercise of human rights work. See: State of El Salvador, Observations of the State of El Salvador on the IACHR Report "State of Emergency and Human Rights in El Salvador," Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, p. 122.

996 Iniciativa Mesoamericana de Mujeres Defensoras de Derechos Humanos. "Roundtable on the Right to Defend Rights presents a Report on attacks against human rights defenders and journalists: analysis of 2021-2022 cases in El Salvador." September 7, 2002, p. 25.

997 IACHR, Report on the Situation of Human Rights Defenders and Social Leaders in Colombia, OEA/Ser.L/V/II. 124 doc. 262, December 6, 2019, par. 68.

998 I/A Court H.R., I/A Court H.R. Case of Digna Ochoa and family v. Mexico. Preliminary Objections, Merits, Reparations, and Costs. Judgment of November 25, 2021. Series C No. 447, par. 125.

999 I/A Court H.R., I/A Court H.R. Case of Digna Ochoa and family v. Mexico. Preliminary Objections, Merits, Reparations, and Costs. Judgment of November 25, 2021. Series C No. 447, par. 101.

391. The Commission notes that stigmatizing speeches and smear campaigns have been more recurrent in the context of the state of emergency. Civil society organizations indicate that the work of human rights organizations conducted within the framework of the state of emergency has been the object of attacks and discrediting by government authorities, from the highest level.[1000] It is reported that the most common approach has been to equate the defense of rights with the defense of "gang members."[1001] The Commission is concerned that these speeches come from the highest levels of the State.[1002] This has led to attacks that go so far as to include threats, especially on social networks.[1003]

392. The Commission recalls that the disqualification of the work carried out by human rights defenders through pronouncements by State officials generates stigmatization and, at the same time, can promote a climate of hostility and intolerance on the part of different sectors of the population that hinders the legitimate exercise of their freedom of association.[1004]

393. In addition, the Commission has learned of allegedly arbitrary detentions of human rights defenders. For example, on July 17, 2022, indigenous leader Adolfo Santo Zetino and his son Alexander Zetino were detained by agents of the National Civil Police while they were at their home in the San Ramón district, in the department of Sonsonate. During his arrest, authorities reportedly made comments with racist

[1000] Azul Originario et al, Annual Report on Human Rights Violations during the State of Emergency in El Salvador, March 2023, p. 15.

[1001] Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report for March 27 2022 to March 27, 2023, May 12, 2023, p. 19.

[1002] WOLA, El Salvador State of Emergency and Attacks against Human Rights Defenders and Organizations Facilitate State Abuses, March 31, 2022; Human Rights Watch, Cristosal, "We Can Arrest Anyone We Want" Widespread Human Rights Violations During the "State of Emergency" in El Salvador, December 2022.

[1003] Cristosal, One year under the state of emergency: a permanent measure of repression and human rights violations. Situation Report for March 27 2022 to March 27, 2023, May 12, 2023, p. 19.

[1004] IACHR, Second Report on the Situation of Human Rights Defenders in the Americas, OEA/Ser.L/V/II. Doc. 66, December 31, 2011, par. 125.

connotations against the defender because of his long hair. After five hours and following social pressure from the community, the authorities released Adolfo Santo Zetino without formally notifying him of the reasons for his detention.[1005] Similarly, on April 19, 2022, agents of the National Civil Police detained human rights defender Esmeralda Beatriz Rodríguez de Peña near her home in Cantón Sisiguayo, in the municipality of Jiquilisco, department of Usulután.[1006] [1007]

394. Given these obstacles, the Commission notes that to date there has been no progress in the creation of a solid legal framework to support the work of human rights defenders in El Salvador,[1008] a situation also noted by the United Nations Committee against Torture, which urged the State to adopt a regulatory framework in this regard.[1009] The Commission reiterates its recommendation that the State of El Salvador adopt a legal framework for the protection and defense of human rights defenders and implement a comprehensive policy for the protection of human rights defenders, taking all necessary measures to put an end to stigmatization and degrading remarks originating from the State or its agents in order to prevent violence against journalists and human rights defenders, and in compliance with the inter-American standards that establish special responsibilities for public authorities to ensure the exercise of their freedom of expression.

---

1005 La Prensa Grafica, "The police said that they would take him away for review": family member of indigenous leader captured under the state of emergency, July 18, 2022; Resumen Latinoamericano , El Salvador. State of Emergency Persecutes Environmentalists and Their Families, September 11, 2022; Front Line Defenders, El Salvador: Prolonged state of emergency exposing human rights defenders to increased risks, September 14, 2022.

1006 La Prensa Grafica, Esmeralda Domínguez, Human Rights Defender in Usulután, Detained, April 23, 2023; El Salvador Now, Human rights activist in Bajo Lempa communities detained, April 23, 2023; Front Line Defenders, El Salvador: Prolonged state of emergency exposing human rights defenders to increased risks, September 14, 2022.

1007 In its observations on the draft of this report, the State said that it had no record of the existence of a request for information by the Commission, and therefore the Commission describes the detentions as arbitrary without previously verifying the State's position, thereby ignoring the complementary nature of the inter-American system. See: State of El Salvador, Observations of the State of El Salvador on the IACHR Report "State of Emergency and Human Rights in El Salvador," Diplomatic Note MPOEA-OEA-054/2024, April 8, 2024, p. 122.

1008 IACHR, Annual Report 2022, Chapter IV.A. Development of Human Rights in the Region, par. 377

1009 Committee Against Torture - CAT, Concluding observations on the third periodic report of El Salvador, 25 November 2022, par. 37.

# CAPÍTULO 5: **CONCLUSIONS AND RECOMMENDATIONS**

## CONCLUSIONS AND RECOMMENDATIONS

395. The Commission concludes this report by reaffirming that the actions of the maras and gangs in El Salvador are a reality that for decades has impacted the exercise of human rights of the Salvadoran population. The State must adopt effective actions to confront and eradicate organized crime, tailored to the stroke and seriousness of the particular situation of the country, and in accordance with the legal and international obligations that must govern the actions of the State. The contrast between these two aspects is a false dilemma, and the guarantee and protection of human rights should be the objective and starting point of any effort in the area of citizen security.

396. The IACHR has highlighted the high rates of crime and violence recorded in the decades following the end of the internal armed conflict, and has also monitored the use of various citizen security strategies in El Salvador's recent history. Following a remarkable and unprecedented reduction in acts of violence in the country in recent years, which was recognized by the Commission in its 2021 Report, the wave of violence perpetrated in March 2022 resulted in multiple deaths and led the State to adopt extraordinary measures to eradicate the common gangs, declaring a state of emergency. The Commission notes that this critical episode in March 2022 does not reflect the current citizen security situation in El Salvador, which once again shows a significant decrease in violence rates. Therefore, the emergency situation established in the American Convention on Human Rights to maintain suspended rights, a measure that has been in effect for more than 19 months, is not observed. The State must abide by the international obligations it has assumed, which establish requirements and limits for adopting such an exceptional mechanism for suspending the rights and guarantees protected by the Convention, which cannot become an integral part of its permanent citizen security policy. In this regard, the IACHR urges the State to repeal the state of emergency, ending the suspension of rights and guarantees through the extensions to Legislative Decree No. 333 of 2022, and reiterates that indispensable judicial guarantees must be maintained in force in all circumstances.

397. In this context, the Commission highlights the importance of addressing the causes and consequences of crime from a comprehensive and intersectoral perspective, adopting prevention, control, and response measures within the limits and procedures that guarantee respect for human rights, including gender and intersectional approaches. The Commission appreciates the measures implemented by the State of El Salvador that espouse a crime prevention perspective in its different dimensions, protection of vulnerable groups, mitigation of the impacts of violence, and rehabilitation of the social fabric in part of the territories affected by the actions of gangs. The IACHR encourages their strengthening, and highlights the importance of these measures including greater openness to citizen participation in the formulation, implementation, and accountability of citizen security policies. On the other hand, it notes that, during the period analyzed in this report, multiple legislative reforms were promoted with a markedly punitive approach that reportedly contravene inter-American standards on juvenile justice, judicial guarantees, and the rational use of pretrial detention, among other aspects. The Commission draws attention to the significant increase in sentences, even for crimes that have low offensive potential, and their effects on the re-socialization of convicted persons.

398. Likewise, in view of the allegations of systematic and widespread illegal and arbitrary detentions by the security forces, as well as other violations of rights in the justice system and places of deprivation of liberty, the IACHR considers it necessary to identify the circumstances that generated this pattern of alleged violations, the possible institutional and individual responsibilities, as well as the identification of the victims and the damages suffered in order to provide them with comprehensive reparations and adopt guarantees for non-repetition. In addition, it urges the Justice Administration System to adopt immediate measures to address the high number of people who are deprived of their liberty without a final conviction and to ensure that judicial proceedings are carried out under due process of law with full guarantees of hearing and defense for the accused, as well as the presumption of their innocence. In addition, it calls for

ensuring special protection standards for children and adolescents in conflict with the law and their reintegration as one of the main objectives of juvenile justice.

399. The administration of justice has a relevant role in guaranteeing the rights of the victims of human rights violations and their families, which includes ensuring the right to the truth about the facts and those responsible for the violations committed through the investigation, trial, and application of the corresponding punishment to the guilty parties, as well as making it possible to seek due reparation. To this end, judges in El Salvador must have guaranteed judicial independence. The Commission also considers that measures to assist crime victims are an important pillar to be considered in the public policies developed by the State and values the willingness expressed by the State to receive technical cooperation to strengthen measures of this nature[1010].

400. The Commission warns that the automatic application of pretrial detention violates its precautionary purpose based on the individualized circumstances of the specific case and its use as a priority aggravates the situation of prison overcrowding in El Salvador, which has tripled in a few months. This context has produced inhumane conditions of detention, which have been made more extreme by "security" or "emergency" measures in the prisons that preceded and were maintained during the state of emergency. The Commission expresses particular concern about deaths in state custody and allegations of torture and ill-treatment, and urges the investigation of state responsibility when they occur. It also recalls the various impacts that the mass incarceration of people has had on the families of detainees.

401. Finally, the IACHR warns that, in a state of emergency, freedom of expression acquires an essential function as it contributes to preserving the values and functioning of the democratic system.

[1010] IACHR, Meeting Notes with the State of El Salvador, September 6, 2023, IACHR Archive.

Access to information and active transparency are essential tools to ensure citizen participation and the accountability of the State in these complex scenarios. These tools allow the population to learn about the context and extent of the exceptional measures imposed on their fundamental rights and to act against the adoption of measures that are not justified. The Commission also highlights the important work of journalism and the defense of human rights in these situations and calls on the State of El Salvador to take the necessary actions to ensure that there is no hostile environment for either the exercise of journalism or the defense of human rights. Thus, the IACHR calls upon the State to ensure that journalists and media workers reporting during the state of emergency are not arrested, threatened, assaulted, or restricted in any manner for practicing their profession. In particular, it calls upon the State to refrain from intimidating, threatening, and disqualifying the work of journalists and to reject, investigate, and punish any type of violence against them. In addition, the IACHR calls on the State to adapt the regulations that may impair the right to freedom of expression and of the press, and to adopt specific measures that guarantee the plurality of the media, in order to foster freedom and pluralism in society.

402. Based on the provisions of Article 41, paragraph b, of the American Convention on Human Rights and the information indicated in this report, the Commission reasserts some of the recommendations of the 2021 country report and makes the following recommendations to the State of El Salvador:

1. Put an end to the suspension of the rights and guarantees curtailed under the state of emergency.

2. Elaborate and implement a comprehensive and multisectoral public security policy on the causes and consequences of crime, based on evidence, with a focus on human rights, establishing the participation of civil society bodies in its definition and implementation.

3. Periodically publish data on the actions taken in connection with citizen security policy and the results obtained, including within the framework of the different stages of the Territorial Control Plan.

4. Develop and implement a policy of attention to victims of crimes perpetrated by gangs, ensuring the participation of victims and civil society throughout the process.

5. Draw up a list of the victims of human rights violations perpetrated in the context of detentions and criminal prosecutions initiated under the state of emergency, ensuring the participation of victims and civil society throughout the process.

6. Elaborate and implement a comprehensive reparation plan for the victims of human rights violations perpetrated in the context of detentions under the state of emergency, considering the gender perspective and the intersectionality of other factors of vulnerability and discrimination.

7. Bring the criminal and criminal procedure legislation adopted or amended during the state of emergency into line with inter-American norms and standards, in particular:

   a. Repeal any provision that require the mandatory application of pretrial detention or that prevents its substitution due to the type of crime, in particular Article 5° of Legislative Decree No. 339 of March 30, 2022;

   b. Repeal the provisions that allow for the confidentiality of the identity of justice operators in the context of their actions in criminal proceedings, in particular Article 2 of Legislative Decree No. 339 of March 30, 2022.

8. Bring the legislation on juvenile justice amended during the state of emergency into line with inter-American norms and standards, in particular:

    a. Repeal any provision ordering the mandatory application of preventive detention or imprisonment or preventing its substitution due to the type of crime, in particular Article 3° of Legislative Decree No. 342 of March 30, 2022;

    b. Repeal the provisions that allow application of adult prison sentences to persons under 18 years of age within the framework of juvenile justice, in particular Articles 1° and 2° of Legislative Decree No. 342 of March 30, 2022.

9. Produce, and move ahead with implementing, the plan for the gradual withdrawal of the armed forces from citizen security tasks.

10. Urgently conduct diligent and impartial investigations in all cases that occurred within the framework of the state of emergency where civilians were injured or killed by police or military forces, or in state custody, while also investigating possible acts of torture, in order to establish the facts and determine the corresponding criminal or other responsibilities.

11. Prepare a diagnosis on the current needs of the following institutions, regarding their competencies in criminal cases, as well as a road map with concrete actions for them to carry out their work effectively:

    a. Office of the Procurator General of the Republic;

    b. Office of the Attorney General;

    c. Judiciary

12. Adopt measures to guarantee due process for all people arrested in the context analyzed. In particular:

    a. Immediately inform the person under arrest and their family and representatives of the motives and reasons for which they are being held.

    b. Safeguard exercise of the right of the accused to defend himself or herself personally or to be assisted by counsel of his or her own choosing, and to communicate freely and privately with that person.

    c. Cease the practice of mass judicial hearings.

13. Maintain a registration system for all persons deprived of liberty, including those detained in penitentiary centers as well as in places of temporary housing, in the terms indicated in paragraph 273 of this report, updated and easily accessible by the competent authorities, representatives, and persons in charge of the defense and/or protection of rights, as well as their relatives.

14. Regarding the use of pretrial detention as a measure of last resort and justified by the procedural purposes of each specific case:

    a. Modify the legislation by incorporating more alternative measures to pretrial detention;

    b. Adopt a protocol or guidelines addressed to judicial authorities on pretrial detention that:

       (i) prioritize the application of less burdensome measures than pretrial detention;

       (ii) address the gender perspective; the best interests of

children and the impact on persons belonging to groups at special risk when deciding on precautionary measures in criminal investigations or proceedings.

c. Adopt a system of periodic review of both the validity of the circumstances that led to the initial application of pretrial detention in each case and compliance with the maximum periods of detention, allowing for the immediate release of persons held in pretrial detention when such circumstances are no longer in force, the maximum periods established have been met, or the reasonable period of time that allows a person to be held under this precautionary measure has expired.

15. Immediately remedy any overcrowding situation. To this end, issue an order from the justice sector and the penitentiary system prohibiting the entry of new detainees into facilities already occupied beyond their official capacity.

16. Design and establish a plan of action to remedy the deficiencies identified in this report with respect to the minimum conditions of detention of persons deprived of liberty, especially in the areas of shelter, hygiene conditions, food, drinking water, and access to medical treatment, taking into account the gender perspective and the special risk situation of specific groups.

17. Guarantee regular visits by family members, representatives, and competent authorities in all penal centers and repeal all provisions prohibiting family visits contained in Article 79-A of Decree 93 - Reforms to the Penitentiary Law.

18. Design and implement an accessible, available and safe complaint system for all persons deprived of their liberty where they can receive free assistance and file the corresponding legal actions to stop the violation of their rights.

19. Ensure the socio-educational purpose of the juvenile justice system, developing educational, professional training, and recreational programs for children and adolescents in the custody of the State authorities; likewise, that the educational programs comply with the same content and time requirements established by the educational authorities for children who are not deprived of their liberty.

20. Guarantee compliance with the principle of maximum disclosure of public information held by the State, and ensure that the classification of information as confidential is carried out in accordance with inter-American standards on the subject and is subject to periodic review to assess the relevance of the restriction.

21. Within the framework of the ongoing training provided by the State, ensure the implementation of programs aimed at:

    a. security forces on human rights and inter-American standards on deprivation of liberty, use of force, gender perspective, and differentiated approaches.

    b. justice operators on inter-American standards on access to justice, pretrial detention, juvenile justice, gender perspective, differentiated approaches.

    c. prosecutors, penitentiary agents, and personnel of the Forensic Medical Service on the application of the Istanbul Protocol, as well as the Minnesota Protocol for the case of extrajudicial executions or suspicious deaths in detention.

22. Ratify:

    a. the Inter-American Convention on Forced Disappearance of Persons;

    b. the International Convention for the Protection of all Persons from Forced Disappearance;

    c. the Convention on the Non-Applicability of Statutory Limitations to War Crimes and Crimes against Humanity;

    d. The Optional Protocol of the Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment; and create the National Mechanism to Prevent Torture.

23. Agree to a working visit by the IACHR.

# ANNEX:
# EXPLANATIONS OF VOTES

# REASONED OPINION OF COMMISSIONER CARLOS BERNAL PULIDO ON THE REPORT "STATE OF EMERGENCY AND HUMAN RIGHTS IN EL SALVADOR", JOINED BY COMMISSIONER STUARDO RALÓN ORELLANA

With the customary respect for my colleagues and in accordance with Article 19.1 of the Rules of Procedure of the Inter-American Commission on Human Rights ("the Commission" or "the IACHR"), I present a partial dissenting opinion in relation to the country report, entitled "State of Exception and Human Rights in El Salvador."

While I recognize the important value of the report issued and its contribution to the guarantee of human rights in El Salvador, I consider it essential, on this occasion, to express my partial disagreement, as I consider that the Report: (i) requires greater methodological precision; (ii) it seems to ignore essential principles of the System that they apply in a cross-cutting manner, even in the framework of the exercise of the IACHR's observance function, and (iii) it represents an opportunity to advance in strengthening the transparency of the Commission.

## 1. The importance of methodological rigor in country reports

In this section, I will refer to the importance of methodological rigor in country reports by the Inter-American Commission, in view of the duties of transparency and impartiality. On the other hand, I will identify some gaps in the report.

### 1.1. Methodological rigor in the formulation of Country Reports

Articles 58 and 60 of the IACHR's Rules of Procedure grant the Commission the power to prepare reports on the human rights situation in a country. From a reading of these provisions, two characteristics emerge that form the foundation of the process of formulating this type of report: on the one hand, it has a participatory nature and involves direct dialogue with the State – insofar as the procedure provides for the submission of the draft report to

the State in question[1011]– and, on the other hand, it tends to a rigorous approach, as the procedure also contemplates the modification of the draft report once the observations of the State have been received[1012].

This claim to rigor that underlies the process of preparing country reports is reinforced by a systematic review of the Commission's Rules of Procedure and, in particular, from other provisions that, although they refer to other types of procedures, reflect the incorporation of this purpose in the exercise of all the functions assigned to the Inter-American Commission.

Thus, Article 13 of the Rules of Procedure provides for the role of the Executive Secretariat to request from interested parties all the information it deems relevant for the preparation of draft reports, among other documents prepared by the Commission. This point is especially relevant if one bears in mind that the collection of information – its quality and objective approach – is an essential prerequisite for ensuring rigor in addressing the social and legal realities that are the object of the Commission's knowledge.

In the same sense, Article 59(5) of the Rules of Procedure states that the Commission shall use reliable and convincing information obtained from, among other things, official acts of the State, the system of petitions and cases, on-site visits, public hearings, or human rights reports[1013].

This provision, although it is framed within the formulation of Annual Reports, is of great relevance, since its chapters IV and V have a structure and teleology similar to the Country Reports and, in any case, the aforementioned provision reflects the importance of ensuring the reliability of the sources consulted – as an essential element to ensure the rigor with which the findings are presented and the recommendations are justified. It could hardly be stated that such a prerogative is not applicable to the other reports issued by the Commission.

[1011] IACHR Rules of Procedure. Article 60.a.

[1012] IACHR Rules of Procedure. Article 60.b.

[1013] Item a to h

In this framework, the Commission's Strategic Plan 2023-2027 includes elements of great relevance that reinforce the importance of the rigor and quality of the Country Reports. In particular, it first establishes as a mitigation strategy the examination of the quality of its reports, including the country reports, and the strengthening of accountability with a focus on results and transparency[1014].

Second, and for the purpose of assessing possible risks of human rights violations – a task that would feed into the country reports – the Strategic Plan provides for the adoption of indicators, methodologies and tools for the collection, recording, cataloguing and analysis of information from closed and open sources[1015].

Finally, the Strategic Plan places transparency as an institutional value, by virtue of which the IACHR must account for its decisions or work[1016]. This institutional value, notwithstanding the observations that I will make at the end, must permeate in a cross-cutting way each of the processes that take place in the Commission, and its implementation, within the framework of the formulation of Country Reports, is subject, among others things, to the existence of clear and objective parameters for the collection and comparison of information.

In this way, all these provisions urge the Commission to ensure a rigorous and methodologically sound approach in each of the pronouncements it makes and, in particular, in the reports in which it analyzes the human rights situation in the States Parties to the OAS.

Methodological rigor, as has been maintained doctrinally, implies adopting parameters and measures that ensure the credibility, authenticity, trust,

---

[1014] IACHR. Strategic Plan 2023-2027. Page 103.

[1015] IACHR. Strategic Plan 2023-2027. Page 68.

[1016] IACHR. Strategic Plan 2023-2027

and integrity of certain findings[1017]. In this regard, I must emphasize that in the social sciences a good quality study differs from a deficient one when it is rigorous[1018].

Rigor becomes even more relevant when the information that is issued has the potential to define policies, strategies and actions to be followed in the face of certain phenomena. In this framework, this conceptual power must be regulated in some way, in such a way that the judgments that are issued, based on that knowledge, are legitimate to the sources from which they emerged[1019]. This, meanwhile, an investigation without rigor, becomes the unauthorized voice of a knowledge that becomes uncertain[1020].

Under this framework, I emphasize that a rigorous and methodologically sound approach is not only a mandate underlying the important functions assigned to the Inter-American Commission, under the OAS Charter, but also clarifies, enriches, makes transparent, and ensures the quality, relevance, and usefulness of the findings identified in the Reports – as an essential premise for the promotion of human rights.

### 1.2. Observations on the Report

Having defined the importance of methodological rigor in the Commission's activities, I will now expose some gaps in the Country Report on El Salvador.

---

1017 Castillo, Edelmira; Vásquez, Martha Lucía Methodological rigor in qualitative research

Colombia Médica, vol. 34, no. 3, 2003, pp. 164-167 Universidad del Valle

Cali, Colombia

1018 CORNEJO, Marcela and SALAS, Natalia. Methodological Rigor and Quality: A Challenge to Qualitative Social Research. *Psicoperspectivas* [online]. 2011, vol.10, n.2 [cited 2024-07-02], pp.12-34. Available at: <http://www.scielo.cl/scielo.php?script=sci_arttext&pid=S0718-69242011000200002&lng=es&nrm=iso>. ISSN 0718-6924. http://dx.doi.org/10.5027/psicoperspectivas-Vol10-Issue2-fulltext-144.

1019 Ibid

1020 Ibid

In particular, I will make some observations regarding: (i) the temporal delimitation of the Report, (ii) the absence of methodological clarity in the selection of testimonies and reports cited, and (iii) the rigor of the sources that support the alleged facts described.

- **In relation to the temporal delimitation**

In the report analyzed in this dissenting partial opinion, information has been included that exceeds the temporal, factual and contextual framework on which the document deals. In particular, in paragraphs 227, 229, 230, 231, 237, 238, 239, 263, 386, 387, 388, 389 and 391.

Thus, the purpose defined in the draft report corresponds to the following: "to analyze the effects of the state of emergency decreed in March 2022 on human rights in El Salvador, as well as the compatibility of the suspension of the exercise of rights and guarantees with inter-American human rights regulations and standards."

However, the aforementioned paragraphs include information on the dismissal of judges and other political matters that are not directly related to the state of emergency and, in view of the temporal and contextual overflow of these incorporated facts, there is not enough information to allow them to be contrasted and verified.

- **In relation to the rigor of the sources that support alleged events that occurred**

I note with concern that the report refers to the alleged existence of systematic patterns or practices of human rights violations (for example, in paragraphs 147 or 177), without, on the one hand, identifying the sources from which such statements are derived, which, moreover, are particularly serious.

On the other hand, I emphasize that the sources cited (for example in paragraph 177) do not correspond to the factual or contextual element to be proved. In particular, in the aforementioned paragraph, reference was made

to the alleged existence of a pattern of illegal and arbitrary, generalized and systematic detentions" and in a footnote there are cases of other States or figures of detentions carried out in a specific period, without providing any further elements that would allow concluding that they are arbitrary.

In this regard, I emphasize the importance of the Commission's reports being legally and factually supported. This implies including the sources that support the conclusions and reflecting a true exercise in confrontation – when one of the various positions on a reality is assumed. This becomes more important when delicate statements are made in the face of the alleged existence of patterns or practices.

On this last point, I emphasize that the Inter-American Court of Human Rights has pointed out the seriousness of affirming that a State has perpetrated or tolerated a pattern of human rights violations and, therefore, has stressed that an evaluation of the evidence must be carried out that is capable of creating the conviction of the truth of the facts denounced[1021].

Although this pronouncement was formulated by the Inter-American Court of Human Rights within the framework of its contentious jurisdiction, it is fully applicable to any scenario in which it is intended to factually delimit a reality and attribute actions or omissions to a State – associated with patterns or practices of human rights violations – as in fact occurs in the Report analyzed.

- **In relation to the methodological criteria considered for the selection of testimonies and reports that substantiate some of the findings**

On the one hand, in several sections of the report, reference is made to the collection of 29 testimonies from people detained and released, legal representatives and family members. These accounts are of the greatest relevance, as they support several of the statements or conclusions reached by the Commission.

[1021] Inter-American Court of Human Rights. Case of Velásquez Rodríguez v. Honduras. Bottom. Judgment of July 29, 1988. Series C No. 4. Paragraph 129

In spite of the above, I find an important gap in the Report in that it does not account in a transparent and objective manner for: (i) the criteria taken into account to delimit such a universe of testimonies and select the people interviewed; (ii) the relevant characteristics of the participants – discrimination by roles, i.e. how many correspond to detainees, family members and representatives; (ii) the civil society organizations that facilitated communication with the interviewees, and (iv) whether any of the testimonies listed coincide with possible petitions pending before the Commission.

On the other hand, I note that the Report repeatedly cites several civil society organizations – whose voice, of course, has the greatest relevance. However, given the special value given in the Report to its findings, it would have been essential to have a methodological chapter that, in turn, would allow: (i) to identify the criteria considered to select such a source of information and (ii) to incorporate, in turn, the relevant methodological approaches of the external sources of information consulted.

In this regard, I would like to draw attention to the fact that such information is not only necessary to ensure the rigor of the Report, the transparency of the Commission and its objective approach to the facts; but also to materially guarantee the State's right to defense, with respect to the information provided, and an exercise of comprehensive contrast.

## 2. The IACHR's Enforcement Function and the Alleged Non-Application of Essential Human Rights Principles

In this vote, I have referred to the State's right to defense in the formulation of the Country Report under scrutiny. At the same time, and as I indicated in the deliberation phase, by virtue of the principle of subsidiarity, it is not for the Commission to determine whether or not there were sufficient reasons in the State to declare and maintain the state of emergency; rather, to analyze, for example, whether the legal acts issued that declared and extended the state of emergency had the motivation required in international human rights law.

I uphold the latter because, first, the State is in the best position to define the appropriateness or otherwise of measures such as those analyzed in the specific case and, second, insofar as, under this framework, the Commission does not have sufficient inputs to make such an assessment – which, by the way, requires a comprehensive approach, that goes beyond the legal.

The truth is that behind these observations, two essential questions arise at the center of the discussion: Does the principle of subsidiarity apply to the Country Reports of the Inter-American Commission? Is the right to defense also enforceable in these types of proceedings? My answer is in the affirmative for the reasons that I will develop below.

In this context, first, I would like to draw attention to the fact that the complementary nature of the Inter-American Human Rights System derives from the preamble to the ACHR, which establishes that the IAHRS is "an adjuvant or complementary to the [protection] offered by the domestic law of the American States" and that there is no treaty provision that limits its framework of application.

In fact, the Inter-American Court of Human Rights and the IACHR have established that the principle of complementarity is the core or central pillar of the IAHRS and informs the entire System transversally[1022] , so it is consistent with this that it is also applied to processes related to the issuance of country reports.

This, since these diagnoses of general or special human rights situations also require taking into account that, precisely, it is the States that are the

[1022] Case of Gelman v. Uruguay. Supervision of Compliance with Judgment. Resolution of the Inter-American Court of Human Rights of 20 March 2013: https://www.oas.org/es/cidh/informes/pdfs/proteccion-personas-defensoras.pdf; https://www.oas.org/es/cidh/decisiones/mc/2022/res_50-22_mc_517-22_br_es.pdf

first to be called upon to guarantee human rights within their territories[1023]. The foregoing, since its authorities are in a privileged position to define the best ways to protect and guarantee human rights, since they face internal problems with a degree of immediacy, contextual knowledge and even specialization – for example, through ministries or special administrative departments – infinitely greater than that which any organ of the IAHRS could achieve.

This is reinforced if we bear in mind that these reports – as indeed the report analyzed in this vote does – address the aforementioned international obligations of the States, derived from the American Convention and other instruments of the System, and make recommendations.

Second, the Inter-American Court of Human Rights has established that judicial guarantees must be observed in the different proceedings[1024] without there being any justification for the fact that the same rights that the IAHRS has developed should not be guaranteed by its organs to the States.

This is especially true when the contradiction and the right to defense are expressly provided for in the procedure itself in the country reports – in particular, when it contemplates a stage for the submission of observations by the State to the draft report approved by the Commission.[1025]

---

[1023] Inter-American Court of Human Rights. Case of Gelman v. Uruguay. Supervision of Compliance with Judgment. Resolution of the Inter-American Court of Human Rights of March 20, 2013, Paragraph 70; Inter-American Court of Human Rights. Case of the Santo Domingo Massacre v. Colombia. Preliminary Objections, Merits, and Reparations. Judgment of November 30, 2012. Series C No. 259. Paragraph 142. Case of Acevedo Jaramillo et al. v. Peru. Interpretation of the Judgment on Preliminary Objections, Merits, Reparations and Costs. Judgment of November 24, 2006. Series C No. 157. Paragraph 66.

[1024] Inter-American Court of Human Rights. Case of the Constitutional Court v. Peru. Merits, Reparations and Costs. Judgment of January 31, 2001. Series C No. 71. Paragraph 69; Inter-American Court of Human Rights. Case of Favela Nova Brasília v. Brazil. Preliminary Objections, Merits, Reparations and Costs. Judgment of February 16, 2017. Series C No. 333. Paragraph 185; Inter-American Court of Human Rights. Case of Petro Urrego v. Colombia. Preliminary Objections, Merits, Reparations and Costs. Judgment of July 8, 2020. Series C No. 406. Paragraph 119

[1025] IACHR Rules of Procedure. Article 60

Third, the Commission's Strategic Plan 2023-2027 recognized coherence as an institutional value." In particular, under the Resolution, the Commission stressed that "in order to effectively support the promotion and defense of human rights in the hemisphere, [the] internal structures and processes must be consistent with [the] mission."[1026]

In this regard, it is worth noting that the Strategic Plan's mission was to promote "the observance and defense of human rights in each and every one of the States of the Americas in accordance with the highest international standards, in order to safeguard the dignity of individuals and strengthen the rule of law and democracy."[1027]

Under this framework, the value of coherence requires the Commission to adopt a human rights perspective in each of the proceedings carried out. This means ensuring the full enjoyment of fundamental guarantees, among which is the right to defense.

Finally, the need for these principles and guarantees is reinforced when the report formulates findings associated with the international responsibility of the State, such as the alleged *unconventionality* of legal frameworks or the alleged existence of human rights violations perpetrated by agents of the State – even though, as I have pointed out on several occasions, this does not represent the opportunity or the mechanism to do so.

For these reasons, I reiterate that the principle of subsidiarity and fundamental guarantees such as the right to defense, by virtue of the preamble of the Convention itself and the institutional value of coherence, extend to all proceedings in the Inter-American Commission, including country reports.

---

1026 IACHR. Strategic Plan 2023-2027. Page 28.

1027 IACHR. Strategic Plan 2023-2027. Page 28.

## 3. A call for transparency

In the processing of the report analyzed, the State of El Salvador raised some concerns regarding the financing of the Inter-American Commission and the organizations cited in the report, as well as the alleged existence of conflicts of interest[1028]. In particular, he highlighted the existence of the same funder for both the Commission and civil society organizations referenced in the Report[1029].

In this regard, I would like to point out again that the Strategic Plan 2023-2027 (i) identifies transparency as an institutional value[1030] and (ii) projects the strengthening of accountability and transparency of institutional processes as one of the programs to be advanced[1031].

In particular, the Strategic Plan states that "the IACHR will promote greater dissemination and transparency of its administrative processes and the use of financial resources, as well as the management of human talent, in accordance with the standards of the OAS and the IACHR. To this end, a specific plan will be developed with a route to address the priorities defined on the basis of consultations and internal policy."[1032]

It is in this context that the Commission issued its Policy on Access to Information and Proactive Transparency, in which it reiterated that institutional transparency represents a central element for the functioning of the Inter-American Commission[1033].

---

[1028] Permanent Mission of El Salvador to the OAS. Observations of the State of El Salvador on the IACHR Report "State of Exception and Human Rights in El Salvador." Page 12 et seq

[1029] Permanent Mission of El Salvador to the OAS. Observations of the State of El Salvador on the IACHR Report "State of Exception and Human Rights in El Salvador." Page 15 et seq

[1030] IACHR. Strategic Plan 2023-2027. Page 28.

[1031] IACHR. Strategic Plan 2023-2027. Page 58.

[1032] IACHR. Strategic Plan 2023-2027. Page 85.

[1033]IACHR. Inter-American Commission on Human Rights Policy on Access to Information and Proactive Transparency

The foregoing is fully consistent with the Inter-American Democratic Charter, an instrument that expressly recognizes that transparency is a fundamental component of the exercise of democracy and, therefore, of the guarantee of human rights[1034].

In this context, I take this opportunity to make a special call to consider the observations presented by the State – and previously enunciated – and to promote a true inter-American dialogue that, from an active approach to transparency, allows these concerns to be resolved and addressed in a comprehensive manner.

[1034] Inter-American Democratic Charter. Article 4.

## CONCURRING VOTE BY COMMISSIONER JOSÉ LUIS CABALLERO OCHOA AND COMMISSIONER ANDREA POCHAK ON THE REPORT ON THE STATE OF EMERGENCY AND HUMAN RIGHTS IN EL SALVADOR.

### I. On the importance of the Report

1. On June 28, 2024, the Inter-American Commission on Human Rights (hereinafter "IACHR") approved the *Report on the State of Emergency and Human Rights in El Salvador*, after more than two years of monitoring the situation in the country since the declaration of the state of emergency in March 2022, which remains in force as of the date of issuance of this report.

2. This is a key report, linked to a **central theme** of the inter-American human rights system. Thus, the practice espoused by several countries in the region during the twentieth century of resorting to states of exception, emergency, or siege (estados de excepción, emergencia o de sitio) to resolve internal security issues, and the human rights abuses that were perpetrated during them, induced the American Convention on Human Rights (hereinafter, "American Convention"), more than 35 years ago, to regulate the substantive and formal limits to the suspension of rights (Article 27) and the Inter-American Court on Human Rights (hereinafter, "I/A Court H.R." or the "Inter-American Court") to dedicate two Advisory Opinions to this issue.[1035] In other words, the report on El Salvador does not address a "novel" issue, but one that has been on the central agenda of the inter-American system since its origins, giving rise to numerous jurisprudential pronouncements.

3. The seriousness of the situation evidenced by the *Report on the State of Emergency and Human Rights in El Salvador* requires emphasizing

---

[1035] I/A Court H.R., Advisory Opinion OC-8/87, Habeas Corpus in Emergency Situations (Articles 27.2, 25.1 y 7.6 Convención Americana sobre Derechos Humanos), Serie A Nº 8, 30 de enero de 1987; y Opinión Consultiva OC-9/87, Garantías judiciales en estados de emergencia (arts. 27.2, 25 y 8 Convención Americana sobre Derechos Humanos), Serie A Nº 9, 6 de octubre de 1987.

that the States Parties to the American Convention must pay special attention to the meaning and nature of this concept, as well as the **risks it may pose to democracy and human rights**, especially if the state of emergency is prolonged, rendering it normal rather than exceptional and more liable to contravene the Convention.

4. For this reason, the first part of this concurring opinion briefly highlights aspects related to the state of emergency, in order to highlight its adverse effects on human rights and democratic institutions when its use does not comply with international standards on the matter. The second part of this opinion discusses some methodological aspects related to the preparation of these kinds of monitoring reports in general, and of this document in particular.

## II. The main inter-American standards regarding states of emergency and human rights

5. Although the standards developed by the inter-American system - and particularly by the Inter-American Court through its Advisory Opinions 8/87 and 9/87- are categorical with respect to the fact that states of emergency must be interpreted restrictively, the term continues to be used frequently in the region.

6. In the Commission's view, states of emergency must precede **situations that seriously threaten public order or the security of the State**, such as war, public danger, or other emergency that threatens its independence or security;[1036] that is, there must be an actual "threat [to] the normal life of a nation [...] greater than mere civil disorder, [...] in the sense that damage to security is imminent and not latent or potential."[1037] The Human Rights Committee, for its part, has

[1036] IACHR, Informe anual de la Comisión Interamericana de Derechos Humanos 1980-1981, OEA/Ser.L/V/II.54 doc.9 rev.1, October 16, 1981states of Emergency; Informe sobre la situación de los Derechos Humanos de un sector de la población nicaragüense de origen Miskito, OEA/Ser.L/V/II.62 doc. 10 rev. 3, 29 de noviembre de 1983, Segunda Parte, apartado E; Informe No. 48/00, Caso 11.166, Walter Humberto Vásquez Vejarano Perú, 13 de abril de 2000, párrs. 33 and 39.

[1037] CIDH, Informe sobre la situación de los Derechos Humanos de un sector de la población nicaragüense de origen Miskito, ya citado.

pointed out that "not every disturbance or catastrophe constitutes an exceptional situation endangering the life of the nation."[1038] Although the IACHR stated that States have "discretionary leeway to assess the existence of such threats"[1039], such leeway cannot be conceived in isolation from the American Convention on Human Rights.

7. The review of the facts pursues, from a practical and legal point of view, an obvious purpose: the defense of the State and, of course, the guaranteeing of a democratic Constitution. This purpose is undermined if the facts preceding a state of emergency respond to situations that are not serious or only apparently serious. The IACHR emphasized that the state of emergency is **intended** to eliminate threats to the independence or security of the State, or public order and, consequently, to **preserve and/or recover democratic institutions or the integrity and sovereignty of the State**.[1040] Likewise, the Human Rights Committee has specified that the purpose of a state of emergency is to eliminate actual or imminent dangers that threaten "the life of the nation."[1041] In the same vein, the Siracusa Principles approved by the now defunct Commission on Human Rights emphasize that the purpose of a state of emergency is to protect the integrity of the entire population, the territory of the State, political independence, or the functioning of institutions to ensure and protect rights in a comprehensive manner.[1042] Consequently, as clarified by the Inter-American Court of Human Rights, internal conflict and unrest that do not represent a serious

---

1038 ONU, Comité de Derechos Humanos, Observación General No. 29, Estados de Emergencia (artículo 4), CCPR/C/21/Rev.1/Add.11, 31 de agosto de 2001, párr. 3.

1039 CIDH, Informe sobre la situación de los Derechos Humanos de un sector de la población nicaragüense de origen Miskito, ya citado.

1040 IACHR, Annual Report of the Inter-American Commission on Human Rights 1980-1981, OEA/Ser.L/V/II.54 doc.9 rev.1, October 16, 1981, "States of Emergency"; Informe sobre la situación de los Derechos Humanos de un sector de la población nicaragüense de origen Miskito, already cited.

1041 Comité de Derechos Humanos, Observación General No. 29, Estados de Emergencia (artículo 4), ya citado, párr. 2.

1042 Comisión de Derechos Humanos, Principios de Siracusa sobre las Disposiciones de Limitación y Derogación del Pacto Internacional de Derechos Civiles y Políticos, 28 de septiembre de 1984. Ver, entre otros, Principio 39.

and imminent threat in the aforementioned sense do not justify a legitimate state of emergency.[1043]

8. The purpose of the state of emergency has a broader justification which consists precisely in eliminating threats to democratic rights and institutions posed by the exceptional circumstances. Consequently, the means adopted to confront a serious situation cannot involve the elimination of rights and freedoms of the population or a segment of it, as this would involve a contradiction and contravene the ultimate purpose of the state of emergency. Consequently, **the reasonableness and proportionality of the measures are key** and must be designed "to the extent [and for the period of time] strictly required by the exigencies of the situation" (Article 27, ACHR). In this regard, the American Convention requires that the measure adopted must be proportionate to the end sought, or, in other words, in no way may the degree of restriction be greater than the degree of danger.[1044] In this task it is vital to ensure that reasons (motives) for the measure are provided, and that the need for the restrictions to be imposed is explained.[1045] Thus, the means used to fulfill the purpose of the state of emergency must necessarily comply with the principle of legality, the regulated exercise of power, and accountability.[1046]

9. Likewise, it is necessary to highlight the duration of the measure. The **duration** (*temporalidad*) of states of emergency and the consequent suspension of rights entails a very thin line that can turn life in democracy into a political system with autocratic features. It is that delicate.

---

[1043] Corte IDH, Opinión Consultiva OC-8/87, ya citada, paras. 20, 35 and 42.

IACHR, Report on the Situation of Human Rights of a Segment of the Nicaraguan Population of Miskito Origin, November 29, 1983.

[1045] CIDH, Informe No. 48/00, Caso 11.166, Walter Humberto Vásquez Vejarano, Perú, ya citado, paras. 34 and 36.

[1046] Comisión de Derechos Humanos, Principios de Siracusa sobre las Disposiciones de Limitación y Derogación del Pacto Internacional de Derechos Civiles y Políticos, cit., Principio 51 y siguientes; Corte IDH, Opinión Consultiva OC-8/87, ya citada, paras. 26-27.

10. The prolongation in time of a state of emergency undermines its purpose, since opportunities are lost to recover a situation of normality typical of a democracy, with full rights and freedoms. The Inter-American Court has expressed it very well by understanding that "the suspension of guarantees cannot be disassociated from the "effective exercise of representative democracy" referred to in Article 3 of the OAS Charter [...]. The suspension of guarantees lacks all legitimacy whenever it is resorted to for the purpose of undermining the democratic system."[1047]

11. The IACHR has made it clear that a state of emergency prolonged the time strictly needed to attend to the emergency generates concentration of power and undermines the rule of law.[1048] The Sicaracusa Principles emphasize that measures to suspend rights should ensure a return to normality in the shortest possible time.[1049] The temporary and provisional nature of states of emergency is essential to ensure that these extraordinary measures do not become permanent. This has been noted by the Human Rights Committee in its supervision of states of emergency in a number of countries, in which serious human rights violations were committed.[1050] The temporary nature of a state of emergency also implies a **periodic review** of the need to continue with the measure.[1051]

12. These considerations point directly to a public security policy based on the declaration of states of emergency. The report on El Salvador, which prompts this concurring opinion, leads to the need to

I/A Court H.R., Advisory Opinion OC-21/87 , the aforementioned. Series A No.21, par. 20.

[1048] IACHR, Annual Report of the Inter-American Commission on Human Rights 1980-1981, cited above; and Report No. 48/00, Case 11.166, Walter Humberto Vásquez Vejarano, Peru, cit. 35.

[1049] Comisión de Derechos Humanos, Principios de Siracusa sobre las Disposiciones de Limitación y Derogación del Pacto Internacional de Derechos Civiles y Políticos, cit., Principio 48.

[1050] Comité de Derechos Humanos, Examen de los informes presentados por los Estados parte en virtud del Art. 40 del Pacto, Israel, CCPR/C/79/Add.93 (1998), párr. 11; Examen de los informes presentados por los Estados parte en virtud del Art. 40 del Pacto, Líbano, CCPR/C/79/Add.78 (1997), párrs. 10-11.

[1051] Comisión de Derechos Humanos, Principios de Siracusa sobre las Disposiciones de Limitación y Derogación del Pacto Internacional de Derechos Civiles y Políticos, cit., Principio 55.

emphasize this premise. A traditional approach to public security is biased towards excessive repression, centralization of power, limited participation, and violation of human rights. A public security policy disguised by prolonged restrictions under a state of emergency represents the application of a traditional approach, as it weakens or even nullifies human development.

13. It is important to recall that the inter-American system has moved away from the traditional public security approach to adhere to the multidimensional approach. *The Inter-American Democratic Charter* of 2001 is one of the first steps toward this broader approach to security in the region and underscores the importance of democracy, development, and cooperation for security. It believes that democracy is essential for the stability, peace, and development of the region, and promotes the protection of human rights and fundamental freedoms as well as internal security.[1052] The 2003 *Declaration on Security in the Americas* explicitly recognizes the multidimensional approach and goes beyond military threats and the pure exercise of force/violence, including concepts such as human security, economic development, public health, and the environment in the design of public policies.[1053] *The 2011 Declaration of San Salvador on Security in the Americas* broadens the concept of security to include non-traditional threats such as terrorism, organized crime, poverty, and natural disasters. This 2011 declaration states that "public security policies require the participation and cooperation of multiple actors".[1054] Thanks to these developments within the inter-American system, the traditional approach to public security is now rejected and with it the possibility of constituting states of emergency as a normal mechanism for maintaining public order.

1052 Organization of American States, Inter-American Democratic Charter (2001), arts. 1-3. https://www.oas.org/dil/esp/carta_democratica_interamericana_11sep2001.pdf

1053 Organización de Estados Americanos, Declaración de Seguridad en las Américas (2003), párrs. 1 and 2. https://www.oas.org/sap/peacefund/VirtualLibrary/KeyPeaceInstruments/DeclarationOnSecurityInTheAmericas/DeclarationSecurityAmericasSpanish.pdf

1054 Organización de Estados Americanos, Declaración de San Salvador sobre Seguridad en las Américas (2011), art. 5. https://www.oas.org/sap/peacefund/VirtualLibrary/DeclarationSanSalvadorCitizenSecurityAmericas/DeclaracionSanSalvadorSobreSeguridad.pdf

14. Our societies must be warned of the risks posed by security policies based on the traditional approach. In the short term, they can show apparently effective results, due to a "hard line" policy that generally focuses on restricting rights, mass arrests, and legal amendments to maximize the effectiveness of the State's punitive power. Security policies, however, have made little progress in dismantling the highest levels of illegal networks, or in strengthening police and judicial institutions to deal with these criminal phenomena within the parameters of the rule of law. Public opinion in the region has closely monitored the results obtained in El Salvador, and some authorities and candidates for elected office have been tempted to imitate its policy.[1055] Despite the immediate success in controlling the presence of gangs in the streets,[1056] the model has had very high costs in terms of the human rights of many people, while it has made it difficult to devote efforts to the institutionalization of democratic and efficient security policies, sustainable in the medium and long term.

## III. On the process of preparation and approval of the Report

15. The report was challenged by the State of El Salvador and by the dissenting partial vote of Commissioners Carlos Bernal Pulido and Stuardo Ralón Orellana (although Commissioner Gloria M. De Mees voted against the report without specifying in what terms) for an alleged lack of methodological rigor. In this regard, it is important to note that the criticisms formulated in the dissenting partial vote - which this concurring vote will attempt to respond to - were not pointed out during the process of drafting the *Report* by the Commissioners who are now voting in partial dissent, but only when the State of El Salvador sent its observations on the preliminary version.

16. In this regard, it should be clarified that the process of preparing this type of Commission report is complex and involves different stages,

[1055] Meléndez-Sánchez, M., & Vergara, A., "The Bukele Model: Will It Spread?," en Journal of Democracy 35(3), 2024, 84-98; disponible en: https://doi.org/10.1353/jod.2024.a930429

[1056] "Sin maras y sin democracia," El Faro, 3 de febrero de 2023, disponible en: https://elfaro.net/es/202302/columnas/26696/Sin-maras-y-sin-democracia.htm.

which implies several months of work. Even though the technical team of the Executive Secretariat of the IACHR bears the greatest responsibility, it is true that the commissioners - especially those who serve as rapporteurs of the countries concerned - can and should participate in the different bodies involved. Of course, it is the plenary of the Commission that takes the decision to address the issue through a specific report. For their part, the Country Rapporteurs are usually involved in defining the specific topics to be included in the report (work plan), in the questionnaires that are sent to the State and civil society to enable them to participate with contributions, in the requests for working visits, or in the calls for public hearings aimed at compiling the information that will be used in the report. It should also be noted that the preliminary version of the reports, before being sent to the States concerned, requires the approval of the plenary of the Commission.

17. 17. In this particular case, the preliminary version of the *Report on the State of Emergency and Human Rights in El Salvador* -which, of course, already included the essential information systematized by the IACHR and contained practically the same conclusions that are part of the final version- was approved by the seven members of the Inter-American Commission, in its previous composition, including the two commissioners who are now voting in partial dissent. None of the methodological criticisms later formulated in the dissenting vote were expressed at the time.

## IV. On the monitoring mandate of the IACHR and its differences with the jurisdictional mandate

18. A distinctive feature of the IACHR is that it pursues[1057] two unique mandates, which are independent of each other and, at the same time, derive from the same mission: "... to promote the observance

[1057] Speech by René Cassin at the Inter-American Specialized Conference on Human Rights, 1969, cit. in: Respuesta de la Comisión Interamericana de Derechos Humanos al Consejo Permanente de la OEA respecto de las recomendaciones contenidas en el "Informe del Grupo de Trabajo Especial de Reflexión sobre el Funcionamiento de la CIDH para el Fortalecimiento del Sistema Interamericano de Derechos Humanos", 24 de octubre de 2012, CP/INF.6541/12 corr. 1.

and protection of human rights" (Article 106 of the OAS Charter). Indeed, the Inter-American Commission on Human Rights has a jurisdictional or contentious mandate, and a monitoring and promotional mandate.

19. In contentious matters there is a dispute or controversy of fact and/or law, in which the IACHR exercises a quasi-jurisdictional role to determine international liability. For this reason, the contentious procedures are regulated in detail, including procedural arrangement specifically designed for States to make observations, check evidence, and make suggestions. These arrangements are established as genuine procedural rights for States.[1058]

20. On the other hand, the rules governing the exercise of the monitoring mandate are considerably more flexible than those established for the contentious/jurisdictional procedure. Thus, while the American Convention subjects the admissibility of petitions to compliance with a series of substantive and procedural requirements (Article 46), it makes the approval of reports and recommendations subject only to an analysis of "convenience" by the IACHR (pursuant to Article 41.b and c of the ACHR, and Article 18.b and c of the Statute of the IACHR).

21. That said, in strictly procedural terms, even in this monitoring function, the State is given an opportunity to defend its position/disclaimer, by a specific deadline. Apart from the disclaimer, any State disagreement with respect to the monitoring exercised by the IACHR should be channeled through the political bodies of the OAS.[1059] The IACHR, for its part, must study the State observations it receives, and may maintain and/or modify the report or even make decisions regarding the publication of the document, all on the basis of such observations (pursuant to Article 60.a, b and c of the Rules of Procedure). This is

[1058] I/A Court H.R., Advisory Opinion No. 19/05, Control of Legality in the Exercise of the Powers of the Inter-American Commission on Human Rights, Series A No. 19, November 28, 2005, para. 27.

[1059] Ibid, par. 30.

precisely what happened with this *Report on the State of Emergency and Human Rights in El Salvador.*

22. The principle of subsidiarity does not preclude the IACHR's exercise of its autonomous monitoring powers. Indeed, while enshrining the principle of subsidiarity, the Convention grants the IACHR the power to decide, based on its own "expediency" analysis, whether to approve a country report. Therefore, it is up to the IACHR to reconcile the validity of both elements, based on its institutional nature as a principal and autonomous organ of the OAS.

23. The adoption of a thematic report or a country report does not constitute a prejudgment on possible contentious cases.[1060] The adoption of a country report, even when it refers to individual cases, does not rule on petitions, since the latter, depending on the case, "will follow the corresponding regulatory procedure, which, if it has not yet been completed, will end with a pronouncement or resolution on the merits of the matter that has been the subject of the complaint."[1061] In general, mentions of individual cases or complaints in a country or thematic report serve to illustrate the standards and support the interpretative dimension that elucidates the content of rights. For the same reason, there is no lis pendens or duplication between the two types of cases.[1062]

24. Moreover, the thematic or country reports do not seek to establish the international responsibility of the State in relation to the situations examined.

---

1060 IACHR, Report on the Situation of Human Rights in Argentina, OEA/Ser.L/V/II.49 doc.19, April 11, 1980, Introduction OEA/Ser.L/V/II.49 doc.19, April 11, 1980, Introduction; IACHR, Report on the Situation of Human Rights in Guatemala, October 13, 1981, Methodology, October 13, 1981, Method used, paras. 1-3; CIDH, Informe sobre la Situación de los Derechos Humanos en Panamá, 9 de noviembre de 1989, Introducción.

1061 CIDH, Informe sobre la Situación de los Derechos Humanos en Argentina, ya citado.

1062 Digesto de decisiones sobre admisibilidad y competencia de la CIDH, OEA/Ser.L/V/II.175 Doc. 20, March 04, 2020, paras. 90-91.

## V. On the methodology of monitoring reports

25. On the other hand, the IACHR's sixty-year tradition in the autonomous exercise of its monitoring mandate should be taken into account.

26. First of all, it is important to emphasize that the Inter-American Commission has **full autonomy** to carry out that mandate and, for that reason, it is its own rules of procedure that define the methodology to be followed in doing so (Article 39 of the American Convention). In this regard, the preparatory work for the American Convention reflects an explicit concern to safeguard the autonomy of the IACHR, seeking to prevent the OAS General Assembly from diminishing or altering it through the Statute.[1063]

27. Second, the **flexibility of** the monitoring mandate has allowed the IACHR to deploy, over the last 65 years of its existence, all its wisdom and creativity [1064]to enhance its legitimacy and advocacy capacity. To date, 231 thematic, country, and chapter IV.B reports in its annual report have been approved. In particular, 150 of these reports involve a country or group of countries in the region, while 81 are country reports. In all these cases, the IACHR fulfilled its mandate in an independent, objective, and impartial manner, applying the methodology enshrined in its rules of procedure and tradition.

28. Indeed, from the outset, the IACHR has made use of different sources of information, all of which are duly mentioned in the documents it issues, to carry out this monitoring task. In this regard, it clarified early on that the lack of consent for a visit does not

[1063] Proceedings and Documents of the Inter-American Specialized Conference on Human Rights, San José, Costa Rica, 7-22 November 1969, OEA/Ser.K/XVI/1.2, cit. in: Respuesta de la Comisión Interamericana de Derechos Humanos… cit., párr. 14.

[1064] Medina Quiroga, Cecilia; "The Role of Country Reports in the Inter-American System of Human Rights"; in: Netherlands Quarterly of Human Rights 14(5), 1997, págs. 457-473.

prevent it from issuing a country report "... based on the use of other sources it has been able to collect."[1065]

29. The **collection of testimonies** from victims, family members, social sources, and human rights activists, among others, is an established practice in monitoring activity.[1066] For example, the IACHR used the testimonies in its first reports on Cuba[1067] and, more recently, when it was prevented from visiting Venezuela. This practice was also adjusted to overcome restrictions imposed by the pandemic by making intensive use of virtual and remote media.

30. On many occasions, the Commission decides not to reveal the identity of the persons heard or interviewed and to keep the testimony confidential,[1068] for security reasons. Particularly in the context of El Salvador, the Commission frequently encountered fear of reprisals for the information provided.

31. The contribution of **reports and documents from civil society organizations** is also vital for the IACHR to carry out its mandate. These organizations play a key role in any monitoring activity (requests for information, public hearings, working visits, on-site visits, country reports, thematic reports, etc.), due to the embodiment of these types of organizations in the political and social fabric of each

---

[1065] Vargas Carreño, Edmundo; "Funciones de la Comisión Interamericana de Derechos Humanos: observaciones in loco e informes de la Comisión Interamericana de Derechos Humanos"; in: AA.VV, El sistema interamericano de protección de los derechos humanos en el umbral del siglo XXI, T. 1, Corte IDH, San José, 2003, pág. 512.

[1066] United Nations High Commissioner for Human Rights, "Commissions of Inquiry and Human Rights Fact-finding Missions. Guía y práctica", 2015, pág. 49.

[1067] Vargas Carreño, Edmundo, "Funciones…", cit.

IACHR, Second Report on the Situation of Human Rights in Peru, June 2, 2000. 30 y 31; Informe sobre la Situación de los Derechos Humanos en Guatemala, 13 de octubre de 1981, Capítulo II, C, "Muertes Atribuidas a las Autoridades Gubernamentales o a sus Agentes", párrs. 1 y 2; Informe sobre la Situación de los Derechos Humanos en Argentina, 11 de abril de 1980, Capítulo III; CIDH, Honduras: derechos humanos y golpe de estado, 30 de diciembre de 2009, párr. 161.

country and/or region.[1069] The IACHR's tradition has involved, to a large extent, an alliance with the continent's human rights organizations, whose work it must promote and protect.[1070]

32. The consistent methodology also contemplates the **systematization and analysis of official information** obtained by the Commission or expressly provided by the State referred to in the report. In this sense, although in the preparation of thematic or country reports a contradictory opinion is not adopted, the State is assured the opportunity to present its observations on the text, as provided for in Article 60 of the IACHR Rules of Procedure. The opportunity for States to present information to enrich the report should not be confused, as the dissenting vote suggests, with exercise of the right of defense provided for in contentious proceedings (because it is not an adversarial process), and, even less so, maintain that this State right is guaranteed by Article 8 of the American Convention, which is dedicated exclusively to the protection of the rights of individuals.

33. In this regard, the practice of the IACHR is to send a specific questionnaire to the State during the preparation of the report, to gather documentation and the State's position on the different issues to be addressed in the document; as well as to provide the draft report once it has been prepared so that the State can send its observations and final comments by a given deadline that may be extended at the request of the State.

34. Finally, the methodology of this type of report establishes a **time frame** in which the specific situation will be evaluated. The definition of this time frame does not prevent the IACHR from resorting to previous data, initiatives, or events precisely to contextualize the policies or practices that are being analyzed on this occasion; that is, to establish comparisons, showing progress and/or setbacks.

[1069] United Nations High Commissioner for Human Rights, Commissions of Inquiry and Verification Missions..., cit.

[1070] OAS, General Assembly, AG/RES.1671(XXIX-0/99), June 7, 1999.

## VI. On the methodology used in the *Report on the State of Emergency and Human Rights in El Salvador*

35. The methodology applied is explicitly described in this report (paragraphs 17 to 20). In particular, it should be noted that, in the absence of consent for an on-site observation, after successive requests from the IACHR, the use of the different types of primary and secondary sources provided for in the Rules of Procedure, which the IACHR has used on similar occasions, was especially relevant.[1071]

36. Specifically, the IACHR interviewed persons who were detained or their relatives or representatives, and/or relatives of persons who died in state custody (footnote 11). In addition, it held public hearings, held meetings with civil society organizations that defend human rights and with alleged victims of human rights violations, and used the information available in other proceedings (footnote 12). The Commission also referred expressly and in detail to the long list of contributions from human rights organizations whose documents it consulted, identifying the respective link in each case (footnote 14).

37. The Report also details its extensive dialogue with the State of El Salvador. Specifically, the report explains that in 2023 a questionnaire was sent to the State requesting information on 33 issues and a request for additional information on 3 additional topics. In addition, the information provided by the State through other letters, data obtained in multiple public hearings, meetings, among other sources provided for in Article 59.5 of the Regulations, was also considered. It should also be noted that, once the draft document was submitted, the State prepared a report of 134 pages and 124 annexes, in which observations were made and various requests were formulated. Many of these observations were taken into account by the IACHR and led

---

CIDH, Democratic institutions, the rule of law, and human rights in Venezuela: Informe de país, 31 de diciembre de 2017, párrs. 60, 67; CIDH, Democracia y derechos humanos en Venezuela, 30 de diciembre de 2009, Introducción, paras. 6, 8, 9, 11, 13 y 14; CIDH, Informe sobre la Situación de los Derechos Humanos en Guatemala, 13 de octubre de 1981, A. Introducción párr. 10, B, Método empleado, paras. 1-3; CIDH, Informe sobre la Situación de los Derechos Humanos en Panamá, 9 de noviembre de 1989, Introducción.

to modifications in the final version of the report. As can be seen, the Report incorporates excerpts from the State's statements in order to reflect its position on the different issues.

38. In short, in the report under analysis, the Commission applied the methodology established in its Rules of Procedure. Indeed, the IACHR is empowered to use "reliable and convincing" information (Article 59.5). In particular, it may "freely and privately" interview individuals and organizations (pursuant to Article 57.a and e). The State, for its part, is obliged to provide such persons and organizations with "guarantees" and to refrain from taking "reprisals" against them (Articles 56 and 57.b). Likewise, Article 59.5.g explicitly empowers the IACHR to consult contributions from civil society organizations and individuals. In summary, the methodology employed in the *Report on the State of Emergency and Human Rights in El Salvador* is consistent with the nature, tradition, and regulations of the Inter-American Commission's monitoring mandate over the past 65 years.

## VII. On the transparency and independence of the IACHR

39. Finally, it is necessary to refer briefly to the issue of transparency regarding the funding and independence of the IACHR.

40. Transparency in the financing of the Inter-American Commission on Human Rights is fundamental for guaranteeing its credibility and effectiveness in the region. The accountability information published year after year in Chapter VI of the Annual Report, which has the approval of the plenary of the IACHR, is a clear commitment to transparency. In this chapter, the IACHR exhaustively details the origin and use of its financial resources, allowing member states and the general public to evaluate the proper management of funds. In addition, in compliance with the mandate established by operative paragraph I.4 of resolution AG/RES. 2957 (L-O/20), since 2020, the Commission has reported annually to the Permanent Council of the Organization of American States on the execution of its resources, ensuring continuous and transparent oversight of its financial activities.

41. Consequently, possible allegations of alleged conflicts of interest generated by sharing funding sources with civil society organizations should be analyzed on a case-by-case basis, based on concrete evidence that the decisions of the Inter-American Commission were not adopted in an autonomous and independent manner; especially considering that the IACHR receives funds from a variety of state or inter-state public agencies or foundations that usually finance other human rights institutions and even programs or policies promoted by governments in the region.

65 YEARS IACHR

Inter-American Commission on Human Rights

Case No. 25-cv-1774-JEB

# Exhibit 9

An official website of the United States Governmen Here's how you know

U.S. DEPARTMENT *of* STATE



# Secretary of State Marco Rubio and Salvadoran Foreign Minister Alexandra Hill Tinoco at the Signing of a Memorandum of Understanding Concerning Strategic Civil Nuclear Cooperation

REMARKS

MARCO RUBIO, SECRETARY OF STATE

INTERCONTINENTAL SAN SALVADOR

SAN SALVADOR, EL SALVADOR

FEBRUARY 3, 2025

**FOREIGN MINISTER HILL:**(Via interpreter) His Excellency the Secretary of State, my friend, Marco Rubio, and members of his delegation; your excellency the U.S. ambassador accredited in our country, Mr. William Duncan; Madam Vice Minister of Foreign Affairs Adriana Mira; to the president of the Hydroelectric Commission of the Lempa River, Daniel Álvarez; Madam Salvadoran Ambassador to the United States, Ms. Milena Mayorga; our friends from the press; ladies and gentlemen, I feel privileged today and filled with enormous gratitude toward the people and the new administration of the United States of America.

Cookie Settings

Two weeks have gone by and we have this visit from the Secretary of State, who is already a friend of our country. That is only a sign of the ties of friendship and goodwill for the well-being of our peoples. Thank you, Mr. Secretary. Thank you for this enormous gesture.

It is an honor to be able to sign this agreement, this memorandum of understanding and cooperation for civil nuclear energy. It is another accomplishment and goal for President Bukele. In addition to offering energy 24 hours a day at competitive pricing without depending on geopolitics or on oil prices, it is a commitment for our prosperity. And to that end, this nuclear energy is a strategic option which will not just help reduce our carbon footprint, it will also ensure reliable and efficient electric energy for our country's development and for the well-being of our people.

El Salvador is making rapid progress in building our key infrastructure, from housing projects to the establishment of large-scale technology companies. In these specific efforts, we need the accompaniment from our greatest and most trustworthy partner, from our friends on whom we can depend that they will give us the best training and knowledge transfer which will be essential. The experience that you have on civil nuclear energy will give us all of the tools we need to train our people, to train our Salvadoran experts, who will lead the technical and regulatory aspects of this transition – this unprecedented transition.

Support from the U.S. Government, as we all know, goes much beyond just energy generation. This memorandum of understanding also opens the doors to develop nuclear applications for essential sectors such as medicine, agriculture, water resource management, and safe waste management. This will also build our capacity for research, innovation, and sustainable development.

Thank you once again, Mr. Secretary. Thank you on behalf of El Salvador, on behalf of each of our inhabitants. I'm grateful deeply for your support and commitment. This is and always will be a place where you are welcome. It is a country that welcomes you with open arms and an open heart, ready to walk hand in hand with you. I am convinced that this is just the beginning and a

great start of a stage of close and fruitful cooperation and strengthening between our nations and our peoples. Thank you very much. (Applause.)

**MODERATOR:** (Via interpreter) Thank you very much to the Minister of Foreign Affairs of El Salvador, Alexandra Hill, for those remarks. At this time, we will hear and I invite His Excellency the Secretary of State of the United States of America.

**SECRETARY RUBIO:** (In Spanish) and then I'll switch to English for our friends as well, and I'll be brief on both.

(In Spanish.)

It's a great honor and a privilege. This is my first signing ceremony. Been Secretary of State now for just – is today Tuesday? Two weeks. (Laughter.) And it's great to do it here in a nation, among people with which we have so much in common that unifies us. There's an extraordinary Salvadoran American community in South Florida and also in the Washington, D.C. metropolitan area, where I've worked in the Senate, now as Secretary of State, for a number of years. And we are unified and hold in common so many things.

It's also exciting to be here in the presence of all of you to see the transformation of a society and of a nation that not too long ago faced great insecurity. But we have seen the transformation under the leadership of this administration here and President Bukele. A country that was once known for violence and for the inability to live openly and freely with one's family and enjoy life has now become one of the most secure in the hemisphere thanks to his leadership, to the difficult decisions that had to be made.

But now in addition to continuing to maintain and build upon that security comes the extraordinary opportunity of transformation – to prepare this country and its people for the 21st century, for the technologies like nuclear energy that will allow you to power a 21st century economy that will allow this to be the home of every advanced technology and industry of this

new era, so that the people – the young people of this country and all people of this country – will be able to live not just in peace but in prosperity, raise their families here, and give their children the chance at a life even better than their own.  It's so exciting to be here today as part of this agreement that – of civil nuclear cooperation, in which we can take the first step, side by side with you, the people of El Salvador, to build that better future.

I think I would also take a moment to announce, especially to our friends covering this back home in America, of an extraordinary meeting we had.  We spent over two and a half – (in Spanish) – two and a half to three hours with my friend President Bukele and his team, and then we had some time privately.  And while more details will be forthcoming, the president in an act of extraordinary friendship to our country, knowing the challenges we face in the U.S., has agreed to the most unprecedented and extraordinary migratory agreement anywhere in the world.

First, obviously, he continues with full cooperation on the returning of Salvadorans who find themselves illegally in the United States and welcome them back home, and that's already existing and that will continue.  But second, he has agreed to accept for deportation any illegal alien in the United States who is a criminal from any nationality, be they MS-13 or Tren de Aragua, and house them in his jails.  And third, he has offered to house in his jails dangerous American criminals in custody in our country, including those of U.S. citizenship and legal residents.  No country's ever made an offer of friendship such as this.

You can think about it: any unlawful immigrant, illegal immigrant in the United States who's a dangerous criminal – MS-13, Tren de Aragua, whatever it may be – he has offered his jails so we can send them here and he will put them in his jails.  And he's also offered to do the same for dangerous criminals currently in custody and serving their sentences in the United States, even if they're U.S. citizens or legal residents.  We are just profoundly grateful.  I spoke to President Trump about this earlier today, and it's just one more sign of what an incredible friend we have here in President Bukele and the people of El Salvador.

Thank you and God bless you, and now let's – I look forward to signing this agreement. (Applause.)

(The memorandum was signed.)

TAGS

Bureau of International Security and Nonproliferation | Bureau of Western Hemisphere Affairs | El Salvador | Energy | Nuclear Energy | Office of Nuclear Energy, Safety, and Security | Office of the Spokesperson | The Secretary of State

U.S. DEPARTMENT *of* STATE

White House

USA.gov

Office of the Inspector General

Archives

Contact Us

America 250

Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

Case No. 25-cv-1774-JEB

# Exhibit 10

Post Reply

**Nayib Bukele**
@nayibbukele

We have offered the United States of America the opportunity to outsource part of its prison system.

We are willing to take in only convicted criminals (including convicted U.S. citizens) into our mega-prison (CECOT) in exchange for a fee.

The fee would be relatively low for the U.S. but significant for us, making our entire prison system sustainable.



9:44 PM · Feb 3, 2025 · **40.6M** Views

12K 38K 211K 14K

Post your reply

Reply

Case No. 25-cv-1774-JEB

# Exhibit 11

An official website of the United States Governmen Here's how you know



# Secretary of State Marco Rubio Remarks to the Press

REMARKS

MARCO RUBIO, SECRETARY OF STATE
EN ROUTE MIAMI, FLORIDA

MARCH 28, 2025

**QUESTION:** Can I ask a non-trip question, because I want to know what's happening with this Ukrainian children grant.

**SECRETARY RUBIO:** Grant?

**QUESTION:** The Ukrainian children who —

**SECRETARY RUBIO:** Oh, the data. The data is secured. We secured the data. We'll transfer it to the appropriate party. We've ensured that. And we'll be able to say that next week. We already notified that. If we haven't, we're about to notify Congress. I think we've gotten some letters.

Cookie Settings

**QUESTION:** Yeah.

**SECRETARY RUBIO:** So there's no danger to the data that's been collected on that.

**QUESTION:** But is the program back on?

**SECRETARY RUBIO:** No, no, the program we're not – the program is not funded. It was part of the reductions that were made, but we secured the data and we've ensured that we have it and it can be transferred to any appropriate authorities, and we'll issue a congressional – I don't know if it's a notification or just responses to the letters they've written us.

**QUESTION:** This is the Conflict Observatory?

**SECRETARY RUBIO:** Yes.

**QUESTION:** How is the —

**SECRETARY RUBIO:** You're not going to hit me with that mike like the President got hit? (Laughter.) Okay.

**QUESTION:** And when you were answering the – Mr. Secretary, earlier, you said 300 visas? It's actually —

**SECRETARY RUBIO:** Well, the —

**QUESTION:** Are they all student visas or —

**SECRETARY RUBIO:** No, no, no, you guys – you asked – the question was, was there 300? I know that number's been cited. I said it might be more because we're doing them every day, primarily student visas, some visitors visas.

**QUESTION:** Okay, so just making sure. Just making sure.

**SECRETARY RUBIO:** I don't know actually if it's primarily student visas. It's a combination of visas. They're visitors to the country. If they're taking activities that are counter to our foreign – to our national interest, to our foreign policy, we'll revoke the visa.

**QUESTION:** Are all of those related to pro-Palestinian protests or (inaudible)?

**SECRETARY RUBIO:** I'm trying to remember – there's a lot of them now, because I've gone through every one of them. I think there might be a few that are not, that are related to other groups that are – of people – we've also identified – but this actually is – it should be automatically revoked. We've also identified people that have criminal charges and even while in the country, and still have active visas. Some are unrelated to any protests and are just having to do with potential criminal activity.

**QUESTION:** (Inaudible.)

**SECRETARY RUBIO:** Huh?

**QUESTION:** (Inaudible.)

**SECRETARY RUBIO:** Yeah, I have to sign every single one.

**QUESTION:** And what is the —

**SECRETARY RUBIO:** Or the autopen. I'm kidding. No autopen. I'm just joking.

**QUESTION:** And what does it mean when you say against the foreign policy of the United States?

**SECRETARY RUBIO:** It runs counter to our foreign – that's how we issue visas coming in. I think about it this way. If we knew this information – my standard: If we knew this information about them before we gave them a visa, would we have allowed them in? And if the answer is no, then we revoke the visa.

**QUESTION:** Can I ask you on a different topic, Türkiye? You had the meeting with the foreign minister a few days ago. I think yesterday they – yesterday or today they expelled the BBC correspondent. They arrested an AP photographer. How concerned are you with how things are going there?

**SECRETARY RUBIO:** Well, ultimately – and look, we've expressed that we're concerned. We don't like to see the direction that's going. It's an ally. It's a partner in NATO. Anytime you have instability on the ground, you don't like to see it. Obviously, they have internal domestic political considerations. We're not necessarily going to always opine on every single one of them. To the extent we have deeper concerns, we expect to express them at least privately at the outset, certainly in a new administration when we're trying to establish relations. But we watch the same news reports everybody else sees about what's going on. We're certainly concerned about these protests and some of the reports. But we raised that and – but I haven't seen what – what you referenced in the last day, yeah.

**QUESTION:** Just on Turkey, in your tweet —

**SECRETARY RUBIO:** Türkiye.

**QUESTION:** Yes, Türkiye. In your tweet —

**QUESTION:** Are you guys going to change that? Are you going to back to Turkey?

**SECRETARY RUBIO:** When we're in Türkiye we're going to say Türkiye.

**QUESTION:** In your tweet, the final sentence is basically about the arrest of Istanbul mayor. You're not saying that explicitly, but those are their (inaudible).

**SECRETARY RUBIO:** Well, I mean, and we talked about that. I mean, their argument is that the mayor is involved in corruption, that this has been a longstanding issue that it's finally got acted

upon, and that he is seeking refuge behind his politics. I don't know all the facts about it. Obviously, that's not what the mayor is saying or what the political opposition is saying is that this is a leader that might have won the election had he been allowed to run.

So we're watching it. We've expressed concern. We don't like to see instability like that in the governance of any country that's such a close ally, especially, and it —

**QUESTION:** After your post, Turkish diplomatic sources actually denied that this had come up and you had expressed your concern. I just wanted to ask you about that.

**SECRETARY RUBIO:** Well, I did raise it with the foreign minister, and probably exactly in the words that I'm using now, and that is we're watching these reports and obviously it's disturbing to see, and we talked about it in those terms. But as I said, we don't like to see that kind of instability or these things happening inside countries that we hope to partner with on a bunch of things. And President Trump had a very good working relationship with President Erdogan in the first administration. I think they would like to restart that. But they're a NATO ally, and we would like to cooperate with them in Syria and in other places. So I think it's possible to raise concerns and at the same time understand we have a lot of other things to partner on as well. We have – that's the balance of conducting a mature foreign policy.

**QUESTION:** Can you speak about the European leaders who said today that they – they oppose lifting sanctions on Russia, they don't think it's time to do that? Are you all considering that? Can you talk about deliberations?

**SECRETARY RUBIO:** Well, no, so we met with the Russians. Our team was over there this week. They came back and they arrived last night, I think, or early some point yesterday. So we're going to reconvene. I had some calls about it today. We're sort of going to analyze what they're – what they're raising and sort of study what exactly it is. It's a host of sanctions, including sanctions that are not American. They've raised potentially a couple – my readout of it – they're not even American sanctions, so we couldn't lift them if we wanted to. We're going to sort of analyze what

our team came back with. We'll present those options to the President. The President will make those decisions. We're not there yet.

**QUESTION:** Have you received Iran's response to the President's letter?

**SECRETARY RUBIO:** Have I what? I'm sorry.

**QUESTION:** Received it, Iran's response.

**SECRETARY RUBIO:** Yeah, I'm not going to comment on that yet other than to say the President's letter has been publicly reported. I expect there will be a response, and obviously, at that point, the President will decide what steps, if any, he wants to take next.

**QUESTION:** Can we go back to visa issue just for a second? I mean, a lot of people feel freedom of speech concerns about it. Are you saying that if you come and if you apply for a visa and get a student visa and you don't lie, and you tell the truth and you're not coming to protest or anything, but during the course of your studies, wherever it is in the U.S., you develop views or opinions that are at odds with the administration's foreign policy – say you learn something in your course of study that makes you think that what the policy is wrong – and then you protest it or write something about it, don't do anything violent, is that grounds enough to revoke a visa?

**SECRETARY RUBIO:** Well, I think there's a little bit of common sense here. You come to the States and then you decide you don't like those paper straws that some of the stores are selling and you start protesting or complaining about paper straws – I mean, we're obviously not going to yank a visa over that. I think it crosses a line – think about it this way. No one has a right to a visa. These are things that we decide. We deny visas every day for all kinds of reasons all over the world. We deny visas because we think people might overstay. We deny visas because the country they come from are people that historically overstay. We deny visas every day, and we can revoke visas. If you have the power to deny, you have the power to revoke.

I would argue that the – what I would add to it is what we have seen on campuses across the country where students literally cannot go to school, you cannot – buildings are being taken over, activities going on – this is clearly an organized movement. And if you are in this country on a student visa and are a participant in those movements, we have a right to deny your visa. I think it would make sense to deny your visa. We're going to err on the side of caution. We are not going to be importing activists into the United States. They're here to study. They're here to go to class. They're not here to lead activist movements that are disruptive and undermine the – our universities. I think it's lunacy to continue to allow that.

**QUESTION:** So expressing any kind of view —

**SECRETARY RUBIO:** And by the way, I've been saying that since I was in the Senate. Now I'm just in a position to do something about it.

**QUESTION:** Mr. Secretary —

**SECRETARY RUBIO:** Now that's a broad thing to say – any kind of views. But when you're aligning yourself with groups that are behind these activities, openly aligning yourself with these groups that are behind these disruptive criminal activities in the United States, your visa is going to get yanked.

**QUESTION:** Mr. Secretary, I don't —

**QUESTION:** Hamas?

**SECRETARY RUBIO:** Yeah, there may be others. I mean, if you come here and join Tren de Aragua, we're going to yank your visa too. If —

**QUESTION:** Mr. Secretary?

**SECRETARY RUBIO:** And so there may be other movements, but that's partly the movement we've seen on college campuses. Let's be clear: It is a movement that is supportive of the group that just slaughtered babies, like deliberately targeted and slaughtered babies and civilians and took hostages and killed hostages. That's the group they're aligning with.

But beyond that, they are spray-painting buildings. They are taking over buildings. You must have seen these reports in campus after campus where students can't go to class and can't function and the universities don't know what to do about it. When you look at it and you realize that some of the people involved in this are here on student visas, it's crazy. We're not going to keep doing that. We're not. Don't come here. If you're going to do that, go somewhere else. Don't come here.

**QUESTION:** And I brought up the protests in Hong Kong in 2019, which I covered, because there were also shutdowns of college campuses back then. There were foreign students that were involved. There was graffiti. They stopped traffic at intersections. They shut down subway stations. They were largely peaceful, but there were also these instances that disrupted public life and there were foreign students that were involved there. And so, like, under your rationale, the Hong Kong authorities or the —

**SECRETARY RUBIO:** Well, every country in the world can deny visas to whoever they want. It's that simple. That's a fact. Whether we like it or not, they can deny visas.

Number two, that movement was not a movement in favor of a group that slaughtered babies and innocents. That's not what that – that movement, they were people who were complaining because there was no democracy, but I mean and they were upset about the direction Hong Kong was headed and the Chinese law that was being imposed. But they have – every country in the world has a right to deny you a visa. I'm not entitled to a visa. You're not entitled to a visa. Nobody is entitled to a visa in any other country. They can determine it and they can revoke it at any time they want.

Now, let's – I think it's important is that there's a clear distinction between protesting against the democratic order and protesting in favor of groups that advocate the slaughter and murder of innocent people, which is what many of these groups are supportive of. Beyond that, these groups are not just taking over – these are not sit-ins we're talking about. We are talking about buildings that have been vandalized, defaced, that where they – for months on end in some cases. We're just not going to continue to allow it. I don't understand what people don't get. A visa is a gift. It's a voluntary thing. We decide to give you a visa. We deny visas all over the world every day for a variety of reasons, and that means we can also revoke those visas. No one is entitled to a visa.

**QUESTION:** I guess some of the examples have come up like a student at Tufts University, like all they did was write an op-ed for the student newspaper advocating for a certain point of view. They're not – as far as we can tell, they haven't openly advocated for Hamas.

**SECRETARY RUBIO:** Well, we will – those – as they go, or if they seek to self-deport they can do that, because that's what we've done. We're basically asking them to leave the country. That's why they've been detained. They can do so tomorrow. Buy an airplane ticket and leave. No problem.

**QUESTION:** Mr. Secretary?

**SECRETARY RUBIO:** But I would add to this that I would caution you against solely going off of what the media has been able to identify, and those presentations, if necessary, will be made in court.

**QUESTION:** But for example, in that – the Turkish students, the Tufts student's case, I asked you today did she have – has she committed, like, or has she carried out any of those things that you just listed?

**SECRETARY RUBIO:** The activities presented to me meet the standard of what I've just described to you: people that are supportive of movements that run counter to the foreign policy of the United States. If necessary and a court compels us, we'll provide that information. But ultimately it's a visa. Judges don't issue student visas. There is no right to a student visa. We can cancel a student visa under the law just the same way that we can deny a student visa under the law. And we will do so in cases we find appropriate.

The overwhelming majority of student visas in this country will not be revoked, because the overwhelming majority of people that are coming to this country to study are not involved and associated or aligned with organizations that seek to do damage in this country, and that, frankly, organizations that hate the United States Government and hate our way of life. So I just think it's crazy to continue to provide visas so people can come here and advocate for policies that are in direct contradiction of our national interest.

**QUESTION:** Right, but are the schools raising these issues with you? Are these – are there out —

**SECRETARY RUBIO:** Oh, I'm sure they're —

**QUESTION:** Are these outside groups that they're raising —

**SECRETARY RUBIO:** Oh, I don't know. I mean, I'm sure they are. I mean —

**QUESTION:** Like, how does it come to – come to your desk? Yeah.

**SECRETARY RUBIO:** Oh, bringing it to us? Well, we're not – we're not going to talk about the process by which we're identifying it because obviously we're looking for more people.

**QUESTION:** Have you seen the video of her being detained?

**SECRETARY RUBIO:** I haven't. But look, detention is simple. Your visa is expired, your visa is revoked, you have to leave.

**QUESTION:** But it's six hooded figures with masks on their face who don't identify themselves until they already grabbed her wrist. It's quite horrifying.

**SECRETARY RUBIO:** Yeah, I mean, unfortunately our agents – I mean, I'm not – that's a DHS or ICE, so I don't know what their practices are. But our agents have had to protect their identity because they've found themselves targeted – targeted for violence, targeted for operations against them. I would say most of these protesters are wearing masks too, and they're not in law enforcement.

**QUESTION:** Can I ask you a different topic? U.S.-funded media. Radio Martí is something that I believe you've supported in the past. What do you think of the cut in funding for that entity?

**SECRETARY RUBIO:** Well, first of all, they're not part of the – they're not – we don't control that. That's a separate entity that does it. My understanding is that Martí has actually started rebroadcasting today, and a few others. I think the executive order called for them to be – all these agencies to be reduced to the statutory minimum. And I think the goal ultimately over time, as I understand it, is to reform these entities so that they provide news that, frankly, favors and advances the national interest of the United States. We have plenty of independent media outlets, including all of you, and then we are interested in media outlets that present America's point of view from our foreign policy standpoint. And so that review will be ongoing, but obviously that's outside the State Department. I don't control those.

**QUESTION:** What about the cuts (inaudible) —

**SECRETARY RUBIO:** I wish I did, though, but I don't. Not yet, anyway. Maybe we'll see, but I don't know.

**QUESTION:** What about cuts to some of the other programs in Cuba that were supporting dissidents, that were supporting political prisoners?

**SECRETARY RUBIO:** Yeah, well, some of them were not. Some of them will be restudied over time. I think ultimately we're trying to find programs that are effective. No one's been —

**QUESTION:** But no, it – as you know, there's (inaudible) in general always in Cuba right now.

**SECRETARY RUBIO:** Yeah, but there's – I – there's a bunch that were – that we approved that are on the – not even got waivered, just got restarted and we're doing them. There's others that we have suspended because we didn't think we were getting the return on the investment. That money may be repurposed to a program that works better for the same cost.

**QUESTION:** You mentioned that Marines have said – Marines at Guantanamo Bay have said that the Tren de Aragua members there —

**SECRETARY RUBIO:** Oh, yeah.

**QUESTION:** — were more violent than al-Qaida members.

**SECRETARY RUBIO:** Not just more violent, very well organized. They were able to communicate with each other, the hand signals, all kinds of – I mean, this is a prison gang, so it doesn't surprise me. That's how the Tren de Aragua originates from, so it doesn't surprise me that they're very effective in that setting.

They're also very dangerous to keep in our country. When you keep prison gangs in your country, they grow, they metastasize. MS-13 was actually a group that was started by Salvadoran – either Salvadoran refugees and/or actually people born in the U.S. of Salvadoran descent in prisons. MS-13 did not originate in El Salvador; they originated in U.S. prisons and spread down and back to El Salvador. Prison gangs are very dangerous because they recruit and then they – they almost create academies within the prisons that then metastasize and spill out to the general population.

**QUESTION:** Have you spoken to the Marines down in Guantanamo, or did they (inaudible)?

**SECRETARY RUBIO:** I spoke to one that was in Guantanamo because I know them through a family friend, but I've also spoken to both Pete Hegseth about this and, if I'm not mistaken, Secretary Noem as well. And they both – when I asked them, "Is this true?" they both confirmed that's what their officers and people on the ground were telling them. So actually I heard this from a personal acquaintance, and then I actually had it affirmed to me by two members of the cabinet.

**QUESTION:** (Inaudible.)

**QUESTION:** (Inaudible) some of the people sent down to El Salvador to the prison weren't actually gang members, but that, for example, there was a (inaudible) with a tattoo (inaudible) supporting autism, people with autism, but it looked like a gang tattoo to the immigration agent and then (inaudible) mistakes made. How do you address that?

**SECRETARY RUBIO:** Well, ultimately that – all of that was the work of the Department of Homeland Security. They've identified them. I have confidence in the assessments that they've made. They're – but I can't speak to any one of the individual cases because we're not involved in compiling them. But I have no reason – in fact, I have confidence that they compiled a good list. And if we have an opportunity to send more, we will – gang members, MS-13, whatever we can send.

**QUESTION:** (Inaudible) isn't it an issue of due process? I mean, was that raised with President Bukele? Do these people have a right to appeal in some way?

**SECRETARY RUBIO:** Every single one of them was deportable for reasons even beyond the Alien Enemies Act. The MS-13 as well. They were all deportable. Many of these people had orders of deportation already and were either in custody or had been recently apprehended. So every single person that was sent there was deportable.

Unfortunately, if they're of Venezuelan descent, up until this week the Venezuelans were not picking anybody up. They were not allowing anybody to go back. They're the only country in the hemisphere that was refusing to accept anyone. They have restarted those suddenly, and hopefully they'll continue and then we won't have to use El Salvador.

**QUESTION:** So why use the Alien Enemies Act if they were deportable anyway? Because that just seems to be (inaudible) inviting a challenge to it.

**SECRETARY RUBIO:** No, I think the expedited nature of it. These gangs were organized. They were – they were presenting very real and immediate risks in a number of communities in our country in an organized fashion. We have reason to believe that they were actually being pushed towards the United States in large numbers by the regime in Venezuela. You saw just yesterday one of them arrived in Venezuela and was greeted on the tarmac as a hero. This is an individual that was arrested for – caught on video – attacking police officers in Times Square, (inaudible) to law enforcement after doing so. So we believe that in many ways the Venezuelan regime has encouraged that flow of these groups towards the United States to create harm in our country.

**QUESTION:** The reason I ask is that we know (inaudible) Thursday before we left on Friday (inaudible) spoken to President Bukele twice, and this was all arranged, and —

**SECRETARY RUBIO:** I've spoken to him a number of times.

**QUESTION:** I know, but this —

**SECRETARY RUBIO:** Not just the only time you were around.

**QUESTION:** Well, no, no, no, this was the (inaudible).

**SECRETARY RUBIO:** Yes.

**QUESTION:** This was the Thursday – Thursday night.

**SECRETARY RUBIO:** Yes.

**QUESTION:** So now we're into Friday, and it became clear with this transfer of diplomatic notes from El Salvador and the stuff that the State Department was doing to get the money ready – 20 grand per person per year for this initial tranche of (inaudible). And it made clear that the President was going to go in and sign the AEA declaration, and yet it didn't come out until after, so Saturday. Why? Was that —

**SECRETARY RUBIO:** Well, about the AEA declaration, that came from the White House. My conversations with President Bukele were as a follow-up and to finalize in a verbal agreement we had reached in my visit to El Salvador on my first trip as the Secretary, so it was just sort of following up on that and how we were going to proceed with it. We were ready now to execute at some point, and we were working through those arrangements with them. And that's what those calls were about. It was just sort of to finalize what we had agreed on.

**QUESTION:** So you don't think that the White House delayed (inaudible)? Because the President did sign the AEA declaration on Friday.

**SECRETARY RUBIO:** Yeah.

**QUESTION:** (Inaudible) it wasn't (inaudible)?

**SECRETARY RUBIO:** I can't speak to the timing of why they released the one they did. I can tell you – and I think you were on that trip – that the agreement to house criminal aliens was reached with President Bukele back in February.

**QUESTION:** Yes.

**SECRETARY RUBIO:** And so we spoke – I've spoken to him since then, but obviously this – those days that I was there we did because we had a couple of open questions that we wanted answers

to and that he wanted answers to, and we were finalizing that.

**QUESTION:** Mr. Secretary, on Russia, about a month ago when we were in Riyadh, you were first starting on speaking with them, and you said something. You said soon enough we're going to find out whether they're acting in good faith or not, we just need to test it out. So a month later where do you stand? Are they (inaudible) —

**SECRETARY RUBIO:** Well, I'm not prepared to pass judgment on it. They're meeting with us. They're talking to us. They're making proposals. They're agreeing to ceasefires but with conditions that we need to analyze.

**QUESTION:** So is that dragging their feet, actually?

**SECRETARY RUBIO:** I wouldn't – I'm not prepared to characterize it as one or the other. What I've said almost from the very beginning is, I mean, this war is complex. As you can see, it's now going on three years. And I never said it was going to be simple. There's a lot of work to be done with both sides, in particular the Russian side, which we haven't talked to in years. So —

**QUESTION:** How long do you anticipate these negotiations to continue?

**SECRETARY RUBIO:** We're going to – we're trying to achieve peace. We're committed to trying to achieve peace as long as it takes. That doesn't mean that I can guarantee you that there's going to be an agreement in a week or a month. I just can't put a timeframe on it because it doesn't depend on us. It depends on the Russians and it depends on the Ukrainians. It also depends on our partners in Europe who have sanctions that will have to be taken into account, I believe, as part of any final deal.

But I always think it's progress when at least specifics are being agreed to even though they may not be agreeable to both sides, because we get to determine sort of the negotiating posture and what the impediments are to peace. So I think when you negotiate, when you sit down with

people and they – and you talk about these things, they have to memorialize these things in documents, at least it begins to give definition to what the impediments to peace are.

As far as willingness, that'll be tested when the time comes to sign or if – if we've dealt with impediments and there's still resistance from one side or the other, then we'll know. But we're not at that stage yet.

**QUESTION:** Do you anticipate this moving soon beyond the technical level and back to higher-level talks?

**SECRETARY RUBIO:** Well, I think you have to make more progress on a technical level at this point, but we'll see. We're going to analyze it. As I said, when they arrive back from Saudi Arabia I want to sit and talk to our team that was on the ground and get a better sense how those negotiations went, because a lot of it isn't just what was written and what was said over 12 hours. And by the way, we met with the Ukrainians twice as well, so we want to get that perspective, which we met with them on Sunday and again on Tuesday, and the Russians on Monday. So I need to hear from them directly a little bit more about how it went, and then we'll present that. We'll meet with the team and we'll present that to the President, and then decide on a path of what the next steps are.

**QUESTION:** Can I ask you a different topic? Sudan. We've seen certainly an upsurge in violence. The army says they have kicked out from the presidential palace. You've seen the strike on the market. Is there anything diplomatically that the U.S. can (inaudible)?

**SECRETARY RUBIO:** We're engaged in conversations with a number of countries, with Ethiopia, with Kenya, in just over the last 72 hours where we've been raising that. And we're very concerned that we're going to backslide to where we were a decade or less ago, and so we don't want to see that. And so we're trying to figure out and we've been engaging with our partners about soliciting their ideas about what can we do on this matter to – what contributions can the United States make to stabilize it now. There are a number of places we're doing that. We're

doing that with DRC-Rwanda as well. So there are a couple of places like that that we find ourselves sort of asking our regional partners how do they believe we can be most helpful and engaging, and with our partners outside the region as well. We've spoken – I spoke to the foreign minister of the UK yesterday about this topic.

**QUESTION:** (Inaudible) Iran and the (inaudible) letter (inaudible)?

**SECRETARY RUBIO:** Oh, he just asked me that, but you couldn't hear.

**QUESTION:** Oh, sorry.

**SECRETARY RUBIO:** No, that's okay. I just have to – now I have to remember the answer, because it has to be identical. (Laughter.)

**QUESTION:** You have to (inaudible).

**QUESTION:** Give us the details.

**SECRETARY RUBIO:** It's been publicly reported that the – that the President sent a message. I anticipate a response on that, and – but we have nothing else to announce on that. Is that pretty much what I told you? All right.

**QUESTION:** Can I ask —

**SECRETARY RUBIO:** All right. Well, the game is going to start. That's why. (Laughter.)

**QUESTION:** What brought about your hatred for ecotourism?

**SECRETARY RUBIO:** I don't hate ecotourism. It's just —

**QUESTION:** You said —

**SECRETARY RUBIO:** No, no, no, no. I said I'm not a fan of ecotourism, but I'm not against it. People like to do that stuff. But like, to me, a vacation does not involve snakes and spiders. So that's my view. Maybe that'll change. I don't know.

**MS BRUCE:** All right.

**SECRETARY RUBIO:** All right. Thanks, guys.

---

TAGS

Bureau of European and Eurasian Affairs | Bureau of Western Hemisphere Affairs | Cuba | El Salvador | Office of the Spokesperson | Russia | The Secretary of State | Turkey | Ukraine

---

Contact Us

America 250

Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

Case No. 25-cv-1774-JEB

REDACTED

# Exhibit 12

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LIYANARA SANCHEZ, as next friend on behalf of FRENGEL REYES MOTA, et al.,<br><br>Petitioner,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, et al.,<br><br>Respondents. | Civil Action No. 1:25-cv-00766-JEB<br><br><u>Declaration Of Michael G. Kozak</u> |

**DECLARATION OF MICHAEL G. KOZAK**

I, Michael G. Kozak, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1. I am the Senior Bureau Official within the Bureau of Western Hemisphere Affairs (WHA) of the United States Department of State, a position I have held on different occasions previously and since January 2025. In that capacity, I lead and oversee WHA, including the country offices handling affairs regarding Central and South America and other countries in the Hemisphere. I am a career member of the Senior Executive Service and have served in a variety of senior positions in the Department of State. WHA is responsible for diplomatic relations between the United States and countries in the Western Hemisphere, including El Salvador and

Venezuela. I make the following statements based upon my personal knowledge, including from my experience since 1971 engaging in diplomatic and other work of the State Department with respect to El Salvador, Venezuela, and other countries in the region and around the world, as well as upon information made available to me in the performance of my official duties.

2. Attached are several exhibits that are true and accurate: diplomatic notes dated March 13, 14, and 31, 2025, and a letter grant dated March 22, 2025.

**U.S.-El Salvador Arrangement**

3. El Salvador has for many years accepted the return of its own nationals removed from the United States without conditions. [redacted], the United States and El Salvador memorialized an arrangement concerning the removal of third country nationals from the United States through a non-legally-binding exchange of diplomatic notes dated March 13 and 14. In this exchange, El Salvador expressed its "readiness to accommodate approximately 300" members of TdA to be transferred to El Salvador by the United States, along with other commitments.

4. More specifically, in the March 13 note, the U.S. Embassy in San Salvador expressed the United States' understanding that "El Salvador intends to accommodate [the TdA members] for a duration of one year unless or until a determination concerning their long-term disposition is made." [redacted]

5. [redacted]

[redacted] It is my understanding that El Salvador decided to house these TdA members in CECOT, in a part of the prison that is separated from the general prison population.

6. The March 13 diplomatic note also memorializes the United States' intention, "[i]n recognition of El Salvador's assistance on this matter, and in order to advance the shared objective of advancing the anti-crime and anti-drug objectives of our countries," to provide in-kind and financial support to the Government of El Salvador. In its March 14 response, El Salvador expressed its appreciation for this offer. Thereafter, on March 22, the United States and El Salvador entered into a letter grant providing funds for El Salvador's law enforcement and anticrime needs. The letter grant acknowledged that El Salvador could choose to use these funds for "costs associated with" the housing of TdA members. However, the use of the funds was not limited to this purpose but was available to help address law enforcement and anticrime needs more generally. [redacted]

7. In the March 13 and 14 arrangement, as reinforced in a third diplomatic note dated March 31, the United States and El Salvador acknowledged that El Salvador would receive and

treat individuals removed pursuant to the arrangement in accordance with Salvadoran domestic law and El Salvador's international legal obligations regarding human rights and the treatment of prisoners, including obligations under the Convention Against Torture. In its March 14 note, El Salvador provided its express assurance to uphold these obligations in its reception of these individuals. El Salvador also reaffirmed "its commitment to assist the United States in combating terrorism and promoting peace and freedom across our nations, while upholding human rights."

8. The March 13 and 14 exchange of notes between the United States and El Salvador was reported to Congress as a "qualifying non-binding instrument" under the Case-Zablocki Act, 1 U.S.C. § 112b, on April 30, 2025.

**Other Implications of the U.S.-El Salvador Arrangement**

9. It was and remains my understanding that the detention and ultimate disposition of those detained in CECOT and other Salvadoran detention facilities are matters within the legal authority of El Salvador in accordance with its domestic and international legal obligations. Some recent events may inform this point. On April 20, Salvadoran President Bukele made a public proposal to Nicolas Maduro of Venezuela for a "humanitarian agreement that contemplates the repatriation of 100%" of the TdA members transferred from the United States to El Salvador "in exchange for the release and surrender of an identical number (252) of the thousands of political prisoners you hold." https://x.com/nayibbukele/status/1914070199659098258. On April 22, President Bukele lamented Maduro's apparent rejection of his proposal and reiterated the proposal, posting a formal version from the Salvadoran Ministry of Foreign Relations addressed to the Maduro regime. https://x.com/nayibbukele/status/1914802146325004726.

10. Several Members of Congress have in recent weeks requested to visit CECOT or to visit specific detainees housed there, including Kilmar Abrego Garcia, a Salvadoran national

transferred to El Salvador at the same time as the TdA members. While the U.S. Embassy has facilitated these U.S. congressional trips to El Salvador per routine practice, the Salvadoran government has decided, without seeking U.S. concurrence, to accommodate some of the delegations' requests to visit CECOT and to deny others. Moreover, El Salvador transferred Mr. Abrego Garcia out of CECOT and to a different facility several weeks ago. The United States found out about this transfer only when Mr. Abrego Garcia told Senator Van Hollen, in a meeting arranged by the Government of El Salvador, that he had been transferred.

11. Statements by high-ranking officials of both the United States and El Salvador regarding the March 13 and 14 arrangement reflect the fact that the two nations have shared common interests and that each country respects and takes into account the opinions and arguments of the other. El Salvador makes its own determinations regarding whether to accept or decline requests from the United States, just as the United States makes its own determinations regarding the requests of El Salvador. For example, the United States has requested the return of Mr. Abrego Garcia from El Salvador's custody. El Salvador has yet to return him. [redacted]

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 9th day of May 2025.

______________________________

Michael G. Kozak
Senior Bureau Official
Western Hemisphere Affairs
U.S. Department of State

Case No. 25-cv-1774-JEB

REDACTED

# Exhibit 13

Case No. 25-cv-1774-JEB

# Exhibit 14

CONFIDENTIAL//FGI//MOD

The Embassy of the United States of America presents its compliments to the Ministry of Foreign Affairs of the Republic of El Salvador and has the honor to request that El Salvador accept, by March 14, 2025, César Antonio Lopez Larios, Mara Salvatrucha (MS-13) gang leader requested by President Bukele, César Eliseo Sorto Amaya, MS-13 gang leader convicted of murder in El Salvador, and up to 500 Venezuelan Tren de Aragua (TdA) members.

The United States understands that El Salvador will take these actions in accordance with its authorities under Salvadoran domestic law, and in a manner that is consistent with El Salvador's international legal obligations regarding human rights and treatment of prisoners, including the Convention Against Torture. Further, with regard to the TdA members, the United States understands El Salvador intends to accommodate them for a duration of one year unless or until a determination concerning their long-term disposition is made.

**[CONFIDENTIAL//FGI//MOD]**
**DIPLOMATIC NOTE**

In recognition of El Salvador's assistance on this matter, and in order to advance the shared objective of advancing the anti-crime and anti-drug objectives of our countries, the United States intends, consistent with U.S. domestic legal requirements to provide in-kind and financial support to the Government of El Salvador.

This note serves as 24-hour notice of the arrival of the Lopez Larios, Amaya, and up to 500 Venezuelan TdA members.

The United States requests the Ministry of Foreign Affairs of the Republic of El Salvador confirm receipt of this diplomatic note and provide a response to the Embassy of the United States of America confirming that it shares the understandings set forth in this note.

The Embassy avails itself of this opportunity to express to the Ministry of Foreign Affairs the renewed assurances of its highest consideration.

Embassy of the United States of America,

San Salvador, March 13, 2025.

**Classified By:** Michael G. Kozak, WHA Senior Bureau Official

**Reasons:** 1.4(b) & (d), E.O. 13526

**Declassify On:** Exempt from auto declass sec. 3.3(b)(6), foreign government information, consult with El Salvador prior to declassification.

Declassified by Michael G. Kozak
Senior Bureau Official
Western Hemisphere Affairs
Declassified on: 20250509

Case No. 25-cv-1774-JEB

# Exhibit 15

THE MINISTRY OF FOREIGN AFFAIRS
OF THE REPUBLIC OF EL SALVADOR

Antiguo Cuscatlán, March 14, 2025.

To the Honorable Embassy of the United States of America:

In response to your Diplomatic Note No. 2025-068, regarding the transfer of two individuals identified as members of the terrorist organization MS-13 (Cesar Antonio Lopez Larios and Cesar Eliseo Sorto Amaya), as well as individuals designated by the United States as members of the foreign terrorist organization "Tren de Aragua," we wish to communicate the following:

The Ministry of Foreign Affairs of the Republic of El Salvador reaffirms its commitment to assist the United States in combating terrorism and promoting peace and freedom across our nations, while upholding human rights. In this context, we respectfully:

Agree to the transfer of the two individuals mentioned above, who are members of MS-13.

Express our readiness to accommodate approximately 300 members of the foreign terrorist organization "Tren de Aragua," currently detained by the United States. The Republic of El Salvador confirms it will house these individuals for one (1) year, pending further decisions on their long-term disposition.

Furthermore, we assure you that the reception of these individuals will be conducted in accordance with Salvadoran law and international obligations, including adherence to the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, of which we have been a signatory since May 19, 1994.

We also wish to express our appreciation for the United States offer of in-kind and financial support to El Salvador in recognition of this cooperation.

In closing, we take this opportunity to reiterate our highest esteem and consideration for the Honorable Embassy of the United States of America.

Declassified by Michael G. Kozak
Senior Bureau Official
Western Hemisphere Affairs
Declassified on: 20250509

MINISTRA DE RELACIONES EXTERIORES EL SALVADOR

Minister of Foreign Affairs
Republic of El Salvador

**Classified By:** Michael G. Kozak, WHA Senior Bureau Official

**Reasons:** 1.4(b) & (d), E.O. 13526

**Declassify On:** Exempt from auto declass sec. 3.3(b)(6), foreign government information, consult with El Salvador prior to declassification.

Case No. 25-cv-1774-JEB

# Exhibit 16

No. 2025-93

The Embassy of the United States of America presents its compliments to the Ministry of Foreign Affairs of the Republic of El Salvador and wishes to express its appreciation for the Government of El Salvador's support in combatting the crisis of illegal immigration and its acceptance of Foreign Terrorist Organization members.

This note acknowledges one flight which arrived in El Salvador March 30, 2025, carrying 16 passengers as per the attached manifest. All seven non-Salvadoran passengers are identified as Venezuelan members of the Foreign Terrorist Organization Tren de Aragua (TdA). All nine Salvadoran passengers are identified as members of the Foreign Terrorist Organization MS-13. The United States highlights the importance of the Government of El Salvador's previous assurance that El Salvador's reception and treatment of TdA and MS-13 individuals will be in accordance with Salvadoran law and international obligations, including adherence to the Convention Against Torture.

The Embassy of the United States avails itself of this opportunity to express to the Ministry of Foreign Affairs the renewed assurances of its highest consideration.

Embassy of the United States of America

San Salvador, March 31, 2025.

**Classified By:** Michael G. Kozak, WHA Senior Bureau Official

**Reasons:** 1.4(b) & (d), E.O. 13526

**Declassify On:** Exempt from auto declass sec. 3.3(b)(6), foreign government information, consult with El Salvador prior to declassification.

Case No. 25-cv-1774-JEB

# Exhibit 17

Post

**Secretary Marco Rubio**
@SecRubio

We have sent 2 dangerous top MS-13 leaders plus 21 of its most wanted back to face justice in El Salvador. Also, as promised by @POTUS, we sent over 250 alien enemy members of Tren de Aragua which El Salvador has agreed to hold in their very good jails at a fair price that will also save our taxpayer dollars. President @nayibbukele is not only the strongest security leader in our region, he's also a great friend of the U.S. Thank you!

7:59 AM · Mar 16, 2025 · **5.1M** Views

3.6K 16K 96K 1.3K

Post your reply

Reply

Case No. 25-cv-1774-JEB

# Exhibit 18

**[redacted] STATEMENT**

I, [redacted], declare as follows:

1. I am 41 years old. I was born in Caracas, Venezuela.

2. I submit this statement to document what happened to me in the Salvadoran prison known as CECOT (*Centro de Confinamiento del Terrorismo* [Terrorism Confinement Center]) after the United States government sent me there.

**Detention in the United States**

3. I arrived in the United States with my son in September 2024 through the International Organization for Migrations resettlement program. I was supposed to reunite with my family that lives there.

4. However, when my son and I arrived at Houston airport, he was arrested and deported back to Ecuador, where we had been living.

5. They also detained me, but they could not send me to Ecuador because I did not have an Ecuadorian visa. So I was kept detained at several immigrant detention centers in the United States.

6. I applied for asylum and had several hearings, but the government accused me of being a member of the Tren de Aragua [Venezuelan gang] solely for having entered the United States without authorization. I am not a member of the Tren de Aragua. My application for asylum was denied and the judge ordered my deportation.

7. Around March 7, 2025, I was transferred to the Rio Grande Detention Center along with a large group of Venezuelans. The guards told me they were going to deport me to Mexico.

8. I had always worn a blue uniform, but now I was given a red one. I was told that all Venezuelans were going to wear red.

9. On March 13, I called my partner and told her that I thought we were going to be deported.

10. On March 14, the guards came to pick us up at 2 o'clock in the morning. They told us to shower and they picked us up around 5 o'clock in the morning. ICE was there, along with helicopters, drones, trucks and Rio Grande guards dressed in anti-riot equipment. They put five-point shackles on us, handcuffed our hands, feet and waist, and put us on buses. We were handcuffed, waiting on the bus for about two hours. The buses started to circulate, but then they made us come back. They told us that the planes couldn't fly because of bad weather.

11. On March 15, they woke us up again, this time at 4 o'clock in the morning. They handcuffed us again with five-point shackles and got us on buses. We were taken to Laredo Airport. There were three planes there. They put the women who were with us on the first plane. I was put on the third. I saw a man from El Salvador with La Mara [gang-related] tattoos. He told me he was going to El Salvador.

12. The planes took off and the first stop was in Honduras. When we landed, they gave us food. We asked one of the ICE agents: "Boss, where are we going?" The agent simply responded: "It's a surprise." We asked: "Are we going to Venezuela?" He simply responded again: "It's a surprise."

**Arrival at CECOT**

13. When we landed again, we saw police, buses and helicopters at the airport. The man next to me said: "We're in El Salvador." At first, I thought they were only dropping off people from El Salvador. When I found out we were all going to get out of the plane, I started to get very nervous.

14. ICE agents told us: "Either you go voluntarily or we will force you to go." They brought the anti-riot police into the plane and the police started hitting the people up ahead with their batons. One of the agents said: "I'm going to break open everyone's head if you don't get out."

15. When I arrived at the aircraft door, the anti-riot agent put another set of handcuffs on my wrists, on top of the five restraint straps, and said to me: "Welcome to El Salvador." We had two pairs of handcuffs on our hands and two on our feet. They dragged me, put me on a bus, and handcuffed me to the seat. They did the same with everyone.

16. The bus started and we left the airport. Finally, we heard: "Pantera 1 entering CECOT". Pantera 1 was the name of the bus.

17. When we stopped, the guards grabbed us by our hair, our shirts and handcuffs; there were three guards per person. I stumbled and fell, and they started kicking and hitting me nonstop, saying: "Fuck, son of a bitch, you're going to die." They pulled me up and tightened my handcuffs. Then one of the guards hit me on the lower right side of my head, near my neck with a stick . The blow caused me unbearable pain. The guard hit me so hard that I suffered significant

hearing loss for two months. The blow dislocated my jaw. The guards made fun of us, cut our hair, spit on us, hit us with a wooden baton and stripped us naked.

18. Then they gave us some briefs and sandals and forced us to walk with our heads down to a part of the CECOT called Module 8. It was very far away; it took about 20 to 30 minutes to get there. Some people fell and were kicked and hit without mercy.

19. When we got to Module 8, we were seated in the infirmary, the cameras were turned off and they beat us more. They beat me for about ten minutes, kicked me and hit me all over my body. Then they turned the cameras back on and the CECOT director started talking to us. He told us: "You're not going to see your families again because I'll make sure you never leave here." Some people told him: "We are not criminals, we are migrants." But the director replied that they had been sentenced to maximum penalties in the United States. He told them: "Whether or not you are migrants, the rest of your lives will be here, and I'll make sure you never leave here because you're a gang of terrorists. You are terrorists." I desperately tried to explain to them that I was not a member of the Tren de Aragua and urged the officials to check my criminal history.

**Detention at CECOT**

20. There were ten of us in each cell. The cells had cement tanks that were filled halfway with water and they told us that it had to last us two days to wash the toilet and bathe. They gave us a thermos for the water, but we did not have access to enough drinking water and the heat was hell. They only filled the thermos once a day, and only half full, and it had to last until the next day. The thirst was intense.

21. All they gave us was rice with pasta and rice with tortillas. Sometimes they would put good food on our trays—chicken, meat, cookies—and take pictures and videos, and when they were done taking them, they would take the trays away.

22. The only beds we had to sleep on were hard metal surfaces. When the Red Cross came, which was twice, the guards gave us mattresses. As soon as the Red Cross left, the mattresses were taken away and we slept on the metal, as usual. We could not say anything to the Red Cross workers while they were there.

23. The heat was unbearable and the lights made it even worse. Everyone had a hard time breathing. The lights were on constantly, 24 hours a day. The guards did not let us sleep.

24. We only had one hour to bathe at 3 o'clock or 4 o'clock in the early morning. If they found someone bathing in the afternoon, something people were trying to do because it was very hot, they would beat them in an isolation cell. Those who could see the isolation cell from their cells shouted frequently: "Stop! They are vomiting blood!"

25. When people started vomiting blood, they took them to the infirmary and gave them vitamin C. That was the treatment for everything. They would just tell us: "You're dehydrated." Many prisoners had skin diseases, such as scabies, but were not given medicine.

26. I suffered significant hearing loss in both ears and jaw dislocation after a guard hit me and punched me in the head when I was first taken to CECOT. I did not receive medical treatment for this injury and the CECOT medical staff only gave me vitamin C.

27. We were constantly beaten and abused. Every morning, we were beaten during the count. We were also beaten every time we did something that was considered "out of place." They handcuffed us to the bars and forced us to kneel for hours. It was unbearable. They squeezed our hands so hard that it seemed like they were going to come off. Later, they had to pull one of my teeth because it had broken after so many blows. They broke open the head of someone I knew with a padlock because he tried to get up to go to the bathroom.

28. They almost never let us out, just a couple of times to take pictures of us for advertising. I now have difficulty seeing because of the constant mistreatment and being locked in under those bright lights. I see blurs and can no longer read fine print.

29. There was an officer we called "Satan". He was one of the worst torturers. He would tell people: "If I see you bathing or if I find the cell wet, I swear that I will make you vomit blood."

30. After being at CECOT for about a month, some people went on hunger strike because the guards kept hitting us. The director came and spoke with them. He told them that they had to eat, whether they wanted to or not, and that if they didn't, he would force them to eat "with blows using sticks." One of the prisoners responded: "So you'll have to hit us."

31. The anti-riot police arrived that night. They dragged the handcuffed men out, hit them, sprayed a black gas in their faces, and put their heads in a water tank to suffocate them. The director asked them: "Are you going to eat or not?" This happened to the prisoners in cell 32, who were Venezuelans. All of those in our module were Venezuelan.

32. The beatings in prison left some people in wheelchairs. The guards grabbed one of our friends and hit him in his legs because they had to take him to the infirmary for tests. When he returned, he started talking to a friend who was in another cell and was beaten up for that. The young man was unable to walk for more than 20 days.

33. There was a gay man named Andry Hernandez there. Once, the guards found him bathing in the afternoon. They forced him to kneel and forced him to practice oral sex on them and much more. I found out about this from others there and later from Andry himself.

34. Some of the prisoners had bronchitis and were in poor health. They decided to do a "blood strike." They had been given sheets when the Red Cross had visited and had managed to tear off some pieces before they were removed. They began to cut themselves with the water pipes on the wall and to soak the white pieces of the sheets with blood. They told the guards: "Before we are killed, we will commit suicide." The guards were scared because they understood that things were getting to a point where, at any time, someone was going to commit suicide. It was a constant psychological terror and torture. Everyone was fed up.

35. After the blood strike, we were left alone for about 15 days and allowed to sleep. At some point, they made another check of the cells, took us out and hit us again. One of our colleagues was asleep in his cell. They handcuffed him, pulled him out and threw him to the ground. One of the anti-riot officers shoved him and he hit his head against the floor. That was when a mutiny broke out.

36. Everyone started complaining and yelling, and throwing the bars of soap they were given that day to wash their briefs at the anti-riot police. The anti-riot police began to back up and shoot us with rubber bullets. They shot us from the bars, from the outside cell, from above... Desperately, some broke their cell locks and came out. In the end, things calmed down.

37. The next day, other officials arrived and beat us nonstop, kicking us and hitting us with sticks. Some people had their ribs broken. They beat me in my legs. Then the director came and ordered us to be taken out of the cells, one by one, and taken to "the island", which is an isolation room where guards left people for hours without water or food. This time, they took everyone out of the cells and took them to the island to hit them. The director told us: "Either you calm down or we will calm you down."

38. While I was there, they also told us that we were not entitled to an attorney, that we had no rights. Throughout the time I was there, I never had the opportunity to try to contact an attorney and I do not know anyone who did. We had no chance to communicate with anyone from the outside world.

39. At CECOT, we prayed a lot. Sometimes a pastor would visit us and read the Bible for about ten minutes. Once he was hit after someone gave the pastor a rosary made with a tortilla. They did not allow us to have Bibles in our cells. If we asked for a Bible, they would tell us: "At CECOT, we don't believe in God."

40. They told us that we were going to rot there, at CECOT, and that we would never get out. The director told us: "We have everything here. If any of you die here, we have a crematory.

No one will claim your remains. We will incinerate them and spread your ashes. No one comes in here and no one goes out."

**Release from CECOT**

41. One Friday at dawn, all officers and the director entered. We all expected to be hit again.

42. Instead, they brought us stuffed tortillas, which surprised us. They gave us shampoo, soap and deodorant and told us to bathe. We were given shaving cream so we could shave.

43. It was all for making videos and taking photos for advertising. There were journalists and even a TikToker there, along with the director and some people from the government. A minister arrived and told us that we were going to leave. They gave us shoes, pants and a shirt.

44. We were boarded on a bus and taken to the airport. They told us that we would return to Venezuela. Finally, a plane arrived and I boarded. When we landed, we were greeted by Jorge Rodriguez, Delcy Rodriguez and other Venezuelan officials. They told us: "Those who have committed crimes must pay." The rest of us would get medical exams and they would take us home.

45. When I was released, none of my personal belongings I had while I was detained in the United States were returned to me. I struggle to understand what happened to me, because I have never had problems with the law. I have always been a hardworking, law-abiding person. My family has also suffered a lot from the separation and my detention at CECOT. My mother has been hospitalized several times after having a stroke and becoming paralytic.

Docusign Envelope ID: 7750F658-7CC0-44CC-914A-FA8AD3D08F52

Up to this day, I continue to have difficulty falling asleep and feel depressed. I struggle to find the motivation to do anything. I dream I am still in my CECOT cell.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Signed on August [hw:] *14*, 2025.

[signature]

[redacted] [redacted]

**DECLARACIÓN DE [redacted]**

Yo, [redacted], declaro lo siguiente:

1. Tengo 41 años. Nací en Caracas, Venezuela.

2. Presento esta declaración para documentar lo que me sucedió en la prisión salvadoreña conocida como CECOT después de que el gobierno de los Estados Unidos me enviara allí.

**Detención en los Estados Unidos**

3. Llegué a los Estados Unidos con mi hijo en septiembre de 2024 a través del programa de reasentamiento de la Organización Internacional para las Migraciones. Se suponía que me reuniría con mi familia que vive allí.

4. Sin embargo, cuando mi hijo y yo llegamos al aeropuerto de Houston, él fue detenido y deportado de vuelta a Ecuador, donde habíamos estado viviendo.

5. A mí también me detuvieron, pero no pudieron enviarme a Ecuador porque no tenía visa ecuatoriana. Así que me mantuvieron detenido en varios centros de detención de inmigrantes de Estados Unidos.

6. Solicité asilo y tuve varias audiencias, pero el Gobierno me acusó de ser miembro del Tren de Aragua únicamente por haber entrado en Estados Unidos sin autorización. No soy miembro del Tren de Aragua. Mi solicitud de asilo fue denegada y el juez ordenó mi deportación.

7. Alrededor del 7 de marzo de 2025, me trasladaron al Centro de Detención de Río Grande junto con un gran grupo de venezolanos. Los guardias me dijeron que me iban a deportar a México.

8. Siempre había llevado un uniforme azul, pero ahora me dieron uno rojo. Me dijeron que todos los venezolanos iban a vestir de rojo.

9. El 13 de marzo llamé a mi pareja y le dije que creía que nos iban a deportar.

10. El 14 de marzo, los guardias vinieron a buscarnos a las 2 de la mañana. Nos dijeron que nos ducháramos y nos recogieron alrededor de las 5 de la mañana. Allí estaba el ICE, junto con helicópteros, drones, camiones y guardias de Río Grande vestidos con equipo antidisturbios. Nos pusieron grilletes de cinco puntos, nos esposaron las manos, los pies y la cintura, y nos subieron a autobuses. Estuvimos esposados, esperando en el autobús durante unas dos horas. Los autobuses empezaron a circular, pero luego nos hicieron volver. Nos dijeron que los aviones no podían volar debido al mal tiempo.

11. El 15 de marzo nos despertaron de nuevo, esta vez a las 4 de la mañana. Nos volvieron a esposar con grilletes de cinco puntos y nos subieron a los autobuses. Nos llevaron al aeropuerto de Laredo. Allí había tres aviones. Subieron a las mujeres que estaban con nosotros al primer avión. A mí me subieron al tercero. Vi a un hombre de El Salvador con tatuajes de La Mara. Me dijo que iba a El Salvador.

12. Los aviones despegaron y la primera parada fue en Honduras. Cuando aterrizamos, nos dieron comida. Le preguntamos a uno de los agentes del ICE: «Jefe, ¿adónde vamos?». La

agencia solo respondió: «Es una sorpresa». Le preguntamos: «¿Vamos a Venezuela?». Él solo respondió de nuevo: «Es una sorpresa».

**Llegada al CECOT**

13. Cuando aterrizamos de nuevo, vimos policías, autobuses y helicópteros en el aeropuerto. El hombre que estaba a mi lado dijo: «Estamos en El Salvador». Al principio, pensé que solo estaban dejando a gente de El Salvador. Cuando supe que nos iban a sacar a todos del avión, empecé a ponerme muy nervioso.

14. Los agentes del ICE nos dijeron: «O se van voluntariamente o les obligaremos a irse». Trajeron a la policía antidisturbios al avión y los policías empezaron a golpear a la gente de adelante con sus porras. Uno de los agentes dijo: «Les voy a romper la cabeza a todos si no se bajan».

15. Cuando llegué a la puerta del avión, el agente antidisturbios me puso otro juego de esposas en las muñecas, encima de las cinco correas de sujeción, y me dijo: «Bienvenido a El Salvador». Teníamos dos pares de esposas en las manos y dos en los pies. Me arrastraron, me subieron a un autobús y me esposaron al asiento. Hicieron lo mismo con todos.

16. El autobús arrancó y salimos del aeropuerto. Finalmente oímos: «Pantera 1 entrando en CECOT». Pantera 1 era el nombre del autobús.

17. Cuando nos detuvimos, los guardias nos agarraron del pelo, de la camisa y de las esposas, eran tres guardias por persona. Tropecé y caí, y empezaron a darme patadas y golpes sin parar, diciendo: «Mierda, hijo de puta, vas a morir». Me pusieron de pie y me apretaron las esposas. Luego, uno de los guardias me golpeó en la parte inferior derecha de la cabeza con un palo, cerca

del cuello. El golpe me causó un dolor insoportable. El guardia me golpeó tan fuerte que sufrí una pérdida significativa de audición durante dos meses . El golpe me dislocó la mandíbula. Los guardias se burlaron de nosotros, nos cortaron el pelo, nos escupieron, nos golpearon con una porra de madera y nos desnudaron.

18. Después, nos dieron unos calzoncillos y unas sandalias y nos obligaron a caminar con la cabeza agachada hasta una parte del CECOT llamada Módulo 8. Estaba muy lejos, tardamos unos 20 o 30 minutos en llegar. Algunas personas se caían y eran pateadas y golpeadas sin piedad.

19. Cuando llegamos al Módulo 8, nos sentaron en la enfermería, apagaron las cámaras y nos golpearon más. Me golpearon durante unos diez minutos, me dieron patadas y golpes por todo el cuerpo. Luego volvieron a encender las cámaras y el director del CECOT comenzó a hablarnos. Nos dijo: «No van a volver a ver a vuestras familias porque me aseguraré de que nunca salgan de aquí». Algunas personas le dijeron: «No somos delincuentes, somos migrantes». Pero el director les respondió que habían sido condenados a penas máximas en Estados Unidos. Les dijo: «Sean migrantes o no, van a estar aquí el resto de vuestras vidas, y me aseguraré de que nunca salgan de aquí porque son una banda de terroristas. Son terroristas». Intenté desesperadamente explicarles que no era miembro del Tren de Aragua y rogué a los funcionarios que comprobaran mis antecedentes penales.

**Detención en el CECOT**

20. Éramos diez en cada celda. Las celdas tenían tanques de cemento que llenaban hasta la mitad con agua y nos decían que tenía que durarnos dos días para lavar el retrete y bañarnos. Nos dieron un termo para el agua, pero no teníamos acceso a suficiente agua potable y el calor era

infernal. Solo llenaban el termo una vez al día, y solo hasta la mitad, y tenía que durarnos hasta el día siguiente. La sed era intensa.

21. Lo único que nos daban de comer era arroz con pasta y arroz con tortilla. A veces ponían comida buena en nuestras bandejas —pollo, carne, galletas— y tomaban fotos y vídeos, y cuando terminaban de tomarlas, se llevaban las bandejas.

22. Las únicas camas que teníamos para dormir eran superficies duras de metal. Cuando vino la Cruz Roja, que fue dos veces, los guardias nos dieron colchones. En cuanto se marchaba la Cruz Roja, se llevaban los colchones y dormíamos sobre el metal, como de costumbre. No podíamos decir nada a los trabajadores de la Cruz Roja mientras estaban allí.

23. El calor era insoportable y las luces lo empeoraban aún más. Todo el mundo se asfixiaba. Las luces estaban encendidas constantemente, las 24 horas del día. Los guardias no nos dejaban dormir.

24. Solo teníamos una hora para bañarnos, a las 3 o 4 de la madrugada. Si encontraban a alguien bañándose por la tarde, cosa que la gente intentaba hacer porque hacía mucho calor, lo golpeaban en una celda de aislamiento. Los que podían ver la celda de aislamiento desde sus celdas gritaban con frecuencia: «¡Paren! ¡Están vomitando sangre!».

25. Cuando la gente empezaba a vomitar sangre, la llevaban a la enfermería y le daban vitamina C. Ese era el tratamiento para todo. Solo nos decían: «Está deshidratado». Muchos presos tenían enfermedades de la piel, como sarna, pero no les daban medicinas.

26. Sufrí una pérdida auditiva importante en ambos oídos y una dislocación de la mandíbula después de que un guardia me golpeara y me diera un puñetazo en la cabeza cuando

me llevaron por primera vez al CECOT. No recibí tratamiento médico por esta lesión y el personal médico del CECOT solo me dio vitamina C.

27. Nos golpeaban y maltrataban constantemente. Cada mañana, nos golpeaban durante el recuento. También nos golpeaban cada vez que hacíamos algo que se consideraba «fuera de lugar». Nos esposaban a los barrotes y nos obligaban a arrodillarnos durante horas. Era insoportable. Nos apretaban las manos con tanta fuerza que parecía que se nos iban a desprender. Más tarde, tuvieron que sacarme un diente porque se me había roto de tantos golpes. A alguien que conocía le rompieron la cabeza con un candado porque intentó levantarse para ir al baño.

28. Casi nunca nos dejaban salir, solo un par de veces para hacernos fotos para propaganda. Ahora tengo dificultades para ver debido a los constantes malos tratos y a estar encerrado bajo esas luces tan brillantes. Veo borroso y ya no puedo leer la letra pequeña.

29. Había un oficial al que le decíamos Satanás. Era uno de los peores torturadores. Les decía a las personas: «Si te veo bañándote o encuentro la celda mojada, te juro que te haré vomitar sangre».

30. Después de estar en el CECOT durante aproximadamente un mes, algunas personas se declararon en huelga de hambre porque los guardias no dejaban de golpearnos. El director vino y habló con ellos. Les dijo que tenían que comer, quisieran o no, y que si no lo hacían, los obligaría a comer «con palos». Uno de los presos respondió: «Entonces tendrás que golpearnos».

31. Esa noche llegó la policía antidisturbios. Arrastraron a los hombres esposados, los golpearon, les rociaron un gas negro en la cara y les metieron la cabeza en un tanque de agua para

asfixiarlos. El director les preguntó: «¿Van a comer o no?». Esto les pasó a los presos de la celda 32, que eran venezolanos. Todos los de nuestro módulo eran venezolanos.

32. Las palizas en la prisión dejaron a algunas personas en silla de ruedas. Los guardias agarraron a uno de nuestros amigos y le golpearon en las piernas porque tenían que llevarlo a la enfermería para hacerle pruebas. Cuando volvió, empezó a hablar con un amigo que estaba en otra celda y le golpearon sin parar por eso. El chico no pudo caminar durante más de 20 días.

33. Había allí un hombre gay llamado Andry Hernández. Una vez, los guardias lo encontraron bañándose por la tarde. Lo obligaron a arrodillarse y lo obligaron a practicarle sexo oral y mucho más. Me enteré de esto por otros allí y más tarde por el propio Andry.

34. Algunos de los presos tenían bronquitis y estaban en mal estado de salud. Decidieron hacer una «huelga de sangre». Les habían dado sábanas cuando visitó la Cruz Roja y habían conseguido arrancar algunos trozos antes de que se las quitaran. Empezaron a cortarse con las tuberías de agua que había en la pared y a empapar los trozos de sábana blanca con sangre. Les dijeron a los guardias: «Antes de que nos maten, nos suicidaremos». Los guardias se asustaron porque comprendieron que las cosas estaban llegando a un punto en el que, en cualquier momento, alguien iba a suicidarse. Era un terror psicológico y una tortura constantes. Todos estaban hartos.

35. Después de la huelga de sangre, nos dejaron solos durante unos 15 días y nos dejaron dormir. En algún momento, hicieron otro registro de las celdas, nos sacaron y nos volvieron a golpear. Uno de nuestros compañeros estaba dormido en su celda. Lo esposaron, lo sacaron y lo tiraron al suelo. Uno de los policías antidisturbios lo empujó y se golpeó la cabeza contra el suelo. Fue entonces cuando estalló un motín.

36. Todos empezaron a quejarse y a gritar, y a lanzarles a los policías antidisturbios las pastillas de jabón que les habían dado ese día para lavarse los calzoncillos. Los policías antidisturbios empezaron a retroceder y a dispararnos con balas de goma. Nos disparaban desde los barrotes, desde la celda de fuera, desde arriba... Desesperados, algunos rompieron las cerraduras de sus celdas y salieron. Al final, las cosas se calmaron.

37. Al día siguiente, llegaron otros funcionarios y nos golpearon sin parar, dándonos patadas y golpes con palos. A algunas personas les rompieron las costillas. A mí me golpearon en las piernas. Luego vino el director y ordenó que nos sacaran de las celdas, uno por uno, y nos llevaran a «la isla», que es una sala de aislamiento donde los guardias dejaban a la gente durante horas sin agua ni comida. Esta vez, sacaron a todos de las celdas y los llevaron a la isla para golpearlos. El director nos dijo: «O se calman ustedes o los calmamos nosotros».

38. Mientras estuve allí, también nos dijeron que no teníamos derecho a un abogado, que no teníamos derechos. En todo el tiempo que estuve allí, nunca tuve la oportunidad de intentar contactar con un abogado y no conozco a nadie que lo haya hecho. No teníamos posibilidad de comunicarnos con nadie del mundo exterior.

39. En el CECOT rezaba mucho. A veces, un pastor nos visitaba y nos leía la Biblia durante unos diez minutos. Una vez lo golpearon después de que alguien le diera al pastor un rosario hecho con una tortilla. No nos permitían tener Biblias en nuestras celdas. Si pedíamos una Biblia, nos decían: «En el CECOT no creemos en Dios».

40. Nos decían que nos íbamos a pudrir allí, en el CECOT, y que nunca saldríamos. El director nos dijo: «Aquí lo tenemos todo. Si alguno de ustedes muere aquí, tenemos un crematorio.

Nadie reclamará sus restos. Los incineraremos y esparciremos sus cenizas. Nadie entra aquí y nadie sale».

**Liberación del CECOT**

41. Un viernes al amanecer, entraron todos los funcionarios y el director. Todos esperábamos ser golpeados de nuevo.

42. En cambio, nos trajeron pupusas, lo que nos sorprendió. Nos dieron champú, jabón y desodorante y nos dijeron que nos bañáramos. Nos dieron crema de afeitar para que pudiéramos afeitarnos.

43. Todo era para hacer vídeos y tomar fotos para propaganda. Había periodistas e incluso un TikToker allí, junto con el director y algunas personas del gobierno. Llegó un ministro y nos dijo que nos íbamos. Nos dieron zapatos, pantalones y una camisa.

44. Nos subieron a un autobús y nos llevaron al aeropuerto. Nos dijeron que volveríamos a Venezuela. Finalmente llegó un avión y subí a bordo. Cuando aterrizamos, nos recibieron Jorge Rodríguez, Delcy Rodríguez y otros funcionarios venezolanos. Nos dijeron: «Los que han cometido delitos deben pagar». El resto de nosotros seríamos sometidos a exámenes médicos y nos llevarían a casa.

45. Cuando me liberaron, no me devolvieron ninguna de las pertenencias personales que tenía mientras estuve detenido en Estados Unidos. Me cuesta entender lo que me pasó, porque nunca he tenido problemas con la ley. Siempre he sido una persona trabajadora y respetuosa con la ley. Mi familia también ha sufrido mucho por la separación y mi detención en el CECOT. Mi madre ha sido hospitalizada varias veces tras sufrir un derrame cerebral y quedar paralítica. A día

de hoy, sigo teniendo dificultades para conciliar el sueño y me siento deprimido. Me cuesta encontrar la motivación para hacer cualquier cosa. Sueño que sigo en mi celda del CECOT.

Declaro bajo pena de perjurio ante las leyes de los Estados Unidos que lo anterior es cierto y correcto.

Firmado el 14 de agosto de 2025. [redacted]

# DECLARATION OF ROBERT BRIAN TAYLOR

I, Robert Brian Taylor, declare as follows:

1. I am a translator fluent in the English and Spanish languages. I was engaged through Transperfect Legal to translate the accompanying document from Spanish into English.

2. The attached document is, to the best of my knowledge and belief, a true and correct translation of the Declaration of [redacted] in a form that reflects the intention and meaning of the original text.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 15 202

Robert Brian Taylor

Case No. 25-cv-1774-JEB

# Exhibit 19

Docusign Envelope ID: BDF6DACA-DA26-4378-AB9A-717A6B7BE31E

**STATEMENT BY [redacted]**

I, [redacted], declare as follows:

1. I am a 35-year-old Venezuelan citizen. I was one of the Venezuelans transferred, missing, arrested and arbitrarily tortured at the CECOT of El Salvador. RFK Human Rights are my lawyers.

2. In 2016, I left Venezuela for Colombia. After a few months, I moved to Ecuador, along with my mother. She had breast cancer and I wanted to help her and make sure she had access to the medications she needed.

3. While in Ecuador, I worked as a mason and sold clothing. I also owned a grilled chicken restaurant. During that time, I met my wife and had our son, who is now four years old. In 2022, I had to leave my wife, son and mother in Ecuador and I looked for protection in the United States.

4. My trip to the United States was terrible. When I arrived in Mexico City, I was kidnapped for five days until I paid a $3,000 ransom. After I was released, I crossed the border into the United States, where I turned myself in to immigration authorities, and I was held for three days in a detention center, but I was released to process my asylum application. Fortunately, a humanitarian organization provided me with a plane ticket to Orlando, Florida, and I settled there.

5. When I arrived in Orlando, the first thing I did was look for a job washing cars, which allowed me to make enough money to buy clothes. I later found work at a pizzeria, where I spent about a year, and then at the Paris bakery, where I worked for about eight months.

6. During this time, I applied for Temporary Protection Status and it was granted to me. This gave me a work permit. I also applied for asylum, with a hearing projected for 2026. I did everything I had to do to comply with the legal requirements: I had a device to take a picture of myself and send it to immigration services every Tuesday, which I did. And I always showed up for my hearings (although they were often postponed). I did not have an order for deportation and I paid my taxes.

7. I never had problems with the law in the United States or Venezuela. I have no criminal history. And I was never a member of the Tren de Aragua or any other gang.

8. On March 12, 2025, around 3:30 p.m., ICE agents arrived at the bakery while I was working. I had just got in my car to go home when three vehicles intercepted me and the ICE agents pointed at me with their weapons. They called me by name and when I opened the car door, they grabbed me, threw me to the ground and handcuffed me. They told me: "The TPS is over, the drive is over, you're a member of the Tren de Aragua." Everything was a bit confusing, because I don't speak English well and ICE agents were still speaking English. But I told them that I was not part of the Tren de Aragua

9. ICE agents took me to a detention center and then moved me to the Orange County Detention Center. They left me there all night and then took me to another center two or three hours away, I think in Atlanta. When I was there, the ICE agents again accused me of being part of the Tren de Aragua. They said it was because I was from the state of Aragua, because I appeared in a photo making a "thumbs up" gesture, and because I had a tattoo of an elephant on my hand.

Docusign Envelope ID: BDF6DACA-DA26-4378-AB9A-717A6B7BE31E

10. I told them that it didn't mean anything and that I didn't belong to the gang, just because I happened to be from that state. I explained that I had the elephant tattoo in honor of my mom, who had survived her second breast cancer operation, because it is a symbol of strength and endurance.

11. They didn't care. They told me they were going to deport me. I was asked to sign several papers, but I refused because they were in English and I did not understand them. I never saw a judge. They kidnapped me and took me secretly.

12. The agents put me on a plane. I was told I was going to Venezuela, but it was actually going to Texas. I spent three days in Hidalgo. I was given a red uniform, which the guards told me was for people who represented "maximum hazard." Others wore blue and orange. Then, on March 15, I was boarded on another plane. During the flight, one of the agents said: "We have a surprise for you." We made a stopover in Honduras and they gave us some food. I thought we were going to Venezuela this time, but when the plane landed, I realized I was in El Salvador. One of the people on the plane, who spoke English, translated one of the documents they had given him: he said we would be detained for at least a year in El Salvador.

13. When the plane stopped, I saw soldiers, military tanks, and drones. I didn't want to get off the plane. We took about two and a half hours to get everyone off the plane, because we were very resistant. Even when people were voluntarily getting off, officials began dragging them along the floor with their hands on their backs. I saw that on another plane they fired tear gas because Venezuelans didn't want to get off.

14. When I got off the plane, Salvadoran officials dragged me and threw me off the plane. They beat me and kicked me from the stairs. They told me: "Welcome to hell. You'll never leave here. You'll never eat meat again."

15. They put me on a bus and took me to CECOT. I was handcuffed and chained, with a chain around my ankles and waist. I couldn't see the way to CECOT because the agents kept my head down under constant threats and blows. When I finally got off the bus, the handcuffs and shackles were too tight and cut off my circulation. I begged the agent to loosen them. Instead of helping me, they beat me without mercy on my head and ribs while forcing me into CECOT. I still have marks from the handcuffs and on my feet. The pain caused by the handcuffs was indescribable. It hurt so much that I fell. So the agents kicked me and hit me even more. Since I couldn't walk anymore, they dragged me.

16. When we entered the CECOT, there were cameras and the press watching. The Salvadoran agents stripped me and all the other people sent on the planes and shaved off all of our hair. They took away the clothes, the phone, the money and a gold pendant that I wore for luck. They never returned these belongings to me. They screamed again: "Welcome to Hell." I felt like I was dying. It was the first time I had suffered so much and felt so much pain. Some of the other people on the plane were crying. Some prayed. Some were begging to be killed.

17. The Salvadoran agents took us to another space and passed us through an X-ray machine. Then they threw us face down to the ground while a drone filmed it.

Docusign Envelope ID: BDF6DACA-DA26-4378-AB9A-717A6B7BE31E

18. The CECOT Director "welcomed us." He said: "Welcome to CECOT. You will never see daylight again. You will never eat chicken or meat again. You will never leave here. You'll have to earn how little you get." The director told us that all of our belongings were now in the hands of CECOT. They had stolen everything I had. While this was happening, I tried to keep my head down so that they wouldn't break my teeth. My hands were bleeding and my ribs were swollen. Everyone was bleeding.

19. Then they put us in cells. I was in cell 23, where there were ten to fifteen people. We were all given white shorts and sandals. There were no beds, sheets or mattresses.

20. That night, everyone in the cell was unknown. Everyone had been hit. Some were crying. Others were trying to figure out why they were there: for nothing, for driving without a license. Everything was said in a low voice because we couldn't even talk. We were monitored everywhere.

21. During the first two weeks, our lives followed a terrible routine. They woke us up at 4:30 a.m. with screams, put us in line and counted us. Between 4:30 a.m. and 5:00 a.m., we were allowed to bathe, and it was the only opportunity of the day. Between 5:00 and 6:00 in the morning food arrived. "Meals" consisted only of rice, tortillas, beans and a bad coffee that was actually pure water. Inside the cell we had two tanks connected to a plastic tube. We had to make that water last all day to drink.

22. At 11:00 a.m., there was another count, followed by a search where we were forced to bend down and look at the floor. The search lasted between twenty and thirty minutes.

Docusign Envelope ID: BDF6DACA-DA26-4378-AB9A-717A6B7BE31E

23. Around noon, we were given another "meal": rice, beans and a tasteless white pasta, accompanied by juice that looked dyed. They said they had put iodine in the juice.

24. At 4:00 p.m. there was another count. At 5:00 p.m., another "meal." At 6:00 p.m., silence. If we made noise, the guards would come in, hit us, and take us to "The Island," an isolation cell where they hit people. And at 9:00 p.m., bedtime.

25. The cells had very bright and hot white lights 24 hours a day, 7 days a week. The heat was unbearable. There were two cement tanks in each cell, each with a toilet. There was a jug of red water for bathing or drinking, but it was never drinking water, just water from the tank.

26. We never saw daylight. Sometimes they took us to play soccer (inside) for twenty minutes or gave us twenty minutes to briefly read the Bible. But it was clear that it was only to be able to take photos and record videos. We didn't have TV. We didn't have books. We were not allowed to have a copy of the Bible. We could not call, write, or receive visits from friends or family. I couldn't talk to my lawyers.

27. On the third day, immigration officials appeared and photos were taken of all our tattoos. They separated us into "good" and "bad" cells based on tattoos. I was classified into one of the "good" cells. Perhaps they realized that I was not a member of the Tren de Aragua, as I had told them.

28. After the third week, the treatment in the "good" cells improved a little. The guards didn't insult us as much and they sometimes turned off the lights and let us sleep more. The food also improved a lot. They started giving us American food, like pancakes, bacon and juice.

Docusign Envelope ID: BDF6DACA-DA26-4378-AB9A-717A6B7BE31E

29. But the "bad people" in "bad" cells continued to suffer. The guards beat them without mercy, bleeding them and leaving their bodies swollen. They started a hunger strike and spent four days without eating or drinking, but they didn't get anything. The director retaliated against the entire prison. The guards took away the good food.

30. When a group of American politicians visited CECOT, guards moved people with the most visible wounds to the cells that were farthest away.

31. When the Red Cross first came, the guards gave us the good food again. We were also given a half of a bar of soap, a little toothpaste and a cloth to dry.

32. But two days after the Red Cross left, the guards took us out of our cells and started hitting us without mercy. They beat me on my ribs, back and feet with their hands and a wooden stick. While I was being beaten, they would say to me: "This beating is because of everything you've said to the Red Cross." A woman named Jacqueline, who worked in the infirmary, screamed laughing: "Hit him, hit him, hit him!" and she called me piñata.

33. Medical care at CECOT was terrible. Once, I had a fever and felt bad. I asked for an appointment with the doctor, but they took a week to take me. My urine was very dark in color and had a foul smell, and I had abdominal pain. I suspected I had some kind of infection. I couldn't sleep, I was depressed, and I was thinking about suicide. Even when I had a fever, they kept hitting me. Jacqueline, the nurse, asked me if anything hurt, and I told her it was because they didn't stop hitting me; she took notes while we were talking. Later, when we were released, our records were delivered to us. Mine said that I had broken my foot playing soccer. Jacqueline had falsified the medical records. Sometimes the doctor would watch us be beaten and then smile and ask: "How do you feel?" It was the most perverse form of humiliation.

34. During the third month, some of the other prisoners began to cut themselves. They made a banner with the Venezuelan flag and covered it with blood. And they didn't eat or drink water again. I didn't have the courage to cut myself. And, anyway, that didn't work at all.

35. As punishment for the hunger strike, I was taken to the punishment cell called "The Island." They would hit you, close the door, mark a cross on it, and leave you there for hours. It smelled very bad. When they threw me into The Island, I was also shot in my right hand with rubber bullets, causing a deep contusion. Some of my companions suffered deep wounds from point-blank shots. One had his leg shredded with rubber bullets.

36. Once, a man returned to the cell crying. He told us that he had been forced to perform oral sex on the guards. I offered to talk to the prison staff, but he told us not to, because he was afraid that it would cause even more aggression.

37. Since leaving CECOT, I have not been able to sleep well. When I fall asleep, I wake up scared, not knowing where I am, terrified that I am back at CECOT. I don't have an appetite. It has been very difficult for me to understand why this has happened to me.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Signed by:

Signed on August [handwritten:] *15*, 2025.

[signature]

[redacted]

**DECLARACIÓN DE [redacted]**

Yo, [redacted], declaro lo siguiente:

1. Soy ciudadano venezolano de 35 años. Fui uno de los venezolanos trasladados, desaparecidos, detenidos y torturados arbitrariamente en el CECOT de El Salvador. RFK Human Rights son mis abogados.

2. En 2016, salí de Venezuela hacia Colombia. Después de unos meses, me trasladé a Ecuador, junto con mi madre. Ella tenía cáncer de mama y yo quería ayudarla y asegurarme de que tuviera acceso a los medicamentos que necesitaba.

3. Mientras estuve en Ecuador, trabajé como albañil y vendí ropa. También era propietario de un restaurante de pollos asados. Durante ese tiempo, conocí a mi esposa y tuvimos a nuestro hijo, que ahora tiene cuatro años. En 2022, tuve que dejar a mi esposa, mi hijo y mi madre en Ecuador y busqué protección en los Estados Unidos.

4. Mi viaje a los Estados Unidos fue terrible. Cuando llegué a la Ciudad de México, me secuestraron durante cinco días hasta que pagué un rescate de $3,000 dólares. Después de que me liberaron, crucé la frontera hacia Estados Unidos, donde me entregué a las autoridades migratorias, y me retuvieron durante tres días en un centro de detención, pero me pusieron en libertad para tramitar mi solicitud de asilo. Afortunadamente, una organización humanitaria me proporcionó un tiquete de avión a Orlando, Florida, y me instalé allí.

5. Cuando llegué a Orlando, lo primero que hice fue buscar trabajo lavando carros, lo que me permitió ganar suficiente dinero para comprar ropa. Más tarde encontré trabajo en una

pizzería, donde estuve aproximadamente un año, y luego en la panadería Paris, donde trabajé durante unos ocho meses.

6. Durante este tiempo, solicité el Estatus de Protección Temporal y me lo concedieron. Esto me dio un permiso de trabajo. También solicité asilo, con una audiencia prevista para 2026. Hice todo lo que tenía que hacer para cumplir con los requisitos legales: tenía un dispositivo para hacerme una foto y enviarla a los servicios de inmigración todos los martes, cosa que hice. Y siempre me presenté a mis audiencias (aunque a menudo se posponían). No tenía orden de deportación y pagaba mis impuestos.

7. Nunca tuve problemas con la ley en Estados Unidos ni en Venezuela. No tengo antecedentes penales. Y nunca fui miembro del Tren de Aragua ni de ninguna otra pandilla.

8. El 12 de marzo de 2025, alrededor de las 3:30 p. m., agentes del ICE llegaron a la panadería mientras yo estaba trabajando. Acababa de subir a mi coche para irme a casa cuando tres vehículos me interceptaron y los agentes del ICE me apuntaron con sus armas. Me llamaron por mi nombre y, cuando abrí la puerta del coche, me agarraron, me tiraron al suelo y me esposaron. Me dijeron: «Se acabó el TPS, se acabó conducir, eres del Tren de Aragua». Todo fue un poco confuso, porque no hablo bien inglés y los agentes del ICE seguían hablando en inglés. Pero les dije que no formaba parte del Tren de Aragua.

9. Los agentes del ICE me llevaron a un centro de detención y luego me trasladaron al Centro Penitenciario del Condado de Orange. Me dejaron allí toda la noche y luego me llevaron a otro centro a dos o tres horas de distancia, creo que en Atlanta. Cuando estaba allí, los agentes del ICE volvieron a acusarme de formar parte del Tren de Aragua. Dijeron que era porque era del

estado de Aragua, porque aparecía en una foto haciendo un gesto de «pulgar hacia arriba» y porque tenía un tatuaje de un elefante en la mano.

10. Les dije que eso no significaba nada y que no pertenecía a la banda, solo porque por casualidad era de ese estado. Les expliqué que me había hecho el tatuaje del elefante en honor a mi mamá, que había sobrevivido a su segunda operación de cáncer de mama, porque es un símbolo de fuerza y resistencia.

11. No les importó. Me dijeron que me iban a deportar. Me pidieron que firmara varios papeles, pero me negué porque estaban en inglés y no los entendía. Nunca vi a un juez. Me secuestraron y se me llevaron en secreto.

12. Los agentes me subieron a un avión. Me dijeron que iba a Venezuela, pero en realidad fue a Texas. Pasé tres días en Hidalgo. Me dieron un uniforme rojo, que los guardias me dijeron que era para personas que representaban «peligro máximo». Otros vestían de azul y naranja. Luego, el 15 de marzo, me subieron a otro avión. Durante el vuelo, uno de los agentes dijo: «Tenemos una sorpresa para ustedes». Hicimos escala en Honduras y nos dieron algo de comida. Pensé que esta vez íbamos a Venezuela, pero cuando aterrizó el avión, me di cuenta de que estaba en El Salvador. Una de las personas que iba en el avión, que hablaba inglés, tradujo uno de los documentos que le habían dado: decía que estaríamos detenidos durante al menos un año en El Salvador.

13. Cuando el avión frenó, vi soldados, tanques militares y drones. No me quería bajar del avión. Tardamos unas dos horas y media en bajar todos, porque nos resistíamos mucho. Incluso cuando la gente bajaba voluntariamente, los funcionarios empezaban a arrastrarlos por el suelo con

las manos a la espalda. Vi que en otro avión disparaban gases lacrimógenos porque los venezolanos no querían bajar.

14. Cuando me tocó bajar del avión, los funcionarios salvadoreños me arrastraron y me tiraron fuera. Me golpearon y patearon desde las escaleras. Me dijeron: «Bienvenido al infierno. Nunca saldrás de aquí. Nunca volverás a comer carne».

15. Me metieron en una autobús y me llevaron al CECOT. Estaba esposado y encadenado, con una cadena alrededor de los tobillos y la cintura. No pude ver el camino al CECOT porque los agentes me mantuvieron la cabeza agachada bajo amenazas y golpes constantes. Cuando finalmente salí del autobús, las esposas y los grilletes estaban demasiado apretados y me cortaban la circulación. Le rogué al agente que me los aflojara. En vez de ayudarme, me golpearon sin piedad en la cabeza y las costillas mientras me obligaban a entrar en el CECOT. Todavía tengo marcas de las esposas y en los pies. El dolor que me causaban las esposas era indescriptible. Me dolía tanto que me caí. Entonces los agentes me dieron más patadas y golpes. Como ya no podía caminar, me arrastraron.

16. Cuando entramos en el CECOT, había cámaras y prensa observando. Los agentes salvadoreños nos desnudaron a mí y a todas las demás personas enviadas en los aviones y nos afeitaron todo el pelo. Nos quitaron la ropa, el teléfono, el dinero y un colgante de oro que llevaba para la suerte. Nunca me devolvieron estas pertenencias. Volvieron a gritar: «Bienvenidos al infierno». Sentí que me moría. Era la primera vez que sufría tanto y sentía tanto dolor. Algunas de las otras personas del avión lloraban. Algunas rezaban. Algunas suplicaban que las mataran.

17. Los agentes salvadoreños nos llevaron a otro espacio y nos pasaron por una máquina de rayos X. Luego nos tiraron boca abajo al suelo mientras un dron lo filmaba.

18. El director del CECOT nos «dio la bienvenida». Dijo: «Bienvenidos al CECOT. Nunca volverán a ver la luz del día. Nunca volverán a comer pollo ni carne. Nunca saldrán de aquí. Tendrán que ganarse lo poco que tengan». El director nos dijo que todas nuestras pertenencias estaban ahora en manos del CECOT. Me habían robado todo lo que tenía. Mientras esto sucedía, intenté mantener la cabeza agachada para que no me rompieran los dientes. Me sangraban las manos y tenía las costillas hinchadas. Todo el mundo sangraba.

19. Después nos metieron en celdas. Yo estaba en la celda 23, donde había entre diez y quince personas. A todos nos dieron pantalones cortos blancos y sandalias. No había camas, sábanas ni colchones.

20. Esa noche, todos los que estábamos en la celda éramos desconocidos. Todos habían sido golpeados. Algunos lloraban. Otros intentaban averiguar por qué estaban allí: por nada, por conducir sin licencia. Todo se decía en voz baja porque ni siquiera podíamos hablar. Nos vigilaban por todas partes.

21. Durante las dos primeras semanas, nuestras vidas siguieron una rutina terrible. Nos despertaban a las 4:30 de la mañana con gritos, nos ponían en fila y nos contaban. Entre las 4:30 y las 5:00 de la mañana, nos dejaban bañarnos, y era la única oportunidad del día. Entre las 5:00 y las 6:00 de la mañana llegaba la comida. Las «comidas» consistían solo en arroz, tortillas, frijoles y un café malo que en realidad era agua pura. Dentro de la celda teníamos dos tanques conectados a un tubo de plástico. Teníamos que hacer que esa agua nos durara todo el día para beber.

22. A las 11:00 a. m., hubo otro recuento, seguido de un registro en el que nos obligaron a agacharnos y mirar al suelo. El registro duró entre veinte y treinta minutos.

23. Alrededor del mediodía, nos dieron otra «comida»: arroz, frijoles y una pasta blanca insípida, acompañada de un jugo que parecía teñido. Dijeron que le habían puesto yodo al jugo.

24. A las 4:00 p. m. hubo otro recuento. A las 5:00 p. m., otra «comida». A las 6:00 p. m., silencio. Si hacíamos ruido, los guardias entraban, nos golpeaban y nos llevaban a «La Isla», una celda de aislamiento donde golpeaban a la gente. Y a las 9:00 p. m., hora de dormir.

25. En las celdas había luces blancas muy brillantes y calientes las 24 horas del día, los 7 días de la semana. El calor era insoportable. En cada celda había dos tanques de cemento, cada uno con un retrete. Había una jarra de agua roja para bañarse o beber, pero nunca era agua potable, solo agua del tanque.

26. Nunca veíamos la luz del día. A veces nos llevaban a jugar al fútbol (en el interior) durante veinte minutos o nos daban veinte minutos para leer brevemente la Biblia. Pero estaba claro que solo era para poder hacernos fotos y grabar vídeos. No teníamos televisión. No teníamos libros. No nos permitían tener una copia de la Biblia. No podíamos llamar, escribir ni recibir visitas de amigos o familiares. No podía hablar con mis abogados.

27. Al tercer día, aparecieron los funcionarios de inmigración y nos tomaron fotos de todos nuestros tatuajes. Nos separaron en celdas «buenas» y «malas» según los tatuajes. Me clasificaron en una de las celdas «buenas». Quizás se dieron cuenta de que no era miembro del Tren de Aragua, como les había dicho.

28. Después de la tercera semana, el trato en las celdas «buenas» mejoró un poco. Los guardias no nos insultaban tanto y a veces apagaban las luces y nos dejaban dormir más. La comida también mejoró mucho. Empezaron a darnos comida americana, como tortitas, tocineta y jugo.

29. Pero los «malos» de las celdas «malas» seguían sufriendo. Los guardias los golpeaban sin piedad, haciéndoles sangrar y dejándoles el cuerpo hinchado. Empezaron una huelga de hambre y pasaron cuatro días sin comer ni beber, pero no consiguieron nada. El director tomó represalias contra toda la prisión. Los guardias nos quitaron la comida buena.

30. Cuando un grupo de políticos estadounidenses visitó el CECOT, los guardias trasladaron a las personas con las heridas más visibles a las celdas más alejadas.

31. Cuando la Cruz Roja vino por primera vez, los guardias nos dieron otra vez la comida buena. También nos dieron media pastilla de jabón, un poco de pasta de dientes y un paño para secarnos.

32. Pero dos días después de que se marchara la Cruz Roja, los guardias nos sacaron de nuestras celdas y comenzaron a golpearnos sin piedad. Me golpearon en las costillas, la espalda y los pies con las manos y un palo de madera. Mientras me golpeaban, me decían: «Esta paliza es por todo lo que le has dicho a la Cruz Roja». Una mujer llamada Jaqueline, que trabajaba en la enfermería, gritaba riendo: «¡Pégale, pégale, pégale!», y me llamaba piñata.

33. La atención médica en el CECOT era pésima. Una vez, tuve fiebre y me sentí mal. Pedí cita con el médico, pero se demoraron una semana en llevarme. Mi orina era de un color muy oscuro y tenía un olor fétido, y tenía dolor abdominal. Sospechaba que tenía algún tipo de infección. No podía dormir, estaba deprimido y pensaba en suicidarme. Incluso cuando tenía fiebre, no dejaban de golpearme. Jackeline, la enfermera, me preguntó si me dolía algo, y le dije que era porque no dejaban de golpearme; ella tomaba notas mientras hablábamos. Más tarde, cuando nos liberaron, nos entregaron nuestros expedientes. El mío decía que me había roto el pie jugando al fútbol. Jackeline había falsificado los registros médicos. A veces, el médico observaba

cómo nos golpeaban y luego sonreía y preguntaba: «¿Cómo te sientes?». Era la forma más perversa de humillación.

34. Durante el tercer mes, algunos de los otros presos comenzaron a cortarse. Hicieron una pancarta con la bandera venezolana y la cubrieron con sangre. Y no volvieron a comer ni a beber agua. Yo no tuve el valor de cortarme. Y, de todos modos, eso no sirvió de nada.

35. Como castigo por la huelga de hambre, me llevaron a la celda de castigo llamada «La Isla». Te golpeaban, cerraban la puerta, marcaban una cruz en ella y te dejaban allí tirado durante horas. Olía muy mal. Cuando me metieron en La Isla, también me dispararon en la mano derecha con balas de goma, causándome una contusión profunda. Algunos de mis compañeros sufrieron heridas profundas por disparos a quemarropa. A uno le destrozaron la pierna con balas de goma.

36. Una vez, un hombre regresó a la celda llorando. Nos contó que le habían obligado a practicar sexo oral a los guardias. Me ofrecí a hablar con el personal de la prisión, pero nos dijo que no lo hiciéramos, porque temía que eso provocara aún más agresiones.

37. Desde mi salida del CECOT, no he podido dormir bien. Cuando me duermo, me despierto asustado, sin saber dónde estoy, aterrorizado por pensar que estoy de vuelta en el CECOT. No tengo apetito. Me ha resultado muy difícil entender por qué me ha pasado esto.

Declaro bajo pena de perjurio ante las leyes de los Estados Unidos que lo anterior es cierto y correcto.

Firmado por:
[redacted]

Firmado el 15 de agosto de 2025.

[redacted]

# DECLARATION OF ROBERT BRIAN TAYLOR

I, Robert Brian Taylor, declare as follows:

1. I am a translator fluent in the English and Spanish languages. I was engaged through Transperfect Legal to translate the accompanying document from Spanish into English.

2. The attached document is, to the best of my knowledge and belief, a true and correct translation of the Declaration of [redacted] in a form that reflects the intention and meaning of the original text.

declare under penalty of perjury that the foregoing is true and correct.

Executed on 09/16/2025

ROBERT BRIAN TAYLOR

Case No. 25-cv-1774-JEB

# Exhibit 20

Post

Secretary Marco Rubio
@SecRubio

Thank you for your assistance and friendship, President Bukele.

Nayib Bukele @nayibbukele · Mar 16

Today, the first 238 members of the Venezuelan criminal organization, Tren de Aragua, arrived in our country. They were immediately transferred to CECOT, the Terrorism Confinement Center, for a period of one year (renewable).

The United States will pay a very low fee for them,
Show more



2:40

8:39 AM · Mar 16, 2025 · **3.8M** Views

3.2K 15K 101K 1.5K

Post your reply

Reply

Case No. 25-cv-1774-JEB

# Exhibit 21

TRUTH.

# Truth Details

2244 replies

**Donald J. Trump**
@realDonaldTrump

I look forward to watching the sick terrorist thugs get 20 year jail sentences for what they are doing to Elon Musk and Tesla. Perhaps they could serve them in the prisons of El Salvador, which have become so recently famous for such lovely conditions!

**7.54k** ReTruths **34.1k** Likes Mar 21, 2025, 7:43 AM

Case No. 25-cv-1774-JEB
REDACTED

# Exhibit 22

Case No. 25-cv-1774-JEB

# Exhibit 23

An official website of the United States Government Here's how you know



# U.S. Department of State Terms and Conditions for Foreign Public Entities

BUREAU OF POLITICAL-MILITARY AFFAIRS

DOWNLOAD PDF [88 KB]

A Department of State (DOS) Notice of Award for Foreign Public Entities (FPEs) consists of the following two mandatory components:

- DS-1909 Federal Assistance Award Coversheet
- Terms and Conditions for Foreign Public Entities (data elements below)

DATA ELEMENTS:

1. **Federal Assistance Identification Number:** [Insert number]

2. **Amount of Award:** [Insert amount]

Cookie Settings

3. **Purpose/Scope of Award:**[Insert general purpose of award from SOO]. For full scope of award, see attached Statement of Objectives (Attachment A).

4. Grants Officer (GO)

The Grants Officer is responsible for exercising prudent management of this award and is the only individual authorized to award, amend, suspend, and terminate financial assistance awards. In addition, the Grants Officer is responsible for coordination and liaison with the Recipient. This individual receives appropriate material from the Grants Officer Representative and/or the Recipient for review. The Grants Officer's name, address, telephone number and email address are:

Grants Officer
U.S. Department of State
PM/WRA, SA-09 2nd East
2025 E Street, NW
Washington, DC 20006
Telephone:
E-mail:

5. Grants Officer Representative (GOR)

The Grants Officers Representative (GOR) for this award is responsible for coordinating the programmatic and administrative aspects of this award. The GOR's name, address, telephone number, and email address are:

Program Manager
U.S. Department of State

PM/WRA, SA-09 2nd East
2025 E Street, NW
Washington, DC 20006
Telephone:
E-mail:

6. Recipient Point of Contact and Signatory

a. The Recipient must inform the Grants Officer in writing of the name of its representative authorized to administer the award, and bind the Recipient.

b. The Recipient Point of Contact name, title, address, telephone number, and email address is:

[Name]
[Address Line 1]
[Address Line 2]
[Phone]
[Email]

c. The Recipient Signatory name, title, address, telephone number, and email address is:

[Name]
[Address Line 1]
[Address Line 2]
[Phone]
[Email]

7. Payment Method:

***If the payment method is through the Department of Health and Human Services Payment Management System (PMS), use the following provision:***

Payments under this award will be made through the U.S. Department of Health and Human Services Payment Management System (PMS). The Payment Management System instructions are available under the PMS website and can be accessed at the following address: **http://www.dpm.psc.gov/**. Recipients should request funds based on immediate disbursement requirements and disburse funds as soon as possible to minimize the Federal cash on hand.

***Or***

***If the payment method is through Automated Clearing House Electronic Funds Transfer (ACH/EFT), USG Cash or Cashier Check — SF-270 Request for Advance or Reimbursement — use the following provision:***

The Standard Form 270 Request for Advance or Reimbursement is used to request payments in the amounts required by the Recipient to carry out the purpose of this award. The SF-270 must identify the period for which payment is being claimed/requested; be numbered consecutively, and be certified by the organization's authorized requesting official. Each payment request must equal the amount of expenditures anticipated or actually incurred during the period covered by the request, less any unexpended funds remaining from prior payments.

When submitting a request for payment, use the address provided on the DS-1909 Federal Assistance coversheet. Requests for payments must be submitted in sufficient time to allow at least fourteen (l4) working days for processing.

8. Post-Award Compliance:

The Department of State Terms and Conditions for Foreign Public Entities are included below and made part of this Notice of Award.

The Recipient must comply with these terms and conditions during the award/project period, as well as with any assurance and certifications made part of the Notice of Award. Subrecipients must be informed of, and must comply with, any applicable terms and conditions in this award during the award period.

9. Authorized Budget

***Note: FPEs may use an alternative summarized activity budget format in lieu of the standard budget categories as described below. However, the line item budget is preferred, as it conforms to OMB's standard format and cost classifications. PIOs may have a fixed indirect rate, which has been agreed to by member states. This indirect rate is not considered a NICRA nor is it limited by the 10% de minimis rate in 2 CFR 200, which does not apply to PIOs.***

Summarized Activity Budget

| Grant Activity | Amount |
|---|---|
| 1. Activity 1 | |
| 2. Activity 2 | |
| Total | |

*Or*

Standard Budget Format

| Budget Categories | Amount |
|---|---|
| 1. Personnel | |
| 2. Fringe Benefits | |
| 3. Travel | |
| 4. Equipment | |
| 5. Supplies | |
| 6. Contractual | |
| 7. Construction | |
| 8. Other Direct Costs | |

| |
|---|
| 9. Total Direct Costs (lines 1-8) |
| 10. Indirect Costs |
| 11. Total Costs (lines 9-10) |
| 12. Cost-Sharing |

10. Allowable Costs

a. The Recipient will be reimbursed for costs incurred in carrying out the purposes of this award, which are reasonable, allocable, and allowable.

(1) "Reasonable" means those costs that do not exceed those that would ordinarily be incurred by a prudent person in the conduct of normal business.

(2) "Allocable" means those costs that are necessary to this award.

(3) "Allowable" means those costs that are reasonable and allocable, and that conform to any limitations set forth in this award. Alcohol is not an allowable cost under this award.

b. The Recipient is encouraged to obtain the Grants Officer's written determination as to whether the cost will be allowable before incurring a questionable or unique cost.

11. Revision of Award Budget

a. The approved award budget is the financial expression of the Recipient's program as approved during the award process.

b. The Recipient must immediately request approval from the Grants Officer when there is reason to believe that within the next 30 calendar days a revision of the approved award budget will be necessary for any of the following reasons:

(1) To change the scope or the objectives of the program or to add any new activity.

(2) To revise the funding allocated among program objectives or direct cost categories by more than 10 percent of the total budget amount.

(3) The project goals and objectives cannot be completed within the approved budget amount.

c. Except as required by other provisions of this award specifically stated to be an exception from this provision, DOS will not be obligated to reimburse the Recipient for costs incurred in excess of the total amount obligated under the award. The Recipient will not be obligated to continue performance under the award (including actions under the "Termination Procedures" provision) or otherwise to incur costs in excess of the amount obligated under the award, unless and until the Grants Officer notifies the Recipient in writing that such obligated amount has been increased and specifies the new award total amount.

12. Award/Project Period

The award/project period of performance is shown on the DS-1909 Federal Assistance Award coversheet. All expenditures paid with funds provided by this award must be incurred for authorized activities that take place during this period unless otherwise stipulated. In the event the time prescribed herein should prove insufficient for the Recipient to carry out the program provided for herein, the Grants Officer may provide such extension of the period of the award as may be deemed advisable. Any extension will be effective only upon the execution of an amendment to the Award for this purpose. All requests for extensions must be received in writing at least ten days prior to the expiration date.

13. Amendment

This document constitutes the entire agreement between the parties. No amendment changing its scope or terms shall have any force or effect unless it is in writing and signed by the Grants Officer for the Department of State and a duly authorized representative for the Recipient.

14. Non-Liability

The DOS does not assume liability for any third-party claims for damages arising out of this award.

15. Notices

Any notice given by DOS or the Recipient will be sufficient only if in writing and delivered in person, mailed, or transmitted by e-mail, as follows:

- To the DOS Grants Officer and/or Grants Officer Representative, at the address specified in the Notice of Award.

- To Recipient, at the address shown in the award or such other address designated within the Notice of Award.

Notices will be effective when delivered in accordance with this provision, or on the effective date of the notice, whichever is later.

16. Refunds

a. If the Recipient earns interest on Federal advances before expending the funds for program purposes, the Recipient must remit the interest annually. Refunds should not be returned to DOS; contact the Grants Officer for instructions on remitting to the U.S. government through the Automated Clearing House (ACH) network or a Fedwire Funds Service payment. Interest amounts up to $500 per year may be retained by the Recipient for administrative expenses.

b. Funds obligated by DOS, but not disbursed to the Recipient before the award expires or is terminated, will revert to DOS, except for funds committed by the Recipient to a legally binding transaction applicable to this award. Any funds advanced to, but not expended by, the Recipient before the time of expiration or termination of the award must be refunded to DOS, except for funds committed by the Recipient to a legally binding transaction applicable to this award.

c. If, at any time during the life of the award, or as a result of final audit, it is determined that DOS funds provided under this award have been expended for purposes not in accordance with the terms of this award, the Recipient must promptly refund such amount to DOS.

17. Termination Procedures

This award may be terminated by either party, in whole or in part, at any time with 30 days written notice of termination.

a. Upon receiving a termination notice from the Grants Officer, the Recipient must take immediate action to cease all expenditures financed by this award and to cancel all unliquidated obligations if possible. The Recipient may not enter into any additional obligations under this award after receiving the notice of termination, other than those reasonably necessary to effect the close out of this award. Except as provided below, no further reimbursement will be made after the effective date of termination.

b. As soon as possible, but in any event no later than 90 days after the effective date of termination, the Recipient must repay to DOS all unexpended DOS funds that are not otherwise obligated by a legally binding transaction applicable to this award.

c. If the funds paid by DOS to the Recipient before the effective date of termination are not sufficient to cover the Recipient's obligations under a legally binding transaction, the Recipient may submit a written claim for such amount to DOS within 90 days after the effective date of termination. The Grants Officer will determine the amount(s) to be paid by DOS to the Recipient under such claim in accordance with the "Allowable Costs" provision of this award.

18. Audit and Records

***Use for foreign government entities and non-UN organizations when DOS is not the sole contributor under the award program.***

The Recipient is required to maintain books, records, documents, and other evidence in accordance with the Recipient's usual accounting procedures to sufficiently substantiate charges

to the award. The Recipient confirms that this program will be subject to an independent audit in accordance with the Recipient's usual auditing procedures, and agrees to furnish copies of these audit reports to DOS along with such other related information as may be reasonably requested by DOS with respect to questions arising from the audit report.

***Or***

***Use for foreign government entities and non-UN organizations when DOS is the sole contributor under the award program.***

The Recipient is required to maintain books, records, documents, and other evidence in accordance with the Recipient's usual accounting procedures to sufficiently substantiate charges to the award. The Recipient agrees to make available to DOS or the Comptroller General of the United States all records and documents that support expenditures made under this program.

***Or***

***Use for all awards to the United Nations (UN) or its subsidiaries. When this provision is used, edit the "Reporting and Evaluation" provision to include the appropriate level of required reporting.***

a. The Recipient agrees to furnish the U.S. Government with a final report on activities carried out under this award, including accounting for award funds in sufficient detail to enable DOS to liquidate the award.

***Optional:*** The report must be submitted to the U.S. Mission to the UN in New York for forwarding to the DOS program office, as well as submitted according to the Reporting and Evaluation provision below.

b. It is understood that financial records, including documentation to support entries on accounting records and to substantiate charges against the award, will be maintained in accordance with the Recipient's usual accounting procedures, which must follow generally accepted accounting practices. All such financial records must be maintained for at least three years after the final disbursement of funds under this award.

c. The Recipient confirms that the award account will be audited applying established procedures under appropriate provisions of the financial regulations and rules of the United Nations.

19. Reporting and Evaluation

Programmatic Reporting:

The recipient is expected to submit [Select one: annual, bi-annual, quarterly, monthly] programmatic reports. All reports should be uploaded to the award as a Post Award Activity in SAMS Domestic on or before the report due date. The report must follow the format of the Narrative Progress Report Template attached to this award.

| Grant Quarter | USG Fiscal Year and Quarter | Calendar Year Dates | Report Due Date |
|---|---|---|---|
| 1 | FY2017, Quarter 1 | October 1, 2016 – December 31, 2016 | January 30, 2017 |
| 2 | FY2017, Quarter 2 | January 1, 2017 – March 31, 2017 | April 30, 2017 |
| 3 | FY2017, Quarter 3 | April 1, 2017 – June 30, 2017 | July 30, 2017 |
| 4 | FY2017, Quarter 4 | July 1, 2017 – September 30, 2017 | October 30, 2017 |
| 5 | FY2018, Quarter 1 | October 1, 2017 – December 31, 2017 | January 30, 2018 |

| | | | |
|---|---|---|---|
| 6 | FY2018, Quarter 2 | January 1, 2018 – March 31, 2018 | April 30, 2018 |
| 7 | FY2018, Quarter 3 | April 1, 2018 – June 30, 2018 | July 30, 2017 |
| 8 | FY2018, Quarter 4 | July 1, 2018 – September 30, 2018 | October 30, 2018 |

**Final Programmatic Report Due: March 30, 2019**

Financial Reporting:

The recipient is expected to submit quarterly financial reports (SF-425). All reports should be submitted in the HHS Payment Management System (PMS) **and** uploaded to the award as a Post Award Activity in SAMS Domestic on or before the report due date.

| Grant Quarter | USG Fiscal Year and Quarter | Calendar Year Dates | Report Due Date |
|---|---|---|---|
| 1 | FY2017, Quarter 1 | October 1, 2016 – December 31, 2016 | January 30, 2017 |
| 2 | FY2017, Quarter 2 | January 1, 2017 – March 31, 2017 | April 30, 2017 |
| 3 | FY2017, Quarter 3 | April 1, 2017 – June 30, 2017 | July 30, 2017 |
| 4 | FY2017, Quarter 4 | July 1, 2017 – September 30, 2017 | October 30, 2017 |
| 5 | FY2018, Quarter 1 | October 1, 2017 – December 31, 2017 | January 30, 2018 |

| | | | |
|---|---|---|---|
| 6 | FY2018, Quarter 2 | January 1, 2018 – March 31, 2018 | April 30, 2018 |
| 7 | FY2018, Quarter 3 | April 1, 2018 – June 30, 2018 | July 30, 2017 |
| 8 | FY2018, Quarter 4 | July 1, 2018 – September 30, 2018 | October 30, 2018 |

**Final Financial Report Due: March 30, 2019**

Final Financial and Programmatic Reporting:

The recipient is expected to submit a final programmatic and financial report on or before [enter due date]. The final programmatic and financial reports should reflect all activity undertaken during the life of the award. See above for submission instructions.

20. Terrorist Financing

***Use with all PIO awards, except the UN or its subsidiaries:***

U.S. Executive Orders and U.S. law prohibit transactions with, and the provision of resources and support to, individuals and organizations associated with terrorism. It is the responsibility of the

Recipient to ensure compliance with these Executive Orders and laws. This provision must be included in all contracts or sub-awards/agreements issued under this award.

***Or***

***Use with all awards made to the UN or its subsidiaries:***

Consistent with numerous United Nations Security Council resolutions, including S/RES/1269 (1999), S/RES/1368 (2001), and S/RES/1373 (2001), both DOS and the Recipient are firmly committed to the international fight against terrorism, and in particular, against the financing of terrorism. It is the policy of DOS to seek to ensure that none of its funds are used, directly or indirectly, to provide support to individuals or entities associated with terrorism. In accordance with this policy, the Recipient undertakes to use reasonable efforts to ensure that none of the DOS funds provided under this award are used to provide support to individuals or entities associated with terrorism.

21. Publications and Media Releases

a. The Recipient shall provide the project office and Grants Officer with one copy of all published works developed under this award and with lists of other written work produced under this award.

b. If the Recipient intends to identify DOS's contribution to any publication, video, media release, or other electronic or print material or resulting from this award, the following conditions apply:

(1) The product must be approved by the GOR, with the Grant Officer's authorization, prior to release or publication; and

(2) The product must identify the sponsoring DOS office, bureau or mission, and state that the views expressed by the author(s) do not necessarily reflect those of DOS, using the following language:

"This [publication, video or other information/media product (specify)] was made possible through support provided by the United States Department of State, under the terms of Award No. . The opinions expressed herein are those of the author(s) and do not necessarily reflect the views of the United States Department of State."

c. Except as otherwise provided in the terms and conditions of the award, the author or the Recipient is free to copyright any books, publications, or other copyrightable materials developed in the course of or under this award, but DOS reserves a royalty-free nonexclusive and irrevocable right to reproduce, publish, or otherwise use, and to authorize others to use the work for U. S. Government purposes.

22. Trafficking in persons ***(Required when the Recipient plans to provide subawards to private entities, as defined below, under this award. If the Grants Officer expects that the subawards will be made under this award, the following provision must be inserted in its entirety. Note: only paragraphs b, c, and d apply to FPEs, but paragraph a may not be omitted.)***

a. Provisions applicable to a recipient that is a private entity.

(1) You as the recipient, your employees, subrecipients under this award, and subrecipients' employees may not—

i. Engage in severe forms of trafficking in persons during the period of time that the award is in effect;

ii. Procure a commercial sex act during the period of time that the award is in effect; or

iii. Use forced labor in the performance of the award or subawards under the award.

(2) We as the Federal awarding agency may unilaterally terminate this award, without penalty, if you or a subrecipient that is a private entity

i. Is determined to have violated a prohibition in paragraph a(1) of this award term; or

ii. Has an employee who is determined by the agency official authorized to terminate the award to have violated a prohibition in paragraph .a.1 of this award term through conduct that is either—

A. Associated with performance under this award; or

B. Imputed to you or the subrecipient using the standards and due process for imputing the conduct of an individual to an organization that are provided in 2 CFR part 180, "OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement)," as implemented by our agency at 2 CFR part 601.

b. Provision applicable to a recipient other than a private entity. We as the Federal awarding agency may unilaterally terminate this award, without penalty, if a subrecipient that is a private entity—

(1) Is determined to have violated an applicable prohibition in paragraph .a.1 of this award term; or

(2) Has an employee who is determined by the agency official authorized to terminate the award to have violated an applicable prohibition in paragraph a(1) of this award term through conduct that is either—

i. Associated with performance under this award; or

ii. Imputed to the subrecipient using the standards and due process for imputing the conduct of an individual to an organization that are provided in 2 CFR part 180, “OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement),” as implemented by our agency at 2 CFR part 601.

c. Provisions applicable to any recipient.

(1) You must inform us immediately of any information you receive from any source alleging a violation of a prohibition in paragraph a(1) of this award term.

(2) Our right to terminate unilaterally that is described in paragraph a(2) or b of this section:

i. Implements section 106(g) of the Trafficking Victims Protection Act of 2000 (TVPA), as amended (22 U.S.C. 7104(g)), and

ii. Is in addition to all other remedies for noncompliance that are available to us under this award.

(3) You must include the requirements of paragraph a(1) of this award term in any subaward you make to a private entity.

d. Definitions. For purposes of this award term:

(1) "Employee" means either:

i. An individual employed by you or a subrecipient who is engaged in the performance of the project or program under this award; or

ii. Another person engaged in the performance of the project or program under this award and not compensated by you including, but not limited to, a volunteer or individual whose services are contributed by a third party as an in-kind contribution toward cost sharing or matching requirements.

(2) "Forced labor" means labor obtained by any of the following methods: the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery.

(3) "Private entity":

i. Means any entity other than a State, local government, Indian tribe, or foreign public entity, as those terms are defined in 2 CFR 175.25.

ii. Includes:

A. A nonprofit organization, including any nonprofit institution of higher education, hospital, or tribal organization other than one included in the

definition of Indian tribe at 2 CFR 175.25(b).

B. A for-profit organization.

(4) “Severe forms of trafficking in persons,” “commercial sex act,” and “coercion” have the meanings given at section 103 of the TVPA, as amended (22 U.S.C. 7102).

23. Investment Promotion: N/A

24. Specific Award Conditions

a. Standard Reporting Metrics

All conventional weapons destruction and humanitarian mine action grants must fill out the standard reporting metrics annually on the progress of the grant. It is recommended that a similar format is used for quarterly reporting of progress. In addition, all Humanitarian Demining and surface and sub-surface Explosive Remnants of War (ERW) activities must produce and maintain to-scale maps of these activities and record the location of all landmines and other ERW found and cleared.

b. Key Personnel

Key Personnel are defined as individuals who contribute to the development or execution of a project in a substantive, measurable way. The Principal Investigator/Program Director (Primary Vendor/Recipient Contact in SAMS Domestic) is always considered to be Key Personnel. The Recipient agrees that a partial basis for award of the grant or cooperative agreement is the list of Key Personnel included in the proposal. Accordingly, the Recipient agrees to assign to this task order those key persons whose resumes were submitted with

the proposal necessary to fulfill the requirements of the award. No substitution shall be made without prior notification to and concurrence of the Grants Officer. All proposed substitutes shall meet or exceed the qualifications of the person to be replaced. The Grants Officer shall be notified in writing of any proposed substitution at least thirty (30) days in advance of the proposed substitution. Such notification shall include:

1. An explanation of the circumstances necessitating the substitution;

2. A complete resume of the proposed substitute; and

3. Any other information requested by the Grants Officer to enable him/her to judge whether or not the Recipient is maintaining the same high quality of personnel that provided the partial basis for award.

c. Gender and Age-Based Reporting Requirement

Recipients shall disaggregate reporting on beneficiaries based on gender and age, and report separately on the number of men and women employed in the program funded by the grant. Additionally, grantees are required to report whether non-technical and technical survey teams include female employees to ensure the voices of women and girls are included in survey results. Age-based reporting requires that the number of individuals served under the age of eighteen (18) and the number over the age of eighteen (18) be listed where possible.

d. Anti-Prostitution Policy and Requirements

The U.S. Government is opposed to prostitution and related activities, which are inherently harmful and dehumanizing, and contribute to the phenomenon of trafficking in persons.

Consistent with the Trafficking Victims Protection Act (TVPA), recipients are required to agree to the following special conditions prior to a grant or cooperative agreement being awarded:

e. None of the funds made available herein may be used to promote, support, or advocate the legalization or practice of prostitution. Nothing in the preceding sentence shall be construed to preclude assistance designed to combat trafficking in persons, including programs for prevention, protection of victims, and prosecution of traffickers and others who profit from trafficking in persons, by ameliorating the suffering of, or health risks to, victims while they are being trafficked or after they are out of the situation that resulted from such victims being trafficked. The Recipient shall insert this provision in all sub-agreements under this award. TVPA sec. 113(g)(1)(P.L. 108-193).

f. MANPADS Reporting

If during the course of its operations the Recipient discovers any Man Portable Air Defense Systems (MANPADS) or other weapons systems of high value, the Recipient shall immediately alert PM/WRA and provide as much photographic and forensic evidence as possible, including serial numbers, markings, nomenclature, places of manufacture, and place/date of transfers of missiles and/or gripstocks. Attachment C (MANPADS Disposal Certificate) is provided below for reference and assistance.

g. Accidents

Recipients shall inform the PM/WRA Grants Officer, Deputy Director for Programs, and relevant GOR of any and all accidents, incidents, or events that result in loss of life, limb, or property within twenty-four (24) hours of occurrence. The recipient shall provide WRA with any and all accident reports and/or investigation reports as soon they become available.

h. IMAS and NMAS Compliance

All of the Recipient's work on this project, including any MRE components, will meet International Mine Action Standards (IMAS) and all applicable National Mine Action Standards (NMAS).

i. The Recipient shall provide all necessary services, equipment, and facilities necessary to accomplish the goals and objectives of this grant.

j. Equipment

An Equipment List (Attachment D) must be completed and submitted to the Grants Officer on an annual basis. A separate Equipment List should be filled out per grant award. Instructions are included in the attachment.

k. Budget Revisions

The Recipient may not transfer funds among direct cost categories in which the cumulative amount of such transfers exceeds—or is expected to exceed—ten (10) percent of the total budget, without obtaining prior permission from the Grants Officer.

l. USG Acknowledgement

All programs, projects, assistance, activities, and public communications to foreign audiences, partially or fully funded by the Department, should be marked appropriately overseas with the standard U.S. flag in a size and prominence equal to (or greater than) any other logo or identity. The Recipient should ensure that all publicity and promotional materials underscore the sponsorship by or partnership with the U.S. Government or the

U.S. Embassy. The Recipient may continue to use existing logos or program materials; however, a standard rectangular U.S. flag must be used in conjunction with such logos. To the extent practicable, the U.S. flag should be placed on U.S.-funded items such as vehicles, heavy machinery, personal protective equipment, helmets, uniforms/t-shirts, detectors, laptops, signage, pamphlets/leaflets, reports, and briefing materials. See the Department of State Standard Terms and Conditions attached to this award for further information on branding and marking.

Additionally, for all media engagements regarding an award fully or partially funded by PM/WRA, award recipients must:

1. Notify WRA in advance, where possible, of any media engagement related to a U.S.-funded effort;

2. Acknowledge that their work is made possible by the generous support of the United States of America; and

3. Obtain advance written concurrence from the GOR if there is a compelling reason for not acknowledging U.S. support publicly (e.g., for security reasons).

m. **For Iraq ONLY**: Iraqi citizens and nationals employed in Iraq by grant and cooperative agreement recipients: This requirement implements section 1248 of the National Defense Authorization Act (NDAA) for Fiscal Year 2008, as amended. The recipient must complete one form DS-7655 “Iraqi Citizens and Nationals Employed by Federal Contractors, Grantees, and Cooperative Agreement Partners” for each applicable employee within 45 days of signature of this award. The forms must be submitted to the GO. The recipient agrees to complete a DS-7655 form on each subsequent applicable new employee within 45 days of date of hire, and to submit those forms to the GO.

n. **Construction** (delete if N/A):

1. Only the activities explicitly stated in the SOO are allowable.

2. The designated GO has the authority to halt any and all construction activities during the award period of performance.

3. Any proposed modification to the site location, SOO, budget (including re-alignment of costs), or project duration must be approved by the designation GO in writing.

o. Pre-award Costs: [If not pre-award costs, insert NA]

The Department of State hereby agrees to reimburse the Recipient an amount not to exceed $XXXX for pre-award costs incurred and considered allowable. This pre-award condition applies to costs incurred from DATE.

p. Option Years: [If not option years, insert NA]

This award includes option years. Under this award, only the base year is funded, and the grant is scheduled to end on December 31, 2017. The option year is not funded at this time and will only be continued at the convenience of DOS; the option year is dependent upon the availability of funds. Should funding be unavailable, an option year will not be executed. Final determination of whether or not to execute an option year lies with the Grants Officer. The option years are as follows:

Base Year: January 1, 2017 – December 31, 2017
Option Year 1: January 1, 2018 – December 31, 2018
Option Year 2: January 1, 2019 – December 31, 2019

If Option Year 1 is executed, the quarterly reports will continue on the same schedule as listed above, with the final report due March 30, 2019.

TAGS

Bureau of Political-Military Affairs | Political-Military Cooperation | Weapons Abatement

Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

Case No. 25-cv-1774-JEB

# Exhibit 24

CNN Politics Subscribe Sign in

# Trump admin proposed sending up to 500 alleged Venezuelan gang members during negotiations to use El Salvador's mega-prison

By Jennifer Hansler and Priscilla Alvarez, CNN

6 min read · Updated 6:50 PM EDT, Mon April 28, 2025



This handout photo from Press Secretary of the President of El Salvador show US military personnel escorting an alleged gang member to El Salvador's Cecot prison at the El Salvador International Airport in San Luis Talpa, El Salvador, on April 12. Press Secretary of the President of El Salvador/Reuters

**(CNN)** — The United States proposed sending up to 500 Venezuelan migrants with alleged ties to the Tren de Aragua gang to El Salvador as the two governments sought to reach an agreement on the use of the Central American nation's notorious mega-prison, according to emails seen by CNN.

The details of the arrangement, which have not been previously reported, reveal the Trump administration's deal-making with El Salvador to take the unprecedented step of sending migrants to the country to be detained in CECOT, officially known as the Terrorism Confinement Center.

El Salvador eventually agreed to accept up to 300 people in mid-March, according to an internal document. A US official described 500 as a "notional" figure, adding that the arrangement between the two countries is a "cooperation agreement but in a friendly non-binding fashion," and still stands.

President Donald Trump has lavished praise on El Salvador's Trump-friendly President Nayib Bukele, telling reporters earlier this month "he's doing a fantastic job." "He's been amazing," Trump said. "They have some very bad people in that prison," he added referring to CECOT.

Trump officials have long touted El Salvador as a key ally to the administration's immigration agenda — but deportation flights carrying 238 Venezuelan migrants to the country last month sparked a fraught legal battle and fierce criticism from Democrats and immigrant advocates.

Prior to those flights, though, the United States had been setting up a costly arrangement with El Salvador to detain migrants with alleged ties to Tren de Aragua, a Venezuelan gang that the administration labeled a foreign terrorist organization.

The US has approved $15 million in foreign affairs funding to be sent to El Salvador. But, as of late April, just under $5 million has been sent in the form of a grant to El Salvador's government, according to two sources familiar. According to the US official, the Trump administration is providing compensation per individual imprisoned in the country which is why another tranche of money hasn't been sent yet.

The proposed arrangement included the US providing transportation and related costs and paying a one-time maintenance fee of $10 million, about $20,000 per person sent to the facility, according to emails sent between Bukele's brother Ibrajim and Michael Needham, the counselor and chief of staff to Secretary of State Marco Rubio days before the deportation flights departed.

"Upon all nine being returned, (El Salvador) will provide (US government) a 50% discount for Year 2, if necessary, of the original TdAs," one email reads, referring to a request by the El Salvadoran government of certain MS-13 members.

The US official told CNN that deportations of MS-13 gang members, particularly of its leaders,

was a priority for Bukele, and the Trump administration agreed.

Prior to the correspondence between Bukele's brother and Needham, Rubio and the Salvadoran president discussed detaining US deportees during Rubio's visit in February.

## 'Reasonable' terms

Ibrajim Bukele described the terms as seeming "reasonable" and requested requirements for the inmates who would be deported there. Needham told him that the "baseline requirements do not differ from El Salvador's for the treatment of prisoners, as both are in accordance with international legal norms."

While he asked for the agreement to be limited to 500 members of Tren de Aragua, Needham added the US "would like to keep the door open for a separate discussion on how the USG can help El Salvador with a new facility in the future."

A day before the March 15 flights, El Salvador's government agreed to accept up to 300 alleged Tren de Aragua members for up to one year, as well as two alleged MS-13 members, according to the internal document seen by CNN.

Rubio and President Bukele also spoke again prior to the flights.

"The United States has provided funding for El Salvador's law enforcement and anticrime needs in connection with the Government of El Salvador's offer to receive Venezuelan Tren de Aragua gang members removed from the United States," a State Department spokesperson told CNN.

"The United States is fully engaging with our regional partners, including El Salvador, to put an end to the exploitation and deaths that stem from illegal immigration, which can also involve human trafficking and alien smuggling," they said.

"As countries continue to work with us in securing our borders and addressing illegal immigration, we will provide assistance as necessary in support of these collaborative efforts," the spokesperson said. "Our goal is to ensure that our partners are well-equipped to handle the challenges they face, ultimately contributing to a more stable and secure region."

During a meeting between Trump and Bukele in the Oval Office, Trump urged the Salvadoran president to build more mega-prisons, like CECOT, and signaled that deportees could also include US citizens who are violence criminals.

A formal notice of the $4.76 million grant to El Salvador, dated March 22, notes the purpose of

the grant" to provide funds to be used by Salvadoran law enforcement and corrections agencies for its law enforcement needs, which include costs of detaining the 238 TdA members recently deported to El Salvador," according to the internal document seen by CNN.

Migrants sent to CECOT are considered to be in Salvadoran custody, according to US officials, and therefore no longer in the control of the US despite payments from the United States.

CNN previously reported that the Trump administration was preparing to send more immigrants to CECOT on the heels of a Supreme Court decision allowing the use of the centuries-old Alien Enemies Act, which effectively wipes away due process and allows for the swift removal of migrants.

"It's one of the reasons I went to El Salvador last week was a visit with the president. Asked him to continue to take terrorists from the United States of America that no longer belong here," Homeland Security Secretary Kristi Noem said following a trip to El Salvador.

But across the country, cases have cropped up contesting the removal of migrants under the wartime authority for fear that they may be sent to El Salvador and never returned. Since the flights in March, multiple attorneys have shared stories of clients who were deported to El Salvador with no ties to Tren de Aragua.

A federal judge in New York blasted the Trump administration last week for its use of the notorious prison in El Salvador for ICE detainees.

The comments came during a hearing in a case with a pending habeas petition filed by the ACLU on behalf of a class of Venezuelan immigrants facing removal under Trump's invocation of the Alien Enemies Act.

"These people are being thrown out of the country because of tattoos," Judge Alvin Hellerstein said in court last Tuesday. "There is nothing in this statute or proclamation that authorizes the United States of America to hire a jail in a foreign country for people could be subjected to cruel and unusual punishment not allowable in the United States jails."


## Up next

Democratic states sue to force Trump to hand over crime grant money in immigration fight

2 minute read



The thing Trump's generals feared about him could now be arriving
5 minute read




US suspends visitor visas for people from Gaza
2 minute read



Fact check: Trump repeats false Ukraine aid figure while sitting with Zelensky
5 minute read



## Most read

1 Hurricane Erin threatens dangerous surf for much of the East Coast as a new tropical system brews in its wake

2 Trump's remarkable statement against states' rights

3 Why Trump deserves credit for his Ukraine push — and why it may all fall apart

### MORE FROM CNN




Democratic states sue to force Trump to hand over crime grant money in ...




The thing Trump's generals feared about him could now be arriving



US suspends visitor visas for people from Gaza

### NEWS & BUZZ



Hurricane Erin



threatens dangerous surf for much of the East ...



Trump's remarkable statement against states' rights



Why Trump deserves credit for his Ukraine push — and why it may ...

---

Search CNN...

Subscribe

Sign in

Live TV

Listen

Watch

US

World

Politics

Business

Markets

Health

CNN Underscored

Entertainment

Tech

Style

Travel

Sports

Science

Climate

Weather

Ukraine-Russia War

Israel-Hamas War

Watch

Listen

Games

About CNN

Politics

FOLLOW CNN POLITICS

Terms of Use Privacy Policy Do Not Sell Or Share My Personal Information Ad Choices Accessibility & CC About

Subscribe Newsletters Transcripts Help Center

© 2025 Cable News Network. A Warner Bros. Discovery Company. All Rights Reserved.
CNN Sans ™ & © 2016 Cable News Network.

Case No. 25-cv-1774-JEB

# Exhibit 25

An official website of the United States Government Here's how you know



# More Foreign Gang Terrorists Deported Out of America

PRESS STATEMENT

MARCO RUBIO, SECRETARY OF STATE

MARCH 31, 2025

Last night, in a successful counter-terrorism operation with our allies in El Salvador, the United States military transferred a group of 17 violent criminals from the Tren de Aragua and MS-13 organizations, including murderers and rapists.

In order to keep the American people safe, President Trump designated the Tren de Aragua and MS-13 as Foreign Terrorist Organizations. These criminals will no longer terrorize our communities and citizens.

Once again, we extend our gratitude to President Bukele and the government of El Salvador for their unparalleled partnership in making our countries safe against transnational crime and terrorism.

TAGS

Cookie Settings

Bureau of Counterterrorism | Bureau of Western Hemisphere Affairs | Counterterrorism | El Salvador | MS-13 | Office of the Spokesperson | The Secretary of State | Tren de Aragua

---

U.S. DEPARTMENT *of* STATE

White House

USA.gov

Office of the Inspector General

Archives

Contact Us

America 250

Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

Case No. 25-cv-1774-JEB

# Exhibit 26

Post

**Secretary Marco Rubio**
@SecRubio

Last night, another 10 criminals from the MS-13 and Tren de Aragua Foreign Terrorist Organizations arrived in El Salvador.

The alliance between @POTUS and President @nayibbukele has become an example for security and prosperity in our hemisphere.

10:45 AM · Apr 13, 2025 · **1M** Views

2.3K 5.6K 33K 250

Post your reply

Reply

Case No. 25-cv-1774-JEB

# Exhibit 27

← Post

Nayib Bukele
@nayibbukele

Today, we have handed over all the Venezuelan nationals detained in our country, accused of being part of the criminal organization Tren de Aragua (TDA). Many of them face multiple charges of murder, robbery, rape, and other serious crimes.

As was offered to the Venezuelan regime back in April, we carried out this exchange in return for a considerable number of Venezuelan political prisoners, people that regime had kept in its prisons for years, as well as all the American citizens it was holding as hostages.

These individuals are now en route to El Salvador, where they will make a brief stop before continuing their journey home.

This operation is the result of months of negotiations with a tyrannical regime that had long refused to release one of its most valuable bargaining chips: its hostages.

However, thanks to the tireless efforts of many officials from both the United States and El Salvador, and above all, thanks to Almighty God, it was achieved.

In this, as in other matters, I remind you: patience and trust.



0:01 / 0:32

3:49 PM · Jul 18, 2025 · **2.9M** Views

4K · 10K · 45K · 1.5K

Case No. 25-cv-1774-JEB

# Exhibit 28

*Democracy Dies in Darkness*

# ‘Welcome to hell’: Inside the megaprison where the U.S. deported migrants

Interviews with 16 former detainees of El Salvador’s Terrorism Confinement Center offer the most complete view yet of conditions at the notorious prison.

July 31, 2025

By Samantha Schmidt, Helena Carpio, María Luisa Paúl, Silvia Foster-Frau, Teo Armus and Aaron Steckelberg

*Leer en español*

One detainee was beaten unconscious. Others emerged from the dark isolation room covered in bruises, struggling to walk or vomiting blood. Another returned to his cell in tears, telling fellow detainees he’d just been sexually assaulted.

“Let’s hit him like a piñata,” guards shouted amid the beatings, detainees recalled, the blows echoing against the metal walls.

They called it “La Isla” — The Island — the cell where Venezuelans deported from the United States by the Trump administration said they suffered some of the worst abuse of their 125 days in El Salvador’s Terrorism Confinement Center, or CECOT.






The matching firsthand accounts across multiple interviews offer the most complete view yet of conditions inside the megaprison, where inmates are denied access to lawyers and almost all contact with the outside world — and where about 14,000 Salvadorans remain incarcerated. Few detainees have ever left CECOT, and fewer have spoken publicly of their experience there.

The Washington Post interviewed 16 of the more than 250 men who were deported by the United States to CECOT, held there for four months and then released this month to Venezuela as part of an international prisoner swap.

The Venezuelans, rounded up in President Donald Trump's mass deportation campaign, told The Post they were subjected to repeated beatings that left them bruised, bleeding or injured. They said prison staff restricted medical care for detainees suffering from diabetes, high blood pressure or kidney failure.

The men slept on metal bunks — usually with no cushions — in group cells where overhead lights blazed 24 hours a day. They were expected to bathe and relieve themselves using a water tank and toilets that offered no privacy from cellmates. They were rarely allowed out of their cells.

Three Salvadoran government spokespersons, provided with detailed accounts of the detainees' allegations, did not respond to requests for comment. Damian Merlo, a U.S.-based lobbyist for Salvadoran President Nayib Bukele, described the detainees as criminals who belong in prison, and said their claims are "baseless."

"Additionally, footage made available on social media of their departure from El Salvador showed them in good spirits," Merlo said, "happily … heading back home to Venezuela."

Tricia McLaughlin, a spokeswoman for the Department of Homeland Security, provided a statement that repeated administration claims that the detainees were members of the Tren de Aragua gang — though government officials have acknowledged in court that many of those sent to CECOT had no criminal record.

Robert L. Cerna, an acting field office director at U.S. Immigration and Customs Enforcement, said in a court filing in March that the "lack of a criminal record does not indicate they pose a limited threat" and that the limited information about each individual "actually highlights the risk they pose."

"President Trump and [DHS] Secretary [Kristi L.] Noem will not allow criminal gangs to terrorize American citizens," McLaughlin said. "Once again the media is falling all over themselves to defend criminal illegal gang members. We hear far too much about gang members and criminals' false sob stories and not enough about their victims."

Abigail Jackson, a White House spokeswoman, said the Trump administration is grateful for its partnership with Bukele "to help remove the worst of the worst illegal criminals, terrorists, and gang members from the United States." She deferred questions about specific allegations to El Salvador's government.

If the detainees' accounts are true, their treatment at CECOT may have violated U.N. conventions against torture to which El Salvador and the U.S. are signatories, said Isabel Carlota Roby, a senior staff attorney at the Robert F. Kennedy Human Rights organization who has spoken with some of the detainees. Whether the U.S., which paid Bukele's government $6 million to hold the Venezuelans, could be implicated in human rights violations would depend on the evidence, Roby said, including how much U.S. officials knew about the conditions.

Torture, arbitrary detentions, forced disappearances and sexual assault, if proved to be systematic or generalized and known to the government, can all constitute crimes against humanity. An international panel is preparing a report on El Salvador and investigating whether any of those crimes were committed. At least one member of the panel thinks a criminal investigation is warranted.

"Based on the information I have reviewed," said Santiago Canton, secretary general of the International Commission of Jurists, "there are reasonable grounds for an investigation by the International Criminal Court."

The Post has found that many of the detainees had entered the United States legally and were actively complying with U.S. immigration rules.

Many of the men had fled political oppression and extreme poverty under Venezuelan President Nicolás Maduro, a U.S. adversary. Some had been granted permission to live and work in the United States. At least two arrived in the U.S. as refugees seeking safety from persecution in Venezuela.

A number suspected they had been detained and deported by the U.S. based solely on their tattoos.

Marco Jesús Basulto Salinas, 35, had temporary protected status shielding him from deportation and worked legally in kitchens and pizzerias to pay for his mother's breast cancer treatments back home.

Andry Hernández, a 31-year-old makeup artist, entered the U.S. legally with a CBP One appointment, where an official in a preliminary screening determined he had shown a credible fear of persecution as a gay man living and working in Venezuela.

Roger Molina, a food delivery driver and aspiring professional soccer player, had been vetted by U.S. Citizenship and Immigration Services and federal law enforcement, flown to the U.S. and conditionally accepted into a State Department resettlement program for refugees.

As the detained men were shuttled onto flights in Texas on March 15, none were told where they were being taken.

## 'We're giving you a surprise'

Shackled at their wrists, waists and ankles, the migrants were loaded onto three GlobalX charter planes, with many of them believing they were headed to Venezuela. At least they would be going home, Basulto thought. They were prohibited from opening the window shades. "We're giving you a surprise," he remembers one immigration official telling them.

When they landed, Basulto said, he found the courage to peek out the window. He saw El Salvador's blue-and-white flag waving in the air. Detainees began to panic, he said. A female deportee who spoke English read aloud from one of the documents she'd been given. She translated for the rest of the passengers: They would be detained for at least a year in El Salvador.

Some migrants refused to get off the plane. A guard struck a female passenger, Basulto said. Screams filled the plane. Eventually, Basulto and other detainees said, they were kicked, shoved, beaten and forced off. Two Salvadoran officers grabbed his arms.

"Throw them down!" officers yelled, as detainees were pummeled and dragged to buses, according to detainee Miguel Rojas Mendoza. He recounted watching one man get slammed so hard against a bus that his face began gushing blood.

Molina, the refugee who had been vetted for resettlement in the U.S., begged officers for an explanation.

"Please, I don't understand what I'm doing here," Molina said. "I haven't committed any crime. Please, let me talk to someone." He began to pray. Then a Salvadoran officer grabbed him by the neck.

"Run, son of a b----," he commanded, according to Molina, and jammed a rifle into his ribs.

Hernández, the makeup artist, watched as the women were turned around and put on a flight back to the United States. The Salvadorans, he said, refused to accept them. The buses now filled with men began rolling.

"Welcome to El Salvador," hooded officers shouted on the ride, six detainees said. "Welcome to hell."

At CECOT, Basulto said, guards shaved his head, stripped him of his clothes and took his phone, $700 in cash and the gold pendant he wore for luck.

Hernández cried out for his mother. "Why are you shaving my head?" he asked. "I'm a makeup stylist, I'm gay, I'm not a gang member."

The men were pushed together in a warehouse, flanked by photographers and guards, and forced to kneel. They were addressed by the prison director.

Here, the director said, the men would have no rights — no right to a lawyer, no access to the sun. They would not eat chicken or meat for the rest of their lives.

"The only way that you will leave," he said, according to multiple detainees, "is inside a black bag."

## 'The most perverse form of humiliation'

CECOT, opened by Bukele in 2023 as part of his crackdown on Salvadoran gangs, was designed to terrify the most violent of criminals. His government hailed it as the largest prison in the Americas, initially announcing a capacity for 20,000 detainees and later doubling it. The imposing fortress outside San Salvador sprawls across more than 280 acres, surrounded by an electrified perimeter fence and 19 watchtowers. The roof of each pavilion is made of diamond-shaped mesh with sharp edges.

The Venezuelans were placed in cells, up to 20 men in each. The concrete walls showed sweat stains, drops of dried blood and what appeared to be scratches from human nails, one detainee recalled.

Each cell held 80 metal beds stacked closely together in tiers of four, according to detainees and images of CECOT previously shared by Bukele's government. Use of the water tanks and toilets was controlled by the guards and restricted to certain times of day. With no windows or fans, the detainees lived and ate amid the stench of their own sewage.

The detainees could gauge the time only by the heat that made them sweat during the day and the cold that chilled their metal beds at night. They couldn't see the sun, they said, but sometimes could hear the rain.

CECOT "seemed like it was for animals," said detainee Julio Fernández Sánchez, 35. "It was designed for people to go crazy or kill themselves."

Basulto said detainees were occasionally allowed to leave their cells to play soccer for 20 minutes or attend a brief Bible reading, but time dragged. The men in one cell counted the days by scratching marks into a wall.

Detainees with medical concerns were often housed in Cell No. 8, said Fernández, who was held there after an injury to his shoulder during a beating. There were men suffering from diabetes, skin problems and panic attacks. One day a diabetic prisoner was given the wrong insulin and began convulsing after it was injected, Fernández recalled. Guards took nearly half an hour to get him help.

"The doctor would watch us get beaten and then ask us, 'How are you feeling?' with a smile," Basulto said. "It was the most perverse form of humiliation."

When Tito Martínez, 26, was in immigration detention in the U.S., he said, a doctor told him he had kidney failure and would need a transplant. After repeated beatings in CECOT, Martínez said he could no longer get out of bed. He would wet himself, and he relied on his cellmates to feed him.

"Tito is dying," his friends told prison staff. When he was finally treated, Martínez said, the doctor told him that his functioning kidney was operating at only 20 percent and that he would soon need dialysis to survive.

Some detainees attempted suicide by tying sheets around their necks or using rusted pipes to cut their veins.

Disobeying rules proved costly. When Hernández's head ached from the heat, he tried to cool down by bathing. He forgot to tell his friends to watch for guards.

"Get up, piece of sh--," an officer told him, he said. He was taken to La Isla, where a tiny hole in the ceiling provided only a needle of light and almost no air.

Four men entered and began touching him with their clubs and putting them between his legs. One forced Hernández to perform oral sex on him, he said.

Basulto said Hernández returned to the cell in tears and told him what had happened. He and other detainees offered to speak up to the prison staff, but he urged them not to. He feared it would provoke officers to "attack us even more."

## 'The locks will break'

After weeks of daily beatings, detainees said, they launched a hunger strike. They went four days without food or water.

"People started fainting. Falling to the floor," said detainee Mervin Yamarte, 29. The guards "laughed."

When the hunger strike failed to draw attention, some used shards from metal pipes to slice their skin and write messages on their sheets in blood: "We are not terrorists, we are migrants."

"We wanted them to see we were willing to die," said Neiyerver Adrián León Rengel, 27.

The men grew desperate. About two months after arriving at CECOT, detainees tore rails off bunks and used them to break their locks. Dozens broke free and hurled soap and juice cartons at guards. Some broke cement off the walls to throw at them.

The guards fired back with rubber bullets, stormed the cells and forced men to kneel with their hands behind their heads.

"They stood on our legs until we couldn't feel them anymore," León Rengel said.

Then came their punishment: They were taken to La Isla. Molina said he sometimes heard screams echoing into his cell for hours at a time.

The next day, he said, guards lined up the handcuffed detainees and took turns beating them.

They broke a tooth of one man and dislocated an arm of another, Molina said. "That [day] was the worst of the beatings."

Conditions improved only when outsiders visited the prison or when government officials wanted photographs, multiple detainees said. Shortly after a Red Cross visit, Bibles were handed out to each cell.

For a visit by DHS's Noem, the detainees were given better food and even mattresses, though thin. When a group of U.S. politicians toured the prison, Basulto said, detainees with visible injuries were moved to the remotest cells. After detainees began singing the Venezuelan national anthem, Basulto said, the prison director "quickly cut the politicians' visit short and hurried them away."

The Red Cross, which visits Salvadoran prisons regularly, appeared at CECOT twice during the Venezuelans' time there. Delegates met with the men and collected brief spoken messages for their families, according to Martina Ferraris, deputy protection coordinator for the International Committee of the Red Cross mission in El Salvador. These were vetted by prison staff, Ferraris said.

In their final days in CECOT, detainees said, conditions seemed to improve. Molina was taken to the doctor for an evaluation. He was given a clean shave and the haircut of his choice.

The detainees were given Colgate toothpaste, a Gillette razor and deodorant. A prison official took photos. The director told them to brush their teeth.

At 5 a.m. on July 18, they were loaded onto buses, unsure where they were headed. Then a man in a uniform with a Venezuelan flag on one sleeve stepped onto Molina's bus. They were going home.

On the plane, the Venezuelans sang a Christian song — with new words.

"If I had faith as small as a mustard seed, I would tell my brothers, 'We're leaving. We're leaving. We're leaving!'" they sang. "And the locks will break."

Men dressed in black waited for the detainees on a plane set to fly to Venezuela. Detainees would later learn that Maduro had sent officers of the SEBIN, his feared secret police, usually used to detain or disappear his political opponents.

Before being reunited with their families, one detainee said, they were told to record a video thanking the Venezuelan government. He said he was warned that if he fled again and was deported back, he could be charged with treason. The detainee spoke on the condition of anonymity for fear of retribution from the Maduro government.

Several of the men, who had once fled the authoritarian country, said they were genuinely grateful to Maduro for negotiating their release when it seemed no one else would. Still, some said they'd leave for the U.S. again, perhaps once Trump leaves office.

Not Molina. He doesn't think he could do it again, he said, "having lived through that."

"The American Dream," he said, "became a nightmare."

*Ana Vanessa Herrero, Sarah Blaskey, Razzan Nakhlawi and Monika Mathur contributed to this report. Maps by Laris Karklis. Diagrams by Aaron Steckelberg. Video editing by Erin Patrick O'Connor.*

## What readers are saying

The comments express strong condemnation of the conditions at El Salvador's Terrorism Confinement Center, highlighting the inhumanity and lack of due process for detainees, many of whom were reportedly in the U.S. legally. Commenters criticize the Trump administration for its... Show more

This summary is AI-generated. AI can make mistakes and this summary is not a replacement for reading the comments.

Case No. 25-cv-1774-JEB

# Exhibit 29

PROPUBLICA

# Now That They're Free



Case 1:25-cv-01774-JEB Document 19-1 Filed 08/22/25 Page 702 of 940






Juan José Ramos Ramos, who was held in a maximum-security prison in El Salvador known as CECOT, is back home in Guatire, Venezuela.

Venezuelan men deported by the Trump administration say they endured months of physical and mental abuse inside a Salvadoran prison. Though happy to be home, they say the fact that they were released is proof of how senseless their detentions were.

**by Perla Trevizo, ProPublica and The Texas Tribune, Melissa Sanchez and Mica Rosenberg, ProPublica, Ronna Rísquez, Alianza Rebelde Investiga, and Adrián González, Cazadores de Fake News, photography and additional reporting by Adriana Loureiro Fernández for ProPublica and The Texas Tribune**

July 30, 2025, 6 a.m. EDT

*Leer en español.*

**Reporting Highlights**

- **Powerful Accounts:** The Venezuelan men deported by the Trump administration and held at a prison in El Salvador said they were physically abused and mistreated during their incarceration.
- **Struggling With Freedom:** In the first days of freedom, some of the Venezuelan men are still trying to understand why they were singled out for deportation and how they'll move forward.
- **Broad Claims, Exaggerations:** Trump and administration officials have made numerous claims about the men deported to El Salvador, many of which have failed to withstand scrutiny.

These highlights were written by the reporters and editors who worked on this story. Were they helpful?

Now that he's free, Leonardo José Colmenares Solórzano, a 31-year-old Venezuelan, wants the world to know that he was tortured over four months in a Salvadoran prison. He said guards stomped on his hands, poured filthy water into his ears and threatened to beat him if he didn't kneel alongside other inmates and lick their backs.

Now that he's free, Juan José Ramos Ramos, 39, insists he's not who President Donald Trump says he is. He's not a member of a gang or an international terrorist, just a man with tattoos whom immigration agents spotted riding in a car with a Venezuela sticker on the back.

Now that he's free, Andry Omar Blanco Bonilla, 40, said he wondered every day of his time in prison whether he'd ever hold his mother in his arms again. He's relieved to be back home in Venezuela but struggles to make sense of why he and the other men were put through that ordeal in the first place.

"We are a group of people who I consider had the bad luck of ending up on this black list," he said.

These are the accounts being shared by some of the more than 230 Venezuelan men the Trump administration deported on March 15 to a maximum-security prison in El Salvador known as CECOT. Throughout the men's incarceration, the administration used blanket statements and exaggerations that obscured the truth about who they are and why they were targeted. The president has both hailed the

men's removal as a signature achievement of his first 100 days in office and touted it as a demonstration of the lengths his administration was willing to go to carry out his mass deportation campaign. He assured the public that he was fulfilling his promise to rid the country of immigrants who'd committed violent crimes, and that the men sent to El Salvador were "monsters," "savages" and "the worst of the worst."

Few cases have gotten as much attention as the Venezuelans sent to CECOT. They were deported against the instructions of a federal judge, frog-marched off American planes and forced to kneel before cameras and have their heads shaved. The administration rebuffed requests to confirm the men's names or provide information about the allegations it had made against them. Meanwhile, the deportees were held without access to lawyers or the ability to speak to their families. Then, 12 days ago, they were returned to Venezuela in a prisoner swap.

ProPublica is a nonprofit newsroom that investigates abuses of power. Sign up to receive our biggest stories as soon as they're published. This article is co-published with The Texas Tribune, a nonprofit, nonpartisan local newsroom that informs and engages with Texans, and Alianza Rebelde Investiga and Cazadores de Fake News.

Now that they're home, they've begun to talk. We interviewed nine men for this story. They are bewildered, frightened, angry. Some said their feelings about what happened were still so raw they had trouble finding words to describe them. All of the men said they were abused physically and mentally during their imprisonment. Their relatives say they, too, went through hell wondering whether their loved ones were alive or dead, or if they would ever see them again. All the men said they were relieved to be free, though some said their release was proof the U.S. had no reason to send them to prison to begin with.

Blanco, for example, has no criminal record in the U.S., according to the government's own data. His only violation was having entered the country illegally. He'd come because he wasn't earning enough to help his parents and support his seven children, ages 2 to 19, after his family's wholesale dairy and deli supply business failed. He arrived in December 2023 and turned himself in to immigration authorities in Eagle Pass, Texas, to request asylum. Then he was released to continue his immigration process.

Afterward, Blanco moved to Dallas and found work delivering food. In February 2024, he accompanied his cousin to a routine appointment with Immigration and Customs Enforcement officials. While he was there, he decided to notify the agency that he'd changed his address. On his way out of the building, an immigration agent stopped him and asked about his tattoos. He has several of them, including a blue rose, a father hugging his son behind railroad tracks and a clock showing the time his mother was born.

He said the tattoos signified his affection for his family, not evidence of affiliation with a gang. Records show the officials didn't believe him and detained him. While in custody, a judge ordered his deportation. However, because Washington and Caracas don't have diplomatic relations, the Venezuelan government was refusing to accept most deportees from the United States at the time. Immigration officials released Blanco back into the U.S. until they could send him home.

For the next seven months, Blanco continued on in Dallas and picked up additional work as a mechanic. Then, shortly after Trump was inaugurated, ICE officers asked Blanco to come in for another appointment and detained him. A month later, despite Venezuela agreeing to take back some deportees, Blanco was on one of three planes bound for El Salvador.

"From the moment I realized I was in El Salvador and that I would be detained, it was anguish," he said. "I was shaken. It hit me hard. Hard, hard, hard."

To deport the Venezuelans, Trump invoked an obscure law from the 1700s known as the Alien Enemies Act. He declared that the men were all part of a Venezuelan prison gang called Tren de Aragua that was invading the United States. Within days, CBS News published a list of the men's names, and there were anecdotal reports indicating that not all of the deportees were hardened criminals, much less "savages." By early April, several news organizations had reported that the majority of the men did not appear to have criminal records.

Administration officials dismissed the reports, saying that many of the deportees were known human rights abusers, gang members and criminals outside of the U.S. The fact they hadn't committed crimes in the United States, they said, didn't mean they weren't a threat to public safety.

To examine those claims, ProPublica, The Texas Tribune and a team of Venezuelan journalists from Alianza Rebelde Investiga (Rebel Alliance Investigates) and Cazadores de Fake News (Fake News Hunters) launched an exhaustive investigation of the backgrounds of the 238 men on the list of detainees first published by CBS. Last week, we published a first-of-its-kind database that highlights our findings, including the fact the Trump administration knew at least 197 of the men had no criminal convictions in the U.S. Nearly half the men had open immigration cases when they were deported, and at least 166 have tattoos, which experts have told us are not an indicator of gang membership.

When asked for comment for this story, Abigail Jackson, a White House spokesperson, called ProPublica a "liberal rag hellbent on defending violent criminal illegal aliens who never belonged in the United States." She added, "America is safer with them out of our country."

A Department of Homeland Security spokesperson echoed the White House's claim. "Once again, the media is falling all over themselves to defend criminal illegal gang members," the spokesperson said in a statement. "We hear far too much about gang members and criminals' false sob stories and not enough about their victims."

The fact that border encounters have plummeted to record lows after reaching record highs during the Biden presidency suggests that the administration's efforts are having the effect that Trump intended. After what happened to him, Colmenares said he didn't think migrating to the U.S. was safe anymore.

He'd been a youth soccer coach in Venezuela before setting off for the U.S. He followed the rules and got an appointment to approach the U.S.-Mexico border last October, as had more than 50 of the men. At the appointment, Colmenares said an agent pulled him aside to take pictures of his many tattoos — then detained him. He never set foot in the U.S. as a free man.

"The country with the Statue of Liberty deprived us of our liberty without any kind of evidence," he said in an interview two days after he was returned to his family. "Who is going to go to the border now, knowing that they will grab you and put you in a prison where they will kill you?"

---

The men we interviewed said the terror they felt in El Salvador began almost immediately upon arrival.

Salvadoran police boarded the planes and began forcing the shackled men off — shoving them, throwing them to the ground, hitting them with their batons. Five said they saw flight attendants crying at the sight.

"This will teach you not to enter our country illegally," Colmenares said one ICE official told him in Spanish. He wanted to explain that wasn't true in his case but could tell there was no point. He got off the plane and was loaded onto a bus to prison.

Once inside, guards stripped them down to white boxers and sandals. Those who tried to refuse to have their heads shaved were beaten. Blanco said he heard their screams and didn't dare resist. Humiliated and

enraged, he did as he was told: head down, body limp.

They were loaded up again on the buses and taken to another part of the compound. Blanco said the shackles were so tight that he couldn't walk as fast as the guards wanted, so they beat him until he passed out and dragged him the rest of the way. Inside, they dropped him so hard that his head banged on the floor. As he opened his eyes and saw the guards, bright lights and polished concrete floor, he asked: "God, why am I here? Why?"



Blanco was detained during an immigration appointment and sent to CECOT, where he says guards beat and humiliated him.

The men said beatings by the guards were random, severe and constant. Guards lashed out at them with their fists and batons. They kicked them while wearing heavy work boots and shot them at close range with rubber pellets. One man we spoke to said he suspects he will have a lasting injury from a hard kick to the groin.

Colmenares recalled seeing one man defecate all over himself after a particularly severe beating. Guards laughed at him and left him there for a day, saying that the Venezuelans weren't "real men."

Just as vicious, the men said, was the psychological abuse. They lost track of the days because they were never allowed outdoors. Blanco said that whenever he asked a guard for the time, they'd mock him: "Why do you want to know what time it is? Have somewhere to be? Is someone waiting for you?"

Over and over, the men said, the guards called them criminals and terrorists and sons of bitches who deserved to be locked up. They said the guards told them so often that they were nobodies and that no one, not even their families, cared about them that some started to believe it.

The men said they waged at least two dayslong hunger strikes, skipping the beans, rice and tortillas they were fed most days, to demand an end to the abuses and an explanation for why they were in prison. "They told us nothing about how the process was going, what was going to happen to us, when we were going to see a judge, when we were going to see an attorney," Ramos said.

Several of those interviewed said suicide crossed their minds. Ramos said he thought: "I'd rather die or kill myself than to keep living through this experience. Being woken up every day at 4 a.m. to be insulted and beaten. For wanting to shower, for asking for something so basic. … Hearing your brothers getting beaten, crying for help."

Four talked about a man who started cutting himself and writing messages on the walls and sheets with his blood: "Stop hitting us." "We are fathers." "We are brothers." "We are innocent people."

Some of them became friends. They made playing cards out of juice boxes and soaked tortillas in water and shaped the cornmeal into dice. They talked about their families and wondered if anyone knew where they were. They prayed.

About three and a half months into their detention, the men said they noticed a change in the guards and in the conditions in the facility. They were beaten less frequently and less severely. They were given ibuprofen, antibiotics and toothbrushes. They were told to shave and shower. And a psychologist came in to evaluate them.

Then, sometime after midnight on July 18, guards began banging their batons on the bars of the men's cells. "Everyone take a shower," they yelled.

This time, when Blanco asked for the time, a guard gave it to him. It was 1:40 a.m.

Photographers and reporters were allowed into the facility. Blanco wondered whether he was about to be a part of a publicity stunt. He told himself he wouldn't give them what they wanted. No smiles for the camera.

Then, a top Salvadoran official walked in. "You are leaving."

---

In a brief phone interview, Félix Ulloa, El Salvador's vice president, denied any mistreatment and pointed to videos of the men looking unscathed as they left the prison as proof they were in good shape. He declined to comment on what role, if any, the U.S. had played in what happened to the men while they were in El Salvador. However, according to court records, the Salvadoran government previously told the United Nations that while it was physically holding the men, they remained under U.S. jurisdiction.

The Trump administration pledged millions of dollars to El Salvador to hold the deportees in CECOT.

Natalia Molano, a spokesperson for the U.S. State Department, said the U.S. is not responsible for the conditions of the men's detention in El Salvador. If there are complaints now that the men have returned to Venezuela, she said, "the United States is not involved in the conversation."

During his months in CECOT, Ramos said he found solace in the Bible, the only book available. He said he felt particularly drawn to the Book of Job, a wealthy man whom God tested with loss and pain. Despite his losses, Ramos said, Job "never denied God." He said Job "had a lot of faith."

That's how Ramos, a former telephone technician, saw his time in El Salvador: a divine test that he'd overcome with faith. The seven long months it had taken him to migrate from Venezuela to the United States — which involved walking through the treacherous Darién jungle — seemed easy by comparison.

As soon as his family and neighbors got word that he was on his way home to Guatire, just outside Caracas, they cobbled together $20 to help his mother, Lina Ramos, decorate the house and make a meal of chicken and rice with plantains.

Knowing that his mother had marched and fought for his release, that no one had forgotten him and the other men who'd been detained with him, he said, "was the best gift we could have gotten."

But the effects of what he went through still linger. Now, when he tries to read the Bible, he said, he notices his sight is failing in his left eye. He thinks it was caused by a particular beating, one of many, where guards repeatedly hit him on his ears and head after he tried to bathe outside of the designated time. He said he has no money at the moment to see a doctor. He arrived home with nothing but the clothes he was wearing.

He is sure he'll work something out, though. He has faith.

---

Design and development by Zisiga Mukulu. Photo editing by Cengiz Yar. Gabriel Sandoval contributed reporting.

**Perla Trevizo**
I'm a reporter with the ProPublica-Texas Tribune investigative unit and focus on border and immigration issues.
MORE STORIES HAVE A TIP FOR A STORY?
Contact me, by email or securely on Signal, with tips about the role Texas is currently playing in immigration enforcement and the impact of policies on both sides of the border.



**Melissa Sanchez**
I report on immigration and labor, and I am based in Chicago.
MORE STORIES NEED TO GET IN TOUCH?



**Mica Rosenberg**
I am an investigative reporter on ProPublica's national desk focusing on immigration.
MORE STORIES HAVE A TIP FOR A STORY?
If you have tips or story ideas you can share from inside the government, the companies where you work or from your communities, please reach out securely via Signal or email.

## What We're Watching

During Donald Trump's second presidency, ProPublica will focus on the areas most in need of scrutiny. Here are some of the issues our reporters will be watching — and how to get in touch with them securely.



**Learn more about our reporting team.** We will continue to share our areas of interest as the news develops.

**Sharon Lerner**

I cover health and the environment and the agencies that govern them, including the Environmental Protection Agency.



Contact Me

**Andy Kroll**

I cover justice and the rule of law, including the Justice Department, U.S. attorneys and the courts.

**Contact Me**



**Melissa Sanchez**

I report on immigration and labor, and I am based in Chicago.

**Contact Me**



**Jesse Coburn**

I cover housing and transportation, including the companies working in those fields and the regulators overseeing them.

**Contact Me**






If you don’t have a specific tip or story in mind, we could still use your help. Sign up to be a member of our **federal worker source network** to stay in touch.

Case No. 25-cv-1774-JEB

# Exhibit 30

# *Abrego Garcia Was Beaten and Tortured in El Salvador Prison, Lawyers Say*

Kilmar Armando Abrego Garcia was made to kneel overnight, denied bathroom access and confined in an overcrowded cell with bright lights and no windows, his lawyers say.

**Listen to this article · 8:13 min** Learn more



**By Alan Feuer**

July 2, 2025

Kilmar Armando Abrego Garcia, the Maryland man who was wrongfully deported to El Salvador in March, was beaten, deprived of sleep and psychologically tortured during the nearly three months he spent in Salvadoran custody, according to court papers filed on Wednesday evening by his lawyers.

The papers, filed in Federal District Court in Maryland, detailed a litany of horrors that Mr. Abrego Garcia's lawyers said he suffered while being held at the so-called Terrorism Confinement Center, or CECOT, one of El Salvador's most notorious prisons.

His lawyers said that he and 20 other Salvadoran men who were deported to the prison from the United States on March 15 were once made to kneel overnight "with guards striking anyone who fell from exhaustion."

During the time he spent there, the lawyers said, Mr. Abrego Garcia was "denied bathroom access and soiled himself." He and other prisoners were confined to metal bunks with no mattresses in an overcrowded cell that had no windows, but was outfitted with bright lights that remained on 24 hours a day.

When Mr. Abrego Garcia first arrived at the prison, his lawyers maintained, he was greeted by an official who told him, “Welcome to CECOT. Whoever enters here doesn’t leave.”

Two weeks later, the lawyers added, he had lost nearly 31 pounds.

The court papers offer a startling glimpse of the conditions under which Mr. Abrego Garcia was held. Even though his description aligns with what is known about the prison and the treatment of detainees, the more than 200 Venezuelans who were sent to CECOT on the same set of flights that day were placed in a separate cell block, leaving it unclear whether they were subject to different conditions.

The papers were submitted to Judge Paula Xinis, who had issued the initial order in April instructing the Trump administration to “facilitate” Mr. Abrego Garcia’s release from El Salvador. The papers included a revised version of the original complaint the lawyers filed in March seeking his return from Salvadoran custody. They asked Judge Xinis to immediately free their client from custody in the United States.

Mr. Abrego Garcia is currently being held by federal authorities in Nashville after the Trump administration, in a surprising move, brought him back from El Salvador last month after weeks of asserting it was powerless to do so. But the Justice Department stated that it had returned him for a specific reason: to stand trial on a federal indictment accusing him of having taken part in a yearslong conspiracy to smuggle undocumented immigrants as a member of the violent street gang MS-13.

The new filing by his lawyers appeared to undercut charges that he was a member of MS-13 as well as a specific accusation lodged by President Trump himself that his tattoos indicated he belonged to the gang.

The filing claimed that Salvadoran prison officials recognized that Mr. Abrego Garcia “was not affiliated with any gang” and acknowledged that his tattoos “were not gang-related,” going so far as to tell him at one point, “Your tattoos are fine.”

A spokeswoman for El Salvador's president did not immediately respond to a request for comment.

Almost from the moment that Mr. Abrego Garcia was back on U.S. soil, there has been uncertainty about what might happen to him next.

It remains unclear if he will remain in jail on his criminal charges as the case moves through the courts or will be released on bail and placed instead into immigration custody as an undocumented migrant. It is also possible that he could be expelled from the country again just weeks after the Trump administration brought him back.

Along with their revised complaint, Mr. Abrego Garcia's lawyers filed separate papers on Wednesday evening, repeating their request to Judge Xinis to issue a new order that would effectively bar him from being sent out of the country until further notice.

Later on Wednesday night, the Justice Department was expected to ask the federal judge in his criminal case to reverse another judge's decision allowing his release and keep him locked up on the indictment as he awaits trial.

Much of the confusion has stemmed from ambiguous — even contradictory — statements from the Trump administration and from what appears to be dueling views from the Justice Department and the Department of Homeland Security about how to handle the case.

Early last month, things seemed somewhat clearer.

Attorney General Pam Bondi announced at a news conference on June 6 that Mr. Abrego Garcia had been returned to the United States to face immigrant smuggling charges in Federal District Court in Nashville. She insisted that he would be re-deported only after his criminal case was over.

"Upon completion of his sentence," Ms. Bondi said, "we anticipate he will be returned to his home country of El Salvador."

But last week, a Justice Department lawyer introduced a new twist. During a hearing in Maryland, the lawyer, Jonathan Guynn, told Judge Xinis that the administration planned to expel Mr. Abrego Garcia again — this time, not to El Salvador but to an unnamed third country.

While Mr. Guynn made clear that there were "no imminent plans" to remove Mr. Abrego Garcia, other Trump officials immediately sought to clarify his comments. In some ways, their efforts only further muddied the waters.

First, a White House spokeswoman posted a message on social media describing news accounts of Mr. Guynn's statements as "fake news." Then an administration official, repeating what Ms. Bondi had said at her news conference, asserted that the Justice Department was still planning to try Mr. Abrego Garcia before deporting him again.

All of this was sufficiently perplexing to the lawyers handling Mr. Abrego Garcia's criminal case that they made an unusual request to a federal magistrate judge in Tennessee. Even though the judge, Barbara D. Holmes, had already decided that their client should be freed from criminal custody and handed over to the Department of Homeland Security, they asked her to delay his release for at least two weeks, concerned that if the transfer took place, D.H.S. might soon re-deport him.

The Justice Department agreed to the request. But in a filing to Judge Holmes, the department appeared to leave open the possibility of the thing it said would not happen — that D.H.S. might, in fact, expel Mr. Abrego Garcia again.

"The prosecution intends to see this case to resolution," lawyers for the department told the judge. "Yet as stated before this court as recently as June 25, 2025, D.H.S. will and must follow their own process, relevant regulations, the existing federal statutory scheme, and appropriate case law in handling the defendant's future immigration proceedings and potential deportation."

In the coming days, there will be two hearings — one in Maryland and one in Tennessee — that will help determine what will happen to Mr. Abrego Garcia.

The first is scheduled for Monday in front of Judge Xinis who will consider, among other things, the request for the new order to keep Mr. Abrego Garcia in the United States. Such an order, if granted, would come months after her original decision, handed down in April, instructing the Trump administration to bring him back from overseas.

The second hearing is set to take place on July 16 in front of Judge Waverly D. Crenshaw Jr., the district court judge who is handling the criminal case. Judge Crenshaw is expected to reconsider the ruling by Judge Holmes freeing Mr. Abrego Garcia from criminal custody. He might also weigh in on the question of deportation.

Until then, Mr. Abrego Garcia will remain in the hands of federal jailers in Tennessee, placed there protectively by his lawyers.

Annie Correal contributed reporting.

**Alan Feuer** covers extremism and political violence for The Times, focusing on the criminal cases involving the Jan. 6 attack on the Capitol and against former President Donald J. Trump.

---

A version of this article appears in print on , Section A, Page 12 of the New York edition with the headline: Abrego Garcia Beaten in Prison, Lawyers Say

Case No. 25-cv-1774-JEB

# Exhibit 31

**DECLARATION OF ANTHONY ENRIQUEZ**

I, Anthony Enriquez, declare as follows:

1. I am the Vice President of U.S. Advocacy and Litigation at RFK Human Rights and have held this position for over three years, since January 2022. Since graduating from New York University School of Law in 2013 and being admitted to the New York bar in 2014, I have been a practicing attorney specializing in legal representation of people in immigration detention.

2. RFK Human Rights is a nonprofit organization created in 1968 to carry on Senator Robert F. Kennedy's unfinished work in pursuit of a more just and peaceful world. RFK Human Rights advocates for human rights, engages in public education, and pursues strategic litigation to hold governments accountable at home and around the world, including by pursuing immigrants' rights and anti-detention advocacy and litigation

3. RFK Human Rights's work to advance human rights within the United States and abroad includes visiting immigration detention facilities to give presentations that inform detained people about their legal rights and protections against abusive government treatment; exposing and combatting human and civil rights abuses that occur in immigration detention, including through litigation and human rights reporting; and publishing informational materials to teach attorneys, advocates, and detained people how to effectively vindicate the human rights of people in detention.

4. Carrying out each of these vital parts of its mission requires that RFK Human Rights be able to communicate with its clients and others held in immigration detention and assess the conditions of their confinement. RFK Human Rights frequently represents people held in detention who are seeking to challenge unjust and inhumane conditions, including sexual abuse, prolonged solitary confinement, brutality from guards, and denial of essential medical care. RFK Human Rights typically communicates with its clients through phone and video calls and in-person visits and does so on a regular basis, generally weekly by phone and monthly by in-person visit.

5. RFK Human Rights represents before the Inter-American Commission on Human Rights ten Venezuelan men who had been rendered to CECOT pursuant to the Agreement at issue in this case. RFK continues to represent them after their recent release, but while they were held in CECOT, RFK Human Rights attorneys were not permitted to communicate directly with those clients—as I understand it, because the Agreement does not require El Salvador to facilitate such communication. Exhibits 18 and 19 to this motion for summary judgment are declarations from two men whom RFK represented while they were in CECOT, having been rendered pursuant to the Agreement, and whom RFK continues to represent after their release.[1] As Exhibits 18 and 19 reflect, RFK Human Rights attorneys were not permitted to speak with them while they were in CECOT, and

[1] I have redacted the names of the declarants in Exhibits 18 and 19 because, since they signed their declarations, I have become aware that men who were released from CECOT have been contacted or surveilled by Venezuelan authorities. I am therefore concerned that making public these declarants' names in this context could put their safety at risk and expose them to harassment or other harms.

those two men were not permitted to speak with any counsel. In late April, attorneys from RFK Human Rights, lacking any other means of making contact with clients in CECOT, were forced to travel to El Salvador in an attempt to meet with these clients in person, but were denied entry to CECOT and denied access to their clients.

6. In addition to the ten Venezuelan men rendered to CECOT, RFK Human Rights currently represents before the Inter-American Commission on Human Rights two Salvadoran men currently in incommunicado detention in El Salvador and rendered there by the United States, as I understand it, on the same flight carrying the Venezuelan men we represent. One of the Salvadoran men is detained in CECOT and the other in a prison known as the Centro Industrial de Santa Ana. Our information on their rendition and imprisonment comes from family members who requested our services to find and secure release of their loved ones, whom they saw in videos of the Venezuelan men recorded at CECOT and publicly circulated. One of the families spoke with Kilmar Ábrego García after his release from detention in El Salvador. Kilmar confirmed their loved one's transfer from CECOT to Santa Ana, where Kilmar had also been transferred. The other family received confirmation from a Salvadoran lawyer and the Red Cross that their loved one remains detained in CECOT. We have been unable to communicate directly with our clients because, as I understand it, the Agreement does not require El Salvador to facilitate such communication.

7. RFK Human Rights's work on behalf of its clients in CECOT and Santa Ana and their families has been and continues to be materially impeded by its inability to communicate with those held within the facility. Although our Venezuelan clients have been released, our Salvadoran clients have not. And RFK Human Rights remains concerned that additional clients will be rendered to CECOT or another Salvadoran prison under the Agreement, and, again, RFK Human Rights will be unable to contact them. The information RFK Human Rights has learned from the declarants in Exhibits 18 and 19, and its other clients, only strengthens that concern: the horrifying details they have shared about their experiences at CECOT have confirmed that the ability to communicate with those held in Salvadoran prisons pursuant to the Agreement is of paramount importance to our mission, and that we must continue to take steps to protect clients at risk of rendition.

8. The Agreement also harms RFK Human Rights's ability to carry out its core mission to monitor and combat human rights abuses through education of detained people, reporting on conditions of confinement, strategic litigation over conditions of confinement, and otherwise addressing the mistreatment, abuse, and torture of those held in immigration detention and other facilities. By authorizing the rendition and disappearance of individuals within the United States, whom RFK Human Rights otherwise would have had some ability to reach and track through normal channels (such as phone calls and in-person visits), to black sites in El Salvador where they are held incommunicado, the Agreement directly impairs

RFK Human Rights's ability to communicate with and defend those who are disappeared under the Agreement. It also thwarts its ability to more broadly monitor and call attention to the conditions in which those individuals are held.

9. Staff capacity and organizational financial resources are both strained by time-consuming and expensive travel to El Salvador from the United States that would not need to occur but for the Agreement facilitating the forcible disappearance of RFK Human Rights clients. These strains mean that RFK Human Rights is unable to devote staff time and financial resources to other work it would have completed, including U.S. federal litigation seeking redress for violations of human rights by police and prison officials and informational campaigns and advocacy to promote human rights causes related to suppression of civic space and against government abuse of power.

10. The Agreement further harms RFK Human Rights because the Agreement's terms—under which individuals held in immigration detention in the United States need fear their sudden disappearance to El Salvador—materially impede RFK Human Rights's ability to provide legal education to detained people on how to vindicate their human rights while in detention. For example, if people held at CECOT were instead detained in U.S. immigration detention centers, RFK Human Rights attorneys could and in many cases would have visited them in person to provide legal rights presentations explaining how to file a pro se habeas corpus petition with the federal courts, a complaint about conditions of confinement with a Department of Homeland Security oversight body, or a request for release

from detention through administrative advocacy with Immigration and Customs Enforcement or the Executive Office for Immigration Review.

11. The Agreement further harms RFK Human Rights by requiring it to devote attorney time and organizational resources to representing clients who have been rendered to (or are at risk of being rendered to) facilities in El Salvador, diminishing the overall number of clients that RFK Human Rights is able to assist and projects that RFK Human Rights is able to undertake.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 21, 2025

Anthony Enriquez

Case No. 25-cv-1774-JEB

# Exhibit 32

**DECLARATION OF MELISSA SHEPARD**

I, Melissa Shepard, declare as follows:

1. I am the Legal Services Director at the Immigrant Defenders Law Center. I have practiced immigration law for over 11 years with experience in removal defense including for unaccompanied minors, border work and complex family-based immigration.

2. ImmDef is a nonprofit organization based in California. ImmDef's mission and vision is that no immigrant should have to face deportation proceedings alone and that every person facing removal deserves to have zealous, competent counsel at their side.

3. To accomplish ImmDef's mission to ensure that no immigrant goes unrepresented in immigration court, ImmDef provides full-scale deportation defense, legal representation, legal education, and connections to social services to thousands of detained and non-detained adults and children each year. These projects include legal consultations and full-scope deportation defense for unaccompanied children; representation of immigrants seeking post-conviction relief from criminal convictions that are impacting their immigration status; serving as court-appointed counsel for people unable to represent themselves in immigration court because of serious mental disorders; providing training and resources to partner organizations to increase capacity to represent clients; and providing non-legal holistic support through a client wellness initiative that connects clients to mental health services and other support while their cases are

pending. ImmDef also monitors detention conditions and submits complaints about conditions to the Department of Homeland Security.

4. The Agreement at issue in this case materially harms ImmDef's ability to carry out these critical projects.

5. ImmDef represents eight clients that have been rendered from the United States and were held in CECOT pursuant to the Agreement for 125 days—including one that ImmDef represented before his rendition. ImmDef has ongoing responsibilities to these clients. But ImmDef attorneys were not permitted to communicate directly with those clients while they were in CECOT because as ImmDef understands, the Agreement does not require El Salvador to facilitate such communication.

6. ImmDef's representation of its clients who were in CECOT (including ImmDef's ability to develop its clients' legal claims for their immigration proceedings) was directly impeded by its inability to communicate with those held within the facility and their clients' lack of access to the legal process they are due more generally.

7. For example, one of ImmDef's clients had a court date for his asylum hearing in the United States on March 17, 2025—but was not brought to the hearing, because he had been rendered to CECOT two days earlier. In May 2025, the immigration judge granted the government's motion to dismiss that client's case based on his absence from the United States, over ImmDef's objections in court and in writing.

8. For that client, and four others where an immigration judge granted the government's motion to dismiss based on their absence from the United States, over ImmDef's objections, ImmDef has filed an appeal to the Board of Immigration Appeals—without even having had the opportunity to consult with these clients about taking the appeal because we were unable to communicate with them at that time. While those clients were in CECOT, ImmDef was assessing whether there is additional, extra-record evidence it may attempt to enter into the record before the BIA, but our efforts to do so were stymied by our inability to communicate with these clients and adequately develop a factual record.

9. Cases for other two clients remain pending before immigration judges as one was administratively closed. ImmDef is similarly hampered by our continued inability to access one of our clients to develop the facts we need to advocate for them, and to ensure our clients are fully informed of our strategy. And the eighth client was removed in absentia, again hampering both his legal rights and our ability to represent him effectively.

10. ImmDef has been compelled to devote additional staff time to representing our clients who were held in CECOT as compared to what would have been required had those clients remained in the United States. Representing these clients while they were in CECOT required several additional hours per week, for multiple attorneys across case teams, compared to ImmDef's typical practice. That change is directly traceable to the Agreement and has necessarily reduced the number of clients ImmDef can help overall, given that ImmDef has finite staff and

resource capacity. The increase in time invested in each case continues to remain in place as we navigate the various strategies for our clients who are now in Venezuela.

11. We also had to devote significant resources to simply trying to ascertain whether our clients even remained alive. We spent time telling congressional staff about the plight of our clients, asking them to attempt to visit our clients at CECOT, in hopes of the legislative branch being able to secure access to our clients or, at the very least, proof of life.

12. Although these clients have now been released from CECOT, they suffered terribly while they were there. When discussing the current situation with our clients and attempting to ascertain how to navigate their legal cases, we have found that some have endured so much trauma that their memory and ability to focus has been severely impacted. This means that we must spend more time talking to our clients to obtain the information that we need. Because the Agreement remains in place, we remain alarmed at the likelihood that more of our clients will be rendered to El Salvador under the Agreement. We remain alert to our clients who may not be removed to their country of origin because of logistical and political challenges as we fear they would be subject to being sent to El Salvador.

13. Additionally, our inability to communicate with clients rendered to El Salvador hampers our ability to monitor their detention conditions and submit complaints as necessary.

14. The unpredictability created by the Agreement has materially impeded ImmDef's ability to represent and counsel its clients who are at risk of rendition by making it more difficult for ImmDef to provide concrete advice. ImmDef attorneys are spending additional time advising them about the range of potential outcomes in their situation. For example, we must now not only defend removal to their country of origin, but also to third countries to which they may be removed. This includes more research and compiling supplemental evidence. We must also screen for and document any tattoos that may be used to flag them for removal to a third country. However, we had clients without any tattoos sent to El Salvador, thus making it impossible to give any concrete advice.

15. Because we understand the Agreement can also facilitate the rendition of children over the age of fourteen, this uncertainty—and the additional resources it requires ImmDef to expend—apply likewise to ImmDef's clients who are children, particularly those from Venezuela who reasonably fear rendition, and whose cases are often more complex and resource-intensive.

16. Moreover, ImmDef's relationship with its clients—and the provision of services to these clients—is not limited to legal representation, nor does it end simply because the client is released from detention. ImmDef's mission-critical work also includes a client wellness initiative, through which ImmDef staff work with clients to create individualized post-release plans, including referrals for medical care and setting up travel arrangements for detained clients upon their release. This initiative is an integral part of ImmDef's mission because in many

cases it helps to ensure that ImmDef's clients are able to meet their obligations to prepare their cases with ImmDef and to attend their court hearings. ImmDef also stays in contact with some clients who have been deported, for example, when there may be a basis to reopen their case later or if they are removed pending appeal. Rendition to El Salvador pursuant to the Agreement thwarts ImmDef's ability to deliver these services.

17. ImmDef also provides technical assistance on removal defense to legal service providers throughout California, including one-on-one meetings, office hours, and quarterly meetings to help build capacity to provide representation in furtherance of ImmDef's mission to ensure universal representation for immigrants. ImmDef also provides community education materials, which it has had to spend staff hours to update to include both video and written information regarding the heightened risk factors for being rendered to El Salvador. ImmDef is compelled to continually use additional staff time to modify these materials to meet this ongoing need for information and to maintain its reputation as a trusted source on these topics. All of these obligations created by the Agreement take away valuable staff time and resources that could otherwise be spent serving additional clients.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 18, 2025.

Melissa Shepard

____________________________

Melissa Shepard

Case No. 25-cv-1774-JEB

# Exhibit 33

United States Senate
COMMITTEE ON FOREIGN RELATIONS
WASHINGTON, DC 20510–6225

April 14, 2025

The Honorable Marco Rubio
U.S. Department of State
2201 C St NW
Washington, DC 20520
April 14, 2025

Dear Secretary Rubio:

I write to request that the State Department move with urgency to expedite the release of all those who have been unlawfully detained in El Salvador's Terrorism Confinement Center (CECOT), including, among others, Andry Hernandez Romero and Kilmar Armando Abrego Garcia, a United States resident with no criminal record. The Trump administration has itself acknowledged that Mr. Abrego Garcia was transferred to CECOT because of an "administrative error" and a United States court has now directed the federal government to "take all steps to facilitate the return" of Abrego Garcia to the United States.

In a Justice Department filing on April 12, Senior Western Hemisphere Bureau Official Michael Kozak confirmed that Mr. Abrego Garcia was being held in CECOT. The Trump administration has confirmed that it has sent millions of taxpayer dollars to CECOT to facilitate these detentions and State Department documents suggest that upwards of $15 million in International Narcotics Control and Law Enforcement (INCLE) funds have been set aside to send to El Salvador to house additional detainees.

I write to affirm not only that this is an unprecedented and inappropriate use of INCLE funds, but also to note the absurdity of any statement from the Trump administration regarding their inability to request and facilitate the return of those wrongfully detained in light of the fact that the administration is funding these detentions.

I write also concerning agreements or arrangements made between the United States and the Governments of El Salvador and Venezuela regarding the deportation of Venezuelan nationals. A March 15 declaration of Senior Western Hemisphere Bureau Official Michael Kozak states "arrangements were recently reached" related to "the removal to Venezuela and El Salvador of some number of Venezuelan nationals detained in the United States who are associated with Tren de Aragua." Your subsequent March 24 declaration also references "negotiating and executing the agreement." You have also mentioned "the agreement to house criminal aliens" and "an arrangement" with El Salvador in a press conference and interview on March 19 and 28.[1]

---

[1] Marco Rubio, "Secretary of State Marco Rubio with Hugh Hewitt," State Department Press Releases, March 19, 2025; Marco Rubio, "Secretary of State Marco Rubio Remarks to the Press," State Department Press Releases, March 28, 2025.

Pursuant to the Case-Zablocki Act (1 U.S.C. § 112b), as amended by the National Defense Authorization Act for Fiscal Year 2023 (P.L. 117-263), the State Department is generally obligated to provide to the Senate Foreign Relations Committee and the House Foreign Affairs Committee agreements or non-binding instruments that are the "subject of a written communication from the Chair or Ranking Member" of either Committee.

You will recall that this provision of law and the Case Act transparency reforms have a long bipartisan history including when you were a member of this committee. Indeed, you voted in favor of these transparency reforms in committee on April 21, 2021, and again on the floor on December 15, 2022. This provision has been used to good effect numerous times on a bipartisan basis, including a request I made to former Secretary Blinken in January 2025 requesting a U.S.-Vietnam Memorandum of Understanding on cybersecurity.

This letter constitutes the statutorily required "written communication." As such, please provide the text of any implementing agreements, arrangements for international agreements, or non-binding instruments referenced in the attached declarations by you and Senior Bureau Official Kozak, or any such agreements, arrangements, or non-binding instrument made within the past four months related to the deportation of Venezuelan nationals or other alleged criminals to El Salvador, as soon as possible.

Thank you for your attention to this matter.

Sincerely,

Jeanne Shaheen

Jeanne Shaheen
Ranking Member

Case No. 25-cv-1774-JEB

# Exhibit 34

← Post

**Acyn**
@Acyn

Reporter: The president of El Salvador said he would be willing to take American citizens in federal prison population.

Trump: I love that




7:56 PM · Apr 6, 2025 · **2.9M** Views

587 2.5K 6.3K 1.6K

Post your reply

Reply

Case No. 25-cv-1774-JEB

# Exhibit 35

EXCLUSIVE

IMMIGRATION

# As legal fight raged, ICE buses filled with Venezuelans heading toward airport turned around, video shows

At least 28 detainees were placed on buses Friday evening at ICE's Bluebonnet Detention Center in Anson, Texas, and then driven toward an airport about an hour away.



Get more news LIVE on NBC NEWS NOW. >

April 20, 2025, 7:58 AM EDT

**By Vaughn Hillyard, Julia Ainsley, Kayla McCormick, Sarah Dean and Rebecca Cohen**

Video from Friday night shows Immigration and Customs Enforcement buses full of Venezuelan migrants headed toward an airport in North Texas and abruptly turning around before the Supreme Court ruled the Trump administration must, for now, refrain from deporting Venezuelan men based in the state under the Alien Enemies Act.

At least 28 detainees – most, if not all, understood to be Venezuelan nationals – were placed on buses Friday evening at ICE's Bluebonnet Detention Center in Anson, Texas, and driven toward Abilene Airport, about 30 miles away.

The motorcade – including at least 18 squad cars from various law enforcement agencies with flashing lights along the North Texas highways – left the ICE facility, with some men on board being told they were being deported to El Salvador and some that they were headed to Venezuela, according to the wife of one of the detainees and two lawyers representing other detainees at the facility. Before they departed, it was not clear what their destinations would be.

The video, obtained exclusively by NBC News, shows the ICE motorcade pass the airport's exit and then turn around, looping back to return to the Bluebonnet detention facility.

The Trump administration is seeking to deport the men, who it says are members of the Tren de Aragua gang. It remains unclear whether the government has the authority to apply the Alien Enemies Act to gang members outside of a war situation and whether adjudications about gang membership are accurate.

The administration has asked the Supreme Court to stop its pause on the would-be deportation flights.

## An abrupt turnaround amid Friday's court fight

As the motorcade was headed for the airport, a last-minute federal hearing on the matter was taking place in Washington.

U.S. District Judge James Boasberg, who has been hearing a case related to the flights to El Salvador, scheduled an emergency hearing for Friday evening – just hours after a bus rolled up to Bluebonnet.

Shortly before that hearing kicked off, attorneys for the American Civil Liberties Union also asked the Supreme Court to step in.

“We hear they are on buses on the way to the airport,” said Lee Gelernt, the ACLU lawyer arguing on behalf of detainees on the verge of being deported under the Alien Enemies Act.



A bus departs ICE's Bluebonnet Detention Center in Anson, Texas on Friday. NBC News

Upon learning the information, Boasberg asked Justice Department lawyer Drew Ensign to make calls to ensure no flights were deporting immigrants from Bluebonnet under the Alien Enemies Act on Friday night.

Ensign said that he understood there would be no flights Friday night and that he was "not aware of any plans" for flights Saturday but that the Department of Homeland Security reserved the right to conduct flights Saturday.

At the same time, the ICE buses were nearing their approach to the airport exit.

The Supreme Court heard the case overnight, after Boasberg declined to rule in favor of the ACLU lawyers and told them, "I just don't see really how you're asking me to do anything different from what the Supreme Court told me I couldn't do."

The high court then offered its ruling early Saturday that the administration must halt its deportation flights for now.

A spokesperson for the Department of Homeland Security would not comment on who was on the buses or why they turned around. DHS and ICE did not immediately respond to requests for comment Saturday night.

Each of the men was asked to sign a removal order, though many refused to sign it. NBC News has viewed video of numerous men holding up their copies of the removal order and protesting ICE's apparent efforts to get them to sign.

Had any of the men signed – and had they been deported less than 24 hours after putting their signatures on the forms – the Trump administration could have been in danger of violating the Supreme Court's April 7 order to provide "reasonable time" for those targeted for deportation under the Alien Enemies Act to appeal.

"We are confident we will ultimately prevail against the onslaught of meritless litigation brought by radical activists who care more about the rights of these terrorist aliens than those of the American people," White House press secretary Karoline Leavitt said Saturday evening on X.

White House deputy chief of staff Stephen Miller, also writing Saturday on X, called the immigrants "documented foreign terrorists who infiltrated the country at the direction of an adversarial regime."

## One detainee's wife describes the near-deportation

Judy Maldonado Rall, wife of Eduardo Daboin Rall, who is being held at Bluebonnet and was among the detainees on the buses Friday, said she drove 6½ hours from El Paso on Saturday morning to Anson, where she was able to visit with her husband.

She relayed the chaotic scene her husband described.

Officers came into the facility and "pulled out a bunch of them and told them that they were going to be deported based on the orders that were given and that they needed to sign the documents," she said, referring to the removal orders.

They were given documents titled "Notice and Warrant of Apprehension and Removal under the Alien Enemies Act" and told to sign, she said, and some were told they were being sent back to their home country of Venezuela.

“They don’t know what they were signing. They didn’t know what was going on,” Judy Rall said, adding that some of the men refused.

She said her husband and other detainees were then loaded onto the buses, headed toward the airport before they turned around and ended up back at Bluebonnet.

“It happened as fast as they got there, and then they realized they did the turnaround, and that’s when they realized – on this turnaround back to the center – is that they were returning to Bluebonnet,” Judy said.

Upon returning, Eduardo Rall was told by a guard: “Well, you were lucky you were sent back because you were going to El Salvador, not Venezuela," his wife said.

DHS and ICE did not provide additional information and context about the detention of Eduardo Rall in response to a request early Saturday afternoon. Neither did the White House late Saturday afternoon. As of Saturday night, no details had been provided.

Judy Rall said Eduardo Rall is a Venezuelan national who entered the United States legally in 2023 via the CPB One app – which allowed migrants to apply to legally enter the country as asylum-seekers but which the Trump administration has since tried to eliminate. He applied for temporary protected status a year later but has not been granted approval.

Judy Rall said that her husband has no affiliation with Tren de Aragua, MS-13 or any other gang and that he is being targeted because of his tattoos.

ICE first detained Eduardo Rall about a year ago for an incident at home, Judy Rall said. He was initially let go with no citations but ended up being taken to a processing center in El Paso a week later and going through a court process, in which he got out on bail and had to wear a tracker.

He was detained again last month, and Judy Rall said they have not been told why.

“He’s never been given any documentation to see what are the charges against him,” she said.

NBC News was not able to locate any state or federal criminal records with Eduardo Rall's name and date of birth. It verified that the man is in ICE custody and that his next hearing is scheduled for May 1 in El Paso.

In video of Eduardo Rall inside Bluebonnet, he said he and his fellow inmates were "simply being unjustly judged because of our tattoos."

"I am Venezuelan and they put me to sign a detention and deportation order to a country that we do not know. They told us that they did not know where they were going to take us," he said. "And we hope that they simply return us to our country safe and sound, so that we can be with our families."

Vaughn Hillyard

Vaughn Hillyard is a correspondent for NBC News.

Julia Ainsley

I am NBC News' Senior Homeland Security Correspondent.

Kayla McCormick

Kayla McCormick is a producer for NBC News.

Sarah Dean

Sarah Dean is a 2024 NBC News campaign embed.

Rebecca Cohen

Rebecca Cohen is a breaking news reporter for NBC News Digital.

Tangni Noriega and Didi Martinez contributed.

Case No. 25-cv-1774-JEB

# Exhibit 36

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/world/americas/el-salvadors-bukele-plans-to-double-giant-prison-holding-u-s-deportees-af950c70

EXCLUSIVE AMERICAS

# El Salvador's Bukele Plans to Double the Size of Giant Prison Holding U.S. Deportees

World's largest prison already holds hundreds of alleged gang members from the U.S.

*By Vera Bergengruen* Follow *and Michelle Hackman* Follow

*April 16, 2025 3:44 pm ET*



A soldier stands guard during a media tour at El Salvador's Terrorism Confinement Center earlier this month. PHOTO: JOSE CABEZAS/REUTERS

Quick Summary

- El Salvador plans to double the size of its largest prison, already housing 15,000, including U.S. deportees.

**View more**

El Salvador's President Nayib Bukele plans to double the size of the maximum-security prison where his government is holding U.S. deportees.

Bukele plans to expand the Terrorism Confinement Center, the sprawling compound known as Cecot that is already the largest prison in the world, he told Homeland Security Secretary Kristi Noem when she visited last month, people familiar with the discussion said.

Opened in 2023 to house up to 40,000 inmates during Bukele's crackdown on El Salvador's gangs, the facility currently holds roughly 15,000 people, including hundreds of alleged gang members the Trump administration has recently deported from the U.S. Doubling the prison's capacity would create space for a total of 80,000 inmates.

"We have no plans to bring them back, this is a long-term solution," Noem told The Wall Street Journal after her visit with Bukele. "He has plans to double the size. He has 80-plus acres there that he's going to continue to build on."

In mid-March, the U.S. deported more than 250 alleged gang members to El Salvador—most of them Venezuelan—after President Trump invoked a rarely used wartime law. The U.S. is paying Bukele's government $6 million to incarcerate them at the facility for a year.

Among them is Kilmar Abrego Garcia, a sheet-metal laborer who lived with his family in Maryland and was deported in what the Trump administration acknowledged was an "administrative error."

Bukele and Trump said during a meeting in the Oval Office on Monday that they don't intend to return Abrego Garcia to the U.S., despite a Supreme Court ruling last week that the administration must facilitate his return after his illegal deportation.

Trump told Bukele during the meeting that "you gotta build about five more places."

"We've got space," Bukele said.

"It's not big enough," Trump replied.

Bukele has become a top ally in Trump's deportation agenda, eagerly offering to detain alleged criminals from the U.S. The young, media-savvy president's crackdown on Salvadoran gangs earned him admirers in Trump's inner circle including Elon Musk, Donald Trump Jr. and Tucker Carlson. The prison has become a popular destination for GOP lawmakers, many of whom have posed for selfies showing inmates behind bars.



El Salvador's Terrorism Confinement Center, a sprawling compound known as Cecot, pictured in 2023.
PHOTO: SALVADOR MELENDEZ/ASSOCIATED PRESS

One in every 57 Salvadorans in the country of 6.3 million is incarcerated—triple the rate of the U.S. and the highest in the world. Any prison expansion would likely be geared toward holding more foreign inmates. "Up to the U.S. to send enough to fill it," someone familiar with Bukele's plans said.

Noem, who posed in front of rows of tattooed inmates during her visit to the prison, said Salvadoran officials told her the prisoners deported from the U.S. were treated better than local inmates.

"They have mattresses. They have full meals," she said. "They receive time for exercise and are getting medical checks on a regular basis."

Bukele told Noem he wants to focus on incarcerating alleged criminals rather than serving as a destination for third country nationals, like other countries in the region, which accept U.S. deportees before repatriating them to their home countries.

"I don't think he's really interested in that," Noem said.

Sen. Chris Van Hollen (D., Md.) traveled to San Salvador Wednesday to check on Abrego Garcia and discuss his release. He said he wasn't allowed to meet Abrego Garcia or speak with him on the phone. Van Hollen said he asked Vice President Félix Ulloa why El Salvador is keeping him at the prison without evidence he is a gang member.

"His answer was that the Trump administration is paying the government of El Salvador to keep him at Cecot," he said. "It's a prison where they say they send the worst of the worst. It's where they send the terrorists."

The plan to send U.S. deportees to the prison emerged from Secretary of State Marco Rubio's February visit to Bukele's lake house in El Salvador.

Bukele said during the visit that he was offering the Trump administration "the opportunity to outsource part of its prison system...in exchange for a fee," which "would be relatively low for the U.S. but significant for us, making our entire prison system sustainable."

"No country has ever made an offer of friendship such as this," Rubio said.

Write to Vera Bergengruen at vera.bergengruen@wsj.com and Michelle Hackman at michelle.hackman@wsj.com

*Appeared in the April 17, 2025, print edition as 'El Salvador to Double Size of Prison Holding U.S. Deportees'.*

## Videos

Case No. 25-cv-1774-JEB

# Exhibit 37

**DECLARATION OF KATHLEEN KAVANAGH**

I, Kathleen Kavanagh, declare as follows:

1. I am a supervising attorney with the California Collaborative for Immigrant Justice (CCIJ). I am admitted to practice law and in good standing in the state of New York. I have been working in the immigration legal field since 2005 and practicing as an immigration attorney for approximately nine years.

2. CCIJ is a California-based nonprofit organization that utilizes coordination, advocacy, and legal services to fight for immigrants in carceral settings. CCIJ's mission is to strengthen and guide grassroots efforts to support detained and incarcerated immigrants and push for their liberation, seeking to empower immigrants in and at risk of detention. CCIJ furthers this mission through direct legal services, other legal support, advocacy initiatives, data collection and reporting, and public health advocacy for immigrants, particularly those who are detained.

3. CCIJ provides legal services to immigrants through direct representation and through clinics supporting immigrants with their pro se claims. CCIJ offers regular legal clinics at ICE detention centers in California. CCIJ also provides legal consultations related to immigration matters to noncitizens incarcerated in federal prisons around the country. It is one of only a few organizations that does so. As part of its clinic and consultation work, CCIJ staff provide individual consultations and group "Know Your Rights" information, distribute self-help materials, offer limited assistance with form-filling and other

preparation of court filings, screen for competency concerns and advocate for appointed counsel in such cases, and provide direct representation in certain cases.

4. Many individuals in immigration detention and federal prisons participate repeatedly in CCIJ's clinics as they pursue their own pro se representation. Via its regular clinics, CCIJ is able to provide ongoing support through a pro se person's immigration court case and appeals, and in collateral matters like post-conviction relief or habeas petitions. CCIJ typically continues to communicate with clients (and sometimes clinic participants) even after they are released from detention or prison in the United States or deported to another country, in order to provide ongoing legal services and to support CCIJ's public education initiatives.

5. When clients or clinic participants are transferred from the detention facility or prison at which CCIJ has previously connected with them, and CCIJ is unable to locate them or get in contact with them, CCIJ's ability to continue providing legal services and engaging in related advocacy initiatives is materially impaired.

6. The Agreement at issue in this case, by providing for the rendition of detained or incarcerated immigrants beyond communication with CCIJ, impairs its ability to provide services. Rendition not only prevents CCIJ from serving pro se individuals at its regular clinics (which are the most efficient way to serve an overwhelming number of unrepresented people), but prevents CCIJ from serving them at all. At least two people whom CCIJ has served through its clinics have

been relocated to Texas and, CCIJ believes, would be rendered to El Salvador under the Agreement but for other court orders enjoining that action.

7. As a result of the Agreement, CCIJ has had to implement new procedures to identify clients and clinic participants who may face rendition under the Agreement and to change how it provides advice and operates its clinics. To begin, CCIJ must now screen every individual for risk factors for possible rendition to El Salvador or other third countries. Where risk factors are identified, individuals receive additional advice from a CCIJ attorney, beyond the self-help materials that CCIJ typically offers.

8. CCIJ largely staffs its immigration detention clinics with rotating volunteers from other organizations and law firms, and volunteers now must, because of the Agreement, receive additional training (from CCIJ staff) to screen for risk factors for rendition in order to flag such cases for a CCIJ attorney. At-risk individuals also receive specialized material—which CCIJ and a partner organization developed in response to the Agreement and translated into multiple languages—to advise individuals of their rights and to attempt to enable access to counsel by requesting that CCIJ and the partner organization be contacted before they are transferred for possible rendition. Because of the Agreement, CCIJ staff now must devote additional time and resources to providing these materials and advice to individuals at risk of rendition and translating it to additional languages as needed.

9. CCIJ also provides at-risk individuals with contact information and instructions to call CCIJ if they believe they are being transferred for possible rendition. CCIJ has also received a number of unsolicited communications from immigrants detained at the Bluebonnet Detention Center in Texas from which the government has previously attempted to render people to El Salvador, and so who reasonably fear rendition under the Agreement, and from family of people detained there; these communications have required CCIJ to devote additional staff time and resources to creating records to track these people.

10. CCIJ also supports and engages in advocacy alongside former clients and other individuals after they are released from ICE detention and federal prisons. CCIJ has had to reach out to many such individuals—many of whom were previously granted protection from removal under the Convention Against Torture or as applicants for U-Visas—to advise on the new risk that they could be re-detained and rendered to El Salvador or another third country, in order to protect these individuals and ensure they can continue to serve as partners in work that is central to CCIJ's mission. For the same reasons, CCIJ has also devoted time to arranging for attorney accompaniment for such individuals when attending check-ins with ICE, due to the new risks and uncertainties caused by the Agreement.

11. Overall, the Agreement has required CCIJ to devote substantial time to training volunteers, creating materials, providing more complex consultations, and assisting formerly detained or incarcerated individuals. These additional

demands on staff capacity have caused an overall reduction in the quantity and quality of the services CCIJ regularly provides to people in ICE detention and federal prisons. Because clinic consultations now take longer than they previously did in order to ensure that volunteers and CCIJ attorneys are screening for and advising on risks created by the Agreement, CCIJ is not able to serve as many people in those clinic sessions. This is because we are limited in the amount of time we can spend conducting clinic sessions; as individual consultations at each session take longer, we serve a lower number of people at each session.

12. CCIJ also advocates for the health and safety of the people who are being held inside ICE detention facilities. For example, CCIJ conducts outreach with local agencies and public health departments to encourage and facilitate inspections and ensure appropriate oversight of conditions, and files complaints with the Department of Homeland Security on behalf of detained immigrants regarding their health and safety while in detention.

13. CCIJ has also served as class counsel in litigation on behalf of hundreds of people incarcerated in federal prisons, securing a consent decree requiring the provision of medical care, limitations on the use of solitary confinement, appropriate housing designations, and ongoing confidential communication between CCIJ and incarcerated class members. *See California Coalition for Women Prisoners v. Federal Bureau of Prisons*, No. 23-cv-4155, Dkt. 473-1 (N.D. Cal. Feb. 27, 2025). This work, central to CCIJ's mission, depends on CCIJ's ability to know, in real time, what is happening to people who are detained

and incarcerated, and whether their medical and other needs are being met—an impossible task for individuals who were, or will be, disappeared into facilities in El Salvador.

14. To further its mission, CCIJ collects and analyzes data relating to both immigration enforcement and detention center conditions. This data helps CCIJ inform the public and government officials of what is actually happening to those taken into immigration detention. For example, in recent years, CCIJ commissioned and contributed to a report exposing the inhumane labor conditions that had previously led detained workers to initiate a labor strike. It also published a report about the denial of proper nutrition in immigration detention. Reports of this sort rely on access to accurate information collected over time. Again, CCIJ is unable to collect this information as it relates to people who have been disappeared under the Agreement.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 19, 2025.

Katie Ka

Kathleen Kavanagh

Case No. 25-cv-1774-JEB

# Exhibit 38

**DECLARATION OF BRIDGET CRAWFORD**

I, Bridget Crawford, declare as follows:

1. I am the Director of Law and Policy at Immigration Equality.

2. The statements in this declaration are based on my personal knowledge and my review of Immigration Equality's business records.

3. Immigration Equality is a national nonprofit organization whose mission for more than 30 years has been to promote equality and justice for LGBTQ and HIV-positive immigrants and families through direct legal services, policy advocacy, impact litigation, and other programs.

4. Immigration Equality provides full representation to asylum seekers directly through its own staff and through pro bono attorney volunteers.

5. In order to serve as many individuals as possible, Immigration Equality has also developed self-help materials and limited representation programming through which it provides assistance to otherwise unrepresented applicants. For example, we assist asylum applicants in filing asylum applications, provide LGBTQ asylum seekers with general "Know Your Rights" materials, and guide pro se asylum seekers on how to file certain documents, such as work authorization applications.

6. Immigration Equality works not only through our own staff, but also through our pro bono program, a network of volunteer attorneys from law firms across the country.

7. Even where a pro bono volunteer is taking on this work, Immigration Equality remains involved, providing training, resources, in-depth mentorship, and review of the pro bono attorney's work. Immigration Equality also maintains a library of materials for pro bono attorneys on the state of the law and the asylum process, which we update to reflect significant changes in policy or the law.

8. Immigration Equality runs a detention program that provides legal representation, as well as other services to support and protect LGBTQ and HIV-positive immigrants in detention facilities. Through this program, Immigration Equality staff provide advice and materials to pro se asylum seekers; prepare clients for and assist others with credible fear interviews; represent detained individuals in parole applications, on bond motions, and in custody redetermination requests; and monitor and advocate for improvements to conditions of confinement, such as by filing conditions complaints with the DHS Office for Civil Rights and Civil Liberties and similar bodies and by publicly reporting on unlawful and dangerous conditions.

9. Immigration Equality operates a toll-free hotline for exclusive use by detained people. Through the hotline, detained immigrants can speak with a paralegal or attorney regarding their immigration case to determine whether they qualify for representation by Immigration Equality and to receive other assistance, such as self-help guides or referrals to other organizations or attorneys.

10. Through the detention hotline, its main phone line, and an online portal, Immigration Equality answers thousands of phone calls and online inquiries annually regarding LGBTQ and HIV-related immigration issues.

11. Immigration Equality staff and volunteers answer these inquiries. To do so effectively they must receive training from Immigration Equality on the law and asylum process, on commonly recurring issues confronting the populations Immigration Equality serves, and on collecting relevant information from potential clients. In addition to conducting this training, we have developed a library of template responses that provide individuals with basic information on LGBTQ immigration and, in particular, on asylum, withholding of removal, and Convention Against Torture claims.

12. Immigration Equality's in-house legal team and its network of pro bono attorneys assist and represent LGBTQ and HIV-positive immigrants with matters before the U.S. Citizenship and Immigration Services, Executive Office for Immigration Review, U.S. Immigration and Customs Enforcement, the BIA, and federal courts. Immigration Equality's legal services focus primarily on asylum, withholding of removal, and CAT claims, and related applications and benefits, such as work authorization and adjustment of status. Immigration Equality has helped thousands of asylum seekers win asylum, withholding of removal, relief under the CAT, and other benefits and forms of relief.

13. The Agreement entered into between the State Department and El Salvador providing for the rendition of people from the United States into captivity

in El Salvador directly impairs Immigration Equality's ability to operate all of its core programs.

14. Immigration Equality cannot continue to provide legal and other direct services to LGBTQ and HIV-positive immigrants, and otherwise work to improve their conditions of detention and for safe conditions, if those individuals are disappeared to facilities in El Salvador where they cannot be contacted and where conditions are notoriously brutal. Immigration Equality is not able to serve people through our immigration hotline once they have been rendered, and therefore we cannot use the hotline to carry out our mission to identify emerging threats to these people, uncover dangerous conditions of confinement, and provide representation, assistance, and advice to LGBTQ and HIV-positive individuals. Similarly, we can no longer carry out our work of providing assistance to pro se individuals once they are taken to CECOT or other facilities in El Salvador.

15. The risk that individuals Immigration Equality serves will be rendered under the Agreement is all too real. Immigration Equality provides services to hundreds of people each year who are held in immigration detention across the country, including those who face particular risk of rendition under the Agreement. After that Agreement was entered into, for example, Immigration Equality conducted an intake evaluation with an asylum seeker at the Bluebonnet Detention Center in Texas from which the government has previously attempted to render people to El Salvador. The man had received paperwork accusing him of being part of Tren de Aragua. Immigration Equality also provided pro se assistance to another

Venezuelan man with tattoos who is currently being held in detention by ICE. And we recently worked to try to provide pro se assistance to a trans woman from Venezuela until we lost contact with her after she was transferred between detention facilities. We currently and regularly assist other Venezuelan asylum seekers who could be identified for rendition to El Salvador.

16. The constant threat of rendition created by the Agreement itself impedes Immigration Equality's core work. LGBTQ and HIV-positive individuals can face severe risk of persecution and harm in El Salvador, as the State Department itself has previously recognized. If the Agreement remains in place, Immigration Equality will have to expend resources it would otherwise put to other core parts of its mission to updating and creating new guidance, trainings, and materials for detained individuals, volunteers, and pro bono attorneys in order to advise on the risks posed by this new threat to LGBTQ and HIV-positive individuals and avenues for trying to avoid rendition under the Agreement. Immigration Equality is already devoting staff time and resources to following the quickly changing developments on this issue and beginning to research and prepare for the necessary changes to its programs.

17. The Agreement also directly impairs our ability to help members of the communities we serve who face risk of deportation to other countries, besides El Salvador, under third-country deportation agreements. The administration has increasingly turned to such agreements in order to deport people to countries to

which they have no connection, such as South Sudan and Eswatini, sometimes with just hours of notice.

18. We regularly and routinely assist people who cannot be returned to their countries of origin due to the risk of torture or for other reasons, and who therefore face the risk of being deported under third-country agreements. Because of the precedent set by the Agreement with El Salvador, we can't know whether these other third-party agreements might contain similar provisions for the indefinite detention of people who are deported under them, and in what conditions those people may be detained. That uncertainty impairs our ability to help LGBTQ and HIV-positive people facing deportation under these agreements because it makes it impossible for us to fully assess the risks they may face in the third country and to develop or help them develop all available avenues for seeking to contest their deportation, including arguments that such deportation would violate the Convention Against Torture.

19. The fact that some people who were rendered to CECOT were later released and sent to Venezuela does not lessen our concerns about the Agreement, the risks it creates for those we serve, or its affect on our work. The danger remains that additional people will be rendered under the Agreement. And the accounts from those who have been released about the sexual assault of an LGBTQ+ man who was sent to CECOT confirm the particular risks that this population is exposed to because of the Agreement.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 15, 2025

Bridget Crawford

Case No. 25-cv-1774-JEB

# Exhibit 39

# DECLARATION OF LISA MONET WAYNE

I, Lisa Monet Wayne, declare as follows:

1. I am the Executive Director of the National Association of Criminal Defense Lawyers (NACDL) and have served full-time in that role since 2022.

2. Previously I was a Colorado State Public Defender for 13 years, where I served as office head, training director, and senior trial attorney. I have also worked as an attorney in private practice in state and federal courts across the country and in that capacity represented hundreds of clients in both investigations and criminal proceedings. I serve on faculty at the Trial Practice Institute at Harvard Law School, The National Criminal Defense College, and Cardoza Law School, and taught trial advocacy at the University of Colorado for more than 20 years.

3. The statements in this declaration are based on my personal knowledge and review of NACDL business records.

4. NACDL is a nonprofit voluntary professional bar association that works on behalf of criminal defense attorneys to ensure justice and due process for those accused of crime or misconduct. It has a nationwide membership of many thousands of direct members, and up to 40,000 with affiliates.

5. NACDL's mission is to identify and reform flaws and inequities in the criminal legal system and redress systemic racism, and ensure that its members and others in the criminal defense bar are fully equipped to serve all accused persons at the highest level. The Agreement at issue in this case has directly

undermined NACDL members' ability to serve their clients to the best of their ability and consistent with the guarantees of the Fifth and Sixth Amendments.

6. NACDL members, who are criminal defense lawyers, frequently represent in criminal cases people who are simultaneously litigating immigration proceedings. Sometimes, these clients are detained or removed from the United States by U.S. immigration services while their criminal cases remain pending, or are on appeal. Nevertheless, the lawyers representing them in their criminal cases have an ethical obligation to continue to zealously advocate for their interests. Accordingly, NACDL members whose clients have been detained or removed must still communicate regularly with their clients to assist with factual development, keep the clients informed of case milestones, and permit the clients to make strategic litigation decisions.

7. The Agreement interferes with this attorney-client relationship, as it provides for the rendition to facilities in El Salvador where clients are held incommunicado. An inability to adequately communicate with one's client—and perhaps even being forced to defend them at trial in absentia—materially harms these lawyers' ability to carry out their constitutionally required role of providing representation in criminal proceedings.

8. NACDL members representing immigrants who are at risk of rendition under the Agreement have also been forced to take, as required by their ethical responsibilities to their clients, additional steps to prepare for that eventuality. This

practice, which is often non-compensable, deprives these members of the limited (and often, too scarce) time they have to prepare their defense in the first place.

9. Similarly, members must advise clients who are not U.S. citizens about the potential immigration consequences of their litigation strategy, even if those clients are not presently in immigration proceedings. The Agreement has materially changed the stakes that may, for example, attach to a guilty plea (because, depending on the circumstances, the collateral consequences could include rendition), requiring NACDL members to spend valuable time recalibrating their advice. Because NACDL members (especially public defenders) are often working under crushing caseloads, the extra time required for each client can quickly multiply into a significant burden, and even a few extra minutes required to properly advise a client can meaningfully impinge on the lawyer's ability to provide appropriate counsel. The Agreement, however, can require that a lawyer spend far more than a few extra minutes to provide competent counsel.

10. I have reviewed NACDL's records and confirmed that the declarants in Exhibits 40 and 41 are current members of NACDL, and were members of NACDL at the time this case was filed.

11. In my role as Executive Director, I am responsible for understanding the evolving needs and concerns of our members to best direct our advocacy. My understanding is that the experiences recounted by those declarants are not unique to those NACDL members. Many of our members struggle to advise clients who are at risk of rendition under the Agreement, and have asked NACDL for resources to

help them navigate this uncertainty. But the problems created by the Agreement cannot be solved by additional NACDL resources: no resource will enable a criminal defense attorney to provide competent counsel to a client they cannot talk with, or manage a caseload made unworkable by uncertainty.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 19, 2025

L M Wayne

Lisa Monet Wayne

Case No. 25-cv-1774-JEB

# Exhibit 40

**DECLARATION OF [redacted]**

I, [redacted], declare as follows:

1. I am a member of NACDL and have been throughout the pendency of this suit. I am an attorney with the [redacted]. Our office provides representation to indigent individuals in criminal proceedings and certain post-conviction proceedings. We handle misdemeanor and felony cases.

2. I understand that this declaration will be filed with my name and identifying information about my law office and clients redacted. I have asked for these redactions because I am worried that if this information is public—or even just available to the defendants in this matter—I or my clients will face retaliation. I am concerned that if the government is able to identify any of the clients referred to in this declaration, it could render them to El Salvador under the Agreement at issue in this lawsuit, or otherwise retaliate in their criminal prosecutions.

3. I have background and experience in advising clients on the immigration consequences of criminal convictions pursuant to criminal defense attorneys' obligations under *Padilla v. Kentucky,* 559 U.S. 356 (2010), and perform that function for noncitizen clients at my current law office.

4. Our work is demanding and requires long hours meeting with our clients who are often detained, reviewing extensive discovery, investigating and gathering evidence, conducting legal research, drafting motions and other memoranda to file in court, and representing our clients in court, among other duties.

5. My work in this role has changed—and become meaningfully more challenging—as a result of the Agreement between the Department of State and El Salvador that facilitates the rendition and extraterritorial detention of people in the United States.

6. Because of the Agreement, I have expended significant time creating materials to assist the rest of my office in identifying and advising clients at risk of rendition under the Agreement. For example, I have created intake guidance and internal resources such as checklists and reference materials for other attorneys in my office to help them identify clients who are at greater risk of rendition under the Agreement. I have participated in training sessions to educate fellow attorneys about the risk of rendition and how to assess the same for their clients. When one of my colleagues is representing a client at risk of rendition, they typically turn to me for additional guidance and support. In addition, I have spent considerable time reaching out to experts on the renditions and State of Emergency in El Salvador in order to understand the level of risk that individual clients face.

7. These demands require substantial additional work beyond the immigration advisal work I typically perform for my colleagues and their noncitizen clients on the immigration consequences of criminal convictions and cases, pursuant to our obligations under *Padilla v. Kentucky,* 559 U.S. 356 (2010). All told, I have probably spent about 15-20% of my time on these additional demands, particularly in the months of April, May and June, as a result of the Agreement.

8. Were it not for the Agreement, I would not have been forced to devote my limited time to these projects. This additional work threatens the time and attention I need to represent my clients in their criminal proceedings—the central mission and purpose of my office and my work.

9. This work is essential because our office has represented numerous clients at significant risk of rendition under the Agreement—and that risk influences the decisions we must make in advising them. Representing and advising those clients has become extremely difficult because of the Agreement. For example, my concerns that a given client may be rendered require advising them not only of the strength of any fear-based immigration claims the client may have, but also the actual risk to that client's safety and life should any decision point in their litigation lead to the client's rendition. In some instances, I am forced to advise clients to undertake strategies that may actually be detrimental to success in their criminal case because that success could leave them more vulnerable to rendition.

10. These amplified collateral consequences have required me to consult multiple different experts and to review human rights reports, as well as vigorously seek independent immigration counsel for clients at risk of rendition—work I would not ordinarily have to do in representing clients but that is now necessary as a direct result of the Agreement. All of these activities require time-intensive coordination, delay resolution of the client's case, involve far greater unknowns than is typical in criminal practice, and therefore meaningfully diminish the quality and certainty of advice I am able to offer. For example, one matter I had would typically be considered

routine, and take only few hours of my time—but I expended around forty hours as a result of the risks created by the Agreement.

11. The news that some people who were rendered to El Salvador have now been sent to Venezuela has not lessened these concerns. If anything, seeing confirmation of the torture and other human rights abuses they suffered in El Salvador has made me more concerned about the possibility of my clients being rendered there, and has clarified that I must continue advising clients about these risks. As an attorney, this experience has been harrowing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 14, 2025.

[redacted]

Case No. 25-cv-1774-JEB

# Exhibit 41

**DECLARATION OF AMRUTHA N. JINDAL**

I, Amrutha N. Jindal, declare as follows:

1. I am a member of the National Association of Criminal Defense Lawyers and was so at the time this suit was filed.

2. I am a criminal defense attorney and executive director of the Lone Star Defenders Office (LSDO).

3. LSDO defends people who have been arrested at the U.S.-Mexico border as part of a Texas state initiative called Operation Lone Star (OLS). Since its inception in 2021, over 15,000 people have been prosecuted under Operation Lone Star. Most of them have been charged with misdemeanor criminal trespass. Our office represents people in those state proceedings, assigns attorneys in public defender offices and private defense attorneys to represent people who are charged, and provides support and resources to defense attorneys involved in these cases.

4. From 2012 to 2020, I was a trial attorney and supervisory attorney at the Federal Defenders of San Diego, Inc. where I represented indigent clients predominantly charged with immigration crimes, like illegal entry, illegal reentry, and alien smuggling, from initial appearance through sentencing. In January 2022, I became the Chief Defender of the OLS defense program at the Lubbock Private Defenders Office, which received a grant award from the Texas Indigent Defense Commission to serve as the indigent defense hub for OLS. In October 2023, our program spun off into its own nonprofit, LSDO.

5. As the Executive Director of LSDO, I oversee the criminal defense representation provided by defense attorneys to indigent individuals arrested under OLS in 10 different counties at the Texas-Mexico border. In addition to management responsibilities for the almost 30 employees working at LSDO, I serve as a liaison for the defense program to stakeholders, brainstorm cases with defense attorneys, and ensure that we have sufficient funding and resources, like access to investigators, experts, and interpreters, to provide high-quality representation on cases.

6. Since OLS began in 2021, the defense program has been extremely busy, particularly due to the volume of cases, the logistics involved in operating in numerous counties, and the challenges associated with our clients being detained in multiple jails spread out around the state. A typical day for a defense attorney involves appearing in Zoom court that can sometimes take 2 to 3 hours, meeting with clients over Zoom with an interpreter, and reviewing discovery like reports of investigation and body-camera video recordings. My schedule usually involves at least 4 hours of meetings per day with LSDO staff, attorneys, or stakeholders, in addition to all of my other responsibilities. This work requires strong time management and project management skills. There is little slack in my schedule.

7. As part of my work at LSDO, I and my colleagues have represented and continue to represent in state criminal proceedings a client who was rendered to CECOT under the Agreement between the Department of State and El Salvador.

8. The mere fact of a client's disappearance to CECOT under the Agreement does not necessarily end their criminal prosecution in the United States.

When those prosecutions continue, I have an ethical obligation to continue to zealously advocate for my client's interests.

9. The Agreement significantly impairs my ability to meet that obligation and directly interferes with the attorney-client relationship because it means I can no longer communicate with clients following their rendition to El Salvador. Where their prosecutions continue to move forward, it can even require that I defend them in absentia. The Agreement does not, to my knowledge, include a provision to enable meetings and calls with attorneys.

10. As noted, this is not a theoretical concern. I and my colleagues began representing a Venezuelan man in state criminal proceedings in January 2025 who was subsequently rendered to CECOT. The man was arrested by state authorities and charged with criminal trespassing after he and others crossed the Rio Grande in the presence of state law enforcement and turned themselves in. Texas authorities frivolously decided that our client was a member of Tren de Aragua because he is Venezuelan and because someone else in the group that crossed the river had tattoos.

11. In January 2025, our client was able to post bond and was transferred into ICE custody. In March, he was flown to CECOT as part of the administration's first wave of renditions.

12. Following our client's disappearance, we had no way to communicate with him in CECOT. We were only able to learn of his whereabouts from press reporting and from his family members.

13. The inability to access our client materially interfered with my ability and my colleagues' ability to carry out our work consistent with our obligations to provide constitutionally adequate counsel. It required that we devote significant additional time and resources to the matter, such as by conducting additional legal research and engaging in motions practice that would not have been required had our client remained relatively more accessible in ICE detention.

14. For example, in response to our client's rendition to CECOT, we were forced to prepare and file a motion for a speedy trial seeking to force the state to ask the federal government to temporarily transfer our client back into state custody, so he could have a trial on his pending state charge. The total staff time devoted to that motion alone was roughly 40 hours. That motion would not have been necessary but for our client's rendition under the Agreement, and preparing it required attorney time and attention that I and my colleagues could otherwise have put towards representing our clients in other cases or even representing additional clients. Preparing the motion was also made materially more difficult by our inability to communicate directly with our client.

15. In June, the state moved to dismiss the charges without prejudice. While the court granted that motion, we continue to represent our client in the case for purposes of awaiting a final judgment and closing out the case file.

16. On July 18, 2025, our client was released from CECOT and returned to Venezuela as part of a prisoner exchange between the United States and Venezuela. He is now residing in Venezuela with his family.

17. We continue to represent other Venezuelans in pending cases who are at risk of being labeled as members of Tren de Aragua and rendered to CECOT.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 18, 2025.

Amrutha N. Jindal

Amrutha N. Jindal

Case No. 25-cv-1774-JEB

# Exhibit 42

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| J.G.G. et al.,<br><br>*Plaintiffs*;<br><br>LIYANARA SANCHEZ, as next friend on behalf of FRENGEL REYES MOTA, et al.,<br><br>*Petitioners–Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, et al.,<br><br>*Respondents–Defendants*. | Case No. 1:25-cv-00766-JEB<br><br>**RESPONDENTS–DEFENDANTS' OPPOSITION TO PLAINTIFFS' AND PETITIONERS–PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

## Table of Contents

Introduction ........................................................................................... 1

Background ........................................................................................... 2

Legal Standard ........................................................................................... 4

Argument ........................................................................................... 5

I. This Court Lacks Jurisdiction. ........................................................................................... 5

A. The United States does not have constructive custody of the terrorists in El Salvador. ........................................................................................... 5

B. This Court lacks jurisdiction over the putative criminal custody subclass's claims........................................................................................... 13

II. Petitioners' Constitutional Claims Fail........................................................................................... 14

A. The Government is providing adequate due process. ........................................................................................... 14

B. The Government is not illegally detaining or punishing aliens after removal ........................................................................................... 19

1. Petitioners' substantive due process claims fail. ........................................................................................... 19

2. Petitioners' Fifth, Sixth, and Eighth Amendment claims fail as well. ........................................................................................... 22

3. The AEA does not control this issue. ........................................................................................... 25

III. Petitioners' Challenges to the AEA Fail........................................................................................... 26

A. Petitioners' claims are nonjusticiable. ........................................................................................... 26

B. The INA and other statutes do not supersede the AEA. ........................................................................................... 31

C. The Proclamation satisfies the statutory prerequisites. ........................................................................................... 35

1. TdA's actions constitute an invasion or predatory incursion. ........................................................................................... 35

2. Given its intimate connection to Venezuela, TdA is a foreign nation or government. ........................................................................................... 38

3. Petitioners are not entitled to a period for voluntary departure. ........................................................................................... 41

IV. The Remaining Equitable Factors Weigh Strongly in the Government's Favor. ... 42

A. Petitioners have not established irreparable harm. ... 42

B. The balance of equities and public interest favor denial of preliminary injunctive relief. ... 43

Conclusion ... 45

Exhibit A: Declaration of Deputy Secretary of State Christopher Landau

Exhibit B: Declaration of Assistant Field Office Director Carlos D. Cisneros

## Introduction

This is Petitioners' second attempt to challenge the President's invocation of the Alien Enemies Act (AEA) with respect to Tren de Argua (TdA) in a district in which none of the affected individuals are located.[1] The Supreme Court decisively rejected the first attempt. *See Trump v. J.G.G.*, 145 S. Ct. 1003, 1005 (2025) (per curiam). This second one should meet the same fate.

The President properly designated members of TdA as alien enemies and terrorists in the Proclamation. Proclamation No. 10,903, *Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua*, 90 Fed. Reg. 13,033, 13,033 (Mar. 20, 2025). As a result, the government has been steadfastly attempting to remove them while fully complying with the law. Petitioners have responded by attempting to disrupt that lawful process by throwing theories at the wall and seeing what sticks. Unsatisfied with the Supreme Court's rejection of their first-line theories, Petitioners have concocted two new innovations to establish jurisdiction in this court. First, they claim that *some* Respondent in this district must have constructive custody over the aliens removed to El Salvador. Not so. Those aliens are in the custody of a foreign nation pursuant to its laws. The United States does not have custody so there is no jurisdiction. Second, Petitioners claim aliens in criminal custody *may* be removed to El Salvador at *some* undefined point in the future, thus custody exists in this district as well. Such speculation cannot establish

---

[1] For brevity, "Petitioners" will refer to the parties styled Plaintiffs and Petitioners–Plaintiffs, and "Respondents" will refer to the parties styled Respondents–Defendants.

Case 1:25-cv-01007-JEB Document 110-8 Filed 08/22/25 Page 786 of 940

custody or jurisdiction. So this Court lacks jurisdiction to grant the extraordinary relief Petitioners seek.

In any event, Petitioners' claims fail on the merits. The United States has and will continue to provide procedural due process. Petitioners' substantive due process and Fifth, Sixth, and Eighth Amendment claims, however, are not cognizable against the United States and are baseless in any event. Petitioners' complaints with the Proclamation are similarly nonjusticiable. But even if they were, the President had ample basis to determine that TdA, for purposes of the AEA, is a foreign nation or government invading or engaging in a predatory incursion in the United States. Given that, Petitioners are not likely to succeed on the merits. Nor do the equities or public interest favor Petitioners, as an injunction would disrupt the government's sensitive foreign affairs relationships and keep terrorists in the United States. As a result, the Court should deny the Petitioners' motion for a preliminary injunction.

**Background**

In March, the President issued Proclamation No. 10,903, invoking the AEA, 50 U.S.C. § 21, to detain and remove Venezuelan nationals "who are members of TdA." 90 Fed. Reg. at 13,034. In the early hours of March 15, the five named Plaintiffs, representing a putative class, initiated this litigation and sought immediate injunctive relief against their removal under the AEA. ECF 1, 4. In the complaint, Plaintiffs sought relief in habeas but then dismissed their habeas claims and proceeded on their other causes of action. ECF 1 at 20–21; Mar. 15 Hr'g Tr. at 22:21–25. This Court issued two temporary restraining orders (TROs) preventing any removal of the named Plaintiffs and preventing removal under the AEA of a

provisionally certified class consisting of "[a]ll noncitizens in U.S. custody who are subject to" the Proclamation, Minute Order on Class Cert., and later extended the TROs for up to an additional 14 days, ECF 66.

After the D.C. Circuit denied the government's stay motions, the government applied to the Supreme Court to vacate the TROs. The Supreme Court granted that application, holding that, because the aliens' claims "fall within the 'core' of the writ of habeas corpus and thus must be brought in habeas," "jurisdiction lies in only one district: the district of confinement." *J.G.G.*, 145 S. Ct. at 1005 (quoting *Rumsfeld v. Padilla*, 542 U.S. 426, 443 (2004)). The Court further held that the aliens are "entitled to notice and opportunity to be heard 'appropriate to the nature of the case,'" including notice "that they are subject to removal under" the AEA, "within a reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue before such removal occurs." *Id.* at 1006 (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950)).

In defiance of the Supreme Court's decision, Petitioners persist in their efforts to anchor this habeas litigation outside the jurisdiction of confinement. After an unsuccessful attempt at a third TRO, Petitioners amended their complaint to add new claims on behalf of two new subclasses, a subclass of aliens detained at the Terrorism Confinement Center (CECOT), and a subclass of criminal detainees. Petitioners have now moved for emergency injunctive relief a fourth time. ECF 102 ("Mot."). This time they seek an order requiring the government to facilitate the return of the putative CECOT subclass to the United States and an order enjoining

AEA removals of members of the putative criminal subclass. *Id*. at 1–3. As Deputy Secretary Landau makes clear, however, the members of TdA in CECOT are being detained under the authority of El Salvador, a sovereign nation. Ex. A ("Landau Decl.") ¶ 3. There is no binding arrangement between the United States and El Salvador that provides the United States with control over these individuals.

**Legal Standard**

A plaintiff seeking a preliminary injunction "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (alteration in original) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)). The "first and most important factor" is whether the moving party has "established a likelihood of success on the merits." *Aamer*, 742 F.3d at 1038. "[W]hen a plaintiff has not shown a likelihood of success on the merits, [the court] need not consider the other factors." *Greater New Orleans Hous. Action Ctr. v. HUD*, 639 F.3d 1078, 1088 (D.C. Cir. 2011). The last two factors merge when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948 (2d ed. 1995)). That is especially true, as here, where the requested injunction "would alter, rather than preserve, the status quo by commanding some positive act;" so courts

require the moving party to "meet a higher standard than in the ordinary case by showing a clear entitlement to relief to avoid extreme or very serious damage." *Elec. Privacy Info. Ctr. v. DOJ*, 15 F. Supp. 3d 32, 39 (D.D.C. 2014) (Jackson, J.) (collecting cases).

## Argument

### I. This Court Lacks Jurisdiction.

#### A. The United States does not have constructive custody of the terrorists in El Salvador.

Petitioners' first innovation[2] to get around the Supreme Court's ruling is to argue that the United States has "custody" of prisoners held in the territory of—and by agents of—a separate, sovereign nation. That is not the case. There is no basis on which Petitioners can claim that the United States exercises plenary, indefinite control over El Salvador. To the extent the United States and El Salvador made a bilateral arrangement, it is not an enforceable agreement providing that the United States can obtain or retain control over aliens imprisoned on Salvadoran soil by Salvadoran guards. And in any case, the burden is on *Petitioners*, not Respondents, to make a clear showing that this Court's orders will likely effect the desired outcome of their habeas petition—release from Salvadoran custody. Because Petitioners cannot make that showing, this Court lacks both constitutional and statutory jurisdiction over Petitioners in El Salvador.

[2] That is, setting aside Petitioners' inappropriate attempt to aggregate habeas claims in a class action, not to mention the problems with their putative classes. Respondents will address those issues in a separate filing opposing Petitioners' motion for class certification.

At the outset, the Supreme Court's own definition of "custody" for habeas purposes demonstrates the futility of Petitioners' argument. Begin with the statute: it applies to those held "in custody under or by color of the authority of the United States." 28 U.S.C. § 2241(c)(1). And a person is "held 'in custody' by the United States when the *United States official* charged with his detention has 'the power to produce' him." *Munaf v. Geren*, 553 U.S. 674, 686 (2008) (emphasis added) (quoting *Wales v. Whitney*, 114 U.S. 564, 574 (1885)).

It is undisputed that Petitioners in El Salvador are not actually within the United States' physical custody. Nor can Petitioners invoke "constructive custody" by asserting that "the imprisoning sovereign is the respondent's agent." *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 47 (D.D.C. 2004) (quoting *Steinberg v. Police Ct. of Albany, N.Y.*, 610 F.2d 449, 453 (6th Cir. 1979)). Agency requires *control*. *See* Restatement (Third) of Agency § 1.01 (Am. L. Inst. 2006); *id.* cmt. f(1) ("An essential element of agency is the principal's right to control the agent's actions."). The United States has no *control* over the actions of a foreign sovereign.

As courts have repeatedly confirmed, plenary and indefinite control over the detention site is key. This case is not like *Boumediene v. Bush*, 553 U.S. 723, 765 (2008), where the United States held "plenary control" over the place of imprisonment despite *de jure* sovereignty by Cuba. Instead, this case is closer to *Johnson v. Eisentrager*, 339 U.S. 763 (1950). As the Supreme Court explained, "the United States' control over the prison in Germany [housing the petitioners in *Eisentrager*] was neither absolute nor indefinite." *Boumediene*, 553 U.S. at 768. The same was true

in *Al Maqaleh v. Gates*, 605 F.3d 84, 97 (D.C. Cir. 2010), where the D.C. Circuit found no habeas jurisdiction even though the aliens were held by the U.S. military at an Air Force base because the U.S. was merely leasing the base and did not have *de facto* sovereignty over it. Here, not only does the government not have sovereignty over CECOT, but it does not even have a military presence or a lease. That defeats habeas jurisdiction.

Even more analogous is *United States ex rel. Keefe v. Dulles*, 222 F.2d 390 (D.C. Cir. 1954). There, the petitioner pled guilty to crimes while stationed in France and was serving a five-year sentence in a French civilian prison. *Id.* at 391. The petitioner's wife had petitioned for a writ of habeas corpus on his behalf, naming various United States officials as respondents instead of, "[f]or obvious reasons," "the foreign jailer." *Id.* The D.C. Circuit held there was no habeas jurisdiction because the petition "show[ed] on its face that Keefe [was] not in the custody of the respondents." *Id.* at 392. Moreover, "because [the petition] allege[d] he [was] detained by French civil authorities, that there [was] no one within the jurisdiction of the court who [was] responsible for his detention and who would be an appropriate respondent." *Id.* This was despite allegations that the Secretary of State, the Secretary of Defense, and the Secretary of the Army "acting through their agents, servants, or employees . . . 'actually have deprived the [petitioner] of his liberty.'" *Id.* at 391. Likewise in *Koki Hirota v. Gen. of the Army McArthur*, the Supreme Court rejected a habeas petition against General McArthur because the petitioners were Japanese citizens in Japanese custody even though McArthur established the military tribunals that

convicted the petitioners. 338 U.S. 197, 198 (1948) (per curiam).[3] Courts have been "hesitant" to expand even the collateral-consequences doctrine to avoid habeas mootness because it "could infringe upon the domain of the branches of government responsible for the external relations of the Nation." *Gul v. Obama*, 652 F.3d 12, 17 (D.C. Cir. 2011). That is especially true for constructive custody here given the involvement of a separate sovereign's own custody. So this Court should avoid significantly expanding constructive custody in this novel manner.

Indeed, here there is even less reason than in *Eisentrager*, *Koki Hirota*, or *Al Maqaleh* to find the United States has plenary "control" over prisons in El Salvador, let alone for an "indefinite" time. El Salvador is a separate sovereign over which the United States has no control. Landau Decl. ¶3. There is no bilateral treaty between the United States and El Salvador governing prisoner detention in El Salvador; El Salvador makes its own decisions regarding detentions. *Id.* And any bilateral arrangement there may be between the United States and El Salvador is not an enforceable agreement that somehow allows the United States to retain some degree of jurisdiction or control over these individuals. Indeed, the "corrective machinery specified in the [agreement] itself is nonjudicial." *Holmes v. Laird*, 459 F.2d 1211, 1221–22 (D.C. Cir. 1972). The prisons are operated exclusively by the Salvadoran government, which has its own law and procedures.

---

[3] *See also Rasul v. Bush*, 542 U.S. 466, 481–82 (2004) ("At common law, courts exercised habeas jurisdiction over the claims of aliens detained within . . . dominions under the sovereign's control."); *Medvid ex rel. Medvid v. Lambert*, 621 F. Supp. 575, 576 (E.D. La. 1985) (finding no control over petitioner—"except in the most indirect, metaphysical sense"—where respondents were alleged to have constructive custody over seaman on Soviet vessel because of United States' "administrative ability to deter the ship's departure").

It is not for U.S. courts to question a separate sovereign's choices. In fact, the D.C. Circuit credited the United States declaration that it no longer had custody or control of Guantanamo Bay detainees transferred to Afghanistan and Sudan. *Gul*, 652 F.3d at 17. While petitioners argued that their habeas petitions were not moot due to collateral consequences, the court held that the harms were "traceable to the act of a foreign sovereign, and that any decision to lift those restrictions will depend upon an exercise of broad and legitimate discretion a court cannot presume either to control or to predict." *Id.* (cleaned up). Indeed, "[t]he interests of international comity are ill-served by requiring a foreign nation . . . to satisfy a United States district judge concerning the fairness of its laws and the manner in which they are enforced." *Ahmad v. Wigen*, 910 F.2d 1063, 1067 (2d Cir. 1990).

Petitioners' limited citations to *Abu Ali* and *Munaf* do not serve them. Those cases reiterate the point that United States *control* over the detainee is required for habeas jurisdiction. *See Munaf*, 553 U.S. at 688 (holding habeas jurisdiction exists where petitioners "held overseas in the immediate 'physical custody' of American soldiers who answer only to an American chain of command"); *Abu Ali*, 350 F. Supp. 2d at 68 (reciting factors used in the inquiry for constructive custody, including whether the petitioner "would be released upon nothing more than a request by the United States"). Moreover, these cases underscore the importance of citizenship to the inquiry—when it comes to detention abroad, the writ may run to citizens where it does not run to aliens. *See Munaf*, 553 U.S. at 688 (declining to extend the holding of *Kiko Hirota* "to preclude American citizens held overseas by American soldiers

subject to a United States chain of command from filing habeas petitions"); *Abu Ali*, 350 F. Supp. 2d at 41, 53–57, 60–65 (emphasizing throughout that the petitioner was a United States citizen). And no Petitioner here alleges United States citizenship. ECF 101, ¶¶ 12–17 (alleging Venezuelan nationality for all Petitioners alleging membership in putative CECOT subclass).

Petitioners' primary evidence that the United States has custody comes from a handful of vague statements by a few officials that the United States is paying El Salvador to detain Petitioners. Mot.7–8. In related contexts, public statements by officials have not been credited as evidence of the purpose behind an executive policy. *See Trump v. Hawaii*, 585 U.S. 667, 701–02 (2018). Such limited, out-of-context statements cannot establish that Petitioners are more likely than not to succeed on their novel constructive custody theory. This is contrasted by a clear official declaration under oath that the United States does not have custody or control over the Petitioners; El Salvador makes its own detention choices as a separate sovereign. *See* Landau Decl. ¶ 3; *Gul*, 652 F.3d at 17 (crediting declaration that U.S. did not have custody). That should suffice.

Moreover, Petitioners' position is at odds with this Court's interpretation of its own TRO. This Court interpreted its TRO enjoining the government from "removing members of [the] class" to prohibit "transferring class members into another country's custody." ECF 81, at 23. The Court then found probable cause that the government violated that order by "transferring class members out of U.S. custody." *Id.* at 31. So the Court ordered the government to "purge" contempt namely "by asserting custody

of the individuals." *Id.* at 43. Petitioners defended the Court's interpretation, findings, and order on appeal. Yet the Court's order already established that Respondents do *not* have custody over Petitioners, El Salvador does. If the United States retained custody, as Petitioners now insist, then it could not have violated the Court's order. Nor could the government "purge" the putative contempt by asserting custody over Petitioners if it always had custody to begin with. *Id.* Petitioners cannot have it both ways.[4] This Court, the United States, and even the Petitioners realize the reality: the government does not have custody of the Petitioners in CECOT, the separate sovereign nation of El Salvador does. That ends the inquiry.

One last point related to custody. Even if the United States were to take steps to "facilitate" Petitioners' release and return to the United States, as Petitioners seek, Mot. 2, Petitioners have not shown that these actions would have a "substantial likelihood" of effectuating their release from Salvadoran custody, as it is their burden to show Article III standing for preliminary relief. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017). Nor have they even attempted to. They present no facts or allegations that the United States could obtain the release of any Petitioner merely by asking. Mot. 7–9. They instead focus on whether the United States sent the detainees to El Salvador—which is undisputed—and its motives for doing so. *See, e.g.*, *id.* at 8 (noting Secretary of State Rubio's remark that it would

[4] Respondents still disagree with the Court's interpretation of its TRO and finding of probable cause for criminal contempt. Respondents' point is that the Court has already found that the government transferred custody to a separate sovereign (which Petitioners agreed with on appeal).

"save our taxpayer dollars" if detainees were no longer held in United States custody); *id.* (alleging, without any factual support, that "Respondents have sought to 'deliberately shield'" Petitioners "from seeking judicial review").

Petitioners merely assume—without any factual support—that the existence of any bilateral agreement about detainees means that the United States is their effective custodian. That is not just contrary to the realities of international affairs, it is a failure of proof on an essential element of the "irreducible constitutional minimum of standing." *Lujan*, 504 U.S. at 560; *see also Elec. Priv. Info. Ctr.*, 878 F.3d at 377 ("[T]he plaintiff cannot 'rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts' that, if 'taken to be true,' demonstrate a substantial likelihood of standing."). Indeed, the D.C. circuit rejected a similar argument that the court "might order the Government to take all steps within its power to alleviate their injury" because the injury was "traceable" to a foreign sovereign with broad discretion on how to act regardless of what a court ordered the United States to do. *Gul*, 652 F.3d at 18. So the remedy sought is "too speculative" because it relies on the "the unfettered choices made by independent actors not before the court[ ]"—here, the separate sovereign of El Salvador. *Bernhardt v. Cnty. of Los Angeles*, 279 F.3d 862, 869–70 (9th Cir. 2002) (quoting *Lujan*, 504 U.S. at 560) (no standing because remedy relied on actions of third parties). Thus, this Court lacks jurisdiction because the United States does not have custody of the Petitioners and Petitioners do not have standing for the remedy they seek.[5]

[5] Petitioners meekly suggest (Mot. 9–10) that *Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025), establishes a separate type of jurisdiction here. But a remedy in a separate case, not involving the

### B. This Court lacks jurisdiction over the putative criminal custody subclass's claims.

The second innovation Petitioners try in order to skirt the Supreme Court's ruling is to argue that a putative class of "individuals in *criminal* custody" may challenge their "*future* confinement" in this Court. Mot. 10. That argument fails for all the reasons Petitioners' constructive-custody arguments fail. And doubly so. It is completely speculative that anyone (much less every member of the putative criminal custody subclass) will be confined in CECOT under the constructive custody of one of the Respondents in this district. *See Dremann v. Francis*, 828 F.2d 6, 7 (9th Cir. 1987) (no habeas jurisdiction because "such potential confinement is considered too speculative to warrant federal habeas corpus protection"); *Hilton v. Johnson*, 82 F. App'x 521, 522 (9th Cir. 2003) (rejecting speculative possibility of future constructive custody). Indeed, some of the class members may be in state custody for years. Much can change by then. *Braden v. 30th Judicial Circuit Court of Kentucky* is not to the contrary because Kentucky issued a detainer actively seeking the petitioner's confinement in the district and the petitioner's habeas challenge was to a "present denial of a speedy trial." 410 U.S. 484, 487 (1973).[6] So the confinement and injury there were immediate and concrete, whereas here it is wholly speculative. In any

---

AEA, cannot justify jurisdiction here because the Supreme Court already held that, absent habeas jurisdiction, Petitioners' claims cannot be maintained in this Court. *J.G.G.*, 145 S. Ct. at 1005.

[6] *Chatman-Bey v. Thornburgh*, 864 F.2d 804, 805 (D.C. Cir. 1988), is inapposite because it did not involve future confinement, but rather which district was proper for a habeas challenge to parole eligibility. That case rested on the premise that the custodian for all prisoners could be in D.C. because the district of confinement is not jurisdictional, jurisdiction can be based on "service of process," and the government waived its defenses. *Id.* at 812–13. The Supreme Court rejected this view of habeas jurisdiction. *See Padilla*, 542 U.S. at 443 (rejecting service of process because "jurisdiction lies in only one district: the district of confinement").

event, named Petitioner T.C.I. is currently in custody in New Jersey. Like the named Petitioners who originally brought this case, the putative criminal custody subclass should try petitioning for habeas where they are in custody first. *See, e.g., G.F.F. v. Trump*, No. 1:25-cv-2886 (S.D.N.Y.); *J.A.V. v. Trump*, No. 1:25-cv-00072 (S.D. Tex.).[7] The Court lacks jurisdiction over this putative subclass's claims.

## II. Petitioners' Constitutional Claims Fail.

### A. The Government is providing adequate due process.

Petitioners once again argue that they are not receiving sufficient notice and opportunity to seek habeas to challenge their designations under the Alien Enemies Act. Mot. 14. That is wrong. Due process is "flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). This is especially true in the realm of immigration and foreign affairs, where the "Constitution gives the political department of the government plenary authority to decide which aliens to admit" and thus "the power to set the procedures to be followed." *DHS v. Thuraissigiam*, 591 U.S. 103, 139 (2020) (cleaned up) (holding that expedited removal does not violate the Suspension Clause). What the Supreme Court required is notice that "they are subject to removal under the Act . . . within a reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue before such removal occurs." *J.G.G.*, 145 S. Ct. at 1005. That is precisely what the government provides.

[7] It is unclear whether those original named Petitioners are part of the putative criminal custody subclass or if they seek preliminary relief at all. If so, those claims lack jurisdiction for the same reasons. In addition (as will be explained more in the opposition to class certification), their exact claims were rejected by the Supreme Court for a lack of jurisdiction. *See J.G.G.*, 145 S. Ct. at 1005. And they are pursuing identical claims through habeas petitions in their districts of confinement.

The government gives individual notice to all aliens who are detained or may be removed under the Proclamation who have been determined to be members of TdA and are subject to removal under the AEA. Ex. B, Cisneros Decl. ¶¶ 4, 9. The notice is provided in a language the aliens can understand, generally through an interpreter. *Id.* ¶¶ 5, 9. The alien is also informed that they can make a call to anyone they choose, including counsel. *Id.* ¶ 10. Once an alien receives notice, they have *at least* 12 hours to express an intent to file a habeas petition. *Id.* ¶ 11. After that, they have *at least* 24 hours to file a petition. *Id.* In practice, they often receive more time, as they can file at any time prior to their removal. *Id.* Generally, once a habeas petition is filed the alien will not be removed until the petition is adjudicated. *Id.* ¶ 12. Given the serious national security interests at stake in removing members of a designated foreign terrorist organization, that is more than sufficient due process.

In fact, courts have rejected due process challenges to Alien Enemies Act removal procedures, including a case without a hearing. *See United States ex rel. Schlueter v. Watkins*, 158 F.2d 853, 853–54 (2d Cir. 1946) (no hearing before removal). The ability to seek a full habeas adjudication is even greater here. And the amount of notice provided to seek such habeas relief has been deemed sufficient in analogous contexts.

Take expedited removal under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. The entire purpose of the Act was to "substantially shorten and speed up the removal process" for those "who [are] arriving in the United States[,]" or have not shown that they were "physically present in the United States

continuously for the 2-year period immediately prior to the date of the determination of inadmissibility." *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 618–19 (D.C. Cir. 2020) (quoting 8 U.S.C. § 1225(b)(1)(A)(i), (iii)). If an immigration officer determines that an alien is inadmissible because they do not have valid entry documents, the "officer shall order the alien removed . . . without further hearing or review unless the alien indicates either an intention to apply for asylum . . . or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i). Even if the individual claims asylum or a fear of persecution, the "process is scarcely more involved" because the immigration officer can quickly deny the claim. *Make the Rd. N.Y.*, 962 F.3d at 618–19 (citing 8 U.S.C. § 1225(b)(1)(B)(iii)(III)). In fact, Congress was explicit on how fast this process was supposed to be: "Review shall be concluded as expeditiously as possible, to the maximum extent practicable within 24 hours, but in no case later than 7 days after the date of the determination under subclause (I)." *Id.* § 1225(b)(1)(B)(iii)(III).

The D.C. Circuit has held that this suffices for due process. *See Am. Immigr. Laws. Ass'n v. Reno*, 18 F. Supp. 2d 38, 58 (D.D.C. 1998), *aff'd*, 199 F.3d 1352, 1357 (D.C. Cir. 2000) ("We see no reason to disturb the district court's analysis, and so we affirm the dismissal of these claims substantially for the reasons stated in the court's thorough opinion."). This was because the Supreme Court has been clear that "the power to expel or exclude aliens is a fundamental sovereign attribute exercised by the Government's political departments, largely immune from judicial control." *Id.* (quoting *Fiallo v. Bell,* 430 U.S. 787, 792 (1977)). That logic applies equally here: "[w]hatever the procedure authorized by Congress is, it is due process."

*Thuraissigiam*, 591 U.S. at 139 (quoting *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950)) (holding that expedited removal does not violate the Suspension Clause for similar reasons). Indeed, much like the Alien Enemies Act, the executive branch is given "sole and unreviewable discretion" to determine who is subject to the 2-year period for expedited removal. 8 U.S.C. § 1225(b)(1)(A)(iii)(I). And as in this case, "'[j]udicial review' of expedited removal orders is only 'available in habeas corpus proceedings.'" *I.M. v. CBP*, 67 F.4th 436, 437–38 (D.C. Cir. 2023) (quoting 8 U.S.C. § 1252(e)(2)). So if 24 hours for someone who may have resided in the United States for two years is sufficient to satisfy due process, then surely it is sufficient for that category of persons whom the Commander-in-Chief has determined to be enemies invading the United States under United States law. Indeed, it would be perverse to hold otherwise. So if the government provides at most 24 hours of notice, there is no due process issue. And as noted, in practice, aliens receive much more time.

Petitioners point to a district court order and practices during World War II to argue for a longer period. A TRO from another district that is being appealed does not justify the sweeping nationwide one-size-fits-all relief that Petitioners request. *See D.B.U. v. Trump*, 2025 WL 1163530, at *4 (D. Colo. Apr. 22, 2025). Indeed, because "due process is flexible" and based on the circumstances, it is questionable whether broad relief is ever appropriate. *Jennings v. Rodriguez*, 583 U.S. 281, 314 (2018) (citation omitted) (raising questions over applicability of class actions for due process claims). As to the 30 days provided in World War II, the D.C. Circuit noted

that the proclamation was "less" than the scope of the Act and the procedures reflected the "restraint with which the Attorney General has exercised his authority." *Citizens Protective League v. Clark*, 155 F.2d 290, 295 (D.C. Cir. 1946). In addition, more time was required to provide notice, communicate, file claims, and hold hearings in World War II due to technological limitations. Given the generous procedures provided at the time, the process afforded during World War II hardly marks the minimum requirements of due process.

Regardless, many of the named Petitioners here have received sufficient notice and due process. For example, T.C.I., the representative for the putative criminal custody subclass, has been in custody since January 2024 and has had notice of his removability under the AEA for weeks. ECF 102-13 ¶¶ 3, 5. The original named Petitioners have been in custody for months and have filed habeas petitions that are, and will be, adjudicated. *See, e.g.*, *G.F.F. v. Trump*, No. 1:25-cv-2886 (S.D.N.Y.); *J.A.V. v. Trump*, No. 1:25-cv-00072 (S.D. Tex.).[8] This is likely true of the other class members who have yet to be removed (which illustrates why class certification is improper). And the Supreme Court has stayed removal in the Northern District of Texas for two weeks, offering more than enough time to seek habeas. *See A.A.R.P. v. Trump*, 145 S. Ct. 1034 (2025). By the time they can be removed, they may have had more time than even Petitioners' extreme position demands. In addition, even those who have already been removed had some notice prior to their removal. In any event,

[8] Again, it is unclear whether the original named Petitioners are part of this motion. If so, they and their class members have had notice and opportunity to seek habeas for a significant period.

the Supreme Court made clear that the notice and opportunity it ordered was prospective, "after the date of this order." *J.G.G.*, 145 S. Ct. at 1006. So none of the Petitioners' procedural due process rights have been violated.

**B. The Government is not illegally detaining or punishing aliens after removal**

As has been made clear, the government does not have custody over the Petitioners in El Salvador. So the government cannot be detaining or punishing aliens it has already removed from its custody. Petitioners assert that detaining them after removal violates the AEA and constitutes a criminal punishment in violation of substantive due process, the Fifth, Sixth, and Eighth Amendments. Mot. 29–37. This theory remains contrary to this Court's contempt order (and Petitioners' support for that order on appeal), which found probable cause that the government transferred "class members into another country's custody" in violation of the Court's interpretation of its TRO. ECF 81, at 10–15, 22–43. That order acknowledges that the aliens were "transferred . . . from U.S. to Salvadoran custody." *Id.* at 24. So even if the government had constructive custody for habeas purposes, it could not control how El Salvador—a sovereign nation—detains and treats its detainees. And Petitioners cannot raise or sustain such claims in any event.

**1. Petitioners' substantive due process claims fail.**

Petitioners claim that detaining them after removal constitutes criminal punishment in violation of substantive due process. Mot. 30. Again, the government does not have custody of Petitioners and is not responsible for El Salvador's detainment. Landau Decl. ¶ 3. And even if the government had constructive custody

of Petitioners for habeas purposes, that would not mean it had control over the conditions in—or the conduct of El Salvador regarding—Salvadoran prisons. If Petitioners are being punished, it is pursuant to Salvadorian laws and procedures, a separate sovereign. *Id.* Courts cannot remedy the "the act of a foreign sovereign" that depends on that sovereign's "exercise of broad and legitimate discretion." *Gul*, 652 F.3d at 18. "It is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation." *Sahagian v. United States*, 864 F.2d 509, 514 (7th Cir. 1988) (quotation omitted). "Such an assumption would directly conflict with the principle of comity . . . ." *Id.* So conduct in El Salvador cannot be attributed to the United States and courts cannot get involved in the procedures and conditions of another country.

In any event, even if the United States had some control, courts must be "reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). Applying substantive due process regarding confinement to alien enemies being detained by a foreign sovereign would be a massive expansion of substantive due process. As a general matter, the D.C. Circuit has held that even detainees in Guantanamo Bay cannot bring substantive due process claims regarding their conditions of confinement or treatment. *See Ali v. Trump*, 959 F.3d 364, 369 (D.C. Cir. 2020) (rejecting substantive due process challenge to 17-year detainment), *id.* at 373 (Randolph, J., concurring) (making it clear that detainees do not have procedural due process either). This is so

even though detainees in Guantanamo can bring habeas claims because the compound is under *de facto* United States control. *See Boumediene*, 553 U.S. at 771. By contrast, the writ did not run to those held in United States custody at Bagram Air Force Base because the United States was merely leasing the land—it did not have "*de facto* sovereignty" over the land. *Al Maqaleh*, 605 F.3d at 97. If the writ runs to those detained at Guantanamo but they could not assert substantive due process, then those detained at Bagram certainly could not raise substantive due process claims. That is triply true here, where the United States not only lacks *de facto* sovereignty over CECOT, but unlike Bagram it does not even have a lease or military presence there. Since CECOT is operated by El Salvador, detainees cannot bring substantive due process claims against the United States *even if* it had custody and some degree of control.

And even if Petitioners could raise substantive due process claims, they could not prove they would likely prevail on the merits. To show intent to punish, Petitioners rely on vague statements from one Respondent that she wants to deter illegal immigrants. Mot. 31–32. Such statements do not demonstrate a purpose by the government to punish aliens by removing them to El Salvador. Even statements by the President have been held not to establish the purpose behind a particular executive policy. *See Hawaii*, 585 U.S. at 701–02. Instead, the legitimate nonpunitive purpose is public safety. *See Smith v. Doe*, 538 U.S. 84, 103 (2003) (public safety is a legitimate and rationally related purpose that is nonpunitive). As noted, the Secretary of State designated TdA as a foreign terrorist organization. 90 Fed. Reg. at

13,034. Yet the government could not remove TdA members to Venezuela, who would not accept them. Substantial deference must be afforded to the government's stated public-safety intent, so "only the clearest proof'" will demonstrate a punitive intent. *Smith*, 538 U.S. at 92. Petitioners have made no such showing here.

Petitioners conclude that confinement is "excessive" compared to normal detention. Mot. 33. It is unclear what Petitioners mean by this. If they are raising an excessive force claim under *Kingsley*, they have not pleaded it or proved it in their motion. *See Kingsley v. Hendrickson*, 576 U.S. 389, 398–99 (2015). If, as Petitioners suggest, this is a "deliberate indifference" claim, Mot. 33, then they still need to establish that Respondents "subjectively disregard[ed]" a substantial risk. *Strain v. Regalado*, 977 F.3d 984, 992 (10th Cir. 2020). That analysis would fail for much of the same reasons already stated. But what Petitioners really seem to be arguing (Mot. 33–34) is that the conditions at CECOT amount to torture and prove that their detention is punitive. That fails for the reasons explained and for additional reasons laid out below. Petitioners cannot maintain a substantive due process claim against the United States while in detention in El Salvador.

#### 2. Petitioners' Fifth, Sixth, and Eighth Amendment claims fail as well.

Petitioners' Fifth and Sixth Amendment arguments just reflect their argument that detention here is criminal and thus requires criminal process. Mot. 34–36. In addition, Petitioners argue that detention at CECOT imposes torture in violation of the Eighth Amendment. *Id.* These claims largely rest, again, on an intent to punish. Thus they fail for many of the same reasons. Namely, the United States does not have

custody over Petitioners, so it is not, nor does it intend to, punish them through confinement at CECOT. More fundamentally, as with the substantive due process claim, even under United States custody, aliens held in a foreign nation's sovereign territory cannot raise Fifth or Eighth Amendment claims against the United States. *See Ali v. Rumsfeld*, 649 F.3d 762, 772 (D.C. Cir. 2011) ("They offer no reason—and we see none ourselves—why the plaintiffs' Fifth and Eighth Amendment claims would be any stronger than the Suspension Clause claims of the Bagram detainees.").

So even if the government has constructive custody, it does not control what El Salvador does within its prison. *See Gul*, 652 F.3d at 18. Indeed, the analogous realm of foreign extradition illustrates why Petitioners' theory is implausible and would severely hamper foreign affairs. Petitioners do not have constitutional rights "when surrendered to a foreign country." *Neely v. Henkel*, 180 U.S. 109, 122 (1901). If knowledge that a foreign nation seeking extradition might violate United States standards of due process or even inflict cruel and unusual punishment could create a constitutional claim against the United States, it would disrupt sensitive extradition treaties. *See Extradition of Chen*, 161 F.3d 11 (9th Cir. 1998) (rejecting claim that United States participation in extradition to Singapore where he could face the death penalty allowed an Eighth Amendment claim). To prevent such upheaval, courts avoid the "responsibility for supervising the integrity of the judicial system of another sovereign nation." *Sahagian*, 864 F.2d at 514 (quotation omitted). Thus, the rule is that "a surrender of an American citizen required by treaty for purposes of a foreign criminal proceeding is unimpaired by an absence in the foreign judicial system of

safeguards in all respects equivalent to those constitutionally enjoined upon American trials." *Holmes v. Laird*, 459 F.2d 1211, 1219 (D.C. Cir. 1972). The same is true here. If every constitutional concern that could arise in a removal nation could be imputed on the United States, it would upend the immigration system and foreign affairs.

Petitioners' argument is better suited for a Convention Against Torture ("CAT") claim, not a constitutional one. *See Cadet v. Bulger*, 377 F.3d 1173, 1196 (11th Cir. 2004). Petitioners are effectively trying to constitutionalize CAT. But there is a reason CAT exists separately, it allows the executive to determine valid claims without the disruption of a full court proceeding. *See* 8 C.F.R. § 1208.18(e) (strictly confining judicial review). And, as explained further below, courts cannot question "the Executive's assessment of the likelihood a detainee will be tortured by a foreign sovereign." *Arar v. Ashcroft*, 585 F.3d 559, 578 (2d Cir. 2009) (quoting *Kiyemba v. Obama*, 561 F.3d 509, 515 (D.C. Cir. 2009)). Indeed, the Supreme Court did not question the United States determination that transferring a detainee to Iraqi custody was not likely to result in torture. *See Munaf*, 553 U.S. at 702. The United States's policy continues to be not to remove aliens to places where they are likely to be tortured. That should resolve this issue.

And even if Petitioners could bring claims, they have not established the government intends to punish them for the same reasons expressed earlier. Tweets and statements do not establish a governmental purpose. And the government has a nonpunitive public safety interest in keeping terrorists detained. Petitioners'

argument that their classification is itself a punishment or strong evidence of such intent is absurd. Mot.36. If that was the case, then every time the Act was used the fully panoply of criminal procedural protections would apply. Yet that was not the case in World War II. *See Watkins*, 158 F.2d at 853–54 (no hearing prior to removal); *Citizens Protective League*, 155 F.2d at 294. So Petitioners' claims of punishment and torture are incorrect and, in any event, not cognizable or attributable to the United States.

### 3. The AEA does not control this issue.

Petitioners argue that the Alien Enemies Act does not authorize detention after removal. Mot. 29. Again, Petitioners are not in United States custody, and the government has no control over what El Salvador does in its prisons. The fact that the Alien Enemies Act is silent on what another sovereign country does after removal is unsurprising and irrelevant. In any event, if Petitioners were correct that the government maintains custody over the alien enemies, then it makes sense that the government would seek to keep those enemies detained for national security purposes. Such concerns are why the Act provides broad authority for detention during a proclamation. 50 U.S.C. §§ 21–23. At a minimum, the Act certainly does not foreclose such custody. Although not about removal under the Act, the Supreme Court in *Eisentrager* relied on the Alien Enemies Act to support its holding that foreigners held abroad (even by the United States military) do not have habeas rights. 339 U.S. at 773–75. Indeed, there are other ways the government can detain enemy aliens abroad. *See Al Maqaleh*, 605 F.3d at 96 (alien enemies could be detained by U.S.

military in Iraq without habeas). So the statute does not foreclose detention (whether by the United States or a foreign sovereign) after removal.

## III. Petitioners' Challenges to the AEA Fail.

### A. Petitioners' claims are nonjusticiable.

Courts cannot review the Proclamation or enjoin the President's exercise of authority under Article II and the AEA. The Supreme Court has long recognized that courts cannot issue an injunction purporting to supervise the President's performance of his duties. *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867) (courts have "no jurisdiction . . . to enjoin the President in the performance of his official duties"); *Trump v. United States*, 603 U.S. 593, 607 (2024) (recounting that the President "has important foreign relations responsibilities: [including] . . . recognizing foreign governments . . . overseeing international diplomacy and intelligence gathering, and managing matters related to terrorism . . . and immigration"); *see also Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("With regard to the President, courts do not have jurisdiction to enjoin him.").

Consistent with that general rule, courts have held for more than a century that the President's authority and discretion under the AEA is not a proper subject for judicial scrutiny: "The authority of the President to promulgate by proclamation or public act 'the manner and degree of the restraint to which they (alien enemies) shall be subject, and in what cases,' is, of course, *plenary and not reviewable*." *Ex parte Gilroy*, 257 F. 110, 112 (S.D.N.Y. 1919) (emphasis added); *see also United States ex rel. Schlueter v. Watkins*, 67 F. Supp. 556, 565 (S.D.N.Y. 1946) (reviewing habeas petition challenging detention as an alien enemy and explaining "courts are without

power to review the action of the executive in ordering removal of an alien enemy . . . except with respect to . . . whether the relator is an enemy alien"), *aff'd*, 158 F.2d 853 (2d Cir. 1946). Ultimately, "[t]he very nature of the President's power to order the removal of all enemy aliens rejects the notion that courts may pass judgment upon the exercise of his discretion." *Ludecke v. Watkins*, 335 U.S. 160, 163–64 (1948) (reasoning, on appeal from "[d]enial of a writ of habeas corpus," that "some statutes 'preclude judicial review'" and "the Alien Enemy Act of 1798 is such a statute," as demonstrated by the clear text and "controlling contemporary construction"); *id.* at 164–65 (noting that "every judge before whom the question has since come has held that the statute barred judicial review"). For that reason, it has long been established that "[u]nreviewable power in the President . . . is the essence of the" AEA. *Citizens Protective League*, 155 F.2d at 296.

Thus, as the Supreme Court has already held in this case, the AEA "largely preclude[s] judicial review," only permitting very "limited" review. *J.G.G.*, 145 S. Ct. at 1006 (quoting *Ludecke*, 335 U.S. at 163). The limited review that is permitted, via habeas, involves "'questions of interpretation and constitutionality' of the Act as well as whether he or she 'is in fact an alien enemy fourteen years of age or older'" *Id.* (quoting *Ludecke*, 335 U.S. at 163 n.17). The questions Petitioners raise about whether the AEA's prerequisites have been met are neither of those questions—they are political questions which the Supreme Court has said that courts are ill-suited and without authority to review. And that makes sense—the President recognizes foreign nations, receives ambassadors, and is Commander-in-Chief of the armed

forces. *See Trump*, 603 U.S. at 607. His powers are at their zenith in the realm of foreign and military affairs. *See, e.g.*, *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 15 (2015) ("Between the two political branches, only the Executive has the characteristic of unity at all times. And with unity comes the ability to exercise, to a greater degree, '[d]ecision, activity, secrecy, and dispatch.'").

*Ludecke* does not support Petitioners' view that a court can override a political judgment that the prerequisites of the AEA have been satisfied. Despite a vigorous dissent contesting otherwise, the Supreme Court explained that "[w]hether and when it would be open to this Court to find that a war though merely formally kept alive had in fact ended, is *a question too fraught with gravity* even to be adequately formulated when not compelled." *Ludecke*, 335 U.S. at 169 (emphasis added). These are matters of political judgment for which judges have neither technical competence nor official responsibility." *Id.* Thus, the Court did not "reach[] the merits" of whether the nation was still at war with Germany. Mot. 11. So *Ludecke* stands for the proposition that the courts may not to review a political judgment that the AEA's prerequisites have been met and persist. *See also Citizens Protective League*, 155 F.2d at 295 ("[I]t is not for the courts to determine the end of a war.").

Petitioners' other citations do not prove the contrary. The bulk are for the proposition that a court may review the meaning of terms not at issue here—"denizen," "citizen," "within the United States," "reasonable time" to depart, etc.—or who bears the burden of proof. Again, the government does not contest that a court can interpret the words of the statute. The point is that a court cannot review the

President's determination that those statutory prerequisites have been met. Even Petitioner's case for the proposition that a court may review whether some entity is a "foreign nation or government," *United States ex rel. Kessler v. Watkins*, 163 F.2d 140 (2d Cir. 1947), takes the same tack on that question as *Ludecke* did on "declared war." That decision is consonant with the principle that a court must respect political judgments, not override them. Courts can interpret statutes. But here, where complex questions of foreign affairs are involved, court may not second guess the President's determinations that the statutory requirements have been established.

This Court lacks power to review the President's Proclamation for another reason as well: Whether the AEA's preconditions are satisfied is a political question committed to the President's discretion, no different from the President's determination to trigger the Constitution's Invasion Clause (Article IV, section 4). *See California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997); *Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996); *Chiles v. United States*, 69 F.3d 1094, 1097 (11th Cir. 1995). Any challenge to that determination is therefore foreclosed.

The Supreme Court has held that the political-question doctrine is "essentially a function of the separation of powers." *Baker v. Carr*, 369 U.S. 186, 217 (1962). The President's determination under the AEA goes to the core of separation of powers and raises thorny questions that are not amenable to manageable judicial standards.

*First*, the determination that an "invasion" or "predatory incursion" is being perpetrated sits at the intersection of two areas the Constitution commits to the political branches: (1) foreign affairs, *see Barclays Bank PLC v. Franchise Tax Bd.*,

512 U.S. 298, 327–28 (1994); and (2) immigration policy, *see Mathews v. Diaz*, 426 U.S. 67, 81 (1976). Indeed, "any policy towards aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952). Similarly, the power to recognize foreign states and governments "resides in the President alone." *Zivotofsky ex rel. Zivotofsky*, 576 U.S. at 28; *see also El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 842 (D.C. Cir. 2010) ("The political question doctrine bars our review of claims that, regardless of how they are styled, call into question the prudence of the political branches in matters of foreign policy or national security constitutionally committed to their discretion.").

*Second*, even without the clear textual commitment to the Executive of the constitutional responsibilities undergirding issuance of the Proclamation, there are no manageable standards permitting courts to assess exactly when hostile entry and criminal and violent acts constitute an "invasion" or "predatory incursion" for AEA purposes. *See Martin v. Mott*, 25 U.S. 18, 31–32 (1827) (Story, J.). Thus there is no basis for second-guessing the Executive's policy judgment that such an "invasion" or "predatory incursion" is occurring. *See Chi. & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) ("The President, both as Commander-in-Chief and as the Nation's organ for foreign affairs, has available intelligence services whose reports

neither are nor ought to be published to the world. It would be intolerable that courts . . . should review and perhaps nullify actions of the Executive taken on information properly held secret.”).

AEA proclamations are thus conclusive and preclusive. As for whether the Act’s preconditions are satisfied, that is the President’s call alone; the federal courts have no role to play.

**B. The INA and other statutes do not supersede the AEA.**

Nor are Petitioners correct that the INA is the sole mechanism for removing an alien. The AEA does not require an “admissibility” or “deportability” determination of any alien, so there is no reason that Title 8 and its “sole and exclusive” means for addressing *those* questions is implicated here. *See* 8 U.S.C. § 1229a(a)(3) (removal proceedings are “exclusive” only to the extent the government is determining admissibility or removability, as those terms are defined under Title 8). Rather, the INA and AEA are distinct mechanisms for effectuating the removal of certain aliens, just as Title 42 and the INA constitute different bases for *excluding* aliens. *See generally Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022).

In fact, the immigration laws and AEA have been read harmoniously for more than 75 years. *See United States ex rel. Von Kleczkowski v. Watkins*, 71 F. Supp. 429, 437 (S.D.N.Y. 1947). Not all alien enemies will be subject to removal under Title 8 because the authority under Title 50 extends to aliens regardless of lawful status. On the other hand, the AEA applies to a fairly narrow set of aliens and circumstances, as reflected in the Proclamation. And for aliens subject to both Title 8 and Title 50, the Executive has discretion in deciding how and whether to proceed under either or

both statutes. *See id.* (recognizing this discretion under pre-INA immigration law). Thus, the AEA and INA coexist with some overlap that gives the Executive discretion to determine how, whether, or when to apply them. *See*, *e.g.*, *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) ("When confronted with two Acts of Congress allegedly touching on the same topic, this Court ... must ... strive to give effect to both.").

Petitioners' argument is that Congress effectively repealed a 150-year-old law that was just used with nary a mention. Indeed, the INA was enacted less than a decade after the use of the AEA during World War II. This Court must not interpret the INA to impliedly repeal such a recently used statute without a peep from the legislature. *See TVA v. Hill*, 437 U.S. 153, 189–90 (1978) (reiterating the "cardinal rule . . . that repeals by implication are not favored" (quoting *Morton v. Mancari*, 417 U.S. 535, 549 (1974)) and collecting cases). If Congress intended the repeal of a law dating back to the beginnings of the Republic, it would have said so.

And even if there *were* a conflict between the AEA and the INA, the AEA would control here. "[I]t is a commonplace of statutory construction that the specific governs the general." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992). Here, the AEA provides specific rules for removing a subset of aliens—those designated alien enemies—against the more general provisions relating to removability provided by the INA. Thus, to the extent there may be any conflict, the AEA provides an exception to the more general applicability of the INA's removal provisions, and this is true regardless of the later enactment of the INA. *See*, *e.g.*, *Morton v. Mancari*, 417 U.S. 535, 550–51 (1974) ("Where there is no clear intention otherwise, a specific

statute will not be controlled or nullified by a general one, regardless of the priority of enactment.").

Nor is there a colorable argument that enemy aliens *must* be permitted to seek relief or protection before removal. Such relief is generally permitted only in the exercise of Executive discretion. *See Citizens Protective League*, 155 F.2d at 294 (noting common-law rule that "alien enemies have no rights, no privileges, unless by the king's special favor"). Petitioners' asserted conflict between the INA and the AEA is illusory. The INA provides a system for determining removability and any relief or protection from removal for aliens under the authority of Title 8, whereas the AEA provides its own mechanisms to implement procedures and regulations governing removal and detention. *See* 50 U.S.C. § 21.

With respect to asylum and statutory withholding of removal related to persecution claims, none of the cited provisions constrain the *President's* actions under Title 50. *See* 8 U.S.C. § 1158(b)(1)(A) (Attorney General or Secretary of Homeland Security); 8 U.S.C. § 1231(b)(3) (Attorney General); 8 C.F.R. §§ 1208.16, 1208.18 (immigration judges, via delegation from the Attorney General); *see also Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 172–73 (1993) (recognizing distinct grants of authority under the INA to the President and Attorney General among others). Nor are such constraints implicated just because the President has delegated certain authorities, including implementation of the Proclamation, to the Attorney General. *See id.* at 172 n.28 (in implementing Proclamation, Attorney General is "carrying out

an executive, rather than a legislative, command, and therefore would not necessarily [be] bound" by provisions of the INA).

In any event, individuals subject to removal under Title 50 are barred from asylum and withholding of removal. Asylum is a discretionary form of relief, and eligibility for such relief may be foreclosed on a categorical basis. *See Huisha-Huisha*, 27 F.4th at 730–31. Here, the AEA disallows relief for covered enemy aliens, representing the categorical conclusion that such aliens are not entitled to relief in the exercise of discretion. Likewise, aliens subject to removal under the AEA would not be eligible for statutory withholding of removal because the President's invocation of the AEA suggests that "there are reasonable grounds to believe that [such aliens are] a danger to the security of the United States." 8 U.S.C. § 1231(b)(3)(B)(iv).

Nor may this Court review Petitioners' claims under the Convention Against Torture, as codified by the Foreign Affairs Reform and Restructuring Act ("FARRA"). As a threshold matter, the D.C. Circuit among other circuits has held there is no jurisdiction to consider CAT claims in habeas, under 8 U.S.C. § 1252(a)(4). *See Omar v. McHugh*, 646 F.3d 13, 18 (D.C. Cir. 2011); *Kapoor v. DeMarco*, 132 F.4th 595, 608 (2d Cir. 2025); *Mironescu v. Costner*, 480 F.3d 664, 676–77 (4th Cir. 2007).

Moreover, there is no direct conflict between the United States' obligations under the CAT and removals under the AEA. The United States continues to abide by its policy not to remove aliens to countries in which they are likely to be tortured. *See Munaf v. Geren*, 553 U.S. 674, 702 (2008). And "[s]eparation of powers principles . . . preclude the courts from second-guessing the Executive's assessment of the

likelihood a detainee will be tortured by a foreign sovereign." *Arar v. Ashcroft*, 585 F.3d 559, 578 (2d Cir. 2009) (en banc) (ellipsis in original) (quoting *Kiyemba v. Obama*, 561 F.3d 509, 515 (D.C. Cir. 2009)). "Under *Munaf* . . . the district court may not question the Government's determination that a potential recipient country is not likely to torture a detainee." *Kiyemba*, 561 F.3d at 514. The United States continues to uphold its anti-torture policy and obligations.

**C. The Proclamation satisfies the statutory prerequisites.**

In all events, the Proclamation and its implementation are perfectly lawful. The AEA grants the President discretion to issue a proclamation directing the apprehension, restraint, and removal of alien enemies when two conditions are met. First, there either must be "a declared war," "invasion," or a "predatory incursion" that is "perpetrated," "attempted," or "threatened against the territory of the United States." 50 U.S.C. § 21. Second, that hostile action must be by a "foreign nation" or "government." *Id.* The Proclamation satisfies both conditions.

**1. TdA's actions constitute an invasion or predatory incursion.**

As to the first prerequisite, the President determined that TdA is perpetrating an invasion *or* a predatory incursion into the United States. Although the word "invasion" includes a military entry and occupation of a country, the accepted definition of that term is far broader, as definitions contemporaneous with the passage of the AEA make clear. "Invasion" was defined to include a "hostile entrance," *see*, *e.g.*, 1 John Ash, *The New and Complete Dictionary of the English Language* (1775), or a "hostile encroachment" on another's territory, *see* Thomas Sheridan, *A*

*Complete Dictionary of the English Language* (2d ed. 1789). Nor is there any requirement that the purpose of the incursion be to possess or hold territory. *See*, *e.g.*, *United States v. Texas*, 719 F. Supp. 3d 640, 681 (W.D. Tex. 2024). Here, the actions of TdA fit accepted conceptions of an invasion. TdA's encroachment on U.S. territory is a hostile act contrary to the rights of citizens to be free from criminality and violence. *See* Smith Decl., ECF 72-1 ¶¶ 8–18.

At a minimum, the actions of TdA constitute a "predatory incursion" that justifies invocation of Section 21. The phrase "predatory incursion" encompasses (1) an entry into the United States (2) for purposes contrary to the interests of the United States. *See*, *e.g.*, *Amaya v. Stanolind Oil & Gas Co.*, 62 F. Supp. 181, 189–90 (S.D. Tex. 1945) (noting use of the phrase to describe raids during hostilities with Mexico falling well short of "invasion"); *see also Davrod Corp. v. Coates*, 971 F.2d 778, 785 (1st Cir. 1992) (using the phrase to refer to foreign fishing fleets unlawfully fishing in territorial waters); *Bas v. Tingy*, 4 U.S. (4 Dall.) 37 (1800) (broadly defining "enemy" and "war").

Petitioners are wrong that "invasion" and "predatory incursion" both *necessarily* entail military actions or the opening salvo of war meant to displace a government or conquer territory. There is no question that both terms include military actions, but both unquestionably have broader meanings not foreclosed by any source Petitioners cite. In fact, many of the sources relied on by Petitioners contain definitions supporting the government's argument. *See Webster's Dictionary*, "Invasion" (1828) ("[a] hostile entrance into the possessions of another); *id.*,

"Incursion" ("entering into a territory with hostile intention"). In short, both definitions *include* military action, but neither is *limited to* such action.

The canon of *noscitur a sociis* does not aid Petitioners, either. Although "declared war" certainly connotes certain military and political formalities, that term alone cannot rob "invasion" and "predatory incursion" of their meanings, especially in light of the purpose of the AEA. The statute gives the President the power to act even outside of a declared war—as it must. The United States' enemies do not invariably announce their intent to attack. Merely consider the surprise Japanese attack on Pearl Harbor, or al-Qaeda's attacks on September 11, 2001. The President, acting on public reports or intelligence information, must have the ability to restrain and remove aliens who might, by virtue of their legal allegiance to an attacking force, work against the nation's interests. *Citizens Protective League*, 155 F.2d at 294 ("The President not only has the power, under the broad grants by the Congress, but has the solemn responsibility to make certain that the conduct of war is not only unimpeded but suffers from no threat of impediment."). The Founders realized this, which is why they permitted the President to act upon something less than armed conflict between militaries. "Invasion" and "predatory incursion" must have capacious meanings, untethered to "declared war," to give the President the ability to act in emergencies, as the Founders intended. *See Russell Motor Car Co. v. United States*, 261 U.S. 514, 519 (1923) ("That a word may be known by the company it keeps is, however, not an invariable rule, for the word may have a character of its own not to be submerged by its association.").

Here, there is no question that TdA members have effected entries into the United States for purposes contrary to both the interests and laws of this country: trafficking in substances and people, committing violent crimes, and conducting criminal business with interests antithetical to those of the United States. *See* 90 Fed. Reg. at 13,034. These grave problems affecting the safety of the entire nation are caused by the concerted efforts of aliens adhering to a foreign enemy, may be deemed by the President to be tantamount to acts of war by a foreign enemy for purposes of the AEA. Congress intended that the President have the ability as Commander-in-Chief to respond to such acts by restraining or removing those liable to join in those efforts. *Citizens Protective League*, 155 F.2d at 294.

**2. Given its intimate connection to Venezuela, TdA is a foreign nation or government.**

The Proclamation makes clear that TdA is a "foreign nation or government" for purposes of the AEA for at least two independent reasons. First, TdA's infiltration of key elements of the Venezuelan government make it indistinguishable from that government. *See* 90 Fed. Reg. at 13,033. TdA's growth itself can be attributed to promotion via the actions of former Governor of Aragua Tareck El Aissami, who was later appointed Vice President in the Maduro regime. 90 Fed. Reg. at 13,033. And Maduro's connections to the group, via the regime-sponsored narco-terrorism enterprise Cártel de los Soles, are also clear. *Id*. The Cártel de los Soles "coordinates with and relies on TdA . . . to carry out its objective of using illegal narcotics as a weapon to 'flood' the United States." *Id*. Given how significantly TdA is intertwined

in the fabric of Venezuela's structures, it functions as a governing entity. And through those ties, TdA has become indistinguishable from the Venezuelan government.

Although Petitioners try to depict this invocation of the AEA as novel, the United States has a long history of using war powers against formally nonstate actors. Historically, the United States authorized the use of force against "slave traders, pirates, and Indian tribes." Curtis A. Bradley & Jack L. Goldsmith, *Congressional Authorization and the War on Terrorism*, 118 Harv. L. Rev. 2047, 2066 (2005). It has engaged militarily, during broader armed conflicts, with "opponents who had no formal connection to the state enemy," including during the Mexican–American and Spanish–American Wars. *Id.* at 2066–67. President Wilson famously sent U.S. troops into Mexico to pursue Pancho Villa, the leader of rebels opposed to the Mexican government. *Id.* at 2067. And more recently, President Clinton authorized missile strikes on al-Qaeda targets in Africa and elsewhere. *See generally El-Shifa Pharm. Indus.*, 607 F.3d 836.

This history is important because statutes must be read "but with reference to the statutory context, 'structure, history, and purpose.'" *Abramski v. United States*, 573 U.S. 169, 179 (2014) (quoting *Maracich v. Spears*, 570 U.S. 48, 76 (2013)). The AEA is a war-powers statute and thus must be read in light of a robust history of employing war powers against nonstate actors.

In all events, TdA also acts as a governing authority in the areas where it operates. As the Proclamation recognizes, "Venezuelan national and local authorities have ceded ever-greater control over their territories to transnational criminal

organizations, including TdA." 90 Fed. Reg. at 13,033. In those areas where it operates, TdA acts as a criminal governing entity, independent or in place of the normal civil society and government. *See id.* Given TdA's governance and organizational structure, as well as its *de facto* control over parts of Venezuela where it operates with impunity, it is well within the President's discretion to determine it constitutes a foreign "government" for purposes of invoking § 21.

Petitioners' contrary arguments lack merit. The government is not arguing that TdA is itself a "nation." But the control and authority TdA exercises in Venezuela is consistent with Founding-era definitions of "government." *See* Thomas Dyche & William Pardon, *A New General English Dictionary* (1754) ("the power or authority that one person exercises over another"). Additionally, although the AEA references the possibility that a covered entity *may* be able to enter a treaty with the United States, the statute does not establish treaty-making authority as a prerequisite to inclusion. *See* 50 U.S.C. § 22 (contemplating circumstances "where no such treaty exists"). Nor is there any reason that specific terminology used in the Proclamation should weigh against the President's determination. Members of TdA are clearly "subject" to the authority of that criminal organization and the governance it wields. *See* Dyche & Pardon, *supra*.

Fundamentally, Petitioners argue that other individuals do not agree with the President's determination that TdA and the government of Venezuela are sufficiently intertwined to justify invocation of the AEA. Mot. 22–24. Yet the President is entitled to examine the available evidence, including intelligence not available to others, and

make a final determination based on his *own* assessment. *See Zemel v. Rusk*, 381 U.S. 1, 17 (1965) (noting "the changeable and explosive nature of contemporary international relations, and the fact that the Executive is immediately privy to information" unavailable to others); *cf. United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319 (1936) ("[T]he President alone has the power to speak or listen as a representative of the nation."). It is not the role of this Court to second-guess those determinations based on a handful of declarations by individuals not involved with the assessment of evidence or decisionmaking culminating in the Proclamation. *See Chi. & S. Air Lines*, 333 U.S. at 111.

**3. Petitioners are not entitled to a period for voluntary departure.**

Petitioners contend that a period of voluntary departure is *required* by the AEA. Mot. 16. It is not. While the AEA permits the President to "provide for the removal of those who, not being permitted to reside within the United States, refuse or neglect to depart therefrom," 50 U.S.C. § 21, it also dictates that they "*shall be* liable to be . . . removed as alien enemies." *Id.* (emphasis added). In this context, where the alien enemies are members of the hostile force itself, the President cannot be required to provide any period of voluntary departure prior to effectuating removal. Indeed, the Act expressly reflects this understanding, as voluntary departure is available only if an alien enemy is "not chargeable with actual hostility, or other crime against public safety." 50 U.S.C. § 22. This is because the AEA's entire purpose would be undercut if active participants in hostilities must be allowed to depart on their own terms.

For that reason, the Proclamation explains that TdA engaged in "mass illegal migration" with the objective of "harming United States citizens," and that this activity undermines public safety, while also enhancing the "Maduro regime's goal of destabilizing democratic nations in the Americas, including the United States." 90 Fed. Reg. at 13,033. So all members of TdA have been so charged under the Proclamation and through their designation as members of a Foreign Terrorist Organization. 90 Fed. Reg. at 13,034. That finding negates Petitioners' assertion that a period of voluntary departure is statutorily required. And Petitioners cite no authority for their conclusory assertion that 50 U.S.C. § 22 "cannot be invoked categorically." Mot. 16. So there is no basis for imposing an arbitrary and uniform period for notice on the government.

## IV. The Remaining Equitable Factors Weigh Strongly in the Government's Favor.

### A. Petitioners have not established irreparable harm.

Because no Petitioner in this case can make a clear showing that irreparable harm is likely without preliminary relief, Petitioners' requested injunction must be denied.

First, Petitioners have not made a showing of likely irreparable harm from "life-threatening conditions, persecution and torture" if removed to El Salvador. Mot. 37. Correctly conceding that "removal does not by itself ordinarily constitute irreparable harm," *id.* (citing *Nken*, 556 U.S. at 435), Petitioners instead emphasize allegations of harsh conditions in Salvadoran prisons. But, as explained above, the United States continues to abide by its policy not to remove aliens to countries where

they are likely to be tortured. *See Munaf*, 553 U.S. at 702; *Arar*, 585 F.3d at 578. Nor have Petitioners demonstrated a likelihood of persecution in El Salvador. Their only evidence to that effect are conclusory "expert" declarations. Mot. 37–38. That is not enough to make the clear showing of likely irreparable harm that is their burden to demonstrate.

And as to Petitioners still in the United States, they can make no showing of irreparable harm either. As explained above, the process provided to Petitioners is adequate to provide them notice and opportunity to meaningfully challenge their designation as an alien enemy or raise any questions of interpretation or constitutionality, which is precisely the judicial review available to Petitioners under the AEA. *J.G.G.*, 145 S. Ct. at 1006. Indeed, the Petitioners in this case have already filed a habeas petition and are receiving due process through those proceedings.

**B. The balance of equities and public interest favor denial of preliminary injunctive relief.**

The balance of harms and the equities strongly favor the government here as an injunction irreparably harms the conduct of foreign policy. An injunction effectively usurps the President's statutory and constitutional authority to address what he has identified as an invasion or predatory incursion by a group undertaking hostile actions and conducting irregular warfare. Such an injunction "deeply intrudes into the core concerns of the executive branch," *Adams*, 570 F.2d at 954, and frustrates the "public interest in effective measures to prevent the entry of illegal aliens," *United States v. Cortez*, 449 U.S. 411, 421 n.4 (1981). The Executive's protection of these interests, including "sensitive and weighty interests of national

security and foreign affairs" inherent to combating terrorist groups, warrants the utmost deference. *Humanitarian Law Project*, 561 U.S. at 33–35; *see also Barr v. DOJ*, 819 F.2d 25, 26 (2d Cir. 1987). Here the government's inability to remove them as quickly as possible—let alone a requirement to facilitate their *return* to the United States—would cause substantial harm to the government and public interest; especially where TdA is a designated foreign terrorist organization whose members threaten the public safety, Smith Decl., ¶¶ 15–25, pose a danger to their government custodians, and take up limited space for detaining aliens, Charles Decl., ECF 72-2 ¶ 9.

Additionally, the Supreme Court has warned of "the danger of unwarranted judicial interference in the conduct of foreign policy." *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 116 (2013); *Biden v. Texas*, 597 U.S. 785, 816 (2022) (Kavanaugh, J., concurring) ("Nothing in the relevant immigration statutes . . . suggests that Congress wanted the Federal Judiciary to improperly second-guess the President's Article II judgment with respect to American foreign policy and foreign relations."). An injunction does just that, impeding the Executive's ability to swiftly remove alien enemies under the Proclamation. *See, e.g.*, *Nken*, 556 U.S. at 436 (noting there "is always a public interest in prompt execution of removal orders" even where an alien asserts a risk of harm, and the interest "may be heightened" if "the alien is particularly dangerous").

An injunction also risks compromising the ability of the United States to negotiate in the future on key foreign-affairs and national-security issues, as foreign

actors may "change their minds regarding their willingness to accept" alien enemies or might otherwise seek to "leverage [any delay] as an ongoing issue." Kozak Decl., ECF 26-2 ¶¶ 3, 4.

Because Petitioners have not shown the balance of the equities and public interest lie in their favor, they have not made this essential showing for injunctive relief.

**Conclusion**

Petitioners' motion for a preliminary injunction should be denied.

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

s/Drew C. Ensign
DREW C. ENSIGN
Deputy Assistant Attorney General
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044-0878
(202) 514-2000
drew.c.ensign@usdoj.gov

AUGUST FLENTJE
Special Counsel for Immigration

TIBERIUS T. DAVIS
Counsel to the Assistant Attorney General

ANTHONY NICASTRO
Acting Director
Office of Immigration Litigation

ERNESTO MOLINA
Deputy Director

*Counsel for Respondents–Defendants*

Dated: May 1, 2025

Case No. 25-cv-1774-JEB

# Exhibit 43

# *ICE Deported Him. His Father Heard Nothing for Months. Then, a Call.*

Merwil Gutiérrez is one of many immigrants across the United States who have been taken into custody by federal authorities, their whereabouts unknown or unclear.

Listen to this article · 9:01 min Learn more

**By Shayla Colon**

Published Aug. 9, 2025 Updated Aug. 12, 2025

The last time that Wilmer Gutiérrez had heard from his son, he was in an immigration detention center in Texas, not far from the border with Mexico. The phone call was brief and urgent.

"Pay attention," his son, Merwil Gutiérrez, said from the facility, his second stop after being arrested in front of his Bronx apartment building. "They are going to take us out again."

Then, he was gone. It was the middle of March. For more than four months, his father would know little about his son's fate.

Mr. Gutiérrez, who had come to New York from Venezuela with his father two years ago seeking asylum, had become one of an increasing number of immigrants taken into custody by federal authorities, their whereabouts unknown or unclear to their families.

It turned out that he had been sent to a notorious maximum-security prison in El Salvador, where he remained for months. Then in July, his relatives received another phone call. This time, they learned that Mr. Gutiérrez, who is 20, was bound for Venezuela, one of more than 200 men who were returned to their homeland in exchange for the release of 10 Americans from Venezuelan custody.

On July 19, at the airport in Caracas, glass doors slid open, and one by one, the formerly incarcerated Venezuelans, many wearing white polo shirts and jeans, walked through. Mr. Gutiérrez emerged, arms open, and his sister leaped toward him.

“God is great,” the sister, Wisleydy Gutiérrez, said in a social media post.

Mr. Gutiérrez’s case illustrates the fraught, frenzied nature of some of the apprehensions undertaken during the Trump administration’s immigration crackdown, which has unfolded amid a national debate about who should be targeted for deportation and who should get to stay in the United States.

Some cases, including those of a Maryland father named Kilmar Armando Abrego Garcia and a makeup artist named Andry Jose Hernandez Romero, received prominent press coverage.

But many others, like Mr. Gutiérrez’s, are playing out beyond the national spotlight, in a nation divided over the Trump administration’s immigration agenda. As the president’s dragnet sweeps up thousands of people, family members have been left behind in the shadows, hoping for a reunion.

Mr. Gutiérrez and his father arrived in the United States in 2023 after reaching the border with Mexico, where they used a Biden-era mobile app to start the process of applying for asylum and were put on a bus to New York City.

They lived quietly in the Bronx, his family said, and Mr. Gutiérrez worked an overnight shift sorting packages near Kennedy Airport. They were continuing the often yearslong effort to obtain asylum and remained without legal status.

On Feb. 24, when he was returning to his apartment building, law enforcement officials descended. They accused Mr. Gutiérrez of gun crimes and arrested him, though there is no indication charges against him were ultimately pursued.



In the Bronx, Merwil Gutiérrez shared an apartment with his father and about six other men, sleeping in cramped quarters. David Dee Delgado for The New York Times

As with many other immigrants detained by the Trump administration, the details of Mr. Gutiérrez's case, some of which were first reported by the news site Documented, remain murky.

On that February day, his cousin Luis Acosta heard a commotion outside of their apartment building and poked his head out of a third-floor window. He said he saw Mr. Gutiérrez talking to two men outside when officers with "N.Y.P.D." and "F.B.I." emblazoned on their clothing swarmed the building.

The agents asked Mr. Gutiérrez which of the men standing outside the building was named Angel. He did not answer the question and instead gave them his own name, Mr. Acosta said. Even though Mr. Gutiérrez was not the man they were looking for, an agent said to take him anyway, Mr. Acosta recalled. With that, Mr. Gutiérrez was handcuffed, pushed into a car and driven away.

Tricia McLaughlin, an assistant secretary with the Department of Homeland Security, said that F.B.I. agents and city police officers had arrested Mr. Gutiérrez on several gun charges, which she said made him a candidate for deportation. The department issued a news release enumerating the charges.

But there is no evidence that authorities in New York sought to follow through on those charges. The Police Department has repeatedly said that there are “no arrests on file” for Mr. Gutiérrez, and no cases connected to him appear in state or federal databases.

A law enforcement official familiar with the circumstances of the arrest who spoke on the condition of anonymity because he was not authorized to speak publicly said that the charges against Mr. Gutiérrez had not been pursued because of insufficient evidence.

Mr. Gutiérrez’s father and cousin spent days searching for him at police precincts and courthouses in the Bronx. No one knew where he was. Mr. Acosta said it was not until he entered his cousin’s name into a locator operated online by the federal Immigration and Customs Enforcement agency that they realized he had been detained in Pennsylvania at a processing center. He had been sent there the day after he was arrested and turned over to ICE.

Then, on March 15, Wilmer Gutiérrez’s phone rang. He heard his son’s voice.

“He was desperate because he had been arrested and locked up without having ever committed a crime,” the father said. “Then he tells me the problem we have right now is that we are Venezuelans, and they want to deport us.”

From Pennsylvania, Merwil Gutiérrez was transferred to the El Valle Detention Facility in Raymondville, Texas.

And then, he was gone, his record erased from the ICE database.

His father said that after he got the phone call, he searched for reports of immigrant flights landing in Venezuela, to no avail.

His worry turned to despair a day later when news broke that the Trump administration had sent three planes carrying 238 Venezuelan migrants to the prison in El Salvador, known as the Terrorism Confinement Center, or CECOT.

Then, CBS News published the names of Venezuelan men on those flights. There, in bold, black letters, appeared the name “Merwil Gutiérrez Flores.”

It was not until The New York Times began investigating Mr. Gutiérrez’s case that federal immigration officials confirmed that he was taken to CECOT.

Darling Restrepo, one of Mr. Gutiérrez’s lawyers, said that she could not understand how Mr. Gutiérrez had been sent to El Salvador based on charges that were never pursued.

“He was just wiped off and disappeared from his building,” she said. “It’s just wrong.”

The Trump administration has repeatedly defended its decision to send hundreds of Venezuelan men to CECOT, claiming that many had ties to or tattoos associated with the street gang Tren de Aragua. Mr. Gutiérrez has no tattoos, according to a federal immigration document and to his family and lawyers, who insist he has never belonged to a gang.




Merwil Gutiérrez, left, and Wilmer Gutiérrez took a picture of themselves on Eighth Avenue in Times Square. David Dee Delgado for The New York Times

Two years have passed since Wilmer Gutiérrez and his son fled Venezuela, where the economy had cratered. They trekked across Colombian mountaintops and wide swaths of the Darién Gap until they reached Mexico.

There, they entered the United States with the assistance of the mobile app, CBP One, which the Biden administration used to allow people to enter the country legally and begin the lengthy process of claiming asylum. The Trump administration has since called the app unlawful and terminated its use.

Father and son put themselves to work in hopes of earning enough money to return to Venezuela in a couple of years.

At the end of long shifts, they would retreat to an apartment where they lived with about six other men, sleeping in bunk beds.

Since February, Wilmer Gutiérrez had stared at his son's bed wondering if he would ever see him resting there again.

Then came a call last month from his daughter, who told him the United States was devising a prisoner swap and her brother was being freed from CECOT.

The next day, Merwil Gutiérrez boarded a plane to Venezuela. Thousands of miles away, his father waited, calling his relatives there for updates and praying.

Several days later, his phone rang once more. It was his son, speaking through tears as he described his time in the penitentiary in El Salvador. Now, he was back in Venezuela, living with his family.

"He tells me that he was asking God every day for him to give strength to us family members," Wilmer Gutiérrez said, "and to give him strength to continue standing."

**Shayla Colon** is a reporter covering New York City and a member of the 2024-25 Times Fellowship class, a program for journalists early in their careers.

---

A version of this article appears in print on , Section MB, Page 4 of the New York edition with the headline: A Father's Anxious Vigil Ends With a Son's Call

Case No. 25-cv-1774-JEB

# Exhibit 44

# EXHIBIT 1

[LOGO] **Report on Enforced or Involuntary Disappearances** [LOGO]

**El Salvador**

**Case No:** [redacted]
SURNAME(S): [redacted]
Name(s): [redacted]
Date of transmission: **March 26, 2025**
Case solved: **No**

Country(ies) in copy: United States of America, Venezuela (Bolivarian Republic of)

## I. Identity details of the person

SURNAME(S): [redacted] Name(s): [redacted]
Gender: Male
Nationality: Venezuela (Bolivarian Republic of)

## II.1 Date when the person was last seen **March 26, 2025**

## III.1 Place where the person was last seen

City: Arizona District:
Province: Country: United States of America
Place Taken/Seen: DETENTION CENTER

## VI. Complainant(s)

Confidential Date: March 23, 2025
Confidential Date: March 26, 2025

## VII. Other elements of the complaint

**Session:** **136**

**INFORMATION FROM THE SOURCE** Date: March 23, 2025

Case 1:25-cv-00766-JEB Document 16-1 Filed 03/22/25 Page 842 of 920

[LOGO] [LOGO]

**Report on Enforced or Involuntary Disappearances**



**El Salvador** **10015288**

[LOGO] **Report on Enforced or Involuntary Disappearances** [LOGO]

Mr. [redacted] a Venezuelan national and holder of United States non-citizen number ("A Number") [redacted], was in the custody of Immigration and Customs Enforcement (ICE) in Arizona when he was allegedly deported from the United States of America to El Salvador, as part of the mass deportations that took place since March 15, 2025.

Persons associated with Mr. [redacted] stated that his name disappeared from the United States' ICE Online Detention Locator since that date.

On March 21, 2025, persons associated with Mr. [redacted] identified his name on a list of persons allegedly deported from the United States of America to El Salvador, which was published by a local media outlet. However, according to the information received, to date, neither the Government of El Salvador nor the Government of the United States has published official information on the list of deported persons or their current place of detention.

At the time of this communication, the fate and whereabouts of Mr. [redacted] remain unknown.

Sent to the Government: March 26, 2025

**Session: 136**

**INFORMATION FROM THE GOVERNMENT** Date: April 03, 2025

According to information received from the Government of El Salvador:
"The State of El Salvador herewith wishes to refer to the communications from the Working Group on Enforced or Involuntary Disappearances with reference G/SO/217/1/SLV (...) which state that the aforementioned Group has received information on "alleged enforced disappearances in El Salvador, in the context of mass deportations carried out between the Government of the United States of America and El Salvador" (...).

The Salvadoran State has conducted a detailed analysis of the claims presented in the communications sent by the Working Group, which indicate that the persons mentioned: i) were in the custody of the United States Immigration and Customs Enforcement (ICE); ii) were allegedly deported to El Salvador on March 15, 2025; iii) ceased to appear in ICE's Online Detainee Locator System as of that date; iv) were identified on a list of deportees published by a local media outlet1; and v) their fate and whereabouts are unknown.

In response to the above, the State of El Salvador provides its response to these communications, presenting its observations and specific requests for the due attention of the Working Group.

1. On the lack of grounds for the request for information from the State of El Salvador.

The Salvadoran State emphatically states that its authorities have not arrested, detained, or transferred the persons referred to in the communications of the Working Group. The actions of the State of El Salvador have been limited to the implementation of a bilateral cooperation mechanism with another State, through which it has facilitated the use of the Salvadoran prison infrastructure for the custody of persons detained within the scope of the justice system and law enforcement of that other State. In this context, the jurisdiction and legal responsibility for these persons lie exclusively with the competent foreign authorities, by virtue of international agreements signed and in accordance with the principles of sovereignty and international cooperation in criminal matters.

In this regard, the actions attributable to the Salvadoran State are limited to its sovereignty and territorial jurisdiction, and therefore it cannot be held responsible for the failure to observe the principle of non-refoulement with respect to the persons mentioned.

2. On the absence of elements constituting enforced disappearance attributable to the State of El Salvador.

In this regard, the State of El Salvador emphasizes that the claims presented do not attribute any direct action to the Salvadoran State that meets the definition of enforced disappearance under international law and the working methods of the Working Group.

The definition of enforced disappearance, as established in the International Convention for the Protection of All Persons from Enforced Disappearance, the Inter-American Convention on Enforced Disappearance of Persons, the Rome Statute, and the jurisprudence of regional human rights systems, requires the concurrence of specific elements: deprivation of liberty by state agents or persons acting with their acquiescence, followed by a refusal to acknowledge that deprivation of liberty or to reveal the person's whereabouts, whereas in the present case, the claims are based on the alleged disappearance of the persons indicated, derived from the absence of their names in a system administered by a foreign authority—the United States Immigration and Customs Enforcement—and in a publication by a non-official media outlet whose operations are not registered in El Salvador.

The Working Methods of the Working Group on Enforced or Involuntary Disappearances require that communications specify the measures taken by relatives or representatives to determine the person's whereabouts, including the exhaustion of domestic remedies. It should be noted that the claims presented do not meet this requirement. Consequently, failure to comply with the decisions or information mechanisms of foreign authorities cannot be attributed to the State of El Salvador, nor does it constitute a valid basis for the Working Group to request information from it.

3. On the proper registration of these cases by the Working Group on Enforced Disappearances.

In response to the Working Group's statement that these cases are only included in the statistics of the Government of El Salvador, the State notes that, according to the Working Methods of the Working Group on Enforced or Involuntary Disappearances, a case must only be included in the statistics of the State under whose jurisdiction the person was deprived of liberty or last seen. These conditions are not met in the cases mentioned with regard to the State of El Salvador, since those persons were not under the jurisdiction of the Salvadoran State at the time of their alleged deprivation of liberty or when they were last seen.

Consistent with the above, the State respectfully requests the Working Group to exclude the cases of (...) from the statistics and from any records pertaining to El Salvador.

Finally, El Salvador reiterates its commitment to complying with its international human rights obligations, including the prevention of enforced disappearances, in accordance with Human Rights Council Resolution 7/12. To this end, it confirms that it has a solid institutional framework and domestic regulations that constitute a framework for the protection and guarantee of the rights of persons deprived of liberty, regardless of their nationality.

[…]

[LOGO] [LOGO]

**Report on Enforced or Involuntary Disappearances**

**El Salvador**

**Case No:** [redacted]
SURNAME(S): [redacted]
Name(s): [redacted]
Date of transmission: **March 26, 2025**
Case solved: **No**

Country(ies) in copy: United States of America, Venezuela (Bolivarian Republic of)

## I. Identity details of the person

SURNAME(S): [redacted] Name(s): [redacted]
Gender: Male
Nationality: Venezuela (Bolivarian Republic of)
Identity: IDENTITY CARD Date: No.: [redacted]
Place: Country: El Salvador

## II.1 Date when the person was last seen

**March 26,2025**

## III.1 Place where the person was last seen

City: El Valle District:
Province: Texas Country: United States of America

## VI. Complainant(s)

Confidential Date: March 23, 2025

## VII. Other elements of the complaint

**Session:** **136**

**INFORMATION FROM THE SOURCE** Date: March 23, 2025

[LOGO] [LOGO]

**Report on Enforced or Involuntary Disappearances**

Mr. [redacted], a Venezuelan national and holder of “A” Number [redacted], was in the custody of ICE in El Valle, Texas when he was allegedly deported from the United States of America to El Salvador, as part of the mass deportations that took place since March 15, 2025. Persons associated with Mr. [redacted] stated that his name disappeared from the United States’ ICE Online Detainee Locator System on the same day.

It has been reported that persons associated with Mr. [redacted] spoke with him on the morning of March 15, 2025, when he told them that immigration agents had informed him that he would be deported “soon.”

On March 21, 2025, persons associated with Mr. [redacted] identified his name on a list of persons allegedly deported from the United States of America to El Salvador, which was published by a local media outlet.
However, according to the information received, to date, neither the Government of El Salvador nor the Government of the United States has published official information on the list of deported persons or their current place of detention.

At the time of this communication, the fate and whereabouts of Mr. [redacted] remain unknown.

Sent to the Government: March 26, 2025

**Session: 136**

**INFORMATION FROM THE GOVERNMENT** Date: April 03, 2025

According to information received from the Government of El Salvador:
"The State of El Salvador herewith wishes to refer to the communications from the Working Group on Enforced or Involuntary Disappearances with reference G/SO/217/1/SLV (...) which state that the aforementioned Group has received information on "alleged enforced disappearances in El Salvador, in the context of mass deportations carried out between the Government of the United States of America and El Salvador" (...).
The Salvadoran State has conducted a detailed analysis of the claims presented in the communications sent by the Working Group, which indicate that the persons mentioned: i) were in the custody of the United States Immigration and Customs Enforcement (ICE); ii) were allegedly deported to El Salvador on March 15, 2025; iii) ceased to appear in ICE's Online Detainee Locator System as of that date; iv) were identified on a list of deportees published by a local media outlet1; and v) their fate and whereabouts are unknown.
In response to the above, the State of El Salvador provides its response to these communications, presenting its observations and specific requests for the due attention of the Working Group.
1. On the lack of grounds for the request for information from the State of El Salvador.
The Salvadoran State emphatically states that its authorities have not arrested, detained, or transferred the persons referred to in the communications of the Working Group. The actions of the State of El Salvador have been limited to the implementation of a bilateral cooperation mechanism with another State, through which it has facilitated the use of the Salvadoran prison infrastructure for the custody of persons detained within the scope of the justice system and law enforcement of that other State. In this context, the jurisdiction and legal responsibility for these persons lie exclusively with the competent foreign authorities, by virtue of international agreements signed and in accordance with the principles of sovereignty and international cooperation in criminal matters.
In this regard, the actions attributable to the Salvadoran State are limited to its sovereignty and territorial jurisdiction, and therefore it cannot be held responsible for the failure to observe the principle of non-refoulement with respect to the persons mentioned.
2. On the absence of elements constituting enforced disappearance attributable to the State of El Salvador.
In this regard, the State of El Salvador emphasizes that the allegations presented do not attribute any direct action to the Salvadoran State that meets the definition of enforced disappearance under international law and the working methods of the Working Group.

The definition of enforced disappearance, as established in the International Convention for the Protection of All Persons from Enforced Disappearance, the Inter-American Convention on Enforced Disappearance of Persons, the Rome Statute, and the jurisprudence of regional human rights systems, requires the concurrence of specific elements: deprivation of liberty by state agents or persons acting with their acquiescence, followed by a refusal to acknowledge that deprivation of liberty or to reveal the person's whereabouts, whereas in the present case, the claims are based on the alleged disappearance of the persons indicated, derived from the absence of their names in a system administered by a foreign authority—the United States Immigration and Customs Enforcement—and in a publication by a non-official media outlet whose operations are not registered in El Salvador.

The Working Methods of the Working Group on Enforced or Involuntary Disappearances require that communications specify the measures taken by relatives or representatives to determine the person's whereabouts, including the exhaustion of domestic remedies. It should be noted that the claims presented do not meet this requirement. Consequently, failure to comply with the decisions or information mechanisms of foreign authorities cannot be attributed to the State of El Salvador, nor does it constitute a valid basis for the Working Group to request information from it.
3. On the proper registration of these cases by the Working Group on Enforced Disappearances.
In response to the Working Group's statement that these cases are only included in the statistics of the Government of El Salvador, the State notes that, according to the Working Methods of the Working Group on Enforced or Involuntary Disappearances, a case must only be included in the statistics of the State under whose jurisdiction the person was deprived of liberty or last seen. These conditions are not met in the cases mentioned with regard to the State of El Salvador, since those persons were not under the jurisdiction of the Salvadoran State at the time of their alleged deprivation of liberty or when they were last seen.

Consistent with the above, the State respectfully requests the Working Group to exclude the cases of (...) from the statistics and from any records pertaining to El Salvador.
Finally, El Salvador reiterates its commitment to complying with its international human rights obligations, including the prevention of enforced disappearances, in accordance with Human Rights Council Resolution 7/12. To this end, it confirms that it has a solid institutional framework and domestic regulations that constitute a framework for the protection and guarantee of the rights of persons deprived of liberty, regardless of their nationality.

[…]

[LOGO] [LOGO]

**Report on Enforced or Involuntary Disappearances**

## El Salvador

**Case No:** [redacted]
SURNAME(S): [redacted]
Name(s): [redacted]
Date of transmission: **April 16, 2025**
Case solved: **No**

Country(ies) in copy: United States of America, Venezuela (Bolivarian Republic of)

## I. Identity details of the person

SURNAME(S): [redacted] Name(s): [redacted]

Gender: Male

Nationality: Venezuela (Bolivarian Republic of)

Identity: IDENTITY CARD Date: No.: [redacted]

Place: Country: El Salvador

## II.1 Date when the person was last seen

**March 26,2025**

## III.1 Place where the person was last seen

City: El Valle District:

Province: Texas Country: United States of America

## VI. Complainant(s)

Confidential Date: March 23, 2025

## VII. Other elements of the complaint

**Session: 136**

**INFORMATION FROM THE SOURCE** Date: March 23, 2025

Mr. [redacted], a Venezuelan national and holder of “A” Number [redacted], was in the custody of ICE in El Valle, Texas since December 2024 when he was allegedly deported from the United States of America to El Salvador, as part of the mass deportations that took place since March 15, 2025. Persons associated with Mr. [redacted] stated that his name disappeared from the United States’ ICE Online Detainee Locator System on the same day.

On March 21, 2025, persons associated with Mr. [redacted] identified his name on a list of persons allegedly deported from the United States of America to El Salvador, which was published by a local media outlet.

However, according to the information received, to date, neither the Government of El Salvador nor the Government of the United States has published official information on the list of deported persons or their current place of detention.

At the time of this communication, the fate and whereabouts of Mr. [redacted] remain unknown.

**El Salvador** **10015290**

Sent to the Government: April 16, 2025

**Session: 136**

**INFORMATION FROM THE GOVERNMENT** Date: April 03, 2025

[LOGO] [LOGO]



According to information received from the Government of El Salvador:
"The State of El Salvador herewith wishes to refer to the communications from the Working Group on Enforced or Involuntary Disappearances with reference G/SO/217/1/SLV (...) which state that the aforementioned Group has received information on "alleged enforced disappearances in El Salvador, in the context of mass deportations carried out between the Government of the United States of America and El Salvador" (...).

The Salvadoran State has conducted a detailed analysis of the claims presented in the communications sent by the Working Group, which indicate that the persons mentioned: i) were in the custody of the United States Immigration and Customs Enforcement (ICE); ii) were allegedly deported to El Salvador on March 15, 2025; iii) ceased to appear in ICE's Online Detainee Locator System as of that date; iv) were identified on a list of deportees published by a local media outlet1; and v) their fate and whereabouts are unknown.

In response to the above, the State of El Salvador provides its response to these communications, presenting its observations and specific requests for the due attention of the Working Group.

1. On the lack of grounds for the request for information from the State of El Salvador.

The Salvadoran State emphatically states that its authorities have not arrested, detained, or transferred the persons referred to in the communications of the Working Group. The actions of the State of El Salvador have been limited to the implementation of a bilateral cooperation mechanism with another State, through which it has facilitated the use of the Salvadoran prison infrastructure for the custody of persons detained within the scope of the justice system and law enforcement of that other State. In this context, the jurisdiction and legal responsibility for these persons lie exclusively with the competent foreign authorities, by virtue of international agreements signed and in accordance with the principles of sovereignty and international cooperation in criminal matters.

In this regard, the actions attributable to the Salvadoran State are limited to its sovereignty and territorial jurisdiction, and therefore it cannot be held responsible for the failure to observe the principle of non-refoulement with respect to the persons mentioned.

2. On the absence of elements constituting enforced disappearance attributable to the State of El Salvador.

In this regard, the State of El Salvador emphasizes that the allegations presented do not attribute any direct action to the Salvadoran State that meets the definition of enforced disappearance under international law and the working methods of the Working Group.

The definition of enforced disappearance, as established in the International Convention for the Protection of All Persons from Enforced Disappearance, the Inter-American Convention on Enforced Disappearance of Persons, the Rome Statute, and the jurisprudence of regional human rights systems, requires the concurrence of specific elements: deprivation of liberty by state agents or persons acting with their acquiescence, followed by a refusal to acknowledge that deprivation of liberty or to reveal the person's whereabouts, whereas in the present case, the claims are based on the alleged disappearance of the persons indicated, derived from the absence of their names in a system administered by a foreign authority—the United States Immigration and Customs Enforcement—and in a publication by a non-official media outlet whose operations are not registered in El Salvador.

The Working Methods of the Working Group on Enforced or Involuntary Disappearances require that communications specify the measures taken by relatives or representatives to determine the person's whereabouts, including the exhaustion of domestic remedies. It should be noted that the claims presented do not meet this requirement. Consequently, failure to comply with the decisions or information mechanisms of foreign authorities cannot be attributed to the State of El Salvador, nor does it constitute a valid basis for the Working Group to request information from it.

3. On the proper registration of these cases by the Working Group on Enforced Disappearances.

In response to the Working Group's statement that these cases are only included in the statistics of the Government of El Salvador, the State notes that, according to the Working Methods of the Working Group on Enforced or Involuntary Disappearances, a case must only be included in the statistics of the State under whose jurisdiction the person was deprived of liberty or last seen. These conditions are not met in the cases mentioned with regard to the State of El Salvador, since those persons were not under the jurisdiction of the Salvadoran State at the time of their alleged deprivation of liberty or when they were last seen.

Consistent with the above, the State respectfully requests the Working Group to exclude the cases of (...) from the statistics and from any records pertaining to El Salvador.

Finally, El Salvador reiterates its commitment to complying with its international human rights obligations, including the prevention of enforced disappearances, in accordance with Human Rights Council Resolution 7/12. To this end, it confirms that it has a solid institutional framework and domestic regulations that constitute a framework for the protection and guarantee of the rights of persons deprived of liberty, regardless of their nationality.

[…]

[LOGO] **Report on Enforced or Involuntary Disappearances** [LOGO]

**El Salvador**

**Case No:** [redacted]
SURNAME(S): [redacted]
Name(s): [redacted]
Date of transmission: **April 16, 2025**
Case solved: **No**

Country(ies) in copy: United States of America, Venezuela (Bolivarian Republic of)

## I. Identity details of the person

SURNAME(S): [redacted] Name(s): [redacted]
Gender: Male
Age: Date of birth: [redacted]
Parents: [redacted]

Nationality: Venezuela (Bolivarian Republic of)
Civil status: [redacted]
Residence: [redacted]
Identity: IDENTITY CARD Date: No.: [redacted]

Place: Country: El Salvador

## II.1 Date that the person was detained **March 2024**

## III.1 Place where the person was detained

Province: Country: United States of America

## II.2 Date when the person was last seen **March 15, 2025**

## III.2 Place where the person was last seen

Place: Webb County Detention Center
City: Laredo District:

Province: Texas Country: United States of America

## V. Procedures carried out

INVESTIGATIONS IN Date: [redacted]
Place: [redacted]

[LOGO] **Report on Enforced or Involuntary Disappearances** [LOGO]

Report

Date: [redacted]

Place: [redacted]



**El Salvador** **10015365**

## VI. Complainant(s)

Confidential Date: April 08, 2025

## VII. Other elements of the report

**Session: 136**

**INFORMATION FROM THE GOVERNMENT** Date: April 03, 2025

According to information received from the Government of El Salvador:
"The State of El Salvador herewith wishes to refer to the communications from the Working Group on Enforced or Involuntary Disappearances with reference G/SO/217/1/SLV (...) which state that the aforementioned Group has received information on "alleged enforced disappearances in El Salvador, in the context of mass deportations carried out between the Government of the United States of America and El Salvador" (...).

The Salvadoran State has conducted a detailed analysis of the claims presented in the communications sent by the Working Group, which indicate that the persons mentioned: i) were in the custody of the United States Immigration and Customs Enforcement (ICE); ii) were allegedly deported to El Salvador on March 15, 2025; iii) ceased to appear in ICE's Online Detainee Locator System as of that date; iv) were identified on a list of deportees published by a local media outlet1; and v) their fate and whereabouts are unknown.

In response to the above, the State of El Salvador states that it has responded to previous communications from the Working Group on alleged disappearances of persons of Venezuelan nationality, in particular through Note B1592025, dated April 3 of this year, which pointed out the lack of grounds for requesting information from the State of El Salvador, as well as the lack of elements that would constitute an enforced disappearance attributable to the State of El Salvador. It therefore requested that the cases be excluded from El Salvador's statistics, in accordance with the working methods of the Working Group on Enforced or Involuntary Disappearances, since those persons were not under the jurisdiction of the Salvadoran State at the time of their alleged deprivation of liberty or when they were last seen.

In response to the above, the State of El Salvador states that it has responded to previous communications from the Working Group on alleged disappearances of persons of Venezuelan nationality, in particular through Note B1592025, dated April 3 of this year, which pointed out the lack of grounds for requesting information from the State of El Salvador, as well as the lack of elements that would constitute an enforced disappearance attributable to the State of El Salvador. It therefore requested that the cases be excluded from El Salvador's statistics, in accordance with the working methods of the Working Group on Enforced or Involuntary Disappearances, since those persons were not under the jurisdiction of the Salvadoran State at the time of their alleged deprivation of liberty or when they were last seen.

The State reiterates each of the terms of its previous communication, in particular that:
i its authorities have not arrested, detained, or transferred the persons referred to in the Working Group's communications.
ii the actions of the State of El Salvador have been limited to the implementation of a bilateral cooperation mechanism on prison matters with another State,
iii it has only facilitated the use of Salvadoran prison infrastructure for the reception and custody of persons detained within the scope of the justice system and law enforcement of another State,
iv the jurisdiction and legal responsibility for these persons lie exclusively with the competent foreign authorities, by virtue of international agreements signed and in accordance with the principles of sovereignty and international cooperation in criminal matters,
v the actions attributable to the Salvadoran State are limited to its sovereignty and territorial jurisdiction,
vi the claims presented do not attribute any direct action to the Salvadoran State that meets the definition of enforced disappearance under international law and the working methods of the Working Group, vii) there are no valid grounds for the Working Group to request information from El Salvador, and
vii El Salvador is committed to complying with its international human rights obligations, including the prevention of enforced disappearances, in accordance with Human Rights Council Resolution 7/12. To this end, it confirms that it has a solid institutional framework and domestic regulations that constitute a framework for the protection and guarantee of the rights of persons deprived of liberty, regardless of their nationality.

Consequently, it REQUESTS the Working Group on Enforced Disappearances to:

1. Consider the response of the State of El Salvador to communication G/SO/217/1/SLV dated April 16, 2025, as having been submitted.
2. Exclude from the statistics and any records pertaining to El Salvador the cases referred to in the communication, as their registration does not comply with the provisions of the Working Methods of the Working Group on Enforced or Involuntary Disappearances, which state that a case must only be included in the statistics of the State under whose jurisdiction the person was deprived of liberty or last seen, conditions that are not met in the cases mentioned with regard to the Salvadoran State at the time of their alleged deprivation of liberty or when they were last seen."

**Session:** **136**

**INFORMATION FROM THE SOURCE** Date: April 08, 2025

[LOGO] [LOGO]

**Report on Enforced or Involuntary Disappearances**

Mr. [redacted] (identified as Mr. [redacted] in U.S. immigration records), a Venezuelan national and holder of identity card number [redacted], was in custody at the Webb County Detention Center (Laredo, Texas) when he was allegedly deported from the United States of America to El Salvador as part of the mass deportations that have taken place since March 15, 2025.

Mr. [redacted] had been in custody at the Moshannon Valley Processing Center (Philipsburg, Pennsylvania) since May 2024. A judge ordered his removal on December 2, 2024. He was subsequently transferred to a detention center in El Paso, Texas, and on March 10, 2025, he was transferred to the Webb County Detention Center.

On March 14, 2025, Immigration and Customs Enforcement (ICE) officials reportedly informed Mr. [redacted] that he would be removed from the center. Persons associated with Mr. [redacted] claim that after this date, they were unable to find his information on the ICE Online Detainee Locator System, implying that Mr. [redacted] had been released or deported.

On March 15, 2024, it was reported that the bus transporting Mr. [redacted] broke down and he was returned to the Webb County Detention Center. Mr. [redacted] informed persons associated with him that his departure had been rescheduled for around 3 p.m. Central Time.

Since this call, persons associated with Mr. [redacted] have been unable to contact him. Furthermore, persons associated with him have requested assistance from his congressional representative's office. According to the information received, the congressional office has requested information from the U.S. Department of Homeland Security and is awaiting a response.

In addition, persons associated with him have [redacted].

At the time of this communication, the fate and whereabouts of Mr. [redacted] remain unknown.

Sent to the Government: April 16, 2025

Case 1:25-cv-00766-JEB Document 160-1 Filed 08/20/25 Page 519 of 920

CapitalLinguists

**Capital Linguists LLC.** **Tel:** 833-888-6588 **Email:** info@capitallinguists.com
https://capitallinguists.com **Address:** 8158 Front Street, Derwood, MD 20855, USA.

# Certification of Translation Accuracy

Translation of "**Report on Enforced or Involuntary Disappearances**" from **Spanish** to **English**.

We, Capital Linguists LLC, a professional translation company, hereby certify that the above-mentioned document(s) has (have) been translated by experienced and qualified professional translators and that, in our best judgment, the translated text truly reflects the content, meaning, and style of the original text and constitutes in every respect a correct and true translation of the original document.

This is to certify the correctness of the translation only. We do not guarantee that the original is a genuine document, or that the statements contained in the original document are true. Furthermore, Capital Linguists LLC assumes no liability for the way in which the translation is used by the customer or any third party, including end users of the translation.

I declare under penalty of perjury that the foregoing is true and correct.

A copy of the translation is attached to this certification.

**Signature:**

Bruno Cardoso, Project Manager

Capital Linguists LLC
Dated: July 3, 2025

## El Salvador

**Caso No:** [redacted]

APELLIDO(S): [redacted]

Nombre(s): [redacted]

Fecha de transmisión: **26-mar.-2025**

Caso aclarado: **No**

País en copia: Estados Unidos de América, Venezuela (República Bolivariana de)

## I. Datos de identidad de la persona

APELLIDO(S): [redacted] Nombre(s): [redacted]

Sexo: Masculino

Nacionalidad: Venezuela (República Bolivariana de)

## II.1 Fecha en que la persona fue vista por ultima vez

**26-mar.-2025**

## III.1 Luguar en que la persona fue vista por ultima vez

Ciudad: Arizona

Distrito:

Provincia:

País: Estados Unidos de América

Medio de

Tomado / Visto: CENTRO DE DETENCION

## VI. Denunciantes(s)

Confidential — Fecha: 23-mar.-2025

Confidential — Fecha: 26-mar.-2025

## VII. Otros elementos de la denuncia

**Sesión: 136**

**INFORMACIÓN DE LA FUENTE** — Fecha: 23-mar.-2025

El Sr. [redacted], nacional de Venezuela y titular del número de no-ciudadano de los Estados Unidos ("Número A") [redacted], se encontraba bajo custodia del Immigration Customs Enforcement (ICE) en Arizona cuando fue presuntamente deportado de los Estados Unidos de América a El Salvador, como parte de las deportaciones masivas que tuvieron lugar desde el 15 de marzo de 2025.

Personas asociadas con el Sr. [redacted] afirmaron que su nombre dejó de aparecer en el Sistema de Localización de Detenidos en Línea del Servicio de ICE de los Estados Unidos desde ese día.

El 21 de marzo de 2025, personas asociadas con el Sr. [redacted] identificaron su nombre en una lista de personas presuntamente deportadas de los Estados Unidos de América a El Salvador publicada por un medio de comunicación local. Sin embargo, según la información recibida, hasta la fecha, ni el Gobierno de El Salvador ni el Gobierno de los Estados Unidos no ha publicado información oficial sobre la lista de personas deportadas ni su actual lugar de detención.

Al momento de la presente comunicación, la suerte y paradero del Sr. [redacted] siguen siendo desconocidos.

Enviado al Gobierno: 26-mar.-2025

**Sesión: 136**

**INFORMACIÓN DEL GOBIERNO** Fecha: 03-abr.-2025

Según información recibida por el Gobierno de El Salvador:
"El Estado de El Salvador atentamente se refiere a las comunicaciones del Grupo de Trabajo sobre Desapariciones Forzadas o Involuntarias con referencia G/SO/217/1/SLV (…) por medio de las cuales se comunica que el citado Grupo ha recibido información sobre "presuntas desapariciones forzadas en El Salvador, en el marco de deportaciones masivas llevadas a cabo entre el Gobierno de los Estados Unidos de América y El Salvador" (…).
El Estado salvadoreño ha analizado detenidamente las alegaciones presentadas en las comunicaciones que han sido remitidas por el Grupo de Trabajo, las cuales señalan que las personas mencionadas: i) se encontraban bajo custodia del Servicio de Inmigración y Control de Aduanas de los Estados Unidos (ICE -por sus siglas en inglés-); ii) fueron presuntamente deportadas a El Salvador el 15 de marzo de 2025; iii) dejaron de aparecer en el sistema de localización de detenidos en línea del ICE desde aquella fecha; iv) fueron identificadas en una lista de deportados publicada por un medio de comunicación local1; y v) su suerte y paradero son desconocidos.
En atención a lo anterior, el Estado de El Salvador brinda su repuesta a estas comunicaciones, sobre las que presenta sus observaciones y solicitudes específicas para la debida atención del Grupo de Trabajo.
1. Sobre la ausencia de fundamentos para el requerimiento de información al Estado de El Salvador.
El Estado salvadoreño es enfático en señalar que sus autoridades no han realizado arrestos, detenciones, ni traslados de las personas referidas en las comunicaciones del Grupo de Trabajo. La actuación del Estado de El Salvador se ha circunscrito a la implementación de un mecanismo de cooperación bilateral con otro Estado, mediante el cual se ha facilitado el uso de infraestructura penitenciaria salvadoreña para la custodia de personas detenidas en el marco del sistema de justicia y aplicación de la ley de ese otro Estado. En este contexto, la jurisdicción y la responsabilidad legal sobre dichas personas recaen exclusivamente en las autoridades extranjeras competentes, en virtud de acuerdos internacionales suscritos y en conformidad con los principios de soberanía y cooperación internacional en materia penal.
En ese sentido, las acciones atribuibles al Estado salvadoreño se circunscriben a su soberanía y jurisdicción territorial, por lo que tampoco le es atribuible la inobservancia del principio de no devolución (non-refoulement) respecto de las personas mencionadas.
2. Sobre la ausencia de elementos que configuren una desaparición forzada atribuible al Estado de El Salvador
Al respecto, el Estado de El Salvador subraya que las alegaciones presentadas no atribuyen ninguna acción directa al Estado salvadoreño que se ajuste a la definición de desaparición forzada conforme al derecho internacional y a los métodos de trabajo del Grupo de Trabajo.

La definición de desaparición forzada, tal como se establece en la Convención Internacional para la Protección de Todas las Personas contra las Desapariciones Forzadas, la Convención Interamericana sobre Desaparición Forzada de Personas, el Estatuto de Roma y la jurisprudencia de los sistemas regionales de derechos humanos, exige la concurrencia de elementos específicos: privación de libertad por agentes estatales o personas que actúan con su aquiescencia, seguida de la negativa a reconocer dicha privación o revelar el paradero de la persona, siendo que en el presente caso, las alegaciones se basan en la supuesta desaparición de las personas señaladas, derivada de la ausencia de sus nombres en un sistema que es administrado por una autoridad extranjera -Servicio de Inmigración y Control de Aduanas de los Estados Unidos- y en una publicación de un medio de comunicación no oficial, cuyas operaciones no están registradas en El Salvador.

Los Métodos de trabajo del Grupo de Trabajo sobre Desapariciones Forzadas o Involuntarias exigen que las comunicaciones especifiquen las medidas adoptadas por los familiares o representantes para determinar el paradero de la persona, incluyendo el agotamiento de recursos internos. Cabe destacar que las alegaciones presentadas no cumplen con este requisito. En consecuencia, la inconformidad con decisiones o mecanismos de información de autoridades extranjeras no puede atribuirse al Estado de El Salvador ni constituye un fundamento válido para que el Grupo de Trabajo le requiera información.
3. Sobre el debido registro de estos casos por el Grupo de Trabajo sobre la Desaparición Forzada
En atención a lo comunicado por el Grupo de Trabajo, sobre que estos casos sólo se contabilizan en las estadísticas del Gobierno de El Salvador, el Estado advierte que según estipulan los Métodos de trabajo del Grupo de Trabajo sobre Desapariciones Forzadas o Involuntarias, un caso solo debe figurar en las estadísticas del Estado bajo cuya jurisdicción la persona fue privada de libertad o vista por última vez, condiciones que no se cumplen en los casos mencionados en lo que respecta al Estado de El Salvador, ya que dichas personas no se encontraban bajo la jurisdicción del Estado salvadoreño al momento de su presunta privación de libertad o última vez que fueron vistas.

En coherencia y por las razones expuestas, el Estado solicita respetuosamente al Grupo de Trabajo la exclusión de los casos de (….) de las estadísticas y de cualquier registro correspondiente a El Salvador.
Finalmente, El Salvador reitera su compromiso con el cumplimiento de sus obligaciones internacionales en materia de derechos humanos, incluyendo la prevención de desapariciones forzadas, conforme a la Resolución 7/12 del Consejo de Derechos Humanos, para lo cual confirma que cuenta con una institucionalidad sólida y con regulaciones en su derecho interno que constituyen un marco de protección y de garantía para los derechos de las personas privadas de libertad, con independencia de su nacionalidad.

[…]

## El Salvador

**Caso No:** [redacted]
APELLIDO(S): [redacted]
Nombre(s): [redacted]
Fecha de transmisión: **26-mar.-2025**
Caso aclarado: **No**
País en copia: Estados Unidos de América, Venezuela (República Bolivariana de)

### I. Datos de identidad de la persona

APELLIDO(S): [redacted] Nombre(s): [redacted]
Sexo: Masculino
Nacionalidad: Venezuela (República Bolivariana de)
Identidad: CEDULA DE IDENTIDAD Fecha: No.: [redacted]
Lugar: País: El Salvador

### II.1 Fecha en que la persona fue vista por ultima vez

**26-mar.-2025**

### III.1 Luguar en que la persona fue vista por ultima vez

Ciudad: El Valle Distrito:
Provincia: Texas País: Estados Unidos de América

### VI. Denunciantes(s)

Confidential Fecha: 23-mar.-2025

### VII. Otros elementos de la denuncia

**Sesión: 136**

**INFORMACIÓN DE LA FUENTE** Fecha: 23-mar.-2025

El Sr. [redacted], nacional de Venezuela y titular del número "A" [redacted] se encontraba bajo custodia del ICE en El Valle, Texas, cuando presuntamente fue deportado de los Estados Unidos de América a El Salvador, como parte de las deportaciones masivas que tuvieron lugar desde el 15 de marzo de 2025. Personas asociadas con el Sr. [redacted] afirmaron que su nombre dejó de aparecer en el Sistema de Localización de Detenidos en Línea del ICE de los Estados Unidos ese mismo día.

Se ha informado que personas asociadas con el Sr. [redacted] hablaron con él la mañana del 15 de marzo de 2025, cuando él les indicó que agentes de inmigración le informaron que sería deportado "pronto".

El 21 de marzo de 2025, personas asociadas con el Sr. [redacted] identificaron su nombre en una lista de personas presuntamente deportadas de los Estados Unidos de América a El Salvador publicada por un medio de comunicación local.
Sin embargo, según la información recibida, hasta la fecha, ni el Gobierno de El Salvador ni el Gobierno de los Estados Unidos no ha publicado información oficial sobre la lista de personas deportadas ni su actual lugar de detención.

Al momento de la presente comunicación, la suerte y el paradero del Sr. [redacted] siguen siendo desconocidos.

Enviado al Gobierno: 26-mar.-2025

**Sesión: 136**

**INFORMACIÓN DEL GOBIERNO** Fecha: 03-abr.-2025

Según información recibida por el Gobierno de El Salvador:
"El Estado de El Salvador atentamente se refiere a las comunicaciones del Grupo de Trabajo sobre Desapariciones Forzadas o Involuntarias con referencia G/SO/217/1/SLV (…) por medio de las cuales se comunica que el citado Grupo ha recibido información sobre "presuntas desapariciones forzadas en El Salvador, en el marco de deportaciones masivas llevadas a cabo entre el Gobierno de los Estados Unidos de América y El Salvador" (…).
El Estado salvadoreño ha analizado detenidamente las alegaciones presentadas en las comunicaciones que han sido remitidas por el Grupo de Trabajo, las cuales señalan que las personas mencionadas: i) se encontraban bajo custodia del Servicio de Inmigración y Control de Aduanas de los Estados Unidos (ICE -por sus siglas en inglés-); ii) fueron presuntamente deportadas a El Salvador el 15 de marzo de 2025; iii) dejaron de aparecer en el sistema de localización de detenidos en línea del ICE desde aquella fecha; iv) fueron identificadas en una lista de deportados publicada por un medio de comunicación local1; y v) su suerte y paradero son desconocidos.
En atención a lo anterior, el Estado de El Salvador brinda su repuesta a estas comunicaciones, sobre las que presenta sus observaciones y solicitudes específicas para la debida atención del Grupo de Trabajo.
1. Sobre la ausencia de fundamentos para el requerimiento de información al Estado de El Salvador.
El Estado salvadoreño es enfático en señalar que sus autoridades no han realizado arrestos, detenciones, ni traslados de las personas referidas en las comunicaciones del Grupo de Trabajo. La actuación del Estado de El Salvador se ha circunscrito a la implementación de un mecanismo de cooperación bilateral con otro Estado, mediante el cual se ha facilitado el uso de infraestructura penitenciaria salvadoreña para la custodia de personas detenidas en el marco del sistema de justicia y aplicación de la ley de ese otro Estado. En este contexto, la jurisdicción y la responsabilidad legal sobre dichas personas recaen exclusivamente en las autoridades extranjeras competentes, en virtud de acuerdos internacionales suscritos y en conformidad con los principios de soberanía y cooperación internacional en materia penal.
En ese sentido, las acciones atribuibles al Estado salvadoreño se circunscriben a su soberanía y jurisdicción territorial, por lo que tampoco le es atribuible la inobservancia del principio de no devolución (non-refoulement) respecto de las personas mencionadas.
2. Sobre la ausencia de elementos que configuren una desaparición forzada atribuible al Estado de El Salvador
Al respecto, el Estado de El Salvador subraya que las alegaciones presentadas no atribuyen ninguna acción directa al Estado salvadoreño que se ajuste a la definición de desaparición forzada conforme al derecho internacional y a los métodos de trabajo del Grupo de Trabajo.

La definición de desaparición forzada, tal como se establece en la Convención Internacional para la Protección de Todas las Personas contra las Desapariciones Forzadas, la Convención Interamericana sobre Desaparición Forzada de Personas, el Estatuto de Roma y la jurisprudencia de los sistemas regionales de derechos humanos, exige la concurrencia de elementos específicos: privación de libertad por agentes estatales o personas que actúan con su aquiescencia, seguida de la negativa a reconocer dicha privación o revelar el paradero de la persona, siendo que en el presente caso, las alegaciones se basan en la supuesta desaparición de las personas señaladas, derivada de la ausencia de sus nombres en un sistema que es administrado por una autoridad extranjera -Servicio de Inmigración y Control de Aduanas de los Estados Unidos- y en una publicación de un medio de comunicación no oficial, cuyas operaciones no están registradas en El Salvador.

Los Métodos de trabajo del Grupo de Trabajo sobre Desapariciones Forzadas o Involuntarias exigen que las comunicaciones especifiquen las medidas adoptadas por los familiares o representantes para determinar el paradero de la persona, incluyendo el agotamiento de recursos internos. Cabe destacar que las alegaciones presentadas no cumplen con este requisito. En consecuencia, la inconformidad con decisiones o mecanismos de información de autoridades extranjeras no puede atribuirse al Estado de El Salvador ni constituye un fundamento válido para que el Grupo de Trabajo le requiera información.
3. Sobre el debido registro de estos casos por el Grupo de Trabajo sobre la Desaparición Forzada
En atención a lo comunicado por el Grupo de Trabajo, sobre que estos casos sólo se contabilizan en las estadísticas del Gobierno de El Salvador, el Estado advierte que según estipulan los Métodos de trabajo del Grupo de Trabajo sobre Desapariciones Forzadas o Involuntarias, un caso solo debe figurar en las estadísticas del Estado bajo cuya jurisdicción la persona fue privada de libertad o vista por última vez, condiciones que no se cumplen en los casos mencionados en lo que respecta al Estado de El Salvador, ya que dichas personas no se encontraban bajo la jurisdicción del Estado salvadoreño al momento de su presunta privación de libertad o última vez que fueron vistas.

En coherencia y por las razones expuestas, el Estado solicita respetuosamente al Grupo de Trabajo la exclusión de los casos de (….) de las estadísticas y de cualquier registro correspondiente a El Salvador.
Finalmente, El Salvador reitera su compromiso con el cumplimiento de sus obligaciones internacionales en materia de derechos humanos, incluyendo la prevención de desapariciones forzadas, conforme a la Resolución 7/12 del Consejo de Derechos Humanos, para lo cual confirma que cuenta con una institucionalidad sólida y con regulaciones en su derecho interno que constituyen un marco de protección y de garantía para los derechos de las personas privadas de libertad, con independencia de su nacionalidad.

[…]

## El Salvador

**Caso No:** [redacted]
APELLIDO(S): [redacted]
Nombre(s): [redacted]
Fecha de transmisión: **16-abr.-2025**
Caso aclarado: **No**
País en copia: Estados Unidos de América, Venezuela (República Bolivariana de)

### I. Datos de identidad de la persona

APELLIDO(S): [redacted] Nombre(s): [redacted]
Sexo: Masculino
Nacionalidad: Venezuela (República Bolivariana de)
Identidad: CEDULA DE IDENTIDAD Fecha: No.: [redacted]
Lugar: País: El Salvador

### II.1 Fecha en que la persona fue vista por ultima vez

**26-mar.-2025**

### III.1 Luguar en que la persona fue vista por ultima vez

Ciudad: El Valle Distrito:
Provincia: Texas País: Estados Unidos de América

### VI. Denunciantes(s)

Confidential Fecha: 23-mar.-2025

### VII. Otros elementos de la denuncia

**Sesión: 136**

**INFORMACIÓN DE LA FUENTE** Fecha: 23-mar.-2025

El Sr. [redacted], nacional de Venezuela y titular del número "A"[redacted], se encontraba bajo custodia del ICE en El Valle, Texas, desde diciembre de 2024, cuando presuntamente fue deportado de los Estados Unidos de América a El Salvador, como parte de las deportaciones masivas que tuvieron lugar desde el 15 de marzo de 2025. Personas asociadas con el Sr. [redacted] afirmaron que su nombre dejó de aparecer en el Sistema de Localización de Detenidos en Línea del ICE de los Estados Unidos ese día.

El 21 de marzo de 2025, personas asociadas con el Sr. [redacted] identificaron su nombre en una lista de personas presuntamente deportadas de los Estados Unidos de América a El Salvador publicada por un medio de comunicación local.

Sin embargo, según la información recibida, hasta la fecha, ni el Gobierno de El Salvador ni el Gobierno de los Estados Unidos no ha publicado información oficial sobre la lista de personas deportadas ni su actual lugar de detención.

Al momento de la presente comunicación, la suerte y el paradero del Sr. [redacted] siguen siendo desconocidos.

Enviado al Gobierno: 16-abr.-2025

**Sesión: 136**

**INFORMACIÓN DEL GOBIERNO** Fecha: 03-abr.-2025

Según información recibida por el Gobierno de El Salvador:
"El Estado de El Salvador atentamente se refiere a las comunicaciones del Grupo de Trabajo sobre Desapariciones Forzadas o Involuntarias con referencia G/SO/217/1/SLV (…) por medio de las cuales se comunica que el citado Grupo ha recibido información sobre "presuntas desapariciones forzadas en El Salvador, en el marco de deportaciones masivas llevadas a cabo entre el Gobierno de los Estados Unidos de América y El Salvador" (…).
El Estado salvadoreño ha analizado detenidamente las alegaciones presentadas en las comunicaciones que han sido remitidas por el Grupo de Trabajo, las cuales señalan que las personas mencionadas: i) se encontraban bajo custodia del Servicio de Inmigración y Control de Aduanas de los Estados Unidos (ICE -por sus siglas en inglés-); ii) fueron presuntamente deportadas a El Salvador el 15 de marzo de 2025; iii) dejaron de aparecer en el sistema de localización de detenidos en línea del ICE desde aquella fecha; iv) fueron identificadas en una lista de deportados publicada por un medio de comunicación local1; y v) su suerte y paradero son desconocidos.
En atención a lo anterior, el Estado de El Salvador brinda su repuesta a estas comunicaciones, sobre las que presenta sus observaciones y solicitudes específicas para la debida atención del Grupo de Trabajo.
1. Sobre la ausencia de fundamentos para el requerimiento de información al Estado de El Salvador.
El Estado salvadoreño es enfático en señalar que sus autoridades no han realizado arrestos, detenciones, ni traslados de las personas referidas en las comunicaciones del Grupo de Trabajo. La actuación del Estado de El Salvador se ha circunscrito a la implementación de un mecanismo de cooperación bilateral con otro Estado, mediante el cual se ha facilitado el uso de infraestructura penitenciaria salvadoreña para la custodia de personas detenidas en el marco del sistema de justicia y aplicación de la ley de ese otro Estado. En este contexto, la jurisdicción y la responsabilidad legal sobre dichas personas recaen exclusivamente en las autoridades extranjeras competentes, en virtud de acuerdos internacionales suscritos y en conformidad con los principios de soberanía y cooperación internacional en materia penal.
En ese sentido, las acciones atribuibles al Estado salvadoreño se circunscriben a su soberanía y jurisdicción territorial, por lo que tampoco le es atribuible la inobservancia del principio de no devolución (non-refoulement) respecto de las personas mencionadas.
2. Sobre la ausencia de elementos que configuren una desaparición forzada atribuible al Estado de El Salvador
Al respecto, el Estado de El Salvador subraya que las alegaciones presentadas no atribuyen ninguna acción directa al Estado salvadoreño que se ajuste a la definición de desaparición forzada conforme al derecho internacional y a los métodos de trabajo del Grupo de Trabajo.

La definición de desaparición forzada, tal como se establece en la Convención Internacional para la Protección de Todas las Personas contra las Desapariciones Forzadas, la Convención Interamericana sobre Desaparición Forzada de Personas, el Estatuto de Roma y la jurisprudencia de los sistemas regionales de derechos humanos, exige la concurrencia de elementos específicos: privación de libertad por agentes estatales o personas que actúan con su aquiescencia, seguida de la negativa a reconocer dicha privación o revelar el paradero de la persona, siendo que en el presente caso, las alegaciones se basan en la supuesta desaparición de las personas señaladas, derivada de la ausencia de sus nombres en un sistema que es administrado por una autoridad extranjera -Servicio de Inmigración y Control de Aduanas de los Estados Unidos- y en una publicación de un medio de comunicación no oficial, cuyas operaciones no están registradas en El Salvador.

Los Métodos de trabajo del Grupo de Trabajo sobre Desapariciones Forzadas o Involuntarias exigen que las comunicaciones especifiquen las medidas adoptadas por los familiares o representantes para determinar el paradero de la persona, incluyendo el agotamiento de recursos internos. Cabe destacar que las alegaciones presentadas no cumplen con este requisito. En consecuencia, la inconformidad con decisiones o mecanismos de información de autoridades extranjeras no puede atribuirse al Estado de El Salvador ni constituye un fundamento válido para que el Grupo de Trabajo le requiera información.
3. Sobre el debido registro de estos casos por el Grupo de Trabajo sobre la Desaparición Forzada
En atención a lo comunicado por el Grupo de Trabajo, sobre que estos casos sólo se contabilizan en las estadísticas del Gobierno de El Salvador, el Estado advierte que según estipulan los Métodos de trabajo del Grupo de Trabajo sobre Desapariciones Forzadas o Involuntarias, un caso solo debe figurar en las estadísticas del Estado bajo cuya jurisdicción la persona fue privada de libertad o vista por última vez, condiciones que no se cumplen en los casos mencionados en lo que respecta al Estado de El Salvador, ya que dichas personas no se encontraban bajo la jurisdicción del Estado salvadoreño al momento de su presunta privación de libertad o última vez que fueron vistas.

En coherencia y por las razones expuestas, el Estado solicita respetuosamente al Grupo de Trabajo la exclusión de los casos de (….) de las estadísticas y de cualquier registro correspondiente a El Salvador.
Finalmente, El Salvador reitera su compromiso con el cumplimiento de sus obligaciones internacionales en materia de derechos humanos, incluyendo la prevención de desapariciones forzadas, conforme a la Resolución 7/12 del Consejo de Derechos Humanos, para lo cual confirma que cuenta con una institucionalidad sólida y con regulaciones en su derecho interno que constituyen un marco de protección y de garantía para los derechos de las personas privadas de libertad, con independencia de su nacionalidad.

[…]

## El Salvador

**Caso No:** [redacted]

APELLIDO(S): [redacted]

Nombre(s): [redacted]

Fecha de transmisión: **16-abr.-2025**

Caso aclarado: **No**

País en copia: Estados Unidos de América, Venezuela (República Bolivariana de)

### I. Datos de identidad de la persona

APELLIDO(S): [redacted] Nombre(s): [redacted]

Sexo: Masculino

Edad: Fecha de nacimiento: [redacted]

Padres: [redacted]

Nacionalidad: Venezuela (República Bolivariana de)

Estado civil: [redacted]

Domicilio: [redacted]

Identidad: CEDULA DE IDENTIDAD Fecha: No.: [redacted]

Lugar: País: El Salvador

### II.1 Fecha en que la persona fue detenida

**mar.-2024**

### III.1 Luguar en que la persona fue detenida

Provincia: País: Estados Unidos de América

### II.2 Fecha en que la persona fue vista por ultima vez

**15-mar.-2025**

### III.2 Luguar en que la persona fue vista por ultima vez

Lugar: Webb County Detention Center

Ciudad: Laredo Distrito:

Provincia: Texas País: Estados Unidos de América

### V. Diligencias realizadas

AVERIGUACIONES EN Fecha: [redacted]

Lugar: [redacted]

Denuncia Fecha: [redacted]

Lugar: [redacted]

Case 1:25-cv-01766-JEB Document 16-1 Filed 07/22/25 Page 630 of 940



## VI. Denunciantes(s)

Confidential Fecha: 08-abr.-2025

## VII. Otros elementos de la denuncia

**Sesión: 136**

**INFORMACIÓN DEL GOBIERNO** Fecha: 03-abr.-2025

Según información recibida por el Gobierno de El Salvador:
“El Estado de El Salvador atentamente se refiere a las comunicaciones del Grupo de Trabajo sobre Desapariciones Forzadas o Involuntarias con referencia G/SO/217/1/SLV (…) por medio de las cuales se comunica que el citado Grupo ha recibido información sobre “presuntas desapariciones forzadas en El Salvador, en el marco de deportaciones masivas llevadas a cabo entre el Gobierno de los Estados Unidos de América y El Salvador” (…).
El Estado salvadoreño ha analizado detenidamente las alegaciones presentadas en las comunicaciones que han sido remitidas por el Grupo de Trabajo, las cuales señalan que las personas mencionadas: i) se encontraban bajo custodia del Servicio de Inmigración y Control de Aduanas de los Estados Unidos (ICE -por sus siglas en inglés-); ii) fueron presuntamente deportadas a El Salvador el 15 de marzo de 2025; iii) dejaron de aparecer en el sistema de localización de detenidos en línea del ICE desde aquella fecha; iv) fueron identificadas en una lista de deportados publicada por un medio de comunicación local1; y v) su suerte y paradero son desconocidos.
En atención a lo anterior, el Estado de El Salvador expresa que ha brindado respuesta a comunicaciones previas del Grupo de Trabajo, sobre alegadas desapariciones de personas de nacionalidad venezolana, en particular, a través de la Nota Verbal B159-2025, de fecha 3 de abril del año en curso, en la cual se señaló la ausencia de fundamentos para el requerimiento de información al Estado de El Salvador; así como la ausencia de elementos que configuren una desaparición forzada atribuible al Estado de El Salvador; por lo que se solicitó la exclusión de los casos de las estadísticas de El Salvador, de conformidad a los Métodos de trabajo del Grupo de Trabajo sobre Desapariciones Forzadas o Involuntarias, ya que dichas personas no se encontraban bajo la jurisdicción del Estado salvadoreño al momento de su presunta privación de libertad o última vez que fueron vistas.
En atención a lo anterior, el Estado de El Salvador expresa que ha brindado respuesta a comunicaciones previas del Grupo de Trabajo, sobre alegadas desapariciones de personas de nacionalidad venezolana, en particular, a través de la Nota Verbal B159-2025, de fecha 3 de abril del año en curso, en la cual se señaló la ausencia de fundamentos para el requerimiento de información al Estado de El Salvador; así como la ausencia de elementos que configuren una desaparición forzada atribuible al Estado de El Salvador; por lo que se solicitó la exclusión de los casos de las estadísticas de El Salvador, de conformidad a los Métodos de trabajo del Grupo de Trabajo sobre Desapariciones Forzadas o Involuntarias, ya que dichas personas no se encontraban bajo la jurisdicción del Estado salvadoreño al momento de su presunta privación de libertad o última vez que fueron vistas.
El Estado reitera cada uno de los términos de su comunicación previa, en particular, que:
i sus autoridades no han realizado arrestos, detenciones, ni traslados de las personas referidas en las comunicaciones del Grupo de Trabajo,
ii la actuación del Estado de El Salvador se ha circunscrito a la implementación de un mecanismo de cooperación bilateral en materia penitenciaria con otro Estado,
iii únicamente se ha facilitado el uso de infraestructura penitenciaria salvadoreña para la recepción y custodia de personas detenidas en el marco del sistema de justicia y aplicación de la ley de otro Estado,
iv la jurisdicción y la responsabilidad legal sobre dichas personas recaen exclusivamente en las autoridades extranjeras competentes, en virtud de acuerdos internacionales suscritos y en conformidad con los principios de soberanía y cooperación internacional en materia penal,
v las acciones atribuibles al Estado salvadoreño se circunscriben a su soberanía y jurisdicción territorial,
vi las alegaciones presentadas no atribuyen ninguna acción directa al Estado salvadoreño que se ajuste a la definición de desaparición forzada conforme al derecho internacional y a los métodos de trabajo del Grupo de Trabajo, vii) que no existen fundamentos válidos para que el Grupo de Trabajo le requiera información a El Salvador, y
vii El Salvador se encuentra comprometido con el cumplimiento de sus obligaciones internacionales en materia de derechos humanos, incluyendo la prevención de desapariciones forzadas, conforme a la Resolución 7/12 del Consejo de Derechos Humanos, por lo que cuenta con una institucionalidad sólida y con regulaciones en su derecho interno que constituyen un marco de protección y de garantía para los derechos de las personas privadas de libertad, con independencia de su nacionalidad.

En consecuencia, SOLICITA al Grupo de Trabajo sobre las Desapariciones Forzadas que:

1. Tenga por presentada la respuesta del Estado de El Salvador a la comunicación G/SO/217/1/SLV de fecha 16 de abril de 2025.
2. Excluya de las estadísticas y de cualquier registro correspondiente a El Salvador, los casos referidos en la comunicación, por no cumplir su registro con lo establecido en los Métodos de trabajo del Grupo de Trabajo sobre Desapariciones Forzadas o Involuntarias, que regulan que un caso solo debe figurar en las estadísticas del Estado bajo cuya jurisdicción la persona fue privada de libertad o vista por última vez, condiciones que no se cumplen en los casos mencionados en lo que respecta a la jurisdicción del Estado salvadoreño al momento de su presunta privación de libertad o última vez que fueron vistas.”

**Sesión:** **136**

**INFORMACIÓN DE LA FUENTE** Fecha: 08-abr.-2025

El Sr. [redacted] (identificado como el Sr. [redacted] en los registros de migración de E.E.U.U), nacional de Venezuela y titular de la cedula de identidad número [redacted], se encontraba bajo custodia en el Centro de Detención del Condado de Webb (Laredo, Texas) cuando fue presuntamente deportado de los Estados Unidos de América a El Salvador, como parte de las deportaciones masivas que han tenido lugar a partir del 15 de marzo de 2025.
El Sr. [redacted] se encontraba bajo custodia en el Centro de Procesamiento de Moshannon Valley (Philipsburg, Pensilvania) desde mayo de 2024. Un juez ordenó su expulsión el 2 de diciembre de 2024. Posteriormente fue trasladado a un centro de detención en El Paso, Texas, y el 10 de marzo de 2025 trasladado al Centro de Detención del Condado de Webb.
El 14 de marzo de 2025, funcionarios del Servicio de Inmigración y Control de Aduanas (ICE) le habrían comunicado al Sr. [redacted] que este sería retirado del centro. Las personas asociadas con el Sr. [redacted] afirman que después de esta fecha ya no pudieron encontrar su información en el localizador de detenidos en línea del ICE, lo que implicaba que el Sr. [redacted] había sido puesto en libertad o deportado.
El 15 de marzo de 2024, se informa de que el autobús en el que se estaba realizando el traslado del Sr. [redacted] se descompuso, y éste fue devuelto al Centro de Detención del Condado de Webb. El Sr. [redacted] informó a personas asociadas que su salida se había reprogramado para alrededor de las 3 p.m., hora central.
Desde esta llamada, las personas relacionadas con el Sr. [redacted] no han podido ponerse en contacto con él.
Adicionalmente, las personas asociadas han solicitado ayuda a la oficina de su representante en el congreso. Según la información recibida, la oficina del congresista ha solicitado información al Departamento de Seguridad Nacional de Estados Unidos y está a la espera de una respuesta.
Además, las personas asociadas han [redacted]
Al momento de la presente comunicación, la suerte y el paradero del Sr. [redacted] siguen siendo desconocidos.

Enviado al Gobierno: 16-abr.-2025

Case No. 25-cv-1774-JEB

# Exhibit 45

BRIAN J. MAST, FLORIDA
CHAIRMAN

JAMES LANGENDERFER
STAFF DIRECTOR

GREGORY W. MEEKS, NEW YORK
RANKING MEMBER

SAJIT GANDHI
DEMOCRATIC STAFF DIRECTOR

One Hundred Nineteenth Congress
U.S. House of Representatives
Committee on Foreign Affairs
2170 Rayburn House Office Building
Washington, DC 20515
www.foreignaffairs.house.gov

April 17th, 2025

The Honorable Marco Rubio
Secretary of State
U.S. Department of State
2201 C Street NW
Washington, D.C. 20520

Dear Secretary Rubio,

We write with grave concern regarding the State Department's lack of transparency and potential circumvention of laws, including the Case-Zablocki Act, codified as amended at 1 U.S.C. Section 112b[1], and 2024 and 2025 Appropriations Acts[2] or prior year State Foreign Operations Appropriation Acts, to facilitate the recent removals of individuals from the United States and their detention in El Salvador, and reiterate our requests for information on international agreements or non-binding instruments governing, and any State Department funding being utilized to facilitate, these removals and/or detentions.

In remarks to the press on February 4, you announced that the United States had concluded an agreement with the Government of El Salvador to accept and detain deportees from the United States of any nationality, describing it as "the most unprecedented and extraordinary migratory agreement anywhere in the world." [3] In remarks to the press on March 28, you appeared to

---

[1] 1 U.S.C. 112b. United States international agreements and non-binding instruments; transparency provisions.
[2] Division F of P.L. 118-47 for FY2024 SFOPS and Division A of P.L. 119-4 for the full-year Continuing Appropriations Act, 2025.
[3] U.S. Department of State, "Secretary of State Marco Rubio and Salvadoran Foreign Minister Alexandra Hill Tinoco at the Signing of a Memorandum of Understanding Concerning Strategic Civil Nuclear Cooperation," February 3, 2025, https://www.state.gov/secretary-of-state-marco-rubio-and-salvadoran-foreign-minister-alexandra-hill-tinoco-at-the-signing-of-a-memorandum-of-understanding-concerning-strategic-civil-nuclear-cooperation.

confirm that an agreement had been reached with President Bukele in February.[4] Subsequently, reporting has indicated that the United States has transferred hundreds of migrants—including individuals mistakenly identified as members of criminal gangs —to El Salvador without due process, where they are reportedly being held in the country's high-security mega-prisons, including the Centro de Confinamiento del Terrorismo (CECOT), which is notorious for reported human rights abuses and harsh conditions.[5]

The Case-Zablocki Act requires that the State Department report monthly to the Foreign Affairs Committee and Senate Foreign Relations Committee on all international agreements that were "signed, concluded, or otherwise finalized the prior month" and those that entered into force the prior month.[6] The Department must also report on any non-binding instruments that "could reasonably be expected to have a significant impact on the foreign policy of the United States" or that have been requested by the Chair or Ranking Member of either the Senate Foreign Relations Committee or House Foreign Affairs Committee within 30 days of receipt of such a request.[7] Despite multiple requests from Committee staff, the State Department has yet to provide to the Committee any information on, or text of, the agreement or non-binding instrument you announced on February 4.

Additionally, pursuant to Section 7015(f) of the Further Consolidated Appropriations Act, 2024 which remains in effect for FY2025 pursuant to P.L. 119-4, the State Department is required to notify Congress prior to obligating or expending funds for El Salvador.[8] Publicly available reporting suggests that the State Department may be using International Narcotics Control and Law Enforcement (INCLE) funds to facilitate these removals and/or detentions.[9] El Salvador's Vice President Félix Ulloa also reportedly corroborated in an April 16 meeting with U.S. Senator Chris Van Hollen that the United States is paying the Government of El Salvador to detain individual deportees outside of any judicial process.[10] However, the Committee's requests as to the use of such funds have gone unanswered, and no notification has been provided to Congress to date on the use of State Department funds for facilitating removals to and/or detentions in El Salvador. The potential use of State Department foreign assistance funds to facilitate removals to and/or detentions in El Salvador also raises concerns regarding whether the Department has

---

[4] U.S. Department of State, "Secretary of State Marco Rubio Remarks to the Press," March 28, 2025, https://www.state.gov/secretary-of-state-marco-rubio-remarks-to-the-press-.

[5] Julie Turkewitz, Christina Thornell, David Jouppi, et al., "Who Are the Venezuelan Deportees Sent to El Salvador?," *New York Times*, April 15, 2025, https://www.nytimes.com/video/us/politics/100000010085123/who-are-the-venezuelan-deportees-sent-to-el-salvador.html.

[6] The list of required recipients also includes the Majority Leader of the Senate, the Minority Leader of the Senate, the Speaker of the House of Representatives, and the Minority Leader of the House of Representatives (1 U.S.C. 112b(a)(1)).

[7] 1 U.S.C. 112b(c), (k)(1), & (k)(5).

[8] The explanatory statement accompanying P.L. 118-47 states, "For purposes of the Act, the term 'regular notification procedures of the Committees on Appropriations' shall mean such Committees must be notified not less than 15 days in advance of the initial obligation of funds."

[9] Ariana Figueroa, "Experts: $6 million payment to Salvadoran prison likely violates US human rights law," *Baltimore Sun*, April 15, 2025, https://www.baltimoresun.com/2025/04/15/experts-6-million-payment-to-salvadoran-prison-likely-violates-u-s-human-rights-law/.

[10] Nelson Renteria, Diego Oré, and Steve Holland, "El Salvador blocks US senator from visiting wrongly deported Salvadoran man," *Reuters*, https://www.reuters.com/world/americas/us-senator-lands-el-salvador-seeking-release-wrongly-deported-salvadoran-man-2025-04-16/.

complied with its Leahy Law obligations, including to vet foreign security units and ensure those associated with credible allegations of gross violations of human rights do not receive such funds.[11]

As part of our constitutional oversight duties, and in light of the opacity surrounding the State Department's role in the agreement or non-binding instrument with El Salvador that you referenced on February 4 and its implementation, the Committee seeks to ascertain whether the Executive Branch is acting consistent with the Case-Zablocki Act, appropriations statutes, and any other applicable laws. We are additionally concerned as to whether the Executive Branch is acting consistent with the United States' obligations under international law regarding non-refoulement of an individual to a country where they face the risk of torture or other cruel, inhumane, or degrading treatment or punishment or other irreparable harm.

President Trump's meeting this week with Salvadoran President Nayib Bukele only underscores the need for answers on these pressing questions. We were disturbed to see President Trump in the Oval Office celebrating President Bukele's "state of exception" policy to crackdown on gang activity in the country, given concerns about the Bukele government's respect for human rights and its approach to combating gang activity. The State Department's 2023 Human Rights Report on El Salvador found that under the ongoing state of exception, authorities have committed widespread abuses including mass arbitrary detentions, torture, and severe due process violations, while prison conditions remain "harsh and life-threatening," marked by extreme overcrowding, systemic abuse by guards, and hundreds of deaths in custody.[12] Notably Osiris Luna, chief of the Salvadoran Penal System and Vice Minister of Justice and Public Security and a key architect of President Bukele's mass incarceration policy, is among two Salvadoran officials presently sanctioned by the U.S. Treasury for negotiating with the MS-13 gang on behalf of President Bukele and facilitating financial incentives to MS-13 gang leaders, including provision of prostitutes and cell phones, in exchange for political support for Bukele's "Nuevas Ideas" party.

Given these concerns, we request that you provide to the Committee by April 24, 2025 the full text of any agreement or non-binding instrument between the United States and El Salvador.

Additionally, we request detailed, written information by April 24, 2025 on the following:

1. A detailed and complete description of the legal authorities[13] that the Executive Branch is relying on for the agreement or non-binding instrument to support removals to El Salvador or the detention in El Salvador of removed individuals since January 20, 2025;
2. A detailed and complete description of the assistance accounts through which the State Department has facilitated removals to El Salvador or the detention in El Salvador of

---

[12] U.S. Department of State, Bureau of Democracy, Human Rights, and Labor, "2023 Country Reports on Human Rights Practices: El Salvador," 2023, https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/el-salvador/.

[13] The Case-Zabloki Act requires that the Secretary provide "the specific article or section and subsection reference whenever available and, if not available, [to be] as specific as possible" (1 U.S.C. 112b(a)(1)(A)(iii)).

removed individuals since January 20, 2025 and a breakdown of the purposes for which funds are being or will be used;

3. The date by which the Committee can expect a Congressional Notification on the use of State Department funds to support removals to, or the detention of individuals in, El Salvador, or the legal justification for why such funds are not being notified to Congress;
4. The total amount, and a list of recipients, of State Department funding expended related to removals of individuals from the United States to El Salvador or their detention since January 20,2025, including support to the Government of El Salvador to operate prisons holding removed individuals, broken out by account and fiscal year;
5. A description of the mechanisms the Department is utilizing to monitor and evaluate the expenditure of any State Department foreign assistance funds related to removals to El Salvador or the detention in El Salvador of removed individuals and any findings resulting from such monitoring and evaluation;
6. A justification for the certification you noticed on April 2, 2025 in order to obligate certain assistance funds for the central government of El Salvador under Section 7045(b)(2)(A) of the Department of State, Foreign Operations, and Related Programs Appropriations Act, 2024 (Div. F, Pub. L. 118-47) and how, if at all, the international agreement or non-binding instrument referenced by you on February 4, 2025 factored into that certification decision.[14]; and
7. Any role the State Department has played to expand the use of Salvadoran detention facilities for U.S. deportees, including but not limited to proposals to send American citizens convicted of crimes to El Salvador, as has been publicly discussed by the Trump Administration.

The State Department's failure to provide the Committee with information regarding the agreement or non-binding instrument with El Salvador and any related use of Department funds to implement such an agreement is a potential violation of law. We ask for your urgent attention in correcting this situation and await your timely response.

Sincerely,

Gregory W. Meeks
Ranking Member
House Foreign Affairs Committee

Joaquin Castro
Ranking Member
Subcommittee on Western Hemisphere

[14] Department of State, "Certification Under Section 7045(b)(2)(A) of the Department of State, Foreign Operations, and Related Programs Appropriations Act, 2024 (Div. F, Pub. L. 118-47)," *Federal Register*, April 2, 2025, https://www.federalregister.gov/documents/2025/04/02/2025-05662/certification-under-section-.

Case No. 25-cv-1774-JEB

# Exhibit 46

# Attachment 1

Donald Trump (00:00):
Well, thank you very much. It's an honor to have a friend of mine because we went through this together and got along very well for my entire period of time. So I knew him as a very young man. Now, he's just a young man and he's done a fantastic job. Mr. President, it's an honor to have you.

Nayib Bukele (00:23):
Thank you.

Donald Trump (00:24):
You're doing incredibly for your country, and we appreciate working with you because you want to stop crime and so do we, and it's very, very effective. And I want to just say hello to the people of El Salvador and say they have one hell of a president. And I mean that, and I know him well. I know him as a very young man, Marco, even younger than you. You know, he started pretty young.

Marco Rubio (00:52):
I'll always be younger.

Donald Trump (00:54):
Young at heart. But I want to thank you for the great job you're doing. I appreciate it.

Nayib Bukele (01:00):
Thank you. Well, it's an honor to be here in the Oval Office with the president and leader of the free world. We're very happy and we're very eager to help. We know that you have a crime problem, a terrorism problem that you need help with, and we're a small country, but if we can help, we will do it. And we actually turned the murder capital of the world… That was the journalists call it, right? Murder capital of the world to the safest country in the the Western Hemisphere. And sometimes they say that we increase in thousands. I like to say that we actually liberated millions, so-

Donald Trump (01:44):
It's very good. Who gave him that line? Do you think I can use that?

Nayib Bukele (01:50):
Yes, you can use it.

Kristi Noem (01:51):
Yes.

Nayib Bukele (01:51):
And in fact, Mr. President, you have 350 million people to liberate. But to liberate 350 million people, you have to imprison some. That's the way it works, right? You cannot just free the criminals and think crimes are going to go down magically. You have to

imprison them, so you can liberate 350 million Americans that are asking for the end of crime and the end of terrorists. I mean, it can be done. I mean, you're doing it already. And I am sure that people have seen the change in the streets. A long way to go because you're just initiating your second term, but it's clear that with the numbers at the border, even in Democrat run cities, they get help from the work you're doing. So I'm really happy to be here, honored and eager to help.

Donald Trump (02:43):
Well, we had a terrible thing happen. We had an administration that allowed people to come in freely into our country from not only South America, but from all over the world. Many from the Congo and Africa, Asia, all over the world. Europe, rough parts of Europe. And they came from prisons and they came from mental institutions and they came from gangs and the gangs of Venezuela and other places, and hundreds of thousands, and even millions of them came. 21 million people altogether. But many of the people that came, just a tremendous percentage of them, were criminals. In some cases, violent criminals. We had 11,088 known murderers. Half of them murdered more than one person. This was allowed by a man who… What he did to our country is just unbelievable. So we're straightening it out. We're getting them out.
(03:41)
But what they did and what that party did to our country, open borders, anybody could come in. As soon as I heard that, I said, "Every prison's going to be emptied out into our country." That's what happened. And we're straightening it out. And we just had numbers. We had the highest recruiting numbers in the history of our country going into police departments. And a year ago, we had the lowest numbers. You couldn't hire a policeman.

Nayib Bukele (04:04):
Biggest change. From the lowest to the highest.

Donald Trump (04:06):
And the military now, Marines, the Army, air Force, Coast Guard, every slot is… I mean, we have the best numbers we've ever had. We call it recruitment numbers, and we've never had anything like it. We had records at every single level. But very important, the policemen. The policemen are joining forces now that we really were having a hard time with policemen because we weren't protecting our police. And we cherish our police. The police are great and the firemen and everybody else, but we have the highest numbers that we've ever had. The most enthusiasm, great enthusiasm, and on trade and other things we're doing great. We're taking in billions and billions of dollars. I gave them a little bit of a pause because you have to show a little flexibility. But we go back to what we have to do.
(05:02)
The markets have been very strong once they got used to it, but we were losing $2 billion a day. There's no company big like this. This is the biggest deal ever made. Now we're making $3 billion a day. We're a great country, but we had stupid people running this country, and I can say it, but what they've done to us at the border should never and can never be forgotten. It's a sin what they did, and you are helping us out, and we appreciate it.

Nayib Bukele (05:36):
Thanks. Thank you. Actually, what you're doing with the border is remarkable. It has dropped what? 95%? It's incredible.

Donald Trump (05:46):
As this morning, 99.1% to be exact.

Marco Rubio (05:51):
Why are those numbers not in the media?

Donald Trump (05:54):
Well, they get out with the fake news like CNN. CNN over here doesn't want to put them out because they don't like putting out good numbers. They only like putting out… because I think they hate our country, actually, but it's a shame. You're right. Isn't that a great question? Why doesn't the media… Why don't they put out numbers?

Nayib Bukele (06:11):
Yeah, I mean 99%. I mean, it's crazy, right?

Donald Trump (06:14):
We're doing a great-

Nayib Bukele (06:15):
It's a crazy turnaround.

Donald Trump (06:16):
Kristi, could you maybe say a couple of words about the border, how we do it?

Kristi Noem (06:20):
Yeah. It's just been absolutely phenomenal what a great leader can do. Clear direction. Our laws matter. We should only have people in our country that love us and the border patrol and our ICE officers and law enforcement officers have done fantastic work, so we're proud of them. Now we just need to get the criminals and murderers and rapists and dangerous gang members and terrorist organizations out of our country. So, Mr. President Bukele, we thank you very much for your partnership. It has been wonderful for us to be able to have somewhere to send the worst of the worst and someone to partner with. And we'd like to continue that partnership because it's been a powerful message of consequences. Mr. President, you wanted people to know that there was consequences if you break our laws and harm our people and endanger families, and this is a clear consequence for the worst of the worst that we have somewhere to put them.

Nayib Bukele (07:12):
Thank you very much. Yeah. We even had this gang member from Venezuela, from one of the ones you sent, and we interviewed him just to get some information, et cetera from them. And he said, "Oh, well, I got arrested six times, but they released me the six times,

so I should be released again." And then I said, "Well, what's the last thing you do?" And he said, "Well, I shot a cop in the leg, but I didn't kill him. I just shot him in the leg." And we're like, "This guy was arrested six times here in the United States. Six times. He was released five times. And the last time he was sent to El Salvador, so he's not getting a release." But the last time he shot a cop, actually, and he shot him in the leg. So these are-

Donald Trump (07:57):
[inaudible 00:08:00]

Nayib Bukele (07:59):
Yeah, there's something broken.

Donald Trump (08:02):
The Liberal establishment, but they're not running things anymore in this country. And we're run by, and I don't say conservative, I don't say anything. We're run by people with great common sense.

Nayib Bukele (08:13):
Yeah, common sense.

Donald Trump (08:14):
'Cause it's all common sense. It's not liberal conservative. It's common sense.

Nayib Bukele (08:17):
Exactly, yeah.

Donald Trump (08:19):
Do you allow men to play in women's sports? Do you allow men to box your women and boxing? 'Cause I know you have a lot of boxers.

Nayib Bukele (08:26):
That's violence.

Donald Trump (08:29):
That's abuse of a woman.

Nayib Bukele (08:31):
Violence against women.

Donald Trump (08:31):
It's abuse of a woman. But we have people that fight to the death because they think men should be able to play in women's sports. And some of those sports, it wouldn't matter much, but it still matters. But some of them are very dangerous for women.

Nayib Bukele (08:44):

Some years ago, like we said, a decade ago or so, women rights movements were pressuring so that we enact a specific laws to avoid men abusing women. And I think those laws were brave because there were a lot of men abusing women. But now some of the same people are trying to backtrack on that and actually trying to make new laws, allowing men to abuse women, women in sport. So actually that doesn't make sense.

Donald Trump (09:12):
We do it in sports.

Nayib Bukele (09:13):
It doesn't make sense.

Donald Trump (09:14):
It's crazy. They have weightlifting records, right?

Nayib Bukele (09:16):
Yeah.

Donald Trump (09:17):
A woman gets up this weight. She's incredible. A guy gets up and beats her by a hundred pounds. What are you going to do? A record that hadn't been broken in 18 years. They put on an ounce and an ounce, quarter of an ounce, eighth of an ounce for 18 years. Now they have a guy come up, ping. The whole thing is crazy. But they continue to fight. And I don't like talking about it because I want to save it for just before the next election. I said to my people, "Don't even talk about it because they'll change." But I watched this morning, there was a congressman fighting to the death for men to play against women in sports. And you say to yourself, "Why? What are they doing? What are they doing?" But your country's not too big on that.

Nayib Bukele (10:06):
No. No, of course not. We're big on protecting women.

Donald Trump (10:10):
That's a very important form of protection.

Nayib Bukele (10:13):
And as you can see, most of my cabinet are women.

Donald Trump (10:16):
That's impressive.

Nayib Bukele (10:17):
Yeah. Yeah.

Donald Trump (10:18):
That's why you bring them.

Nayib Bukele (10:18):
And they're not DEI hires or anything, they're just great at what they do, right?

Donald Trump (10:23):
That's right. This is very impressive. This is a first. We've had women, but we've never had three of them right here.

Nayib Bukele (10:30):
Four and three men.

Donald Trump (10:32):
Look at what you have. Do you guys feel a little bit mistreated? That's great. I like it. We've been advanced. I've been very advanced in that regard too. We have, Pam and Sue's been so fantastic.

Nayib Bukele (10:47):
Yes, I know. It's her birthday.

Donald Trump (10:49):
Kristi, and the most powerful woman they see in my office.

Speaker 1 (10:51):
Exactly.

Donald Trump (10:53):
They're all afraid of Susie Wiles. They say, "Oh, she's tough." Most powerful woman in the world according to magazines. What do I know? But
(11:00)
Yeah. She probably is.

Donald Trump (11:00):
I think she probably is.

Nayib Bukele (11:00):
Yeah, she probably is.

Donald Trump (11:00):
Yeah, she probably is.

Nayib Bukele (11:04):
Congratulations.

Donald Trump (11:05):
And Stephen has done such a great job. We have great people-

Nayib Bukele (11:10):
Very famous staff.

Donald Trump (11:11):
… but we love working with [inaudible 00:11:13]. He really lets him have it, right.

Nayib Bukele (11:14):
Yeah, exactly.

Donald Trump (11:15):
There's no games.

Nayib Bukele (11:16):
No, no. Very good.

Donald Trump (11:17):
He knows. Do you have any questions, please?

REPORTERS (11:20):
President Trump?

Donald Trump (11:21):
Go ahead. Let's not start with CNN because they're so, they're just so-

REPORTERS (11:25):
Mr. President?

Donald Trump (11:25):
… wrong. Yeah, please.

REPORTERS (11:27):
Yeah. Thank you, Mr. President. You repeatedly mentioned last night that Russia's attack on Ukraine was a mistake. What is the exact mistake? And had you given Putin a deadline to actually move toward a ceasefire?

Donald Trump (11:39):
The mistake was letting the war happen. If Biden were competent, and if Zelenskyy were competent, and I don't know that he is. We had a rough session with this guy over here. He just kept asking for more and more. That war should have never been allowed to happen. That war… I went four years and Putin wouldn't even bring it up. And as soon as the election was rigged and I wasn't here, that war started. There was no way that war should have been allowed to happen. And Biden should have stopped it.
(12:09)
And you take a look at Putin, I'm not saying anybody's an angel, but I will tell you I went four years and it wasn't even a question. He would never. And I told him, "Don't do it.

You're not going to do it." And it was the apple of his eye, but there was no way that he would've done it.
(12:26)
All you had to do is lower oil prices. If you lowered oil prices… Biden kept the prices so high because he made it impossible to get it. If you lowered oil prices, you would've never had the war, but you wouldn't have had it with me anyway. That war would've never happened. And I think it's a great abuse.
(12:42)
So now what do you do? You get a country where 25% of its land is gone and the best locations. Where millions of people are killed, you haven't reported accurately the death. And this was Biden's war and I'm trying to stop it. And I think we're going to do a good job, I hope we're going to do it. They lose 2,500 young people a week, on average. Now they're Russians and they're Ukrainians, but it's 2000. We don't care. It's like whatever it is. They're not from your country, they're not from mine, but I want to stop it.
(13:17)
2,500, it's a killing field. It's like the Civil War. You take a look. I look at the satellite pictures. This should not be happening in our time. Of course, our time can be pretty violent as we know. But that's a war that should have never been allowed to start. And Biden could have stopped it and Zelenskyy could have stopped it and Putin should have never started it. Everybody's to blame.

REPORTERS (13:46):
Have you spoken to President Zelenskyy, sir, out his offer to purchase more Patriot missile batteries?

Donald Trump (13:51):
Oh, I don't know. He's always looking to purchase missiles. He's against… Listen, when you start a war, you got to know that you can win the war, right? You don't start a war against somebody that's 20 times your size and then hope that people give you some missiles. If we didn't give them what we gave, remember I gave them Javelins. That's how they won their first big battle. With the tanks that got stuck in the mud and they took them out with Javelins. They have an expression that Obama, at the time, Obama gave them sheets and Trump gave them Javelins. But just something that should have never happened. It's a really shame. The towns are destroyed. Towns and cities are largely destroyed.
(14:36)
They have the spires, the beautiful spires that go up. They say that we're the most beautiful in the world, in Ukraine for whatever reason, but the most beautiful in the world. They're mostly laying on their side, shattered and broken. And most importantly, you have millions of people dead. Millions of people dead because of three people, I would say three people. Let's say Putin, number one. But let's say Biden who had no idea what the hell he was doing, number two and Zelenskyy. And all I can do is try and stop it. That's all I want to do. I want to stop the killing. And I think we're doing well in that regard. I think you'll have some very good proposals very soon.

REPORTERS (15:20):

Last question, sir, have you attributed a motive through the FBI investigation behind the attack on Governor Josh Shapiro over the weekend?

Donald Trump (15:29):
No, I haven't, but the attacker was not a fan of Trump, I understand. Just from what I read and from what I've been told. The attacker basically wasn't a fan of anybody. It's probably just a whack job and certainly a thing like that can not be allowed to happen.

REPORTERS (15:45):
Is your good relations with President Bukele the best guarantee that this time you won't terminate the temporary protected status-

Donald Trump (15:54):
I have a great relationship with this man.

REPORTERS (15:55):
… [inaudible 00:15:56] nationals of El Salvador?

Donald Trump (15:55):
I have the best relationship with him. We've known each other. I've known him since he was a very young man. As I said, very, very young. And I was impressed. I said, "Look out, this guy is…" In fact, you sort of look like a teenager.

Nayib Bukele (16:08):
That's good.

Donald Trump (16:10):
You look like a teenager. I said what kind of a country is this?

Nayib Bukele (16:13):
I don't know if that's good or bad, Mr. President.

Donald Trump (16:16):
He grew up well in the last five years.

REPORTERS (16:19):
Do you support extension for nationals of El Salvador under temporary protected status?

Donald Trump (16:22):
I support him.

REPORTERS (16:22):
Do you plan to-
(16:22)
President Bukele?

(16:22)
President Trump?

Donald Trump (16:22):
Let's hear the question from this very low-rated anchor at CBS.

REPORTERS (16:34):
President Trump, do you plan to ask President Bukele to help return the man who your administration says was mistakenly deported?

Donald Trump (16:38):
Which one is it?

REPORTERS (16:39):
The man who was mistakenly deported to El Salvador?

Donald Trump (16:41):
Well, let me ask. Pam, would you answer that question?

Pam Bondi (16:45):
Sure President. First and foremost, he was illegally in our country. He had been illegally in our country. And in 2019, 2 courts, an immigration court and an appellate immigration court ruled that he was a member of MS-13 and he was illegally in our country. Right now, it was a paperwork, it was additional paperwork had needed to be done. That's up to El Salvador if they want to return him, that's not up to us. The Supreme Court ruled President that if, as El Salvador wants to return him, this is international matters, foreign affairs. If they wanted to return him, we would facilitate it, meaning provide a plane.

REPORTERS (17:28):
So will you return him President Bukele?

Donald Trump (17:30):
And you are doing a great job. Thank you.

Pam Bondi (17:32):
Thank you.

Donald Trump (17:32):
Wait a minute. Can you just also respond to that question? Because it's asked by CNN and they always ask it with a slant. Because they're totally slanting because they don't know what's happening. That's why nobody's watching them. But would you answer that question also, please?

Steve Miller (17:47):
Yes, gladly. So as Pam mentioned, there's an illegal alien from El Salvador. So with respect to you, he's a citizen of El Salvador. So it's very arrogant, even for American

media to suggest that we would even tell El Salvador how to handle their own citizens as a starting point, as two immigration courts found that he was a member of MS-13. When President Trump declared MS-13 to be a foreign terrorist organization, that meant that he was no longer eligible under federal law, which I'm sure you know, you're very familiar with the INA, that he was no longer eligible for any form of immigration relief in the United States.
(18:25)
So he had a deportation order that was valid. Which meant that under our law, he's not even allowed to be present in the United States and had to be returned because of the foreign terrorist designation. This issue was then, by a district court judge, completely inverted, and a district court judge tried to tell the administration that they had to kidnap a citizen of El Salvador and flying back here. That issue was raised with the Supreme Court.
(18:51)
And the Supreme Court said the District court order was unlawful and its main components were reversed 9-0 unanimously stating clearly that neither Secretary of State nor the President could be compelled by anybody to forcibly retrieve a citizen of El Salvador from El Salvador, who again is a member of MS-13. Which is, I'm sure you understand, rapes little girls, murders women, murders children, is engaged in the most barbaric activities in the world. And I can promise you, if he was your neighbor, you would move right away.

REPORTERS (19:22):
So you don't plan to ask for-
(19:22)
But the Supreme Court is asking to-

Donald Trump (19:24):
And what was the ruling in the Supreme Court, Steve? Was it nine to nothing?

Steve Miller (19:29):
Yes. It was a 9- 0-

Donald Trump (19:31):
In our favor?

Steve Miller (19:32):
In our favor against the District Court. Ruling saying that no district court has the power to compel the foreign policy function of the United States. As Pam said, the ruling solely stated that if this individual, at El Salvador's sole discretion, was sent back to our country, that we could deport him a second time.
(19:49)
No version of this legally ends up with him ever living here because he's a citizen of El Salvador. That is the president of El Salvador. Your questions about it per the court can only be directed to him.

REPORTERS (20:02):
I ask, President Bukele, what is your… Can President Bukele weigh in on this? Do you plan to return him?

Nayib Bukele (20:06):
Well, I'm supposed you're not suggested that I smuggle a terrorist in the United States, right?

Donald Trump (20:11):
It's only CNN.

Nayib Bukele (20:13):
How can I smuggle… How can I return him to the United States? Like I smuggle him into the United States, or whether do I do? Of course I'm not going to do it. It's like the question is preposterous. How can I smuggle the terrorist into the United States? I don't have the power to return him to the United States.

REPORTERS (20:29):
But you can release him inside of El Salvador.

Nayib Bukele (20:31):
Yeah, but I'm not releasing… We're not very fond of releasing terrorists into our country. We just turned the murder capital of the world into the safest country of the Western Hemisphere. And you want us to go back into releasing criminals so we can go back to being the murder capital of the world? That's not going to happen.

Donald Trump (20:46):
Well, they'd love to have a criminal released into our country.

Nayib Bukele (20:49):
I mean, there's a fascination-

Donald Trump (20:51):
They would love it.

Nayib Bukele (20:52):
Yeah.

Donald Trump (20:54):
These are sick people. Marco, do you have something to say about that?

Marco Rubio (20:57):
Yeah, I mean, Stephen, I don't understand what the confusion is. This individual is a citizen of El Salvador. He was illegally in the United States and was returned to his country. That's where you deport people, back to their country of origin. Except for Venezuela that was refusing to take people back of places like that. I can tell you this, Mr.

President. The foreign policy of the United States is conducted by the President of the United States, not by a court. And no court in the United States has a right to conduct a foreign policy of the United States. It's that simple. End of story.

REPORTERS (21:26):
More specifically-

Steve Miller (21:27):
And that's what the Supreme Court held, by the way. To Marco's Point, the Supreme Court said exactly what Marco said. That no court has the authority to compel the foreign policy function in the United States. We won a case 9-0. And people like CNN are portraying it as a loss, as usual, because they want foreign terrorists in the country who kidnap women and children. But President Trump, his policy is foreign terrorists that are here illegally get expelled from the country, which by the way is a 90/10 issue.

REPORTERS (21:52):
Well, Mr. President, you said that if the Supreme Court said someone needed to be returned, that you would abide by that. You said that on Air Force One just a few days ago. And they said-

Donald Trump (21:59):
How long do we have to answer this question today?

REPORTERS (21:59):
…

Speaker 2 (22:00):
It must be facilitated.

Donald Trump (22:02):
Why don't you just say, "Isn't it wonderful that we're keeping criminals out of our country?" Why can't you just say that?

Speaker 2 (22:07):
Well, it's illegal to, so I just wanted some clarity on it.

Donald Trump (22:08):
Why do you go over and over? And that's why nobody watches you anymore. You have no credibility. Please, go ahead.

Speaker 3 (22:15):
President Trump, thank you so much. How many illegal criminals are you planning on exporting to El Salvador? And, President Bukele, how many are you willing to take from the U.S.?

Donald Trump (22:25):

As many as possible. And I just asked the president … it's this massive complex that he built, jail complex. I said, "Can you build some more of them, please?" As many as we can get out of our country that were allowed in here by incompetent Joe Biden through open borders. Open borders. You probably hear open borders and you can't even understand it, because nobody can understand. Nobody smart or with common sense can understand it. So we have millions of people that should not be in this country that are dangerous. Not just people, because we have people, but we have millions of people that are murderers, drug dealers. They've been allowed to come into our country by other countries that were very smart.
(23:10)
When they heard that this very low IQ president … and by the way, I took my cognitive exam as part of my physical exam and I got the highest mark. And one of the doctors said, "Sir, I've never seen anybody get that kind of a … that was the highest mark." I hope you're happy with that. Although they haven't been bugging me too much to take a cognitive, but I did do my physical and it was released. I hope you're all happy with it. I noticed there's no question, so probably you are. But the cognitive, they said to me, "Sir, would you like to take a cognitive test?" I said, "Did Biden take one?" "No." "Did anybody take one?" "No, not too many people took them." I said, "What about Obama? Did he take one?" "No, he didn't take one either." I said, "Let me be the only one to take one." But I've actually taken them three times already. I like taking them, because they're sort of … they're not too tough for me to take.
(24:05)
But we had a great physical exam, so I know you're going to ask that. And the doctors who are total professionals, Walter Reed Medical Center, they're great people. And I visited a soldier that was badly wounded. Incredible soldier. Lost his leg. And … who I spent a lot of time with him, I mean, [inaudible 00:24:26] with his mother, and it was really a very great thing. They do a phenomenal job. I just want to say Walter Reed, I was there for, what? Five, six hours. You were there with me. But I took a full physical and it came out perfecto, so that's good. That means you've got me for a little longer.

Speaker 3 (24:40):
Would the U.S. be willing pay for those facilities to be opened if new ones were going to be built [inaudible 00:24:45]?

Donald Trump (24:44):
I'd do something. We'd help them out. Yeah, we'd help them out. They're great facilities, very strong facilities, and they don't play games. I'd like to go a step further. I said it to Pam. I don't know what the laws are. We always have to obey the laws, but we also have homegrown criminals that push people into subways, that hit elderly ladies on the back of the head with a baseball bat when they're not looking, that are absolute monsters. I'd like to include them in the group of people to get them out of the country, but you'll have to be looking at the laws on that, Steve. Okay?

Speaker X (25:21):
[inaudible 00:25:22]

Speaker 4 (25:21):
[foreign language 00:25:22].

Speaker 5 (25:21):
How special is it for you guys to be locking up these prisoners, and do you think more presidents should follow suit, like you guys, in as far as taking a stand on crime here in the United States?

Donald Trump (25:31):
Well, I do. I think everybody has to. The president said it better than anybody. He said, "You have liberty and you have to have liberty. But to have liberty, you're going to … not everybody is going to be good." And some are bad, because they're sick. They're mentally deranged, they're bad. Then you have to take them … if you're going to have a country, you're going to have to take those people out. And we've been doing that. But this was like an unforced error, they would call it, where we had people that may hate our country or maybe they're just stupid people. I think they're probably stupid people more so. A lot of people said they did it for the vote, but I did better with Hispanic people than they did, because they always use Hispanic. I did better. Your people love me. I saw my poll numbers in your country, up through the roof, right? 91%. No, no. Some people think they do it for the vote. But they don't have to do it for the vote. They cheat. They're professional cheaters. That's about the only thing they do well.
(26:34)
So we just have had a great relationship and it's become bigger, because of a strange thing that's happened. I came back. We had no war in Ukraine. We had no war with … we had no October 7th, Middle East problem. We had nothing. We had no inflation. We didn't have the Afghanistan most embarrassing moment in the history of our country, the Afghanistan … not withdrawing, because I would have been out … I had it all set to bring people out with dignity and pride. That was the worst, most embarrassing moment in the history of our country. Afghanistan. We didn't have any of that. You wouldn't have had the war with Russia-Ukraine. You wouldn't have had the Middle East problem, because Iran was broke. They had no money, because we had secondary sanctions on and lots of other sanctions.
(27:23)
And now every single thing. Got a problem with Iran, but I'll solve that problem. That's almost an easy one. We got to solve a war that should have never started, Ukraine and Russia, and we'll get that solved. And we have to solve problems. And we already solved inflation. If you look at the numbers, the numbers are incredible, actually. Stock markets up, and we're not letting other countries take advantage of this country like they have for the last 40 years, so thank you very much. Do you have a question, please?

Speaker 6 (27:55):
[inaudible 00:27:55], Mr. President. Thank you so much. You scored another major investment win this morning when NVIDIA pledged to build its AI supercomputer, for the first time, ever right here in the United States.

Donald Trump (28:05):

Thank you. Now that's a question I like. That's true.

Speaker 6 (28:09):
What is your reaction to this announcement, Sir, and how will this positively [inaudible 00:28:13] Americans across the entire country.

Donald Trump (28:17):
Well, it's one of the biggest announcements you'll ever hear, because NVIDIA, as you know, controls almost the entire sector, which is one of the most important sectors in the world, between chips and semiconductors and everything else, and they're the biggest. And the other biggest, we already have coming in and spending 300 million, as you know. They announced two weeks ago. But NVIDIA is so highly respected, and this was an announcement that a lot of people, I knew it was going to happen, but not to the extent that it happened. It's big. And the reason they did it is because of the election on November 5th, and because of a thing called tariffs. As I say, the most beautiful word in the dictionary, after love, God, relationship. The press actually hit me. I said, "Tariff is the most beautiful word in the dictionary." "What about family, love, God?"
(29:13)
So I got hit even on that. Do you understand? I said, "Okay." So now I say it's my fifth most favorite word, because they get you on anything. But no, it's one of the great companies of the world. Modern, super modern companies. It controls segments that nobody … it sort of control the world, in a sense. And they're coming in here, in the biggest way, with hundreds of billions of dollars. Not like millions of dollars. Hundreds of billions of dollars, and I'm honored by it. And want to thank Jensen and all the people that we deal with. They're great people. They're brilliant people. And without tariffs, they wouldn't be doing it. Thank you very much. That was a very good [inaudible 00:29:59]. Yeah, please. Go ahead.

Speaker 7 (30:00):
Are you considering additional sanctions against Russia after their latest attack? And do you have an update on the rate and when you might announce semiconductor tariffs?

Donald Trump (30:08):
Well, I already have sanctions on Russia. I put them there. If you remember Nord Stream 2, that's the big pipeline that goes through Europe, I stopped it. That's Russia's pipeline. The largest pipeline, I think, in the world. Goes to Germany. And I stopped it. And when Biden came in, he approved it, and then they say, "Oh, I'm friendly with Russia." No, no. Putin said, "If you're my friend, I'd hate to see you when you're my enemy." I stopped the biggest economic job they ever had. I stopped it cold. Right? It was dead. You know that, right? And Biden came in and he immediately approved it. What was that all about?

Speaker 7 (30:47):
What about additional sanctions, Sir?

Donald Trump (30:49):

And it's a pipeline that takes care of a lot of the needs. Now, it was a very controversial thing, but I stopped it and Biden approved it. Question?

Speaker 8 (31:01):
On tariffs, do you have an update-

Donald Trump (31:02):
No, not you?

Speaker 4 (31:02):
[foreign language 00:31:04].

Speaker X (31:02):
[inaudible 00:31:05].

Speaker 9 (31:05):
[inaudible 00:31:05] update today on [inaudible 00:31:06] semiconductor tariffs, and potentially pharmaceuticals?

Donald Trump (31:09):
What?

Speaker 9 (31:09):
Semiconductor tariffs, and potentially pharmaceuticals, any update on that?

Donald Trump (31:12):
Pharmaceuticals, we're going to do. We don't make our own drugs, our own pharmaceuticals. We don't make our own drugs anymore. The drug companies are in Ireland and they're in lots of other places. China. And all they have to do is impose a tariff. The more, the faster they move in. The higher the tariff, it's very … it's inversely proportional. The higher the tariff, the faster they come. And, yeah, we're going to be doing that. That's going to be like we have on cars. We have, as you know, a 25% tariff on cars. We have a 25% tariff on steel and aluminum. And that's what that category fits right now.

Speaker 9 (31:52):
Do you have a percentage in mind and the timeline?

Donald Trump (31:54):
I have a timeline. Not too distant future. We're doing it, because we want to make our own drugs. We're doing it, because we want to make our own steel and aluminum, lumber, other things. And they're all coming in. We have record numbers, $7 trillion since I announced, a month and a half ago. Since I came. Basically, since I came in, we have over $7 trillion being invested in the country. We didn't have 1 trillion, we didn't have a half a trillion dollars with some of these guys. I didn't know what the hell they were doing. So we have the largest investment that we've ever heard of, and we're only two

months in. And that'll continue at levels that you've never seen before. It's going to happen. And even the stock market's up today. We also … a lot of people didn't say it the way it was. We had the largest gain in the stock market in history, on every single category, last week. That was a nice game, because we were getting a little hit, because people didn't understand the power

Donald Trump (33:00):
… power of our country economically, if you use it right. Do you have something to say on that, JD?

Steve Miller (33:09):
Yes, sir. I mean, look, for 40 years we have lost manufacturing capacity. Workers have seen their wages stagnate, and some of the most critical things that we need from the pharmaceuticals, the drugs that we give to our children, the antibiotics that we give to our kids, to the weapons that we actually need to fight a war if, God forbid, we had to fight a war, we don't make enough of that stuff. And so President Trump ran explicitly on changing that. Yes, as the president mentioned, it caused a little bit of disruption in the market. But I actually think over the long term, workers are going to benefit, stocks are going to go up. American businesses are going to benefit as we reinvest and re-industrialize our country.

Donald Trump (33:45):
And the autoworkers and the teamsters and all of the unions, not traditionally Republican, but I'm winning those unions by… We're up 40, 50 points on the Democrats. They're losing everything. And they're losing everything because they just have policies that are not believable. They fight for policies that are 5% popular, and nobody knows who the 5% are. I mean, nobody can find the 5%. But if you go back to Ohio… And by the way, we have the great championship team from Ohio coming in today. Right?

Steve Miller (34:20):
Very big day.

Donald Trump (34:21):
And that's going to be a little bit later. And if you want to stick around, I'll introduce you to some nice people. You'll see some very large people. You'll see some people that… Even you have not seen people like this. These are 6'7, 380 pounds, with no fat. That's pretty good. But the national championship team is being honored today at the White House. So that'll be exciting. If you want to stay around, I'll have you up there. You can tell them all about your prison, how you have to behave.

Speaker 10 (35:00):
Mr. President, for businesses that want clarity-

Donald Trump (35:01):
Who else?

Speaker 10 (35:01):
… how temporary are those exemptions on electronics?

Donald Trump (35:01):
Go ahead, please.

Speaker 11 (35:03):
You said yesterday that you're making a decision on Iran very quickly. What do you mean by that? Is that a decision to strike Iran?

Donald Trump (35:10):
Well, they have to solve to their problem very quickly. Iran wants to deal with us, but they don't know how. They really don't know how. We had a meeting with them on Saturday. We have another meeting scheduled next Saturday. I said, "That's a long time." That's a long time. So I think they might be tapping us along. But Iran has to get rid of the concept of a nuclear weapon. They cannot have a nuclear weapon. He can't have a nuclear weapon. We can't have anybody having nuclear weapons. We can't have nuclear weapons. And I think they're tapping us along because they were so used to dealing with stupid people in this country. And I had Iran perfect. You had no attacks. You would've never had October 7th in Israel, the attack by Hamas, because Iran was broke. It was stone-cold broke when I was president. And I want them to be a rich, great nation. The only thing is… One thing, simple. It's really simple. They can't have a nuclear weapon. And they've got to go fast because they're fairly close to having one, and they're not going to have one. And if we have to do something very harsh, we'll do it. And I'm not doing it for us. I'm doing it for the world. These are radicalized people, and they cannot have a nuclear weapon.

Speaker 11 (36:27):
Does that include an eventual strike on Iranian nuclear facilities?

Donald Trump (36:30):
Of course it does.

Speaker 11 (36:32):
And just a follow-up question, a clarification. You mentioned that you're open to deporting individuals that aren't foreign aliens, criminals to El Salvador. Does that include potentially US citizens, fully [inaudible 00:36:45]?

Donald Trump (36:45):
If they're criminals and if they hit people with baseball bats over their head that happen to be 90 years old, if they rape eighty-seven-year-old women in Coney Island, Brooklyn, yeah. Yeah, that includes them. Do you think they're a special category of person? They're as bad as anybody that comes in. We have bad ones too. And I'm all for it, because we can do things with the president for less money and have great security. And we have a huge prison population. We have a huge number of prisons. And then we have the private prisons. And some are operated well, I guess, and some aren't. But he does a great job

with that. We have others that we're negotiating with too. But no, if it's a homegrown criminal, I have no problem.
(37:38)
Now, we're studying the laws right now. Pam is studying. If we can do that, that's good. And I'm talking about violent people. I'm talking about really bad people, really bad people. Every bit as bad as the ones coming in. And I made the statement when I heard about this a long time ago now, four years ago, when I heard that this guy was having open borders, I said, "Every single criminal from all over the world is going to be dumped into our country." And that's what happened. The jails of the Congo were emptied out. The jails of Venezuela were emptied out. And you know what happened? Their crime went way down. But now Venezuela has other problems. You know what the problem is? They have no money because I shut off their oil and we put secondary tariffs because they're not doing what's right over there. They know what to do. We spoke to them. I spoke to them. They know what to do. But they have no money. Venezuela has no money. But Iran had no money, and Iran behaved so beautifully. And then Biden took all those secondary tariffs on. I told China, "You can't buy oil. If you buy oil from Iran…" China. I told it to President Xi… "then we no longer want you to do business with the United States of America." And those ships disappeared from that harbor so quickly. China. Get along great with China.

Speaker 10 (39:05):
Are the talks with Iran productive? Do you want to continue that?

Donald Trump (39:07):
What?

Speaker 10 (39:09):
The talks with Iran, do you believe those are productive? Do you want to continue that?

Donald Trump (39:12):
I think Iran could be a great country as long as it doesn't have nuclear weapons. If they have nuclear weapons, they'll never get a chance to be a great country. They will never get a chance. It won't even come close.

Speaker 12 (39:24):
Sir, on tariffs.

Donald Trump (39:24):
Yeah. Please.

Speaker 12 (39:25):
Yeah. Thank you. Yesterday, you mentioned short-lived product exemptions. Which specific products are you considering and how long is short-lived? Weeks, months?

Donald Trump (39:34):

I'm looking at something to help some of the car companies where they're switching to parts that were made in Canada, Mexico, and other places. And they need a little bit of time because they're going to make them here, but they need a little bit of time. So I'm talking about things like that.

Speaker 12 (39:51):
What about any Apple products, other cell phones?

Donald Trump (39:55):
Look, I'm a very flexible person. I don't change my mind, but I'm flexible. And you have to be. You just can't have a wall. No, sometimes you have to go around it, under it or above it. There'll be maybe things coming up. I speak to Tim Cook. I helped Tim Cook recently, that whole business. I don't want to hurt anybody, but the end result is, we're going to get to the position of greatness for our country. We're the greatest economic power in the world if we're smart. If we're not smart, we're going to hurt our country very badly. We lost, with China, over the Biden years, trillions of dollars on trade, trillions of dollars. He let them fleece us. And we can't do that anymore. And you know what? I don't blame China at all. I don't blame President Xi. I like him. He likes me. I mean, who knows? Who the hell cares?

Speaker 12 (40:54):
Do you have any updates on talks with China?

Donald Trump (40:55):
What?

Speaker 12 (40:55):
Do you have any updates with talks with China?

Donald Trump (40:56):
No. Let me just tell you this. I don't blame China. I don't blame Vietnam. I see their meeting today. Isn't that wonderful? That's a lovely meeting. The meeting trying to figure out, "How do we screw the United States of America?" Don't forget, the European Union was formed to do just that. The European Union was formed to hurt the United States on trade, and they get us on NATO because they don't pay their bills. But now, since I got involved, they have been paying their bills. I took in over $600 billion for NATO. Nobody took in anything. I mean, they were all delinquent. Eight nations out of 28 paid their bills. The rest of them were way delinquent. And I said, "If you don't pay your bills, we're not going to protect you anymore." And the money poured in. The Secretary General last week made that statement. He said, "I've never seen anything like it. We couldn't get anybody to pay," because the United States was footing the bill for NATO.
(41:53)
Well, we got hurt there and we got hurt on trade likewise, European Union. And they've got to come to the table, and they're trying to, they're trying to. But the European Union is taking terrible advantage. They don't take our food products. They don't take our cars. We have millions of their cars. BMW, Volkswagen, Mercedes-Benz, many others. They come

in by the millions. There were no Chevrolets in Munich, I can tell you that. I said to Angela Merkel when she was there as she was letting millions of people infiltrate Germany, which was not so good from… We would call them illegal immigrants, but she made them legal. But I said to her… And I get along with her very well. I said, "How many Chevrolets do we have in Munich or Frankfurt?" "None, Donald. None." I said, "You're right." And yet we take in millions and millions of cars. No, those days are over.
(42:54)
Okay. Thank you very much everybody.

Case No. 25-cv-1774-JEB

# Exhibit 47

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| KILMAR ARMANDO ABREGO GARCIA, *et al.*,<br>Plaintiffs,<br>v.<br>KRISTI NOEM, Secretary of Homeland Security, *et al.*,<br>Defendants. | No. 8:25-cv-00951-PX<br><br>Declaration Of Joseph N. Mazzara |

**DECLARATION OF JOSEPH N. MAZZARA**

I, Joseph N. Mazzara, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1. I am the Acting General Counsel at the Department of Homeland Security.

2. I provide this declaration based on my personal knowledge, reasonable inquiry, and information obtained from other Department of Homeland Security (DHS) employees.

3. I am aware that the instant lawsuit has been filed regarding the removal of Kilmer Armando Abrego Garcia (Abrego Garcia) to El Salvador.

4. On March 15, 2025, Abrego Garcia, a native and citizen of El Salvador, was removed to El Salvador, pursuant to Title 8 of the United States Code. *See* Declaration of Evan C. Katz, *Abrego Garcia v. Noem*, No. 8:25-cv-00951-PX (D. Md. Apr. 13, 2025), ECF No. 64 ¶ 4.

5. During bond proceedings in 2019, an Immigration Judge upheld DHS's decision not to grant bond, finding that DHS's determination that he was a member of MS-13 was "trustworthy" and "supported by other evidence," and noted that Abrego Garcia "failed to present evidence to rebut that assertion." The Board of Immigration Appeals upheld the finding when

Abrego Garcia appealed. *See* Declaration of Evan C. Katz, *Abrego Garcia v. Noem*, No. 8:25-cv-00951-PX (D. Md. Apr. 13, 2025), ECF No. 64 ¶ 6.

6. Abrego Garcia was ordered removed by an Immigration Judge. He was also granted withholding of removal by an Immigration Judge. Abrego Garcia is no longer eligible for withholding of removal because of his membership in MS-13, which is now a designated foreign terrorist organization. *See* Declaration of Evan C. Katz, *Abrego Garcia v. Noem*, No. 8:25-cv-00951-PX (D. Md. Apr. 13, 2025), ECF No. 64 ¶ 7.

7. Abrego Garcia is being held in the sovereign, domestic custody of the independent nation of El Salvador. DHS does not have authority to forcibly extract an alien from the domestic custody of a foreign sovereign nation.

8. DHS has established processes for taking steps to remove domestic obstacles that would otherwise prevent an alien from lawfully entering the United States. I have been authorized to represent that DHS is prepared to facilitate Abrego Garcia's presence in the United States in accordance with those processes if he presents at a port of entry.

9. I have been authorized to represent that if Abrego Garcia does present at a port of entry, he would become subject to detention by DHS. In that case, DHS would take him into custody in the United States and either remove him to a third country or terminate his withholding of removal because of his membership in MS-13, a designated foreign terrorist organization, and remove him to El Salvador.

10. I am aware that the President of El Salvador, Nayib Bukele, was in Washington, D.C. yesterday to meet with President Donald Trump. President Bukele and President Trump held a bilateral summit at the White House yesterday.

11. What I understand to be the unofficial transcript of the meeting is attached to this declaration, with the relevant discussion beginning at the 16:34 timestamp. The transcript can also be found here: https://www.rev.com/transcripts/trump-meets-with-the-president-of-el-salvador.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 15th day of April 2025.

Joseph N. Mazzara
Acting General Counsel
U.S. Department of Homeland Security

Case No. 25-cv-1774-JEB

# Exhibit 48

# Immigration Enforcement:
## Actions Needed to Better Track Cases Involving U.S. Citizenship Investigations

**GAO-21-487**
Published: Jul 20, 2021. Publicly Released: Jul 20, 2021.

## Fast Facts

In recent years, some U.S. citizens have claimed they were mistakenly identified as foreign nationals and detained by U.S. Immigration and Customs Enforcement (ICE) or held by U.S. Customs and Border Protection (CBP) on immigration charges.

ICE and CBP have policies and procedures for investigating citizenship, but we found some ICE guidance is inconsistent and ICE does not systematically track these encounters. Our analysis of available ICE data indicates arrests, detentions, and removals of some U.S. citizens over the last 5 years.

We made 2 recommendations to ICE to better identify and track cases involving U.S. citizens.

**ICE Detention Facility in Louisiana**



Source: GAO.

# Highlights

## What GAO Found

Department of Homeland Security's (DHS) U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP) have policies and procedures for investigating citizenship, but some ICE guidance is inconsistent. Specifically, ICE policy requires officers to interview individuals claiming U.S. citizenship in the presence of, or in consultation with, a supervisor, but its training materials direct officers to end questioning if the officer believes the individual and the evidence suggests the individual is a U.S. citizen—without consulting a supervisor. By making its training materials consistent with ICE policy, ICE would have more assurance that all encounters with potential U.S. citizens receive appropriate supervisory review.

Further, while ICE policy requires officers to document citizenship investigations in ICE data systems, it does not require officers to update the citizenship field after identifying evidence that an individual may be a U.S. citizen. As a result, ICE

does not know the extent to which its officers are taking enforcement actions against individuals who could be U.S. citizens. By systematically collecting and maintaining electronic data, ICE would have better insight into its officers' enforcement of administrative immigration law.

Available data indicate ICE and CBP took enforcement actions against some U.S. citizens. For example, available ICE data indicate that ICE arrested 674, detained 121, and removed 70 potential U.S. citizens from fiscal year 2015 through the second quarter of fiscal year 2020 (March 2020).

**U.S. Immigration and Customs Enforcement (ICE) Enforcement Actions Against Potential U.S. Citizens from Fiscal Years 2015 through 2020 Quarter 2 (March 2020)**




Source: GAO analysis of ICE data. | GAO-21-487

ICE has policies and procedures for investigating citizenship of individuals for detainers. Detainers are notices from ICE to other law enforcement agencies that articulate probable cause for removability. They also request for such agencies to inform DHS of a removable individual's pending release date and to maintain custody for up to 48 hours to allow DHS to assume custody. ICE officers are, to the extent feasible, to interview individuals in the custody of another law enforcement agency to aid in assessing the individuals' potential citizenship prior to issuing detainers. Available ICE data indicate ICE issued detainers for at least 895 potential U.S. citizens from fiscal year 2015 through the second quarter of 2020 and cancelled about 74 percent of those detainers.

## Why GAO Did This Study

In recent years, some U.S. citizens have claimed that they were mistakenly detained or removed by ICE and held by CBP on administrative immigration

charges. Such charges are based on civil violations of U.S. immigration law, but these charges are not applicable to U.S. citizens.

GAO was asked to review issues related to U.S. citizens detained by ICE or held by CBP on administrative immigration charges. This report examines (1) the extent to which ICE and CBP have developed and implemented policies and procedures for investigating the potential U.S. citizenship of individuals its officers and agents encounter; (2) ICE and CBP data on U.S. citizens detained by ICE or held by CBP on administrative immigration charges; and (3) the extent to which ICE has developed and implemented policies and procedures for investigating the potential U.S. citizenship of individuals its officers identify for detainers. GAO analyzed DHS documents and record-level enforcement data, and interviewed DHS officials at headquarters and in the field.

## Recommendations

GAO recommends that ICE (1) update its training materials to reflect ICE policies regarding potential U.S. citizens, and (2) systematically collect and maintain electronic data of its encounters with individuals for whom there is evidence of potential U.S. citizenship. DHS concurred with the recommendations.

### Recommendations for Executive Action

| Agency Affected | Recommendation | Status |
|---|---|---|
| United States Immigration and Customs Enforcement | The Director of ICE should update ICE's training materials to reflect ICE policies requiring officers to consult supervisors during encounters with potential U.S. citizens. (Recommendation 1) | Closed – Implemented<br>In July 2021, we reported on DHS's detention of U.S. citizens. We found that ICE officer training materials contained guidance for notifying supervisors of encounters with potential U.S. citizens that are inconsistent with ICE policy. Therefore, we recommended that ICE update its training materials to reflect ICE policies requiring officers to consult supervisors during encounters with potential U.S. citizens. ICE agreed |

| Agency Affected | Recommendation | Status |
|---|---|---|
| | | with this recommendation. In May 2022, ICE revised its training materials for ERO officer trainings to reflect ICE's policy that officers are to interview all individuals claiming U.S. citizenship or with potential indicia of citizenship in the presence of, or in... View More |
| United States Immigration and Customs Enforcement | The Director of ICE should systematically collect and maintain electronic data on its encounters with individuals for whom there is probative evidence of U.S. citizenship. (Recommendation 2) | Closed – Implemented<br>In July 2021, we reported on DHS's detention of U.S. citizens. We found that ICE's policy did not ensure reliable electronic data on the individuals ICE arrested, detained, or removed but for whom ICE later identified probative evidence of U.S. citizenship. This was because the policy did not require ERO officers to update the citizenship field in the individual's electronic record specifically after identifying probative evidence that an individual may be a U.S. citizen. As a result, ICE did not know the extent to which its officers were taking enforcement actions against individuals who could be U.S. citizens. We recommended that ICE systematically collect and maintain electronic data... View More |

# Full Report

Highlights Page (1 page)

Full Report (97 pages)

Accessible PDF (118 pages)

# GAO Contacts

**Rebecca S. Gambler**
Director
Homeland Security and Justice
gamblerr@gao.gov

### Media Inquiries

**Sarah Kaczmarek**
Managing Director
Office of Public Affairs
media@gao.gov

### Public Inquiries

Contact Us

# Topics

Homeland Security

Arrests | Border control | Border patrol | Citizenship | Civil liberties | Civil rights | Contraband | Crime | Criminal investigations | Customs enforcement | Foreign nationals | Homeland security | Immigration | Immigration detention | Immigration enforcement | Law enforcement | Naturalization | Policies and procedures | Ports of entry | Smuggling



Case No. 25-cv-1774-JEB

# Exhibit 49

*Democracy Dies in Darkness*

**Immigration**

# Trump officials issue quotas to ICE officers to ramp up arrests

The administration wants to increase the number of arrests from a few hundred per day to at least 1,200 to 1,500, increasing the chances that non-criminals will be detained.

Updated January 26, 2025

By Nick Miroff and Maria Sacchetti

U.S. Immigration and Customs Enforcement officials have been directed by Trump officials to aggressively ramp up the number of people they arrest, from a few hundred per day to at least 1,200 to 1,500, because the president has been disappointed with the results of his mass deportation campaign so far, according to four people with knowledge of the briefings.

The quotas were outlined Saturday in a call with senior ICE officials, who were told that each of the agency's field offices should make 75 arrests per day and managers would be held accountable for missing those targets. The four people spoke on the condition of anonymity to disclose internal briefings.

The orders significantly increase the chance that officers will engage in more indiscriminate enforcement tactics or face accusations of civil rights violations as they strain to meet quotas, according to current and former ICE officials.




Podcast episode

Trump's deportation campaign has begun

The Trump administration's plan to rapidly ramp up deportations.

Play now 26 min

Follow on

White House "border czar" Tom Homan has said for weeks that ICE would not conduct mass roundups and its officers would prioritize immigrants with criminal records and who are gang members. But the quotas issued this weekend would place ICE officers under more pressure to seize a wider range of potential deportees to avoid reprimand, including immigrants who have not committed crimes.

Neither ICE nor Homan responded to requests for comment. After an earlier version of this article was published, White House press secretary Karoline Leavitt said in an email that, "your story is false," but did not reply when asked for specifics.

Homan told ABC News in an interview broadcast Sunday that the administration is "in the beginning stages" of its mass deportation plan, and while public safety threats and national security threats are a priority, "as that aperture opens, there'll be more arrests nationwide."

ICE announced in a statement Sunday that agents "began conducting enhanced targeted operations today in Chicago," with help from other federal agencies, including the FBI. Acting Homeland Security secretary Benjamine C. Huffman last week revoked a directive that had essentially barred ICE from arresting immigrants in or around sensitive areas such as schools, hospitals and churches.

Later Sunday, Homan appeared on a streaming service with Phil McGraw, the television doctor known as Dr. Phil, to emphasize that ICE is searching for specific immigrants who have committed crimes.

"Sweeps don't occur anywhere," Homan told McGraw, whose MeritTV said they were inside the ICE Command Center in Chicago.

### ICE increasingly targets undocumented migrants with no criminal record

The Trump administration is increasingly targeting unauthorized immigrants with no criminal record as it ramps up arrests, a Washington Post analysis of U.S. Immigration and Customs Enforcement data shows.

An ICE official who was not authorized to discuss the quota said the agency's list of criminal suspects was sufficiently long, so officers would be able to continue prioritizing public safety and national security threats to meet quotas.

Last year, ICE told lawmakers there were about 670,000 immigrants on its caseload who had criminal convictions or faced criminal charges. Some are serving sentences in jails and prisons.

But Paul Hunker, a former ICE chief counsel in Dallas, said arresting serious offenders takes time, staff and planning — more time than quotas might allow.

“Quotas will incentivize ICE officers to arrest the easiest people to arrest, rather than the people that are dangerous noncitizens,” said Hunker, who, as the agency’s chief counsel in Dallas, oversaw offices in North Texas and Oklahoma from 2003 through January 2024.

“I’ve just never heard of that,” he said, referring to the quotas.

The agency manages a docket of about 7.8 million people who potentially face deportation, but many of them have pending claims in the U.S. immigration system or a form of provisional residency status. ICE’s caseload more than doubled during Joe Biden’s presidency amid record numbers of illegal border crossings.

ICE officers deployed aggressively during President Donald Trump’s first week in office, boosting the number of immigrants taken into custody from fewer than 400 on Tuesday to nearly 600 on Friday. The number declined to 286 on Saturday, according to ICE.

Trump’s supporters and others have pointed out that those totals will not yield the “millions” of deportations the president has promised.

Trump made a similar promise during his first term and came up far short, reaching a peak of about 267,000 during the 2019 fiscal year. The Biden administration deported 271,000 in fiscal year 2024, the highest annual total in a decade. Trump has long had little patience for explanations of why his goals are not realistic.

ICE officers have been told for years that indiscriminate roundups are unsafe and counterproductive, because they spread panic throughout immigrant communities and produce significant public backlash. ICE and the White House did not immediately respond to requests for comment.

Trump officials have told ICE the president expects arrest operations to proceed around-the-clock and that officers should cancel personal leave, according to the four people briefed on the directives.

ICE has about 5,500 officers nationwide working on immigration enforcement, a staffing level that has remained roughly flat for the past decade. The Trump administration took steps to supplement those numbers by deputizing officers and agents at the Justice Department to investigate immigration violations and make arrests, enlisting personnel from the FBI, U.S. Marshals, the Drug Enforcement Administration, the Bureau of Alcohol, Tobacco, Firearms and Explosives and the Federal Bureau of Prisons.

**Trump presidency**

Follow live updates on the Trump administration. We're tracking Trump's progress on campaign promises and legal challenges to his executive orders and actions.

Trump also ordered ICE's Homeland Security Investigations division to shift its focus to immigration enforcement. The agency is DHS's investigative division for counterterrorism, drug smuggling, human trafficking cases, child exploitation and other crimes.

"Mobilizing these law enforcement officials will help fulfill President Trump's promise to the American people to carry out mass deportations," Huffman said in a statement. "For decades, efforts to find and apprehend illegal aliens have not been given proper resources. This is a major step in fixing that problem."

Former ICE officials, speaking on the condition of anonymity to describe the work of Homeland Security Investigations, said reassigning special agents to carry out civil immigration enforcement will mean they devote less time to probing serious crimes.

## What readers are saying

The comments express strong opposition to the quotas issued to ICE officers for increasing arrests, highlighting concerns about potential civil rights violations and the indiscriminate targeting of non-criminal immigrants. Many commenters draw parallels to historical injustices,... Show more

This summary is AI-generated. AI can make mistakes and this summary is not a replacement for reading the comments.

Case No. 25-cv-1774-JEB

# Exhibit 50

US immigration

This article is more than **2 months old**

# Trump administration sets quota to arrest 3,000 people a day in anti-immigration agenda

## The target was delivered by Stephen Miller and Kristi Noem, and triples figures from earlier this year




Plainclothes Ice agents load people detained at the Miami immigration court into a van on 21 May. Photograph: Rebecca Blackwell/AP

José Olivares *in New York*

Thu 29 May 2025 18.14 EDT

The Trump administration has set aggressive new goals in its anti-immigration agenda, demanding that federal agents arrest 3,000 people a day - or more than a million in a year.

The new target, tripling arrest figures from earlier this year, was delivered to Immigration and Customs Enforcement (Ice) leaders by Stephen Miller, the White House deputy chief of staff, and Kristi Noem, the Department of Homeland Security (DHS) secretary, in a strained meeting last week.

The intense meeting, first reported by Axios and confirmed by the Guardian, involved Ice officials from enforcement and removal operations (ERO) and homeland security investigations (HSI) - both separate offices within DHS. ERO is in charge of immigration enforcement, including arrests, detention and deportation, while HSI typically focuses on investigating transnational crime, such as drug trafficking, human smuggling and the spread of online child abuse.

The 21 May meeting in Washington DC is the latest example of the increasing pressure being placed on officials nationwide to increase the number of arrests of immigrants, as the administration doubles down on its anti-immigration agenda.

The latest phase of the crackdown includes new tactics, such as mandating federal law enforcement agents outside Ice to assist in arrests and transports, more deputizing of compliant state and local law enforcement agencies, and arresting people at locations that were once protected, like courthouses.

"This administration came into office with the illusion that they had been given a broad mandate to effectuate an aggressive immigration enforcement agenda, and they are doubling down now on that agenda," said Nayna Gupta, the policy director for the American Immigration Council. "Public polling is showing decreasing support for Trump's immigration agenda, as Americans wake up to the reality that mass deportation means arrests of our neighbors and friends, masked agents in our communities and people afraid to go to work and show up to school, in ways that undermine our local economies."

Helter-skelter action has led to citizens caught up in the dragnet, Ice skirting due process - to the chagrin of the supreme court and lower courts - over-crowding in detention centers, arrests based on ideology and officials deporting people to third countries.

"The sweeping Ice raids and arrests are hitting families, longtime residents, children and communities in a way never seen before," said Jesse Franzblau, the associate director of policy for the National Immigrant Justice Center.

As the number of people crossing the border into the US without authorization has plummeted even further than after the final Biden crackdown, operations in the US interior have increased.

"Under Secretary Noem, we are delivering on President Trump's and the American people's mandate to arrest and deport criminal illegal aliens and make America safe," Tricia McLaughlin, the homeland security assistant secretary, said in a statement.

But even if the new target is fulfilled, it's a far cry from Trump's election campaign pledges to deport 15m to 20m people, which itself is more than the estimated 11m undocumented population.

Agents with the FBI, HSI, Drug Enforcement Administration, Bureau of Alcohol, Tobacco, Firearms and Explosives and other federal law enforcement agencies have been co-opted from normal priorities to carry out immigration enforcement work. Current and former federal officials told the Guardian there is concern that important non-immigration-related investigations are falling by the wayside as a result.

There has also been a huge escalation by local police and sheriff's departments assisting, deputized by Ice to perform federal immigration arrests under a program called 287(g).

Ice has also been targeting unusual places.

On Tuesday, Ice and several other federal law enforcement agencies arrested roughly 40 people on the Massachusetts islands of Nantucket and Martha's Vineyard. The US Coast Guard transported those apprehended, Ice said, angering some residents, local media reported.

The agency has also been arresting people at courthouses throughout the country - a trend that has troubled advocates and policy analysts.

"We're seeing the Trump administration take the unprecedented step of arresting non-citizens who are following the government's rules and procedures, and showing up for their court hearings," said Gupta. "They are desperate to reach a certain number of arrests per day. And the only way they can find non-citizens easily and quickly is to go to the courthouses, where they [immigrants] are doing exactly what they're supposed to do."

On Wednesday, sources told the Guardian that officials had arrested people at two separate immigration courts in New York City. The outlet the City observed seven people arrested in a lower Manhattan court.

Internal documents accessed by the Washington Post show Ice officers in more than 20 states have been instructed to arrest people at courthouses immediately after a judge orders them deported or after their criminal cases are dropped and they try to leave.

The number of people held in detention by Ice reached 49,000 by 18 May, an increase of more than 10,000 since Trump took office, with the agency using local jails and federal prisons to hold immigrants, amid overcrowding.

Austin Kocher, an assistant research professor at Syracuse University who closely tracks immigration detention data, said of the 3,000 daily arrest quota: "The big question for me is: where are they going to put people?"

Meanwhile, last month, the Trump administration ordered immigration judges to quickly dismiss cases by denying asylum seekers a hearing. The directive "has nothing to do with efficiency - it's about slamming shut the courthouse door on people who have the right to seek asylum and a fair day in court", Shayna Kessler, the director of the Advancing Universal Representation initiative at the Vera Institute of Justice, said.

On Capitol Hill, the major spending bill passed by the House would balloon spending for immigration enforcement, at the US-Mexico border and in the interior, while cutting everyday services.

"The administration is on a reckless spending spree, counting on Congress to bail them out for overspending hundreds of millions of dollars in private prison contracts with ties to top-level officials," Franzblau said.

He concluded: "It is beyond cruel to superfund Ice's rampant violations of constitutional protections and expand the deadly immigration detention and enforcement apparatus."

Miller confirmed to Fox News on Wednesday that the White House was setting a goal for Ice to arrest at least 3,000 migrants per day, far above an earlier 1,000 per day arrest quota.

Reuters reported later on Thursday that the Trump administration was removing two senior immigration enforcement officials amid demands to step up enforcement, three people familiar with the move said.

Top Ice officials Kenneth Genalo and Robert Hammer will be pulled from their posts, the people told the news agency, requesting anonymity to discuss the shift. DHS denied that they were pushed out.

## Most viewed

Case No. 25-cv-1774-JEB

# Exhibit 51

HOURLY NEWS
WAMU 88.5
Morning Edition
LISTEN LIVE
MY PLAYLIST

npr WAMU 88.5 AMERICAN UNIVERSITY RADIO +

DONATE

THE AMERICAS

# What to know about CECOT, El Salvador's mega-prison for gang members

MARCH 17, 2025 · 1:52 AM ET

By The Associated Press



In this photo provided by El Salvador's presidential press office, prison guards transfer deportees from the U.S., alleged to be Venezuelan gang members, to the Terrorism Confinement Center in Tecoluca, El Salvador, Sunday, March 16, 2025.

*AP/El Salvador presidential press office*

SAN SALVADOR, El Salvador — The crown jewel of El Salvador's aggressive anti-crime strategy — a mega-prison where visitation, recreation and education are not allowed — became the latest tool in U.S. President Donald Trump's crackdown on

immigration on Sunday, when hundreds of immigrants facing deportation were transferred there.



POLITICS

**U.S. deports hundreds of Venezuelans to El Salvador, despite court order**

The arrival of the immigrants, alleged by the U.S. to be members of the Venezuelan Tren de Aragua gang, took place under an agreement for which the Trump administration will pay the government of President Nayib Bukele $6 million for one year of services.

Bukele has made the Central American country's stark, harsh prisons a trademark of his fight against crime. In 2023, he opened the Terrorism Confinement Center, or CECOT, where the immigrants were sent over the weekend even as a federal judge issued an order temporarily barring their deportations under an 18th century wartime declaration targeting Venezuelan gang members.

## What is the CECOT?

Bukele ordered the mega-prison built as he began his campaign against El Salvador's gangs in March 2022. It opened a year later in the town of Tecoluca, about 72 kilometers (45 miles) east of the capital.

The facility has eight sprawling pavilions and can hold up to 40,000 inmates. Each cell can fit 65 to 70 prisoners.

CECOT prisoners do not receive visits and are never allowed outdoors. The prison does not offer workshops or educational programs to prepare them to return to society after their sentences.

Occasionally, prisoners who have gained a level of trust from prison officials give motivational talks. Prisoners sit in rows in the corridor outside their cells for the talks or are led through exercise regimens under the supervision of guards.

Bukele's justice minister has said that those held at CECOT would never return to their communities.

The prison's dining halls, break rooms, gym and board games are for guards.

## How many prisoners does El Salvador hold?

The government doesn't regularly update the figure, but the human rights organization Cristosal reported that in March 2024 El Salvador had 110,000 people behind bars, including those sentenced to prison and those still awaiting trial. That's more than double the 36,000 inmates that the government reported in April 2021, a year before Bukele ramped up his fight against crime.

Cristosal and other advocates have accused authorities of human rights violations.

Cristosal reported last year that at least 261 people had died in El Salvador's prisons during the gang crackdown. The group and others have cited cases of abuse, torture and lack of medical attention.

In slickly produced videos, the government has shown CECOT prisoners in boxer shorts marching into common areas and made to sit nearly atop each other. Cells lack enough bunks for everyone.

## Why were immigrants sent to CECOT?

The migrants were deported after Trump's declaration of the Alien Enemies Act of 1798, which has been used only three times in U.S. history.

The law requires a president to declare the U.S. is at war, giving him extraordinary powers to detain or remove foreigners who otherwise would have protections under immigration or criminal laws. Trump claimed the Tren de Aragua gang was invading the U.S. in invoking the wartime authority.



THE AMERICAS

**Tren de Aragua — all you need to know about the Venezuelan gang**

Tren de Aragua originated in an infamously lawless prison in Venezuela and accompanied an exodus of millions of Venezuelans, the overwhelming majority of whom were seeking better living conditions after their nation's economy came undone last decade.

The Trump administration has not identified the migrants deported, provided any evidence they are in fact members of Tren de Aragua or that they committed any crimes in the U.S.

Video released by El Salvador's government Sunday showed men exiting airplanes into an airport tarmac lined by officers in riot gear. The men, who had their hands and ankles shackled, struggled to walk as officers pushed their heads down to have them bend at the waist.

The video also showed the men being transported to CECOT in a large convoy of buses guarded by police and military vehicles and at least one helicopter. The men were shown kneeling on the ground as their heads were shaved before they changed into the prison's all-white uniform – knee-length shorts, T-shirt, socks and rubber clogs – and placed in cells.

Our commitment to you will never waver.

President Trump has signed the bill that eliminates $1.1B of federal funding for public media.

This devastating decision means fewer reporters on the ground, fewer voices that dare to ask difficult questions, and fewer stories that reflect the depth and diversity of our country.

**But here's what will never change: NPR's commitment to you and our mission to create a more informed public.**

If you believe that everyone deserves access to trustworthy, inspirational journalism and programming— now is the time to act.

Commit to a recurring monthly gift today to help ensure that this American resource continues to be a reliable companion and civic cornerstone.

DONATE NOW

## More Stories From NPR




NATIONAL

**Far fewer Canadians are visiting the U.S. this year, new numbers show**



THE AMERICAS

**Brazilian police say ex-President Bolsonaro had planned to flee to Argentina**




WORLD

**Air Canada flights slowly resume after flight attendants agree to end their strike**



THE AMERICAS

**Bolivia's presidential vote goes to runoff between centrist and right-wing candidates**




BUSINESS

## Government forces Air Canada flight attendants back to work, into arbitration



WEATHER

## Category 4 Hurricane Erin moves past northern Caribbean islands

## Popular on NPR.org



UKRAINE INVASION — EXPLAINED

### A Russian airstrike hits a U.S. factory in western Ukraine



NATIONAL

## The National Guard has been deployed to enforce the law before. What's different now?



RELIGION

## Mormon women can wear new sacred undergarments. Some wonder: Why now?



EDUCATION

## Are 'COVID kindergartners' ready for school?



IMMIGRATION

## Living in the shadows: Stateless people face unique perils during Trump's crackdown



LAW

## Appeals court allows end of protected status for migrants from 3 countries

## NPR Editors' Picks




GOATS AND SODA

## Pakistan is tapping into solar power at an 'unprecedented' rate. Here's why



LIVING BETTER

**The transitions of aging: How parents and adult children can adjust**



POP CULTURE HAPPY HOUR

**In 'Lurker' a social striver squirms his way into a star's inner circle**



HEALTH CARE HELPLINE

## Try this when your doctor says 'yes' to a preventive test but insurance says 'no'



SPACE

## A 'black moon' will appear in the sky this weekend, but you won't see it. Here's why




HEALTH CARE HELPLINE

**Have a health care system headache? Share your story**

READ & LISTEN

**Home**

**News**

**Culture**

**Music**

**Podcasts & Shows**

CONNECT

**Newsletters**

**Facebook**

**Instagram**

**Press**

**Public Editor**

**Corrections**

**Transcripts**

**Contact & Help**

ABOUT NPR

**Overview**

**Diversity**

GET INVOLVED

**Support Public Radio**

**Sponsor NPR**

**NPR Network**

**NPR Careers**

**Accessibility**

**NPR Shop**

**Ethics**

**NPR Events**

**Finances**

**NPR Extra**

---

terms of use

privacy

your privacy choices

text only

© 2025 npr