# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ROBERT F. KENNEDY HUMAN
RIGHTS, *et al.*,

         *Plaintiffs*,

    v.

DEPARTMENT OF STATE, *et al.*,

         *Defendants*.

Case No. 1:25-cv-01774-JEB

# DEFENDANTS' COMBINED OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND .............................................................................................................. 4

I.     Factual Background ............................................................................................ 4

II.    This Litigation.................................................................................................... 7

III.   Subsequent Developments ................................................................................ 8

LEGAL STANDARD....................................................................................................... 9

ARGUMENT ................................................................................................................. 10

I.     All Plaintiffs Have Failed to Demonstrate Standing.......................................... 10

     A.    No injury exists for any Plaintiff because all Venezuelan nationals transferred to El Salvador pursuant to the Arrangement have been returned to Venezuela. ...... 11

     B.    No Plaintiff has established an injury in fact for organizational standing............ 15

     C.    No Plaintiff has established an injury in fact for associational standing. ............. 19

     D.    Plaintiffs have failed to demonstrate the Arrangement caused any alleged injuries. ................................................................................................................ 20

     E.    The alleged injuries are not likely to be redressed by a court order. ................... 22

II.    Plaintiffs' APA Claims Fail As A Matter of Law............................................... 24

     A.    Plaintiffs do not identify any reviewable final agency action.............................. 24

     B.    The Arrangement is not subject to APA review. .................................................. 27

     C.    The Arrangement is not contrary to law. .............................................................. 29

     D.    The Arrangement is not arbitrary or capricious..................................................... 39

     E.    Plaintiffs' lack of statutory authority claim fails as a matter of law.................... 42

III.   Plaintiffs' *Ultra Vires* Claim Lacks Merit. ....................................................... 44

CONCLUSION............................................................................................................... 45

## TABLE OF AUTHORITIES

**Cases**

*Abigail All. for Better Access to Developmental Drugs v. Eschenbach*,
    469 F.3d 129 (D.C. Cir. 2006) ............................................................... 15

*Air Brake Sys., Inc. v. Mineta*,
    357 F.3d 632 (6th Cir. 2004) ................................................................. 26

*Al-Aulaqi v. Obama*,
    727 F. Supp. 2d 1 (D.D.C. 2010) ......................................................... 28

*Al Maqaleh v. Gates*,
    605 F.3d 84 (D.C. Cir. 2010) ................................................................. 31

*Al-Zahrani v. Rodriguez*,
    669 F.3d 315 (D.C. Cir. 2012) ............................................................... 10

*Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*,
    946 F.3d 615 (D.C. Cir. 2020) ............................................................... 15

*Am. Foreign Serv. Ass'n v. Trump*,
    2025 WL 1742853 (D.C. Cir. June 20, 2025) ....................................... 44

*Am. Legal Found. v. FCC*,
    808 F.2d 84 (D.C. Cir. 1987) ................................................................. 19

*Am. Nat'l Ins. Co. v. FDIC*,
    642 F.3d 1137 (D.C. Cir. 2011) ............................................................... 9

*Arabzada v. Donis*,
    725 F. Supp. 3d 1 (D.D.C. 2024) ............................................................ 9

*Bennett v. Spear*,
    520 U.S. 154 (1997) ............................................................................... 25

*Biden v. Nebraska*,
    600 U.S. 477 (2023) ............................................................................... 44

*Boumediene v. Bush*,
    553 U.S. 723 (2008) ......................................................................... 31, 32

*California Cmtys. Against Toxics v. EPA*,
    934 F.3d 627 (D.C. Cir. 2019) ............................................................... 27

*Cincinnati Soap Co. v. United States*,
    301 U.S. 308 (1937) ............................................................................... 38

*Citizens to Pres. Overton Park v. Volpe*,
   401 U.S. 402 (1971) ......................................................................... 27

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983) .............................................................. 13, 14, 15

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ........................................................ 11, 13, 14

*Conn v. Gabbert*,
   526 U.S. 286 (1999) ........................................................................ 30

*Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
   601 U.S. 416 (2024) ........................................................................ 37

*Ctr. for Responsible Sci. v. Gottlieb*,
   346 F. Supp. 3d 29 (D.D.C. 2018) .................................................. 20

*Daimler Chrysler Corp. v. Cuno*,
   547 U.S. 332 (2006) .......................................................................... 9

*Dep't of Navy v. Egan*,
   484 U.S. 518 (1988) ........................................................................ 28

*El-Shifa Pharm. Indus Co. v. United States*,
   607 F.3d 836 (D.C. Cir. 2010) (en banc) ...................................... 28

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021) ........................................................................ 39

*Fed. Defs. of San Diego, Inc. v. U.S. Sent'g Comm'n*,
   680 F. Supp. 26 (D.D.C. 1988) ...................................................... 16

*Federal Express Corp. v. United States Dep't of Comm.*,
   39 F.4th 756 (D.C. Cir. 2022) ........................................................ 44

*Fla. Audubon Soc'y v. Bentsen*,
   94 F.3d 658 (D.C. Cir. 1996) (en banc) ........................................ 22

*Food & Drug Admin. v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024) ................................................................. *passim*

*Food & Water Watch, Inc. v. Vilsack*,
   808 F.3d 905 (D.C. Cir. 2015) .................................................... 9, 18

*Fryshman v. United States Comm'n for Pres. of Am.'s Heritage Abroad*,
   422 F. Supp. 3d 1 (D.D.C. 2019) ................................................... 24

*FW/PBS, Inc. v. City of Dallas*,
   493 U.S. 215 (1990) ........................................................................ 15

iii

*Gettman v. DEA,*
  290 F.3d 430 (D.C. Cir. 2002) ........................................................................................... 19

*Glob. Health Council v. Trump,*
  --- F.4th ---, 2025 WL 2480618 (D.C. Cir. Aug. 28, 2025) ............................................. 44, 45

*Greater Tampa Chamber of Commerce v. Goldschmidt,*
  627 F.2d 258 (D.C. Cir. 1980) ........................................................................................... 23

*Haaland v. Brackeen,*
  599 U.S. 255 (2023) ........................................................................................................... 24

*Havens Realty Corp. v. Coleman,*
  455 U.S. 363 (1982) ..................................................................................................... 15, 18

*Hecate Energy LLC v. FERC,*
  126 F.4th 660 (D.C. Cir. 2025) ......................................................................................... 13

*Heckler v. Chaney,*
  470 U.S. 821 (1985) ........................................................................................................... 27

*Indigenous People of Biafra v. Blinken,*
  639 F. Supp. 3d 79 (D.D.C. 2022) ..................................................................................... 23

*Islamic Am. Relief Agency v. Gonzales,*
  477 F.3d 728 (D.C. Cir. 2007) ........................................................................................... 39

*J.G.G. v. Trump,*
  2025 WL 1577811 (D.D.C. June 4, 2025) ................................................................. *passim*

*Jenkins v. Howard Univ.,*
  123 F.4th 1343 (D.C. Cir. 2024) ......................................................................................... 9

*Kiyemba v. Obama,*
  561 F.3d 509 (D.C. Cir. 2009) ..................................................................................... 33, 40

*Kowalski v. Tesmer,*
  543 U.S. 125 (2004) ........................................................................................................... 30

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affs.,*
  104 F.3d 1349 (D.C. Cir. 1997) ......................................................................................... 28

*Lopez Bello v. Smith,*
  651 F. Supp. 3d 20 (D.D.C. 2022) ..................................................................................... 40

*Lopez v. Fed. Aviation Admin.,*
  318 F.3d 242 (D.C. Cir. 2003) ........................................................................................... 27

*\*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ................................................................................................... *passim*

*Metro. Washington Chapter, Associated Builders & Contractors, Inc. v. D.C.*,
    62 F.4th 567 (D.C. Cir. 2023) ............................................................... 30

*Micei Int'l v. Dep't of Commerce*,
    613 F.3d 1147 (D.C. Cir. 2010) ............................................................. 10

*Michelson v. INS*,
    897 F.2d 465 (D.C. Cir. 1990) ............................................................... 32

*Mori v. Dep't of the Navy*,
    731 F. Supp. 2d 43 (D.D.C. 2010) ........................................................... 9

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ............................................................................... 39

*Munaf v. Geren*,
    553 U.S. 675 (2008) ........................................................................ 33, 34

*Murthy v. Missouri*,
    603 U.S. 43 (2024) ......................................................................... 10, 13

*Nat'l Fed'n of Indep. Bus. v. OSHA*,
    595 U.S. 109 (2022) .............................................................................. 43

*Nuclear Regul. Comm'n v. Texas*,
    605 U.S. 665 (2025) ......................................................................... 44, 45

*Oestereich v. Selective Serv. System Loc. Board No. 11*,
    393 U.S. 233 (1968) .............................................................................. 44

*Omar v. McHugh*,
    646 F.3d 13 (D.C. Cir. 2011) ................................................................. 33

*Oryszak v. Sullivan*,
    565 F. Supp. 2d 14 (D.D.C. 2008) .......................................................... 27

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*,
    810 F.3d 631 (9th Cir. 2015) ................................................................. 24

*Pro-Football, Inc. v. Harjo*,
    284 F. Supp. 2d 96 (D.D.C. 2003) ...................................................... 9, 10

*Reed v. Goertz*,
    598 U.S. 230 (2023) .............................................................................. 31

*Saavedra Bruno v. Albright*,
    197 F.3d 1153 (D.C. Cir. 1999) ............................................................. 28

*Santelises v. INS*,
    491 F.2d 1254 (2d Cir. 1974) ................................................................. 34

*Scenic Am. v. Dep't of Transp.*,
    983 F. Supp. 2d 170 (D.D.C. 2013) ........................................................ 18

*Schroer v. Billington*,
    525 F. Supp. 2d 58 (D.D.C. 2007) ......................................................... 44

*Sierra Club v. EPA*,
    955 F.3d 56 (D.C. Cir. 2020) ................................................................ 25

*Sorenson Commc'ns v. FCC*,
    897 F.3d 214 (D.C. Cir. 2018) .............................................................. 19

*Sprint Commc'ns Co. v. APCC Servs., Inc.*,
    554 U.S. 269 (2008) ............................................................................. 22

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ............................................................................... 20

*Summers v. Earth Island Institute*,
    555 U.S. 488 (2009) ............................................................................. 19

*Thomas v. Principi*,
    394 F.3d 970 (D.C. Cir. 2005) ................................................................ 9

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ....................................................................... 10, 20

*Trump v. J.G.G.*,
    604 U.S. 670 (2025) ............................................................................. 28

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*,
    578 U.S. 590 (2016) ....................................................................... 24, 25

*United States ex rel. Keefe v. Dulles*,
    222 F.2d 390 (D.C. Cir. 1954) .............................................................. 32

*United States v. Curtiss-Wright Exp. Corp.*,
    299 U.S. 304 (1936) ............................................................................. 43

*United States v. Texas*,
    599 U.S. 670 (2023) ....................................................................... 10, 11

*Warth v. Seldin*,
    422 U.S. 490 (1975) ............................................................................. 15

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ............................................................................. 43

*Viasat, Inc. v. FCC*,
    47 F.4th 769 (D.C. Cir. 2022) .............................................................. 19

*Zevallos v. Obama*,
    10 F. Supp. 3d 111 (D.D.C. 2014) ........................................................................... 40

## U.S. Constitution

U.S. Const. amend. V ........................................................................................................ 31

U.S. Const. amend. VIII ................................................................................................... 34

U.S. Const., Art. I, § 9, cl. 2 ............................................................................................ 31

## United States Code

1 U.S.C. § 112b ......................................................................................................... 7, 42

5 U.S.C. § 701 ................................................................................................................. 27

5 U.S.C. § 704 ................................................................................................................. 24

6 U.S.C. § 251 ..................................................................................................... 23, 32, 43

8 U.S.C. § 1231 ......................................................................................................... *passim*

18 U.S.C. § 3621 ............................................................................................................. 35

18 U.S.C. § 4001 ............................................................................................................. 34

22 U.S.C. § 2291 ............................................................................................................. 37

22 U.S.C. § 2395 ............................................................................................................. 37

22 U.S.C. § 2656 ............................................................................................................. 42

31 U.S.C. § 6301 ............................................................................................................. 38

42 U.S.C. § 2000dd ......................................................................................................... 35

50 U.S.C. § 21 ................................................................................................................. 43

## Rules

Fed. R. Civ. P. 56 .............................................................................................................. 9

## Regulations

6 C.F.R., subpts A, B ...................................................................................................... 35

28 C.F.R. § 543.13 .......................................................................................................... 35

28 C.F.R. § 548.10 .......................................................................................................... 35

28 C.F.R. § 551.110 ........................................................................................................ 35

28 C.F.R. § 551.117 ........................................................................................................ 35

FAR 1.104 ....................................................................................................................... 38

FAR 2.101 ....................................................................................................................... 38

**Other Authorities**

Press Release, Dep't of State, *Secretary of State Marco Rubio with Guy Benson of Fox News Radio* (Mar. 17, 2025),
   https://www.state.gov/secretary-of-state-marco-rubio-with-guy-benson-of-fox-news-radio/ . 4

Press Release, Dep't of State, *Secretary of State Marco Rubio with Lara Trump of Fox News* (July 21, 2025),
   https://www.state.gov/releases/office-of-the-spokesperson/2025/07/secretary-of-state-marco-rubio-with-lara-trump-of-fox-news/ ........................................................................................ 4

U.S. presentation before Comisión Interamericana de Derechos Humanos, *United States: Human rights situation of migrants, refugees and asylum seekers* (July 22, 2025),
   https://www.youtube.com/watch?v=5zJpvgzxnwg ................................................... 4, 6, 8, 16

https://foia.state.gov/FOIALIBRARY/QNI2.aspx ...................................................... 7

## INTRODUCTION

Plaintiffs are five advocacy organizations that assert that they represent aliens who were removed to El Salvador pursuant to a diplomatic arrangement between the United States and El Salvador. The Supreme Court held in *Trump v. J.G.G.*, however, that aliens challenging their removal to El Salvador pursuant to the diplomatic arrangement may seek relief only through habeas. Plaintiffs now seek to make an end-run around that decision by challenging the diplomatic arrangement through the Administrative Procedure Act ("APA"). They cannot do so because this Court lacks subject matter jurisdiction, and in any event, Plaintiffs' arguments—which amount to no more than superficial reliance on a wide variety of constitutional provisions and federal laws— fail as a matter of law. Accordingly, the Court should either grant Defendants' motion to dismiss for lack of jurisdiction or deny Plaintiffs' motion for summary judgment and enter judgment in favor of Defendants.

To begin, Plaintiffs lack standing. Except for two named MS-13 individuals, the challenged arrangement with El Salvador pertains only to Venezuelan members of Tren de Aragua ("TdA"), and the State Department made the arrangement on behalf of the United States because, at the time, the Maduro regime refused to take back Venezuelan nationals. The Maduro regime has since changed course, and the Venezuelans accepted by El Salvador have been transferred to Venezuela. Plaintiffs' assertion that they will have Venezuelan clients who will be transferred to, and accepted by, El Salvador in the future pursuant to the challenged arrangement is too speculative to support their request for prospective injunctive relief. Further, Plaintiffs—all organizations—fail to demonstrate an injury in fact either by a harm to their organizations or by establishing an associational injury. Nor could they show that the challenged arrangement was the cause of their asserted injuries or that a court order would redress them. Indeed, El Salvador and

the U.S. Department of Homeland Security ("DHS")—not the State Department—are responsible for all actions that allegedly caused Plaintiffs' injuries.  DHS decides who should be removed from the United States to El Salvador (if the latter is willing to accept them), and El Salvador decides whether and where to detain them and for how long.  An order enjoining the State Department from taking any further action pursuant to the challenged arrangement will not change those facts, let alone redress Plaintiffs' asserted injuries, as Plaintiffs' hypothetical clients could still be removed to El Salvador under the Immigration and Nationality Act ("INA").

Even if Plaintiffs could somehow establish standing, the challenged arrangement is not subject to review under the APA.  First, it is not a final agency action because it is nonbinding and can be discontinued at any time at the discretion of either the United States or El Salvador.  As such, no legal consequences flow from it; rather, any legal consequences to Plaintiffs flow from DHS's independent decision to remove their clients to El Salvador.  And even if this diplomatic arrangement were a final agency action, the State Department's action concerning it is committed to agency discretion and therefore unreviewable.

Beyond the significant threshold hurdles that Plaintiffs cannot overcome, the arrangement violates none of the many provisions of the Constitution or statutes Plaintiffs rely on, even if Plaintiffs had third party standing to advance the asserted rights under those laws on behalf of their current and future clients.  For instance, even assuming purely for the sake of argument that Venezuelans TdA members transferred to El Salvador were deprived of procedural due process in being removed to El Salvador, that would not be because of the challenged arrangement, which merely reflects El Salvador's decision to accept them, and is ancillary to the removal process.  Nor does the arrangement suspend the writ of habeas corpus by facilitating transfer to another country; otherwise, the Suspension Clause would be implicated whenever an alien is removed beyond the

custody of the United States.  Plaintiffs' reliance on an assortment of constitutional amendments also fails.  The Sixth Amendment, for example, does not apply to civil removal proceedings, and the Eighth Amendment is inapplicable because removal is not punishment.

Equally misplaced is Plaintiffs' reliance on the Convention Against Torture ("CAT"), which Plaintiffs assert is implicated because of alleged conditions at El Salvador's Terrorism Confinement Center, known as CECOT.  Federal law prohibits judicial review of CAT claims except as part of the review of a final removal order—which this case is not.  But even so, the United States explicitly requested El Salvador's commitment to abide by its obligations under the CAT and other applicable domestic and international law, and it is not the purview of courts to second guess the Executive's determination about the sufficiency of such commitment.  Plaintiffs assert that the challenged arrangement violates other laws, too, discussed below, none of which apply in this context.  To the extent Plaintiffs contend that removing an alien from the United States necessarily makes it impossible for the alien to seek relief under those domestic laws and, therefore, those laws are deemed violated, they cite no support for such an extraordinary proposition, nor are Defendants aware of any.

Plaintiffs' remaining arguments likewise have no merit.  The State Department acted reasonably and well within its broad decision-making authority in the sphere of foreign affairs in making the arrangement with El Salvador on behalf of the United States to remove Venezuelan TdA members whom the Maduro regime refused to take back at the time.  This is not *ultra vires* action.  Indeed, Plaintiffs cannot meet the exceedingly high bar for such a claim—*i.e.*, by identifying statutory bounds that Defendants clearly have crossed or by showing that Defendants' actions are blatantly lawless.

## BACKGROUND

### I.    Factual Background

Following weeks of high-level diplomatic discussions that began early in this Administration and accelerated after Secretary of State Marco Rubio's trip to El Salvador on February 3, 2025, the United States and El Salvador exchanged diplomatic notes on March 13 and 14, 2025, concerning the removal of certain Venezuelan nationals from the United States to El Salvador.   Pl. Ex. 12 ¶ 3 (RFK Human Rights_0011); *see also* Pl. Ex. 14 (RFK Human Rights_0001-02); Pl. Ex. 15 (RFK Human Rights_0003).[1]   At the time, the Maduro regime was refusing to accept the return of Venezuelan citizens from the United States.[2]   In this exchange, El Salvador expressed its "readiness to accommodate approximately 300" Venezuelan members of TdA from the United States, along with other commitments.   Pl. Ex. 15 (RFK Human Rights_0003).

Specifically, in the March 13 note, the U.S. Embassy in San Salvador requested that El Salvador accept, by March 14, 2025, two named MS-13 gang leaders and "up to 500 Venezuelan

---

[1] All Plaintiffs' exhibits are attached to the Declaration of Jessica Anne Morton, ECF No. 19-1.  For ease of reference, Defendants refer to each exhibit as numbered by Plaintiffs as "Pl. Ex. ##."

[2] *See* U.S. presentation before Comisión Interamericana de Derechos Humanos, *United States: Human rights situation of migrants, refugees and asylum seekers* (July 22, 2025), https://www.youtube.com/watch?v=5zJpvgzxnwg, 25:47 to 43:46 [hereinafter "Inter-Am. Comm'n presentation"], as cited in Decl. of Deputy Secretary of State ¶ 4, *J.O.P. v. U.S. Dep't of Homeland Security*, No. 8:19-cv-01944 (Sept. 11, 2025), ECF No. 395-3 ["Decl. of Deputy Secretary of State"]; Press Release, Dep't of State, *Secretary of State Marco Rubio with Guy Benson of Fox News Radio* (Mar. 17, 2025), https://www.state.gov/secretary-of-state-marco-rubio-with-guy-benson-of-fox-news-radio/ (noting that TdA members "should be going to Venezuela" but that Venezuela was "refus[ing] to take them"); Press Release, Dep't of State, *Secretary of State Marco Rubio with Lara Trump of Fox News* (July 21, 2025), https://www.state.gov/releases/office-of-the-spokesperson/2025/07/secretary-of-state-marco-rubio-with-lara-trump-of-fox-news/ ("So, since Venezuela wouldn't take [back the Venezuelan TdA members], we sent them to El Salvador, who housed them in their prisons.").

[TdA] members." Pl. Ex. 14 (RFK Human Rights_0001). The U.S. Embassy further stated the United States' "understand[ing] that El Salvador will take these actions in accordance with its authorities under Salvadoran domestic law, and in a manner that is consistent with El Salvador's international legal obligations regarding human rights and treatment of prisoners, including the Convention Against Torture." *Id.* The March 13 note also expressed the United States' understanding that "El Salvador intends to accommodate [the TdA members] for a duration of one year unless or until a determination concerning their long-term disposition is made." *Id.* Additionally, the March 13 diplomatic note memorialized the United States' intention: "In recognition of El Salvador's assistance on this matter, and in order to advance the shared objective of advancing the anti-crime and anti-drug objectives of our countries," and "consistent with U.S. domestic legal requirements to provide in-kind and financial support to the Government of El Salvador." *Id.* at 2.

In its March 14 response, El Salvador committed to accept the transfer of the two MS-13 gang leaders and expressed its "readiness to accommodate approximately 300 members of [TdA], currently detained by the United States," Pl. Ex. 15 (RFK Human Rights_0003), which was approximately 200 fewer than the number the United States had requested. El Salvador also confirmed it would house such individuals for a period of one year, "pending further decisions on their long-term disposition." *Id.*[3] The March 14 response also provides El Salvador's assurance

---

[3] Initially, El Salvador's March 13 note stated that it would "house these individuals for one (1) year pending the United States' decision on their long-term disposition." *See* Pl. Ex. 12 ¶ 4 (RFK Human Rights_0011). Because neither the United States nor El Salvador intended, nor negotiated, for the United States to retain any decision-making authority over the TdA members' disposition once in El Salvador, the United States quickly drew this mistake to El Salvador's attention. *Id.* ¶ 5 (RFK Human Rights_0011-12). El Salvador rescinded the diplomatic note almost immediately and replaced it with one that accurately reflects the two countries' mutual understanding. *Id.* .

that "the reception of these individuals will be conducted in accordance with Salvadoran law and international obligations, including adherence to the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, of which [El Salvador has] been a signatory since May 19, 1994." *Id.*

On March 22, the United States and El Salvador entered into a letter grant providing funds for El Salvador's law enforcement and anticrime needs. Pl. Ex. 22 (RFK Human Rights_0004-06). The letter grant acknowledged that El Salvador could choose to use these funds for "costs associated with" the detention of TdA members. *Id.* The use of the funds, however, was not limited to that purpose but was available to help address law enforcement and anticrime needs more generally. *Id.*; Pl. Ex. 12 ¶ 6.

On March 31, 2025, the U.S. Embassy in San Salvador sent another diplomatic note to El Salvador acknowledging a flight that arrived in El Salvador on March 30, 2025, carrying sixteen passengers, including seven non-Salvadoran passengers identified as Venezuelan members of TdA and nine Salvadoran passengers identified as members of MS-13. Pl. Ex. 16 (RFK Human Rights_0008). In that note, the United States highlighted "the importance of the Government of El Salvador's previous assurance that El Salvador's reception and treatment of TdA and MS-13 individuals will be in accordance with Salvadoran law and international obligations, including adherence to the Convention Against Torture." *Id.*

In total, the United States deported to El Salvador 252 Venezuelan nationals associated with Tren de Aragua. Decl. of Deputy Secretary of State ¶ 4. Defendants understand that El Salvador placed them in CECOT in a part of the prison separate from the general population. Pl. Ex. 12 ¶¶ 5 (RFK Human Rights_0011-12); Inter-Am. Comm'n presentation. CECOT is El Salvador's largest maximum-security prison and can hold up to 40,000 inmates. Pl. Ex. 51 at 2.

On April 30, 2025, the State Department reported the diplomatic notes between the United States and El Salvador to Congress as a "qualifying non-binding instrument" under the Case-Zablocki Act, 1 U.S.C. § 112b.  Pl. Ex. 12 ¶ 8 (RFK Human Rights_0013).  Pursuant to the requirements of the Case-Zablocki Act, on July 11, 2025, the State Department published the declassified version of the diplomatic notes at https://foia.state.gov/FOIALIBRARY/QNI2.aspx.

## II.    This Litigation

Plaintiffs are five nonprofit organizations, Robert F. Kennedy Human Rights, National Association of Criminal Defense Lawyers ("NACDL"), Immigrant Defenders Law Center, Immigration Equality, and California Collaborative for Immigrant Justice ("CCIJ").  *See* Compl. ¶¶ 8-12, ECF No. 1.  They filed suit against the U.S. Department of State and Secretary of State Marco Rubio on June 5, 2025.

Plaintiffs challenge the nonbinding arrangement between the United States and El Salvador, which Plaintiffs characterize as an "Agreement," pursuant to which according to Plaintiffs, "the United States government has disappeared individuals living in the United States into confinement in El Salvador." *Id*. ¶ 2.  Plaintiffs' Complaint contains four counts.  Count One alleges that the arrangement is contrary to the Suspension Clause; the Appropriations Clause; and the First, Fifth, Sixth, and Eighth Amendments to the U.S. Constitution and therefore violates the APA.  *See id.* ¶¶ 114-22.   Count One also alleges that the arrangement "is contrary to the Convention Against Torture" because of the alleged conditions at CECOT, where El Salvador placed the Venezuelan TdA members, and a host of laws and regulations, including the INA, the Americans with Disabilities Act, the Non Detention Act, the Detainee Treatment Act, the First Step Act, Federal Bureau of Prisons and Department of Homeland Security regulations, and the Federal Acquisitions Regulations.  *Id.* ¶¶ 123-33.   In Count Two, Plaintiffs allege that the

arrangement "violates the APA because it is arbitrary and capricious." *Id.* ¶¶ 134-44. Count Three, another APA claim, alleges that the arrangement "is in excess of the State Department's statutory authority. *Id.* ¶¶ 145-49. And, finally, in Count Four, Plaintiffs allege that the "Agreement" is *ultra vires. Id.* ¶¶ 150-52.

Plaintiffs seek a declaration that the "Agreement" is unlawful and a broad injunction preventing "Defendants, their officers, employees, and agents from taking any further action pursuant to the Agreement, including but not limited to rendering any person to El Salvador for detention, and/or taking any steps to implement, give effect to, or reinstate the Agreement under a different name." *Id.*, Prayer for Relief. As noted, because the challenged "Agreement" is a nonbinding understanding between two nations, Defendants will refer to it as the "Arrangement" for the remainder of this brief.

## III.    Subsequent Developments

Following the removal of the 252 Venezuelan nationals to El Salvador, the Maduro regime resumed accepting the return of Venezuelan nationals deported from the United States and thousands of Venezuelan nationals have been deported directly from the United States to Venezuela since that time. *See* Inter-Am. Comm'n presentation. As for the 252 Venezuelans removed from the United States to El Salvador, the State Department helped facilitate a deal between El Salvador and the Maduro regime whereby all of them were released to Venezuela in exchange for the Maduro regime's release of political prisoners (including ten Americans) in its custody.[4] None of the Venezuelans returned to Venezuela is believed to be in custody. *See* Inter-Am. Comm'n presentation.

_____

[4] *See* Decl. of Deputy Secretary of State ¶ 5; *see also* Pl. Ex. 27 (Salvadoran President Bukele's tweet noting that El Salvador "handed over all Venezuelan nationals detained in our

**LEGAL STANDARD**

To survive a Rule 12(b)(1) motion, the party asserting subject matter jurisdiction bears "the burden of establishing it." *Jenkins v. Howard Univ.*, 123 F.4th 1343, 1347 (D.C. Cir. 2024) (quoting *Daimler Chrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006)). In considering assertions of subject matter jurisdiction, courts "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting plaintiff[s] the benefit of all inferences that can be derived from the facts alleged.'" *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)). At the same time, however, the court "need not accept inferences drawn by a plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the court accept a plaintiff's legal conclusions." *Arabzada v. Donis*, 725 F. Supp. 3d 1, 9 (D.D.C. 2024) (citing *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015)).

Rule 56(a) provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment." *Pro-Football, Inc. v. Harjo*, 284 F. Supp. 2d 96, 112 (D.D.C. 2003) (citation omitted). Rather, the dispute must regard a question of fact that is material, meaning that it is "capable of affecting the substantive outcome of the litigation." *Id.* That is determined by "look[ing] to the substantive law on which each claim rests." *Mori v. Dep't of the Navy*, 731 F. Supp. 2d 43, 45 (D.D.C. 2010) (citation omitted), *appeal dismissed*, 2010 WL

---

country, accused of being part of [TdA]"); Pl. Ex. 7 ¶ 17 (noting "the government of El Salvador transferred 252 Venezuelan prisoners to Venezuela pursuant to an agreement between the Salvadoran [government]" and the Maduro regime).

5371504 (D.C. Cir. 2010). The dispute must also be genuine, meaning that it is "supported by sufficiently admissible evidence such that a reasonable trier-of-fact could find for the nonmoving party." *Pro-Football*, 284 F. Supp. 2d at 112.

## ARGUMENT

### I.    All Plaintiffs Have Failed to Demonstrate Standing.

Federal courts are courts of "limited subject-matter jurisdiction" and have the power "to decide only those cases over which Congress grants jurisdiction." *Al-Zahrani v. Rodriguez*, 669 F.3d 315, 317 (D.C. Cir. 2012) (citing *Micei Int'l v. Dep't of Commerce*, 613 F.3d 1147, 1151 (D.C. Cir. 2010)). To invoke the Court's jurisdiction, a plaintiff must have standing, meaning (1) it has suffered or is likely to suffer an injury in fact; (2) the injury was likely caused by the defendant; and (3) the injury is likely to be redressed by the requested judicial relief. *See Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024); *United States v. Texas*, 599 U.S. 670, 676 (2023). Standing cannot be asserted "in gross," as Plaintiffs must have standing for "each claim that they press against each defendant," *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (citation omitted), and "for each form of relief that they seek," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). Further, Plaintiffs bear the burden of proving standing at each stage of the litigation, and standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Finally, for a plaintiff to have standing to pursue "forward-looking" relief such as an injunction, a party must show that the plaintiff "face[s] 'a real and immediate threat of repeated injury.'" *Murthy*, 603 U.S. at 58 (citation omitted).

Failing to follow the above principles would ignore Article III standing as "a bedrock constitutional requirement," *Texas*, 599 U.S. at 675, and "usurp the powers of the political

branches," *id.* at 676 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013)).  As the Supreme Court has cautioned, "Article III does not contemplate a system where 330 million citizens can come to federal court whenever they believe that the government is acting contrary to the Constitution or other federal law." *All. for Hippocratic Med.*, 602 U.S. at 382.  As discussed below, this Court has no Article III jurisdiction over this case for several reasons, thus, this case should be dismissed for lack of subject matter jurisdiction.

A.    **No injury exists for any Plaintiff because all Venezuelan nationals transferred to El Salvador pursuant to the Arrangement have been returned to Venezuela.**

No injury exists here for any Plaintiff because all Venezuelan nationals removed to El Salvador pursuant to the Arrangement have been returned to Venezuela.

Except for two named MS-13 Salvadorans requested by El Salvador—whom Plaintiffs do not argue that they represent—the Arrangement concerned the removal and accommodation of Venezuelan nationals only.  *See* Pl. Ex. 14 (RFK Human Rights_0001); Pl. Ex. 15 (RFK Human Rights_0003); Pl. Ex. 12 ¶¶ 3-5 (RFK Human Rights_0011-12).  As discussed above, however, the Maduro regime has since resumed accepting the return of Venezuelan nationals from the United States; El Salvador, in turn, has released all Venezuelan nationals El Salvador had accepted from the United States and the Maduro regime transported them to Venezuela.  No Venezuelan transferred by the United States remains in CECOT or anywhere in El Salvador; indeed, those Plaintiffs who had Venezuelan clients in CECOT acknowledge as much.  *See* Pl. Ex. 31 ¶¶ 5, 7 (all of RFK Human Rights' Venezuelan clients have been released from CECOT); Ex. 18 ¶¶ 1-2, 44 (statement signed by a Venezuelan national who was placed in CECOT but was later "return[ed] to Venezuela"); Ex. 19 ¶¶ 1, 37 (statement signed by a "Venezuelan citizen" who has "le[ft] CECOT"); Pl. Ex. 32 ¶¶ 5, 12 (Immigrant Defenders Law Center declaring that it represents eight clients who "were held in CECOT pursuant to the Agreement for 125 days" but "have now been

11

released from CECOT"); Pl. Ex. 41 ¶¶ 7, 16 (NACDL had one member attorney who represented one client sent to El Salvador, but that client "was released from CECOT and returned to Venezuela" on July 18, 2025).[5]  Plaintiffs argue that "RFK Human Rights continues to represent other clients who remain in CECOT and another Salvadoran prison."  Pls.' Mot. for Summ. J. at 16, ECF No. 19, but they neglect to mention that both of those individuals are Salvadoran, Pl. Ex. 31 ¶ 6, about whom the Arrangement has nothing to do because it relates only to Venezuelans with the exception of two named Salvadoran MS-13 members.

To be sure, Plaintiffs also argue that they *could* have clients who *could* be affected by the Arrangement in the future.[6]  But Plaintiffs' theory of future harm is too speculative to support Article III standing because the hypothesis is based on layers of speculation—that the United States would decide to transfer more of Plaintiffs' clients to El Salvador in the future pursuant to the Arrangement despite the fact that the Maduro regime has resumed taking back Venezuelans removed from the United States; that El Salvador would be willing to accept more Venezuelans despite its experience accepting and then releasing the 252 Venezuelans; and that, if El Salvador did decide to accept more Venezuelans, it would house them in CECOT (even though the Arrangement does not specify the location of any detention).  This chain of events is purely conjectural, especially because it is based on how a sovereign nation—El Salvador—would

---

[5] CCIJ and Immigration Equality do not allege that they have any clients who were sent to El Salvador pursuant to the Arrangement.

[6] *See* Pl. Ex. 31 ¶ 7 ("RFK Human Rights remains concerned that additional clients will be rendered to CECOT or another Salvadoran prison under the Agreement . . . ."); Pl. Ex. 32 ¶ 12 (Immigrant Defenders Law Center stating that "[b]ecause the Agreement remains in place, we remain alarmed at the likelihood that more of our clients will be rendered to El Salvador under the Agreement"); Pl. Ex. 38 ¶ 14 (Immigration Equality's declarant stating that it would not be able to provide legal services to individuals "if those individuals are disappeared to facilities in El Salvador"); *see also* Pl. Ex. 37 ¶ 6 (CCIJ's declarant noting that two people it "served through its clinics" were "relocated to Texas," leading CCIJ to "believe[] [that those persons] would be rendered to El Salvador under the Agreement but for other court orders enjoining that action").

exercise its unfettered discretion.  Courts have been particularly "reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment."  *Clapper*, 568 U.S. at 413; *see also Lujan*, 504 U.S. at 562 (where the elements of standing "depend[] on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict," standing is "substantially more difficult to establish" (citation omitted)); *Hecate Energy LLC v. FERC*, 126 F.4th 660, 665-66 (D.C. Cir. 2025) (simple "guesswork as to how independent decisionmakers will exercise their judgment" is insufficient).  Under such circumstances, Plaintiffs may not simply argue that either the United States' future actions or El Salvador's independent decisions in the future are "predictable." Pls.' MSJ at 22.  Much more is needed to show any purported imminent harm.

This also means that Plaintiffs cannot demonstrate entitlement to forward-looking relief, which requires a plaintiff to "establish a *substantial* risk of future injury," not a "speculative" one. *Murthy*, 603 U.S. at 69 (emphasis added).  The Supreme Court's decision in *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), is instructive.  There, a plaintiff sought an injunction to vacate a policy where he had allegedly been placed in a chokehold by a police officer in the past and believed the same conduct could happen in the future.  *Id.* at 105.  But as the Supreme Court explained, the past conduct "d[id] nothing to establish a real and immediate threat" of being placed in a chokehold in the future unless there is proof that all police officers choked citizens at every encounter or that the governmental entity always acted in such a manner.  *Id.* at 105-06.  Importantly, the Court's analysis is not limited to simply whether the plaintiff himself will again be subjected to the chokehold.  As the Court explained, the plaintiff "is no more entitled to an injunction than any other citizen of Los Angeles" because "a federal court may not entertain a

claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional." *Id.* at 111.

Also instructive is the Supreme Court's decision in *Clapper v. Amnesty International USA*, where the plaintiffs alleged that their communications with foreign contacts were being targeted and intercepted by the government pursuant to a statute, but the Supreme Court held that they lacked standing because they did not "set forth [] specific facts demonstrating that the communications of their foreign contacts will be targeted" and instead "merely speculate[d] and ma[d]e assumptions about whether their communications with their foreign contracts w[ould] be acquired." 568 U.S. at 411-12. At most, the statute "authorize[d]" the surveillance but "d[id] not mandate or direct it, thus making the plaintiffs' allegations "necessarily conjectural." *Id.* at 412.

The same is true here. The mere existence of the nonbinding Arrangement does not give rise to the requisite substantial risk of future injury for prospective injunctive relief. Not only are Plaintiffs' asserted injuries based on layers of speculation as explained above, but Plaintiffs also do not allege that every Venezuelan national—or even every Venezuelan TdA member—will be sent to CECOT under the Arrangement. In fact, they cannot, because, as discussed above, the circumstances have changed significantly given the Maduro regime's willingness to accept the return of Venezuelan nationals. And El Salvador's incentives may well have changed given its experience in detaining and then releasing the first 252 Venezuelans. Indeed, whatever monetary incentive the Arrangement arguably might have provided El Salvador, the payment has already been made, *see* Pl. Ex. 22 (RFK Human Rights_0004-06), so the incentive no longer exists. The past experience of the 252 Venezuelan nationals in CECOT thus "does nothing to establish a real and immediate threat" for anyone in the future. *Lyons*, 461 U.S. at 105-06. This case is therefore

an improper mechanism for challenging the Arrangement, as the Court has nothing but speculation of future action to rule upon.

### B.        No Plaintiff has established an injury in fact for organizational standing.

Nor is any plaintiff "a proper party to invoke judicial resolution of the [asserted] dispute." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).  All plaintiffs are organizations, and there are two ways that an organization can have Article III standing: (1) it can have standing "on its own behalf," which is called "organizational standing"; and (2) it can have standing to advance a claim "on behalf of its members," which is called "associational standing." *Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006).  All Plaintiffs, except NACDL, argue that they have organizational standing.  To have standing "in [its] own right," an organization must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals.  *All. for Hippocratic Med.*, 602 U.S. at 393-94.  And like an individual, an organization may not establish standing simply based on the intensity of its interest or because of strong opposition to the government's conduct, "no matter how longstanding the interest and no matter how qualified the organization," *id.* at 394 (citation omitted); rather, the organization must show "far more than simply a setback to the organization's abstract social interests," *id.* (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)); *see also Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*, 946 F.3d 615, 618 (D.C. Cir. 2020) ("an organization must allege a concrete and demonstrable injury to the organization's activities" (citation omitted)).

Here, Plaintiffs cannot make the requisite showing.  They first argue that the Arrangement makes it more difficult for RFK Human Rights, Immigrant Defenders Law Center, and CCIJ to

15

provide legal services to their clients in confinement.  Pls.' MSJ at 15-16.[7]  This alleged harm is insufficient to demonstrate an injury in fact, which must be "concrete and particularized," and "actual or imminent, not conjectural, or hypothetical."  *Lujan*, 504 U.S. at 560 (citations and internal quotation marks omitted).  Plaintiffs do not explain how the Arrangement is currently causing an "actual or imminent" injury to their ability to represent individuals.  As noted, none of their Venezuelan clients apparently remains in detention anywhere.  And increased complexity or workload in legal representation is not enough for lawyers to demonstrate an injury in fact.  *See Fed. Defs. of San Diego, Inc. v. U.S. Sent'g Comm'n*, 680 F. Supp. 26, 28 (D.D.C. 1988) (no injury in fact where criminal defense lawyers alleged that their workload "will be more complex and will markedly increase," because the harm is no different from those stemming from any changes in law).  As for RFK Human Rights' argument that it still has two Salvadoran clients "with whom it is allowed no contact," Pls.' MSJ at 16, it says nothing about RFK Human Rights' standing because, as noted above, prospectively, the Arrangement is only concerned with Venezuelans, and the State Department (as opposed to DHS) has no authority to remove anyone—Venezuelan or not—to any country.  Nor is the United States, much less the State Department, responsible for the lack of contact.  That is within El Salvador's exclusive control.

Plaintiffs next argue that the Arrangement inhibits "their core missions [of] monitoring, reporting on, and working to improve conditions of confinement," and further interferes with those core missions by causing some Plaintiffs to spend additional time advising clients about risks and

---

[7]  Though its stated mission is to "pursue strategic litigation to hold governments accountable," Compl. ¶ 8, RFK Human Rights declared that it is representing individuals sent to CECOT in proceedings before the Inter-American Commission on Human Rights.  *See* Pl. Ex. 31 ¶¶ 5-6.  And Immigrant Defenders Law Center represented one client in some capacity in the United States before he was sent to CECOT but began seven other representations after those individuals were in CECOT.  *See* Pl. Ex. 32 ¶ 5.  CCIJ also provides legal services, but it does not say that it represented anyone sent to CECOT.

creating new training materials, thereby increasing costs and leaving fewer resources for other organizational needs. Pls.' MSJ at 16-18. These assertions do not suffice to establish standing either. As an initial matter, it is unclear how the Arrangement affects Plaintiffs' ability to monitor and improve the condition of confinement in U.S. prisons, nor does any Plaintiff allege a mission to improve the condition of foreign prisons. *See* Pl. Ex. 31 ¶ 8 (RFK Human Rights); Pl. Ex. 32 ¶¶ 16-17 (Immigrant Defenders Law Center); Pl. Ex. 37 ¶¶ 12-14 (CCIJ); Pl. Ex. 38 ¶¶ 8, 14 (Immigration Equality). Even if they had such a foreign mission, there is no evidence that the Arrangement made monitoring or conditions worse in Salvadorian prisons. Plaintiffs' assertions of standing, in any event, are foreclosed by *Alliance for Hippocratic Medicine*. There, the Supreme Court held that several medical associations lacked organizational standing to challenge the approval by the Food and Drug Administration ("FDA") of mifepristone. The Court so held despite those organizations' allegations that the FDA's actions "impaired" their "ability to provide services and achieve their organizational missions" and "caused" the associations to expend "considerable resources" to conduct their own research and engage in public advocacy and public education, all to the detriment of the organizations' other priorities. 602 U.S. at 394.

The reasoning of *Alliance for Hippocratic Medicine* applies with equal force here. Like the medical associations in that case, Plaintiffs allege no more than "simply a setback to the organization's abstract social interests" and an "impair[ment]" to their "ability to provide services and achieve their organizational missions." *Id.* (citation omitted). As for Plaintiffs' alleged expenditure of resources, *Alliance for Hippocratic Medicine* makes clear that "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing." *Id.*

17

Instead of addressing *Alliance for Hippocratic Medicine* head-on, Plaintiffs argue that the standard for assessing harm to an organization is a "generous" one, with an organization's expenditure of "resources to counteract the effects of the defendant's challenged conduct" being enough to satisfy Article III standing. Pls.' MSJ at 14 (quoting *Scenic Am. v. Dep't of Transp.*, 983 F. Supp. 2d 170, 177 (D.D.C. 2013)); *see id.* at 18 ("Each organization has [] been forced to divert resources, leaving fewer for other organizational needs."). But the Supreme Court explained that this diversion of resources theory of organizational standing is limited to the "unusual case" of *Havens Realty Corporation v. Coleman*, and the Supreme Court "has been careful not to extend the *Havens* holding beyond its context." *All. For Hippocratic Medicine*, 602 U.S. at 396. In *Havens*, a defendant that owned and operated apartment complexes was alleged to have conducted racial steering by providing false information about apartment availability to black employees of an organization that provided housing counseling and referral services. *See id.* at 395 (citing *Havens*, 455 U.S. at 366 & n.1, 368). The defendant's provision of false information harmed the organization by "directly affect[ing] and interfer[ing] with [the organization's] core business activities" because the organization could not provide accurate "counseling and referral services for low- and moderate-income homeseekers." *Id.* (quoting *Havens*, 455 U.S. at 379). The Court likened the harm "to a retailer who sues a manufacturer for selling defective goods to the retailer." *Id.* That is not the kind of injury Plaintiffs allege here. Instead, Plaintiffs' injuries here are purely abstract or, at best, a voluntary diversion of resources to provide advice, training, education, and advocacy. *See Food & Water Watch*, 808 F.3d at 920 (shifting resources to educate members and advocate was insufficient). That is insufficient. Accordingly, Plaintiffs have no organizational standing.

### C.    No Plaintiff has established an injury in fact for associational standing.

Plaintiffs argue that NACDL has standing to sue in a representational capacity because two of its members have "expended significant time" creating informational materials and attempting to communicate with clients housed in CECOT and because one member had a client in CECOT who has now been "returned to Venezuela" to be with his family.  Pl. Ex. 41 ¶¶ 9-10, 16; Pl. Ex. 40 ¶ 6.  But this too fails to establish standing.

To assert associational standing, an organization must have the "indicia of a traditional membership association," which turns on considerations such as whether members finance the organization, guide its activities, or select its leadership.  *Viasat, Inc. v. FCC*, 47 F.4th 769, 781 (D.C. Cir. 2022) (citation omitted).  This Circuit routinely has denied associational standing when these criteria are not met, *see, e.g.*, *Gettman v. DEA*, 290 F.3d 430, 435 (D.C. Cir. 2002); *Am. Legal Found. v. FCC*, 808 F.2d 84, 90 (D.C. Cir. 1987), or when the plaintiff's evidence left it "unclear" whether the group satisfied these criteria, *see, e.g.*, *Sorenson Commc'ns v. FCC*, 897 F.3d 214, 225 (D.C. Cir. 2018).  At a minimum, it is unclear whether NADCL has satisfied the criteria.

Moreover, as NACDL acknowledges, Pls.' MSJ at 20, an association suing on behalf of its members must show, among other things, that its members would otherwise have standing to sue in their own right.  *See Summers v. Earth Island Institute*, 555 U.S. 488, 499 (2009) (associations suing on behalf of members must "identify [the] members who have suffered the requisite harm").  But the two NACDL members' declarations do not present a cognizable injury.  Like with the plaintiffs claiming organizational standing, their injuries relate to (1) expending more time on intake guidance and reference materials for cases relating to illegal aliens who could be deported to El Salvador and "to consult multiple different experts and [] review human rights reports," Pl.

19

Ex. 40 ¶¶ 6, 8; and (2) allegedly having increased difficulty with representing a client who was in CECOT and had his case dismissed without prejudice, Pl. Ex. 41 ¶¶ 13-16.

Neither injury suffices. Increased time and administrative costs are insufficient to establish standing because "diversion of resources from one program to another" does not constitute harm on its own. *See Ctr. for Responsible Sci. v. Gottlieb*, 346 F. Supp. 3d 29, 41 (D.D.C. 2018) (citation omitted), *aff'd sub nom. Ctr. for Responsible Sci. v. Hahn*, 809 F. App'x 10 (D.C. Cir. 2020). And Plaintiffs do not explain how mere expenditures of time and effort constitute "tangible harms, such as physical harms and monetary harms," or "intangible harms" that qualify as concrete injuries. *TransUnion*, 594 U.S. at 425. Nor do Plaintiffs explain how any NACDL lawyer is presently burdened in representing any client, as the only client discussed ultimately was returned to Venezuela and his case was dismissed without prejudice. Pl. Ex. 41 ¶¶ 15-16. There is simply no factual explanation for how any member of the NACDL is currently (or imminently) facing a concrete injury.

### D.   Plaintiffs have failed to demonstrate the Arrangement caused any alleged injuries.

Even if the Plaintiffs could establish an injury in fact, they cannot establish that their alleged injuries likely are caused or likely will be caused by the Arrangement. Causation requires "a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998). The chain of causation between the illegal conduct and the injury cannot be "too speculative or too attenuated." *All. for Hippocratic Med.*, 602 U.S. at 382-83. Unregulated parties—like Plaintiffs here—often "have more difficulty establishing causation" because in such a circumstance, causation "ordinarily hinge[s] on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well." *Id.* (quoting *Lujan*, 504 U.S.

at 562). Thus, the plaintiff must demonstrate "a predictable chain of events leading from the government action to the asserted injury," showing that any third parties "will likely react in predictable ways" and that those actions will then "likely injure the plaintiffs." *Id.* at 383, 385 (citation omitted). The causation requirement "rules out attenuated links . . . where the government action is so far removed from its distant (even if predictable) ripple effects." *Id.*

Here, Plaintiffs have not demonstrated that their alleged injury is "fairly traceable" to the Arrangement. As for alleged impairment to certain Plaintiffs' ability to provide legal representation, nothing suggests that it was caused by the Arrangement, which merely reflects an understanding that the United States could transfer the custody of Venezuelan TdA members (and two MS-13 members) to El Salvador. The Arrangement does not require anything of El Salvador, as it is nonbinding, much less require El Salvador to house them in any particular prison, and any lack of communication with Plaintiffs' clients is caused by actions taken by El Salvador, which has unfettered discretion to make detention decisions. As for the alleged interference with Plaintiffs' ability to monitor and improve conditions of confinement, Plaintiffs do not demonstrate that they ordinarily can monitor and improve confinement conditions of those who have been removed from the United States to a foreign country. And again, El Salvador made the decision to house the detainees at CECOT. *See J.G.G. v. Trump*, 2025 WL 1577811, at *11 (D.D.C. June 4, 2025) (recognizing that "El Salvador has chosen … to detain Plaintiffs at CECOT"), *vacated and remanded on other ground*, No. 25-5217, 2025 WL 2317650 (D.C. Cir. Aug. 8, 2025). Thus, it is unclear how the Arrangement caused this asserted injury.

Similarly, there is no causal connection between the alleged increased administrative costs and the Arrangement. For example, although Plaintiff RFK Human Rights declares that "[s]taff capacity and organizational financial resources are both strained by time-consuming and expensive

travel to El Salvador from the United States that would not need to occur but for the Arrangement,"
Ex. 31 ¶ 9, it is not clear how the Arrangement caused RFK Human Rights to go to El Salvador,
especially because it nowhere argues that it represented any client *before* he was sent to El Salvador
and placed in CECOT by El Salvador.  There is nothing in the record suggesting that it would have
performed any services for any of its clients except for the fact that they were housed in CECOT.
Moreover, Immigrant Defenders Law Center does not provide any facts regarding how the
Arrangement increased its costs other than that it was required to modify training materials.  Pl.
Ex. 32 ¶ 17.  And CCIJ argues that it has "devote[d] substantial time to training volunteers, creating
materials, providing more complex consultations, and assisting formerly detained or incarcerated
individuals," Ex. 37 ¶ 11, but it provides no details about what those additions were or how the
Arrangement specifically caused CCIJ to spend more time and resources on these materials.
Simply put, none of the costs or additional time are sufficiently connected to the Arrangement and
could instead be the byproduct of increased immigration enforcement generally.

> **E.      The alleged injuries are not likely to be redressed by a court order.**

"Redressability examines whether the relief sought, assuming that the court chooses to
grant it, will likely alleviate the particularized injury alleged by the plaintiff." *Fla. Audubon Soc'y
v. Bentsen*, 94 F.3d 658, 663-64 (D.C. Cir. 1996) (en banc).  Although causation and redressability
"are often 'flip sides of the same coin,'" "[r]edressability can still pose an independent bar in some
cases." *All. for Hippocratic Med.*, 602 U.S. at 380-81 & n.1 (quoting *Sprint Commc'ns Co. v.
APCC Servs., Inc.*, 554 U.S. 269, 288 (2008)).

Here, redressability poses an independent bar because enjoining Defendants from "taking
any [] action pursuant to the Arrangement," *see* Compl., Prayer for Relief, will not redress the
alleged injuries.  When discussing the alleged substantive legal and constitutional violations,
Plaintiffs argue that "[t]he [Arrangement] deprives people of foundational constitutional and

statutory protections before they are rendered" and that "[t]he [Arrangement] unlawfully condemns people to torture and abuse in confinement." *See* Pls.' MSJ at 25, 29. But neither of those alleged injuries are redressable by a court order. *First*, the Arrangement does not relate to any constitutional and statutory protections available to aliens. The State Department has no authority to transfer anyone to a foreign country for detention or otherwise; DHS is the only federal agency charged with the responsibility of removing aliens from the United States pursuant to immigration and other laws. Even without the challenged Arrangement, DHS may continue to remove aliens to El Salvador, whether or not the alien is Salvadoran, as long as El Salvador is willing to accept them. *See, e.g.*, 8 U.S.C. § 1231(b) (setting forth the process for determining the country to which an alien may be removed); 6 U.S.C. § 251 (transferring removal program from the Attorney General to DHS). This is true with any removal, even when an alien is being removed to his home country.

*Second*, the Arrangement does not require anything related to any alien's custody. Once an alien is in El Salvador's custody, that sovereign nation alone determines whether detention is appropriate and, if so, where to house the alien and the conditions of that alien's confinement. This circumstance is similar to *Greater Tampa Chamber of Commerce v. Goldschmidt*, 627 F.2d 258 (D.C. Cir. 1980), in which the D.C. Circuit held the plaintiffs lacked standing to challenge the validity of an international agreement between the United States and another sovereign nation because nothing could force the other nation to abide by the order when that nation "completely control[led]" what would redress the challenged conduct and when there was no evidence that the nation was willing to modify its conduct. *Id.* at 264; *see also Indigenous People of Biafra v. Blinken*, 639 F. Supp. 3d 79, 87 (D.D.C. 2022) (noting the difficulty of finding redressability when the dispute involves "independent actors" who are "foreign sovereigns over whom the Court

exercises no authority"); *Fryshman v. United States Comm'n for Pres. of Am.'s Heritage Abroad*, 422 F. Supp. 3d 1, 8 (D.D.C. 2019) ("Federal courts are simply not well-suited to draw the types of inferences regarding foreign affairs and international responses to U.S. policy that Plaintiffs' theory of causation posits." (citation omitted)).  So too here because even if Plaintiffs had clients in detention in El Salvador—which they do not—El Salvador would exclusively control the means for redressing Plaintiffs' alleged injuries.

Thus, enjoining the State Department from taking any further actions pursuant to the Arrangement would not serve to address Plaintiffs' asserted injuries.  And the Court lacks authority to grant the requested broad injunction here, because entering an injunction "would not give petitioners legally enforceable protection from the allegedly imminent harm."  *See Haaland v. Brackeen*, 599 U.S. 255, 292 (2023) (finding that an injunction against federal agencies was improper because other parties—state courts and state agencies—carried out the relevant provisions); *cf. Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 633 (9th Cir. 2015) ("When a plaintiff seeks injunctive relief based on claims not pled in the complaint, the court does not have the authority to issue an injunction.").  In sum, Plaintiffs have failed to establish their standing, and this Court has no jurisdiction to proceed.

## II.    Plaintiffs' APA Claims Fail As A Matter of Law.

Although the Court need not proceed further, if it decides otherwise, it should find that Plaintiffs' APA claims fail as a matter of law.

### A.    Plaintiffs do not identify any reviewable final agency action.

At the outset, Plaintiffs do not identify any final agency action, which is a prerequisite to judicial review under the APA.  *See* 5 U.S.C. § 704.  Agency action is final—and therefore reviewable in a judicial action brought pursuant to the APA—only when it "mark[s] the

consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).  As the D.C. Circuit explained in *Sierra Club v. EPA*, 955 F.3d 56 (D.C. Cir. 2020), there is no final agency action where the challenged act "imposes no obligations, prohibitions or restrictions on regulated entities" and "does not subject them to new penalties or enforcement risks." *Id.* at 63.

Plaintiffs' APA claims challenge the Arrangement between the United States and the Government of El Salvador, which was concluded through an exchange of diplomatic notes.  *See* Pl. Ex. 14 (RFK Human Rights_0001-02); Pl. Ex. 15 (RFK Human Rights_0003).  The diplomatic notes, however, are merely statements of intention between two sovereign nations and are considered "nonbinding" by the two sovereigns, which is why the exchange was reported to Congress as such under the Case-Zablocki Act.  *See* State Department's May 30, 2025 Report to Congress Regarding Qualifying Nonbinding Instruments, Case Act # 2025-0001CQN ("El Salvador: Understanding Between the United States of America and the Republic of El Salvador Relating to the Transfer of Members of Terrorist Organizations, Exchange of Notes March 13 and March 14, 2025, with a related U.S. note dated March 31, 2025") (attached as Exhibit A).[8]  So by its nature, no legal consequences or rights arise from the Arrangement.  If El Salvador chooses not to accept any Venezuelans under the Arrangement, the United States would have no legal recourse.

---

[8] The State Department first notified the Arrangement to Congress on April 30, 2025, as required by the Case-Zablocki Act, as a classified qualifying nonbinding instrument.  Pl. Ex. 12 ¶ 8 (RFK Human Rights_0013).  Following the Arrangement's declassification, the Department notified the declassified version on May 30, 2025.  *See infra* note 11.

And even absent the Arrangement, El Salvador could still accept Venezuelans removed from the United States.

Any legal consequences to Plaintiffs thus flow not from those diplomatic exchanges, but rather from the United States' independent decision to remove individuals to El Salvador—under either the INA or the Alien Enemies Act ("AEA")—which Plaintiffs do not challenge in this case, and for which neither the State Department nor El Salvador has any legal responsibility. Thus, even assuming those diplomatic notes "consummated" a decisionmaking process, Plaintiffs cannot establish that the challenged Arrangement determines any rights or obligations or that legal consequences flow from it.

Plaintiffs attempt to resist this conclusion in a single sentence, asserting that, "[w]ithout [the Arrangement], the United States would have no mechanism to facilitate extrajudicial rendition—into Salvadoran prisons." Pls.' MSJ at 23-24. Plaintiffs are incorrect. As already explained, the United States has independent authority to remove aliens to El Salvador. And El Salvador, like any other country, is free to accept third-country nationals from the United States with or without a written arrangement. That the United States and El Salvador chose to memorialize the nonbinding arrangement through an exchange of diplomatic notes merely reflects a policy preference and does not change the legal effect (or the lack thereof) of the arrangement. In addition, the Arrangement itself does not require the removal of any Venezuelan, nor does it specify where any Venezuelan should be detained, much less in CECOT. Even if the diplomatic negotiations between the United States and El Salvador may produce indirect, practical consequences for Plaintiffs, it would not be final agency action. Adverse effects "accompany many forms of indisputably non-final government action." *Air Brake Sys., Inc. v. Mineta*, 357 F.3d 632, 645 (6th Cir. 2004).

For example, "initiating an enforcement proceeding against a company . . . may have a devastating effect on the company's business, but that does not make the agency's action final." *Id*.  What matters is that the challenged nonbinding diplomatic arrangement here has no "direct and appreciable legal consequences" for Plaintiffs.  *California Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 640 (D.C. Cir. 2019).  The legal consequences for Plaintiffs, if any, flow from the separate removal decision or El Salvador's detention decisions.  These considerations foreclose Plaintiffs' APA claim.

**B.    The Arrangement is not subject to APA review.**

Plaintiffs bring their claims under the APA, but the APA's waiver of sovereign immunity does not apply to matters "committed to agency discretion."  *See* 5 U.S.C. § 701(a); *see Heckler v. Chaney*, 470 U.S. 821, 828 (1985) ("[B]efore any review at all may be had, a party must first clear the hurdle of § 701(a)."); *Lopez v. Fed. Aviation Admin*., 318 F.3d 242, 243 (D.C. Cir. 2003), *as amended* (Feb. 11, 2003) (explaining that the "court does not have jurisdiction to review the substance of the [agency's] decision [if] it is 'committed to agency discretion by law'" (quoting 5 U.S.C. § 701(a)(2)).  An agency decision is deemed to be "committed to agency discretion" if "there is no law to apply" in a given case.  *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 410 (1971) (internal quotation omitted).  "[I]f no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for 'abuse of discretion.'"  *Heckler*, 470 U.S. at 830; *Oryszak v. Sullivan*, 565 F. Supp. 2d 14, 18 (D.D.C. 2008).

That is precisely the case here, where Plaintiffs challenge a nonbinding diplomatic arrangement between two sovereign nations.  As this Court recognized in *J.G.G.*, the relevant diplomatic notes show that "the United States and El Salvador have struck a diplomatic bargain

vis-à-vis [] detainees," and El Salvador has "chosen—in negotiation with the United States and far outside the ken of a federal district court—to detain Plaintiffs at CECOT." 2025 WL 1577811, at *11. There are no judicially manageable standards for this Court to judge this type of foreign relations decision.[9] It is no surprise therefore that none of the cases Plaintiffs cite involves the APA review of a nonbinding diplomatic arrangement between two sovereigns, *see* Pls.' MSJ at 36-41, nor are Defendants aware of any such case. Simply arguing, as Plaintiffs do, that the Arrangement violates a whole host of domestic laws that do not have extraterritorial application does not supply a basis for the Court's review under the APA because none of those laws governs nonbinding diplomatic arrangements of the United States in this context.

It is helpful to contrast this case with the ongoing litigation in *J.G.G.* In that case, the plaintiffs challenged the specific circumstances of their removal from the United States, and the Supreme Court held that those plaintiffs' claims for "relief against the implementation of [the Presidential Proclamation announcing that Venezuelan nationals who were members of TdA

---

[9] *See Saavedra Bruno v. Albright*, 197 F.3d 1153, 1159-60 (D.C. Cir. 1999) (explaining that, "[w]hen it comes to matters touching on national security or foreign affairs. . . the presumption of review 'runs aground'" (quoting *Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988)); *id.* at 1158 (noting a well-recognized limitation on APA review is when courts are asked to "'decide issues about foreign affairs, military policy and other subjects inappropriate for judicial action'" (quoting 1 RECOMMENDATIONS AND REPORTS OF THE ADMINISTRATIVE CONFERENCE 191, 225)); *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affs.*, 104 F.3d 1349, 1353 (D.C. Cir. 1997) (finding plaintiffs' claims were unreviewable and stating that "the argument for executive branch discretion [wa]s even stronger" than the Supreme Court's decision in *Heckler* because "[b]y long-standing tradition, courts have been wary of second-guessing executive branch decision involving complicated foreign policy matters"); *El-Shifa Pharm. Indus Co. v. United States*, 607 F.3d 836, 843 & n.1 (D.C. Cir. 2010) (en banc) ("The conclusion that the strategic choices directing the nation's foreign affairs are constitutionally committed to the political branches reflects the institutional limitations of the judiciary and the lack of manageable standards to channel any judicial inquiry into these matters."); *id.* 854 n.1 (Kavanaugh, J., concurring); *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1 (D.D.C. 2010) (recognizing that courts should not resolve claims that "would require assessment of 'strategic choices directing the nation's foreign affairs'").

would be detained and removed] and against their removal under the AEA . . . must be brought in habeas." *Trump v. J.G.G.*, 604 U.S. 670, 671-72 (2025) (citations omitted).  Here, however, Plaintiffs do not seek relief as to any specific individual; they instead ask the Court to invalidate wholesale a nonbinding diplomatic arrangement with another sovereign nation.  That is not the stuff of APA review.

The Court lacks meaningful standards to judge the exercise of the State Department's discretion in executing a negotiated, nonbinding diplomatic arrangement with El Salvador.  Thus, even if the Court considers the diplomatic arrangement to be final agency action, Plaintiffs' APA claims would still fail as a matter of law.

### C.    The Arrangement is not contrary to law.

Plaintiffs' contrary to law claims all fail, because they are based on multiple layers of inaccurate premises.  To start, Plaintiffs are incorrect that the Arrangement provides for the "sudden rendition of people in the United States."  Pls.' MSJ at 25.  As the record shows, the diplomatic notes exchanged between the United States and El Salvador establish only that El Salvador would commit to accept a specified number of individuals for removal from the United States.  Pl. Ex. 14 (RFK Human Rights_0002).  The Arrangement does not address the circumstances of any person's removal from the United States, which results from a process under legal authorities the State Department does not implement and in which the State Department has at most a facilitative role.  Aliens still must be removed under the INA, AEA, or another source of legal authority.  Nor does the Arrangement discuss whether and where El Salvador would detain anyone.  And, if anything, the diplomatic notes exchanged between the United States and El Salvador demonstrate the commitment of both sides that any removed individuals be treated consistent with El Salvador's international obligations, including the protections of the CAT.  Pl.

Ex. 14 (RFK Human Rights_0001-02); Pl. Ex. 15 (RFK Human Rights_0003); Pl. Ex. 16 (RFK Human Rights_0008-09).

Notably, the purported "sudden rendition of people" is already the subject of the proceedings in *J.G.G.*, and it is evident that Plaintiffs are attempting to make an end-run around those proceedings by trying to shoehorn a challenge to the removal of the same class members in *J.G.G.* into a programmatic challenge to the diplomatic arrangement between the United States and El Salvador. What is more, as organizations, Plaintiffs' asserted injuries have nothing to do with the purported violations of the long list of constitutional provisions, statutes and regulations Plaintiffs identify; indeed, virtually all of the asserted rights, if they are cognizable, belong to the individuals transferred to El Salvador. But "ordinarily, a party 'must assert [its] own legal rights' and 'cannot rest [its] claim to relief on the legal rights . . . of third parties.'" *Metro. Washington Chapter, Associated Builders & Contractors, Inc. v. D.C.*, 62 F.4th 567, 573 (D.C. Cir. 2023) (citation omitted); *see also Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) ("[W]e have not looked favorably upon third-party standing."); *Conn v. Gabbert*, 526 U.S. 286, 292-93 (1999) (rejecting an attorney's attempt to adjudicate the rights of a client). While the Court has sometimes allowed a litigant to assert the rights of a third party under narrow circumstances, it is the litigant's burden to show that it has third-party standing, which Plaintiffs have failed to do.

In any event, as discussed below, the Arrangement does not violate any provision of the Constitution, or any other of the myriad laws Plaintiffs identify, even if Plaintiffs had third-party standing to assert those rights.

***Procedural Due Process.*** Plaintiffs contend that the Arrangement "lacks protections to ensure" that no person is deprived of due process. Pls.' MSJ at 26. Plaintiffs further assert that "[t]he Arrangement's lack of safeguards to avoid such results renders it contrary to the Due Process

Clause." *Id.* at 27.  Even assuming purely for the sake of argument that the individuals transferred to El Salvador were deprived of due process, that would not be because of an ancillary diplomatic arrangement between nations that provides for their acceptance by another country.  Again, any violation would stem from the removal process itself.  It is not surprising then that Plaintiffs do not attempt to make out a procedural due process claim against the State Department.  "A procedural due process claim consists of two elements: (i) deprivation by [government] action of a protected interest in life, liberty, or property, and (ii) inadequate [government] process." *Reed v. Goertz*, 598 U.S. 230, 236 (2023).  The diplomatic arrangement between the United States and El Salvador of course does not constitute "deprivation" because the State Department did not cause the Venezuelans at issue to be removed from the United States, nor did it remove them to El Salvador, let alone decide to house them in CECOT.  And any process surrounding each detainee's detention and transfer—whether or not adequate—is not within the State Department's control.  In a word, the State Department did not "deprive" them "of life, liberty, or property, without due process," U.S. Const. amend. V.  And, as this Court has held, any detention after removal was carried out by El Salvador.

**Suspension Clause.**  Plaintiffs' assertion that the Arrangement violates the Suspension Clause likewise fails as a matter of law.  Pls.' MSJ at 27.  That Clause provides that "[t]he Privilege of the Wirt of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safey may require it."  U.S. Const., Art. I, § 9, cl. 2.  But the Arrangement does not suspend habeas corpus for anyone; in fact, it says nothing about habeas corpus.  It merely reflects the two governments' political understanding regarding the transfer of a certain number of aliens from one country to the other.

31

To be sure, except in rare circumstances, the Suspension Clause has no extraterritorial application. *See Boumediene v. Bush*, 553 U.S. 723 (2008); *Al Maqaleh v. Gates*, 605 F.3d 84, 97 (D.C. Cir. 2010). And an alien transferred to a foreign country necessarily cannot initiate a petition for habeas relief in U.S. courts. *See United States ex rel. Keefe v. Dulles*, 222 F.2d 390, 392 (D.C. Cir. 1954). But such transfer decisions—which in any event are not made by the State Department—do not constitute a suspension within the meaning of the Suspension Clause, which is focused on laws or formal government pronouncements that cut off the habeas rights of those who otherwise have such rights without regard to their place of detention. *See Boumediene*, 553 U.S. at 792 (provision of the Military Commissions Act denying federal courts jurisdiction to hear habeas corpus action by aliens determined to be enemy combatant was unconstitutional suspension of writ of habeas corpus). Were it otherwise, any time DHS removed any alien from the United States pursuant to any immigration law, it would constitute a Suspension Clause violation. That is not the law.

**Sixth Amendment.** It is well settled that aliens subject to removal—removal proceedings being civil in nature, not criminal—do not have Sixth Amendment rights. *See Michelson v. INS*, 897 F.2d 465, 468-67 (D.C. Cir. 1990). Plaintiffs, without explaining how the challenged action constitutes a criminal prosecution, appear to contend, nonetheless, that the diplomatic arrangement between the United States and El Salvador violates the Sixth Amendment because members of TdA were imprisoned upon their arrival in El Salvador. *See* Pls.' MSJ at 27. But Plaintiffs' conclusion does not follow, and accepting Plaintiffs' argument would constitute a dramatic expansion of Sixth Amendment rights.

**Immigration and Nationality Act.** Plaintiffs argue, next, that the Arrangement is contrary to the INA because it "allows for removal without any observance" of the procedures required by

that statute.  Pls.' MSJ at 28.  But that argument once again illustrates the fundamental flaw in Plaintiffs' lawsuit: the State Department does not remove aliens under the INA or otherwise.  *See* 8 U.S.C. § 1231(a); 6 U.S.C. § 251.  Moreover, arranging for another country to accept unspecified aliens under specific circumstances—as the State Department did through its negotiations with El Salvador—is entirely consistent with the INA, which allows the United States to remove an alien to a country that is not the alien's home country.  *See* 8 U.S.C. § 1231(b).

**Convention Against Torture.**  As to Plaintiffs' claim that the Arrangement violates the CAT, it is unreviewable because Plaintiffs do not seek review of any final order of removal—the only circumstance under which this Court has jurisdiction to review a CAT claim.  The Foreign Affairs Reform and Restructuring Act of 1998 ("FARR Act"), which implements Article 3 of the Convention Against Torture, explicitly prohibits review of such claims "except as part of the review of a final order of removal pursuant to section 242 of the [INA]."  Pub. L. No. 105-277, § 2242, 112 Stat. 2681-2761, 2822 (1998) (codified at 8 U.S.C. § 1231 note).

Moreover, the diplomatic notes reflect the United States' understanding, and El Salvador's commitment, that El Salvador will abide by its obligations under the CAT.  *See* Pl. Ex. 14 (RFK Human Rights_0001-02); *see also* Pl. Ex. 16 (RFK Human Rights_0008).  It is not the purview of courts to question the Executive's determinations about the reliability of the diplomatic assurances provided or the likelihood that a person will be tortured in a foreign country.  In *Kiyemba v. Obama*, 561 F.3d 509 (D.C. Cir. 2009), the D.C. Circuit applied the Supreme Court's decision in *Munaf v. Geren*, 553 U.S. 675 (2008), to prohibit the district court from blocking the transfer of a detainee from Guantanamo based on the possibility of torture in Iraq.  *Kiyemba*, 561 F.3d at 514-15; *see also Omar v. McHugh*, 646 F.3d 13, 15 (D.C. Cir. 2011) (construing *Munaf* to hold that "Omar did not have a habeas corpus or due process right to judicial second-guessing of the Executive's

33

determination that he was not likely to be tortured in Iraqi custody"). And as the Supreme Court explained in *Munaf*, "[t]he Judiciary is not suited to second-guess such determinations—determinations that would require federal courts to pass judgment on foreign justice systems and undermine the Government's ability to speak with one voice in this area." 553 U.S. at 702. By contrast, "the political branches are well suited to consider sensitive foreign policy issues, such as whether there is a serious prospect of torture at the hands of an ally, and what to do about it if there is. *Id.* The Court therefore should reject Plaintiffs' invitation to second guess the determination of a political branch that removing aliens to El Salvador is consistent with its obligations under the CAT.

**Eighth Amendment.** Plaintiffs' Eighth Amendment claim is also without merit. To start, contrary to Plaintiffs' argument, Pls.' MSJ at 29, the Arrangement does not "provid[e] for the rendition" of anyone, because it is not within the State Department's authority to remove aliens from the United States. But even assuming the removal of Venezuelan nationals to El Salvador could somehow be attributed to Defendants, their removal is not a "punishment" such that the Eighth Amendment could conceivably apply. *See* U.S. Const. amend VIII; *cf. Santelises v. INS*, 491 F.2d 1254, 1255-56 (2d Cir. 1974) (rejecting "out of hand petitioner's claim that deportation constitutes cruel and unusual punishment," concluding that the Eighth Amendment is not applicable in the context of deportation). And to the extent Plaintiffs are referring to the conditions at CECOT, again, the Arrangement does not require their detention, and El Salvador, not Defendants, decides whether to detain individuals within its country and under what conditions. Defendants are not punishing anyone.

**Non-Detention Act.** Along a similar vein, Plaintiffs contend in a single sentence of their brief that "the Arrangement fails to include sufficient safeguards against rendition and indefinite

detention of U.S. citizens" and therefore "violates the Non-Detention Act's prohibition on the United States 'imprison[ing] or otherwise detain[ing]' one of its citizens 'except pursuant to an Act of Congress.'"  Pls.' MSJ at 28-29 (quoting 18 U.S.C. § 4001(a)).  Plaintiffs' argument is meritless.  The diplomatic notes, on their face, pertain only to certain Venezuelan nationals (and two specified Salvadoran MS-13 leaders).  *See* Pl. Ex. 14 (RFK Human Rights_0001-02); Pl. Ex. 16 (RFK Human Rights_0008-09).  There is no support, either in the record or otherwise, for Plaintiffs' claim that United States citizens will be detained in a foreign country in violation of the Non-Detention Act.  The Act simply does not apply.

*Detainee Treatment Act.*  Plaintiffs acknowledge that the Detainee Treatment Act applies only to persons "in the custody or under the physical control of the United States Government," 42 U.S.C. §§ 2000dd(a).  *See* Pls.' MSJ at 30.  But they make no effort to explain why the statute nevertheless applies here, when individuals removed to El Salvador pursuant to the Arrangement are no longer in the actual or constructive custody of the United States.  *Cf. J.G.G.*, 2025 WL 1577811, at *8.  The claim therefore fails.

*First Step Act and Detention Regulations.*  Plaintiffs' remaining arguments in the "basic rights" portion of their brief are also easily dispatched.  *See* Pls.' MSJ at 33.  The First Step Act governs the placement of prisoners by the Federal Bureau of Prisons ("BOP") and therefore has no application to the facts of this case.  *See* 18 U.S.C. § 3621(b).  Similarly, Plaintiffs cannot show that the Arrangement violates regulations that provide certain protections to persons in the custody of the BOP or DHS.  It is undisputed that no one accepted under the Arrangement is in either BOP or DHS custody.  The regulations Plaintiffs cite therefore do not apply.  *See* 28 C.F.R. § 551.110 (allowing for religious programs for "pretrial inmates"); *id.* § 548.10 (providing "inmates" with reasonable and equitable opportunities to pursue religious beliefs and practices); *id.* § 551.117

(providing for "pretrial inmate-attorney visits"); *id.* § 543.13 (detailing conditions for attorney-inmate visitation); 6 C.F.R., subpts A, B (providing standards for DHS immigration detention and housing facilities). Plaintiffs' theory appears to be that, because removing an alien from the United States necessarily makes it impossible for the alien to seek relief under those domestic laws, those laws are deemed violated. But they cite no support for such an extraordinary proposition, nor are Defendants aware of any. And to the extent they claim these regulations were violated in CECOT, once again, El Salvador chooses whether and where to detain those in its country and under what conditions. That has nothing to do with the Arrangement or Defendants.[10]

***First Amendment and the Religious Freedom Restoration Act.*** The Court should also reject Plaintiffs' argument that Arrangement violates the First Amendment and the Religious Freedom Restoration Act ("RFRA"). Unsurprisingly, Plaintiffs cite no authority for the proposition that the First Amendment or RFRA are implicated in the removal context, much less by a diplomatic arrangement that allows for the receipt of aliens removed from the United States. *See* Pls.' MSJ at 32-33. Any impact on Plaintiffs' clients' religious exercise is entirely collateral and not cognizable under the First Amendment or RFRA. And even if there were a substantial burden on their religious exercise such that the First Amendment or RFRA were implicated, expelling alien TdA members from the United States would satisfy strict scrutiny. To the extent

---

[10] Plaintiffs also assert in their Complaint that, by sending aliens to El Salvador, Defendants are violating the Americans with Disabilities Act ("ADA") because Salvadorian prisons do not comply with that statute. *See* Compl. ¶ 126. Plaintiffs do not move for summary judgment on this claim. Even putting aside the threshold issue of whether Plaintiffs have a cause of action under the ADA against Defendants, the Arrangement does not request El Salvador to detain anyone much less to do so in a prison that has accessibility issues for disabled individuals. In addition, Plaintiffs never allege or provide evidence that any of their clients who were detained or might be detained have disabilities that require accommodations. Similarly, Plaintiffs claim the Arrangement violates DHS policies on sexual abuse. Compl. ¶ 131. This fails for similar reasons and because Plaintiffs have no allegations or evidence that any client has suffered sexual abuse. Those additional claims should be dismissed.

Plaintiffs argue that their religious exercise is being abridged in detention, once again, that is El Salvador's choice and responsibility, not Defendants. The Arrangement does not request, much less require, El Salvador to detain anyone or to do so without providing the ability to exercise their religious beliefs.

***Appropriations Clause.*** Plaintiffs' reliance on the Appropriations Clause is likewise misplaced. To comply with the Appropriations Clause, "appropriations need only identify a source of public funds and authorize the expenditure of those funds for designated purposes." *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 426 (2024). In this case, the State Department provided the grant to El Salvador using funds appropriated to carry out provisions of "the Foreign Assistance Act of 1961 [], including sections 481 [22 U.S.C. § 2291] and 635 [22 U.S.C. § 2395] of the Act." Pl. Ex. 22 at 1 (RFK Human Rights_0004). Those provisions, in turn, allow foreign assistance grants to be given to sovereign nations "as may be determined to be best suited to the achievement of the purposes of" the Foreign Assistance Act, *see* 22 U.S.C. § 2395 (a)-(b), and authorize the provision of assistance to foreign countries "on such terms and conditions as [the President] may determine, for the control of narcotic and psychotropic drugs and other controlled substances, or for other anticrime purposes," *see* 22 U.S.C. § 2291 (a)(4). The State Department also identified the purpose of the $4.76 million foreign assistance grant to El Salvador, which is for "El Salvador's law enforcement and anticrime needs," including potentially for the costs associated with detaining the TdA members accepted by El Salvador. Pl. Ex. 22 at 1 (RFK Human Rights_0004).

Plaintiffs argue that more is required, averring that Congress must "appropriate[] money to fund the rendition of those in the United States to be held in CECOT or other facilities in El Salvador." Pls.' MSJ at 34. But no such requirement exists. The State Department provided the

grant for El Salvador's law enforcement and anticrime needs consistent with the purposes of the relevant appropriation, as well as with the authorities to provide such assistance under the Foreign Assistance Act, discussed above. Moreover, our government's history is "replete with instances of general appropriations of large amounts, to be allotted and expended as directed by designated government agencies." *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 322 (1937), *cited by Cmty. Fin. Servs. Ass'n*, 601 U.S. at 443 (Kagan, J., concurring). And the State Department acted appropriately within the realm of its broad discretion here.

> *Federal Acquisition Regulation.* Plaintiffs are also wrong to argue that the Federal Acquisition Regulations ("FAR") apply here. Contrary to Plaintiffs' assertion, the State Department did not "contract for services from El Salvador" by "outsourcing the detention of those held in confinement in the United States." Pls.' MSJ at 35. The FAR does not apply because the United States did not request or contract for any services from El Salvador when it transferred the TdA members to El Salvador. In other words, the grant does not "acquir[e]" anything "by contract." FAR 2.101 (defining "Acquisition"); *see also id.* (defining "Contract" to exclude "grants and cooperative agreements covered by 31 U.S.C. § 6301"); FAR 1.104 (indicating that the FAR applies to "acquisitions"). Instead, the relevant individuals were placed in the legal and physical custody of El Salvador, and as discussed above, the grant provided to El Salvador could be used for broader purposes beyond the potential use for costs associated with detaining the TdA members. Pl. Ex. 12 ¶¶ 5-6 (RFK Human Rights_0011-12). While the United States understood that El Salvador would detain these individuals for up to "a duration of one year" in accordance with El Salvador's authorities under its domestic law, Pl. Ex. 14 (RFK Human Rights_0001), that by no means suggests that the United States was purchasing El Salvador's detention services. Neither the Arrangement nor the grant requested (much less required) the aliens to be detained by

El Salvador.  Indeed, within months, El Salvador released the detainees and the Maduro regime transported them to Venezuela, independent of the fact that the United States had already provided the $4.76 million foreign assistance grant.  To the extent El Salvador chose to use any part of the $4.76 million to help pay for housing the Venezuelan detainees, with their July 18 release, El Salvador must use any remaining portion of the $4.76 million on other law enforcement and anticrime purposes.  Regardless, per the terms of the grant, El Salvador must report these activities to the State Department.  The nonbinding nature of the Arrangement underscores that the Arrangement is not a service contract within the meaning of the FAR.[11]

### D.    The Arrangement is not arbitrary or capricious.

The Arrangement is not subject to arbitrary-and-capricious review for the reasons stated above—there was no final agency action, and the decision was committed to the State Department's discretion.  But even if it were, Plaintiffs' arbitrary-and-capricious challenge readily fails because the State Department acted reasonably in entering into the Arrangement with El Salvador.

Judicial review under the APA's arbitrary-and-capricious standard "is deferential, and a court may not substitute its own policy judgment for that of the agency."  *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  That review is "narrow."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  All that is required is for the agency to "act[] within a zone of reasonableness."  *Prometheus*, 592 U.S. at 423.  That deferential standard

---

[11] Plaintiffs also allege, but do not press on summary judgment, that Defendants violated the Case-Zablocki Act by failing to report the arrangement to Congress.  Compl. ¶ 124.  The Act, however, does not create a private cause of action.  Moreover, as a factual matter, the State Department did indeed timely report the Arrangement to Congress, first on April 30 in a classified format, Pl. Ex. 12 ¶ 8 (RFK Human Rights_0013), and then again on May 30 once the Arrangement had been declassified.  *See* Ex. A.  On July 11, as explained above, the State Department published the declassified Arrangement online in further compliance with its Case Act obligations.

of review is magnified when an agency's decisions concern matters of foreign policy and national

security. *See Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007) ("[O]ur

review—in an area at the intersection of national security, foreign policy, and administrative law—

is extremely deferential."); *Lopez Bello v. Smith*, 651 F. Supp. 3d 20, 32 (D.D.C. 2022) (The APA's

"already deferential review is made even more deferential to the agency's decisions in matters, as

here, concerning matters of foreign policy and national security."), *aff'd sub nom. Bello v. Gacki*,

94 F.4th 1067 (D.C. Cir. 2024); *Zevallos v. Obama*, 10 F. Supp. 3d 111, 119 (D.D.C. 2014) ("[T]he

D.C. Circuit has suggested that an even more deferential review applies when matters of foreign

policy and national security are concerned").

Defendants' actions easily satisfy this highly deferential review. The Secretary of State

decided to pursue a diplomatic arrangement providing for removal of TdA members from the

United States to El Salvador because the Maduro regime would not accept Venezuelan nationals

at that time and those gang members presented real, immediate risks to the safety of communities

in the United States. *See* Pl. Ex. 11 at 14. But before removing them, the United States requested

and received assurances from El Salvador that it would act "in a manner that is consistent with El

Salvador's international legal obligations regarding human rights and treatment of prisoners,

including the Convention Against Torture." Pl. Ex. 14 (RFK Human Rights_0001); *see*; Pl. Ex.

15 (RFK Human Rights_0003) (El Salvador's confirmation); Ex. 16 (RFK Human Rights_0008)

(same assurances for March 31). Those actions were not arbitrary or capricious.

Plaintiffs' arguments to the contrary are unavailing. Plaintiffs' first argument that the

Arrangement is unlawful, *see* Pls.' MSJ at 36-37, should be rejected out of hand for the reasons

discussed above. The State Department requested, and reasonably deemed it sufficient, El

Salvador's assurance that it would comply with its obligations concerning human rights and the

treatment of prisoners, including the CAT—an assessment that is not suited to judicial second-guessing in any event, as discussed above. *See Kiyemba*, 561 F.3d at 514-15. Suffice to say, the State Department did not ignore the conditions in El Salvador or fail to include provisions sufficient to ensure an appropriate standard of care for the TdA members. *See* Pls.' MSJ at 37-38; *see also J.G.G.*, 2025 WL 1577811, at *11 (noting El Salvador had authority to detain and release TdA members held at CECOT).

Equally without merit is Plaintiffs' suggestion that the United States should have created a "mechanism for securing someone's return after rendition" or considered other "alternative approaches" relating to prison conditions and certain types of communications, among other things. Pls.' MSJ at 39-40. They cite no authority for their novel argument, and, in fact, they cannot, because the State Department could not impose conditions on El Salvador in a manner that contravenes its sovereignty, including its authority over individuals in its custody.

Plaintiffs also argue that the State Department failed to consider their "reliance interests"—namely, Plaintiffs' interests in communicating with clients about legal strategy, in providing certain materials to illegal aliens detained in the United States and subject to removal, and in monitoring prison conditions. Pls.' MSJ at 40. But the State Department had no obligation to consider the interests of specific advocacy groups before entering into a nonbinding arrangement with a foreign sovereign, and Plaintiffs have identified no authority suggesting otherwise. Third parties such as the plaintiff organizations simply do not have legitimate interests sufficient to veto an arrangement with a foreign country to accept removed aliens. The purported obligation is also unworkable because the asserted reliance interest would exist whenever aliens are removed.

Finally, contrary to Plaintiffs' argument, *see* Pls.' MSJ at 41, the State Department has not changed course. The State Department exercised its longstanding authority to negotiate with other

nations on matters within the President's Article II foreign affairs powers.  As discussed above, federal law has long given the Executive Branch the authority to remove aliens to other sovereign nations if their home countries would not take them.  And the Executive consistently has exercised that authority, sometimes with a nonbinding written arrangement or binding written agreement, and many times without either.  Using a nonbinding arrangement to memorialize a policy preference in the circumstances here is not a departure from the Executive's longstanding practice. There was no change of course here.

### E.    Plaintiffs' lack of statutory authority claim fails as a matter of law.

Plaintiffs summarily argue that "[n]o statute authorized the State Department to outsource the detention of individuals within the United States."  Pls.' MSJ at 41.  But as already discussed above, the State Department is not outsourcing detention at all, because El Salvador alone decides whether (and where) to detain the transferred individuals "in accordance with its authorities under Salvadoran domestic law."  Pl. Ex. 14 (RFK Human Rights_0001); *see also J.G.G.*, 2025 WL 1577811, at *11 (noting El Salvador had authority to detain and release TdA members held at CECOT).  In fact, as discussed above, within months, El Salvador decided to release for transfer to Venezuela all Venezuelan detainees it had received, and the Maduro regime in return released all of them such that none are apparently in detention in Venezuela.  There can be no dispute that the State Department has authority to represent the United States when the United States enters into a nonbinding diplomatic arrangement given its broad discretion in managing diplomacy and foreign affairs under the President's direction.  *See, e.g.*, 22 U.S.C. § 2656 (Secretary of State is to perform duties on "matters respecting foreign affairs as the President of the United States shall assign to the Department . . . in such a manner as the President shall direct").  Federal law contemplates such nonbinding arrangements, *see* 1 U.S.C. § 112b, and indeed, they are

commonplace, *see, e.g.*, Case Act Reporting: Qualifying Non-Binding Instruments, https://foia.state.gov/FOIALIBRARY/QNI2.aspx (listing 94 qualifying nonbinding instruments concluded between October 2023 and May 2025 alone).  In any event, the President is "the sole organ of the nation in its external relations, and its sole representative with foreign nations," *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319 (1936) (citation omitted), and clearly has the authority to enter into the Arrangement under Article II of the Constitution, as he has repeatedly done in the past.

Federal law, moreover, contemplates removal of aliens to places other than their home countries.  *See* 8 U.S.C. § 1231 (b)(1)(C)(iv); *see also* 50 U.S.C. § 21.  Here, DHS removed Venezuelan nationals who are TdA members to El Salvador because at the time the Maduro regime was unwilling to take them.  That the Arrangement was one means that DHS could use in removing an illegal alien to a third country with El Salvador's consent does not mean that the State Department acted beyond any statutory authority.

Plaintiffs' invocation of the major questions doctrine—arguing that Congress must speak clearly when invoking "powers of vast economic and political significance," Pls.' MSJ 42-43 (quoting *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022))—is similarly unconvincing.  The major-questions doctrine addresses the "particular and recurring problem" of "agencies asserting highly consequential power beyond what Congress could reasonably be understood to have granted."  *West Virginia v. EPA*, 597 U.S. 697, 724 (2022).  Those concerns dissipate when, as here, Congress has spoken and given DHS the ability to remove illegal aliens to third countries.  8 U.S.C. § 1231 (b)(1)(C)(iv); *see also* 6 U.S.C. § 251 (transferring removal program from the Attorney General to DHS).  A necessary prerequisite of being able to remove those individuals is a separate country's government willingness to "accept the alien into the

country's territory." *Id.* Negotiating and concluding international arrangements concerning such activities falls squarely within the State Department's responsibilities and the President's broad authority over foreign affairs, so there is no "mismatch[]" between the breadth of the asserted power and the "narrow[ness]" of the statute in which the agency claims to have discovered it, *Biden v. Nebraska*, 600 U.S. 477, 511, 517 (2023) (Barrett, J., concurring) (citation omitted), which is when the major questions doctrine applies. In sum, there is no basis to resort to the major questions doctrine in this case.

## III.    Plaintiffs' *Ultra Vires* Claim Lacks Merit.

Plaintiffs assert in the Complaint that the Arrangement is an *ultra vires* action. *See* Compl. ¶¶ 150-52. But *ultra vires* review is "a doctrine of last resort," *Schroer v. Billington*, 525 F. Supp. 2d 58, 65 (D.D.C. 2007), "essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681-82 (2025). Under an *ultra vires* theory, "[t]he agency overstep must be 'plain on the record and on the face of the [statute].'" *Federal Express Corp. v. United States Dep't of Comm.*, 39 F.4th 756, 765 (D.C. Cir. 2022) (citation omitted). That overstep must amount to a "clear departure by the [agency] from its statutory mandate" or be "blatantly lawless." *Oestereich v. Selective Serv. System Loc. Board No. 11*, 393 U.S. 233, 238 (1968). The violation must be "so extreme that one may view it as jurisdictional or nearly so," and the "prohibition at issue must confer rights upon the individual seeking ultra vires review." *Glob. Health Council v. Trump*, --- F.4th ---, 2025 WL 2480618, at *12 (D.C. Cir. Aug. 28, 2025) (quotation omitted).

Here, Plaintiffs obviously have failed to meet this demanding standard. Plaintiffs fail to identify any "congressionally drawn line in the sand" that Defendants have "plainly and openly crossed," *Fed. Express*, 39 F.4th at 765, let alone any agency action that is "blatantly lawless,"

*Oestereich*, 393 U.S. at 238. They do not point to "a *specific prohibition* in a statute" that prohibits the challenged Arrangement, *Am. Foreign Serv. Ass'n v. Trump*, 2025 WL 1742853, at *2 (D.C. Cir. June 20, 2025) (per curium) (quoting *Nuclear Regul. Comm'n*, 605 U.S. at 681), or a statute that "confer[s] rights upon the [plaintiff] seeking ultra vires review," *Glob. Health Council*, 2025 WL 2480618, at *12. It is not enough to argue, for example, that TdA members in El Salvador may not enjoy certain rights that they would otherwise have in the United States, or to allege that the removed aliens may be subject to torture. At best those are the rights of the removed aliens, not Plaintiffs. And the relevant question is whether the State Department's negotiation of the diplomatic arrangement itself plainly exceeds any specific legal boundary or is otherwise blatantly lawless. The answer is clearly no as discussed above.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for summary for judgment and grant Defendants' cross-motion to dismiss or, in the alternative, for summary judgment.

Dated: September 22, 2025                    Respectfully submitted,

                                             BRETT A. SHUMATE
                                             Assistant Attorney General
                                             Civil Division

                                             ERIC HAMILTON
                                             Deputy Assistant Attorney General
                                             Federal Programs Branch

                                             TIBERIUS DAVIS
                                             Counsel to Assistant Attorney General

                                             JEAN LIN
                                             Special Litigation Counsel

                                             */s/ J. Stephen Tagert*
                                             J. STEPHEN TAGERT

45

BRADLEY P. HUMPHREYS
Federal Programs Branch
Civil Division, Department of Justice
1100 L Street NW
Washington, DC 20005
Telephone: (202) 305-8486
Stephen.Tagert@usdoj.gov

*Counsel for Defendants*