## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBERT F. KENNEDY HUMAN RIGHTS, *et al.*, | |
| *Plaintiffs,* | |
| v. | Case No. 25-cv-1774-JEB |
| DEPARTMENT OF STATE, *et al.*, | |
| *Defendants.* | |

## PLAINTIFFS' CORRECTED CONSOLIDATED REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND CROSS-MOTION FOR SUMMARY JUDGMENT

Defendants the Department of State and Secretary Rubio entered into an Agreement with El Salvador that has already facilitated the extrajudicial rendition of hundreds of people to confinement in conditions the government knew and knows to be dangerous and inhumane. Plaintiffs' motion for summary judgment and nearly a thousand pages of supporting material established that the Agreement—which remains in place—violates the Administrative Procedure Act and is ultra vires. Unable to defend the lawsuit Plaintiffs brought, Defendants attack a version of the complaint that simply does not exist: they repeatedly misconstrue Plaintiffs' allegations, ignore contrary facts, and misapply the law. And they offer no contrary evidence that could defeat Plaintiffs' entitlement to summary judgment (much less support their own). There is none. The Court should grant Plaintiffs' motion for summary judgment and deny Defendants' cross-motion for summary judgment.

Defendants also move to dismiss, but their motion makes no relevant reference to any of the allegations in the complaint—let alone shows that those allegations are insufficient. To the extent this motion is even proper at this stage, *but see Alaska v. Dep't of Agric.*, 17 F.4th 1224, 1230 (D.C. Cir. 2021), the Court should deny it for the same reasons it should deny Defendants' cross-motion for summary judgment.

## ARGUMENT

At the outset, Defendants misconstrue the claims at issue. That error undermines each of their substantive arguments. Properly understood, the undisputed record establishes that Plaintiffs have standing, that the Agreement is subject to review under the APA, that the Agreement violates the APA as contrary to law and constitutional right, arbitrary and capricious, and in excess of statutory authority, and that the Agreement is ultra vires.

## I.    Defendants Misconstrue the Claims in This Case.

As Plaintiffs have made clear from the first paragraph of their complaint, they challenge unprecedented agency action: an Agreement entered into by Defendants to outsource the detention of people in the United States by facilitating and funding their extraordinary rendition into prisons in El Salvador. Defendants try to make this case about something else entirely: the government's ability to effectuate ordinary removals to El Salvador under the immigration laws. But that is not what Plaintiffs challenge or what the Agreement entails, and Plaintiffs do not seek vacatur of any order of removal. Defendants cannot defeat Plaintiffs' well-supported motion for summary judgment—let alone show that *they* are entitled to summary

judgment—by simply denying the reality of what they have done and ignoring the undisputed facts in the record. *See, e.g.*, *Dist. Intown Props. Ltd. P'ship v. District of Columbia*, 198 F.3d 874, 878 (D.C. Cir. 1999).

Put succinctly: removal is not the same as rendition into U.S.-funded detention. And the undisputed facts show that the Agreement provides for the latter. Defendant Secretary Rubio, for example, publicly described the Agreement as one in which El Salvador's president had "agreed to accept for deportation any illegal alien . . . who is a criminal from any nationality . . . and house them in his jails." Ex. 9, at 4; *see also id.* (reiterating that "he has offered his jails so we can send them here and he will put them in his jails"). Secretary Rubio later stated that "El Salvador has agreed to hold" people rendered from the United States "in their very good jails at a fair price that will also save our taxpayer dollars." Ex. 17. He elsewhere described the Agreement as "the agreement to house criminal aliens." Ex. 11, at 15.[1] El Salvador's president confirmed that he had in fact offered "the opportunity to outsource part of [the United States] prison system." Ex. 10. El Salvador has described the Agreement as "facilitat[ing] the use of the Salvadoran prison infrastructure for the custody of persons detained within the scope of the justice system and law enforcement of [the United States]." Ex. 44, at 5 (per *J.G.G.* file-stamp). And negotiations reflected discussion about "baseline requirements" that,

---

[1] Others in the administration have also confirmed this aspect of the Agreement. *See, e.g.*, Ex. 52 ( "this facility is one of the tools in our toolkit"); Ex. 53; Ex. 54, at 1; Ex. 55, at 2 (people rendered to CECOT "should stay there for the rest of their lives").

according to Secretary Rubio's chief of staff, "do not differ from El Salvador's for the treatment of prisoners."  Ex. 24, at 3.

The diplomatic notes describing particular renditions under the Agreement make clear that "the United States understands El Salvador intends to accommodate them for a duration of one year unless or until a determination concerning their long-term disposition is made" and specifically referred to El Salvador's "treatment of prisoners," confirming each side's understanding and intention that those rendered would be held as prisoners.  Ex. 14, at 1; *see also* Ex. 15 (similar).  That is exactly what happened: people rendered under the Agreement have been held in CECOT and other Salvadoran prisons and were even flown to CECOT by the U.S. government.  *See, e.g.*, Ex. 18 ¶¶ 10–16; Ex. 19 ¶¶ 12–15.  And once they arrived at CECOT, they were told by Salvadoran officials that they were there at the behest of the United States.  *See* Ex. 18 ¶ 19 (reporting that the CECOT director told them "they had been sentenced to maximum penalties in the United States"); *see also* Ex. 56 ¶¶ 3–6; Ex. 57 ¶¶ 9–10; Ex. 58 ¶¶ 7–8; Ex. 59 ¶¶ 2–3.

Not only did Defendants negotiate for El Salvador to imprison those rendered from the United States, Defendants paid El Salvador for it.  The grant letter confirms this understanding: it explains four separate times in four pages that the grant funds are "to support costs related to detention of" the people the United States had sent to El Salvador.  *See* Ex. 22 at 4, 5, 6.  Defendants largely ignore this key aspect of the Agreement, which is wholly inconsistent with their unsupported and implausible attempt to rewrite the Agreement as merely concerned with ordinary removals.

4

Rather than grapple with the record, Defendants rely (at 27–28) on this Court's finding at one point in the *J.G.G.* litigation that evidence in that case "appear[ed] to show that, while the United States and El Salvador have struck a diplomatic bargain *vis-à-vis* the detainees, the ongoing detention is not solely at the 'behest' of the United States, nor is El Salvador 'indifferent' to their detention." *J.G.G. v. Trump*, 786 F. Supp. 3d 37, 57 (D.D.C. 2025), *vacated on other grounds*, 2025 WL 2317650 (D.C. Cir. Aug. 8, 2025). That finding, however, addressed only the question of whether detainees in CECOT were in the constructive custody of the United States—not whether the Agreement facilitated detention in the first instance. Nor did it have the benefit of the full evidence available in this case, including a statement by El Salvador that "the jurisdiction and legal responsibility for these persons lie exclusively with the [United States], by virtue of international agreements signed." *See* Ex. 44, at 5 (per *J.G.G.* file-stamp). And even if Defendants were correct that El Salvador had sole responsibility for deciding how long to detain rendees, that in no way improves the legality of Defendants' scheme to render them into detention in the first place.

Defendants' related attempt to recharacterize the Agreement as limited to Venezuelans fares no better (and would not save the lawfulness of the Agreement in any event). They contend (at 11) that, "[e]xcept for two named MS-13 Salvadorans," the Agreement "concerned the removal and accommodation of Venezuelan nationals only." That statement is again contradicted by the facts Plaintiffs have set forth, including Defendants' own prior admissions. *See, e.g.*, Ex. 9, at 4 (statement of Defendant Rubio that El Salvador had agreed to accept "criminal[s] from any

nationality"). And Defendants' reliance on the March 13 diplomatic note's reference to "Venezuelan[s]" does not help them. As Plaintiffs have explained (at 5 & n.1), and Defendants fail to meaningfully address, the diplomatic notes do not constitute the whole of the Agreement, which Defendant Rubio admitted was "finalize[d]" not in those notes but "in a verbal agreement" with President Bukele. Ex. 11, at 15; *see also* Ex. 60, at 1 (describing other aspects of the Agreement not reflected in the diplomatic notes). And in any event, the March 31 diplomatic note—which Defendants conspicuously fail to reference—reflects the rendition under the Agreement of nine Salvadorans in addition to seven Venezuelans. Ex. 16. Likewise, Defendants seek to rely on the Kozak declaration, but the paragraphs they cite merely describe the March 13 and 14 notes, without in any way establishing that those notes constitute the whole of the Agreement. Ex. 12 ¶¶ 3–5. Just the opposite: the Kozak declaration specifically states that the original version of the March 14 note "ran contrary to the United States' understanding of what leadership of both countries had negotiated," *id.* ¶ 5—negotiations that, again, took place and were finalized verbally, not in these diplomatic notes. (And in any event, the uncontroverted evidence makes clear that the rendition of Venezuelans was not limited to members of Tren de Aragua. *See* Ex. 18 ¶¶ 6, 19; Ex. 19 ¶¶ 7–11.)

Having mischaracterized the substance of the agency action at issue, Defendants move on to misidentify the actors. They suggest (at 2, 16, 23, 43) that Plaintiffs' grievances really rest with DHS, and not State. But this is just another reiteration of the view that this case is about individual removals, when it explicitly

challenges the Agreement, *see, e.g.*, Compl. ¶¶ 117–33, 136–44, 149, 151, and the evidence shows that the Agreement was entered into by Defendants, not DHS, *see* Exs. 12–16, 22. Defendants' argument (at 1) that this challenge impermissibly circumvents the Supreme Court's decision in *Trump v. J.G.G.*, which addressed venue for individuals challenging removal pursuant to the Alien Enemies Act, is likewise inapposite.

## II.    Plaintiffs Have Standing and This Case Is Not Moot.

### A.    Plaintiffs have established injury.

As Plaintiffs showed in their opening motion (at 13–23), the undisputed facts at the time the complaint was filed establish each Plaintiff's standing. Each organizational Plaintiff—plus NACDL's members—all deliver direct services to individuals as part of their core missions. Those services include, for example, providing legal representation, including to people rendered under the Agreement; running clinics and providing resources and pro se materials to help people in detention or elsewhere pursue available remedies; and operating a phone hotline through which detained people can seek advice and report unsafe conditions. Plaintiffs' central missions also include pursuing strategic litigation to protect the rights of those held in detention; monitoring and collecting data on conditions of confinement in the United States and abroad; and training and providing resources to volunteers, attorneys, and other organizations on removal defense and other aspects of immigration representation.

As Plaintiffs have also shown (at 15–18, 20–21), the undisputed record evidence establishes that the Agreement directly interferes with their (and NACDL members') ability to carry out all these important parts of their missions. For example, the ability of RFK Human Rights, ImmDef, and individual NACDL members to provide representation to clients after those clients were rendered and held incommunicado in El Salvador is obviously, directly, and significantly impaired by the Agreement. Even the mere existence of the Agreement—and the constant uncertainty and threat of rendition it creates—has materially impeded Plaintiffs' core functioning by, among other things, making it substantially more difficult and time-consuming for them to screen and advise clients. That in turn has left Plaintiffs with fewer resources available for their other needs and left them able to serve fewer people than they otherwise could.

Those harms are all at least as significant as those the Supreme Court found sufficient in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982) (finding standing where defendants' provision of false information about the availability of apartments "perceptibly impaired [plaintiff's] ability to provide counseling and referral services for low-and moderate-income homeseekers"); the D.C. Circuit found sufficient in *League of Women Voters of United States v. Newby*, 838 F.3d 1, 8–9 (D.C. Cir. 2016) (finding standing where defendants' proof-of-citizenship requirements for voter registration "unquestionably ma[d]e it more difficult for [plaintiffs] to accomplish their primary mission of registering voters"); and this Court found sufficient in *Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1, 20–23

(D.D.C. 2020) (finding standing where defendants' repeal of anti-discrimination rules would "inhibit[] [plaintiffs'] daily operations by forcing them to deliver costlier and more difficult treatment to a growing number of patients" (quotation marks omitted)).

Defendants do not dispute any of the specific facts in Plaintiffs' declarations. Instead, Defendants primarily argue (for example, at 11–12) that Plaintiffs lack standing because, after the filing of the complaint in this case, many people rendered under the Agreement were released to Venezuela. This argument, however, is contrary to controlling law, which requires that standing be assessed based on "the circumstances existing at the time of filing," *Barker v. Conroy*, 921 F.3d 1118, 1130 (D.C. Cir. 2019), not events after the complaint was filed, *see N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1258 (D.C. Cir. 2020). Defendants' main argument on standing is therefore foreclosed by binding precedent. (It also fails as an argument about mootness, as explained below.) And it wholly ignores the evidence that the continued existence of the Agreement injures Plaintiffs regardless of whether at any given moment they have clients in CECOT or other Salvadoran prisons.

Defendants' other arguments also fall short. They seek to rely (at 17–18) on *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), but that case only confirms Plaintiffs' standing. True, the Court in *Alliance for Hippocratic Medicine* observed that the plaintiffs there could not "assert standing simply because they object to [the defendant's] actions," and that an organization "that has not suffered a concrete injury . . . cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* at 394. But that

unremarkable summation of the law is no help to Defendants here. The record documents that—far from simply "object[ing]" to Defendants' actions—Plaintiffs have been harmed in their ability to provide direct services and carry out other critical parts of their missions. *See, e.g.*, Ex. 32 ¶¶ 10, 14; Ex. 38 ¶ 18; Ex. 37 ¶¶ 6–8. As only one example, the Agreement impedes Plaintiffs' core missions by making it impossible for them to contact some of their clients. This effect is at least as bad if not worse than the impairment to the *Havens Realty* organizational plaintiff's ability to serve its clients, an injury the Court emphasized was cognizable in *Alliance for Hippocratic Medicine*, 602 U.S. at 395.

Defendants also err in their related suggestion (at 17–18) that Plaintiffs' injuries consist of merely a "voluntary diversion of resources." First, that claim ignores the many well-documented ways—which themselves suffice to show injury—in which the Agreement impedes Plaintiffs' core missions. Second, while the additional obstacles created by the Agreement make key parts of Plaintiffs' work more time- and resource-intensive, *see* Mot. 18–20, the question is not whether the resulting diversion of resources from other parts of Plaintiffs' work is "voluntary," but "whether the organization undertook the expenditures in response to, and to counteract, the effects of the defendants' alleged unlawful acts rather than in anticipation of litigation," *PETA v. Dep't of Agric.*, 797 F.3d 1087, 1096–97 (D.C. Cir. 2015) (quotation marks omitted). The record is clear that these resources were not for mere advocacy. *See* Mot. 18–19. In response, Defendants offer a citation (at 18) to a case in which—unlike here—"nothing . . . indicates that [the plaintiff's]

organizational activities have been perceptibly impaired in any way." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 921 (D.C. Cir. 2015).

Relying on one district court decision from nearly forty years ago, Defendants argue broadly that organizations cannot be harmed by "increased complexity or workload in legal representation." Cross-Mot. 16 (citing *Fed. Defs. of San Diego, Inc. v. U.S. Sent'g Comm'n*, 680 F. Supp. 26 (D.D.C. 1988)).  As an initial matter, this argument has no relevance to the many other aspects of Plaintiffs' work beyond legal representation that have been impeded by the Agreement. *See, e.g.*, Mot. 16–18.  But even where this argument would apply, it fails. *Federal Defenders* merely stands for the proposition that a change in the law—via statute, regulation, or guideline—does not establish standing for lawyers who must adapt to the new legal environment.  *See Fed. Defs.*, 680 F. Supp. at 28.  Plaintiffs' harms are of a different type entirely, as Plaintiffs challenge an executive branch action, not a change in the law, and one that directly confounds their ability to provide legal representation at all, such as by cutting off their ability to contact their clients, limiting their recourse to U.S. courts, and making it impossible to fully assess the consequences of certain choices in litigation. *See, e.g.*, Ex. 31 ¶¶ 5, 7; Ex. 32 ¶¶ 5–9; Ex. 18 ¶ 38; Ex. 19 ¶ 26; Ex. 40 ¶ 9; Ex. 41 ¶¶ 7–10, 13.  For similar reasons, Defendants are wrong to suggest elsewhere (at 30) that Plaintiffs are relying on a theory of "third-party" standing; Plaintiffs' standing is based on injuries they themselves suffer as a result of the Agreement.

Defendants' remaining arguments on injury fare no better.  They say (at 17) the Agreement does not impede Plaintiffs' ability to "monitor and improve the

conditions of confinement in U.S. prisons." But that facile claim ignores that Plaintiffs' work seeks to improve conditions *for people detained in U.S. facilities*, not improve those facilities in the abstract. (Defendants also overlook that, contrary to their claims, RFK Human Rights *does* work to improve conditions of detention in other countries. *See* Ex. 31 ¶¶ 2–5.) The Agreement frustrates that work by outsourcing the detention of people who may otherwise remain in facilities in the United States and sending them to foreign black sites where they are held incommunicado and subject to horrific conditions, including torture.

Defendants next try (at 16) to shift the blame to El Salvador, arguing that it is "exclusive[ly]" responsible for injuries related to Plaintiffs' inability to contact their clients. But even if El Salvador chose to start abiding by human rights obligations, that (remote) possibility does not obviate Defendants' role in facilitating rendition to prisons they knew violated those obligations.

Defendants further contend (at 12) that it is "too speculative" whether Plaintiffs may have additional clients in the future who are "affected by" the Agreement. But at the relevant point in time—i.e., when the complaint was filed— Plaintiffs *already* had clients "affected by" the Agreement. There was also nothing "speculative" about the possibility that other people to whom Plaintiffs provide direct services could be rendered under the Agreement. As the evidence shows, several Plaintiffs serve those who—because they are Venezuelan or have tattoos—face a heightened risk of rendition. *See, e.g.*, Ex. 32 ¶ 14. *see also* Ex. 37 ¶ 6. El Salvador has already agreed to accept more people than have so far been rendered, *see* Ex. 15,

and Defendants have planned to grant El Salvador millions more, *see* Ex. 33, at 1. And even apart from whether any particular client was or will be disappeared under the Agreement, the threat and confusion created by the Agreement itself harms Plaintiffs' ability to carry out their missions by, for example, requiring that Plaintiffs expend additional time on screening and advising clients who may be subject to rendition. *See* Mot. 17–18, 20–21.

Defendants' reliance on *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), is also inapposite. Defendants suggest (at 12–14) that the "chain of events" between their entering into the Agreement and people being rendered into Salvadoran prison is simply too long and attenuated to support standing. That claim makes little sense on its face. It is also directly contradicted by the factual record, which demonstrates that such rendition was the express purpose of the Agreement, and that *everyone* rendered under the Agreement was sent directly to a Salvadoran prison, *see supra* Sec. I.[2] Unlike *Clapper*, this case does not involve a long chain of highly speculative events calling standing into question.

Defendants also imply (at 13–14) that "prospective injunctive relief" is unavailable, a view that undergirds many of their arguments. But Defendants entirely ignore that the gravamen of the relief requested is *vacatur* of the Agreement, *see, e.g.*, Mot. 45; Proposed Order, Dkt. 19-2, a form of relief that Defendants wholly fail to address and to which *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), is simply irrelevant, *contra* Cross-Mot. 13–14. Even if *Lyons* were relevant to vacatur,

---

[2] Defendants fixate on CECOT, but Plaintiffs have never claimed that the Agreement is limited to CECOT at the exclusion of other Salvadoran prisons. See Mot. at 1–4.

13

Plaintiffs are not, like Mr. Lyons, individuals asserting that they are likely to encounter government actors who will violate the law. Instead, they are organizations that are already suffering injuries from ongoing violations.

Finally, as to NACDL only, Defendants argue (at 19) that it is "unclear" whether NACDL has demonstrated "indicia of a traditional membership association." Defendants ignore Supreme Court precedent that "[w]here, as here, an organization has identified members and represents them in good faith, our cases do not require further scrutiny into how the organization operates." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 201 (2023). Because NACDL has "identified members" it represents, *see* Ex. 39 ¶¶ 4, 10, "[t]he indicia of membership analysis . . . has no applicability" here. *Students for Fair Admissions*, 600 U.S. at 201.

### B.    Plaintiffs have established causation.

For standing, Plaintiffs also must show that their injury "likely was caused or likely will be caused by the defendant's conduct." *All. for Hippocratic Med.*, 602 U.S. at 382. When that injury involves third parties, "a court must conclude that 'third parties will likely react' to the government regulation . . . 'in predictable ways' that will likely cause . . . the plaintiff's injury." *Diamond Alt. Energy, LLC v. EPA*, 145 S. Ct. 2121, 2134 (2025) (quoting *All. for Hippocratic Med.*, 602 U.S. at 383); *see also Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019). "The D.C. Circuit has repeatedly held that 'injurious private conduct is fairly traceable to the administrative action contested in the suit if that action authorized the conduct or established its legality.'"

*Whitman-Walker Clinic*, 485 F. Supp. 3d at 29 (quoting *Tel. & Data Sys., Inc. v. FCC*, 19 F.3d 42, 47 (D.C. Cir. 1994)).

Plaintiffs have shown that their injuries are likely caused by the Agreement because the Agreement is the legal and practical predicate allowing for and facilitating rendition to El Salvador. *See* Mot. 21–22. As Plaintiffs explained above, they are injured by the Agreement in and of itself, regardless of whether a third party takes steps to avail themselves of it—and injured all the more once that occurred.

In response, Defendants do not dispute the predictable effect of the Agreement on other organs of the federal government, including the Department of Homeland Security—namely, that those other actors will render people to Salvadoran prisons. Indeed, DHS had already done so by the time this case was filed, and enabling such renditions is the very point of the Agreement. Both DHS and Secretary Noem have also openly announced their intention to continue renditions. *See* Ex. 61 ("If you are in America illegally, you could find yourself in CECOT, Cornhusker Clink, Speedway Slammer, or Louisiana Lockup."); Ex. 62, at 1 (same).

Defendants instead question (at 21) whether *El Salvador's* actions were sufficiently predictable to support standing when this case was filed. Their arguments here again simply ignore the basic nature of the Agreement, as documented by the undisputed facts in the record: for the United States to pay El Salvador to, in Defendant Secretary Rubio's words, "accept for deportation any illegal alien in the United States who is a criminal from any nationality . . . and house them in [its] jails." Ex. 9, at 4; *see also* Sec. I. It was thus entirely predictable that

El Salvador would, in exchange for payment, do just that. It was equally obvious that those rendered into Salvadoran prisons would face barbaric conditions and be denied communications with Plaintiffs or others in the United States. *See, e.g.*, Mot. 1–4. And, as the record shows, that is exactly what happened. Defendants cannot hope to evade review by claiming that the obvious, intended, and *already realized* consequences of their actions are simply too unpredictable or speculative.

Defendants' other efforts merely reflect their crabbed understanding of the injuries Plaintiffs have and continue to suffer. Defendants (at 21) dismiss Plaintiffs' inability to monitor and improve confinement conditions in El Salvador, arguing that Plaintiffs ordinarily cannot monitor the conditions of individuals who have been removed. But these are not ordinary removals; the point, of course, is that Defendants moved the detention location beyond Plaintiffs' reach.

Defendants next try (at 22) to cast doubt on the causal relationship between the costs Plaintiffs have incurred and the Agreement. But, as above, Plaintiffs do not rely solely on a diversion-of-resources theory; they instead have produced uncontested evidence that their missions have been impaired. And even if the Court were to limit its review to that theory alone, and to focus only on the lines Defendants cherry-pick from the declarations, Defendants still fall short. They surmise, without citation, that these injuries are not "sufficiently connected to the Agreement and could instead be the byproduct of increased immigration enforcement more generally." But that would be flatly inconsistent with the uncontroverted declarations themselves, which explain that the Agreement is the source of these

injuries: increased immigration enforcement is quite different from the likelihood of rendition into incommunicado imprisonment.

### C.    Plaintiffs have established redressability.

The final element of standing requires only that a favorable ruling "would likely redress at least some" of Plaintiffs' injuries. *Diamond Alt. Energy*, 145 S. Ct. at 2135. A decision declaring unlawful and setting aside the Agreement would do so because it would deprive the government of its avenue for rendition into Salvadoran prisons.

Defendants dispute this (at 23) on the grounds that it is DHS—not Defendants—that actually renders people. But (setting aside the fact that Plaintiffs' injuries encompass more than individual renditions) those renditions are done pursuant to the Agreement entered into by Defendants, regardless of which agency carries them out. Defendants further argue that setting aside the Agreement would not stop DHS from continuing "to remove aliens to El Salvador." *Id.* That argument once again ignores the stark differences between what this case is actually about (an Agreement to facilitate and fund the rendition of people into incarceration) and what Defendants sorely wish it were about instead (ordinary removals under the immigration laws).

Defendants also argue (at 23) that vacating the Agreement is not likely to redress Plaintiffs' injuries because, Defendants suggest, the Agreement does not require El Salvador to hold people in its prisons. Even if that were true, *but see supra* Sec. I, it would not undermine redressability because, whether or not the Agreement

*required* that El Salvador detain people in horrid conditions, it clearly enabled it. And Defendants have pointed to no mechanism under which they could continue to outsource the detention and brutalizing of people in Salvadoran prisons if the Agreement were held unlawful and set aside. Vacating that Agreement is therefore likely to redress at least some part of Plaintiffs' injury.[3]

Only two loose ends remain on redressability. First, Defendants assert (at 24), without support or explanation, that Plaintiffs do not have clients currently in detention in El Salvador. That claim is irrelevant to the question whether Plaintiffs had standing when this suit was filed. It is also simply incorrect, *see* Ex. 31 ¶ 6 (documenting that RFK Human Rights continues to represent people in detention in El Salvador), as Defendants themselves elsewhere recognize, *see* Cross-Mot. 16. Second, Defendants again fixate on the idea that Plaintiffs are seeking a "broad injunction." *See id.* at 24. But Defendants continue to leave unaddressed the vacatur remedy that is the focus of Plaintiffs' motion and to which their arguments about injunctive relief have no relevance.

---

[3] Defendants cite cases where redressability was lacking because the courts could not order sovereign nations to take action to remedy the plaintiffs' injuries. *See Greater Tampa Chamber of Com. v. Goldschmidt*, 627 F.2d 258, 263 (D.C. Cir. 1980) (court could not order United Kingdom to allow increased air traffic); *Indigenous People of Biafra v. Blinken*, 639 F. Supp. 3d 79, 87 (D.D.C. 2022) (court could not order Nigeria to return already delivered military aircraft); *Fryshman v. United States Comm'n for Pres. of Am.'s Heritage Abroad*, 422 F. Supp. 3d 1, 7 (D.D.C. 2019) (court could not order defendant to compel Lithuania to protect historic cemetery). These cases are irrelevant here, as Plaintiffs do not ask the Court to order El Salvador to do anything.

**D.    This case is not moot.**

Although not framed in these terms, Defendants' claim that events following the filing of this case have deprived the Court of jurisdiction is really a claim about mootness.  *See, e.g.*, *N. Am. Butterfly Ass'n*, 977 F.3d at 1258 (concluding that the government's "objection is more aptly framed in terms of mootness, which focuses on . . . events subsequent to the filing of the complaint").  But the voluntary cessation doctrine would require Defendants to overcome "a 'formidable burden'" to show that this case is moot.  *See FBI v. Fikre*, 601 U.S. 234, 241 (2024) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000)).  To do so, "a defendant must prove no reasonable expectation remains that it will return to [its] old ways," *id.* (quotation marks omitted), "whether the challenged conduct might recur immediately or later at some more propitious moment," *id.* at 243.  "That much holds for governmental defendants no less than for private ones." *Id.* at 241.

Defendants do not even try to—and could not—satisfy that "formidable burden."  They do not dispute that the Agreement remains in place and has not been rescinded.  And they do not disclaim that additional people will be rendered under the Agreement in the future. (Nor could they, as the administration continues to threaten people with rendition to CECOT even after some rendees were released to Venezuela, *see* Ex. 61; Ex. 62, and to take steps to carry out its side of the Agreement, *see* Ex. 60, at 2, 4, 7–8.)  They do not address the undisputed record evidence showing that there is still capacity for additional renditions, *see* Ex. 15 (describing El Salvador as "read[y] to accommodate" more people than have so far been rendered); Ex. 60, at

4 (reporting that President Bukele "promised to incarcerate hundreds or even thousands more immigrants from the United States"), and that Defendants have taken concrete steps to ensure still more, *see* Ex. 33, at 1 (noting that "upwards of $15 million in International Narcotics Control and Law Enforcement (INCLE) funds have been set aside to send to El Salvador to house additional detainees"). Defendants also fail to grapple with the fact that RFK Human Rights continues to represent people rendered under the Agreement who remain incarcerated in Salvadoran prisons, *see* Ex. 31 ¶¶ 6–7, and that the Agreement itself (regardless of specific renditions) causes ongoing injury.

Nor have Defendants put forward any evidence of their own. For example, they have not submitted a declaration or other evidence from which the Court could conclude that renditions will cease going forward. *Cf. Fikre*, 601 U.S. at 242 (finding that case was not moot even where the government provided a declaration stating that the plaintiff "will not be placed on the No Fly List in the future based on the currently available information"). Defendants also tender no evidence to support their assertions (at 12) about the Venezuelan government's future willingness to accept Venezuelans removed from the United States—assertions that, in any event, are irrelevant to the rendition of people of other nationalities and do not prove that the United States would not choose to render Venezuelans into El Salvador regardless.

Under these circumstances, where Defendants have failed even to claim—let alone submit any evidence to establish—that they will change their conduct in the

future, Defendants have not come close to meeting their "formidable burden" to show that this case is moot.

## III.    The Agreement Violates the APA.

### A.    The Agreement is final agency action subject to judicial review.

#### 1.    The Agreement is final agency action.

As Plaintiffs have explained (at 23–24), the Agreement marks the consummation of the State Department's decisionmaking process, and it is an action by which rights or obligations have been determined, or from which legal consequences will flow. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). The Agreement has not only been completed, but executed, and the Agreement provides the necessary mechanism to facilitate extrajudicial rendition into El Salvador.

Defendants do not dispute that the Agreement marks the consummation of their decisionmaking process. They argue instead (at 25) about the second prong, focusing on the diplomatic notes alone and asserting that those notes do not carry legal rights or consequences because they are "nonbinding." This mistakes the analysis. First, as explained above, the diplomatic notes are not equivalent with the Agreement. Second, a "nonbinding" agreement in this context is simply one that is "not governed by international law—meaning it does not trigger the *international law* rules relating to compliance and state responsibility for breach." *See* Curtis A. Bradley, Jack Goldsmith & Oona A. Hathaway, *The Rise of Nonbinding International Agreements: An Empirical, Comparative, and Normative Analysis*, 90 U. Chi. L. Rev. 1281, 1284 (2023) (emphasis added). That is irrelevant to the question whether the Agreement is final: legal consequences have already flowed, because the Agreement

has already allowed the government to outsource the detention of people from the United States.

Defendants dispute this conclusion (at 26) on the grounds that "[a]ny legal consequences to Plaintiffs . . . flow not from [the Agreement], but rather from the United States' independent decision to remove individuals to El Salvador." That argument, however, "confuses the question whether [Defendants'] action is final with the separate question whether [Plaintiffs'] harm is fairly traceable to [Defendants'] action." *See Bennett*, 520 U.S. at 177 (quotation marks omitted). The Agreement is one from which legal consequences flow because it enables the rendition of people into prison in El Salvador, an option the administration did not have previously. The fact that any particular rendition under the Agreement requires additional action by the government does not undermine that conclusion, just as in *Bennett* the challenged agency action was "final" even though it affected the plaintiffs by "alter[ing] the legal regime" under which a separate agency would choose to operate an irrigation project. *Id.* at 177–78; *cf. id.* at 168–69 (explaining that plaintiffs were "wrongly equat[ing] injury fairly traceable to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation" (quotation marks omitted)). Defendants' argument here also entirely ignores that the mere existence of the Agreement—even aside from any particular rendition under the Agreement—creates uncertainty and confusion that directly undermines Plaintiffs' ability to carry out their core functions.

The government also disputes (at 26) that the Agreement is necessary in order for the United States to "remove aliens to El Salvador."  But, again, Plaintiffs contest rendition, not removal.  *See supra* Sec. I.  Defendants have not identified (or claimed to have identified) any alternative legal mechanism by which the United States could pay to outsource the detention of people in the United States into Salvadoran prisons. For this reason, Defendants' reliance on *Sierra Club v. EPA*, is misplaced. *See* 955 F.3d 56, 63–64 (D.C. Cir. 2020) (explaining that guidance was not final agency action where it was neither necessary nor sufficient "to support a permitting decision").  To the extent Defendants mean to suggest (at 26–27) that paying for people to be involuntarily held in a Salvadoran prison facility produces "practical" but not "legal" consequences, that suggestion can be readily rejected.

### 2.    The Agreement is subject to review under the APA.

Defendants next argue (at 27) that the Court lacks jurisdiction because the agency action at issue is "committed to agency discretion by law."  5 U.S.C. § 701(a). "This is a very narrow exception," applicable only "in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971). But the point is that Defendants have acted with no authority at all, *infra* Sec. III.D, much less authority written so broadly as to provide no meaningful standards.   Indeed, Defendants are unable to point to any statute supporting their argument.[4]  But

---

[4] Defendants elsewhere (at 42) cite 22 U.S.C. § 2656 for the proposition that Secretary Rubio has broad authority to represent the United States in diplomatic negotiations, although it does not rely on that provision here.  But even if that provision, read in isolation, did provide unfettered discretion to negotiate international agreements, *but*

Plaintiffs have identified many legal restrictions on the executive branch's dealings with people within the United States, *infra* Sec. III.B, all of which create law to apply here. Defendants' answer, essentially, is that their compliance with these protections is unreviewable merely because they made an agreement with a foreign government to ignore them. The Court should not countenance this attempt to evade review.

Defendants attempt (at 28) to cast the Agreement purely as a "foreign relations decision," arguing that the Court has no standards to apply "govern[ing] nonbinding diplomatic arrangements of the United States in this context." They cite nothing to support this proposition. And this characterization is inaccurate, several times over. First, Plaintiffs' claims address numerous provisions of law governing removal and detention, and Defendants do not even try to contest that those statutes contain "law to apply." Rather, Defendants try to sweep them away by arguing (at 28) that those laws "do not have extraterritorial application." But this fundamentally misunderstands the Agreement, which seeks to do far more than merely remove people from the country, but instead creates a system to circumvent domestic legal protections by outsourcing the detention of people who would otherwise receive those protections. Whether that system is established through an agreement with another country or, say, a private prison corporation is immaterial to the question whether that action violates the APA.

---

*see, e.g.*, *id.* § 2656d, it does not shield from judicial review Defendants' action regarding the detention and treatment of people in the United States.

Second, Defendants are wrong as a general matter that they can evade APA review by the simple expedient of involving a foreign actor.[5]  As the Supreme Court has observed, "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance."  *Baker v. Carr*, 369 U.S. 186, 211 (1962).  One example: another court in this district found that a State Department agreement with Canada concerning bridge-crossing between the two countries was subject to judicial review under the APA.  *Detroit Int'l Bridge Co. v. Canada*, 133 F. Supp. 3d 70 (D.D.C. 2015), *partially reconsidered on other grounds*, 189 F. Supp. 3d 85, 95 n.9 (D.D.C. 2016) (clarifying that the court held the crossing agreement "is subject to judicial review under the APA").  As here, the government argued that the agreement was not subject to judicial review because the State Department's approval thereof was committed to agency discretion by law, including because it "involves complex concerns regarding foreign relations, diplomacy, and national interest."  *Id.* at 104 (quotation marks omitted).  The court rejected the government's arguments.  The court acknowledged that courts hesitated to second-

_____

[5] Defendants offer (at 28 n.9) some cases in which courts have hesitated to weigh in on sensitive foreign affairs or national security matters.  This case presents neither.  It does not address visa determinations, *see Saavedra Bruno v. Albright*, 197 F.3d 1153, 1162 (D.C. Cir. 1999), or applying for a visa abroad, *see Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 104 F.3d 1349, 1353 (D.C. Cir. 1997), or security clearance denials, *see Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988), much less the decision to launch a military strike (or targeted killing) abroad, *El-Shifa Pharm. Inds. Co. v. United States*, 607 F.3d 836, 844 (D.C. Cir. 2010) (en banc); *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 9, 41–42, 50 (D.D.C. 2010) (declining to decide whether the agency action is committed to its discretion).  Instead, it concerns an agreement for the rendition and indefinite detention of people located within the United States.  Defendants do not cite any authority where a court has declined to review an agreement that effectively extraterritorializes a domestic matter, whether effectuated through a non-binding international agreement or otherwise.

guess "complicated foreign policy matters," but explained that "it is surely within the province of this Court to determine whether [the State Department] acted in contravention of the standards set forth in 5 U.S.C. § 706(2) by approving an agreement that violates state law," as "[s]uch a decision would not touch on foreign policy matters." *Id.*  So too here: the fact that a foreign state is a counterparty to an agreement does not put the agreement solely in the province of foreign affairs.

Finally, even if Defendants were correct—and they are not—their argument under section 701(a) about action "committed to agency discretion by law" would still be irrelevant to Plaintiffs' claims that the Agreement is contrary to law and constitutional right, in excess of statutory authority, and ultra vires. *See Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002) ("§ 701(a)(2) encodes the principle that an agency cannot abuse its discretion, and thus violate *§ 706(2)(A)*, where its governing statute confers such broad discretion as to essentially rule out the possibility of abuse" (emphasis added)).  If there is no statutory authority for the agency to act— as Plaintiffs have shown—the question of discretion never arises.  *See Make the Rd. New York v. Wolf*, 962 F.3d 612, 634 n.14 (D.C. Cir. 2020) (in case holding that section 701(a)(2) barred claims that rule was arbitrary and capricious and no good cause existed to skip notice and comment, expressly reserving question whether the plaintiff could challenge rule as "exceed[ing] the bounds of statutory authority"); *Assiniboine & Sioux Tribes of Fort Peck Indian Rsrv. v. Bd. of Oil & Gas Conservation of Montana*, 792 F.2d 782, 791–92 (9th Cir. 1986) ("Courts have widely held that claims that an agency has acted outside its statutory authority are reviewable even

though its decision on the merits might be unreviewable as committed to agency discretion."). And no statute confers discretion on Defendants to act contrary to other statutes or the Constitution. *See Make the Rd.*, 962 F.3d at 632 ("If no standards for judging the agency action are discernible, meaningful judicial review is impossible, and agency action is shielded from the scrutiny of the courts, *at least as long as the the agency's action does not otherwise infringe some constitutional right or protection*." (quotation marks, citation, and alteration omitted; emphasis added)); *Farmworker Just. Fund, Inc. v. Brock*, 811 F.2d 613, 622 (D.C. Cir.) ("[T]he holding in *Chaney* in no way precludes judicial review of agency decisions that are contrary to law."), *vacated as moot*, 817 F.2d 890 (D.C. Cir. 1987); *see also Lincoln v. Vigil*, 508 U.S. 182, 195 (1993) ("[T]he APA contemplates, in the absence of a clear expression of contrary congressional intent, that judicial review will be available for colorable constitutional claims . . . .").

## B.    The Agreement is contrary to law and constitutional right.

The Agreement is contrary to law because it violates numerous laws and constitutional provisions, enables conduct that is prohibited by law, and denies rights to those rendered. *See* Mot. at 24–25. Defendants do not dispute this standard, but instead reprise their arguments about third-party standing (at 30, to no greater avail) and reiterate their counterfactual account of the Agreement (at 29, and throughout). Once more, Defendants fail to persuade. Their unsubstantiated statement (at 29) that the Agreement does not "discuss whether and where El Salvador would detain anyone" is flatly contradicted by the record evidence. *See supra* Sec. I. Moreover,

Defendants seem to acknowledge (at 29) that the State Department may have a "facilitative role" in individuals' removal.  This does them no favors, because facilitating conduct that is prohibited by law violates the APA. *See Humane Soc'y of the U.S. v. Glickman*, 217 F.3d 882, 884 (D.C. Cir. 2000).  Whether or not specific individuals could, in theory, be removed lawfully under the INA does not insulate from review an agency action in which Defendants arranged for and agreed to finance indefinite detention in contravention of numerous legal protections.

Defendants' arguments as to the many specific provisions of law the Agreement violates are no more persuasive—largely because they rely on the view that the Agreement is the stuff of ordinary removals, and that an examination of individual removals, not the underlying Agreement itself, is the appropriate scope.  That is wrong.

***Foundational Protections Before Rendition.***  There is no dispute that the Agreement fails to incorporate protections sufficient to ensure due process before people are rendered out of the United States, including because it required no more than 24 hours' notice of the initial renditions, *see* Ex. 14 (providing notice on March 13 for renditions on March 14), and incorporated no requirement of advance notice sufficient to ensure an opportunity to be heard.  Defendants' only answer (at 31) is that any violations of due process arose from the decision to render specific people into Salvadoran prisons, rather than from the Agreement.  That argument ignores that it is the Agreement that provided for renditions into captivity, and that by enabling that deprivation of due process, the Agreement is contrary to the Fifth

Amendment, *see Humane Soc'y*, 217 F.3d at 884.  Defendants' arguments as to the INA (at 32–33) falter for similar reasons; those arguments rely entirely on Defendants' conception of this case as about ordinary removals.  But the INA does not provide for U.S.-funded detention in third countries.  And Defendants have no answer for Plaintiffs' point (at 28) that the Agreement fails to account for the limitations the INA places on third-country removals, *see* 8 U.S.C. § 1231(b), nor to Plaintiffs' point (at 28 n.6) that the Agreement fails to comport with the process required by the Alien Enemies Act.

As to the Sixth Amendment, Defendants argue only (at 32) that removals are civil, not criminal, in nature, and so the Sixth Amendment has no relevance to the government's decision to send people allegedly guilty of crimes into indefinite detention and punishment in an overseas prison without trial.  But again, the Agreement specifically provides for rendition into U.S.-funded detention, not just removal from the country.  Defendants cite no authority for the shocking proposition that if the government takes action to incarcerate someone in the United States in a foreign country, the Sixth Amendment simply does not apply.

As to the Suspension Clause, Defendants again confuse standards for ordinary removals, after which habeas relief is typically not available, with extraordinary rendition into incarceration.  Defendants maintain (at 32) that the rendition provided for by the Agreement puts those rendered beyond access to habeas corpus.  But they suggest—yet again, without citation—that this is not a "suspension" because a government actor hasn't made a formal pronouncement that it is.  That is not the

law.  *Cf. Boumediene v. Bush*, 553 U.S. 723, 771 (2008) ("If the privilege of habeas corpus is to be denied to the detainees now before us, Congress must act in accordance with the requirements of the Suspension Clause.  This Court may not impose a *de facto* suspension by abstaining from these controversies." (citation omitted)).

Nor does the Agreement include sufficient safeguards to protect U.S. citizens under the Non-Detention Act.  Defendants argue (at 35) that the diplomatic notes discuss only Venezuelan and Salvadoran nationals.  But, as explained, the notes do not constitute the entirety of the Agreement.  And even if they did, the Agreement still fails to include any meaningful protection against people (including U.S. citizens, *see, e.g.*, Ex. 63, at 2–3, 6–7) being rendered mistakenly—particularly since the government has taken the position that if a mistake is made, the United States is powerless to correct it.  Defendants fail to address the gravity of these mistakes in light of Mr. Abrego Garcia's mistaken rendition and the government's own data showing that ICE has a history of erroneously deporting and detaining U.S. citizens, *see* Pls.' Mot. at 39; Ex. 64, at 2.

***Torture and Abuse in Confinement.***  Facilitating rendition to indefinite detention in abusive conditions clearly violates domestic protections against cruel and unusual punishment, ill treatment of detainees, and torture.  *See, e.g.*, *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989).  Defendants' only response—again—is to ignore the crucial fact of detention in Salvadoran prisons. Defendants contend (at 34) that removal is not "punishment" for Eighth Amendment purposes.  But, of course, Plaintiffs challenge rendition into detention, not removal.

Defendants continue to ignore the evidence that the Agreement provides for detention, and included no meaningful safeguards against barbaric conditions.

As to the Detainee Treatment Act, Defendants do not dispute that conditions in El Salvador constitute a substantive violation. Instead, they merely argue (at 35, in reliance on *J.G.G.*) that people rendered under the Agreement are no longer within U.S. custody or control. But Defendants fail to address record evidence that came to light since the decision in *J.G.G.* that supports a finding of U.S. control. *See* Ex. 44, at 5 (per *J.G.G.* file-stamp). Moreover, Defendants fail to grapple with the fact that those rendered under the Agreement were indisputably in U.S. custody and control *at least* until the government delivered them to the door of CECOT and that they would not have been sent to CECOT were it not for the Agreement. By enabling the rendition of people in U.S. custody directly into CECOT, the Agreement "subject[ed]" those people to "cruel, inhuman, or degrading treatment or punishment" in violation of the Detainee Treatment Act.

Defendants contend (at 33–34) that Plaintiffs cannot challenge the Agreement as contrary to the Convention Against Torture (and its implementing laws) because, Defendants say, courts have jurisdiction to review a CAT claim only when reviewing final orders of removal. But while the provision of the Foreign Affairs Reform and Restructuring Act that Defendants cite affirmatively strips jurisdiction for review of CAT's implementing regulations ("no court shall have jurisdiction to review"), it merely notes that it does not affirmatively *provide* jurisdiction for CAT claims outside of final orders of removal ("nothing in this section shall be construed as providing any

court jurisdiction"). *See* Pub. L. No. 105-277, § 2242(d), 112 Stat. 2681, 822 (1998). That distinction is relevant here, because Plaintiffs do not rely on FARRA for jurisdiction: they invoke federal question jurisdiction by suing under the APA, and courts routinely address agencies' compliance with substantive statutes based on jurisdiction provided through the APA. And even if FARRA did strip APA jurisdiction (which it does not), Plaintiffs do not bring a claim relating to (non-existent) determinations as to the likelihood of torture for any individual person, but a broad scheme of extraordinary rendition. *Cf. Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 216–17 (2012) ("When a statute is not addressed to the type of grievance which the plaintiff seeks to assert, then the statute cannot prevent an APA suit." (quotation marks omitted)).

Defendants further argue (at 33–34), citing *Kiyemba v. Obama* and *Munaf v. Geren*, that the court cannot second-guess the executive branch's determination that torture was unlikely to occur. But Defendants point to nothing in the administrative record, or elsewhere, suggesting that they actually *made* such a determination. In *Kiyemba*, by contrast, the government offered evidence that it "does everything in its power to determine whether a particular country is likely to torture a particular detainee." 561 F.3d 509, 514 (D.C. Cir. 2009); *see also Munaf*, 553 U.S. 674, 702 (2008) (explaining that the State Department had "determined that the . . . department that would have authority over [the petitioners] as well as its prison and detention facilities have generally met internationally accepted standards for basic prisoner needs" (quotation marks omitted)). And Defendants conveniently ignore that

here, there is record evidence that any reliance on the assurances in the diplomatic notes was woefully erroneous—a far cry from *Kiyemba* and *Munaf*, where the courts were invited to speculate as to whether torture might occur in the future.

Those cases are also distinguishable insofar as they address the question whether a handful of specific individuals (Guantanamo detainees in one case; individuals being transferred to Iraqi custody to stand criminal charges in another) were likely to be subject to torture if they were transferred, whereas the entire point of the Agreement is to render hundreds of people directly into detention in conditions Defendants knew featured human rights abuses. Indeed, as record evidence shows, it is clear that the poor conditions were a feature, and not a bug, for the government. *See, e.g.*, Ex. 20; Ex. 21. This, too, presents a novel question, which is not beyond the Court's review. *Cf. Kiyemba*, 561 F.3d at 514 n.5 (noting that, as in *Munaf*, the case "need not address what rights a detainee might possess in the more extreme case in which the Executive has determined that a detainee is likely to be tortured but decides to transfer him anyway" (quotation marks omitted)).[6]

**Basic Legal Rights and Protections.** As Plaintiffs previously established (at 32–33), the record evidence demonstrates that prison conditions in El Salvador do not provide detainees with the right to practice religion guaranteed by the First Amendment and the Religious Freedom Restoration Act, and so the Agreement is

---

[6] Moreover, even if Defendants did make such a determination (for which there is no evidence) and even if *Kiyemba* were not distinguishable (and it is) the deference afforded to the executive in that line of cases implicitly rested on a presumption of regularity to which it is no longer entitled. *See, e.g.*, *Fed. Educ. Ass'n v. Trump*, No. 25-cv-1362, 2025 WL 2355747, at *10 (D.D.C. Aug. 14, 2025) (collecting cases).

contrary to those provisions. Again, Defendants fall back (at 36–37) on their argument that those provisions do not apply in the removal context and that El Salvador alone is responsible for detention; this is no more persuasive for the dozen repetitions. Defendants' statement (at 37) that the Agreement "does not request, much less require" El Salvador abridge free exercise turns the question upside down: the Agreement provides for detention, it does so with Defendants' full knowledge that detention in Salvadoran prisons does not afford the right to religious practice, and it does so without Defendants' including any conditions guaranteeing that right (although they negotiated for other conditions). Defendants' cursory assertion (at 36) that "expelling alien TdA members from the United States would satisfy strict scrutiny" is wholly unsubstantiated. Defendants in no way explain how rendition was the "least restrictive means" of furthering any government interest, especially with respect to people already in U.S. detention. And, yet again, the issue is not expulsion, but rendition.

As to the First Step Act, Bureau of Prisons Regulations, and Department of Homeland Security regulations: to the extent the Agreement outsources the detention of people who had been in the custody of BOP or DHS, it is contrary to those protections. Defendants' only response (at 35) is that "[i]t is undisputed that no one accepted under the Arrangement is in either BOP or DHS custody." But the fact that once rendered, people are no longer in BOP or DHS custody is beside the point. To the extent they *were* in BOP or DHS custody at the time they were rendered, the Agreement keeps them in detention, while depriving them of those protections.

*Appropriations and Funding Requirements.* Defendants argue (at 37–38) that the millions of dollars it paid El Salvador to detain people rendered from the United States fall within a general appropriation of funds under the Foreign Assistance Act. This, they say, suffices. But Defendants do not even try to explain, nor does the record support, how financing rendition is "for the control of narcotic and psychotropic drugs and other controlled substances, or for other anticrime purposes," *see* 22 U.S.C. § 2291(a)(4). Although the grant letter pays lip service to "El Salvador's law enforcement and anticrime needs," Ex. 22, at 4, it makes clear that the purpose of the grant is to cover "costs associated with detaining" the people Defendants had rendered, *id.* at 4, 5, 6. Indeed, it spells out that "[t]he purpose of this grant . . . is to support costs related to detention of members of TdA." *Id.* at 6. Defendants ignore this record evidence.

They likewise fail to address the clear statutory directives that funding is intended "to eliminate inhumane conditions in foreign prisons and other detention facilities," Further Consolidated Appropriations Act, Pub. L. No. 118-47, 2024 § 7035(a)(5), 138 Stat. 795, not to finance them. Indeed, it is *only* in furtherance of "eliminat[ing] inhumane conditions in foreign prisons and other detention facilities" that INCLE funding can overcome the Foreign Assistance Act's general bar on "provid[ing] any financial support[] for police, prisons, or other law enforcement forces for any foreign government." *See* 22 U.S.C. § 2420(a). There is no evidence that this funding eliminated such conditions rather than funding them.

Defendants likewise fail to address that no funds "may be obligated or expended" for El Salvador absent required notification to the Committees on Appropriations. *See* Further Consolidated Appropriations Act, 2024 § 7015(f), 138 Stat. 768. The uncontested record evidence shows Defendants did not undertake that required notification. *See* Ex. 45, at 2. And "any decision" to provide assistance under 22 U.S.C. Ch. 32 must "take[] into account the status of the country with respect to its dues, assessments, and other obligations to the United Nations." 22 U.S.C. § 2370(u). Defendants identify nothing in the administrative record, or elsewhere, to show that any of this information was "taken into account"—a failure that additionally renders the Agreement arbitrary and capricious.

As to FAR, Defendants largely repeat (at 38–39) their prior erroneous statements that, record evidence to the contrary, Defendants did not pay El Salvador for its detention services. (The fact that the people rendered were eventually released was consistent with terms that they be detained for a year *unless* another determination was made—as it clearly was, to the benefit of the United States, with the release of U.S. prisoners from Venezuela.) Defendants also suggest (at 38) that the use of a grant letter removes the Agreement from the ambit of a "contract" under FAR's definitions, *see* 48 C.F.R. § 2.101. But, again, the grant letter is not coextensive with the Agreement; it is simply the mechanism under which Defendants fulfilled their side of the deal.

**C.    The Agreement is arbitrary and capricious.**

As Plaintiffs set forth in their opening motion (at 36–41), the Agreement is arbitrary and capricious in at least seven different ways, each of which would independently support vacatur.  Defendants barely resist this conclusion.

Defendants seek refuge (at 40) in the particularly deferential standard of review they claim applies, relying on a D.C. Circuit case that has described an "extremely deferential" standard "in an area at the intersection of national security, foreign policy, and administrative law."  *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007).  There are a few problems with this argument.  First, as this Court has recognized, the "area" the Court of Appeals was describing was a specific, if recurring, situation: executive blocking orders from the Office of Foreign Assets Control.  *See, e.g.*, *Rakhimov v. Gacki*, No. 19-cv-2554, 2020 WL 1911561, at *6 (D.D.C. Apr. 20, 2020).  OFAC sanctions—and the particularized, often classified, fact-finding involved—are irrelevant here.  If anything, the OFAC cases Defendants cite only undermine their suggestion that any agency action with a conceivable nexus to foreign policy is outside the scope of APA review.

Second, even if the Court were to apply a more deferential standard, Defendants would not clear it.  The cases on which Defendants rely (at 40) upheld OFAC designations where there was "clear and substantial evidence in the record" supporting the government's actions.  *Islamic Am. Relief Agency*, 377 F.3d at 734; *see also López Bello v. Smith*, 651 F. Supp. 3d 20, 32–33 (D.D.C. 2022) (record included news article and "other evidence compiled during the OFAC's multi-year

investigation" (quotation marks omitted)); *Zevallos v. Obama*, 10 F. Supp. 3d 111, 120 (D.D.C. 2014) (record included "substantial evidence," including "DEA reports and documentation").

In contrast, Defendants identify nothing in the record that would show their actions were substantively reasonable or reasonably explained. *See FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). They point (at 40) to a single line from a press conference at which Secretary Rubio stated that Tren de Aragua members "were presenting very real and immediate risks in a number of communities." Ex. 11, at 14. But that conclusory assertion about the general threat of Tren de Aragua says nothing at all about the threat supposedly posed by gang members *already in detention* in the United States or about the need to pay El Salvador to hold those members in brutal conditions in its prisons. Still less does it justify striking a much broader deal with El Salvador to send "any illegal alien . . . who is a criminal from any nationality" to be housed in Salvadoran jails. Ex. 9, at 4; *see also United Techs. Corp. v. Dep't of Def.*, 601 F.3d 557, 562 (D.C. Cir. 2010) ("We do not defer to the agency's conclusory or unsupported suppositions." (alteration and quotation marks omitted)). That statement does nothing to explain why Defendants chose to outsource detention to that country, much less give any confidence that Defendants considered important aspects of the problem, including obvious alternatives and reliance interests. However deferential the Court's review, the Court is "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (quotation marks omitted).

Defendants suggest (at 40–41) that the diplomatic notes' language that El Salvador would abide by the Convention Against Torture show a thorough consideration of the prison conditions in El Salvador and was "sufficient to ensure an appropriate standard of care." Defendants do not explain why they believed these assurances sufficient, or how these assurances overcame the State Department's own findings about barbaric conditions, *see* Exs. 1–6, or, by the time of the March 31 note, video evidence showing the poor treatment of the first rendees. They offer no evidence on that point at all. It would be difficult for them to do so, considering that the assurances in the original diplomatic notes—which came after the Agreement itself was entered into—address only the "accept[ance]" or "reception" of people rendered, not their treatment once in confinement. *See* Ex. 14, at 1; Ex. 15. The limited assurances provided by El Salvador are particularly underwhelming in this unique situation where there is record evidence that—to the extent Defendants considered this issue at all, which they have not documented—they were proven absolutely incorrect in deeming El Salvador's assurances sufficient. *See* Exs. 18–19 (detailing torture and other human rights abuses).

Even if the diplomatic notes' cursory reference to CAT were sufficient—and it is not—it set a floor well below domestic standards for treating prisoners or detainees. Defendants do not even pretend to have considered the myriad other laws that apply to detention and removal—important aspects of the problem. *Cf. Motor Vehicles Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). And, as described above, the Agreement actively conflicts with those laws.

Defendants next dispute (at 41) Plaintiffs' argument that the Agreement was arbitrary and capricious because it failed to incorporate sufficient safeguards. Defendants say that "the State Department could not impose conditions on El Salvador." But that is contradicted by the record evidence, which Defendants again neglect to address. As Plaintiffs set forth (at 38–39), Defendants imposed numerous conditions on El Salvador, including through the grant letter, *see* Ex. 22. For example, they included conditions about abortion and DEI, but not about the treatment of people they had rendered. And they required El Salvador to agree that none of the grant funds would go to people designated under Executive Order 13818, 82 Fed Reg. 60839 (Dec. 20, 2017), for corruption, sec. 1(a)(ii)(B)—but makes no mention of that same executive order's prohibition on funding people engaged in serious human rights abuse, sec. 1(a)(ii)(A). *See* Ex. 22, at 5.

More fundamentally, whether or not El Salvador would have accepted additional conditions on the treatment of rendees, Defendants do not dispute that they did not even consider seeking such conditions—itself a fatal failure to consider an important aspect of the problem. They also do not dispute their failure to consider available alternatives if El Salvador would not agree, such as not rendering people to indefinite detention in prisons infamous for human rights abuses. Even if, as Defendants suggest, the decision to incarcerate had been El Salvador's alone, Defendants were still fully aware of that intention—an "important aspect of the problem" that they failed to adequately consider. Similarly, in agreeing to return alleged MS-13 leaders to "the very government they were cooperating against,"

Ex. 60, at 2, there is no evidence that Defendants considered whether doing so would hinder the government's efforts to secure cooperation in the future. Defendants demean their obligation to consider alternatives as a "novel argument," but in fact it reflects a foundational requirement of the APA as set forth in binding precedent. *See Spirit Airlines, Inc. v. Dep't of Transp.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021) (the requirement that an agency "consider responsible alternatives to its chosen policy and . . . give a reasoned explanation for its rejection of such alternatives" "goes to the heart of reasoned decisionmaking"). Defendants decline to acknowledge that law or to point to any facts showing that Defendants followed it, because they cannot.

Defendants likewise misunderstand (and fail to cite to) the law on reliance interests. Defendants suggest (at 41) that they had no obligation to consider the reliance interests of the specific Plaintiffs because they "simply do not have legitimate interests sufficient" to affect the outcome. This statement—presented without citation—assumes the outcome. (And it also ignores whether Defendants considered *anyone's* reliance interests.) But the Supreme Court has made clear that even if an entity's reliance "was unjustified," the agency still must assess whether there were any reliance interests in the first instance (whether Plaintiffs' or others'), and weigh them. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30–33 (2020). Defendants identify no evidence that they did so, and counsel's post hoc rationalizations cannot substitute for that lack. *See State Farm*, 463 U.S. at 50.

Defendants dispute (at 41–42) that they have changed course. The Agreement, they say, is simply the State Department continuing to negotiate with other nations,

sometimes using nonbinding written arrangements.  They put forward no support, however, for the idea that this level of abstraction is appropriate.  Defendants may as well argue that an agency did not change course in adopting a new rule, because it was "exercis[ing] its longstanding authority to" engage in rulemaking.  Defendants likewise argue (at 42) that the Agreement is in line with "Executive Branch . . . authority to remove aliens."  But removal is not coextensive with rendition into U.S.-funded detention overseas.

### D.    The Agreement exceeds statutory authority.

As Plaintiffs previously explained (at 41–42), the law is clear that "[a]n agency . . . literally has no power to act . . . unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022) (quotation marks omitted).  The law is equally plain that a general authorizing statute setting forth an overarching mission does not provide "some default authority," particularly where more specific statutory directives control.  *See Michigan v. EPA*, 268 F.3d 1075, 1084 (D.C. Cir. 2001).  And no statute authorized the State Department to outsource (abusive and inhumane) detention of individuals within the United States by entering into the Agreement with El Salvador.

Defendants' response is unconvincing—largely because it fails to engage with either that precedent or the facts to which it applies.  Defendants argue (at 42) that it has authority to manage foreign affairs, as set forth in 22 U.S.C. § 2656.  And so it does.  But Defendants offer no explanation of how this "general authority," *see Michigan*, 268 F.3d at 1084, could suffice.  Instead, Defendants reprise (at 42–43)

their argument that this case is about ordinary removals, and has nothing to do with detention.  But even if that were true (and it is not), whether the Department of Homeland Security has statutory authority to conduct removals is irrelevant to whether the Department of State has authority to contract with foreign entities for the indefinite detention of those in the United States.  Nor is it relevant whether the President has authority to enter into treaties or other international agreements, *see* Cross-Mot. at 43, as the President is not a defendant here, and all documents in evidence make clear that the Agreement was an agency, rather than Presidential, action (and Defendants do not claim otherwise), *see, e.g.*, Exs. 14–16, 22.

Defendants' arguments as to the major questions doctrine (at 43–44) entirely miss the point.  They again seek to shift the focus to the government's power to conduct removals.  But Defendants do not (and could not) dispute that arranging and paying for people in the United States to be held indefinitely in CECOT and other Salvadoran prisons is an issue of at least as much significance as others the Supreme Court has found to involve major questions.  *See, e.g.*, *Biden v. Nebraska*, 600 U.S. 477, 506 (2023) (forgiving student loan debt); *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021) (pausing evictions from rental properties).  Defendants do not (and could not) identify any statutory provision in which Congress has "clearly" authorized them to take that action.  *See Ala. Ass'n of Realtors*, 594 U.S. at 764.  So Defendants do not (and cannot) overcome application of the major-questions doctrine in this case.  Their suggestion (at 43–44) that because DHS is statutorily authorized to effectuate removals, that implies that the State Department must have the power to contract

for people to be held in Salvadoran prisons makes little sense and fails even on its own terms because the major questions doctrine requires that Congress "speak clearly," *id.*—not merely imply the power.

## IV.    The Agreement Is Ultra Vires.

Plaintiffs' opening motion explained why there are no genuine disputes of material fact and Plaintiffs are entitled to judgment as a matter of law on both their constitutional ultra vires claim (i.e., that the Agreement infringes rights protected by multiple provisions of the Constitution) and their statutory ultra vires claim (i.e., that Defendants "ha[ve] taken action entirely in excess of [their] delegated powers and contrary to a specific prohibition in a statute," *NRC v. Texas*, 145 S. Ct. 1762, 1775–76 (2025)). *See* Mot. 43–44. Defendants' ultra vires arguments do not contest the former and focus exclusively on the latter, and all of Defendants' cited authorities involve statutory ultra vires claims. *See* Cross-Mot. 44–45.

Defendants, however, are unable to defeat those claims. They say Plaintiffs have failed to point to any "specific prohibition in a statute" that Defendants have violated, while ignoring that Plaintiffs previously identified as examples the prohibitions on expelling people to countries in which they are likely to face torture, 8 U.S.C. § 1231 note, or subjecting those in U.S. custody or control to cruel, inhuman, or degrading treatment or punishment, 42 U.S.C. §§ 2000dd(a), 2000dd-0(1), actions that the Agreement directly enables. *See* Mot. 44.

Defendants also argue that, for a statutory ultra vires claim to proceed, the statutory prohibition "must confer rights upon the individual seeking ultra vires

review." Cross-Mot. 44 (quoting *Glob. Health Council v. Trump*, --- F.4th ----, 2025 WL 2480618, at *12 (D.C. Cir. Aug. 28, 2025)). Even assuming arguendo that none of the relevant statutes confer rights on Plaintiffs—something Defendants simply assert without elaboration—the language Defendants cite from *Global Health* was not necessary to the outcome and is dicta. *See Att'y Gen. of United States v. Wynn*, 636 F. Supp. 3d 96, 104 (D.D.C. 2022), *aff'd*, 104 F.4th 348 (D.C. Cir. 2024). Defendants' claimed rule is also not to be found in the sole case cited by *Global Health*—*Leedom v. Kyne*—which declined to infer "that Congress does not intend judicial protection of rights it confers against agency action taken in excess of delegated powers," but did not restrict, or even address, who could sue to vindicate those rights. *Kyne*, 358 U.S. 184, 190 (1958). Indeed, Defendants do not identify—and Plaintiffs are unaware of—any case to have ever rejected an ultra vires claim on these grounds.

## CONCLUSION

The Court should grant Plaintiffs' motion, deny Defendants' motions, and declare unlawful and set aside the Agreement.

Dated:  October 22, 2025

Respectfully submitted,

/s/ *Jessica Anne Morton*

Jessica Anne Morton (DC Bar No. 1032316)
Kevin E. Friedl (DC Bar No. 90033814)
Robin F. Thurston (DC Bar No. 1531399)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
jmorton@democracyforward.org
kfriedl@democracyforward.org
rthurston@democracyforward.org

*Counsel for All Plaintiffs*


Anthony Enriquez (DDC Bar No. NY0626)
Sarah T. Gillman (DDC Bar No. NY0316)
Robert F. Kennedy Human Rights
88 Pine Street, Suite 801
New York, NY 10005
(917) 284-6355
enriquez@rfkhumanrights.org
gillman@rfkhumanrights.org

Sarah E. Decker (DDC Bar No. NY0566)
Robert F. Kennedy Human Rights
1300 19th Street NW, Suite 750
Washington, DC 20036
(202) 559-4432
decker@rfkhumanrights.org

*Counsel for Plaintiff RFK Human Rights*