**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ROBERT F. KENNEDY HUMAN
RIGHTS, *et al.*,

               *Plaintiffs*,

      v.

DEPARTMENT OF STATE, *et al.*,

           *Defendants*.

Case No. 1:25-cv-01774-JEB

**DEFENDANTS' REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR,
IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

ARGUMENT ........................................................................................................ 4

    I.     Plaintiffs' Characterization of the Diplomatic Arrangement Is Incorrect ............. 4

    II.    Plaintiffs' Filing Confirms Their Lack of Standing ............................................ 6

        A.    Plaintiffs have failed to establish an injury-in-fact .................................. 6

        B.    Plaintiffs have failed to demonstrate causation ..................................... 10

        C.    The alleged injuries are not likely to be redressed by a court order ......... 11

    III.   Plaintiffs' APA Claims Fail As A Matter of Law ............................................. 12

        A.    Plaintiffs do not identify any reviewable final agency action. ................ 12

        B.    The Arrangement is committed to agency discretion and thus unreviewable. ..................................................................................... 14

        C.    The Arrangement is not contrary to law. ............................................. 15

        D.    The Arrangement is not arbitrary or capricious. .................................... 22

        E.    Plaintiffs' lack of statutory authority claim fails as a matter of law. ........ 24

    IV.   Plaintiffs' *Ultra Vires* Claim Lacks Merit ...................................................... 24

CONCLUSION ..................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Air Courier Conf. of Am. v. Am. Postal Workers Union,*
   498 U.S. 517 (1991)................................................................2

*Barker v. Conroy,*
   921 F.3d 1118 (D.C. Cir. 2019)..........................................6

*Bennett v. Spear,*
   520 U.S. 154 (1997).........................................12, 13, 14

*Boumediene v. Bush,*
   553 U.S. 723 (2008)..............................................................17

*Choice v. Kohn L. Firm,*
   77 F.4th 636 (7th Cir. 2023)...............................................8

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
   401 U.S. 402 (1971)............................................................14

*City of Los Angeles v. Lyons,*
   461 U.S. 95 (1983)..................................................................9

*Clapper v. Amnesty International USA,*
   568 U.S. 398 (2013)..............................................................9

*Dalton v. Specter,*
   511 U.S. 462 (1994)............................................................25

*Dep't of the Navy v. Egan,*
   484 U.S. 518 (1988)............................................................14

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,*
   489 U.S. 189 (1989)............................................................18

*Detroit Int'l Bridge Co. v. Canada,*
   883 F.3d 895 (D.C. Cir. 2018)...............................3, 14, 15

*Detroit Int'l Bridge Co. v. Canada,*
   133 F. Supp. 3d 70 (D.D.C. 2015)......................................3

*Diamond Alternative Energy, LLC v. EPA,*
   606 U.S. 100 (2025)............................................................11

*Eagle Tr. Fund v. U.S. Postal Serv.*,
  811 F. App'x 669 (D.C. Cir. 2020)........................................................................25

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021)...........................................................................................22

*FDA v. Alliance for Hippocratic Medicine*,
  602 U.S. 367 (2024)..........................................................................1, 7, 10, 11

*FDA v. R. J. Reynolds Vapor Co.*,
  606 U.S. 226 (2025)........................................................................................2, 16

*Fed. Defs. of San Diego, Inc. v. U.S. Sent'g Comm'n*,
  680 F. Supp. 26 (D.D.C. 1988)..............................................................................8

*Finnbin, LLC v. Consumer Prod. Safety Comm'n*,
  45 F.4th 127 (D.C. Cir. 2022)..............................................................................10

*Glob. Health Council v. Trump*,
  153 F.4th 1 (D.C. Cir. 2025)...........................................................................3, 25

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982)...............................................................................................7

*Humane Soc'y of the U.S. v. Glickman*,
  217 F.3d 882 (D.C. Cir. 2000)........................................................................15, 16

*Islamic Am. Relief Agency v. Gonzales*,
  477 F.3d 728 (D.C. Cir. 2007)..............................................................................22

*J.G.G. v. Trump*,
  786 F. Supp. 3d 37 (D.D.C. 2025)..............................................................1, 2, 4, 11

*Kiyemba v. Obama*,
  561 F.3d 509 (D.C. Cir. 2009)........................................................................19, 23

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*,
  104 F.3d 1349 (D.C. Cir. 1997)............................................................................14

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014).............................................................................................16

*Lopez Bello v. Smith*,
  651 F. Supp. 3d 20 (D.D.C. 2022)........................................................................22

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)................................................................... 6, 10, 12

*N. Am. Butterfly Ass'n v. Wolf*,
    977 F.3d 1244 (D.C. Cir. 2020)................................................................. 6

*Nuclear Regul. Comm'n v. Texas*,
    605 U.S. 665 (2025)................................................................. 3, 15, 25

*Omar v. Geren*,
    689 F. Supp. 2d 1 (D.D.C. 2009)................................................................. 19

*Omar v. McHugh*,
    646 F.3d 13 (D.C. Cir. 2011)................................................................. 19

*Pennsylvania v. Trump*,
    2025 WL 2349798 (E.D. Pa. Aug. 13, 2025)................................................. 10

*Rainbow Nav., Inc. v. Dep't of Navy*,
    911 F.2d 797 (D.C. Cir. 1990)................................................................. 4

*Reed v. Goertz*,
    598 U.S. 230 (2023)................................................................. 17

*Renal Physicians Ass'n v. U.S. Dep't of Health & Hum. Servs.*,
    489 F.3d 1267 (D.C. Cir. 2007)................................................................. 11

*Saavedra Bruno v. Albright*,
    197 F.3d 1153 (D.C. Cir. 1999)................................................................. 14

*Scranton Quincy Hosp. Co. v. Azar*,
    514 F. Supp. 3d 249 (D.D.C. 2021)................................................................. 15

*Sears, Roebuck & Co. v. U.S. Postal Serv.*,
    844 F.3d 260 (D.C. Cir. 2016)................................................................. 25

*Sierra Club v. EPA*,
    292 F.3d 895 (D.C. Cir. 2002)................................................................. 6

*Sierra Club v. EPA*,
    955 F.3d 56 (D.C. Cir. 2020)................................................................. 12

*Spirit Airlines, Inc. v. Dep't of Transp.*,
    997 F.3d 1247 (D.C. Cir. 2021)................................................................. 24

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021)....................................................................................16

*Warth v. Seldin*,
    422 U.S. 490 (1975)....................................................................................16

*West Virginia v. EPA*,
    597 U.S. 697 (2022)......................................................................................6

*Young v. EPA*,
    106 F.4th 56 (D.C. Cir. 2024)......................................................................6

**United States Code**

1 U.S.C. § 112b............................................................................................4

5 U.S.C. § 701............................................................................................14

5 U.S.C. § 702............................................................................................19

5 U.S.C. § 706................................................................................3, 15, 25

8 U.S.C. § 1231......................................................................................18, 24

8 U.S.C. § 1252............................................................................................19

22 U.S.C. § 2291..........................................................................................21

42 U.S.C. § 2000dd......................................................................................20

Further Consolidated Appropriations Act, 2024,
    Pub. L. No. 118-47, § 7035(a)(5), 138 Stat. 460........................................21

The Foreign Affairs Reform and Restructuring Act of 1998 ("FARR Act"),
    Pub. L. No. 105-277 § 2242, 112 Stat. 2681 (1998) (codified at 8 U.S.C. § 1231 note)........19

**Other Authorities**

Curtis A. Bradley, Jack Goldsmith & Oona A. Hathaway, *The Rise of Nonbinding International Agreements: An Empirical, Comparative, and Normative Analysis*,
    90 U. Chi. L. Rev. 1281 (2023)....................................................................15

## INTRODUCTION

Plaintiff organizations bring this Administrative Procedure Act ("APA") action, seeking to vacate and enjoin a non-binding diplomatic arrangement between the United States and El Salvador (the "Arrangement") that has been used only to transfer certain Venezuelans who were part of Tren de Aragua ("TdA") from the United States to El Salvador. Plaintiffs concede that they cannot pursue third-party standing for those transferred but claim that their organizations are injured due to it being more difficult for them to assist current and future clients who were or may be sent to El Salvador pursuant to the Arrangement. But such alleged injury is insufficient to establish Article III standing under *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 394 (2024), the Supreme Court's most recent guidance on organizational standing. Among other things, these organizational plaintiffs cannot demonstrate any actual or imminent injury because all Venezuelans sent to El Salvador pursuant to the Arrangement—including those whom Plaintiffs represented in their attempt to establish injury in this case—have been repatriated. Although Plaintiffs claim that the Arrangement is a broader attempt to "outsource" the U.S. prison system, that cannot overcome a State Department official's sworn declaration on the scope of the Arrangement that this Court has previously credited. *See J.G.G. v. Trump*, 786 F. Supp. 3d 37, 57 (D.D.C. 2025) (court crediting the "sworn declaration from a knowledgeable government official" concerning the nature of the detention in El Salvador, despite "public statements characterizing the arrangement as outsourcing the U.S. prison system"), *vacated and remanded on other grounds*, No. 25-5217, 2025 WL 2317650 (D.C. Cir. Aug. 8, 2025).[1]

Nor are Plaintiffs' alleged injuries sufficient to support their asserted constitutional,

---

[1] That declaration has since been corroborated by the Secretary of State and the Deputy Secretary of State, as discussed by the United States in the *JGG* litigation. *See* Defs' Opp. Br., ECF No. 182, *J.G.G. v. Trump*, No. 1:25-cv-766-JEB, at 9 & Exs. A & B (Oct. 31, 2025).

statutory, and regulatory violations about prison conditions that can be brought only by the individuals affected—ranging broadly from the First, Sixth, and Eighth Amendments; the Suspension, Due Process, and Appropriations Clauses of the Constitution; and the Convention Against Torture ("CAT"), to numerous statutes and regulations concerning conditions of confinement, among others. As Defendants explained in their opening brief, any legal rights under those provisions belong to the persons sent to El Salvador and do not relate to any of the harms allegedly suffered by Plaintiffs. Plaintiffs do not have third-party standing to pursue those purported violations; instead, they disclaim any attempt to adjudicate those aliens' rights under the cited constitutional and statutory provisions, thus reinforcing that Plaintiffs are not proper plaintiffs to assert the Complaint's legal claims. Even when a plaintiff has Article III standing, he still must "establish that the injury he complains of (*his* aggrievement, or the adverse effect *upon him*) falls within the 'zone of interests' sought to be protected by the statut[e] [or constitutional guarantee] whose violation forms the legal basis for his complaint." *Air Courier Conf. of Am. v. Am. Postal Workers Union*, 498 U.S. 517, 523-524 (1991) (citation omitted); *accord FDA v. R. J. Reynolds Vapor Co.*, 606 U.S. 226, 232 (2025). Plaintiffs do not attempt to make this showing.

In any event, APA review is unavailable. Aside from Plaintiffs' inability to identify a "final agency action," the challenged Arrangement—whereby "the United States and El Salvador have struck a diplomatic bargain *vis-à-vis* [] detainees," *J.G.G.*, 786 F. Supp. 3d at 57—is quintessentially committed to agency discretion by law because there are no judicially manageable standards for this Court to judge this foreign relations decision. Plaintiffs claim that the standards are supplied by "the numerous provisions of law governing removal and detention." Pls.' Reply & Opp., ECF No. 40, at 24, ("Opp."). But as Defendants' opening brief explained, the Arrangement does not effect any removal, nor does it speak to the detention of aliens sent to El

Salvador—El Salvador alone decided where to house the aliens.

In fact, *Detroit International Bridge Co. v. Canada*—upon which Plaintiffs place central reliance, *see* Opp. at 25-26—highlights why APA review is unavailable here. There, the district court held that the State Department's approval of an agreement to construct an international bridge was not committed to agency discretion because the court could still review whether the agreement violated state law. 133 F. Supp. 3d 70, 104 (D.D.C. 2015). But the Court of Appeals disagreed, finding that "[i]n the foreign affairs arena, the court lacks a standard to review the agency action." *Detroit Int'l Bridge Co. v. Canada*, 883 F.3d 895, 903-04 (D.C. Cir. 2018). As the court explained, "generally 'judgments on questions of foreign policy and national interest . . . are not subjects fit for judicial involvement.'" *Id.* at 904 (citation omitted). "By long-standing tradition," the D.C. Circuit said, "courts have been wary of second-guessing executive branch decision[s] involving complicated foreign policy matters." *Id.* (citation omitted). The same reasoning applies here, and accordingly, the challenged diplomatic arrangement is not subject to APA review, which would encompass all of Plaintiffs' statutory and constitutional claims, as well as their arbitrary and capricious claim. *See* 5 U.S.C. § 706 (APA review includes constitutional and statutory claims).

That leaves Plaintiffs with their *ultra vires* claim, which is "essentially a Hail Mary pass" that "rarely succeeds." *Nuclear Regul. Comm'n v. Texas* ("*NRC*"), 605 U.S. 665, 681-82 (2025) (citation omitted). Per usual, it does not succeed here because Plaintiffs cannot show that the challenged action is "plainly" in "excess of [the agency's] delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Glob. Health Council v. Trump*, 153 F.4th 1, 20 (D.C. Cir. 2025) (citation omitted). Indeed, far from demonstrating that the agency's purported "error is so extreme that one may view it as jurisdictional or nearly so," *id.*, Plaintiffs' legal claims are meritless. This Court should thus enter judgment in Defendants' favor.

# ARGUMENT

## I.    Plaintiffs' Characterization of the Diplomatic Arrangement Is Incorrect.

As an initial matter, Plaintiffs claim that they are challenging a diplomatic agreement designed to "circumvent domestic legal protections" by indefinitely "outsourc[ing] the detention of people in the United States" to El Salvador.  Opp. at 2, 24.  They maintain that "the diplomatic notes do not constitute the whole of the Agreement," *id.* at 6, and cite public statements of officials for the proposition that any illegal alien in the United States is subject to being "rend[ered] into captivity" in El Salvador.  But no such secret agreement exists, and none was reported to Congress by the State Department as required by the Case-Zablocki Act, 1 U.S.C. § 112b.  As Ambassador Kozak explained, the Arrangement resulted from "high-level diplomatic discussions" and was "memorialized . . . through a non-legally-binding exchange of diplomatic notes dated March 13 and 14."  Pl. Ex. 12 ¶ 3.  It concerned only the transfer of up to 300 Venezuelan TdA members for one year (along with two identified MS-13 Salvadorans).  *Id.*  Crucially, the Arrangement does not require anyone's detention, nor dictate or control El Salvador's disposition of any person.  Rather, those transferees were under the authority of Salvadoran law and discretion alone.  *See J.G.G.*, 786 F. Supp. 3d at 57 (recognizing that "El Salvador has chosen — in negotiation with the United States and for reasons far outside the ken of a federal district court — to detain Plaintiffs at CECOT, and it can choose to release them as well" and crediting the Kozak declaration).

The public statements of officials Plaintiffs cite do not constitute such a secret diplomatic agreement, nor can it change the plain text of the Arrangement as discussed and memorialized by the two countries.  *Cf. Rainbow Nav., Inc. v. Dep't of Navy*, 911 F.2d 797, 802 (D.C. Cir. 1990) (saying that ambiguous statements made by a member of the Executive branch could not obscure the plain meaning of a treaty's text).  For example, Plaintiffs point to a statement that people rendered to CECOT "should stay there for the rest of their lives."  Opp. at 3, n.1. (quoting Pl. Ex.

55, at 2). But that cannot reflect the Arrangement, which was for one year. The reality is that all the TdA members were transferred by El Salvador back to their home country within a few months. Indeed, Plaintiffs have no evidence that non-Salvadorans were removed to El Salvador beyond what was expressly contemplated by the Arrangement, and certainly none about what might happen in the future pursuant to any purported secret agreement.

While it is true that the State Department provided a monetary grant to El Salvador to support the two countries' mutual anticrime and antidrug interests and made clear that the funds may be used to house the transferred Venezuelans, *see* Pl. Ex. 22 at 1, it was entirely El Salvador's discretion how to use the funds (consistent with the terms of the grant). Indeed, El Salvador kept those funds even though the Venezuelans were returned to their home country within a few months once the Maduro regime was willing to take back Venezuelan citizens, and must report by June 30, 2026, on how it ends up spending the money. *See* Pl. Ex. 22 at 2 (RFK Human Rights_0005). The record thus does not support the proposition that the United States outsourced any detention or facilitated any option that would not otherwise be available to El Salvador regarding any third-country nationals it receives from the United States.

Plaintiffs fault Defendants for purportedly failing to reference a March 31 diplomatic note, which noted the transfer of nine Salvadoran MS-13 members and seven Venezuelan TdA members to El Salvador. Opp. at 6; *see also* Pl. Ex. 16. But Defendants discussed that note in their opening brief, *see* Defs.' MTD or Mot. for SJ, ECF No. 33, at 6, 25, 40 ("Defs' Br."), and, more importantly, the note does not change the scope of the Arrangement. The Venezuelans were transferred pursuant to the Arrangement. And the return of Salvadorans to El Salvador is unremarkable; they are clearly subject to the laws of their own sovereign upon their return. If anything, the note "highlight[ed] the importance" of El Salvador's "previous assurance that [its] reception and treatment of the TdA

and MS-13 individuals will be in accordance with Salvadoran law and international obligations, including adherence to the Convention Against Torture." Pl. Ex. 16.

## II.    Plaintiffs' Filing Confirms Their Lack of Standing.

### A.    Plaintiffs have failed to establish an injury-in-fact.

Despite the undisputed fact that all Venezuelans sent to El Salvador pursuant to the Arrangement have been returned to their home country, Plaintiffs argue that standing is "based on 'the circumstances existing at the time of filing'" of complaint.  Opp. at 9 (quoting *Barker v. Conroy*, 921 F.3d 1118, 1130 (D.C. Cir. 2019)).  Plaintiffs are wrong.  "Although most disputes over standing concern whether a plaintiff has satisfied the requirement when filing suit, Article III demands that an actual controversy persist throughout all stages of litigation."  *West Virginia v. EPA*, 597 U.S. 697, 718 (2022) (citation omitted).  *Barker* and the other case Plaintiffs cite, *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244 (D.C. Cir. 2020), do not help Plaintiffs because they were decided at the motion to dismiss stage.  Moreover, while "general factual allegations of injury resulting from the defendant's conduct may suffice" to withstand a motion to dismiss, at the summary judgment stage "the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts.'"  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (quoting Fed. R. Civ. P. 56(e)); *accord Young v. EPA*, 106 F.4th 56, 60 (D.C. Cir. 2024).

That is, a plaintiff must "identify . . . record evidence sufficient to support its standing," *see Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002), which Plaintiffs have not.  To begin, Plaintiffs fail to show any concrete and particularized imminent harm caused by the Arrangement. *See Lujan*, 504 U.S. at 560.  They argue that the Arrangement "directly interferes with their . . . ability to carry out . . . important parts of their missions," Opp. at 8, including advocacy services; "pursuing strategic litigation"; and "training and providing resources" regarding "immigration representation." *Id.* at 7. But under *FDA v. Alliance for Hippocratic Medicine*, the "impair[ment]"

6

of issue-advocacy organizations' "ability to provide services and achieve their organizational missions . . . does not work to demonstrate standing." 602 U.S. at 394. This is true even if the organizations expend more resources to accomplish their advocacy missions, because "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing." *Id.*

Plaintiffs persist in relying on *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), and its progeny. *See* Opp. at 8-10. But as Defendants explained in their opening brief (Defs' Br at 18), the Supreme Court has made clear that *Havens Realty* is limited to its "unusual" facts. *All. for Hippocratic Medicine*, 602 U.S. at 396. There the defendant's provision of false information on the availability of housing harmed the organizational plaintiffs' core business activities of providing housing and referral services—a situation "not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer." *Id.* at 395. Here, by contrast, Plaintiffs' showing tracks that of the medical associations in *Alliance for Hippocratic Medicine*, which alleged that the defendant's actions "impaired" their "ability to provide services and achieve their organizational missions" and "caused" the associations to expend "considerable resources" to conduct their own research and engage in public advocacy and public education, all to the detriment of the organizations' other priorities. *Id.* at 394.

Plaintiffs similarly argue "the mere existence of the [Arrangement]" makes their jobs "more difficult and time-consuming," thus leaving them "with fewer resources available for their other needs." Opp. at 8. All the injuries alleged—such as "additional hours" worked, Pl. Ex. 37 ¶¶ 10, 14; not knowing whether there will be other third-country agreement, Pl. Ex. 38 ¶ 18; and "confusion" about the Arrangement that affects "Plaintiffs' ability to carry out their mission," Opp. at 13—are just another way of saying that Plaintiffs' "ability to provide services and achieve their

organizational missions" is impaired, which is a theory of standing foreclosed by *Alliance for Hippocratic Medicine*. The natural import of Plaintiffs' argument is that any advocacy organization uncertain about the scope of a defendant's action or potential future developments flowing from such action has an injury in fact. That is not the law. *Cf. Choice v. Kohn L. Firm*, 77 F.4th 636, 639 (7th Cir. 2023) ("confusion leading one to hire a lawyer is insufficient to establish standing"); *see also Fed. Defs. of San Diego, Inc. v. U.S. Sent'g Comm'n*, 680 F. Supp. 26, 28 (D.D.C. 1988) (organization of public defenders did not have standing to challenge sentencing guidelines on the basis that its members' workload "will be more complex and will markedly increase"). Plaintiffs' argument that they are "challeng[ing] an executive branch action, not a change in the law," Opp. at 11, is a distinction without a difference; both are based on purported increased complexity of the organizations' work.

Plaintiffs' reliance on their purported impaired ability to represent clients, Opp. at 8, fares no better because their explanations relate to harm to the represented individuals rather than Plaintiffs. For example, Immigrant Defenders Law Center was able to file appeals to the Board of Immigration Appeals in cases involving clients who did not have an attorney-client relationship with it before they were removed from the country. *See* Pl. Ex. 32 ¶¶ 5, 8. And although a member of the NADCL stated she had to spend more time on legal research and writing a motion allegedly because the lawyer could not reach one Venezuelan TdA member, *see* Pl. Ex. 41 ¶¶ 13-15, nothing suggests there was any harm in the representation. Indeed, that individual is now out and in Venezuela. *Id.* ¶ 16. And Plaintiffs' declarations confirm that all Venezuelan clients in CECOT were repatriated to Venezuela. *See* Pl. Ex. 18 ¶¶ 1-2; Pl. Ex. 19 ¶¶ 1, 37; Pl. Ex. 31 ¶¶ 5, 7; Pl. Ex. 32 ¶¶ 5, 12; Pl. Ex. 41 ¶¶ 7, 16.

There is also no showing that there is a real risk that Plaintiffs' current Venezuelan clients will be sent to El Salvador pursuant to the Arrangement, despite Plaintiffs' claim that they "serve those who . . . face a heightened risk of rendition." Opp. at 12. Since April, no Venezuelan TdA member has been sent to El Salvador. Indeed, the Maduro regime has changed course since the Arrangement and is now willing to regularly accept the return of Venezuelan nations. And even if there were an imminent risk of transfer, that still does not suggest Plaintiffs suffered or are substantially likely to suffer an injury in fact. Notably, at least one Plaintiff, Immigrant Defenders Law Center, was able to *begin* seven representations after those individuals were already in CECOT. *See* Pl. Ex. 32 ¶ 5. And RFK Human Rights attorneys met their clients in CECOT in April 2025, not to mention that they represent ten Venezuelans who were in CECOT before the Inter-American Commission on Human Rights. *See* Pl. Ex. 31 ¶¶ 5-7.

The remainder of Plaintiffs' injury-in-fact arguments are frivolous. They claim that the Arrangement impairs their ability to improve U.S. prison conditions, *see* Opp. at 11, but they do not explain how, nor is it sufficient to say that these are not "ordinary removals." *Id.* at 16. They also argue that *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), is "inapposite" because their asserted injury is not speculative. Opp. at 13. But they ignore that the Arrangement has not been utilized since April or after the Maduro regime began regularly accepting Venezuelan nationals removed from the United States. Moreover, El Salvador alone decides whether and where to detain individuals sent to El Salvador pursuant to the Arrangement. Pl. Ex. 12 ¶ 5. Thus, it is speculative to suggest that the Arrangement will be utilized in the future in the same manner.

Finally, despite Plaintiffs' protestation to the contrary, Opp. at 13, *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), controls, and its facts are similar to this litigation where a plaintiff sought to enjoin a policy in the future based on his alleged past injury. *Id.* at 105-06. The fact that

Plaintiffs seek vacatur does not change this analysis.  *See Pennsylvania v. Trump*, 2025 WL 2349798, at *12 (E.D. Pa. Aug. 13, 2025) (applying *Lyons* to vacatur as it is prospective relief). The law requires a plaintiff seeking prospective injunctive relief, including vacatur, to demonstrate a likelihood of future injury; past injury alone is not enough, which is all that Plaintiffs purportedly have.  *See Finnbin, LLC v. Consumer Prod. Safety Comm'n*, 45 F.4th 127, 137 (D.C. Cir. 2022).

### B.    Plaintiffs have failed to demonstrate causation.

Even if the Plaintiffs had demonstrated an injury in fact, they have failed to show causation. Plaintiffs argue that "their injuries are likely caused by the [Arrangement] because the [Arrangement] is the legal and practical predicate allowing for and facilitating rendition to El Salvador." Opp. at 15.  But Plaintiffs must demonstrate "a predictable chain of events leading from the government action to the asserted injury." *All. for Hippocratic Med.*, 602 U.S. at 385. And Plaintiffs' asserted injuries—their difficulty in representing individuals, increased workload, and expenditure of resources—must not be "the result of the independent action of some third party not before the Court." *Lujan*, 504 U.S. at 560 (quotation modified).  Plaintiffs cannot make this showing because Plaintiffs' asserted injuries depend on the actions of entities other than the State Department.  The State Department did not transfer anyone to El Salvador; the Department of Homeland Security did that.  And any problems that Plaintiffs had communicating with their clients in El Salvador are not attributable to the United States, the sovereign nation of El Salvador alone determines that.  All other alleged injuries—caused by the possibility that similar diplomatic arrangements will be made in the future—are not connected to the challenged Arrangement.

Plaintiffs claim that they do not need to establish the causal chain because it was "obvious" that individuals removed from the United States to El Salvador "would face barbaric conditions and be denied communications with Plaintiffs or others in the United States." Opp. at 16.  While a plaintiff may establish causation by showing that "third parties will likely react to the government

regulation . . . in predictable ways that will likely cause (or redress) the plaintiff's injury," *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 112 (2025) (quoting *All. for Hippocratic Medicine*, 602 U.S. at 383), there is no such showing here. El Salvador alone decided how to treat the transferred individuals. *See J.G.G.*, 786 F. Supp. 3d at 57 ("El Salvador has chosen — in negotiation with the United States and for reasons far outside the ken of a federal district court — to detain Plaintiffs at CECOT, and it can choose to release them as well."). And the United States obtained the assurance that "the reception of [the TdA members] will be conducted in accordance with Salvadoran law and international obligations." Pl. Ex. 15; *see also* Pl. Ex. 14 ("The United States understands that El Salvador will [act] in accordance with its authorities under Salvadoran domestic law, and in a manner that is consistent with El Salvador's legal obligations regarding human rights and treatment or prisoners, including the Convention Against Torture."); Pl. Ex. 16 (same). Any alleged mistreatment of individuals cannot reasonably be attributed to the Arrangement, nor is it relevant, as Plaintiffs disclaimed that they are seeking to assert their injuries under the doctrine of third-party standing. *See* Opp. at 11.

As for the supposition that El Salvador necessarily would deny the detainees' communications with attorneys, it is not borne out by the record because at least some of the client relationships started after the individuals were placed in CECOT. *See* Pl. Ex. 32 ¶ 5 (beginning seven representations with individuals in CECOT). And again, RFK Human Rights attorneys met their clients in CECOT in April 2025, not to mention that they represent ten Venezuelans who were in CECOT before the Inter-American Commission on Human Rights. *See* Pl. Ex. 31 ¶¶ 5-7.

## C.    The alleged injuries are not likely to be redressed by a court order.

Even if causation exists, "causation does not inevitably imply redressability." *Renal Physicians Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 489 F.3d 1267, 1278 (D.C. Cir. 2007).

Plaintiffs argue that a court order would redress their injuries "because it would deprive the government of its avenue for rendition into Salvadoran prisons." Opp. at 17. They are mistaken. Even if the Court were to vacate the diplomatic arrangement or enjoin its implementation, DHS could still remove Venezuelan TdA members and other aliens to El Salvador if the latter is willing to accept them, and El Salvador could still house them in CECOT or some other Salvadoran prison. Plaintiffs would still need to expend resources anticipating future similar arrangements, counseling their clients whom they say face "heightened risk of rendition." Opp. at 12. In sum, the requested court order will not "likely" redress Plaintiffs' asserted injuries. *Lujan*, 504 U.S. at 561.

## III.    Plaintiffs' APA Claims Fail As A Matter of Law.

Plaintiffs face other significant hurdles—namely that the APA review is unavailable for all of their statutory and constitutional claims—not to mention that their legal claims are meritless.

### A.    Plaintiffs do not identify any reviewable final agency action.

As Defendants explained in their opening brief, the Arrangement is not a final agency action because no "rights or obligations have been determined," nor will any "legal consequences [] flow" from the Arrangement. *See Bennett v. Spear*, 520 U.S. 154, 178 (1997). *See* Defs' Br. at 24-27. In other words, there are no "direct and appreciable legal consequences" based on the agency action, *Bennett*, 520 U.S. at 178, especially when the challenged act "imposes no obligations, prohibitions or restrictions on regulated entities" and "does not subject them to new penalties or enforcement risks." *Sierra Club v. EPA*, 955 F.3d 56, 63 (D.C. Cir. 2020).

Plaintiffs argue that "legal consequences have already flowed, because the [Arrangement] has already allowed the government to outsource the detention of people from the United States." Opp. at 21-22. They characterize the Arrangement as presenting a new "option" or a new "legal regime" for "outsourc[ing] the detention of people in the United States into Salvadoran prisons."

*Id.* at 22, 23. As a factual matter, however, no such outsourcing occurred here as discussed above because El Salvador took complete custody of all transferred individuals.

In any event, the relevant legal question is whether the Arrangement determined any regulated party's rights and obligations and whether legal consequences flow from it. It did not. The Arrangement is a non-binding diplomatic arrangement, memorializing statements of intention between two sovereign nations. It did not comprehensively regulate the removal of individuals from the United States—it merely reflects that if DHS chooses to remove any TdA members to El Salvador, the latter likely will accept them (up to a certain number) but is not bound to do so. Nor does the Arrangement determine whether any transferred individual will be detained, and if so, where. The Arrangement does not effectuate the removal of anyone; that must be done by DHS. It does speak to certain conditions of such individuals' confinement—the State Department sought, and El Salvador provided, the assurance that El Salvador will comply with Salvadoran law and its international obligations including under the CAT. Such an assurance by a foreign sovereign, however, is not a basis to find "final agency action" because again, no right is determined by, nor any legal consequence flows from, the Arrangement. It also follows that the secret agreement alleged by Plaintiffs is not a final agency action because even Plaintiffs themselves allege that there is "uncertainty and confusion" about the scope of that purported agreement, Opp. at 22.

The case is therefore unlike *Bennett*, upon which Plaintiffs rely, *see id.*, where the Court found that the "challenged Biological Opinion and accompanying Incidental Take Statement alter[ed] the legal regime to which the action agency is subject, authorizing it to take the endangered species if (but only if) it complies with the prescribed conditions." *Bennett*, 520 U.S. at 178. While "[t]he action agency is technically free to disregard the Biological Opinion and proceed with its proposed action, but it does so at its own peril (and that of its employees), for 'any

person' who knowingly 'takes' an endangered or threatened species is subject to substantial civil and criminal penalties, including imprisonment." *Id.* at 170.  The Arrangement effects no similar alternation of the relevant "legal regime," let alone exposes any regulated parties to potential civil or criminal penalties; indeed, no one is directly regulated by the Arrangement.  The transferred individuals already could be deported to El Salvador and elsewhere and placed in prison as appropriate under the governing legal jurisdiction, when outside the United States' custody.

**B.    The Arrangement is committed to agency discretion and thus unreviewable.**

The Arrangement, in any event, is unreviewable under the APA because the APA's waiver of sovereign immunity does not apply to matters "committed to agency discretion," *see* 5 U.S.C. § 701(a), which occurs when "there is no law to apply." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971) (citation omitted).  Here, there are no judicially manageable standards for the Court to judge the non-binding diplomatic arrangement. *See* Defs' Br. at 27-29.

Plaintiffs argue there is a presumption of reviewability.  Opp. at 23.  But that presumption "runs aground" when it comes to "matters touching on national security or foreign affairs," *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1162 (D.C. Cir. 1999) (quoting *Dep't of the Navy v. Egan*, 484 U.S. 518, 527 (1988)), precisely because courts have long "been wary of second-guessing executive branch decision[s] involving complicated foreign policy matters." *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 104 F.3d 1349, 1353 (D.C. Cir. 1997). The only case Plaintiffs cite—*Detroit International Bridge Co.*, *see* Opp. at 25-26—does not help them because on appeal, the D.C. Circuit held that the challenged agreement was committed to agency discretion even assuming the challenged action was *not* Presidential action and thus subject to the APA.  883 F.3d at 903-04.  Reiterating the Judiciary's longstanding reluctance to second-guess foreign policy decisions, the court explained that "[i]n the foreign affairs arena, the court

14

lacks a standard to review the agency action." *Id.*; *cf.* Curtis A. Bradley, Jack Goldsmith & Oona A. Hathaway, *The Rise of Nonbinding International Agreements: An Empirical, Comparative, and Normative Analysis*, 90 U. Chi. L. Rev. 1281, 1333, 1358 (2023) (counting hundreds of non-binding arrangements and noting that they are generally lawful).

Plaintiffs also insist that § 701(a) is irrelevant because "Defendants [purportedly] acted with no authority at all." Opp. at 23. In their view, outside of the APA, they can still argue that "the Agreement is contrary to law and constitutional right, in excess of statutory authority, and ultra vires." Opp. at 26. But as the Complaint acknowledges, *see* Compl. ¶¶ 115, 146, the means for a court to review whether an agency action is "contrary to constitutional right, power, privilege, or immunity" is located in 5 U.S.C. § 706(2)(B), and § 706(2)(C) is the way for a court to determine whether an agency action is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." Plaintiffs cannot make an end-run around § 701(a)(2) by arguing that they may proceed anyway absent a statute allowing judicial review because Congress can, of course, "preclude judicial review of an administrative action by statute." *Scranton Quincy Hosp. Co. v. Azar*, 514 F. Supp. 3d 249, 260 (D.D.C. 2021). Plaintiffs can still pursue their *ultra vires* claim, but, as discussed below, that claim "rarely succeeds." *NRC*, 605 U.S. at 681-82 (citation omitted).

## C.    The Arrangement is not contrary to law.

Because Plaintiffs lack standing and APA review is unavailable, the Court need not proceed further. But if it does decide to proceed, Plaintiffs' contrary-to-law claims fail.

Plaintiffs start with a mistaken premise—that if the State Department had a facilitative role in any substantive legal violations by others, then the Arrangement itself violates the APA. Opp. at 28. For support, they cite *Humane Soc'y of the U.S. v. Glickman*, 217 F.3d 882 (D.C. Cir. 2000), which is of no help. That case merely held that the plain language of a federal statute implementing

15

a treaty applied equally to federal agencies as private entities. *Id.* at 885 (holding that "[n]othing in [the statute] turns on the identity of the perpetrator").

Importantly, virtually all of Plaintiffs' substantive claims relate to the Venezuelan TdA members' removal to El Salvador and their detention in CECOT, but Plaintiffs have now disclaimed seeking to assert those individuals' rights. *See* Opp. at 2 (disclaiming any challenge to any order of removal); *see also id.* at 11 ("Defendants are wrong to suggest . . . that Plaintiffs are relying on a theory of 'third-party' standing; Plaintiffs' standing is based on injuries they themselves suffer as a result of the Agreement."). With that clarification, Plaintiffs cannot then challenge the removal and conditions of confinement of the now-released Venezuelan individuals. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("[P]laintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek.").

It is also beyond dispute that Plaintiffs are outside the "zone of interest" of the cited constitutional, statutory, and regulatory provisions because any rights under those laws belong to the transferred aliens. As the Supreme Court has long held, even when there is Article III standing, "the court must ask 'whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief.'" *Warth v. Seldin*, 422 U.S. 490, 500 (1975). That is, "[t]o invoke a statutory [or constitutional] cause of action, a plaintiff must be within the 'zone of interests' that the statute [or the constitutional provision] protects." *R. J. Reynolds Vapor Co.*, 606 U.S. at 232 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014)). "Put differently, a plaintiff must belong to the class of persons to whom the statute grants a right to sue." *Id.* Even a cursory review of the asserted constitutional, statutory, and regulatory violations shows that Plaintiffs do not belong to the classes of individuals protected by those provisions.

Each claim also fails on the merits:

***Procedural Due Process.***  Plaintiffs argue that non-parties' due process rights were violated because the Arrangement did not "incorporate protections sufficient to ensure due process" or "require[] [] advance notice sufficient to ensure an opportunity to be heard."  Opp. at 28.  But even assuming those individuals' due process rights were violated (a matter that is the subject of *J.G.G.*), the Arrangement is a non-binding foreign relations instrument that necessarily is not designed to address individual rights under the U.S. Constitution.  Plaintiffs also do not explain why or how the State Department deprived them or anyone else of any protected interest through an inadequate governmental process.  *See Reed v. Goertz*, 598 U.S. 230, 236 (2023).  And nothing in the Arrangement prevents individuals from receiving due process before any removal.

***The Suspension Clause.***  Plaintiffs skip past the fact that the Suspension Clause does not apply extraterritorially except in rare circumstances.  *See* Defs' Br. at 31-32.  They argue instead that the removal of TdA members to El Salvador and El Salvador's subsequent decision to imprison those individuals constitute a suspension of the writ of habeas corpus.  Opp. at 29-30.  Plaintiffs cite only *Boumediene v. Bush*, 553 U.S. 723 (2008), for this extraordinary proposition, but the case has no relevance.  It held that the Suspension Clause applied to the Guantanamo Bay Naval Station in Cuba because the United States has de facto sovereignty over this territory, *id.* at 755, and thus, a federal statute depriving detainees held there of the writ of habeas corpus is unconstitutional.  The Arrangement says nothing about the writ of habeas corpus.  Even if the practical effect of an alien removed to another country is that he or she could no longer petition for a writ of habeas corpus, the Arrangement also does not require anyone's removal.

***The Sixth Amendment.***  For the Sixth Amendment, Plaintiffs argue only that the Arrangement "send[s] people . . . into indefinite detention and punishment" and "specifically

17

provides for rendition into U.S.-funded detention." Opp. at 29. As discussed elsewhere, that is a misstatement of the record. Plaintiffs otherwise have no answer for how the Sixth Amendment can apply to non-criminal proceedings or why it applies extraterritorially—neither is true.

*Immigration and Nationality Act.* In addition to repeating that the Arrangement provides for "U.S.-funded detention," Plaintiffs argue that the Arrangement fails to account for limitations the INA places on third-country removals, citing 8 U.S.C. § 1231(b). Opp. at 29. But that argument ignores 8 U.S.C. § 1231(b)(1)(C)(iv), which allows removals to third countries in certain circumstances. Moreover, at the time of the Arrangement, the Maduro regime was unwilling to take back Venezuelan nationals, creating the need to find a third country to send the TdA members.

*Non-Detention Act.* Plaintiffs argue that there is a secret agreement broader than stated above, as the Arrangement fails to include meaningful protections for U.S. citizens—the only individuals the Non-Detention Act protects. Opp. at 30. But the argument is divorced from the record as none exists. Nor is there evidence of any citizen being removed or detained.

*Eighth Amendment.* Plaintiffs do not explain how the Eighth Amendment applies when the Venezuelan individuals' removal is not "punishment." *See* Defs' Br. at 34. Instead, Plaintiffs argue the State Department violates the Eighth Amendment by "facilitating rendition to indefinite detention," citing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989). Opp. at 30. But *DeShaney* actually shows no Eighth Amendment violation exists. It held that a State was not liable for a child's harm suffered while in the parent's custody because it had no affirmative duty to protect the child, even if "the State may have been aware of the dangers." *Id.* at 200-02. The only entity that detained the non-party Venezuelan individuals here was El Salvador.

*Convention Against Torture.* For their CAT claim, Plaintiffs argue that the statute limiting judicial review to final order of removal actually opens door to APA challenge. They are wrong.

18

The Foreign Affairs Reform and Restructuring Act of 1998 ("FARR Act"), which implements Article 3 of the CAT, explicitly states that "nothing in this section shall be construed as providing any court jurisdiction to consider or review claims raised under the Convention or this section . . . except as part of the review of a final order of removal pursuant to [the INA]."  Pub. L. No. 105-277, § 2242, 112 Stat. 2681-2761, 2822 (1998) (codified at 8 U.S.C. § 1231 note); *see also Omar v. Geren*, 689 F. Supp. 2d 1, 4 (D.D.C. 2009) ("The FARR Act severely limits the availability of judicial review of CAT claims[.]"), *aff'd sub nom. Omar v. McHugh*, 646 F.3d 13 (D.C. Cir. 2011).  That limitation also means that APA review is not available because the APA provides that "[n]othing herein . . . confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought."  5 U.S.C. § 702.

Notwithstanding Plaintiffs' protestation to the contrary, *see* Opp. at 31-32, the law cannot be clearer.  As the D.C. Circuit said in *Kiyemba v. Obama*, "the Congress limited judicial review under the Convention to claims raised in a challenge to a final order of removal."  561 F.3d 509, 514-15 (D.C. Cir. 2009) (citing 8 U.S.C. § 1252(a)(4) ("Notwithstanding any other provision of law . . . including section 2241 of Title 28, or any other habeas corpus provision, . . . a petition for review [of an order of removal] shall be the sole and exclusive means for judicial review of any cause or claim" arising under the Convention)).  The detainee at issue in *Kiyemba* therefore could not raise a CAT claim because he was not challenging a final order of removal.  *Id.*

Although no more needs to be said, it is worth noting that Plaintiffs essentially ask the Court to assess the adequacy of El Salvador's assurance about complying with the CAT, something even Plaintiffs acknowledge courts should not do under *Kiyemba*.  *See* Opp. at 32-33.  According to Plaintiffs, "the entire point of the [Arrangement] is to render hundreds of people directly into detention in conditions Defendants knew featured human rights abuses."  Opp. at 33.  Plaintiffs

cite a post on X by Secretary Rubio thanking President Bukele, Pl. Ex. 20, and a Truth Social post by the President mentioning that El Salvador's prisons have "lovely conditions," Pl. Ex. 21. But neither supports Plaintiffs' assertion that the United States expected anyone to be tortured, and the record clarifies the opposite is true. *See* Pl. Exs. 14-16.

**Detainee Treatment Act.** Regarding the Detainee Treatment Act, which applies only to those in U.S. custody, 42 U.S.C. § 2000dd(a), Plaintiffs argue that it applies because El Salvador stated in a report that it believed "foreign authorities" retained jurisdiction. *See* Opp. at 31 (citing Pl. Ex. 44 at 5). But the Arrangement is clear that El Salvador had sole custody of the detainees. Pl. Ex. 12 ¶ 5; Pl. Ex. 15. Plaintiffs also argue that the Act applies because the Arrangement purportedly "enabl[ed]" rendition. Opp. at 31.[2] Plaintiffs cite nothing to support that inferential leap, and Defendants are aware of none.

**First Step Act and Detention Regulations.** Plaintiffs recognize that the First Step Act and the detention regulations they cite do not apply to individuals not in Bureau of Prisons ("BOP") or DHS custody. Opp. at 34. But they argue that "is beside the point" because those individuals "*were* in BOP or DHS custody" before their removal. *Id.* Plaintiffs provide no support for this novel theory, and there is none. Defs' Br. at 36.

**First Amendment and the Religious Freedom Restoration Act.** Plaintiffs contend that the Arrangement is contrary to RFRA and the First Amendment because "prison conditions in El Salvador do not provide detainees with the right to practice religion." Opp. at 33. But that argument skips several steps for which there is no evidence, including (1) whether the United

---

[2] Plaintiffs argue that this Court's previous determination in *J.G.G.* that the United States does not have constructive custody is irrelevant. But Plaintiffs' theory is that Defendants outsourced their prison system and are responsible for all the consequences, insinuating that Defendants had custody somehow, as this claim and others show. Plaintiffs cannot have it both ways.

States had custody of the individuals who allegedly lost their free exercise of religion (it did not); and (2) whether the RFRA and First Amendment rights apply extraterritorially (they do not). Again, El Salvador alone controls prison conditions within its borders.

*Appropriations Clause.* Plaintiffs dispute that the funds provided to El Salvador were used "for [] anticrime purposes." Opp. at 35 (quoting 22 U.S.C. § 2291(a)(4)). The record belies that argument. All Venezuelan nationals removed to El Salvador under the Arrangement were determined to be members of TdA, a dangerous gang, so if El Salvador chose to use those funds to house those gang members, that would clearly be an "anticrime" purpose. *See* Pl. Ex. 22 at 1 (RFK Human Rights_0004). And any funds remaining after the Venezuelans returned to Venezuela can continue to be used by El Salvador for anticrime needs with El Salvador being required to report by June 30, 2026, how it used the money. *See* Pl. Ex. 22 at 2 (RFK Human Rights_0005). Plaintiffs cite an appropriations bill from 2024 about eliminating inhumane conditions in foreign prisons. Opp. at 35 (citing Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, § 7035(a)(5), 138 Stat. 460, 795). It is unclear why they do so or how it relates to this claim. This FY 2024 appropriations law requires the use of some foreign assistance funds to "eliminate inhumane conditions in foreign prisons and other detention facilities" but it does not require that all such foreign assistance funds be used for that purpose nor does it mandate any related conditions on such assistance. Finally, Plaintiffs misstate the record by arguing that Defendants did not provide the required notification to Congress by citing a letter from April 17, 2025. *See* Opp. at 36 (citing Pl. Ex. 45). Defendants did at the appropriate time after that date. *See* Defs.' Br. at 39 n.11.

*Federal Acquisition Regulation.* Defendants have shown that FAR does not apply because the United States did not request or contract for any services with El Salvador. Defs' Br. at 38-39.

The grant provided to El Salvador does not change that reality. Plaintiffs nevertheless insist that Defendants "pa[id] El Salvador for its detention services." Opp. at 36. Even if El Salvador did use part of the funds to house the TdA members pursuant to the express language of the letter grant, that does not transform the two countries' Arrangement into a contract. The same is true even if any benefit inured to the Unted Stated from El Salvador's ultimate release of the Venezuelan TdA members to Venezuela. There is no support for Plaintiffs' assertion that a contract was formed or that the grant letter should be ignored.

### D.    The Arrangement is not arbitrary or capricious.

Arbitrary and capricious review is a deferential standard, allowing only narrow review for the Court to determine whether the agency acted within "a zone of reasonableness." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). That deference is magnified in areas involving foreign policy. *See, e.g.*, *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007) (courts are "extremely deferential" when there is an "intersection of national security, foreign policy, and administrative law"). The Arrangement is not arbitrary or capricious as it was a reasonable means to facilitate removal of TdA members from the United States to El Salvador during a time when the Maduro regime would not accept them.

Plaintiffs fail to rebut Defendants' showing, seeking, for example, to confine *Islamic American Relief Agency* to its facts and ignoring that the principle governs all cases, *see, e.g.*, *Lopez Bello v. Smith*, 651 F. Supp. 3d 20, 32 (D.D.C. 2022). Worse, Plaintiffs argue that even if the Court gives Defendants "extreme deferen[ce]," the Secretary's judgment should still be re-evaluated. Opp. at 37-38. Plaintiffs argue that TdA and MS-13 gang members already in detention do not pose a threat, despite the Secretary's statements about how these gangs "metastasize" in prisons by "recruit[ing]" and "creat[ing] academies within the prisons that then . . . spill out to the

general population." Pl. Ex. 11 at 12. Plaintiffs further argue there are "obvious alternatives and reliance interests" at stake and thus, the State Department should have considered an alternative way to solve the problem. Opp. at 38. But even if true, and even though Plaintiffs provide no alternatives or state what reliance interests they had, *see id.* at 41, that is an improper invitation for the Court to second-guess the Secretary's decision, informed by his unique experience and perspective as the United States' chief diplomatic officer, rather than giving Defendants deference. And in any event, the Arrangement merely facilitates the transfer of TdA members and does not itself determine whether any transfer should occur or what occurs after the transfer.

Plaintiffs argue that State Department could not reasonably rely on the assurances provided by El Salvador that it would comply with all domestic and international legal obligations especially because of events that allegedly happened later. *See* Opp. at 39. But again, the State Department's judgment about the adequacy of such assurance is not amenable judicial second guessing, whether under the APA or otherwise. *See Kiyemba*, 561 F.3d at 514-15.

Plaintiffs then criticize Defendants for including certain provisions related to not using funds for illegal discrimination, to lobby for or against abortion, and to encourage mass-migration caravans, while not explicitly speaking about the individuals' confinement conditions. *See* Opp. at 40 (citing Pl. Ex. 22). But as explained above, it otherwise was committed to El Salvador's sovereign discretion of how to use the grant funds consistent with the terms of the grant. Moreover, El Salvador had already provided assurances in the Arrangement that it would follow all domestic and international legal obligations for the individuals it received. Plaintiffs cite no case for the proposition that the Court could revise a diplomatic arrangement or a foreign assistance grant. The only case they cite is irrelevant and stands for the unremarkable proposition that when agencies

take final agency action, they must give a reasoned explanation for rejecting alternatives. *See* Opp. at 41 (citing *Spirit Airlines, Inc. v. Dep't of Transp.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021)).

### E.    Plaintiffs' lack of statutory authority claim fails as a matter of law.

Plaintiffs once again mischaracterize the record for their excess of statutory authority claim, arguing that "no statute authorized the State Department to outsource . . . detention." Opp. at 42; *compare with* Pls.' Mot. for Summ. J., ECF No. 19, at 41 ("[n]o statute authorized the State Department to outsource [] detention"). As already discussed throughout, there is no outsourcing of detention. And Plaintiffs do not, and cannot, dispute that the State Department can—and usually does—represent the United States when entering into nonbinding diplomatic arrangements. *See* Defs.' Br. at 42-43. Although the State Department is not responsible for removals, federal law allows removal of aliens to places other than home countries. *See* 8 U.S.C. § 1231(b)(1)(C)(iv).

Plaintiffs rely on the same mischaracterization for their invocation of the major questions doctrine, arguing that "arranging and paying for people in the United States to be held indefinitely . . . is an issue of at least as much significance as others the Supreme Court has found to involve major questions." Opp. at 43. The argument again misrepresents the record, and in any event, the State Department has authority to make diplomatic arrangements with foreign countries, and by allowing DHS to remove individuals to third countries, Congress has recognized that the Executive Branch can make arrangements such as the one at issue here.

## IV.    Plaintiffs' *Ultra Vires* Claim Lacks Merit.

Plaintiffs argue that they "are entitled to judgment as a matter of law on both their constitutional ultra vires claim . . . and their statutory ultra vires claim." Opp. at 44. Plaintiffs criticize Defendants for not addressing their "constitutional ultra vires claim." *Id.* While "[c]ertain constitutional claims might . . . be brought *on their own* where a statute forecloses APA review,"

D.C. Circuit "opinions to that effect do not speak in terms of ultra vires review." *Eagle Tr. Fund v. U.S. Postal Serv.*, 811 F. App'x 669, 670 (D.C. Cir. 2020) (citing *Sears, Roebuck & Co. v. U.S. Postal Serv.*, 844 F.3d 260, 265 (D.C. Cir. 2016)); *see* 5 U.S.C. § 706(2) (granting courts the power to set aside unconstitutional final agency action). Further, courts must be hesitant to turn claims that a defendant exceeded its statutory authority into a constitutional claim. *See Dalton v. Specter*, 511 U.S. 462, 474 (1994). In any event, Plaintiffs do not establish any constitutional violations here, so they cannot show a constitutional ultra vires claim, even if such a claim exists.

Plaintiffs' statutory *ultra vires* claim fares no better. To establish a statutory *ultra vires* claim, a plaintiff must establish an "extreme" violation of a "clear and mandatory statutory command" that "must confer rights upon the individual seeking ultra vires review." *Glob. Health Council*, 153 F.4th at 20 (citation omitted). Plaintiffs do not come close to that standard because (1) as discussed above, the State Department had statutory authority to operate as it did; (2) Plaintiffs cannot establish how their alleged harms—such as conducting impact litigation or communicating with their clients—were the subject of a clear and mandatory statutory command ignored by Defendants; and (3) even if Plaintiffs could establish a violation, there was no "extreme" departure from what Defendants were authorized to do. Plaintiffs argue that the relevant language in *Global Health* is dicta—implicitly acknowledging they cannot meet that standard— but they do not explain why this Court has authority to ignore that language, especially given that an *ultra vires* claim is a doctrine of last resort. *See NRC*, 605 U.S. at 681-82.

## CONCLUSION

The Court should deny Plaintiffs' motion for summary for judgment and grant Defendants' cross-motion to dismiss or, in the alternative, for summary judgment.

Dated: November 12, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC HAMILTON
Deputy Assistant Attorney General
Federal Programs Branch

JEAN LIN
Special Litigation Counsel

TIBERIUS DAVIS
Counsel to Assistant Attorney General


*/s/ J. Stephen Tagert*
J. STEPHEN TAGERT
Federal Programs Branch
Civil Division, Department of Justice
1100 L Street NW
Washington, DC 20005
Telephone: (202) 305-5486
Stephen.Tagert@usdoj.gov

*Counsel for Defendants*