**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| ROBERT F. KENNEDY HUMAN RIGHTS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DEPARTMENT OF STATE, *et al.*, <br><br> Defendants. | Civil Action No. 25-1774 (JEB) |

### <u>MEMORANDUM OPINION</u>

This Court is all too familiar with the Government's hasty deportation of immigrants to El Salvador, though only through the lens of individual removals.  See, e.g., <u>J.G.G. v. Trump</u>, 772 F. Supp. 3d 18 (D.D.C. 2025); <u>J.G.G. v. Trump</u>, 786 F. Supp. 3d 37 (D.D.C. 2025).  The present suit arrives from a different vantage point, training its sights not on those removals but on the diplomatic instrument that preceded and allegedly enabled them.

In March 2025, the United States began transferring individuals from its custody to detention facilities in El Salvador.  Those transfers followed a diplomatic understanding between the two governments and were accompanied by funding to support the individuals' confinement abroad.  Organizations that provide legal and related services to those affected — and to others who may face the same fate — have challenged that Agreement, contending that it violates a host of statutory and constitutional constraints.  They now move for summary judgment to set aside the Agreement and clear the cloud of uncertainty looming over their work and clients.  The Government responds by moving to dismiss and, in the alternative, for summary judgment.  It

1

maintains that Plaintiffs lack standing, that the Agreement is not subject to judicial review, and that it represents a lawful exercise of the Executive's foreign-affairs authority.

Defendants ultimately prevail on the threshold question of standing. Even assuming the Agreement helped set in motion the events Plaintiffs describe, it does not itself carry independent legal force, and vacating it would not likely prevent the conduct that produces their injuries. The Court will therefore grant the Motion to Dismiss.

## I.    Background

The facts surrounding this Administration's expedited removal of individuals from the United States to El Salvador and their subsequent detention there are well documented and need not be rehearsed at length. J.G.G. v. Trump, 2025 WL 3706685 (D.D.C. Dec. 22, 2025). The Court instead focuses on the Agreement between the two countries and its consequences for the organizations that bring this suit.

In February 2025, following discussions between Secretary of State Marco Rubio and Salvadoran President Nayib Bukele, the State Department entered into an arrangement with El Salvador under which the United States would transfer individuals from this country to detention in Salvadoran prisons. See ECF No. 1 (Compl.), ¶¶ 2, 41. Secretary Rubio announced that El Salvador had "agreed to accept for deportation any illegal alien in the United States who is a criminal from any nationality . . . and house them in his jails." Id., ¶ 44. President Bukele, in turn, characterized the arrangement as offering the United States the opportunity "to outsource part of its prison system." Id., ¶ 46. Plaintiffs allege that the parties thus contemplated not ordinary removal but the transfer of individuals directly into Salvadoran detention — funded by the United States — in facilities internationally notorious for human-rights abuses. Id., ¶¶ 17–30, 46.

The written components of the understanding between the two countries consist primarily of diplomatic notes exchanged on March 13 and 14, 2025.  See ECF No. 19-1, Exh. 14 (Mar. 13 Diplomatic Note); Exh. 15 (Mar. 14 Diplomatic Note).  The State Department has described those communications as "a non-legally-binding exchange of diplomatic notes."  ECF No. 35-2 (Michael G. Kozak Declaration), ¶ 3.  Plaintiffs, by contrast, allege that those communications form part of a broader "Agreement" under which "the United States government has disappeared individuals living in the United States into confinement in El Salvador."  Compl., ¶ 2.

On March 15, the United States flew more than 250 individuals to El Salvador, where they were detained in Salvadoran prisons, including the Terrorism Confinement Center (CECOT).  Id., ¶ 53.  Plaintiffs allege that these transfers were carried out pursuant to the Agreement and resulted in individuals being detained abroad without meaningful access to counsel or the ability to challenge their confinement.  Id., ¶¶ 38, 53, 63.  On March 22, the State Department provided a $4.76 million grant to El Salvador "to be used by Salvadoran law enforcement and corrections agencies" for "costs of detaining" those recently transferred.  Id., ¶ 59.  The Government subsequently transferred additional individuals to El Salvador on March 31 and April 13.  Id., ¶ 60.

Plaintiffs are five nonprofit organizations: RFK Human Rights, the National Association of Criminal Defense Lawyers (NACDL), Immigrant Defenders Law Center (ImmDef), Immigration Equality, and the California Collaborative for Immigrant Justice (CCIJ).  Id., ¶¶ 8–12.  Consistent with their missions, they provide legal representation, advocacy, and related services to noncitizens and to attorneys providing representation in immigration and criminal matters, including in detention settings.  Id.  They filed this action on June 5, 2025, against the Department of State and the Secretary of State in his official capacity.  Id., ¶¶ 13–14.

According to the Complaint, the Agreement has concretely impaired Plaintiffs' ability to carry out those programs in two related ways.   First, several organizations represent clients who were rendered to El Salvador pursuant to the Agreement and, as Plaintiffs allege, were "held incommunicado," id., ¶ 70, beyond the reach of counsel, severing ongoing attorney-client relationships and preventing necessary communication.  Id., ¶¶ 66–82.  Second, each organization has been forced to restructure its operations in response to the ongoing risk the Agreement creates for clients who remain in the United States, including by screening for rendition risk factors, retraining staff and volunteers, developing new guidance and educational materials, and diverting time and resources from existing programs and client services.  E.g., id., ¶¶ 84–87, 100–04.

The Complaint asserts four counts: three under the Administrative Procedure Act alleging that the Agreement is contrary to law and constitutional right, arbitrary and capricious, and in excess of statutory authority, see 5 U.S.C. § 706(2)(A)–(C), and one *ultra vires* claim.  Id., ¶¶ 114–52.  Those claims invoke a broad constellation of constitutional provisions and statutory regimes, ranging from the Eighth Amendment and the Appropriations Clause to the Convention Against Torture and the Americans with Disabilities Act.  Id., ¶¶ 117–32.  To remedy their harms, Plaintiffs seek vacatur as well as declaratory and injunctive relief.  Id. at 52–53.

The landscape shifted only weeks after this case began.  When Plaintiffs initially filed their Complaint in June 2025, several of their clients were placed beyond reach in Salvadoran prisons.  E.g., id., ¶ 68.  The next month, however, Venezuelan President Nicolás Maduro resumed accepting deportation flights from the United States and receiving Venezuelan nationals.  See ECF No. 33-1 (Defs. MTD) at 8.  With that cooperation secured, the 252 Venezuelan nationals who had been held at CECOT since March 2025 — including the vast majority of

Plaintiffs' clients — were released and returned to Venezuela.  J.G.G., 2025 WL 3706685, at *3.

Despite these developments, the Agreement between the United States and El Salvador has not

been rescinded and remains in place.  See ECF No. 47 (Defs. Order Resp.).

Against that backdrop, Plaintiffs now move for summary judgment on all four counts,

arguing that the Agreement constitutes final agency action that facilitates and funds the rendition

of individuals from the United States into detention in El Salvador.  See ECF Nos. 19 (Pls. MSJ)

at 1, 23; 40 (Pls. Reply) at 1–2.  They emphasize that their challenge attacks the Agreement

itself, rather than individual removal decisions, and seeks its vacatur as the operative relief.  See

Pls. MSJ at 45; Pls. Reply at 13, 18.  Defendants, for their part, move to dismiss for lack of

subject-matter jurisdiction, arguing that Plaintiffs cannot establish standing.  See Defs. MTD at

1–3.  In the alternative, they seek summary judgment on the merits.  Id.

## II.    Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), a plaintiff

bears the burden of proving that the court has subject-matter jurisdiction to hear her claims.  See

Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992); U.S. Ecology, Inc. v. Dep't of Interior, 231

F.3d 20, 24 (D.C. Cir. 2000).  A court has an "independent obligation to determine whether

subject-matter jurisdiction exists, even in the absence of a challenge from any party."  Arbaugh

v. Y & H Corp., 546 U.S. 500, 514 (2006).  "For this reason, the plaintiff's factual allegations in

the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a

12(b)(6) motion for failure to state a claim."  Grand Lodge of the Fraternal Ord. of Police v.

Ashcroft, 185 F. Supp. 2d 9, 13–14 (D.D.C. 2001) (cleaned up).  Additionally, unlike with a

motion to dismiss under Rule 12(b)(6), the court "may consider materials outside the pleadings

in deciding whether to grant a motion to dismiss for lack of jurisdiction."  Jerome Stevens

Pharms. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005); see also Venetian Casino Resort, LLC v. EEOC, 409 F.3d 359, 366 (D.C. Cir. 2005); Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C. Cir. 1992).

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation, and a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Liberty Lobby, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1).

The summary-judgment standard set forth in Federal Rule of Civil Procedure 56 does not apply in the usual way to APA claims "because of the limited role of a court in reviewing the administrative record." Sierra Club v. Mainella, 459 F. Supp. 2d 76, 89–90 (D.D.C. 2006). "[W]hen a party seeks review of agency action under the APA, . . . the district judge sits as an appellate tribunal." Rempfer v. Sharfstein, 583 F.3d 860, 865 (D.C. Cir. 2009) (citation omitted). The APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness." FCC v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009).

### III.    Analysis

The parties' Motions present competing assertions concerning jurisdiction, reviewability, and legality. Plaintiffs contend that the challenged Agreement is reviewable final agency action

under the APA because it establishes a framework for transferring individuals from the United States to detention in El Salvador. On that premise, they argue that the Agreement is contrary to constitutional and statutory constraints, arbitrary and capricious, in excess of the State Department's authority, and *ultra vires*. See Pls. MSJ at 1. They accordingly seek to have the Agreement set aside. Id. at 45; Pls. Reply at 13, 18.

Defendants respond with a series of objections. They first assert that Plaintiffs lack standing, disputing the full range of injury, causation, and redressability. See Defs. MTD at 10–24. They next maintain that the challenged instrument is unreviewable under the APA because it is not final agency action and, in any event, is committed to agency discretion. Id. at 24–29. Finally, even if the Agreement were reviewable, they contend that it is lawful, falling within the Executive's foreign-affairs authority and violating none of the constitutional or statutory provisions Plaintiffs invoke. Id. at 29–45.

These disputes present complex and nuanced questions, particularly those related to standing. Because standing is a threshold requirement, the Court begins — and ultimately ends — there, finding that Plaintiffs have not met their burden. While that conclusion is dispositive, the Court nonetheless also addresses the related question of final agency action.

A. Standing

Federal courts decide only "Cases" or "Controversies," a requirement expounded by the doctrine of standing. See U.S. Const. art. III, § 2, cl. 1; see also Lujan, 504 U.S. at 560 ("[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III."). To have standing, a plaintiff must show that she "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016). A

plaintiff's ability to satisfy those elements "is determined as of the date an action is filed." Alvin

Lou Media, Inc. v. FCC, 571 F.3d 1, 7 (D.C. Cir. 2009) (quoting U.S. Airwaves, Inc. v. FCC, 232

F.3d 227, 232 (D.C. Cir. 2000)).  The Court therefore assesses standing as of June 5, 2025, the

date this action was filed and when several of Plaintiffs' clients remained imprisoned in El

Salvador.  The subsequent release of those clients bears on mootness, not standing.  See N. Am.

Butterfly Ass'n v. Wolf, 977 F.3d 1244, 1258 (D.C. Cir. 2020).

Organizations can satisfy Article III on their own behalf ("organizational standing") or

through their members ("associational" or "representational standing").  Ctr. for Responsible Sci.

v. Gottlieb, 346 F. Supp. 3d 29, 36 (D.D.C. 2018).  Here, the organizational Plaintiffs —

ImmDef, CCIJ, RFK Human Rights, and Immigration Equality — assert standing in their own

right, while NACDL asserts associational standing on behalf of its members.  See Pls. MSJ at 13,

20.  Because the injury inquiry differs for each form of standing, the Court analyzes that prong

separately for the organizational and associational Plaintiffs.  Compare Equal Rts. Ctr. v. Post

Props., Inc., 633 F.3d 1136, 1138–40 (D.C. Cir. 2011) (analyzing organizational standing based

on injury to organization's own programs and activities), with Am. Library Ass'n v. FCC, 401

F.3d 489, 492–93 (D.C. Cir. 2005) (analyzing associational standing based on injuries suffered

by organization's members).  The remaining Article III elements — causation and redressability

— apply equally to all Plaintiffs and are addressed together.  See Citizens for Resp. & Ethics in

Washington v. U.S. Off. of Special Couns., 480 F. Supp. 3d 118, 128 (D.D.C. 2020) (causation

and redressability for organizations "mirror, with little added gloss, the requirements for a non-

organizational plaintiff who attempts to invoke the jurisdiction of the federal courts").

Although Plaintiffs emerge from the twisting maze of standing having established injury and causation, they do not pass the redressability screen. Their claims must therefore be dismissed.

### 1. *Organizational Injury in Fact*

To determine an organizational injury in fact, the D.C. Circuit applies a two-part test: courts first ask "whether the agency's action or omission to act injured the [organization's] interest," and then "whether the organization used its resources to counteract that harm." PETA v. USDA, 797 F.3d 1087, 1094 (D.C. Cir. 2015) (quotation marks and citation omitted); see also Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 919 (D.C. Cir. 2015). That framework gives content to the familiar requirements of injury and concreteness as they apply to organizational plaintiffs. The first step confirms that the challenged conduct genuinely impaired the organization's ability to operate, and the second ensures that the organization's response was a genuine counteraction of that harm rather than a self-directed expenditure to bring a policy dispute to the courthouse doors. See Food & Water Watch, 808 F.3d at 919–20; Food & Drug Admin. v. All. for Hippocratic Med., 602 U.S. 367, 394–96 (2024).

The thrust of the organizational Plaintiffs' injury is that the Agreement between the United States and El Salvador perceptibly impairs their ability to provide a range of services to noncitizen clients with a consequent drain on the organizations' resources. See Pls. MSJ at 13–20. At the time suit was filed, the Agreement had been invoked to render individuals — including Plaintiffs' own clients — to incommunicado detention in El Salvador, severing active attorney-client relationships and placing a broader population of noncitizen clients at concrete risk of the same fate. Id. at 15–18. The organizations, in response, restructured their operations: screening clients for rendition risk, retraining volunteers, developing new materials, and

diverting staff time from existing programs.  Id. at 18–20.  The Court considers whether these facts satisfy both prongs of the organizational-standing test.

a.   Harm to Organizational Interests

Under the first prong, the challenged conduct must "perceptibly impair[] the organization's ability to provide services."  Food & Water Watch, 808 F.3d at 919 (quoting Turlock Irrigation Dist. v. FERC, 786 F.3d 18, 24 (D.C. Cir. 2015)).  The conduct, in other words, must "inhibit[]" the organization's "daily operations," PETA, 797 F.3d at 1094, or "ma[k]e the organization's activities more difficult."  Nat'l Treasury Emps. Union v. United States, 101 F.3d 1423, 1430 (D.C. Cir. 1996) (emphasis omitted).  Conversely, "a mere setback to the organization's abstract social interests is not sufficient."  Equal Rts. Ctr., 633 F.3d at 1138 (quotation marks omitted).  The Court must thus distinguish "organizations that allege that their activities have been impeded" — which suffices for standing purposes — "from those that merely allege that their mission has been compromised" — which does not.  Citizens for Resp. & Ethics in Washington, 480 F. Supp. 3d at 127–28; compare Havens Realty Corp. v. Coleman, 455 U.S. 363, 369 (1982) (standing where discriminatory practices "frustrated the organization's counseling and referral services"), with All. for Hippocratic Med., 602 U.S. at 394–95 (no standing where organization "expend[ed] money to gather information and advocate against" policy).

A critical mandate of this prong is that the organization identify an external fact concerning the operating environment — i.e., something that the defendant did that changed the conditions in which the organization functions, independent of the organization's response.  See Gottlieb, 346 F. Supp. 3d at 41.  For example, agency action that forecloses a mechanism through which an organization carries out its work may satisfy this requirement.  See PETA, 797 F.3d at

1094–97.  In contrast, a diversion of resources — the focus of the second prong — cannot itself constitute harm because such a standard "would be hopelessly circular."  Gottlieb, 346 F. Supp. 3d at 41; see also Fair Emp't Council of Greater Washington, Inc. v. BMC Mktg. Corp., 28 F.3d 1268, 1277 (D.C. Cir. 1994) (organizational standing based not on "diversion of resources from one program to another, but rather on the alleged injury that the defendants' actions themselves had inflicted upon the organization's programs").  In prototypical cases of organizational standing, "the plaintiff organization engaged in direct services to individuals that were made more difficult by the challenged action."  Gottlieb, 346 F. Supp. 3d at 42.

Applying the above framework, the organizational Plaintiffs establish injury in fact. Before the implementation of the Agreement, each organization provided services to noncitizen clients wading through the ordinary mechanisms of the immigration system.  ImmDef provided "full-scale deportation defense, legal representation, legal education, and connections to social services."  ECF No. 19-1, Exh. 32 (Melissa Shepard Declaration), ¶ 3.  CCIJ operated "regular legal clinics at ICE detention centers" and provided legal consultations to "noncitizens incarcerated in federal prisons around the country."  ECF No. 19-1, Exh. 37 (Kathleen Kavanagh Declaration), ¶ 3.  RFK Human Rights visited detention facilities to deliver legal-rights presentations, pursued strategic litigation, and maintained regular contact with clients — "generally weekly by phone and monthly by in-person visit."  ECF No. 19-1, Exh. 31 (Anthony Enriquez Declaration), ¶¶ 2–4.  Immigration Equality provided "full representation to asylum seekers," operated a toll-free hotline for detained individuals, and "developed self-help materials and limited representation programming" for unrepresented individuals.  See ECF No. 19-1, Exh. 38 (Bridget Crawford Declaration), ¶¶ 4–9.  In short, these are not issue-advocacy organizations. They are providers of direct legal services — the kind of "core business activities" whose

11

impairment has consistently sustained organizational standing.  All. for Hippocratic Med., 602 U.S. at 394–95; see also League of United Latin Am. Citizens v. Exec. Off. of the President (LULAC), 780 F. Supp. 3d 135, 179 (D.D.C. 2025).

The Agreement changed the external environment in which these organizations operated. It set the stage for the transfer of individuals from the United States to detention in Salvadoran prisons, where inmates are not only placed in "poor living conditions" and "disciplined through beatings and humiliation," J.G.G., 772 F. Supp. 3d at 42, but also have little to no access to counsel.  See Pls. MSJ at 25.  The injury to the organizations' interests and activities arising from the Agreement thus manifests in two related ways.

Begin with the organizations whose clients were spirited away to El Salvador.  ImmDef represents eight men who were rendered to CECOT pursuant to the Agreement, including one whom the organization represented before his rendition.  See Shepard Decl., ¶ 5.  ImmDef's attorneys "were not permitted to communicate directly with those clients" while they were in CECOT, leading to tangible consequences that were far from de minimis.  Id.  One client, for instance, had an asylum hearing in the United States scheduled for March 17, 2025.  Id., ¶ 7. The immigration judge ultimately dismissed his case since the client was rendered to CECOT on March 15 and understandably absent from the proceeding.  Id.  For four clients whose cases were similarly dismissed based on absence, ImmDef filed appeals to the Board of Immigration Appeals "without even having had the opportunity to consult with these clients about taking the appeal."  Id., ¶ 8.  Their representation was "stymied by [their] inability to communicate with these clients and adequately develop a factual record."  Id.  These procedural consequences are not in the rearview mirror — they are ongoing.  Cases for two of the organization's clients remain pending before immigration judges, and ImmDef explains that it remains unable "to

access one of [its] clients to develop the facts [it] need[s] to advocate for them." Id., ¶ 9.

RFK Human Rights represents before the Inter-American Commission on Human Rights ten Venezuelan men rendered to CECOT and two Salvadoran men rendered on the same flight. See Enriquez Decl., ¶¶ 5–6. The organizations' attorneys "were not permitted to communicate directly with those clients" while they were in CECOT "because the Agreement does not require El Salvador to facilitate such communication." Id., ¶ 5. "[L]acking any other means of making contact," RFK attorneys traveled to El Salvador in late April 2025 to attempt to visit their clients in person and were "denied entry to CECOT and denied access to their clients." Id. While RFK's Venezuelan clients have been released, its Salvadoran clients remain in incommunicado detention; the organization has been "unable to communicate directly with [them]." Id., ¶ 6.

These injuries do not constitute "a setback to the organization's abstract social interests," Havens, 455 U.S. at 379, nor do they amount to "a strong moral, ideological, or policy objection to a government action." All. for Hippocratic Med., 602 U.S. at 381. They interfere with active attorney-client relationships and frustrate the ongoing legal representation that sits at the heart of these organizations' missions. Cf. RAICES v. Noem, 793 F. Supp. 3d 19, 67 (D.D.C. 2025) (finding organizational standing where challenged executive action impaired immigration legal-services organizations' "core business activity of providing direct legal services to individuals at risk of removal").

The Agreement's injury to the organizational Plaintiffs is not limited to the clients who were rendered, however. Each organization also serves noncitizen clients who, at the time suit was filed, faced a concrete risk of rendition under the operative Agreement. The organizations' ability to assist those clients has been concretely disrupted as well — not as a matter of speculation about what the Agreement might produce but as a direct consequence of its

successful implementation.  See Pls. Reply at 12 ("Plaintiffs already had clients 'affected by' the Agreement.  There [is] nothing 'speculative' about the possibility that other people to whom Plaintiffs provide direct services could be rendered under the Agreement.").

ImmDef's Legal Services Director explains that "[t]he unpredictability created by the Agreement has materially impeded ImmDef's ability to represent and counsel its clients who are at risk of rendition by making it more difficult for ImmDef to provide concrete advice."  Shepard Decl., ¶ 14.  Attorneys must now "not only defend removal to [clients'] country of origin, but also to third countries to which they may be removed," requiring "more research and compiling supplemental evidence."  Id.  They must also screen every client for tattoos that may flag them for rendition — a new intake step that did not exist before the Agreement and that is necessitated by the risk the Agreement created.  Id.  Even that added step, however, is of limited use. ImmDef has "had clients without any tattoos sent to El Salvador," leaving the organization with unknowable criteria and making it "impossible to give any concrete advice."  Id.

CCIJ's supervising attorney similarly describes a structural transformation in how that organization operates its clinics.  Before the Agreement, CCIJ's model was standardized for efficiency: volunteer attorneys from outside organizations and law firms staffed the clinics, received general training from CCIJ, and provided self-help materials and brief consultations to detained individuals.  See Kavanagh Decl., ¶¶ 3, 7–8.  As a result of the Agreement, "CCIJ must now screen every individual for risk factors for possible rendition to El Salvador or other third countries."  Id., ¶ 7.  When risk factors are identified, CCIJ must provide specialized attorney advice "beyond the self-help materials CCIJ typically offers," fundamentally altering the clinic's service model from standardized self-help to individualized attorney involvement.  Id. Volunteers "must . . . receive additional training (from CCIJ staff) to screen for risk factors,"

changing how CCIJ recruits, trains, and deploys its workforce.  Id., ¶ 8.  The organization had to

develop "specialized material" in response to the Agreement, "translated into multiple

languages," to help individuals understand their rights and maintain access to counsel in the

event of rendition.  Id.  CCIJ has also received "unsolicited communications from immigrants

detained in Bluebonnet Detention Center" (a facility that has attempted renditions), requiring

new tracking systems.  Id., ¶ 9.  The result is an "overall reduction in the quantity and quality of

the services CCIJ regularly provides."  Compare LULAC, 780 F. Supp. 3d at 189 (finding

standing where challenged action would "render obsolete" organizations' existing tools, "force"

them to "update educational information[,] . . . much of which they have translated into multiple

languages," and "require [them] to invest additional resources in training their staff and

volunteers").

    The harms stemming from rendered clients and clients at risk of being rendered are two

manifestations of a single injury: the Agreement's concrete impairment of the organizational

Plaintiffs' capacity to deliver the services that constitute their core mission.  The modifications

for at-risk clients are the organizations' necessary operational response — what competent legal-

services providers were compelled to do once they experienced firsthand what the Agreement

produces.  And because the framework established by the Agreement remains in place, the need

for those modifications persists.

    The nature of those injuries, moreover, establishes that the organizations' activities have

been "impeded," Abigail All. for Better Access to Developmental Drugs v. Eschenbach, 469 F.3d

129, 133 (D.C. Cir. 2006), and that the Agreement has "perceptibly impaired [their] ability to

provide services."  Food & Water Watch, 808 F.3d at 919.  RFK Human Rights does not describe

an organization that must work somewhat harder to reach its clients — it describes one that

15

traveled to El Salvador, was denied entry to CECOT, and remains unable to communicate with its clients at all.  See Enriquez Decl., ¶ 5.  ImmDef does not describe an organization for which advising clients about rendition risk is marginally harder — it describes one for which it is "impossible to give any concrete advice" in circumstances with dire stakes.  See Shepard Decl., ¶ 14.  CCIJ does not describe a clinic that operates with added friction — it describes one structurally transformed from standardized self-help workshops to individualized screening sessions, with a consequent reduction in the number of people served.  See Kavanagh Decl., ¶¶ 7–8, 11.  Courts have consistently found organizational standing where the challenged conduct impaired the organization's ability to deliver direct services in just this way.  See, e.g., Havens, 455 U.S. at 379; Whitman-Walker Clinic, Inc. v. HHS, 485 F. Supp. 3d 1, 21–22 (D.D.C. 2020); RAICES, 793 F. Supp. 3d at 67; LULAC, 780 F. Supp. 3d at 189.

Defendants nonetheless dispute the existence of injury on several grounds.  First, they contend that no cognizable injury exists because all Venezuelan nationals transferred to El Salvador pursuant to the Agreement have been returned to Venezuela.  See Defs. MTD at 11–15; ECF No. 43 (Defs. Reply) at 2–3.  Standing, however, is assessed at the time the complaint is filed, and subsequent changes in circumstances do not retroactively eliminate the injury that existed then.  Barker v. Conroy, 921 F.3d 1118, 1130 (D.C. Cir. 2019).  The Supreme Court confirmed as much in Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc., 528 U.S. 167 (2000).  There, the defendant's facility ultimately closed, and its permit violations ceased.  Yet the Court held that standing was not defeated because the violations were ongoing when suit was filed.  Id. at 189–91.  What mattered was the injury to the plaintiffs at the time they sued, not the ultimate condition of the environment.  Id. at 181.  So too here.  At the time suit was filed, the Agreement was operative, clients remained in CECOT, the Government was

16

actively seeking to render additional individuals, and the organizations had restructured their operations in response. That Venezuelan detainees were later released does not retroactively eliminate the injury any more than the closure of the Laidlaw facility eliminated the standing of the plaintiffs, who sued while it was still operating.

Defendants' reliance on City of Los Angeles v. Lyons, 461 U.S. 95 (1983), is likewise unavailing in diminishing Plaintiffs' injury. See Defs. MTD at 13–14. Lyons stands for the proposition that a past discrete harm cannot support standing for prospective relief where there is no showing that the unlawful conduct is ongoing or substantially likely to recur. See 461 U.S. at 105–08. In that case, the plaintiff's injury was the discrete act of being subjected to a police chokehold, and he could not credibly allege that he faced a realistic threat of recurrence. Id. Here, in contrast, the organizations' injury is not a discrete event whose recurrence must be established. It is a structural transformation of their operations — screening, reorganization, inability to advise — that persists because the Agreement remains in place.

In a similar vein, Defendants invoke Clapper v. Amnesty International USA, 568 U.S. 398 (2013), arguing that any future injury from the Agreement is speculative. They maintain that the Agreement has not been used to render anyone to El Salvador since April, the post-Maduro regime has begun "regularly accepting Venezuelan nationals," and "El Salvador alone decides whether and where to detain individuals." Defs. Reply at 9. In Clapper, however, the plaintiffs could not show that the challenged surveillance authority had ever been used against them; their voluntary expenditures and theory of standing rested on a "highly attenuated chain of possibilities." 568 U.S. at 410–11. Here, there is no chain to construct. The Agreement was invoked against the organizations' own clients, and the operational modifications they have implemented are responses to a demonstrated reality, not precautionary measures against a

17

hypothetical risk. Indeed, <u>Clapper</u> itself recognizes that a plaintiff who "reasonably incur[s] costs to mitigate or avoid" a "substantial risk" of harm suffers a cognizable injury. <u>Id.</u> at 414 n.5 (quotation marks omitted); <u>see also</u> <u>Bost v. Ill. State Bd. of Elections</u>, 146 S. Ct. 513, 524 (2026) (Barrett, J., concurring in the judgment); <u>Monsanto Co. v. Geertson Seed Farms</u>, 561 U.S. 139, 154–55 (2010). Plaintiffs have shown more than a "substantial risk that the harm will occur." <u>Susan B. Anthony List v. Driehaus</u>, 573 U.S. 149, 158 (2014) (quotation marks omitted). They have established that the harm has already occurred and that the instrument that precipitated such harm remains operative.

Defendants further contend that the organizations' injuries amount to nothing more than a workload increase. <u>See</u> Defs. MTD at 16; Defs. Reply at 7–8. They invoke <u>Federal Defenders of San Diego, Inc. v. United States Sentencing Commission</u>, 680 F. Supp. 26 (D.D.C. 1988), which held that an "increase in workload — or an increase in the difficulty of doing [a] duty" could not sustain organizational standing where it was indistinguishable from "the sort of harm that could be alleged by any lawyer confronted with new, complex legislation." <u>Id.</u> at 30–31. The analogy is inapt. In <u>Federal Defenders</u>, the Sentencing Guidelines made public defenders' work more complex but did not change the nature of that work. The plaintiffs "retain[ed] their ability to represent their clients"; their "duties [were] simply recast by a change in the substantive criminal law," and their "resources remain[ed] intact." <u>Id.</u> at 31–32. The Agreement, conversely, produces a qualitatively different kind of harm. It did not make the organizations' existing work harder — it made that work impossible for some clients and fundamentally transformed it for the rest. The distinction is between increased difficulty within an intact practice model (<u>Federal Defenders</u>) and structural impairment of the service itself (this case).

18

b.  Diversion of Resources

The Court now turns to the second prong: whether the organizations have "used [their] resources to counteract . . . harm." Food & Water Watch, 808 F.3d at 919 (quotation marks omitted).  Resources spent on normal-course educational initiatives, advocacy for preferred policies, or litigation fall short.  Id. at 919–20; Turlock, 786 F.3d at 24; Ctr. for L. & Educ. v. Dep't of Educ., 396 F.3d 1152, 1161 (D.C. Cir. 2005).  "[B]ecause a party cannot 'spend its way into standing,' mere 'issue-advocacy' activities are not sufficient to support organizational standing." LULAC, 780 F. Supp. 3d at 180 (quoting All. for Hippocratic Med., 602 U.S. at 394–95).  The mere fact that an organization "voluntarily, or willfully, diverts its resources, however, does not automatically mean that it cannot suffer an injury sufficient to confer standing." Equal Rts. Ctr., 633 F.3d at 1140 (cleaned up).  The pertinent question is whether the organization "undertook the expenditures in response to, and to counteract, the effects of the defendants' [challenged conduct] rather than in anticipation of litigation." Id.

The record establishes that Plaintiffs satisfy this standard.  ImmDef has been "compelled to devote additional staff time to representing [its] clients who were held in CECOT." Shepard Decl., ¶ 10.  "Representing these clients while they were in CECOT required several additional hours per week, for multiple attorneys across case teams, compared to ImmDef's typical practice." Id.  The organization also "had to devote significant resources to simply try[] to ascertain whether [its] clients even remained alive," including communicating with congressional staff in hopes of securing access or proof of life. Id., ¶ 11.  ImmDef "has had to spend staff hours to update" its materials for legal-service providers "to include both video and written information regarding the heightened risk factors for being rendered to El Salvador," an obligation that is ongoing because the Agreement remains in place. Id., ¶ 17.

19

CCIJ has devoted "substantial time to training volunteers, creating materials, providing more complex consultations, and assisting formerly detained or incarcerated individuals." Kavanagh Decl., ¶ 11.  In particular, staff time has gone to training volunteer attorneys to screen for rendition risk factors, developing specialized materials in response to the Agreement and translating them into multiple languages, and providing individualized attorney advice in cases that CCIJ's self-help model would previously have handled.  Id., ¶¶ 7–8.  "CCIJ has also received a number of unsolicited communications from immigrants detained at the Bluebonnet Detention Center . . . and from family of people detained there," requiring the organization "to devote additional staff time and resources to creating records to track these people."  Id., ¶ 9.  And, finally, CCIJ has had to reach out to former clients — including individuals previously granted protection under the Convention Against Torture — "to advise on the new risk that they could be re-detained and rendered to El Salvador," as well as to arrange attorney accompaniment for such individuals at ICE check-ins.  Id., ¶ 10.  As an organization already "limited in the amount of time [it] can spend conducting clinic sessions," the time and resources spent on these new tasks mean the organization "serve[s] a lower number of people."  Id., ¶ 11.

RFK Human Rights has incurred the costs of "time-consuming and expensive travel to El Salvador from the United States that would not need to occur but for the Agreement."  Enriquez Decl., ¶ 9.  That travel — in which RFK attorneys were denied entry to CECOT and denied access to their clients, id., ¶ 5 — was not a strategic choice but a necessary attempt to maintain contact with existing clients when no other means were available.  The resulting strains "mean that RFK Human Rights is unable to devote staff time and financial resources to other work it would have completed, including U.S. federal litigation seeking redress for violations of human rights by police and prison officials."  Id., ¶ 9.  RFK Human Rights must also "devote attorney

time and organizational resources to representing clients who have been rendered to (or are at risk of being rendered to) facilities in El Salvador," thereby "diminishing the overall number of clients" that the organization can assist.  Id., ¶ 11.

These diversions are specific, documented, and directly responsive to the impairment identified under the first prong.  They are not the "self-inflicted budgetary choice[s]" that result from an organization's decision to oppose government policy, Am. Soc'y for the Prevention of Cruelty to Animals v. Feld Ent., Inc., 659 F.3d 13, 25 (D.C. Cir. 2011) (quotation marks omitted), but "expenditures in response to, and to counteract, the effects of the defendant's [challenged conduct]."  Equal Rts. Ctr., 633 F.3d at 1140; see also Humane Soc'y of U.S. v. U.S. Dep't of Agric., 41 F.4th 564, 567–68 (D.C. Cir. 2022) (finding sufficient organizational plaintiff's diversion of resources from existing programs to counteract ongoing challenged conduct).

Defendants characterize these operational modifications as the kind of advocacy expenditures that cannot establish standing under Alliance for Hippocratic Medicine, 602 U.S. at 395–96.  See Defs. MTD at 17–18; Defs. Reply at 6–7.  Not so.  In that case, the organizational plaintiffs had no direct-service relationship with patients affected by the challenged FDA action. Alliance for Hippocratic Medicine, 602 U.S. at 385–86, 395.  The medical associations' costs — conducting studies on mifepristone, drafting citizen petitions, and engaging in public education — were thus efforts to oppose the policy, not to deliver services that the policy had disrupted. Id. at 394–95.   Here, every organization provides direct legal services: representation, clinics, hotlines, rights presentations.  And their expenditures are not for opposing the Agreement as a policy matter.  They are for tasks that the Agreement made necessary for the first time: screening every client for ambiguous rendition risk factors that did not previously exist, retraining

21

volunteer workforces to identify those risks, developing and translating new materials for a threat that had no prior analogue in domestic immigration practice, traveling to a foreign country to locate clients, and prosecuting appeals for clients who could not be consulted about whether to appeal.  The decision to make such expenditures rests less on choice than on necessity.  Cf. RAICES, 793 F. Supp. 3d at 67 (finding standing where "the organization has incurred additional expenses and has faced new obstacles in pursuing its core business activity").

As a result, the Court can conclude that the Plaintiff organizations have sufficiently established their injury in fact.

### 2. *Associational Injury in Fact*

In contrast to the above organizations, NACDL asserts associational standing on behalf of its members.  See Pls. MSJ at 20.  An organization has associational standing when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977).

As a threshold matter, NACDL must have the "indicia of a traditional membership association."  Sorenson Commc'ns, LLC v. FCC, 897 F.3d 214, 225 (D.C. Cir. 2018) (quotation marks omitted).  Defendants assert without any elaboration that "it is unclear whether NACDL has satisfied the criteria."  Defs. MTD at 19.  The declaration from NACDL, however, explains that the organization is a "nonprofit voluntary professional bar association" whose members affirmatively join and work through the organization "to ensure justice and due process" and to "ensure that its members and others in the criminal defense bar are equipped to serve all accused persons."  ECF No. 19-1, Exh. 39 (Lisa Monet Wayne Declaration), ¶¶ 4–5.  That structure

reflects the hallmarks of a traditional membership organization — voluntary membership, representation of members' shared interests, and member participation in the organization's work — that the D.C. Circuit has recognized as sufficient for associational standing. See Viasat, Inc. v. FCC, 47 F.4th 769, 781 (D.C. Cir. 2022). In any event, the Supreme Court has made clear that where an organization "has identified members and represents them in good faith, our cases do not require further scrutiny into how the organization operates." Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 600 U.S. 181, 201 (2023). Because NACDL has identified such members and represents them in good faith, see Wayne Decl., ¶ 10, the threshold requirement is satisfied.

The second and third Hunt prongs are not seriously contested. The interests NACDL seeks to protect — ensuring that its members can provide constitutionally adequate representation to clients who may face rendition under the Agreement — are germane to the organization's purpose of equipping criminal-defense attorneys to "serve all accused persons at the highest level." Wayne Decl., ¶ 5. And because Plaintiffs seek vacatur rather than damages, their claims do not require individual member participation. See United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc., 517 U.S. 544, 553–54 (1996) (individual participation not normally necessary where association seeks prospective relief for its members).

The dispositive question under Hunt, then, is whether at least one NACDL member would have Article III standing to sue in her own right. At this stage of the analysis, the Court's focus is limited to whether the record reflects a concrete injury to a member's professional activities. The declarations of two NACDL members readily answer that question. They describe injuries similar to those suffered by the organizational Plaintiffs, stemming from clients

23

who were rendered to El Salvador and clients who face a continuing risk of rendition under the Agreement.

The Executive Director of the Lone Star Defenders Office describes the Agreement's most direct documented consequence for criminal-defense representation. See ECF No. 19-1, Exh. 41 (Amrutha N. Jindal Declaration). Her office represented a Venezuelan man in Texas state criminal proceedings who was rendered to CECOT in March 2025, leaving her and her colleagues with "no way to communicate with him." Id., ¶¶ 10–12. Their inability to access their client "materially interfered with [their] ability . . . to carry out [their] work consistent with [their] obligations to provide constitutionally adequate counsel." Id., ¶ 13. To preserve her client's rights while he was beyond reach, she was forced to prepare and file motions seeking his temporary return to state custody without any information beyond what they could glean from his family members. Id., ¶¶ 12, 14. That is not a workload increase within functioning representation. It is the disruption of an active attorney-client relationship with consequences that ran directly to the attorney's client and to her office's capacity to serve him.

A declaration from another NACDL member describes a structural transformation of the member's practice that persists while the Agreement remains in place. See ECF No. 19-1, Exh. 40 (NACDL Member Declaration). The member advises noncitizen clients on the immigration consequences of criminal convictions, a function defense counsel is obligated to perform. Id., ¶ 3; see also Padilla v. Kentucky, 559 U.S. 356 (2010). The Agreement has diverted the declarant from direct client representation to developing office-wide guidance for clients at risk of rendition, including intake protocols, trainings, and consultation with colleagues and outside experts. See NACDL Member Decl., ¶ 6. Most significantly, the declarant identifies an injury qualitatively distinct from a heavier workload: in some instances, the Agreement has placed

24

attorneys in an irreconcilable professional conflict.  Counsel is "forced to advise clients to undertake strategies that may actually be detrimental to success in their criminal case because that success could leave them more vulnerable to rendition."  Id., ¶ 9.  The Agreement has thus made it impossible to give advice both optimal for the criminal case and appropriate in light of the risk of rendition, compelling counsel to choose between the two.

NACDL's Executive Director confirms that these injuries are representative, not aberrational.  Wayne states that many members struggle to advise at-risk clients and have reached out to the organization for resources.  See Wayne Decl., ¶ 11.  But those resources are of minimal utility.  As Wayne explains, "[T]he problems created by the Agreement cannot be solved by additional NACDL resources: no resource will enable a criminal defense attorney to provide competent counsel to a client they cannot talk with, or manage a caseload made unworkable by uncertainty."  Id.  The NACDL members' injuries, in sum, are neither the by-products of policy opposition nor the result of a heavier workload.  They stem from the Agreement's direct interference with the members' ability to carry out the professional obligations of criminal-defense counsel.  The first prong is thus satisfied.

### 3.  *Causation*

Having emerged from the thicket of organizational and associational injury, the Court now enters somewhat smoother terrain: causation.  Plaintiffs must show that their injuries are "fairly traceable to the challenged action of the defendant," Lujan, 504 U.S. at 560 (quotation marks and alterations omitted), meaning that the chain of causation "must not be too speculative or too attenuated."  All. for Hippocratic Med., 602 U.S. at 383.

Plaintiffs meet this standard, although it is a fairly close call.  One could hardly dispute that the Agreement set the renditions in motion.  Before it was reached, there was no bilateral

25

understanding for transferring individuals to Salvadoran prisons.  By its terms, however, the United States signaled its intent to transfer detainees and El Salvador signaled its willingness to receive them, thereby establishing the framework in which the subsequent renditions occurred. See Mar. 13 Diplomatic Note at 1 (explaining that United States intends to send two Salvadorans and up to 500 Venezuelans to El Salvador); Mar. 14 Diplomatic Note at 1 (explaining that El Salvador "[a]gree[s] to the transfer" and "[e]xpress[es] [its] readiness to accommodate" the group).  DHS then carried out the renditions the very next day by transporting the individuals on U.S. aircraft to El Salvador, where they were detained shortly thereafter.  See ECF No. 19-1, Exh. 18 (First RFK Client Declaration), ¶¶ 10–16.  In recognition of El Salvador's acceptance of those individuals, the State Department executed a grant letter — referencing "detention" four separate times — providing funds to El Salvador to support the costs of detaining those individuals.  See ECF No. 31-1, Exh. 22 (Grant Letter) at 4–6.  The Agreement set in motion a sequence — transfer, incommunicado detention, exchange of funds — that produced precisely the injuries Plaintiffs document.

Defendants contend that the State Department "did not transfer anyone to El Salvador" and that DHS carried out the physical removals under its own statutory authority.  See Defs. Reply at 10.  But traceability does not require that the challenged agency itself execute the actions that directly produce the injury.  Where a plaintiff's injury is most immediately caused by the actions of a third party, standing may nonetheless be established upon "substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation."  Ams. for Safe Access v. Drug Enf't Admin., 706 F.3d 438, 446 (D.C. Cir. 2013) (quotation marks omitted).  The D.C. Circuit has recognized that causation may be established even where the relevant third-party conduct is voluntary, so long as that conduct is

reasonably predictable.  See Competitive Enter. Inst. v. FCC, 970 F.3d 372, 383–84 (D.C. Cir. 2020) (consumer injury traceable to FCC when regulation caused Internet provider to raise prices); Energy Future Coal. v. EPA, 793 F.3d 141, 144 (D.C. Cir. 2015) (that petitioners were not intended target of regulation does not preclude causation); Competitive Enter. Inst. v. NHTSA, 901 F.2d 107, 115–16 (D.C. Cir. 1990).  In other words, traceability does not require that the challenged agency physically execute the injurious conduct, or that the Agreement have bound any party to act.  It is enough that the Agreement set in motion a foreseeable cascade of events.

The record leaves little doubt as to that foreseeability.  Secretary Rubio called the arrangement an "agreement to house criminal aliens."  ECF No. 19-1, Exh. 11 (Rubio Press Remarks) at 15.  Then-Secretary Noem, championing the Agreement, announced that if you are in the country illegally, you "could find yourself in CECOT."  ECF No. 40-1, Exh. 61 (Noem X Post).  El Salvador's president described the Agreement as "the opportunity to outsource part of [the United States'] prison system."  ECF No. 19-1, Exh. 10 (Bukele X Post).  The Court need not speculate about whether third parties would react to the Agreement in predictable ways when the participants' own public statements alleviate any doubt.

Defendants' related contention — that El Salvador's independent discretion over how to treat the transferred individuals severs the causal chain, see Defs. MTD at 23 (noting that El Salvador alone decided how to treat the transferred individuals) — fares no better.  As the Government notes, this Court initially observed that "El Salvador ha[d] chosen . . . to detain Plaintiffs at CECOT."  J.G.G., 786 F. Supp. 3d at 57; see also Defs. Reply at 11.  But that observation addressed whether detainees were in the constructive custody of the United States for purposes of habeas jurisdiction.  In any event, the Court later revisited the question on a more

complete record and reached the opposite conclusion. See J.G.G., 2025 WL 3706685, at *11. On the fuller record, it found that El Salvador had detained the transferred individuals "at the behest of the United States," that El Salvador was "indifferent" to their detention apart from receiving payment, and that the two countries had "behaved as principal and agent in the [individuals'] detention." Id. If El Salvador was acting as an agent of the United States in detaining the transferred individuals, its conduct cannot be characterized as the "independent action of some third party" sufficient to defeat traceability.

Finally, Defendants suggest that Plaintiffs' increased costs and resource diversion "could instead be the byproduct of increased immigration enforcement generally." Defs. MTD at 22. While that might make intuitive sense in this current environment, the uncontroverted declarations belie the contention. As canvassed above, each Plaintiff specifically identifies the Agreement — not generalized enforcement activity — as the source of the burdens it faces. See Enriquez Decl., ¶ 9; Shepard Decl., ¶¶ 10, 14; Kavanagh Decl., ¶¶ 6–8; Crawford Decl., ¶ 16; Wayne Decl., ¶ 5; NACDL Member Decl., ¶¶ 8–9; Jindal Decl., ¶ 9.

### 4. *Redressability*

That leaves redressability. "Causation and redressability typically 'overlap as two sides of a causation coin.'" Carpenters Indus. Council v. Zinke, 854 F.3d 1, 6 n.1 (D.C. Cir. 2017) (quoting Dynalantic Corp. v. Dep't of Def., 115 F.3d 1012, 1017 (D.C. Cir. 1997)). The reason is straightforward: "[I]f a government action causes an injury, enjoining the action will usually redress that injury." Id. That said, the two inquiries are not identical, and "[r]edressability can still pose an independent bar in some cases." All. for Hippocratic Med., 602 U.S. at 381 n.1; see also Renal Physicians Ass'n v. U.S. Dep't of Health & Hum. Servs., 489 F.3d 1267, 1278 (D.C. Cir. 2007) ("[C]ausation does not inevitably imply redressability."). The distinction is partially

temporal.  Causation looks backward to whether the challenged action set the injury-producing chain in motion.  Redressability, by contrast, looks forward to whether a court order would likely or substantially alleviate the injury.  See Fla. Audubon Soc'y v. Bentsen, 94 F.3d 658, 663–64 (D.C. Cir. 1996) (*en banc*) ("Redressability examines whether the relief sought, assuming that the court chooses to grant it, will likely alleviate the particularized injury alleged by the plaintiff.").  "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement."  Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 107 (1998).  It is that independent bar that defeats standing in this case.

The redressability quandary stems from Plaintiffs' choice of remedy.  As they explain, "[T]he focus of Plaintiffs' motion" is vacatur of the Agreement.  See Pls. Reply at 18; see also id. at 13 ("[T]he gravamen of the relief requested is vacatur of the Agreement.").  The Court's prior causation analysis treated the Agreement as the catalyst for the events that led to Plaintiffs' injury — a role sufficient for that prong.  Redressability, however, asks a different question: would vacating that catalyst likely interrupt the chain going forward?  Even if the Agreement helped launch the sequence of events Plaintiffs describe, standing requires a further showing that removing it from the field would likely disrupt the conduct that now produces their injuries.  See West v. Lynch, 845 F.3d 1228, 1236 (D.C. Cir. 2017) ("If the challenged conduct is at best an indirect or contributing cause of the plaintiff's injury[,] . . . the plaintiff faces an uphill climb in pleading and proving redressability.").  The inquiry thus becomes whether vacating the Agreement would deprive Defendants of the legal authority to keep rendering individuals to El Salvador or change the practical odds of Defendants doing so.

The nature of the instrument Plaintiffs seek to vacate forecloses either possibility.  The Agreement is a nonbinding diplomatic exchange of notes that, by definition, creates no legal obligations and confers no new authority.  A nonbinding international agreement is one "not governed by international law — meaning it does not trigger the international law rules relating to compliance and state responsibility for breach" and does not create direct legal obligations.  See Curtis A. Bradley, Jack L. Goldsmith & Oona A. Hathaway, The Rise of Nonbinding International Agreements: An Empirical, Comparative, and Normative Analysis, 90 U. Chi. L. Rev. 1281, 1284, 1290 (2023).  Nor do such instruments derive operative force from the domestic legal system.  Nonbinding agreements "do not have the status of domestic federal law" and are not among the instruments enumerated in the Supremacy Clause.  Id. at 1299.

The Agreement's nonbinding character is evident from the diplomatic notes themselves. Rather than employing the obligatory terms associated with binding commitments, the notes use language of expectation and intent — e.g., the United States "understands" that El Salvador will act in certain ways and "intends" to take future actions in response, and El Salvador "reaffirms its commitment to assist the United States."  Mar. 13 Diplomatic Note at 1–2; Mar. 14 Diplomatic Note at 1.  The State Department's representative likewise confirmed that the Agreement was "a non-legally-binding exchange of diplomatic notes."  Kozak Decl., ¶ 3.  And the Government reported it to Congress as such under the Case-Zablocki Act, formally representing that the instrument creates no binding legal obligation.  See Defs. MTD at 7; see also 1 U.S.C. § 112b(a) (requiring reporting of international agreements to Congress).  The Agreement, in short, contains no commitments "enforceable by courts or legal advocates." Guillermo J. Garcia Sanchez, The Other Secret Deals: Uncovering the Power of Non-Binding International Agreements, 48 Fordham Int'l L.J. 285, 295–97 (2025).  In other words, neither

party could invoke legal process to compel the other's compliance — or noncompliance — with the Agreement's terms.  It follows that vacating the Agreement, which carries no legal force of its own, would not alter the legal landscape in a way that meaningfully bears on the injury-producing conduct.

The uncertainty surrounding the Agreement's scope reinforces the conclusion that it is not a legally operative instrument.  Plaintiffs contend that the Agreement extends well beyond the March 13–14 diplomatic notes to encompass Secretary Rubio's verbal representations and understandings that, in Rubio's own words, were "finalize[d] in a verbal agreement" with President Bukele rather than in the written notes.  See Pls. MSJ at 5 & n.1.  Defendants insist that the Agreement is coextensive with those two notes and limited to the transfer of Venezuelan Tren de Agua members and two identified Salvadoran MS-13 leaders.  See Defs. Reply at 4–5; Kozak Decl., ¶¶ 3–5.  That foundational disagreement — about what the challenged instrument even consists of — would be difficult to imagine with respect to a binding legal commitment whose scope is defined and knowable.  It is instead what one would expect of nonbinding diplomatic exchanges whose contours were never fixed in a legally operative instrument.  That has direct consequences for redressability: where the parties cannot identify the outer boundaries of what is being vacated, a court order cannot reliably be said to reach and neutralize the framework that produced the injury.  Cf. West, 845 F.3d at 1237 ("When conjecture is necessary, redressability is lacking.").

Plaintiffs' own characterization of the Agreement's role confirms the redressability problem.  Throughout their submissions, they describe the Agreement as having "facilitated" and "enabled" the renditions by providing a "basis for" transfer and detention.  See Pls. MSJ at 21–22, 25; Pls. Reply at 17–18.  That characterization is accurate in that the Agreement between

Rubio and Bukele prompted the engines of our government to corral individuals and ship them for detention in El Salvador in exchange for cash. Yet it also reveals the limits of what vacatur can accomplish. An instrument that facilitates conduct is not the same as an instrument that provides the legal authority for that conduct. The Agreement created the conditions under which DHS and State were prompted to act, but it did not confer the legal authority under which they acted. Removing a facilitative instrument therefore leaves the underlying legal authority for the facilitated conduct undiminished. See Nat'l Wrestling Coaches Ass'n v. Dep't of Educ., 366 F.3d 930, 938–41 (D.C. Cir. 2004) (no redressability where challenged policy did not itself determine conduct producing alleged injury).

The authorities that produced Plaintiffs' injuries arise from statute. DHS's authority to remove aliens to third countries derives from the Immigration and Nationality Act. See 8 U.S.C. § 1231(b) (establishing process for determining country of removal); 6 U.S.C. § 251 (transferring removal authority to DHS). Nothing in that statutory framework requires a bilateral diplomatic arrangement as a precondition for removal to El Salvador. State's authority to provide foreign-assistance funding derives from the Foreign Assistance Act of 1961 §§ 481, 635, 22 U.S.C. §§ 2291, 2395, which likewise exists independent of the Agreement. That authority was exercised through a grant agreement that references "detention" four times and provided the financial consideration undergirding El Salvador's acceptance of individuals transferred by DHS. See Grant Letter at 4–6.

Plaintiffs therefore are incorrect to assert that vacating the Agreement would leave the Government with "no mechanism" to continue the conduct they challenge. See Pls. MSJ at 22. Section 1231(b) provides the mechanism for removal to El Salvador (and so to CECOT), and the Foreign Assistance Act provides the mechanism to pay the Salvadoran government to detain

Plaintiffs' clients.  Plaintiffs attempt to distinguish their claim from "ordinary removals," insisting that the Agreement enabled something categorically different — "rendition into U.S.-funded detention."  Pls. Reply at 2–3.  That distinction, however, does not close the statutory gap.  Whether the conduct is characterized as rendition, removal, or outsourced detention, the legal authority making it possible is grounded in DHS's INA authority and State's FAA authority, neither of which depends on the Agreement's validity.  As long as both agencies retain those statutory authorities, the conduct that produced Plaintiffs' injuries can continue regardless of whether the diplomatic notes are vacated.

The practical consequences of vacatur confirm that it would accomplish little.  Whether the Agreement consists of the diplomatic notes or the broader discussions Rubio described, the result of vacatur would be the same.  The two governments have already reached a meeting of the minds to transfer individuals from the United States to Salvadoran prisons in exchange for funds.  See Mar. 14 Diplomatic Note at 1.  That shared understanding does not dissolve were a court to set aside the Agreement.  And with the understanding in place, the Government need only reach for the tools it already has — DHS's statutory removal authority and State's foreign-assistance funding — to execute the same transfers again.  Vacatur of the Agreement, in short, would leave the two governments exactly where they are: in possession of shared interests, the legal means to act on them, and a process of rendition and payment that they have already put in practice.  To the extent Plaintiffs argue that vacatur might deter similar arrangements in the future, that sort of speculative deterrent effect is insufficient for redressability.  Klamath Water Users Ass'n v. FERC, 534 F.3d 735, 738 (D.C. Cir. 2008) (plaintiff must show "that it is likely as opposed to merely speculative that the injury will be redressed by a favorable decision of the court").

The cases that Plaintiffs invoke to support redressability illustrate the limits of the organizations' standing theory.  Plaintiffs first rely on the familiar proposition that when a government action causes an injury, setting aside that action will ordinarily redress the harm.  See Pls. MSJ at 22 (citing Carpenters Indus. Council, 854 F.3d at 6 n.1) ("[I]f a government action causes an injury, enjoining the action usually will redress that injury.").  But Carpenters Industrial Council states only the ordinary rule.  It presupposes that the challenged action is itself the operative source of the injury-producing conduct, such that eliminating it changes the framework under which that conduct occurs.  The same principle undercuts Plaintiffs' reliance on Diamond Alternative Energy v. EPA, 606 U.S. 100 (2025).  There, federal fuel-economy standards imposed binding requirements that governed automakers' production decisions, and vacating those standards would have predictably altered the downstream conduct producing the alleged injury.  Id. at 112.  The Agreement is not operative in that sense.  It neither imposed binding obligations nor supplied the legal authority under which DHS removed individuals or State funded their detention.

*     *     *

At bottom, Plaintiffs describe real injuries stemming from an unprecedented detention arrangement between the United States and El Salvador.  They have thus directed their challenge at the nonbinding diplomatic instrument that preceded the agencies' actions.  But, legally, the Agreement is not what authorized the Government to render Plaintiffs' clients to El Salvador and to pay the Salvadoran government to detain them.  Instead, that power comes from statutes that predate the Agreement and that would stay in force no matter how the Court decides this case.  Even if the Court vacated the Agreement, then, the Government could keep using those same statutes to inflict the same injury on Plaintiffs.  And, as a practical matter, vacating this

34

nonbinding exchange of notes would not change the Government's willingness or ability to do so. Because the relief Plaintiffs seek would not likely redress their injuries, the Court must dismiss their claims for lack of standing.

B. Final Agency Action

Because the Court dismisses for lack of standing, it need not resolve Defendants' alternative arguments, including their contention that Plaintiffs' APA claims fail for want of "final agency action." Pls. MSJ at 24–27; see also 5 U.S.C. § 704. It addresses that issue nonetheless because the structural feature that defeats redressability also reveals that same defect in Plaintiffs' APA claim. As explained above, the Agreement that Plaintiffs challenge did not itself produce the legal consequences they seek to undo; those consequences instead stem from subsequent exercises of statutory authority. For similar reasons, the Agreement is not final agency action reviewable under the APA.

That Act authorizes judicial review only of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Finality turns on two conditions, both of which must be satisfied. "First, the action must mark the 'consummation' of the agency's decisionmaking process — it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" Bennett v. Spear, 520 U.S. 154, 177–78 (1997) (citations omitted); accord U.S. Army Corps of Eng'rs v. Hawkes Co., 578 U.S. 590, 597 (2016). A central consideration in the finality analysis is "the actual legal effect (or lack thereof) of the agency action." Nat'l Mining Ass'n v. McCarthy, 758 F.3d 243, 252 (D.C. Cir. 2014). As the D.C. Circuit has explained, "[I]f the practical effect of the agency action is not a certain change in the legal obligations of a party, the action is non-final for the purpose of judicial review." Nat'l

Ass'n of Home Builders v. Norton, 415 F.3d 8, 15 (D.C. Cir. 2005). The relevant question is therefore whether the challenged instrument itself determines rights or obligations or alters the legal regime governing those the agency is charged to regulate. See Bennett, 520 U.S. at 177–78; Cal. Cmtys. Against Toxics v. EPA, 934 F.3d 627, 636 (D.C. Cir. 2019).

The first Bennett condition — consummation — is not seriously in dispute. Defendants' briefing focuses almost entirely on prong two without meaningfully contesting that the Agreement marked the end of a decisionmaking process. See Defs. MTD at 24–27. Understandably so. As Plaintiffs correctly observe, the Agreement was not "merely tentative or interlocutory" — it was executed, publicly disclosed, and promptly implemented. See Pls. MSJ at 23. Neither the Agreement's nonbinding character nor its susceptibility to subsequent modification defeats consummation; an action may be complete for purposes of the first Bennett prong even if it remains subject to revision. Hawkes, 578 U.S. at 597–98 (holding that ability to revise jurisdictional determination did not render it non-final). The Agreement here marked the end of the State Department's diplomatic decisionmaking process regarding the terms under which El Salvador would receive transferred individuals. Consummation is thus satisfied.

Where the rubber meets the road is with Bennett's second condition. Plaintiffs assert that the Agreement's "nonbinding" label carries little weight, as the term simply indicates that the instrument is not governed by international law and creates no obligations enforceable on the international plane. See Pls. Reply at 21. In their view, the Agreement has the legal consequences necessary for final agency action because it enabled the transfer of individuals to Salvadoran prisons — an option previously unavailable to the Government. See Pls. MSJ at 23–24; Pls. Reply at 21–22. Defendants counter that the Agreement is a nonbinding diplomatic exchange that imposes no domestic legal obligations, and that any consequences Plaintiffs

36

experienced came from the Government's independent exercise of statutory authority rather than the notes themselves.  See Defs. MTD at 24–27; Defs. Reply at 12–13.  Defendants have the better of this argument.

The relevant inquiry under the APA is whether the Agreement produces legal consequences in the domestic legal order.  As a nonbinding instrument, it does not.  Although such an instrument may be implemented through binding domestic action, any legal consequences arise from that implementing action, not from the diplomatic commitment standing alone.  When the Executive gives effect to an international commitment through preexisting statutory authority, it is the agency's implementation of that authority — not the commitment itself — that generates legal consequences and is subject to judicial review.  See Jean Galbraith, From Treaties to International Commitments: The Changing Landscape of Foreign Relations Law, 84 U. Chi. L. Rev. 1675, 1710 (2017) (explaining that international commitments require President to work through agency authority under existing statutes and that resulting actions are subject to judicial review for statutory compliance and arbitrariness).  The finality inquiry therefore centers on the implementing action under domestic law, not the nonbinding agreement that preceded it.

As the Court explained in the preceding section, the conduct that led to Plaintiffs' injuries was carried out through implementing actions pursuant to independent statutory authority.  DHS's authority to remove aliens derives from the Immigration and Nationality Act.  See 8 U.S.C. § 1231(b).  The State Department's authority to provide funding derives from the Foreign Assistance Act.  See 22 U.S.C. §§ 2151 et seq.  Those authorities exist independently of the Agreement and were used to carry out the injury-producing conduct, including DHS's decision to render individuals to El Salvador and State's decision to transmit funds in exchange for those

renditions.  The implementing actions — rather than a nonbinding diplomatic commitment that confers no rights and imposes no legal obligations — are the proper focus of APA review.

That conclusion is reinforced by several cases outlining the parameters of final agency action.  In Bennett, a biological opinion "alter[ed] the legal regime to which the action agency [was] subject, authorizing it to take the endangered species if (but only if) it compl[ied] with the prescribed conditions."  520 U.S. at 178.  While the action agency was "technically free to disregard" the biological opinion, doing so exposed it and its employees to "substantial civil and criminal penalties."  Id. at 170.  Similarly, in Hawkes, an Army Corps jurisdictional determination had "direct and appreciable legal consequences" because it deprived landowners of a five-year safe harbor from civil-enforcement proceedings and exposed them to penalties for discharging pollutants without a permit.  See 578 U.S. at 597–98.  And in Sackett v. EPA, 566 U.S. 120 (2012), a compliance order was final agency action because it commanded the plaintiffs to restore their property under the threat of substantial penalties.  Id. at 126.  In each case, the challenged instrument itself altered the legal rights, obligations, or exposure of the regulated party.  The Agreement here does no such thing: it neither authorizes nor constrains conduct, imposes no legal consequences, and does not alter the legal regime governing the agencies' actions.

The D.C. Circuit's finality decisions confirm that the inquiry focuses on what the instrument itself does legally, not on what downstream events it helped produce.  In National Mining Association, agency guidance was not final agency action because it "impos[ed] no obligations or prohibitions on regulated entities" and regulated parties were "free to ignore it." 758 F.3d at 252.  The governing question was whether the instrument "tell[s] regulated parties what they must do or may not do in order to avoid liability."  Id.  In Sierra Club v. EPA, 955 F.3d

56 (D.C. Cir. 2020), the guidance document at issue was not final agency action because it was neither necessary nor sufficient to support a permitting decision; the legally operative act was the state's issuance of a permit.  Id. at 63–65.  The court in California Communities Against Toxics reaffirmed that only "direct and appreciable legal consequences" satisfy finality.  See 934 F.3d at 637.  It further explained that an instrument lacking independent legal authority — one that cannot be relied upon in any proceeding and may be disregarded without penalty — does not give rise to such consequences.  Id.  The Agreement fails each of these tests.  It tells no party what to do or avoid.  It was neither necessary nor sufficient to authorize the renditions and funding.  And El Salvador could disregard it without triggering any legal mechanism.

Centro de Trabajadores Unidos v. Bessent, 167 F.4th 1218 (D.C. Cir. 2026), a recent decision of this Circuit, is particularly instructive.  There, the court held that an IRS-ICE memorandum of understanding for sharing taxpayer address information in connection with immigration enforcement was "a nonbinding policy statement without legal effect" and "not a final agency action reviewable under the [APA]."  Id. at 1224.  Affirming the district court, the D.C. Circuit left undisturbed the conclusion that "[a]ny substantive change" attributable to the MOU stemmed not from the MOU itself but "from the Administration's decision to use . . . statutorily authorized tools" to further its enforcement objectives.  Id. at 1228.  The agreement in Centro involved coordination between domestic agencies, whereas the Agreement here reflects cooperation between the United States and a foreign sovereign.  But the analytical structure is the same: any legal consequences stem from later exercises of statutory authority rather than nonbinding documents of shared intent.  Whatever the Agreement set in motion, the consequences Plaintiffs identify flow from agencies' subsequent exercise of statutory authority.

39

Plaintiffs contend that the Agreement is final agency action because it provided "the necessary mechanism to facilitate extrajudicial rendition into El Salvador," an option the administration "did not have previously." Pls. Reply at 21–22. That, however, conflates two propositions: that the Agreement set in motion the events Plaintiffs describe, and that it altered the legal regime governing those events. The former may be true, as the Court's causation analysis found, but the APA's finality doctrine turns on the latter. Under Bennett, the question is whether the challenged instrument "alter[ed] the legal regime" under which a regulated actor operates — that is, whether it changed what that actor is legally permitted or required to do. See 520 U.S. at 169. The Agreement did neither. It memorialized a diplomatic understanding between sovereigns that, as the Government represents, El Salvador was free to disregard without legal consequence. See Defs. MTD at 25 ("If El Salvador chooses not to accept any Venezuelans under the Arrangement, the United States would have no legal recourse.").

Plaintiffs' argument that § 1231(b) authorizes removal, not rendition into paid detention, is similarly unsuccessful. See Pls. Reply at 23. That point does not engage the finality question — it goes to the merits of whether the agencies acted within their statutory authority. Whether the FAA and INA permitted the conduct that injured Plaintiffs goes to the legality of the agencies' implementing actions, not to whether the Agreement itself determined rights or altered a legal regime. If DHS's removal orders or State's grant letter exceeded those agencies' statutory authority, those instruments are the proper objects of APA review. See Sierra Club, 955 F.3d at 63–64 (explaining that nonbinding guidance is not final agency action where it does not itself determine rights or obligations, and that any legal consequences flow from subsequent decisions). An alleged defect in the agencies' implementing authority does not transform the Agreement into final agency action.

The observation that finality is "separate" from traceability and cannot be collapsed does not advance Plaintiffs' position.  See Pls. Reply at 22 (quoting Bennett, 520 U.S. at 177).  The Court's causation analysis accepts that the Agreement set in motion the events that followed. Finality asks a different question: which instrument determined rights or gave rise to legal consequences?  Here, those consequences flow not from the Agreement as a diplomatic predicate, but from the agencies' subsequent exercises of statutory authority.  A plaintiff who could show that one of those actions was arbitrary, contrary to statute, or beyond statutory authority would have a cognizable APA claim.  See Galbraith, *supra*, at 1710 (agency action implementing nonbinding agreement "will almost certainly be subject to judicial review (under the APA or the statute's own terms)").  Plaintiffs, however, expressly disclaim any challenge to those implementing actions.  See Pls. Reply at 17–18.  Having done so, they cannot satisfy the APA's finality requirement by challenging only the nonbinding diplomatic instrument that preceded them.

Ultimately, the Court's final-agency-action analysis converges with its redressability analysis, though they proceed on distinct doctrinal paths.  Plaintiffs identify serious consequences arising from the Government's conduct, but the Agreement they challenge is not the instrument that determines rights, imposes obligations, or provides authority for those consequences.  It is a statement of diplomatic intent that set the backdrop for later agency action, not an operative legal act.  In the absence of final agency action, the APA provides no basis for review.

## IV.    Conclusion

For the foregoing reasons, the Court will grant Defendants' Motion to Dismiss and deny Plaintiffs' Motion for Summary Judgment.  A separate Order so stating will issue this day.

41

42

/s/ James E. Boasberg
JAMES E. BOASBERG
Chief Judge

Date:  March 25, 2026