**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ROBERT F. KENNEDY
HUMAN RIGHTS, *et al.*,

    *Plaintiffs,*

v.

DEPARTMENT OF STATE, *et al.*,

    *Defendants.*

Case No. 25-cv-1774-JEB

## <u>MOTION FOR RECONSIDERATION</u>

This case challenges the Agreement between the Department of State and El Salvador that has already enabled the rendition of hundreds of people into U.S.-funded confinement in Salvadoran prisons. As Plaintiffs alleged—and evidenced—the Agreement creates a mechanism for such rendition that did not previously exist. In granting the government's motion to dismiss, the Court did not credit Plaintiffs' well-supported factual allegations concerning the scope and effect of the Agreement and assumed the merits against Plaintiffs in assessing standing. That deviation from bedrock legal principles was clear error. And it fatally undermined the opinion's analysis of both redressability and final agency action. Reconsideration is therefore warranted—all the more so because the opinion's flawed reasoning has already been adopted by another court in this District. *See Hines Immigration Law, PLLC v. EOIR*, No. 1:26-cv-01018, 2026 WL 969020, at \*6, 11 (D.D.C. Apr. 10, 2026).

Pursuant to Local Rule 7(m), the government has stated that it opposes this motion.

1

## LEGAL STANDARD

Federal Rule of Civil Procedure 59(e) permits a "motion to alter or amend a judgment" that is filed within twenty-eight days after entry of the judgment. Reconsideration under Rule 59(e) is "discretionary" but should be granted where necessary "to correct a clear error or prevent manifest injustice." *See Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996). In resolving a motion for lack of subject-matter jurisdiction under Rule 12(b)(1), the court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss," but "must still accept all of the factual allegations in the complaint as true." *Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253–54 (D.C. Cir. 2005) (quotation marks and brackets omitted). In resolving a motion to dismiss for failure to state a claim under Rule 12(b)(6), *see Trudeau v. FTC*, 456 F.3d 178, 184 (D.C. Cir. 2006) (clarifying that the Administrative Procedure Act's final-agency-action requirement is not jurisdictional), the court "must treat the complaint's factual allegations as true, and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged." *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quotation marks and citation omitted).

## ARGUMENT

I.  **The opinion erroneously construed factual questions about the Agreement's scope and effect against Plaintiffs on a motion to dismiss.**

Central to the opinion's analysis of both redressability and final agency action is its statement that the Agreement "was neither necessary nor sufficient to authorize

2

the renditions and funding." Op. at 39. But it is black letter law that, in assessing standing at the motion to dismiss stage, a court must "accept facts alleged in the complaint as true and draw all reasonable inferences from those facts in the plaintiffs' favor." *Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015); *see also, e.g.*, *Sparrow*, 216 F.3d at 1113 (same for motion to dismiss under Rule 12(b)(6)). The opinion did the opposite.

Plaintiffs here alleged and showed that the Agreement was the necessary means by which the government was able to render people into U.S.-funded confinement in Salvadoran prisons. *See, e.g.*, Compl. ¶¶ 41–52 (describing terms of Agreement as enabling such renditions), ¶¶ 53–60 (describing renditions effectuated "under the Agreement"), ¶ 63 (describing harms to Plaintiffs' ability to deliver core services to those who "because of the Agreement" may be or have been rendered to El Salvador), ¶ 112 (explaining that "the Agreement provides the terms for and facilitates the disappearance of individuals in the United States to El Salvador"). The opinion failed to credit these and other well-supported factual allegations as to the Agreement's central—and, in Defendant Secretary Rubio's words, "unprecedented," *id.* ¶ 41—role in enabling the rendition of people into U.S.-funded confinement in El Salvador.

The opinion compounded that error, in the redressability section, by according significance to the government's bare denials as to the scope of the Agreement. *See* Op. at 31. Controlling law required that any factual disagreement on this point be resolved in Plaintiffs' favor. *E.g.*, *Humane Soc'y*, 797 F.3d at 8. Rather than doing so,

the opinion cited the existence of a factual disagreement as itself providing reason the case could not proceed past a motion to dismiss. *See* Op. at 31. But a stated dispute about the facts cannot overcome Plaintiffs' well-pled factual allegations or result in dismissal.

Nor did the government back up its bare disagreement with any relevant evidence (even if that could have been sufficient to secure dismissal). The opinion cites a declaration submitted by Defendants. *See id.* But that declaration does not, as the opinion suggests, even state that "the Agreement is coextensive with . . . two [diplomatic] notes" and limited to the rendition of just two Salvadorans (in addition to Venezuelans). *Compare id. with* Dkt. 35-2, Ex. 12 ¶¶ 3–5 (stating only that the March 13 and 14 notes "memorialized an arrangement concerning the removal of third country nationals"). Nor would such a limited understanding of the Agreement have been consistent with other record evidence: Defendants' own production of a *third* diplomatic note concerning an additional *nine* Salvadorans; the grant letter; or the government's own statements that the Agreement remains in effect and that it intends to continue to avail itself of the Agreement. *See* Dkt. 19-1, Ex. 16; Dkt. 31-1, Ex. 22; Dkt. 47; Compl. ¶ 60–62. The grant letter (and the government's statements) are instead consistent with Plaintiffs' factual allegations concerning the broad scope of the Agreement and, at a minimum, do not permit inferences against Plaintiffs on a motion to dismiss. The opinion's failure to credit those allegations fed directly into its mistaken understanding of the Agreement's effect and the likely consequences of vacating the Agreement.

Instead of accepting Plaintiffs' allegations that the Agreement provided a unique mechanism for the renditions into U.S.-funded detention in El Salvador, as required to resolve a motion to dismiss, the opinion stated as a factual matter that, even without the Agreement, the likelihood of the government conducting these renditions would remain unchanged. *See* Op. at 29, 32–33 (surmising that to vacate the Agreement would not "change the practical odds" of further renditions into U.S.-funded confinement). But the opinion identified no mechanism by which the government could render people from the United States into U.S.-funded confinement in Salvadoran prisons absent the Agreement (or some similar future agreement), and no such mechanism exists. *Cf.* Compl. ¶ 112.

In place of such a mechanism, the opinion appears to make substantive assumptions regarding the statutory authority of the State Department and the Department of Homeland Security to continue the renditions. *E.g.*, Op. at 33. Specifically, the opinion noted that the State Department could send El Salvador money for certain purposes and DHS send people subject to removal. *Id.* But removal is not the same as rendition to torture. And there is no basis—again, especially at the motion to dismiss stage—to conclude as a factual matter that doing so would or could result in those people being held in U.S.-funded confinement absent an agreement like the one challenged here. In any event, Plaintiffs' complaint rests in part on claims that the statutory authorities the opinion cites do not themselves allow for rendition into U.S.-funded confinement in Salvadoran prisons absent the Agreement, and that the Agreement is instead contrary to those authorities. *See* Compl. ¶¶ 118, 125, 145–

49. The opinion does not assume the merits of these claims, as it should. *See infra* Sec. II.

The opinion's failure to "accept facts alleged in the complaint as true and draw all reasonable inferences from those facts in the plaintiffs' favor" was clear error, *see Humane Soc'y*, 797 F.3d at 8, and that error fatally undermines the opinion's conclusions with respect to both redressability and final agency action.

## II.    The opinion's redressability analysis contradicts binding precedent.

The opinion's failure to credit Plaintiffs' allegations regarding the Agreement permeates its redressability analysis, which reached a result that is likewise clearly erroneous.

The overly narrow understanding of the Agreement adopted in the opinion led the Court to assume, incorrectly, that the government could carry out similar actions in the future even if the Agreement were vacated. Op. at 34 (stating that "the Government could keep using those same statutes to inflict the same injury on Plaintiffs" via future actions). Because the Agreement, as Plaintiffs allege it, constitutes far more than the diplomatic notes and grant letter, *see* Dkt. 35-1 at 4–5 & n.1; Dkt. 39 at 6, vacating the Agreement would require that the Defendants take some additional, extra steps—such as negotiating new and presumably different terms—if they sought to reinstate a similar agreement. And, as explained below, Defendants likely could not do so at all if Plaintiffs succeeded on the merits of their contrary to law and excess of statutory authority claims. This is true notwithstanding that the Agreement is "non-binding" as a matter of international law: The mere fact that El Salvador could not sue the United States in international court for failure to

transmit the promised payment does not mean that vacating the Agreement would not, as a factual matter, require the State Department to take additional steps if it sought to enter a similar agreement later. *Contra* Op. at 30–31.

The necessity that Defendants take further action before they could again deliver people into U.S.-funded confinement in El Salvador (and that any new agreement not be arbitrary and capricious) "change[s] the practical odds of Defendants doing so," Op. at 29, and makes it at least likely that some portion of Plaintiffs' injuries will be redressed. *See Swan v. Clinton*, 100 F.3d 973, 980–81 (D.C. Cir. 1996) (explaining that redressability does not require a showing that complete relief is certain, but only that "partial relief" is "likely, as opposed to merely speculative"); *cf. also Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021) ("True, a single dollar often cannot provide full redress, but the ability to effectuate a partial remedy satisfies the redressability requirement." (quotation marks omitted)); *Sierra Club v. Dep't of Interior*, 899 F.3d 260, 284–85 (4th Cir. 2018) (finding redressability where, if the court were to "invalidate the NPS permit as requested, the pipeline cannot exist in its proposed form with its current authorizations and would have to be re-authorized with a new permit or possibly a new route to proceed," because "granting the requested relief would at least mitigate, if not eliminate, the alleged harm").

The opinion's conclusion that the potential for repetition defeats redressability is also contrary to a wealth of case law in this Circuit and the Supreme Court entertaining Administrative Procedure Act challenges to rules and other actions that

agencies could put back in place even following vacatur. For example, the fact that an agency might exercise its statutory authorities to re-do a regulation held to be arbitrary and capricious is not considered to frustrate redressability—it is instead a commonplace. *See, e.g.*, *Biden v. Texas*, 597 U.S. 785, 808 (2022) (explaining that, if agency action is found invalid, "the agency can deal with the problem afresh by taking *new* agency action" (quotation marks omitted)); *Williams Gas Processing-Gulf Coast Co., L.P. v. FERC*, 475 F.3d 319, 322, 330 (D.C. Cir. 2006) (vacating and remanding "for lack of reasoned decisionmaking" even though the agency action at issue "ultimately may prove to be justified on the merits").

Moreover, assuming the merits of Plaintiffs' claims that the Agreement is contrary to law and in excess of statutory authority would mean that Defendants would not be able to simply reach a "new" agreement with El Salvador on the same terms as before. And those claims must be presumed meritorious at this stage under controlling law holding that "federal standing . . . 'in no way depends on the merits of the [claim]'" asserted. *ASARCO Inc. v. Kadish*, 490 U.S. 605, 624 (1989) (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)); *see also City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003) (courts, in assessing standing, "must . . . assume that on the merits the plaintiffs would be successful in their claims").

But the opinion did the opposite. Plaintiffs alleged that the Agreement was contrary to both the Immigration and Nationality Act and the Appropriations Clause (in part because it involved payments not authorized by the Foreign Assistance Act), *see* Compl. ¶¶ 118, 125, and further argued that there was no legal authority—

statutory or otherwise—that supported the Agreement, *see id.* ¶¶ 145–49. Indeed, Plaintiffs contend that, on the merits, both the Agreement and actions taken under the Agreement were affirmatively prohibited by law. *See* Dkt. 35-1 at 25–35; Dkt. 39 at 28–36. (The opinion did not address these claims explicitly nor resolve any of Plaintiffs' arguments on that point, including that the major questions doctrine required Congress to "speak clearly.") Instead of assuming, for standing purposes, that Plaintiffs would succeed on their legal theory, the opinion took the reverse approach, apparently assuming that the INA and FAA together authorized the government's relevant conduct. Op. at 32–33. In thus construing the merits against Plaintiffs when assessing their standing, the opinion strayed from the path marked by controlling law.

Finally, the opinion's analysis focuses entirely on vacatur, overlooking that Plaintiffs also sought declaratory and injunctive relief. *See* Compl. at 53 (prayer for relief); *see also* Op. at 4 (acknowledging, but not analyzing, these claims for relief). Although the opinion is correct that vacatur was "the focus of Plaintiffs' motion," Op. at 29 (alteration omitted), this was because three of Plaintiffs' claims were brought under the APA, for which vacatur is the typical remedy. But Plaintiffs also expressly stated that if the Court were to "award relief only as to Plaintiffs' ultra vires claim"— if, for example, it found no final agency action—"it should declare the Agreement unlawful and enjoin Defendants and those described in Rule 65(d)(2) from taking any steps to implement, give effect to, or reinstate the Agreement under a different name." *See* Dkt. 35-1 at 45. The opinion did not address whether—assuming for

standing purposes that Plaintiffs would succeed on their ultra vires claim—the injunctive relief they sought would provide redressability. This oversight alone is clear error.

## III.   The opinion's analysis of final agency action was likewise clearly erroneous.

Similar errors undermine the opinion's analysis of final agency action. As explained, the opinion's conclusion that the Agreement is not "necessary" to allow for rendition into U.S.-funded confinement in Salvadoran prisons failed to credit Plaintiffs' allegations regarding the scope of the agreement, namely that it provided a unique mechanism for such renditions, and it erroneously drew factual inferences in Defendants' favor.

Because the Agreement is necessary for the paid renditions at issue here, it produces consequences, and those consequences are "legal." As alleged and shown by Plaintiffs, for DHS and other agencies involved in carrying out removals and renditions, the Agreement expands their discretion with respect to where and how to send people from the United States, and into what conditions. *Cf., e.g.*, *NRDC v. EPA*, 643 F.3d 311, 319–20 (D.C. Cir. 2011) (document that cabined allowable exercise of discretion by agency officials "thus qualifie[d] as final agency action"); *Humane Soc'y of the U.S. v. Glickman*, 217 F.3d 882, 884 (D.C. Cir. 2000) (affirming APA challenge to agency memo that allowed other agencies to take or kill migratory birds without a permit); *Scenic Am., Inc. v. Dep't of Transportation*, 983 F. Supp. 2d 170, 183 (D.D.C. 2013) (holding that document that "limits agency discretion . . . therefore has a binding effect that makes it final agency action").

By the same token, as properly understood at this stage, the Agreement produces legal consequences for those subject to potential rendition under the Agreement, including those to whom Plaintiffs provide services: Those people now face the new possible consequence not just of being removed to their liberty in their home countries or appropriate third countries but being rendered into U.S.-funded confinement in unspeakable conditions in El Salvador. *Cf. Rhea Lana, Inc. v. Dep't of Labor*, 824 F.3d 1023, 1032 (D.C. Cir. 2016) ("By rendering Rhea Lana a candidate for civil penalties, the Department's Letter establishes legal consequences and is, accordingly, final agency action."); *Ipsen Biopharmaceuticals, Inc. v. Azar*, 943 F.3d 953, 956–58 (D.C. Cir. 2019) ("increased risk of prosecution and penalties constitutes a 'legal consequence' under *Bennett*" even where such consequences were "not . . . certain"). And the legal consequences are even clearer for the people actually rendered under the Agreement. Their legal rights are plainly altered, including, for example, with respect to constitutional and statutory rights they would have had if they had continued to be confined in facilities in the United States. *See, e.g.*, Compl. ¶¶ 114–31. Thus, the relevant question was never whether the Agreement created binding international law obligations between the U.S. and El Salvador, *contra* Op. at 37, but whether it produced legal consequences for the agencies' own range of discretion, for the people subject to rendition under the Agreement, and for those actually rendered under it.

Because the Agreement, as properly construed for motion to dismiss purposes, itself produces legal consequences and enables the State Department and DHS to

11

undertake conduct they otherwise could not, the Court erred in concluding that this case is controlled by the final agency action analysis in *Centro de Trabajadores Unidos v. Bessent*. *See* Op. at 39. That case, unlike this one, concerned an internal government MOU that "merely explains how IRS will administer a process established by statute and makes explicit existing [statutory] requirements." *Trabajadores Unidos*, 167 F.4th 1218, 1236 (D.C. Cir. 2026) (alterations and quotation marks omitted). The Agreement, in contrast, set up a mechanism that had not previously existed, changing both the scope of agency discretion and the range of legal consequences available for people subject to it.

To the extent that the opinion rested on a view that, in an APA case, the "legal consequences" of the challenged agency action must operate directly on the plaintiffs, rather than on others, that view is foreclosed by controlling precedent. *Bennett v. Spear* itself demonstrates as much. 520 U.S. 154 (1997). As this Court's opinion recognized, the agency action challenged in *Bennett* "altered the legal regime to which [a different agency] was subject." Op. at 38 (quoting *Bennett*, 520 U.S. at 178) (brackets omitted). It did not alter the legal regime to which the plaintiffs themselves were subject—even while injuring them as a practical matter "by substantially reducing the quantity of available irrigation water." *Id.* at 160 (quotation marks omitted). Many other controlling cases are similar. *See, e.g.*, *Biden v. Texas*, 597 U.S. 785, 808 (2022) (agency memorandum terminating Remain in Mexico program was final agency action subject to challenge by states not themselves directly subject to that program); *Ctr. for Biological Diversity v. Zeldin*, --- F.4th ----, 2026 WL 850257,

at *12 (D.C. Cir. Mar. 27, 2026) (agency's approval of state permitting program was final agency action subject to challenge by environmental groups not themselves directly subject to that program). As in those other cases, the fact that legal consequences flowed from the Agreement (and that the Agreement undisputedly constituted the end of the State Department's decisionmaking process) makes the Agreement final agency action.

To the extent the opinion suggests that the Agreement could not be final because it has been followed by additional agency actions—i.e., DHS rendering people to the doorstep of CECOT and the State Department making payment for their detention—that view is likewise foreclosed by precedent. *Contra* Op. at 40–41. *Bennett* again provides an example. In that case, the subject of the plaintiffs' challenge was a biological opinion issued by the Fish and Wildlife Service. 520 U.S. at 157. The opinion caused injury to the plaintiffs via its implementation by a different agency, the Bureau of Reclamation, not named as a defendant. *Id.* at 159. In allowing the plaintiffs' challenge to move forward, the Court rejected the government's argument (in both the causation and final agency action sections of its opinion) that the plaintiffs were restricted to challenging the implementing actions of the Bureau—"the very last step in the chain of causation." *Id.* at 168–69, 177–78.

## CONCLUSION

The Court should grant Plaintiffs' motion, vacate the March 25 Memorandum Opinion and accompanying Order, and assess the motions for summary judgment on the merits.

Dated:  April 22, 2026

Respectfully submitted,

/s/ *Jessica Anne Morton*

Jessica Anne Morton (DC Bar No. 1032316)
Kevin E. Friedl (DC Bar No. 90033814)
Robin F. Thurston (DC Bar No. 1531399)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
jmorton@democracyforward.org
kfriedl@democracyforward.org
rthurston@democracyforward.org

*Counsel for All Plaintiffs*


Anthony Enriquez (DDC Bar No. NY0626)
Sarah T. Gillman (DDC Bar No. NY0316)
Robert & Ethel Kennedy Human Rights Center
88 Pine Street, Suite 801
New York, NY 10005
(917) 284-6355
enriquez@kennedyhumanrights.org
gillman@kennedyhumanrights.org

Sarah E. Decker (DDC Bar No. NY0566)
Robert & Ethel Kennedy Human Rights Center
1300 19th Street NW, Suite 750
Washington, DC 20036
(202) 559-4432
decker@kennedyhumanrights.org

*Counsel for Plaintiff*
*Robert & Ethel Kennedy Human Rights Center*
*(formerly RFK Human Rights)*

14